# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ABBY OWENS, SAMANTHA BRENNAN, CALISE RICHARDSON, JADE LEWIS, KENNAN JOHNSON, ELISABETH ANDRIES, JANE DOE, ASHLYN ROBERTSON, CORINN HOVIS, SARAH BETH KITCH, AND OTHER UNIDENTIFIED DOES<br>*Plaintiffs*<br><br>v.<br><br>LOUISIANA STATE UNIVERSITY; BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE; TIGER ATHLETIC FOUNDATION; F. KING ALEXANDER in his official and personal capacity; ANGELO-GENE "A.G." MONACO, in his official and personal capacity; JOSEPH ALLEVA, in his official and personal capacity; EDWARD JAMES ORGERON, JR., in his official and personal capacity; "O" THE ROSY FINCH BOYZ, LLC; VERGE AUSBERRY, in his official and personal capacity; MIRIAM SEGAR, in her official and personal capacity; SHARON LEWIS, in her official and personal capacity; KEAVA SOIL-CORMIER, in her official and personal capacity; JULIA SELL, in her official and personal capacity; MICHAEL SELL, in his official and personal capacity; JONATHAN SANDERS, in his official and personal capacity; TRACY BLANCHARD, in her official and personal capacity; JIM MARCHAND, in his official and personal capacity; JENNIE STEWART, in her official and personal capacity; MARI FUENTES-MARTIN, in her official and personal capacity<br>*Defendants* | Case No.: 3:21-cv-00242<br><br>Complaint-Class Action<br><br>Jury Demanded |

## <u>AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND</u>

Plaintiffs Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan

Johnson, Elisabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, and Sarah Beth Kitch,

through undersigned counsel, each individually and on behalf of all other similarly situated

1

members of the putative class pursuant to Rule 23 of the Federal Rules of Civil Procedure, hereby

file the following Complaint against Defendants as captioned above.

## INTRODUCTION

1.    The LSU Title IX and sexual misconduct response program has been in a state of complete

neglect and dysfunction at all dates relevant to this complaint. For years, LSU and the Tiger

Athletic Foundation have ignored known systemic issues in LSU's response to reports of sexual

misconduct in favor of promoting and glorifying LSU student-athletes and coaches to reap the

financial and reputational benefits of a venerated college football program.  This has created a

campus culture which ignores and even tacitly allows trauma to be inflicted upon female

presenting and LGBTQ+ identifying individuals and a prioritization of sports and money over

academics and student well-being. LSU's failure to comply with even the most basic of Title IX

obligations has been, in the words of Louisiana Senator Paula Davis, "a major screw-up," and in

the words of then Interim President Tomas Galligan, "We failed those who it was our first duty to

protect[,]" "it was an example of institutional betrayal[,]" and  "I am ashamed."[1]

2.    Plaintiffs, individually and on behalf of the putative class, are current and former Louisiana

State University ("LSU") students who attended the Baton Rouge campus at some point from 2013

to 2021, and are female presenting and/or LGBTQ+ identifying individuals who were victims of

sex-based discrimination, including rape, sexual assault, sexual harassment, and/or stalking,

perpetrated by male LSU students and LSU employees.

3.    Pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), no person in the

United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

---

[1]  Hearing Before Senate Women and Children Committee, March 10, 2021, at 3:36 (available at
https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0.)

of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

4.   Many of the Plaintiffs were unable to ever make their reports to LSU's Office of the Title IX Coordinator ("Title IX Office") because LSU employees discouraged or even overtly prevented them from doing so. The few Plaintiffs who were able to attempt to file complaints with the Title IX Office were ignored and their complaints were not appropriately investigated or addressed. Some Plaintiffs experienced unlawful retaliation after attempting to report sex-based discrimination.

5.   LSU's investigation and response to Plaintiffs' complaints of sex-based discrimination is insufficient and does not comply with basic due process requirements or Title IX response requirements as outlined in guidance issued by the U.S. Department of Education, Office for Civil Rights ("OCR"). LSU's response to Plaintiffs is sex-based discrimination.

6.   LSU routinely failed to follow its own policies and procedures in responding to and investigating claims of sexual misconduct, including sexual assault and other forms of sex-based discrimination. LSU did not provide appropriate training on Title IX response to its staff and faculty.

7.   LSU's Title IX policies are contradictory, confusing, and difficult to understand both for students and employees.

8.   LSU's failure to appropriately respond to and investigate Plaintiffs' claims, as well as the sex discrimination and other harms perpetrated by LSU against Plaintiffs, caused them severe harm, denied them due process, denied them equal protection under the law, denied them freedom of speech, and denied them the ability to participate fully in their education as LSU students.

9.   In multiple instances, Plaintiffs were forced to leave LSU to the detriment of their

educational, athletic, and career opportunities because of the severity of the harm caused to them by LSU.

10. LSU, LSU's Athletic Department, and the Tiger Athletic Foundation ("TAF") funded and implemented a purposefully deficient sexual misconduct and Title IX reporting scheme separate and apart from LSU's official Title IX Office to keep legitimate sexual assault claims within the Athletic Department. This scheme stymied LSU's overall Title IX reporting system, successfully insulated coaches and players within LSU's athletic programs from legitimate sexual assault claims and allowed the programs to continue operating unhindered to reach levels of success the program wouldn't have reached otherwise. This scheme allowed the University as a whole, as well as TAF, to reap the rewards of the football program's incredible success – including, but not limited to, a national championship, unprecedented increases in revenue, increases in merchandise and ticket sales, increases in TV contracts, increases in admission applications, and increases in alumni donations.

## JURISDICTION AND VENUE

11. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., and to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

12. This Court has subject matter jurisdiction over the class claims in this case pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the Plaintiff Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

13. Plaintiffs and the putative class allege that the total claims of the individual members of

the proposed Plaintiff Class are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5). As set forth below, Plaintiffs are domiciled in several states and are citizens of Georgia, Louisiana, California, Texas, and New Zealand; and Defendants are considered citizens of Louisiana, Texas, and Oregon or Florida. Therefore, minimal diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

14. This Court also has subject matter jurisdiction over this case based on 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights. This Court has supplemental subject matter over state law claims pursuant to 28 U.S.C. § 1367.

15. Plaintiffs' claims are cognizable under the United States Constitution, 20 U.S.C. §§ 1681 *et seq.*, 29 U.S.C. §§ 701 *et seq.*, 42 U.S.C. §§ 12101 *et seq.*, and 18 U.S.C. §§ 1961 *et seq.*

16. This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

17. The events giving rise to this lawsuit occurred in the city of Baton Rouge, Louisiana, Parish of East Baton Rouge, which sits in this District. Venue is proper in this District pursuant to 28

U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

18. Defendants are subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

19. Plaintiff Abby Owens ("Owens") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Owens is a citizen of the State of Georgia.

20. Plaintiff Samantha Brennan ("Brennan") is a person of the age of majority and a current student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Brennan is a citizen of the State of Louisiana.

21. Plaintiff Calise Richardson ("Richardson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Richardson is a citizen of the State of California.

22. Plaintiff Jade Lewis ("Plaintiff Lewis") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Lewis is a citizen of New Zealand.

23. Plaintiff Kennan Johnson ("Johnson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Johnson is a citizen of the State of Louisiana.

24. Plaintiff Elisabeth Andries ("Andries") is a person of the age of majority and a former

student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Andries is a citizen of the State of Louisiana.

25. Plaintiff Jane Doe[2] ("Plaintiff Doe") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Plaintiff Doe is a citizen of the State of Louisiana.

26. Plaintiff Ashlyn Robertson ("Robertson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Robertson is a citizen of the State of Georgia.

27. Plaintiff Corinn Hovis ("Hovis") is a person of the age of majority and a current student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Hovis is a citizen of the State of Louisiana.

28. Plaintiff Sarah Beth Kitch ("Kitch") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Kitch is a citizen of the State of Texas.

29. Plaintiffs Other Unidentified Does are natural persons and, at all times relevant to this complaint, were students at LSU.

30. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("Board of Supervisors") was at all relevant times and continues to be the governing body of the Louisiana State University system, which includes LSU, a public, state university located in Baton Rouge, Louisiana, Parish of East Baton Rouge, with its principal place

---

[2] Jane Doe is a pseudonym.

of business at 3810 West Lakeshore Drive, Baton Rouge, Louisiana, 70808.

31. Defendant Louisiana State University ("LSU") was at all relevant times and continues to be a public educational institution in Baton Rouge, Louisiana, organized and existing under the laws of the State of Louisiana.

32. Defendant Tiger Athletic Foundation ("TAF") is a nonprofit corporation organized under the laws of the State of Louisiana with its principal place of business in Baton Rouge, Louisiana, whose mission is to "to assist Louisiana State University in building and maintaining a superior athletic program by providing private financial support for programs and facilities that ensure LSU student-athletes the opportunity to win in the classroom, in competition, and in life." Upon information and belief, TAF has over $400 million dollars in total assets and has funneled hundreds of millions of dollars to LSU, in particular for the benefit of its football program, coaches, and athletes.

33. Defendant Fieldon King Alexander ("Alexander"), in his official and personal capacity as the President of LSU, from July 1, 2013 to December 31, 2019, was a person of the age of majority and an agent and/or employee of LSU. Upon information and belief, Alexander is a citizen of either Oregon or Florida.

34. Defendant Angelo-Gene "A.G." Monaco ("Monaco"), in his official and personal capacity as the Associate Vice President of Human Resource Management for LSU from 2010 to April 10, 2018, was a person of the age of majority and an agent and/or employee of LSU. Upon information and belief, Monaco is a citizen of Louisiana.

35. Defendant Joseph Louis Alleva ("Alleva"), in his official and personal capacity as the Athletic Director for LSU from July 1, 2008 to April 17, 2019, was a person of the age of majority and an agent and/or employee of LSU. Upon information and belief, Alleva then spent an unknown

period of time serving as special assistant to the president for donor relations, a position within LSU created by and for Alleva, and has since left LSU. Upon information and belief, Alleva is a citizen of Louisiana.

36. Defendant Edward James Orgeron, Jr. ("Orgeron"), in his official and personal capacity as the head football coach at LSU from September 2016 to present and the defensive line coach from January 2015 to September 2016, was a person of the age of majority and an agent and/or employee of LSU. Upon information and belief, Orgeron is a citizen of Louisiana.

37. Defendant "O" The Rosy Finch Boyz, LLC, is a Louisiana Limited Liability Company owned by Defendant Orgeron and Kelly L. Orgeron with its principal place of business in Mandeville, Louisiana. Upon information and belief, both members of "O" The Rosy Finch Boyz, LLC are citizens of Louisiana. Defendant Edward James Orgeron, Jr. and Defendant "O" The Rosy Finch Boyz, LLC shall be referred to collectively as "Orgeron Defendants."

38. Defendant Verge Ausberry ("Ausberry"), in his official and personal capacity, was at all relevant times a person of an age of majority and an agent and/or employee of LSU. From July 2019 to present, Ausberry has been the Executive Deputy Athletic Director and Executive Director of External Relations for LSU. Before July 2019, he served in increasingly senior roles within the LSU Athletics Department, including Associate Athletics Director for Operations and Senior Associate Athletics Director. Upon information and belief, Ausberry is a citizen of Louisiana.

39. Defendant Miriam Segar ("Segar"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. Segar is the Senior Associate Athletics Director and Senior Woman Administrator for LSU. Prior to that role, she served in increasingly senior roles within the LSU Athletics Department, including Assistant Athletics Director and Associate Athletics Director for Student Services. Upon information and

9

belief, Segar is a citizen of Louisiana.

40. Defendant Sharon Lewis ("Defendant Lewis"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. From August 2020 to present, Defendant Lewis has been the Associate Athletics Director of Football Recruiting and Alumni Relations for LSU. Before that, she served in increasingly senior roles within the LSU athletics department, including Assistant Athletic Director for Football Recruiting and Associate Athletic Director for Football Recruiting. Upon information and belief, Defendant Lewis is a citizen of Louisiana.

41. Defendant Keava Soil-Cormier ("Soil-Cormier"), in her official and personal capacity, is a person of the age of majority and an agent and/or employee of LSU. Soil-Cormier currently serves as the Associate Director of Recruiting Operations for LSU.  Prior to that role, she served as a Recruiting Analyst in the LSU athletics department. Upon information and belief, Soil-Cormier is a citizen of Louisiana.

42. Defendant Julia Sell, in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. At all relevant times, Julia Sell served as the co-head coach of the LSU women's tennis team. Upon information and belief, Julia Sell is a citizen of Louisiana.

43. Defendant Michael Sell ("Mike Sell"), in his official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. At all relevant times, Michael Sell served as the co-head coach of the LSU women's tennis team. Upon information and belief, Michael Sell is a citizen of Louisiana.

44. Defendant Jonathan Sanders ("Sanders"), in his official and personal capacity, is a person of the age of majority and an agent and/or employee of LSU. Sanders serves as the Associate Dean

of Students and Director of LSU's Office of Student Advocacy & Accountability. Upon information and belief, Sanders is a citizen of Louisiana.

45. Defendant Tracy Blanchard ("Blanchard"), in her official and personal capacity, is a person of the age of majority and an agent and/or employee of LSU. Blanchard serves as the Assistant Dean of Students & Associate Director of Advocacy in LSU's Office of Student Advocacy & Accountability. Upon information and belief, Blanchard is a citizen of Louisiana.

46. Defendant Jim Marchand ("Marchand"), in his official and personal capacity, is a person of the age of majority and an agent and/or employee of LSU. From 2013-2015, Marchand served as LSU's Title IX Coordinator. Upon information and belief, Marchand is a citizen of Louisiana.

47. Defendant Jennie Stewart ("Stewart"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. From 2015 to March 2021, Stewart served as LSU's Title IX Coordinator. Upon information and belief, Stewart is a citizen of Louisiana.

48. Defendant Mari Fuentes-Martin ("Fuentes-Martin"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. From 2015 to January 2020, Fuentes-Martin served as LSU's Associate Vice President and Dean of Students. Upon information and belief, Fuentes-Martin is a citizen of Texas.

49. Collectively, the Board of Supervisors, LSU, and the individually named Defendants in their official capacities shall be referred to as "the LSU Defendants."

50. Each of the LSU Defendants was acting in the course and scope of their employment with LSU at all times relevant to the allegations contained herein.

51. Other Defendants may be identified in the course of this litigation and Plaintiffs reserve the right to amend this Complaint to add them as defendants as they become known.

## BACKGROUND FACTS RELEVANT TO ALL PLAINTIFFS AND OTHER SIMILARLY SITUATED STUDENTS

*LSU's Inadequate and Unlawful Title IX Oversight and Response*

52. The Board of Supervisors is vested with the authority to supervise and manage LSU by the Louisiana Constitution.

53. LSU has three policies which guide the University's response to potential Title IX violations - Policy Statement 1: Equal Opportunity ("Equal Opportunity Policy"), last revised April 1, 2016; Policy Statement 73: Sexual Harassment ("Sexual Harassment Policy"), last revised April 1, 2016; and Permanent Memorandum 73: Title IX Policy Prohibiting Sexual Misconduct ("Title IX Policy"), last revised August 14, 2020.

54. The Equal Opportunity Policy reads:

> The University reaffirms and emphasizes its commitment to provide a workplace free from discrimination and harassment and to provide a means to address complaints of discrimination and/or harassment. LSU also reiterates its commitment and responsibility to protect its employees and students from discrimination, harassment, and retaliation for participating in the complaint process….

> All complaints of discrimination and/or harassment will be addressed. Substantiated cases shall result in appropriate discipline or other corrective action. The severity of the disciplinary action shall be consistent with the seriousness of the act of discrimination and/or harassment….

> The President, Vice Presidents, Deans, Directors, Department Heads, and all other supervisory employees are responsible for assisting the University in the implementation of this policy.

55. The Equal Opportunity Policy provides:

> LSU complies with the provisions of Title IX, Title VI, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title VII, the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA) and applicable state law. The Associate Vice President for Human Resource Management or his/her designee…is designated as the individual at LSU responsible for coordinating the University's compliance with these statutory provisions.

56. The Title IX Policy includes the following statement of purpose:

Sexual Misconduct violates an individual's fundamental rights and personal dignity and will not be tolerated. LSU prohibits and is committed to an environment free of discrimination on the basis of sex and Sexual Misconduct. This policy affirms these principles and provides recourse for individuals whose rights have been violated.

LSU will take prompt action to prevent prohibited conduct, discipline those who violate this policy, prevent recurrence of prohibited behavior, and effect equitable remedies.

LSU will affirmatively promote prevention, awareness and training programs to encourage individuals to report concerns or complaints. Everyone has a responsibility to prevent and report acts of prohibited conduct. The entire LSU community is responsible for fostering a welcome environment conducive to learning.

57. The Title IX Policy reads: "Responsible Employees who receive notice or witness incidents of Sexual Misconduct must promptly notify the Title IX Campus Coordinator." The Title IX Policy identifies the following individuals as Responsible Employees: "Any employee given the duty of reporting actual notice of incidents of sexual violence or any other misconduct prohibited by this policy. Responsible Employees do not include victims' advocates, mental health counselors, or LSU Ombudsperson."

58. The Sexual Harassment Policy includes the following statement of purpose: "To state the University policy and responsibility regarding sexual harassment as related to its employees and to its students who believe they have been harassed by an employee."

59. The LSU Defendants repeatedly engaged in discriminatory, retaliatory, and other unlawful actions in their interactions with Plaintiffs and in response to Plaintiffs' reports of Title IX violations and violations of LSU's Code of Student Conduct, thereby violating their own policies.

60. Upon information and belief, the training LSU provided for students and employees on its sexual misconduct and antidiscrimination policies, definitions, and investigation and reporting

13

procedures falls far short of what is considered industry standard in terms of educating community members at higher education institutions about their rights and obligations with respect to sexual misconduct and sex discrimination on campus. There are numerous consulting and training resources available to higher education administrators to assist them with the task of training their campuses on sexual misconduct prevention and response as required by Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, federal guidance, and as a matter of basic due diligence.

61. Upon information and belief, institutions the size and scale of LSU generally provide much more comprehensive training to students and employees to inform them of their rights and obligations under the institution's Title IX Policy than LSU did.

62. Upon information and belief, LSU had only one employee – from 2013 to 2015, Defendant Marchand, then from 2015 to approximately 2018, Defendant Stewart – staffing the Title IX Office.  For a number of years, LSU did not have a single Title IX investigator or administrative staff member to assist the Title IX Coordinator with carrying out his or her duty to ensure that an institution consisting of around 31,000 students and 6,500 employees remained free of sex discrimination. LSU's Title IX Office of one was woefully inadequate to meet the needs of its campus and well outside the scope of industry standards for an institution of LSU's size.

63. Defendant Monaco, designated as the employee responsible for coordinating Title IX compliance pursuant to the Equal Opportunity Policy, was reported to have been placed on leave and subsequently resigned from LSU in 2018 after allegations of his abuse of power and repeated use of sex-based profanity with coworkers and subordinates came to light.

64. It has also been reported that Monaco refused to provide interim measures to one of the student victims of former LSU football coach Les Miles.

65. As set forth herein, LSU handled Title IX complaints against student-athletes in a different manner compared to how complaints against non-athletes were handled. As a practical matter, Title IX complaints against student-athletes are purposefully buried or diverted so as to ensure that those complaints were never properly investigated or addressed and the student-athletes are not negatively impacted or prevented from concentrating on their athletics, all of which benefits both LSU and TAF financially and causes further harm to Plaintiffs and other similarly situated students.

66. Defendants' actions and inactions in response to Plaintiffs' reports of Title IX violations subjected Plaintiffs and other similarly situated students to additional harassment and created a sexually hostile environment on campus.

67. Plaintiffs and all other similarly situated students suffer harm as a direct and indirect result of Defendants' actions and inactions, as detailed herein.

***The Husch Blackwell Report***

68.  In November 2020, LSU retained the Husch Blackwell law firm to investigate the school's handling of several Title IX-related incidents as well as LSU's Title IX policies and procedures.

69. On March 5, 2021, Husch Blackwell's investigative report and findings (hereinafter, the "Report") was publicly released and aimed to answer three broad questions.[3]

70. The first question is, "Whether the University and its employees handled the matters identified by the *USA Today* article in a manner consistent with obligations under Title IX, widely recognized best practices, and University policy?"[4]

71. The Report finds that, "The University did not handle various items identified in the *USA*

---

[3] Attached hereto as Exhibit A.
[4] Report at 1.

*Today* article in a manner consistent with obligations under Title IX, widely recognized best practices, and/or University policy."[5]

72. The second question is, "Whether Title IX-related misconduct involving LSU student athletes has been systematically siloed in the University's Athletics Department and not shared with the University's Title IX Office?"[6]

73. The Report finds that: "Various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator. We are especially concerned about a lack of reporting prior to November 2016. . . . It is worth noting, though, that our concerns about reporting are not limited to Athletics. Institutional reporting policy and training have been unclear for years."[7]

74. The third question is, "Whether the University is appropriately handling Title IX-related matters which are reported to its Title IX Office."[8]

75. The Report finds that: "The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates. We have identified concerns that the Office has at times not handled those matters reported to it appropriately. Again, while the *USA Today* article focused primarily on Athletics, we found deficiencies in a variety of different matters."[9]

76. Husch Blackwell found that LSU did not follow federal laws and regulations, best practices, or even its own policies and procedures in cases of reported sexual misconduct.

77. At a university level, the Report found that LSU lacked effective Title IX leadership and

---

[5] *Id*. at 3.
[6] *Id*. at 1.
[7] *Id*. at 3-4.
[8] *Id*. at 1.
[9] *Id*. at 4.

was slow to adopt Title IX policies, hire personnel, and meaningfully address concerns identified by community members and internal and external reviews.

78. In 2011, federal law changed, and educational institutions were required to designate a Title IX Coordinator. LSU did not name a Title IX Coordinator until 2013, when Defendant Marchand filled the role as an "other duties assigned" role.[10] Defendant Marchand was also a full-time deputy general counsel for LSU during this time and his acting in this role was a conflict of interest, as the role of a general counsel is to protect the institution, not the students.

79. Stewart was hired as a full-time Title IX Coordinator in 2015 and was expected to fulfill the roles of Title IX Coordinator for the whole LSU System, the Baton Rouge campus coordinator, and the Clery Coordinator for the entire LSU System.[11] By 2018, the entire LSU Title IX Office staffing for nine campuses consisted solely of two full-time employees and one graduate assistant.

80.  The Report also found a unique problem in athletics surrounding reporting and lack of training. Husch Blackwell recommended that the Athletics Department receive clarity from leadership about roles and expectations as well as training, including bystander training for all athletes.

81. The Report found that at all relevant times, a single athletics employee reviewed each report of sex discrimination and made a determination regarding whether the report was to be sent to the Title IX Coordinator. This method of processing and investigating reports of sex-based

---

[10] Upon information and belief, for the two years prior to Defendant Marchand's appointment, LSU was in violation of federal law.  *See* 34 CFR § 106.8(a): "Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph."

[11] The LSU System includes all nine LSU campuses: LSU - Baton Rouge; LSUS - Shreveport; LSU Health - New Orleans; LSU of Alexandria; Pennington Biomedical Research Center; LSU Health - Shreveport; LSUE - Eunice; LSU Ag Center & Research Stations; LSU Health Care Services Division.

discrimination is contrary to federal guidelines and best practices.

82. The Report concluded that all athletics employees must be clearly instructed that they are required to make reports of sex-based discrimination directly to the Title IX Coordinator because such instructions have not previously been provided. Galligan concurred with this finding under oath, stating, "The athletic department incorrectly directed where to report potential Title IX issues."[12]

83. The Report noted that the football team was long overdue for training targeted to their players with the goal of minimizing the rate of sexual misconduct. According to the Report, no such training had ever occurred.

