## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.**<br>*Plaintiff* | **Civil Case No.: 21-242-WBV-SJD** |
| | **Class Action** |
| **v.** | |
| | **Jury Demanded** |
| **LOUISIANA STATE UNIVERSITY,**<br>**ET AL.**<br>*Defendant* | |

### PLAINTIFFS' LOUISIANA RACKETEERING ACT CASE STATEMENT

Pursuant to this Court's Louisiana Racketeering Act Order (Doc. 93), Plaintiffs Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan Johnson, Elisabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, Sarah Beth Kitch, and other unidentified Does provide the following information regarding their Louisiana Racketeering Act ("**LRA**") claims. The allegations of Plaintiffs' Amended Complaint (Doc. 22) are based upon facts known to and discovered by Plaintiffs after a reasonable inquiry, as required by the Federal Rules of Civil Procedure. Plaintiffs' present knowledge of the pattern of misconduct allegedly committed and sponsored by Defendants, as well as co-conspirators, both known and unknown, is incomplete. The misconduct at issue in this case was, by its very nature, concealed from Plaintiffs and the public until recently. Complete information regarding the nature and full scope of Defendants' alleged misconduct will come to light during discovery in this matter.

In addition to filing this Louisiana Racketeering Act Case Statement, Plaintiff incorporates by reference the allegations of Plaintiffs' Amended Complaint (Doc. 22) and the exhibits attached thereto: Exhibit A-The Husch Blackwell Report, and Exhibit B-Employment Contract of Orgeron and The "O" Rosy Finch Boyz, LLC. Plaintiffs reserve the right to amend this Louisiana

1

Racketeering Act Case Statement and/or seek amendment of their pleadings after discovery is obtained.

### 1. LRA Sections Under Which Plaintiffs Assert Their Claims

Plaintiffs allege violations of

- La. R.S. § 15:1353(A),

- La. R.S. § 15:1353(B),

- La. R.S. § 15:1353(C), and

- La. R.S. § 15:1353(D).[1]

### 2. List Each Defendant and State the Alleged Misconduct and the Basis of Liability for Each

#### A. Defendant Tiger Athletic Foundation ("TAF")

i. La. R.S. § 15:1353(A)

TAF is liable under La. R.S. § 15:1353(A) for knowingly receiving hundreds of millions of dollars generated by the Enterprise[2] designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of

---

[1] Although the Court's Louisiana Racketeering Act Order (Doc. 93) does not specifically request information related to La. R.S. § 15:1353(D), it is included herein for additional clarity.

[2] "Enterprise" means any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities. The Enterprise at issue in this case is described in detail *infra*. La. R.S. § 15:1352(B).

Sexual Misconduct[3] victims through a pattern of racketeering activity[4]. TAF used and invested these funds to operate and further establish the Enterprise through its control of LSU's athletics program.

      ii.    La. R.S. § 15:1353(B)

TAF is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to funding an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct; supplying incentive-based and other compensation to pay LSU Responsible Employees,[5] including but not limited to Orgeron, J. Sell, M. Sell, Ausberry, Segar, and Alleva, in a manner that intentionally influenced their reporting of Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise. The Louisiana State

---

[3] LSU's Title IX Policy defines Sexual Misconduct as follows:

> A sexual act or contact of a sexual nature that occurs, regardless of personal relationship, without the consent of the other person(s), or that occurs when the person(s) is unable to give consent or whose consent is coerced or obtained in a fraudulent manner. For the purpose of this Policy, Sexual Misconduct includes, but is not limited to, sexual abuse, violence of a sexual nature, Sexual Harassment, Non-Consensual Sexual Intercourse, Sexual Exploitation, video voyeurism, or the obtaining, posting or disclosure of intimate descriptions, photos, or videos without the express consent or the persons depicted therein, as well as dating violence, domestic violence and stalking, as well as crimes of a sexual nature as defined in Title 14 of the Louisiana Revised Statutes or at La. R.S. 44:51.

[4] "Pattern of racketeering activity" means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . . . La. R.S. § 15:1352(C). "[R]acketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under the following provisions: La. R.S. § 14:230 (Money laundering), La. R.S. § 14:122 (Public intimidation and retaliation), La. R.S. § 14:120 (Corrupt influencing), La. R.S. § 14:129.1 (Intimidating, impeding, or injuring witnesses; injuring officers), La. R.S. § 14:132 (Injuring public records), and La. R.S. § 14:133 (Filing or maintaining false public records).

[5] LSU's Title IX Policy defines a Responsible Employee as "Any employee given the duty of reporting actual notice of incidents of sexual violence or any other misconduct prohibited by this policy. Responsible Employees do not include victims' advocates, mental health counselors, or LSU Ombudsperson."

University ("LSU") Organization Chart distributed through LSU's website shows TAF directly supervising and controlling LSU's Athletics Department, a vital component of the Enterprise.[6]

As set forth in the Amended Complaint[7] and fully incorporated herein by reference, TAF used funds generated by the Enterprise to provide deficient Title IX training to LSU Responsible Employees and students to further the Enterprise by repressing reports of Sexual Misconduct (and causing the concealment of public records and maintenance of false public records both internally within LSU and provided to third parties); to influence and incentivize LSU Responsible Employees through payment of expenses and compensation; and to provide mechanisms, such as private cell phones, which were, upon information and belief, for the purpose of concealing information from public records requests.

     iii.    La. R.S. § 15:1353(C)

TAF is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

     iv.    La. R.S. § 15:1353(D)

TAF is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more of the defendants to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue

---

[6] Organization Chart attached hereto as Exhibit A.
[7] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 32, 99, 100, 548(a)-(b), 548(d)-(f), 548(h), 548(k)-(l), 548(o).

created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**B. Defendant "O" The Rosy Finch Boyz, LLC ("Finch")**

      i.   La. R.S. § 15:1353(A)

Finch is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Finch used and invested these funds to operate and further establish the Enterprise through its control of LSU's football program.

      ii.   La. R.S. § 15:1353(B)

Finch is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; accepting incentive based compensation from TAF in a manner that intentionally influenced its reporting of Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[8] and fully incorporated herein by reference, Finch had knowledge of, *inter alia*, John Doe's rape of Plaintiff Robertson and John Coe's relationship violence against Plaintiffs Lewis and Richardson. Finch did not report any of this Sexual

---

[8] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 93, 96-98, 169-71, 256, 414, 530, 531, 542-43, 548(p), 563, 567, 575, 577.

Misconduct nor did it offer Supportive Measures[9] to any victims, as required by law. Finch had authority to hire, fire, and discipline LSU Responsible Employees in the football department and used this status to influence LSU Responsible Employees to avoid mandatory reporting requirements. Finch knowingly made available to the Enterprise Orgeron's status as a public official and leader of the LSU football team to assist in repressing instances of Sexual Misconduct that could damage the future revenue generated for the Enterprise by, *inter alia*, making personal calls to victims of John Doe's Sexual Misconduct and persuading them to drop criminal charges against one of LSU football's most valuable assets.

iii.    La. R.S. § 15:1353(C)

Finch is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise through its agents to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

iv.    La. R.S. § 15:1353(D)

Finch is liable under La. R.S. § 15:1353(D) for conspiring through its agents with LSU, Alexander, Alleva, Orgeron, TAF, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more of the co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future

---

[9] LSU's Title IX Policy defines Supportive Measures as follows:

> Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or Respondent regardless of whether a formal complaint has been filed. Such measures are designed to restore or preserve equal access to the education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the educational environment, or deter Sexual Misconduct.

revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

## C. Defendant Edward James Orgeron, Jr. ("Orgeron")

v.    La. R.S. § 15:1353(A)

Orgeron is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Orgeron used and invested these funds to operate and further establish the Enterprise through his control of LSU's football program.

vi.    La. R.S. § 15:1353(B)

Orgeron is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; accepting incentive based compensation from TAF in a manner that intentionally influenced his reporting of Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[10] and fully incorporated herein by reference, Orgeron had knowledge of John Doe's rape of Plaintiff Robertson and John Coe's relationship violence against Plaintiffs Lewis and Richardson. Orgeron did not report any of this Sexual Misconduct nor did he offer Supportive Measures to any victims, as required by law. Orgeron had

---

[10] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 93, 96-98, 169-71, 256, 414, 530, 531, 542-43, 548(p), 563, 567, 575, 577.

authority to hire, fire, and discipline LSU Responsible Employees in the football department and used this status to influence LSU Responsible Employees to avoid mandatory reporting requirements. Orgeron knowingly made available to the Enterprise his status as a public official and his authority over the LSU football team to prevent damages to the future revenue generated for the Enterprise by, *inter alia*, making personal calls to victims of John Doe's Sexual Misconduct, and attempting to persuade them to drop criminal charges against one of LSU football's most valuable assets, and protecting John Doe's ability to earn additional money for the Athletics Department during bowl games.

vii.    La. R.S. § 15:1353(C)

Orgeron is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

viii.    La. R.S. § 15:1353(D)

Orgeron is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Finch, TAF, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**D. Defendants Louisiana State University & Board of Supervisors of LSU A&M ("LSU")**

i.    La. R.S. § 15:1353(A)

LSU is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. LSU used and invested these funds to operate and further establish the Enterprise through its control of its Athletics Department and Title IX Office.

      ii.    La. R.S. § 15:1353(B)

LSU is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to funding an inadequate Title IX program with miniscule resources and insufficient training; intimidating witnesses into not reporting Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; authorizing and allowing TAF to fund an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly allowing TAF to supply incentive based compensation to LSU Responsible Employees, including but not limited to Orgeron, J. Sell, M. Sell, Ausberry, Segar, and Alleva, in a manner that intentionally influenced their reporting of  Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise.

Then-Interim President of LSU, Thomas Galligan testified that there was "no culture of punishment at LSU" with regard to Sexual Misconduct. LSU has not terminated any of the employees involved in the now highly publicized suppression of Title IX complaints and other failures.

      iii.    La. R.S. § 15:1353(C)

LSU is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

      iv.     La. R.S. § 15:1353(D)

LSU is liable under La. R.S. § 15:1353(D) for conspiring with TAF, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin Monaco, and various non-defendants to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**E. Defendant F. King Alexander ("Alexander")**

      i.     La. R.S. § 15:1353(A)

Alexander, in his capacity as President of LSU, is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by those successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Alexander used and invested those proceeds to operate and further establish the Enterprise through his control of LSU.

      ii.     La. R.S. § 15:1353(B)

Alexander, in his capacity as President of LSU, is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to funding an inadequate Title IX program with miniscule resources and insufficient training, which intimidates witnesses into not reporting Sexual

Misconduct and incentivize LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influences their reporting of Sexual Misconduct; knowingly allowing TAF to supply incentive based and other compensation to pay LSU Responsible Employees, including but not limited to Orgeron, J. Sell, M. Sell, Ausberry, Segar, and Alleva, in a manner that intentionally influenced their reporting of Sexual Misconduct and maintaining records related to the same; and making available things of value to be used for the purpose of running the Enterprise

As set forth in the Amended Complaint[11] and fully incorporated herein by reference, Alexander has ultimate authority over LSU Responsible Employees and authority to regulate TAF's relationship with LSU. Alexander himself is only supervised by the Board. Alexander used his leadership role to underfund an inadequate Title IX program with miniscule resources, which provided insufficient training for both students and Responsible Employees and maintained inaccurate and incomplete records of Sexual Misconduct. Alexander's Title IX system was knowingly unable to meet the standards mandated by federal regulations and was purposefully protecting the future income of LSU's athletics programs for the benefit of the Enterprise and its members. Alexander made available his authority as LSU's President to further the Enterprise by *inter alia*, knowingly ignoring audits indicating deficiencies in LSU's Title IX system.

