## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ABBY OWENS, SAMANTHA BRENNAN, CALISE RICHARDSON, JADE LEWIS, KENNAN JOHNSON, ELISABETH ANDRIES, JANE DOE, ASHLYN ROBERTSON, CORINN HOVIS, and SARAH BETH KITCH,<br>  *Plaintiffs* | Case No.: 3:21-cv-00242<br><br>Second Amended Complaint |
| v. | Jury Demanded |
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, and VERGE AUSBERRY, MIRIAM SEGAR, JENNIE STEWART, and JONATHAN SANDERS, in their individual capacities,<br>  *Defendants* | |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan Johnson, Elisabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, and Sarah Beth Kitch, through undersigned counsel, hereby file the following Complaint against Defendants as captioned above.

## JURISDICTION AND VENUE

1. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., and to redress the deprivation of Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

2. This Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law

to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights. This Court has supplemental subject matter over state law claims pursuant to 28 U.S.C. § 1367.

3.    The United States Congress has abrogated sovereign immunity as under its authority to enforce the civil rights amendments.[1]

4.    State actors may always be sued in their individual capacities.[2]  "State officials sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them...[O]fficers sued in their personal capacity come to court as individuals."[3]

5.    Plaintiffs' claims are cognizable under the United States Constitution, 20 U.S.C. §§ 1681 *et seq*., and 42 U.S.C. § 1983.

6.    The events giving rise to this lawsuit occurred in the city of Baton Rouge, Louisiana, Parish of East Baton Rouge, which sits in this District. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

7.    All Defendants are subject to the Court's personal jurisdiction with respect to this action.

---

[1] *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976).
[2] *See, e.g., College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd*., 527 U.S. 666 (1999).
[3] *Hafer v. Melo*, 502 U.S. 21, 26 (1991).

## PARTIES

8.  Plaintiff Abby Owens ("Owens") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Owens is a resident of the State of South Carolina.

9.  Plaintiff Samantha Brennan ("Brennan") is a person of the age of majority and a current student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Brennan is a resident of the State of Tennessee.

10. Plaintiff Calise Richardson ("Richardson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Richardson is a resident of the State of North Carolina.

11. Plaintiff Jade Lewis ("Plaintiff Lewis") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Lewis is a resident of New Zealand.

12. Plaintiff Kennan Johnson ("Johnson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Johnson is a resident of the State of Louisiana.

13. Plaintiff Elisabeth Andries ("Andries") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Andries is a resident of France.

14. Plaintiff Jane Doe[4] ("Plaintiff Doe") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Plaintiff Doe is a resident of the State of Louisiana.

15. Plaintiff Ashlyn Robertson ("Robertson") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Robertson is a resident of the State of Georgia.

16. Plaintiff Corinn Hovis ("Hovis") is a person of the age of majority and a current student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Hovis is a resident of the State of Louisiana.

17. Plaintiff Sarah Beth Kitch ("Kitch") is a person of the age of majority and a former student at LSU, and at all times pertinent to this suit resided either on campus at LSU, or in private housing in the city of Baton Rouge, Louisiana. Currently, Kitch is a resident of the State of Texas.

18. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("Board of Supervisors") was at all relevant times and continues to be the governing body of the Louisiana State University system, which includes LSU, a public, state university located in Baton Rouge, Louisiana, Parish of East Baton Rouge, with its principal place of business at 3810 West Lakeshore Drive, Baton Rouge, Louisiana, 70808.

19. Defendant Verge Ausberry ("Ausberry"), in his official and personal capacity, was at all relevant times a person of an age of majority and an agent and/or employee of LSU. From July 2019 to present, Ausberry has been the Executive Deputy Athletic Director and Executive Director

---

[4] Jane Doe is a pseudonym.

of External Relations for LSU.  Before July 2019, he served in increasingly senior roles within the LSU Athletics Department, including Associate Athletics Director for Operations and Senior Associate Athletics Director. Upon information and belief, Ausberry is a citizen of Louisiana.

20. Defendant Miriam Segar ("Segar"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. Segar is the Senior Associate Athletics Director and Senior Woman Administrator for LSU. Prior to that role, she served in increasingly senior roles within the LSU Athletics Department, including Assistant Athletics Director and Associate Athletics Director for Student Services. Upon information and belief, Segar is a citizen of Louisiana.

21. Defendant Jennie Stewart ("Stewart"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. From 2015 to March 2021, Stewart served as LSU's Title IX Coordinator. Upon information and belief, Stewart is a citizen of Louisiana.

22. Defendant Jonathan Sanders ("Sanders"), in his official and personal capacity, is a person of the age of majority and an agent and/or employee of LSU. Sanders serves as the Associate Dean of Students and Director of LSU's Office of Student Advocacy & Accountability. Upon information and belief, Sanders is a citizen of Louisiana.

23. The individual defendants were acting in the course and scope of their employment with LSU at all times relevant to the allegations contained herein.

24. Other defendants may be identified in the course of this litigation and Plaintiffs reserve the right to amend this Complaint to add them as defendants as they become known.

## BACKGROUND FACTS RELEVANT TO ALL PLAINTIFFS

*LSU's Inadequate and Unlawful Title IX Oversight and Response*

25. LSU and LSU's Athletics Department funded and implemented a purposefully deficient sexual misconduct and Title IX reporting scheme separate and apart from LSU's official Title IX Office to keep legitimate sexual assault claims within the Athletics Department.

26. This scheme stymied LSU's overall Title IX reporting system, successfully insulated coaches and players within LSU's athletic programs from legitimate sexual assault claims and allowed the programs to continue operating unhindered to reach levels of success the program wouldn't have reached otherwise.

27. This scheme allowed the University to reap the rewards of the football program's incredible success – including, but not limited to, a national championship, unprecedented increases in revenue, increases in merchandise and ticket sales, increases in TV contracts, increases in admission applications, and increases in alumni donations.

28. The Board of Supervisors is vested with the authority to supervise and manage LSU by the Louisiana Constitution.

29. LSU has three policies which guide the University's response to potential Title IX violations – Policy Statement 1: Equal Opportunity ("Equal Opportunity Policy"), last revised April 1, 2016; Policy Statement 73: Sexual Harassment ("Sexual Harassment Policy"), last revised April 1, 2016; and Permanent Memorandum 73: Title IX Policy Prohibiting Sexual Misconduct ("Title IX Policy"), last revised August 14, 2020.[5]

30. The Equal Opportunity Policy reads:

> The University reaffirms and emphasizes its commitment to provide a workplace free from discrimination and harassment and to provide a means to address

---

[5] These documents are on file with Plaintiffs' counsel.

complaints of discrimination and/or harassment. LSU also reiterates its commitment and responsibility to protect its employees and students from discrimination, harassment, and retaliation for participating in the complaint process….

All complaints of discrimination and/or harassment will be addressed. Substantiated cases shall result in appropriate discipline or other corrective action. The severity of the disciplinary action shall be consistent with the seriousness of the act of discrimination and/or harassment….

The President, Vice Presidents, Deans, Directors, Department Heads, and all other supervisory employees are responsible for assisting the University in the implementation of this policy.

31. The Sexual Harassment Policy provides:

LSU complies with the provisions of Title IX, Title VI, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title VII, the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA) and applicable state law. The Associate Vice President for Human Resource Management or his/her designee…is designated as the individual at LSU responsible for coordinating the University's compliance with these statutory provisions.

32. The Title IX Policy includes the following statement of purpose:

Sexual Misconduct violates an individual's fundamental rights and personal dignity and will not be tolerated. LSU prohibits and is committed to an environment free of discrimination on the basis of sex and Sexual Misconduct. This policy affirms these principles and provides recourse for individuals whose rights have been violated.

LSU will take prompt action to prevent prohibited conduct, discipline those who violate this policy, prevent recurrence of prohibited behavior, and effect equitable remedies.

LSU will affirmatively promote prevention, awareness and training programs to encourage individuals to report concerns or complaints. Everyone has a responsibility to prevent and report acts of prohibited conduct. The entire LSU community is responsible for fostering a welcome environment conducive to learning.

33. The Title IX Policy reads: "Responsible Employees who receive notice or witness incidents of Sexual Misconduct must promptly notify the Title IX Campus Coordinator."

34. The Title IX Policy identifies the following individuals as Responsible Employees: "Any employee given the duty of reporting actual notice of incidents of sexual violence or any other misconduct prohibited by this policy. Responsible Employees do not include victims' advocates, mental health counselors, or LSU Ombudsperson."

35. The Sexual Harassment Policy includes the following statement of purpose: "To state the University policy and responsibility regarding sexual harassment as related to its employees and to its students who believe they have been harassed by an employee."

36. Defendants repeatedly engaged in discriminatory, retaliatory, and other unlawful actions in their interactions with Plaintiffs and in response to Plaintiffs' reports of Title IX violations and violations of LSU's Code of Student Conduct, thereby violating their own policies.

37. Upon information and belief, the training LSU provided for students and employees on its sexual misconduct and antidiscrimination policies, definitions, and investigation and reporting procedures falls far short of what is considered industry standard in terms of educating community members at higher education institutions about their rights and obligations with respect to sexual misconduct and sex discrimination on campus.

38. There are numerous consulting and training resources available to higher education administrators to assist them with the task of training their campuses on sexual misconduct prevention and response as required by Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), and federal guidance, all of which were available to Defendants as a matter of basic due diligence.

39. Upon information and belief, institutions the size and scale of LSU generally provide much more comprehensive training to students and employees to inform them of their rights and obligations under the institution's Title IX Policy than LSU did.

40. Upon information and belief, LSU had only one employee staffing the Title IX Office – from 2013 to 2015, former Title IX Coordinator Jim Marchand, then from 2015 to approximately 2018, Defendant Stewart.

41. For many years, LSU did not have a single Title IX investigator or administrative staff member to assist the Title IX Coordinator with carrying out his or her duty to ensure that an institution consisting of around 31,000 students and 6,500 employees during the period in question remained free of sex discrimination.

42. LSU's Title IX Office of one was woefully inadequate to meet the needs of its campus and well outside the scope of industry standards for an institution of LSU's size.

43. As set forth herein, LSU handled Title IX complaints against student-athletes differently than complaints against non-athletes.

44. As a practical matter, Title IX complaints against student-athletes are purposefully buried or diverted so as to ensure that those complaints were never properly investigated or addressed and the student-athletes are not negatively impacted or prevented from concentrating on their athletics, all of which benefits LSU financially and causes further harm to Plaintiffs.

45. Defendants' actions and inactions in response to Plaintiffs' reports of Title IX violations subjected Plaintiffs to additional harassment and created a sexually hostile environment on campus.

46. Plaintiffs suffered harm as a direct and indirect result of Defendants' actions and inactions, as detailed herein.

***The Husch Blackwell Report***

47. In November 2020, LSU retained the Husch Blackwell law firm to investigate the school's handling of several Title IX-related incidents as well as LSU's Title IX policies and procedures.

48. On March 5, 2021, Husch Blackwell's investigative report and findings (hereinafter, the "Report") were publicly released and aimed to answer three broad questions.[6]

49. The first question was, "Whether the University and its employees handled the matters identified by the *USA Today* article in a manner consistent with obligations under Title IX, widely recognized best practices, and University policy?"[7]

50. The Report found that, "The University did not handle various items identified in the *USA Today* article in a manner consistent with obligations under Title IX, widely recognized best practices, and/or University policy."[8]

51. The second question was, "Whether Title IX-related misconduct involving LSU student athletes has been systematically siloed in the University's Athletics Department and not shared with the University's Title IX Office?"[9]

52. The Report found that: "Various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator. We are especially concerned about a lack of reporting prior to November 2016.... It is worth noting, though, that our concerns about reporting are not limited to Athletics. Institutional reporting policy and training have been unclear for years."[10]

53. The third question was, "Whether the University is appropriately handling Title IX-related matters which are reported to its Title IX Office."[11]

54. The Report found that: "The University's Title IX Office has never been appropriately

---

[6] Attached hereto as Exhibit A.
[7] Report at 1.
[8] *Id*. at 3.
[9] *Id*. at 1.
[10] *Id*. at 3-4.
[11] *Id*. at 1.

staffed or provided with the independence and resources to carry out Title IX's mandates. We have identified concerns that the Office has at times not handled those matters reported to it appropriately. Again, while the *USA Today* article focused primarily on Athletics, we found deficiencies in a variety of different matters."[12]

55. Husch Blackwell found that LSU did not follow federal laws and regulations, best practices, or even its own policies and procedures in cases of reported sexual misconduct.

56. At a university level, the Report found that LSU lacked effective Title IX leadership and was slow to adopt Title IX policies, hire personnel, and meaningfully address concerns identified by community members and internal and external reviews.

57. In 2011, federal guidance changed, and educational institutions were required to designate a Title IX Coordinator.[13]

58. LSU did not name a Title IX Coordinator until 2014, when Jim Marchand filled the role as an "other duties assigned" role.[14,15]

59. Marchand was also a full-time deputy general counsel for LSU during this time.[16]

60. Marchand serving in both roles was a conflict of interest, as the role of a general counsel is to protect the institution, not the students.

61. Defendant Stewart was hired as a full-time Title IX Coordinator in 2015 and was expected to fulfill the roles of Title IX Coordinator for the whole LSU System, campus coordinator for the

---

[12] *Id.* at 4.

[13] *Dear Colleague Letter*, U.S. Department of Education Office for Civil Rights (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[14] Report at 8.

[15] Upon information and belief, for the two years prior to Marchand's appointment, LSU was in violation of federal law. *See* 34 CFR § 106.8(a).

[16] Report at 8.

Baton Rouge campus, and the Clery Coordinator for the entire LSU System.[17]

62. By 2018, the entire LSU Title IX Office staffing for nine campuses consisted solely of two full-time employees and one graduate assistant.

63.  The Report also found a unique problem in Athletics surrounding reporting and lack of training.[18]

64. Husch Blackwell recommended that LSU leadership provide the Athletics Department with clarity and training about roles and expectations as well as training, including bystander intervention training for all athletes.[19]

65. The Report found that at all relevant times, a single athletics employee reviewed each report of sex discrimination and decided whether the report was to be sent to the Title IX Coordinator.[20]

66. This method of processing and investigating reports of sex-based discrimination is contrary to federal guidance and best practices.

67. The Report concluded that all athletics employees must be clearly instructed that they are required to make reports of sex-based discrimination directly to the Title IX Coordinator because such instructions have not previously been provided.[21]

68. Interim President Thomas Galligan concurred with this finding under oath, stating, "The Athletics Department incorrectly directed where to report potential Title IX issues."[22]

---

[17] The LSU System includes all nine LSU campuses: LSU-Baton Rouge; LSUS-Shreveport; LSU Health-New Orleans; LSU of Alexandria; Pennington Biomedical Research Center; LSU Health-Shreveport; LSU-Eunice; LSU Ag Center & Research Stations; and LSU Health Care Services Division.

[18] Report at 142-143.

[19] Report at 145.

[20] Report at 34-35, 143.

[21] Report at 143-144.

[22] *Hearing Before Senate Women and Children Committee*, Louisiana State Senate (Mar. 10, 2021), https://www.senate.la.gov/s_video/videoarchive.asp?v=senate/2021/03/031021SCWC_0 at 3:48.

69. The Report noted that the football team was long overdue for training targeted to their players with the goal of minimizing the rate of sexual misconduct.[23]

70. In a 2017 audit entitled "Oversight and Prevention of Sexual Misconduct (Multi-Campus)" completed by LSU's Office of Internal Audit, which was included as Exhibit B to the Report, auditors made the following findings, among others:

    a.  Based on interviews and testing performed, it appears that additional procedures may be required to ensure "responsible employees" have been identified and understand their reporting obligations under Title IX.

    b.  Policies, procedures, and publications related to Title IX are not sufficient to meet institutional obligations outlined by OCR.[24]

    c.  Published contact information for Title IX Campus Coordinators is incomplete and/or not widely communicated (all campuses except LSU A&M).

    d.  Campus Title IX websites are difficult to find through regular navigation or the use of keyword searches.

    e.  Identifies contradicting University employee and student policies and identifies potential risks associated with unclear, inconsistent, or outdated reporting procedures and investigative processes.

    f.  Recognizes the challenges associated with romantic or dating relationships in a work, educational, or athletic environment and that the University currently does not have policy or guidelines in this area.[25]

71. According to the audit report's distribution list, Defendant Stewart received a copy on

---

[23] Report at 143.

[24] U.S. Department of Education, Office for Civil Rights.

[25] Exhibit B to Report (attached as Exhibit A to the Complaint).

September 13, 2017.

72. A document entitled "Management's Response to Internal Audit Prevention of Sex-Based Discrimination" is included as Attachment A to the Report.

73. This document is dated December 5, 2017 and outlined steps LSU management planned to take to address the concerns outlined in the September 2017 internal audit.

74. However, this document did not indicate any plans to address many of the concerns outlined in the September 2017 audit.

75. For example, there is nothing in the document to remedy the issue of responsible employees not understanding or complying with their reporting obligations.

76. The Report indicated that most of the sexual misconduct that occurs on campuses around the country are never reported and when reports are made and involve prominent campus athletes, survivors are commonly reluctant to participate in university disciplinary processes because of fear of retaliation.

77. The Report identified several instances of this fear of retaliation during the Husch Blackwell review and deemed it a deeply entrenched cultural problem at LSU.

78. LSU's failure to comply with even the most basic of Title IX obligations has been, in the words of Louisiana State Representative Paula Davis, "a major screw-up."

79. In the words of President Galligan, "We failed those who it was our first duty to protect[,]" "it was an example of institutional betrayal[,]" and "I am ashamed."[26]

80. Until the release of the Report in March 2021, Plaintiffs had no way of knowing of the deluge of harms perpetrated against them by Defendants.

81. Upon information and belief, Defendants knowingly and intentionally concealed these

---

[26] *Hearing Before Senate Women and Children Committee*, *supra* note 15, at 3:36.

harms from Plaintiffs.

82. Plaintiffs also discovered that the harms are continuing in nature and damages will continue to accrue until resolution by the courts.

83. Until the release of the Report in March 2021, Plaintiffs could not have known that:

    a. LSU's reporting and response system was woefully inadequate in comparison to other comparable universities and substantially deviated from the duty of care as outlined in industry standards;

    b. LSU and its employees, including Defendant Stewart, had specific knowledge of its institutional level procedural deficiencies;

    c. LSU purposely handled complaints of sexual misconduct perpetrated by student athletes or others affiliated with the LSU Athletics Department in a different manner than complaints of sexual misconduct perpetrated by other individuals;

    d. There was a causal connection between the failure of LSU's Title IX system and the success of its Athletics Department;

    e. LSU and its employees, including Defendants Ausberry and Segar, encouraged and perpetrated sex discrimination by retaliating against employees that attempted to follow their reporting obligations;

    f. LSU and its employees, including Defendants Ausberry and Segar, had concealed disclosures of sexual misconduct that should have been reported to LSU's Title IX Office;

    g. Defendants intentionally instituted a process of responding to disclosures of Title IX violations in a manner designed to deter any future disclosures;

    h. LSU football players never received appropriate training regarding prevention of

sexual misconduct; and

    i.    Numerous LSU employees, including the majority of those in the Athletics Department, did not understand their reporting obligations under Title IX.

***Louisiana State University's Football-Centric Culture***

84. For years, the LSU Athletics Department prioritized the highly profitable football program in its decision making.

85. In July 2019, the Athletics Department unveiled a $28 million locker room for the football team, complete with nap pods, a pool, a theatre, and performance nutrition center for athlete recovery.[27]

86. LSU now ranks number seven for college football's best facilities in the nation, according to the website 247Sports.[28]

87. The excessive expenses and resources allocated to the football program were at the direct expense of and detriment to Plaintiffs.

88. At the March 26, 2021, Louisiana State Senate Women and Children Committee Hearing, an example of LSU football players committing sexual misconduct without any consequences was discussed.

89. At this hearing, Gloria Scott ("Scott"), a 74-year-old Mercedes-Benz Superdome security officer, testified that in December 2017, LSU football player John Doe[29] sexually harassed her in the Superdome after a game.

---

[27] Jessica S. Lee, *LSU's football team has a new $28 million locker room — complete with sleep pods, a pool, and a mini theater*, Business Insider (Aug. 30, 2019), https://www.businessinsider.com/louisiana-state-university-football-locker-room-athletic-facility-2019-8.

[28] Brad Crawford, *Ranking college football's 25 best facilities in 2021*, 247Sports (Mar. 3, 2021), https://247sports.com/LongFormArticle/college-football-recruiting-2021-facilities-Alabama-Clemson-Ohio-State-LSU-Texas-Georgia-Florida-160189814/#160189814_8.

[29] John Doe is a pseudonym.

90. Scott testified that John Doe said: "I like to fuck women like you, you older women, because y'all know y'all like us young men to fuck y'all."

91. Scott testified that John Doe continued to make vulgar comments while rubbing his genitals and smiling at Scott.

92. Scott testified that John Doe's friends were watching, laughing, and encouraging John Doe.

93. Scott testified that she felt scared, degraded, and humiliated, but she still filed complaints with officials at the Superdome, the LSU Athletic Department, and the police department.

94. In response to this blatant sexual misconduct, Scott testified that LSU head football Coach Ed Orgeron, Jr. personally called Scott and told her that John Doe was a "troubled child," and that he was "just kidding."

95. Scott testified that she requested that John Doe be held back from the upcoming 2018 Citrus Bowl game, but John Doe never faced any disciplinary action for his sexual misconduct.

96. LSU has a culture of failing to hold male students, and especially male student athletes, accountable for their acts of sexual misconduct against female presenting students.

97. As discussed in the Report, this culture is known to encourage sexual harassment and assault by creating a hostile environment.[30]

98. President Galligan himself confirmed under oath that there was "no culture of punishment at LSU" regarding sexual misconduct.[31]

***Employee Terminations at Other Institutions***

99. The former president of LSU, F. King Alexander ("Alexander") faced disciplinary action as a direct result of his mishandling of sexual misconduct reports while at LSU.

---

[30] Report at 52.
[31] *Hearing Before Senate Women and Children Committee*, *supra* note 15, at 3:59.

100.    Alexander was selected to become President of Oregon State University ("OSU") on December 13, 2019 and assumed office on July 1, 2020.

101.    The publication of the Report, outlining Alexander's role in covering up sexual misconduct reports at LSU, prompted a meeting of the OSU Board of Trustees to review the findings and recommendations of the Report, publicly discuss Alexander's leadership over Title IX at LSU, and share subsequent information that OSU had received about the mishandling of sexual violence and misconduct at LSU during Alexander's tenure.[32]

102.    On March 17, 2021, the OSU Board of Trustees placed Alexander on probation.[33]

103.    On March 18, 2021, the Faculty Senate of OSU declared a vote of no confidence in Alexander's leadership and demanded he resign in response to revelations about his role in failing to enforce policies against sexual misconduct while at LSU.[34]

104.    On March 23, 2021, Alexander resigned from his position at OSU effective April 1, 2021.[35]

105.    Former LSU football coach Les Miles ("Miles"), who went on to coach at the University of Kansas starting in 2018, faced disciplinary action as a direct result of his mishandling of reports of sexual misconduct.

106.    The Report detailed accusations that Miles had sexually harassed female student

---

[32] Carolyn Roy, *OSU board reviews report detailing president F. King Alexander's response to allegations of abuse at LSU*, ArkLaTex Homepage (Mar. 17, 2021), https://www.arklatexhomepage.com/news/state-news/louisiana/osu-board-reviews-report-detailing-president-f-king-alexanders-response-to-allegations-of-abuse-at-lsu/.

[33] Suzanne Stevens, *OSU President F. King Alexander on probation over handling of LSU sexual misconduct case*, Portland Business Journal (Mar. 18, 2021), https://www.bizjournals.com/portland/news/2021/03/18/osu-pres-f-king-alexander-on-probation-over-han.html.

[34] Meerah Powell, *OSU Faculty Senate, others continue call for university president's resignation*, Oregon Public Broadcasting (Mar. 18, 2021), https://www.opb.org/article/2021/03/19/oregon-state-university-faculty-president-f-king-alexander-resignation-calls/.

[35] Kenny Jacoby, Nancy Armour and Natalie Pate, *Oregon State University President F. King Alexander resigns amid fallout from LSU scandal*, USA Today (Mar. 23, 2021), https://www.usatoday.com/story/news/investigations/2021/03/23/oregon-state-university-president-alexander-resigns-amid-lsu-scandal/6965847002/.

workers while at LSU, and that LSU suppressed these reports of sexual misconduct.

107.    On March 8, 2021, the University of Kansas released a statement announcing that they would be "mutually parting ways" with Miles.[36]

108.    Jeff Long, the Director of Athletics at the University of Kansas and the person responsible for hiring Miles in 2018, stepped down from his role on March 10, 2021.[37]

109.    Upon information and belief, LSU has not terminated any of the employees involved in suppressing Title IX complaints and the other failures outlined in the Report and in this Complaint.

