IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHERIDAN THOMAS, MIRANDA MELSON, JANE DOE 1, JANE DOE 2, SYDNEY BRUN-OZUNA, JANE DOE 3, JANE DOE 4, JANE DOE 5, OTHER UNIDENTIFIED FEMALE DOES, and CAPRI DAVIS, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA; PETE JEYARAM; LAURIE BELLOWS; JAKE JOHNSON; MATTHEW HECKER; TAMIKO STRICKMAN; JEFF LAMOUREAUX; MEAGAN COUNLEY; RYAN FETTE; BRIANA PALLAS-SEARS; SUE KELLY MOORE; SANDRA CHAVEZ; and JAMIE PEER, <br><br> Defendants. | **4:20CV3081** <br><br> **MEMORANDUM AND ORDER** |

This matter is before the Court on defendants' Board of Regents of the University of Nebraska ("BRUN"), Pete Jeyaram ("Jeyaram"), Laurie Bellows ("Bellows"), Jake Johnson ("Johnson"), Matthew Hecker ("Hecker"), Tamiko Strickman ("Strickman"), Jeff Lamoureaux ("Lamoureaux"), Meagan Counley ("Counley"), Ryan Fette ("Fette"), Briana Pallas-Sears ("Pallas-Sears"), Sue Kelly Moore ("Moore"), Sandra Chavez ("Chavez"), and Jamie Peer ("Peer") (collectively, the "individual defendants," and with BRUN,

"defendants") Motion to Dismiss For Failure to State a Claim and to Sever (Filing No. 40) plaintiffs'[1] remaining claims.[2]

The plaintiffs in this case are nine female students or former students that attended the University of Nebraska at Lincoln ("UNL"). All assert they were either sexually assaulted or sexually harassed by male students at UNL[3] and brought, or attempted to bring, complaints to BRUN and its Title IX officers within the Office of Institutional Equity and Compliance ("IEC"). The plaintiffs assert numerous failures of BRUN and IEC regarding the handling of their complaints and the Title IX reporting process at UNL. The plaintiffs oppose dismissal (Filing Nos. 44 and 54) of Counts I, II, and V. The United States also submitted a statement of interest (Filing No. 47) pursuant to 28 U.S.C. § 517, asserting its "significant interest in the proper interpretation of Title IX in ensuring that federally funded schools meet their Title IX obligations." For the reasons stated below, the defendants' motion is granted in part and denied in part.

---

[1]Five of the plaintiffs have filed suit under the pseudonym "Jane Doe," and all of them refer to their alleged assailants as separately numbered "John Roes." Although there is a strong presumption against using pseudonyms, courts may allow it if the plaintiff can "demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016) (quoting *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997)). Although no plaintiffs have addressed this issue, the Court will allow them to use pseudonyms for the public record *at this stage of these proceedings* because the allegations of sexual assault or sexual harassment are "sensitive and highly personal." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

[2]On September 9, 2021, the Court dismissed Counts III, IV, VI, VII, VIII, IX, and X of the plaintiffs' Second Amended Complaint (Filing No. 29) and ordered the plaintiffs to submit supplemental briefing (or file an amended complaint) as to Count I for "Deliberate Indifference to Sex Discrimination" under Title IX, 20 U.S.C. § 1681 *et seq.* ("Title IX"); Count II for "Retaliation by Withholding Protection Otherwise Conferred by Title IX;" and Count V for "Denial of Equal Protection" under 42 U.S.C. § 1983 and the Fourteenth Amendment. The defendants also moved to sever any remaining claims. Based on this Memorandum and Order on the motion to dismiss, severance is unnecessary.

[3]The "John Roe" assailants are not parties to this action.

# I.    BACKGROUND

The following facts are taken from the relevant portions of the second amended complaint and are accepted as true for the purpose of this motion to dismiss.  *See Joyce v. Armstrong Teasdale, LLP,* 635 F.3d 364, 365 (8th Cir. 2011).

## A.    Sheridan Thomas

Sheridan Thomas ("Thomas") enrolled as an undergraduate student at UNL in August 2015.  On August 12, 2015, Thomas and her friend "Sally"[4] went to meet some UNL student-athletes, "John Roe 1" ("JR-1") and "John Roe 2" ("JR-2") in a dorm room.  JR-1 and JR-2 offered alcohol, and Thomas consumed some.  Thomas told Sally she wanted to leave, but Sally told her to lie down because neither could drive home.  Thomas laid down on JR-1's bed, then JR-1 began touching Thomas's genitals and breasts and raped her.  Thomas and Sally escaped, but Thomas did not report the sexual assault because Sally was afraid they would get in trouble for drinking alcohol underage.  Later that evening, JR-1 and JR-2 sent Thomas harassing text messages, jeering that JR-1's penis was "too big to fit into" Thomas.  Thomas did not go to the hospital.

Thomas began suffering immense trauma and stress as a result of the rape, so she sought sexual-assault counseling on campus. On November 6, 2015, Thomas met with Strickman, a Title IX coordinator and director of IEC, to seek an academic accommodation because she was struggling with the aftermath of the rape.  Strickman told Thomas that if she wanted an academic accommodation, she needed to file a formal complaint against JR-1.  Terrified of initiating a Title IX investigation, Thomas withdrew her accommodation request.  On December 16, 2015, Thomas was permitted to withdraw from a class but was not advised that other services were available to her or that JR-1 could potentially face discipline for the rape.

---

[4]Sally is the pseudonym used by plaintiffs.

On January 22, 2016, Thomas filed an anonymous report of the rape to the UNL Police Department ("UNLPD"). Thomas filed the report anonymously because she did not want JR-1 to know she reported him or for her parents to find out what happened to her. After talking with a sexual-assault advocate, Thomas decided she was willing to identify herself and wanted to move forward with a Title IX investigation. On February 12, 2016, Thomas told UNLPD and IEC that JR-1 raped her. She explained that JR-1 "had groped her, kissed her, and raped her, all without her consent and while she repeatedly told him, 'No.'" She also informed them of the harassing text messages and phone calls after the rape. Although Thomas told IEC there were witnesses, IEC never interviewed them. IEC also told Thomas the investigation would take longer than the stated policy timeline of sixty days.

While the investigation was ongoing, Thomas learned JR-1 had been interviewed by UNLPD, and he stated their sexual encounter was consensual. UNLPD concluded its investigation on March 11, 2016, and it did not file charges against JR-1. On April 22, 2016, Thomas received IEC's decision letter, finding JR-1's "version of events surrounding the parties' interaction on the bed aligns more closely with the evidence provided by the parties." Thomas thought the letter contained factual misrepresentations and failed to address the post-assault text messages and phone calls from JR-1. The decision letter advised her to "continue to refrain from contact with" JR-1. Thomas sought an appeal.

On May 2, 2016, Thomas again sought leave to withdraw from a class due to stress and anxiety caused by the rape and investigation. Her request was granted. She was told she would not be dismissed from UNL. In May, Thomas met with Moore—the IEC appeal officer—twice to discuss the appeal process and to request a hearing. Moore denied her an opportunity for a hearing, stating "[Y]ou're not going to win. You said two different things." On June 7, 2016, Moore provided Thomas with a decision letter, again finding JR-1 did not violate UNL policy. Moore's letter stated, "In reviewing information, I

4

understood you to say that [JR-1] did not vaginally penetrate you." This was contrary to Thomas's testimony.

On May 14, 2016, Thomas received an email from the UNL Registrar, informing her she had been "academically dismissed" from UNL and could not reapply again for two semesters.

