UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO
MOTION FOR SUMMARY JUDGMENT NO. 2: SAMANTHA BRENNAN**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 2: Samantha Brennan, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue: [1]

1. In July 2016, Samantha Brennan was an LSU student and student worker in LSU's football department. (R. Doc. 182, ¶ 289; Brennan 230) [2]

2. She met John Doe on July 9, 2016 at an off-campus bar. (R. Doc. 182, ¶ 290; Brennan 18-19) Doe drove Brennan home to her off-campus apartment complex where Doe also lived. (Brennan 20-21, 25)

3. Doe dropped her off, but Brennan left her apartment door unlocked for Doe to return. (Brennan 47-48, 198) She believes Doe returned to her apartment later that evening and that they "fooled around." (Brennan 48, 82, 198-199)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.
[2] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Ashlyn Mize Robertson, Calise Richardson, Miriam Segar, Jennie Stewart, and 30(b)(6) of the Board are attached to the Board's motion as Exhibits A-F respectively. The declarations of Segar and Jonathan Sanders are also attached to the Board's motion as Exhibits G and H, respectively. Citations to the depositions will be by the last name of the deponent and the page or exhibit number. Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume. Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

1

4. Brennan woke up the next morning and at first made the assumption that she had sex with Doe, but she does not know whether that happened or not. (R. Doc. 182, ¶¶ 293-294; Brennan 30-31) She testified that "I can't for certain say sexual relations occurred." (Brennan 74-75)

5. Brennan does not consider that she was sexually assaulted or raped. (Brennan 74-75, 83; Brennan Exh. 6) Instead, she complains that Doe took a picture of her standing naked in her apartment. (R. Doc. 182 ¶ 297; Brennan 83-84)

6. Brennan claims the picture was taken "without Brennan's consent while she was incapacitated," but she testified that she was "standing up" for the picture. (R. Doc. 182, ¶ 298; Brennan 202) She also testified that, while she was intoxicated, she was able to stand and walk and was aware of her surroundings. (Brennan 104-106)

7. The only two people whom she learned had seen the picture were a male friend (who also rode home with Doe and Brennan after the bar) and his girlfriend. (Brennan 147, 149, 151)

8. Brennan believes Doe took the photograph that night. (R. Doc. 182, ¶ 298; Brennan 288) Brennan was unsure to what extent the photo was shared with anyone else. (Brennan 79-80, 151, 194-95)

9. Brennan reported her concerns about the photo to her supervisor, Sharon Lewis. (Brennan 58-59) Lewis reported the situation to Miriam Segar, Senior Associate Athletic Director. (Segar 242)

10. Segar and Lewis met with Brennan the same day. (Brennan 57-58, 60) In the meeting, Brennan "expected…to be shut down" because she believed LSU would not want "this to get out." (Brennan 64) However, Brennan acknowledged that her expectation was

2

wrong. Instead, she found Segar to be "supportive." (Brennan 65, 114-115; Brennan Exh. 8, p. 5)

11. Segar felt that Brennan wanted her to speak with Doe and make Doe delete the picture from his phone. (Segar 243) Segar did not think Segar should go to Doe directly because she did not want to compromise any evidence of his wrongdoing. *Id*.

12. Segar had no authority to take Doe's personal phone and would not be able to control or verify whether Doe deleted evidence. *Id*. Therefore, Segar strongly suggested that Brennan report the matter to the police who could conduct a forensic examination of Doe's phone and preserve evidence. *Id*.

13. Brennan agreed to meet with the LSU police ("LSUPD"), and Segar accompanied Brennan to the police department to make the report. (Brennan 64-66) Brennan was very appreciative of Segar's support. (Brennan 65-68)

14. Once at the LSUPD, Brennan said she was again "very surprised" that the LSUPD was supportive and did not attempt to shut down her report. (Brennan 68)

15. The police interviewed Brennan, who indicated she had not yet seen the picture and could not say for sure that it was of Brennan. (Brennan 83-84, 98-99; Brennan Exh. 6) The police created a report that became part of the police records, and the report accurately recounted Brennan's information. (Brennan 74; Brennan Exh. 6)

16. As Segar expected, the LSUPD talked to Brennan about Title IX and asked Brennan whether she would want to file a report with Title IX. (Brennan Exh. 6) The police also gave Brennan a Sexual Violence Confidentiality Notice and Waiver, which gave Brennan the option to waive confidentiality and allow the police to contact Student Affairs, the Lighthouse Program, and the Title IX office to share her concerns. *Id*.

3

17. Brennan signed the form but declined to allow a waiver to would give the police access to LSU's resources for victims of sexual violence. (Brennan 89; Brennan Exh. 6)

18. Later that same day, Brennan texted Segar and thanked her, writing: "Thanks again so much I really appreciate everything you did today!" (Brennan 68-69; Brennan Exh. 5) Segar replied immediately, saying "No problem.. (sic) Let me know if [you] need anything." (Brennan 68-70; Brennan Exh. 5)

19. Months later, Brennan recounted the event to someone, saying: "I was really surprised how supportive everyone was, especially Ms. Sharon. I would have thought they would have tried to shut me down, but her and an advocate [Segar] were the ones who encouraged me to go to the police and the advocate [Segar] came with me." (Brennan 152-153; Brennan Exh. 8, p. 5)

20. After Brennan's initial police meeting, LSUPD Detective Jeffery Melchior followed up with Brennan by phone to check whether she wanted to move forward with her complaint. (Brennan 89-92; Brennan Exh. 6)

21. Brennan again advised that she did not want to do so at that time. *Id*. Brennan advised that she would think about the situation and let Detective Melchior know if she changed her mind. (Brennan 92; Brennan Exh. 6) Plaintiff recalls that the officer was "very encouraging" of her to press charges. (Brennan 93)

22. Brennan said, "everybody was very encouraging . . . like nobody tried to keep me from pressing charges." (Brennan 93)

23. Brennan recalls also being offered the opportunity to undergo a physical exam, which she declined. (Brennan 95) She does not dispute the police report account that Brennan

4

was offered Title IX, Lighthouse and other resources. (Brennan 94-97, 289-290; Brennan Exh. 6)

24. Three days after Brennan's report to Segar and Lewis, Mari Fuentes-Martin, Associate Vice President and Dean of Students, reached out to LSUPD about the potential report and learned that Brennan (whose name was unknown to Fuentes-Martin) instructed LSUPD that she did not want her report disclosed to the Title IX office. (Sanders Decl. ¶ 10, Exh. 5)

25. Fuentes-Martin stated she thought the nude picture allegation "might" be a PM-73 case (the scope of which is broader than Title IX). *Id*. However, based on the limited information known by the Title IX office at the time (because Brennan did not authorize disclosure to Title IX), Fuentes-Martin and Jennie Stewart, Title IX Coordinator, documented the case as "information only," and closed the case to "respect the wishes of the Complainant." *Id*.

26. Stewart indicated that if other factors became known in the future, then they would take a different approach. *Id*.

27. As of this date, the only other plaintiff who alleges sexual misconduct by Doe prior to Brennan is Mize.[3]

28. Mize provided no account to LSU of her alleged assault by Doe or even that Doe was her perpetrator. (Mize 133-134, 206)

---

[3] Although plaintiff Owens alleges she was assaulted by Doe in June 2016, she did not disclose the assault until April 2017, so Owens' allegations are irrelevant to Brennan's heightened risk claim. (R. Doc. 182, ¶ 340) Also, while the Complaint alleges that Richardson's "attempted rape" occurred prior to Brennan's experience (R. Doc. 182, ¶ 315), the parties acknowledge that timing is wrong, because Richardson knew of Brennan's allegations before Doe's "attempted rape" of Richardson. (Brennan 115, Richardson II 23) Richardson's issue with Doe occurred in December 2016, so it is also irrelevant to Brennan's heightened risk claim. (Richardson 90-91)

5

29. Segar only learned of Mize's alleged assault through Mize's friend, who witnessed nothing, and according to Mize, there were no witnesses to what occurred that night. (Segar 268-269; Mize 103)  Thus, at most, Segar knew of a possibility of an alleged sexual assault.

30. The second-hand report that Segar received from Student A included that Mize had been assaulted by two men that night. (Segar Decl. ¶ 7)  Later, Mize denied knowledge of a second person. (Mize 110-112)

31. Brennan is the only plaintiff who alleged that Doe took their nude picture. (R. Doc. 182, ¶¶ 297-298)

32. The conduct Brennan alleges occurred at her off-campus apartment and not connected to any LSU activity. The photo was allegedly taken on Doe's personal cell phone. (Brennan 15, 19, 25-26, 86; Segar 242-243)

33. No one teased or harassed Brennan about the photo. (Brennan 118, 147, 149, 151)

34. The following occurred on January 26, 2016:

    o Within one hour of receiving the report from Student A, Segar met with Student A in person to obtain details about the potential issue. Student A insisted that the alleged victim did not want to report. (Segar Decl., ¶ 7, Exh. 5)

    o Segar notified Student Affairs of the concern. *Id*.

    o Segar emailed Student A and shared detailed information on the LSU Lighthouse program and the LSU Policy on Sexual Misconduct. *Id*

    o Segar reached out to Fuentes-Martin to update her on the situation. *Id*

35. The following occurred on January 27, 2016:

6

- Segar spoke with Fuentes-Martin, and they discussed that they needed an account from the alleged victim about what happened. (Segar 267)

- Segar again met with Student A to ask if she spoke with the alleged victim about resources and reporting the incident. Student A was adamant that the alleged victim [Mize] did not want assistance and did not want to report. Segar asked Student A to again speak with the alleged victim about reporting to the university or to the police. (Segar Decl., ¶ 7, Exh. 5; Mize 105, 108) The friend said she would do so. (Segar Decl., ¶ 7, Exh. 5)

36. The following occurred on January 28, 2016:

- Student A reported to Segar by text that "she [Mize] really isnt' wanting to have anything to do with it." (Segar Decl., ¶ 7, Exh. 5)

37. The following occurred on January 29, 2016:

- Fuentes-Martin asked Lighthouse representative, Sierra Fowler, to reach out to Mize." *Id*.

38. The following occurred on February 1, 2016:

- Fuentes-Martin reached out to Mize by email, saying she wanted to discuss all of the services provided by LSU to address Mize's concerns, to offer medical and psychological care, to offer academic support, and to discuss options for investigating the incident. Fuentes-Martin asked Mize to schedule a date and time to meet with Fuentes-Martin and provided Mize with her phone number and email address. (Mize Exh. 2)

39. The following occurred on February 5, 2016:

7

- o   Mize finally responded, at which time Mize apologized for her delay, stated that she had thought about everything and weighed her options, and she did not want to move forward with an investigation. Mize assured Fuentes-Martin that she had met with the Lighthouse Program and knew all of the resources available to Mize. (Mize 118-119; Mize Exh. 3)

- o   Fuentes-Martin responded to Mize and asked Mize to come back to Fuentes-Martin if she changed her mind. (Mize 123-124; Mize Exh. 3)

40. Mize never returned to Fuentes-Martin or to anyone else to file a complaint against Doe or to provide any details for an investigation. (Mize 124)

41. Segar and Fuentes-Martin endeavored to provide, and did provide, Mize with information about the services and resources available at LSU for victims of sexual assault. Their communications with Mize conveyed their interest in obtaining information from Mize and moving forward with an investigation.

42. Fuentes-Martin's communications conveyed her interest in hearing from Mize. Fuentes-Martin stated:

- "I would like to encourage you to schedule an appointment with me so we can discuss this matter further.

- "Please know that LSU is concerned for all of its student's [sic] and wishes to provide support and services through difficult challenges."

- "I urge you to contact my office at (225) 578-XXXX to schedule a date and time that you can meet and discuss further."

- "If you have any questions or just need to get further support and resources, please contact me either by phone or email at mari@lsu.edu."(Mize Exh. 2)

43. Mize had no issue with LSU's response at the time. (Mize 133)

44. Mize considered that "[She] was responsible for [her] decisions to use or not use the resources, . . ." (Mize 184)

8

45. Segar communicated Doe's name to Fuentes-Martin. (Segar I 264-68, 271-72; SEGAR 000344) Although Segar did not include his name in her write-up of the events, she did not conceal it from Title IX. (Segar 267)

46. Fuentes-Martin, Deputy Title IX Coordinator for Students, played a role in both Mize and Brennan's situations and had the knowledge of the alleged perpetrators. Fuentes-Martin, who processed Brennan's anonymous report from the police, knew that Doe was the accused in both Brennan's situation and in Mize's third-hand account that reached LSU.

47. Brennan had no complaint with how LSU responded to her situation. (Brennan 166)

48. Brennan attended LSU football games that fall, while Doe was a player. (R. Doc. 182, ¶ 316, Brennan 174-175, 167-168, 305) She lived in housing near campus and worked in a bar near campus. (Brennan 132, 174-175, 167-168, 305)

49. Before this incident, Brennan had only attended one semester of classes at LSU (Spring 2016), after which she was placed on formal scholastic warning due to her 1.98 GPA. (Sanders Decl. ¶ 8, Exh. 3)

50. The Board's policies, including PM-73, were promulgated to students and staff alike before and after Brennan's alleged harassment. ( Board 30(b)(6) I 29, 52-54; Board 30(b)(6) II 259-261; Stewart 38-41)

51. Brennan had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative. (Board 30(b)(6) 51-52) Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students

9

website, HRM website, and on the Title IX website at various points. Board 30(b)(6) II 259-261; Stewart 38-41)

52. When Brennan reported the alleged conduct to Sharon Lewis and Segar, Segar brought her to the police, and the information regarding her report, albeit anonymously at her request, made it to Title IX within three days of her report. (Sanders Decl. ¶ 10, Exh. 5) Brennan declined LSU's Title IX process, which is her right. (Brennan Exh. 6)

53. Brennan did not have any complaint with how she was treated, stating: "So I wouldn't say that there was an initial lack of response from LSU with me. . . ." (Brennan 166)

54. Doe's name appeared in the LSU police record for Brennan as well as the Maxient report that disclosed Brennan's allegation (but left Brennan's identity anonymous, as she requested). (Brennan Exh. 6; Brennan 190-191; Sanders Decl. ¶ 10, Exh. 5) Student A's name is also missing from the Maxient record. (Segar Decl., ¶ 7, Exh. 5)

55. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37)

56. In addition to the campus-wide training, Athletics administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39, 41-43) Like other students, Brennan and her alleged harasser, Doe, received MyStudentBody training. (Sanders Decl. ¶ 3) Because of his role as a student athlete, Doe received **additional** training through the Dan Beebe Group/Protection for All. (Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl. ¶ 5, Exh. 2)

57. Brennan received additional training because of her role as a student worker in football. (Segar Decl. ¶ 5, Exh. 3; s*ee* Board 30(b)(6) I 40-41)

58. Brennan and Doe each received LSU's training on Title IX.[4]

59. Brennan's photo incident allegedly took place on July 9, 2016, yet she did not file suit until almost five years later, on April 26, 2021. (R. Doc. 1, R. Doc. 182, ¶¶ 290-294)

60. As of July 16, 2016, Brennan had received notice of available resources, been informed by email of LSU's resources for victims of sexual assault, had been taken to the LSUPD to file a complaint, and been asked to report the incident with Title IX. She also knew of the previous training she had received prior to the alleged harassment. *Id.* As of July 22, 2016, Brennan knew of her injury, knew of the perpetrator, and knew how LSU responded. (R. Doc. 340, p. 18)

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**


BY:    /s/ *Susan W. Furr*
Shelton Dennis Blunt Bar Roll No. 21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.: 30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436
Michael B. Victorian Bar Roll No.: 36065
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802

---

[4] *See* facts in Summary Judgment No. 10, Section III.C.b.iii, which are adopted herein by reference.

11

> Telephone: 225 346 0285
> Facsimile: 225 381 9197
> Email: dennis.blunt@phelps.com
> Email: susie.furr@phelps.com
> Email: karleen.green@phelps.com
> Email: jessica.huffman@phelps.com
> Email: molly.mcdiarmid@phelps.com
> Email: greg.stevens@phelps.com
> Email: michael.victorian@phelps.com
>
> ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

> /s/ *Susan W. Furr*
> Susan W. Furr