UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO MOTION FOR SUMMARY JUDGMENT NO. 5: JADE LEWIS**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 5: Jade Lewis, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue: [1]

1. Lewis played tennis for LSU for only one semester—Spring 2017—before entering the professional tennis circuit. (Lewis 125, 172)

2. In or around April 2018, Lewis returned to LSU, but she was no longer eligible to play tennis due to her receipt of compensation from her professional career. (Lewis 10, 170, 191-192)

3. Lewis asserts domestic violence by Coe, not sexual assault. (Lewis 24-25)

4. Lewis admits she never reported "sexual abuse" as opposed to "physical abuse" to LSU. (Lewis 387)

5. Lewis first met Coe via text message in January 2017, and they immediately met up off-campus and began a sexual relationship. (Lewis 11-15; R. Doc. 182, ¶ 456)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion only.

6. According to Lewis, Coe was manipulative and controlling, and he became physically abusive. (Lewis 138-139; R. Doc. 182, ¶ 457)

7. Lewis' Complaint identifies the date of her first assault as May 19, 2017. (R. Doc. 182, ¶ 462) Lewis said she was **"fully leaving LSU"** and "was all packed up" and needed all of her things before her flight in a day or two. (Lewis 42) In her deposition, Lewis testified differently about whether she was fully leaving LSU a day or two later for her professional career or for the NCAA women's tennis tournament. (Lewis 157)

8. When she went to Coe's apartment, she kicked a hole in Coe's bedroom door, and then Coe punched her in the stomach. (Lewis 42-44)

9. In her Complaint, Lewis said she reported this incident to LSU athletic trainers Donovan White and/or Sean Carter. (R. Doc. 182, ¶ 465) Lewis explains that she disclosed the incident to trainer Donovan White, while practicing before leaving for the tournament. (Lewis 158, 167)

10. Lewis also alleges that one of her teammates reported her abuse to White or Carter that same day. (R. Doc. 182, ¶ 467)

11. Lewis believes White did not understand the "severity" of her situation. (Lewis 165) She believes White perceived that she was describing "playful" conduct with Coe. (Lewis 165)

12. Lewis admitted she had no visible signs of injury. (Lewis 165-167)

13. White confirmed that he did not believe Lewis disclosed any physical abuse in May 2017. (White 41, 53)

14. Lewis made no other reports to anyone at LSU about the incident, nor did any coaches or trainers indicate they observed she was injured. (Lewis 167-169)

2

15. While Lewis speculates in her Complaint that a teammate may have reported her May 2017 abuse to White, and one of her teammates reported her abuse to Julia Sell between May 2017 and August 2018, Lewis has no evidence of whether or when her teammates reported anything. (R. Doc. 182, ¶¶ 459, 467; Lewis 153-156)

16. Lewis believes three teammates, "Luba, Joana, and Kennan" made reports about her assaults to Julia Sell, but she believes Luba talked to Sell **after** Lewis disclosed her April 2018 assault (so not at the time of the May 2017 incident). (Lewis 151-153)

17. Regarding "Joana," Lewis testified that she has never spoken to Joana about whether she reported Lewis' abuse to Sell. (Lewis 154-156) Instead, she speculates that: "I think Joana also told Donovan or Sean Carter that I got hit, possibly, because I think they asked her. I don't know. . . if I am thinking correctly . . . I don't have a specific recollection . . . I might be wrong." (Lewis 154-156) However, she testified that she is not even sure Joana was present on the day of this supposed conversation, and admitted she is "not a hundred percent," what Joana might have disclosed. (Lewis 153, 162-165)

18. Regarding Kennan Johnson, Lewis testified that Johnson said she talked to the coaches, but Lewis acknowledged "I'm just speculating, so I have no idea." (Lewis 154) Johnson testified that it is possible she only spoke with Julia Sell about Jade Lewis in 2018 (so not at the time of the May 2017 incident). (Johnson 194-195, 259, 262-263)

19. Lewis left LSU in May 2017 to pursue her professional tennis career and did not return until April 2018 (after which she was ineligible to return to college tennis). (Lewis 125, 170) During her year away from LSU, Lewis continued to be "very attached to Coe." (Lewis 172)

3

20. Lewis alleges that her second physical assault by Coe occurred on April 3, 2018, while Lewis was not yet an enrolled student (following her tennis career). (Segar II 415-417) She said Coe punched her in her stomach, fracturing her ribs. (R. Doc. 182, ¶¶ 477-478; Lewis 45-46)

21. Several weeks later, on April 25, 2018, Lewis went to LSU's athletic trainers, including Donovan White, due to her lingering pain from the assault, and she reported that Coe had assaulted her. (R. Doc. 182, ¶¶ 483-485; Lewis 61, White 39-41) The trainers promptly reported the incident to Miriam Segar, Senior Associate Athletic Director, who promptly reported Coe's abuse to the Title IX office. (R. Doc. 182, ¶ 486; Lewis 219; Lewis Exh. 2; Segar II 413-416; Segar Exh. 22)

22. On April 26, 2018, Segar met with Lewis and encouraged Lewis to utilize domestic abuse resources and made an appointment for Lewis with an LSU Psychologist. (Lewis Exh. 2; Lewis 228) Lewis chose not to utilize the Lighthouse services. (Lewis 228)

23. Segar advised Lewis to contact the police if she felt threatened. (Segar II 415) Lewis indicated to Segar that she was in a relationship with Coe and did not believe he would be violent again. (Lewis 226; Lewis Exh. 2)

24. On May 14, 2018, Jeffrey Scott, LSU Title IX investigator, wrote to Lewis and advised her that he was investigating her case and advised Lewis in writing of the resources available, including Lighthouse (for assistance with filing a report, seeking outside assistance, or confidential counseling), the Office of Disability Services (for academic accommodations), C.A.R.E. (for intervention and assistance to students in distress or crisis), and referred her to the additional resources on LSU's website. (Lewis Exh. 1,

4

Lewis I 214-217) Despite being encouraged by LSU to go to the police, Lewis did not want to do so. (Lewis 220-229; Lewis Exh. 2; Segar II 416)

25. Although LSU investigated Lewis' off-campus incidents as potential violations of PM-73, PM-73 encompasses broader conduct than Title IX. (*See* Sanders Decl. ¶ 4; Exh. 1)

26. After delays from Lewis in scheduling the interview, Segar drove Lewis to meet with Scott for an interview. (Lewis 229-230; Lewis Exh. 3; Segar II 424-425) In the interview, Lewis said she did not want Coe to get into trouble. (Lewis 231-232; Lewis Exh. 3) Lewis did not ask for Coe to be kept away from her; instead, she simply wanted someone to tell Coe that his conduct was not okay. (Lewis 231-231, 240; Lewis Exh. 3)

27. The Title IX office's typical process "gives a great deal of deference to a reluctant complainant. . . [n]ot to move forward in a process that that person doesn't desire because of the compounding harm it can cause." (Stewart 195-196)

28. At the end of the interview, Scott again provided Lewis with a Title IX handbook and highlighted the services available to her. (Lewis 231-232; Lewis Exh. 3) Lewis had no issue with how Scott treated her. (Lewis 241)

29. Scott then interviewed Coe about the incident. (Lewis 243-244; Lewis Exh. 4) Segar helped Scott organize this meeting with Coe because Coe was not responding. (Segar II 423-424)

30. In the meeting, Scott reviewed and explained Title IX and the PM-73 obligations to Coe, and Coe said he understood. (Lewis Exh. 4) Coe admitted that Lewis and Coe got into an argument, and that after she hit Coe, he punched Lewis in the stomach. *Id*.

5

Coe reported that he has asked Lewis to stop calling and texting him, but she still shows up at his apartment. *Id*.

31. Scott advised Coe to limit his contact with Lewis and placed Coe in mandatory counseling with an LSU mental health professional. (R. Doc. 182, ¶ 491; Lewis 243; Lewis Exh. 4)

32. Lewis accepted the counseling services from LSU therapist, Dr. Lakeitha Poole for a little while, and she felt Dr. Poole treated her well during the therapy sessions. (Lewis 232, 236) However, Lewis stopped after five to ten sessions with Dr. Poole, choosing not to continue and not to seek any other available services from LSU. (Lewis 237-238)

33. Almost immediately thereafter, Segar learned fourth-hand of another assault by Coe in June 2018, this time at Lewis' on-campus apartment. (Lewis 71-72; R. Doc. 182, ¶¶ 505-506) Lewis' roommate heard Lewis and Coe arguing (but did not see the assault) and called the LSU Police, who responded immediately. (R. Doc. 182, ¶ 509; Lewis 72, 276; Lewis Exh. 8)

34. Upon their arrival, the police separated Lewis and Coe and interviewed them. (Lewis 75, 276, Lewis Exh. 8) Lewis lied to the police and said Coe did not physically harm her. (Lewis 75-77, 79) Lewis also gave a similar written statement to the police that she admits was intentionally false. (Lewis 281)

35. Lewis was injured from the altercation, so she wore a hoodie to disguise her injuries from police view. (Lewis 76-77, 79) The police did not observe any evidence of physical violence. (Lewis Exh. 8)

36. Based on Lewis' false statements that the altercation was verbal and not physical, the police did not pursue charges. (Lewis Exh. 8) They instructed Coe not to return to the apartment that night and to make sure both parties were calm before meeting again. *Id*.

37. The police followed up with Lewis a week later for further investigation. (Lewis Exh. 8) Lewis again lied and denied that Coe had abused her. (Lewis 282-283)

38. Segar learned of this incident from Lewis' roommate's coach and called Lewis. (Segar II 427; Lewis 269; Lewis Exh. 6)

39. Again, Lewis lied and said that Coe did not harm her. (Lewis 269; Lewis Exh. 6) Instead, she said she hit her ear on the bed, causing bleeding. *Id.* Lewis told Segar she was in a committed relationship with Coe and did not plan to stop seeing him. *Id*.

40. Segar promptly reported to the Title IX office and expressed her concern "for escalation of domestic violence," stating: "This is the second incident I have reported with these same 2 individuals. I am concerned about higher level of escalation and potential injury." (Lewis 269; Lewis Exh. 6; Segar II 428)

41. At this point, Jonathan Sanders in the Student Advocacy and Accountability ("SAA") office worked with the Title IX office to try to learn the truth of what was happening with Lewis and Coe. (Sanders 70-71; Lewis Exh. 17) Sanders suggested that he meet with Lewis to see if she would be truthful about what was occurring with Coe. (Sanders 71-72).

42. Sanders initiated charges related to the police report through the Code of Student Conduct process, but Sanders' efforts did not yield any new results. (Sanders 71, 75-77, 80-82; Lewis Exh. 7) Lewis again lied and said the arguments involved no physical violence. (Sanders 72, 74; Lewis 272-273; Lewis Exh. 17)

7

43. Lewis was separately and unrelatedly cited by Residential Life for having a candle in her dorm room. (Sanders 67-68, 79-80; Scott 62) The Title IX office and SAA knew nothing of the candle violation or citation. (Sanders 67-68, 79-80; Scott 62)

44. Based on Lewis' continued denials to the police, to Title IX, SAA, and Segar, LSU had no evidence on which to take action against Coe for this occurrence. (Sanders 73-74)

45. Per Stewart in the Title IX office, what action to take was a delicate balancing act. (Stewart 190-193)

46. Per Lewis, Coe was barred from weight room privileges and was removed from the football team at this time. (Lewis 268, 286) Lewis criticized the decision, saying that, based on the false information she provided, LSU did not have grounds to suspend Coe from the team at this time. (Lewis 287-288) Lewis believed that after one incident, LSU should have had "a good sit down" and "give[n] him some therapy," both of which occurred. (Lewis 289)

47. It was not until August 2018 that Lewis finally told the truth about what occurred. (Lewis 296; Sanders 74; Segar II 437) She did so because she said "it was just getting tough because I lied . . . I just couldn't keep up – I couldn't, you know, keep up with what I had said and it was just getting a bit challenging." (Lewis 297)

48. On August 12, 2018, Lewis texted Segar and asked to meet the following day. (Lewis 299; Lewis Exh. 9; Segar II 437) When they met, Lewis disclosed to Segar that she wanted to be truthful with LSU about her abuse by Coe. (Lewis 296-297, Lewis Exh. 9; Segar II 439) Lewis said she was breaking up with Coe, so she had no reason to cover for him any longer. (Segar II 437; Lewis Exh. 9)

8

49. Lewis expressed interest in filing for a protective order, and Segar encouraged her to file a police report and seek a protective order. (Lewis 296-297; Lewis Exh. 9; Segar II 439) Segar encouraged her to be truthful and to provide complete information. (Segar II 437-438; Lewis Exh. 9) Lewis said she first wanted to answer questions truthfully to LSU staff, and she provided text messages and photos of bruises and scratches and threatening text messages Lewis received from Coe. (R. Doc. 182, ¶ 535; Lewis 301)

50. One incident Lewis reported at this time was an assault that occurred earlier that summer. (Lewis 78) In her deposition, she testified that Coe was angry at her for making dinner plans with friends. (Lewis 78) She said Coe drove her into "the hood" and threw her phone out of the car, then left her there for under five minutes. (Lewis 62-66) Once back in the car, she said Coe strangled her for the entire ride to her apartment. (Lewis 66)

51. Lewis did not call the police, nor did she report this to LSU until her meeting with Segar in August 2018. (Lewis 70, 78)

52. Segar forwarded the information to the Title IX office and asked that the case be handled "with high priority" based on Segar's concerns for Lewis' safety. (Lewis Exh. 9)

53. Separately, Coe also reported to Segar's office on August 14, 2018, to express concern for Lewis' mental health and safety. (Segar II 441; Segar Exh. 26) Coe provided text messages from Lewis threatening to harm herself. (Segar II 442) Lewis confirmed that she wrote the text messages to Coe and that she cut herself because "[Coe] was just absolutely awful to [her]." (Lewis II 311)

9

54. Segar reported Coe's concern to the Title IX office and instructed Lewis and Coe to cease contact with the other. (Segar II 444; Exh 26)

55. On August 16, 2018 (promptly after speaking with Lewis), Segar submitted the evidence and a complaint of abuse to the LSU police. (R. Doc. 182, ¶ 537; Lewis Exh. 12) Segar also accompanied Lewis to give her story to the police. (Lewis 230)

56. Lewis confirmed that the information in the initial report by the police was consistent with what she reported to Segar on August 16, 2018. (Lewis 321; Lewis Exh. 12) As shown from the police records, Segar was integral to reporting Coe's abuse to the police. (*Id.*)

57. Segar also filed a Title IX complaint regarding the information Lewis provided, and Lewis confirmed the accuracy of the information in the Title IX report. (Lewis 299; Exh. 9)

58. As a result of Lewis' disclosures, Coe was arrested and charged with felony dating violence the following day. (R. Doc. 182, ¶ 539) The police took Coe into custody on August 17, 2018. (Lewis 320-321; Exh. 12).

59. Coe was already suspended from the football team, and he received an interim suspension from LSU on August 18, 2018. (Lewis 108-109; Sanders 100, 102, 104-106)

60. The night of Coe's release from police custody (in August 2018), Lewis was waiting for him at his apartment. (Lewis 82) Lewis stayed with Coe thereafter. (Lewis 105)

61. Lewis consistently went to Coe's off-campus apartment while he was "on house arrest" and watched TV and had sex with Coe. (Lewis 105-107) She said they could not be seen together because of the court's protective order. (Lewis 106)

10

62. Coe continued to assault Lewis by pushing her into a couch, causing a lump on her shin, and by slapping her and causing a black eye. (Lewis 79, 108)  Both incidents occurred at Coe's off campus apartment. (Lewis 83, 108)

63. Lewis did not report the assaults to LSU.  (Lewis 107, 113)  She testified that at this time "[Coe] already got in trouble . . ." (Lewis 112)

64. Lewis also did not report these incidents to the police until later.  (Lewis 106-107)  However, her friend reported the abuse, causing the police to contact Lewis.  (Lewis 111)

65. Lewis again lied to the police and denied that the black eye was caused by Coe.  (Lewis 111-112; 364-365)  In spite of Lewis' lies, the police again arrested Coe on September 16, 2018.  (R. Doc. 182, ¶ 544)

66. Coe withdrew from LSU the following day and never re-enrolled.  (R. Doc. 182, ¶ 544)

67. Coe pled guilty to two counts of battery and one count of violation of a protective order. (R. Doc. 182, ¶ 546)

68. Even though Coe never returned, LSU ultimately expelled Coe on July 18, 2019, as a result of the Lewis-related reports. (R. Doc. 182, ¶¶ 545, 552)

69. Letters were addressed and sent to Lewis utilizing her correct email address with information about each investigation regarding Coe. (R. Doc. 182, ¶553; Lewis II 372, Lewis Exh. 19) Lewis received communication about Coe's interim suspension from LSU via email to her LSU email address. (*Id*.) Lewis also received communication about Coe's expulsion from LSU via email to her LSU email address. (Lewis Vol. II 372; Lewis Exh. 20)

70. Coe continued to abuse Lewis at off-campus locations, but Lewis never again reported any issues regarding Coe to LSU. (Lewis 113; Lewis II 365, 366, 392-393, 453-454)

71. Lewis could not see Coe between his second arrest in September of 2018 and January of 2019. (Lewis I 114-115) However, Lewis visited Coe at his aunt's house in January 2019, spent the night with Coe, and began having sex with him immediately. (Lewis I 115-119)

72. Lewis saw Coe secretly, sometimes sneaking through a window at Coe's aunt's house. (Lewis 121-122; *see* Lewis II 409, 448, Exh. 30)

73. Lewis claims Coe was physically abusive to her beginning again in the summer of 2019, but she reported none of the assaults to the police or LSU. (Lewis 119-120, 122-125)

74. Lewis regularly saw Coe from January of 2019 until she moved back to New Zealand in June of 2020. (Lewis 120) She maintained contact with Coe until November of 2020, when she learned he was expecting a child with another woman. (Lewis 130-131)

75. Lewis graduated from LSU in December 2020 with a degree in Sports Administration and a minor in business. (Lewis 422; Sanders Decl. ¶ 9, Exh. 4)

76. As of January 2017 when Lewis began a sexual relationship with Coe, the only information known to anyone at LSU regarding prior misconduct by Coe was Richardson's discussion with Sharon Lewis and Keava Soil-Cormier two months earlier about an incident at JL's off-campus bar between Richardson and Coe. (Richardson 190-191; Lewis 11-15)

77. Richardson's version of Coe's conduct varies from saying that Coe threw a drink at her to saying Coe pushed her to the ground (Richardson 179, 192, 267), and Richardson

12

admits that she cannot specifically remember what she told Sharon Lewis and Soil-Cormier had happened. (Richardson 190-191)

78. Although Richardson also claims she told Sharon Lewis and Soil-Cormier that Coe was abusive in the past, her deposition testimony refutes this, as she acknowledges she merely told them "exactly what . . .happened that night." (Richardson 191) Richardson also testified that Sharon Lewis and Soil-Cormier "never asked" if what happened that night was the only time. (Richardson 261)

79. In that meeting, Sharon Lewis and Soil-Cormier did not perceive Richardson to be making a claim of physical abuse by Coe. (S. Lewis 161; Soil-Cormier 119) They described Richardson's demeanor as laughing it off and defensive about having herself thrown a drink at Coe. (S. Lewis 171-172; Soil-Cormier 92) Richardson acknowledges that she may have laughed when telling them the story of what happened. (Richardson II 30)

80. PM-73 only covers gender-based violence. (*See* Sanders Decl. ¶ 4; Exh. 1)

81. Jeffrey Scott, who had experience with domestic abuse cases, was assigned to investigate the domestic violence case against Coe. (Scott 37, 38, 42) He interviewed Lewis and others and advised Lewis in writing of all resources that LSU provided. (Lewis 229-230, 241-242; Lewis Exh. 3)

82. Scott referred Lewis to the Lighthouse program because of his fear for her safety. (Lewis Exh. 18; Scott 57-58) Lighthouse would provide Lewis with much needed support. (Lewis Exh. 18; Scott 57-58) As Lewis admits, she lied to Scott about what occurred. (Lewis Exh. 18; Scott 57-58)

13

83. Segar offered Lewis resources related to dating violence, assistance reporting to the police, free counseling, and drove Lewis to her appointment at the Title IX office. (Lewis 228-230; Exh. 2)

84. Scott and Stewart in Title IX partnered with Sanders in SAA to encourage Lewis to disclose if she was being abused by Coe, and Lewis would not do so. (Sanders 71-72, 74; Lewis Exh. 17)

85. Sanders wanted to communicate with Lewis to let her know that the situation is "tough" and "it may be challenging to tell the truth," but "[he] was concerned about her safety and was just trying to assist her in the best way we could." (Sanders 83)

86. After the June 2018 event where the campus police were called by Lewis' roommate, and Lewis denied physical violence by Coe, Sanders moved forward with the Code of Conduct process to bring Lewis in for questioning and see whether she would be truthful. (Sanders 70-74) Lewis still denied any abuse by Coe. (Sanders 74)

87. In August 2018 when Lewis finally told Segar that she was ready to be truthful, Segar promptly escorted Lewis to the police to tell her story. (Lewis 230)  Even still, Lewis again returned to Coe. (Lewis 82) Nevertheless, LSU moved forward with an interim suspension and ultimately expelled Coe from the university. (R. Doc. 182, ¶¶ 545, 552)

88. Despite having been instructed by multiple persons, including her friends, parents, and LSU employees, to stay away from Coe, Lewis ignored those instructions and continued a relationship with Coe. (Lewis 166; Lewis II 449-450)

89. While Lewis claims she was deprived of educational benefits because she temporarily withdrew from LSU in 2017, that was always her plan.  (R. Doc. 182, ¶ 790; Lewis 189)  She testified that when she "signed the contract" with LSU, she knew she was

14

only staying for a semester before going pro. (Lewis 189) Afterward, Lewis returned and earned her bachelor's degree. (Lewis II 421-22)

90. Lewis was consistently denying violence to the LSU police, Title IX, SAA, and Segar. (Lewis 297)

91. In the case of Plaintiff Brennan, Sharon Lewis was quick to report sexual misconduct, negating any intent to hide complaints. (Brennan 58-59; Segar 242)

92. While Ausberry failed to report a text message he received from Coe, in which Coe disclosed that he hit Lewis, Coe sent the text message on April 14, 2018, and, fortunately, LSU otherwise received notice of the incident shortly after on April 25, 2018. (Ausberry 342; Lewis 219; Lewis Exh. 2; Segar II 413-416) The text message provided no information that Coe did not also disclose to Scott. (Lewis 243-244; Lewis Exh. 4)

93. Lewis was not an LSU student at the time of the assault, so the reporting obligations were unclear to Ausberry, although he agrees he should have reported it. (Segar II 407-408, 437-437; Ausberry 317-318)

94. That same year, Ausberry quickly passed along information he received from Plaintiff Richardson regarding Coe. (Ausberry 262-263)

95. Like other students, Lewis and her alleged assaulter, Coe, received LSU's training. (Sanders Decl., ¶ 3)

96. Because of their roles as student athletes, Lewis and Coe received **additional** training through the Dan Beebe Group/Protection for All. (Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl.¶ 5, Exhs. 2-3)

97. Lewis testified that she loved Coe until 2020. (Lewis 447)

15

98. The only pre-assault information Lewis learned from the Husch Blackwell Report was the drink incident with Richardson two months earlier. (R. Doc. 1, 1-1)

          Respectfully submitted,

          **JEFF LANDRY**
          **ATTORNEY GENERAL**

          BY:   /s/ *Susan W. Furr*
                   Shelton Dennis Blunt Bar Roll No. 21230
                   Susan W. Furr Bar Roll No. 19582
                   Karleen J. Green Bar Roll No. 25119
                   Jessica Coco Huffman LA Bar No.: 30445
                   Molly McDiarmid Bar Roll No. 36426
                   Gregory T. Stevens Bar Roll No. 29436
                   Michael B. Victorian Bar Roll No.: 36065
                   II City Plaza | 400 Convention Street, Suite 1100
                   Baton Rouge, Louisiana 70802
                   Telephone: 225 346 0285
                   Facsimile: 225 381 9197
                   Email: dennis.blunt@phelps.com
                   Email: susie.furr@phelps.com
                   Email: karleen.green@phelps.com
                   Email: jessica.huffman@phelps.com
                   Email: molly.mcdiarmid@phelps.com
                   Email: greg.stevens@phelps.com
                   Email: michael.victorian@phelps.com

                   ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr