UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO
MOTION FOR SUMMARY JUDGMENT NO. 6: JANE DOE**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 6: Jane Doe, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue:

1. Jane Doe enrolled at LSU as a freshman in Fall 2018. (Rec. Doc. 182, ¶ 597; Doe 19)[1]

2. Soon after her enrollment, Doe met John Poe, another LSU student, through her roommate. (Doe 20) Poe was a friend of Doe's roommate's boyfriend. (Doe 20)

3. Doe, her roommate, and Poe all lived in North Hall, a residence hall at LSU. (Doe 20)

4. Doe admits Poe was "really, really nice" when they first met, and they were friends. (Doe 28) Doe and Poe would go places together, including attending football games. (Doe 28)

5. According to Doe, she and Poe did not date. (Doe 29) They kissed two times, but they did not have any other intimate contact. (Doe 74-75)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion only.

6. Doe alleges that, sometime after they attended a football game together, Poe's behavior toward her changed. (Doe 35)

7. Doe claims Poe took food from her room and took decorations off her dorm room door. (Doe 22, 26, 20) Doe alleges Poe sometimes offered to return the items if she would go to his room and cuddle with him. (Doe 26)

8. Doe further claims that Poe would "play fight" with her and call her names like "fat" and "pig." (Doe 26, 35) Doe admits she was never injured as a result of the play fighting, and she did not report Poe's actions to LSU. (Doe 28)

9. Despite Doe's objections, her roommate allowed Poe to enter their dorm room. (Doe 20-21)

10. As a result of his behavior, Doe distanced herself from Poe. (R. Doc. 182, ¶ 604) She stopped talking to him and blocked him on her cell phone and social media accounts. (Doe 31)

11. Doe alleges that, despite her efforts, Poe would find ways to contact her or relay messages to her through her roommate. (Doe 31-32)

12. Doe and Poe each received LSU's training on Title IX. (Doe 127-129; Doe Exhs. 20-21; Sanders Decl. ¶ 3)

13. In late Fall 2018, Doe received information about LSU's policies regarding campus safety. (Doe 127-129; Doe Exhs. 20-21)

14. Doe was required to complete MyStudent Body training, a program that addresses alcohol, drugs, and sexual violence before November 2, 2018. (Sanders Decl. ¶ 3; Doe 127-128; Doe Exh. 20) Completion of the training was a prerequisite for Spring 2019 registration. (Doe Exh. 20; Sanders Decl. ¶ 3)

15. The Board's policies were promulgated to students and staff alike before and after Doe's alleged harassment. (Doe 127-129; Doe Exhs. 20-21; Board 30(b)(6) I 29, 52-54; Board 30(b)(6) II 259-261; Stewart 38-41)

16. Employees, non-employees, and students, including Doe, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative. (Board 30(b)(6) I 49-52) Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (*Id.* 53-54)

17. The Board provided annual training beginning in at least 2014. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37) Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) I 39, 42)

18. In addition to the campus-wide training, some departments, such as Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 39, 42)

19. LSU did not receive a report from Doe about Poe's behavior in 2018. (Doe 32; Board 30(b)(6) I 48-49; Sanders Decl. ¶ 12)

20. During the Spring semester 2019, Doe's roommate invited her to go to Chipotle, and Doe agreed. (Doe 38, 40; R. Doc. 182, ¶ 606) Doe claims she did not realize Poe was invited to go until he got into her roommate's car. (Doe 38, 40)

21. Doe claims Poe grabbed her butt as they were walking to Chipotle. (Doe 38, 40-41) Doe testified in her deposition that she told Poe to stop and not touch her again. (Doe 38)

22. After the interaction, the three returned to North Hall with their food, but Doe and Poe did not eat together. (Doe 42)

23. Doe did not report Poe's behavior to anyone at LSU. (Doe 42)

24. Doe alleges she was upset about not receiving a job, and Poe sent her a message on Twitter congratulating her on a job offer. (Doe 37-38, 43)

25. Doe also alleges Poe took a picture from her room and wrote a phone number on it (which was not Doe's) with a message reading "Call for a good time." (Doe 22-25)

26. After these incidents, Doe told her roommate that she was going to report Poe and her roommate's boyfriend to Residential Life. (Doe 38-39)

27. After Doe's conversation with her roommate, Doe alleges Poe got a new phone number, called Doe, and left a voicemail telling Doe although she was "struggling in life," that was not an excuse to take her anger out on her roommate. (Doe 39)

28. Doe alleges the next day or so, she received a text message from the same number (because she did not block the number). (Doe 39-40) In the text message, Doe alleges Poe confirmed his identity and threatened to report her. (Doe 40)

29. On or around March 19, 2019, Doe reported Poe to her former resident assistant. (Doe 32, 46, 49-50; Doe Exhs. 1-2)

30. A few hours later, a representative of Residential Life met with Doe (who was accompanied by one of her friends at Doe's request) in Doe's room at North Hall. (Doe

4

53-54)  During the meeting, Doe was informed about available resources like the Lighthouse Program, a "No Contact" order, and the LSU Police Department.

31. Doe's complaint was submitted to the Title IX Office, and Doe was contacted by a representative of that office on March 21, 2019.  (Doe Exh. 5)

32. Plaintiff testified that she never interacted with or spoke to Jennie Stewart. (Doe 118, 154-155)

33. Stewart testified that Kimberly Davis, a graduate student in the Title IX office, handled the intake of Doe's case, and that Stewart did not communicate directly with Doe. (Stewart 261-262)

34. Doe was offered the option to move to "a safe space" (*i.e.,* another room for a three-day period), with the option to move to another room permanently.  (Doe 53-55; R. Doc. 182, ¶¶ 620-622)  Doe accepted the temporary housing and ultimately relocated to another dorm.  (Doe 54-56)

35. Doe testified that after the meeting she felt like her concerns had been addressed and she was satisfied with the meeting.  (Doe 56)

36. Doe visited Lighthouse on March 29, 2019 seeking academic accommodations, specifically, extended time, a distraction reduced environment, consideration for absences, and note taking. (Doe 57, 71-72; Doe Exh. 4)

37. Doe testified that she met weekly with Crystal Loup in the Lighthouse Program from March 2019 to Fall 2019.  (Doe 63)

38. The Title IX office investigated Doe's complaint. (Doe Exh. 7) Based on the information gathered during the investigation, the Title IX office determined that Doe's allegations fell outside of Title IX. (Doe 84)

39. The Maxient file regarding Doe's complaint indicates that Doe was interviewed by Davis of the Title IX Office, and the notes of her interviews were included in the file. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 6)

40. According to the Maxient file, although Doe provided the names of students to be interviewed in connection with her complaint, neither student responded to requests to be interviewed by Title IX. (Doe Exh. 7)

41. Based on the information obtained during the investigation, including Davis's notes, the Title IX office determined that Doe's complaint did not constitute a Title IX violation. (Doe 84; Sanders Decl. ¶ 12)

42. Doe's complaint was referred to Student Advocacy and Accountability ("SAA") for further review to determine whether Poe's actions violated the Student Code of Conduct. (Sanders Decl. ¶ 12; Doe 84-85; Doe Exhs. 8 and 9)

43. SAA investigated Doe's complaint and cited Poe for violations of the Student Code of Conduct. (Sanders Decl. ¶ 12) Specifically, Poe was charged with Harassment, Offensive Behavior, Property Misuse, and Stalking, and was ultimately found responsible for Harassment and Property Misuse. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

44. As a result of the findings by SAA, Poe was placed on disciplinary probation from June 7, 2019 through May 31, 2020. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

45. In addition, a mutual "No Contact" Order between Poe and Doe was issued. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7) Under the terms of the order, the parties were directed to avoid contact with each other until the directive was lifted in writing. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

PD.42450748.1

46. Poe was also required to write a reflection essay and submit it to SAA by July 7, 2019. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

47. Prior to Doe's complaint, the Title IX office did not receive any complaints about Poe. (Board 30(b)(6) I 48-49)

48. Doe admits she did not have any interaction with Poe after her report to Residential Life in March 2019. (Doe 46)

49. Plaintiff filed suit on April 26, 2021. (R. Doc. 1)

50. Doe did not read the entirety of the Husch Blackwell Report, and none of the allegations in the Husch Blackwell Report relate to her. (Doe 95; R. Doc. 1-2)

51. According to Doe, her alleged harassment occurred in the Fall of 2018 and the Spring of 2019. (R. Doc. 182, ¶¶ 597-616; Doe 22-23, 35) By this time, she knew of her alleged injuries and the perpetrator. (*See* Doe 22-25, 37-39, 40-44)

52. Doe's complaint reached the Title IX office by March 2019 and the SAA office by May 2019. (Doe Exhs. 5, 8)

53. Between March and May 2019, Doe communicated with representatives in Residential Life, Lighthouse, Title IX, and Student Advocacy and Accountability to process her report. (Doe 53-54, 57, 71-72, 84-85; Doe Exhs. 4-5, 7-9)

54. On May 14, 2019, Doe responded to an email from Crystal Loup, Coordinator, Wellness & Health Promotion at The Lighthouse Program stating: "I met with student accountability and advocacy and the person I talked to said that title ix said that [Poe] wasn't in violation of their policies so they sent it to their office to try and find a violation there." (Doe 86-87; Doe Exh. 9)

55. As of at least May 14, 2019, Doe knew that her complaint was not being handled by Title IX and instead was being handled by SAA. (Doe 84)

56. All of the examples in the Second Amended Complaint and Jury Demand (the "Complaint") of how LSU allegedly created a heightened risk of sexual misconduct on campus for Poe's victims relate to conduct occurring **after** Doe's alleged harassment by Poe. (R. Doc. 182, ¶ 934 (a)-(c))

57. Doe is the **first and only** plaintiff to allege conduct by Poe, and the only student who made claims of a sexual nature against Poe. (Sanders Decl. ¶ 12; Board 30(b)(6) I 48-49)

58. In 2017, the LSU Office of Internal Audit conducted an audit regarding Title IX obligations, specifically sexual misconduct (the "Audit"). (R. Doc. 1-1, p. 164) The Audit reviewed activities between June 1, 2015 and December 31, 2016 (prior to Doe becoming an LSU student and prior to Doe's alleged interactions with Poe), and its findings related to multiple campuses. (*Id*.) The Audit noted that PM-73 was already in place since 2014, pre-dating the Audit's review period. (R. Doc. 1-1, p. 166)

        Respectfully submitted,

        **JEFF LANDRY**
        **ATTORNEY GENERAL**

BY:   /s/ *Susan W. Furr*
       Shelton Dennis Blunt Bar Roll No. 21230
       Susan W. Furr Bar Roll No. 19582
       Karleen J. Green Bar Roll No. 25119
       Jessica Coco Huffman LA Bar No.: 30445
       Molly McDiarmid Bar Roll No. 36426
       Gregory T. Stevens Bar Roll No. 29436

Michael B. Victorian Bar Roll No.: 36065
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 346 0285
Facsimile: 225 381 9197
Email: dennis.blunt@phelps.com
Email: susie.furr@phelps.com
Email: karleen.green@phelps.com
Email: jessica.huffman@phelps.com
Email: molly.mcdiarmid@phelps.com
Email: greg.stevens@phelps.com
Email: michael.victorian@phelps.com

ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr

9

PD.42450748.1