UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO MOTION FOR SUMMARY JUDGMENT NO. 9: KENNAN JOHNSON**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 9: Kennan Johnson, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue: [1]

1. Kennan Johnson was a student at LSU from Fall 2016 to her graduation in Spring 2019. (Johnson 18, 81; R. Doc. 182, ¶¶ 560, 594)

2. Johnson joined the LSU tennis team after having been suspended from the tennis teams at the University of Central Florida (for a physical altercation with another student) and the University of Oregon (for violating team rules). (Johnson 23, 41-43, 66-67)

3. After leaving Oregon, Johnson reached out to Julia Sell ("J. Sell"), LSU's tennis coach, about transferring to LSU. (J. Sell 186-187; Johnson 72-74)

4. Johnson was ineligible under NCAA rules to play tennis for her first year, but thereafter J. Sell allowed Johnson to join the LSU team and gave Johnson a tennis scholarship for each remaining year of eligibility. (Johnson 70-71, 80-81; J. Sell 189-190; R. Doc. 182, ¶¶ 561-562)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.

1

5. Johnson had known J. Sell since she was about twelve years old. (R. Doc. 182, ¶ 559; Johnson 18)

6. Johnson describes her relationship with J. Sell as "hit or miss" (also, "nice one day and cold the next"); she believed J. Sell's mood changed depending on whether the team was winning. (Johnson 87-88, 95-96, 174) Johnson felt that the better players remained on J. Sell's good side. (Johnson 89, 92-93)

7. With that said, Johnson felt there were some weeks in which J. Sell "adored" her. (Johnson 93)

8. Johnson also believed that everyone was on J. Sell's "bad side" at some point. (Johnson 90-91) The players whom J. Sell did not recruit (including Johnson) felt J. Sell was harder on them. (Johnson 92-93)

9. Johnson believed she started off "behind" because she had been kicked off two other teams. (Johnson 89) Johnson understood that she was more of a risk to bring in at LSU because she had already been kicked off of two teams. (Johnson 80)

10. Johnson appreciated J. Sell's efforts to try to get her the year of eligibility and to get Johnson admitted at LSU. (Johnson 80)

11. Johnson always had a good relationship with Mike Sell ("M. Sell"), who also served as LSU tennis coach with J. Sell. (Johnson 87, 257) Johnson felt that M. Sell was one of the few people who got her through LSU. (Johnson 200-202)

12. Johnson testified that she met with a nutritionist regarding her weight, but others did so as well. (Johnson 165-166, 170) Johnson found that the more she weighed, the harder it was to recover and be quick during matches. She testified that her weight also made her more prone to injury. (Johnson 157-158)

2

13. Johnson sustained injuries to her knee, shoulder, back, biceps, wrist, foot strain, and a concussion while attending LSU. (Johnson 138-140) From time to time, she missed matches and training based on these on and off injuries. (Johnson 141-142)

14. Johnson told J. Sell when she went to LSU that she had been seeing a nutritionist and wanted to continue doing the same thing at LSU. (Johnson 72; *see* J. Sell 193-194)

15. J. Sell gave Johnson a scholarship each year. (R. Doc. 182, ¶ 569; Johnson 81)

16. Johnson alleges only one negative comment by J. Sell about Johnson's sexual orientation. (R. Doc. 182, ¶¶ 585-586; Johnson 205-206) Specifically, Johnson claims that one day J. Sell asked Johnson "to keep her lifestyle" out of the locker room. (R. Doc. 182, ¶ 586; Johnson 205-206)

17. Johnson assumes Elyse Lavender, another player on the team, said something to J. Sell about Johnson's sexual orientation and that was why J. Sell said something to Johnson. (Johnson 102, 205-206) However, Johnson also acknowledges that her relationship with fellow teammate, Taylor Bridges, created distractions in the locker room, and thus, this could be the basis for the alleged comment. (Johnson 99)

18. Johnson never made any report to LSU about J. Sell's conduct. (R. Doc. 182, ¶¶ 563, 576; Johnson 180, 283)

19. Johnson claims harassment during the period 2017 to Spring 2019 when she graduated. Johnson did not file suit until approximately two years later, on April 26, 2021. (Johnson 18, 265; R. Doc. 1; R. Doc. 182, ¶ 594)

20. The Husch Blackwell Report did not mention Johnson's own allegations against J. Sell. (Johnson 289; R. Doc. 1-2) Johnson was not interviewed by Husch Blackwell, and she

3

only appears to be referenced, not by name, in connection with her conversation regarding Jade Lewis's alleged assault. (Johnson 289; R. Doc. 1-2)

21. Johnson graduated in Spring 2019. (Johnson 18; R. Doc. 182, ¶ 594) By that date, Johnson knew of the previous training she had received prior to the alleged abuse. (Johnson 81-84, 86; Johnson Exhs. 9, 10) She also knew of the entirety of J. Sell's conduct toward her. (Johnson 81, 285-286; R. Doc. 182, ¶¶ 563-579, 585-587)

22. Johnson also knew of the Title IX process, having already engaged in it in January 2019 regarding her altercation with Taylor Bridges, a teammate who Johnson briefly dated. (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12) Thus, at that time, Johnson knew that an altercation in a same sex relationship implicated LSU's Title IX process. (Johnson Exh. 12)

23. Johnson was also informed of LSU's resources for victims of sexual assault and was advised of support services. (Johnson 131-132; Johnson Exh. 11) Indeed, Johnson was offered and utilized counseling services at LSU. (Johnson 131-132, 142-146; Johnson Exh. 11)

24. At no time during that Title IX process or after did Johnson complain about any conduct by J. Sell. (Johnson 283) She otherwise never made any Title IX complaints for which she can criticize LSU's response. (Johnson 127-130, 180-181)

25. Johnson was the **first** and only plaintiff to assert sexual allegations against J. Sell (R. Doc. 182, ¶ 563) No one complained of sexual assault by J. Sell before Johnson's complaint.

26. Johnson testified that she never told anyone about alleged sexual abuse by J. Sell. (Johnson 180, 283)

4

27. Johnson testified to many reasons why she believes J. Sell treated players harshly, if at all, including the player's performance, whether J. Sell was in a bad mood due to a loss, whether the player had a good attitude, and whether J. Sell recruited the player. (Johnson 87-89, 93-98, 174, 277)

28. Many players, not just Johnson, had issues with J. Sell. (Johnson 90-92)

29. The incidents Johnson complains about occurred between Spring 2017 and Spring 2019. (Johnson 18, 81; R. Doc. 182, ¶¶ 562, 594)

30. Johnson testified that many players, not just Johnson, were worried about disappointing J. Sell. (Johnson 96) Those other players were heterosexual. (Johnson 105)

31. Johnson testified that J. Sell preferred players with good attitudes and who played well. (Johnson 87, 89, 93-94, 96-97) By contrast, Johnson had "tiffs" with just about everyone on the team at one point or another over tennis and she threw her tennis racquet in a trash can and "broke a racquet or two." (Johnson 103-104, 217)

32. Johnson describes herself as an "emotional" person, stating that "if I'm not a zero, I'm a ten." (Johnson 147, 227) Johnson testified that her emotions got her into trouble on the tennis court. (Johnson 215-217, 277-278)

33. In one tournament near the end of her tennis career, Johnson got emotional after losing a game. (Johnson 215-216) She acknowledges she may have given J. Sell the impression that she stopped trying in her match, including that she put her tennis bag in the trash can and broke one or two racquets. (Johnson 216-217)

34. Johnson said it would make "100 percent" sense to pull Johnson from the singles match if she had stopping trying in the doubles match. (Johnson 216-217) After this match, Johnson was pulled from the singles event. (Johnson 216)

5

35. Johnson testified that J. Sell told her to meet J. Sell at the indoor courts and said "You might want to bring tissues, because I'm going to make you cry." (Johnson 277; Johnson Exh. 40)  In that conversation, J. Sell talked to Johnson about her attitude. (Johnson 277-278)

36. She told Johnson that she needed "to continue to work on it, because when [Johnson] got angry it affects others." (Johnson 277)  Johnson agrees that her actions sometimes affected how others played.  (Johnson 277-278)

37. Johnson testified that J. Sell often made players, not just Johnson, run extra fitness when the players would lose a match.  (Johnson 93-94, 98-99)  Johnson felt this behavior was toxic, but it applied to all players.  (Johnson 98-99)

38. J. Sell recruited Johnson to LSU, knowing Johnson's sexual orientation. (Johnson 106-108; J. Sell 195-196)  J. Sell also told Johnson that her sexuality made no difference to J. Sell.  (Johnson 106-107)

39. When Johnson was having difficulties with Johnson's mother due to Johnson's sexuality, J. Sell asked Johnson's LSU counselor to reach out to Johnson because J. Sell was worried Johnson felt pressured by the discussions with her mother. (Johnson 149-150; Johnson Exh. 13, p. 11)

40. Johnson's social media posts and text messages suggest she felt very supported by J. Sell up to the time she was graduating.  (Johnson 222-226, 264; Johnson Exhs. 16-23)  For example, in social media posts and text messages, Johnson stated that she was "Soooo thankful for these two amazing human beings," referring to Julia and Michael Sell; thanked the Sells for putting up with Johnson's emotions and "vouching" for

6

Johnson to play on LSU's team; and thanked them for never giving up on Johnson. (Johnson 222-231; Johnson Exhs. 16-18, 20-23)

41. Johnson admitted that she had a lot of confidence issues, and Mike and Julia Sell helped her through those and kept her from crumbling. (Johnson 226)

42. At one point Johnson dated one of the other players on the team, Taylor Bridges. (Johnson 106, 205-206, 117-120) Johnson said J. Sell never commented negatively about Johnson's relationship with Bridges; Johnson just believed from J. Sell's "body language" that J. Sell was not happy that the two teammates were dating. (Johnson 118, 120) Johnson admits that her relationship with Bridges caused friction. (Johnson 118-122)

43. Per Johnson, J. Sell showed concern "because [the relationship] was bringing drama into the locker room, which I understand, because we're dating and we're on the same team." (Johnson 99) Johnson describes that she and Bridges were "toxic for each other." (Johnson 115) She said that "[b]eing together on the team was rough for us," and "it became one of those things like we saw each other too much. So there were those little arguments where like some of the girls on the team were like, You need to just not [date]." (Johnson 118)

44. Everybody on the team told them at one point that they needed to break up, which Johnson said was "common sense" (Johnson 120-121) She said there was a "lot of tension in the locker room, which then affected the girls," and Bridges and Johnson did not socialize with the other girls on the team. (Johnson 119-121)

45. For example, Johnson testified that other teammates felt like Johnson and Bridges were not "branch[ing] out" with the other team members. (Johnson 119) As an additional

7

example, at away tennis tournaments, other players complained to J. Sell that they could not use their hotel room because Johnson and Bridges were engaging in sexual conduct in the shared hotel room. (J. Sell 199-200; Johnson 121-122)

46. Johnson testified that Jade Lewis' abusive relationship with John Coe was also stressful for the team. (Johnson 189)

47. Neither M. Sell or J. Sell ever said they did not want Johnson dating Bridges. (Johnson 118) Other than checking on Bridges and Johnson periodically to make sure they were okay with the relationship, J. Sell did not otherwise say anything about the relationship to Bridges and Johnson. (Johnson 120)

48. Per Johnson, one day J. Sell asked Johnson "to keep her lifestyle" out of the locker room. (R. Doc. 182, ¶ 586; Johnson 205-206, 208) This is the only negative comment Johnson said that J. Sell made. (Johnson 205-206, 208, 213) J. Sell denies making this comment. (J. Sell 196-197) Johnson testified that this single comment by J. Sell was "kind of offensive." (Johnson 200, 206)

49. Johnson acknowledged that the alleged comment may have been precipitated by the issues created by the relationship in the locker room (Johnson 99, 119-121) Johnson suspects the comment was made because another player, who Johnson believes is homophobic, said something to J. Sell. (Johnson 205-206) Johnson describes the player as "sheltered" and "homeschooled," and someone who did not participate in team dinners or hang out with the teammates. (Johnson 203-205)

50. Johnson disclosed to J. Sell shortly after arriving at LSU that Johnson had been in a toxic dating relationship with a woman at the University of Oregon. (Johnson 106-108) Johnson indicated that J. Sell already knew Johnson was homosexual since she

8

first met Johnson. (Johnson 106-107; J. Sell 195-196) J. Sell responded that it did not matter to J. Sell that Johnson was homosexual. (Johnson 107)

51. Johnson cannot show any prior reports, nor did Johnson make any reports. (Johnson 283; Board 30(b)(6) I 66-67; Segar Decl. ¶ 9)

52. Johnson graduated from LSU on schedule in Spring 2019. (Johnson 18; R. Doc. 182, ¶ 594)

53. Johnson's transcript shows her grades fluctuated up and down, with **no** indication her grades during her first year (when she was not playing on the tennis team)—2.67 and 2.12—were notably higher than her grades during her time on the tennis team—2.35, 2.9, 3.5, 2.13, 3.5. (Johnson 200; Johnson Exh. 14; R. Doc. 182, ¶ 596) Indeed, Johnson testified that her grades were good when she was at LSU. (Johnson 291)

54. Johnson testified that missing out on graduate school, not her grades, was her only lost educational opportunity. (Johnson 291)

55. Johnson testified that she was hospitalized after graduating. (Johnson 214)

56. Johnson alleged that J. Sell would not write Johnson a letter of recommendation for graduate school. (Johnson 132) Johnson speculates J. Sell would not do so because "she didn't like me," but Johnson testified that J. Sell never told her that she did not like Johnson. (Johnson 136) Johnson did not apply to graduate school. (Johnson 132-133)

57. The Board's written official policy, Permanent Memorandum 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video

9

without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203; Stewart Exh. 2)

58. PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy." (Stewart 203; Stewart Exh. 2)  The Board's policies were promulgated to students and staff alike before and after Johnson's alleged issues with J. Sell.  (Johnson 81-86; Johnson Exhs. 9, 10; Board 30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 259-261; Stewart 38-41)

59. Employees, non-employees, and students, including Johnson, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative, or through Maxient.  (Board 30(b)(6) I, 49-52)

60. Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points.  (Board 30(b)(6) I 53-54)

61. Johnson participated in the Title IX process in January 2019 when she made a report to Miriam Segar, Senior Associate Athletic Director, that her teammate and girlfriend, Taylor Bridges, slapped her.  (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12)

62. Per Johnson, Taylor hit Johnson during an argument (after Johnson disclosed she had kissed another girl). (Johnson 125) Johnson was drunk during the altercation. (Johnson 125-126)  Johnson was not injured in the altercation.   (Johnson 126-7)

10

63. Afterward, Johnson called her mom, who told her to contact J. Sell. (Johnson 117) Johnson reported this incident to J. Sell and J. Sell wanted Johnson to report the situation to Segar, which Johnson did. (Johnson 127-128)

64. Segar met with Bridges and Johnson separately, and both indicated they felt safe, that they were okay to continue practicing and traveling together on the team, and that they did not need any accommodations. (Johnson Exh. 12; Johnson 131-132)

65. Johnson was informed that the alleged conduct was unlawful and that "in addition to the Title IX process, she could file a police report and press legal charges regarding the interaction." (Johnson 131; Johnson Exh. 12)

66. Both women indicated they did not want to move forward with the Title IX process. (Johnson Exh. 12; Johnson 131)

67. Johnson felt she had the full opportunity to report this incident to Title IX, and she had no problems with how Segar responded to the incident. (Johnson 132, 304-305)

68. Johnson never complained to Segar or the Title IX office about J. Sell, nor at any other time. (Johnson 180, 283; Segar Decl. ¶ 9)

69. This was the only report Johnson ever made to Miriam Segar or Title IX. (Johnson 180, 283) Johnson testified that Bridges hit Johnson other times, but Johnson did not report such conduct. (Johnson 126-127, 180, 283)

70. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (R. Doc. 30(b)(6) I 33, 36-37)

PD.42454896.1

71. In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39, 41-43)

72. Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) I 39, 42-44)

73. Johnson and her alleged harasser, J. Sell, received training. (Johnson 81-86; Johnson Exhs, 9, 10; J. Sell 83-88; Sanders Decl. ¶¶ 3, 5; Segar ¶¶ 5, 6, Exh. 3,4; Board 30(b)(6) 88) In addition, Johnson admits that, "[a]s an athlete, Johnson was required to go to Title IX trainings." (R. Doc. 182, ¶ 593; *see* Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl. ¶ 5, Exh. 3) Johnson also acknowledged that she received and completed a training course on sexual assault, which training LSU mandated that students complete as a prerequisite to registering for classes. (Johnson 84)[2]

74. As indicated above, Johnson never made a report of sexual misconduct regarding J. Sell while at LSU. (Johnson 283) LSU has also never received a report regarding sexual orientation harassment in the women's tennis program, by Julia Sell, whether from Plaintiff or otherwise. (Board 30(b)(6) I 66-67)

75. Johnson and J. Sell each received training. (Segar Decl, ¶¶ 5, 6, Exh. 3, 4; Sanders Decl., ¶¶ 3, 6)

76. Johnson never reported her frustrations with J. Sell to the Title IX office when she reported the conduct with Bridges, nor did she make any reports to Title IX thereafter,

---

[2] The Board adopts the facts contained in discussion in Section III.D.b.iii of Summary Judgment No. 10.

12

PD.42454896.1

despite having received training and received a response and resources from the Title IX office. (Johnson 81-86, 283; Johnson Exhs. 9, 10)

    Respectfully submitted,

    **JEFF LANDRY**
    **ATTORNEY GENERAL**


BY:   /s/ *Susan W. Furr*
    Shelton Dennis Blunt Bar Roll No. 21230
    Susan W. Furr Bar Roll No. 19582
    Karleen J. Green Bar Roll No. 25119
    Jessica Coco Huffman LA Bar No.: 30445
    Molly McDiarmid Bar Roll No. 36426
    Gregory T. Stevens Bar Roll No. 29436
    Michael B. Victorian Bar Roll No.: 36065
    II City Plaza | 400 Convention Street, Suite 1100
    Baton Rouge, Louisiana 70802
    Telephone: 225 346 0285
    Facsimile: 225 381 9197
    Email: dennis.blunt@phelps.com
    Email: susie.furr@phelps.com
    Email: karleen.green@phelps.com
    Email: jessica.huffman@phelps.com
    Email: molly.mcdiarmid@phelps.com
    Email: greg.stevens@phelps.com
    Email: michael.victorian@phelps.com

    ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

Case 3:21-cv-00242-WBV-SDJ Document 661-21 SEALED 07/10/26 Page 13 of 14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr