UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO
MOTION FOR SUMMARY JUDGMENT NO. 10: CORINN HOVIS**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 10: Corinn Hovis, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue: [1]

1. Hovis attended LSU as an undergraduate student from 2019 to 2022, graduating in three years.  (Hovis 14-15)[2]

2. Hovis then enrolled in a master's program at LSU, which, at the time of her deposition, she expected to complete in May 2023.  (Hovis 15-16)

3. Hovis alleges that on January 24, 2020, she was sexually assaulted and/or raped by a football player, John Loe.  (R. Doc. 182, ¶¶ 652-653, 660, 664)

4. She met Loe for the first time in an off-campus bar, and when Loe asked her to go home with him to his residence, Hovis agreed.  (R. Doc. 182, ¶ 657-658)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.
[2] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Jonathan Sanders, Jennie Stewart and the 30(b)(6) of the Board are attached to the Board's motion as Exhibits A through D, respectively.  The declarations of Segar and Jonathan Sanders are also attached to the Board's motion as Exhibits E and F, respectively.  Citations to the depositions will be by the last name of the deponent and the page or exhibit number.  Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume.  Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

1

5. Hovis believes Loe then raped her in his vehicle, although Hovis has no knowledge of that occurring. (R. Doc. 182, ¶ 660; Hovis 43-44)

6. That night, Hovis filed a report with the LSU Police Department, who then contacted the Baton Rouge Police Department ("BRPD"). (R. Doc. 182, ¶¶ 665-666)

7. The BRPD refused to take a statement from Hovis because Hovis had consented to go home with Parrish. (R. Doc. 182, ¶ 665-666)

8. The LSUPD did not agree with this conclusion, and, instead, they drove Hovis to the hospital for a Sexual Assault Nurse Examiner ("SANE") examination. (R. Doc. 182, ¶ 667)

9. LSU's Residential Life staff (in Hovis' dorm) promptly reported the incident to LSU's Title IX office. (R. Doc. 182, ¶ 669)

10. On January 31, Jennie Stewart, Title IX Coordinator, met with Hovis to "explain [Hovis'] reporting options," and Hovis decided to move forward with a Title IX investigation. (R. Doc. 182, ¶¶ 670-671)

11. As a part of the Title IX process, LSU connected Hovis with the LSU Lighthouse Program, which provides assistance and accommodations to student-survivors of sexual assault, interpersonal violence, stalking, and harassment. (R. Doc. 182, ¶¶ 672-673)

12. The Lighthouse Program arranged accommodations for Hovis as a result of the incident with Loe, including time and a half on assignments and exams, a note taker, distraction-reduced environments, and consideration for absences. (R. Doc. 182, ¶ 674)

2

13. On February 3, 2020, investigator Jeffrey Scott interviewed Hovis, and, over the next month of his investigation, Scott concluded that Loe had sexually assaulted Hovis. (R. Doc. 182, ¶ 676-677)

14. LSU suspended Loe from the football team in February 2020. (Hovis 77, 191-193; Segar Decl.__)

15. Loe appealed the Title IX decision, but LSU upheld his suspension. (Hovis 75)

16. By electronic letter dated on May 1, 2020, LSU suspended Loe from the university and its campus for one year (from May 10, 2020 to May 31, 2021) and issued a no-contact directive, ordering him to have no communication or contact with Hovis. (R. Doc. 182, ¶ 679; Hovis 79; Sanders Decl. ¶ 15, exh. 10, 11)

17. Loe never returned to LSU after his suspension because he transferred to another university to play football. (R. Doc. 182, ¶ 682)

18. Hovis had no further direct communications with Loe. (Hovis 108)

19. Hovis also never saw Loe again. (Hovis 72)

20. Following LSU's Title IX investigation and response, Hovis' mother sent the following email to Stewart:

    Good morning, Jennie. It's Karrie Hovis, Corinn's mom. I wanted to reach out and say thank you. We appreciate everything you did to help us through Corinn's case. The news has been harsh about how the university handles [T]itle IX cases. I can't speak for other victims['] parents, but for us, you went over and above to help us navigate the process. Corinn is doing so well, and we attribute that to how you helped her through this situation. Thank you again! (Hovis Exh. 7; Hovis 139-140)

21. Following issuance of the no-contact order to Loe, Hovis received two direct messages on Instagram that she assumed were sent on behalf of Loe. (Hovis 108-110; Sanders Exh. 2)

22. Hovis said one was from Tia Martin, who represented herself as Loe's possible girlfriend, and the other was from "an anonymous football account," who Hovis also believed to be Tia Martin. (Hovis 108-109; Sanders Exh. 2)

23. After Hovis received the first message from an anonymous Instagram account, "lsufootballupdates2020," Hovis forwarded the message to Jonathan Sanders on May 8, 2020. (Hovis 109-110; Sanders Decl. ¶ 16, Exh. 12)

24. Sanders responded almost immediately, thanking Hovis for letting him know, asking whether she knew the identity of the person, encouraging her to block the sender, and informing her that he would look into the situation. (Sanders Decl. ¶ 16, Exh. 12)

25. Hovis replied that she did not know the identity but would block them immediately and thanked Sanders for his help. *Id*.

26. Sanders contacted Miriam Segar, Sr. Associate Athletics Director/SWA to determine if LSU Athletics knew the owner of the account. (Sanders 156; Sanders Decl. ¶ 16, Exh. 13) Segar confirmed that the account was not associated with LSU. *Id*.

27. Sanders also contacted LSUPD to determine if there was a way for LSUPD to determine the account ownership. (Sanders Decl. ¶ 16, Exh. 13) LSUPD responded that a criminal investigation would be required in order to determine the account owner, and that at this point, the messages did not show criminality. *Id.*

28. The second Instagram message came from a different sender, who referred to herself as Loe's "on-and-off again girlfriend" and asked Hovis to "have mercy on [Loe], don't pursue that." (Hovis 108-110)

29. Hovis forwarded the message to Jennie Stewart on May 11, 2020, who responded that she was so sorry that Hovis had to deal with this and said that Stewart would "work on it." (Hovis 110).

30. Hovis also forwarded the message to Sanders that same day, who responded that he was "so sorry to hear that" and "would be happy to look further into this as well." (Sanders Decl, ¶ 17, Exh. 14)

31. LSU contacted Loe about the communications by email. (Sanders Decl. ¶ 17, Exhs. 15, 16)

32. LSU reiterated the no-contact prohibitions which included no contact to Hovis through a third party. *Id.*

33. The communications ceased after Hovis notified LSU. (Hovis 110, 132)

34. Hovis does not know whether the two social media messages were sent on Loe's behalf. (Hovis 110-111).

35. LSU received no information showing Loe that instigated the messages. (Hovis 111)

36. Loe denied to LSU that he had any knowledge of the communications. (Sanders Decl. ¶ 17, Exh. 15, 16)

37. LSU's no-contact directive to Loe specifically advised him of this particular prohibition. (Sanders Decl. ¶ 15, Exhs. 10, 11) It stated, among other things, ". . . Both you and Corinn Hovis are to refrain from: . . . 4. Contacting or communicating with one another, **including through a third party, social media, or in any way at any time**. . ." (Sanders Decl. ¶ 15, Exhs. 10, 11) (emphasis added)

38. Hovis also received a copy of this directive to Loe. (Sanders Decl. ¶ 15, Exh. 11)

5

39. After Hovis received the second message, Scott contacted Loe about the communications, stating by email on May 15, 2020:

> It has come to my attention that persons claiming to be associated with you, one in particular claiming to be your "on and off girlfriend," have been contacting Corinn Hovis. I wanted to take this opportunity to remind you of the **No Contact Order** between yourself and Corinn that was referenced in the letter sent to you on May 1, 2020, from Dr. Jonathan Sanders Associate, Dean of Students. (Sanders Decl. ¶ 17, Exhs. 13, 14)

40. Scott further reiterated Loe's no-contact prohibitions, which included no contact to Hovis through a third party. *Id.*

41. Hovis sent the third-party communications to LSU on May 8 and May 11, 2020, respectively, and Scott contacted Loe and advised Loe of the violation on May 15, 2020. (Sanders Decl. ¶ 17, exh. 13, 14)

42. The Board's written official policy, Permanent Memoranda 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203, Stewart Exh. 2)

43. PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy." (Stewart Exh. 2)

44. The Board's policies were promulgated to students and staff alike before and after Hovis' assault. Board 30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 256-261; Stewart 38-

45. Employees, non-employees, and students, including Hovis, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX

6

representative, or through Maxient, and Hovis utilized the Title IX system. (Board 30(b)(6) I 51-52)

46. Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. *Id.* at 53-54.

47. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37)

48. In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39,41-43) Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) 39, 42-44)

49. Like other students, Hovis and her alleged assaulter, Loe, received MyStudentBody training. (Sanders Decl. ¶ 3) Because of his role as a student athlete, Loe received additional training through the Dan Beebe Group/Protection for All. (Segar Decl. ___)

50. The LSU Office of Internal Audit conducted an audit regarding Title IX obligations, specifically sexual misconduct (the "Audit"). (R. Doc. 1-1, p. 164)

51. The audit reviewed activities between June 1, 2015 and December 31, 2016, years before Hovis' alleged assault, and its findings related to multiple campuses. *Id*.

7

52. The Audit noted that PM-73 was already in place since 2014, pre-dating the audit's review period and Hovis's enrollment, and it acknowledged that the Athletics Department already required student athletes and coaches to attend an annual comprehensive training session on Title IX provided by a consultant, Dan Beebe Group Consulting. (R. Doc. 1-1, p. 166)

53. Audit Finding No. 2 related to "Obligations of Responsible Employees" contains only two findings that were possibly be related to LSU's Baton Rouge campus:

    - "Confusion at multiple campus regarding victim confidentiality when incidents are disclosed to an employee holding licenses that typically protect personal information; and

    - Lack of coordination with LSU A&M policy at [sic] due to interpretation of state statute."

54. Neither finding relates to Hovis.

55. As to the first bullet, the Audit acknowledged that all employees are required to report a potential incident within 24 hours, with the exception of privileged individuals (confidential advisors, victim advocates, mental health counselors, and clergy). (R. Doc. 1-1, p. 168) The Audit also noted the differing reporting obligations in place for employees who may possess certain professional licenses but who are "not engaged in employment with the University in a capacity offering such privilege," such as a psychologist employed as a professor versus a psychologist employed at the Student Health Center. (R. Doc. 1-1, p. 168) The Audit recommended that management "ensure confidential advisors have been clearly identified and all employees understand

8

the applicability of the exceptions to sexual misconduct reporting obligations." (R. Doc. 1-1, p. 169)

56. The Audit did not find that Responsible Employees were not properly trained.

57. As to the second bullet, the Audit recommended seeking guidance from the Attorney General's office regarding the applicability of La. R.S. 46:1844, relating to disclosure of a victim's identity who has been subjected to a crime. (R. Doc. 1-1, pp. 168-169) This finding does not relate to responsible employee training in the context of Hovis' case.

58. University management set forth specific steps it would take to implement the Audit's recommendations, including that management agreed to ensure that "[a]ll Confidential Advisors have received the state created and required training as of October 16, 2017" and to "[w]ork with LSU A&M HRM to consider the option of embedding language recognizing the privilege of employees whose employment duties and licensure afford a confidential privilege." (R. Doc. 1-1, p. 174)

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

BY: /s/ *Susan W. Furr*
Shelton Dennis Blunt Bar Roll No. 21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.: 30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436
Michael B. Victorian Bar Roll No.: 36065

9

II City Plaza | 400 Convention Street, Suite 1100<br>
Baton Rouge, Louisiana 70802<br>
Telephone: 225 346 0285<br>
Facsimile: 225 381 9197<br>
Email: dennis.blunt@phelps.com<br>
Email: susie.furr@phelps.com<br>
Email: karleen.green@phelps.com<br>
Email: jessica.huffman@phelps.com<br>
Email: molly.mcdiarmid@phelps.com<br>
Email: greg.stevens@phelps.com<br>
Email: michael.victorian@phelps.com<br>
<br>
ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr

10

PD.42458661.1