

# EXPERT REPORT

*Abby Owens et. al.*
*v.*
*Board of Supervisors of Louisiana State University*

**U.S. District Court**
**Middle District of Louisiana**
**3:21-cv-00242**

**CONFIDENTIAL**

**March 1, 2023**

**REPORT BY:**

**BRETT A. SOKOLOW, J.D.**
**CHAIR, TNG**

Exhibit 1 page 1 of 58

# Table of Contents

QUALIFICATIONS AND EXPERIENCE ................................................................................................ 3

PREVIOUS EXPERT WITNESS WORK ............................................................................................... 4

BILLING RATE ................................................................................................................................... 4

BASIS FOR OPINIONS AND CONCLUSIONS ..................................................................................... 4

EVIDENCE REVIEWED ...................................................................................................................... 4

    Relevant Individuals.............................................................................................................................5

REBUTTAL OF PLAINTIFF'S EXPERT WITNESS OPINION AND CONCLUSIONS ................................ 6

OVERVIEW OF TITLE IX & THE STANDARD OF CARE ...................................................................... 7

THE UNIVERSITY & TITLE IX'S GENERAL APPLICABILITY ................................................................ 8

TITLE IX INDUSTRY STANDARDS ..................................................................................................... 8

    Training & Title IX Industry Standards ...............................................................................................10

    Athletics Compliance Industry Standards ..........................................................................................11

    Grievance Procedures Industry Standards .........................................................................................12

    Industry Standards, Compliance, and Enforcement from 2011-2020 ................................................16

TITLE IX DELIBERATE INDIFFERENCE FRAMEWORK ..................................................................... 17

    Overview of Deliberate Indifference ..................................................................................................17

    Industry Standards and Harassment/Discrimination Policies & Procedures .......................................19

    Notice & Industry Standards...............................................................................................................21

DISCUSSION .................................................................................................................................. 24

    *Incidents involving John Coe - Calise Richardson and Jade Lewis* .....................................................25

    *Incidents involving* ▌▌▌ *John Doe - Ashlyn Mize (Robertson), Samantha Brennan, Abby Owens, Calise*

    *Richardson*........................................................................................................................................33

    *Sarah Beth Kitch*................................................................................................................................43

    *Elisabeth Andries*..............................................................................................................................45

    *Kennan Johnson*................................................................................................................................48

    *Jane Doe*...........................................................................................................................................49

    *Corinn Hovis* .....................................................................................................................................51

    A Reasonable Jury Could Conclude that LSU's Actions Were Not Clearly Unreasonable ........................53

CONCLUSION ................................................................................................................................. 55

**Exhibit 1 page 2 of 58**

## QUALIFICATIONS AND EXPERIENCE

I currently serve as Chair of the TNG Board of Directors and the TNG Management Committee. I received my Juris Doctorate in 1997 from the Villanova University School of Law. I am licensed to practice in Pennsylvania and New Jersey. I have a B.A. in International Studies from the College of William and Mary, which I received in 1993.

I have been a consultant to the education field since 1997. I founded TNG (formerly The NCHERM Group, LLC) in 2000. Today, it is one of the largest education-specific law and consulting practices in the country. TNG currently serves as legal counsel to more than 60 colleges, universities, and school districts, and has served more than 400 since its inception. TNG consults with more than 500 colleges and schools each year.

I have served as a guest speaker/educator for students on alcohol, sexual assault, hazing, and risk management to over 2,200 colleges and schools, and have provided risk management consulting and/or legal services to the administrations of more than 4,000 colleges, universities, schools, fraternities, sororities, chapters, governmental agencies, and military institutions. I have consulted on litigation, liability, negligence, foreseeability, special relationships, duty of care, supervision, school safety, threat assessment, event management, student organizations risk management, risk mitigation, insurance, FERPA compliance, ADA, Section 504, Title IX, Title VII, Title VI, Title IV, the Clery Act, state law, 1st Amendment, academic freedom, search and seizure, admissions, and dozens of other areas impacting education law.

I have been involved with more than 1,000 school and campus sexual misconduct cases as an investigator, trainer, consultant, expert, advisor, decision-maker, appeal decision-maker, Title IX administrator and attorney. I have previously served as the President of ATIXA, the Association of Title IX Administrators, and currently serve as the Chair of the ATIXA Advisory Board. This association is the primary professional development venue for Title IX in the United States, with more than 10,000 members. ATIXA provides certifications to administrators responsible for coordination of Title IX compliance. ATIXA has certified more than 59,000 Title IX Coordinators and Civil Rights Investigators since 2011.

I have written codes of conduct for more than 200 colleges, universities, and schools and have done extensive policy and handbook development for school districts and colleges across the country. The ATIXA Model Sexual Misconduct Policy is in use by hundreds of colleges and universities, has been approved by the US Department of Justice and has been accepted to resolve complaints by the US Department of Education's Office for Civil Rights (OCR). I have provided hearing panel training to boards and administrators on more than 1,000 college and university campuses in the US and Canada.

I have authored fifteen books and more than 100 articles in my field, including "College and University Liability for Violent Campus Attacks" published in the peer-reviewed Journal of College and University Law in April of 2008, and five other peer-reviewed journal articles in various publications. I have presented at well over 100 state, regional, and national

Exhibit 1 page 3 of 58

conferences, including dozens of keynote addresses. From November 2021 to February 2023, I served as the Acting Title IX Case Manager for Connecticut College.

Through my experience as an attorney and consultant to colleges, universities, and schools, I have developed a special expertise in sex discrimination, sexual misconduct, and negligence related to institutional creation and remediation of hostile environments.

This is a summary of my background and qualifications. A copy of my curriculum vitae has been provided separately.

## Previous Expert Witness Work

See attached CV.

## Billing Rate

$850/hr.

## Basis for Opinions and Conclusions

I base my analysis of and opinions in this matter on my education and 25 years of professional experience as legal counsel to dozens of colleges and as a consultant to thousands of colleges and schools; on my research, writing and publications on alcohol, hazing, liability, sexual misconduct, threat assessment, and risk management, and on other publications regarding these topics generally known and respected as authoritative in the education community; on information, dialogue, and exchange with my peers and colleagues; from my experiences and involvement in professional associations, and the respect my organizations command as helping to define best practices for risk management in the field of higher education. I have reviewed the documents provided to me by counsel regarding this case as well as any commonly available by a Google™ search with respect to this case. All opinions stated are held to a reasonable degree of professional certainty. A list of documents reviewed has been provided below.

## Evidence Reviewed

- **Litigation Documents**
  - Second Amended Complaint
  - Report of Lin-Chi Wang, 1/6/23 with Exhibits (Wang Report)

- **Depositions**
  - Abby Owens Deposition Transcript 9/27/22
  - Ashlyn Mize Deposition Transcript 10/10/22
  - Calise Richardson Deposition Transcripts 9/22/22, 10/21/22

Exhibit 1 page 4 of 58

- o  Corinn Hovis Deposition Transcript 9/28/22
- o  Donovan White Deposition Transcript 11/15/22
- o  Elisabeth Andries Deposition Transcript 9/23/22
- o  Jade Lewis Deposition Transcripts 10/7/22, 12/2/22
- o  Jane Doe Deposition Transcript 10/5/22
- o  Jennie Stewart Deposition Transcript 11/9/22
- o  Jonathan Sanders Deposition Transcript 1/20/23
- o  Julia Sell Deposition Transcript 1/30/23
- o  Keava Soil-Cormier Deposition Transcript, 1/25/23
- o  Kennan Johnson Deposition Transcript 10/6/22
- o  Mike Sell Deposition Transcript 1/31/23
- o  Miriam Segar Deposition Transcripts 11/1/22-11/2/22
- o  Samantha Brennan Deposition Transcript 9/26/22
- o  Sarah Beth Kitsch Deposition Transcript 10/12/22
- o  Sharon Lewis Deposition Transcript 10/27/22-10/28/22
- o  Verge Ausberry Deposition Transcripts 11/3/22-11/4/22

- **Other Documents Reviewed**
  - o  Husch Blackwell 3/3/21 Report (HB Report), with Exhibits

## Relevant Individuals

*Note: As this matter involves information spanning over a decade, titles and positions were in flux.*

- **Jennie Stewart** – LSU Title IX Coordinator 2016 – 2021
- **Miriam Segar** – LSU Senior Associate Athletic Director/Senior Woman Administrator
- **Verge Ausberry –** Executive Deputy Athletic Director/Executive Director of External Relations
- **Jonathan Sanders –** Director of Student Advocacy & Accountability (SAA)
- **Abby Owens –** Plaintiff, former LSU tennis player
- **Ashlyn Mize/Ashlyn Robertson –** Plaintiff; former LSU Student
- **Calise Richardson –** Plaintiff; former LSU Student
- **Corinn Hovis –** Plaintiff; former LSU Student
- **Elisabeth Andries –** Plaintiff; former LSU Student
- **Jade Lewis –** Plaintiff; former LSU tennis player
- **Kennan Johnson –** Plaintiff; former LSU tennis player
- **Jane Doe –** Plaintiff; former LSU student
- **Samantha Brennan –** Plaintiff; former LSU student
- **Sarah Beth Kitch –** Plaintiff; former LSU student
- **Sharon Lewis –** Plaintiff in separate proceedings; former Assistant Athletic Director of Football Recruiting and Alumni Relations
- **Keava Soil-Cormier**- Employee in the football recruiting office, reported to Sharon Lewis
- **Donovan White** – Former Athletic Trainer at LSU
- **Jeffrey Scott** – Former LSU Title IX Investigator

Exhibit 1 page 5 of 58

- **John Coe** – Former LSU student, accused of assaulting Jade Lewis and Calise Richardson
- ████████ **John Doe** – former LSU student, accused of assaulting or attempting to assault Ashlyn Mize, Abby Owens and Calise Richardson, accused of taking/showing a nude photo of Samantha Brennan.
- **F. King Alexander** – Former LSU President
- **Ed Orgeron** – Former LSU head football coach
- **Les Miles** – Former LSU head football coach
- **Joe Alleva** – Former LSU Athletic Director
- **Scott Woodward –** LSU Athletic Director
- **Julia Sell** – Former co-coach of LSU women's tennis
- **Mike Sell –** Former co-coach of LSU women's tennis
- **Mari Fuentes-Martin** – Former Associate Vice President, Dean of Students at LSU

## REBUTTAL OF PLAINTIFF'S EXPERT WITNESS OPINION AND CONCLUSIONS

- Louisiana State University Agriculture and Mechanical College ("LSU") is the main campus of the Louisiana State University system. LSU is located in Baton Rouge, LA. As a recipient of federal funding, LSU must comply with federal laws, including Title IX.
- In 2016, LSU hired its first full-time Title IX Coordinator to oversee Title IX compliance for the system – a role previously occupied by an external attorney with LSU personnel in Human Resources and the Dean of Students being involved in employee and student cases, respectively. Additionally, due to the similar requirements under NCAA rules and bylaws, gender equity as it relates to Athletics was largely overseen by athletics staff.
- Between 2016 and 2020, LSU hired additional staff in the Title IX Office to respond to sexual harassment to allow for additional individuals to assist with overseeing compliance in Athletics.
- In 2020, an online article was published detailing the stories of several LSU-affiliated individuals who experienced some form of sexual or intimate partner violence. Over the next several months, LSU contracted with an outside firm to conduct a review of LSU's response to those, and other, instances of sexual misconduct since 2012. The review made a series of recommendations based on "national trends, well recognized best practices, and … the input of the University community" and highlighted areas where LSU did not follow "industry standards, best practices and/or LSU's own policies." Throughout the report, there is no further or meaningful distinction between these three very different concepts. Generally, higher education views its practices as falling between the range of the floor and the ceiling. The floor is the baseline of required practices identified as industry standards, which all recipients must meet. When the term "compliance" is used in the Title IX context, the question is whether or not the floor of industry standards is being met. The ceiling is reflected by best practices, those things all schools should aspire to in order to accomplish programmatic excellence. Schools are not required to attempt or achieve best practices, though both the Husch Blackwell report and the Plaintiffs' expert try to blur the line between what is mandated and what is pie-in-the-sky. In fact, what is and what is not a best practice is widely

Exhibit 1 page 6 of 58

debated, and it's most accurate to consider that a range of practices can result in excellence, rather than there being one right way. Policies may reflect industry standards, best practices, or some combination. Sometimes, policies deviate from industry standards, as well, which could be evidence of negligence.

- After that review, 10 plaintiffs filed suit claiming that LSU acted with "deliberate indifference" that contributed to or caused their assaults between 2012 and 2020, the majority of which neither occurred on LSU's campus nor were reported to LSU administration or law enforcement close in time to the incident.

- The Plaintiffs retained the services of Lin-Chi Wang (Wang), a solo-practitioner attorney with prior experience as a Title IX Coordinator and investigator.[1] Wang is a self-proclaimed expert on interpreting and implementing Title IX compliance requirements who provided her findings and assessment in support of the Plaintiffs' claims (hereafter referred to as the "Wang Report"). This report offers a rebuttal to Ms. Wang's findings which overwhelmingly rely upon the Complaint rather than on the record evidence. Despite her claims to expert status, Wang misunderstands the legal basis for sufficient claims under Title IX and has difficulty distinguishing between sub-regulatory and regulatory guidance, regulations, and law. Wang liberally interchanges best practices (which carry no legal obligation) with industry standards (which serve as a baseline for legally-required actions) and conflates and misconstrues the meanings of these terms, and their appropriate applications, in such a way as to undermine the validity of her assessments and render her report and its conclusions without value.

## OVERVIEW OF TITLE IX & THE STANDARD OF CARE

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §1681 et seq., "…is a comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity. The principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices. Title IX applies, with a few specific exceptions, to all aspects of federally funded education programs or activities. In addition to traditional educational institutions such as colleges, universities, and elementary and secondary schools, Title IX also applies to any education or training program operated by a recipient of federal financial assistance [funding recipient]."[2]

Title IX is subject to administrative enforcement by the U.S. Department of Education, via the Office for Civil Rights (OCR), as well as enforcement by the courts. While Title IX's regulations became both explicit and prescriptive in 2020, prior to that time they offered a wireframe for compliance without much detail. At the time pertinent to this litigation, all schools were required by Title IX regulations to designate a Title IX Coordinator, whose responsibility is to "coordinate its

---

[1] Wang Report, p. 1-2

[2] United States Department of Justice website, www.justice.gov, *Overview of Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §1681 et seq.*

Exhibit 1 page 7 of 58

efforts to comply with and carry out its responsibilities under this [Title IX], including any investigation of any complaint communicated to such recipient."[3]

Schools were also "required by the Title IX regulations to adopt and publish procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment."[4] OCR's regulations were duly promulgated subsequent to public notice and comment and negotiated rule making and thus have the force of law. OCR and the courts require those procedures to detail a prompt, effective, and equitable remedy, and have laid out four primary institutional requirements once a school receives notice of harassment or discrimination that falls within Title IX's protections:

1. **Investigation:** The funding recipient must promptly, thoroughly, and impartially investigate the discriminatory conduct;
2. **Stop the Harassment**: The funding recipient must bring an end to the discriminatory conduct;
3. **Prevent its Recurrence:** The funding recipient must take steps reasonably calculated to prevent the future recurrence of the discriminatory conduct;
4. **Remedy the Discriminatory Effect:** The funding recipient must restore the victim to their pre-deprivation status or wholeness.

## THE UNIVERSITY & TITLE IX'S GENERAL APPLICABILITY

LSU is a state-funded university located in Baton Rouge, LA and serves as the main campus of the Louisiana State University System. The System has eight additional campuses located throughout Louisiana and a virtual campus, LSU Online. The System is a recipient of federal funds and Title IX applies to all of its educational programs or activities. As such, the System has an obligation to address incidents of sexual harassment or discrimination of which it receives notice in a manner reasonably consistent with industry standards – in a way that is not deliberately indifferent to known discrimination.

## TITLE IX INDUSTRY STANDARDS

At the time of the incidents at issue in this litigation, there was no published, recognized, collected source of standards legally required to ensure Title IX compliance. Some industries have clear standards (e.g., ISOs in manufacturing), whereas the education industry has tried to comply with Title IX without an authoritative source of standards. Thus, the standard of care in Title IX cases must be discerned via applicable statutes and regulations, case law, and the customs and practices commonly adopted within the field or profession. An examination of these elements serves to inform the standard of care in a negligence action and the industry standards in a Title IX action (the concepts are reasonably interchangeable, substantively).

---

[3] 34 C.F.R. 106(a).
[4] Department of Education, Office for Civil Rights (2001). *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, p. 14.

Exhibit 1 page 8 of 58

As noted, regulatory requirements will constitute industry standards, though they don't comprehensively address all compliance elements and questions. However, sub-regulatory guidance does not have the force and effect of law, and any effort by Plaintiffs' expert Wang to characterize sub-regulatory guidance as industry standards is inapposite, unless the practices recommended by sub-regulatory guidance become so widely adopted that it becomes fair to say they have become industry standards. Wang's level of experience does not suggest to me that she has the breadth of experience necessary to have these industry-wide insights sufficient to help a court to determine whether that level of widespread adoption may have existed at the time of the incidents underlying this litigation.

Title IX governs some obligations of educational institutions with respect to sex and gender discrimination, which includes sexual harassment and sexual assault. The statute and the Department of Education's implementing regulations prohibit discrimination on the basis of sex in a school's "education program or activity," which includes "all" of the school's operations.[5] Title IX applies to every public and private school that receives federal funds, including elementary and secondary schools, as well as colleges and universities.[6] A school specifically agrees, as a condition of receiving federal funds, to operate all of its programs and activities in compliance with Title IX and the Department of Education's Title IX regulations.[7]

Since regulations were first promulgated under Title IX in 1975,[8] there has been a requirement that a school "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b). It has also long been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX."[9] "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual assault, stalking, and domestic/dating violence. Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.[10]

In 1997, OCR published in the Federal Register[11] a document entitled *"Sexual Harassment Guidance; Harassment of Students by School Employees, Other Students, or Third Parties."* OCR published the document to set forth "the standards that are used by [OCR], *and that institutions should use,* to investigate and resolve allegations of sexual harassment of students engaged in by

---

[5] 20 U.S.C. §§ 1681(a), 1687.

[6] *Id. §* 1681(c).

[7] 34 C.F.R. § 106.

[8] U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001)) *("Revised Sexual Harassment Guidance").*

[9] *Id.*

[10] *Id.* at 2-3 & nn.2, 3, 6, 8, 20.

[11] 62 Fed. Reg. 12034 (March 13, 1997).

**Exhibit 1 page 9 of 58**

school employees, other students (peers), or third parties."[12] In January 2001, OCR published a *"Revised Sexual Harassment Guidance,"[13]* which "continues to provide the principles *that a school should use* to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving federal financial assistance."[14]

The regulations —requiring each school to have, *inter alia,* "prompt and equitable" procedures for the resolution of student-on-student sexual assault allegations— "have the force and effect of law," for they affect individual rights and obligations. *Chrysler Corp. v. Brown,* 441 U.S. 281, 295, 301-02 (1979). The same is true for OCR's *Revised Sexual Harassment Guidance,* published in 2001. This interpretation of the regulations was published in the Federal Register and was subject to public comment.[15] As such, it is entitled to deference, under the doctrine articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). The same can be said for OCR's most recent regulations which were published in May 2020 after going through the requisite rulemaking process and public comment period.[16]

Reflecting the lack of collected standards, OCR recognized that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes, and administrative structures, State or local legal requirements, and past experience."[17] Nevertheless, OCR has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirement of the regulations. To this end, between 2011 and 2018, OCR issued a number of non-regulatory and sub-regulatory (or even sub-sub-regulatory) guidance in the form of "Dear Colleague Letters" and "FAQ" documents that were not subject to the rulemaking process articulated in *Chevron*.

## Training & Title IX Industry Standards

Prior to 2020, Title IX and its implementing regulations did not require specific training to be offered to employees or students, though there were some generalized training references in the *2001 Guidance*. Over time, some level of training has become commonplace at institutions. This training can take many forms – whether online, via document, or in person – and as there is no requirement, there is no specific length of training or number of hours that must be completed. Under industry standards for Title IX, there is also no requirement to show that the training (in any form) was effective, or that every trainee internalized the components of the training.

As a best practice (an aspiration, not a legal obligation), schools should therefore make efforts to train all their responsible employees on their reporting obligations related to Title IX, but there is also no explicit requirement under Title IX industry standards that a school ensure that

---

[12] *Id.* (emphasis added).
[13] *See* note 2 *supra.*
[14] Revised Sexual Harassment Guidance at i (emphasis added).
[15] *Revised Sexual Harassment Guidance* at ii.
[16] 85 FR 30026 (May 19, 2020).
[17] *Revised Sexual Harassment Guidance* at 20.

Exhibit 1 page 10 of 58

every single employee has been trained; rather, schools are to make good faith efforts to do so. Many schools initially train employees during new employee orientation and provide policy bulletins or updated training as either refreshers, or to provide updates on law or policy. There is no set requirement for the frequency with which such training is to occur. Rather, guidance and sub-regulatory guidance from OCR indicates that such training should be performed "regularly," which is construed anywhere from annually to every three or four years.

In its formative *2001 Guidance* on Title IX in schools the Department of Education's Office for Civil Rights wrote:

> *Schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials. Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.* [18] *(2001 Guidance, p. 13).*

This guidance was reiterated virtually verbatim in OCR's 2011 Dear Colleague Letter on Title IX and Sexual Violence, after which OCR added:

> *Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond.* [19]

Of course, a failure to train is not itself actionable as a violation of Title IX, or as negligence. It is only when the failure to train causes a failure of compliance, resulting in deliberate indifference, that the failure to train becomes salient.

## Athletics Compliance Industry Standards

Title IX requires institutions to provide equal opportunities based on sex for all clubs and organizations – including intercollegiate teams and athletics programs.[20] Generally, athletic programs are evaluated by examining three questions:
- Are students' interests and abilities being met?[21]
- Is the institution awarding athletic scholarships equitably?[22]

---

[18] 2001 OCR Guidance Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, p. 13. Note that the 2001 OCR Guidance was withdrawn by the Department of Education in 2020.
[19] OCR DCL, p.4. Note that the 2011 DCL was withdrawn by the Department of Education in September 2017.
[20] OCR Guidance - Title IX and Athletic Opportunities in Colleges and Universities: A Resource for Students, Coaches, Athletic Directors, and School Communities, 2023.
[21] 34 CFR 106.41(c)(1)
[22] 34 CFR 106.37(c)

Exhibit 1 page 11 of 58

- Are men's and women's teams treated equitably?[23]

Assessing these questions often involves having at least basic knowledge of the programs offered and, in certain instances, can involve examining particular nuances of the various athletics teams to determine whether equal opportunities are truly being provided.

For those institutions that are members of the NCAA, similar requirements exist related to gender equity. These institutions are also required to designate the most senior female administrator within athletics as the Senior Woman Administrator (SWA).[24] In addition to designating an SWA, institutions have to have at least one "Compliance Officer" responsible for the oversight of all NCAA compliance areas and the SWA and the Compliance Officer often work together with respect to meeting the NCAA requirements with respect to gender equity. Many of the NCAA requirements generally align with requirements under Title IX.

Given this overlap, it has become common for Title IX Coordinators to designate, formally or informally, an official within Athletics, typically the SWA, to assist the Title IX Coordinator in monitoring Athletics compliance under Title IX as it relates to gender equity. This person often has zero role in the resolution of complaints of sexual harassment or any other form of sex-based discrimination aside from mandated reporting requirements. It is common for athletics departments to require and oversee internal training efforts for student-athletes and athletics staff on a myriad of prevention efforts, including identifying, preventing, and responding to sexual harassment.

## Grievance Procedures Industry Standards

Institutions have, through custom, practice, and the mandates of the law, developed a common set of appropriate resolution procedures. Those procedures commence with a complaint or notice. That complaint can be formal or informal. Although informal complaints at some schools result in no action in certain circumstances, others result in informal actions such as warnings, or no-contact orders. When formal action is requested, it is almost always initiated by the alleged victim or, more rarely, by credible information provided by a third party. Any action, whether formal or informal, must both grant complainants certain rights and not infringe upon any due process owed to respondents. There are five phases of a typical school disciplinary process for a serious incident like a sexual assault: (1) the preliminary inquiry/gatekeeper phase; (2) the formal investigation phase; (3) the charging/notice phase; (4) the hearing phase; and (5) the appeal phase.

**Gatekeeper Phase.** The term "gatekeeper" refers to an initial evaluation, frequently known as a preliminary inquiry, as to whether the alleged victim's complaint facially alleges sufficient facts to initiate the discipline process and whether the facts as alleged fall within the school's jurisdiction. The gatekeeper phase typically begins with an initial evaluation of the sufficiency of

---

[23] 34 CFR 106.41(c)(2)-(10)

[24] https://www.ncaa.org/sports/2016/3/2/gender-equity-and-title-ix.aspx

the alleged victim's complaint. This evaluation is performed by a school official, usually the person in charge of the process. In most schools, that person is the Title IX coordinator or their designee. This official determines if there are statements or inconsistencies in the complaint that cause serious doubt as to whether a sexual assault (or sexual harassment) occurred, whether the accused student is the perpetrator, and even whether, if true, the alleged misconduct would be a violation of school policy. After or as part of this initial evaluation, sometimes the school will conduct a preliminary investigation if more facts are needed. Finally, if the complaint has passed the initial evaluation, then there is a second determination made by the school official: whether reasonable cause exists to believe that the school's sexual misconduct policy has been violated and whether there is sufficient evidence to charge the alleged perpetrator. This may include determining whether the school has jurisdiction to take disciplinary action if the policy has been violated. If the complaint fails to make it through these two stages of the gatekeeper phase, no official action is taken by the school and the complaint is closed. Otherwise, the complaint proceeds to the next phase.

**Formal Investigation Phase**. In the formal investigation phase, the person in charge of the process appoints an investigator or sometimes a team of two investigators drawn from the administration, who interview witnesses and gather relevant evidence. It is more common for institutions with a full-time investigator to conduct investigations without a secondary investigator. Rarely are campus police used to investigate claims under Title IX except in a supportive role, because of the potential conflict of interest between investigating both a crime and a potential civil rights violation, simultaneously. The investigator typically interviews the alleged victim, the alleged perpetrator, witnesses to the event itself, and anyone else with potentially relevant information. The investigator must be trained in the investigation of sexual assault allegations. The investigation commonly takes place before the school charges the accused student, as the investigation is the basis of the charge, though some schools will give an initial charge notice before or during the investigation, subject to updates or revision as the investigation unfolds and more evidence is discovered.

**Charging/Notice Phase**. In the charging/notice phase, the charges, if any, are determined and the accused student is given notice of the charges. It is important to distinguish between the allegations made by the alleged victim and a formal charge brought by the school (or, more accurately, the school's disciplinary mechanism for charges of sexual assault). An accuser's allegations are not a formal charge. The school undertakes a formal process – the gatekeeper and investigation phases – before determining whether the school will charge the accused with sexual assault and any other offenses within its policy and/or Code of Student Conduct. A school official – usually the Title IX coordinator– determines, based on the investigation, the appropriate offense(s) to charge or decides that no charges should be brought.

Notice to the alleged perpetrator – commonly called the respondent or responding party – usually occurs at the end of the investigation, or whenever the respondent is questioned. At the end of the investigation, the charges should be dropped if the investigation determines that no policy was violated or that the complaint is baseless or false, or that a case of mistaken identity has occurred.

Exhibit 1 page 13 of 58

If the respondent is questioned during the course of the investigation, they may also be informed of the formal charge if it has been determined by the time of that interview, but would always be informed of the nature of the allegations, at least. The industry standard is to charge with specificity once a charge is issued. This commonly takes the form of a written statement transmitted from the school to the alleged perpetrator. The statement typically includes all alleged violations, some description of the circumstances underlying those allegations, references to the applicable policies and procedures, the sanctions that can result, information about a support person/advisor, and who to contact for further information. It may also include notice of the hearing date, time, and location.

The notice of the charges is given to or mailed to the respondent, and the respondent is typically given a chance to meet with the person in charge of the process. At this meeting, the respondent is often given a summary of the complaint, or a copy of the alleged victim's statement. It is also common to summarize the investigative findings or share a copy of the investigation findings or report with the accused student, prior to the hearing. Some schools separate notice of the charges and notice of the hearing, and some may at this point wait until the accused student has a chance to respond to the allegations before scheduling the hearing.

If a student admits the violation at this point, many schools use an informal "hearing" structure to implement administrative findings and sanctions. If the student denies the complaint and/or contests the findings of the investigation, they are often given a chance to formulate a written response to the complaint, if they have not had a chance to do so already in the course of the investigation or respond in writing to the investigation report.

Once the respondent's statement is submitted to the administration, they are given notice of the formal hearing or resolution. A no contact order or similar restriction is sometimes put in place between the parties at this point, at the latest. In the field, it is customary to provide a minimum of 5-7 business days for the respondent to prepare for the hearing/resolution. Advisors and advocates for both parties may be identified and consulted at this time, if permitted. Within 24-48 hours of the hearing/resolution, the parties are usually given a list of the names of the hearing officers, so that they may raise objections on the grounds of bias. If a formal hearing format is used, the parties are asked to provide a list of the witnesses they wish the school to call at the hearing, and copies of documentary evidence they will be offering. This information is usually exchanged between the parties and shared with the panel/hearing officer 24-48 hours prior to the hearing. The school also exchanges documentation between the parties, typically between 24-48 hours prior to the hearing, including a list of any witnesses it will call and copies of all written statements and the investigation report, if it has not been shared already. Direct witnesses are common, character witnesses are not. Sometimes, written statements can be submitted in lieu of character witnesses appearing before the panel/hearing officer, or when fact witnesses are unwilling or unable to attend the hearing. Some schools have a less formal decision-making step, where a decision-maker conducts a paper review of the record, asks questions of the parties, elicits questions from the parties, and then makes a decision without an in-person formal hearing.

Exhibit 1 page 14 of 58

**Hearing Phase.** At the hearing, some campuses use an adversarial model, with the parties making their own arguments, making opening and closing statements, calling and questioning their own witnesses and each other, and being questioned by the panel. The complainant and witnesses are questioned by the panel/hearing officer and respondent. Then, the respondent presents, calls witnesses, and questions come from the complainant and panel/hearing officer. The chair or another administrator is usually present as a custodian of the process, and to answer any procedural questions, questions about evidence, or policy.

At other schools, the parties are more like witnesses, and proxies or administrators make the arguments and conduct the hearing. If parties question witnesses or each other, they do it through their proxies or through the panel/hearing officer. Still other schools use shuttle diplomacy, with parties coming before the panel/hearing officer as needed, but without direct contact or confrontation with each other, or with witnesses. Hearings are almost always recorded or transcribed. Attorneys are rarely permitted to represent clients at the hearing itself, and if present, are not actively involved in the process except to advise their clients. Many schools engage outside counsel to serve as hearing officers.

Once the evidence is given, and all questions are answered, the panel/hearing officer goes into closed session to deliberate and make its finding. The findings are made on each alleged policy violation, with a determination made by a preponderance of the evidence. The panel/hearing officer then determines or recommends sanctions based on the finding, which are then shared with the parties. It is not uncommon for another administrator or department to have ultimate control over sanctions. Outcomes are often shared in person and in writing, with a summary of findings, rationale, and appellate options.

**Appeal Phase**. At many schools, the parties are given an opportunity to appeal the finding and/or the sanction, usually within 2-3 business days of the hearing decision. For some schools, the due process hearing occurs at this step of the process, rather than the prior step. Typical grounds for appeal are bias, procedural error, new evidence, disproportionate sanction, and sometimes, erroneous finding. The appeal is heard by a committee or single officer, often someone who supervises the original hearing officer(s). Appellate officers can be deferential to the panel/hearing officer at some schools and may actively change findings and sanctions frequently at others. The appellate decision is then given to the parties. Sanctions may be implemented in the interim or withheld until the appeal is determined, but at public institutions it is common to withhold implementation of sanctions until any appeals are final.

Lastly, the final determination is made, a letter of rationale is issued, and sanctions are implemented if the policy or policies have been violated. Sometimes the appeal can result in a remand, which then resets the process back to the investigation or hearing phase. Suspension and expulsion are common for serious and repeat sex offenses. The Title IX coordinator then takes any other remedial steps as indicated, on behalf of the victim and the school community.

Exhibit 1 page 15 of 58

It is worth noting that between 2018 and 2020, institutional responses to sexual harassment began to change, at the direction of the Department of Education.[25] Particularly in this time period, institutions became more focused on ensuring that certain due process protections were in place. This resulted in many institutions issuing written notice to the respondent *prior to* conducting an investigation and allowing the respondent to participate throughout the investigation rather than only at the end. During this time, it also was becoming more common to respond to a complainant's immediate need by offering supportive measures to the complainant, rather than take interim actions against the respondent. These practices became requirements when the 2020 regulations were implemented.

## Industry Standards, Compliance, and Enforcement from 2011-2020

Industry standards pre-2011 were quite different than they have recently become. In 2011, few institutions had formally designated a Title IX Coordinator or implemented comprehensive policies, procedures, or practices for investigating and resolving Title IX-related complaints. While there was key guidance on sexual harassment and sexual violence in schools from OCR in 2001, few applied the guidance and OCR engaged in minimal enforcement. This was an era where the applicable guidelines set by OCR far outpaced the practices in the field, and very few institutions materially complied with OCR's 2001 guidance, though some level of adherence to the 1975 Title IX regulations was common.

In 2011, OCR jolted higher education by releasing what has become known in the field as **the** Dear Colleague Letter ("DCL").[26] The DCL focused on sexual violence in higher education, was only sent to colleges, and signaled a new era of significantly enhanced expectations and enforcement. In 2014, OCR released additional sub-regulatory guidance titled, "Q&A on Title IX and Sexual Violence" that provided additional considerations for institutions in addressing sexual violence on campus.

To further complicate the idea of industry standards, both the 2011 DCL and the 2014 guidance were withdrawn by OCR in the fall of 2017. Subsequent guidance from OCR was released in 2017 that emphasized school flexibility, contrary to the rescinded guidance.[27] Furthering the turn from the 2011 and 2014 sub-regulatory guidance, OCR began the rulemaking process in 2018 by publishing a Notice of Proposed Rulemaking in the Federal Registrar for public comment.[28] In May 2020, those regulations were published and emphasized that OCR was adopting more rigid standards akin to those elaborated by the Supreme Court when examining whether a school responded with deliberate indifference. Currently, OCR is in the process of another rulemaking process and new regulations are expected in May of 2023.

---

[25] Department of Education, Notice of Proposed Rulemaking 2018

[26] Department of Education, Office for Civil Rights (April 4, 2011), "Dear Colleague Letter."

[27] 2017 Q&A on Campus Sexual Misconduct.

[28] Department of Education, Notice of Proposed Rulemaking 2018.

Exhibit 1 page 16 of 58

## TITLE IX DELIBERATE INDIFFERENCE FRAMEWORK

### Overview of Deliberate Indifference

The leading Supreme Court cases impacting school liability under Title IX are *Gebser v. Lago Vista,* 524 U.S. 274 (1998) and *Davis v. Monroe County*, 526 U.S. 629 (1999). Liability via a private right of action under Title IX exists when "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the [accused party's] misconduct."[29] The *Gebser* decision continues: "Thus, a damages remedy will not lie unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination and fails adequately to respond."[30]

The *Davis* court noted that Title IX liability attaches when an institution has "control over both the harasser and the context in which the harassment occurs."[31] Behaviors that occur within school grounds are generally understood to give an institution control over the context of the harassment.[32] Deliberate indifference is nominally characterized by the courts as a "failure to act," but means much more. Funding recipients can become a party to acts of sex discrimination by a third party when a school's response to notice of sexual harassment is "clearly unreasonable in light of the known circumstances."[33] Obligations to investigate and provide adequate remedies are widely recognized by the courts as reasonable actions in response to sexual harassment.[34]

The courts have set the bar for proving "deliberate indifference" almost insurmountably high. In *Davis*, the Supreme Court specifically stated:

> We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. We thus disagree with respondents' contention that, if Title IX provides a cause of action for student-on-student harassment, "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." [Citations omitted]. Likewise, the dissent erroneously imagines that victims of peer harassment now

---

[29] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, p. 285 (1998).

[30] *Ibid.*, p. 276.

[31] *Davis v. Monroe County*, 526 U.S. 629, p. 631 (1999).

[32] *Id.* See also *Doe v. Board of Supervisors of the University of Louisiana System*, 22-00338-BAJ-SDJ, 2023 WL 143171 (M.D. Louisiana, 2023) wherein this Court declined to grant summary judgment for off-campus conduct when the Respondent had been accused five times, arrested, and allowed to enroll in another school within the system prior to harassing Doe.

[33] *Ibid.,* p. 649.

[34] *See, e.g., Tiffany Williams vs. Board of Regents of the University System of Georgia, et al.*, 477 F.3d 1282 (11th Cir. 2007); *Melissa Jennings and Debbie Keller vs. The University of North Carolina at Chapel Hill, et al.,* 482 F.3d 686 (4th Cir. 2007).

Exhibit 1 page 17 of 58

have a Title IX right to make particular remedial demands. [Citations omitted]. In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators. [Citations omitted]. School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.[35]

In sum, courts limit "deliberate indifference" actions from serving as a way of having courts substitute their own judgment for that of school administrators. Plaintiffs who have attempted to do so have had their arguments rejected. Courts have repeatedly reasserted as "well-established law that [schools have] no obligation under Title IX to 'engage in [a] particular disciplinary action,'" and that courts do not sit as "super-administrators," "second-guess[ing] school disciplinary decisions."[36]

The 5th Circuit, like other circuits, has recognized that clearly unreasonable is a "high bar" and that neither negligence nor mere unreasonableness is enough.[37] This high bar is illustrated by the established principle that a school's "general non-compliance with statutory, regulatory, and administrative guidance cannot, of itself, establish deliberate indifference."[38] Further, when looking to determine whether a school's response was indifferent, the Courts recognize that "schools are not required to remedy the harassment."[39] This Circuit has previously recognized that even ineffective responses, erroneous investigatory outcomes, the recurrence of behaviors, and/or lenient sanctions do not necessarily amount to deliberate indifference.[40] This can even be the case when, in doing so, the school fails to follow its own written policies and procedures.[41]

Under Title IX, some courts have recognized that institutions act with deliberate indifference in two situations: those where the school failed to respond (post-assault) and those wherein individuals allege the school's actions before an assault, or a previous failure to respond, increased the risk (called a heightened-risk or pre-assault claim)[42] of foreseeable harm. Here, the Plaintiff brings allegations of both types of sexual harassment.

In the 5th Circuit, when examining either type of harassment, a plaintiff must prove:
  1. The school had actual knowledge of the harassment;

---

[35] *Davis v. Monroe County Board of Education,* 526 U.S. 629, 648 (1999).

[36] *Doe v. University of Pacific,* NO. CIV. S-09-764 FCD/KJN. (E.D. Cal. Dec. 8, 2010). S*ee also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.,* 647 F.3d 156 (5th Cir. 2011) citing *Davis.*

[37] *Sanches* at 167.

[38] *Doe v. Board of Supervisors of the University of Louisiana System*, 22-00338-BAJ-SDJ, 2023 WL 143171 (M.D. Louisiana, 2023) *citing Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 612 (W.D. Tex. 2017).

[39] *Sanches v. Carrollton-Farmers Branch Independent*, 647 F.3d 156, 167-68 (5th Cir. 2011) *citing Davis.*

[40] *Sanches* at 167. *See also Doe ex rel. Doe v. Dallas Independent School District*, 220 F.3d 380 (5th Cir. 2000).

[41] *Sanches* at 169, citing *Gebser* and *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, 511 F.3d 1114 (10th Cir. 2008).

[42] *See Poloceno v. Dallas Indep. Sch. Dist.* 826 Fed. Appx. 359 (5th Cir. 2020) (Declining to recognize or adopt heightened risk as a theory of liability.)

2. The harasser was under the control of the school;
3. The harassment was based on the sex of the Plaintiff;
4. The harassment was "so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an education opportunity or benefit;" and
5. The school was then deliberately indifferent to the harassment.[43]

In summation, courts only get to the question of whether a school was deliberately indifferent *after* establishing that the school was on notice of some form of sex-based harassment that was so severe, pervasive, and objectively offensive that it effectively prevented access to the education program.

## Industry Standards and Harassment/Discrimination Policies & Procedures

Turning to some LSU-specific details, there is no requirement that recipients have stand-alone Title IX policies, though most do (even if they don't use the Title IX label). Best practices suggest that all harassment and discrimination allegations are addressed using a unified set of policies and procedures. Prior to 2020, it was not uncommon for schools to have widely varying retention policies and procedures related to investigations and the documentation of reports of sexual harassment and discrimination, though there is greater uniformity now.

Industry standards for Title IX-related sexual harassment and discrimination policies are not lockstep, but typically contain most of the following elements. Because the reports in this case span nearly a decade, this review focuses on PM-73 that took effect in June 2014.

- Covers the three forms of harassment: Quid pro Quo, Hostile Environment and Retaliation
  - Yes.
- Contains a jurisdictional statement.
  - Yes. LSU's jurisdictional statement even goes beyond the floor set by Title IX and gives LSU discretionary jurisdiction over conduct that is committed by LSU affiliated students and employees off-campus in certain, limited circumstances.[44]
- Explicitly mentions that the policies uphold Title IX.
  - Yes.
- Designates a Title IX Coordinator.
  - Largely, yes. The policy does not name the Title IX Coordinator but discusses naming a Title IX Coordinator and designating a Deputy Title IX Coordinator for Athletics in charge of monitoring sports equity.
- Addresses the range of Title IX-related protected classes (sex, sexual orientation, gender identity, pregnancy/parenting).
  - Largely, yes. Although PM-73 does contemplate sex, gender, and gender identity it does not specifically mention pregnancy or parenting status.

---

[43] *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022)
[44] PM-73, p. 2

- Provides information on how and to whom to report a complaint.
  - Yes. PM-73 states "Any student or employee who believes that he or she has been subjected to discrimination, harassment or sexual misconduct or any other violation of this policy has a right to report the conduct to the Campus Title IX Coordinator or to any other responsible party which includes: the campus administrator with responsibility for human resource management, student conduct, or the department head of the relevant academic department."[45] Additionally, a statement on the obligation of mandated reporters is included.[46]
- Prohibits the range of Title IX-related issues, such as sexual assault, sexual harassment, retaliation, etc.
  - Yes.
- Protects students, employees, and third parties.
  - Partially. Students and employees are explicitly mentioned.

Industry standards for Title IX-related procedures are also not absolutely lockstep but typically contain most of the following elements:
- Provides for prompt investigation of complaints deemed to warrant investigation under these procedures.
  - Yes.
- Requires prompt resolution/remedial action.
  - PM-73 does discuss the idea of promptness, though no specific timeframes are included outside of the informal resolution process.[47]
- Recognition and incorporation of due process protections for the accused (especially at public schools)
  - Yes. Although not specifically identified as such, PM-73 contemplates the right to an advisor of choice, the ability to identify witnesses and pertinent evidence, and written notice and outcomes. The preponderance of the evidence is offered as the standard of evidence.[48]
- Provides the parties notice of the allegation.
  - Yes.
- Provides notice of meetings, interviews, and hearings[49]
  - Not specified.
- Provides parties with the opportunity to provide evidence and a list of potential witnesses to investigators.
  - Yes.
- Allows the parties to have an advisor with them (e.g.: parent, attorney, union rep) for all meetings, interviews, and hearings.

---

[45] PM-73, p. 5
[46] PM-73, p. 6
[47] PM-73, p. 8
[48] PM-73, p. 9
[49] This standard is based on guidance from the Clery Act, not Title IX. There is no private right of action based on the Clery Act (VAWA §304).

Exhibit 1 page 20 of 58

       ○  Yes.
- Provides that investigators be trained.
  - ○  Yes.

Processes that incorporate most of these elements fulfill Title IX industry standards by ensuring a response that is not clearly unreasonable in light of the known circumstances. The Title IX standard is more deferential to schools than the negligence standard of care, which is a broader reasonableness requirement. Thus, a school may escape Title IX liability, but still fail to meet the negligence standard of care, on the same facts.

LSU's policies and procedures as detailed in PM-73 were materially consistent with industry standards and the standard of care. As discussed below in more detail, this is consistent with my opinion that LSU upheld the industry standards with respect to these Plaintiffs.

## Notice & Industry Standards

As described, Title IX's requirements apply only once a funding recipient has received actual notice of behavior that would, if true, represent conduct that is severe, pervasive, and objectively offensive, and that creates a discriminatory effect on the basis of sex. Such notice typically comes to a school in the form of a report or complaint. To constitute notice, the report, information, or complaint must be made to a "responsible employee," and the industry-standard definition is articulated by OCR in its 2001 Guidance:

> *A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.*[50]

While this definition applies to both institutions of higher education and primary and secondary schools, the subset of employees who qualify as a responsible employee in higher education is much smaller. When it comes to identifying the employees who might have the authority to address discrimination, OCR will generally defer to the postsecondary institution.[51]

Notice to a responsible employee can come either from the complainant directly, or through a third party, or even the news media, and sets the same requirements in motion to investigate the allegation and take reasonable actions to stop the harassment, remedy its effects, and prevent its recurrence.

---

[50] 2001 OCR Guidance, p. 13.

[51] 34 CFR 106 citing Merle H. Weiner, *A Principled and Legal Approach to Title IX Reporting,* 85 Tenn. L. Rev. 71, 139 (2017) ("Overall, this category is rather narrow and the identity of the relevant employees rests on an institution's own policies regarding who has the authority to take action to redress sexual violence.").

Exhibit 1 page 21 of 58

The U.S. Supreme Court in *Gebser* and again in *Davis* laid the foundation for industry standards pertinent to notice – which roundly reject agency principles of *respondeat superior* or constructive notice. Industry standards have broadened notice to include – in limited cases – situations where a school fosters or blindly enables obvious signs of serious misconduct (the so-called "official policy" claim). Otherwise, *Gebser* and *Davis* serve as the primary influence on the standard of care for notice in Title IX cases. In *Gebser*, Justice O'Connor detailed the actual notice standard, which has become the standard of care adopted by the field in Title IX cases.

In that case, Gebser, an 8th-9th grader, had a lengthy sexual relationship with a teacher over the course of nearly a year, but she did not tell anyone at the school and the school did not otherwise receive notice from a third party or others. In an action that established industry standards for notice, the Court refused to hold a school in violation of Title IX if the school had not received notice of the alleged behavior:

> *Allowing recovery of damages based on principles of respondeat superior or constructive notice in cases of teacher-student sexual harassment would be at odds with that basic objective, as liability would attach even though the district had no actual knowledge of the teacher's conduct and no opportunity to take action to end the harassment. It would be unsound for a statute's express enforcement system to require notice and an opportunity to comply while a judicially implied system permits substantial liability—including potentially an award exceeding a recipient's federal funding level—without regard to either requirement…*

> *Thus, a damages remedy will not lie unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination and fails adequately to respond.[52]*

Reaffirming this statement later in its opinion and expressly rejecting OCR's more expansive views on constructive knowledge, the Supreme Court added,

> *Petitioners and the United States submit that a school district should at a minimum be liable for damages based on a theory of constructive notice, i.e., where the district knew or "should have known" about harassment but failed to uncover and eliminate it…[53]*

> *[W]e conclude that it would "frustrate the purposes" of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official.[54]*

---

[52] *Gebser*, Syllabus, p. 1.
[53] *Gebser, p. 282*.
[54] *Ibid.,* p. 285.

Exhibit 1 page 22 of 58

The *Gebser* court added that indifference to an allegation must be intentional:

> *Moreover, the response must amount to deliberate indifference to discrimination, in line with the premise of the statute's administrative enforcement scheme of an official decision by the recipient not to remedy the violation.*[55]

In 2001, OCR rejected an obligation to follow *Gebser* and *Davis*, and reiterated its continued approval of the "should have known" administrative enforcement standard:

> *A school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.*[56]

The "should have known" standard is typically only applied when the same or similar level of behavior should have been – through the exercise of reasonable care – known to the funding recipient.

> *Consistent with its obligation under Title IX to protect students…OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination.*[57]

The "should have known" standard – enforced by OCR but not the courts – must be more than speculation, or a function of hindsight projecting what is known now onto conduct or behavior that, at the time, would not have been viewed as a reasonable indication of sexual harassment. For example, knowledge that a staff member makes repeated sexist comments or sexual advances in the past would not, under industry standards, be construed as creating a "should have known" situation if the funding recipient later learns that the staff member had sexually assaulted a student. Such an extension of behavior and foreseeability would be speculative and would not be deemed to represent "reasonably obvious discrimination." For the "should have known" standard to apply, the harassment or discrimination should be openly practiced or known to administrators who fail to take action, even if that action is only to alert the Title IX coordinator or another responsible employee. Further, when a funding recipient has addressed – through investigations, coaching, intervention, etc. – the sexist comments or sexual advances upon receipt of notice, that would not represent "neglect" under the standard of care.

Industry standards indicate that a school is not on notice when the only people aware of the misconduct are those engaging in the violative behavior. For example, in *Gebser*, the Supreme Court found there was a lack of actual notice, even though Waldrup - the man who sexually assaulted the student on multiple occasions – was a teacher at the school. If a school was on notice each time one of its teachers engaged in misconduct, there would never need to be a notice-based analysis because the school would have strict liability. Further, OCR takes many

---

[55] *Gebser, pp. 275-276.*
[56] 2001 OCR Guidance, p. 10.
[57] 2001 OCR Guidance, p. 33, fn 73.

Exhibit 1 page 23 of 58

pages of its key regulatory and sub-regulatory guidance documents to discuss how and when a school is on actual or constructive notice of harassment or discrimination.[58] OCR would not have to do that if knowledge of the employee engaging in the behavior is simply imputed to the employer.[59]

## DISCUSSION[60]

As I have explained, the standard for "deliberate indifference" under Title IX is set exceedingly high. The question is not whether the particular process employed by the school was the best possible process, or even whether it was a good process; nor is the question whether the school failed to follow its own procedures. The question is whether defendant's actions were "clearly unreasonable in light of the known circumstances." And the courts have held that deliberate indifference claims are reserved for very limited circumstances. In my expert opinion and to a reasonable degree of professional certainty, these circumstances are not present because LSU's response upheld applicable industry standards.

As I will describe, overall, LSU had reasonable policies and processes in place to respond to sex-based discrimination occurring within its programs and activities. More specifically, the record shows that LSU took many reasonable actions in response to various reports of potential sexual harassment between 2012-2020, all of which met or exceeded the industry standards, including the following:

- Had available policies and procedures detailing reporting and investigating various forms of sexual harassment.[61]
- Offered training to students about reporting sexual misconduct, including online trainings on sexual violence.[62]
- Offered recurring training to employees about Title IX and mandated reporting.[63]
- Offered training to student-athletes, specifically, about reporting sexual misconduct.[64]
- Offered supportive measures to students including No Contact Orders, Safe Housing, referrals to Counseling and Lighthouse Programs, referrals to law enforcement, academic accommodations, and interim measures.

---

[58] *See e.g.*: 2001 Guidance, pp. 13-14, 18-19; 2014 OCR: *Q&A on Title IX and Sexual Violence*, pp. 2, 14-18.

[59] For the avoidance of any doubt on this point, the 2020 Title IX regulations state with logic and certainty that notice to a harasser, even if that harasser is a responsible employee, is not sufficient to constitute notice to a recipient.

[60] Throughout this report, my opinion is based largely on information contained in the record and testimony by parties and witnesses. Any assumptions are solely my own and do not constitute a reflection of credibility of any party and are not a reflection of admissions by LSU.

[61] PM-73.

[62] Owens Deposition, p. 217, 218, Exhibit 8, Exhibit 9. Doe Deposition, p. 128. Mize Deposition, p. 162. Johnson Deposition, p. 84. Kitch Deposition, p. 94, 96.

[63] Segar Deposition Day 2, p. 71, 73. Ausberry Deposition, p. 27-28. Sharon Lewis Deposition p. 68 71, p. 81, p. 321. Kitch Deposition, p. 94.

[64] Owens Deposition, p. 218. Johnson Deposition, p. 82. Segar Deposition Day 2, p. 49.

**Exhibit 1 page 24 of 58**

- Explained the process of an investigation commencing after a formal complaint.[65]

In addition to these actions during this time period, I additionally offer opinions rebutting the Wang Report as it relates to each Plaintiff.[66]

### Incidents involving John Coe - Calise Richardson and Jade Lewis[67]
#### *Calise Richardson[68]*

Calise Richardson enrolled at LSU in 2014.[69] In the fall of 2016, Richardson was in a dating relationship with John Coe, an LSU football player.[70] At the time, Richardson believed it to be a healthy relationship, but in hindsight, Richardson recognized John Coe's behavior as abusive, physically, mentally, and verbally.[71] ███ would pin Richardson against the wall or choke Richardson.[72]

In fall 2016, after a football game during John Coe and Richardson's relationship, Richardson walked into an off-campus bar, JL's, and saw ███ kissing another a girl.[73] Sometime later, John Coe walked over to Richardson and attempted to kiss and touch her. Richardson described that she "swiped him off" and told him to "leave her alone" at which point John Coe "hand pushed" Richardson and she fell onto the group.[74] Richardson then threw a drink at John Coe.[75]

Subsequently, John Coe and Richardson cursed at each other and called each other names while John Coe attempted to get closer to Richardson while swinging – ultimately, John Coe was kicked out of the bar.[76] Later, when Richardson left the bar, John Coe "charged" at Richardson again, but one of the other football players got Richardson into the car without John Coe making contact.[77] Later that evening, John Coe was attempting to "find" Richardson at the off-campus apartment complex where they both lived.[78] Richardson never filed a police report against John Coe.[79]

---

[65] Hovis Deposition, p. 128.
[66] In order to stay consistent with the Wang Report, the incidents of several plaintiffs will be reviewed together as they alleged harassment by the same student.
[67] Throughout this report, all plaintiffs will be referred to by their last name or pseudonym with the exception of Jade Lewis. Due to potential confusion with Sharon Lewis, all references to Jade Lewis will use her first or full name.
[68] The incident involving Calise Richardson and John Doe is discussed below.
[69] Richardson Deposition, p. 24
[70] Richardson Deposition, p. 166
[71] Richardson Deposition, p. 99, 166
[72] Richardson Deposition, p. 171
[73] Richardson Deposition, p. 179
[74] Richardson Deposition, p. 179
[75] Richardson Deposition, p. 179
[76] Richardson Deposition, p. 180
[77] Richardson Deposition, p. 181
[78] Richardson Deposition, p. 185
[79] Richardson Deposition, p. 173

Exhibit 1 page 25 of 58

The next day, Richardson received a call from her supervisor in the LSU football recruitment office, Sharon Lewis.[80] Sharon[81] had been informed of the incident with John Coe and wanted to know why Richardson threw a drink at John Coe, at which point Richardson disclosed to Sharon "what happened" the night before.[82] Sharon had been asked by John Coe's football coach to fire Richardson, but Sharon did not do so.[83] Richardson did not recall what exactly she told Sharon, or what she said to Sharon and Keava Soil-Cormier during the follow-up meeting that week about the incident.[84] Sharon Lewis disputes Richardson's account that Richardson reported being pushed, though Lewis and Soil-Cormier are of the opinion that Richardson instigated the altercation by throwing the drink because he was with another girl.[85]

Sharon and Soil-Cormier asked Richardson if she wanted to go to the police and offered to help her, but Richardson remembered them "specifically" saying to do so if Richardson thought this was "big enough" or enough to ruin his life.[86] Sharon agrees that she asked Richardson if she wanted to file a police report.[87] Richardson felt like Sharon gave Richardson the ability to determine the punishment and felt supported.[88] Richardson wanted John Coe to get therapy.[89]

Richardson never told Sharon and Soil-Cormier that there had been other instances of violence, and Richardson was never told about Title IX.[90] Richardson recalled Sharon and Soil-Cormier laughing when Richardson said she was scared of John Coe, while Sharon recalls Richardson laughing and being annoyed about the incident.[91] Richardson never reported this incident to the police.[92] Richardson never reported to any other non-confidential administrator on LSU's campus about how John Coe treated her.[93]

At the time, Richardson was not mad at Sharon or Soil-Cormier, but over a year later while in therapy, Richardson became angry about how it was handled and that John Coe was not held accountable.[94] Richardson wanted to hold Sharon accountable for how that meeting went, and ultimately, that contributed to Richardson going to the Title IX Office in 2018.[95] After John Coe was arrested, sometime in the of fall 2018, Richardson's supervisor walked Richardson over to the Title IX office and reported John Coe's conduct.[96] Prior to disclosing to her supervisor,

---

[80] Richardson Deposition, p. 187
[81] For similar reasons, all references to Sharon Lewis will use her first or full name.
[82] Richardson Deposition, p. 188-191
[83] Richardson Deposition, p. 189
[84] Richardson Deposition, p. 191
[85] Sharon Lewis Deposition, p. 165-173, Soil-Cormier, p. 42
[86] Richardson Deposition, p. 193
[87] Sharon Lewis Deposition, 170
[88] Richardson Deposition, p. 193
[89] Richardson Deposition, p. 193
[90] Richardson Deposition, p. 193
[91] Sharon Lewis Deposition, p. 171-172
[92] Richardson Deposition, p. 194
[93] Richardson Deposition, p. 197
[94] Richardson Deposition, p. 202-204
[95] Richardson Deposition, p. 205
[96] Richardson Deposition, p. 213

Exhibit 1 page 26 of 58

Richardson had a conversation with Verge Ausberry where she said that she believed John Coe was "capable" of doing the things he was arrested for, because he had been abusive to her.[97] During this conversation, Richardson told Ausberry that Sharon knew "and did nothing" and also learned that Ausberry was aware of what happened at JL's in 2016.[98] The record reflects that after this conversation, Ausberry attempted to connect Segar and Richardson but that did not occur and then Richardson made her report to Title IX.[99]

Prior to John Coe's arrest, Richardson had received training on Title IX.[100] Richardson was aware of resources at LSU, like the Lighthouse program, in 2016 and knew she could report Title IX matters to people within athletics.[101] Richardson was unwilling to report, prior to John Coe's arrest, because she did not trust anyone at LSU to respond after the conversation with Sharon.[102] Once Richardson disclosed to Title IX, she connected with the Lighthouse program.[103] Richardson was interviewed by the Title IX Office about her earlier report to Sharon.[104] Title IX interview notes indicated that Sharon did not believe it had to be reported to Title IX because it was not a physical assault and there "was no sexual assault," but Richardson believed that was outside of Sharon's job as a mandated reporter to make those determinations.[105] Sharon disputes the notes and indicated that she did make a report to Segar.[106] After quickly beginning the investigation, in approximately 60 days Scott conducted an investigation into Sharon Lewis's failure to report Richardson's 2016 disclosure that led to a determination that Sharon should've reported.[107] Richardson was unhappy with the investigation because Scott did not contact additional witnesses, but she did not tell that to Scott.[108]

Ultimately, it is unclear if Sharon Lewis made a report as required under LSU's policies related to this incident, but it is clear that the information never made it to the Title IX Office.

Under Title IX, institutions have an obligation to respond to harassment that is severe, pervasive, and objectively offensive within their education program and activity. The record does not support that the behavior at JL's was severe, pervasive, and objectively offensive. This incident occurred off-campus at a bar and was in no way affiliated with LSU or LSU Athletics. LSU, therefore, had no duty to investigate. While it does seem that Richardson may have experienced a pattern of abuse at the hands of John Coe, she did not tell anyone at LSU about the previous incidents of abuse. I cannot say on this record that the 2016 incident, as described, is severe, pervasive, and objectively offensive (a single incident can be pervasive, but that's not

---

[97] Richardson Deposition, p. 217-218
[98] Richardson Deposition, p. 218-221
[99] Segar Deposition, p. 210
[100] Richardson Deposition, p. 240
[101] Richardson Deposition, p. 150, Day 2, p. 53
[102] Richardson Deposition, p. 243
[103] Richardson Deposition, p. 253
[104] Richardson Deposition, p. 257
[105] Richardson Deposition, p. 260-262
[106] Sharon Lewis Deposition, p. 179
[107] Richardson Deposition, p. 272
[108] Richardson Deposition, p. 275

Exhibit 1 page 27 of 58

obvious here), and the record does not show clearly that Richardson was deprived of education program access as a result. Further, while the best practice in 2016 was to consider dating violence to be covered by Title IX, stating that it was protected by Title IX as an industry standard is a harder conclusion to make. I don't know of anything definitive in regulations or case law at the time that established conclusively that Title IX covers dating violence.

In 2018, Richardson made a disclosure to Verge Ausberry and Ausberry then made a report to Miriam Segar. Segar unsuccessfully attempted to speak to Richardson in response.[109] Around this same time, Richardson disclosed to her supervisor in the Life Skills department, who accompanied her to LSU Cares where she made a report – the report was immediately assigned to Investigator Scott with Title IX who interviewed her two days later. In less than 60 days, Scott conducted a thorough, prompt, and impartial investigation into Sharon Lewis's failure to report Richardson's 2016 disclosure.

This delay did not create a hostile environment for Richardson or further subject to her abuse from John Coe. Plaintiffs' expert expresses concern that she was unaware of Title IX resources, but that is simply not the case, Richardson knew about resources throughout her time at LSU because LSU was providing training and resources to students.[110] Further, even though Richardson expressed concern about taking classes with John Coe, she cannot show whether that would have been avoided even if she made a complaint and received a no contact order – generally, no contact orders often don't stop people from registering for classes and, as previously explained, LSU had no obligation to respond under Title IX.

Plaintiffs' expert also hypothesizes that the Title IX office could have had documentation prior to Jade Lewis later being subject to dating violence at the hands of John Coe.[111] While it is true that there could perhaps have been documentation, Plaintiffs' expert can't speculate as to whether that would have prevented the incidents involving Jade Lewis – especially when Richardson did not request the school to act, and many of the incidents described by Jade Lewis occurred off-campus or were not reported to LSU at the time. Conversely, there is evidence to suggest that a jury could find that it would not have prevented the incidents involving Jade Lewis, because once John Coe was ultimately expelled, Jade continued dating and spending time with John Coe, as discussed more below. Colleges have limited ability to protect students from off-campus violence, and it is too tenuous of an argument to suggest that LSU had a duty to protect Jade Lewis from someone she did not protect herself from.

Irrespective of whether LSU followed its own internal policies in 2016, Richardson never requested an investigation and told administrators she only wanted John Coe to get help. Richardson had the option to report to law enforcement, who would have had jurisdiction to do more, but Richardson chose not to report. While this incident did reveal some instances where employees did not follow LSU's reporting policy in 2016, it is not clear that the policy required

---

[109] Segar Deposition, p. 214
[110] Wang Report, p. 26, Richardson Deposition, p. 150
[111] Wand Report, p. 27

Exhibit 1 page 28 of 58

reporting of off-campus conduct, and these failures do not transgress against the compliance floor set by industry standards – especially when LSU had no obligation to respond to off-campus conduct that did not constitute sex discrimination within LSU's program. As it relates to this incident, LSU's response aligned with industry standards.

### Jade Lewis

Jade Lewis enrolled at LSU in spring 2017 and began dating John Coe.[112] Jade played tennis for LSU in spring 2017.[113] Jade did not enroll at LSU in the fall 2017, but returned in March 2018.[114] At that time, Jade was taking an online course and was returning to LSU for courses beginning in the spring intercession term.[115] [116]

Over the course of their relationship, Jade was assaulted by John Coe 10-15 times.[117] Jade was first assaulted by John Coe in April or May of 2017, off-campus, by being punched in the stomach.[118] It is disputed when this was reported to LSU. Jade reports that this was reported in 2017 to Donovan White, but that is denied by White.[119] While conducting its review, Husch Blackwell found it to be credible that White was not notified in 2017.[120] This is consistent with Jade's own statement to Sanders and Scott in 2018 that she had told no one of the first assault.[121]

It has also been suggested that Jade's father reported John Coe's abuse to LSU, through Coach Mike Sell, in June 2017, but this account was determined to be inconsistent during the Husch Blackwell review, in part because David Lewis reported not knowing about the abuse until July 25, 2017.[122] Plaintiffs' expert correctly points out that there is "no evidence" that Sell reported the physical abuse to LSU's administration – however, what evidence could Sell have reported if he didn't know of any physical abuse?[123] Jade reported that multiple teammates came to her and told her that they had reported what was going on to Julia Sell, but Jade's timeline is unclear.[124] Sell maintains that she did not knowing anything about Jade and John Coe until June

---

[112] Jade Lewis Deposition, p. 19
[113] Jade Lewis Deposition, p. 125
[114] Jade Lewis Deposition, p. 221
[115] Jade Lewis Deposition, p. 125
[116] There is disagreement in the record as to whether Jade's enrollment in the online course made her a "student;" however, since Jade was registered to re-enroll, it is plausible she was considered a student. Ultimately, it was reported, and she received a letter from the Title IX office and no additional incidents were reported in between her disclosure to White and hearing from Title IX.
[117] Jade Lewis Deposition, p. 42
[118] Jade Lewis Deposition, p. 42
[119] Jade Lewis Deposition, p. 61, Donovan White, p.28
[120] HB Report, p. 68
[121] Jade Lewis Deposition, p. 315
[122] HB Report, p. 72
[123] Wang Report, p. 21
[124] Jade Lewis Deposition, p. 151, 154

Exhibit 1 page 29 of 58

2018 and once aware, relayed all information to Segar.[125] Mike Sell also denies knowledge up until June 2018.[126]

The next instance of abuse occurred in April 2018, John Coe again punched Jade in the stomach, this time at Jade's on-campus apartment.[127] This time, Jade did report to Donovan White who took her to see the LSU athletics doctor.[128] After seeing the doctor, Donovan White reported to Miriam Segar who then made a report to Title IX about Jade's injury.[129]

In May 2018, Jade received a letter from LSU's Title IX office about the April 2018 incident.[130] After a period of delay caused by Jade's indecisiveness about participating in the investigation, Jade met with Jeffrey Scott and told him that John Coe punched her.[131] John Coe was also interviewed in June 2018, but did not tell Jade about the interview.[132] Prior to his interview, John Coe sent Jade a series of threatening text messages; however, this was never reported to anyone at LSU.[133]

Despite Jade's reluctant participation, John Coe was ultimately found in violation of policy and sanctioned to mandated counseling.[134] In hindsight, Stewart does not disagree with Husch Blackwell's finding that more could have been done; however, the choices made at the time were to attempt to "balance the harm."[135] Further, under *Davis*, just because other administrators (or a court) might have taken a different action does not indicate deliberate indifference. LSU did not ignore this report or fail to act upon it. It investigated, made a finding, and imposed a consequence that was in the realm of appropriate sanctions, given that LSU was not made aware of the true extent of John Coe's abuse. LSU is not held to the standard of a perfect response. As stated above, even if LSU had suspended or expelled John Coe, Jade continued her relationship with him. I am not blaming Jade for doing so. Learned helplessness is common in dating violence situations, but that does not indicate LSU could have done anything more.

During the summer of 2018, John Coe picked Jade up outside of her on-campus apartment, drove away and threw her phone out of the car and then left her in the middle of Baton Rouge before returning a couple of minutes later.[136] Once back in the car, John Coe "strangled" Jade the "whole car ride back."[137] Despite being fearful for her life, Jade did not want to call law

---

[125] Julia Sell Deposition, p. 97-101
[126] Mike Sell Deposition, p. 92
[127] Jade Lewis Deposition, p. 46, 59
[128] Jade Lewis Deposition, p. 61
[129] White Deposition, p. 47
[130] Jade Lewis Deposition, p. 216
[131] Jade Lewis Deposition, p. 218, Stewart Deposition, p. 185
[132] Jade Lewis Deposition, p. 249
[133] Stewart Deposition, p. 188
[134] Stewart Deposition, p. 194
[135] Stewart Deposition, p. 195
[136] Jade Lewis Deposition, p. 65
[137] Jade Lewis Deposition, p. 66

Exhibit 1 page 30 of 58

enforcement.[138] Jade did not report this to anyone at LSU at the time.[139] She eventually reported this off-campus conduct in August 2018, after John Coe was arrested.[140]

The fourth instance of violence occurred in summer 2018 when John Coe came to Jade's on-campus apartment and punched then strangled Jade for approximately twenty minutes.[141] Jade's roommate called LSUPD and the police responded, but Jade did not tell the police about the other incidents because she "didn't want him getting in trouble."[142] Jade did not tell the police about the choking, strangling, or that John Coe had ripped out her earring – she just stated it was a verbal dispute and covered her injuries with a hoodie.[143] Jade did not further report this incident to anyone at LSU, but LSU administrators found out through LSUPD.[144]

Jade met with Miriam Segar related to this incident and Jade told Miriam that John Coe "did not hit or harm her."[145] Jade told Segar she hit her ear on the bed.[146] Jade was offered resources related to dating violence, assistance reporting to the police, free counseling, and was driven to appointments with Title IX.[147] Jade was aware of what LSU had to offer to support her, and that LSU was proactively reaching out to help her, even though she had not contacted the Title IX office. This exceeds the floor set by industry standards.[148]

Jade was also investigated by the SAA office for giving John Coe a key to her on-campus apartment.[149] During this meeting, Jade denied being hit by John Coe.[150] Jade later met with Jeffrey Scott and Jonathan Sanders where she said, "she wanted to tell the truth" and disclosed many instances of abuse between she and John Coe.[151] Segar encouraged Jade to go back to the police.[152] Throughout this series of reports and recantations, the Title IX office was attempting to balance the need to take action without putting Jade in a more dangerous situation based on the known dangers represented when a dating violence victim leaves a relationship or that it might seem to John Coe that Jade was cooperating with the investigation.[153] Plaintiffs' expert identified SAA's investigation of Jade to be a "material mistake;" however, amnesty policies are not required by industry standards, Jade wasn't participating in a Title IX investigation, and by having Jade come in, LSU was actually able to

---

[138] Jade Lewis Deposition, p. 71
[139] Jade Lewis Deposition, p. 78
[140] Jade Lewis Deposition, p. 78
[141] Jade Lewis Deposition, p. 72
[142] Jade Lewis Deposition, p. 72, 74
[143] Jade Lewis Deposition, p. 75-76
[144] Jade Lewis Deposition, p. 77
[145] Jade Lewis Deposition, p. 267
[146] Jade Lewis Deposition, p. 268
[147] Jade Lewis Deposition, p. 227, 230, 237
[148] Jade Lewis Deposition, p. 238
[149] Jade Lewis Deposition, p. 266
[150] Jade Lewis Deposition, p. 273
[151] Jade Lewis Deposition, p. 314
[152] Jade Lewis Deposition, p. 284
[153] Stewart Deposition, p. 185-192

Exhibit 1 page 31 of 58

compel a meeting wherein LSU administrators could speak to Jade and visually assess her well-being and see if Jade was willing to talk about what was happening.[154] While it may be a best practice (not required) to extend amnesty to victims, that might not extend to not enforcing a policy that was designed to keep Jade safe from John Coe. Again, there is only so much a college can do to protect a student who won't act to protect herself.

Ultimately, Jade went back to the police and admitted she was dishonest. John Coe was arrested and Jade felt subsequent pressure from John Coe's mom to "fix it."[155] John Coe was immediately suspended from non-class programs and activities at LSU after his arrest, undermining the deliberate indifference narrative that LSU somehow ignored serious misconduct.[156] After his arrest, there was a protective order issued, but Jade continued to see John Coe.[157] After being released from jail, John Coe pushed Jade at his off-campus apartment, leaving a lump on Jade, and was later arrested again.[158] Between his first and second arrest, while at his off-campus apartment, John Coe gave Jade a black eye and repeatedly slapped her after learning he was suspended from the football team.[159] Jade's friend reported this incident to the police, but Jade did not tell the truth about what occurred.[160] Jade did not report this incident to LSU.[161] During a supplemental interview, Jade continued to lie to police.[162] John Coe was ultimately suspended from classes on or around August 30, 2018.[163]

After John Coe's second arrest in September 2018, John Coe moved away from LSU's campus.[164] Jade saw him again in January 2019.[165] John Coe resumed abusing Jade in the summer of 2019 while Jade and John Coe were at his aunt's house.[166] Jade did not report it to the police or LSU.[167] John Coe punched Jade in the fall of 2019.[168] Jade did not report this incident to the police or LSU, but Jade alleges that Mike and Julia Sell saw her with a black eye. Jade attributed it to a tennis injury.[169] This is disputed.[170] Jade also remembered additional instances of "minor" assaults and property damage occurring throughout this time.[171] John Coe

[154] Wang Report, p. 29, Sanders Deposition, p. 81
[155] Jade Lewis Deposition, p. 80-90
[156] HB Report, p. 86
[157] Jade Lewis Deposition, p. 107
[158] Jade Lewis Deposition, p. 79-80
[159] Jade Lewis Deposition, p. 108
[160] Jade Lewis Deposition, p. 112
[161] Jade Lewis Deposition, p. 113
[162] Jade Lewis Deposition, p. 284
[163] Jade Lewis Deposition, p. 109, Sanders Deposition, p. 100-101
[164] Jade Lewis Deposition, p. 114
[165] Jade Lewis Deposition, p. 114
[166] Jade Lewis Deposition, p. 120
[167] Jade Lewis Deposition, p. 121
[168] Jade Lewis Deposition, p. 123
[169] Jade Lewis Deposition, p. 125
[170] Mike Sell Deposition, p. 94
[171] Jade Lewis Deposition, p. 127

was officially expelled from LSU in July 2019.[172] Jade regularly saw John Coe between January 2019 and June 2020.[173]

Plaintiff's report suggests that had LSU responded more quickly or taken more severe action, despite the evidence, future harm may have been prevented.[174] Unfortunately, as is common in dating violence situations, even after John Coe was arrested and removed from campus, Jade and John Coe continued to see one another and Jade was further victimized – despite the protection order, despite the arrests, despite the expulsion.

Jade knew about the resources that LSU had to offer, but she was trapped in a cycle of violence that is all too common in dating violence situations. This led to her lying to administrators and law enforcement, making any level of investigation difficult. Still, LSU implemented an informal process and took some disciplinary action with a reluctant complainant and then, once Jade wanted to share more, assisted her with reporting to law enforcement and Title IX and John Coe was ultimately arrested.

It is unclear what would have happened had LSU learned of the incident between John Coe and Richardson in 2016. It is unclear whether Richardson would have participated in an investigation. It is not clear that, had LSU investigated, John Coe would not have met Lewis in 2017. Further, it is not clear that a one-time altercation alleged by Richardson -- involving inebriated individuals and accusations of infidelity -- would reasonably put LSU on notice that John Coe would go on to repeatedly engage in dating violence against Jade, especially if it is true that Richardson took the first physical action.

The actions with respect to Jade Lewis in 2018 comport with industry standards. Further, they illustrate the improved integration between LSU's athletics department and Title IX office since 2016. Here, there were reports made within athletics and reports made immediately to Title IX from within athletics using the online reporting system. This goes to show that LSU was attempting to reach for best practices in many areas during this time period and even if their responses may have fallen short of best practices, that hardly makes the response unreasonable. As it relates to Jade Lewis, LSU's response aligned with industry standards.

**Incidents involving John Doe - Ashlyn Mize (Robertson), Samantha Brennan, Abby Owens, Calise Richardson**

*Ashlyn Mize (Robertson)*
In January 2016 Ashlyn Mize hosted a party at her off-campus apartment.[175] Over the course of the next few days, Mize realized that she had been sexually assaulted by fellow student John

---

[172] Jade Lewis Deposition, p. 372, Stewart Deposition, p. 210
[173] Jade Lewis Deposition, p. 130
[174] Wang Report, p. 28-29
[175] Mize Deposition, p. 5

Doe, while she was passed out during or after the party.[176] John Doe was not invited to the party by Mize.[177] Mize chose not to report this incident to the police and when Mize disclosed to a friend the day after the party, she asked her friend not to tell anyone.[178] Despite this, Mize's friend chose to report to her mom.[179]

Although there is some dispute over how the conversations occurred, it is possible that Mize originally told her friend that she "hooked up" with two students and then the next day, explained that it was rape.[180] Mize is unsure who the second person could have been or whether there was a second person.[181]

After the friend told her mother, the mother called her daughter's coach, and the coach got the information to Miriam Segar.[182] Segar was then able to meet with Mize's friend and learn additional details, including the names of the individuals potentially involved and that Mize did not want to make a report.[183] Segar documented the information learned, but did not include the student names in the documentation.[184] At that time, Segar was unsure whether LSU had an online reporting form like they later implemented after Jennie Stewart was hired.[185] If such a system did exist, Segar did not have the ability to add names on the backend and was concerned about including student names in documents due to potential public record requests and the lack of a firsthand report.[186]

Despite the fact that Mize did not want to report, Segar followed up with the friend that same day and included "information…that [the friend] can share with the individual you are concerned about" and that email included some of Mize's rights, including the right to report to law enforcement or the University to investigate.[187]

Although Mize does not recall the friend telling her about the resources in the email, the friend did encourage Mize to visit LSU's health center which Mize believed to be confidential.[188] Mize had also received online training from LSU about sex and alcohol as a student.[189] LSU trainings typically include information on reporting options and potential resources.

---

[176] Mize Deposition, p. 67 -68
[177] Mize Deposition, p. 67
[178] Mize Deposition, p. 96, 105
[179] Mize Deposition, p. 108
[180] Mize Deposition, p. 110-111
[181] Mize Deposition, p. 112
[182] Segar Deposition, p. 269
[183] Segar Deposition, p. 269-271
[184] Segar Deposition, p. 271-272
[185] Segar Deposition, p. 271
[186] Segar Deposition, p. 272
[187] Mize Deposition, p. 113
[188] Mize Deposition, p. 110
[189] Mize Deposition, p. 162

Exhibit 1 page 34 of 58

After Segar received the report, she ultimately shared the information, including the names, with Mari Fuentes-Martin.[190] Following this report, Fuentes-Martin did reach out to Mize and Mize responded on February 5, 2016 and informed Fuentes-Martin that she "[knew] all the resources that are available" and that she "decided [she] would not like an investigation to be performed."[191] Mize also met with someone in the Lighthouse Program and discussed resources after being examined at the health center.[192] Mize stated that she did not need academic support even though it was also offered in the email.[193] Fuentes-Martin responded to Mize to let her know that the "door [was] open" should Mize want to have any conversations or needs in the future.[194] I'd call this a textbook response that met all applicable industry standards, and even exceeded them, given that the conduct occurred off-campus, outside of Title IX jurisdiction.

In fall 2016, Mize's boyfriend came to LSU and Mize indicated that he disclosed Mize's rape to Coach Ed Orgeron.[195] It is unclear how this conversation came to be, when it occurred, or what exactly was said. Although it is possible that this conversation could have triggered a reporting obligation from Orgeron, it is possible he was given insufficient information or was told that it had previously been addressed by LSU.

As it related to Mize, despite any confusion about reporting options that may or may not have existed, the system worked. Upon being notified of Mize's sexual assault, the information was passed through Athletics to the appropriate LSU personnel at the time, who reached out and offered Mize information about her options and resources. Segar even attempted to provide information to Mize, through her friend, before a formal reach out could occur. Mize understood these resources, used them, and exercised her right not to request an investigation or further use LSU resources. As the Wang report indicates, LSU's response to the third-hand account of Mize's disclosure was appropriate.[196] Although Plaintiffs' expert expresses concern that Segar did not report to Stewart, it would not have made sense for Segar to report to Stewart in January 2016 as Stewart was not offered the position of Title IX Coordinator until February 2016.[197] Perhaps Plaintiffs' expert was confused, because that also explains why Segar would not yet be following any directives from Stewart – they were not yet in place.[198] Regardless, I cannot see how that purported failure would have deviated from industry standards in any case, as Mize chose not to pursue a formal response.

While Plaintiffs' expert deems LSU's decision not to document John Doe's identity as a "material mistake," in the same paragraph Plaintiffs' expert more accurately classifies this as

---

[190] Mize Deposition Day 2, p. 22-24
[191] Mize Deposition, p. 118-110, Exhibit 3
[192] Mize Deposition, p. 119-120.
[193] Mize Deposition, p. 117
[194] Mize Deposition, p. 124
[195] Mize Deposition, . 137
[196] Wang Report, p. 34
[197] Stewart Deposition, p. 28 Wang Report, p. 34
[198] Wang Report, p. 34

Exhibit 1 page 35 of 58

something LSU *should* have done.[199] It is not an explicit requirement under Title IX to document all reports of off-campus conduct that come in, especially when there is no request for an investigation from the Complainant. I agree with Plaintiffs' expert when she states that a Title IX Coordinator should (but not must) "monitor and identify students or employees who have multiple complaints filed against them,"[200] but that quote comes from non-binding Title IX guidance that does not have the force and effect of law, and thus does not form an industry standard. However, the Wang Report seems to overlook the fact that in this case, there was no complaint filed against John Doe and so, even under Wang's own standard, LSU did not err by not documenting this report. As it relates to Mize, LSU's response exceeded the expectation under industry standards.

### Samantha Brennan

In July 2016, Samantha Brennan was a student employed as a recruiter for LSU's football team. She met John Doe at a bar and he drove Brennan home to her off-campus apartment.[201] Brennan woke up the next morning and made the assumption that they had sex.[202] Over a week later, Brennan heard that John Doe had taken a naked photograph of Brennan from the night he drove her home and had shared it with the football team.[203] Brennan was unsure of the extent to which the photo was shared because the only person who had it was someone who came home with John Doe and Brennan after the bar.[204]

Brennan reported her concerns about the photo being shared to her supervisor, Sharon Lewis.[205] Initially, Sharon was "harsh and distant" but later, after Brennan offered evidence John Doe had been in her apartment, Sharon Lewis's "demeanor changed."[206] That same day, Brennan was in another meeting with Sharon and Miriam Segar.[207] During the meeting, Brennan recalled being very confused and nervous.[208] Brennan described that she "expected…to be shut down" because LSU wouldn't want "this to get out."[209] Instead, she found Segar to be "supportive."[210] Although Brennan recalled being presented with the options to report the behavior "officially or unofficially" she did not really know what that meant, but assumed officially involved a report and an investigation.[211]

---

[199] Wang Report, p. 34
[200] Wang Report, p. 34
[201] Per the HB Report, p. 101, Brennan lived at University House which contained off-campus apartments.
[202] Brennan Deposition, p. 31-33
[203] Brennan Deposition, p. 51
[204] Brennan Deposition, p. 118-119, 150-152
[205] Brennan Deposition, p. 58
[206] Brennan Deposition, p. 58-60
[207] Brennan Deposition, p. 60
[208] Brennan Deposition, p. 62
[209] Brennan Deposition, p. 64
[210] Brennan Deposition, p. 65
[211] Brennon Deposition, p. 64

Confidential – Subject to Protective Order

Exhibit 1 page 36 of 58

After Brennan told Sharon and Segar that she wanted to handle it "unofficially," Segar and Sharon separately told Brennan that she had the ability to make a report to the police.[212] Brennan denied that Segar "forced" her to go to the police and instead found Segar to be supportive and Segar accompanied her to the police department to make a report.[213] At LSUPD, Brennan was "very surprised" that LSUPD was supportive and didn't attempt to shut down her report.[214] Segar was of the opinion that LSUPD would talk to Brennan about Title IX and ask Brennan whether she would want to file a report with Title IX – something that did in fact occur while Brennan was at LSUPD.[215]

It is important to clarify that Brennan never reported to anyone that she was sexually assaulted.[216] In fact, Brennan "did not feel as if [John Doe] sexually assaulted [her.]"[217] Brennan, while admittedly drinking, was not passed out, falling down, or unable to stand and Brenan was at least somewhat aware of her surroundings.[218] Although it is impossible to draw any conclusions without an investigation, it is safe to say that those are typically things that a trained investigator would look for when investigating whether someone was unable to consent due to incapacitation and seemingly those factors would not be present. Again, the conduct was off-campus, thus a Title IX response was not required.

Three days after Brennan reported to Sharon Lewis, Mari Fuentes-Martin reached out to LSUPD about Brennan's report and learned that Brennan told LSUPD she wanted to remain anonymous as it related to Title IX.[219] Fuentes-Martin stated she thought it "might" be a PM-73 case, and it is important to note that PM-73, in addition to prohibiting harassment as defined by Title IX, also included a "sexual misconduct" policy that included things that would not have risen to the severe, pervasive, and objectively offensive harassment standard under Title IX and John Doe's conduct would have likely fallen under the sexual misconduct category.[220]

Two days later, Fuentes-Martin and Stewart agreed that the case should be documented as "information only" and closed the case in order to "respect the wishes of the Complainant."[221] Stewart also indicated that if other factors became known, then they may have taken a different approach.[222]

In her original police report, Brennan stated that she recalled "fooling around" with John Doe.[223]

---

[212] Brennan Deposition, p. 64
[213] Brennan Deposition, p. 65-66
[214] Brennan Deposition, p. 67-68
[215] Segar Deposition, p. 244, Brennan Deposition, p. 92-94
[216] Brennan Deposition, p. 73
[217] Brennan Deposition, p. 103
[218] Brennan Deposition, p. 104-106
[219] HB Report, p. 99
[220] PM-73, p. 4. HB Report, p. 99.
[221] HB Report, p. 99
[222] HB Report, p. 99
[223] Brennan Deposition, p. 198

Exhibit 1 page 37 of 58

During her deposition, Brennan also admitted that she must have invited John Doe into her apartment in order for him to have known her apartment number.[224] I point these things out not to invalidate Brennan's experience, but to illustrate that what Brennan reported to LSU was not sexual assault despite the other Plaintiffs who have interpreted it as such.[225] Brennan's concerns were about an explicit photo of herself being potentially shared between students, including students she worked with.

Without conducting an investigation, which would have gone against Brennan's wishes, it is hard to speculate whether this act rises to the level of harassment necessary under *Davis* (it is unlikely to be pervasive), but even if so, if John Doe showed a naked photo, there is insufficient evidence to conclude that would have put LSU on notice that he would go on to physically or sexually abuse others. Even though both Brennan and Mize reported having sexual encounters with John Doe after consuming amounts of alcohol, Brennan did not feel as if she was sexually assaulted and did not report it as such. Future consensual sexual activity (i.e. Brennan) is not pattern evidence to prove a past instance of non-consensual sexual activity (i.e. Mize.) This is true even if Brennan later believed that the sexual activity was no longer consensual in her mind – because LSU could only operate based on the information that was told to them at the time.

Brennan decided not to enroll in classes for the fall 2016 semester, but still continued living in Baton Rouge.[226] She later heard that football players "got questioned by LSU higher-ups" about the photo and that John Doe, and the other person who had the photo, were "not allowed to communicate with" Brennan.[227] This seems to align with Brennan's wishes that the response be handled "unofficially" and with athletics' attempt to prevent the behavior from recurring and avoiding any retaliatory behavior by issuing its own no contact directive.

This case came forward after Jennie Stewart had been serving as Title IX Coordinator for only a few months, but it still shows that from the beginning, LSU's Title IX program under Stewart was attempting to improve its practices. This can be seen in the way that documentation increased between Mize's and Brennan's reports. This also further shows that LSU's reporting procedures, even if misunderstood in some instances, were working because Fuentes-Martin and Stewart learned of the *potential* PM-73 case even though Brennan herself did not make a report. As it relates to Brennan, LSU's response aligned with industry standards.

### *Calise Richardson*
In December 2016, while off-campus, John Doe attempted to sexually assault Calise Richardson.[228] John Doe had been kicked out of his apartment and asked to stay with Richardson. The next afternoon, while both were completely sober, Richardson described John

---

[224] Brennan Deposition, p. 198
[225] Richardson Deposition, p. 104
[226] Brennan Deposition, p. 167-168
[227] Brennan Deposition, p. 170
[228] Richardson Deposition, p. 92

Exhibit 1 page 38 of 58

Doe pulling down her pants and attempting to put his penis into her vagina while she told him to stop.[229] Later the same day, Richardson told Keava Soil-Cormier that John Doe "tried to have sex" with her, that she did not want to, and that John Doe got really angry and was going to try to get Richardson fired.[230] Richardson only recalled Soil-Cormier asking why she let John Doe sleep in her bed if she didn't want to have sex.[231]

Richardson did not ask Soil-Cormier for any help but said that she was scared to get in trouble.[232] Richardson subconsciously hoped her boss "would step in and do something" to protect her, but Richardson did not know what that would have looked like.[233] Richardson did not want to file a police report.[234] Richardson did not want to file a Title IX report.[235] Richardson felt like she knew "nothing was going to happen" and she feared retaliation.[236]

Prior to December 2016, Richardson had surmised that John Doe had sexually assaulted Samantha Brennan based on a conversation Brennan had with Richardson in the bathroom, wherein Brennan was crying over John Doe sharing a naked photo of her.[237] Brennan did not tell Richardson that the sex was nonconsensual or that she was raped, she said that she "didn't really remember" the sex.[238] Based on Richardson's understanding of the law, she determined that this constituted sexual assault.[239]

It is in no way the victim's fault when someone attempts to sexually assault them. Richardson is not to be blamed for John Doe's actions. But neither is LSU. Plaintiffs' expert states that there were four opportunities to properly document and respond to John Doe's sexual misconduct, but to suggest that this allowed John Doe[240] to engage in harm to additional students is inaccurate, a very fuzzy interpretation of foreseeability, and implies a duty to off-campus students that is extra-legal.[241] When John Doe attempted to assault Richardson, LSU had no knowledge of any incidents involving Abby Owens. All LSU knew was that John Doe took and shared a naked photo of a sexual encounter with Samantha Brennan – something that Calise Richardson also knew – and the third-hand report involving Ashlyn Mize. If Richardson had made a report to Title IX, that would have been the first evidence of a "pattern.". Even under OCR's rarely used "should have known" standard, LSU was not aware of "reasonably obvious discrimination." Wang's approach here seems to be one of assuming that where there is smoke,

---

[229] Richardson Deposition, p. 92-93
[230] Richardson Deposition, p. 96-97, 100
[231] Richardson Deposition, p. 98
[232] Richardson Deposition, p. 96-98
[233] Richardson Deposition, p. 98
[234] Richardson Deposition, p. 101
[235] Richardson Deposition, p. 102
[236] Richardson Deposition, p. 101-102
[237] Richardson Deposition, p. 103-104
[238] Richardson Deposition, p. 103-104
[239] Richardson Deposition, p. 104
[240] In the Wang report, Wang refers to "John Doe" and "John Coe" interchangeably at times, but based on context and other references in the paragraph, I am assuming that these are typos and another reference to John Doe.
[241] Wang Report, p. 36

there is fire, but to get there requires layering assumptions upon assumptions, none of which made it reasonably foreseeable to LSU that any particular student was at risk.

It is unclear what evidence exists as to the conversation between Richardson and Soil-Cormier. Although Husch Blackwell investigated other potential instances of sexual misconduct allegations not being reported to the Title IX office, this instance was not mentioned at all. Richardson also never reported it to Title IX. If this conversation occurred, the earlier instance of Sharon Lewis and Soil-Cormier potentially mishandling her report about John Coe seemingly did not deter Richardson from reaching out to Soil-Cormier about Richardson. Soil-Cormier stated that if Richardson had told her that John Doe attempted to assault her, Soil-Cormier would have made a report.[242]

It also seems possible that rather than an intentional failure to report, Soil-Cormier misunderstood what Richardson views as a report of attempted sexual assault to be something less than that. Richardson stated she told her that he "tried" to have sex with her and it seems reasonable that someone might construe that in a way that does not indicate force, such as John Doe hitting on Richardson. Soil-Cormier denies that Richardson ever told her that John Doe attempted to sexually assault her.[243] Without more information, it is difficult to discern whether Soil-Cormier intentionally disregarded her obligations as a mandated reporter, though again the incident was off-campus and outside of Title IX.

Even still, Richardson knew about resources and rights available to her and chose not to avail herself of them, which is her right. Assuming *arguendo* that LSU had a duty to investigate this off-campus conduct, Richardson didn't ask for and did not want an investigation to occur. Had this been properly reported and documented, it is true that LSU may have then been on notice of a pattern of off-campus behavior, but the record does not suggest that these Plaintiffs suffered any additional harm after this alleged failure occurred. If there was a failure to report in this case, it is unfortunate, but it does not indicate LSU acted outside of industry standards. As it relates to this incident and the incident described above, LSU's response met the floor set by industry standards.

### Abby Owens

In April 2017, Abby Owens, a former LSU student and tennis player, disclosed to staff at the rehabilitation center she was in that she had been raped by John Doe in June 2016. Prior to April 2017, Owens did not register the encounter with John Doe as sexual assault.[244] Prior to April 2017, Owens did not tell anyone at LSU that she had been sexually assaulted by John Doe.[245]

---

[242] Soil-Cormier Deposition, p. 118
[243] Soil-Cormier Deposition, p. 115-116
[244] Owens Deposition, p. 73
[245] Owens Deposition, p. 86

Prior to her 2016 assault, Owens was diagnosed with anxiety and depression, battled an eating disorder, and sometime before 2017, Owens began abusing Adderall with alcohol.[246] Sometime around April 2017, Coach Julia Sell took Owens to a rehabilitation center after a failed drug test.[247] After starting rehab, Owens withdrew from LSU for the spring 2017 semester.[248] Sometime around April or May 2017, Owens's dad attended the SEC Tennis Tournament.[249] Owens understood that while at the tournament, Owens's dad had a conversation with Coach Julia Sell and during that conversation he told Sell that an LSU football player had raped Owens.[250] Owens did not believe that her dad knew the name of the football player.[251] Owens's and Sell never had any further conversations about the topic.[252]

On June 28, 2016, Owens went to a bar in Baton Rouge after pre-gaming at an off-campus apartments with friends.[253] While out, Owens became "star-struck" when she met ████ John Doe.[254] Sometime during the night, John Doe and Owens exchanged numbers.[255] John Doe eventually drove Owens and at least one friend home. After they stopped and got chicken, they then dropped off Owens' friend and then John Doe returned to Owens' off-campus apartment.[256] Owens and John Doe lived at the same apartment complex.[257] The next day, and up until Owens went to rehab, she began having "flashbacks" and pieced together that John Doe had assaulted her.[258] Owens found text messages where John Doe asked if he could come over and Owens agreed.[259] Owens remembered John Doe having Owens perform oral sex on John Doe and "not resisting."[260] Sometime over the next few days, Owens told a friend that "she had sex" with John Doe.[261]

On April 12, 2017 Owens disclosed for the first time to anyone that she had been "raped by an athlete at school."[262] Owens is "95% sure" that she eventually shared John Doe's name with her counselor or someone at the rehab, but this would have been later.[263] Owens also disclosed the incident to her family while in rehab, but did not originally disclose John Doe's name.[264] Someone at Owens' rehab facility later told Owens that they had disclosed to LSU and Owens'

---

[246] Owens Deposition, p. 21-22
[247] Owens Deposition, p. 29, 96
[248] Owens Deposition, p.95
[249] Owens Deposition, p. 77
[250] Owens Deposition, p. 79
[251] Owens Deposition, p. 79
[252] Owens Deposition, p. 80
[253] Owens Deposition, p. 43-44
[254] Owens Deposition, p. 47
[255] Owens Deposition, p. 62-63
[256] Owens Deposition, p. 48-52
[257] Owens Deposition, p. 50
[258] Owens Deposition, p. 53-55
[259] Owens Deposition, p. 62
[260] Owens Deposition, p. 57
[261] Owens Deposition, p. 59-60
[262] Owens Deposition, p. 40
[263] Owens Deposition, p. 71
[264] Owens Deposition, p. 73

Exhibit 1 page 41 of 58

parents that she had been assaulted; however, there is no documentation and so it is possible that was not the case and it is also possible that they did not disclose John Doe's name.[265] In further evidence that LSU had a working protocol for reporting, Segar made a report to Stewart via phone call about this information.

While in rehab, Owens realized for the first time that another sexual encounter with an LSU tennis player was rape.[266] Owens never notified anyone at LSU about the sexual encounter with this student.[267] When asked whether she remembered consenting to have sex with the other student, Owens stated "I mean I was drunk but, yeah, like I guess" and further went on to say that she "kind of" remembered consenting.[268] LSU's definition of consent does not prohibit someone who is "drunk" from consenting to sexual activity.[269] This aligns with best practice. In ATIXA's model policies, the definition of consent includes specific language that "incapacitation is… not synonymous with intoxication, impairment, blackout, and/or being drunk."[270]

In order for LSU to take action, LSU had to know that something occurred. Prior to April 2017, Owens neither recognized the encounters as sexual assault nor reported them to any administrators at LSU. LSU was not made aware of the reports until *after* Owens was in rehab, where she withdrew and ultimately did not return to LSU.

After becoming aware that something was disclosed at rehab, Segar made a report to Jennie Stewart, in accord with LSU policy.[271] It is unclear from the record whether anyone at that point knew who Owens had alleged raped her. During Segar's conversation with Sell, Segar learned that Owens's dad never gave Sell the name of the football player.[272] Owens was not currently a student at this time, but Segar was under the assumption that Owens would return.[273] Segar and Stewart planned to reach out and meet with Owens once she returned to LSU because they could not proceed without additional information, including the name of the football player.[274] This is a reasonable response. Plaintiffs' expert says this is irresponsible, but what would be the alternative?[275] Attempt to schedule a meeting with the student who is in rehab and clearly processing a lot? That would hardly be reasonable and is certainly not in line with what is expected under either industry standards or best practices. Title IX still doesn't apply, given the off-campus nature of the conduct. Plaintiffs' expert also says it was misstep not to inform

---

[265] Owens Deposition, p. 86-87, p. 205, 201
[266] Owens Deposition, p. 85
[267] Owens Deposition, p. 85
[268] Owens Deposition, p. 84
[269] PM-73, p. 3, defining consent as something that "cannot be given by any individual who is … physically incapacitated … through the effects of drugs or alcohol."
[270] ATIXA's 1P2P V. 5, p. 32. Available at: https://www.atixa.org/resources/atixa-one-policy-two-procedures-1p2p/
[271] Segar Deposition Day 2, p. 92
[272] Segar Deposition Day 2, p. 92
[273] Segar Deposition Day 2, p. 93
[274] Segar Deposition Day 2, p. 93
[275] Wang Report, p. 36

Exhibit 1 page 42 of 58

Owens of her rights and resources, but at this point, Owens was no longer affiliated with LSU, so what rights would LSU have notified her of?[276]

Once it was clear that Owens was not going to return, LSU *could* have reached out, but this is not a must. There is also no guarantee that Owens would have been willing to speak with anyone from LSU or provide any information after the falling out between Sell and her father. In hindsight, Owens was critical that LSU never reached out to her to ask about the name; however, Owens never reached out to anyone either.[277]

If anything, LSU showed tremendous support for Owens before, during, and after her disclosure. LSU took her to rehab, paid for it, paid for extended care, and kept Owens' scholarship slot available so that she could return. While these things may not have been because of her sexual assaults, Owens never looked for any information about sexual assault resources on LSU's campus and has stated that she did not know whether she would have used them if she knew they existed.[278] LSU can only respond to things that they know about, and here, LSU had no notice until April 2017 and even then, did not have sufficient information to act. Could they have done more to get it? Yes. Did they have to under Title IX? No. As it relates to Owens, LSU's response aligned with industry standards.

### Sarah Beth Kitch

Sarah Beth Kitch was enrolled as a graduate student at LSU from 2009-2014.[279] During her time as a student, Kitch did not make any reports to any LSU employees regarding any sexual harassment or sex-based discrimination.[280] In 2019, Kitch, who was no longer affiliated with LSU, made two calls to LSU and disclosed that a former professor, ████████, sexually harassed her beginning in 2012. ████████ retired in 2015.[281]

Prior to 2019, the record does not indicate that Kitch told any LSU employees, let alone any official with the authority to institute corrective measures, as required in *Gebser*. Even looking at the more aspirational guidance from OCR, there is no evidence that LSU should have known anything had happened with Kitch.

Kitch knew that reporting to LSU was an option. While enrolled at LSU, Kitch took Title IX training as a "student" and also as a "teacher."[282] Kitch was aware that other students had reported faculty members and that there had been at least some level of discipline even if she thought it was insufficient.[283] In actuality, Kitch admitted that she did not know what discipline

---

[276] Wang Report, p. 36
[277] Owens Deposition, p. 208
[278] Owens Deposition, p. 208, 213
[279] Kitch Deposition, p. 22, 89
[280] Kitch Deposition, p. 94, 144
[281] Kitch Deposition, p. 60, 127
[282] Kitch Deposition, p. 94, 96
[283] Kitch Deposition, p. 57

was implemented.[284] Even if the response was not what Kitch would have wanted it to be, Kitch's statements indicate that LSU had a mechanism in place for students to report and for LSU to respond to complaints – which aligns with industry standards at the time.

Over the ten-year period between Kitch beginning at LSU and alerting LSU to potential misconduct, Title IX went through a number of changes – and Plaintiff's report fails to appreciate that there were no universal "best practices" under the law for the entire ten-year period as the field was evolving. In 2009, it would have been a rarity for any institution to have readily available information on a website related to Title IX and sexual harassment – the directive from ED that pulled this topic into focus for institutions did not come for two more years, and even still, it took time for the field to begin contemplating the sub-regulatory guidance. Yet, during Kitch's tenure as an LSU student she received multiple trainings on these topics.[285]

According to Kitch, her rationale for reporting was "in case there were other cases that might be linked to it and just to – register that this had happened on the academic side of LSU and I wanted there to be a record."[286] There is no indication that Kitch requested any sort of formal action during these calls and Kitch did not describe any remedies that she was seeking and in fact, after the call, Kitch reported that she "felt some settleness [sic]."[287]

What more could LSU have done? Not much. Prior to 2019, LSU had no actual knowledge of the harassment. In 2019, LSU had no control over the retired faculty member who was accused. Even if LSU did, some of the behavior described by Kitch included unprofessional, misogynistic comments made by ████. These comments have no place in an educational setting, but are hardly the type of severe, pervasive, and objectively offensive behavior that *Davis* contemplated. Even a one-time, unwelcome kiss is unlikely to rise to this required level. But let's say that it did, for the sake of argument. LSU was not on notice until several years after both ████ **and** Kitch were no longer affiliated. Title IX sets out to prevent harassment in the education program – the program that Kitch was no longer even attempting to participate in.

Under the current 2020 Title IX regulations, which were not in effect at the time Kitch was a student or when she made a call to LSU in 2019 -- since Kitch was neither affiliated with LSU or otherwise attempting to participate in any of LSU's education programs or activities -- she would not even be eligible to file a formal complaint under Title IX.

At this point, even if the incident from years ago could have been remedied, LSU's failure to do so would not amount to deliberate indifference. Further, LSU took some action. LSU took multiple calls with Kitch and offered her a sympathetic ear as she attempted to document what happened to her years earlier. Kitch did not request formal action and there would have been

[284] Kitch Deposition, p. 57
[285] Kitch Deposition, p. 94, 96
[286] Kitch Deposition, p. 124
[287] Kitch Deposition, p. 125

no applicable action for LSU to take. Did LSU document these conversations? Seemingly no. Should they have? Sure. Were they required to do so? Not under Title IX. Plaintiffs' expert's opinion that this goes against guidance from OCR in the 2011 DCL misconstrues that guidance as industry standard when in fact, it would have been at best a best practice.[288] Again, sub-regulatory guidance does not have the force and effect of law and does not form a basis for industry standards. As it relates to Kitch, LSU's response aligned with industry standards.

**Elisabeth Andries**

In October 2016 and July 2017, Andries experienced unwelcome sexual contact from another student, John Roe. After an off-campus Halloween party in 2016, Andries described that in the car, John Roe grabbed Andries' waistband and rubbed her back and while walking back to Andries' residence, John Roe grabbed her waistband and her butt.[289] In 2017, John Roe touched Andries under her shirt on her chest without consent.[290] Andries did not disclose these incidents at the time to any LSU administrator.[291]

In the fall of 2017, months after the second incident, Andries told her therapists about these two incidents.[292] The therapist, as a confidential resource, did not have the obligation to report Andries' experience to University officials, but the therapist did recommend Andries reach out to LSU's Lighthouse Program to learn more about LSU's sexual violence support programs and services and gave her a pamphlet.[293]

Andries did not reach out to the Lighthouse program until February of 2018.[294] Andries did not want to continue to participate in the offerings at Lighthouse, but Andries thought it was possible they told her about Title IX.[295] Andries did use Lighthouse to request disability services at some point in spring 2018.[296] Around this time, Andries began struggling academically.[297] She attributed this, in part, to the incidents of sexual harassment, but also to a separate medical issue that eventually caused her to request a retroactive medical withdrawal for the semester.[298] Andries attributed 2-3 weeks of missed classes to her doctors' appointments and believed another 1/3 of her classes were missed as the result of her depression.[299]

---

[288] Wang Report, p. 18.
[289] Andries Deposition, p. 34, 38
[290] Andries Deposition, p. 50-51
[291] Andries Deposition, p. 53
[292] Andries Deposition, p. 53
[293] Andries Deposition, p. 54
[294] Andries Deposition, P. 58
[295] Andries Deposition, P. 55-56, 66
[296] Andries Deposition, p. 58-59
[297] Andries Deposition, p. 59
[298] Andries Deposition, p. 60
[299] Andries Deposition, p. 61

Exhibit 1 page 45 of 58

Andries returned in the fall of 2018 and was on academic probation.[300] When Andries returned, she saw John Roe for the first time since July 2017 while at a bar off-campus.[301] John Roe attempted to talk to Andries and her boyfriend told him to knock it off, which led to the boyfriend and John Roe nearly getting into a fight.[302] John Roe made no further attempt to speak to or interact with Andries after this incident in 2018.[303] In spring 2019, Andries did have a class with John Roe, but they did not interact with or sit near each other.[304] Andries missed half of her classes as the result of fear and panic attacks because John Roe had "assaulted [her] successfully once and attempted a second time."[305] At this point, Andries disclosed the incident to Disability Services in order to get an excuse to miss class and was immediately told to file a Title IX report.[306]

After "not finding much" after searching for "Title IX LSU," Andries went instead to the Student Advocacy and Accountability Office in February or March of 2019.[307] She was referred to the appropriate office, the Title IX Office, and had an intake meeting within the week.[308] During the meeting, Andries requested a no contact order, but ultimately was given a "peer-to-peer" no contact order that Andries could send, but that would not be sent by the Title IX Office.[309]

Jennie Stewart explained that in order to act in a way that was not punitive, she had to conduct a fact specific inquiry before issuing a no contact order and since there had been no contact in over a year and no threats, she did not feel like she could implement contact restrictions against John Roe simply because Andries was, understandably, uncomfortable.[310] Stewart also indicated that the academic accommodations, requested by Andries through SAA, were provided by Tracy Blanchard, although they did not ultimately make it into Stewart's case file.[311]

LSU initiated an investigation and John Roe was found responsible for violating policy with respect to Andries and one other complainant.[312] LSU then complied with its policies and procedures and, after Respondent appealed, sent the case back to SAA to determine sanctions as required under PM-73.[313] Plaintiffs' expert points to Stewart's decision to extend John Roe's appeal window as some sort of problem, but even if Stewart did not explain her rationale to Andries' satisfaction, it is not clearly unreasonable for her to ensure that a student just found

---

[300] Andries Deposition, p. 60-61
[301] Andries Deposition, p. 63
[302] Andries Deposition, p. 63
[303] Andries Deposition, p. 83
[304] Andries Deposition, p. 64
[305] Andries Deposition, p. 64
[306] Andries Deposition, p. 66
[307] Andries Deposition, p. 67
[308] Andries Deposition, p. 70-71
[309] Andries Deposition, p. 77
[310] Stewart Deposition, p. 224
[311] Stewart Deposition, p. 226, 228-229
[312] Andries Deposition, p. 87-88, 97-101
[313] Andries Deposition, 89-92

**Exhibit 1 page 46 of 58**

responsible for a policy violation could have his questions answered to file an appeal.[314] Such extensions are common in Title IX proceedings, and are provided to both parties.

After John Roe was sanctioned, Andries misread the outcome letter provided by SAA but ultimately chose not to challenge the sanction at a hearing, but the other complainant and John Roe did.[315] After the hearing, John Roe was suspended until May 2020.[316] John Roe appealed the sanctions and the appeal was still pending in August 2019 when classes began.[317] This led Andries to take most of her classes online because John Roe was in four of her five classes and was allowed to remain while his appeal was pending.[318] This aligned with industry standards for a public university in 2019. Once the process was final, Andries did not have any issues with the Title IX Office.[319]

After May 2020, Andries reached out to LSU multiple times to determine if John Roe was back on campus after his suspension ended.[320] In fall 2020, prior to John Roe returning, Andries was notified that John Roe had been readmitted and would be returning to campus.[321] At that point, Andries was informed that LSU was reviewing her schedule to determine if there were any potential issues with John Roe returning.[322] Andries did not have any classes in common with John Roe in fall 2020 or spring 2021 and did not have to move any of her classes to avoid John Roe.[323] Ultimately, Andries was able to graduate on time.[324]

Plaintiffs' expert correctly points out that LSU did not implement a no contact order in this case; however, industry standards for no contact orders, at the time and still today, don't prohibit students from being in the same courses and the guidance the Wang Report points to is just that -- guidance. When examining whether something was clearly unreasonable, courts don't just do so based solely on whether they would have done something different. While it is unfortunate that Andries and John Roe had a number of courses together while LSU's procedure played out, Andries was not subject to further contact in the interim, and Title IX provides no guarantee that a victim will be physically separate from, or never see/encounter, a perpetrator. It is designed to ensure that a hostile environment does not continue within the program. Industry standards applicable at the time would have given the Title IX Coordinator discretion to determine that a no contact order was not necessary because there was no contact over a long period of time.

---

[314] Andries Deposition, p. 93
[315] Andries Deposition, p. 103-106
[316] Andries Deposition, p. 112
[317] Andries Deposition, p. 117
[318] Andries Deposition, p. 118
[319] Andries Deposition, p. 139
[320] Andries Deposition, p. 146-147
[321] Andries Deposition, p. 145
[322] Andries Deposition, p. 147
[323] Andries Deposition, p. 148
[324] Andries Deposition, p. 122

Exhibit 1 page 47 of 58

LSU's actions were not so clearly unreasonable that courts have found such failures to constitute deliberate indifference. Indeed, Stewart's careful consideration of Andries' request itself could be considered proof that LSU was not indifferent. Indifference would be failing to consider the request. LSU considered it and then proposed an alternative that Stewart believed was more appropriate. A reasonable jury could see that not as indifference, but as a difference of opinion. Andries claims that she requested academic support from SAA that was not followed up upon, but LSU's position is that there was follow up and the support was provided.

LSU had a complicated appeal procedure that led to a clunky sanctioning process. While true, that is not the same as failing to act, and LSU's appeal apparatus was not dissimilar from that of other large public institutions at the time. Is it best practice to have multiple levels of appeal? Perhaps not. But it is not clearly unreasonable, and there is no evidence that it was implemented to somehow allow LSU to shirk its Title IX responsibilities.

In this case, once LSU was put on notice of the incident, LSU completed a reasonably prompt investigation that resulted in the Respondent being found responsible for violating policy, and ensured that no hostile environment was ongoing. I can't think of a Title IX suit that found deliberate indifference on such facts. Even before then, Andries was connected with resources and took advantage of them. The fact that she was dissatisfied with the outcome does not mean that LSU failed to uphold the standard of care. Under Title IX, no one is entitled to a "particular disciplinary action" and the purpose of Title IX is not to second-guess those decisions made by school administrators.[325] As it relates to Andries, LSU's response aligned with industry standards.

### Kennan Johnson

Kennan Johnson was an LSU tennis player in 2017.[326] Johnson reported that she was negatively impacted by Coach Julia Sell's treatment of her. Specifically, Johnson pointed to comments Sell made about Johnson's weight and sexual orientation that Plaintiffs argue amount to harassment.[327] Johnson never reported the harassment to LSU.[328]

The record does not indicate that Sell disparaged Johnson on the basis of her sex. Sell coached the women's tennis program and oversaw Johnson's performance on the team. Johnson admitted that her weight impacted her performance as a tennis player, but Johnson felt harassed due to her weight while on the team.[329] Johnson, along with several other players, were sent to a nutritionist and were given feedback about their weight related to their performance as athletes.[330] Sell coaching her players to peak performance is not inherently sex-

---

[325] *Davis v. Monroe County*
[326] Johnson Deposition, p. 19
[327] Johnson Deposition, p. 154, 155, 159, 161-162, 206
[328] Johnson Deposition, p. 283
[329] Johnson Deposition, p. 157
[330] Johnson Deposition, p. 155-156, 162, 166

Exhibit 1 page 48 of 58

based just because Sell was the women's coach or because Johnson identifies a woman. Weight is not a protected class issue under Title IX.

Johnson also described feeling out of place based on her sexual orientation and often felt that she was "not a good fit" with Sell, but the only comment made about Johnson's sexual orientation was not reliant on sex stereotypes as would be required under Title IX.[331] Johnson was allegedly told to keep her lifestyle "out of the locker room" so as to not "offend" her teammates.[332] However, even if this behavior is the type of severe, pervasive, and objective harassment contemplated by *Davis* (which would be unlikely given that Johnson pointed to a one time comment), Johnson did not report it to LSU or claim that it excluded her from educational opportunities.

Even *if* this behavior rose to the level of creating a hostile environment under Title IX, LSU was not on notice simply because one of LSU's employees was engaging in the harassing conduct. This is the type of logic that *Gebser* shot down. As such, there is no evidence that LSU had actual notice. Therefore, LSU could not reasonably take any action to remedy the conduct.

Plaintiffs' expert is of the opinion that LSU failed to comply with Title IX because LSU failed to train students and employee on the definitions of Title IX.[333] Since the behavior described by Johnson does not likely amount to hostile environment sexual harassment under Title IX, even if Wang's review of the record was accurate, I disagree with her conclusions about training. For a failure to train to be actionable, it needs to be linked causally to the creation of a hostile environment or a failure to remedy. Here, not only was the conduct not reported to LSU, but there is no connection between the training and any hostile environment or failure to remedy.

Johnson recalled completing several trainings related to Title IX and sexual harassment during her time at LSU and at previous institutions.[334] Rather than not knowing how to report, as the Wang Report suggests, Johnson simply did not want to go to Title IX.[335] So, while the Wang Reports seeks to highlight this as an example of a "pervasive problem," it is just another example of LSU being unable to address conduct of which it was unaware. As it relates to Johnson, LSU did not deviate from industry standards.

## Jane Doe

In March 2019, Jane Doe made a report to residence life about some ongoing negative interactions she had with a fellow student who lived on the same floor.[336] The behavior also consisted of an off-campus butt grab, but Doe did not include that in her report.[337]

---

[331] Johnson Deposition, p. 205-209, 258-260
[332] Johnson Deposition, p. 206
[333] Wang Report, p. 44
[334] Johnson Deposition, p. 82, 298
[335] Johnson Deposition, p. 304
[336] Doe Deposition, p. 49
[337] Doe Deposition, p. 38, 42, 155

After reporting, someone from LSU's Title IX office responded to Doe, at her residence hall, that same day.[338] Doe was immediately moved into a new residence hall room at her request and Title IX commenced an investigation and offered options including a No Contact Order and supportive measures including the Lighthouse program.[339] Doe felt that her concerns were addressed after this meeting.[340] Doe stayed in safe housing for three days and was then given an option to move.[341] LSU did not offer to move the other student, but this is consistent with industry standards at the time for public institutions.[342]

Doe requested a No Contact Order and later communication referenced a No Contact Order being in place.[343] Doe continued using Lighthouse weekly.[344] Title IX met with Doe on two additional occasions and reached out to witnesses.[345] Ultimately, after conducting multiple interviews with Doe, it was determined that the student's behavior did not violate PM-73 and would instead be sent to the SAA office.[346] Doe cannot recall whether she ever told anyone at LSU about the butt grab.[347] Doe never considered the other student to be a boyfriend, they never dated, and she never told anyone at LSU that they dated.[348]

Here, Plaintiffs' expert focuses on the fact that Doe never received a copy of the no contact order to suggest that LSU acted outside of industry standards.[349] However, the record suggests that not only was the no contact order implemented, despite the Plaintiffs' expert suggesting otherwise, but, importantly, there was never any additional contact. Even if a No Contact Order had not been implemented, there was no further harm to Doe.

Importantly, Doe never disclosed to anyone at LSU the butt grab. LSU arguably would not have taken jurisdiction over this off-campus behavior, but that is the only behavior that would have, if on-campus, *potentially* risen to the level necessitating a response from LSU under Title IX (and frankly, at the time, whether a one-time butt grab would have qualified as sex discrimination under Title IX was not an established industry standard, though it is now). Despite all of this, LSU still did respond, promptly, effectively, and thoroughly. The mere fact that Doe was dissatisfied with the (correct) jurisdictional determination by LSU (that Title IX was not applicable) does not indicate that LSU acted unreasonably in any way. Industry standard practices would have required this referral to SAA, in fact. Likewise, industry standards in 2019

---

[338] Doe Deposition, p. 53
[339] Doe Deposition, p. 56
[340] Doe Deposition, p. 57
[341] Doe Deposition, p. 53
[342] Doe Deposition, p. 162
[343] Doe Deposition, p. 59, 115, Exhibit 17
[344] Doe Deposition, p. 62
[345] Doe Deposition, p. 72, 83
[346] Doe Deposition, p. 80
[347] Doe Deposition, p. 155
[348] Doe Deposition, p. 157
[349] Wang Report, p. 46

Exhibit 1 page 50 of 58

would not have required, nor expected, LSU to force the other student to move rooms prior to a finding of responsibility being made.

In this case, LSU's response exceeded the industry standards.

### Corinn Hovis

In the early hours of January 24, 2020, Corinn Hovis reported to her RA that earlier that night she was possibly drugged and sexually assaulted off-campus by a fellow student, John Loe.[350] Residence life staff contacted LSUPD at Hovis' request and made a report to Title IX.[351] LSUPD initially connected Hovis with Baton Rouge Police Department (BRPD), but BRPD declined to further interview Hovis after determining Hovis consented to the sexual activity.[352] The LSUPD officer did not agree with BRPD's assessment and offered to take Hovis to the hospital.[353] After getting a SANE exam, Hovis ultimately decided not to press charges.[354]

The same day, Hovis' parents made a Title IX report and Title IX then contacted Hovis "pretty soon" thereafter.[355] After emailing Hovis, Jennie Stewart set up a meeting.[356] During the meeting Stewart explained "what a Title IX case was" and talked about resources including the Lighthouse program and mental health options.[357] Even though the incident occurred off-campus, Title IX opened an investigation and Hovis was interviewed in early February.[358] Early in the investigation process, John Loe was indefinitely suspended from the football team.[359]

Throughout the investigation and interviews of other people, Title IX Investigator Jeffrey Scott kept Hovis, generally, in the loop with what was occurring.[360] Hovis was able to view the final investigative report that found that John Loe violated policy and that decision was upheld after an appeal.[361] John Loe was sanctioned to a one-year suspension from LSU.[362]

Hovis had no complaints with the way that Stewart conducted herself through her involvement with Title IX.[363] Hovis' only complaint with the investigation was one question asked by Investigator Scott wherein he inquired as to what she was wearing the night of the incident.[364]

---

[350] Hovis Deposition, p. 51-52
[351] Hovis Deposition, p. 52, Wang Report, p. 47 citing the Complaint p, 81
[352] Hovis Deposition, p. 53-54
[353] Hovis Deposition, p. 55
[354] Hovis Deposition, p. 57, 61
[355] Hovis Deposition, p. 63-64
[356] Hovis Deposition, p. 65
[357] Hovis Deposition, p. 65
[358] Hovis Deposition, p. 68
[359] Hovis Deposition, p. 77
[360] Hovis Deposition, p. 69
[361] Hovis Deposition, p. 71, 73, 75
[362] Hovis Deposition, p. 80
[363] Hovis Deposition, p. 83
[364] Hovis Deposition, p. 80

Exhibit 1 page 51 of 58

It is unclear why Scott was asking the question, but as someone who has conducted countless investigations and trained thousands of investigators, it is often a relevant question that in no way indicates that the Investigator believes the person "was asking for it." Attire can be used to identify individuals on camera footage, connect photos to an incident date, and can even be used to bolster or detract from someone's credibility based on a party's description of how the sex occurred and the removal of clothing – something that can be extremely important when one party does not remember much of the encounter. Even if it had been a bad question, one bad question has never been found to establish deliberate indifference, especially where the outcome upheld the complainant's complaint. Also, even if LSU treated this matter as covered by Title IX, that does not constrain the court to do so, and Title IX jurisdiction is hard to see on these allegations.

At some point, Hovis began receiving messages from someone she associated with John Loe even though the No Contact Order was in place. Hovis reported this to Lighthouse and the messages subsequently ceased.[365] Hovis reported being thankful for the Lighthouse program.[366] Hovis reported having no complaints with the way Residence Life or LSUPD responded.[367] Hovis never met with, spoke with, or saw John Loe after making a complaint.[368]

On January 31st, Hovis requested accommodations through LSU's disability support services with the assistance of the director of the Lighthouse program.[369] After review, Hovis received accommodations beginning in June 2020.[370] It is worth noting that between January and June 2020, LSU, like many institutions was adjusting to offering services while being physically closed as the result of COVID-19. Hovis again requested accommodations in January 2021.[371] All accommodations were requested through LSU's disability office.[372] Based on the information provided, it may not have been clear to LSU's disability office that Hovis' disabilities were related to a sexual assault as the request was based on "increased stress and anxiety related to past traumatic incidents in addition to current retraumatization" even though the request was coming from LSU's Lighthouse program that serves students who have experienced interpersonal issues."[373] Hovis was required to see a separate doctor in order to get her accommodations approved in spring 2021.[374] Hovis ultimately met her goal of graduating within three years, despite having to retake some courses.[375] Still, Hovis did not find the disability accommodations to be helpful.[376] Instead she found reaching out to her professors to be the

---

[365] Hovis Deposition, p. 106
[366] Hovis Deposition, p. 165
[367] Hovis Deposition, p. 164-165
[368] Hovis Deposition, p. 72
[369] Hovis Deposition, p. 86-87
[370] Hovis Deposition, p. 88, 90
[371] Hovis Deposition, p. 88
[372] Hovis Deposition, p. 97
[373] Hovis Deposition, p. 99
[374] Hovis Deposition, p. 102
[375] Hovis Deposition, p. 14
[376] Hovis Deposition, p. 105

Exhibit 1 page 52 of 58

most helpful throughout her remaining semesters.[377] If Hovis struggled with obtaining accommodations smoothly, she had a route to file a complaint with the Title IX office or at least alert them to her challenges. The record does not show that she did so, and because of confidentiality, the disability office would not likely have known about her Title IX complaint.

It is not clear whether Hovis would have experienced a different outcome had she sought any supportive measures through the Title IX office related to academics. Instead, Hovis worked with other LSU offices to request disability accommodations that were ultimately put into place, but because they did not apply retroactively – as is common for disability accommodations -- Hovis was required to retake some courses and pay that tuition. Title IX supportive measures can include connecting someone with Disability Services but are often different and serve a different function. They can be implemented retroactively in some cases, Ultimately, while Title IX could have assisted Hovis with these courses in addition to staff at DSS and Lighthouse, Hovis was able to maintain her scholarships and graduate in three-years and continue her graduate education. As it relates to Hovis, LSU's response aligned with industry standards.

## A Reasonable Jury Could Conclude that LSU's Actions Were Not Clearly Unreasonable

LSU was not perfect in its responses to every situation between 2012 and 2020; No school is, but neither is that the standard or expectation. LSU had policies in place that exceeded the requirements of Title IX in many ways. LSU students and employees received training and had some familiarity with Title IX and the reporting and investigation process, and LSU, through its Title IX Coordinator, appropriately identified shortcomings within the Title IX program throughout the system and was progressing toward not only addressing those deficiencies but also going beyond the bare minimum requirements under Title IX.

Between 2012 and 2020, LSU did something else. It improved. LSU made strides over a period of time and evolved its compliance program. LSU neither rested on its laurels nor buried its head in the sand. This reasonable progress is exactly what you might expect once LSU made the decision to hire an in-house Title IX Coordinator in 2016 and discovered ways to improve its response.

In 2016, Jennie Stewart brought her concerns to LSU's administration, including LSU's vice president for finance and Stewart's supervisor.[378] In this presentation, Stewart presented information about the need to centralize Title IX and provided information based on how other schools were complying with Title IX.[379] The administration affirmed Stewart's conclusions and no one, including the President, disagreed with the needs.[380] Following Stewart's presentation,

---

[377] Hovis Deposition, p. 108
[378] Stewart Deposition, p. 63
[379] Stewart Deposition, p. 65
[380] Stewart Deposition, p. 66-67

LSU immediately responded to Stewart's concerns by granting Title IX a graduate assistant who worked 20 hours a week.[381] Then, in early 2018, Jeff Scott began as LSU's first full-time investigator.[382] While Stewart indicated that the delay between her request and Scott beginning was the result of financial concerns, there is no obligation under Title IX to have a full-time investigator or have a specific budget, no matter the size of the institution.

Over this period of time, LSU also began to see increased integration between Title IX and Athletics and more complete documentation of reports. Even if the reporting process could have been more straightforward, the structure in place resulted in LSU responding and the Title IX Office being notified. To put it another way, the system was effective and the University was responsive.

LSU, like most schools, still has a long way to go toward adopting best practices, but LSU met the floor set by industry standards, to a reasonable degree of professional certainty. LSU did many things right, or at least sufficiently. And they were trying to do more and better – the very nature of which seems at odds with any argument that they acted with deliberate indifference. Plaintiffs seem to want Title IX to protect them off-campus, and I very much like the idea that it should. In fact, the 2023 proposed regulations seem to be headed in that direction. But, funding grant legislation, like Title IX, operates on a fairness principle that a recipient cannot and should not be liable for conduct it was not aware it was required to address. Title IX doesn't have an on-campus/off-campus brightline rule, but I cannot see any reasonable basis to argue that LSU had control over students in the instances when they were entirely off-campus actors when these incidents took place.

Unfortunately, these types of changes do not happen overnight and at times LSU's response was not in perfect alignment with best practices, its own policies, or even guidance from OCR. However, that does not mean that LSU's actions were clearly unreasonable. Plaintiffs' expert describes several systemic and structural issues that LSU faced during this time.[383] As discussed throughout, many of these "problems" were not indicators that LSU was operating outside of industry standards, but rather highlighted the gap between industry standards and best practices. Unfortunately, this nuance is lost in both the Husch Blackwell report and the Wang Report, which both tend to sloppily lump industry standards and best practices together.[384]

Neither Title IX nor its regulations specify that "nationally recognized" institutions are held to a different standard under Title IX. There is nowhere in the entirety of Title IX or the implementing regulations that specify that large schools must be placed under increased scrutiny. The standard is whether LSU was deliberately indifferent, and to a reasonable degree of professional certainty, it is my opinion that the record supports a conclusion that LSU was

---

[381] Stewart Deposition, p. 80
[382] Stewart Deposition, p. 79
[383] Wang Report, p. 10
[384] HB Report, p. 3 "The University did not handle various items identified in the USA Today article in a manner consistent with obligations under Title IX, widely recognized best practices, and/or University policy."

Exhibit 1 page 54 of 58

responsive, and despite some imperfections, did not act unreasonably in light of the known circumstances.

The Wang Report tries to create the impression that these missteps somehow create the systemically deliberate indifferent response pondered in *Gebser* and *Davis*. This death by a thousand cuts approach fails when you consider that in order for the school to be deliberately indifferent, LSU must first have been on notice. A close examination of the records shows a number of instances where LSU responded with expediency, provided sufficient information for students to generally have an understanding of resources available, and had an overall process that met the floor of Title IX compliance. As such, LSU's numerous actions reflect the actions of a system that was trying to comply with the guidance from OCR and industry best practices. Was LSU always successful? No. Still, this type of effort indicates LSU was acting in way that was the opposite of how deliberate indifference is understood in the field and applied by the courts.

## CONCLUSION

The question posed to me is not whether LSU followed best practices at every juncture, or came to a resolution that each Plaintiff agrees with. Instead, there is a set of practices that form the floor or baseline of industry standard approaches that each college minimally must take to avoid being deliberately indifferent. My role is to identify the industry standards and to compare LSU's response to the hundreds of others I have seen or participated in.

If LSU had recorded incidents differently, been better funded, or if any of the plaintiffs had reported earlier or came forward at all, that still does not allow Plaintiffs' expert or me to speculate as to whether that would have changed, limited, or mitigated the harm alleged by Plaintiffs. I note this because findings of causation likely belong to a jury, not to an expert witness.

I disagree with Plaintiffs' expert's conclusions, as evidenced throughout my report, but my role is confined to identifying industry standards and opining on whether LSU comported with them. It is not my place to speculate on what could've or would've or should've occurred – it is my role to speak to what LSU was required to do under Title IX's industry standards. LSU upheld the requisite standard of care in terms of its response to incidents upon receiving actual notice, its trainings offered to both staff and students, and in its policies and procedures.

Review of all documents and evidence available to me supports my opinions that the defendants:

- Had appropriate policies in place that reasonably aligned with industry standards
- Had appropriate procedures in place that reasonably aligned with industry standards
- Offered training to students and employees that reasonably aligned with industry standards
- Responded in accordance with industry standards to complaints for which they had notice and jurisdiction under Title IX.

Further, with respect to each individual plaintiff, my review of all documents and evidence available to me supports my opinions as outlined below and stated above.

- Plaintiff Richardson
  - John Coe
    - Review of all documents and evidence available to me supports my opinion that:
      - Despite a potential failure to report by a mandated reporter, LSU complied with the floor set by industry standards when LSU investigated the only Title IX complaint Richardson made and conducted a prompt investigation into the allegation that the underlying, off-campus conduct, was not reported.
  - John Doe
    - Review of all documents and evidence available to me supports my opinion that:
      - It is unclear whether Richardson made a report; however, she did not report to Title IX in 2016 and did not report a failure to report related to the alleged conduct with John Doe. LSU aligned with the floor set by industry standards for off-campus conduct outside of LSU's program or activity.
- Plaintiff Jade Lewis
  - Review of all documents and evidence available to me supports my opinion that, the defendants:
    - Acted according to industry standards by responding to reports and investigating allegations despite the Plaintiff admitting to being dishonest, recanting, and otherwise expressing reluctance to participate in an investigation process.
    - Appropriately issued interim measures after an arrest occurred.
- Plaintiff Mize
  - Review of all documents and evidence available to me supports my opinion that the defendants:
    - Exceeded the standard of care by making multiple attempts to contact Plaintiff to make her aware of resources available to her after a third-party reported that Plaintiff may have experienced an off-campus sexual assault.
    - Appropriately offered resources and support despite Plaintiff declining to pursue an investigation or formally make a report.
- Plaintiff Brennan
  - Review of all documents and evidence available to me supports my opinion that the defendants:
    - Met the standard of care by addressing potential misconduct informally, at the request of the Plaintiff.
    - Aligned with industry standards by assisting Plaintiff to make a police report.
- Plaintiff Owens

Exhibit 1 page 56 of 58

- o Review of all documents and evidence available to me supports my opinions that the defendants:
  - Were not on notice of any potential harassment experienced by Plaintiff off-campus while she was a student.
  - Acted in accord with industry standards by not seeking out additional information while Plaintiff was hospitalized and instead, planned to learn more upon Plaintiff's return to campus, none of which exposed her to an ongoing hostile environment.
- Plaintiff Kitch
  - o Review of all documents and evidence available to me supports my opinions that the defendants:
    - Aligned with industry standards upon receipt of notice of a complaint in 2019
- Plaintiff Johnson
  - o Review of all documents and evidence available to me supports my opinions that the defendants:
    - Were not on notice of any potential harassment experienced by Johnson, thus, LSU had no obligation or ability to respond. LSU comported with Title IX industry standards and the standard of care.
- Plaintiff Andries
  - o Review of all documents and evidence available to me supports my opinions that the defendants:
    - Acted in alignment with industry standards by having confidential resources connect Plaintiff with resources related to her sexual assault.
    - Met the floor set by industry standards by investigating Andries' complaint even though it was originally reported to another office.
    - Exceeded industry standards by providing multiple copies of LSU's policies.
    - Met the industry standard in the overall investigation by promptly conducting an intake, investigating, updating Plaintiff throughout, and providing academic accommodations.
    - Met industry standards for offering appeal rights.
    - Exceeded industry standards by alerting Plaintiff prior to the respondent returning to LSU's campus after suspension.
- Plaintiff Doe
  - o Review of all documents and evidence available to me supports my opinions that the defendants:
    - Exceeded industry standards by responding to a potential report of sexual harassment that occurred off-campus, outside of and unconnected to LSU's programs and activities, upon receipt of notice
    - Exceeded industry standards by taking immediate action to implement supportive measures, including implementing a No Contact Order at the request of the Complainant and placing the Complainant in safe housing
    - Appropriately referred the case to another department after determining the Title IX office did not have jurisdiction

- ▪ Complied with the industry standards and the standard of care in their response.
- • Plaintiff Hovis
  - ○ Review of all documents and evidence available to me supports my opinions that the defendants:
    - ▪ Exceeded industry standards by immediately responding to a potential report of sexual harassment that occurred off-campus, outside of and unconnected to LSU's programs and activities
    - ▪ Appropriately assisted Hovis in reporting to law enforcement
    - ▪ Exceeded industry standards by assisting Hovis in receiving a SANE exam, even after determining the assault did not occur within LSU's jurisdiction
    - ▪ Exceeded industry standards by meeting with Plaintiff to offer and explain multiple resources available to her
    - ▪ Exceeded industry standards by meeting with Plaintiff to offer and explain the investigative process.

As described, reasonable recipients develop and implement grievance procedures, investigate incidents once on notice of alleged sex discrimination, hold hearings, make findings, afford appeal opportunities, and impose sanctions and remedial actions. LSU did those things, in part or in whole, for all plaintiffs for whom LSU had notice of behavior that was so severe, pervasive, and objectively offensive that it could constitute hostile environment harassment under Title IX.

All the opinions expressed in this report are held to a reasonable degree of professional certainty. This report is based on the information reviewed considering my experience, training, skill, knowledge, and expertise. I also understand that documents may be produced after the date of this report and I, therefore, reserve the right to amend, revise, or supplement this report based on the availability of new information.

Respectfully Submitted,

Brett A. Sokolow, J.D.
Chair, TNG, LLC

Exhibit 1 page 58 of 58