84. In a 2017 audit entitled "Oversight and Prevention of Sexual Misconduct (Multi-Campus)" completed by LSU's Office of Internal Audit which was included as Exhibit B to the Report, auditors made the following findings, among others:

a.      Based on interviews and testing performed, it appears that additional procedures may be required to ensure "responsible employees" have been identified and understand their reporting obligations under Title IX.

b.      Policies, procedures, and publications related to Title IX are not sufficient to meet institutional obligations outlined by OCR.

c.      Published contact information for Title IX Campus Coordinators is incomplete and/or not widely communicated (all campuses except LSU A&M).

d.      Campus Title IX websites are difficult to find through regular navigation or the use of keyword searches.

---

[12]  Hearing Before Senate Women and Children Committee, March 10, 2021 at 3:48 (available at https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0.)

e.      Identifies contradicting University employee and student policies and identifies potential risks associated with unclear, inconsistent, or outdated reporting procedures and investigative processes.

f.      Recognizes the challenges associated with romantic or dating relationships in a work, educational, or athletic environment and that the University currently does not have policy or guidelines in this area.[13]

85. According to the audit report's distribution list, Defendants Alexander and Stewart received a copy on September 13, 2017.

86. A document entitled "Management's Response to Internal Audit Prevention of Sex-Based Discrimination" is included as Attachment A to the Report.  This document is dated December 5, 2017 and outlined steps LSU management planned to take to address the concerns outlined in the September 2017 internal audit. However, this document did not indicate any plans to address many of the concerns outlined in the September 2017 audit.  For example, there is nothing in the document to remedy the issue of responsible employees not understanding or complying with their reporting obligations.

87. The Report indicated that the vast majority of sexual misconduct on campuses around the country are never reported and when reports are made and involve prominent campus athletes, survivors are commonly reluctant to participate in university disciplinary processes because of fear of retaliation.  The Report identified several instances of this type of coercion during the Husch Blackwell review and deemed it a deeply entrenched cultural problem at LSU.

88. Until the release of the Report in March 2021, Plaintiffs had no way of knowing of the deluge of harms perpetrated against them by the Defendants, as these harms were concealed by

---

[13] Exhibit B to Report (attached as Exhibit A to the Complaint).

the Defendants from Plaintiffs' discovery, such as the conspiracy between LSU and TAF. Plaintiffs also discovered that the harm perpetrated by Defendants is continuing in nature and damages will continue to accrue for all putative class members until resolution by the courts.

***Louisiana State University's Football-Centric Culture***

89. The LSU Athletic Department prioritizes their decision making around the highly profitable football program.

90. In July 2019, the LSU Athletic Department unveiled a brand new $28 million locker room for the football team, complete with nap pods, a pool, a theatre, and performance nutrition center for athlete recovery. LSU now ranks number seven for college football's best facilities in the nation, according to the website 247Sports.

91. The excessive expenses and resources allocated to the football program were at the direct expense of and detriment to Plaintiffs and other similarly situated students.

92. At the March 26, 2021, Louisiana State Senate Women and Children Committee Hearing, an example of LSU football players committing sexual misconduct without any consequences was discussed. At this hearing, Gloria Scott ("Scott"), a 74-year-old Mercedes-Benz Superdome security officer, testified that in December 2017, John Doe[14] sexually harassed her in the Superdome after a game. Scott testified that John Doe said: "I like to fuck women like you, you older women, because y'all know y'all like us young men to fuck y'all." John Doe continued to make vulgar comments while rubbing his genitals and smiling at Scott. John Doe's friends were watching, laughing, and encouraging John Doe. Scott testified that she felt scared, degraded, and humiliated, but she still filed complaints with officials at the Superdome, the LSU Athletic Department, and the police department.

---

[14] John Doe is a pseudonym.

93. In response to this blatant sexual misconduct, Orgeron Defendants personally called Scott and told her that John Doe was a "troubled child," and that he was "just kidding." Scott requested that John Doe be held back from the upcoming 2018 Citrus Bowl game, but John Doe never faced any disciplinary action for his sexual misconduct.

94. LSU has a culture of failing to hold male students, and especially male student athletes, accountable for their acts of sexual misconduct against female presenting students. As discussed in the Report, this culture is known to encourage sexual harassment and assault by creating a hostile environment. Galligan himself confirmed under oath that there was "no culture of punishment at LSU" with regard to sexual misconduct.[15]

***The Relationship between LSU and TAF***

95. LSU has a close relationship with TAF, and TAF's level of control over LSU and its athletic programs goes well beyond what would normally be expected of a nonprofit organization whose stated mission is "to assist Louisiana State University in building and maintaining a superior athletic program."

96. In fact, TAF directly compensates LSU employees, including the Head Football Coach Defendant Orgeron and his private company, "O" The Rosy Finch Boyz, LLC. The contract between LSU and Orgeron Defendants specifically provides for TAF to pay Orgeron Defendants a yearly sum totaling at least $400,000.00, and up to several million dollars based on the performance of the LSU football team during regular and post-season games. Orgeron Defendants, are paid the following compensation directly by TAF:

> (a) any monetary benefits earned or received for services rendered by [Defendant Orgeron] directly to the Tiger Athletic Foundation ("TAF"), which is currently calculated to be Four Hundred Thousand Dollars ($400,000) during each Contract

---

[15] Hearing Before Senate Women and Children Committee, March 10, 2021, at 3:59 (available at https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0.).

Year; (b) any supplemental monetary benefits paid or funded in its discretion by TAF…[16]

97. The Orgeron Defendants' contract also provides for "affiliated foundation funds" to pay for a number of perks Defendant Orgeron receives, including membership in a social club, business-related expenses, a mobile communications device and service, auto insurance coverage for his courtesy vehicles, and "other customary, reasonable and related employee benefits."[17]

98. The Orgeron Defendants' contract also allows TAF to purchase insurance on the life of Defendant Orgeron, the underwriting and issuance of which requires Orgeron Defendants to cooperate.[18]

99. Further evidencing TAF's control over LSU athletics in general and its Title IX policies specifically, TAF spent over $128,000.00 on training related to sexual misconduct, bullying, discrimination, and other bad behavior within LSU's Athletics Department—training that was led by a consultant chosen by TAF. Educational institutions like LSU generally have their own budget for Title IX training, and thus are able to independently decide who will provide the training. Funding of sexual misconduct and discrimination training is a highly unusual role for an athletics booster organization to play.

100.     Upon information and belief, TAF also pays for LSU athletics employees' cell phones. At most educational institutions with the size and budget of LSU, the institution itself would pay for employees' cell phones. If true, this would allow LSU athletics employees to attempt to evade public records requests by asserting that LSU did not own the cell phones they used to

---

[16] Exhibit B at 7-8.
[17] *Id*. at 13-14.
[18] *Id*. at 30.

communicate.[19] Such actions go well beyond TAF's stated mission and reasonable expectations of the activities in which an athletics booster organization would engage.

***Employee Terminations at Other Institutions***

101.     The former president of LSU, Defendant Alexander, faced disciplinary action as a direct result of his mishandling of sexual misconduct reports while at LSU. Defendant Alexander was selected to become President of Oregon State University ("OSU") on December 13, 2019 and assumed office on July 1, 2020.  The publication of the Report, outlining Defendant Alexander's role in covering up sexual misconduct reports at LSU, prompted a meeting of the OSU Board of Trustees to review the findings and recommendations of the Report, publicly discuss Defendant Alexander's leadership over Title IX at LSU, and share subsequent information that OSU had received about the mishandling of sexual violence and misconduct at LSU during Defendant Alexander's tenure.

102.     On March 17, 2021, the OSU Board of Trustees placed Defendant Alexander on probation. On March 18, 2021, the Faculty Senate of OSU declared a vote of no confidence in Defendant Alexander's leadership and demanded he resign in response to revelations about his role in failing to enforce policies against sexual misconduct while at LSU. On March 23, 2021, Defendant Alexander resigned from his position at OSU effective April 1, 2021.

103.     Former LSU football coach Les Miles, who went on to coach at the University of Kansas starting in 2018, faced disciplinary action as a direct result of his mishandling of reports of sexual misconduct. The Report detailed accusations that Miles had sexually harassed female

---

[19] In fact, Louisiana's Public Records Law does not exempt any communications on the basis of who pays for its means, and such communications would not be exempt from disclosure under the law.  *See* La. Rev. Stat. 44:1 *et seq.* However, upon information and belief, public employees frequently believe that they can exempt communications if they use their own personal email or a cell phone not paid for by their employer from disclosure under public records laws.

student workers while at LSU, and that LSU suppressed these reports of sexual misconduct. On March 8, 2021, the University of Kansas released a statement announcing that they would be "mutually parting ways" with Miles. Jeff Long, the Director of Athletics at the University of Kansas and the person responsible for hiring Miles in 2018, stepped down from his role on March 10, 2021.

104.    Upon information and belief, LSU has not terminated any of the employees involved in suppressing Title IX complaints and the other failures outlined in the Report and in this Complaint. When asked by the Louisiana Senate why Defendants Ausberry and Segar were the only individuals disciplined with a short suspension, Galligan responded under oath, "The messages from the top were very, very unclear."[20] In fact, news outlets recently released emails from Defendants Ausberry and Segar that demonstrate that these individuals continued to work during their "suspension;" thus, LSU has not actually disciplined any parties at fault for endangering the safety of female presenting and LGBTQ+ identifying students. Over the course of these Senate Committee Hearings, various Defendants repeatedly acknowledged the harm suffered by the putative class members.

***Defendant Sharon Lewis' Allegations and Lawsuit Against LSU***

105.    On April 8, 2021, Defendant Sharon Lewis filed a lawsuit against LSU in this Court alleging that she had been repeatedly disciplined and retaliated against for attempting to address known Title IX violations within the LSU athletics department. Defendant Lewis also makes a number of admissions indicating that she herself did not comply with either federal Title IX obligations or LSU policies and procedures.

---

[20] Hearing Before Senate Women and Children Committee, March 10, 2021, at 4:06 (available at https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0.)

106.       Specifically, in her lawsuit, Defendant Lewis alleges the following:

a.       In 2013, a female student employee came to Defendant Lewis and told her that former football coach Les Miles had done something inappropriate to her.

b.       Defendant Lewis confronted Miles about these allegations and subsequently reported them to Defendant Segar, but LSU took no action. Presumably, Defendant Lewis did not report these allegations to then-Title IX Coordinator Defendant Marchand, as this is not mentioned in Defendant Lewis' complaint

c.       On another occasion in 2013, a different student employee reported to Defendant Lewis that she had received inappropriate text messages from Miles. Defendant Lewis reported these allegations to Defendant Segar. Again, presumably, Defendant Lewis did not report these allegations to then-Title IX Coordinator Defendant Marchand.

d.       LSU hired its own outside counsel to investigate the second set of allegations. Rather than making its findings based on LSU's policy definitions of sexual misconduct, as required by federal Title IX guidance, the investigation report found there was no Title IX violation because the reporting student was "of consenting age."

e.       On a number of other occasions, Defendant Lewis observed or was told about other acts of sexual misconduct by Miles, but either she did nothing or she reported the incidents to her supervisors, and they did nothing.

f.       Defendants Miles, Ausberry, and Segar engaged in retaliation against Defendant Lewis after she attempted to report some of Miles' alleged acts of sexual misconduct. Defendant Lewis did not take any steps to report or address the retaliation beyond the Athletics Department.

107.       It was also reported that during a March 22, 2021, staff meeting and discussion of

the Report, persons stated in Defendant Lewis's presence that individuals in the athletic department that attempted to comply with LSU's Title IX Policy were "Tattletales."[21]

108.    Defendant Lewis's admissions are consistent with LSU General Counsel Winston G. DeCuir, Jr.'s statements during the March 10, 2021 Senate Hearing: "Our big problem was complaints not getting to Title IX. People trying to handle complaints themselves instead of invoking the Title IX Office."[22] When asked by Senator Paula Davis, "Who felt confused when reporting?" President Galligan answered, "I think everybody."[23]

109.    Not only were LSU employees not properly trained in responding to Title IX reports, but they were also actively discouraged from reporting and were retaliated against if they attempted to report.  The concerns about retaliation were so severe that employees like Defendant Lewis, who attempted to understand her reporting obligations, still chose not to report out of fear.

## INDIVIDUAL FACTUAL ALLEGATIONS

### *Calise Richardson*

110.    Richardson began her education at LSU as a freshman in the fall of 2014 and worked for the recruiting staff of LSU's football team from approximately September 2014 to January 2017.

111.    During Richardson's freshman year at LSU, she was raped by an LSU football player while she was drunk. Unfortunately, this was only the first of many times Richardson would be abused by an LSU football player with no repercussions for the perpetrators.

---

[21] Glenn Guilbeau, *LSU whistleblower's complaint may lead to second federal lawsuit after filing with EEOC*, Lafayette Daily Advertiser, Apr. 19, 2021, https://www.theadvertiser.com/story/sports/college/lsu/2021/04/19/lsu-whistleblower-complaints-against-les-miles-may-prompt-2nd-federal-lawsuit/7278952002/.

[22] Hearing Before Senate Women and Children Committee, March 10, 2021, at 4:29 (available at https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0.)

[23] *Id*. at 4:34.

### *Richardson's Abuse as a Football Recruiter*

112.     During her time working in the LSU football recruiting office, female recruiters were expected by LSU staff to do "anything" to bring potential recruits to LSU. Over the course of Richardson's job, she began to realize that female recruiters were expected to please the recruits in any way they could, which included having sex with the recruits.

113.     In the fall of 2015, Richardson received a text message from a recruit asking if he could stay over at her apartment because he was locked out of his friend's apartment. When Richardson asked how he got her number, the recruit told her he had gotten it from the football player he was staying with during his visit to LSU. The recruit kept pressuring and guilting Richardson by telling her he would have to sleep on the streets.

114.     Richardson finally agreed to let the recruit stay at her apartment, but she made it clear that nothing sexual would happen between the two of them and that he would be sleeping on the couch. When the recruit entered Richardson's apartment, he raped her.

115.     Richardson did not report the assault because she was afraid of getting in trouble for having a recruit sleep over at her apartment, even though she had been pressured multiple times to do "anything" to make recruits happy.

116.     Richardson had to end her lease early and move to another apartment because she could not continue to live in the home where she had been raped.

117.     The understanding that she should not report the rape was reinforced by the conduct of her supervisors in the Athletic Department and the football coaches. During her sophomore year in approximately January 2016, Richardson talked with LSU wide receivers coach Tony Ball ("Ball") and a recruit at a recruiting event.  Ball told the recruit multiple times, "Calise is going to show you a good time and all that LSU has to offer" in a sexually suggestive tone. Richardson

tried to keep the conversation professional by telling the recruit about the scheduled LSU group tour and dinner. However, Ball reiterated he wanted Richardson to "show the recruit a good time this weekend."

118.     On multiple occasions, recruits would ask Richardson for her phone number or to "hang out." Recruits would get offended when she turned them down. Recruits would also send Richardson unwelcome direct messages on social media. Richardson wanted to be friendly and welcoming to recruits to convince them to attend LSU, but she always felt uncomfortable whenever recruits would act as if she was supposed to spend time with them outside of her employment responsibilities at LSU.

119.     On multiple occasions, Richardson received unwelcome text messages from recruits, coaches, ex-players, and other grown men. Richardson has received dozens of texts of this nature, and to this day still receives text messages from random men affiliated with LSU even though she no longer attends school there. Richardson did not provide these people with her phone number. One of the individuals, who texted Richardson when she was eighteen years old, was at least twenty years older than Richardson and told her that he got her number from Coordinator of Defensive Operations Tamara Davis.

### *Richardson and John Coe*

120.     John Coe[24] was a highly recruited athlete who played on the LSU football team as a wide receiver from 2016 to 2017. In the summer of 2016, Richardson and John Coe began an on again, off again relationship. John Coe soon became verbally and physically abusive towards Richardson.

121.     John Coe emotionally abused Richardson by expecting her to be available

---

[24] John Coe is a pseudonym.

whenever he demanded, telling her what she was allowed to wear, deciding which friends she could spend time with, and dictating whether she could go to bars without him.

122.    John Coe was much larger than Richardson and would hold her down by putting all of his body weight on her until she started to cry and told him she could not breathe.

123.    In October 2016, after a football game, Richardson went to J.L.'s in Tigerland with her friends from the football team. When Richardson got to J.L.'s, she saw John Coe kissing another woman at the bar. John Coe made eye contact with Richardson while he was kissing the other woman, then came over to Richardson and began to grope her without her consent. Richardson got angry with John Coe for groping her, and John Coe shoved Richardson to the ground. John Coe's teammates had to restrain him from attacking Richardson further, and he was kicked out of the bar.

124.    When Richardson left the bar later than night, John Coe appeared out of nowhere outside of the bar and ran at her. John Coe's teammates had to restrain him again so he would not hurt Richardson. Later that night John Coe appeared uninvited at Richardson's apartment, and she had to call his teammates to come get him away from her.

125.    The following day, Richardson received a call from Defendant Lewis, her other direct supervisor in the recruiting office, about the incident with John Coe the night before. Defendant Lewis started the conversation by asking Richardson why she had thrown a drink at John Coe.

126.    When Richardson told Defendant Lewis that John Coe had physically attacked her, Defendant Lewis asked Richardson if she wanted to set up a meeting with John Coe, Defendant Lewis, and John Coe's coach to "iron things out." For clarity, after Richardson's disclosure of dating violence, her direct supervisor and a Responsible Party, requested that Richardson have a

meeting with her abuser as opposed to properly reporting the dating violence. Neither Defendant Lewis nor any other LSU staff member offered Richardson any support, resources, accommodations, or interim measures. Upon information and belief, no report was made to the Title IX Office and no investigation was initiated.

127.    Richardson refused to meet with John Coe but agreed to meet with Defendants Lewis and Soil-Cormier the following week. At that meeting, Richardson disclosed John Coe's assault at the bar that weekend to Defendants Lewis and Soil-Cormier.

128.    Defendants Lewis and Soil-Cormier minimized Richardson's experience of dating violence by stating that they could call the police if Richardson felt like this was "big enough to ruin John Coe's career at LSU."

129.    Richardson told Defendants Lewis and Soil-Cormier that she was afraid of John Coe because he had stalked her and tried to attack her at her housing complex. Defendants Lewis and Soil-Cormier laughed at Richardson and mockingly questioned why she was afraid of John Coe. This was one of the first times Richardson had opened up about the extent of the abuse she experienced at the hands of John Coe and her supervisors' laughter and mockery at her abuse humiliated and terrified her.

130.    Defendants Lewis and Soil-Cormier reiterated that John Coe's punishment was up to Richardson, again making it clear that they believed that Richardson was responsible for getting John Coe into trouble and ruining his football career.

131.    Defendants Lewis and Soil-Cormier never offered Richardson resources, counseling, support services, or even asked her if she felt safe. To Richardson's knowledge, neither Defendant Lewis nor Defendant Soil-Cormier ever reported the incident to the Title IX Office. Defendants Lewis and Soil-Cormier also never told Richardson she could report the abuse to the

Title IX Office herself.

132.    Immediately after Richardson spoke with Defendants Lewis and Soil-Cormier, she faced retaliation at work.  The LSU Athletics Department refused to schedule Richardson to work at the events in which John Coe participated.   However, John Coe continued to approach Richardson with impunity. Several times while she was at the LSU gym, John Coe would come in and work out right next to her.  No one at LSU prevented John Coe from continuing to menace Richardson or made any attempt to stop his behavior.

133.    No one at LSU offered Richardson any support, resources, accommodations, or interim measures. Richardson never heard from the Title IX Office.

### *Richardson and John Doe*

134.    In the fall of 2016, Richardson went to a bar in Tigerland with her friends, including football player John Doe, to celebrate the end of final exams. John Doe told Richardson he had gotten kicked out of his apartment and asked if he could stay over at her apartment. John Doe had been at Richardson's apartment multiple times before and they were good friends at that point, so Richardson allowed him to stay over. Richardson and John Doe fell asleep without incident.

135.    When they woke up the next morning, Richardson and John Doe began to joke around, which they had done multiple times before as friends. Richardson had a broken foot with a hard cast on at the time, which severely limited her mobility. Without warning, John Doe got on top of Richardson, attempted to remove his and Richardson's pants, and attempted to rape Richardson.

136.    Richardson told John Doe to stop multiple times. John Doe became angry with Richardson. John Doe threatened Richardson by yelling at her, telling her that he would "ruin her life" by getting her fired, and said she would "regret this." John Doe remained in Richardson's

apartment for some time after Richardson had instructed him to leave.

137.     Within a day, Richardson called one of her direct supervisors in the recruiting office, Defendant Soil-Cormier, to tell her about the incident and John Doe's threats to get her fired. At this point in time, the Athletic Department had received *at least* two other rape accusations from both Plaintiffs Brennan and Robertson. Although John Doe's predatory behavior was known to the Athletics Department, Defendant Soil-Cormier responded to Richardson's disclosure of John Doe's sexual misconduct by asking why Richardson would let John Doe in her room if she did not want to have sex with him, implying that Richardson was the cause of John Doe's sexual misconduct. In front of other recruiters, Defendant Soil-Cormier also asked Richardson's coworkers in the recruiting office what happened between Richardson and John Doe. This led to rumors spreading about Richardson and caused dissension with one of her coworkers who was dating John Doe at the time. Defendant Soil-Cormier strongly encouraged Richardson to apologize to her coworker to restore harmony in the workplace, placing further blame on Richardson for being sexually assaulted.

138.     For clarity, following Richardson's disclosure of an attempted rape, Richardson's direct supervisor and an LSU Responsible Party began spreading office rumors about Richardson's sexual activity and then told Richardson to apologize to her rapist's significant other.

139.     To Richardson's knowledge, Defendant Soil-Cormier never filed a Title IX report and no investigation was initiated. No one at LSU ever offered Richardson any resources, support, or accommodations to help her cope with the sexual assault.

140.     After the assault, John Doe publicly harassed and humiliated Richardson by telling other football players, coaches, and athletics workers that he and Richardson had slept together, and that Richardson was a "whore." John Doe also tormented Richardson for years after by causing

a scene every time they were in public together. Whenever John Doe would see Richardson at a bar, he would go to the bouncers and try to kick her out until bar owners told him to stop.

### *Retaliation against Richardson*

141.     While studying abroad in the spring of 2017, Richardson received an email from the football recruiting office informing her that she was being let go from her job despite the fact that she had returned to campus to work in January 2017 (the busiest part of the recruiting season) before going abroad.

142.     When Richardson contacted Defendant Soil-Cormier to ask why she was being let go after she was told she could return to her job when she returned to LSU, Defendant Soil-Cormier told Richardson to talk to her in August 2017 when she returned so they could "figure it out." In August 2017, when Richardson met with Defendant Lewis, Defendant Soil-Cormier, and one of the assistants to the head coaches, Ya'el Lofton, they told her that she was being let go for reasons that were clearly pretextual.

143.     In fall 2018, Richardson experienced further retaliation by the Athletic Department for reporting the abuse by John Doe and John Coe when she was denied an athlete tutor position. Director of Educational Support Services Dorothy Kemp first told Richardson she could not be a tutor because she used to be a recruiter, then claimed it was because she used to date a football player, and lastly claimed it was because she had gotten a bad reference. Again, this was clearly pretextual, as many of the tutors were former recruiters who dated football players, and Richardson had a good relationship with her reference.

144.     In fall 2018, another two job opportunities with the football department vanished for Richardson without any explanation. For both positions, Richardson's would-be supervisors approached her about working for them and were very enthusiastic about working with her before

the positions suddenly fell through without warning.

### *LSU's Flawed Title IX Investigation*

145.     Richardson could not escape the cycle of abuse in which John Coe trapped her.  She continued to date John Coe until his arrest in fall 2018 for assaulting Plaintiff Lewis.

146.     The week after Richardson found out that John Coe was abusing Plaintiff Lewis just like he had abused Richardson, she went to her mentor, Defendant Ausberry, in tears, and told him about John Coe's abuse. Defendant Ausberry immediately stopped Richardson and told her she had to report the abuse to Defendant Segar. Defendant Segar called Richardson, but when Richardson returned the call, Defendant Segar never responded. At this point in time, Segar had actual knowledge of the claims of sexual assault against Doe and Coe from *at least* three other LSU students, specifically Plaintiffs Robertson, Brennan, and Lewis.

147.     In fall 2018, Richardson was working in the LSU Athletic Department for Life Skills Manager Brenton Sumler ("Sumler"). On or around October 1, 2018, Richardson went to Sumler's office. Richardson broke down in tears in front of Sumler and told him about John Coe's abuse.

148.     Sumler immediately took Richardson to LSU Cares, an office within LSU's Student Advocacy and Accountability office ("SAA") where students can report concerns regarding sexual misconduct. Richardson reported her abuse to a staff member at the LSU Cares office.

149.     That same day, LSU's Title IX Office opened a complaint and assigned the case to Title IX Lead Investigator Jeffrey Scott ("Scott"). Scott, who had personal knowledge of Coe's history of abuse through Plaintiff Lewis's investigation, met with Richardson on or around October 3, 2018, to obtain her statement. For reasons Richardson did not understand, Defendant Lewis, **an LSU employee**, was named as the respondent in the investigation instead of John Coe. This was

an attempt to conceal John Coe's identity and protect him from the accusations. Richardson's interview with Investigator Scott was limited and focused primarily on Defendant Lewis rather than on John Coe, again, in an effort to protect John Coe.

150.    Defendant Lewis met with Investigator Scott on November 5, 2018, to provide her statement in the investigation. In her interview, Defendant Lewis stated that she did not report Richardson's complaint to the Title IX Office because she felt there was no report of a sexual assault. Defendant Lewis appeared to have no understanding that Title IX also covers domestic and dating violence and stalking. During the interview, Defendant Lewis also admitted that she had not been completely aware of the Title IX Office until 2017 and that Title IX issues in athletics always went through Defendant Segar's office.

151.    Investigator Scott also interviewed Defendants Segar and Ausberry as witnesses in the investigation on November 8 and 9, 2018, respectively. In his final investigative report dated November 16, 2018, Investigator Scott made a finding that Defendant Lewis had violated LSU's Title IX Policy by failing to notify the Title IX Office about Richardson's report of John Coe's abuse. No finding was made regarding John Coe's abuse. When Richardson met with Investigator Scott to review the final report, Investigator Scott informed her that Defendant Lewis was not going to receive any discipline or sanction from the overseeing human resources department.

152.    Richardson was extremely upset to learn that Defendant Lewis would not be sanctioned even though she was found to have violated LSU's Title IX Policy and that John Coe, the perpetrator, would be receiving no discipline or sanction.  The only action LSU took was to require Defendant Lewis to attend an online training about sexual harassment.  Richardson was never informed as to whether Defendant Lewis completed the training.

153.    To be clear, Richardson's rapes and the overall treatment by those affiliated with

the football team were directly linked to the image that John Doe had painted of Richardson as a "whore" because of her refusal to have sex with him and the Athletics Department's belief that the women who worked in the recruiting department were there to please and service players and potential recruits at any cost. As reported in relation to former head coach Les Miles, he demanded that certain women receive opportunities (or not) in football recruiting based solely upon their physical appearance (or his opinion of it).

154.    Until the release of the Report in March 2021, Richardson was unaware of the knowledge that LSU and the Board of Supervisors had regarding the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members as well as the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Richardson was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

155.    As a direct and indirect result of Defendants' actions and inactions, Richardson has suffered severe emotional and physical distress and economic loss. She goes to therapy once a week and is diagnosed with PTSD. The anxiety she developed as a result of her experiences at

LSU causes her to suffer from stomach aches, headaches, and body aches and she has incurred expenses for related health care. Richardson actively avoids many events because she does not feel safe doing things on her own. She has turned down multiple jobs with male supervisors and refrained from meeting with male professors one-on-one because she is afraid of being alone with men. Richardson's experiences with John Doe and John Coe made her afraid to go to class, so she drastically changed her routes to class and planned her campus migration around John Doe and John Coe's football schedules. Oftentimes, she was so afraid to go to class that she could not go, and her grades suffered accordingly. Richardson's substance use drastically increased after the assaults and she is unable to fall asleep without having vivid nightmares of her assaults.  Her relationships with others have been negatively impacted, and she is fearful and guarded.

### Ashlyn Robertson

156.    Robertson began her education at LSU as a freshman in the fall of 2015 as a recipient of a TOPS scholarship, which required her to maintain a certain grade point average and to graduate from LSU.

157.    On January 22, 2016, Robertson hosted a party at her apartment. Robertson lived in an off-campus apartment complex at which many LSU athletes were housed, so several members of the LSU football team attended. John Doe attended even though he had not been invited.

158.    When John Doe arrived at the party, Robertson was intoxicated and made a comment about not liking John Doe because of his attitude. John Doe told Robertson that he would "make [her] like" him. Robertson later went to her bedroom to lay down.

159.    John Doe entered Robertson's bedroom while Robertson was passed out, and raped her. The next day, Robertson experienced flashbacks of John Doe spitting on her and roughly

penetrating her both vaginally and anally without her consent.  She also suffered from painful vaginal and anal trauma.

160.     John Doe's number was also in Robertson's phone, even though she did not remember giving him her phone or taking his phone number at any point. Robertson's friends on the football team told her that John Doe had bragged about having sex with her.

161.     Robertson told a few close friends about the rape, one of whom was on the LSU swimming and diving team. Robertson's friend told her friend's mother about the rape, who told the diving coach, who then told Defendant Segar on January 26, 2016. Segar spoke with Robertson's friend, who told Robertson that some LSU staff were aware of the issue.

162.     Robertson did not want to report the rape because Doe was revered "like a god" on campus, and she thought that reporting would cause her to be the most hated person on campus and force her to leave LSU, but her friend encouraged her to report to access medical assistance and counseling.

163.     Robertson went to the LSU Student Health Center a few days after the rape, and a nurse told Robertson it was better to not pursue an investigation against John Doe. Robertson also discovered that she had contracted chlamydia as a result of the rape.

164.     On February 1, 2016, Associate Vice President and Dean of Students Mari Fuentes-Martin ("Fuentes-Martin") emailed Robertson to ask if she wanted to proceed with a Title IX investigation. On February 5, 2016, Robertson emailed Defendant Fuentes-Martin back stating that she did not want to proceed with a Title IX investigation.

165.     After the rape, John Doe began a campaign of vicious harassment against Robertson. During finals week in May 2016, John Doe threw a protein shake on Robertson's car.

166.     During the late spring/early summer of 2016, around the same time Doe sexually assaulted Plaintiffs Owens and Brennan, John Doe came to a football player's room where Robertson was hanging out with several of her friends. When the players realized John Doe had arrived, they hid Robertson in a different room in an attempt to protect her from John Doe's abuse. John Doe eventually found Robertson in the room and harassed her about "spreading rumors." John Doe told Robertson he had "a gun with [her] name on it."

167.     During that same summer, Robertson went to a party and saw John Doe standing by the door with a group of women. When John Doe saw Robertson, he said, "There's that bitch right there," causing Robertson to quickly leave the party.

168.     John Doe lived at the same apartment complex as Robertson, so she was afraid of seeing him at her apartment. No one from LSU told Robertson that she could request a change in housing accommodations.

169.     In fall 2016, Robertson told her new boyfriend, who had been recruited to play on the LSU football team, about the rape. Robertson's boyfriend stayed away from John Doe because he was angry with him for raping Robertson, which caused tension between the two players. Robertson's boyfriend disclosed the rape to Defendant Orgeron, and Defendant Orgeron responded by telling Robertson's boyfriend to not be upset because "everybody's girlfriend sleeps with other people."

170.     Upon information and belief, Orgeron Defendants never reported the rape to the Title IX Office or any other entity at LSU. Orgeron Defendants never offered Robertson any accommodations to help her deal with the aftermath of the rape.

171.     It was not until Robertson read the Husch Blackwell Report that she realized that John Doe's name was not included in any of the records of her rape, even though Defendant Segar,

Defendant Orgeron, and Defendant Fuentes-Martin all knew John Doe's identity. As a result of John Doe's exclusion from all of the records, LSU never contacted Robertson when Plaintiffs Owens and Brennan reported assaults by John Doe to ask if she wanted to come forward with a complaint against John Doe at those times.

172.     Prior to studying at LSU, Robertson had top grades and was the valedictorian of her high school class. After being raped by John Doe, Robertson's grades began to decline.

173.     As a result of John Doe's rape and subsequent harassment, Robertson began drinking heavily, using drugs, and engaging in hypersexual behavior to cope with the trauma. Robertson was arrested on drug charges in September 2017 and sent to two rehabilitation centers between September 2017 and January 2018.

174.     When Robertson was arrested in September 2017, her mother withdrew her from LSU. Because she was forced to leave LSU before graduating, Robertson has to repay her TOPS scholarship. No one at LSU offered Robertson any support, resources, accommodations, or interim measures, failing to ensure that Robertson could return safely to complete her degree.

175.     Publication of the stories of John Doe's multiple assaults of her and other women has forced Robertson to relive her trauma on a national stage. Until the release of the Report in March 2021, Robertson was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Robertson was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Robertson was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and

outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

176.     As a direct and indirect result of Defendants' actions and inactions, Robertson has suffered severe emotional and physical distress and economic loss. Robertson lost four semester's worth of tuition and spent what should have been the remainder of her college career in two rehabilitation centers and sober houses, for which she paid out of pocket totaling approximately $30,000.00. Robertson also lost her TOPS scholarship and is still paying back the money she owes as a result of losing the scholarship. Robertson is unable to complete her education at another school because LSU will not release her transcript until she pays back her TOPS scholarship. Robertson is still recovering from the debilitating alcohol and substance abuse problems she developed as a result of the rape. Robertson is currently taking medication for depression and anxiety to cope with the trauma of the rape and the devastating effect it had on her life.

*Samantha Brennan*

177.     In the spring of 2016, Brennan transferred from the University of Minnesota to LSU and began working as a recruiter for LSU's football team.

178.     On July 9, 2016, Brennan went out with a friend. At the bar, Brennan ran into a friend, who worked for the media department of the LSU football team. This friend introduced Brennan to John Doe, and Doe drove Brennan home that night.

179.      The next thing Brennan remembered was waking up naked in her apartment with her living room completely disheveled. Brennan usually did not sleep naked, so she assumed that she had sexual relations with John Doe but could not remember. Brennan found John Doe's wallet on her couch. John Doe texted Brennan the next day and asked if his friend could pick up his wallet.

180.      On or around July 22, 2016, Brennan's coworker told her that John Doe had taken a nude photo of her and shared it with the football team. The photograph was taken without Brennan's consent while she was incapacitated on the night of July 9, 2016. Brennan's coworker encouraged her to speak to Defendant Lewis to report the incident.

181.      On or around July 22, 2016, Brennan met with Defendants Lewis and Segar at Defendant Lewis' request. Brennan was told that Defendant Segar was a student advocate but was not told about Defendant Segar's affiliation with the Athletics Department. At this point in time, Defendant Segar had actual knowledge of John Doe's rape of *at least* one other LSU student, specifically Plaintiff Robertson.

182.      Defendant Lewis told Brennan that she heard about the photograph and wanted to hear her side of the story, since according to Defendant Lewis, John Doe denied being in Brennan's apartment. Brennan told Defendants Lewis and Segar that she found John Doe's wallet in her couch cushions and had text messages from him asking about his wallet. Defendant Lewis appeared to be angry that John Doe had lied to her about what happened.

183.      Defendant Lewis asked Brennan if she wanted to initiate a police investigation or if she wanted LSU to handle it internally. Brennan told Defendant Lewis that she wanted LSU to handle it internally. Defendant Segar ignored Brennan's request and took Brennan to the LSU Police Department ("LSUPD") to file a report. Brennan met with an LSUPD officer who attempted

to coerce her into pressing charges against John Doe.

184.     Despite insistence from LSU employees that Brennan file a police report and press charges, Brennan never received any notice from LSU about whether a Title IX investigation was conducted. No one at LSU ever offered Brennan any support, resources, accommodations, or interim measures. Brennan was never contacted by anyone in the Title IX Office or any other school officials about any potential investigation of her report.

185.     Despite the Athletic Department's actual knowledge of *at least* two rape allegations by Plaintiffs, in fall 2016, John Doe became LSU's star football player. In August 2016, Brennan left the LSU recruiting team because of intense feelings of humiliation and shame resulting from John Doe distributing a nonconsensual nude photograph of her. Brennan could not attend classes without hearing classmates cheer on John Doe. The intense depression and lack of self-worth Brennan felt, caused by John Doe's distribution of her nude photograph without her consent, LSU's lack of response, and the subsequent public support of John Doe caused Brennan to leave LSU.

186.     On or around August 19, 2020, Brennan decided to come forward with her account of being sexually exploited by John Doe when she read a news article reporting that John Doe had raped at least two other students.

187.     Brennan contacted LSUPD on or around August 19, 2020 to obtain a copy of her police report. LSUPD refused to give Brennan a full copy of her police report and only provided her with a one-page summary that did not name John Doe or provide any detail about what had happened to her. The time stamp on the report was also inaccurate.

188.     Brennan continued to try to get a full copy of her police report but was told by LSU's Office of Legal Affairs & General Counsel that she would have to file a subpoena to obtain

it. Eventually, Brennan was forced to sue LSU to obtain a copy of her police report.

189.    Brennan recently applied for readmission to LSU, was accepted, and started classes in May 2021 to complete her undergraduate degree.

190.    Until the release of the Report in March 2021, Brennan was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Brennan was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Brennan was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

191.    As a direct and indirect result of Defendants' actions and inactions, Brennan has suffered severe emotional and physical distress, including but not limited to headaches, difficulty focusing, an inability to be alone with her thoughts, depression, anxiety, and lack of self-worth, and has incurred expenses for related health care. Brennan lost income from her job on the recruiting team, and she lost future income as a result of her inability to obtain a college degree without delay and incurred moving expenses after leaving and returning to LSU. Brennan's

relationships and her health have been negatively impacted by LSU's failure to appropriately respond to her report of sexual exploitation.

***Abby Owens***

192.    Owens began her education at LSU as a freshman in the fall of 2013 after Defendant Julia Sell recruited Owens to attend LSU and play for the tennis team.

193.    On or around June 28, 2016, Owens went to J.L.'s, a student bar in Tigerland, with other LSU student athletes. LSU football player and student athlete John Doe was also at J.L.'s on the night of June 28, 2016. When Owens arrived at J.L.'s, she had already been drinking heavily.

194.    Owens knew John Doe as the star player on the football team but had not formally met him before that night. John Doe bought Owens multiple shots of Patron tequila, which increased her already intoxicated state. After buying Owens multiple shots, John Doe drove Owens in his car to her apartment.

195.    At Owens' apartment, John Doe orally and vaginally raped Owens.

196.    Owens was afraid to report the rape or disclose it to anyone due to John Doe's status as a star athlete. John Doe's sexual assaults of Owens severely exacerbated the substance abuse problem she had developed as a result of a prior abusive relationship. After being dismissed from the LSU tennis team for testing positive for Adderall, Owens checked into a nearby rehabilitation facility on or about April 4, 2017 and took a medical withdrawal from school.

197.    After her first few days of treatment at the rehabilitation facility, Owens disclosed for the first time that she had been raped by John Doe. A rehabilitation center official reported the sexual assault to LSU's Athletics Department approximately a week after the initial disclosure and informed Owens and her parents of the report. Owens was never contacted by anyone at the Title IX Office.

198.     In late April 2017, while Owens was still at the rehabilitation facility, her father attended a Southeast Conference ("SEC") tennis match where Defendant Julia Sell was in attendance. At the match, Owens's father told Defendant Julia Sell that Owens had been raped.

199.     Defendant Julia Sell told Owens's father that she did not believe that Owens had been raped. Defendant Julia Sell never reported Owens' rape to the police, the Title IX Office, or any other entity.

200.     No one at LSU offered Owens any support, resources, accommodations, or interim measures, failing to ensure that Owens could return safely to complete her degree. Owens left LSU halfway through her senior year in March 2017 because she could not bear to be in close proximity to her rapist. Owens transferred to the University of Georgia in January 2018 and finished her degree in August 2020, approximately three years after her original graduation date.

201.     During her time as a student at LSU, Owens was not aware of the existence of the Title IX Office.

202.     Owens never heard anything about Title IX through the athletics department, other than that Title IX was the reason female players were able to get scholarship money.

203.     Owens only learned about LSU's Title IX Office and their obligations in 2019 when she spoke with Jessica Luther, a reporter who covered her story. Luther advised Owens to call the Title IX Office to request a copy of her Title IX report. On May 20, 2019, Owens had her first contact with LSU's Title IX Office when she called and asked for a copy of her report. Owens spoke with Defendant Stewart, who said she would get back to her the next day.

204.     On May 22, 2019, Defendant Stewart told Owens that she had heard about Owens' rape, but decided not to move forward with an investigation since the Athletics Department did not give her the name of the assailant. To be clear, at this point, Defendant Stewart had known

about Owen's alleged rape for approximately three years and during that time never did a single

thing to investigate the claims or to reach out to Owens to offer support or resources.

205.     Defendant Stewart did not tell Owens who reported the rape to the Title IX Office

or when it was reported. Owens had no further contact with Defendant Stewart until her attorney

submitted a Public Records Act ("PRA") request to the Title IX Office to obtain a copy of any

record relating to her rape.

206.     On or around August 17, 2020, Owens received an email from Defendant Stewart

in response to her attorney's PRA request, stating that the Title IX Office did not have any record

of her Title IX case. When Owens called Defendant Stewart in response to her email, Defendant

Stewart confirmed that she had no record to give her. Defendant Stewart also told Owens that if

she wanted to know who the rape was reported to, she would have to ask the rehabilitation facility

since they were the ones that initially reported it to LSU, thereby confirming for Owens that there

had been a report made to LSU.

207.     Until the release of the Report in March 2021, Owens was unaware of LSU and the

Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault,

and retaliation suffered by herself and the putative class members. Owens was also unaware of the

severe institutional level procedural deficiencies that avoid discipline for perpetrators and

disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX

violation and other wrongs to LSU and the Board of Supervisors. Owens was additionally unaware

of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title

IX violations in an extreme and outrageous manner designed to deter any future disclosures;

intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for

the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional

denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

208.     As a direct and indirect result of Defendants' actions and inactions, Owens has suffered significant economic damages including the loss of her scholarship, additional educational expenses as a result of her transfer to the University of Georgia and the extended time it took to complete her degree, loss of income attributed to the delay in receiving her degree, health care expenses, moving expenses, and the cost of multiple rehabilitation programs. Owens continues to suffer damages as a result of her rape and LSU's failure to investigate or provide her with appropriate support including heavy substance abuse, depression, eating disorder tendencies, Post-Traumatic Stress Disorder ("PTSD"), and self-harm.  Owens has had to attend multiple rehabilitation programs focusing on substance abuse, trauma therapy, and co-occurring disorders. After going through her first rehabilitation program, Owens 18 credit hours away from graduation when she was forced to move back home to Georgia and transfer to the University of Georgia to complete her degree. Owens did not receive a scholarship at the University of Georgia and had to pay all costs for tuition, room and board, books, and other educational expenses. After one semester, Owens then had to go into another rehabilitation program, costing her additional time and money. Owens's relationships and health continue to be negatively impacted by LSU's failure to properly respond to the report of her rape.

***Elisabeth Andries***

209.     Andries began her education at LSU as a freshman in fall 2016.

210.       Andries met LSU student John Roe[25] through their shared Greek life participation and engineering majors. In October 2016, John Roe invited Andries on a Halloween bus trip hosted by his fraternity. During the trip, Andries became intoxicated and required assistance. John Roe separated Andries from her friends and put her on a separate bus with himself. John Roe took Andries to the back of the bus, then left her alone while he went to the front of the bus.

211.       While at the front of the bus, John Roe attempted to sexually assault a female classmate, Sarah Zoe.[26] Sarah Zoe told John Roe to get away from her, so he went back to the back of the bus where Andries was sitting. At this point, Andries was so intoxicated that she was throwing up in her hands.

212.       When John Roe rejoined Andries at the back of the bus, he sexually assaulted her by putting his hands in her shirt and forcefully groping her breasts without her consent. Andries kept shaking her head and told John Roe "no" and "stop" multiple times even as she was throwing up, but John Roe continued to grope her. At this point, Andries blacked out from a combination of the alcohol and the trauma she was enduring. When Andries woke up the next morning, she had bruises all over her chest.

213.       The trauma instilled a lack of self-worth and a sense of shame that caused Andries to suppress the experience, and she maintained a misplaced friendship with John Roe. In November 2016, Andries started therapy through LSU's mental health services to deal with her depression, which she has since realized was triggered by John Roe's assault.

214.       John Roe again attempted to sexually assault Andries in July 2017 after she picked him up from a bar. When Andries let John Roe stay over at her apartment that night, he started

---

[25] John Roe is a pseudonym.
[26] Sarah Zoe is a pseudonym.

groping her without her consent until she told him to stop and kicked him out of her apartment.

215.    After the July 2017 incident, Andries began avoiding John Roe by not going to college bars in the area, changing which coffee shop she went to, and avoiding his friends. However, there was only so much Andries could do to avoid John Roe since they were both engineering majors.

216.    It was not until after the second assault that Andries began to process John Roe's abuse during the bus trip. In fall 2017, Andries told her LSU therapist Tiffany McCaughey ("McCaughey") about John Roe's assault for the first time.

217.    McCaughey told Andries about LSU's Lighthouse Program, which provides resources for sexual violence support and services. McCaughey told Andries that she would not have to tell the program John Roe's name in order to receive services. On or around February 5, 2018, Andries went to the Lighthouse Program's office to get resources.

218.    On the first day of spring 2019 semester classes, Andries walked into her industrial engineering class ("IE 4113") and saw John Roe sitting there. Andries tried to ignore him, but the memories of John Roe assaulting her overwhelmed her to the point where she had a panic attack and had to leave during the class. When Andries told her roommate about the panic attack, her roommate told her that she could sign up for disability accommodations to be excused from classes.

219.    In approximately late January 2019, Andries went to the LSU medical clinic and told Dr. Laura Jones ("Dr. Jones") that Andries needed disability accommodations because she was assaulted by someone in her class. Dr. Jones told Andries she would have to meet with the Disability Services office to finalize her paperwork.

220.    On or around February 20, 2019, Andries met with Dawn Sousa-Hearn ("Sousa-Hearn") in the LSU Disability Services office to discuss Andries' need for accommodations in IE

4113. When Sousa-Hearn asked why Andries needed disability accommodations, Andries told her about John Roe sexually assaulting her and the panic attacks she was experiencing as a result of seeing him in class. Sousa-Hearn encouraged Andries to make a report to LSU's Title IX Office, which was the first time Andries had ever heard of the Title IX Office. Andries googled "LSU Title IX" but could not find any information about the Title IX Office, so she went to SAA for help.

221.     On or around February 25, 2019, Andries's request for disability accommodations was approved, and she sent the approval to her IE 4113 professor, Roberto Champney ("Champney"). On or around March 7, 2019, Andries met with Defendant Blanchard in SAA to report John Roe's assault. Defendant Blanchard told Andries that she would reach out to Champney to explain why Andries would not be attending many in-person classes.

222.     SAA reported Andries's assaults to the Title IX Office on or around March 8, 2019. That same day, Investigator Scott sent Andries a letter asking her to meet with him. On or around March 15, 2019, Andries went to the Title IX Office to meet with Investigator Scott.

223.     Instead of Investigator Scott, graduate assistant Kimberly Davis ("Investigator Davis") conducted Andries's Title IX interview. No explanation was provided to Andries as to why her Title IX investigation was being handled by a graduate student rather than an employee. Before the interview, Andries asked Investigator Davis several times if the Title IX Office could issue a no-contact order against John Roe. Andries also provided Investigator Davis with Sarah Zoe's name and the name of another student who knew the names of other students John Roe had assaulted to be interviewed as witnesses in the Title IX investigation. Upon information and belief, Investigator Davis never contacted Andries's witnesses.

224.     On or around April 2, 2019, Defendant Stewart told Andries that, since Andries had

not talked to John Roe since July 2017, there was no reason for Stewart to issue a no-contact order. Defendant Stewart told Andries that Andries could issue a peer-to-peer no-contact order, but Andries was afraid that John Roe would not take a no-contact order directly from her seriously.

225.     On April 8, 2019, Andries met with Champney to discuss her grades and learned that no one from SAA had ever reached out to him to explain why she could not be in class with John Roe. Andries was forced to explain the situation to Champney herself, which caused her further emotional trauma. Upon information and belief, on or around April 24, 2019, Champney made a report to the Title IX Office because of his concerns about Andries's well-being. Upon information and belief, the Title IX Office never followed up with Champney, and Andries did not even know that he had made a report.

226.     On or around June 3, 2019, the Title IX investigation concluded that John Roe was responsible for violating LSU's Title IX Policy. On June 4, 2019, Andries received a six-sentence letter stating that John Roe violated the Title IX Policy.

227.     Andries then learned that John Roe planned to appeal the Title IX Office's finding against him. John Roe requested to extend the appeal deadline from approximately June 19, 2019 to June 28, 2019, and the Title IX Office granted John Roe's request. After John Roe's appeal was extended, Sarah Zoe spoke with Defendant Stewart to ask why she was not interviewed as a witness in the investigation and determine whether she should file her own complaint against John Roe. When Sarah Zoe asked why John Roe's appeal deadline was extended twice, Defendant Stewart stated that she did not have to "justify her decisions" to students.

228.     John Roe eventually submitted his appeal on July 11, 2019, two weeks after the extended deadline, and the Title IX Office still accepted his appeal. Andries was not provided with a copy of John Roe's written appeal nor given any opportunity to respond to the appeal. Defendant

Stewart did not provide Andries with any updates on the status of the appeals process.

229.     On or around July 22, 2019, Defendant Stewart denied John Roe's appeal. Defendant Stewart did not notify Andries of the appeal outcome until several days later.

230.     On or around August 22, 2019, Andries met with Defendant Sanders at his request to discuss the appeals and sanctioning process. Even though John Roe had already been found responsible for violating the Title IX Policy and it was LSU's responsibility to determine sanctions, Defendant Sanders asked Andries inappropriate and unnecessary questions like whether she was "on drugs" during the assault and where she was sitting on the bus when she was assaulted.

231.     During their meeting, Andries told Defendant Sanders that she was aware of a third student who had been assaulted by John Roe and provided Defendant Sanders with the student's name and contact information. Upon information and belief, Defendant Sanders never contacted the student, never reported this incident to the police, the Title IX Office, or any other entity, and no investigation was conducted into Andries's report.

232.     On or around August 29, 2019, Andries met with Defendant Blanchard to discuss her case. Andries asked Defendant Blanchard what would happen if John Roe was suspended and later returned to LSU, because Andries would then have to begin avoiding him again in their shared engineering classes. Defendant Blanchard told Andries that SAA had not thought of that and did not offer Andries any advice or solutions.

233.     At the beginning of the fall 2019 semester, Andries walked into one of her classes and saw John Roe sitting there. Andries had a panic attack and immediately left class.

234.     On or around August 30, 2019, Andries met with Defendant Blanchard again. Andries asked Defendant Blanchard why John Roe was in her lab class and why Andries was forced to rearrange her schedule to avoid John Roe rather than John Roe rearranging his schedule.

Defendant Blanchard told Andries that SAA had reached out to John Roe and asked him to change his schedule, but he never responded. Defendant Blanchard also told Andries that Andries and John Roe were both students, so they had "the same rights."

235.     Even though John Roe had been found responsible for sexually assaulting Andries, LSU placed the burden on Andries to avoid John Roe and failed to provide any protective measures or reasonable accommodations to Andries.

236.     On or around September 26, 2019, Andries received a copy of the disciplinary letter SAA sent to John Roe. The letter stated that SAA had issued a mutual no-contact order between John Roe and Andries, that John Roe was required to attend counseling and an anger management course, and that John Roe was issued a deferred suspension effective September 5, 2019, through May 31, 2021. No one explained to Andries that a deferred suspension meant that John Roe would still be allowed to remain on campus.

237.     LSU's issuance of a mutual no-contact directive against Andries violated her right to due process and constituted retaliation, as she had not been found in violation of any LSU policies and should not have been subject to disciplinary measures simply for reporting a sexual assault and should have been given the opportunity to go through process prior to limitations on her liberty being imposed upon her.

238.     John Roe was again given the opportunity to appeal the decision. John Roe submitted his appeal on or around September 27, 2019. No one notified Andries that John Roe had appealed SAA's discipline decision and that the discipline imposed upon him would be stayed until a decision on his appeal was issued.

239.     On or around October 12, 2019, Andries saw John Roe at an LSU football game. On or around October 14, 2019, Andries called SAA and asked why John Roe was on campus and

able to purchase a football ticket. This is when Andries learned for the first time that John Roe had submitted another appeal.

240.     SAA did not give Andries a clear answer until her father called a few days later. SAA staff told Andries's father that Andries was not told about the appeal because "it wouldn't affect [her] at all so it wasn't [her] business." SAA's response showed an utter disregard of Andries's emotional well-being as well as a lack of basic understanding of Title IX compliance requirements, as the presence of a respondent on campus would clearly deeply affect a claimant who had been told her assailant was not permitted to be on campus.

241.     On or around October 16, 2019, seven months after Andries made her first Title IX report, LSU denied John Roe's final appeal. On November 16, 2020, Defendant Blanchard sent Andries an email stating that John Roe would be back on campus for spring 2021 classes. Defendant Blanchard told Andries that she would have to change her schedule if she did not want to be in class with John Roe.

242.     Until the release of the Report in March 2021, Andries was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Andries was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Andries was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting

donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

243.     As a direct and indirect result of Defendants' actions and inactions, Andries has suffered severe emotional and physical distress, including anxiety and depression. She missed a significant number of classes in the fall of 2019 because she was forced to carefully craft her schedule around John Roe's even though he had been found guilty of assaulting her. Andries withdrew from campus activities she previously loved because she was so afraid of seeing John Roe on campus. Andries developed anxiety and panic attacks that she still suffers from to this day, her relationships with her friends and family have been affected, and she has incurred related health care expenses.

### Jade Lewis

244.     In spring 2017, Plaintiff Lewis was recruited to LSU from New Zealand for her exceptional tennis skills.  She received a full scholarship to attend LSU which included tuition, room and board, and all education and athletic related expenses. Plaintiff Lewis chose LSU over the many other schools that recruited her because LSU agreed to keep her on a full scholarship if she chose to take a leave of absence to play tennis professionally.

245.     Plaintiff Lewis played for the LSU tennis team under the co-head coaches, Defendants Julia Sell and Mike Sell.

246.     In January 2017, Plaintiff Lewis began a romantic relationship with John Coe, who had previously dated Richardson. John Coe soon began physically abusing and controlling Plaintiff Lewis in the same way he had abused Richardson during their relationship. On at least six

occasions, John Coe physically assaulted Plaintiff Lewis until she was bruised and bloodied.

247.    Upon information and belief, between May 2017 and August 2018, one or more of Plaintiff Lewis's teammates on the tennis team reported the assaults to Defendant Julia Sell. To Plaintiff Lewis's knowledge, Defendant Julia Sell did not report any of these witness statements to the police, the Title IX Office, or any other entity, and she did not ask Plaintiff Lewis about them. Neither Defendant Julia Sell nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures after the reports were made by multiple members of the tennis team, and no Title IX investigation was initiated.

248.    On or around May 19, 2017, Plaintiff Lewis went to John Coe's house to get some of her personal belongings. John Coe became angry with Plaintiff Lewis and punched her in the stomach so hard that she could not perform a tennis serve.

249.    Plaintiff Lewis's injuries from the assault were so severe that she had to see a team athletic trainer, Donavon White ("White") and/or Sean Carter ("Carter"), to manage the pain. During a meeting with White and/or Carter in May 2017, Plaintiff Lewis disclosed John Coe's abuse. That disclosure was the first time Plaintiff Lewis personally told anyone at LSU about John Coe's abuse. That same day, one of Plaintiff Lewis's teammates also made a comment to White about John Coe's repeated violent assaults on Plaintiff Lewis. At this point in time, the Athletics Department had knowledge of Coe's prior pattern of abuse of Plaintiff Richardson.

250.    To Plaintiff Lewis's knowledge, neither White nor Carter reported this incident to the police, the Title IX Office, or any other entity. Neither White nor Carter nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

251.    In summer 2017, Plaintiff Lewis's father called Defendant Michael Sell on two

occasions to share his concerns about his daughter's relationship with John Coe. During the second phone call, Plaintiff Lewis's father told Defendant Michael Sell that John Coe had punched Plaintiff Lewis in the stomach. Defendant Michael Sell's response was that this "couldn't be possible, wouldn't be possible." To Plaintiff Lewis's knowledge, Defendant Michael Sell did not report this incident to the police, the Title IX Office, or any other entity. Neither Defendant Michael Sell nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

252.     LSU did not respond to the many reports of John Coe's abuse of Plaintiff Lewis until nearly a year later. On or around April 3, 2018, John Coe went to Plaintiff Lewis's on-campus apartment to pick up some of his clothing. While at Plaintiff Lewis's apartment, John Coe became angry with her and punched her in the stomach so hard that he fractured her ribs.

253.     In a text message to Defendant Ausberry dated April 14, 2018, John Coe admitted to punching Plaintiff Lewis in the stomach.[27] Defendant Ausberry was aware of John Coe's prior pattern of violent abuse of his romantic partners because Plaintiff Richardson had told him about John Coe's abuse. To Plaintiff Lewis's knowledge, Defendant Ausberry did not report this incident to the police, the Title IX Office, or any other entity. Neither Defendant Ausberry nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

254.     On or around April 25, 2018, three weeks after John Coe fractured Plaintiff Lewis's rib, she went to LSU athletic trainers to get examined because she was still in pain. Defendant Segar, White, and Senior Athletic Trainer Micki Collins ("Collins") asked Plaintiff Lewis during the examination how she had gotten hurt. Plaintiff Lewis told them that John Coe had punched her

---

[27] Report at 73.

multiple times over the course of the past year. The following day, Defendant Segar finally reported John Coe's abuse of Plaintiff Lewis to the Title IX Office, where the case was assigned to Investigator Scott. Upon information and belief, Defendant Segar did not make a report to the police.

255.     Investigator Scott did not interview Plaintiff Lewis until May 21, 2018, approximately three weeks after Defendant Segar made the report. Investigator Scott did not interview John Coe until June 5, 2018, approximately a month and a half after Segar filed the report. In his interview with Investigator Scott, John Coe admitted to punching Plaintiff Lewis in the stomach. The day after John Coe's interview, Investigator Scott concluded his report by noting that John Coe would be put in mandatory counseling and Defendant Segar would inform Defendant Orgeron of the situation.

256.     Upon information and belief, John Coe only participated in one of his five mandated counseling sessions. Defendant Segar only told Defendant Orgeron that John Coe "needed to stay away from" Plaintiff Lewis, and John Coe continued to be allowed to play football.

257.     Plaintiff Lewis never received any formal report detailing the findings of the Title IX investigation, a direct violation of federal guidance regarding the handling of Title IX investigations.[28] John Coe continued to abuse Plaintiff Lewis soon after Investigator Scott concluded the Title IX investigation. Neither Investigator Scott nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures.

258.     In the month and a half it took the Title IX Office to interview John Coe, he continued to abuse Plaintiff Lewis. In a text message dated May 31, 2018, John Coe threatened

---

[28] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently." U.S. Dep't of Ed., Office for Civil Rights, Q&A ON CAMPUS SEXUAL MISCONDUCT 6 (Sept. 2017) https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

Plaintiff Lewis by stating that he was "really about to beat [her]," "might kill [her]," and that she should "just kill [her]self."[29]

259.     In early to mid-June 2018, Plaintiff Lewis and John Coe got into an argument outside of a bar in Tigerland because John Coe refused to return Plaintiff Lewis's belongings. When Plaintiff Lewis tried to go to her car to leave, John Coe put his hands in her face, slammed her against the car, and was about to hit her again until one of his friends stopped him.

260.     In early to mid-June 2018, John Coe became angry with Plaintiff Lewis because she waved to a friend while riding in his car. John Coe then drove down the road and threw Plaintiff Lewis's phone out the window. As Plaintiff Lewis exited the vehicle, John Coe abandoned her. When John Coe returned and Plaintiff Lewis reentered the vehicle, he began strangling her.

261.     In the early morning hours of June 18, 2018, John Coe entered Plaintiff Lewis's apartment while intoxicated, jumped on her while she was sleeping in her bed, and began strangling her. John Coe then hit Plaintiff Lewis and ripped her earring out of her ear.  Plaintiff Lewis's roommate woke up to Plaintiff Lewis screaming and called the police.

262.     When LSUPD arrived, they separated Plaintiff Lewis and John Coe, but did not arrest John Coe. Plaintiff Lewis and John Coe both told officers it was a verbal argument that had not turned physical. John Coe's attacks had continued to escalate over time and Plaintiff Lewis feared for her physical safety if she reported him.

263.     John Coe repeatedly told Plaintiff Lewis that if she reported him, his parents would ruin her life by taking her to court, getting her kicked out of school, and having her deported back to New Zealand. Plaintiff Lewis did not tell LSUPD about the physical attack until two months later because she was afraid of the power football players had on campus, and she feared further

---

[29] Report at 77-78.

retaliation and abuse by John Coe.

264.     Later that same day, Defendant Segar found out about the attack from the LSUPD

report and made a second report with the Title IX Office about John Coe's abuse of Plaintiff Lewis.

LSU waited over two weeks to charge John Coe with a potential violation of the Code of Student

Conduct. However, LSU wasted no time in immediately charging Plaintiff Lewis with violating

the residential life policy for having a candle in her room when LSUPD came to her apartment

while John Coe was strangling and hitting her. On or around June 22, 2018, LSU found Plaintiff

Lewis in violation of the residential life policy for having a candle in her room and placed her on

academic probation. Meanwhile, LSU took no disciplinary action against John Coe for physically

attacking Plaintiff Lewis.

265.     Not until around July 11, 2018, did Defendant Sanders interview John Coe

regarding his attack on Plaintiff Lewis. During John Coe's interview, Defendant Sanders only

questioned John Coe about the June 18, 2018 incident and not about the other assaults Plaintiff

Lewis had reported.

266.     When Defendant Sanders interviewed Plaintiff Lewis approximately two weeks

later, she corroborated John Coe's account out of fear that he would attack her again or retaliate

against her. However, Plaintiff Lewis did tell Defendant Sanders during the interview that John

Coe had punched her in the past.

267.     No explanation was provided to Plaintiff Lewis as to why she was forced to go

through a second interview to recount the abuse again when she had already met with Investigator

Scott.

268.     At least three witnesses told Defendant Sanders about the full extent of John Coe's

abuse of Plaintiff Lewis. Plaintiff Lewis's roommate, who called the police on June 18, 2018, told

Defendant Sanders that John Coe had strangled Plaintiff Lewis that night. One of Plaintiff Lewis's teammates told Defendant Sanders that she had helped cover bruises on Plaintiff Lewis's neck with makeup the day after one of John Coe's assaults. John Coe's roommate and teammate on the football team told Defendant Sanders that he knew about the physical abuse and that assistant football coach Mickey Joseph ("Joseph") would call him each week asking if Plaintiff Lewis was at his and John Coe's apartment.

269.     Despite the numerous reports they had received of John Coe's repeated brutal attacks on Plaintiff Lewis and Plaintiff Richardson, LSU did not initiate any formal disciplinary action against John Coe other than banning him from the weight room that summer. LSU allowed John Coe back in the weight room once the 2018 football season began, and he participated in the football team's first practice on August 4, 2018.

270.     When John Coe was banned from the weight room, John Coe's mother began reaching out to Plaintiff Lewis, telling her to "fix it." Some of the football coaches also made comments to Plaintiff Lewis indicating that they blamed her for John Coe being banned from the weight room.

271.     Plaintiff Lewis brought these statements to Defendant Segar's attention and asked Defendant Segar why she was facing retaliation for John Coe's punishment. Defendant Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment." Defendant Segar did nothing to address the retaliation or support Plaintiff Lewis. Defendant Segar did not report the retaliation to the Title IX Office and no investigation was initiated into the retaliation.

272.     On or around August 16, 2018, Plaintiff Lewis showed Defendant Segar photographs of the bruises and scratches John Coe gave her and text messages in which John Coe threatened to kill her and encouraged her to kill herself. Defendant Segar told Plaintiff Lewis that

she should file a police report so it was "in the system" in case it happened again, even though there was already a police report from the June 18, 2018, incident. Defendant Segar finally reported John Coe's continued abuse of Plaintiff Lewis to LSUPD later that day. However, Defendant Segar still did not report the retaliation to the Title IX Office.

273.     John Coe was arrested the next day and charged with felony dating violence. After John Coe's arrest, Orgeron Defendants indefinitely suspended John Coe from the LSU football team.

274.     Plaintiff Lewis was never provided any notification about the discipline imposed on John Coe, in violation of federal Title IX guidance.[30]

275.     When interviewed by police on August 22, 2018, White and Defendants Julia Sell and Michael Sell falsely told police that they did not learn of John Coe's abuse of Plaintiff Lewis until April 2018 and June 2018, respectively. This was not accurate, as Plaintiff Lewis and her teammates told White that John Coe had punched Plaintiff Lewis in the stomach in May 2017; Plaintiff Lewis's teammates told Defendant Julia Sell about John Coe's abuse on prior unknown dates; and Plaintiff Lewis's father had told Defendant Michael Sell about the assault in summer 2017.

276.     On or around September 16, 2018, LSU police arrested John Coe a second time after detectives learned he was continuing to see and physically assault Plaintiff Lewis in violation of court orders. The next day, John Coe withdrew from LSU. In March 2019, John Coe pleaded guilty to two counts of battery and one count of violating a protective order against Plaintiff Lewis.

277.     While the criminal case against John Coe was pending, Defendant Julia Sell

---

[30] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently." Q&A ON CAMPUS SEXUAL MISCONDUCT at 6 https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

instructed Plaintiff Lewis's teammates on the tennis team to stay away from Plaintiff Lewis. This admonition made Plaintiff Lewis feel alienated and isolated from her teammates and closest friends during the time when she most needed their support.

278.     On October 18, 2018, Plaintiff Lewis's father sent letters to the National Collegiate Athletic Association ("NCAA") and the SEC informing them that LSU officials had repeatedly failed to take appropriate action after they were notified months earlier that John Coe was abusing Plaintiff Lewis.

279.     On or around October 26, 2018, Herb Vincent, the SEC's associate commissioner for communications, sent a response to Plaintiff Lewis's father and forwarded her father's letter to LSU's general counsel at the time, Tom Skinner. Upon information and belief, LSU told the SEC that LSU was conducting a Title IX investigation into the situation.

280.     On or around July 18, 2019, LSU expelled John Coe for violating the LSU Code of Student Conduct and the LSU Title IX Policy. LSU never notified Plaintiff Lewis of the actions they took against John Coe, in violation of federal Title IX guidance.[31]

281.     Until the release of the Report in March 2021, Plaintiff Lewis was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Plaintiff Lewis was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Plaintiff Lewis was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting

---

[31] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently."  Q&A ON CAMPUS SEXUAL MISCONDUCT at 6.

to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

282.    As a direct and indirect result of Defendants' actions and inactions, Plaintiff Lewis has suffered and continues to suffer severe emotional and physical distress.  She was forced to change the entire course of her life. The abuse John Coe inflicted upon her and LSU's subsequent repeated failure to properly respond, while also punishing Plaintiff Lewis for having a candle in her room, has completely distorted her perception of people. She worries anytime she makes a mistake like ordering the wrong food that she is going to be hurt. Lewis has been diagnosed with PTSD and her relationships with her family and friends have been torn apart because of her severe emotional and psychological distress. The many LSU employees in positions of authority traumatized Lewis on an almost incomprehensible level as she repeatedly sought help and was mocked, gaslit, and ignored, and then forced to endure more abuse from her assailant.  Lewis also suffered significant economic damages including her opportunity to play professional tennis, moving expenses and the opportunities for significant earning potential related to sponsorships, as well as costs related to her health care.

### *Kennan Johnson*

283.    Born and raised in Baton Rouge, Louisiana, Johnson had always dreamed of continuing her parents' athletic legacy by playing for the LSU tennis team. Johnson had known

Defendant Julia Sell for years, as Johnson was an avid LSU tennis fan.

284.    When Johnson first applied to college, Defendant Julia Sell told Johnson that she was trying to build a "winning team." Defendant Julia Sell told Johnson that she would not be good enough to play for LSU for at least her first two years of college. As a result, Johnson enrolled at the University of Florida during the 2014-2015 school year and at the University of Oregon during the 2015-2016 school year to get the requisite tennis experience she needed before she transferred to LSU in fall 2016. Since Johnson transferred twice, under NCAA rules, she had to sit out for one year before she could play tennis at LSU.

285.    On May 8, 2017, Johnson got an official scholarship offer from LSU and achieved her lifelong dream of becoming a member of the LSU women's tennis team. However, Johnson's dream quickly turned into a nightmare once she began to experience abuse by Defendant Julia Sell.

286.    When Johnson started playing tennis for LSU in fall 2017, Defendant Julia Sell would frequently tell Johnson that she had to lose weight. Defendant Julia Sell would make Johnson weigh in every week and would tell Johnson she had to lose a certain number of pounds per week. There was no requirement for tennis players to see a nutritionist or weigh in, so this made Johnson feel very uncomfortable and alienated.

287.    Johnson would often starve herself so she could meet Defendant Julia Sell's expectations. However, starving herself negatively impacted Johnson's tennis performance at practice, and Defendant Julia Sell would then get angry with Johnson for not having enough energy.

288.    Defendant Julia Sell would hold the threat of losing her scholarship over Johnson's head whenever she exercised this control over Johnson's body. This behavior made Johnson feel very uncomfortable, like she was too overweight and not good enough to be a member of the team.

Johnson needed her scholarship to afford to attend LSU, so she did not feel she could challenge Defendant Julia Sell's repeated harassment and verbal abuse.

289.    Whenever Johnson would try to take on a leadership role on the tennis team, Defendant Julia Sell would retaliate against Johnson by falsely saying that her "attitude" was affecting the team and that her teammates did not like it. Johnson did not have any attitude and was simply trying to step up as a leader, which Defendant Julia Sell used against Johnson to further attack her self-esteem.

290.    Defendant Julia Sell would also blame Johnson if her fellow teammates did not play well. Defendant Julia Sell told Johnson that she did this because she wanted Johnson to "be a leader;" however, this was clearly pretextual, as Defendant Julia Sell would never allow Johnson to take on any leadership roles.

291.    On one occasion, Defendant Julia Sell brought Johnson to the indoor tennis courts and told her, "You might want to bring tissues, because I'm going to make you cry."

292.    Defendant Julia Sell would emotionally abuse Johnson by promising to move Johnson up to singles if she played well, then move her down or keep her at doubles even when Johnson performed well. Defendant Julia Sell also created a toxic environment on the team by pitting players against each other. On several occasions, Defendant Julia Sell falsely told Johnson and Plaintiff Lewis that the other had said hurtful things about each other behind their backs. This caused Johnson and Plaintiff Lewis to get into arguments that fostered distrust and hostility among team members.

293.    Johnson was one of several tennis players who told Defendant Julia Sell about the abuse John Coe repeatedly inflicted on Plaintiff Lewis. When Johnson told her about the abuse, Defendant Julia Sell ignored the information and told Johnson that if she stopped "worrying so

much about other people," she would be a better tennis player. Defendant Julia Sell did not ask Johnson any more details about the abuse. To Johnson's knowledge, Defendant Julia Sell never reported Plaintiff Lewis's abuse to the police, the Title IX Office, or any other entity.

294.    Defendant Julia Sell also told Johnson and her teammates to "stay away from Jade" once Plaintiff Lewis' allegations against John Coe came to light.

295.    Defendant Julia Sell made disparaging comments about Johnson's sexual orientation. Defendant Julia Sell would tell Johnson to keep her "lifestyle" out of the locker room. Defendant Julia Sell also told Johnson that her sexual orientation could make her teammates "uncomfortable" and "distract" them.

296.    Defendant Julia Sell's harassment of Johnson, including her repeated harassment of Johnson because of her sexual orientation, negatively affected Johnson's ability to participate in LSU's educational programs and activities. Johnson's tennis performance suffered while she was at LSU due to Defendant Julia Sell's abuse and harassment. Johnson played much better tennis before attending LSU and after she graduated from LSU.

297.    Johnson would experience severe anxiety and become sick to her stomach whenever Defendant Julia Sell called her into her office. Johnson had difficulty eating and began throwing up regularly due to the nausea and anxiety that resulted from Defendant Julia Sell's abuse and harassment. Eventually, Johnson tried seeing a psychologist to help her deal with the constant abuse from Defendant Julia Sell, but Johnson was afraid that if she reported Julia Sell, she would lose her scholarship.

298.    As an athlete, Johnson was required to go to Title IX trainings, but in these sessions she never learned that weight and sexual orientation harassment constituted sex discrimination and therefore could be addressed via a Title IX report.

299.     When Johnson graduated from LSU in spring 2019, she cried not out of happiness that she had fulfilled her lifelong dream, but rather out of relief that her time there was finally over. Soon after she graduated from LSU, Johnson blocked Defendant Julia Sell's number, thus ending the relationship with her lifelong mentor.

300.     Until the release of the Report in March 2021, Johnson was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Johnson was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Johnson was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

301.     As a direct and indirect result of Defendants' actions and inactions, Johnson has suffered severe emotional and physical distress. Johnson was fully prepared for the stress of college sports, but she did not expect the coach whom she had looked up to for most of her life to create such a hostile environment. Rather than helping Johnson manage the high expectations of college tennis, Defendant Julia Sell put even more pressure on Johnson and constantly made her

feel like she was never thin enough or good enough for the team and disparaged her for her sexual orientation. This made Johnson suffer from severe anxiety and depression during her time on the tennis team, which negatively impacted her grades. Her mental distress became so bad that she became suicidal and had to admit herself to a hospital because she did not want to live anymore. This abuse also made Johnson lose her lifelong love of tennis for a few years after graduation. Johnson's experiences at LSU have had a lasting, detrimental effect on her mental and physical well-being.  Johnson suffered economic damages from her hospital stay and need for other health care which was directly related to the actions and inactions of Defendants.

*Jane Doe*

302.     Plaintiff Doe began her education at LSU as a freshman living in North Hall in fall 2018.

303.     Plaintiff Doe soon met John Poe[32] through her roommate's boyfriend, and the two became friends after attending a football game in October 2018. The two kissed on a few occasions, but Plaintiff Doe was not looking to date and only considered John Poe a friend. John Poe would frequently send unwelcome text messages to Plaintiff Doe asking her to come to his room to "cuddle," which Plaintiff Doe refused to do.

304.     Once Plaintiff Doe started spending more time with John Poe, his "nice guy" facade started to fade, and he became verbally abusive towards Plaintiff Doe. Plaintiff Doe had recently gotten out of a long-term relationship with a woman when she became friends with John Poe. Whenever Plaintiff Doe refused to go to John Poe's room or perform sexual favors, he would get angry and call her derogatory names like "fag," "pig," "fat," and "stupid."

305.     In November, Plaintiff Doe began to distance herself from John Poe when he started

---

[32] John Poe is a pseudonym.

engaging in this abusive behavior by blocking his phone number and blocking him on social media. However, John Poe continued to harass Plaintiff Doe whenever he saw her on campus.

306.     In the winter of 2019, Plaintiff Doe agreed to go to Chipotle with her roommate without realizing John Poe would be joining them. When John Poe arrived, Plaintiff Doe told him not to talk to her. John Poe ignored this request and assaulted Plaintiff Doe by groping her when they went into the restaurant. John Poe then laughed at Plaintiff Doe when she told him never to touch her again.

307.     John Poe would also bang on Plaintiff Doe's door and steal decorations from her door, then send text messages to Plaintiff Doe saying she would have to come to his room and kiss him to get them back.

308.     John Poe would also enter Plaintiff Doe's dorm room without her permission by entering with Plaintiff Doe's roommate's boyfriend. On one occasion, John Poe and Plaintiff Doe's roommate's boyfriend stole Plaintiff Doe's food and threw it under other people's dorm room doors.

309.     In March 2019, John Poe stole a Polaroid photograph off of Plaintiff Doe's bedside table. When Plaintiff Doe realized the photograph was missing, she told her roommate's boyfriend that if he and John Poe continued to touch her stuff, she would report them to residential life. In response, John Poe called Plaintiff Doe that same weekend and left her a voicemail from a fake number telling her she "needed to grow up," "was a little crazy sometimes," and he knew she was "struggling in life."  John Poe continued harassing Plaintiff Doe by testing Plaintiff Doe from this fake number without revealing his identity. When Plaintiff Doe realized it was John Poe texting her, she told him to leave her alone.

310.     The following day, Plaintiff Doe texted her former Resident Assistant about John

Poe's harassment. Plaintiff Doe was told to report it to the Title IX Office. That same day, a Title IX Office staff member came to Plaintiff Doe's dorm room to interview her about the allegations, and Plaintiff Doe stated that she did not feel safe and wanted to move out of her dorm room.

311.     The Title IX staff member never offered to move John Poe out of North Hall. Plaintiff Doe was moved across campus to Evangeline Hall that same day and was told she had three days to decide if she wanted to stay there and get a no contact order. Plaintiff Doe said she wanted a no-contact order but was never given any further information about getting a no-contact order nor did she receive a copy of any no-contact order.

312.     The Title IX Office initiated an investigation.  In total, Plaintiff Doe had four interviews about her claims of harassment against John Poe. Each interview was with a different person, so Plaintiff Doe would have to repeat her account and all of the painful events every time she was interviewed. The interviewers also spoke to Plaintiff Doe in a condescending manner by constantly questioning her version of the events and asking why she had kissed John Poe prior to his abuse. The questioning became so intimidating that Plaintiff Doe would often cry, and the interviewers would press on as if nothing was wrong.  They did not offer any support or resources to Plaintiff Doe.

313.     On May 23, 2019, Plaintiff Doe met with Assistant Director of SAA Daniel DeLuca ("DeLuca"), who had just started working for the office. When Plaintiff Doe asked about the status of her case, DeLuca told her that her claim did not fall under the scope of Title IX, so the SAA office was trying to determine if there were any other violations with which they could charge John Poe. DeLuca did not explain to Plaintiff Doe why her case did not fall under Title IX and did not give her any other information about her case, he just interviewed her in the same way the Title IX Office had already interviewed her multiple times.

314.     Other than the initial interview letter she received on March 21, 2019, Plaintiff Doe never received any formal communications from the Title IX Office. Plaintiff Doe never received a formal resolution on her case, was never told if John Poe was interviewed or disciplined for his actions, and none of the witnesses she identified were ever interviewed.

315.     On March 10, 2021, Plaintiff Doe emailed LSU's human resources office to ask for a copy of her file and to try to find out if John Poe was ever found guilty or disciplined for his harassment of her.  On March 19, 2021, DeLuca emailed Plaintiff Doe a copy of her case file, which consisted of a copy of LSU's Title IX Policy. The file did not contain any notes from the multiple interviews Plaintiff Doe underwent except for her interview with DeLuca on May 23, 2019. The file did include two Sexual Misconduct and Sexual Harassment (PM73) Complaint Forms dated March 21, 2019 and August 30, 2019, which incorrectly stated that Plaintiff Doe had not taken any action to stop John Poe's behavior. This was false, as Plaintiff Doe had blocked John Poe on text and social media months prior and told him on multiple occasions to leave her alone, which he ignored.

316.     When Plaintiff Doe expressed her concerns over not knowing whether John Poe was disciplined, DeLuca stated that he could not give any further information due to the Family Education Rights Protection Act ("FERPA"), a direct violation of federal Title IX guidance.[33]

---

[33] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently… Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions. For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist."   Q&A ON CAMPUS SEXUAL MISCONDUCT at 6 https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

317.     Plaintiff Doe stopped attending classes because she was afraid of seeing John Poe, and she was being retraumatized by the Title IX Office. Plaintiff Doe's fear of John Poe was exacerbated in late May 2019 when she saw him near her car at 1:00 a.m. Plaintiff Doe ducked behind her car, but John Poe began walking towards her until he was one car away. Plaintiff Doe ended up running inside to get her friends and, from then on, was afraid to go to her car at night by herself for fear of seeing John Poe since he now knew where she lived.

318.     Plaintiff Doe's anxiety around attending classes and seeing John Poe caused her attendance and grades to suffer to the point that she was expelled from her classes and lost her Taylor Opportunity Program for Students ("TOPS") scholarship at the end of the spring 2019 semester. Plaintiff Doe successfully appealed the decision to expel her and returned to LSU in fall 2019.  However, she did not receive her scholarship.

319.     In or around December 2019, Plaintiff Doe became so depressed and uncomfortable being on campus after everything she had been through, and because of her fears of seeing John Poe, she left LSU and enrolled in a community college.

320.     Until the release of the Report in March 2021, Plaintiff Doe was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Plaintiff Doe was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Plaintiff Doe was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+

identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

321.     As a direct and indirect result of Defendants' actions and inactions, Plaintiff Doe has suffered severe emotional and physical distress. The harassment she endured caused her to suffer from a relapse of anxiety and depression, and she was diagnosed with obsessive compulsive disorder ("OCD") and binge eating disorder after her retraumatization by LSU's Title IX Office. Plaintiff Doe also felt extremely unsafe on campus and would not be able to go to her car at night unless a friend was with her for fear of running into her stalker. Her inability to get out of bed, attend classes, complete her classwork, or even change her clothes as a result of her mental distress led to her being expelled and eventually dropping out of LSU. She lost three semesters' worth of tuition and access to an education at a major research university and is now enrolled in a community college. She sought counseling from LSU but was told by two therapists that she needed to see a psychiatrist, which, until recently, she was unable to afford through her insurance. Her relationships with her family and friends have been negatively impacted and she has incurred healthcare and moving related expenses.

***Corinn Hovis***

322.     Hovis enrolled at LSU as a freshman on a TOPS scholarship in the fall semester of 2019.

323.     On January 24, 2020, Hovis went to a bar in Tigerland to go drinking and dancing.

John Loe,[34] a highly recruited quarterback on LSU's football team, was also at Tigerland that night. A crowd of people were surrounding Loe and taking photographs with him.

324.    Hovis did not know who Loe was, nor was she aware that he was on the football team. Hovis's friend told her who Loe was, so Hovis joined the crowd and took a selfie photograph with him. After Hovis and Loe took a selfie together, Loe asked Hovis to go back to his residence. Hovis was heavily intoxicated when she agreed to leave the bar with Loe.

325.    Instead of going to Loe's residence, Loe led Hovis to an SUV where Hovis blacked out almost immediately. Loe then raped Hovis in the SUV. Hovis did not consent to any sexual activity and could not have consented given her level of intoxication. Loe's friend drove Hovis back to her residence hall, where her sorority sisters and roommate had to help her to walk. Hovis suspects that she may have been drugged that night.

326.    Later that night, Hovis suffered a panic attack. Hovis's roommate contacted the dorm's Resident Assistant, and Hovis reported that she believed she had been drugged and sexually assaulted while at Tigerland. Hovis decided to file a report with LSUPD, who then contacted Baton Rouge Police Department ("BRPD") because the incident had occurred off campus.

327.    About eleven BRPD officers appeared in response to the call, and eventually refused to take a statement from Hovis. LSUPD did not agree with this conclusion and took Hovis and her roommate to the hospital for an assessment and a Sexual Assault Nurse Examiner ("SANE") exam. The SANE found that Hovis's cervix was bruised from the rape.

328.    Upon information and belief, Residential Life personnel made a report to the Title IX Office. On January 31, 2020, Defendant Stewart met with Hovis to explain her reporting options. Hovis decided to move forward with the Title IX investigation process.

---

[34] John Loe is a pseudonym.

329.    As a part of the Title IX process, Hovis was connected to the LSU Lighthouse Program. The Lighthouse Program provides assistance and accommodations to student-survivors of sexual assault, interpersonal violence, stalking, and harassment. The Lighthouse Program arranged accommodations including time and a half on assignments and exams, a notetaker, distraction reduced environments, and consideration for absences as a result of the trauma she endured.

330.    On February 3, 2020, Investigator Scott interviewed Hovis. Upon information and belief, on February 4, 2020, Defendant Segar was notified that a Title IX complaint had been filed against Loe. On March 6, 2020, Investigator Scott concluded that Loe violated the Title IX Policy by sexually assaulting Hovis on January 24, 2020. Upon information and belief, Defendant Segar was notified of the outcome of the investigation on that same day.

331.    In approximately June 2020, LSU disciplined Loe for violating the Title IX Policy by suspending him from LSU from May 10, 2020 to May 31, 2021 and issuing a no contact directive ordering him to have no communication or contact with Hovis.

332.     Upon information and belief, Loe violated the no contact directive twice by having his girlfriend contact Hovis on two occasions in May 2020. This contact was reported to Defendants Stewart and Sanders, but LSU did not take any disciplinary action against Loe for violations of the no contact directive. On August 6, 2020, Loe transferred to another university to play football.

333.    Hovis was deeply traumatized by the rape and the Title IX investigation process. Hovis felt mentally drained, and it was difficult for her to go to her classes. In addition, one of her classes was in close proximity to the football stadium, and Loe was still a student at LSU at the time. Attending this class in particular was nearly impossible for Hovis because of her fear of

seeing Loe on campus and the resulting anxiety.

334.     Despite being an excellent student prior to the rape, Hovis failed one of her classes as a result of the rape because she couldn't get out of bed for her midterm exam. Hovis attempted to remedy the situation with the help of her Lighthouse Program advocate, but Hovis was ultimately forced to pay to retake the class in the summer. Hovis also did poorly in her other classes, earning Cs in two classes.

335.     In January 2021, Hovis went to LSU's Disability Services office to reinstate her accommodations from the previous semester.  Disability Services refused to review her request for an extension of her accommodations because Lighthouse accommodation are only for six months; however, Hovis still suffered the disabling consequences of Loe's rape. Disability Services did not inquire as to Hovis's physical or mental health needs or perform any assessments to determine whether she may still be in need of disability services. During this time, Hovis was also dealing with retraumatization because of the one-year anniversary of her rape.

336.     As a result of the rape and of LSU's failures, Hovis must go to a psychiatrist to get accommodations and medical intervention for PTSD, generalized anxiety disorder, depression, and panic disorder.

337.     In addition, Hovis had to endure seeing news stories about her rape published nearly every week on national news platforms. Hovis's experiences were also outlined in the Husch Blackwell report under the anonymous name "Respondent H."

338.     Until the release of the Report in March 2021, Hovis was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Hovis was also unaware of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and

disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Hovis was additionally unaware of, as Defendants had concealed, Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

339.     As a direct and indirect result of Defendants' actions and inactions, Plaintiff Hovis has suffered and continues to suffer severe emotional and physical distress and economic loss. Hovis's grades have suffered, adding additional barriers to her hopes of going to graduate school and earning her PhD in the future. Hovis was forced to pay to retake a class because she was so emotionally distraught over her rape that she could not get out of bed. Hovis was subjected to John Loe's unchecked retaliation in repeatedly violating the no-contact directive, for which LSU refused to protect her or discipline her rapist. Hovis's requests for disability accommodations have been denied, forcing Hovis to pay out of pocket to provide her own accommodations.

***Sarah Beth Kitch***

340.     Kitch began her education at LSU as a graduate student in the political science PhD program in the fall of 2009.

341.     Professor John Moe[35] immediately took a greater interest in Kitch than in the other

---

[35] John Moe is a pseudonym

students. At eighteen years old, Kitch was the youngest student in the PhD program, one of only a few women in the department, and began the program with no funding. Moe quickly offered Kitch three separate forms of scholarships and funding on which Kitch relied to remain in the PhD program.

342.     Moe was Kitch's advisor as she completed research for her dissertation. Moe was fifty-nine years older than Kitch and continuously reminded her not only of his power over her as a professor and academic advisor, but also his power over her because of his sex and age. Moe made it clear to Kitch that without him, she would never complete the PhD program or get a job following her graduation.

343.     Moe's sexual harassment of Kitch gradually increased during her time at LSU, including but not limited to requesting that Kitch wear high heels, expressing interest in a sexual relationship with Kitch, propositioning sexual favors from Kitch, discussing how women should "spread their legs wide open," and requesting that Kitch come to Moe's house alone at night. Kitch was terrified to disclose this pervasive harassment because nobody at LSU experienced repercussions for sexual assault because of the administration's desire to maintain its general reputation as a party school unhindered by sexual assault allegations. Kitch was terrified that if she did not maintain a good working relationship with Moe, then she would never graduate. Moe frequently described Kitch as a "mite" while her PhD committee members, like himself, were "celestials." Moe was not the only professor in the department to treat graduate students in this manner. Other professors repeatedly told graduate students their options were either to take on additional work grading undergraduate assignments or to perform sexual favors for the male professors. This environment caused Kitch to live in daily fear of sexual assault and in fear of being dismissed from the program if she did not sexually please the male professors. This

environment caused Kitch to experience severe health problems, including but not limited to panic attacks, persistent feelings of dread and despair, a sense of worthlessness, and feelings of intense shame and humiliation.

344.    After Moe became disabled, he demanded that Kitch drive him to and from campus daily. Kitch was afraid to drive alone with Moe, but again she felt like she could not say "no." Moe used his disability on several occasions to get Kitch into his house alone at night to "help him off the floor," and to inappropriately touch Kitch. For example, in March 2013, Kitch went to Moe's house following a call for help, to find Moe sitting on the couch surrounded by several wine bottles. Moe demanded that Kitch kiss him. Kitch refused to do so, but Moe grabbed her and forcibly kissed her. Kitch was disgusted and immediately nauseated. After forcing Moe off of her, she left the house.

345.    Kitch was not aware of her reporting options to the Title IX Office. Moe was Kitch's advisor on her dissertation committee and, since she needed a recommendation letter from Moe to enter the job market, she had to maintain a good relationship with him despite her daily fear of seeing him, panic attacks, intellectual and emotional paralysis, persistent feelings of dread and despair, a sense of worthlessness, and feelings of intense shame and humiliation.

346.    Despite these conditions, Kitch finished her PhD program at LSU in 2014, but the trauma of Moe's assault and harassment haunted her for the remainder of her career. Following a PhD, aspiring political science professors conduct post-doctoral research, obtain a tenure-track position at a university, and expand their dissertation and post-doctoral research into a published book. The field is highly competitive and failure to complete any of these tasks on a strict timeline could ruin a candidate's chances for stable post-secondary academic employment.

347.    While completing her postdoctoral research, Kitch's work was constantly

triggering flashbacks to the trauma endured while working for Moe. Although Kitch had physically left LSU's campus, Kitch and Moe were now professionals in the same field of study and Kitch continued to live in daily fear of having to interact with Moe through her research, at professional conferences, to obtain letters of recommendation, etc.  In addition to her prior symptoms, this continued daily fear caused Kitch to experience intermittent loss of the ability to verbally communicate, nausea, headaches, and severe chronic pain.

348.    Because of these symptoms, Kitch was unable to finish her book, and she was unable to obtain tenure after being hired for a tenure track position at the University of Missouri. The loss of her tenure-track position eliminated Kitch's ability to be hired for another tenure-track position in the future. Leaving the University of Missouri also caused Kitch to sell her Missouri home at a loss, expend money setting up a new home, changing health insurance plans mid-year, and maintaining therapy.

349.    In approximately August 2019, Kitch realized that her career was already over and she no longer had anything left to lose by reporting Moe's history of abuse to LSU. Kitch assumed LSU would at least maintain a record to assist future students who Moe may victimize. However, Chevon Gates ("Gates") and another Title IX staff member informed Kitch that it was a good choice not to report the harassment when she was a student because "no one would have done anything" and she would have faced consequences as a result of the report. Kitch never received any emails or documentation about her contacts with the Title IX Office.

350.    Since leaving her tenure-track position, Kitch has been underemployed as an adjunct professor during the 2020-2021 academic year. These part-time adjunct positions pay considerably less than her actual and projected income as a tenure-track professor and offer no benefits.  In August 2021, despite the fact that she has a PhD from LSU and did postdoctoral

research at Princeton University, Kitch will be teaching at the high school level.

351.     Until the release of the Report in March 2021, Kitch was unaware of LSU and the Board of Supervisors' knowledge of the pervasive harassment, heightened risk of sexual assault, and retaliation suffered by herself and the putative class members. Kitch was also unaware of the severe institutional-level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating a basis to impute knowledge of the Title IX violation and other wrongs to LSU and the Board of Supervisors. Kitch was additionally unaware of, as Defendants had concealed, all Defendants' intentional pattern of reacting to disclosures of Title IX violations in an extreme and outrageous manner designed to deter any future disclosures; intentional discriminatory treatment of female presenting and LGBTQ+ identifying students for the purposes of maintaining the school's popular reputation and soliciting donor funds; intentional denial of students' rights to Title IX investigations; negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs; and the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

352.     As a direct and indirect result of Defendants' actions and inactions, Kitch has suffered significant emotional and mental distress, as well as economic damages including loss of income attributed to the complete loss of her ability to attain tenure and proceed with her expected academic career as well as significant health care expenses.  Kitch suffered loss of a sense of professional credibility during her doctoral education, intense shame, and the stress of writing a dissertation in the hostile environment her assault created.  Moe's assault and LSU's failure to provide remedies causes Kitch to suffer from depression, Post-Traumatic Stress Disorder ("PTSD"), and severe emotional and physical distress.  Kitch has had to attend trauma

therapy. Kitch's relationships, income, and health continue to be negatively impacted by her experiences at LSU.

## CLASS ACTION ALLEGATIONS

353.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

354.    The class that the Plaintiffs seek to represent (the "Class") is defined as follows (the following hereinafter sometimes referred to as the "Class definition"):

> All present, prospective, and future students, as well as past students from 2013 to present, at Louisiana State University's Baton Rouge campus who are harmed by Defendants' failure to provide resources for students who experience discrimination on the basis of sex, including perceived sexual orientation, and/or gender presentation. Such discrimination includes but is not limited to sexual misconduct in the form of sexual exploitation, sexual harassment, sexual assault, dating violence, domestic violence, stalking, sexual abuse, violence of a sexual nature, video voyeurism, or the obtaining, posting or disclosure of intimate descriptions, photos, or videos without the express consent of the persons depicted therein, as well as crimes of a sexual nature as defined in Title 14 of the Louisiana Revised Statutes.

355.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified. Plaintiffs also reserve the right to establish sub-classes as appropriate.

356.    This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2), or (b)(3), and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

357.    <u>Community of Interest</u>: There is a well-defined community of interest among Class Members, and the disposition of the claims of these Class Members in a single action will provide substantial benefit to all parties and to the Court.

358.     <u>Numerosity</u>: While the exact number of Class Members is unknown to the Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon records maintained by the Defendants and Class Members. Notice can be provided to Class Members through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in similar matters. At this time, the Plaintiffs believe that the Class includes thousands of similarly-situated members. Therefore, the Class is sufficiently numerous that joinder of all Class Members in a single action is impracticable as set forth in Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

359.     <u>Typicality</u>: The Plaintiffs' claims are typical of the claims of other Class Members that they seek to represent under Rule 23(a)(3) of the Federal Rules of Civil Procedure because each Plaintiff and each Class Member has been harmed by the same systemic failure to provide resources for LSU students who experience discrimination on the basis of sex and has incurred damages in a similar manner.

360.     <u>Adequacy</u>: The Plaintiffs will fairly and adequately represent and protect the interests of the Class as Required by Rule 23(a)(4) of the Federal Rules of Civil Procedure. The Plaintiffs are adequate representatives of the Class because they have no interests which are adverse to the interests of the other Class Members. The Plaintiffs are committed to the vigorous prosecution of this action and, to that end, the Plaintiffs have retained counsel who are competent and experienced in handling complex litigation, including class action litigation, on behalf of similar plaintiffs.

361.     <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Rule 23(b)(3) of the Federal Rules

of Civil Procedure because:

a.      the expense and burden of individual litigation make it economically unfeasible for Class Members to seek redress of their claims other than through the procedure of a class action;

b.      Class Members are likely too humiliated, scared, or isolated to seek individual redress of their claims in a public forum for fear of public embarrassment, retraumatization, and retaliation, and a class action procedure allows redress without participation in extended litigation;

c.      Class Members likely suffer from severe mental health issues related to their discrimination and do not have the physical ability to withstand a deposition or trial to seek redress of their claims;

d.      Plaintiffs are unaware of any other actions seeking the same injunctive relief that is sought through the class action procedure;

e.      concentrating the claims against Defendants would grant Defendants finality in litigation as well as guidance through injunctive orders; and

f.      absent a class action, Defendants would likely retain the ill-gotten windfall from their discriminatory activities on the basis of sex and would continue to discriminate on the basis of sex.

362.    Common questions of law and fact exist as to the Class Members, as required by Rule 23(a)(2) of the Federal Rules of Civil Procedure, and predominate over any questions which affect individual members of the Class, as required by Rule 23(b)(2) of the Federal Rules of Civil Procedure.

363.    The common questions of fact include, but are not limited to, the following:

a.      Whether Defendants operate programs in receipt of federal funds;

b.      Whether Defendants systematically discriminated against Plaintiffs and other Class Members on the basis of sex;

c.      Whether Defendants repeatedly failed to seriously investigate, report, and/or appropriately report allegations of sexual misconduct, and whether Defendants intentionally concealed the same;

d.      Whether the sex-based discrimination suffered by Plaintiffs and other Class Members denied them equal access to educational opportunities or benefits;

e.      Whether Plaintiffs and other Class Members are members of a protected class;

f.      Whether Plaintiffs and other Class Members were subjected to a hostile educational environment on LSU's campus;

g.      Whether Defendants exercised substantial control over Plaintiffs' and other Class Members' abusers, who were students enrolled at LSU or employees working at LSU;

h.      Whether Defendants had actual knowledge of the sexual misconduct that was created by and furthered by Defendants' repeated failure to enforce its own policies and federal law and guidance;

i.      Whether Defendants acted with negligence or deliberate indifference to the acts of sexual misconduct;

j.      Whether Defendants had actual knowledge of the Plaintiffs' and other Class Members' abusers' propensity to partake in sexual misconduct against students, but allowed them to continue to have unfettered access to students, including Plaintiffs and other Class Members;

k.      Whether Defendants cultivated a culture of silence by failing to report complaints

of sex discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures, as well as dismissing, laughing at, and/or shaming Plaintiffs and other Class Members;

l.      Whether the Defendants failed to provide appropriate interim measures and accommodations to Plaintiffs and Class Members;

m.      Whether Defendants failed to adequately train employees on how to prevent misconduct and to properly respond to reports of the same;

n.      Whether Defendants intentionally disenfranchised Plaintiffs and other Class Members from the campus Title IX process, by failing to conduct a prompt, equitable, thorough, reliable, and impartial grievance process, and giving the assailants minimal or absolutely no discipline, thus allowing them to avoid the consequences of their abuse;

o.      Whether Plaintiffs and Class Members had a clearly established right to freedom of speech of which a reasonable public official would have known;

p.      Whether Plaintiffs and other Class Members engaged in protected speech and activity when they disclosed instances of sexual misconduct to LSU employees;

q.      Whether allegations of sexual misconduct associated with public entities, such as LSU, are a matter of public concern;

r.      Whether the adverse actions of Defendants were substantially motivated by Plaintiffs' and other Class Members' constitutionally protected speech because Defendants did not want to address and properly respond to disclosures of abuse as it would have negatively impacted the reputation and funding of the school;

s.      Whether Defendants' sex-based discrimination was a systematic policy;

t.      Whether Defendants' discrimination against Plaintiffs and other Class Members was substantially or rationally related to any legitimate government interest;

u.      Whether Defendants' discrimination endangered the safety, privacy, security, and well-being of Plaintiffs and other Class Members;

v.      Whether Defendants' actions and inactions deprived Plaintiffs and other Class Members of their right to equal dignity, liberty, and autonomy by treating them as second-class citizens at LSU;

w.      Whether Defendants were members of, or participants in, the conspiracy alleged herein;

x.      Whether Defendants engaged in a pattern of racketeering activity;

y.      Whether Defendants committed wire fraud;

z.      Whether Defendants committed mail fraud by using the United States Postal Service or private or commercial interstate mail carriers to execute the scheme;

aa.     Whether Defendants concealed their discriminatory actions from the Plaintiffs and other Class Members;

bb.     Whether Plaintiffs and other Class Members sustained damages, and if so, the appropriate measure of damages;

cc.     Whether Plaintiffs and other Class Members are entitled to a permanent injunction, and if so, the appropriate scope of the injunction;

dd.     Whether Plaintiffs and other Class Members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit;

ee.     Whether Defendants breached their contractual obligations to Plaintiffs and other Class Members pursuant to the Code of Student Conduct, Sexual Harassment Policy, and

other governing documents;

ff.     Whether LSU is a public entity and a place of public accommodation;

gg.     Whether Defendants systematically excluded Plaintiff and other Class Members from educational programs and activities for which Plaintiff and other Class Members were otherwise qualified, after receiving notice of Plaintiffs and other Class Members' disability status; and

hh.     Whether Defendants were deliberately indifferent to Plaintiffs and other Class Members' disabilities and Defendants' discrimination on the basis of such disabilities.

364.     In the alternative, this action is certifiable under the provisions of Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure because:

a.     the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

b.     the prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other Class Members, not the parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole, necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

365.     Plaintiffs are unaware of any difficulty which will be encountered in the management of this litigation precluding its maintenance as a class action.

## COUNT I
**Violation of Title IX**
**Deliberate Indifference to Sex Discrimination**
**20 U.S.C. §§ 1681, *et seq.***
**(LSU and Board of Supervisors)**

366.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

367.     All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Defendants LSU and Board of Supervisors due to the LSU Defendants' deliberate indifference to sex-based discrimination. Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex discrimination.

368.     Plaintiffs were repeatedly subject to sex-based discrimination by LSU students and employees as articulated in Plaintiffs' allegations.

369.     The LSU Defendants created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (a) ("Title IX"), because:

a.     As female presenting and LGBTQ+ identifying students seeking equal access to educational programs and activities at LSU, Plaintiffs were members of a protected class covered by Title IX;

b.     Plaintiffs were subjected to sex-based discrimination in the form of sexual assaults, sexual harassment, relationship violence, and/or stalking;

c.     Plaintiffs were subjected to harassment based on their sex; and

d.     Plaintiffs were subjected to a hostile educational environment created by Defendants' lack of policies and procedures and failure to properly investigate, prevent, and/or address the sexual and physical assaults and harassment perpetrated against

Plaintiffs.

370.     At all relevant times, the LSU Defendants exercised substantial control over Plaintiffs' abusers who, at all relevant times, were (or remain currently) students enrolled at LSU and/or employees working at LSU.

371.     The LSU Defendants had actual knowledge of the sex-based discrimination, which was created by and furthered by Defendants' repeated failure to protect Plaintiffs consistent with LSU's own policies and federal law and guidance.

372.     The LSU Defendants acted with deliberate indifference to the acts of sex-based discrimination by failing to take any action to prevent them, deter the students and/or employees responsible, and/or protect Plaintiffs from sexual misconduct. The LSU Defendants also acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective remedial steps to resolve the Plaintiffs' allegations of sex-based discrimination.

373.     The LSU Defendants' repeated failure to promptly and appropriately respond to the sexual misconduct resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in LSU's educational programs and activities in violation of Title IX.

374.     The LSU Defendants acted intentionally and with deliberate indifference to the repeated denial of Plaintiffs' access to educational opportunities or benefits. The LSU Defendants' violation of their duty to Plaintiffs arises from their systemic failure to properly enforce Title IX. Pursuant to the LSU Defendants' official policy, practice, and/or custom of deliberate indifference, they cultivated a culture of silence by failing to report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance

procedures.

375.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the LSU Defendants, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

376.    Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, and in fact Defendants concealed from Plaintiffs, that LSU and the Board of Supervisors were so deliberately indifferent to the severe and pervasive harassment, such that LSU's response or lack thereof was clearly unreasonable in light of the known circumstances and that this deliberate indifference subjected Plaintiffs to continuing harassment on campus.

377.    As a direct, natural, and proximate result of the LSU Defendants' violation of Title IX due to their deliberate indifference to sex-based discrimination, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving to flee their abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

378.    Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to take substantial steps to remedy their deliberate indifference to reports of Title IX violations and

change the culture of silence at LSU by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex-based discrimination; holding students, employees, and student-athletes accountable for their acts of sexual misconduct and discrimination; and remedying any hostile environment that is created as a result of sex-based discrimination, as damages alone are not an adequate remedy for the LSU Defendants' ongoing violations of Title IX.

**COUNT II**
**Violation of Title IX**
**Hostile Environment**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU and Board of Supervisors)**

379.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

380.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Defendants LSU and the LSU Board of Supervisors due to the LSU Defendants' cultivation and perpetuation of a sexually hostile environment against them. Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

381.    As female presenting and LGBTQ+ identifying students seeking equal access to educational opportunities and benefits at LSU, Plaintiffs were members of a protected class covered by Title IX.

382.    The abuse described previously in this Complaint, perpetuated by LSU employees and students, created an abusive and sexually hostile educational environment on LSU's campus that impeded and effectively denied Plaintiffs' equal access to educational opportunities and benefits.

383.     The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the LSU Defendants, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

384.     Defendants LSU and the LSU Board of Supervisors are liable for the abusive and hostile educational environment on campus because the LSU Defendants had actual knowledge of the Plaintiffs' abusers' acts of sex-based discrimination against female presenting and LGBTQ+ identifying students but allowed them to continue to have unfettered access to these students, including Plaintiffs.

385.     Defendants LSU and the LSU Board of Supervisors are also liable for the LSU Defendants' failure to remedy the hostile educational environment experienced by Plaintiffs by failing to offer appropriate interim measures and accommodations that could have provided equal access to educational opportunities and benefits.

386.     Defendants LSU and the LSU Board of Supervisors are also liable for their failure to remedy the hostile educational environment by failing to initiate and conduct proper investigations into the Title IX violations Plaintiffs suffered, appropriately sanction the respondents, and provide appropriate follow-up support to Plaintiffs, thus ensuring they received equal access to educational opportunities and benefits.

387.     Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, and in fact Defendants had concealed from Plaintiffs, that LSU and the Board of Supervisors had actual knowledge of the pervasive harassment creating

an objectively hostile and abusive environment permeated with discriminatory intimidation, ridicule, and insult to alter the condition of Plaintiffs' education environment.

388.    As a direct, natural, and proximate result of the LSU Defendants' violation of Title IX by creating and perpetuating a sexually hostile environment, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income, expenses associated with fleeing their abusers, and other economic and non-economic damages, for which they are entitled to just compensation.

389.    Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to take substantial steps to remedy the sexually hostile environment at LSU by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex discrimination; holding students, employees, and student-athletes accountable for their acts of sexual misconduct and discrimination; and remedying any hostile environment that is created as a result of sex-based discrimination, as damages alone are not an adequate remedy for the LSU Defendants' ongoing violations of Title IX.

**COUNT III**
**Violation of Title IX**
**Heightened Risk**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU and Board of Supervisors)**

390.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

391.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Defendants LSU and the LSU Board of Supervisors due to the heightened risk of

sex-based discrimination on LSU's campus. Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

392.    Despite sexual misconduct occurring frequently among its faculty members and students, the LSU Defendants failed to adequately train its employees on how to prevent and respond to reports of sex-based discrimination and harassment.

393.    In a September 2017 audit completed by LSU's Office of Internal Audit which was included as an exhibit to the Report, a detailed description of the problems and failings within the LSU Title IX process were identified, including the fact that mandatory reporters were not properly trained in their obligations under the Title IX Policy. Although the audit report was distributed to Defendants Alexander and Stewart; upon information and belief, the audit report was not acted upon and no additional training was provided to Responsible Employees to ensure that employees complied with their obligations under LSU policy and federal Title IX guidance.  Defendants willfully ignored their own internal audit findings indicating that Title IX reporting was a problem and did nothing to remedy the situation.

394.    Pursuant to Defendants LSU and the LSU Board of Supervisors' official policy, practice, and/or custom of deliberate indifference, Defendants cultivated a culture of silence by failing to report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures.

395.    One of the Defendants has publicly acknowledged Defendants LSU and the LSU Board of Supervisors' official policy, practice, and/or custom of deliberate indifference towards sexual misconduct. Specifically, Defendant Lewis has made numerous public statements in her April 8, 2021 lawsuit; through her lawyers; and in a complaint she filed against LSU with the

EEOC which indicates that proper Title IX reporting procedures were consistently ignored throughout the entire time period in which the events alleged in this Complaint took place.

396.     The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the LSU Defendants, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

397.     Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that LSU and the Board of Supervisors had specific knowledge of the pervasive harassment and heightened risk of sexual assault by certain assailants suffered by Plaintiffs and interfering with Plaintiffs' access to educational opportunities and benefits.

398.     As a direct, natural, and proximate result of Defendants' violation of Title IX and creation and perpetuation of an environment with heightened risk, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income, costs associated with fleeing abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

399.     Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to take substantial steps to lower the risk of sex-based discrimination at LSU by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex-based discrimination; holding students, employees, and

student-athletes accountable for their acts of sexual misconduct and discrimination; and remedying any hostile environment that is created as a result of sex discrimination, as damages alone are not an adequate remedy for the LSU Defendants' ongoing violations of Title IX.

**COUNT IV**
**Violation of Title IX**
**Erroneous Outcome**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU and Board of Supervisors)**

400. Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

401. All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Defendants LSU and the LSU Board of Supervisors due to the erroneous outcomes of investigations of sex-based discrimination. Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

402. The LSU Defendants discriminated against Plaintiffs by creating erroneous outcomes of investigations counter to their rights to an equitable grievance process under Title IX,[36] including but not limited to, taking disciplinary action against Plaintiffs as a result of their disclosure; denying Plaintiffs' ability to participate fully in the Title IX grievance processes as complainants while allowing assailants to participate fully as a respondents; failing to consider all evidence Plaintiffs submitted in their Title IX investigations; failing to interview Plaintiffs' witnesses; and failing to notify Plaintiffs of the outcomes of the investigations.

403. After disenfranchising Plaintiffs from the campus Title IX process, the LSU Defendants failed to conduct a prompt, equitable, thorough, reliable, and impartial grievance process, as required under Title IX. Instead, Defendants gave the Plaintiffs' assailants minimal

---

[36] 34 C.F.R. § 106.8.

discipline, or in some cases no discipline whatsoever, thus allowing them to avoid the consequences of their abuse against Plaintiffs.

404.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the LSU Defendants, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

405.    Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that LSU and the Board of Supervisors had knew of the severe institutional level procedural deficiencies that avoid discipline for perpetrators and disincentivize student-victim reporting, creating subjecting survivors to additional harassment.

406.    As a direct, natural, and proximate result of Defendants LSU and LSU Board of Supervisors' violation of Title IX and erroneous outcomes in Title IX proceedings, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional pain and suffering,  a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income, costs of fleeing abusers and other economic or non-economic damages, for which they are entitled to just compensation.

407.    Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to ensure individuals who report sex-based discrimination are provided with due process, take substantial steps to properly investigate reports of sex-based discrimination at LSU, provide

appropriate interim measures and reasonable accommodations to complainants, impose appropriate discipline and remedial measures in situations where a violation of the Title IX Policy is found to have occurred, as damages alone are not an adequate remedy for the LSU Defendants' ongoing violations of Title IX.

**COUNT V**
**Violation of Title IX**
**Retaliation by Withholding Protection Otherwise Conferred by Title IX**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU Defendants)**

408.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

409.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against the LSU Defendants due to retaliation. The Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

410.    As President of LSU, Defendant Alexander would have set the tone from the top on the importance of Title IX and would have been responsible for ensuring the Title IX Coordinator and the Associate Vice President for Human Resource Management did their jobs.

411.    As Title IX Coordinators, Defendants Marchand, Stewart, and Fuentes-Martin were responsible for ensuring that the institution as a whole complied with its Title IX obligations.

412.    Pursuant to the Equal Opportunity Policy, Defendant Monaco was also responsible for ensuring that the institution as a whole complied with its Title IX obligations, and as Associate Vice President for Human Resource Management, he would have been responsible for ensuring that all employees complied with their Title IX obligations.

413.    As Athletic Director, Defendant Alleva would have been ultimately responsible for ensuring that the Athletics Department complied with its Title IX obligations.

414.     As Responsible Employees, Defendants Monaco, Orgeron, Ausberry, Segar, Lewis, Soil-Cormier, Julia Sell, Michael Sell, Sanders, and Blanchard were responsible for reporting disclosures of sexual misconduct to the Title IX Coordinator.

415.     Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

416.     Plaintiffs engaged in protected activity by reporting incidents of sex-based discrimination perpetrated on them by LSU students and employees to LSU staff. Plaintiffs' actions were protected by the anti-retaliation provision of Title IX.

417.     The LSU Defendants engaged in materially adverse actions against Plaintiffs when LSU Athletic Department staff failed to report Plaintiffs disclosures of sexual misconduct by student-athletes and when LSU's Title IX Office failed to properly investigate Plaintiffs' claims of sex discrimination, failed to initiate appropriate interim measures to ensure their safety and ongoing equal access to educational opportunities and benefits, and failed to implement appropriate sanctions and responsive measures to remedy the sexually hostile environment and prevent its recurrence.

418.     There was a causal connection between Plaintiffs' decisions to exercise their rights under Title IX by reporting sex-based discrimination and Defendants' decisions to engage in adverse actions against them. Adverse actions included, but are not limited to, issuing a no-contact order against Plaintiffs, opening Plaintiffs up to being found responsible for violating the Code of Student Conduct if their abusers stalked them; depriving Plaintiffs of employment opportunities in the athletics department, despite their excellent work performance; expediently sanctioning Plaintiffs for possessing a candle in the immediate aftermath of reporting a Title IX violation; and

spreading a false narrative about Plaintiffs and telling Plaintiffs' peers to stay away from Plaintiffs.

419.    The LSU Defendants' retaliation constitutes a *per se* violation of Title IX and left Plaintiffs vulnerable to further sex discrimination such that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

420.    Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that LSU and the Board of Supervisors had knowledge of the pervasive harassment and retaliation suffered by Plaintiffs from LSU Responsible Employees following good-faith Title IX violation disclosures.

421.    As a direct and proximate result of the LSU Defendants' Title IX retaliation, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering.

422.    Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to ensure individuals who report sex-based discrimination are provided with due process, take substantial steps to properly investigate reports of sex-based discrimination at LSU, provide appropriate interim measures and reasonable accommodations to complainants, impose appropriate discipline and remedial measures in situations where a violation of the Title IX Policy is found to have occurred, cease all retaliatory action against students who report sex-based discrimination, and impose appropriate discipline and remedial measures where retaliation is found to have occurred, as damages alone are not an adequate remedy for the LSU Defendants'

ongoing retaliation in violation of Title IX.

**COUNT VI**
**First Amendment Retaliation**
**42 U.S.C. § 1983, the First Amendment**
**(All Defendants)**

423.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

424.    All Plaintiffs, individually and on behalf of Class Members, allege violations of 42 U.S.C. § 1983 against all defendants due to retaliation in response to protected speech. LSU Defendants and Individual Defendants in their personal capacities are state actors and at all relevant times were acting under color of law. At all relevant times, TAF and "O" The Rosy Finch Boyz, LLC are willful participants acting jointly with the other defendants in a conspiracy, the object of which was understood by all to be the deprivation of Plaintiffs' constitutional rights.

425.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. Pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public universities. U.S. Const., amend. XIV.

426.    At all relevant times, Plaintiffs had a clearly established right to freedom of speech pursuant to the First Amendment, of which a reasonable public official would have known. Plaintiffs engaged in constitutionally protected speech when they disclosed instances of sexual misconduct to the Individual Defendants and other LSU employees and when they publicly criticized LSU's handling of their complaints as violating the requirements of Title IX. Allegations of sexual misconduct associated with public entities, such as LSU, are a matter of public concern deserving of First Amendment protection. The normal operations of LSU were in no way disrupted by Plaintiffs' disclosures of sexual misconduct in a manner that can be attributed to Plaintiffs.

427.    Actions evidencing attempts to regulate the content of Plaintiffs' speech by chilling an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints include, but are not limited to failing to seriously investigate and/or appropriately report allegations of sexual abuse and/or misconduct; dismissing, laughing at, and/or shaming Plaintiffs when confiding in Defendants about their experiences of sexual misconduct; telling Plaintiffs' teammates to avoid them after they reported sexual misconduct; telling students they made the right choice in not reporting; and funding insufficient training on reporting rights of students.

428.    The LSU Defendants' retaliation against Plaintiffs' speech serves no compelling state interest.  The adverse actions of the Defendants were substantially motivated by Plaintiffs' constitutionally protected speech because Defendants did not want to address and properly respond to Plaintiffs' disclosures of abuse as it would have negatively impacted the reputation of both the LSU football program and the school as a whole. Defendants' retaliatory actions of silencing and ignoring Plaintiffs' reports of abuse constitute a violation of the First Amendment of the United States Constitution.

429.    Until the release of the Report in March 2021, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that all Defendants intentionally reacted to disclosures of Title IX violations in a manner designed to deter any future disclosures.

430.    As a direct and proximate result of Defendants' retaliatory actions of silencing and ignoring Plaintiffs' reports of abuse and concerns about LSU's Title IX process, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational opportunities and benefits, loss

of educational opportunities and benefits including scholarship opportunities, loss of income, and other economic or non-economic damages, for which they are entitled to just compensation.

431.    Plaintiffs are entitled to monetary compensation for violations of Constitutional Rights against the Individual Defendants in their personal capacities, TAF, and "O" The Rosy Finch Boyz, LLC.

432.    Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants take substantial steps to develop a systemic response to disclosures of sex-based discrimination at LSU that does not include retaliatory action in violation of students' Constitutional Rights. Plaintiffs are also entitled to a permanent injunction requiring the LSU Defendants to cease all retaliatory action against students who report sex-based discrimination and impose appropriate discipline and remedial measures where retaliation is found to have occurred, as damages alone are not an adequate remedy for the LSU Defendants' ongoing retaliation in violation of the First Amendment and Title IX.

**COUNT VII**
**Denial of Equal Protection**
**42 U.S.C. § 1983, the Fourteenth Amendment**
**(All Defendants)**

433.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

434.    All Plaintiffs, individually and on behalf of Class Members, allege violations of 42 U.S.C. § 1983 against all Defendants due to discrimination on the basis of sex that denied Plaintiffs equal protection under the law in violation of the Equal Protection Clause of the Fourteenth Amendment. LSU Defendants and Individual Defendants in their personal capacities are state actors and at all relevant times were acting under color of law. At all relevant times, TAF and "O" The Rosy Finch Boyz, LLC are willful participants acting jointly with the other defendants in a

conspiracy, the object of which was understood by all to be the deprivation of Plaintiffs' constitutional rights.

435.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny. Defendants' discrimination against Plaintiffs on the basis of sex was not substantially or rationally related to any legitimate government interest.

436.    Defendants discriminated against Plaintiffs on the basis of sex by subjecting them to a hostile environment and failing to appropriately respond to and investigate reports of sexual misconduct and other violations detailed previously in this Complaint. Defendants' discrimination against Plaintiffs on the basis of sex endangered the safety, privacy, security, and well-being of Plaintiffs. Defendants' actions and inactions deprived Plaintiffs of their right to equal dignity, liberty, and autonomy by treating them as second-class citizens at LSU.

437.    Until the release of the Report in March 2021, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that all Defendants intentionally treated female presenting and LGBTQ+ identifying students, like Plaintiffs, differently than similarly situated non-LGBTQ+ male presenting students for the purposes of maintaining the school's popular reputation and soliciting donor funds.

438.    As a direct and proximate result of Defendants' denial of equal protection, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational opportunities and

benefits, loss of educational opportunities and benefits including scholarship opportunities, loss of income, and other economic or non-economic damages.

439.    Plaintiffs are entitled to monetary compensation for past violations of constitutional rights from the Individual Defendants in their personal capacities, TAF, and "O" The Rosy Finch Boyz, LLC.

440.    Plaintiffs seek injunctive relief for the continuing violations of Constitutional Rights against the LSU Defendants. Plaintiffs are entitled to a permanent injunction requiring the LSU Defendants to create a systematic response to disclosures of sex-based discrimination that protects students' Constitutional Rights, to take substantial steps to properly investigate reports of sex-based discrimination at LSU, provide appropriate interim measures and reasonable accommodations to complainants, and impose appropriate discipline and remedial measures in situations where sex-based discrimination is found to have occurred, as damages alone are not an adequate remedy for the LSU Defendants' ongoing violations of Plaintiffs' right to equal protection under the law.

## COUNT VIII
### Denial of Procedural Due Process
### 42 U.S.C. § 1983, the Fourteenth Amendment
### (All Defendants)

441.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

442.    All Plaintiffs, individually and on behalf of Class Members, allege violations of 42 U.S.C. § 1983 against all Defendants due to deprivation of their property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment. LSU Defendants and Individual Defendants in their personal capacities are state actors and at all relevant times were acting under color of law. At all

relevant times, TAF and "O" The Rosy Finch Boyz, LLC are willful participants acting jointly with the other defendants in a conspiracy, the object of which was understood by all to be the deprivation of Plaintiffs' constitutional rights.

443.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Under the Due Process Clause of the Fourteenth Amendment, deprivation of Plaintiffs' liberty and property interests arising out of the Code of Student Conduct, LSU's Title IX Policy, and federal law and guidance cannot occur without notice and a meaningful opportunity to be heard.

444.    Defendants created a practice and/or custom of deliberate indifference and cultivated a culture of silence by failing to report complaints of sex discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures, all in direct violation of the liberty and property interests of Plaintiffs.

445.    Throughout this deprivation, Defendants continuously failed to provide Plaintiffs with adequate notice of the actions to be taken with regard to the sex-based discrimination they had suffered, as well as meaningful opportunities to be heard. Defendants' history of pervasive deprivation of these rights gives rise to a need for a heightened process to substantially reduce the risk of erroneous deprivation.

446.    For example, certain Plaintiffs had no opportunity to be heard before being fraudulently told not to disclose the sexual misconduct. This deprived Plaintiffs of their liberty and property interests in accessing educational opportunities and benefits. Other Plaintiffs provided substantial evidence including the identities of several witnesses who were not contacted or

interviewed in their Title IX investigations. This deprived Plaintiffs of a meaningful opportunity to be heard and deprived Plaintiffs of their liberty and property interests in access to educational benefits.

447.    In particular, LSU's issuance of a mutual no-contact directive against Plaintiff Andries violated her right to due process, as she had not been found in violation of any LSU policies and should not have been subject to disciplinary measures simply for reporting a sexual assault. Plaintiff Andries should have been given the opportunity to go through due process prior to limitations on her liberty being imposed upon her.

448.    Until the publication of the Report in March 2021 and the following Louisiana Senate Committee Hearing, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that all Defendants intentionally denied Plaintiffs of their rights to Title IX investigations of reported violations by LSU and individual defendants as outlined in LSU's own policies and federal regulations.

449.    As a direct and proximate result of Defendants' deprivation of Plaintiffs' procedural due process rights, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income and other economic and non-economic damages.

450.    Plaintiffs are entitled to monetary compensation for past violations of constitutional rights from the Individual Defendants in their personal capacities, TAF, and "O" The Rosy Finch Boyz, LLC. Plaintiffs seek injunctive relief for the continuing violations of constitutional rights against the LSU Defendants. Plaintiffs are entitled to a permanent injunction requiring the LSU

Defendants to take substantial steps to create a systematic response to disclosures of sex-based discrimination that protects students' Constitutional Rights, to take substantial steps to properly investigate reports of sex discrimination at LSU, to provide appropriate interim measures and reasonable accommodations to complainants, and to impose appropriate discipline and remedial measures in situations where sex-based discrimination is found to have occurred, as damages alone are not an adequate remedy for the LSU Defendants' ongoing denial of due process.

**COUNT IX**
**Conspiracy to Interfere with Civil Rights**
**42 U.S.C. § 1985, 1986**
**(All Defendants)**

451.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

452.     Plaintiffs, individually and on behalf of Class Members, allege violations of 42 U.S.C. § 1985 and 1986 against all Defendants.  The Defendants' pattern, practice, and custom as alleged in this Complaint constitute a conspiracy to permit state actors to deprive Plaintiffs of Constitutional Rights to Free Speech, Due Process, and Equal Protection. The defendants had knowledge that the wrongs conspired were to be committed and, having the power to prevent or aid in preventing commission of the same, neglected or refused to do so.

453.     Until the publication of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, Plaintiffs' that all Defendants participated in the conspiracy to intentionally deprive Plaintiffs of Constitutional Rights.

454.     As a direct and proximate result of the LSU Defendants' conspiracy to deprive Plaintiffs of their Constitutional Rights, Plaintiffs have suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental

distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial

of access to educational benefit, loss of educational benefit including scholarship opportunities,

loss of income and other economic or non-economic damages.

455.    Plaintiffs are entitled to monetary compensation for past violations of constitutional

rights from the Individual Defendants in their personal capacities, TAF, and "O" The Rosy Finch

Boyz, LLC. Plaintiffs seek injunctive relief for the continuing violations of their Constitutional

Rights against the LSU Defendants.

456.    Plaintiffs are entitled to a permanent injunction requiring the LSU Defendants take

substantial steps to create a systematic response to disclosures of sex-based discrimination that

protects students' Constitutional Rights. Plaintiffs are also entitled to a permanent injunction

requiring the LSU Defendants to discipline employees and students who are known to discriminate

on the basis of sex, as damages alone are not an adequate remedy for the Defendants' ongoing sex-

based discrimination.

**COUNT X**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. § 794**
**(LSU and the Board of Supervisors)**

457.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if

fully plead herein.

458.    Plaintiff Hovis, individually and on behalf of Class Members, alleges violations of

29 U.S.C. § 794 against LSU and the Board of Supervisors.

459.    Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, provides

that:

> No otherwise qualified individual with a disability in the United States, as defined
> in section 705(20) of this title, shall, solely by reason of her or his disability, be
> excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance…

460.      Section 504 defines a "program or activity" to include all operations of a college, university, or other postsecondary institution, or a public system of higher education.  29 U.S.C. § 794(b)(2)(A).

461.      The Rehabilitation Act defines an "individual with a disability" as an individual with a physical or mental impairment that substantially limits one or more major life activities of such individual.   29 U.S.C. § 705(20)(C), citing to 42 U.S.C. § 12102(1)(A).

462.      "Major life activities" are defined as follows:

(A) In general
For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions
For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.  42 U.S.C. § 12102(2).

463.      LSU is a program or activity subject to the requirements of Section 504.

464.      Plaintiff Hovis is a person with a disability as defined in the Rehabilitation Act because she is diagnosed with PTSD, generalized anxiety disorder, depression, and panic disorder (collectively referred to hereinafter as "Hovis's Disability").

465.      Hovis's Disability impacts Plaintiff Hovis's major life activities and major bodily functions by impairing her ability to learn, read, concentrate, think, communicate, and work, as well as impairing her nervous system.   In January 2021, Hovis was otherwise qualified to participate in the educational programs and activities at LSU.

466.     In refusing to extend Plaintiff Hovis's accommodations when she made the request to Disability Services in January 2021, and in failing to assess whether additional or new accommodations should be provided to her after she notified Disability Services that she was a person with a disability needing accommodations, LSU excluded Hovis from participation in, denied her the benefits of, and subjected her to discrimination in her educational programs and activities at LSU with deliberate indifference.

467.     As a direct and proximate result of Defendants' violation of Section 504 of the Rehabilitation Act, Plaintiff Hovis has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income and other economic or non-economic damages.

**COUNT XI**
**Violation of the Americans with Disabilities Act**
**42 U.S.C. § 12101 *et seq*.**
**(LSU and the Board of Supervisors)**

468.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

469.     Plaintiff Hovis, individually and on behalf of Class Members, alleges violations of 42 U.S.C. § 12101 *et seq*. against LSU and the Board of Supervisors.

470.     Title II of the Americans with Disabilities Act ("ADA") provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

471.     Title II of the ADA defines a "public entity" to include: "any department, agency, special purpose district, or other instrumentality of a State or States or local government."   42 U.S.C. § 12131(1)(B).

472.     The ADA defines a "qualified individual with a disability" as an individual with a physical or mental impairment that substantially limits one or more major life activities of such individual.   42 U.S.C. § 12102(1)(A).

473.     "Major life activities" are defined as follows:

(C) In general
For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(D) Major bodily functions
For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.   42 U.S.C. § 12102(2).

474.     LSU is a public entity subject to the requirements of Title II of the ADA.

475.     Plaintiff Hovis is a person with a disability as defined in the Rehabilitation Act because she is diagnosed with PTSD, generalized anxiety disorder, depression, and panic disorder (collectively referred to hereinafter as "Hovis's Disability").

476.     Hovis's Disability impacts Plaintiff Hovis's major life activities and major bodily functions by impairing her ability to learn, read, concentrate, think, communicate, and work, as well as impairing her nervous system.

477.     In refusing to extend Plaintiff Hovis's accommodations when she made the request to Disability Services, and in failing to assess whether additional or new accommodations should be provided to her after she notified Disability Services that she was a person with a disability

needing accommodations, LSU excluded Hovis from participation in, denied her the benefits of, and subjected her to discrimination in her educational programs and activities at LSU with deliberate indifference.

478.    As a direct and proximate result of Defendants' violation of the Americans with Disabilities Act, Plaintiff Hovis has suffered and will continue to suffer medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income and other economic or non-economic damages.

## COUNT XII
### Negligence
### Louisiana Civil Code Article 2315
### (All Defendants)

479.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

480.    Plaintiffs, individually and on behalf of Class Members, allege negligence by all Defendants in their response to reports of sexual misconduct and in perpetuating a conspiracy which negatively affected Plaintiffs.

481.    At all relevant times, the LSU Defendants and the Individual Defendants in their personal capacities owed Plaintiffs a duty of reasonable care to ensure their safety and freedom from sex-based assault, harassment, and abuse while students at LSU by, among other things, conducting investigations into their claims of sex-based assault, sexual misconduct, and abuse and enforcing the Title IX Policy.

482.    At all relevant times, TAF undertook a duty of reasonable care to all students to ensure that LSU has a safe and equitable campus environment which allows student athletes to

succeed.

483.    Defendants breached the duty of reasonable care by failing to take appropriate action in several circumstances, including but not limited to the following:

a.  Failing to take reasonable protective measures to prevent recurrence or remedy effects of sexual misconduct after Plaintiffs' disclosures;

b.  Failing to report Plaintiffs' disclosures of sexual misconduct to LSU's Title IX Office;

c.  Failing to properly investigate the Plaintiffs' reports of sexual misconduct;

d.  Failing to properly discipline the perpetrators identified by Plaintiffs;

e.  Failing to follow LSU policies in reviewing, investigating, and resolving complaints of sexual misconduct pursuant to Title IX;

f.  Failing to keep accurate records of Plaintiffs' reports of sexual misconduct;

g.  Failing to respond to substantiated reports of sexual misconduct against high-ranking LSU employees;

h.  Failing to ensure LSU implemented its Title IX Policy and Code of Student Conduct;

i.  Failing to ensure LSU treated all similarly situated students equally;

j.  Failing to encourage students to report instances of sexual misconduct;

k.  Failing to follow through with imposed discipline following Title IX investigations;

l.  Failing to provide reasonable accommodations to students with disabilities;

m.  Failing to provide reasonable accommodations to students following a disclosure of sexual misconduct;

n.  Failing to interview witnesses to sexual misconduct indicated by Plaintiffs;

o.   Failing to inform students of their Title IX rights;

p.   Failing to provide Plaintiffs with information about their reports;

q.   Failing to discipline employees in violation of LSU's Title IX Policy;

r.   Interfering in the enforcement of Title IX by hiring and paying for a separate Title IX training and audit for the Athletics Department; and

s.   Creating an environment where all students are discriminated against on the basis of sex.

484.    But for the negligent acts and omissions of Defendants, Plaintiffs would not have been injured.

485.    Until the publication of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, the extent of Defendants' negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights.

486.    All Defendants knew or reasonably should have known of the assaults perpetrated on Plaintiffs, which were reported to agents of the University on various occasions, and because of the prevalence of sexual misconduct at LSU and other universities and/or institutions of higher learning. With this knowledge, it was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to students, including Plaintiffs, students would be vulnerable to sexual assault, an injury in itself.

487.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational

benefit, and other economic and non-economic damages, for which they are entitled to just compensation.

488.     Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from all Defendants, as damages alone are not an adequate remedy for the Defendants' ongoing negligence. Defendants LSU and the LSU Board of Supervisors are also vicariously liable for the damages caused by the Individual Defendants, as they were all employees of LSU.

## COUNT XIII
### Negligent Supervision
### Louisiana Civil Code Article 2315, 2030
### (All Defendants)

489.     Plaintiffs adopt and incorporate by reference previously plead paragraphs as if fully plead herein.

490.     Plaintiffs, individually and on behalf of Class Members, allege negligent supervision by all Defendants in their training and response to reports of sexual misconduct.

491.     Defendants had a duty to properly supervise, train, and monitor their employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies, but they failed to do so and therefore breached the duties of care owed to Plaintiffs as alleged herein.

492.     Defendant LSU Board of Supervisors had a duty to supervise, train, and monitor the actions of Defendants LSU and Alexander. Defendant Alexander had a duty to supervise Defendant Monaco.  Defendants LSU, Alexander, and Monaco had a duty to supervise, train, and monitor the Title IX Coordinator. Defendants Monaco, Marchand, Fruentes-Martin, and Stewart had a duty to supervise, train, and monitor all LSU personnel and the Title IX Office staff. Defendant Sanders had a duty to supervise, train, and monitor the SAA office staff, including Defendant Blanchard.  Defendant Alleva had a duty to supervise, train, and monitor the Athletic

Department, including Defendants Orgeron Defendants, Ausberry, Segar, Lewis, Soil-Cormier, Julia Sell, and Michael Sell, as well as student-athletes. By interfering in Defendant Alleva's management of the Athletics Department programming, TAF undertook a duty to supervise, train, and monitor the Athletic Department, including Orgeron Defendants, Defendant Ausberry, Defendant Segar, Defendant Lewis, Defendant Soil-Cormier, Defendant Julia Sell, and Defendant Michael Sell, as well as student-athletes. All Defendants had a duty to supervise, train, and monitor students, including but not limited to the Plaintiffs and their assailants. Each of these duties to supervise, train, and monitor included the duty to ensure that the Title IX Policy was followed to prevent, properly respond to, and remedy incidents of sex-based discrimination on LSU's campus.

493.    Defendants' failure to timely report and investigate the physical violence and sexual misconduct perpetrated against Plaintiffs, or to monitor the Title IX investigation and response process at LSU, is a breach of Defendants' duty to supervise.

494.    Until the publication of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, the extent of Defendants' negligent acts and the contribution of the same to the conspiracy to intentionally deprive Plaintiffs of their rights.

495.    As a direct and proximate cause of Defendants' conduct, actions, and/or inactions, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income and other economic and non-economic damages, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter, for which they

are entitled to just compensation.

496.        Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from all Defendants. Defendants LSU and the LSU Board of Supervisors are also vicariously liable for the damages caused by the Individual Defendants, as they were all employees of LSU.

**COUNT XIV**
**Negligent Infliction of Emotional Distress**
**Louisiana Civil Code Article 2315, 2030**
**(All Defendants)**

497.        Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

498.        Plaintiffs, individually and on behalf of Class Members, allege negligent infliction of emotional distress by all Defendants in their response to reports of sexual misconduct and lack of prevention of sex-based discrimination.

499.        Defendants' actions and inactions as described in this Complaint, including Defendants' failure to respond appropriately to reports of sex discrimination, Defendants' interference in and hinderance of a proper Title IX system at LSU, Defendants' failure to conduct appropriate Title IX investigations, failure to provide Plaintiffs with appropriate interim measures and accommodations, retaliation against the Plaintiffs, failure to properly discipline the perpetrators, and failure to ensure that LSU and LSU's Athletic Department in particular were free of sex-based discrimination constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs were injured.

500.        The events described above would naturally and probably result in emotional distress. Defendants' negligent actions and inactions did cause severe emotional distress to Plaintiffs in addition to the physical injuries experienced by Plaintiffs.

501.        Until the publication of the Report in March 2021 and the Louisiana Senate

Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, the extent of Defendants' deviation from the duty of care as outlined in the Title IX Policy, which is specifically meant to avoid the type of emotional distress caused by Defendants' conduct.

502.    The emotional distress suffered by Plaintiffs physically manifested itself in symptoms including, but not limited to, headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, depression, anxiety, post-traumatic stress disorder, obsessive compulsive disorder, eating disorders, substance dependency, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter. Defendants' conduct is a direct and proximate cause of the emotional distress suffered by Plaintiffs.

503.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from all Defendants. Defendants LSU and the LSU Board of Supervisors are also vicariously liable for the damages caused by the Individual Defendants, as they were all employees of LSU.

## COUNT XV
### Intentional Infliction of Emotional Distress
### Louisiana Civil Code Article 2315, 2030
### (All Defendants)

504.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

505.    Plaintiffs, individually and on behalf of Class Members, allege intentional infliction of emotional distress by all Defendants in their response to reports of sexual misconduct.

506.    By dismissing Plaintiffs' allegations of sexual misconduct, failing to properly investigate such claims or protect Plaintiffs from their assailants, justifying the behavior of the assailants, failing to properly discipline the assailants, openly mocking and spreading rumors about Plaintiffs, isolating and alienating Plaintiffs, and improperly disciplining and retaliating against Plaintiffs, the LSU Defendants engaged in extreme and outrageous conduct. By hiring Title IX

training programmers that TAF knew would keep female student-athletes confused and uneducated on their Title IX rights and would not properly discourage hostile sexual behavior of male student athletes and faculty members, but would appear compliant with Title IX directives, TAF engaged in extreme and outrageous conduct. All Defendants specifically intended for their conduct to cause Plaintiffs to suffer emotional distress so severe that it would silence any additional disclosures.

507.    Until the publication of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, Defendants' intentional pattern extreme and outrageous conduct designed to silence survivors of sexual assault to protect the school's money.

508.    As a result of the LSU Defendants' extreme and outrageous conduct, Plaintiffs suffered severe emotional distress including, but not limited to, headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, depression, anxiety, post-traumatic stress disorder, obsessive compulsive disorder, eating disorders, substance dependency, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter. Defendants are aware of such emotional distress suffered by Plaintiffs.

509.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from the Defendants. Defendants LSU and the LSU Board of Supervisors are also vicariously liable for the damages from the Individual Defendants, as they were all employees of LSU.

**COUNT XVI**
**Bad Faith Breach of Contract**

**Louisiana Civil Code Article 1997**
**(LSU, Board of Supervisors, Defendant Alexander, Defendant Monaco, Orgeron**
**Defendants, Defendant Marchand, Defendant Stewart, Defendant Sanders, Defendant**
**Blanchard and Defendant Fuentes-Martin)**

510.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

511.     Plaintiffs, individually and on behalf of Class Members, allege bad faith breach of contract against Defendant LSU, Defendant Board of Supervisors, Defendant Alexander in his official capacity, Defendant Marchand in his official capacity, Orgeron Defendants in their official capacity, Defendant Stewart in her official capacity, Defendant Sanders in his official capacity, Defendant Monaco in his official capacity, Defendant Fuentes-Martin in her official capacity, and Defendant Blanchard in her official capacity.

512.     A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. LA. CIV. CODE art. 1906. Defendant LSU's Code of Student Conduct, Sexual Harassment Policy, Title IX Policy, Equal Opportunity Policy, and other governing documents outline clear contractual obligations to all students at LSU, including Plaintiffs.

513.     The Code of Student Conduct provides, "All students are bound by this Code, the Bylaws and Regulations of the Board of Supervisors, University Policy Statements and Permanent Memoranda."

514.     The Title IX Policy provides that "Sexual Misconduct violates an individual's fundamental rights and personal dignity and will not be tolerated. LSU prohibits and is committed to an environment free from discrimination on the basis of sex and Sexual Misconduct."

515.     The Title IX Policy provides that "LSU will take prompt action to prevent prohibited conduct, discipline those who violate this policy, prevent recurrence of prohibited behavior, and effect equitable remedies."

516.     The Code of Student Conduct defines "Sexual Misconduct" as "any sexual act or contact of a sexual nature that occurs … without the full consent of another." "Sexual Misconduct" includes sexual assault, non-consensual sexual intercourse, video voyeurism, the disclosure of intimate photos without express consent of those depicted, and dating/domestic violence.

517.     The Sexual Harassment Policy states, "The intent of this policy is to express the University's commitment and responsibility to protect its employees and students from sexual harassment and from retaliation for participating in a sexual harassment complaint."

518.     The Sexual Harassment Policy defines sexual harassment as:

...speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged, which would be so offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom…

Sexual harassment is also defined as unwelcome verbal or physical conduct of a sexual nature or gender-based conduct in which the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. Examples include unwelcome touching; persistent, unwanted sexual/romantic attention or display of sexually oriented materials; deliberate, repeated gender based humiliation or intimidation, and similar sexually oriented behavior of an intimidating or demeaning nature.

519.     The Equal Opportunity Policy provides, "All complaints of discrimination and/or harassment will be addressed. Substantiated cases shall result in appropriate discipline or other corrective action. The severity of the disciplinary action shall be consistent with the seriousness of the act of discrimination and/or harassment."

520.     The Equal Opportunity Policy states: "The President, Vice Presidents, Deans, Directors, Department Heads, and all other supervisory employees are responsible for assisting the University in the implementation of this policy."

521.     The Equal Opportunity Policy states:

The purpose of this policy statement is to assert Louisiana State University's (LSU) commitment to provide equal opportunity for all qualified persons in admission to, participation in, or employment in the programs and activities which the University operates without regard to race, creed, color, marital status, sexual orientation, gender identity, gender expression, religion, sex, national origin, age, mental or physical disability, or veteran's status, as well as to implement a procedure to address complaints for those who believe they have been subjected to discrimination and/or harassment in violation of this policy.

522.    Defendants promulgated rules, regulations, and policies with which it requires all students and employees to comply, which constitute a binding agreement. Defendants Alexander, Monaco, Orgeron Defendants, Marchand, Stewart, Sanders, Fuentes-Martin, and Blanchard are responsible for upholding LSU's obligations under these agreements, which are offered and accepted upon student admission. All parties have contractual capacity.

523.    The causes and objects of these obligations include obtaining an education, and the privileges of attending the institution of Louisiana State University, Plaintiffs paying tuition, fees, and costs, as well as state taxes. Defendants accepted Plaintiffs' consideration and obtained the benefit of the Defendant's bargain, and Plaintiffs performed.

524.    Defendants breached their contractual obligations to Plaintiffs pursuant to the Code of Student Conduct, the Title IX Policy, and other governing documents by failing to provide Plaintiffs with an education free from sex-based discrimination and acts of sexual misconduct. Defendants' failure to provide Plaintiffs with their contractually owed benefit of an education free of sexual misconduct is a material failure to perform that included nonperformance, defective performance, and delay in performance. Defendants' material failure to perform (breach) resulted in economic and emotional damages to the Plaintiffs.

525.    Defendants' failure to perform was in bad faith as alleged herein, and thus Plaintiffs are entitled to all damages regardless of foreseeability. LA. CIV. CODE art. 1997. These damages include damages for nonpecuniary loss as the nature of these specific obligations is intended to

gratify a nonpecuniary interest.  Because of the circumstances surrounding the formation and the nonperformance of the obligations, Defendants knew, or should have known, that their failure to perform would cause substantial nonpecuniary loss to Plaintiffs. Additionally, Defendants intended to cause nonpecuniary damages, as alleged herein; thus, these damages may be recovered. LA. CIV. CODE art. 1998. These intentions were concealed from Plaintiffs until the publication of the Report in March 2021.

526.    Any clauses in these policies that would purport to limit Defendants' liability are null as a result of Defendants' gross fault and Plaintiffs' physical injuries. LA. CIV. CODE art. 2004.

527.    As a direct and proximate result of Defendants' failure to perform, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational opportunities and benefits, and other economic or non-economic damages.

528.    Plaintiffs are entitled to monetary compensation for pecuniary and nonpecuniary damages and injunctive relief requiring specific performance from Defendants. *See* LA. CIV. CODE art. 1986.

**COUNT XVII**
**Civil Conspiracy**
**Louisiana Civil Code Article 2324**
**(All Defendants)**

529.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

530.    Plaintiffs, individually and on behalf of Class Members, allege a conspiracy between all Defendants to systematically and fraudulently silence Plaintiffs and deprive them of their Constitutional and federal rights to protect the reputation and income of LSU athletics. The

underlying acts of this conspiracy include the wrongful acts alleged herein, including but not limited to intentional and other torts set forth herein, namely implementing a deficient and secretive Title IX program and reporting scheme using TAF funds that was designed to insulate the Athletic Department in order to protect the income from student-athletics that goes to LSU, TAF, and Orgeron Defendants and otherwise stymie LSU's entire Title IX Policy in order to ensure a profitable and successful student athletics program that was able to continue competing unabridged in interstate collegiate sports by protecting certain athletes from viable Title IX claims and by stifling LSU's Title IX policies as a whole.

531.    The LSU football program generates extraordinary revenue for LSU and TAF both benefit directly and indirectly from ticket and merchandise sales; TV, radio, and internet contracts; advertising; attracting students who want to attend a school with a strong football culture; and attracting donors. Upon information and belief, the football team generated nearly $92 million during the 2018-2019 season, more than half of LSU Athletics' total revenue of $157 million during the same period. Much of this success was due to players like John Coe and John Doe and coaches including Orgeron Defendants who helped the football team achieve great success which led to more financial gain for LSU, TAF, and Orgeron Defendants.

532.    Until the publication of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that all Defendants participated in the conspiracy to intentionally deprive Plaintiffs of constitutional rights and basic care under Louisiana tort law.

533.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical

assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages, for which they are entitled to just compensation.

534.     Plaintiffs are entitled to monetary compensation for past damages from all Defendants *in solido*.

**COUNT XVIII**
**Violations of the Racketeer Influenced and**
**Corrupt Organizations Act, 18 U.S.C. § 1962(c)**
**(TAF, "O" The Rosy Finch Boyz, LLC, and Individually Named Defendants)**

535.     Plaintiffs incorporate by reference the previously plead paragraphs as if fully plead herein.

536.     This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part: "(c) it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

537.     This count is against TAF, "O" The Rosy Finch Boyz, LLC ("O Rosy Finch Boyz"), and all Individually Named Defendants who at all relevant times were deemed a "person" within the meaning of 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property."

538.     However, the activities of all Defendants, including TAF, O Rosy Finch Boyz, and the Individually Named Defendants, created an enterprise that is used as a tool to carry out the scheme and pattern of racketeering activity. The enterprise is engaged in and conducts activities that affect interstate commerce. All Defendants are associated with the enterprise as they do business collectively.

539.     All Defendants, including TAF, O Rosy Finch Boyz, and the Individually Named Defendants, are a group of "persons" associated together in fact for the common purpose of

carrying out an ongoing criminal enterprise. These Defendants form this association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. Each of the Defendants participated in the operation of or management of the enterprise. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may be other members of the enterprise who are unknown at this time, but which will be revealed during discovery.

540.    All Defendants, including TAF, O Rosy Finch Boyz, and the Individually Named Defendants, agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding the Plaintiffs and Class Members.

541.    Specifically, the Defendants conspired and defrauded the Plaintiffs and Class Members by representing and contracting with Plaintiffs to provide an educational and/or work environment in line with federal regulatory guidelines, including one free from harassment and in compliance with the Constitution and federal law, but intentionally and uniformly refusing to do so by knowingly, recklessly, or culpably engaging in the scheme to deter or cover up sexual misconduct complaints at LSU causing physical harm, mental anguish, humiliation, embarrassment, as well as financial loss and destruction of property to the Plaintiffs.

542.    Upon information and belief, pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of wire and mail fraud, including but not limited to solicitation of donations from national and international sources through TAF, who then utilized the funds to pay LSU employees and implement a sexual misconduct reporting scheme

designed to keep complaints within the Athletic Department and away from LSU's Title IX Office. By subsidizing the salaries of LSU employees, including the Orgeron Defendants, TAF exerts control over LSU athletics and protects the male student-athletes who generate large sums of money for TAF and LSU.

543.    The nature of the enterprise's goal is exemplified in the terms of Orgeron's contract, which funnels millions of dollars through the private company O Rosy Finch Boys. That contract provides for incentive-based compensation wherein the Orgeron Defendants would receive greater compensation for more victories, for more post-season games, and for any awards that Orgeron received as coach.[37] To maximize this incentive-based compensation, it was imperative to protect the male athletes that helped achieve these victories, post-season games, and ultimate coaching recognition, and to downplay any reports of sexual misconduct which might jeopardize the athlete's ability to play for LSU.

544.    Upon information and belief, LSU's President, Athletic Director, and Title IX Coordinators knowingly made false certifications to the NCAA that the Athletic Department was in compliance with NCAA mandates regarding student-athlete sexual misconduct education to protect certain male athletes and to continue competing in interstate collegiate sporting events at a competitive level that they otherwise would be unable to maintain. These false certifications had the effect of harming all Plaintiffs and Class Members, not just those experiencing sexual violence or harassment from student-athletes.

545.     Defendants' routine and systematic use of national and international funds to implement a reporting scheme designed to protect male student-athletes constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

---

[37] *See* Exhibit B at 8-11.

131

546.     The racketeering activity, through the use of the interstate mails and wires, was made possible by Defendants' regular and repeated use of the services of the enterprise. Defendants had the specific intent to engage in the substantive Racketeer Influenced and Corrupt Organizations Act ("RICO") violations alleged herein.

547.     Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

548.     The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous in that they sent funds to a company outside of Louisiana and handpicked by TAF to perform an "audit" of LSU's Title IX program. Using a company selected and paid by TAF allowed the Defendants to systematically refuse to acknowledge student complaints of sexual assault or otherwise implement a Title IX complaint system of reporting. There was repeated and continuing conduct during the past eight years for all named Defendants, and there is a continued threat of repetition of such conduct. Specifically, the Defendants committed the following acts of wire and mail fraud:

a.     Around 2016, TAF engaged the Dan Beebe Group "to conduct an independent assessment of human relations risks, including misconduct prevention policies and programs applicable" to both the Louisiana State University's Athletics Department and Louisiana State University;[38]

b.     The Dan Beebe Group drafted a non-final 77-page report that was submitted to

---

[38] Report at 37.

LSU's General Counsel, Tom Skinner, on March 29, 2016;[39]

c.      Upon information and belief, at least nine members of LSU's football program were accused of sexual misconduct and/or relationship violence between 2016 – 2019;

d.      Even though LSU's Athletics Department exhibited an extensive history of sexual misconduct claims, TAF and LSU's General Counsel intentionally decided not to request a final, completed version of the Dan Beebe Group's report which would have detailed what "misconduct and prevention policies" would have prevented the activity which forms the basis of this lawsuit;[40]

e.      From 2016 – 2019, the majority of LSU Athletics' sexual misconduct prevention training was provided by PFA Consulting, a group also owned by Dan Beebe;

f.      Upon information and belief, LSU Athletics paid for the PFA Consulting fees through funds generated by the national fundraising efforts of TAF;

g.      Upon information and belief, TAF solicits donations from donors nationally and internationally;

h.      The PFA Consulting courses provided to LSU's athletes were knowingly and purposefully inadequate in addressing the mandated Title IX education requirements, were intentionally not coordinated with the Title IX Coordinator, did not properly educate student athletes on LSU's Title IX resources and contact person, and did not maintain adequate records;

i.      Defendants were aware that the Athletic Department's sexual misconduct training was wholly inadequate, as was expressed between Defendants;

---

[39] *Id*.
[40] *Id*.

j.      LSU's Athletic Department created a system to keep any sexual misconduct complaints within the Athletic Department and away from the Title IX Office;

k.      In at least one PFA Consulting educational presentation to coaches and staff, the three "reporting options" did not include anyone within the Title IX Office and only included the "supervisor or manager; supervisor's supervisor or manager[;]" "any member of Athletics Department administration[;]" and "Athletics Department Human Resources / Assistant AD."[41]

l.      In a student presentation from 2017-2018, the PFA training made a distinction between "Athletics reporting options" and "University-wide resources," a clear design to keep student athlete-related sexual misconduct allegations within the Athletic Department itself;

m.     LSU's Athletic Department consistently rebuffed Title IX Coordinator Jennie Stewart's concerns regarding her lack of involvement in the Athletic Department's sexual misconduct education programming to maintain its scheme of containing sexual misconduct complaints within the Athletic Department itself;

n.      Many student athletes stated that they believed that Senior Associate Athletics Director Miriam Segar "has been the primary contact" for Title IX issues within the Athletic Department;[42]

o.      Despite LSU's Title IX Coordinator's insistence that she did not have enough involvement in the Athletic Department's sexual misconduct education, LSU's President, Athletic Director, and Title IX Coordinator made certifications yearly to the NCAA that

---

[41] *Id*. at 30.
[42] *Id*. at 29.

LSU was meeting the mandated requirements regarding Title IX education to student athletes — an act designed to ensure LSU did not jeopardize its standing with the NCAA and the valuable financial gain that student-athletics, particularly in the football program, provided;

p.      TAF directly pays a large portion of the salary of Orgeron Defendants who failed to report the rape of Plaintiffs Richardson and Robertson, and the abuse of Plaintiff Lewis in violation of Title IX and in an effort to protect male football players;

q.      Upon information and belief, TAF also funded payments to the student victims of former head coach, Les Miles's sexual misconduct.

549.    Together, TAF, O Rosy Finch Boyz, and the Individually Named Defendants acted in concert to perpetrate these violations against the Plaintiffs and the putative class through the enterprise.

550.    The Enterprise and its violations were unknown to Plaintiffs and, in fact, were concealed by Defendants, prior to the publication of the Report in March 2021.

551.    As a direct and proximate result of TAF, O Rosy Finch Boyz, and the Individually Named Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and the putative class have been injured in their business and property in that they incurred student loans, paid tuition, lost scholarship monies, lost employment and income, incurred expenses related to medical treatment, and other economic damages.

552.    As a result of the actions of the Enterprise, Plaintiffs and the putative class members are entitled to recover pursuant to 18 U.S.C. § 1964(c) three times the actual damages sustained, attorneys' fees in the trial and appellate courts, and costs of investigation and litigation reasonably incurred.

## COUNT XIX
### Civil Violations of the Louisiana Racketeering Act
### Louisiana Revised Statutes 15:1351 *et seq.*
### (All Defendants)

553.    Plaintiffs incorporate by reference the previously plead paragraphs as if fully plead herein.

554.    This claim arises under the Louisiana Racketeering Act ("LRA") which provides a civil cause of action for conducting and/or participating in an enterprise through a pattern of racketeering. *See* La. Rev. Stat. §§ 15:1351 *et seq.*

555.    The LRA defines "enterprise" to mean "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." La. Rev. Stat. § 15:1352(B). Therefore, the LRA specifically contemplates that enterprises, such as this, may involve governmental entities like LSU.

556.    The enterprise at issue in this case, for purposes of LRA Section 15:1353, is an association-in-fact of all named Defendants — hereinafter, the "Enterprise."

557.    While Defendants participated in the Enterprise and were a part of it, Defendants also have an existence separate and distinct from the Enterprise.

558.    The plain language of the LRA Section 15:1356(E) establishes that one element of civil liability under the LRA is that the defendant must have engaged in "racketeering activity."

559.    Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity alleged herein.

560.    Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

561.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

562.    Defendants and all other members of the Enterprise acted in a coordinated effort and shared in the fruits of its predicate acts. The Enterprise, Defendants, and other members of the Enterprise, had a formal, ongoing relationship that functioned as a continuing unit, pursuing a course of conduct as set forth above (i.e., TAF making payments directly to and on behalf of LSU and its employees and implementing a deficient and secretive Title IX program and reporting scheme using TAF funds all of which was designed to insulate the Athletic Department, protect the income from student-athletics that goes to both LSU and TAF, and otherwise stymie LSU's entire Title IX Policy), with a common or shared purpose (i.e., ensuring a profitable and successful student athletics program that was able to continue competing unabridged in interstate collegiate sports by protecting certain athletes and employees from viable Title IX claims and by stifling LSU's Title IX Policy as a whole) and continuity of structure and personnel.

563.    Defendants and those employed by and/or associated with the Enterprise have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of LRA Sections 15:1353(a), (b), and (c) and have conspired to violate Section 15:1353(c) in violation of Section 15:1353(d) by utilizing donations solicited from international and national donors through TAF to make payments directly to LSU and on behalf of its employees and to implement a deficient sexual misconduct education program and reporting scheme within the Athletics Department that was knowingly unable to meet the standards mandated by the NCAA or Title IX and/or by falsely certifying to the NCAA that the Athletics Department was meeting the mandated standards to continue competing in interstate collegiate sporting events to protect the revenue from student-athletics to LSU, TAF, and Orgeron Defendants.

564.    Defendants have violated La. Rev. Stat. § 15:1353(d), inasmuch as they knowingly, intentionally, and unlawfully, aided and abetted each other and the Enterprise and conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

565.    As set forth herein, the members of the Enterprise knowingly, intentionally, and directly participated in, or aided and abetted, counseled, commanded, induced, procured, or caused and conspired in the pursuit of protecting the income from LSU student-athletes received by both LSU and TAF.

566.    The acts of racketeering were not isolated, and included implementing a knowingly deficient sexual misconduct education program and reporting scheme within the Athletics Department by use of funds derived through TAF from international and national donors by the use of the mails and/or wires for purposes of the execution of their scheme; paying secret settlements, salaries, and bonuses on behalf of Athletic Department employees; and making false certifications to the NCAA. These acts of Defendants were related in that they had the same or similar purpose, result, participants, victims, and method of commission. Further, the acts of racketeering by Defendants have been continuous during the past eight years for all named Defendants, and there is a continued threat of repetition of such conduct.

567.    With respect to the activities alleged herein, the Enterprise acted at all times with malice toward Plaintiffs and the putative class members, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and other members of the Enterprise. Such conduct was done with actionable wanton and reckless disregard for the rights of Plaintiffs and Class Members. The predicate acts were acts of deception that furthered the goal of maintaining a profitable sports enterprise within and for the benefit of LSU, TAF and Orgeron Defendants. The

Enterprise knew that it was depriving Plaintiffs and the putative class members of their rights in furtherance of their purpose.

568.     The Enterprise sought to aid and abet and actually did aid and abet activities in violation of LRA Sections 15:1353(a), (b), and (c) and specifically Louisiana Revised Statutes Sections 14:122(A)(3), 14:129.1, 14:132, 14:133, and 14:230.

569.     These activities constitute tortious and illegal acts as defined by Louisiana law including but not limited to violations of Louisiana Revised Statutes Sections 14:122(A)(3), 14:129.1, 14:132, 14:133, and 14:230.

570.     The violations set forth herein constitute "racketeering activity'" within the meaning of LRA Section 15:1353.

571.     The Enterprise has engaged in a "pattern of racketeering activity," as defined in LRA Section 15:1353, by committing and/or conspiring to commit or aiding and abetting a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past ten years. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting similar victims, including Plaintiffs and Class Members. The Enterprise's racketeering activities or predicate acts are related to a continuous criminal activity.

572.     These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein of protecting revenue from student-athletics to LSU, TAF, and Orgeron Defendants); result (LSU, TAF, and Orgeron Defendants were able to continue to obtain significant revenue from student-athletics); victims (Plaintiffs and putative class members); method of commission; and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

573.     The predicate acts were committed in the same manner and constituted the Enterprise's "normal" way of doing business.

574.     The related predicate acts amount to a continued criminal activity because they extended over a period of time.

575.     The Enterprise's course of action spans years, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme. Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning, and structure of the operations described herein to the detriment of Plaintiffs and the putative class members.

576.     The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to commit or aided and abetted in committing by Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity'" within the meaning of LRA Section 15:1353.

577.     With respect to the overt acts and activities alleged herein, each member of the Enterprise conspired with each other co-conspirator entity and individual to violate LRA Sections 15:1353(a), (b), and (c), all in violation of LRA Section 15:1353(d). In violation of LRA Section 15:1353(c), each Member of the Enterprise agreed and conspired with each other Member, to *inter alia*: (1) utilize donations solicited from international and national donors through the TAF organization to make payments to and on behalf of LSU employees and to implement a deficient sexual misconduct education program and reporting scheme within the Athletics Department that was knowingly not able to meet the standards mandated by the NCAA or Title IX; and (2) falsely certify to the NCAA that the Athletics Department was meeting the mandated standards in order

to continue competing in interstate collegiate sporting events in order to protect the revenue from student-athletics to LSU, TAF, and Orgeron Defendants.

578.     The Enterprise and its violations were unknown to and concealed from Plaintiffs prior to the publication of the Report in March 2021.

579.     As a direct and proximate result of the Defendants' racketeering activities and violations of Louisiana law, Plaintiffs and the putative class have been injured in their business and property in that they incurred student loans, paid tuition, lost scholarship monies, lost employment and income, incurred expenses related to medical treatment, and other economic damages.

580.     As a result of the actions of the Enterprise, Plaintiffs and Class Members are entitled to recover pursuant to LRA Section 15:1356(E) three times the actual damages sustained, attorneys' fees in the trial and appellate courts, and costs of investigation and litigation reasonably incurred.

<u>**COUNT XX**</u>
**Enrichment Without Cause**
**Louisiana Civil Code Article 2298**
**(All Defendants)**

581.     Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

582.     Plaintiffs, individually and on behalf of Class Members, allege enrichment without cause against all Defendants. This cause of action is plead in the alternative in the event no other remedy at law is available to Plaintiffs.

583.     Defendants were enriched by the millions of dollars that the LSU football program and TAF were able to bring into the school because of Defendants' scheme of silencing victims of sexual misconduct and the other benefits as alleged herein. There is no justification for denying

Plaintiffs' rights to an education free from sex-based discrimination under the United States Constitution, Louisiana Constitution, federal law, and state law.

584.    As a direct result of Defendants' enrichment, Plaintiffs were impoverished by sustaining injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

585.    Defendants concealed this scheme from Plaintiffs. Plaintiffs became aware of this scheme upon the publication of the Report in March 2021.

586.    Plaintiffs are entitled to monetary compensation damages to the extent of Defendants' enrichment without cause.

587.    To the extent the Court finds any causes of action alleged herein are inconsistent, Plaintiffs urge each such cause of action in the alternative.

## **DAMAGES**

588.    Plaintiffs adopt and incorporate by reference the previously plead paragraphs as if fully plead herein.

589.    As a direct and proximate result of the above-described conduct, Plaintiffs and Class Members suffer general, special, incidental, and consequential injury and damages, past, present, and future, in an amount that shall be fully proven at the time of trial. These past, present, and future damages include but are not limited to the following:

   a.  Pain, suffering, and emotional distress;

   b.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

    c.   Medical expenses;

    d.   Pharmaceutical expenses;

    e.   Loss of education and educational opportunities;

    f.   Additional educational expenses;

    g.   Loss of employment and earning capacity;

    h.   Travel and travel-related expenses;

    i.   Prevention from performing daily activities and obtaining the full enjoyment of life;

    j.   Expenses from psychological treatment, therapy, and counseling;

    k.   Loss of the ability to perform as athletes on their chosen teams;

    l.   Fractured family and personal relationships;

    m.  A loss of consortium society and companionship; and

    n.   All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## **PRAYER FOR RELIEF**

For all the foregoing reasons, Plaintiffs, on behalf of themselves and the putative class, pray for judgment against Defendants as follows:

    A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23, appointment of Plaintiffs as representatives of the Class, and appointment of Plaintiff's counsel as Class Counsel;

    B.    For past, present, and future economic and non-economic damages in an amount to be determined at trial;

    C.    For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

D.      For any appropriate statutory damages;

E.      For costs of this suit;

F.      For punitive damages;

G.      For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

H.      For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law;

I.      For liability *in solido* among all defendants;

J.      A permanent injunction requiring compliance with Title IX and recurring external audits of LSU's Title IX compliance; and

K.      All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Now come Plaintiffs, by and through their attorneys, Karen Truszkowski, Elizabeth K. Abdnour, Catherine E. Lasky, Matthew B. Peters, and Endya L. Hash, and demand a trial by jury.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully submitted,

**/s/ Catherine E. Lasky**
Catherine E. Lasky (La. Bar 28652)
Matthew B. Peters (La. Bar 37514)
Endya L. Hash (La. Bar 38260)
KATIE LASKY LAW LLC
900 Camp St. Suite 439
New Orleans, LA 70130
P: (504) 584-7336
F: (504) 375-2221
katie@katielaskylaw.com
matt@katielaskylaw.com
endya@katielaskylaw.com

**Karen Truszkowski**
*Pro Hac Vice*
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

*Attorneys for Plaintiffs*

**Elizabeth K. Abdnour**
*Pro Hac Vice*
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 709-7700
Email: elizabeth@abdnour.com