### iii.    La. R.S. § 15:1353(C)

Alexander, in his capacity as President of LSU, is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

---

[11] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 1, 4-8, 10, 59-60, 73, 75-76, 84-86, 94, 96, 106(d), 108, 109, 393, 410, 492, 522,

iv.     La. R.S. § 15:1353(D)

Alexander, in his capacity as President of LSU, is liable under La. R.S. § 15:1353(D) for conspiring with LSU, TAF, Alleva, Orgeron, Finch, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future income created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**F.  Defendant Joseph Alleva ("Alleva")**

i.      La. R.S. § 15:1353(A)

Alleva is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Alleva used and invested these funds to operate and further establish the Enterprise through his control of LSU's Athletics Department.

ii.     La. R.S. § 15:1353(B)

Alleva is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to allowing TAF to fund an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly allowing TAF to supply incentive based compensation to LSU Responsible Employees in a manner that intentionally influenced their reporting of  Sexual

Misconduct; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[12] and fully incorporated herein by reference, Alleva used his leadership role to stymie the creation of a compliant Title IX system at LSU and instead maintain a separate system that was knowingly unable to meet the standards mandated by federal regulations to protect the revenue from student-athletics to the Enterprise by, *inter alia*, allowing TAF to provide mechanisms, such as private cell phones, which were used, upon information and belief,  for the purpose of concealing information from public records requests, and specifically directing LSU Responsible Employees to report Sexual Misconduct not to the Title IX Coordinator, Stewart, but to Segar. Alleva had authority to discipline LSU Responsible Employees in the Athletics Department and made available this authority to further the Enterprise. Alleva knowingly made available to the Enterprise access to LSU's Athletics Department, allowing TAF to further the Enterprise.

      iii.    La. R.S. § 15:1353(C)

Alleva is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

      iv.    La. R.S. § 15:1353(D)

Alleva is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, TAF, Orgeron, Finch, J. Sell, M. Sell, Ausberry, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of

---

[12] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 65, 73, 80, 82, 99-100, 132, 137, 153, 202, 204, 413, 492, 530, 531, 548, 562-63.

racketeering activity by agreeing with one or more of the co-conspirators to pursue the common objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

### G. Defendant Verge Ausberry ("Ausberry")

####    i.    La. R.S. § 15:1353(A)

Ausberry is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by the successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Ausberry used and invested these funds to operate and further establish the Enterprise through his control of LSU's athletics programs.

####    ii.    La. R.S. § 15:1353(B)

Ausberry is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; allowing TAF to fund an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; and knowingly allowing TAF to supply incentive based and other compensation to LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct.

As set forth in the Amended Complaint[13] and fully incorporated herein by reference, Ausberry directly controls substantial portions of LSU's Athletics Department, a vital component of the Enterprise. When Plaintiff Richardson disclosed John Coe's dating violence, Ausberry told her to stop talking to Ausberry and to call Segar. John Coe admitted via text message to punching intimate partners, and Ausberry did not report John Coe's Sexual Misconduct nor did he offer Supportive Measures to John Coe's victims, as required by law. Ausberry knew LSU's non-compliant Title IX system was unable to meet the standards mandated by federal regulations. Ausberry had authority to discipline LSU Responsible Employees in the Athletics Department and used this status to influence LSU Responsible Employees to avoid mandatory reporting requirements. Ausberry knowingly made his authority over the Athletics Department available to further the Enterprise.

    iii.    La. R.S. § 15:1353(C)

Ausberry is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

    iv.    La. R.S. § 15:1353(D)

Ausberry is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more of the co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue

---

[13] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 104, 106(f), 146, 253, 414, 492.

created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**H. Defendant Miriam Segar ("Segar")**

     i.    La. R.S. § 15:1353(A)

Segar is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Segar used and invested these funds to operate and further establish the Enterprise through her control of LSU's athletics program.

     ii.    La. R.S. § 15:1353(B)

Segar is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly allowing TAF to supply incentive based and other compensation to LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; allowing TAF to fund an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same; and controlling the inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same.

16

As set forth in the Amended Complaint[14] and fully incorporated herein by reference, Segar knowingly made available to the Enterprise her services as the purported "Athletics Title IX Coordinator," although she has never been officially delegated those responsibilities and she admitted to using this self-appointed power to conceal public records for the benefit of the Enterprise. Segar purposefully made Title IX reports over the telephone to avoid documentation created by the University's online recordkeeping system and to exclude the names of perpetrators on the football team, such as John Doe. When Plaintiff Lewis sought Segar's help in reporting Retaliation[15] by LSU Responsible Employees, Segar merely stated, "That's what happens when the cops come to your apartment," and did not report this Retaliation or offer Supportive Measures to Plaintiff Lewis, as required by law. Segar had authority to discipline LSU Responsible Employees and used this status to influence LSU Responsible Employees to avoid mandatory reporting requirements. Segar made available her authority within the athletic department to further the Enterprise.

     iii.    La. R.S. § 15:1353(C)

Segar is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

     iv.    La. R.S. § 15:1353(D)

---

[14] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 104, 106 (b)-(c), 106(f), 146, 150-51, 161, 171, 181-83, 254-56, 264, 271-72, 330, 414, 548(n).

[15] LSU's Title IX Policy defines Retaliation as follows:

    Any acts or attempted acts against an individual for the purpose of discouraging an individual from exercising a right or privilege under this policy or Title IX. Activities protected from retaliation include reporting Sexual Misconduct, filing a Formal Complaint, and participation in an investigation, process or Hearing, whether as a party, witness or Advisor.

Segar is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Ausberry, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

## I.  Defendant Sharon Lewis ("Defendant Lewis")

### i.  La. R.S. § 15:1353(B)

Defendant Lewis is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; and concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same. As set forth in the Amended Complaint[16] and fully incorporated herein by reference, following Plaintiff Richardson's disclosure of Sexual Misconduct to Defendant Lewis and her subordinate, Soil-Cormier, the two LSU Responsible Employees laughed at Richardson and mockingly questioned her fear while telling her that a report the police would ruin John Coe's career at LSU, implying that this consequence was not proportionate to his serial Sexual Misconduct and discouraging Richardson from continuing with the Title IX reporting process.

### ii.  La. R.S. § 15:1353(C)

---

[16] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 106(a)-(f), 107-09, 125-32, 150-52, 180-83, 395.

Defendant Lewis is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

**J. Defendant Keava Soil-Cormier ("Soil-Cormier")**

    i.    La. R.S. § 15:1353(B)

Soil-Cormier is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and concealing reports of Sexual Misconduct.

As set forth in the Amended Complaint[17] and fully incorporated herein by reference, following Plaintiff Richardson's disclosure of Sexual Misconduct, Defendants Soil-Cormier and Lewis laughed at Richardson and mockingly questioned her fear while telling her that a report the police would ruin John Coe's career at LSU, implying that this consequence is not proportionate to his serial Sexual Misconduct and discouraging Richardson from continuing with the Title IX reporting process. Soil-Cormier later fired Plaintiff Richardson in retaliation for her reports of Sexual Misconduct against players on the LSU's football team.

    ii.    La. R.S. § 15:1353(C)

Soil-Cormier is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

**K. Defendant Julia Sell ("J. Sell")**

    i.    La. R.S. § 15:1353(A)

---

[17] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 127-32, 137-39, 142, 414.

J. Sell is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. J. Sell used and invested these funds to operate and further establish the Enterprise through her control of LSU's tennis program.

    ii.    La. R.S. § 15:1353(B)

J. Sell is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and Sexual Discrimination and incentivizing LSU Responsible Employees to do the same; paying LSU responsible employees in a manner that intentionally influenced their reporting of Sexual Misconduct; accepting incentive based compensation from TAF in a manner that intentionally influenced her reporting of  Sexual Misconduct; knowingly creating, implementing, and/or controlling the inadequate Title IX procedures within the LSU tennis program that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same; participating in acts and patterns of Sexual Discrimination[18] aided by the threat of taking away reporting players' scholarships and the threat of additional emotional abuse ("You might want to bring tissues, because I'm going to make you cry.") that intimidated witnesses into not reporting or maintaining accurate records of Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise.

---

[18] LSU's Title IX Policy defines Sexual Discrimination as, "Behaviors and actions that deny or limit a person's ability to benefit from, and/or fully participate in the educational programs, activities, and services because of a person's gender or perceived gender."

As set forth in the Amended Complaint[19] and fully incorporated herein by reference, J. Sell directly controls portions of LSU's Athletics Department and was knowingly paid in a manner that purposefully influenced her reporting of Sexual Misconduct to further the Enterprise. J. Sell additionally made her authority over the tennis program readily available to further the Enterprise.

    iii.    La. R.S. § 15:1353(C)

J. Sell is liable under La. R.S. § 15:1353(C) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity as described herein.

    iv.    La. R.S. § 15:1353(D)

J. Sell is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, Ausberry, M. Sell, TAF, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**L. Defendant Michael Sell ("M. Sell")**

    i.    La. R.S. § 15:1353(A)

M. Sell is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. M. Sell used and invested these funds to operate and further establish the Enterprise through his control of LSU's tennis program.

---

[19] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 192, 198-99, 247, 275, 277, 283-97, 301, 414.

ii.    La. R.S. § 15:1353(B)

M. Sell is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to knowingly creating and/or implementing the inadequate Title IX procedures within the LSU tennis program that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same; accepting incentive based compensation from TAF in a manner that intentionally influenced his reporting of Sexual Misconduct; intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; concealing the acts and patterns of Sexual Discrimination demonstrated by co-head coach, J. Sell, and aided by the threat of taking away players' scholarships and the threat of additional emotional abuse that intimidated witnesses into not reporting; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; and making available things of value to be used for the purpose of running the Enterprise

As set forth in the Amended Complaint[20] and fully incorporated herein by reference, M. Sell knowingly made available his position of authority within the tennis program to be used for the purpose of running the Enterprise. In 2017, Plaintiff Lewis's father called M. Sell on two occasions and told M. Sell that John Coe had punched Plaintiff Lewis in the stomach. M. Sell's response was that this "couldn't be possible, wouldn't be possible." M. Sell did not report this incident nor did he offer John Coe's victim any Supportive Measures. M. Sell also falsely told police in 2018 that he did not know of Coe's abuse of Plaintiff Lewis.

iii.    La. R.S. § 15:1353(C)

---

[20] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 192, 200, 247, 251, 275, 277, 283-97, 414.

M. Sell is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

    iv.    La. R.S. § 15:1353(D)

M. Sell is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, Ausberry, J. Sell, TAF, Segar, Marchand, Stewart, Fuentes-Martin, Monaco, and various non-defendants to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**M. Defendant Jonathan Sanders ("Sanders")**

    i.    La. R.S. § 15:1353(B)

Sanders is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; and knowingly creating and/or implementing inadequate Title IX procedures that attempted to intimidate witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same. Sanders controlled employees of the Office of Student Advocacy & Accountability ("SAA") and knowingly refused to interview key witnesses in Title IX investigations or enforce no-contact directives as part of a larger plan to intimidate witnesses and conceal records. Sanders made available his authority in SAA to further the Enterprise.

    ii.    La. R.S. § 15:1353(C)

Sanders is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

**N. Defendant Tracy Blanchard ("Blanchard")**

      i.     La. R.S. § 15:1353(B)

Blanchard is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; and knowingly creating and/or implementing inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same.

As set forth in the Amended Complaint[21] and fully incorporated herein by reference, Blanchard controls employees of SAA, particularly student employees. Blanchard refused to provide Supportive Measures to Plaintiff Andries following a conclusive finding that John Roe violated Title IX policy, and misrepresented to Plaintiff Andries that John Roe has "the same rights" under the law. Blanchard made available her authority in SAA to further the Enterprise.

      ii.    La. R.S. § 15:1353(C)

Blanchard is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

**O. Defendant Mari Fuentes-Martin ("Fuentes-Martin")**

---

[21] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 221, 232, 234, 241, 414.

        i.     La. R.S. § 15:1353(A)

Fuentes-Martin is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Fuentes-Martin used and invested those funds to operate and further establish the Enterprise through her control over SAA and the Office of the Dean of Students.

        ii.    La. R.S. § 15:1353(B)

Fuentes-Martin is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; allowing TAF to fund an inadequate Title IX training that intimidated witnesses into not reporting Sexual Misconduct and incentivized LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly creating, implementing, and/or controlling the inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[22] and fully incorporated herein by reference, Fuentes-Martin directly controls SAA. Fuentes-Martin concealed John Doe's name from reports

---

[22] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 164, 171, 411.

of violent rapes. Fuentes-Martin had authority to discipline LSU Responsible Employees in SAA and made her authority readily available to further the Enterprise.

      iii.    La. R.S. § 15:1353(C)

Fuentes-Martin is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

      iv.    La. R.S. § 15:1353(D)

Fuentes-Marin is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Segar, Marchand, Stewart, Ausberry, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**P.  Defendant Jennie Stewart ("Stewart")**

      i.    La. R.S. § 15:1353(A)

Stewart is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Stewart used and invested these funds to operate and further establish the Enterprise through her control over LSU's Title IX Office.

      ii.    La. R.S. § 15:1353(B)

Stewart is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to

intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly creating, implementing, and/or controlling inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[23] and fully incorporated herein by reference, Stewart controls LSU's Title IX Office. Stewart completely concealed any record of John Doe's rape of Plaintiff Owens; denied Supportive Measures and reasonable case updates to survivors, such as Plaintiff Andries; concealed material facts by refusing to interview known witnesses such as Sarah Zoe; forced survivors to endure multiple interviews during which Title IX staff asked condescending, inappropriate, and irrelevant questions that caused survivors to be re-traumatized and sob as the interviewers continued the questioning as if nothing was wrong, such as in Plaintiff Doe's case; trained employees to encourage concealing reports because "no one would [do] anything" and the survivor would face consequences, as was explained to Plaintiff Kitch; issued no contact orders against survivors, such as Plaintiff Andries; concealed perpetrators' identities by naming Responsible Employees as respondents in investigations, such as in Plaintiff Richardson's case; refused to enforce no contact directives, such as in Plaintiff Hovis's case; and knowingly ignored audits indicating deficiencies in the Title IX system. In fact, Stewart kept more thorough records of the steps taken to mediate the impact of complaints on football players than of the actual investigation and disciplinary process; in one file, there was no explanation as to how the

---

[23] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 62, 79, 85-86, 203-06, 224, 227-29, 332, 393, 411,

determination of responsibility was reached, but there was extensive information about the respondent and his mother requiring Stewart to call a football program at another institution and personally vouch for the respondent. Stewart made available her authority as Title IX Coordinator to further the Enterprise.

      iii.    La. R.S. § 15:1353(C)

Stewart is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

      iv.    La. R.S. § 15:1353(D)

Stewart is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Segar, Marchand, Fuentes-Martin, Ausberry, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

**Q. Defendant Angelo-Gene "A.G." Monaco ("Monaco")**

      i.    La. R.S. § 15:1353(A)

Monaco is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by those successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Monaco used and invested these funds to operate and further establish the Enterprise through his control over LSU's Human Resource Office.

      ii.    La. R.S. § 15:1353(B)

Monaco is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to intimidating witnesses and incentivizing LSU Responsible Employees to do the same; concealing reports of Sexual Misconduct and incentivizing LSU Responsible Employees to do the same; paying LSU Responsible Employees in a manner that intentionally influenced their reporting of Sexual Misconduct; knowingly creating, implementing, and/or controlling inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and incentivized LSU Responsible Employees to do the same; and making available things of value to be used for the purpose of running the Enterprise.

As set forth in the Amended Complaint[24] and fully incorporated herein by reference, Monaco directly controlled LSU's Human Resources and made his authority over Human Resources available to further the Enterprise. Monaco refused any Interim or Supportive Measures to survivors of Les Miles's abuse.

iii.    La. R.S. § 15:1353(C)

Monaco is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

iv.    La. R.S. § 15:1353(D)

Monaco is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Segar, Marchand, Stewart, Ausberry, Fuentes-Martin, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or co-conspirators to pursue the common criminal objective of

---

[24] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 63-64, 412, 414.

operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

### R. Defendant Jim Marchand ("Marchand")

   i.    La. R.S. § 15:1353(A)

Marchand, in his capacity as General Counsel and Title IX Coordinator of LSU, is liable under La. R.S. § 15:1353(A) for knowingly receiving funds generated by the Enterprise designed to protect and maximize the continuing future revenue created by LSU's successful athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity. Marchand used and invested these funds to operate and further establish the Enterprise through his control of the Title IX Office and position as General Counsel.

   ii.   La. R.S. § 15:1353(B)

Marchand is liable under La. R.S. § 15:1353(B) for knowingly maintaining control of and an interest in the Enterprise through a pattern of racketeering activity including but not limited to concealing reports of Sexual Misconduct (including but not limited to directing LSU Responsible Employees to direct victims to make reports to Segar or Fuentes-Martin rather than through the University's Title IX system[25]) and directing LSU Responsible Employees to do the same; knowingly creating, implementing, and/or controlling inadequate Title IX procedures that attempted to intimidate witnesses into not reporting or maintaining accurate records of Sexual Misconduct and directing LSU Responsible Employees to do the same; and making available things of value to be used for the purpose of running the Enterprise.

---

[25] *See* Husch Blackwell Report at page 94.

As set forth in the Amended Complaint[26] and fully incorporated herein by reference, Marchand controls portions of LSU's Office of General Counsel and Title IX Office, and made his authority over such available to further the Enterprise

    iii.    La. R.S. § 15:1353(C)

Marchand is liable under La. R.S. § 15:1353(C) for knowingly associating with the Enterprise to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity as described herein.

    iv.    La. R.S. § 15:1353(D)

Marchand is liable under La. R.S. § 15:1353(D) for conspiring with LSU, Alexander, Alleva, Orgeron, Finch, J. Sell, M. Sell, TAF, Segar, Fuentes-Martin, Stewart, Ausberry, Monaco, and various non-defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity by agreeing with one or more co-conspirators to pursue the common criminal objective of operating the Enterprise designed to protect and maximize the future revenue created by LSU's athletics programs by, *inter alia*, violating the rights of Sexual Misconduct victims through a pattern of racketeering activity.

### 3. Other Alleged Wrongdoers and their Misconduct

<u>LSU Interim President Thomas Galligan Jr.</u>: As President of LSU, Galligan committed much of the same misconduct as former President Alexander, *supra*. Galligan has admitted that he controlled a university with a deficient Title IX system that kept false records and intimidated witnesses to repress reports of Sexual Misconduct. Galligan has stated that the Athletic Department incorrectly directed Title IX reports, that nobody at the university understood their reporting obligations, and that there was no culture of punishment at LSU with regard to Sexual Misconduct.

---

[26] *See e.g.*, Amended Complaint, Doc. 22, ¶¶ 62, 78, 411.

LSU Professor John Moe: Moe repressed reporting of Sexual Misconduct by perpetuating Sexual Misconduct himself and intimidating his own victims and witnesses into not reporting. This included the use of LSU funds to create additional leverage to manipulate his victims into concealing all records of his Sexual Misconduct.

LSU Football Player John Doe: Doe raped Plaintiff Robertson; retaliated against and threatened Plaintiff Robertson to conceal reports of Sexual Misconduct by vandalizing her car, verbally assaulting her, and threatening to shoot and kill her; raped Plaintiff Owens; took and distributed non-consensual nude photographs of Plaintiff Brennan; retaliated against Plaintiff Brennan; attempted to rape Plaintiff Richardson; and retaliated against and intimidated Plaintiff Richardson to conceal reports of his sexual misconduct by threatening to have her fired.

LSU Football Player John Coe: Coe committed dating violence against Plaintiff Richardson by emotional abuse, sexual abuse, and stalking; intimidated Plaintiff Richardson to conceal reports of Sexual Misconduct; committed dating violence against Plaintiff Lewis with physical assaults for a number of years; retaliated against and intimidated Plaintiff Lewis to conceal reports of Sexual Misconduct with the threat that he would cause her more harm including killing her or forcing her to kill herself; attempted to murder Plaintiff Lewis multiple times by strangulation; retaliated against Plaintiff Lewis by causing his mother to communicate with Lewis in violation of the no contact directive; and stalked Plaintiff Lewis in violation of court orders. Coe eventually pleaded guilty to dating violence and violating a restraining order.

LSU Student John Poe: Poe stalked and emotionally abused Plaintiff Doe; stole Plaintiff Doe's property; harassed and stalked Plaintiff Doe from a burner phone; ignored Plaintiff Doe's requests to cease contact; and retaliated against and intimidated Plaintiff Doe by stalking her to her new dorm assignment.

LSU Football Player John Loe: Loe kidnapped and raped Plaintiff Hovis and retaliated against Hovis by violating the no contact directive twice.

LSU Football Coach Les Miles: Miles repressed reports of Sexual Misconduct by perpetuating Sexual Misconduct himself and intimidating his own victims into not reporting. This included the use of LSU funds to create additional leverage to manipulate his victims into concealing all records of his Sexual Misconduct.

LSU Student John Roe: Roe sexually assaulted Plaintiff Andries; attempted to sexually assault Plaintiff Andries a second time; and sexually assaulted two other LSU students.

LSU General Counsel Winston G. DeCuir, Jr. and Tom Skinner: DeCuir and Skinner committed much of the same misconduct as former Presidents Alexander and Galligan, DeCuir and Skinner controlled a deficient Title IX system that kept false records and intimidated witnesses to repress reports of Sexual Misconduct.

LSU Title IX Lead Investigator Jeffrey Scott: Scott created and maintained false public records by failing to name John Coe in the investigation of his abuse of Plaintiff Richardson; failing to investigate serious Sexual Misconduct committed by John Coe; intimidating witnesses by not appearing for appointments and assigning complainant interviews to graduate assistants; failing to investigate further allegations of John Roe's Sexual Misconduct; purposefully delaying investigation of Sexual Misconduct perpetrated by John Coe; keeping false public records by not including any credibility analysis nor explanation of the proportionality of the sanction to the conduct in his Title IX reports; failing to ensure sanctions were properly implemented/followed; failing to provide any Supportive Measures to protect Plaintiff Lewis following a conclusive finding that John Coe was physically abusive; and inadequately training LSU Responsible Employees on reporting obligations.

Assistant Director of Student Advocacy & Accountability Daniel DeLuca: DeLuca failed to investigate reports of stalking; failed to record any notes from multiple interviews with survivors and witnesses into case files; refused to update survivors on the status of their case; recorded false information in case files; and violated Title IX regulations by refusing to provide required information to parties under the guise of the Family Education Rights and Privacy Act ("FERPA").

LSU Title IX staff Chevon Gates: Gates intimidated survivors like Plaintiff Kitch by stating that it was a good choice not to report Sexual Misconduct because "no one would have done anything" and telling Plaintiff Kitch that she would have faced consequences as a result of her report.

LSU Wide Receivers Coach Tony Ball: Ball was paid to participate in the commodification of the student recruiting staff to create an environment in which victims and witnesses of Sexual Misconduct could not safely report and assailants were not held responsible. In January 2016, Richardson spoke with Ball and a recruit at a recruiting event. Ball told the recruit multiple times, "Calise [Richardson] is going to show you a good time and all that LSU has to offer" in a sexually suggestive tone, and continuously reiterated that he wanted Plaintiff Richardson to "show the recruit a good time this weekend."

LSU Tennis Athletic Trainer Sean Carter: Sean Carter repressed reports of Sexual Misconduct. During a meeting with Donavon White andCarter in May 2017 to address injuries from an assault, Plaintiff Lewis disclosed John Coe's abuse. Carter did not report this incident to the police, the Title IX Office, or any other entity. Carter did not offer Plaintiff Lewis any Supportive Measures, and as a result no Title IX investigation was initiated into the matter.

LSU Tennis Athletic Trainer Donavon White: Donovan White repressed reports of Sexual Misconduct and concealed public records regarding the same. During a meeting with White and

Carter in May 2017 to address injuries from an assault, Plaintiff Lewis disclosed John Coe's abuse. One of Plaintiff Lewis's teammates also made a comment to White about John Coe's repeated violent assaults on Plaintiff Lewis. White did not report this incident to the police, the Title IX Office, or any other entity. White did not offer Plaintiff Lewis any Supportive Measures. In April 2018, Plaintiff Lewis told White that John Coe had punched her multiple times. White responded, "didn't this already happen last year? I'm gonna have to report it because it's already happened." During the medical examination accompanying this report, White did not type medical notes into LSU's medical record-keeping software, but typed notes in a Microsoft Word document, which was subsequently untraceable during a forensic examination of the device by law enforcement. When interviewed by police, White falsely told police that he did not learn of John Coe's abuse of Plaintiff Lewis until April 2018.

LSU Director of Educational Support Services Dorothy Kemp: Kemp retaliated against Plaintiff Richardson for reporting Sexual Misconduct by denying Plaintiff Richardson job opportunities.

LSU Police Department and Unidentified Employees: LSUPD intimidated Plaintiff Brennan and created incomplete and inaccurate written reports of her statement; tampered with public records by refusing to report Title IX assaults to LSU; endangered a student by responding to Plaintiff Lewis' call of domestic violence and not removing the perpetrator or ensuring Plaintiff Lewis' safety, but instead charging Plaintiff Lewis with the student conduct violation of possessing a candle; and refusing to enter into a memorandum of understanding with LSU regarding each entity's Title IX reporting and response obligations due to a "disagreement" regarding reporting obligations.

LSU Graduate Assistant Kimberly Davis: Davis refused a survivor's request for a no-contact order; tampered with public records by failing to document witnesses to Plaintiff Andries' assault; and failing to investigate further allegations of John Roe's Sexual Misconduct.

LSU Assistant Football Coach Mickey Joseph: Joseph failed to report John Coe's physical abuse of LSU students including Plaintiff Lewis.

LSU Assistant to the Head Coaches Ya'el Lofton: Lofton fired Plaintiff Richardson in retaliation of reporting Sexual Misconduct.

Unnamed LSU Football Coaches: Various Coaches retaliated against Plaintiff Lewis by telling her that they blamed her for John Coe's suspension.

Coordinator of Defensive Operations Tamara Davis: Davis distributed the cell phone number of student employees, including Plaintiff Richardson, to persons affiliated with LSU football without the consent of the student employees and, upon information and belief, for the purpose of those persons communicating with student employees to request sexual favors. Davis distributed Plaintiff Richardson's phone number without her consent to men over twenty years older than her who propositioned her in a sexual manner.

Other Non-Defendant Management, Employees, Agents, and/or Representatives of Defendants: Other individuals whose identities are unknown at this time are believed to have participated in, facilitated, and/or supported the racketeering acts at the behest of Defendants or in their capacity as Defendants' agents, employees, and/or representatives.

### 4. List the alleged victims and state how each victim allegedly was injured

#### A. Plaintiff Abby Owens ("Owens")

Owens has incurred severe physical and emotional distress resulting in substance abuse that necessitated inpatient care at a rehabilitation facility and leaving Louisiana. Owens continues to suffer the effects of heavy substance abuse, depression, eating disorder tendencies, Post-Traumatic

Stress Disorder ("PTSD"), and self-harm. Owens has incurred significant economic damages, including the loss of her scholarship, additional educational expenses as a result of her transfer and the extended time it took to complete her degree, loss of income attributed to the delay in receiving her degree, health care expenses, moving expenses, and the cost of multiple rehabilitation programs.

### B. Plaintiff Samantha Brennan ("Brennan")

Brennan suffered and continues to experience severe emotional and physical distress including headaches, difficulty focusing, an inability to be alone with her thoughts, depression, anxiety, and lack of self-worth. Brennan has also incurred significant economic damages including health care expenses; lost income from her job on the recruiting team; lost future income as a result of her inability to obtain a college degree without delay; moving expenses after leaving LSU.

### C. Plaintiff Calise Richardson ("Richardson")

Richardson suffered severe economic loss by having to move unexpectedly and being denied work in the LSU's Athletic Department. Richardson suffered and continues to suffer severe emotional and physical distress including PTSD, anxiety, stomach aches, headaches, body aches, avoidance and isolation, fear of being alone with men at work or in school, fear of being on LSU's campus, vivid nightmares of assaults, substance use, feeling of humiliation, and negative effects on her interpersonal relationship. These physical damages are accompanied by the costs of weekly therapy, other health care expenses, and lost earning potential.

### D. Plaintiff Jade Lewis ("Plaintiff Lewis")

Plaintiff Lewis suffered and continues to suffer severe emotional and physical distress including PTSD and a loss of relationships with friends and family. Plaintiff Lewis also suffered severe economic damages by losing opportunities for significant earning potential related to

37

sponsorships, costs related to healthcare, the costs of returning to New Zealand, and lost earning potential.

### E. Plaintiff Kennan Johnson ("Johnson")

Johnson suffered and continues to suffer severe emotional and physical distress including anxiety, depression, and loss of the ability to enjoy tennis. Johnson also suffered economic damages from her hospital stay, other health care expenses, and lost earning potential.

### F. Plaintiff Elisabeth Andries ("Andries")

Andries suffered and continues to suffer severe emotional and physical distress, including anxiety, depression, constant fear, and panic attacks, causing a withdrawal from campus and from relationships with her friends and family. Andries also missed a significant number of classes in the fall of 2019 and incurred expenses related to health care and lost earning potential

### G. Plaintiff Jane Doe ("Plaintiff Doe")

Plaintiff Doe suffered and continues to suffer severe emotional and physical distress including relapses of anxiety and depression, and new diagnoses of obsessive-compulsive disorder and binge eating disorder. The physical and emotional impact of these health conditions eventually caused Plaintiff Doe to be expelled from, reinstated into, and then voluntarily withdrawn from LSU. Plaintiff Doe has lost three semesters' worth of tuition and access to an education at a major research university, as well as incurring moving and healthcare related expenses and lost earning potential.

### H. Plaintiff Ashlyn Robertson ("Robertson")

Robertson suffered and continues to suffer severe emotional and physical distress including debilitating alcohol and substance abuse, depression, and anxiety, and spent what should have been the remainder of her college career in two rehabilitation centers and sober houses, for which she paid out of pocket totaling approximately $30,000.00. She has also suffered economic loss in the

38

form of her TOPS scholarship, lost earnings, and the expenses of her health care. Robertson is unable to complete her education at another school because LSU will not release her transcript until she returns all the money received under the TOPS scholarship.

### I.  Plaintiff Corinn Hovis ("Hovis")

Hovis suffered and continues to suffer severe emotional and physical distress and economic loss.  Hovis's grades have suffered, adding additional barriers to her hopes of going to graduate school. Hovis has incurred additional educational expenses and has been forced to pay out of pocket to provide her own accommodations.  Hovis has suffered lost earning potential and has incurred significant health care expenses for treatment of her PTSD, generalized anxiety disorder, depression, and panic disorder.

### J.  Plaintiff Sarah Beth Kitch ("Kitch")

Kitch has suffered and continues to suffer severe emotional and physical distress including loss of a sense of professional credibility during her doctoral education, intense shame, and the stress of writing a dissertation in the hostile environment John Moe created.  Kitch suffers depression, and PTSD, for which she has incurred significant health care expenses for treatment. Kitch has suffered economic damages including loss of income attributed to the complete loss of her ability to attain tenure and proceed with her expected academic career and lost earning potential. Kitch's relationships, income, and health continue to be negatively impacted by her experiences at LSU.

### K.  Other Unidentified Does, including but not limit to Sarah Zoe[27] (Proposed Class)

Damages of the Proposed Class include but are not limited to severe emotional and physical distress, loss of relationships, and economic loss including additional medical and educational

---

[27] Sarah Zoe is a pseudonym. *See* Amended Complaint, Doc. 22, ¶¶ 211, 223, 227.

costs, loss of income and earning potential, moving expenses, loss of scholarships and educational

benefits, and loss of professional and personal opportunities.

### 5. Describe in detail the pattern of racketeering activity alleged for each racketeering claim.

#### A. Alleged Predicate Acts

Public Intimidation (La. R.S. § 14:122); Intimidating Witnesses (La. R.S. § 14:129.1);

Injuring Public Records (La. R.S. § 14:132); Maintaining False Public Records (La. R.S. §

14:133); Corrupt Influencing (La. R.S. § 14:120); and Money Laundering (La. R.S. § 14:230)

#### B. Dates, Participants in, and Description of the Predicate Acts

i. **Public Intimidation** (La. R.S. § 14:122)[28]

    a. *Dates*: Ongoing acts from at least 2009 to the present

    b. *Participants*: TAF, LSU, Alexander, Alleva, Ausberry, Segar, Stewart, Monaco, and Marchand

    c. *Facts:*

The facts surrounding the public intimidation predicate acts are detailed throughout the

Amended Complaint and described herein. In summary, participants threatened public

employees[29] with harm in the form of adverse employment consequences such as Retaliation and

economic loss to influence the public employees' willingness to engage in appropriate reporting,

---

[28] "Public Intimidation is the use of . . . extortionate threats, or true threats upon any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty: (1) Public . . . employee." La. R.S. § 14:122(A). "'Extortionate threats' occur when a person communicates an unlawful threat to harm another person with the intention to obtain anything of value or any . . . advantage, . . . of any description and the person would not otherwise be able to lawfully secure such advantage willingly from the victim." La. R.S. § 14:122(C)(1).

[29] All employees of Louisiana State University are considered public employees. "[P]ublic employee means and applies to any . . . employee . . . of the state of Louisiana or any . . . other political subdivision thereof, or of any agency, board, commission, department, or institution of said state, parish, municipality, district, or other political subdivision. La. R.S. § 14:2.

record-keeping, and training to maintain compliance with federal law and LSU's Title IX Policy.[30]

This is underscored by LSU's failure to hold any of the Defendants accountable despite conclusive

public findings of their failures. The Enterprise[31] has created a culture on LSU's campus that

threatened Retaliation against public employees who reported any Sexual Misconduct and that

made such employees' compensation dependent upon the success of LSU's athletics programs.

Further, athletes were prioritized over victims, including Plaintiffs.[32] Without such threats of

adverse employment consequences and the loss of income, public employees of LSU would

otherwise have willingly reported instances of Sexual Misconduct. Examples of this intimidation

include, but are not limited to:

Defendant Lewis being told by Athletics Department staff during a mandatory meeting that

individuals attempting to report Sexual Misconduct are "Tattletales." This is a direct consequence

of the following: 1) LSU, Alexander, Alleva, Monaco, Ausberry, Marchand, Segar, and Stewart's

consistent attempts to incentivize public employees to Retaliate against such employees; 2) the

same Defendants' threats of Retaliation against individuals attempting to report Sexual

Misconduct; and 3) TAF's provision of bonus or incentive payments to public employees

---

[30] Sexual Misconduct is defined in LSU's Title IX Policy as

> A sexual act or contact of a sexual nature that occurs, regardless of personal relationship, without the consent of the other person(s), or that occurs when the person(s) is unable to give consent or whose consent is coerced or obtained in a fraudulent manner. For the purpose of this Policy, ***Sexual Misconduct includes, but is not limited to***, sexual abuse, violence of a sexual nature, Sexual Harassment, Non-Consensual Sexual Intercourse, Sexual Exploitation, video voyeurism, or the obtaining, posting or disclosure of intimate descriptions, photos, or videos without the express consent or the persons depicted therein, as well as dating violence, domestic violence and stalking, as well as crimes of a sexual nature as defined in Title 14 of the Louisiana Revised Statutes or at La. R.S. § 44:51.

(emphasis added).

[31] The Enterprise is led by TAF and LSU; however, all Defendants named herein are associated with the Enterprise.

[32] This particular aspect of LSU's culture has been identified by several professionals and has been admitted by Interim President Galligan.

dependent upon the success of the athletics program or team—all of which promoted, incentivized and created a culture of silence around allegations of Sexual Misconduct.

Following reports of Sexual Harassment[33] and Retaliation, Defendant Ausberry told Defendant Lewis that she "was making too big of a deal" about allegations of misconduct and told her, "you need to just worry about doing your job," and "if you don't like it here, leave."

    ii. ***Intimidating Witnesses*** (La. R.S. § 14:129.1)[34]

        a. *Dates*: Ongoing dates from at least 2009 to the Present

        b. *Participants*: TAF, Finch, Orgeron, LSU, Alexander, Alleva, Ausberry, Segar, Defendant Lewis, Soil-Cormier, J. Sell, Sanders, Blanchard, Stewart, Monaco, Marchand, and Fuentes-Martin

        c. *Facts:*

The facts surrounding the witness intimidation predicate acts are detailed throughout the Amended Complaint and described herein. In summary, participants threatened Sexual Misconduct survivor witnesses (predominantly crime victims) with economic loss, Retaliation,

---

[33] LSU's Title IX Policy provides a definition of Sexual Harassment that includes "Unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the education program or activity," "An employee conditioning the provision of aid, benefit or service on the Complainant's participation in unwelcome sexual conduct." Sexual Assault, Dating Violence, Domestic Violence, and Stalking.

[34] Louisiana Revised Statute § 14:129.1 provides:

No person shall intentionally: (1) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness . . . with intent to influence . . . his reporting of criminal conduct . . . ; [or](2) Injure or attempt to injure a witness in his person or property . . . with intent to influence . . . his reporting of criminal conduct . . . . 'Witness' means any of the following: (a) A person who is a victim of conduct defined as a crime under the laws of this state, . . . (c) A person who has reported a crime to a peace officer, prosecutor, probation or parole officer, correctional officer, or judicial officer of this state . . . [and] (e) A person who reasonably would be believed by an offender to be a witness as previously defined in this Section.

"'Person' includes a human being . . . and also includes a body of persons, whether incorporated or not... 'Property' refers to both public and private property, movable and immovable, and corporeal and incorporeal property." La. R.S. § 14:2.

and Sexual Harassment to induce them to conceal reports of the Sexual Misconduct that they had suffered. This was accomplished by direct intimidation and Retaliation following reports, as well as inadequate training of both Responsible Employees and students.  Such inadequate training included the use of contradicting and outdated school policies that lacked safe harbor provisions for survivor witnesses of Sexual Misconduct. This inadequate training is a direct consequence of the inadequate Title IX training and reporting system created and implemented by TAF, the LSU Athletics Department, LSU, Alexander, Alleva, Monaco, Ausberry, Marchand, Segar, Fuentes-Martin, and Stewart.  Further, these Defendants engaged in a pattern of attempts to incentivize Responsible Employees and students to Retaliate and threaten Retaliation against individuals attempting to report Sexual Misconduct, which intimidated Plaintiffs and the Proposed Class, all of whom are survivor witnesses.

Examples of this intimidation include, but are not limited to:

Following Plaintiff Richardson's disclosure of John Coe's dating violence, Defendants Lewis and Soil-Cormier laughed at Richardson and mockingly questioned why she was afraid of John Coe. Defendants then stated that they could call the police if Richardson felt like this was "big enough to ruin John Coe's career at LSU." This conduct attempted to injure Richardson in her person through actual and threatened Retaliation and with the intent to influence her to not report Coe's crimes and abuse.

When Plaintiff Andries requested reasonable Supportive Measures from Blanchard, Blanchard refused the request and responded that Andries and her assailant, who at that time had been conclusively found to have assaulted Andries, "had the same rights." Stewart also denied Andries' request to remove Roe from their shared classes because "that would violate his rights." This conduct attempted to injure Andries in her person through actual and threatened Retaliation

and with the intent to influence Andries to cease reporting John Roe's continued violations of the law and the LSU Title IX Policy.

Sanders asked Plaintiff Andries inappropriate and unnecessary questions including whether she was "on drugs" during her assault despite the fact that Plaintiff Andries had already been interviewed for LSU's Title IX investigation. This conduct attempted to injure Andries in her person through Retaliation and with the intent to influence her to stop reporting criminal conduct.

SAA staff told Plaintiff Andries's father that Plaintiff Andries was not informed about her perpetrator's appeal of LSU's finding because "it wouldn't affect [Plaintiff Andries] at all so it wasn't [her] business." Further, LSU issued a no-contact order against Plaintiff Andries. This conduct constituted direct Retaliation against Andries and her immediate family in their person with the intent to influence them to stop reporting criminal conduct.

After disclosing John Doe's rape and Retaliation of Plaintiff Robertson, Orgeron told Plaintiff Robertson's boyfriend not to be so upset because "things like this just happen every now and then" and did not report the rape and Retaliation to the LSU Title IX office, the police, or any other appropriate entity. Further, following public reports of John Doe's Sexual Harassment of Gloria Scott, Orgeron told Ms. Scott that John Doe was just a "troubled kid" and that "things like this just happen," which was also publicly reported. This conduct attempted to injure sexual assault victims in their person through actual and threatened Retaliation and with the intent to influence victims and witnesses to stop reporting John Doe's and other LSU athlete perpetrators' criminal conduct.

Following reports of Sexual Harassment and Retaliation, Defendant Ausberry told Defendant Lewis, she was "making too big of a deal" about allegations of Sexual Misconduct and told her, "you need to just worry about doing your job," and "if you don't like it here, leave." This

44

conduct attempted to injure Sexual Misconduct victims in their person through actual and threatened Retaliation and with the intent to influence witnesses to stop reporting harassing conduct.

Following disclosure of Retaliation by Athletics Department staff, Defendant Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment." This conduct attempted to injure Plaintiff Lewis in her person through actual and threatened Retaliation and with the intent to influence her to stop reporting criminal conduct.

Defendant J. Sell threatened Plaintiff Johnson with the loss of her scholarship as she Sexually Harassed Defendant Johnson because of her weight and sexual orientation, including telling Plaintiff Johnson, "You might want to bring tissues, because I'm going to make you cry." When Plaintiff Johnson told Defendant J. Sell about Plaintiff Lewis's abuse, Defendant J. Sell told Plaintiff Johnson that if Plaintiff Johnson stopped "worrying so much about other people," she would be a better tennis player. These threats to Plaintiff Johnson's property and physical well-being were made by J. Sell through of the actual and threatened Retaliation and with the intent to influence Plaintiff Johnson to not report criminal conduct.

While the criminal case against John Coe was pending, Defendant J. Sell instructed Plaintiff Lewis's teammates on the tennis team to stay away from Plaintiff Lewis. This conduct attempted to injure both Plaintiff Lewis and her teammates' persons through actual and threatened Retaliation and with the intent to influence them to stop reporting criminal conduct.

Following John Coe's assault on Plaintiff Lewis in which Plaintiff Lewis's roommate called LSUPD to remove John Coe from the apartment, LSU charged Plaintiff Lewis with a violation of the residential life policy for having a candle in her room and placed her on academic probation. Meanwhile, LSU took no disciplinary action against John Coe for physically attacking

Plaintiff Lewis. This conduct attempted to injure Plaintiff Lewis in her person and property through actual and threatened Retaliation and with the intent to influence her to conceal reports of criminal conduct.

LSU continues to attempt to injure witnesses with threats of Retaliation by refusing to terminate any of the Responsible Employees involved in concealing the now highly publicized Sexual Misconduct, Retaliation, and Title IX complaints and continuing to ignore established best practices in responding to allegations of violations of Title IX. This intimidation intends to influence survivors and witnesses of Sexual Misconduct to refrain from reporting criminal conduct and Policy violations.

John Moe told Kitch that if she did not maintain a good working relationship with him, then she would never graduate or get a job. Chevon Gates ("Gates") and another Title IX staff member told Kitch that it was a good choice not to report the Sexual Misconduct when she was a student because "no one would have done anything" and she would have faced consequences as a result of the report. This conduct attempted to injure Kitch in her person through actual and threatened Retaliation and with the intent to influence her to stop reporting criminal conduct.

Denying work opportunities to Sexual Misconduct victims, such as Plaintiff Richardson, is a further attempt to injure Richardson and other sexual assault witnesses in their person and property through actual and threatened Retaliation and with the intent to influence them to stop reporting criminal conduct.

Plaintiff Doe was forced to undergo four interviews about her claims of Sexual Misconduct against John Poe, each with a different LSU staff member. The interviewers spoke to Plaintiff Doe in a condescending manner and asked why she had kissed Poe prior to his abuse. The questioning became so intimidating that Plaintiff Doe would cry, and the interviewers would press on as if

46

nothing was wrong. They did not offer any Supportive Measures or resources to Plaintiff Doe. This conduct attempted to injure Jane Doe in her person through actual and threatened Retaliation and with the intent to influence her to stop reporting criminal conduct.

Defendant Monaco refused to provide Interim Measures[35] to one of the student victims of former LSU football coach Les Miles. This conduct attempted to injure students in their person through Retaliation and with the intent to influence them to stop reporting criminal conduct.

    ***iii.***    ***Injuring Public Records*** (La. R.S. § 14:132)[36]

         a.   *Dates*: Ongoing acts from at least 2009 to the Present

         b.   *Participants*: TAF, Finch, Orgeron, LSU, Alexander, Alleva, Ausberry, Segar, Defendant Lewis, Soil-Cormier, J. Sell, M. Sell, Sanders, Marchand, Fuentes-Martin, Stewart, and Monaco

---

[35] LSU's Title IX Policy defines Interim Measures as "Remedial measures taken to help deescalate and offer a short-term temporary resolution during the pendency of a resolution under this policy."

[36] Injuring public records includes "the intentional removal, mutilation, destruction, alteration, falsification, or ***concealment*** of any record, document, or other thing, filed or deposited, by authority of law, in any public office or with any public officer" and "the intentional removal, mutilation, destruction, alteration, falsification, or ***concealment*** of any record, document, or other thing, defined as a public record pursuant to R.S. 44:1 et seq. and required to be preserved in any public office or by any person or public officer pursuant to R.S. 44:36." La. R.S. § 14:122 (emphasis added). Public records pursuant to La. R.S. § 44:1 include "All books, records, writings, accounts, letters and letter books, maps, drawings, photographs, cards, tapes, recordings, memoranda, and papers, and all copies, duplicates, photographs, including microfilm, or other reproductions thereof, or any other documentary materials, regardless of physical form or characteristics, including information contained in electronic data processing equipment, having been used, being in use, or prepared, possessed, or retained for use in the conduct, transaction, or performance of any business, transaction, work, duty, or function which was conducted, transacted, or performed by or under the authority of the constitution or laws of this state, or by or under the authority of any ordinance, regulation, mandate, or order of any public body or concerning the receipt or payment of any money received or paid by or under the authority of the constitution or the laws of this state." All employees of Louisiana State University are considered public officers. Public officer and public employee have the same definition: "any . . . employee . . . of the state of Louisiana or any . . . other political subdivision thereof, or of any agency, board, commission, department, or institution of said state, parish, municipality, district, or other political subdivision." La. R.S. § 14:2. All documents required to be kept by all LSU employees, such as disciplinary and Title IX documents, are public records. Because all LSU employees are required to report disclosures of sexual misconduct, every instance of non-reporting is an intentional injury to the public records.

c. *Facts:*

The facts surrounding the injuring public records predicate acts are detailed in the Amended Complaint and described herein. In summary, participants concealed information required to be included in public records by failing to report Sexual Misconduct to the Title IX Office, writing intentionally incomplete and misleading reports, and failing to meet Title IX requirements for notice to survivors of Sexual Misconduct, knowing that all of this information would have been subject to Louisiana's Public Records Law. Higher-ranking members of the Enterprise (TAF, Board Alexander, Alleva, Ausberry, Segar, Orgeron/Finch, Marchand, Stewart, Fuentes-Martin, Monaco, J. Sell, M. Sell) intentionally trained lower-ranking members to keep inadequate records in maintenance of the Enterprise. Records such as LSU disciplinary files, LSUPD case files, and Title IX reports were all injured as a result of the Enterprise. Specifically, names of public figures at LSU who were identified as assailants by Plaintiffs and other survivor witnesses were intentionally excluded from records. This injury to public records, combined with witness intimidation, was one of the essential features required for the Enterprise's success and which injured Plaintiffs and the Proposed Class.

Examples of this concealment include, but are not limited to:

Defendant Segar concealed the following information from the public records: LSU Athletics Department's Retaliation against Plaintiff Lewis; John Doe's rape of Plaintiff Owens; Les Miles's Sexual Harassment of Defendant Lewis; and John Coe's dating violence against Plaintiff Richardson. As a result of the admissions that all Athletics Department Title IX reports went through Defendant Segar and Defendant's Segar's admission during the Husch-Blackwell investigation that she didn't like to put things in writing because "I got a lot of public information

requests," Plaintiffs believe there may have been many additional injuries to public records committed by Defendant Segar of which Plaintiffs do not yet have knowledge.

Defendants Lewis and Soil-Cormier concealed from public records John Coe's dating violence against Plaintiff Richardson and the Athletics Department's decision to retaliate against Plaintiff Richardson and fire her as a result of her reports against John Coe and John Doe.

Defendants Orgeron/Finch, at a minimum, concealed from public records John Doe's rape of Plaintiff Robertson, and John Doe's Retaliation against Plaintiff Robertson.

Defendant Ausberry concealed the following information from the public records: Les Miles's Sexual Harassment of Defendant Lewis; John Coe's dating violence against Plaintiff Richardson; and John Coe's dating violence against Plaintiff Lewis.

Defendant J. Sell concealed the following information from the public records: J. Sell's Sexual Discrimination of Johnson; J. Sell's Sexual Discrimination of Plaintiff Lewis; John Coe's relationship violence against Plaintiff Lewis; and John Doe's rape of Plaintiff Owens.

Gates and another Title IX staff member concealed Plaintiff Kitch's report of Sexual Misconduct from public records.

Unidentified persons under the control of Defendant Stewart in the Title IX Office and Defendant Fuentes-Martin in the Dean of Students' Office concealed notes or other written evidence of Plaintiff Doe's reports of Sexual Misconduct from public records.

Stewart concealed the following information from the public records: reports of John Loe's multiple violations of the no contact directive; reports of John Doe's rape of Plaintiff Owens; reports of John Coe's abuse of Plaintiff Lewis; witness accounts of John Roe's abuse of Plaintiff Andries; John Roe's abuse of other victims; and reports of John Poe's abuse of Plaintiff Doe.

Defendant Sanders concealed the following information from the public records: John Loe's multiple violations of the no contact directive; John Roe's abuse of other victims; and details of John Coe's continuing abuse of Plaintiff Lewis.

Defendant M. Sell concealed from the public records J. Sell's Sexual Discrimination of Plaintiff Johnson, and John Coe's relationship violence against Plaintiff Lewis.

Defendant TAF (with the knowledge and consent of Alleva, LSU, Alexander and Orgeron) aided in the injuring of public records by providing mechanisms, such as private cell phones, used, upon information and belief, for the purpose of concealing information from public records. These same Defendants allowed student workers in the football recruitment office to be repeatedly subject to Sexual Harassment by LSU football department staff, students, and recruits, and concealed the same from public records.

Defendant Fuentes-Martin concealed John Doe's rape of Plaintiff Robertson from public records.

Coach Mickey Joseph concealed John Coe's abuse of Plaintiff Lewis from public records.

Athletic Trainers Donavon White and Sean Carter concealed John Coe's abuse of Plaintiff Lewis from public records.

   iv.   *Maintaining False Public Records* (La R.S. § 14:133)[37]

      a. *Dates*: Ongoing acts from 2009 to the Present

      b. *Participants*: TAF, LSU, Alexander, Alleva, Ausberry, Segar, Fuentes-Martin, Stewart, Marchand, and Monaco

      c. *Facts:*

---

[37] "Filing false public records is the . . . maintaining as required by law, regulation, or rule, with knowledge of its falsity, of any of the following: . . . Any document containing a false statement or false representation of a material fact." All documents required to be kept by all LSU employees, such as disciplinary and Title IX documents, are public records. *See supra*, n. 36.

The facts surrounding the maintenance of false public records predicate acts are detailed in the Amended Complaint and described herein. In summary, the Enterprise knowingly maintained various public documents that omitted material facts and/or included false information. Additionally, the Enterprise knowingly failed to utilize established federal and LSU Title IX Policy standards when preparing investigatory reports causing the maintenance of false public records with material misrepresentations included in them. These false public records include but are not limited to LSUPD reports, Title IX investigation findings involving both students and Responsible Employees, Title IX reports themselves, reports to the SSA, case management system files, summaries of investigatory interviews, records of Title IX trainings, disciplinary records documenting disciplinary enforcement action, and correspondence between LSU Responsible Employees and students. The higher-ranking Defendants such as LSU, TAF, Alexander, and Alleva trained the lower Defendants to keep these false and misleading records. The breadth of false documents maintained by the Enterprise cannot be known until completion of discovery, but currently known examples include, but are not limited to:

All records prepared by members or associates of the Enterprise that state that LSU is Title IX compliant.

Defendant Monaco knowingly maintained various human resource documents that he knew contained either false information or material misrepresentations of fact, including, but not limited to, any investigation reports stating that Les Miles did not violate Title IX.

Defendants Marchand and Stewart, as campus Title IX Coordinators, were required by law to keep records of all reports of Sexual Misconduct, interview notes and investigation reports related to reports of Sexual Misconduct, and documentation related to the determination of responsibility, sanctioning, and any applicable appeals process for all reports of Sexual

Misconduct. Marchand, Stewart, and their subordinate employees did not maintain these records appropriately and not only concealed material facts but also documented false information. Examples of these false records include but are not limited to: records stating Plaintiff Owens' assailant was unknown; records stating Plaintiff Doe did nothing to attempt to stop her perpetrator from continuing contact; records stating Defendant Orgeron and/or the Athletic Department had no knowledge of John Coe's and/or John Doe's pattern of abuse; records stating the identity of Plaintiff Robertson's assailant as unknown; records stating John Loe did not violate the no contact directive; records indicating that Plaintiff Andries was kept abreast of John Roe's appeals process; records indicating that Plaintiff Richardson's Title IX report was against Defendant Lewis instead of John Coe; records indicating that Defendant Segar informed Defendant Orgeron of Coe's discipline.

Defendant Fuentes-Martin, as Associate Vice President and Dean of Students, was required to keep public records of all disciplinary reports, interviews, investigations, findings, appeals, and sanctions. Defendant Fuentes-Martin's subordinate employees, including Defendants Sanders and Blanchard, had the same duty. Examples of the false records kept by the Office of the Dean of Students include but are not limited to: records stating the identity of Robertson's assailant as unknown; records stating Plaintiff Doe did nothing to attempt to stop her perpetrator from contacting her; records stating that Professor Champney was informed of Defendant Andries' Supportive Measures; records indicating that Defendant Andries was kept abreast of John Roe's appeals process; records indicating that Defendant Andries received all appropriate Supportive Measures; records stating that Plaintiff Doe's report did not implicate Title IX; records stating that Plaintiff Doe received any formal resolution of her case; records indicating that Title IX complainants cannot be told of the resolution of their case as a result of FERPA.

      ***v.***     ***Money Laundering*** (La. R.S. § 14:230)[38]

         a.   *Dates*: Ongoing acts from 2009 to the Present

         b.   *Participants*: TAF, Finch, Orgeron, LSU, Alexander, Alleva, Ausberry,

             Segar, J. Sell, M. Sell, Marchand, Monaco, Stewart, and Fuentes-Martin

         c.   *Facts:*

The facts surrounding the money laundering predicate acts are detailed in the Amended Complaint and described herein. In summary, the Enterprise knowingly made available payment and other things of value to LSU Responsible Employees and to the athletic programs for the purpose of public intimidation, intimidating witnesses, injuring public records, and maintaining false public records, and for the purpose of controlling an athletic program designed to intimidate witnesses, injure public records, and maintain false public records to protect the future income of the Enterprise. Participants also knowingly possessed proceeds derived from the Enterprise, which knowingly protected its revenue through public intimidation, witness intimidation, injury to public records, maintenance of false public records, and corrupt influencing. The breadth of money

---

[38] Money laundering may be any of the following: "(1) Conduct, supervise, or facilitate a financial transaction involving proceeds known to be derived from criminal activity, when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation or to avoid a transaction reporting requirement under state or federal law. (2) Give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity. (3) Direct, plan, organize, initiate, finance, manage, supervise, or facilitate the transportation or transfer of proceeds known to be derived from any violation of criminal activity. (4) Receive or acquire proceeds derived from any violation of criminal activity, or knowingly or intentionally engage in any transaction that the person knows involves proceeds from any such violations. (5) Acquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity. (6) Invest, expend, or receive, or offer to invest, expend, or receive, the proceeds of criminal activity." La. R.S. § 14:230(B). "'Criminal activity' means any offense, including conspiracy and attempt to commit the offense, that is classified as a felony under the laws of this state . . . ." La. R.S. § 14:230(A)(1). "'Felony' is any crime for which an offender may be sentenced to death or imprisonment at hard labor." La. R.S. § 14:2(A)(4). Public intimidation, witness intimidation, injuring public records, maintaining false records, and corrupt influencing are all offenses for which an offender may be sentenced to imprisonment at hard labor, thus are all felonies. La. R.S. § 14:120, 122, 129.1, 132, 133.

laundering committed by the Enterprise cannot be known until completion of discovery, but currently known examples include, but are not limited to:

LSU, TAF, and other participants used millions of dollars derived from the intimidation of witnesses and creation of false records of the Enterprise to build a locker room for the football team, complete with nap pods, a pool, a theatre, and performance nutrition center for athlete recovery, completed in 2019.

TAF used proceeds derived from the intimidation of witnesses and creation of false records of the Enterprise to hire inadequate Title IX training personnel who would educate the Athletics Department to conceal public records (reports of Sexual Misconduct). LSU, Alexander, Alleva, and other participants made available the time and space of the Athletics Department to facilitate this Enterprise-sponsored training.

LSU knowingly allowed Ausberry and Segar to maintain their employment and their positions at LSU to further the Enterprise. LSU knowingly used proceeds of the Enterprise to circumvent internal Title IX staff by hiring their chosen outside counsel to investigate an alleged Title IX violation to further the Enterprise by making an inappropriate finding of no violation against the respondent in the investigation because the reporting student was "of consenting age," despite the respondent's conduct being in direct violation of the LSU Title IX Policy.

TAF used millions of dollars from the Enterprise to directly compensate and provide employment benefits to LSU Responsible Employees, such as Orgeron, Ausberry, and Segar, to assist them in remaining complicit in furthering the purpose of the Enterprise. TAF also paid for LSU Athletics Department Responsible Employees' cell phones, used to further the Enterprise by concealing communications from public records.

Orgeron and Finch have been paid millions of dollars in funds knowingly derived from the criminal activity of the Enterprise, making Orgeron the highest paid public employee in the state of Louisiana. Orgeron and Finch were aware that these funds were derived from the Enterprise because their compensation (as well as the compensation of J. Sell and M. Sell) was directly connected with the performance of the LSU athletics teams under these coaches' control and compensation was provided to them by TAF, an entity that is not their direct employer.

The Sells used funds knowingly derived from the criminal activity of the Enterprise to provide scholarships to certain players. J. Sell then used these scholarships to further her intimidation, Retaliation, and Sexual Discrimination against students.

LSU and Alleva made things of value available to TAF, namely the ability to negotiate employment contracts and to provide cell phones to LSU Athletics Department Responsible Employees, for the purposes of furthering the Enterprise.

Various Leaders of the Enterprise, including Marchand, Monaco, Stewart, and Fuentes-Martin consistently provided their respective Authority and Control of LSU employees to the Enterprise for the furtherance of the Enterprise.

> ### vi.   *Corrupt Influencing* (La. R.S. § 14:120)[39]
>
> > a.   *Dates*: Ongoing acts from 2009 to the Present

---

[39] "Corrupt influencing is the giving or offering to give anything of apparent present or prospective value to, or the accepting or offering to accept anything of apparent present or prospective value by, any person, with the intention that the recipient shall corruptly influence the conduct of any of the persons named in R.S. 14:118 (public bribery) in relation to such person's position, employment or duty." La. R.S. § 14:120. Public officers and employees are persons named in La R.S. § 14:188. Although Plaintiffs do not specifically allege corrupt influencing as a predicate act in the Amended Complaint, "the law is clear that a complaint need not identify with precision the legal basis for the relief requested. Rather, a complaint satisfies the liberal pleading requirements of Rule 8 if it alleges facts sufficient to provide notice of a claim." *White Oak Realty, LLC v. U.S. Army Corp of Engineers*, 2014 WL 4387317, at *9 (E.D. La. Sept. 4, 2014) (citations omitted) (Milazzo, J.). Plaintiffs submit that the Amended Complaint alleges sufficient facts regarding corrupt influencing to provide Defendants with notice of that claim.

b. *Participants*: TAF, Finch, LSU, Orgeron, J. Sell, M. Sell, Alexander, Alleva, Ausberry, Segar, Stewart, Marchand, Monaco

c. *Facts:*

The facts surrounding the corrupt influencing predicate acts are detailed in the Amended Complaint and described herein. In summary, participants created a compensation scheme that gave bonuses and incentive-based payments to Responsible Employees and to certain programs/departments at LSU that intended to and did in fact corruptly influence public employees to have a deficient university-wide Title IX program that ignored, suppressed, and/or minimized Title IX complaints, intimidated victims and witnesses of Sexual Misconduct, and caused false records to be kept at LSU.

TAF paid for Title IX training for the Athletics Department with the intention that the training would influence LSU Responsible Employees in the Athletics Department to conceal reports of Sexual Misconduct and intimidate witnesses.

LSU, Alexander, Alleva, and other participants made available the time and space of the Athletics Department to facilitate this Enterprise-sponsored training that benefited the Enterprise.

LSU knowingly allowed Ausberry and Segar to keep their employment and their positions to further the Enterprise.

TAF directly compensated and provided employment benefits to LSU Responsible Employees, such as Orgeron, Ausberry, and Segar, with the intention that this additional compensation would influence these LSU Responsible Employees to continue the criminal activity of the Enterprise.

Orgeron and Finch have been paid millions of dollars by LSU and TAF with the intention of influencing them to prioritize game wins and LSU's reputation over their Title IX reporting requirements and to increase the earning power of the Enterprise.

J. Sell and M. Sell were compensated by TAF and LSU with the intention of influencing them to prioritize game wins and LSU's reputation over their Title IX reporting requirements and to increase the earning power of the Enterprise.

LSU and other participants, with TAF's knowledge, funded a deficient Title IX training and reporting program for LSU Responsible Employees and students outside of the Athletics Department with the intent of influencing LSU Responsible Employees to ignore reporting requirements as unimportant.

## C. Relationship Between the Predicate Acts and the Enterprise as Part of a Common Plan.

The predicate acts are related to one another and to the Enterprise as part of a common plan. The continuing predicate acts were committed and attempted as part of the overarching scheme to disregard, suppress, and violate the rights of Sexual Misconduct victims so that the Enterprise could continue to generate hundreds of millions of dollars through LSU's successful athletics programs. Specifically, the predicate acts of intimidating and influencing public employees, victims, and witnesses; concealing public records; and maintaining false public records were all essential elements of a plan to insulate coaches, players, and other LSU Responsible Employees from being held responsible for legitimate Sexual Misconduct claims and allow LSU athletic programs to continue operating unhindered to reach levels of success the programs wouldn't have reached had the perpetrators been held accountable. This scheme allowed the Enterprise to reap the rewards of the athletics programs' incredible success–including, but not limited to, a football National Championship, unprecedented increases in revenue, increases in

57

merchandise and ticket sales, increases in TV contracts, increases in admission applications, and increases in alumni donations—for the benefit of the Defendants in a manner that violated multiple provisions of the Louisiana Racketeering Act, Title 14 Section 1353 of the Revised Statutes of Louisiana.

### 6. Description of the Enterprise

i. <u>Individuals and Entities Constituting the Enterprise</u>:

LSU, TAF, and certain agents including but not limited to the defendants listed herein.

ii. <u>Structure, Purpose, Role, Function, and Course of Conduct of the Enterprise</u>:

This information is provided in the Amended Complaint, which is incorporated herein by reference. In summary, the Enterprise is an association in fact between and among LSU, TAF, and various employees and/or agents of LSU and TAF, with a pattern of predicate acts working in concert with the common purpose of generating maximum revenue from LSU's athletics programs for the benefit of the Leaders of the Enterprise: TAF, LSU, Alexander, and Alleva (collectively, "Leaders"). A portion of this revenue was continuously re-invested to operate the Enterprise, which was designed to protect the future income created by LSU's successful athletics programs. This future income was protected by violating the rights of Sexual Misconduct victims through racketeering activity including intimidating victims and witnesses, concealing public records, maintaining false public records, corruptly influencing public employees, and using such proceeds to further establish the Enterprise. Simply put, the Enterprise engaged in these predicate acts to prevent any adverse consequences to the student athletes, coaches, and LSU employees who created income for the Enterprise. As stated by a former Athletics Department employee, "…you just don't talk about it and you don't say anything, you just kinda go, 'cuz we're protecting LSU,

we're protecting our brand…nobody wants a big blowup to where oh, there's a big scandal, you know?...."[40]

The Leaders of the Enterprise influenced and/or directed the secondary managers of the Enterprise, including but not limited to Ausberry, Segar, Orgeron/Finch, Marchand, Stewart, Fuentes-Martin, Monaco, J. Sell, and M. Sell (collectively, "Managers"), to actively and knowingly maintain the Enterprise through racketeering activity including intimidating victims and Responsible Employees, concealing public records, maintaining false public records, and corruptly influencing public employees. The Managers of the Enterprise conspired with the Leaders of the Enterprise, but had less control over the Enterprise. Finally, the lower ranking members of the Enterprise, including but not limited to Defendant Lewis, Soil-Cormier, Sanders, and Blanchard, knowingly benefitted from and participated in the Enterprise through a pattern of racketeering activity, but these members did not reinvest proceeds into the operation of the Enterprise or conspire with the Leaders or Managers of the Enterprise.

Each member of the Enterprise is affiliated with or employed by LSU and TAF and the Enterprise has been in existence since at least 2009. Leaders of the Enterprise predominantly conspired to commit or intimidate others to commit the predicate acts upon which the Enterprise depends. The Managers conspired to commit or intimidate others to commit the predicate acts, as well as actually committing or attempting to commit the predicate acts upon which the Enterprise depends. The lower ranking members of the Enterprise predominantly committed or attempted to commit the predicate acts upon which the Enterprise depends.

    iii.    None of the Defendants are employees, officers, or directors of the Enterprise.

---

[40] *See* Husch Blackwell Report, Ex. A attached to Amended Complaint, at 52-53.

iv.   The Enterprise is an "association in fact" Enterprise. As set forth in subsection (ii), *supra*, all Defendants are associated with the Enterprise.

v.   The Defendants are individuals or entities separate from the Enterprise.

vi.   None of the Defendants are the Enterprise itself.

**7.   Separate Nature of the Enterprise and Racketeering Activity**

The participants in this Enterprise worked in concert with the common purpose of increasing and protecting revenue from LSU's successful athletics programs. As such, the Enterprise as a whole has a common link other than the racketeering activity.

**8.   Relationship Between the Activities of the Enterprise and the Pattern of Racketeering**

The Enterprise's purpose was increasing and protecting revenue from LSU's successful athletics programs. The Enterprise accomplished this purpose through racketeering activity and the non-racketeering activities associated with operating a state university with a competitive athletics program and athletics booster organization. Although Defendants conspired in their ongoing relationship to commit several acts constituting intimidating public employees, intimidating witnesses, injuring public records, maintaining false public records, and laundering money, not every act that Defendants committed in the context of these relationships constituted an element of these crimes. Therefore, the "usual and daily activities" of the Enterprise was peppered with racketeering activities, but did not solely involve racketeering activities.

**9.   Benefits Received by the Enterprise from the Alleged Pattern of Racketeering Activity**

The Enterprise enjoyed substantial financial profits from its racketeering activities. The Enterprise protected and collected the significant revenue generated by LSU's athletics programs

by engaging in racketeering activity designed to repress and/or minimize reports of Sexual Misconduct that would otherwise tend to impede the success (through player or coach suspensions or expulsions), tarnish the reputation, and reduce the revenue of the athletics programs.

**10. Allegations Specific to La. R.S. § 15:1353(A)**

i.   The proceeds derived from the pattern of racketeering activity were received by TAF, LSU, Finch, Orgeron, Alexander, Alleva, Ausberry, Segar, J. Sell, M. Sell, Lewis, Soil-Cormier, Monaco, Sanders, Blanchard, Fuentes-Martin, Stewart, and Marchand.

ii.  Plaintiffs do not allege that Defendant Lewis, Soil-Cormier, Sanders, or Blanchard used or invested the proceeds of the Enterprise received by them, but Plaintiffs reserve all rights to amend the allegations if discovery reveals information supporting such an allegation.

iii. In summary, the Enterprise used and/or invested its proceeds to fund the ongoing operations of the Enterprise, including but not limited to compensating LSU public employees (with incentive payments from TAF based upon the success of the athletics programs) and hiring ineffective Title IX training personnel.

iv.  **TAF** used the proceeds of the racketeering activity to consistently attempt to and actually incentivize public employees to commit predicate acts. This was completed by actually supplying things of value to LSU Responsible Employees, such as incentive based compensation or fringe benefits, including cell phones, with the knowing understanding that these benefits depended on the Responsible Employee's cooperation in protecting LSU athletics.

v.   **Orgeron** and **Finch** used proceeds derived from the Enterprise to hire and promote football personnel that would be complicit in the racketeering scheme as a means of pursuing the purpose of the Enterprise.

vi.  **LSU**, **Alexander**, **Marchand**, **Alleva**, **Ausberry**, **Segar**, **Fuentes-Martin**, and **Monaco** used and/or invested the proceeds derived from the Enterprise to fund the compensation of LSU Responsible Employees that would be complicit in the racketeering scheme as a means of pursuing the purpose of the Enterprise.

vii. **J. Sell** and **M. Sell** used proceeds derived from the Enterprise to hire and promote tennis personnel, including but not limited to other coaches and trainers, who would be complicit in the racketeering scheme as a means of pursuing the purpose of the Enterprise, and to provide scholarships that could later be used as leverage to intimidate and coerce student athletes who were victims or witnesses of Sexual Misconduct.

**11. Allegations Specific to La. R.S. § 15:1353(B)**

i.   The only alleged Enterprise is discussed in Section 6 (*supra*). Each of the following persons (in bold type) acted in relation to that Enterprise.

ii.  **TAF** maintained control of the Enterprise by hiring Title IX training personnel, funding compensation and other benefits for public employees, providing funding for the athletics programs above and beyond what LSU as a public institution could provide, and acting as a direct link between LSU's President and Athletic Director.

iii. **Finch** and **Orgeron** maintained control of the Enterprise by controlling LSU's football program, which included LSU Responsible Employees and several alleged perpetrators of Sexual Misconduct. Finch and Orgeron also controlled and

maintained an interest in the Enterprise by setting the "tone at the top" of the football program and the Athletics Department that claims of Sexual Misconduct and gender-based violence should be dismissed and concealed. Finch and Orgeron maintained an interest in the Enterprise by having millions of dollars in compensation dependent upon the game-by-game success of LSU's football team, as demonstrated by recent news reports of Orgeron's separation from the LSU football team due to its recent poor performance record.

iv.   The **Board**, **LSU**, and **Alexander** maintained control of the Enterprise by hiring several Responsible Employees that were complicit in the Enterprise, incentivizing these Responsible Employees to remain complicit, ignoring repeated calls for reform of LSU's Title IX policy, and permitting TAF and the Athletics Department to undermine and control LSU's Title IX program.

v.   **J. Sell** and **M. Sell** maintained control of the Enterprise by controlling LSU's female tennis team, which includes LSU Responsible Employees and several victims of the Enterprise. J. Sell and M. Sell controlled if/how/which victims were allowed to report allegations of Sexual Misconduct.

vi.   **Alleva**, **Ausberry**, and **Segar** maintained control of the Enterprise by controlling all Responsible Employees in the LSU Athletics Department, regulating the compensation of the same, and knowingly permitting TAF and the Athletics Department to undermine and control LSU's Title IX program.

vii.   **Segar** maintained control of the Enterprise by solely regulating if any how any instances of Sexual Misconduct in the Athletics Department were reported to LSU's

Title IX Office and/or LSUPD and permitting TAF and the Athletics Department to undermine and control LSU's Title IX program.

viii. **Fuentes-Martin**, **Stewart**, **Monaco**, and **Marchand** controlled the Enterprise by controlling the official Title IX reporting channels and documents, including what information was included in each individual Title IX report, which reports of Sexual Misconduct resulted in investigations, which investigations resulted in findings, which findings resulted in sanctions, and permitting TAF and the Athletics Department to undermine and control LSU's Title IX program.

ix. **Defendant Lewis** maintained an interest in the Enterprise as a supervisory Responsible Employee in the football recruiting department. **Soil-Cormier** also maintained an interest in the Enterprise as an employee of the football recruiting department. The success of LSU's athletics programs (on which the Enterprise relied) was dependent upon successful recruiting efforts under the responsibility of Defendant Lewis and Soil-Cormier. Recruiting efforts were successful in part due to LSU's reputation as a state university with a superior athletics program unhindered by complaints of Sexual Misconduct.

x. **Sanders** and **Blanchard** control employees SAA, a vital component of the Enterprise. Sanders and Blanchard control the Enterprise and maintain interests in the Enterprise by knowingly creating, implementing, and participating in inadequate Title IX procedures both within and outside of the Athletics Department.

**12. Allegations Specific to La. R.S. § 15:1353(C)**

i. The only alleged Enterprise is discussed in Section 6 (*supra*).

64

ii.    All Defendants are associated with the Enterprise. No defendants are employed by the Enterprise.

### 13. Relationship Between Injuries and Violations of LRA

But for the assaults, harassment, intimidation, retaliation, and hostile environment created by the Enterprise and experienced by Plaintiffs and the subsequent injury caused when they either attempted to report those events or felt that reporting was futile (furthering the goals of the Enterprise to allow perpetrators to continue to generate income for the Enterprise), Plaintiffs would not have sustained the damages outlined herein. Without the actions of the Enterprise and the specific predicate acts directed at Plaintiffs and the Proposed Class, Plaintiffs would not have experienced the economic and non-economic injuries detailed in the Amended Complaint.

### 14. Additional Helpful Information

Plaintiffs are not aware of any additional information which may be helpful at this time. Plaintiffs' present knowledge of the Enterprise is incomplete, as the Enterprise was concealed from Plaintiffs and the public. Complete information regarding the nature and full scope of Defendants' misconduct will come to the light during discovery in this matter and Plaintiffs reserve all rights to amend this Case Statement.

Respectfully Submitted,

/s/Endya Hash

Catherine E. Lasky (La. Bar 28652)
Endya L. Hash (La. Bar 38260)
Katie Lasky Law
619 Homedale Street
New Orleans, Louisiana 70124
P: (504) 584-7336
F: (504) 375-2221
katie@katielaskylaw.com
endya@katielaskylaw.com

Karen Truszkowski
*Pro Hac Vice*
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

Elizabeth K. Abdnour
*Pro Hac Vice*
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 709-7700
Email: elizabeth@abdnour.com

*Attorneys for Plaintiffs Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan Johnson, Elizabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, Sarah Beth Kitch, and other Unidentified Does*