110.    When asked by the Louisiana Senate why Defendants Ausberry and Segar were the only individuals disciplined with a short suspension, President Galligan responded under oath, "The messages from the top were very, very unclear."[38]

111.    In fact, news outlets recently released emails from Defendants Ausberry and Segar that demonstrate that these individuals continued to work during their "suspension."[39]

112.    Unlike other universities, LSU has not actually disciplined any parties at fault for endangering the safety of Plaintiffs or any other individuals who experienced or reported Title IX violations.

---

[36] Nancy Armour, Kenny Jacoby and Jessica Luther, *Kansas, football coach Les Miles mutually agree to part ways amid probe into inappropriate behavior at LSU*, USA Today (Mar. 9, 2021), https://www.usatoday.com/story/sports/ncaaf/big12/2021/03/08/les-miles-kansas-mutually-agree-part-ways-amid-lsu-probe/4626228001/.

[37] Chris Low, *Jeff Long out as Kansas athletic director days after school ousted football coach Les Miles*, ESPN (Mar. 10, 2021), https://www.espn.com/college-sports/story/_/id/31040149/jeff-long-kansas-athletic-director-sources-say.

[38] *Hearing Before Senate Women and Children Committee*, *supra* note 15, at 4:06.

[39] Johnston Von Springr, *While on leave, suspended LSU athletics officials conduct business*, WBRZ TV (Jun. 17, 2021), https://www.ktbs.com/news/while-on-leave-suspended-lsu-athletics-officials-conduct-business/article_fa259c48-cf9d-11eb-91ad-e7c422e74535.html.

*Sharon Lewis' Allegations and Lawsuit Against LSU*

113.    On April 8, 2021, Associate Athletics Director of Football Recruiting and Alumni Relations Sharon Lewis filed a lawsuit against LSU in this Court alleging that she had been repeatedly disciplined and retaliated against for attempting to address known Title IX violations within the LSU athletics department.[40]

114.    Specifically, in her lawsuit, Sharon Lewis alleges the following:

   a.    In 2013, a female student employee came to Sharon Lewis and told her that former football coach Les Miles had done something inappropriate to her.[41]

   b.    Sharon Lewis confronted Miles about these allegations and subsequently reported them to Defendant Segar, but LSU took no action. Presumably, Defendant Segar did not report these allegations to then-Title IX Coordinator Jim Marchand, as this is not mentioned in Sharon Lewis' complaint.[42]

   c.    On another occasion in 2013, a different student employee reported to Sharon Lewis that she had received inappropriate text messages from Miles. Sharon Lewis reported these allegations to Defendant Segar. Again, presumably, Defendant Segar did not report these allegations to Marchand.[43]

   d.    LSU hired its own outside counsel to investigate the second set of allegations. Rather than making its findings based on LSU's policy definitions of sexual misconduct, as required by federal Title IX guidance, the investigation report found there was no Title IX violation because the reporting student was "of consenting

---

[40] Complaint, *Lewis v. LSU et al.* (M.D. La. 2021) (No. 3:21-cv-00198).
[41] *Id.* at 10.
[42] *Id.*
[43] *Id.*

age."[44]

  e. On several other occasions, Sharon Lewis observed or was told about other acts of sexual misconduct by Miles, but either she did nothing or she reported the incidents to her supervisors, and they did nothing.[45]

  f. Miles, Ausberry, Segar, and Athletic Director Joe Alleva engaged in retaliation against Sharon Lewis after she attempted to report some of Miles' alleged acts of sexual misconduct. Sharon Lewis did not take any steps to report or address the retaliation beyond the Athletics Department.[46]

115. It was also reported that during a March 22, 2021, staff meeting and discussion of the Report, people stated in Sharon Lewis's presence that individuals in the athletic department that attempted to comply with LSU's Title IX Policy were "tattletales."[47]

116. Sharon Lewis's admissions are consistent with LSU General Counsel Winston G. DeCuir, Jr.'s statements during the March 10, 2021, Senate Hearing: "Our big problem was complaints not getting to Title IX. People trying to handle complaints themselves instead of invoking the Title IX Office."[48]

117. At that same Senate Hearing, when State Representative Paula Davis asked, "Who felt confused when reporting?" President Galligan answered, "I think everybody."[49]

118. Upon information and belief, not only were LSU employees not properly trained in Title IX response, but they were also actively discouraged from reporting and were retaliated

---

[44] *Id.* at 11.

[45] *Id.* at 6-11.

[46] *Id.* at 11-17.

[47] Glenn Guilbeau, *LSU whistleblower's complaint may lead to second federal lawsuit after filing with EEOC*, Lafayette Daily Advertiser, Apr. 19, 2021, https://www.theadvertiser.com/story/sports/college/lsu/2021/04/19/lsu-whistleblower-complaints-against-les-miles-may-prompt-2nd-federal-lawsuit/7278952002/.

[48] *Hearing Before Senate Women and Children Committee*, *supra* note 15, at 4:29.

[49] *Id.* at 4:34.

against if they attempted to report.

119.     The concerns about retaliation were so severe that employees like Sharon Lewis, who attempted to understand her reporting obligations, still chose not to report directly to the Title IX Office out of fear.

120.     This culture of non-reporting directly caused Richardson and Brennan's disclosures to remain uninvestigated.

## INDIVIDUAL FACTUAL ALLEGATIONS

### *Calise Richardson*

121.     Richardson began her education at LSU as a freshman in the fall of 2014 and worked for the recruiting staff of LSU's football team from approximately September 2014 to January 2017.

122.     During Richardson's freshman year at LSU, she was raped by an LSU football player while she was drunk.

123.     Unfortunately, this was only the first of many times Richardson would be abused by an LSU football player with no repercussions for the perpetrators.

### *Richardson's Abuse as a Football Recruiter*

124.     During her time working in the LSU football recruiting office, female recruiters were expected by LSU staff to do "anything" to bring potential recruits to LSU.

125.     Over the course of Richardson's job, she began to realize that female recruiters were expected to please the recruits in any way they could, which included engaging in sexual acts with the recruits.

126.     In the fall of 2015, Richardson received a text message from a recruit asking if he could stay over at her apartment because he was locked out of his friend's apartment.

127.    When Richardson asked how he got her number, the recruit told her he had gotten it from the football player he was staying with during his visit to LSU.

128.    The recruit kept pressuring and guilting Richardson by telling her he would have to sleep on the streets.

129.    Richardson finally agreed to let the recruit stay at her apartment, but she made it clear that nothing sexual would happen between the two of them and that he would be sleeping on the couch.

130.    When the recruit entered Richardson's apartment, he raped her.

131.    Richardson did not report the assault because she was afraid of getting in trouble.

132.    Richardson had to end her lease early and move to another apartment because she could not continue to live in the place where she had been raped.

133.    The understanding that she should not report the rape was reinforced by the conduct of her supervisors in the Athletic Department and the football coaches.

134.    During her sophomore year in approximately January 2016, Richardson talked with LSU wide receivers coach Tony Ball ("Ball") and a recruit at a recruiting event.

135.    Ball told the recruit multiple times, "Calise is going to show you a good time and all that LSU has to offer" in a sexually suggestive tone.

136.    Richardson tried to keep the conversation professional by telling the recruit about the scheduled LSU group tour and dinner.

137.    However, Ball reiterated he wanted Richardson to "show the recruit a good time this weekend."

138.    On multiple occasions, recruits would ask Richardson for her phone number or to "hang out."

139.     Recruits would get offended when she did not share her personal information.

140.     Recruits would also send Richardson unwelcome direct messages on social media platforms.

141.     Richardson wanted to be friendly and welcoming to recruits to convince them to attend LSU, but she always felt uncomfortable whenever recruits would insist she was supposed to spend time with them outside of her employment responsibilities at LSU.

142.     On multiple occasions, Richardson received unwelcome text messages from recruits, coaches, ex-players, and other older men.

143.     Richardson has received dozens of texts of this nature, and continues to receive text messages from random men affiliated with LSU Athletics, even though she is no longer associated with any LSU program.

144.     Richardson did not provide these people with her phone number.

145.     One of the individuals who texted Richardson when she was eighteen years old was at least twenty years older than Richardson.

146.     He told Richardson that he had gotten her number from LSU Coordinator of Defensive Operations Tamara Davis.

### *Richardson and John Coe*

147.     John Coe[50] was a highly recruited athlete who played on the LSU football team as a wide receiver from 2016 to 2017.

148.     In the summer of 2016, Richardson and John Coe began an on again, off again relationship.

149.     John Coe soon became verbally and physically abusive towards Richardson.

---

[50] John Coe is a pseudonym.

150.    John Coe emotionally abused Richardson by expecting her to be available whenever he demanded, telling her what she was allowed to wear, deciding which friends she could spend time with, and dictating whether she could go to bars without him.

151.    John Coe was much larger than Richardson and would hold her down by putting all of his body weight on her until she started to cry and could not breathe.

152.    In October 2016, after a football game, Richardson went to J.L.'s bar in Tigerland with her friends from the football team.

153.    When Richardson got to J.L.'s, she saw John Coe kissing another woman at the bar.

154.    John Coe made eye contact with Richardson while he was kissing the other woman, then came over to Richardson and began to grope her without her consent.

155.    Richardson got angry with John Coe for groping her, and John Coe shoved Richardson to the ground.

156.    John Coe's teammates had to restrain him from attacking Richardson further, and he was kicked out of the bar.

157.    When Richardson left the bar later than night, John Coe appeared out of nowhere outside of the bar and ran at her. John Coe's teammates had to restrain him again so he would not hurt Richardson.

158.    Later that night John Coe appeared uninvited at Richardson's apartment, and she had to call his teammates to come get him away from her.

159.    The following day, Richardson received a call from Sharon Lewis, her other direct supervisor in the recruiting office, about the incident with John Coe the night before.

160.    Sharon Lewis started the conversation by asking Richardson why she had thrown a drink at John Coe.

161.     When Richardson told Sharon Lewis that John Coe had physically attacked her, Sharon Lewis asked Richardson if she wanted to set up a meeting with John Coe, Sharon Lewis, and John Coe's coach to "iron things out."

162.     For clarity, after Richardson's disclosure of dating violence, her direct supervisor and a Responsible Employee under the Title IX Policy, requested that Richardson have a meeting with her abuser as opposed to properly reporting the dating violence.

163.     Neither Sharon Lewis nor any other LSU staff member offered Richardson any support, resources, accommodations, or interim measures.

164.     Upon information and belief, no report was made to the Title IX Office and no investigation was initiated.

165.     Richardson refused to meet with John Coe but agreed to meet with Sharon Lewis and Associate Director of Recruiting Operations Keava Soil-Cormier the following week.

166.     At that meeting, Richardson disclosed John Coe's assault at the bar that weekend to Sharon Lewis and Soil-Cormier.

167.     Sharon Lewis and Soil-Cormier minimized Richardson's experience of dating violence by stating that they could call the police if Richardson felt like this was "big enough to ruin John Coe's career at LSU."

168.     Richardson told Sharon Lewis and Soil-Cormier that she was afraid of John Coe because he had stalked her and tried to attack her at her housing complex.

169.     Defendants Lewis and Soil-Cormier laughed at Richardson and mockingly questioned why she was afraid of John Coe.

170.     This was one of the first times Richardson had opened up about the extent of the abuse she experienced at the hands of John Coe and her supervisors' laughter and mockery at her

abuse humiliated and terrified her.

171.    Sharon Lewis and Soil-Cormier reiterated that John Coe's punishment was up to Richardson, again making it clear that they believed that Richardson was responsible for getting John Coe into trouble and ruining his football career.

172.    Sharon Lewis and Soil-Cormier never offered Richardson resources, counseling, support services, or even asked her if she felt safe.

173.    To Richardson's knowledge, neither Sharon Lewis nor Soil-Cormier ever reported the incident to the Title IX Office.

174.    Sharon Lewis and Soil-Cormier also never told Richardson she could report the abuse to the Title IX Office herself.

175.    Immediately after Richardson spoke with Sharon Lewis and Soil-Cormier, she faced retaliation at work.

176.    The LSU Athletics Department refused to schedule Richardson to work at the events in which John Coe participated.

177.    However, John Coe continued to approach Richardson with impunity.

178.    Several times while she was at the LSU gym, John Coe would come in and work out right next to her.

179.    No one at LSU prevented John Coe from continuing to menace Richardson or made any attempt to stop his behavior.

180.    No one at LSU offered Richardson any support, resources, accommodations, or interim measures.

181.    Richardson never heard from the Title IX Office.

### *Richardson and John Doe*

182.     In the fall of 2016, Richardson went to a bar in Tigerland with her friends, including football player John Doe, to celebrate the end of final exams.

183.     John Doe told Richardson he had gotten kicked out of his apartment and asked if he could stay over at her apartment.

184.     John Doe had been at Richardson's apartment multiple times before and they were good friends at that point, so Richardson allowed him to stay over.

185.     When they woke up the next morning, Richardson and John Doe began to joke around, which they had done multiple times before as friends.

186.     Richardson had a broken foot with a hard cast on at the time, which severely limited her mobility.

187.     Without warning, John Doe got on top of Richardson, attempted to remove his and Richardson's pants, and attempted to rape Richardson.

188.     Richardson told John Doe to stop multiple times.

189.     John Doe became angry with Richardson. John Doe threatened Richardson by yelling at her, telling her that he would "ruin her life" by getting her fired, and said she would "regret this."

190.     John Doe remained in Richardson's apartment for some time after Richardson had instructed him to leave.

191.     Within a day, Richardson called one of her direct supervisors in the recruiting office, Soil-Cormier, to tell her about the incident and John Doe's threats to get her fired.

192.     At this point in time, the Athletics Department had received at least two other rape accusations against John Doe from both Plaintiffs Brennan and Robertson.

193.    Although John Doe's predatory behavior was known to the Athletics Department, Soil-Cormier responded to Richardson's disclosure of John Doe's sexual misconduct by asking why Richardson would let John Doe in her apartment if she did not want to have sex with him, implying that Richardson was the cause of John Doe's sexual misconduct.

194.    In front of other recruiters, Soil-Cormier also asked Richardson's coworkers in the recruiting office what happened between Richardson and John Doe.

195.    This led to rumors spreading about Richardson and caused dissension with one of her coworkers who was dating John Doe at the time.

196.    Soil-Cormier strongly encouraged Richardson to apologize to her coworker to restore harmony in the workplace, placing further blame on Richardson for being sexually assaulted.

197.    For clarity, following Richardson's disclosure of an attempted rape, Richardson's direct supervisor and a Responsible Employee under the Title IX Policy began spreading office rumors about Richardson's sexual activity and then told Richardson to apologize to her rapist's significant other.

198.    To Richardson's knowledge, Soil-Cormier never filed a Title IX report and no investigation was initiated.

199.    No one at LSU ever offered Richardson any resources, support, or accommodations to help her cope with the sexual assault.

200.    After the assault, John Doe publicly harassed and humiliated Richardson by telling other football players, coaches, and athletics workers that he and Richardson had slept together, and that Richardson was a "whore."

201.    John Doe also tormented Richardson for years after by causing a scene every time

they were in public together.

202.    Whenever John Doe would see Richardson at a bar, he would go to the bouncers and try to kick her out until bar owners told him to stop.

### *Retaliation against Richardson*

203.    While studying abroad in the spring of 2017, Richardson received an email from the football recruiting office informing her that she was being let go from her job despite the fact that she had returned to campus to work in January 2017 (the busiest part of the recruiting season) before going abroad.

204.    When Richardson contacted Soil-Cormier to ask why she was being let go after she was told she could return to her job, Soil-Cormier told Richardson to talk to her in August 2017 when she returned so they could "figure it out."

205.    In August 2017, when Richardson met with Sharon Lewis, Soil-Cormier, and one of the assistants to the head coaches, Ya'el Lofton, they told Richardson that she was being let go for pretextual reasons.

206.    In fall 2018, Richardson experienced further retaliation by the Athletic Department for reporting the abuse by John Doe and John Coe when she was denied an athlete tutor position.

207.    Director of Educational Support Services Dorothy Kemp first told Richardson she could not be a tutor because she used to be a recruiter, then claimed it was because she used to date a football player, and lastly claimed it was because she had gotten a bad reference.

208.    Again, this was clearly pretextual, as many of the tutors were former recruiters who dated football players, and Richardson had a good relationship with her reference.

209.    In fall 2018, another two job opportunities with the football department vanished for Richardson without any explanation.

210.    For both positions, Richardson's would-be supervisors approached her about working for them and were very enthusiastic about working with her before the positions suddenly fell through without warning.

### *LSU's Flawed Title IX Investigation*

211.    Richardson could not escape the cycle of abuse in which John Coe trapped her.

212.    She continued to date John Coe until his arrest in fall 2018 for assaulting Plaintiff Lewis.

213.    The week after Richardson found out that John Coe was abusing Plaintiff Lewis just like he had abused Richardson, she went to her mentor, Defendant Ausberry, in tears, and told him about John Coe's abuse.

214.    Defendant Ausberry immediately stopped Richardson and told her she had to report the abuse to Defendant Segar.

215.    Defendant Segar called Richardson, but when Richardson returned the call, Defendant Segar never responded.

216.    At this point in time, Segar had actual knowledge of the claims of sexual assault against Doe and Coe from *at least* three other LSU students, specifically Plaintiffs Robertson, Brennan, and Lewis.

217.    In fall 2018, Richardson was working in the LSU Athletics Department for Life Skills Manager Brenton Sumler ("Sumler").

218.    On or around October 1, 2018, Richardson went to Sumler's office.

219.    Richardson broke down in tears in front of Sumler and told him about John Coe's abuse.

220.    Sumler immediately took Richardson to LSU Cares, an office within LSU's Student

Advocacy and Accountability office ("SAA") where students could report concerns regarding sexual misconduct.

221.    Richardson reported her abuse to a staff member at the LSU Cares office.

222.    That same day, LSU's Title IX Office opened a complaint and assigned the case to Title IX Lead Investigator Jeffrey Scott ("Scott").

223.    Scott, who had personal knowledge of Coe's history of abuse through Plaintiff Lewis's investigation, met with Richardson on or around October 3, 2018, to obtain her statement.

224.    For reasons Richardson did not understand, Sharon Lewis, an LSU employee, was named as the respondent in the investigation instead of John Coe.

225.    Upon information and belief, this was an attempt to conceal John Coe's identity and protect him from the accusations.

226.    Richardson's interview with Investigator Scott was limited and focused primarily on Sharon Lewis rather than on John Coe, again, in an effort to protect John Coe.

227.    Sharon Lewis met with Investigator Scott on November 5, 2018, to provide her statement in the investigation.

228.    In her interview, Sharon Lewis stated that she did not report Richardson's complaint to the Title IX Office because she felt there was no report of a sexual assault.

229.    Sharon Lewis appeared to have no understanding that Title IX also covers domestic and dating violence and stalking.

230.    During the interview, Sharon Lewis also admitted that she had not been completely aware of the Title IX Office until 2017 and that Title IX issues in athletics always went through Defendant Segar's office.

231.    Investigator Scott also interviewed Defendants Segar and Ausberry as witnesses in

the investigation on November 8 and 9, 2018, respectively.

232.    In his final investigative report dated November 16, 2018, Investigator Scott made a finding that Sharon Lewis had violated LSU's Title IX Policy by failing to notify the Title IX Office about Richardson's report of John Coe's abuse.

233.    No finding was made regarding John Coe's abuse of Richardson.

234.    When Richardson met with Investigator Scott to review the final report, Investigator Scott informed her that Sharon Lewis was not going to receive any discipline or sanction from the overseeing human resources department.

235.    Richardson was extremely upset to learn that Sharon Lewis would not be sanctioned even though she was found to have violated LSU's Title IX Policy and that John Coe, the perpetrator, would be receiving no discipline or sanction.

236.    The only action LSU took was to require Sharon Lewis to attend an online training about sexual harassment.

237.    Richardson was never informed as to whether Sharon Lewis completed the training.

238.    Upon information and belief, Richardson's rapes and the overall treatment by those affiliated with the football team were directly linked to the image that John Doe had painted of Richardson as a "whore" because of her refusal to have sex with him and the Athletics Department's belief that the women who worked in the recruiting department were there to please and service players and potential recruits at any cost.

239.    As reported in relation to former head coach Les Miles, he demanded that certain women receive opportunities (or not) in football recruiting based solely upon their physical appearance (or his opinion of it).

240.    Along with the information outlined *supra*, until the release of the Report in March

2021, Richardson could not have known that:

    a.  LSU, including specifically Defendants Stewart, Sanders, and Segar, had specific knowledge of the pervasive sex discrimination and retaliation she and others suffered;

    b.  LSU, specifically Defendant Segar, had actual knowledge of other survivors that had reported abuse by John Doe and John Coe, meaning LSU had specific knowledge of a heightened risk of assault by both John Doe and John Coe;

    c.  LSU and its employees failed to train Richardson on the resources available to her as a survivor, even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct; and

    d.  LSU's Title IX Policy is meant to prevent the specific emotional distress that Richardson endured.

241.    As a direct and indirect result of the actions and inactions of Defendants, Richardson has suffered severe emotional and physical distress and economic loss. Richardson goes to therapy once a week and is diagnosed with PTSD. The anxiety she developed as a result of her experiences at LSU causes her to suffer from stomach aches, headaches, and body aches and she has incurred expenses for related health care. Richardson actively avoids many events because she does not feel safe doing things on her own. She has turned down multiple jobs with male supervisors and refrained from meeting with male professors one-on-one because she is afraid of being alone with men. Richardson's experiences with John Doe and John Coe made her afraid to go to class, so she drastically changed her routes to class and planned her campus migration around John Doe and John Coe's football schedules. Oftentimes, she was so afraid to go to class that she could not go, and her grades suffered accordingly. Richardson's substance use

drastically increased after the assaults, and she is unable to fall asleep without having vivid nightmares of her assaults. Her relationships with others have been negatively impacted, and she is fearful and guarded.

***Ashlyn Robertson***

242.    Robertson began her education at LSU as a freshman in the fall of 2015 as a recipient of a Taylor Opportunity Program for Students ("TOPS") scholarship, which required her to maintain a certain grade point average and to graduate from LSU.

243.    On January 22, 2016, Robertson hosted a party at her off-campus apartment complex at which many LSU athletes were housed, so several members of the LSU football team attended.

244.    John Doe attended even though he had not been invited.

245.    When John Doe arrived at the party, Robertson was intoxicated and made a comment about not liking John Doe because of his attitude.

246.    John Doe told Robertson that he would "make [her] like" him.

247.    Robertson later went to her bedroom to lay down.

248.    John Doe entered Robertson's bedroom while Robertson was passed out, and raped her.

249.    The next day, Robertson experienced flashbacks of John Doe spitting on her and roughly penetrating her both vaginally and anally without her consent.

250.    She also suffered painful vaginal and anal trauma.

251.    John Doe's number was also in Robertson's phone, even though she did not remember giving him her phone or taking his phone number at any point.

252.     Robertson's friends on the football team told her that John Doe had bragged about having sex with her.

253.     Robertson told a few close friends about the rape, one of whom was on the LSU swimming and diving team.

254.     Robertson's friend told her friend's mother about the rape, who told the diving coach, who then told Defendant Segar on January 26, 2016.

255.     Segar spoke with Robertson's friend, who told Robertson that some LSU staff were aware of the issue.

256.     Robertson did not want to report the rape because Doe was revered "like a god" on campus, and she thought that reporting would cause her to be the most hated person on campus and force her to leave LSU, but her friend encouraged her to report to access medical assistance and counseling.

257.     Robertson went to the LSU Student Health Center a few days after the rape, and a nurse told Robertson it was better to not pursue an investigation against John Doe.

258.     Robertson also discovered that she had contracted chlamydia because of the rape.

259.     On February 1, 2016, Associate Vice President and Dean of Students Mari Fuentes-Martin ("Fuentes-Martin") emailed Robertson to ask if she wanted to proceed with a Title IX investigation.

260.     On February 5, 2016, Robertson emailed Fuentes-Martin back stating that she did not want to proceed with a Title IX investigation.

261.     Fuentes-Martin had a duty to record all the information that she had related to the disclosure and to offer support measures to Robertson, despite Robertson's choice to not pursue an investigation.

262.    After the rape, John Doe began a campaign of vicious harassment against Robertson, including throwing a shake on Robertson's car during finals week in May 2016.

263.    During the late spring/early summer of 2016, around the same time Doe sexually assaulted Plaintiffs Owens and Brennan, John Doe came to a football player's room where Robertson was hanging out with several of her friends.

264.    When her friends realized John Doe had arrived, they hid Robertson in a different room to protect her from John Doe's abuse.

265.    John Doe eventually found Robertson in the room and harassed her about "spreading rumors."

266.    John Doe told Robertson he had "a gun with [her] name on it."

267.    During that same summer, Robertson went to a party and saw John Doe standing by the door with a group of women.

268.    When John Doe saw Robertson, he said, "There's that bitch right there," causing Robertson to quickly leave the party.

269.    John Doe lived at the same apartment complex as Robertson, so she was afraid of seeing him at her apartment.

270.    No one from LSU told Robertson that she could request a change in housing accommodations.

271.    In fall 2016, Robertson told her new boyfriend, who had been recruited to play on the LSU football team, about the rape.

272.    Robertson's boyfriend stayed away from John Doe because he was angry with him for raping Robertson, which caused tension between the two players.

273.     Robertson's boyfriend disclosed the rape to his coach, Orgeron, and Orgeron responded by telling Robertson's boyfriend to not be upset because "everybody's girlfriend sleeps with other people."

274.     As a Responsible Employee, Orgeron had a duty to report this disclosure to LSU's Title IX Office.

275.     Upon information and belief, Orgeron never reported the rape to the Title IX Office or any other entity at LSU.

276.     Orgeron never offered Robertson any accommodations to help her deal with the aftermath of the rape.

277.     It was not until Robertson read the Husch Blackwell Report that she realized that John Doe's name was not included in any of the records of her rape, even though Defendant Segar, Orgeron, and Fuentes-Martin all knew John Doe's identity.

278.     Publication of the stories of John Doe's multiple assaults of her and other women has forced Robertson to relive her trauma on a national stage.

279.     As a result of John Doe's exclusion from all of the records, LSU never contacted Robertson when Plaintiffs Owens and Brennan reported assaults by John Doe to ask if she wanted to come forward with a complaint against John Doe at those times.

280.     Prior to studying at LSU, Robertson had top grades and was the valedictorian of her high school class.

281.     After being raped by John Doe, Robertson's grades began to decline.

282.     As a result of John Doe's rape and subsequent harassment, Robertson began drinking heavily, using drugs, and engaging in hypersexual behavior to cope with the trauma.

283.    Robertson was arrested on drug charges in September 2017 and sent to two rehabilitation centers between September 2017 and January 2018.

284.    When Robertson was arrested in September 2017, her mother withdrew her from LSU.

285.    Because she was forced to leave LSU before graduating, Robertson has to repay her TOPS scholarship.

286.    No one at LSU offered Robertson any support, resources, accommodations, or interim measures, failing to ensure that Robertson could return safely to complete her degree.

287.    Along with the information outlined *supra*, until the release of the Report in March 2021, Robertson could not have known that:

      a.    LSU and its employees, including specifically Defendant Segar, had specific knowledge of the pervasive harassment and retaliation she and others suffered;

      b.    John Doe assaulted several more LSU students following Robertson's report;

      c.    LSU, including specifically Defendant Stewart, concealed the name of Robertson's assailant from Title IX records;

      d.    LSU and its employees failed to train Robertson on the resources available to her as a survivor; and

      e.    LSU's Title IX Policy is meant to prevent the specific emotional distress that Robertson endured.

288.    As a direct and indirect result of the actions and inactions of Defendants, Robertson has suffered severe emotional and physical distress and economic loss. Robertson lost four semester's worth of tuition and spent what should have been the remainder of her college career in two rehabilitation centers and sober houses, for which she paid out of pocket totaling

approximately $30,000.00. Robertson also lost her TOPS scholarship and is still paying back the money she owes as a result of losing the scholarship. Robertson is unable to complete her education at another school because LSU will not release her transcript until she pays back her TOPS scholarship. Robertson is still recovering from the debilitating alcohol and substance abuse problems she developed as a result of the rape. Robertson is currently taking medication for depression and anxiety to cope with the trauma of the rape and the devastating effect it had on her life.

### Samantha Brennan

289.    In the spring of 2016, Brennan transferred from the University of Minnesota to LSU and began working as a recruiter for LSU's football team.

290.    On July 9, 2016, Brennan went out with a friend.

291.    At the bar, Brennan ran into another friend, who worked for the media department of the LSU football team.

292.    This friend introduced Brennan to John Doe, and Doe drove Brennan home that night.

293.    The next thing Brennan remembered was waking up naked in her apartment with her living room completely disheveled.

294.    Brennan usually did not sleep naked, so she assumed that she had sexual relations with John Doe but could not remember.

295.    Brennan found John Doe's wallet on her couch.

296.    John Doe texted Brennan the next day and asked if his friend could pick up his wallet.

297.    On or around July 22, 2016, Brennan's coworker told her that John Doe had taken

a nude photo of her and shared it with the football team.

298.    The photograph was taken without Brennan's consent while she was incapacitated on the night of July 9, 2016.

299.    On or around July 22, 2016, Brennan met with Sharon Lewis and Defendant Segar at Sharon Lewis' request.

300.    Brennan was told that Defendant Segar was a student advocate but was not told about Defendant Segar's affiliation with the Athletics Department.

301.    At this point in time, Defendant Segar had actual knowledge of John Doe's rape of at least one other LSU student, specifically Plaintiff Robertson.

302.    Upon information and belief, Defendant Segar held no title nor any training or certification required to be considered a victim's advocate under Louisiana law.[51]

303.    However, upon information and belief, Defendant Segar represented herself as such to encourage survivors to report sexual assault to her as opposed to the Title IX Office.

304.    Defendant Segar was a Responsible Employee required to report all disclosures of sexual assault to the Title IX Office.

305.    Sharon Lewis told Brennan that she heard about the photograph and wanted to hear her side of the story, since, according to Sharon Lewis, John Doe denied being in Brennan's apartment.

306.    Brennan told Sharon Lewis and Defendant Segar that she found John Doe's wallet in her couch cushions and had text messages from him asking about his wallet.

307.    Sharon Lewis appeared to be angry that John Doe had lied to her about what

---

[51] La. R.S. § 46:2186 defines "sexual assault advocate" as "a person who is engaged by any office, center, or institution referred to as a sexual assault or rape crisis center or similar program, and who has undergone at least forty hours of training and who is engaged in rendering advice, counseling, advocacy, or assistance to victims."

happened.

308.    Sharon Lewis asked Brennan if she wanted to initiate a police investigation or if she wanted LSU to handle it internally.

309.    Brennan told Sharon Lewis that she wanted LSU to handle it internally.

310.    Defendant Segar ignored Brennan's request and took Brennan to the LSU Police Department ("LSUPD") to file a report.

311.    Brennan met with an LSUPD officer who attempted to coerce her into pressing charges against John Doe.

312.    Despite insistence from LSU employees that Brennan file a police report and press charges, Brennan never received any notice from LSU about whether a Title IX investigation was conducted.

313.    No one at LSU ever offered Brennan any support, resources, accommodations, or interim measures.

314.    Brennan was never contacted by anyone in the Title IX Office or any other school officials about any potential investigation of her report.

315.    Despite LSU's actual knowledge of at least two rape allegations by Robertson and Richardson, in fall 2016, John Doe became LSU's star football player.

316.    In August 2016, Brennan left the LSU recruiting team because of intense feelings of humiliation and shame resulting from John Doe distributing a nonconsensual nude photograph of her. Brennan could not attend classes without hearing classmates cheer on John Doe.

317.    The intense depression and lack of self-worth Brennan felt, caused by John Doe's distribution of her nude photograph without her consent, LSU's lack of response, and the subsequent public support of John Doe caused Brennan to leave LSU.

318.     On or around August 19, 2020, Brennan read a news article reporting that John Doe had raped at least two other students, which encouraged her to decide to come forward with her account of being sexually exploited by John Doe.

319.     Brennan contacted LSUPD on or around August 19, 2020, to obtain a copy of her police report.

320.     LSUPD refused to give Brennan a full copy of her police report and only provided her with a one-page summary that did not name John Doe or provide any detail about what had happened to her.

321.     The time stamp on the report was also inaccurate.

322.     Brennan continued to try to get a full copy of her police report but was told by LSU's Office of Legal Affairs & General Counsel that she would have to file a subpoena to obtain it.

323.     Eventually, Brennan was forced to sue LSU to obtain a copy of her police report.

324.     Brennan recently applied for readmission to LSU, was accepted, and started classes in May 2021 to complete her undergraduate degree.

325.     Along with the information outlined *supra*, until the release of the Report in March 2021, Brennan could not have known that:

    a. LSU, including specifically Defendant Segar, had actual knowledge of other survivors that had reported abuse by John Doe, meaning LSU had specific knowledge of a heightened risk of assault by John Doe;

    b. LSU, including specifically Defendant Segar, had specific knowledge of the pervasive harassment and retaliation she and others suffered;

    c. John Doe assaulted more LSU students following Brennan's report;

d.  LSU and its employees failed to train Brennan on the resources available to her as a survivor, even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct; and

e.  LSU's Title IX Policy is meant to prevent the specific emotional distress that Brennan endured.

326.    As a direct and indirect result of the actions and inactions of Defendants, Brennan has suffered severe emotional and physical distress, including but not limited to headaches, difficulty focusing, an inability to be alone with her thoughts, depression, anxiety, and lack of self-worth, and has incurred expenses for related health care. Brennan lost income from her job on the recruiting team, and she lost future income because of her inability to obtain a college degree without delay and incurred moving expenses after leaving and returning to LSU. Brennan's relationships and her health have been negatively impacted by LSU's failure to appropriately respond to her report of sexual exploitation.

*Abby Owens*

327.    Owens began her education at LSU as a freshman in the fall of 2013 after co-head women's tennis coach Julia Sell recruited Owens to attend LSU and play for the tennis team.

328.    On or around June 28, 2016, Owens went to J.L.'s bar in Tigerland with other LSU student athletes.

329.    LSU football player and student athlete John Doe was also at J.L.'s on the night of June 28, 2016.

330.    When Owens arrived at J.L.'s, she had already been drinking heavily.

331.    Owens knew John Doe as the star player on the football team but had not formally met him before that night.

332.    John Doe bought Owens multiple shots of Patron tequila, which increased her already intoxicated state and then drove Owens in his car to her apartment.

333.    At Owens' apartment, John Doe orally and vaginally raped Owens.

334.    Owens was afraid to report the rape or disclose it to anyone due to John Doe's status as a star athlete.

335.    John Doe's sexual assaults of Owens severely exacerbated the substance abuse problem she had developed as a result of a prior abusive relationship.

336.    On or about April 4, 2017, after being dismissed from the LSU tennis team for testing positive for Adderall, Owens checked into a nearby rehabilitation facility and took a medical withdrawal from school.

337.    After her first few days of treatment at the rehabilitation facility, Owens disclosed for the first time that she had been raped by John Doe.

338.    A rehabilitation center official reported the sexual assault to LSU's Athletics Department approximately a week after the initial disclosure and informed Owens and her parents of the report.

339.    Owens was never contacted by anyone at the Title IX Office.

340.    In late April 2017, while Owens was still at the rehabilitation facility, her father attended a Southeast Conference ("SEC") tennis match where Julia Sell was in attendance.

341.    At the match, Owens's father told Julia Sell that Owens had been raped.

342.    Julia Sell told Owens's father that she did not believe that Owens had been raped.

343.    Upon information and belief, Julia Sell never reported Owens' rape to the police, the Title IX Office, or any other entity.

344.    No one at LSU offered Owens any support, resources, accommodations, or interim

measures, failing to ensure that Owens could return safely to complete her degree.

345.    Owens left LSU halfway through her senior year in March 2017 because she could not bear to be in close proximity to her rapist.

346.    Owens transferred to the University of Georgia in January 2018 and finished her degree in August 2020, approximately three years after her original graduation date.

347.    During her time as a student at LSU, Owens was not aware of the existence of the Title IX Office.

348.    Owens never heard anything about Title IX through the Athletics Department, other than that Title IX was the reason female players were able to get scholarship money.

349.    Owens only learned about LSU's Title IX Office and their obligations in 2019 when she spoke with Jessica Luther, a reporter who covered her story.

350.    Luther advised Owens to call the Title IX Office to request a copy of her Title IX report.

351.    On May 20, 2019, Owens had her first contact with LSU's Title IX Office when she called and asked for a copy of her report.

352.    Owens spoke with Defendant Stewart, who said she would get back to her the next day.

353.    On May 22, 2019, Defendant Stewart told Owens that she had heard about Owens' rape but had decided not to move forward with an investigation since the Athletics Department did not give her the name of the assailant.

354.    At this point, Defendant Stewart had known about Owen's alleged rape for approximately three years and during that time never did a single thing to investigate the claims or to reach out to Owens to offer support or resources or find out the name of her rapist.

355.    Defendant Stewart did not tell Owens who reported the rape to the Title IX Office or when it was reported.

356.    Owens had no further contact with Defendant Stewart until her attorney submitted a Public Records Act ("PRA") request to the Title IX Office to obtain a copy of any record relating to her rape.

357.    On or around August 17, 2020, Owens received an email from Defendant Stewart in response to her attorney's PRA request, stating that the Title IX Office did not have any record of her Title IX case.

358.    When Owens called Defendant Stewart in response to her email, Defendant Stewart confirmed that she had no record to give her.

359.    Defendant Stewart also told Owens that if she wanted to know who the rape was reported to, she would have to ask the rehabilitation facility since they were the ones that initially reported it to LSU, thereby confirming for Owens that there had been a report made to LSU.

360.    Along with the information outlined *supra*, until the release of the Report in March 2021, Owens could not have known that:

      a.    LSU, including specifically Defendant Segar, had actual knowledge of others who had reported abuse by John Doe;

      b.    LSU, including specifically Defendant Stewart, had specific knowledge of the pervasive harassment and retaliation Owens and others suffered;

      c.    John Doe assaulted more LSU students following Owens's report;

      d.    LSU employees, including Defendant Stewart, commonly concealed reports of sexual misconduct from LSU's Title IX Office;

      e.    LSU and its employees failed to train Owens on the resources available to her as a

survivor, even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct; and

    f.   LSU's Title IX Policy is meant to prevent the specific emotional distress that Owens endured.

361.    As a direct and indirect result of the actions and inactions of Defendants, Owens has suffered significant economic damages including the loss of her scholarship, additional educational expenses because of her transfer to the University of Georgia and the extended time it took to complete her degree, loss of income attributed to the delay in receiving her degree, health care expenses, moving expenses, and the cost of multiple rehabilitation programs. Owens continues to suffer damages because of her rape and LSU's failure to investigate or provide her with appropriate support including heavy substance abuse, depression, eating disorder tendencies, Post-Traumatic Stress Disorder ("PTSD"), and self-harm. Owens has had to attend multiple rehabilitation programs focusing on substance abuse, trauma therapy, and co-occurring disorders. After going through her first rehabilitation program, Owens was 18 credit hours away from graduation when she was forced to move back home to Georgia and transfer to the University of Georgia to complete her degree. Owens did not receive a scholarship at the University of Georgia and had to pay all costs for tuition, room and board, books, and other educational expenses. After one semester, Owens then had to go into another rehabilitation program, costing her additional time and money. Owens's relationships and health continue to be negatively impacted by LSU's failure to properly respond to the report of her rape.

***Elisabeth Andries***

362.    Andries began her education at LSU as a freshman in fall 2016.

363.     Andries met LSU student John Roe[52] through their shared Greek life participation and engineering majors.

364.     In October 2016, John Roe invited Andries on a Halloween bus trip hosted by his fraternity.

365.     During the trip, Andries became intoxicated and required assistance.

366.     John Roe separated Andries from her friends and put her on a separate bus with himself.

367.     John Roe took Andries to the back of the bus, then left her alone while he went to the front of the bus.

368.     Upon information and belief, while at the front of the bus, John Roe attempted to sexually assault a female classmate, Sarah Zoe.[53]

369.     Sarah Zoe told John Roe to get away from her, so he went back to the back of the bus where Andries was so intoxicated that she was throwing up in her hands.

370.     When John Roe rejoined Andries at the back of the bus, he sexually assaulted her by putting his hands in her shirt and forcefully groping her breasts without her consent.

371.     Andries kept shaking her head and told John Roe "no" and "stop" multiple times even as she was throwing up, but John Roe continued to grope her.

372.     At this point, Andries blacked out from a combination of the alcohol and the trauma she was enduring.

373.     When Andries woke up the next morning, she had bruises all over her chest.

374.     The trauma instilled a lack of self-worth and a sense of shame that caused Andries

---

[52] John Roe is a pseudonym.
[53] Sarah Zoe is a pseudonym.

to suppress the experience, and she maintained a misplaced friendship with John Roe.

375.     In November 2016, Andries started therapy through LSU's mental health services to deal with her depression, which she has since realized was triggered by John Roe's assault.

376.     John Roe again attempted to sexually assault Andries in July 2017 after she picked him up from a bar.

377.     When Andries let John Roe stay over at her apartment that night, he started groping her without her consent until she told him to stop and kicked him out of her apartment.

378.     After the July 2017 incident, Andries began avoiding John Roe by not going to college bars in the area, changing which coffee shop she went to, and avoiding his friends.

379.     However, there was only so much Andries could do to avoid John Roe since they were both engineering majors.

380.     It was not until after the second assault that Andries began to process John Roe's abuse during the bus trip.

381.     In fall 2017, Andries told her LSU therapist Tiffany McCaughey ("McCaughey") about John Roe's assault for the first time.

382.     McCaughey told Andries about LSU's Lighthouse Program, which provides resources for sexual violence support and services.

383.     McCaughey told Andries that she would not have to tell the program John Roe's name in order to receive services.

384.     On or around February 5, 2018, Andries went to the Lighthouse Program's office to get resources.

385.     On the first day of spring 2019 semester classes, Andries walked into her industrial engineering class ("IE 4113") and saw John Roe sitting there.

386.    Andries tried to ignore him, but the memories of John Roe assaulting her overwhelmed her to the point where she had a panic attack and had to leave during the class.

387.    When Andries told her roommate about the panic attack, her roommate told her that she could sign up for disability accommodations to be excused from classes.

388.    In approximately late January 2019, Andries went to the LSU medical clinic and told Dr. Laura Jones ("Dr. Jones") that Andries needed disability accommodations because she was assaulted by someone in her class.

389.    Dr. Jones told Andries she would have to meet with the Disability Services office to finalize her paperwork.

390.    On or around February 20, 2019, Andries met with Dawn Sousa-Hearn ("Sousa-Hearn") in the LSU Disability Services office to discuss Andries' need for accommodations in IE 4113.

391.    When Sousa-Hearn asked why Andries needed disability accommodations, Andries told her about John Roe sexually assaulting her and the panic attacks she was experiencing because of seeing him in class.

392.    Sousa-Hearn encouraged Andries to make a report to LSU's Title IX Office, which was the first time Andries had ever heard of the Title IX Office.

393.    Andries googled "LSU Title IX" but could not find any information about the Title IX Office, so she went to SAA for help.

394.    On or around February 25, 2019, Andries' request for disability accommodations was approved, and she sent the approval to her IE 4113 professor, Roberto Champney ("Champney").

395.    On or around March 7, 2019, Andries met with Tracy Blanchard ("Blanchard") in

SAA to report John Roe's assault.

396.     Blanchard told Andries that she would reach out to Champney to explain why Andries would not be attending many in-person classes.

397.     SAA reported Andries' assaults to the Title IX Office on or around March 8, 2019.

398.     That same day, Investigator Scott sent Andries a letter asking her to meet with him.

399.     On or around March 15, 2019, Andries went to the Title IX Office to meet with Investigator Scott.

400.     Instead of Investigator Scott, graduate assistant Kimberly Davis ("Investigator Davis") conducted Andries' Title IX interview.

401.     No explanation was provided to Andries as to why her Title IX investigation was being handled by a graduate student rather than an employee.

402.     Before the interview, Andries asked Investigator Davis several times if the Title IX Office could issue a no-contact order against John Roe.

403.     Andries also provided Investigator Davis with Sarah Zoe's name and the name of another student who knew the names of other students John Roe had assaulted to be interviewed as witnesses in the Title IX investigation.

404.     Upon information and belief, Investigator Davis never contacted Andries' witnesses.

405.     On or around April 2, 2019, Defendant Stewart told Andries that, since Andries had not talked to John Roe since July 2017, there was no reason for Stewart to issue a no-contact order.

406.     Defendant Stewart told Andries that Andries could issue a peer-to-peer no-contact order, but Andries was afraid that John Roe would not take a no-contact order directly from her seriously.

407.     On April 8, 2019, Andries met with Champney to discuss her grades and learned that no one from SAA had ever reached out to him to explain why she could not be in class with John Roe.

408.     Andries was forced to explain the situation to Champney herself, which caused her further emotional trauma.

409.     Upon information and belief, on or around April 24, 2019, Champney made a report to the Title IX Office because of his concerns about Andries' well-being.

410.     Upon information and belief, the Title IX Office never followed up with Champney, and Andries did not even know that he had made a report.

411.     On or around June 3, 2019, the Title IX investigation concluded that John Roe was responsible for violating LSU's Title IX Policy.

412.     On June 4, 2019, Andries received a six-sentence letter stating that John Roe violated the Title IX Policy.

413.     Andries then learned that John Roe planned to appeal the Title IX Office's finding against him.

414.     John Roe requested to extend the appeal deadline from approximately June 19, 2019 to June 28, 2019, and the Title IX Office granted John Roe's request.

415.     After John Roe's appeal was extended, Sarah Zoe spoke with Defendant Stewart to ask why she was not interviewed as a witness in the investigation and determine whether she should file her own complaint against John Roe.

416.     When Sarah Zoe asked why John Roe's appeal deadline was extended twice, Defendant Stewart stated that she did not have to "justify her decisions" to students.

417.     John Roe eventually submitted his appeal on July 11, 2019, two weeks after the

extended deadline, and the Title IX Office still accepted his appeal.

418.    Andries was not provided with a copy of John Roe's written appeal nor given any opportunity to respond to the appeal.

419.    Defendant Stewart did not provide Andries with any updates on the status of the appeals process.

420.    On or around July 22, 2019, Defendant Stewart denied John Roe's appeal.

421.    Defendant Stewart did not notify Andries of the appeal outcome until several days later.

422.    On or around August 22, 2019, Andries met with Defendant Sanders at his request to discuss the appeals and sanctioning process.

423.    Even though John Roe had already been found responsible for violating the Title IX Policy and it was LSU's responsibility to determine sanctions, Defendant Sanders asked Andries inappropriate and unnecessary questions like whether she was "on drugs" during the assault and where she was sitting on the bus when she was assaulted.

424.    During their meeting, Andries told Defendant Sanders that she was aware of a third student who had been assaulted by John Roe and provided Defendant Sanders with the student's name and contact information.

425.    Upon information and belief, Defendant Sanders never contacted the student, never reported this incident to the police, the Title IX Office, or any other entity, and Andries' report was never investigated.

426.    On or around August 29, 2019, Andries met with Blanchard to discuss her case.

427.    Andries asked Blanchard what would happen if John Roe was suspended and later returned to LSU, because Andries would then have to begin avoiding him again in their shared

engineering classes.

428.     Blanchard told Andries that SAA had not thought of that and did not offer Andries

any advice or solutions.

429.     At the beginning of the fall 2019 semester, Andries walked into one of her classes

and saw John Roe sitting there.

430.     Andries had a panic attack and immediately left class.

431.     On or around August 30, 2019, Andries met with Blanchard again.

432.     Andries asked Blanchard why John Roe was in her lab class and why Andries was

forced to rearrange her schedule to avoid John Roe rather than John Roe rearranging his schedule.

433.     Blanchard told Andries that SAA had reached out to John Roe and asked him to

change his schedule, but he never responded. Blanchard also told Andries that Andries and John

Roe were both students, so they had "the same rights."

434.     Even though John Roe had been found responsible for sexually assaulting Andries,

LSU placed the burden on Andries to avoid John Roe and failed to provide any protective measures

or reasonable accommodations to Andries.

435.     On or around September 26, 2019, Andries received a copy of the disciplinary letter

SAA sent to John Roe.

436.     The letter stated that SAA had issued a mutual no-contact order between John Roe

and Andries, that John Roe was required to attend counseling and an anger management course,

and that John Roe was issued a deferred suspension effective September 5, 2019, through May 31,

2021.

437.     No one explained to Andries that a deferred suspension meant that John Roe would

still be allowed to remain on campus.

438.     LSU's issuance of a mutual no-contact directive against Andries violated her right to due process and constituted retaliation, as she had not been found in violation of any LSU policies and should not have been subject to disciplinary measures simply for reporting a sexual assault and should have been given the opportunity to go through process prior to limitations on her liberty being imposed upon her.

439.     John Roe was again given the opportunity to appeal the decision.

440.     John Roe submitted his appeal on or around September 27, 2019.

441.     No one notified Andries that John Roe had appealed SAA's discipline decision and that the discipline imposed upon him would be stayed until a decision on his appeal was issued.

442.     On or around October 12, 2019, Andries saw John Roe at an LSU football game.

443.     On or around October 14, 2019, Andries called SAA and asked why John Roe was on campus and able to purchase a football ticket.

444.     This is when Andries learned for the first time that John Roe had submitted another appeal.

445.     SAA did not give Andries a clear answer until her father called a few days later and learned that Andries was not told about the appeal because "it wouldn't affect [her] at all so it wasn't [her] business."

446.     SAA's response showed an utter disregard of Andries' emotional well-being as well as a lack of basic understanding of Title IX compliance requirements, as the presence of a respondent on campus would clearly deeply affect a claimant who had been told her assailant was not permitted to be on campus.

447.     On or around October 16, 2019, seven months after Andries made her first Title IX report, LSU denied John Roe's final appeal.

56

448.    On November 16, 2020, Blanchard sent Andries an email stating that John Roe would be back on campus for spring 2021 classes.

449.    Blanchard told Andries that she would have to change her schedule if she did not want to be in class with John Roe.

450.    Along with the information outlined *supra*, until the release of the Report in March 2021, Andries could not have known that:

    a.  LSU, specifically Defendant Sanders, concealed information regarding John Roe's other victims;

    b.  LSU concealed information regarding subsequent reports related to Andries and John Roe;

    c.  LSU and its employees failed to train Andries on the resources available to her as a survivor; and

    d.  LSU's Title IX Policy is meant to prevent the specific emotional distress that Andries endured.

451.    As a direct and indirect result of the actions and inactions of Defendants, Andries has suffered severe emotional and physical distress, including anxiety and depression. She missed a significant number of classes in the fall of 2019 because she was forced to carefully craft her schedule around John Roe's even though he had been found guilty of assaulting her. Andries withdrew from campus activities she previously loved because she was so afraid of seeing John Roe on campus. Andries developed anxiety and panic attacks that she still suffers from to this day, her relationships with her friends and family have been affected, and she has incurred related health care expenses.

*Jade Lewis*

452.     In spring 2017, Plaintiff Lewis was recruited to LSU from New Zealand for her exceptional tennis skills.

453.     Plaintiff Lewis received a full scholarship to attend LSU which included tuition, room and board, and all education and athletic related expenses.

454.     Plaintiff Lewis chose LSU over the many other schools that recruited her because LSU agreed to keep her on a full scholarship if she chose to take a leave of absence to play tennis professionally.

455.     Plaintiff Lewis played for the LSU tennis team under the co-head coaches, Julia Sell and Mike Sell.

456.     In January 2017, Plaintiff Lewis began a romantic relationship with John Coe, who had previously dated Richardson.

457.     John Coe soon began physically abusing and controlling Plaintiff Lewis in the same way he had abused Richardson during their relationship.

458.     On at least six occasions, John Coe physically assaulted Plaintiff Lewis until she was bruised and bloodied.

459.     Upon information and belief, between May 2017 and August 2018, one or more of Plaintiff Lewis's teammates on the tennis team reported the assaults to Julia Sell.

460.     To Plaintiff Lewis's knowledge, Julia Sell did not report any of these witness statements to the police, the Title IX Office, or any other entity, and she did not ask Plaintiff Lewis about them.

461.     Neither Julia Sell nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures after the reports were made by multiple members

of the tennis team, and no Title IX investigation was initiated.

462.     On or around May 19, 2017, Plaintiff Lewis went to John Coe's house to get some of her personal belongings.

463.     John Coe became angry with Plaintiff Lewis and punched her in the stomach so hard that she could not perform a tennis serve.

464.     Plaintiff Lewis's injuries from the assault were so severe that she had to see a team athletic trainer, Donavon White ("White") and/or Sean Carter ("Carter"), to manage the pain.

465.     During a meeting with White and/or Carter in May 2017, Plaintiff Lewis disclosed John Coe's abuse.

466.     That disclosure was the first time Plaintiff Lewis personally told anyone at LSU about John Coe's abuse.

467.     That same day, one of Plaintiff Lewis's teammates also made a comment to White about John Coe's repeated violent assaults on Plaintiff Lewis.

468.     At this point in time, the Athletics Department had knowledge of Coe's prior pattern of abuse of Plaintiff Richardson.

469.     To Plaintiff Lewis's knowledge, neither White nor Carter reported this incident to the police, the Title IX Office, or any other entity.

470.     Neither White nor Carter nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

471.     In summer 2017, Plaintiff Lewis's father called Mike Sell on two occasions to share his concerns about his daughter's relationship with John Coe.

472.     During the second phone call, Plaintiff Lewis's father told Julia Sell that John Coe

had punched Plaintiff Lewis in the stomach.

473.      Julia Sell Sell's response was that this "couldn't be possible, wouldn't be possible."

474.      To Plaintiff Lewis's knowledge, Julia Sell did not report this incident to the police, the Title IX Office, or any other entity.

475.      Neither Julia Sell nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

476.      LSU did not respond to the many reports of John Coe's abuse of Plaintiff Lewis until nearly a year later.

477.      On or around April 3, 2018, John Coe went to Plaintiff Lewis's on-campus apartment to pick up some of his clothing.

478.      While at Plaintiff Lewis's apartment, John Coe became angry with her and punched her in the stomach so hard that he fractured her ribs.

479.      In a text message to Defendant Ausberry dated April 14, 2018, John Coe admitted to punching Plaintiff Lewis in the stomach.[54]

480.      Defendant Ausberry was aware of John Coe's prior pattern of violent abuse of his romantic partners because Plaintiff Richardson had told him about John Coe's abuse.

481.      To Plaintiff Lewis's knowledge, Defendant Ausberry did not report this incident to the police, the Title IX Office, or any other entity.

482.      Neither Defendant Ausberry nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated.

483.      On or around April 25, 2018, three weeks after John Coe fractured Plaintiff Lewis's

---

[54] Report at 73.

rib, she went to LSU athletic trainers to get examined because she was still in pain.

484.    Defendant Segar, White, and Senior Athletic Trainer Micki Collins ("Collins") asked Plaintiff Lewis during the examination how she had gotten hurt.

485.    Plaintiff Lewis told them that John Coe had punched her multiple times over the course of the past year.

486.    The following day, Defendant Segar finally reported John Coe's abuse of Plaintiff Lewis to the Title IX Office, where the case was assigned to Investigator Scott.

487.    Upon information and belief, Defendant Segar did not make a report to the police.

488.    Investigator Scott did not interview Plaintiff Lewis until May 21, 2018, approximately three weeks after Defendant Segar made the report.

489.    Investigator Scott did not interview John Coe until June 5, 2018, approximately a month and a half after Segar filed the report.

490.    In his interview with Investigator Scott, John Coe admitted to punching Plaintiff Lewis in the stomach.

491.    The day after John Coe's interview, Investigator Scott concluded his report by noting that John Coe would be put in mandatory counseling and Defendant Segar would inform Orgeron of the situation.

492.    Upon information and belief, John Coe only participated in one of his five mandated counseling sessions.

493.    Defendant Segar only told Orgeron that John Coe "needed to stay away from" Plaintiff Lewis, and John Coe continued to be allowed to play football.

494.    Plaintiff Lewis never received any formal report detailing the findings of the Title IX investigation, a direct violation of federal guidance regarding the handling of Title IX

investigations.[55]

495.    John Coe continued to abuse Plaintiff Lewis soon after Investigator Scott concluded the Title IX investigation.

496.    Neither Investigator Scott nor any other LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures.

497.    In the month and a half it took the Title IX Office to interview John Coe, he continued to abuse Plaintiff Lewis.

498.    In a text message dated May 31, 2018, John Coe threatened Plaintiff Lewis by stating that he was "really about to beat [her]," "might kill [her]," and that she should "just kill [her]self."[56]

499.    In early to mid-June 2018, Plaintiff Lewis and John Coe got into an argument outside of a bar in Tigerland because John Coe refused to return Plaintiff Lewis's belongings.

500.    When Plaintiff Lewis tried to go to her car to leave, John Coe put his hands in her face, slammed her against the car, and was about to hit her again until one of his friends stopped him.

501.    In early to mid-June 2018, John Coe became angry with Plaintiff Lewis because she waved to a friend while riding in his car.

502.    John Coe then drove down the road and threw Plaintiff Lewis's phone out the window.

503.    As Plaintiff Lewis exited the vehicle, John Coe abandoned her.

---

[55] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently." U.S. Dep't of Ed., Office for Civil Rights, Q&A ON CAMPUS SEXUAL MISCONDUCT 6 (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.
[56] Report at 77-78.

504.    When John Coe returned and Plaintiff Lewis reentered the vehicle, he began strangling her.

505.    In the early morning hours of June 18, 2018, John Coe entered Plaintiff Lewis's apartment while intoxicated, jumped on her while she was sleeping in her bed, and began strangling her.

506.    John Coe then hit Plaintiff Lewis and ripped her earring out of her ear.

507.    Plaintiff Lewis's roommate woke up to Plaintiff Lewis screaming and called the police.

508.    When LSUPD arrived, they separated Plaintiff Lewis and John Coe, but did not arrest John Coe.

509.    Plaintiff Lewis and John Coe both told officers it was a verbal argument that had not turned physical.

510.    John Coe's attacks had continued to escalate over time, and Plaintiff Lewis feared for her physical safety if she reported him.

511.    John Coe repeatedly told Plaintiff Lewis that if she reported him, his parents would ruin her life by taking her to court, getting her kicked out of school, and having her deported back to New Zealand.

512.    Plaintiff Lewis did not tell LSUPD about the physical attack until two months later because she was afraid of the power football players had on campus, and she feared further retaliation and abuse by John Coe.

513.    Later that same day, Defendant Segar found out about the attack from the LSUPD report and made a second report with the Title IX Office about John Coe's abuse of Plaintiff Lewis.

514.    LSU waited over two weeks to charge John Coe with a potential violation of the

Code of Student Conduct.

515.    However, LSU wasted no time in immediately charging Plaintiff Lewis with violating the residential life policy for having a candle in her room when LSUPD came to her apartment while John Coe was strangling and hitting her.

516.    On or around June 22, 2018, LSU found Plaintiff Lewis in violation of the residential life policy for having a candle in her room and placed her on academic probation.

517.    Meanwhile, LSU took no disciplinary action against John Coe for physically attacking Plaintiff Lewis.

518.    Not until around July 11, 2018, did Defendant Sanders interview John Coe regarding his attack on Plaintiff Lewis.

519.    During John Coe's interview, Defendant Sanders only questioned John Coe about the June 18, 2018, incident and not about the other assaults Plaintiff Lewis had reported.

520.    When Defendant Sanders interviewed Plaintiff Lewis approximately two weeks later, she corroborated John Coe's account out of fear that he would attack her again or retaliate against her.

521.    However, Plaintiff Lewis did tell Defendant Sanders during the interview that John Coe had punched her in the past.

522.    No explanation was provided to Plaintiff Lewis as to why she was forced to go through a second interview to recount the abuse again when she had already met with Investigator Scott.

523.    At least three witnesses told Defendant Sanders about the full extent of John Coe's abuse of Plaintiff Lewis.

524.    Plaintiff Lewis's roommate, who called the police on June 18, 2018, told Defendant

Sanders that John Coe had strangled Plaintiff Lewis that night.

525.    One of Plaintiff Lewis's teammates told Defendant Sanders that she had helped cover bruises on Plaintiff Lewis's neck with makeup the day after one of John Coe's assaults.

526.    John Coe's roommate and teammate on the football team told Defendant Sanders that he knew about the physical abuse and that assistant football coach Mickey Joseph ("Joseph") would call him each week asking if Plaintiff Lewis was at his and John Coe's apartment.

527.    Despite the numerous reports they had received of John Coe's repeated brutal attacks on Plaintiff Lewis and Plaintiff Richardson, LSU did not initiate any formal disciplinary action against John Coe other than banning him from the weight room that summer.

528.    LSU allowed John Coe back in the weight room once the 2018 football season began, and he participated in the football team's first practice on August 4, 2018.

529.    When John Coe was banned from the weight room, John Coe's mother began reaching out to Plaintiff Lewis, telling her to "fix it."

530.    Some of the football coaches also made comments to Plaintiff Lewis indicating that they blamed her for John Coe being banned from the weight room.

531.    Plaintiff Lewis brought these statements to Defendant Segar's attention and asked Defendant Segar why she was facing retaliation for John Coe's punishment.

532.    Defendant Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment."

533.    Defendant Segar did nothing to address the retaliation or support Plaintiff Lewis.

534.    Defendant Segar did not report the retaliation to the Title IX Office and no investigation was initiated into the retaliation.

535.    On or around August 16, 2018, Plaintiff Lewis showed Defendant Segar

photographs of the bruises and scratches John Coe gave her and text messages in which John Coe threatened to kill her and encouraged her to kill herself.

536.    Defendant Segar told Plaintiff Lewis that she should file a police report, so it was "in the system" in case it happened again, even though there was already a police report from the June 18, 2018, incident.

537.    Defendant Segar finally reported John Coe's continued abuse of Plaintiff Lewis to LSUPD later that day.

538.    However, Defendant Segar still did not report the retaliation to the Title IX Office.

539.    John Coe was arrested the next day and charged with felony dating violence.

540.    After John Coe's arrest, Orgeron indefinitely suspended John Coe from the LSU football team.

541.    Plaintiff Lewis was never provided any notification about the discipline imposed on John Coe, in violation of federal Title IX guidance.[57]

542.    When interviewed by police on August 22, 2018, White, Julia Sell and Mike Sell falsely told police that they did not learn of John Coe's abuse of Plaintiff Lewis until April 2018 and June 2018, respectively.

543.    This was not accurate, as Plaintiff Lewis and her teammates told White that John Coe had punched Plaintiff Lewis in the stomach in May 2017, Plaintiff Lewis's teammates told Julia Sell about John Coe's abuse on prior unknown dates, and Plaintiff Lewis's father had told Julia Sell Sell about the assault in summer 2017.

544.    On or around September 16, 2018, LSU police arrested John Coe a second time

---

[57] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently." Q&A ON CAMPUS SEXUAL MISCONDUCT, *supra* note 29.

after detectives learned he was continuing to see and physically assault Plaintiff Lewis in violation of court orders.

545.     The next day, John Coe withdrew from LSU.

546.     In March 2019, John Coe pleaded guilty to two counts of battery and one count of violating a protective order against Plaintiff Lewis.

547.     While the criminal case against John Coe was pending, Julia Sell instructed Plaintiff Lewis's teammates on the tennis team to stay away from Plaintiff Lewis.

548.     This admonition made Plaintiff Lewis feel alienated and isolated from her teammates and closest friends during the time when she most needed their support.

549.     On October 18, 2018, Plaintiff Lewis's father sent letters to the National Collegiate Athletic Association ("NCAA") and the SEC informing them that LSU officials had repeatedly failed to take appropriate action after they were notified months earlier that John Coe was abusing Plaintiff Lewis.

550.     On or around October 26, 2018, Herb Vincent, the SEC's associate commissioner for communications, sent a response to Plaintiff Lewis's father and forwarded her father's letter to LSU's general counsel at the time, Tom Skinner.

551.     Upon information and belief, LSU told the SEC that LSU was conducting a Title IX investigation into the situation.

552.     On or around July 18, 2019, LSU expelled John Coe for violating the LSU Code of Student Conduct and the LSU Title IX Policy.

553.     LSU never notified Plaintiff Lewis of the actions they took against John Coe, in

violation of federal Title IX guidance.[58]

554.     Along with the information outlined *supra*, until the release of the Report in March 2021, Plaintiff Lewis could not have known that:

a. LSU, including specifically Defendants Segar, Julia Sell, Mike Sell, and Ausberry, had actual knowledge of other survivors that had reported abuse by John Coe, meaning LSU had specific knowledge of a heightened risk of assault by John Coe;

b. LSU, including specifically Defendant Stewart, had specific knowledge of the pervasive harassment and retaliation she and others suffered;

c. John Coe assaulted more LSU students;

d. LSU had expelled John Coe for violations of LSU's Student Code of Conduct;

e. Witnesses including Julia Sell and Mike Sell gave false information to the police;

f. At least three witnesses told Defendant Sanders about the full extent of John Coe's abuse of Plaintiff Lewis, but Defendant Sanders only questioned John Coe about the June 18, 2018, incident;

g. John Coe admitted his sexual misconduct to Defendant Ausberry, who was aware of John Coe's prior pattern of violent abuse of his romantic partners, and that Defendant Ausberry concealed this information;

h. LSU and its employees failed to train Plaintiff Lewis on the resources available to her as a survivor, even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct; and

i. LSU's Title IX Policy is meant to prevent the specific emotional distress that

---

[58] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently." Q&A ON CAMPUS SEXUAL MISCONDUCT, *supra* note 29.

Plaintiff Lewis endured.

555.     As a direct and indirect result of the actions and inactions of Defendants, Plaintiff Lewis has suffered and continues to suffer severe emotional and physical distress. She was forced to change the entire course of her life. The abuse John Coe inflicted upon her and LSU's subsequent repeated failure to properly respond, while also punishing Plaintiff Lewis for having a candle in her room, has completely distorted her perception of people. She worries anytime she makes a mistake, like ordering the wrong food, that she is going to be hurt. Plaintiff Lewis has been diagnosed with PTSD and her relationships with her family and friends have been torn apart because of her severe emotional and psychological distress. The many LSU employees in positions of authority traumatized Plaintiff Lewis on an almost incomprehensible level as she repeatedly sought help and was mocked, gaslit, and ignored, and then forced to endure more abuse from her assailant. Plaintiff Lewis also suffered significant economic damages including her opportunity to play professional tennis, moving expenses and the opportunities for significant earning potential related to sponsorships, as well as costs related to her health care.

### Kennan Johnson

556.     Born and raised in Baton Rouge, Louisiana, Johnson had always dreamed of continuing her parents' athletic legacy by playing for the LSU tennis team.

557.     Johnson had known Julia Sell for years, as Johnson was an avid LSU tennis fan.

558.     When Johnson first applied to college, Julia Sell told Johnson that she was trying to build a "winning team."

559.     Julia Sell told Johnson that she would not be good enough to play for LSU for at least her first two years of college.

560.     As a result, Johnson enrolled at the University of Florida during the 2014-2015

school year and at the University of Oregon during the 2015-2016 school year to get the requisite tennis experience she needed before she transferred to LSU in fall 2016.

561.    Since Johnson transferred twice, under NCAA rules, she had to sit out for one year before she could play tennis at LSU.

562.    On May 8, 2017, Johnson got an official scholarship offer from LSU and achieved her lifelong dream of becoming a member of the LSU women's tennis team.

563.    However, Johnson's dream quickly turned into a nightmare once she began to experience abuse by Julia Sell.

564.    When Johnson started playing tennis for LSU in fall 2017, Julia Sell would frequently tell Johnson that she had to lose weight.

565.    Julia Sell would make Johnson weigh in every week and would tell Johnson she had to lose a certain number of pounds per week.

566.    There was no requirement for tennis players to see a nutritionist or weigh in, so this made Johnson feel very uncomfortable and alienated.

567.    Johnson would often starve herself so she could meet Julia Sell's expectations.

568.    However, starving herself negatively impacted Johnson's tennis performance at practice, and Julia Sell would then get angry with Johnson for not having enough energy.

569.    Julia Sell would hold the threat of losing her scholarship over Johnson's head whenever she exercised this control over Johnson's body.

570.    This behavior made Johnson feel very uncomfortable, like she was too overweight and not good enough to be a member of the team.

571.    Johnson needed her scholarship to afford to attend LSU, so she did not feel she could challenge Julia Sell's repeated harassment and verbal abuse.

572.    Whenever Johnson would try to take on a leadership role on the tennis team, Julia Sell would retaliate against Johnson by falsely saying that her "attitude" was affecting the team and that her teammates did not like it.

573.    Johnson did not have any attitude and was simply trying to step up as a leader, which Julia Sell used against Johnson to further attack her self-esteem.

574.    Julia Sell would also blame Johnson if her fellow teammates did not play well. Julia Sell told Johnson that she did this because she wanted Johnson to "be a leader;" however, this was clearly pretextual, as Julia Sell would never allow Johnson to take on any leadership roles.

575.    On one occasion, Julia Sell brought Johnson to the indoor tennis courts and told her, "You might want to bring tissues, because I'm going to make you cry."

576.    Julia Sell would emotionally abuse Johnson by promising to move Johnson up to singles if she played well, then move her down or keep her at doubles even when Johnson performed well.

577.    Julia Sell also created a toxic environment on the team by pitting players against each other.

578.    On several occasions, Julia Sell falsely told Johnson and Plaintiff Lewis that the other had said hurtful things about each other behind their backs.

579.    This caused Johnson and Plaintiff Lewis to get into arguments that fostered distrust and hostility among team members.

580.    Johnson was one of several tennis players who told Julia Sell about the abuse John Coe repeatedly inflicted on Plaintiff Lewis.

581.    When Johnson told her about the abuse, Julia Sell ignored the information and told Johnson that if she stopped "worrying so much about other people," she would be a better tennis

player.

582.     Julia Sell did not ask Johnson any more details about the abuse.

583.     To Johnson's knowledge, Julia Sell never reported Plaintiff Lewis's abuse to the police, the Title IX Office, or any other entity.

584.     Julia Sell also told Johnson and her teammates to "stay away from Jade" once Plaintiff Lewis' allegations against John Coe came to light.

585.     Julia Sell made disparaging comments about Johnson's sexual orientation.

586.     Julia Sell would tell Johnson to keep her "lifestyle" out of the locker room.

587.     Julia Sell also told Johnson that her sexual orientation could make her teammates "uncomfortable" and "distract" them.

588.     Julia Sell's harassment of Johnson, including her repeated harassment of Johnson because of her sexual orientation, negatively affected Johnson's ability to participate in LSU's educational programs and activities.

589.     Johnson's tennis performance suffered while she was at LSU due to Julia Sell's abuse and harassment.

590.     Johnson played much better tennis before attending LSU and after she graduated from LSU.

591.     Johnson would experience severe anxiety and become sick to her stomach whenever Julia Sell called her into her office. Johnson had difficulty eating and began throwing up regularly due to the nausea and anxiety that resulted from Julia Sell's abuse and harassment.

592.     Eventually, Johnson tried seeing a psychologist to help her deal with the constant abuse from Julia Sell, but Johnson was afraid that if she reported Julia Sell, she would lose her scholarship.

593.    As an athlete, Johnson was required to go to Title IX trainings, but in these sessions, she never learned that weight and sexual orientation harassment constituted sex discrimination and therefore could be addressed via a Title IX report.

594.    When Johnson graduated from LSU in spring 2019, she cried not out of happiness that she had fulfilled her lifelong dream, but rather out of relief that her time there was finally over.

595.    Along with the information outlined *supra*, until the release of the Report in March 2021, Johnson could not have known that LSU and its employees failed to train Johnson on the resources available to her as a survivor, even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct; and that LSU's Title IX Policy is meant to prevent the specific emotional distress that Johnson endured.

596.    As a direct and indirect result of the actions and inactions of Defendants, Johnson has suffered severe emotional and physical distress. Johnson was fully prepared for the stress of college sports, but she did not expect the coach whom she had looked up to for most of her life to create such a hostile environment. Rather than helping Johnson manage the high expectations of college tennis, Julia Sell put even more pressure on Johnson and constantly made her feel like she was never thin enough or good enough for the team and disparaged her for her sexual orientation. This made Johnson suffer from severe anxiety and depression during her time on the tennis team, which negatively impacted her grades. Her mental distress became so bad that she became suicidal and had to admit herself to a hospital because she did not want to live anymore. This abuse also made Johnson lose her lifelong love of tennis for a few years after graduation. Johnson's experiences at LSU have had a lasting, detrimental effect on her mental and physical well-being. Johnson suffered economic damages from her hospital stay and need for other health care which was directly related to the actions and inactions of Defendants.

*Jane Doe*

597.    Plaintiff Doe began her education at LSU as a freshman living in North Hall in fall 2018.

598.    Plaintiff Doe soon met John Poe[59] through her roommate's boyfriend, and the two became friends after attending a football game in October 2018.

599.    The two kissed on a few occasions, but Plaintiff Doe was not looking to date and only considered John Poe a friend.

600.    John Poe would frequently send unwelcome text messages to Plaintiff Doe asking her to come to his room to "cuddle," which Plaintiff Doe refused to do.

601.    Once Plaintiff Doe started spending more time with John Poe, his "nice guy" facade started to fade, and he became verbally abusive towards Plaintiff Doe.

602.    Plaintiff Doe had recently gotten out of a long-term relationship with a woman when she became friends with John Poe.

603.    Whenever Plaintiff Doe refused to go to John Poe's room or perform sexual favors, he would get angry and call her derogatory names like "fag," "pig," "fat," and "stupid."

604.    In November, Plaintiff Doe began to distance herself from John Poe when he started engaging in this abusive behavior by blocking his phone number and blocking him on social media.

605.    However, John Poe continued to harass Plaintiff Doe whenever he saw her on campus.

606.    In the winter of 2019, Plaintiff Doe agreed to go to Chipotle with her roommate without realizing John Poe would be joining them.

607.    When John Poe arrived, Plaintiff Doe told him not to talk to her.

---

[59] John Poe is a pseudonym.

608.     John Poe ignored this request and assaulted Plaintiff Doe by groping her when they went into the restaurant.

609.     John Poe then laughed at Plaintiff Doe when she told him never to touch her again.

610.     John Poe would also enter Plaintiff Doe's dorm room without her permission by entering with Plaintiff Doe's roommate's boyfriend.

611.     On one occasion, John Poe and Plaintiff Doe's roommate's boyfriend stole Plaintiff Doe's food and threw it under other people's dorm room doors.

612.     John Poe would also bang on Plaintiff Doe's door and steal decorations from her door, then send text messages to Plaintiff Doe saying she would have to come to his room and kiss him to get them back.

613.     In March 2019, John Poe stole a Polaroid photograph off Plaintiff Doe's bedside table.

614.     When Plaintiff Doe realized the photograph was missing, she told her roommate's boyfriend that if he and John Poe continued to touch her stuff, she would report them to residential life.

615.     In response, John Poe called Plaintiff Doe that same weekend and left her a voicemail from a fake number telling her she "needed to grow up," "was a little crazy sometimes," and he knew she was "struggling in life."

616.     John Poe continued harassing Plaintiff Doe by texting Plaintiff Doe from this fake number without revealing his identity.

617.     When Plaintiff Doe realized it was John Poe texting her, she told him to leave her alone.

618.     The following day, Plaintiff Doe texted her former Resident Assistant about John

Poe's harassment.

619.     Plaintiff Doe was told to report it to the Title IX Office.

620.     That same day, a Title IX Office staff member came to Plaintiff Doe's dorm room to interview her about the allegations, and Plaintiff Doe stated that she did not feel safe and wanted to move out of her dorm room.

621.     The Title IX staff member never offered to move John Poe out of North Hall.

622.     Plaintiff Doe was moved across campus to Evangeline Hall that same day and was told she had three days to decide if she wanted to stay there and get a no-contact order.

623.     Plaintiff Doe said she wanted a no-contact order but was never given any further information about getting a no-contact order nor did she receive a copy of any no-contact order.

624.     The Title IX Office initiated an investigation.

625.     In total, Plaintiff Doe had four interviews about her claims of harassment against John Poe.

626.     Each interview was with a different person, so Plaintiff Doe would have to repeat her account and all of the painful events every time she was interviewed.

627.     The interviewers also spoke to Plaintiff Doe in a condescending manner by constantly questioning her version of the events and asking why she had kissed John Poe before his abuse.

628.     The questioning became so intimidating that Plaintiff Doe would often cry, and the interviewers would press on as if nothing was wrong.

629.     They did not offer any support or resources to Plaintiff Doe.

630.     On May 23, 2019, Plaintiff Doe met with Assistant Director of SAA Daniel DeLuca ("DeLuca"), who had just started working for the office.

631.    When Plaintiff Doe asked about the status of her case, DeLuca told her that her claim did not fall under the scope of Title IX, so the SAA office was trying to determine if there were any other violations with which they could charge John Poe.

632.    DeLuca did not explain to Plaintiff Doe why her case did not fall under Title IX and did not give her any other information about her case, he just interviewed her in the same way the Title IX Office had already interviewed her multiple times.

633.    Other than the initial interview letter she received on March 21, 2019, Plaintiff Doe never received any formal communications from the Title IX Office.

634.    Plaintiff Doe never received a formal resolution on her case, was never told if John Poe was interviewed or disciplined for his actions, and none of the witnesses she identified were ever interviewed.

635.    On March 10, 2021, Plaintiff Doe emailed LSU's human resources office to ask for a copy of her file and to try to find out if John Poe was ever found guilty or disciplined for his harassment of her.

636.    On March 19, 2021, DeLuca emailed Plaintiff Doe a copy of her case file, which consisted of a copy of LSU's Title IX Policy.

637.    The file did not contain any notes from the multiple interviews Plaintiff Doe underwent except for her interview with DeLuca on May 23, 2019.

638.    The file did include two Sexual Misconduct and Sexual Harassment (PM73) Complaint Forms dated March 21, 2019, and August 30, 2019, which incorrectly stated that Plaintiff Doe had not taken any action to stop John Poe's behavior.

639.    This was false, as Plaintiff Doe had blocked John Poe on text and social media months prior and told him on multiple occasions to leave her alone, which he ignored.

640.    When Plaintiff Doe expressed her concerns over not knowing whether John Poe was disciplined, DeLuca stated that he could not give any further information due to the Family Education Rights Protection Act ("FERPA"), a direct violation of federal Title IX guidance.[60]

641.    Plaintiff Doe stopped attending classes because she was afraid of seeing John Poe, and she was being retraumatized by the Title IX Office.

642.    Plaintiff Doe's fear of John Poe was exacerbated in late May 2019 when she saw him near her car at 1:00 a.m.

643.    Plaintiff Doe ducked behind her car, but John Poe began walking towards her until he was one car away.

644.    Plaintiff Doe ended up running inside to get her friends and, from then on, was afraid to go to her car at night by herself for fear of seeing John Poe since he now knew where she lived.

645.    Plaintiff Doe's anxiety around attending classes and seeing John Poe caused her attendance and grades to suffer to the point that she was expelled from her classes and lost her TOPS scholarship at the end of the spring 2019 semester.

646.    Plaintiff Doe successfully appealed the decision to expel her and returned to LSU in fall 2019.

---

[60] "Question 10: What information should be provided to the parties to notify them of the outcome? Answer: OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently… Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions. For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist."  Q&A ON CAMPUS SEXUAL MISCONDUCT, *supra* note 29.

647.    However, she did not receive her scholarship back.

648.    In or around December 2019, Plaintiff Doe became so depressed and uncomfortable being on campus after everything she had been through, and because of her fears of seeing John Poe, she left LSU and enrolled in a community college.

649.    Along with the information outlined *supra*, until the release of the Report in March 2021, Plaintiff Doe could not have known that:

  a.  LSU, including specifically Defendant Stewart, had specific knowledge of the pervasive harassment and retaliation Plaintiff Doe and others suffered;

  b.  Her claims fell under the scope of LSU's Title IX Policy;

  c.  LSU and its employees, specifically Defendant Stewart, had concealed all notes from Plaintiff Doe's multiple interviews and had misrepresented the facts of her report;

  d.  LSU and its employees failed to train Plaintiff Doe on the resources available to her as a survivor; and

  e.  LSU's Title IX Policy is meant to prevent the specific emotional distress that Plaintiff Doe endured.

650.    As a direct and indirect result of the actions and inactions of Defendants, Plaintiff Doe has suffered severe emotional and physical distress. The harassment she endured caused her to suffer from a relapse of anxiety and depression, and she was diagnosed with obsessive compulsive disorder ("OCD") and binge eating disorder after her retraumatization by LSU's Title IX Office. Plaintiff Doe also felt extremely unsafe on campus and would not be able to go to her car at night unless a friend was with her for fear of running into her stalker. Her inability to get out of bed, attend classes, complete her classwork, or even change her clothes because of her mental

distress led to her being expelled and eventually dropping out of LSU. She lost three semesters'
worth of tuition and access to an education at a major research university and is now enrolled in a
community college. She sought counseling from LSU but was told by two therapists that she
needed to see a psychiatrist, which, until recently, she was unable to afford through her insurance.
Her relationships with her family and friends have been negatively impacted and she has incurred
healthcare and moving related expenses.

***Corinn Hovis***

651.    Hovis enrolled at LSU as a freshman on a TOPS scholarship in the fall semester of
2019.

652.    On January 24, 2020, Hovis went to a bar in Tigerland to go drinking and dancing.

653.    John Loe,[61] a highly recruited quarterback on LSU's football team, was also at
Tigerland that night.

654.    A crowd of people were surrounding Loe and taking photographs with him.

655.    Hovis did not know who Loe was, nor was she aware that he was on the football
team.

656.    Hovis's friend told her who Loe was, so Hovis joined the crowd and took a
photograph with him.

657.    After Hovis and Loe took a selfie together, Loe asked Hovis to go back to
his residence.

658.    Hovis was heavily intoxicated when she agreed to leave the bar with Loe.

659.    Instead of going to Loe's residence, Loe led Hovis to an SUV where Hovis blacked
out almost immediately.

---

[61] John Loe is a pseudonym.

660.     Loe then raped Hovis in the SUV. Hovis did not consent to any sexual activity and could not have consented given her level of intoxication.

661.     Loe's friend drove Hovis back to her residence hall, where her sorority sisters and roommate had to help her to walk.

662.     Hovis suspects that she may have been drugged that night.

663.     Later that night, Hovis suffered a panic attack.

664.     Hovis's roommate contacted the dorm's Resident Assistant, and Hovis reported that she believed she had been drugged and sexually assaulted while at Tigerland.

665.     Hovis decided to file a report with LSUPD, who then contacted Baton Rouge Police Department ("BRPD") because the incident had occurred off campus.

666.     About eleven BRPD officers appeared in response to the call, and eventually refused to take a statement from Hovis.

667.     LSUPD did not agree with this conclusion and took Hovis and her roommate to the hospital for an assessment and a Sexual Assault Nurse Examiner ("SANE") exam.

668.     The SANE found that Hovis's cervix was bruised from the rape.

669.     Upon information and belief, Residential Life personnel made a report to the Title IX Office.

670.     On January 31, 2020, Defendant Stewart met with Hovis to explain her reporting options.

671.     Hovis decided to move forward with the Title IX investigation process.

672.     As a part of the Title IX process, Hovis was connected to the LSU Lighthouse Program.

673.     The Lighthouse Program provides assistance and accommodations to student-

survivors of sexual assault, interpersonal violence, stalking, and harassment.

674.    The Lighthouse Program arranged accommodations including time and a half on assignments and exams, a notetaker, distraction reduced environments, and consideration for absences as a result of the trauma she endured.

675.    On February 3, 2020, Investigator Scott interviewed Hovis.

676.    Upon information and belief, on February 4, 2020, Defendant Segar was notified that a Title IX complaint had been filed against Loe.

677.    On March 6, 2020, Investigator Scott concluded that Loe violated the Title IX Policy by sexually assaulting Hovis on January 24, 2020.

678.    Upon information and belief, Defendant Segar was notified of the outcome of the investigation on that same day.

679.    In approximately June 2020, LSU disciplined Loe for violating the Title IX Policy by suspending him from LSU from May 10, 2020, to May 31, 2021 and issuing a no contact directive ordering him to have no communication or contact with Hovis.

680.    Upon information and belief, Loe violated the no-contact directive twice by having his girlfriend contact Hovis on two occasions in May 2020.

681.    This contact was reported to Defendants Stewart and Sanders, but LSU did not take any disciplinary action against Loe for violations of the no-contact directive.

682.    On August 6, 2020, Loe transferred to another university to play football.

683.    Hovis was deeply traumatized by the rape and the Title IX investigation process.

684.    Hovis felt mentally drained, and it was difficult for her to go to her classes.

685.    In addition, one of her classes was near the football stadium, and Loe was still a student at LSU at the time.

686.     Attending this class was nearly impossible for Hovis because of her fear of seeing Loe on campus and the resulting anxiety.

687.     Despite being an excellent student prior to the rape, Hovis failed one of her classes as a result of the rape because she couldn't get out of bed for her midterm exam.

688.     Hovis attempted to remedy the situation with the help of her Lighthouse Program advocate, but Hovis was ultimately forced to pay to retake the class in the summer.

689.     Hovis also did poorly in her other classes, earning Cs in two classes.

690.     In January 2021, Hovis went to LSU's Disability Services office to reinstate her accommodations from the previous semester.

691.     Disability Services refused to review her request for an extension of her accommodations because Lighthouse accommodation are only for six months; however, Hovis still suffered the disabling consequences of Loe's rape.

692.     Disability Services did not inquire as to Hovis's physical or mental health needs or perform any assessments to determine whether she may still need disability services.

693.     During this time, Hovis was also dealing with retraumatization because of the one-year anniversary of her rape.

694.     As a result of the rape and of LSU's failures, Hovis must go to a psychiatrist to get accommodations and medical intervention for PTSD, generalized anxiety disorder, depression, and panic disorder.

695.     In addition, Hovis had to endure seeing news stories about her rape published nearly every week on national news platforms.

696.     Hovis's experiences were also outlined in the Husch Blackwell report under the anonymous name "Respondent H."

697.     Along with the information outlined *supra*, until the release of the Report in March 2021, Hovis could not have known that LSU, including specifically Defendants Stewart and Segar, had specific knowledge of the pervasive harassment and retaliation Hovis and others suffered; and that LSU's Title IX Policy is meant to prevent the specific emotional distress that Hovis endured.

698.     As a direct and indirect result of the actions and inactions of Defendants, Plaintiff Hovis has suffered and continues to suffer severe emotional and physical distress and economic loss. Hovis's grades have suffered, adding additional barriers to her hopes of going to graduate school and earning her PhD in the future. Hovis was forced to pay to retake a class because she was so emotionally distraught over her rape that she could not get out of bed. Hovis was subjected to John Loe's unchecked retaliation in repeatedly violating the no-contact directive, for which LSU refused to protect her or discipline her rapist. Hovis's requests for disability accommodations have been denied, forcing Hovis to pay out of pocket to provide her own accommodations.

### Sarah Beth Kitch

699.     Kitch began her education at LSU as a graduate student in the political science PhD program in the fall of 2009.

700.     Professor John Moe[62] immediately took a greater interest in Kitch than in the other students.

701.     At eighteen years old, Kitch was the youngest student in the PhD program, one of only a few women in the department, and began the program with no funding.

702.     Moe quickly offered Kitch three separate forms of scholarships and funding on which Kitch relied to remain in the PhD program.

703.     Moe was Kitch's advisor as she completed research for her dissertation.

---

[62] John Moe is a pseudonym

704.    Moe was fifty-nine years older than Kitch and continuously reminded her not only of his power over her as a professor and academic advisor, but also his power over her because of his sex and age.

705.    Moe made it clear to Kitch that without him, she would never complete the PhD program or get a job following her graduation.

706.    Moe's sexual harassment of Kitch gradually increased during her time at LSU, including but not limited to requesting that Kitch wear high heels, expressing interest in a sexual relationship with Kitch, propositioning sexual favors from Kitch, discussing how women should "spread their legs wide open," and requesting that Kitch come to Moe's house alone at night.

707.    Kitch was terrified to disclose this pervasive harassment because, based on her observations, nobody at LSU experienced repercussions for sexual assault because of the administration's desire to maintain its general reputation as a party school unhindered by sexual assault allegations.

708.    Kitch was terrified that if she did not maintain a good working relationship with Moe, then she would never graduate.

709.    Moe frequently described Kitch as a "mite" while her PhD committee members, like himself, were "celestials."

710.    Moe was not the only professor in the department to treat graduate students in this manner.

711.    Other professors repeatedly told graduate students their options were either to take on additional work grading undergraduate assignments or to perform sexual favors for the male professors.

712.    This environment caused Kitch to live in daily fear of sexual assault and in fear of

being dismissed from the program if she did not sexually pleasure the male professors.

713.    This environment caused Kitch to experience severe health problems, including but not limited to panic attacks, persistent feelings of dread and despair, a sense of worthlessness, and feelings of intense shame and humiliation.

714.    After Moe became disabled, he demanded that Kitch drive him to and from campus daily.

715.    Kitch was afraid to drive alone with Moe, but again she felt like she could not say "no."

716.    Moe used his disability on several occasions to get Kitch into his house alone at night to "help him off the floor," and to inappropriately touch Kitch.

717.    For example, in March 2013, Kitch went to Moe's house following a call for help, to find Moe sitting on the couch surrounded by several wine bottles.

718.    Moe demanded that Kitch kiss him.

719.    Kitch refused to do so, but Moe grabbed her and forcibly kissed her.

720.    Kitch was disgusted and immediately nauseated.

721.    After forcing Moe off her, she left the house.

722.    Kitch was not aware of her reporting options to the Title IX Office.

723.    Moe was Kitch's advisor on her dissertation committee and, since she needed a recommendation letter from Moe to enter the job market, she had to maintain a good relationship with him despite her daily fear of seeing him, panic attacks, intellectual and emotional paralysis, persistent feelings of dread and despair, a sense of worthlessness, and feelings of intense shame and humiliation.

724.    Despite these conditions, Kitch finished her PhD program at LSU in 2014, but the

trauma of Moe's assault and harassment haunted her for the remainder of her career.

725.     Following a PhD, aspiring political science professors conduct post-doctoral research, obtain a tenure-track position at a university, and expand their dissertation and post-doctoral research into a published book.

726.     The field is highly competitive and failure to complete any of these tasks on a strict timeline could ruin a candidate's chances for stable post-secondary academic employment.

727.     While completing her postdoctoral research, Kitch's work was constantly triggering flashbacks to the trauma endured while working for Moe.

728.     Although Kitch had physically left LSU's campus, Kitch and Moe were now professionals in the same field of study, and Kitch continued to live in daily fear of having to interact with Moe through her research, at professional conferences, to obtain letters of recommendation, etc.

729.     In addition to her prior symptoms, this continued daily fear caused Kitch to experience intermittent loss of the ability to verbally communicate, nausea, headaches, and severe chronic pain.

730.     Because of these symptoms, Kitch was unable to finish her book, and she was unable to obtain tenure after being hired for a tenure track position at the University of Missouri.

731.     The loss of her tenure-track position eliminated Kitch's ability to be hired for another tenure-track position in the future.

732.     Leaving the University of Missouri also caused Kitch to sell her Missouri home at a loss, expend money setting up a new home, changing health insurance plans mid-year, and maintaining therapy.

733.     In approximately August 2019, Kitch realized that her career was already over and

she no longer had anything left to lose by reporting Moe's history of abuse to LSU.

734.    Kitch assumed LSU would at least maintain a record to assist future students who Moe may victimize.

735.    However, Chevon Gates ("Gates") and another Title IX staff member informed Kitch that it was a good choice not to report the harassment when she was a student because "no one would have done anything" and she would have faced consequences as a result of the report.

736.    Kitch never received any emails or documentation about her contacts with the Title IX Office.

737.    After leaving her tenure-track position, Kitch was underemployed as an adjunct professor during the 2020-2021 academic year.

738.    These part-time adjunct positions pay considerably less than her actual and projected income as a tenure-track professor and offer no benefits.

739.    Even though she has a PhD from LSU and did postdoctoral research at Princeton University, Kitch has been teaching at a high school level since August 2021.

740.    Along with the information outlined *supra*, until the release of the Report in March 2021, Kitch could not have known that:

      a.    LSU had specific knowledge of the pervasive harassment and retaliation Kitch and others suffered;

      b.    LSU and its employees failed to train Kitch on the resources available to her as a survivor; and

      c.    LSU's Title IX Policy is meant to prevent the specific emotional distress that Kitch endured.

741.    As a direct and indirect result of the actions and inactions of Defendants, Kitch has

suffered significant emotional and mental distress, as well as economic damages including loss of income attributed to the complete loss of her ability to attain tenure and proceed with her expected academic career as well as significant health care expenses. Kitch suffered loss of a sense of professional credibility during her doctoral education, intense shame, and the stress of writing a dissertation in the hostile environment her assault created. Moe's assault and LSU's failure to provide remedies causes Kitch to suffer from depression, Post-Traumatic Stress Disorder ("PTSD"), and severe emotional and physical distress. Kitch has had to attend trauma therapy. Kitch's relationships, income, and health continue to be negatively impacted by her experiences at LSU.

## LEGAL ARGUMENTS RELEVANT TO MULTIPLE CLAIMS

### Prescription

#### *Counts I-IV*

742.    Title IX claims are subject to the state statutes of limitations for personal injury actions.[63]

#### *Counts V-VIII*

743.    The Civil Rights Act does not prescribe a statute of limitations. Instead, "[t]he statute of limitations for a suit brought under §1983 is determined by the general statute of limitations governing personal injuries in the forum state."[64]

#### *All Counts*

744.    In Louisiana, the relevant prescriptive period is one year.[65]

---

[63] *Sewell v. Monroe City Sch. Bd.,* 974 F.3d 577, 583 (5th Cir. 2020)(citing *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015); *Griffin v. Round Rock Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 166999, at *1 (5th Cir. 1996)).

[64] *Heilman v. City of Beaumont*, 638 F. App'x 363, 366 (5th Cir. 2016)(quoting *Piotrowski*, 237 F.3d at 576).

[65] *Sewell*, 974 F.3d at 583 (citing La. Civ. Code Ann. art. 3492; *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 739 (5th Cir. 2017)).

745.    Although courts look to state law for the length of the prescriptive period, the time at which a Title IX or Civil Rights Act claim accrues and the prescriptive period commences "is a question of federal law," "conforming in general to common-law tort principles."[66]

746.    Accrual under federal common law occurs and the prescriptive period begins to run the moment the plaintiff becomes aware that they have suffered an injury.[67]

747.    "A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions."[68]

748.    Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.[69]

**Qualified Immunity**

*Counts V-VII*

749.    The doctrine of qualified immunity only shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[70]

750.    "Clearly established statutory or constitutional rights" refers to rights that are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[71] "There need not be one case specifically stating which rights qualify as

---

[66] *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019)(quoting *Wallace v. Kato*, 549 U.S. 384, 388, (2007)); *King-White*, 803 F.3d at 762 (quoting *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011)).

[67] *King-White*, 803 F.3d at 762 (quoting *Spotts v. United States*, 613 F.3d 559, 574 (5th Cir. 2010)(quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001))).

[68] *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)(quoting *Stewart v. Parish of Jefferson*, 951 F.2d 681, 684 (5th Cir. 1992) ("The statute of limitations period commences once the plaintiff acquires possession of two critical facts: (1) an injury has occurred; and (2) the identity of the person who inflicted the injury."), cert. denied, 506 U.S. 820, 113 S.Ct. 69, 121 L. Ed. 2d 35 (1992)).

[69] *King-White*, 803 F.3d at 762 (quoting *Piotrowski*, 237 F.3d at 576).

[70] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[71] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

"clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate."[72]  "Clearly established law" must not be defined "at a high level of generality," but must be defined by determining "whether the violative nature of particular conduct is clearly established."[73]

751.    Officials who are either plainly incompetent or knowingly violate the law are not protected by qualified immunity.[74]

752.    Here, Defendants' conduct was not "objectively reasonable in light of 'clearly established' law at the time of the alleged violation;" thus, they are not entitled to qualified immunity.[75]

753.    The subjective state of mind of a defendant does not matter in the decision of whether the official is entitled to qualified immunity.[76]

### COUNT I
### Violation of Title IX
### Deliberate Indifference to Sex Discrimination
### 20 U.S.C. §§ 1681, *et seq.*
### (LSU Board of Supervisors)

754.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

755.    Plaintiffs allege violations of Title IX against Defendant Board of Supervisors due to its deliberate indifference to sex-based discrimination.

756.    The Board of Supervisors operates programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex discrimination.

---

[72] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[73] *Id.* at 742.

[74] *Malley v. Briggs*, 475 U.S. 335, 341 (1986), *see also Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015).

[75] *Kennedy v. Tangipahoa Par. Library Bd. of Control*, 224 F.3d 359, 377 (5th Cir. 2000).

[76] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001).

757.    The Board of Supervisors created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (a) ("Title IX"), because:

      a.   As female and LGBTQ+ identifying students seeking equal access to educational programs and activities at LSU, Plaintiffs were members of a protected class covered by Title IX;

      b.   Plaintiffs were subjected to sex-based discrimination in the form of sexual assaults, sexual harassment, relationship violence, and/or stalking;

      c.   Plaintiffs were subjected to harassment based on their sex; and

      d.   Plaintiffs were subjected to a hostile educational environment created by Defendants' lack of policies and procedures and failure to properly investigate, prevent, and/or address the sexual and physical assaults and harassment perpetrated against Plaintiffs.

758.    At all relevant times, the Board of Supervisors exercised substantial control over Plaintiffs' abusers who, at all relevant times, were (or remain currently) students enrolled at LSU and/or employees working at LSU.

759.    The Board of Supervisors had actual knowledge of the sex-based discrimination, which was created by and furthered by Defendants' repeated failure to protect Plaintiffs consistent with LSU's own policies and federal law and guidance.

760.    The Board of Supervisors acted with deliberate indifference to the acts of sex-based discrimination by failing to take any action to prevent them, deter the students and/or employees responsible, and/or protect Plaintiffs from sexual misconduct. The Board of Supervisors also acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective

remedial steps to resolve the Plaintiffs' allegations of sex-based discrimination.

761.     The Board of Supervisors' repeated failure to promptly and appropriately respond to the sexual misconduct resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in LSU's educational programs and activities in violation of Title IX.

762.     The Board of Supervisors acted intentionally and with deliberate indifference to the repeated denial of Plaintiffs' access to educational opportunities or benefits.

763.     The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the Board of Supervisors, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits.

764.     As a direct, natural, and proximate result of the Board of Supervisors' violation of Title IX due to their deliberate indifference to sex-based discrimination, Plaintiffs have suffered actual damages.

### *Deliberate Indifference Towards Owens*

765.     Owens was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible vaginal and anal rape.

766.     This harassment caused an exacerbation of Owens's underlying conditions in the form of substance abuse, which caused Owens to be deprived of education opportunity and benefit when she had to leave LSU to enter a rehabilitation facility, and severe emotional distress.

767.     The Board of Supervisors had actual knowledge of John Doe's other sexual assaults against women, and Owens's sexual harassment by John Doe was reported to LSU by Owens's rehabilitation facility, and by Owens's father's disclosure to Responsible Employee, Julia Sell.

768.    Defendant Stewart later admitted that LSU had actual knowledge of Owens's sexual harassment. LSU had control over John Doe, a student athlete.

769.    LSU was deliberately indifferent to the harassment experienced by Owens in the following ways:

    a.  Julia Sell told Owens' father, "I don't believe that."

    b.  LSU never opened a Title IX investigation following reports from a reputable rehabilitation facility.

    c.  The Athletics Department took no action in response to a disclosure that a student-athlete had forcibly raped a fellow student-athlete.

    d.  Nobody at LSU ever offered any interim or support measures to Owens.

770.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

771.    LSU's deliberate indifference subjected Owens to additional discrimination in the form of a complete failure to keep any records that would allow Owens to know whether her assailant had assaulted other students.

***Deliberate Indifference Towards Brennan***

772.    Brennan was subject to severe, pervasive, and objectively offensive sexual harassment in the form of the nude photo taken of her and shared without consent.

773.    This harassment caused Brennan to be deprived of education opportunity and benefit when she had to leave the LSU recruiting team, and, eventually, to leave LSU entirely.

774.    LSU and the Board of Supervisors had actual knowledge of Brennan's rape by John Doe, as Brennan directly reported the rape to Responsible Employees Sharon Lewis, Defendant Segar, and LSUPD.

775.     LSU had control over John Doe, a student athlete.

776.     LSU was deliberately indifferent to the harassment experienced by Brennan in the following ways:

   a.   Brennan never received any notice from LSU about whether a Title IX investigation was conducted.

   b.   No one at LSU ever offered Brennan any support, resources, accommodations, or interim measures.

   c.   The LSUPD report did not even include John Doe's name, and worse, was inaccurate.

   d.   Sharon Lewis and Defendant Segar did not make it clear what their roles were with regards to Title IX or conflicts of interest with Defendant Segar's role in the Athletics Department.

777.     Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

778.     LSU's deliberate indifference subjected Brennan to additional harassment in the form of creating a hostile work environment for her at the recruiting team by failing to train students and employees to recognize sexual misconduct and to report it through proper channels—especially in an environment prone to the risk of sexual harassment like the Athletics Department.

779.     LSU's deliberate indifference also subjected Brennan to additional harassment by failing to take action against John Doe, whose violence LSU was already aware of after John Doe assaulted Plaintiff Richardson.

***Deliberate Indifference Towards Richardson***

780.     Richardson was subject to severe, pervasive, and objectively offensive sexual

harassment in the form of forcible rape and dating violence by multiple student-athletes.

781.    This harassment caused Richardson extreme emotional distress and caused Richardson to be deprived of educational opportunities and benefits when she was forced to leave her job and was denied other positions related to the Athletics Department.

782.    The Board of Supervisors had actual knowledge of John Doe and John Coe's other sexual assaults against women, and Richardson's sexual harassment by John Doe and John Coe were reported to Responsible Employees Sharon Lewis and Keava Soil-Cormier.

783.    Richardson later disclosed the harassment to other Responsible Employees, including Defendants Segar and Ausberry.

784.    LSU had control over John Doe and John Coe, both student athletes.

785.    LSU was deliberately indifferent to the harassment experienced by Richardson in the following ways:

    a.    Sharon Lewis attempted to arrange a meeting with Richardson and her abuser to "iron things out."

    b.    Neither Sharon Lewis nor any other LSU staff member offered Richardson any support, resources, accommodations, or interim measures.

    c.    No report was made to the Title IX Office and no investigation was initiated when Richardson first reported her abuse.

    d.    Sharon Lewis and Soil-Cormier laughed at and mocked Richardson and said that they could call the police if Richardson felt like this was "big enough to ruin John Coe's career at LSU."

    e.    Soil-Cormier responded to Richardson's disclosure of John Doe's sexual misconduct by asking why Richardson would let Doe into her apartment.

     f.   Soil-Cormier never filed a Title IX report, and no investigation was initiated.

     g.   Defendant Segar never returned Richardson's call despite actual knowledge of the claims of sexual assault against John Doe and John Coe from at least three other students.

     h.   Sharon Lewis was named as the respondent in the eventual Title IX investigation instead of John Coe.

     i.   No finding was made regarding John Coe's abuse of Richardson after the investigation.

786.    These actions directly discouraged Richardson to report her abuse to other authorities and continued her exposure to a dangerous environment.

787.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

788.    LSU's continuing deliberate indifference subjected Richardson to additional continuing harassment in the form of a hostile environment in the Athletics Department for the following reasons:

     a.   Soil-Cormier also told other student workers about Richardson's abuse by John Doe, which caused Richardson embarrassment and humiliation at her place of work.

     b.   Soil-Cormier also asked Richardson to apologize to John Doe's significant other, causing further embarrassment and humiliation.

     c.   John Doe publicly harassed and humiliated Richardson by telling other football players, coaches, and athletics workers that Richardson was a "whore."

     d.   Whenever Doe would see Richardson at a bar, he would go to the bouncers and try

to get her kicked out until the bar owners told him to stop.

  e. No one at LSU prevented Coe or Doe from continuing to stalk and harass Richardson or made any attempt to stop their behavior.

***Deliberate Indifference Towards Plaintiff Lewis***

789. Plaintiff Lewis was subject to severe, pervasive, and objectively offensive sexual harassment in the form of severe dating violence.

790. The abuse was so severe that Plaintiff Lewis eventually withdrew from LSU, depriving Plaintiff Lewis of educational opportunities and benefits.

791. LSU and the Board of Supervisors had actual knowledge of Plaintiff Lewis's harassment through Responsible Employees Julia Sell, Mike Sell, Donavon White, Sean Carter, Verge Ausberry, and Miriam Segar.

792. LSU also had actual knowledge of John Coe's abuse of Richardson.

793. Plaintiff Lewis's abuser, John Coe, was under the control of LSU as a football player.

794. LSU was deliberately indifferent to the harassment experienced by Plaintiff Lewis.

795. Julia Sell did not report any witness statements to the police, the Title IX Office, or to any other entity, and she did not ask Plaintiff Lewis about them.

796. No one offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated based on these witness statements.

797. LSU was deliberately indifferent to the harassment experienced by Plaintiff Lewis in the following ways:

  a. Mike Sell stated that this "couldn't be possible, wouldn't be possible."

  b. When a Title IX investigation was finally opened, Investigator Scott waited three

weeks to interview Plaintiff Lewis.

c.  Investigator Scott waited a month and a half to interview John Coe.

d.  John Coe only participated in one of his five mandated counseling sessions and LSU did nothing to enforce his participation.

e.  John Coe continued to be allowed to play football.

f.  Plaintiff Lewis never received any findings of the Title IX investigation.

g.  Following LSUPD's required interference in one instance of Coe's abuse, LSU found Plaintiff Lewis in violation of the residential life policy for having a candle in her room and placed her on academic probation.

h.  LSU took no action against John Coe for his violent sexual misconduct that provoked Plaintiff Lewis's roommate to call LSUPD.

i.  At least three witnesses told Defendant Sanders about John Coe's abuse of Plaintiff Lewis, but LSU did not initiate any formal disciplinary action against Coe other than banning him from the weight room that summer.

j.  Some of the football coaches made comments to Plaintiff Lewis indicating that they blamed her for Coe being banned from the weight room.

k.  Plaintiff Lewis brought these statements to Defendant Segar's attention and Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment."

l.  John Coe admitted in writing to his abuse of Plaintiff Lewis, and LSU did nothing.

m. Plaintiff Lewis was never provided any notification about any discipline imposed on Coe.

798.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

799.    LSU's deliberate indifference subjected Plaintiff Lewis to the following continuing abuse by John Coe:

    a.    Coe threatened Plaintiff Lewis by stating that he was "really about to beat [her]," "might kill [her]," and that she should "just kill [her]self."

    b.    Coe put his hands in Plaintiff Lewis' face, slammed her against the car, and was about to hit her again until one of his friends stopped him.

    c.    Coe drove Plaintiff Lewis to a remote area and threw her phone out the window.

    d.    As Plaintiff Lewis exited the vehicle, John Coe abandoned her.

    e.    When John Coe returned, he began strangling her.

    f.    Coe repeatedly told Plaintiff Lewis that if she reported him, his parents would ruin her life by taking her to court, getting her kicked out of school, and having her deported back to New Zealand.

800.    LSU's deliberate indifference also caused Julia Sell to instruct Plaintiff Lewis' teammates on the tennis team to stay away from Plaintiff Lewis, causing Plaintiff Lewis additional emotional distress.

***Deliberate Indifference Towards Johnson***

801.    Johnson was subject to severe, pervasive, and objectively offensive sexual harassment in the form of continuing sexual harassment regarding her weight and sexual orientation.

802.    This harassment was directly based on Johnson's sex, as, upon information and belief, male student-athletes were not subject to such harassment.

803.    This harassment caused Johnson to experience severe anxiety and become sick to her stomach whenever Julia Sell called her into her office.

804.    Johnson had difficulty eating and began throwing up regularly due to the anxiety-induced nausea that resulted from Julia Sell's abuse and harassment.

805.    This harassment caused Johnson to be deprived of educational opportunities and benefits when she became too ill to play tennis or maintain her grades and caused her severe emotional distress, including that she would starve herself due to the abuse.

806.    LSU and the Board of Supervisors had actual knowledge of Johnson's harassment through a Responsible Employee, Julia Sell herself, as Johnson's harasser.

807.    As an LSU employee, Julia Sell was under LSU's control.

808.    LSU was deliberately indifferent to Johnson's harassment in the following ways:

　　a.    A Responsible Employee, Julia Sell, was the harasser.

　　b.    Johnson was never told weight and sexual orientation discrimination could be considered Title IX violations if they were based on sex.

　　c.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

809.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

810.    LSU's deliberate indifference subjected Johnson to the following additional harassment of Johnson:

　　a.    Julia Sell brought Johnson to the indoor tennis courts and told her, "You might want to bring tissues, because I'm going to make you cry."

　　b.    Julia Sell would blame Johnson if her fellow teammates did not play well.

　　c.    Julia Sell falsely told Johnson and Plaintiff Lewis that the other had said hurtful things about each other behind their backs.

d. When Johnson told Julia Sell about Plaintiff Lewis's abuse, Julia Sell ignored the information and told Johnson that if she stopped "worrying so much about other people," she would be a better tennis player.

e. Julia Sell made disparaging comments about Johnson's sexual orientation.

f. Julia Sell would tell Johnson to keep her "lifestyle" out of the locker room.

g. Julia Sell also told Johnson that her sexual orientation could make her teammates "uncomfortable" and "distract" them.

***Deliberate Indifference Towards Andries***

811. Andries was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible groping.

812. This harassment caused Andries to experience extreme anxiety and depression, which caused Andries to be deprived of educational opportunities and benefits when she would see her abuser in class, have a panic attack, and consequently miss the remaining lecture.

813. LSU and the Board of Supervisors had actual knowledge of Andries' harassment through Responsible Employees, including Dr. Jones at the LSU medical clinic, Disability Services staff, and Tracy Blanchard.

814. Andries' harasser, John Roe, was under LSU's control as a student and fraternity member.

815. LSU was deliberately indifferent to the harassment experienced by Andries in the following ways:

a. Andries was never provided any information regarding Title IX and could not find any information online.

b. After reporting, a graduate assistant conducted Andries' Title IX investigation, but

never contacted Andries' witnesses and never issued a no-contact order to Roe.

c.  No one from SAA had ever reached out to Andries' professor to explain why she could not be in class.

d.  The Title IX Office ignored Andries' professor's report.

e.  The Title IX Office accepted John Roe's late appeal without providing any justification for doing so.

f.  Andries was not provided with a copy of John Roe's written appeal nor given any opportunity to respond to the appeal.

g.  Defendant Stewart refused to provide Andries with any updates on the status of the appeals process.

h.  Blanchard told Andries that Andries and her abuser were both students, so they had "the same rights."

i.  LSU failed to provide any interim measures to Andries during the investigation or after a conclusive finding that Roe violated Title IX Policy.

j.  LSU failed to remedy the hostile environment caused at LSU for Andries by Roe.

k.  No one notified Andries that John Roe had appealed SAA's discipline decision and that the discipline imposed upon him would be stayed until a decision on his appeal was issued.

l.  SAA staff told Andries' father that her abuser's appeal was not disclosed because "it wouldn't affect [her] at all so it wasn't [her] business."

816.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

817.    LSU's deliberate indifference subjected Andries to additional discrimination in the

form of inappropriate and unnecessary interviews with Defendant Sanders; additional panic attacks when unexpectedly finding John Roe in her classes; and LSU issuing a no contact order against Andries.

***Deliberate Indifference Towards Plaintiff Doe***

818.    Plaintiff Doe was subject to severe, pervasive, and objectively offensive sexual harassment in the form of stalking.

819.    This harassment caused Plaintiff Doe to experience extreme emotional distress, which in turn caused Plaintiff Doe to be deprived of educational opportunities and benefits when she stopped attending classes because she was afraid of seeing John Poe, and when she was being retraumatized by the Title IX Office, she eventually was forced to leave LSU.

820.    The Board of Supervisors had actual knowledge of this harassment through Responsible Employee resident assistants.

821.    Plaintiff Doe's harasser was under the control of LSU as a student living in on-campus housing.

822.    LSU was deliberately indifferent to the harassment experienced by Plaintiff Doe in the following ways:

   a.  DeLuca wrongly told Plaintiff Doe that Poe's behavior was not a violation of Title IX.

   b.  Title IX staff members never offered to move Poe out of North Hall.

   c.  LSU refused to issue a no-contact order to Poe.

   d.  Four separate interviewers spoke with Plaintiff Doe in a condescending manner and asked why she had kissed Poe prior to his abuse.

   e.  These interviewers caused Plaintiff Doe unnecessary emotional distress and they

did not offer any support or resources.

f.   Plaintiff Doe never received any formal communications from the Title IX Office.

g.   Plaintiff Doe never received a formal resolution on her case, was never told if John Poe was interviewed or disciplined for his actions, and none of the witnesses she identified were ever interviewed.

h.   DeLuca refused to give Plaintiff Doe any information about her case.

823.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

824.    There were no records kept of Plaintiff Doe's reports, and the small notations found in Plaintiff Doe's records were inaccurate.

825.    LSU's deliberate indifference subjected Plaintiff Doe to additional harassment from Poe because Poe continued to stalk Plaintiff Doe and follow her around campus, even late at night.

### Deliberate Indifference Towards Robertson

826.    Robertson was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible vaginal and anal rape.

827.    This harassment caused Robertson extreme emotional distress and substance abuse, which caused her to be deprived of educational opportunities and benefits when she had to leave LSU to enter a rehabilitation facility.

828.    The Board of Supervisors had actual knowledge of Robertson's sexual harassment by John Doe through responsible employees, including Robertson's diving coach, Defendant Segar, Fuentes-Martin, and Orgeron.

829.    LSU had control over John Doe, a student athlete.

830.    LSU was deliberately indifferent to the harassment experienced by Robertson in the following ways:

    a.   Employees at the LSU Student Health Center told Robertson it was better to not pursue an investigation against John Doe.

    b.   No one from LSU told Robertson that she could request a change in housing accommodations.

    c.   Orgeron told Robertson's boyfriend to not be upset because "everybody's girlfriend sleeps with other people."

    d.   No one at LSU offered Robertson any accommodations to help her deal with the aftermath of the rape.

    e.   LSU never contacted Robertson when Plaintiffs Owens and Brennan reported assaults by John Doe to ask if she wanted to come forward with a complaint against John Doe at those times.

    f.   No investigation occurred into the reports of the Title IX violations experienced by Robertson.

831.    Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

832.    LSU's deliberate indifference subjected Robertson to additional discrimination in the form of continuing stalking and sexual harassment by John Doe, including:

    a.   Doe bragged about having sex with Robertson to others.

    b.   Doe threw a protein shake on Robertson's car.

    c.   Doe harassed Robertson about "spreading rumors."

    d.   Doe told Robertson he had "a gun with [her] name on it."

***Deliberate Indifference Towards Hovis***

833.     Hovis was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible rape.

834.     This harassment caused Hovis extreme emotional distress, which caused Hovis to be deprived of educational opportunities and benefits when she was unable to attend class near the football stadium and failed one of her classes because she couldn't get out of bed for her midterm exam.

835.     The Board of Supervisors had actual knowledge of Hovis's sexual harassment through a Responsible Employee resident assistant and LSUPD.

836.     LSU had control over John Loe, a student athlete.

837.     LSU was deliberately indifferent to the harassment experienced by Hovis in the following ways:

      a.  Loe violated his no-contact directive twice.

      b.  Both instances were reported to LSU Responsible Employees.

      c.  LSU took no action to enforce the no-contact order.

838.     Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

839.     LSU's deliberate indifference subjected Hovis to additional discrimination in the form of continued harassment by Loe.

***Deliberate Indifference Towards Kitch***

840.     Kitch was subject to severe, pervasive, and objectively offensive sexual harassment in the form of continuing inappropriate contact with her professor.

841.     This harassment caused Kitch severe emotional distress and caused Kitch to be

deprived of educational opportunities and benefits when she could not complete her tenure track position.

842.     The Board of Supervisors had actual knowledge of the sexual harassment experienced by Kitch as her abuser was a Responsible Employee and other Responsible Employees were aware of Kitch's abuser's behavior.

843.     LSU had control over John Moe, a professor.

844.     LSU was deliberately indifferent to the harassment experienced by Kitch in the following ways:

    a.   An LSU employee was responsible for the harassment.

    b.   No one at LSU told Kitch about her reporting options through the Title IX Office.

    c.   When she eventually reported Moe, Title IX staff members informed Kitch that it was a good choice not to report the harassment when she was a student because "no one would have done anything" and she would have faced consequences as a result of the report.

845.     Such responses, or lack thereof, were clearly unreasonable in light of the known circumstances.

846.     LSU's deliberate indifference subjected Kitch to additional discrimination in the form of ongoing abuse from Moe and sexual harassment from other LSU faculty members.

847.     The Board of Supervisors is liable for their deliberate indifference to the sex discrimination experienced by Plaintiffs by failing to remove their perpetrators from campus or at least ensure that they could not access Plaintiffs or other female and LGBTQ+ students, failing to offer appropriate interim measures and accommodations that could have provided Plaintiffs with equal access to educational opportunities and benefits, failing to properly train staff and students

in appropriate Title IX response, failing to oversee Athletics and other departments as reported in the Husch Blackwell report[77] to ensure Title IX compliance, failing to respond appropriately to reports of Title IX violations, and failing to remedy known sexually hostile environments.

848.     Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, and in fact Defendants concealed from Plaintiffs, that the Board of Supervisors was deliberately indifferent to the severe and pervasive sexual harassment such that LSU's response or lack thereof was clearly unreasonable in light of the known circumstances and that this deliberate indifference subjected Plaintiffs to continuing harassment.

**COUNT II**
**Violation of Title IX**
**Hostile Environment**
**20 U.S.C. §§ 1681,** *et seq.*
**(LSU Board of Supervisors)**

849.     Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

850.     Plaintiffs allege violations of Title IX against Defendant LSU Board of Supervisors due to the Board of Supervisors' cultivation and perpetuation of a sexually hostile environment against them.

851.     The Board of Supervisors operates programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

852.     As female and LGBTQ+ identifying students seeking equal access to educational opportunities and benefits at LSU, Plaintiffs were members of a protected class covered by Title IX.

---

[77] Report at 36.

853.     The abuse described previously in this Complaint, perpetuated by LSU employees and students, created an abusive and sexually hostile educational environment on LSU's campus that impeded and effectively denied Plaintiffs' equal access to educational opportunities and benefits.

854.     The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the Board of Supervisors, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits.

855.     The Board of Supervisors is liable for the abusive and hostile educational environment on campus because the Board of Supervisors had actual knowledge of the Plaintiffs' abusers' acts of sex-based discrimination against female and LGBTQ+ identifying students but allowed them to continue to have unfettered access to these students, including Plaintiffs.

856.     The Board of Supervisors is also liable for their failure to remedy the hostile educational environment experienced by Plaintiffs by failing to offer appropriate interim measures and accommodations that could have provided equal access to educational opportunities and benefits and failing to remedy known sexually hostile environments.

***Owens' Hostile Environment***

857.     Owens was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible vaginal and anal rape in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

858.     Owens' harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of her educational environment, as she was afraid to disclose her rape to anyone due to John Doe's status as a star

athlete, which caused her to experience a substance abuse relapse that forced her to leave LSU.

859.    LSU had actual knowledge of the hostile environment created by John Doe, including Owens' abuse, as multiple people had reported it to multiple Responsible Employees.

860.    LSU had actual knowledge of John Doe's other sexual assaults against women and therefore knew he posed a risk to female students.

861.    LSU had actual knowledge of Owens' sexual harassment by John Doe because it was reported to LSU by Owens' rehabilitation facility, and Owens' father disclosed the harassment to a Responsible Employee, Julia Sell.

862.    Defendant Stewart later admitted that LSU had actual knowledge of Owens' sexual harassment.

863.    LSU failed to remedy the hostile environment experienced by Owens because it failed to provide her with appropriate interim measures and accommodations and it allowed John Doe to continue to have unfettered access to female students, including Owens.

*Brennan's Hostile Environment*

864.    Brennan was subjected severe, pervasive, and objectively offensive sexual harassment in the form of John Doe taking and distributing a nude photo of her without her consent in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

865.    Brennan's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Brennan's educational environment, as LSU's lack of response, and the subsequent public support of John Doe caused Brennan to leave LSU.

866.    LSU had actual knowledge of the hostile environment created by John Doe,

including Brennan's harassment, as multiple people had reported it to multiple Responsible Employees.

867.    LSU had actual knowledge of John Doe's other sexual assaults against women.

868.    LSU had actual knowledge of Brennan's abuse by John Doe because it was reported to Responsible Employees Sharon Lewis, Defendant Segar, and the LSUPD.

869.    LSU failed to remedy the hostile environment experienced by Brennan because it failed to provide her with appropriate interim measures and accommodations and it allowed John Doe to continue to have unfettered access to female students, including Brennan.

### *Richardson's Hostile Environment*

870.    Richardson was subject to severe, pervasive, and objectively offensive sexual harassment in the form of rape, attempted rape, sexual harassment, and dating violence in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

871.    Additionally, female recruiters were expected by LSU staff to do "anything" to bring potential recruits to LSU, which created a hostile environment for Richardson.

872.    Richardson was told to only report dating violence to the police if she felt like this was "big enough to ruin John Coe's career at LSU," which Richardson found to be hostile.

873.    Richardson's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Plaintiff's educational environment, as Richardson was forced to leave her educational job in the Athletics Department.

874.    LSU had actual knowledge of the hostile environment created for Richardson, as she reported it to multiple Responsible Employees.

875.     LSU had actual knowledge of John Doe's other sexual assaults against women and John Coe's dating violence with other women.

876.     LSU had actual knowledge of Richardson's abuse by John Doe and John Coe because it was reported to Responsible Employees Sharon Lewis, Defendant Segar, Defendant Ausberry, and Keava Soil-Cormier.

877.     LSU failed to remedy the hostile environment experienced by Richardson because it failed to provide her with appropriate interim measures and accommodations and it allowed John Doe and John Coe to continue to have unfettered access to female students, including Richardson.

***Plaintiff Lewis' Hostile Environment***

878.     Plaintiff Lewis was subject to severe, pervasive, and objectively offensive sexual harassment in the form of dating violence in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

879.     Plaintiff Lewis's abuse was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Plaintiff's educational environment, as Plaintiff Lewis was ultimately forced to leave LSU out of fear for her physical safety.

880.     Coe repeatedly told Plaintiff Lewis that if she reported him, his parents would ruin her life by taking her to court, getting her kicked out of school, and having her deported back to New Zealand.

881.     LSU had actual knowledge of the hostile environment created by John Coe, including Plaintiff Lewis's abuse, as numerous individuals reported it to numerous Responsible Employees.

882.     LSU had actual knowledge of John Coe's prior pattern of violent abuse of women

with whom he was in a sexual or romantic relationship.

883.     LSU told the SEC that LSU was conducting a Title IX investigation into Plaintiff Lewis' situation.

884.     LSU failed to remedy the hostile environment experienced by Plaintiff Lewis because it failed to provide her with appropriate interim measures and accommodations and it allowed John Coe to continue to have unfettered access to female students, including Plaintiff Lewis.

***Johnson's Hostile Environment***

885.     Johnson was subject to severe, pervasive, and objectively offensive sexual harassment in the form of continued sexual harassment regarding her weight and sexual orientation in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

886.     Johnson's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Plaintiff's educational environment, as Johnson's performance declined on the tennis court and in her classes.

887.     Upon information and belief, no male student-athletes were subject to similar harassment.

888.     LSU had actual knowledge of the hostile environment created by Julia Sell, as Julia Sell is herself a Responsible Employee.

889.     LSU failed to remedy the hostile environment experienced by Plaintiff Lewis because it failed to provide her with appropriate interim measures and accommodations and it allowed Julia Sell to continue to have unfettered access to female and LGBTQ+ identifying students, including Johnson.

### *Andries' Hostile Environment*

890.    Andries was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible groping in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

891.    Andries' harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Plaintiff's educational environment, as Andries had panic attacks when she saw her abuser John Roe in class, forcing her to miss several lectures.

892.    LSU had actual knowledge of the hostile environment created by its response to Title IX reports, as Andries reported to and then experienced harassment by LSU's Title IX Office itself.

893.    Responsible Employee Blanchard told Andries that she and John Roe were both students, so they had "the same rights."

894.    LSU failed to remedy the hostile environment experienced by Andries because it failed to provide her with appropriate interim measures and accommodations and it allowed John Roe to continue to have unfettered access to female students, including Andries.

### *Plaintiff Doe's Hostile Environment*

895.    Plaintiff Doe was subject to severe, pervasive, and objectively offensive sexual harassment in the form of stalking in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

896.    Plaintiff Doe's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Plaintiff Doe's educational environment, as her attendance and grades began to suffer to the point that she lost her

TOPS scholarship and had to leave LSU.

897.     LSU had actual knowledge of the hostile environment created by its lack of enforcement of Title IX, as Plaintiff Doe repeatedly contacted LSU staff regarding the continued stalking by her abuser.

898.     LSU failed to remedy the hostile environment experienced by Plaintiff Doe because it failed to provide her with appropriate interim measures and accommodations and it allowed John Poe to continue to have unfettered access to female students, including Plaintiff Doe.

***Robertson's Hostile Environment***

899.     Robertson was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible vaginal and anal rape and continuing verbal abuse in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

900.     Robertson did not want to report the rape because Doe was revered "like a god" on campus, and she thought that reporting would cause her to be the most hated person on campus and force her to leave LSU.

901.     Robertson's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Robertson's educational environment, as her grades began to decline, and she was forced to leave LSU.

902.     LSU had actual knowledge of the hostile environment Robertson was experiencing, as she told multiple Responsible Employees about it.

903.     LSU failed to remedy the hostile environment experienced by Robertson because it failed to provide her with appropriate interim measures and accommodations and it allowed John Doe to continue to have unfettered access to female students, including Robertson.

*Hovis' Hostile Environment*

904.    Hovis was subject to severe, pervasive, and objectively offensive sexual harassment in the form of forcible rape in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

905.    Hovis' harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Hovis' educational environment, as she could not attend classes near the football stadium because of her fear and anxiety of seeing Loe, and she failed one of her classes because she couldn't get out of bed for her midterm exam due to the stress and anxiety she experienced due to the rape.

906.    LSU had actual knowledge of the hostile environment because Hovis reported it to the Title IX Office and went through the investigation process, reporting it to multiple Responsible Employees in the process.

907.    LSU failed to remedy the hostile environment experienced by Robertson because it failed to provide her with appropriate interim measures and accommodations, allowed John Loe to have unfettered access to female students, including Hovis, and revoked Hovis' interim measures without any rational reason for doing so and after she had notified LSU that she still needed those supports.

*Kitch's Hostile Environment*

908.    Kitch was subject to severe, pervasive, and objectively offensive sexual harassment in the form of inappropriate workplace behavior of her professor, in an environment that lacked appropriate training and support services for survivors of sexual misconduct.

909.    Kitch's harassment was sufficiently severe to create an objectively hostile environment permeated with discriminatory intimidation to alter the conditions of Kitch's

educational environment, as Kitch became ill and struggled to complete her degree.

910.    Kitch was terrified to disclose this pervasive harassment because she reasonably believed that nobody at LSU experienced repercussions for perpetrating sexual abuse.

911.    Kitch reasonably feared that if she did not maintain a good working relationship with Moe, then she would never graduate.

912.    Responsible Employees informed Kitch that it was a good choice not to report the harassment when she was a student because "no one would have done anything" and she would have faced consequences as a result of the report.

913.    LSU had actual knowledge of the hostile environment created by Professor Moe and the other professors but allowed them to continue to have unfettered access to female students, including Kitch.

914.    The Board of Supervisors is liable for their failure to remedy the hostile educational environment experienced by Plaintiffs by failing to remove their perpetrators from campus or at least ensure that they could not access Plaintiffs or other female and LGBTQ+ students, failing to offer appropriate interim measures and accommodations that could have provided Plaintiffs with equal access to educational opportunities and benefits, failing to properly train staff and students in appropriate Title IX response, failing to oversee Athletics and other departments as reported in the Husch Blackwell report[78] to ensure Title IX compliance, failing to respond appropriately to reports of Title IX violations, and failing to remedy known sexually hostile environments.

915.    Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, and in fact Defendants had concealed from Plaintiffs, that the Board of Supervisors had actual knowledge of the pervasive harassment creating an

---

[78] Report at 36.

objectively hostile and abusive environment in which Title IX violations were knowingly not reported properly and which was permeated with discriminatory intimidation, ridicule, and insult which negatively altered the conditions of Plaintiffs' educational environment.

**COUNT III**
**Violation of Title IX**
**Heightened Risk**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU Board of Supervisors)**

916.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

917.    Plaintiffs allege violations of Title IX against Defendant LSU Board of Supervisors due to the heightened risk of sex-based discrimination on LSU's campus.

918.    The Board of Supervisors operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

919.    LSU knew of and permitted a campus condition rife with sexual misconduct, and sexual misconduct was rampant on campus.

920.    LSU mishandled and discouraged reports of sexual assault.

921.    LSU's response to these circumstances substantially increased the risk that plaintiffs and others would be sexually assaulted.

922.    Despite sexual misconduct occurring frequently among its faculty members, staff, and students, the Board of Supervisors failed to adequately train its employees on how to prevent and respond to reports of sex-based discrimination and harassment.

923.    In a September 2017 audit completed by LSU's Office of Internal Audit which was included as an exhibit to the Report, a detailed description of the problems and failings within the LSU Title IX process were identified, including the fact that Responsible Employees were not

properly trained in their obligations under the Title IX Policy.

924.     Although the audit report was distributed to Defendant Stewart and former President F. King Alexander, upon information and belief, the audit report was not acted upon and no additional training was provided to Responsible Employees to ensure that employees complied with their obligations under LSU policy and federal Title IX guidance.

925.     The Board of Supervisors willfully ignored their own internal audit findings indicating that Title IX reporting was a problem and did nothing to remedy the situation.

926.     Pursuant to the LSU Board of Supervisors' official policy, practice, and/or custom of deliberate indifference, they cultivated a culture of silence by failing to report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures in the following ways:

   a.  Failing to properly train employees in their Title IX reporting obligations.

   b.  Failing to ensure employee compliance with Title IX Policy.

   c.  Failing to report complaints of sex-based discrimination.

   d.  Failing to initiate and/or conduct adequate investigations and grievance procedures under Title IX.

   e.  Failing to ensure that victimized students had equal access to educational opportunities and benefits or grievance procedures.

   f.  Failing to ensure victimized students were provided with the interim measures necessary to maintain their educational access after making Title IX reports.

   g.  Failing to remedy hostile environments when they were discovered.

   h.  Failing to prevent the recurrence of hostile environments.

927.    A current LSU employee has publicly acknowledged the Board of Supervisors' official policy, practice, and/or custom of deliberate indifference towards sexual misconduct.

928.    Specifically, Sharon Lewis has made numerous public statements in her April 8, 2021, lawsuit; through her lawyers; and in an EEOC charge, all of which demonstrate that proper Title IX reporting procedures were consistently ignored by numerous LSU employees throughout the entire period in which the events alleged in this Complaint took place.

929.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by the Board of Supervisors, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to LSU's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

930.    Examples of how LSU created a heightened risk of sexual misconduct on campus for John Doe's victims include:

   a.  At the time that John Doe raped Owens, LSU had knowledge of John Doe raping Robertson six months prior.

   b.  Because LSU had not properly recorded John Doe as Robertson's assailant nor properly investigated Robertson's report, LSU allowed a known rapist to remain on campus with unfettered access to the student body. LSU knew or should have known that this substantially heightened Owens's risk of victimization.

   c.  By not offering Owens any support measures nor opening a proper investigation following her disclosure, LSU allowed Owens to continue to experience a substantially heightened risk of sexual assault by John Doe.

d. Because no one at LSU offered Owens any support, resources, accommodations, or interim measures, LSU failed to ensure that Owens could return safely to complete her degree.

e. At the time that John Doe took and distributed a nude photo of Brennan without her consent, LSU had knowledge of John Doe raping Robertson seven months prior.

f. Because LSU had not properly recorded John Doe as Robertson's assailant nor properly investigated Robertson's report, LSU allowed a known rapist to remain on campus with unfettered access to the student body. LSU knew or should have known that this substantially heightened Brennan's risk of victimization.

g. By not offering Brennan any support measures nor opening a proper investigation following her disclosure, LSU allowed Brennan to continue to experience a substantially heightened risk of sexual assault by John Doe.

h. Because no one at LSU offered Brennan any support, resources, accommodations, or interim measures, LSU failed to ensure that Brennan could maintain her on-campus employment and timely complete her degree.

i. LSU's lack of response, and the subsequent public support of John Doe caused Brennan to leave LSU.

j. At the time that John Doe attempted to rape Richardson, LSU had knowledge of John Doe raping Robertson and Owens, as well as knowledge of John Doe distributing a nude photograph of Brennan.

k. Because LSU had not properly recorded John Doe as Robertson's, Owens', or Brennan's assailant nor properly investigated their reports of abuse, LSU allowed a known rapist to remain on campus with unfettered access to the student body.

LSU knew or should have known that this substantially heightened Robertson's, Owens', Brennan's, and Richardson's risk of victimization.

l.  Doe publicly harassed and humiliated Richardson by telling other football players, coaches, and athletics workers that he and Richardson had slept together, and that Richardson was a "whore."

m.  By not offering Richardson any support measures nor opening a proper investigation following her disclosure, LSU allowed Richardson to continue to experience a substantially heightened risk of sexual assault by John Doe.

n.  Because no one at LSU offered Richardson any support, resources, accommodations, or interim measures, LSU failed to ensure that Richardson could return safely to her student job.

931.    Examples of how LSU created a heightened risk of sexual misconduct on campus for John Coe's victims include:

a.  At the time that John Coe was arrested for felony dating violence, LSU had knowledge of John Coe's dating violence against Richardson two years prior and knowledge of Coe's dating violence against Plaintiff Lewis.

b.  Because LSU had not properly recorded nor investigated Richardson's disclosure of John Coe's dating violence, LSU allowed a known abuser to remain on campus with unfettered access to the student body.

c.  No one at LSU prevented John Coe from continuing to menace Richardson or made any attempt to stop his behavior. This substantially heightened Richardson's risk of victimization.

d.  By not offering Richardson any support measures nor opening a proper

investigation following her disclosure, LSU allowed Richardson to continue to experience a substantially heightened risk of sexual assault by John Coe.

e.  Because no one at LSU offered Richardson any support, resources, accommodations, or interim measures, LSU failed to ensure that Richardson could return safely to her student job.

f.  At the time that John Coe and Plaintiff Lewis began a romantic relationship, LSU had knowledge of John Coe's dating violence against Richardson one year prior.

g.  Because LSU had not properly recorded nor investigated Richardson's disclosure of John Coe's dating violence, LSU allowed a known abuser to remain on campus with unfettered access to the student body. This substantially heightened Plaintiff Lewis's risk of victimization.

h.  By not offering Plaintiff Lewis any support measures nor opening a proper investigation following reports of John Coe's dating violence in May 2017, LSU allowed Plaintiff Lewis to continue to experience a heightened risk of sexual assault by John Coe and retaliation by John Coe's supporters.

i.  Plaintiff Lewis reported retaliation by certain football coaches and Defendant Segar did nothing to offer any support to Plaintiff Lewis or to investigate violations of Title IX Policy by LSU employees.

j.  Because no one at LSU offered Plaintiff Lewis any support, resources, accommodations, or interim measures, LSU failed to ensure that Plaintiff Lewis could complete her degree program.

932.    Examples of how LSU created a heightened risk of sexual misconduct on campus for Julia Sell's victim include:

a. At the time that Johnson joined LSU's tennis program, LSU was aware that Julia Sell continuously violated Title IX Policy by refusing support measures to survivors and by refusing to report disclosures of sexual assault.

b. Julia Sell and Mike Sell were both aware of Julia Sell's behavior and were Responsible Employees. Because LSU had not properly trained its Responsible Employees, LSU allowed a known abuser to remain on campus with unfettered access to the student body. This substantially heightened Johnson's risk of victimization.

c. LSU continued to allow this unfettered access for several years, each year heightening Johnson's risk of sexual misconduct by Julia Sell.

d. Because no one at LSU offered Johnson any support, resources, or accommodations, LSU failed to ensure that Johnson was able to participate in student athletics.

933.    Examples of how LSU created a heightened risk of sexual misconduct on campus for John Roe's victim include:

a. At the time that Andries missed lectures because of the panic attacks experienced when she unexpectedly saw Roe in class, LSU was aware of John Roe's assault for at least one year.

b. Because LSU had not followed through with an appropriate investigation against John Roe, LSU forced Andries to sit in the same classroom as her abuser several times each week. This substantially heightened Andries' risk of victimization.

c. Because the Title IX Office refused to keep Andries updated on the status of her case, LSU failed to ensure that Andries' substantially heightened risk did not result

in panic attacks that caused her to miss class.

934.    Examples of how LSU created a heightened risk of sexual misconduct on campus for John Poe's victim include:

   a.   Plaintiff Doe reported John Poe's stalking in March 2019, and LSU did not provide adequate support or accommodations to limit Poe's contact with Plaintiff Doe.

   b.   LSU did nothing to discipline John Poe and he continued to stalk Plaintiff Doe, substantially heightening Plaintiff Doe's risk of victimization.

   c.   Plaintiff Doe's fear kept her attendance low, her grades suffered, and eventually she had to leave LSU prior to completing her degree program.

935.    LSU created a heightened risk of sexual misconduct on campus with regard to the victims of John Loe by allowing John Loe to violate the no-contact order issued against him as to Hovis by doing nothing to discipline Loe or enforce the order, substantially heightening Hovis' risk of victimization.

936.    Examples of how LSU created a heightened risk of sexual misconduct on campus for John Moe's victim include:

   a.   At the time that Kitch attended LSU, LSU was aware that Professor Moe continuously violated the Title IX Policy by actively performing overt acts of sexual misconduct, which many in the political science department knew, including Responsible Employees, but they did nothing.

   b.   Because LSU had not properly trained its Responsible Employees, LSU allowed a known abuser to remain on campus with unfettered access to the student body. This substantially heightened Kitch's risk of victimization.

   c.   LSU continued to allow this unfettered access for several years, each year

heightening Kitch's risk of sexual misconduct by Professor Moe.

937.　　Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Plaintiffs were unable to know, in fact the Board of Supervisors concealed from Plaintiffs, that the Board of Supervisors had specific knowledge of the pervasive harassment and heightened risk of sexual assault by certain assailants suffered by Plaintiffs and interfering with Plaintiffs' access to educational opportunities and benefits.

**COUNT IV**
**Violation of Title IX**
**Retaliation by Withholding Protection Otherwise Conferred by Title IX**
**20 U.S.C. §§ 1681, *et seq*.**
**(LSU Board of Supervisors)**

938.　　Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

939.　　Plaintiffs allege violations of Title IX against the LSU Board of Supervisors due to retaliation.

940.　　The Board of Supervisors operates programs in receipt of federal funds and are thus covered by Title IX's prohibition on sex-based discrimination.

941.　　In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of discrimination "on the basis of sex" forbidden by Title IX.

942.　　Federal courts have repeatedly affirmed that retaliation is a violation of federal civil rights.[79]

943.　　Unlike general claims of Title IX violations, which must be made against recipients

---

[79] *See, e.g., Jackson*, 544 U.S. 167; *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

of federal funding, retaliation claims may be brought against both institutions and individuals:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or Plaintiffs engaged in protected activity by reporting incidents of sex-based discrimination perpetrated on them by LSU students and employees to LSU staff. Plaintiffs' actions were protected by the anti-retaliation provision of Title IX. 34 CFR § 106.71(a).

944.    It is clearly established law that students and student-employees are free to report claims of sexual assault without fear of retaliation.[80]

945.    To establish a *prima facie* case of Title IX retaliation in the Fifth Circuit, a plaintiff must show that they participated in activity protected by Title IX and that the defendant took an adverse action against them because of that activity.[81]

946.    "A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against them because they complained of discrimination."[82]

947.    Plaintiffs engaged in protected activity by reporting violations of Title IX to LSU staff and LSUPD.

948.    LSU staff and other LSU students took adverse action against Plaintiffs after they made reports of sex discrimination and abuse to LSU staff and LSUPD.

949.    Multiple LSU administrators were aware of the retaliation Plaintiffs faced but acted with deliberate indifference toward Plaintiffs' reports of continued harassment, stalking, abuse,

---

[80] *See Landesberg-Boyle v. Louisiana*, No. 03-3582, 2004 U.S. Dist. LEXIS 18276 at *17 (E.D. La. Sep. 9, 2004) (holding that "plaintiff's right as a public employee to report and protest to her employer, without fear of retaliation, instances of sexual abuse and harassment" on campus is a clearly established First Amendment right); *Wilson v. Univ. of Tex. Health Ctr.*, 973 F.2d 1263, 1268-69 (5th Cir. 1992) (holding that a public employer's retaliation for an employee's reports of workplace sexual harassment to her superiors represents a violation of a clearly established right; and *Doe v. Alvey*, No. 1:20-cv- 410, 2021 U.S. Dist. LEXIS 55674 at *10 (S.D. Ohio Feb. 2, 2021) (holding that "a student-athlete's complaint about sexual assault to her coach constitutes constitutionally protected speech").

[81] *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864 (M.D. La. 2014).

[82] *Sewell*, 974 F.3d at 586 (citing *Sanches v. Carrollton-Farmers Branch Independent*, 647 F.3d 156 (5th Cir. 2011)).

and retaliation.

*Retaliation against Owens*

950.    While Owens was in rehabilitation, her counselor reported her rape to LSU.

951.    Following this disclosure, Julia and Mike Sell, Responsible Employees, engaged in materially adverse actions against Owens by disallowing her to re-join the tennis team following her rehabilitation.

952.    Julia Sell admitted that she did not believe that Owens was raped, allowing the inference that Julia and Mike Sells' decision to keep Owens off of the tennis team was motivated in part by her Title IX report.

953.    LSU had knowledge of this retaliation and control over Julia and Mike Sell.

954.    This retaliation contributed to Owens's decision to leave LSU as a result of the pervasive sexual harassment.

*Retaliation against Richardson*

955.    Richardson reported John Coe's abuse to Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry, and Defendant Segar.

956.    Richardson reported John Doe's attempted rape to Keava Soil-Cormier.

957.    Following these disclosures, Responsible Employees engaged in materially adverse actions against Richardson:

      a.    Sharon Lewis and Keava Soil-Cormier mocked Richardson.

      b.    Sharon Lewis and Soil-Cormier limited Richardson's working opportunities.

      c.    Soil-Cormier forced Richardson to apologize to John Doe's girlfriend for John Doe's behavior in attempting to rape Richardson.

      d.    Sharon Lewis fired Richardson from her student job.

  e. Defendant Ausberry told Richardson to stop reporting John Coe to him.

  f. Defendant Segar never returned Richardson's calls.

958. The reasons given for Richardson being fired and not getting further employment are clearly pretextual.

959. All of these adverse actions are directly causally connected to Richardson's report of sexual misconduct.

960. LSU had knowledge of this retaliation and control over Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry, and Defendant Segar.

961. This retaliation contributed to Richardson's struggle to maintain her academic standing, and to her decision to leave LSU as a result of the pervasive sexual harassment.

### *Retaliation against Plaintiff Lewis*

962. Plaintiff Lewis reported John Coe's abuse to various athletic department staff on multiple occasions, including but not limited to Julia Sell, Mike Sell, and Defendant Segar.

963. Following many of these disclosures, Julia Sell and Mike Sell, Responsible Employees, engaged in materially adverse actions against Plaintiff Lewis by telling Plaintiff Lewis's teammates to isolate themselves from Plaintiff Lewis and manipulating Plaintiff Lewis and Johnson into arguments.

964. Mike Sell admitted that he did not believe that Plaintiff Lewis was suffering from dating violence, allowing the inference that Julia and Mike Sells' actions in manipulating teammates against Plaintiff Lewis was motivated in part by her Title IX report.

965. LSU had knowledge of this retaliation and control over Julia and Mike Sell.

966. This retaliation contributed to Plaintiff Lewis's decision to leave LSU as a result of the pervasive sexual harassment.

967.     Plaintiff Lewis also reported John Coe's abuse to LSUPD following an incident in which the police were called to the scene as John Coe's abuse occurred.

968.     Following this disclosure, LSU Responsible Employee Defendant Sanders engaged in materially adverse action against Plaintiff Lewis by finding her in violation of the residential life policy for having a candle in her room and placing her on academic probation.

969.     This behavior was clearly in response to Plaintiff Lewis's disclosure, as LSU would otherwise not have known of her candle possession.

970.     LSU had knowledge of this retaliation and control over its Responsible Employees.

971.     This retaliation contributed to Plaintiff Lewis's decision to leave LSU.

972.     Following John Coe's banishment from the weight room as a result of his dating violence against Plaintiff Lewis, LSU Responsible Employees engaged in materially adverse actions against Plaintiff Lewis by telling her that she was to blame for John Coe's discipline.

973.     This behavior was clearly in response to Plaintiff Lewis's disclosure, as the LSU employees specified the disclosure was the reason John Coe was disciplined.

974.     LSU had knowledge of this retaliation and control over its Responsible Employees.

975.     This retaliation contributed to Plaintiff Lewis's decision to leave LSU.

976.     Following the retaliation by football coaches, Plaintiff Lewis disclosed that retaliation to Defendant Segar.

977.     Defendant Segar engaged in materially adverse actions against Plaintiff Lewis by stating that this retaliation was a natural consequence of her reporting dating violence.

978.     This behavior was clearly in response to Plaintiff Lewis's disclosure as Defendant Segar was defending the actions taken by LSU responsible employees and described in the disclosure.

979.      LSU had knowledge of this retaliation and control over Defendant Segar.

980.      This retaliation contributed to Plaintiff Lewis's decision to leave LSU.

**Retaliation against Johnson**

981.      Johnson told Julia Sell about Plaintiff Lewis's abuse.

982.      Following this disclosure, Julia Sell, a Responsible Employee, engaged in materially adverse action against Johnson by telling Johnson that if she stopped "worrying so much about other people," she would be a better tennis player and subsequently sexually harassed and berated Johnson.

983.      LSU had knowledge of this retaliation and control over Julia Sell.

984.      This retaliation contributed to Johnson's ongoing emotional abuse by Julia Sell.

**Retaliation against Andries**

985.      Andries reported the sexual assault committed by John Roe to the Lighthouse Program, an LSU therapist, Disability Services, and the Title IX office.

986.      Throughout the Title IX investigation and decision-making process, Defendant Stewart and other members of LSU's staff engaged in materially adverse actions against Andries by telling her that she had no right to be kept up to date on the status of her case, and no right to a non-arbitrary, well-reasoned decision-making process.

987.      Defendant Stewart stated that she did not have to "justify her decisions" to Andries.

988.      Defendant Sanders harassed Andries with inappropriate questions during an unnecessary interview.

989.      Blanchard denied reasonable accommodations and interim measures to Andries.

990.      Eventually, the Title IX Office went as far as to issue a no-contact order against Andries, the victim.

991.     There was a causal connection between the Title IX report and these material adverse actions.

992.     LSU had knowledge of and control over Responsible Employees' actions, including those of Defendant Stewart and Defendant Sanders.

993.     Andries was deprived of educational benefits as she expended great effort to understand what was happening with her case while experiencing several panic attacks when she would see John Roe in class and on campus.

### Retaliation against Plaintiff Doe

994.     Plaintiff Doe reported John Poe's stalking to LSU's Title IX Office.

995.     Following this disclosure, Responsible Employees engaged in materially adverse actions against Plaintiff Doe by denying her reasonable accommodations, denying her any information about her case under false pretenses, and telling her that her case did not fall under the scope of Title IX.

996.     LSU additionally forced Plaintiff Doe to undergo four traumatic interviews that caused severe emotional distress.

997.     These adverse actions would not have occurred but for Plaintiff Doe's Title IX report.

998.     LSU had knowledge of this retaliation and control over Responsible Employees.

999.     This retaliation contributed to Plaintiff Doe's decision to leave LSU as a result of the pervasive sexual harassment.

1000.    Retaliation constitutes a *per se* violation of Title IX and left Owens, Richardson, Plaintiff Lewis, Johnson, Andries, and Plaintiff Doe vulnerable to further sex discrimination such that they were denied equal access to LSU's educational opportunities and benefits, as they lost

their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left LSU before completing their degrees.

1001.    Until the release of the Report in March 2021 and the Louisiana Senate Committee Hearings, Owens, Richardson, Plaintiff Lewis, Johnson, Andries, and Plaintiff Doe were unable to know about the retaliation they suffered from LSU Responsible Employees following good-faith Title IX violation disclosures.

**COUNT V**
**First Amendment Retaliation**
**42 U.S.C. § 1983 and the First Amendment**
**(Defendants Ausberry, Segar, Stewart, and Sanders**
**in their individual capacities)**

1002.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

1003.    Plaintiffs allege violations of their right to free speech under the U.S. Constitution against Defendants due to retaliation in response to protected speech.

1004.    Defendants Ausberry, Segar, Stewart, and Sanders are state actors and at all relevant times were acting under color of law.

1005.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I.

1006.    Pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public universities. U.S. Const., amend. XIV.

1007.    "[A] valid individual capacity claim requires a Section 1983 plaintiff to 'establish that the defendant was either personally involved in a constitutional deprivation or that his

wrongful actions were causally connected to the constitutional deprivation.'"[83]

1008.    Across the U.S., including within the Fifth Circuit, it is clearly established that students may exercise their First Amendment rights on any topic unless doing so would "materially and substantially disrupt" school operations.[84]

1009.    It has also been established for decades that school officials may not retaliate against students based on their protected speech.[85]

1010.    More specifically, it is clearly established law that students and student-employees are free to report claims of sexual assault without fear of retaliation.[86]

1011.    At all relevant times, Plaintiffs had a clearly established right to freedom of speech pursuant to the First Amendment, of which a reasonable public official would have known.

1012.    Plaintiffs engaged in constitutionally protected speech when they disclosed instances of sexual misconduct to the Individual Defendants and other LSU employees and when they publicly criticized LSU's handling of their complaints as violating the requirements of Title IX.

1013.    Allegations of sexual misconduct associated with public entities, such as LSU, are a matter of public concern deserving of First Amendment protection.

1014.    The normal operations of LSU were in no way disrupted by Plaintiffs' disclosures of sexual misconduct in a manner that can be attributed to Plaintiffs.

1015.    Defendants engaged in attempts to regulate the content of Plaintiffs' speech by

---

[83] *La. Cleaning Sys. v. Brown*, 2015 U.S. Dist. LEXIS 152077 at *16 (citing *James v. Texas Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008)).

[84] *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) and *Healy v. James*, 408 U.S. 169, 189 (1972).

[85] *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667 (1973).

[86] *See* 34 C.F.R. § 106.71(a) ("[n]o recipient or other person may intimidate, threaten, coerce, or discriminate against any individual . . . because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under [Title IX]"). *See also Landesberg-Boyle*, 2004 U.S. Dist. at *17, *Wilson*, 973 F.2d at 1268-69 and *Alvey*, No. 1:20-cv- 410 at *10.

chilling an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1016.    Defendants' retaliation against Plaintiffs' speech serves no compelling state interest.

1017.    Defendants' adverse actions were substantially motivated by Plaintiffs' constitutionally protected speech because Defendants did not want to address and properly respond to Plaintiffs' disclosures of abuse as it would have negatively impacted the reputation of both the LSU football program and the school.

1018.    Defendants' retaliatory actions of silencing and ignoring Plaintiffs' reports of abuse constitute a violation of the First Amendment of the U.S. Constitution.

1019.    Plaintiffs' protected activity was a substantial or motivating factor in the Defendants' conduct and there was a nexus between the Defendants' actions and an intent to chill the Plaintiffs' speech.

***Retaliation against Owens***

1020.    Owens engaged in constitutionally protected speech by reporting that John Doe raped her.

1021.    The normal operations of LSU were in no way disrupted by Owens' disclosure of rape.

1022.    Following this disclosure, LSU employees engaged in the following retaliatory conduct.

      a.    Julia Sell told Owens' father that she did not believe Owens was raped and refused to offer support services to Owens.  A reasonable public official in Julia Sell's role would have known of Owens' right to free speech at LSU.

b. Defendant Stewart refused to document Owens' disclosure, refused to investigate, and refused to offer support services to Owens. A reasonable public official in Defendant Stewart's role would have known of Owens' right to free speech at LSU.

1023.    There was a causal connection between Owens' report against popular football player John Doe and Defendant Stewart and Julia Sell's retaliatory conduct.

1024.    Defendant Stewart and Julia Sell's actions would chill an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1025.    Defendant Stewart and Julia Sell's actions served no compelling state interest.

*Retaliation against Richardson*

1026.    Richardson engaged in constitutionally protected speech by reporting John Coe's abuse to Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry, and Defendant Segar and reporting John Doe's attempted rape to Keava Soil-Cormier.

1027.    The normal operations of LSU were in no way disrupted by Richardson's disclosures of abuse and attempted rape.

1028.    Following these disclosures, LSU employees engaged in the following retaliatory conduct:

a. Sharon Lewis and Keava Soil-Cormier mocked Richardson.

b. Sharon Lewis and Soil-Cormier limited Richardson's working opportunities.

c. Soil-Cormier forced Richardson to apologize to John Doe's girlfriend for John Doe's behavior in attempting to rape Richardson.

d. Sharon Lewis fired Richardson from her student job.

e. Defendant Ausberry told Richardson to stop reporting John Coe to him.

   f. Defendant Segar never returned Richardson's calls.

1029. There was a causal connection between Richardson's report against popular football players John Coe and John Doe and Sharon Lewis, Soil-Cormier, and Defendants Ausberry and Segar's retaliatory conduct.

1030. Sharon Lewis, Soil-Cormier, and Defendants Ausberry and Segar's actions would chill an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1031. Sharon Lewis, Soil-Cormier, and Defendants Ausberry and Segar's actions served no compelling state interest.

***Retaliation against Plaintiff Lewis***

1032. Plaintiff Lewis engaged in constitutionally protected speech by reporting John Coe's abuse to various athletic department staff on multiple occasions, including but not limited to Julia Sell, Mike Sell, and Defendant Segar, as well as LSUPD.

1033. The normal operations of LSU were in no way disrupted by Plaintiff Lewis' disclosure of abuse.

1034. Following this disclosure, LSU employees engaged in the following retaliatory conduct:

   a. Julia Sell and Mike Sell told Plaintiff Lewis' teammates to isolate themselves from her.

   b. Julia Sell manipulated Plaintiff Lewis and Johnson into arguments.

   c. Mike Sell said did not believe that Plaintiff Lewis was suffering from dating violence.

   d. Defendant Sanders found Plaintiff Lewis in violation of the residential life policy

for having a candle in her room and placing her on academic probation after she called for help due to Coe's abuse

1035.    There was a causal connection between Plaintiff Lewis' report against popular football player John Coe and Defendant Sanders, Mike Sell, and Julia Sell's retaliatory conduct.

1036.    Defendant Sanders, Mike Sell, and Julia Sell's actions would chill an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1037.    Defendant Sanders, Mike Sell, and Julia Sell's actions served no compelling state interest.

***Retaliation against Johnson***

1038.    Johnson engaged in constitutionally protected speech by telling Julia Sell about Plaintiff Lewis's abuse.

1039.    The normal operations of LSU were in no way disrupted by Johnson's disclosure of abuse.

1040.    Following this disclosure, Julia Sell engaged in retaliatory conduct against Johnson by ignoring the information, telling Johnson that if she stopped "worrying so much about other people," she would be a better tennis player, and subsequently sexually harassing and berating Johnson.

1041.    There was a causal connection between Johnson's report about Plaintiff Lewis and Julia Sell's retaliatory conduct.

1042.    Julia Sell's actions would chill an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1043.    Julia Sell's actions served no compelling state interest.

**Retaliation against Andries**

1044.    Andries engaged in constitutionally protected speech by telling her LSU therapist, the Lighthouse program, Disability Services, and the Title IX Office about John Roe's abuse.

1045.    The normal operations of LSU were in no way disrupted by Andries' disclosure of abuse.

1046.    Following these disclosures, Defendant Stewart and other LSU employees engaged in retaliatory conduct against Andries by telling her that she had no right to be kept up to date on the status of her case, and no right to a non-arbitrary, well-reasoned decision-making process, Defendant Stewart stating that she did not have to "justify her decisions" to Andries, Defendant Sanders harassed Andries with inappropriate questions during an unnecessary interview, and Tracy Blanchard denying reasonable accommodations and interim measures to Andries and the Title IX Office issuing a no-contact order against Andries, the victim.

1047.    There was a causal connection between Andries' Title IX reports and Defendant Stewart, Blanchard, and other LSU employees' retaliatory conduct.

1048.    Defendant Stewart, Blanchard, and other LSU employees' actions would chill an ordinary person from reporting sexual misconduct or voicing concerns about LSU's handling of student sexual misconduct and Title IX complaints.

1049.    Defendant Stewart, Blanchard, and other LSU employees' actions served no compelling state interest.

**Retaliation against Plaintiff Doe**

1050.    Plaintiff Doe engaged in constitutionally protected speech by reporting John Poe's stalking to LSU's Title IX Office.

1051.    Following this disclosure, Responsible Employees engaged in materially adverse actions against Plaintiff Doe by denying her reasonable accommodations, denying her any information about her case under false pretenses, and telling her that her case did not fall under the scope of Title IX.

1052.    LSU additionally forced Plaintiff Doe to undergo four traumatic interviews that caused severe emotional distress.

1053.    These adverse actions would not have occurred but for Plaintiff Doe's Title IX report.

1054.    LSU had knowledge of this retaliation and control over Responsible Employees.

1055.    This retaliation contributed to Plaintiff Doe's decision to leave LSU as a result of the pervasive sexual harassment.

1056.    Until the release of the Report in March 2021, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that the individual Defendants were retaliating against them for exercising their Constitutional right to free speech.

1057.    Plaintiffs' First Amendment rights were clearly established at the time of the incidents alleged, and the conduct of Defendants was objectively unreasonable in the light of that then clearly established law.[87]    Therefore, the Defendants' actions are not protected by qualified immunity.

1058.    Plaintiffs are entitled to monetary compensation for violations of Constitutional rights against Defendants Ausberry, Segar, Stewart, and Sanders in their individual capacities.

---

[87] *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998).

**COUNT VI**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Defendants Ausberry, Segar, Stewart, and Sanders**
**in their individual capacities)**

1059.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

1060.    Plaintiffs allege violations of 42 U.S.C. § 1983 against Defendants Ausberry, Segar, Stewart, and Sanders in their individual capacities due to discrimination on the basis of sex that denied Plaintiffs equal protection under the law in violation of the Equal Protection Clause of the Fourteenth Amendment.

1061.    Defendants Ausberry, Segar, Stewart and Sanders are state actors and at all relevant times were acting under color of law

1062.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

1063.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

1064.    The discrimination of Defendants against Plaintiffs on the basis of sex was not substantially or rationally related to any legitimate government interest.

1065.    "[A] valid individual capacity claim requires a Section 1983 plaintiff to 'establish that the defendant was either personally involved in a constitutional deprivation or that his wrongful actions were causally connected to the constitutional deprivation.'"[88]

1066.    Defendants discriminated against Plaintiffs on the basis of sex by subjecting them

---

[88] *La. Cleaning Sys.*, 2015 U.S. Dist. LEXIS 152077 at *16 (citing *James*, 535 F.3d at 373).

to a hostile environment and failing to appropriately respond to and investigate reports of sexual misconduct and other violations detailed previously in this Complaint.

1067.    Defendants' discrimination against Plaintiffs on the basis of sex endangered the safety, privacy, security, and well-being of Plaintiffs.

1068.    Defendants' actions and inactions deprived Plaintiffs of their right to equal dignity, liberty, and autonomy by treating them as second-class citizens at LSU.

1069.    Defendants' actions and inactions deprived Plaintiffs of their rights to liberty and property by forcing some of them to move or leave LSU entirely against their prior wishes.

1070.    Owens, Richardson, Robertson, Brennan, Plaintiff Lewis, Plaintiff Doe, and Kitch all made reports of sexual assault that were not investigated by LSU, Defendants Stewart or Sanders, and were not properly reported by Defendants Ausberry or Segar or any of the leaders of the Athletic Department or any other unit at LSU.

1071.    Owens, Richardson, Robertson, Brennan, Plaintiff Lewis, Johnson, Plaintiff Doe, and Kitch were all denied the opportunity to take advantage of interim measures that could have assisted them in fully accessing their education after they had been abused.

1072.    Plaintiff Doe was forced to move out of her residence hall to avoid her abuser, rather than her abuser being moved out of the residence hall.

1073.    Plaintiff Doe was also wrongly told that her claims did not fall under Title IX and denied an investigation.

1074.    Hovis was denied the protections of a no-contact directive when her abuser repeatedly violated the directive and LSU did nothing to discipline him or prevent future violations, therefore leaving her at ongoing risk of abuse.

1075.    These are indisputable violations of the Equal Protection clause, as Plaintiffs were

denied the school's protective services as female victims of sexual assault, an acknowledged disfavored minority.

1076.    This selective treatment was related to the school's interests in maintaining a successful and income-producing athletics program; in other words, this selective treatment was not substantially or rationally related to any legitimate government interest.

1077.    This selective treatment caused Plaintiffs to have to leave athletic teams, leave their housing, and leave LSU before they had completed their degrees.

1078.    It is clearly established that failing to report or investigate allegations of sexual assault violates the Equal Protection clause.

1079.    First, "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."[89]

1080.    More recently, the Supreme Court heard a case in which petitioners filed suit against the local school district's governing board and superintendent, alleging that their response to allegations of peer-on-peer sexual harassment of petitioners' daughter was inadequate and constituted unconstitutional sex discrimination in schools in violation of 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment.[90]

1081.    The Supreme Court held that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights," and "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools," including in the case of school officials' inadequate responses to allegation of peer-on-peer sexual harassment.[91]

---

[89] *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).
[90] *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 250 (2009).
[91] *Id.* at 258.

1082.    The actions of Defendants violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[92]

1083.    The right to equal protection of Plaintiffs under the law was clearly established at the time of the incidents alleged, and the conduct of Defendants was objectively unreasonable in the light of that then clearly established law.[93]

1084.    Until the release of the Report in March 2021, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that the individual Defendants were retaliating against them for exercising their Constitutional right to Equal Protection.

1085.    Plaintiffs are entitled to monetary compensation for violations of Constitutional rights against Defendants Ausberry, Segar, Stewart, and Sanders in their individual capacities.

**COUNT VII**
**Denial of Substantive and Procedural Due Process**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(Defendants Ausberry, Segar, Stewart, and Sanders**
**in their individual capacities)**

1086.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

1087.    Plaintiffs allege violations of 42 U.S.C. § 1983 against Defendants Ausberry, Segar, Stewart, and Sanders due to deprivation of their property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

1088.    Defendants Ausberry, Segar, Stewart, and Sanders are state actors and at all relevant times were acting under color of law.

---

[92] *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).

[93] *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998).

1089.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1.

1090.    Under the Due Process Clause of the Fourteenth Amendment, deprivation of the liberty and property interests of Plaintiffs arising out of the Code of Student Conduct, LSU's Title IX Policy, and federal law and guidance cannot occur without notice and a meaningful opportunity to be heard.

1091.    Defendants' failure to comply with the administrative requirements of Title IX and its own policies deprived Plaintiffs of their procedural due process right to be heard prior to depriving them of their liberty and property interests.

1092.    Defendants' failure to comply with the administrative requirements of Title IX and their own policies deprived Plaintiffs of their substantive due process rights to their liberty interest in bodily integrity and their property interest in their education.

1093.    "[A] valid individual capacity claim requires a Section 1983 plaintiff to 'establish that the defendant was either personally involved in a constitutional deprivation or that his wrongful actions were causally connected to the constitutional deprivation.'"[94]

1094.    Defendants, in their individual capacities and under color of law, subjected Plaintiffs to violations of their liberty and property interests by failing to:

    a.    Properly train employees in their Title IX reporting obligations.

    b.    Ensure employee compliance with the Title IX Policy and other relevant policies.

    c.    Report complaints of sex-based discrimination.

    d.    Initiate and/or conduct adequate investigations and grievance procedures under

---

[94] *La. Cleaning Sys.*, 2015 U.S. Dist. LEXIS 152077 at *16 (citing *James*, 535 F.3d at 373).

Title IX.

e.  Ensure that victimized students had equal access to educational opportunities and benefits or grievance procedures.

f.  Ensure victimized students were provided with the interim measures necessary to maintain their educational access after making Title IX reports.

g.  Remedy hostile environments when they were discovered.

h.  Prevent the recurrence of hostile environments.

1095.    Throughout this deprivation, Defendants continuously failed to provide Plaintiffs with adequate notice of the actions to be taken with regard to the sex-based discrimination they had suffered, as well as meaningful opportunities to be heard.

1096.    Defendants' history of pervasive deprivation of these rights gives rise to a need for a heightened process to substantially reduce the risk of erroneous deprivation.

1097.    For example, certain Plaintiffs had no opportunity to be heard before being told by Defendants not to disclose the sexual misconduct they had endured.

1098.    Other Plaintiffs were told by Defendants not to report their abuse.

1099.    These actions and inactions deprived Plaintiffs of their liberty and property interests in accessing their full educational opportunities and benefits without due process.

1100.    Other Plaintiffs provided substantial evidence including the identities of several witnesses who were not contacted or interviewed in their Title IX investigations.

1101.    This deprived Plaintiffs of a meaningful opportunity to be heard and deprived Plaintiffs of their liberty and property interests in access to educational benefits.

1102.    LSU's issuance of a mutual no-contact directive against Andries violated her right to due process, as she had not been accused of violating or found in violation of any LSU policies

147

and should not have been subject to disciplinary measures simply for reporting a sexual assault.

1103.    Andries should have been given due process before LSU placed limitations on her liberty.

1104.    As LSU students, Owens, Richardson, Robertson, Brennan, Plaintiff Lewis, Plaintiff Doe, and Kitch were entitled to request and receive Title IX investigations when they reported violations and to obtain support measures, as outlined in LSU's Title IX Policy and relevant federal regulations.

1105.    When Defendants decided not to report or investigate Plaintiffs' reports of sexual misconduct and to deny Plaintiffs support services, they deprived Plaintiffs of their property and liberty interests and caused Plaintiffs to suffer grievous loss by being denied educational benefits.

1106.    Multiple Plaintiffs received limited or no communications from the Title IX Office after reporting or limited or no interim measures – even if requested – thus denying them any procedural protections prior to the deprivation of their property and liberty interests in their education.

1107.    In *Perry v. Sindermann*, the Supreme Court clearly established the obvious principle that if public universities have mandatory disciplinary procedures and plaintiffs are eligible for the protections of those procedures, failing to follow the published procedures constitutes an unconstitutional deprivation of plaintiffs' property without due process.[95]

1108.    In *Sindermann*, a lecturer at a public college was working under a contract for a certain term, with the option for the Board of Regents to renew the lecturer's contract at the end of the term.[96]

---

[95] *See Perry v. Sindermann*, 408 U.S. 593 (1972).
[96] *Id*. at 595.

1109.    The college also published a "Faculty Guide" that stated, "The Administration of the College wishes the faculty member to feel that he has permanent tenure…as long as he is happy in his work."[97]

1110.    Following the lecturer's public critique of the Board of Regents, the Board did not renew the lecturer's contract at the end of its term.[98]

1111.    The Court found that the language in the faculty guide that encouraged professors to "feel" like they had tenure created a property right that cannot be deprived without due process, despite the lecturer's actual contract, which was clearly subject to termination at the end of its term.[99]

1112.    Plaintiffs had a liberty and property right in the investigation of reports of sexual misconduct in accordance with LSU's published Title IX policy and the mandates of federal law.

1113.    Unlike in *Sindermann*, LSU following Title IX procedures was not optional. Following procedures was mandatory after a student made a report.

1114.    Defendants knew or should have known that Plaintiffs were entitled to LSU and its employees following LSU's own published procedures.

1115.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[100]

1116.    Plaintiffs' rights to substantive and procedural due process were clearly established at the time of the incidents alleged, and Defendants' conduct was objectively unreasonable in the light of that then clearly established law.[101]

---

[97] *Id.* at 600.

[98] *Id.* at 595.

[99] *Id.* at 598.

[100] *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).

[101] *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998).

1117.    Until the publication of the Report in March 2021 and the following Louisiana Senate Committee Hearing, Plaintiffs were unable to know, in fact Defendants concealed from Plaintiffs, that all Defendants intentionally denied Plaintiffs of their substantive and procedural due process rights regarding the events outlined *supra*.

1118.    Plaintiffs are entitled to monetary compensation for violations of Constitutional rights against Defendants Ausberry, Segar, Stewart, and Sanders in their individual capacities.

## DAMAGES

1119.    Plaintiffs adopt and incorporate by reference the previously pled paragraphs as if fully pled herein.

1120.    As a direct, natural, and proximate result of the above-described conduct, Plaintiffs suffer general, special, incidental, and consequential injury and damages, past, present, and future, in an amount that shall be fully proven at the time of trial. These past, present, and future damages include but are not limited to the following:

a.   Pain, suffering, and emotional distress;

b.   Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

c.   Medical expenses;

d.   Pharmaceutical expenses;

e.   Loss of education and educational opportunities;

f.   Additional educational expenses;

g.   Loss of employment and earning capacity;

h.   Travel and travel-related expenses;

i.   Prevention from performing daily activities and obtaining the full enjoyment of life;

j.   Expenses from psychological treatment, therapy, and counseling;

k.   Loss of the ability to perform as athletes on their chosen teams;

l.   Fractured family and personal relationships;

m.  A loss of consortium society and companionship; and

n.   All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

For all the foregoing reasons, Plaintiffs, on behalf of themselves and the putative class, pray for judgment against Defendants as follows:

A.   For past, present, and future economic and non-economic damages in an amount to be determined at trial;

B.   For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C.   For any appropriate statutory damages;

D.   For costs of this suit;

E.   For punitive damages;

F.   For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.   For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law;

H.   For liability *in solido* among all defendants;

I.   A permanent injunction requiring compliance with Title IX and recurring external audits of LSU's Title IX compliance; and

151

J.    All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Now come Plaintiffs Owens, Brennan, Richardson, Lewis, Johnson, Andries, Doe, Robertson, Hovis, and Kitch, by and through their attorneys, Karen Truszkowski, Elizabeth K. Abdnour, Catherine E. Lasky, and Endya L. Hash, and demand a trial by jury.

Respectfully submitted,

**/s/ Catherine E. Lasky**
Catherine E. Lasky (La. Bar 28652)
Endya L. Hash (La. Bar 38260)
KATIE LASKY LAW LLC
900 Camp St. Suite 439
New Orleans, LA 70130
P: (504) 584-7336
F: (504) 375-2221
katie@katielaskylaw.com
endya@katielaskylaw.com

**Karen Truszkowski**
*Pro Hac Vice*
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

**Elizabeth K. Abdnour**
*Pro Hac Vice*
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 709-7700
Email: elizabeth@abdnour.com

*Attorneys for Plaintiffs*