### B.    Miranda Melson

Miranda Melson ("Melson") began school at UNL in August 2015. On July 23, 2016, she went on a first date with a fellow UNL student, "John Roe 3" ("JR-3"). Melson explicitly told JR-3 she wanted to get to know him before engaging in sexual activity. At the end of the date, Melson and JR-3 went back to his home. To her surprise, JR-3 undressed himself. When Melson refused to take off her own clothes, JR-3 undressed her, kissed her, touched her, and raped her. While the assault was occurring, Melson froze and was unable to verbalize her objection to JR-3's unwanted sexual advancements. Melson eventually escaped. JR-3 repeatedly contacted Melson after the rape, even after she told him multiple times to stop contacting her.

Melson reported the rape and subsequent unwelcome communication to IEC and discussed the details with Strickman. Melson asked that her conversations with Strickman be recorded. Throughout the investigation, IEC interviewed the witnesses JR-3 provided but did not interview Melson's witnesses. Strickman sent Melson her decision letter on November 30, 2016, stating, "no sanction is deemed to be appropriate or necessary" because "you did not inform [JR-3] that you did not consent to the sexual activity." At that time, consent was defined by IEC as "an agreement, approval, or permission as to some act . . . consent is an affirmative decision to engage in mutually acceptable sexual activity *by clear actions or words*." (Emphasis added).

Melson discussed her concerns about the IEC investigation and process with the then-Vice Chancellor for Student Affairs, Juan Franco ("Franco"). Following that

conversation, Franco agreed to "meet with [JR-3] to help him better understand 'consent.'" Melson was traumatized by the Title IX investigation process due to the "lack of transparency, victim blaming, and lack of consideration for the trauma she had experienced." As a result, she struggled with her schoolwork and her grades suffered.

### C.    Sydney Brun-Ozuna

Sydney Brun-Ozuna ("Brun-Ozuna") began her academic journey at UNL in August 2017. On September 9, 2017, Brun-Ozuna went to "John Roe 6's" ("JR-6") off-campus apartment to watch a movie. During the movie, JR-6 began kissing, groping, molesting, and pushing Brun-Ozuna without her consent. She states that at one point, JR-6 loosened his grip and she escaped back to her dorm. JR-6 attempted to contact her in the days after the assault, but she ignored his messages. On September 14, 2017, Brun-Ozuna reported the sexual assault to her resident assistant, who reported it to IEC. Brun-Ozuna also made an anonymous report to the Lincoln, Nebraska, Police Department ("LPD").

Brun-Ozuna requested a formal Title IX investigation. She met with Counley multiple times, gave Counley a copy of the police report, and provided Counley with witnesses. During an interview with Counley, Counley asked Brun-Ozuna questions that she felt were extremely offensive, inappropriate, and "victim-blaming." For example, Counley asked Brun-Ozuna "What were you wearing?"; "What underwear were you wearing?"; "Were you showing any cleavage?"; and "How short was your skirt?" Counley even had Brun-Ozuna "stand up and show Counley on her body how short her skirt had been on the night in question."

Counley told Brun-Ozuna she had met with JR-6, who initially said "nothing happened," recanted, and then "unrecanted" to say nothing happened. Counley advised him to keep his story consistent. Brun-Ozuna was not given the opportunity for a hearing or to cross-examine JR-6.

On November 27, 2017, Counley sent Brun-Ozuna her decision letter. Counley found JR-6 did not engage in sexual misconduct because Brun-Ozuna's statement to the police and her statement during the investigation were inconsistent, her witnesses were "too vague" because they did not know "specific details about the number of occurrences of where [Brun-Ozuna] w[as] touched," and JR-6 denied the allegations. Brun-Ozuna told the police JR-6 kissed her four times, while she told Counley JR-6 kissed her three times. Brun-Ozuna told Counley she had not been lying but simply could not remember such detail because she was so emotional. Counley responded, "You're not going to change my mind." Brun-Ozuna struggled with the outcome of the investigation and that conversation with Counley and began having suicidal thoughts.

Brun-Ozuna sought an appeal in December 2017, but it was denied without a hearing. Brun-Ozuna also attempted to speak with the Chancellor of UNL to express her concerns about the Title IX investigation process. She and other students eventually met with the chancellor after they posted flyers around campus and created a website with her story of sexual assault.

### D.    Jane Doe 1

Jane Doe 1 started her doctoral program at the UNL School of Biological Sciences in August 2015. At that time, she was dating "John Roe 4" ("JR-4") but broke up with him in April 2017. One month later, JR-4 consistently began sending Jane Doe 1 hundreds of unwelcome text messages, emails, and Facebook messages. He continued for several weeks, even though Jane Doe 1 told him to stop contacting her. On June 1, she told him she considered any further contact to be harassment; instead of stopping, JR-4 "text[ed] Jane Doe 1 multiple times per minute for over three hours, and he left her a voicemail."

A friend of Jane Doe 1 reported JR-4's sexual harassment to IEC in early June 2017. Jane Doe 1 met with Jeff Lamoureaux ("Lamoureaux") in the IEC offices on June 30, 2017, to discuss JR-4's sexual harassment and stalking. Lamoureaux issued a no-contact directive to JR-4. Despite the directive, JR-4 repeatedly tried to communicate with Jane

7

Doe 1 by contacting her friends and Lamoureaux.  He asked her friends and Lamoureaux to convince Jane Doe 1 to speak with him.  On October 17, 2017, Lamoureaux told Jane Doe 1 that JR-4 reached out to him, and Lamoureaux stated he "wanted to share this information with you [Jane Doe 1] in case you wanted to work it out with him."  Jane Doe 1 viewed Lamoureaux as being complicit in JR-4's ongoing harassment.

On November 14, 2017, Jane Doe 1 was participating in a seminar, and JR-4 showed up there unexpectedly.  JR-4 continued his attempts to contact Jane Doe 1 through her friends, and he also sent them emails that disparaged Jane Doe 1 and her academic advisor. The following month, Jane Doe 1 was notified that she would have to take classes with JR-4 during the upcoming spring semester.  She was told there was nothing IEC or BRUN could do, and she would be forced to take classes with him.

On May 5, 2018, JR-4 sent her an email using the pseudonym "John Smith."  In that email, JR-4 called her a "bitch," "coward," and "an ignorant shit pants little attention needing girl," to name a few.  Soon after, Jane Doe 1 met with UNLPD to discuss JR-4's ongoing stalking and the email.  Strickman was also at the meeting.  He advised Jane Doe 1 she could file a Title IX complaint, file an anonymous complaint, or not proceed with an investigation.  The next day, Jane Doe 1 met with UNLPD Officer Eric Fischer ("Fischer") and Counley.  Counley told her "it was not her job to create a safe learning environment" for Jane Doe 1 and that she had "given up" her right to an investigation for all events that occurred prior to June 1, 2017.

On May 14, 2018, Jane Doe 1, through an advocate, requested a formal investigation.  She also sought a protection order in civil court, which was granted and served on JR-4 on May 17, 2018. Jane Doe 1 participated in the Title IX interview process, and she was generally kept up to date on the progress of the investigation.  While the investigation was ongoing, Jane Doe 1 saw JR-4 drive past her on campus.  She reported this to IEC, and Fischer issued a stalking citation to JR-4.  Fischer also told Jane Doe 1 that

JR-4 was going to be in her building on Wednesdays and Fridays, so she may want to avoid being there.  BRUN did not otherwise provide her any assistance in this matter.

IEC issued a decision in the Title IX investigation to Jane Doe 1 on July 27, 2018, finding JR-4 violated three sections of the UNL Student Code of Conduct.  IEC gave JR-4 one year of probation and extended the no-contact directive.  Jane Doe 1 filed an appeal, believing the sanctions issued to JR-4 were not sufficient.  During the appeal process, Jane Doe 1 was told she could not discuss her concerns about the way IEC handled her complaint, was not allowed to review JR-4's statement, and learned IEC recorded JR-4's interviews but would not let her listen to them.  On appeal, the decision was affirmed, but JR-4 faced slightly harsher sanctions: (1) JR-4 would be on probation for the remainder of his time at UNL, (2) the no-contact directive stayed in place, and (3) JR-4's access to Jane Doe 1's place of work was restricted.  Jane Doe 1 appealed again, but it was denied.

Even after the harsher sanctions against JR-4 were in place, Jane Doe 1 notified IEC that JR-4 violated the no-contact order four times in October alone.  He kept showing up at her place of work.  Jane Doe 1 repeatedly asked how the no-contact directive would be enforced, and IEC stated they would "try to warn" her if JR-4 was going to enter the building where she worked.  When Jane Doe 1 switched to a job in a different building, she asked that JR-4 have restricted access to her new place of work, but her request was denied.

In December 2018, the biological sciences program removed JR-4 from the program for a separate stalking incident.  But BRUN "forced" the program to allow him to return for the spring semester.

Jane Doe 1 made another report to IEC in September 2019 when JR-4 sent an email anonymously to the "Dear UNL advocacy group," of which she was a member.  That email stated "Get a fucking life you stupid cunts.  If you can't convince the kangaroo court that is Title IX that you were violated then you have no case.  Go fuck yourselves."  IEC did

9

not consider this to be a violation of JR-4's no-contact directive. Jane Doe 1 found the Title IX process stressful and difficult, stating she suffered severe emotional and physical distress. Due to this stress, Jane Doe 1 did not finish her doctoral program on time.

### E.     Jane Doe 2

In August 2015, Jane Doe 2 began a doctoral program at UNL. During the summer of 2017, Jane Doe 2 told a professor that she had been sexually assaulted, harassed, and abused by "John Roe 5" ("JR-5"), a male student who was in the same doctoral program. These assaults occurred in March 2016 and on July 14 and 24, 2017. Her professor reported the sexual assaults to IEC around November 2017, and Jane Doe 2 met with IEC investigators Counley, Fette, and Strickman to notify them she wanted to begin the formal investigation process.

After she began the Title IX-investigatory process, Jane Doe 2 sought accommodations, but the interim options suggested by IEC placed a large burden on her. For instance, IEC offered to move her to different classrooms and change her schedule. No interim measures offered "placed any burden on" JR-5. Jane Doe 2 declined and therefore did not have interim measures in place to protect her from JR-5.

JR-5 continued harassing Jane Doe 2. While the investigation was ongoing, he shared a "private photograph" of Jane Doe 2 with others, continued stalking her online, sent a nude photograph of Jane Doe 2 to IEC, and changed his social-media profile picture to a photo of Jane Doe 2. JR-5 also went to class across the hall from Jane Doe 2's office and would stop by to see her. BRUN did not investigate these acts.[5] Finally, "[d]uring the

---

[5]Defendants point out that Jane Doe 2 alleges these post-report acts of harassment were not investigated but does not specifically allege that she reported them to IEC. But accepting all facts alleged as true and viewing them in the light most favorable to Jane Doe 2, her allegations reasonably imply IEC was aware of JR-5's actions.

course of the Title IX investigation, IEC learned that [JR-5] carried a gun on campus,"[6] and "no action was taken by [BRUN] to address . . . the threat he posed to Jane Doe 2 and other students in carrying a gun on campus."

Nearing the end of the investigation, Counley, Fette, and Strickman "strongly pressured" Jane Doe 2 to drop formal charges and mediate instead.   Jane Doe 2 insisted she wanted to continue the investigation.  She avers IEC's pressure to mediate violates the Student Code of Conduct, which states, "Mediation shall not be used to resolve sexual assault complaints."   *University of Nebraska-Lincoln Student Code of Conduct and Disciplinary Procedures*, UNL, 19 (May 2014), https://studentconduct.unl.edu/Student%20Code%20of%20Conduct%20May%20Rev%202014%20a.pdf (last visited Apr. 30, 2020).

The investigation took longer than the sixty-day timeline outlined in the Student Code of Conduct, *see id.* at 17, and Jane Doe 2 repeatedly asked what was causing the delay.  IEC provided Jane Doe 2 with a decision on April 6, 2018, finding JR-5 responsible for the sexual assault on July 24, 2017.  IEC found that the other two reported sexual assaults "were problematic" but that there was "insufficient evidence" to find JR-5 violated the Student Code of Conduct in March 2016 and on July 14, 2017.  The letter did not address the subsequent stalking or harassing behavior.   IEC recommended JR-5 be expelled.

JR-5 appealed, and IEC granted a hearing.  The hearing was delayed multiple times. Before the hearing, Stickman told Jane Doe 2, "You could very well lose."  Jane Doe 2 insisted on proceeding with the hearing, which was very traumatic because JR-5 verbally attacked her.  Ultimately, JR-5 was expelled from UNL.  Jane Doe 2 faced severe emotional

---

[6]According to UNL policy at the time, students are not permitted to possess dangerous weapons, including firearms, on campus. *See Weapons Policy*, University of Nebraska-Lincoln, https://police.unl.edu/weapons-policy (last visited May 18, 2020).

distress, dropped out of UNL, was unable to maintain consistent employment, and suffered from other physical health conditions exacerbated by the stress.

### F.    Jane Doe 3

Jane Doe 3 began school at UNL in August 2016 and had a scholarship with the UNL Army National Guard Reserve Officers' Training Corps ("ROTC").  Jane Doe 3 is African American and bisexual/queer, and she was subject to sexual harassment and racial discrimination by "John Roe 7" ("JR-7") while in ROTC.  JR-7 repeatedly called her "the black cadet," asked her unwelcome questions about "how she would perform sex acts on other women," disinvited her from his carpool group after she came out as bisexual/queer, aggressively questioned her about race relations, and made unwelcome sexual comments to her about his own sexual activity with women.

On October 26, 2018, Jane Doe 3 reported these concerns to IEC and requested a formal investigation.  During the investigation, Jane Doe 3 asked for interim measures to avoid contact with JR-7 in ROTC, but ROTC and IEC denied her requests.  ROTC also told her not to talk about the ongoing investigation.  IEC issued a decision on November 27, 2018, and found no violations by JR-7.  She asked Strickman to explain the outcome regarding race discrimination, and Strickman responded that race-discrimination claims "will never be fully investigated [by IEC] because students on campus have a right to free speech."  Jane Doe 3 appealed.  She also filed a complaint with the Army National Guard.

In January 2019, JR-7 told cadets about the Army National Guard investigation and IEC complaint.  Jane Doe 3 reported this information to the IEC employees who were handling her appeal, and she began to avoid ROTC activities.  IEC sent a letter to JR-7, warning him that he could be punished if he retaliated against Jane Doe 3.  On January 28, 2019, Moore sent Jane Doe 3 an email, denying her appeal without a hearing.

On April 22, 2019, Jane Doe 3 met with Jeyaram and filed another formal report with IEC because JR-7 repeatedly followed her to different bars on several occasions.  Jane

Doe 3 felt JR-7 was stalking her.  Jeyaram notified Jane Doe 3 that his investigation would take some time because he was going to be traveling.  On August 1, 2019, he told Jane Doe 3 he was planning to set up an interview with JR-7.  This was concerning for Jane Doe 3 because she was to have a class with JR-7 in the upcoming fall semester.

Jane Doe 3 requested to take her shared class with JR-7 as an independent study, but ROTC denied her request.  Being in the same class as JR-7 caused Jane Doe 3 anxiety and impacted her ability to focus.  Jane Doe 3 also asked Jeyaram if he could provide her with an accommodation, but he told Jane Doe 3 that "only ROTC could implement restrictions on JR7."  In ROTC formations, JR-7 continued to laugh and mock Jane Doe 3.  On October 23, 2019, Jeyaram concluded his investigation into the retaliation and stalking claim and did not make any findings against JR-7.  She appealed and made requests for interim accommodations, which were denied.  Her appeal was denied without a hearing.

Jane Doe 3 felt she could no longer participate in ROTC extracurricular activities because JR-7 "spread rumors and openly shared information about the case with other ROTC cadets."  Jane Doe 3 also avoided the student union because JR-7 worked there.  She felt it was difficult to focus in class due to the ongoing stress and anxiety from the harassment and Title IX investigatory process.

## G.    Capri Davis and Jane Doe 4

Capri Davis ("Davis") was recruited by UNL's women's college volleyball team and began her freshman year at UNL in August 2018.  Jane Doe 4 also began as an undergraduate student at UNL in August 2018.  On August 17, 2018, Jane Doe 4 was raped by two male student-athletes, "John Roe 8" ("JR-8") and "John Roe 9" ("JR-9"), but she did report those assaults immediately.

Around May 2019, Davis and Jane Doe 4 were together at a party when two student-athletes on the football team, JR-8 and "John Roe 10" ("JR-10"), walked up behind them, placed their hands on Davis's and Jane Doe 4's buttocks, and grabbed them without their

consent.  Davis and Jane Doe 4 reported this incident to IEC.  IEC did not investigate and neither heard back from IEC regarding their reports.  Davis spoke with a teacher about the sexual assault, who also reported it to IEC, but IEC did not follow-up with Davis or Jane Doe 4.

In August 2019, Davis and Jane Doe 4 learned that JR-8 and JR-10 were accused of rape by another female student at UNL.  With that knowledge, Davis and Jane Doe 4 made a third report to IEC in September or October regarding the groping incident from March 2019.  IEC finally opened an investigation.

Around Halloween, Davis, Jane Doe 4, and Jane Doe 5 went to an off-campus Halloween party where JR-10 approached Davis and yelled, "Why the fuck did you report us?"  A friend of Jane Doe 4 was standing nearby and responded, "Because you're a rapist." JR-10 responded, "I didn't touch you, though."  JR-8 was also present and called the women "lame ass hos."  Shortly thereafter, Davis and Jane Doe 4 reported this incident to IEC and UNLPD, considering it to be retaliation.  IEC staff told Davis and Jane Doe 4 that IEC would not investigate.  On December 5, 2019, Jane Doe 4 and Davis received a letter from Counley that no finding was made against JR-8 or JR-10 regarding the groping incident, and neither woman was given the opportunity for a hearing.

### 1.    Capri Davis

Davis began to suffer from depression and anxiety.  She decided to withdraw from the volleyball team.  A rumor started that Davis was pregnant with the baby of another student-athlete on the football team.  The rumor was not true, and she began experiencing sexual harassment.  UNL media staff suggested that Davis address the pregnancy rumors on social media.  She did.  The rumored father was never told to address the pregnancy rumor in any fashion.  She feared retaliation and transferred to the University of Texas in January 2020.

### 2. Jane Doe 4

As mentioned above, Jane Doe 4 did not contemporaneously report the August 2018 rapes by JR-8 and JR-9,[7] but she did report them during the Title IX investigation involving Davis around November or December 2019 and asked IEC to conduct an investigation. In a follow-up call, Jane Doe 4 told Counley she had a class with JR-10 but was not provided any interim measures. Jane Doe 4 also asked if the other rape allegations against JR-8 or JR-9 could be considered in her investigation for credibility purposes, but IEC told her no.

On January 14, 2020, IEC sent Jane Doe 4 a letter stating no finding was made against JR-8 or JR-9 in the rape investigation. The letter did not account for Jane Doe 4's witness statements but relied on a witness statement from "an unidentified third party" who recounted she "did not observe" either JR-8 or JR-9 enter or leave the bedroom where Jane Doe 4 was raped. Jane Doe 4 was not given a hearing or allowed to cross-examine JR-8 or JR-9. Jane Doe 4 did not file an appeal because it was commonly known that "no one was ever successful in appealing an IEC finding."

### H. Jane Doe 5

Jane Doe 5 started her undergraduate degree at UNL in August 2018. In December of that year, Jane Doe 5 was raped by two other UNL students, "John Roe 11" ("JR-11") and "John Roe 12" ("JR-12") in the Eastside Suites dormitory. After the rapes, Jane Doe 5 went to the emergency room at a nearby hospital. LPD and IEC made contact with her about reporting these rapes, but Jane Doe 5 decided she did not want to move forward with the Title IX investigation because she "did not believe it would lead to anything being done about the rape." Jane Doe 5 had friends who had initiated Title IX reports with IEC—

---

[7]The facts stated in the second amended complaint allege JR-8 and JR-9 raped Jane Doe 4, citing to Exhibit 17 (Filing No. 29-17). In Exhibit 17, which is the IEC decision letter for Jane Doe 4's investigation, the events are described differently. Per the letter, Jane Doe 4 was having consensual sex with one male when the other took his place and raped Jane Doe 4. The first male permitted the rape to happen and continued to watch.

including Jane Doe 4 and Davis—and many described the experience as "worse than" the sexual assault.

In February 2019, Jane Doe 5 was spending time with JR-10. Jane Doe 5 and JR-10 were just friends, but on that particular day, Jane Doe 5 consented to kissing JR-10. JR-10 then raped Jane Doe 5. After she escaped, JR-10 texted Jane Doe 5, "What the fuck is wrong with you" and "Why did u wanna stop that's what I wanna ask." She returned to her room, crying, and told her roommate that JR-10 raped her. She did not immediately report the rape.

In August 2019, Jane Doe 5 learned that another female student at UNL, Sherry Moe,[8] had been raped by JR-10. After learning this, she decided to make a report to LPD. Based on her understanding and what other women at UNL said about the Title IX investigations, Jane Doe 5 chose not to pursue an investigation with IEC.

In October 2019, Jane Doe 5 was at a Halloween party with Jane Doe 4, Davis, and another friend, Mary Poe 2 ("Mary").[9] Jane Doe 5 was leaving the Halloween party with Mary when JR-10's girlfriend walked up to Mary and punched her. Mary walked away, and then JR-10's girlfriend grabbed Jane Doe 5 by her hair and began punching her. JR-10's girlfriend punched Jane Doe 5 approximately fifteen to twenty times, then pushed her head down and shoved her against a car. Jane Doe 5 was admitted to the emergency room and suffered a concussion. Jane Doe 5 believed this beating was in retaliation for reporting JR-10 for rape, but she did not report this attack to IEC.

Jane Doe 5 began to experience panic attacks when on campus and missed class to avoid seeing her assailants. She was generally fearful of being on campus for fear of being retaliated against.

---

[8] This is a pseudonym.
[9] This is a pseudonym.

16

## II.    DISCUSSION

### A.    Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff is not required to plead "detailed factual allegations" but must provide more than mere "'labels and conclusions' or 'a formulaic recitation of the elements.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Rather, the complaint 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'" *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) (quoting *Twombly*, 550 U.S. at 562).  Although the Court accepts all factual allegations in the complaint as true, the Court need not accept "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.  Any additional facts presented in a brief in opposition and not included in a pleading "cannot be considered on a motion to dismiss." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, 'it stops short of the line between possibility and plausibility'" and must be dismissed.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57).

### B.    Count I: Student-on-Student Sexual Harassment in Violation of Title IX

Title IX provides "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program of activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The two principal objectives of Title IX are (1) to "avoid the use of federal

resources to support discriminatory practices," and (2) to "provide individual citizens effective protection against those practices." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). "Sexual harassment, including student-on-student sexual harassment" is "a form of sex discrimination for Title IX purposes." *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021). The plaintiffs in this case all allege sex-based assault or harassment by male students at UNL and have brought suit against BRUN for its actions, or inaction, after the plaintiffs reported the assaults or harassment. *See Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (noting that a funding recipient may be held liable under Title IX, but "only for its own misconduct"). No one disputes UNL, which acts through BRUN, is a funding recipient.

To assert facts sufficient to make out a Title IX violation "in the wake of a peer sexual assault," a plaintiff must show that the funding recipient was "(1) 'deliberately indifferent,' (2) 'to known acts of discrimination,' (3) 'which occurred under its control.'" *Shank*, 993 F.3d at 273 (quoting *Pearson v. Logan Univ.*, 937 F.3d 1119, 1125 (8th Cir. 2019) (per curiam)). "[T]he discrimination must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Davis*, 526 U.S. at 650).

Deliberate indifference is more than "mere negligence." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019). The plaintiff must show the institution's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "The 'not clearly unreasonable' standard is intended to afford flexibility to school administrators." *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014). A plaintiff's "dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference," as long as it was not clearly unreasonable. *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019).

18

To plausibly allege such a claim, the plaintiff must show the institution's "deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 644-45. "This requires a Title IX plaintiff to demonstrate a 'causal nexus' between the college's conduct and the student's experience of sexual harassment or assault." *Shank*, 993 F.3d at 573; *see also Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1103 (10th Cir. 2019) ("*Davis*, then, clearly indicates that Plaintiffs can state a viable Title IX claim by alleging alternatively either that [the university's] deliberate indifference to their reports of rape caused Plaintiffs 'to undergo' harassment or 'ma[d]e them liable or vulnerable' to it.").

The second requirement to state a Title IX violation for student-on-student sexual harassment is that the funding recipient had actual knowledge of the discrimination. *See Culver-Stockton*, 865 F.3d at 1058. Actual knowledge generally requires "more than after-the-fact notice of a single instance in which the plaintiff experienced sexual assault." *Id.* (rejecting the plaintiff's argument that her report to the school one or two days after the assault was sufficient to plead actual knowledge). Actual knowledge requires an allegation that the school had some sort of prior knowledge of the risk posed by the assailant. *See, e.g.*, *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003) (concluding the plaintiff did not provide enough evidence to show "actual knowledge" because "no female student had reported to [University] officials allegations of sexual harassment or abuse committed by [the assailant], nor had any female student reported sexual harassment or abuse occurring on the [fraternity] premises"); *see also Thomas v. Bd. of Trs. of the Neb. State Colls.*, 667 F. App'x 560, 562 (8th Cir. 2016) (unpublished) (per curiam) (explaining a plaintiff must show that the school "had actual knowledge that [the assailant] posed a substantial risk of sufficiently severe harm to students based on [his] previous known conduct"). This knowledge must be held by an "appropriate person," which is someone who "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290.

19

1.      **Caused to Undergo Further Harassment**

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Davis, Jane Doe 4, and Jane Doe 5 have made allegations that BRUN was deliberately indifferent to their reports of sexual harassment and argue that BRUN's deliberate indifference caused them to undergo further harassment.

a.      **Jane Doe 1**

Jane Doe 1 has sufficiently alleged facts to support a claim that BRUN's action—or inaction—was clearly unreasonable under these specific facts. *Davis*, 526 U.S. at 648. Jane Doe 1 has also alleged a causal connection in that BRUN's deliberate indifference caused her to undergo further harassment. *See Culver-Stockton*, 865 F.3d at 1058 (explaining a Title IX plaintiff must demonstrate a "causal nexus" between the university's conduct and her experience of sexual harassment).

Jane Doe 1 alleges she was continuously stalked and harassed by an ex-boyfriend, JR-4. Through a friend of Jane Doe 1, BRUN became aware that JR-4 was harassing Jane Doe 1 in June 2017, and had been doing so since April. On June 30, 2017, IEC issued a "no-contact directive" to JR-4, although Jane Doe 1 had not filed a formal report or request for an investigation. The no-contact directive required that JR-4 not contact Jane Doe 1 directly or through others. Jane Doe 1 argues these "early, inadequate sanctions did not deter her stalker." Indeed, JR-4 was not deterred. Within one month after the no-contact directive was put in place, JR-4 violated it, and he continued to do so repeatedly. Jane Doe 1 contends Lamoureaux even assisted JR-4 in violating the no-contact directive when he relayed a message from JR-4. Jane Doe 1 repeatedly notified Lamoureaux and others in IEC that JR-4 continued to stalk and sexually harass her. Even after the formal investigation concluded, JR-4 did not stop.

Jane Doe 1 has also sufficiently alleged BRUN had actual knowledge of JR-4's continued harassing behavior. BRUN was first alerted to JR-4's behavior in June 2017. After violations of the no-contact directive, of which BRUN was allegedly aware, Jane Doe 1 filed a formal complaint in May 2018. Jane Doe 1 also told BRUN of further

20

violations. These allegations are sufficient to allege BRUN had "prior notice of a substantial risk of peer harassment . . . based on evidence [of] previous similar incidents of" harassment. *Id.*; *see also Ostrander*, 341 F.3d at 751.

BRUN does not meaningfully dispute it had "substantial control over both the harasser and the context in which the known harassment occur[ed]." *Ostrander*, 341 F.3d at 750. Jane Doe 1 has also alleged facts to support a conclusion that the continued harassment was "severe, pervasive, and objectively offensive," such that she was denied educational benefits. *Davis*, 526 F.3d at 651. Accordingly, the defendants' motion to dismiss Count I as to Jane Doe 1 is denied.

### b.    Jane Doe 2

Jane Doe 2 reported to a professor that she was sexually assaulted by JR-5, who was in the same doctoral program as her. Jane Doe 2 filed a formal complaint and initiated a Title IX investigation with IEC in November 2017. She argues BRUN was deliberately indifferent to her report of sexual assault largely because IEC did not offer her sufficient interim measures that would allow her to avoid contact with JR-5 and did not investigate his post-report harassing and intimidating behavior.

She first asserts that BRUN was deliberately indifferent for failing to offer her interim measures. But her allegations are not sufficient to show that any such failure was clearly unreasonable. IEC *did* offer Jane Doe 2 some interim measures; she just argues those offerings "placed the onus on her to remove herself, such as offering to allow her to move into undergraduate dorms and changing the locations of all of the classes she taught." "[V]ictims of peer harassment" do not "have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648; *see also Maher*, 915 F.3d at 1213 (explaining plaintiff's "dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference" when she was offered two housing alternatives but declined them).

But, taking the facts alleged as true and making all reasonable inferences in favor of Jane Doe 2, the Court finds she has stated a claim against BRUN for its purported failure to take further action or investigate JR-5's post-report acts, which caused her to undergo further harassment. For instance, after Jane Doe 2 filed her formal investigation, she alleges JR-5 stalked her online, distributed "private photographs" of her, and even "sen[t] nude photographs of Jane Doe 2 to IEC." He also attended classes in the same building as her office, and he would often walk past or stop by to contact her. IEC also knew that JR-5 carried a firearm around campus. Jane Doe 2 felt further threatened by JR-5 because he carried a firearm. Jane Doe 2 has alleged that BRUN's lack of response was clearly unreasonable based on JR-5's persistent behavior.

Jane Doe 2 has also alleged facts to show BRUN had actual knowledge, *see Ostrander,* 341 F.3d at 751, as this further harassment occurred after her initial report. BRUN does not meaningfully dispute it had control over JR-5 and the context in which his harassment of Jane Doe 2 occurred. *Id.* at 751. Finally, Jane Doe 2 alleges she dropped out of her doctoral program because "she was so emotionally devastated by the prolonged, abusive Title IX investigation and hearing process." Such allegations are sufficient to show the discrimination was "so severe, pervasive, and objectively offensive" such that it "deprived [her] of access to the educational opportunities . . . provided by the school." *Davis*, 526 U.S. at 650. Accordingly, defendants' motion to dismiss Jane Doe 2's claim under Count I is denied.

### c.      Jane Doe 3

Jane Doe 3 first reported harassment to IEC in October 2018, and she alleges BRUN's failure to provide interim measures or accommodations caused JR-7's continued harassing behavior. Jane Doe 3 asked IEC for interim measures or accommodations so she would not have to interact with JR-7, but IEC denied her request. The first investigation found JR-7 did not create a hostile environment for Jane Doe 3, and she appealed. While her appeal was pending, Jane Doe 3 reported that JR-7 was stalking her, and IEC sent JR-7

22

a letter "warning him that he would be punished if he retaliated against Jane Doe 3 again." Her appeal was denied.

Based upon these allegations, BRUN argues Jane Doe 3 has not stated a claim because it took appropriate steps following her report of harassment. The Court agrees and concludes Jane Doe 3's allegations are insufficient to support her claim that IEC's first investigation was handled with deliberate indifference or clearly unreasonable in light of the known circumstances. BRUN investigated the actions of JR-7, and when he stalked Jane Doe 3 in retaliation of her report, he was issued a warning letter. The "not clearly unreasonable" standard is a high burden, and "is intended to afford flexibility to school administrators." *See Roe*, 746 F.3d at 882.

Jane Doe 3 also filed a second Title IX complaint and requested an investigation. In April 2019, Jane Doe 3 reported further stalking incidents, in which JR-7 followed her to various bars, and she again requested a formal Title IX investigation. She did not receive a decision from the IEC investigator until October 23, 2019, and no explanation was provided for the delay. Jane Doe 3 appealed, and that appeal was again denied. To the extent Jane Doe 3 argues BRUN was deliberately indifferent as to her second investigation, she has sufficiently stated facts as to that element. Taking approximately six months to finish an investigation could surely be considered clearly unreasonable under these circumstances because JR-7 was a repeat offender, of which BRUN had actual knowledge of by the time Jane Doe 3 filed her second complaint. *Culver-Stockton*, 865 F.3d at 1058 (explaining actual knowledge requires more than "after-the-fact notice").

But Jane Doe 3 has failed to allege other key facts to state a claim. BRUN argues that it took reasonable steps in its investigation, but even if it was deliberately indifferent, her allegations of harassment did not rise to the level of what is considered "so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. BRUN also argues, and the Court agrees, that Jane Doe 3 has not sufficiently alleged any

causal nexus between BRUN's inaction—that is, a six-month delay to conclude its investigation—and her experience of any severe or pervasive discrimination. *See id.* at 651 (explaining that behavior such as engaging "in insults, banter, teasing . . . and name-calling" is not the type giving rise to a Title IX claim).

### d. Capri Davis

Davis's Title IX claim under Count I must also be dismissed. While Davis was at a party in March 2019, JR-8 and JR-10 approached Davis and sexually assaulted her by groping her buttocks. Davis reported the assault to IEC, but IEC did not initiate a formal investigation. First, Davis does not allege facts to support a conclusion that BRUN's deliberate indifferent response to the assault has any "'causal nexus' between the college's conduct and [her] experience of sexual harassment or assault." *Shank*, 993 F.3d at 573. The sexual harassment she alleges—the groping of her buttocks—is completely inappropriate and indecent but it likely does not meet the legal standard for what is considered "severe, pervasive, and objectively offensive" such that she was deprived of any educational opportunities. *See Davis*, 526 U.S. at 651. Nor do her allegations support a conclusion that BRUN had "actual knowledge" of discrimination "within the meaning of a Title IX peer harassment claim" before her report. *Culver-Stockton*, 865 F.3d at 1059.

### e. Jane Doe 4

Jane Doe 4 experienced a similar sexual assault as Davis—that is, groping of her buttocks by JR-8 and JR-10 in March 2019. For the same reasons as stated above, Jane Doe 4 also fails to state a claim under Title IX as to that chain of events.

While Jane Doe 4 and Davis were pursuing a formal investigation into JR-8 and JR-10, Jane Doe 4 also reported prior instances of sexual assault to IEC. Jane Doe 4 was raped by JR-8 and JR-9 in August 2018, and she reported those rapes to IEC around November 2019. The IEC office initiated a formal investigation. Jane Doe 4 seems to allege BRUN was deliberately indifferent to her report, but she has not pleaded BRUN had

actual knowledge that JR-8 or JR-9 posed a substantial risk of severe harm to other students based on *prior* conduct. *See Culver-Stockton*, 865 F.3d at 1059.

Jane Doe 4 also fails to state a claim because she has not alleged any causal connection between BRUN's alleged deliberate indifference and her experience of sexual assault. *See Shank*, 993 F.3d at 573.

### f.      Jane Doe 5

Jane Doe 5 has failed to show that BRUN was deliberately indifferent to her report of peer sexual assault. Jane Doe 5 was raped by JR-11 and JR-12 on campus around December 2018 and had a medical evaluation done at a nearby hospital. LPD and IEC contacted Jane Doe 5 about the sexual assault, but she "decided she did not want to move forward with the reporting process." Jane Doe 5 was also raped by JR-10 in February 2019. Initially, she did not report that rape. She later learned that another student was sexually assaulted by JR-10, and so she made a report to LPD. She never reported JR-10's rape to IEC.

These allegations are insufficient to show an "appropriate person" at BRUN had "actual knowledge" of discrimination "within the meaning of a Title IX peer harassment claim." *Culver-Stockton*, 865 F.3d at 1059. Nor has she sufficiently alleged any causal nexus between BRUN's inaction and those sexual assaults. *Id.* at 1058.

### 2.      Made Vulnerable To Further Harassment

Thomas, Brun-Ozuna, and Melson assert BRUN was deliberately indifferent to their reports of sexual assault because its inaction made them vulnerable to potential future harassment. *See Farmer*, 918 F.3d at 1104. None of them allege they were subsequently harassed or assaulted after making their reports of sexual assault to BRUN or IEC, and indeed, they argue such a showing is not required. *Id.* In *Farmer*, the Tenth Circuit explained,

> Once a funding recipient . . . has actual knowledge of sexual harassment that is severe, pervasive and objectively offensive enough to deprive a student of access to the educational benefits and resources the recipient offers, *see Davis*, <u>526 U.S. at 633</u>, <u>650-51</u>, <u>119 S.Ct. 1661</u>, the recipient cannot, acting with deliberate indifference, turn a blind eye to that harassment . . . We conclude, then, that Plaintiffs can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be "vulnerable to" further harassment without requiring an allegation of subsequent actual sexual harassment.

*Id.* at 1104. In *Farmer*, three female students made reports that they were sexually assaulted at off-campus parties or fraternity houses. When each of them reported the sexual assaults to various university departments, all were told the university would not investigate their claims because the assaults took place off campus. *Id.* at 1099-1101.

The Tenth Circuit found that the student victims sufficiently stated a claim that they were made vulnerable to further harassment based on their actual and objectively reasonable fear of encountering their assailants. *Id.* That court explained that the student victims alleged "more than a general fear of running into assailants," they also alleged fear "forced them to take very specific actions that deprived them of the educational opportunities offered to other students," such as withdrawing from certain activities on campus or avoiding going places alone. *Id.* Brun-Ozuna, Thomas, and Melton have not pointed to an Eighth Circuit case applying this theory, as they articulate it. Even under *Farmer*, none have made sufficient factual allegations to state such a claim.

### a.    Sheridan Thomas

Thomas has failed to state a Title IX claim that BRUN was deliberately indifferent to her report of sexual assault such that she was deprived "access to the educational opportunities or benefits provided by the school." *Davis*, <u>526 U.S. at 650</u>. Thomas asserts BRUN and IEC made many mistakes, both before and during the Title IX investigatory process. For instance, she alleges IEC initially refused to grant her an accommodation when she first decided not to file a formal complaint, the IEC investigation process took longer than it should have per UNL policy, and the IEC determination and appeal of her

claim were based on misconstrued facts.  Thomas was also academically dismissed from UNL while the Title IX appeals process was still ongoing, despite officials at UNL having knowledge that her poor academic performance was the result of emotional and physical damage caused by the rape and investigation.

While IEC could have investigated more thoroughly, such allegations are insufficient to state a claim that BRUN's actions or inactions were clearly unreasonable. *See Shank*, 993 F.3d at 574 ("[T]he question is not whether [the college's] policy should have been more comprehensive.  Rather, it is whether the college's response to the sexual assault . . . amounted to deliberate indifference.").  Thomas was initially denied an academic accommodation, but BRUN eventually granted her one.  Thomas may have been upset with UNLPD's findings and the outcome of the IEC investigation, but her claims were indeed investigated.  She also sought an appeal and was issued another decision.  BRUN did not "turn a blind eye" to her allegations of sexual assault.  *See Farmer*, 918 F.3d at 1104.

Even if BRUN's response amounted to deliberate indifference, Thomas's allegations fail to show a connection between BRUN's actions or inactions and Thomas's experience of sexual assault.  *See Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001) ("[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse.").  Thomas's second amended complaint is also devoid of any facts specifically alleging how BRUN's actions or inaction made her more vulnerable to sexual assault.  *See Farmer*, 918 F.3d at 1104.

Thomas's factual allegations also fall short of asserting BRUN had actual knowledge of discrimination "within the meaning of a Title IX peer harassment claim." *Culver-Stockton*, 865 F.3d at 1059.   Thomas presents no facts suggesting BRUN had any prior knowledge of JR-1 committing other acts of sexual assault or harassment.  *See Ostrander,* 341 F.3d at 751.  After-the-fact knowledge of a single incident of sexual assault

is generally insufficient to satisfy the "actual knowledge" requirement of a Title IX violation. *See Culver-Stockton*, 865 F.3d at 1058.

### b.    Miranda Melson

Melson alleges she was raped by JR-3 in July 2016, and she reported it to IEC that September. JR-3 also harassed her by sending her texts and calling her multiple times after he raped her. After she reported the sexual assault and harassment, IEC investigated. Melson argues that the investigation was deficient because it contained numerous factual inaccuracies and was long and drawn-out. Melson did not appeal. In the aftermath of the rape, Melson's grades suffered and she underwent severe emotional and physical distress.

But Melson has failed to allege facts sufficient to state a claim against BRUN. Importantly, she does not state any facts to establish BRUN's action or inaction caused her to undergo harassment or made her vulnerable to it. *See Shank*, 993 F.3d at 576 ("Linking the college's actions or inactions to emotional trauma the plaintiff experienced in the wake of sexual harassment or assault, even if proven, is not enough."). She does not specifically allege she was in fear of running into JR-3, nor does she allege any such fear caused her to take "specific actions" that deprived her of educational opportunities. *See Farmer*, 918 F.3d at 1104. Furthermore, Melson does not allege an "appropriate person" had prior knowledge of any allegations of sexual harassment committed by her assailant prior to her report. *See Ostrander,* 341 F.3d at 751.

### c.    Sydney Brun-Ozuna

Brun-Ozuna argues BRUN was deliberately indifferent to her report of sexual assault based on IEC's "drawn-out and inadequate response." On September 9, 2017, JR-6 sexually assaulted Brun-Ozuna at his off-campus apartment. After Brun-Ozuna told her resident assistant about JR-6's assault, her resident assistant reported the assault to IEC. Brun-Ozuna requested IEC to conduct a formal investigation. According to Brun-Ozuna, an IEC officer asked her numerous victim-blaming questions—such as, "Were you showing any cleavage?" and "How short was your skirt?" When IEC finished its

investigation into the assault, it issued a letter describing its rationale. Brun-Ozuna found the letter lacked both detail and "a sufficient rationale for [the IEC officer's] contradictory findings." Brun-Ozuna appealed, but it was denied.

Nevertheless, BRUN did "respond to known peer harassment" by conducting an investigation. *Roe*, 746 F.3d at 882 ("In order to avoid deliberate indifference liability an institution 'must merely respond to known peer harassment in a manner that is not clearly unreasonable.'" (quoting *Davis*, 526 U.S. at 648-49)). Even if the Court accepts Brun-Ozuna's allegation that IEC asked her victim-blaming questions, and such questions could be considered a deliberate indifference response to her report, Brun-Ozuna fails to allege facts to support an inference that such indifference has any connection to her general allegation that she was made more vulnerable to sexual assault. *See Shank*, 993 F.3d at 573; *Farmer*, 918 F.3d at 1104. Brun-Ozuna's allegations also fall short of showing "actual knowledge" in the context of a Title IX claim. *Culver-Stockton*, 865 F.3d at 1058-59.

### C.    Count II: Retaliation in Violation of Title IX

In the plaintiffs' complaint, they assert BRUN took adverse actions against them in violation of "the anti-retaliation provisions of Title IX." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 167-68 (2005). The Supreme Court in *Jackson* concluded "that when a funding recipient retaliates against a person because [they] complain of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174.

The Eighth Circuit has "never specifically articulated what a plaintiff must plead to establish a cause of action for retaliation under Title IX." *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (acknowledging a circuit split on the elements of a Title IX retaliation claim but declining to pick a side). Most circuits, including the Eighth Circuit, approach Title IX retaliation claims similarly to those asserted under Title VII. *See id.* (collecting cases). "To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in protected conduct;

(2) she suffered a materially adverse employment act; and (3) the adverse act was causally linked to the conduct." *Id.* (citing *Bunch v. Univ. of Ark. Bd. of Tr.*, 863 F.3d 1062, 1069 (8th Cir. 2017) (stating the standard for a retaliation claim under Title VII)). At a minimum, the Eighth Circuit requires a plaintiff asserting a retaliation claim under Title IX to "allege they participated in activity protected by Title IX, and the University took adverse action against them because of their participation in that activity." *See Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 579 (8th Cir. 2021).

None of the plaintiffs have alleged facts sufficient to show BRUN retaliated against them *because* of their protected activity. *See Jackson*, 544 U.S. at 174. The only plaintiff who alleges BRUN took an adverse action against her is Thomas. But Thomas's dismissal was based on poor academic performance. Thomas does not allege that she was dismissed because she made a report to IEC.

Jane Doe 3, Jane Doe 4, Davis, and Jane Doe 5 allege they were retaliated against for their protected activity of initiating investigations with IEC. Any alleged retaliatory acts, however, were not committed by BRUN. Rather, the alleged retaliatory acts were perpetrated by other students. *See Does 1-2,* 999 F.3d at 579 (noting the adverse action must have been taken by "the University"). Because they have failed to allege BRUN took any adverse actions against them, they have failed to state a claim. The remaining plaintiffs' allegations are devoid of any alleged retaliatory acts, so their claims are also dismissed.

### D.    Count V: Denial of Equal Protection Under the Fourteenth Amendment

The plaintiffs also state equal-protection claims under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 against the individual defendants in their individual capacities. The Equal Protection Clause provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

30

To support their equal-protection claims, the plaintiffs generally allege in their second amended complaint that the individual defendants "knew or should have known that female students are more likely to suffer sexual harassment and sexual violence by a significant margin," that the defendants "treatment of these complaints disparately impacts [UNL's] female students . . . in violation of Plaintiffs' right to equal protection under the law," and "Defendants' denial of Plaintiffs' constitutional right to equal protection under the law caused Plaintiffs to forego educational and, in some cases, athletic opportunities." As the individual defendants point out, the plaintiffs' theory of their claims is unclear. Despite the Court's previous allowance for plaintiffs to further amend their complaint or provide additional briefing, they did nothing to clarify their equal-protection claims.

### 1. Qualified Immunity

The individual defendants first argue, "[t]o the extent the alleged violation of the Equal Protection Clause are interpreted as class-of-one gender-based" claims, the plaintiffs' claims must be dismissed because they are entitled to qualified immunity. *See Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010). The individual defendants argue the plaintiffs have failed to state any claims because plaintiffs point to no specific denial of any clearly established constitutional right "in the specific context of each of the Plaintiffs' cases at issue." "Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The Equal Protection Clause requires state actors to treat similarly situated persons alike." *Am. Family Ins. v. City of Minneapolis*, 836 F.3d 918, 921 (8th Cir. 2016). To show a denial of equal protection, the plaintiffs "must as a threshold matter" allege that a

31

certain individual defendant treated a plaintiff "less favorably than similarly-situated" persons based on their gender. *Bogren v. Minnesota*, 236 F.3d 399, 408 (8th Cir. 2000). The plaintiffs generally compare themselves to their assailants or other males[10] at UNL, arguing "male respondents are afforded leniency in the Title IX investigation and hearing process." But "[a]lleged comparators must be 'similarly situated in all relevant aspects.'" *Does 1-2*, 999 F.3d at 580 (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 797 (8th Cir. 2011)). As recently articulated by the Eighth Circuit, "it goes almost without saying that a sexual assault complainant and those she accuses of sexual assault are 'not similarly situated as complainants.'" *Id.* at 581 (quoting *Haidak v. Univ. of Mass.- Amherst*, 933 F.3d 56, 74 (1st Cir. 2019)).

The individual defendants further point out that the plaintiffs make no attempt to argue "which specific individual defendant violated each of the Plaintiffs' clearly established constitutional rights." They argue such omissions are fatal to plaintiffs' claims. *See Perez v. Does 1-10*, 931 F.3d 641, 646 (8th Cir. 2019) (concluding the plaintiffs failed to plausibly allege a § 1983 claim where they relied on "non-specific conclusory allegations" against the defendants "as a group" and failed to plead facts that connect the defendants' actions to the plaintiffs' status).

In response to the individual defendants' assertion of qualified immunity, the plaintiffs respond, "[i]t is difficult to imagine a more clearly established right in the minds of Title IX administrators than the right to equal protection." While that may be true, the plaintiffs must show more. *See Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) ("We do not 'define clearly established law at a high level of generality.'" (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc))). The equal-protection

---

[10]Davis alleges she was treated differently than a male student-athlete when a rumor started that she was pregnant with his child. She alleges, however, that it was the "Media and communications staff at UNL" that treated her differently than the male student. Davis has not alleged that any of the individual defendants are part of the UNL media and communications staff.

right must have been "beyond debate under the specific facts and circumstances of this case." *Doe v. Bd. of Regents of Univ. of Neb.*, 509 F. Supp. 3d 1133, 1144 (D. Neb. 2020). The plaintiffs did not establish a facial showing in their second amended complaint. *See Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) ("To prevail at this stage of the proceedings, defendants must show that they are entitled to qualified immunity on the face of the complaint."). Instead of responding to the individual defendants' well-stated arguments or amending their pleading when given leave to do so, the plaintiffs chose to rely on their assertion that such "arguments are so fact-intensive . . . that they are improper for consideration by the Court at this juncture." But that broad and non-responsive assertion will not do for qualified immunity. *Id.* Because the plaintiffs have failed to allege any violations of a clearly established equal-protection right that goes beyond labels and conclusions, the individual defendants are entitled to qualified immunity and any such claims are dismissed.

### 2. Disparate Impact and Disparate Treatment

Within their equal-protection claims, the plaintiffs make some allegations consistent with a disparate-impact theory, such as asserting the defendants "treatment of these [Title IX] complaints disparately impacts [UNL's] female students." The plaintiffs also argue in their brief that their "Complaint clearly outlines a systemic pattern of failures which are directed at women."

The individual defendants argue that if plaintiffs allege a disparate impact-claim, they have "completely fail[ed] to identify the policy or practice that has an adverse impact on students on the basis of gender." The individual defendants further contend the plaintiffs have failed to state a claim because a disparate-impact claim is not cognizable under the Equal Protection Clause because an equal-protection claim under these circumstances requires an allegation of intentional discrimination based on gender. *Cf. Foster v. Wyrick*, 823 F.2d 218, 221 (8th Cir. 1987) (explaining that "appellant's allegation that [defendant's] employment practices and procedures have a discriminatory impact on

black inmates fails to state a cause of action under the Equal Protection Clause, because there is no allegation of intentional discrimination."). The Court agrees.

In any event, the plaintiffs have also failed to allege facts sufficient to state disparate-treatment claim. In the plaintiffs' brief in opposition (Filing No. 44), they generally state that "male respondents are afforded leniency in the Title IX investigation and hearing process whereas female complainants are ignored or denied hearing and appeal opportunities." They cite *Ezell v. Fayetteville Public Schools*, No. 5:15-CV-05161 (W.D. Ark. Dec. 15, 2015), for support. In *Ezell*, that district court found the plaintiffs had stated a claim for disparate treatment based on facially discriminatory school policies related to the disparity in funding, promotion, facilities, and coaching between the girls' and boys' athletic teams. *Id.* The plaintiffs here have not plausibly alleged any policies that are facially discriminatory on the basis of gender.

## III. CONCLUSION

After a thorough review of the plaintiffs' second amended complaint, the parties' briefing, and statement of interest by the government, the Court concludes that Thomas, Melson, Brun-Ozuna, Jane Doe 3, Jane Doe 4, Davis, and Jane Doe 5 have failed to state a claim under Count I. Their amended complaint lacks the factual content required to state a student-on-student sexual harassment claim under Title IX. Accordingly, those claims are dismissed. Plaintiffs Jane Doe 1 and Jane Doe 2 have pleaded facts sufficient to state a claim under Count I against BRUN. No "other unidentified female does," as reflected in the case caption, have come forward to state a claim. Any such claims by those "unidentified female does" are therefore dismissed. All the plaintiffs' claims as alleged under Count II and V are dismissed.

Based on the foregoing,

IT IS ORDERED:

1.    The defendants' Motion to Dismiss for Failure to State a Claim and to Sever (Filing No. 40) is granted in part and denied in part.

2.    Plaintiffs Thomas, Melson, Brun-Ozuna, Jane Doe 3, Jane Doe 4, Davis, and Jane Doe 5's claims under Count I are dismissed with prejudice.

3.    Any such claims by the "other unidentified does" reflected in the case caption are dismissed without prejudice.

4.    All plaintiffs' claims under Counts II and V are dismissed with prejudice.

5.    The defendants' request for severance is denied.

6.    The defendants' motion is denied in all other respects.

Dated this 11th day of May 2022.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge