## AFFIDAVIT OF DR. APRYL POOLEY

 I, Dr. Apryl Pooley, being first duly sworn, hereby certify and affirm that the following statements are true to the best of my knowledge, information, and belief:

1. I currently live at ███████████████████████████ and am employed by the Michigan State University Department of Psychology.
2. I am interested in this matter as an expert in the neurobiology of trauma and crime victim services. A resume and complete CV account of qualifications and publications are attached on pages 41 and 44.
3. I have no direct or indirect interest in the outcome of this case for which I am offering expert testimony on the facts related to the effects of trauma and the concept of Institutional Betrayal.
4. I am qualified as an expert due to my experience of over 10 years of research, knowledge, experience, education, training, and skills related to neuroscience and crime victim advocacy fields. I hold a PhD in neuroscience and work as a crime victim specialist with published peer-reviewed articles on the biological effects of trauma on the brain and body and on the use of various therapies to mitigate traumatic stress symptoms. I am currently employed at Michigan State University as the Director of Training and Technical Assistance for the Michigan Victim Advocacy Network where I develop training and programming to enhance individual and institutional responses to crime victims.
5. I have previously been recognized as an expert and allowed to testify with respect to my expert opinions in the neurobiology of trauma in state and federal courts. In the past 4 years, I have testified as an expert on two cases: 1) on 4/15/2019 provided testimony in Tawas City, Michigan for Iosco County Prosecution attorney Gary Rapp on the concept of arousal non-concordance in a sexual assault case, and 2) on 4/13/2021 provided an expert affidavit for attorney Marcelo Betti at Justice for Our Neighbors pro-bono legal firm in Detroit, Michigan for a federal immigration case outlining the effects of trauma on memory in a domestic violence case.
6. For all expert testimony offered, including the current case, I receive reimbursement for travel expenses and for time spent preparing and delivering testimony as outlined in the fee schedule attached on page 43.
7. This affidavit is based on a review of recent and relevant peer-reviewed research articles, books, and my own research and professional experience conducting original neuroscience laboratory research and providing training and technical assistance to crime victim service providers. All sources are cited within this report and in the references on page 39. Two specific reports relevant to the case in question were also reviewed: 1) the Second Amended Complaint for case no. 3:21-cv-00242 US District Court Middle District of Louisiana and 2) the Husch Blackwell Louisiana State University Title IX Review dated 3/3/2021. Transcripts of deposition testimony for all plaintiffs were also reviewed, as well as transcripts of former LSU President Tom Galligan's 3/10/21 testimony before the Louisiana state Senate Select Committee on Women and Children. The cited sources, two reports, and testimony transcripts constitute the data and facts considered to generate the professional conclusions at the end of this report.
8. The purpose of this report is not to evaluate the veracity of the claims set forth in this case, but to provide important background information crucial to understanding said claims. In the Seconded Amended Complaint, the term "institutional betrayal" is used by former LSU President Tom Galligan to refer to the findings of the Husch Blackwell report (Second Amended Complaint, p 14, item 79): "We failed those who it was our first duty to protect. It was an example of institutional betrayal" (State Senate testimony transcript timestamp 3:37). To provide clarity on what this term means and how it may be relevant to understanding the claims in this case, recent research findings and facts on Institutional Betrayal are outlined below and applied to the claims outlined for each plaintiff.

**Relevant facts and data: What is Institutional Betrayal?**

9.  Institutional Betrayal is a widely researched concept with more than 2,000 peer-reviewed academic publications to-date defining the role institutions play in traumatic experiences, outlining how to detect it, distinguishing it from other sources of trauma, measuring its physical and psychological effects on health and well-being, measuring its effects on academic success and workplace performance, and identifying ways to address it. Institutional Betrayal generally refers to an institution's mishandling of a member's traumatic experience and can range from passive actions, such as failing to take proactive steps to prevent the experience, to actively working to cover-up the experience or retaliating against the survivor.

10. The term Institutional Betrayal was coined in a landmark study by researchers Dr. Jennifer J. Freyd and Dr. Carly P. Smith documenting harm perpetrated by institutions upon individuals who trust or depend on those institutions via institutional failure to prevent or respond supportively to wrongdoings that occur within the institution[1].

11. Institutional betrayal can occur within any trusted and powerful institution such as a military, religious, government, or academic institution, when that institution fails to uphold its responsibility to protect its members from violence, discrimination, harassment, or retaliation for bringing forth such a complaint[1,2]. Institutional Betrayal can occur at the level of the whole institution or can occur within parts or units of the institution (e.g., a specific department, fraternity or sorority, or dormitory in an academic institution, a single church within an organized religion, an individual unit of the military, etc.)[1].

12. Institutions play a particularly significant role in traumatic experiences such as interpersonal violence (e.g., sexual assault, sexual harassment, stalking, physical assault, intimate partner violence) by harnessing the potential to either worsen post-traumatic outcomes, or alternatively, become sources of justice, support, and healing[2]. This is because when traumatic experiences happen in the context of an institution (e.g., campus sexual assault, military sexual assault, clergy abuse), victims often must also continue to function within the institution with their perpetrator, rely on the institution for safety or security, and may highly identify with being a member of the institution, leading to a strong influence of institutional responses on post-trauma health and recovery outcomes[3].

13. <u>Institutional Betrayal can occur when an institution within which the interpersonal violence occurs (either physically on the location of the institution, or involving one or more members of the institution) does ANY of the following</u>[1,4]:
    a) Creates an environment in which interpersonal violence seems common or like no big deal;
    b) Creates an environment in which interpersonal violence seems more likely to occur;
    c) Does not take proactive steps to prevent interpersonal violence;
    d) Makes it difficult to report the interpersonal violence;
    e) Covers up the interpersonal violence or reports of such;
    f) Responds inadequately to reports of interpersonal violence;
    g) Punishes or retaliates against the victim in some way (e.g., loss of privileges or status);
    h) Mishandles the victim's case (if reported);
    i) Denies the victim's experience in some way;
    j) Suggests the victim's experience might affect the reputation of the institution;
    k) Creates an environment where the victim no longer feels like a valued member of the institution; and/or,
    l) Creates an environment where continued membership is difficult for the victim.

14. The occurrence of Institutional Betrayal is measured by the Institutional Betrayal Questionnaire (IBQ), which incorporates the above examples of Institutional Betrayal and has been rigorously evaluated by peer-review processes and scientifically validated to measure the occurrence of Institutional Betrayal[5].

15. Institutional Betrayal has been shown to be an independent construct and not related to the subjective severity of a traumatic experience itself (i.e., the perception of Institutional Betrayal is not related to an individual's perception of the severity of their own traumatic experience)[1].

PLAINTIFFS_00001518

16. Both interpersonal violence and Institutional Betrayal are common. Research has found that over half of undergraduate college students experience at least one instance of interpersonal violence perpetrated by a trusted individual, and over half of those individuals (in some studies, over 90%) report Institutional Betrayal related to the interpersonal violence (most commonly by schools or universities that failed to prevent or respond supportively) [4,6,7].

17. Institutional Betrayal does not simply result in a feeling of betrayal or disappointment in an institution but involves serious clinical consequences on mental and physical health. The experience of Institutional Betrayal can worsen post-traumatic outcomes for victims of interpersonal violence [8,9], and can have additional effects that are unique and independent from the effects of interpersonal violence [3,4]. When institutions act with Institutional Betrayal, they become barriers to accessing mental health services, medical support, legal recourse, and other accommodations needed for trauma recovery. The long-term harms (e.g., PTSD, chronic pain, etc.) suffered after a traumatic experience like interpersonal violence often arise from a lack of support following the experience and not necessarily solely from the traumatic experience itself. For example, the single greatest risk factor for developing PTSD after a traumatic experience is lack of social support [10], which can include negative responses (e.g., victim blaming, controlling survivor's decisions, shaming, denying, minimizing) from peers, friends, and family, lack of support from neighborhoods and communities, and institutional betrayal from workplaces, educational institutions, and medical, legal, and criminal justice institutions [11–13]. The trauma of interpersonal violence extends beyond the actual assault when victims' needs are not addressed by the very organizations they turn to for assistance, resulting in *additional trauma* for survivors [14].

18. Research has found that among college women who experience sexual assault, those who also experience Institutional Betrayal have more severe posttraumatic symptoms (including anxiety; depression; dissociation; memory issues; sleep issues; avoiding people and places that elicit trauma reminders; negative impacts on work, school, and relationships; higher incidences of irritable bowel syndrome, chronic pain, chronic fatigue, and substance misuse; and more) [1,4], with LGBTQ and racial/ethnic minority students demonstrating even more severe negative health outcomes and even greater risk for both sexual assault and Institutional Betrayal [6,7,9,15]. Among veterans who experience military sexual assault, those who experience Institutional Betrayal have more suicide attempts, PTSD, and depression above and beyond the impact of the sexual assault itself [3,16]. Among undergraduate college student survivors of intimate partner violence, it is Institutional Betrayal, not the violence itself, that accounts for the high levels of PTSD, depression, and anxiety in survivors [17].

19. Not only does Institutional Betrayal exacerbate the negative posttraumatic symptoms arising from the traumatic experience, but Institutional Betrayal inflicts harm above and beyond that of the original trauma and occurs separately from the original trauma—either in events leading up to the trauma (e.g., an institutional failure to prevent a sexual assault by harboring a known offender) or in events following the trauma (e.g., institutional retaliation against someone reporting misconduct). When an institution fails to prevent or adequately respond to misconduct, interpersonal violence experienced within a trusted institution can be more harmful than if that same violence was experienced apart from that institution [2]. This is because of unique post-traumatic symptoms that arise when trauma is experienced in the context of a trusted and/or necessary relationship with an individual or institution that constitutes a betrayal or violation of trust and power [4,18,19]. Institutions such as universities elicit trust and dependency from its members who need the institution for basic needs such as housing, financial security, education, and social and professional development and who expect these institutional environments to be safe [1]. When this trust is broken by an institutional failure to respond to misconduct, not only are the post-traumatic effects of the original trauma present and exacerbated, but additional traumatic effects arise from the betrayal of trust itself and from the threat of potentially losing the safety and security provided by belonging to the institution (e.g., losing educational opportunities, funding, employment, social support, etc.). It is common for survivors of interpersonal violence in a school setting to have PTSD, anxiety, and

PLAINTIFFS_00001519

depression diagnoses linked not only to the violence they experienced but also to their school's response or lack-of-response to that violence[20].

20. The most recent research on sexual assault on college campuses indicates that both sexual assault and Institutional Betrayal are common, with nearly 30% of undergraduate college students experiencing at least one instance of sexual assault and nearly half of those also experiencing Institutional Betrayal[9]. The most common themes of Institutional Betrayal when a sexual assault victim reports the incident to the institution include:

   a) Pressuring disclosure (e.g., survivor feeling coerced, intimidated, or compelled to disclose/report their assault);
   b) Responding with a minimizing or dismissive response (e.g., victim-blaming, stating the survivor should have said "no" more clearly, etc.), and/or;
   c) Failing to provide adequate support (e.g., not being made aware of or experiencing a lack of availability to counseling resources, academic accommodations, or advocacy services).

21. Other recent studies on campus sexual violence found that the most common types of Institutional Betrayal, regardless of whether the victim reported the incident, were 1) not doing enough to prevent this type of experience, 2) creating an environment where this type of experience seems common or normal, and 3) creating an environment where this experience seems more likely to occur[7], and 4) making it difficult to report the experience[21].

22. Institutional Betrayal also contributes to trauma survivors not reporting or seeking help after a traumatic experience, which can further hinder post-traumatic recovery. The majority of college campus sexual assault survivors delay or avoid reporting or seeking formal help out of fear of being blamed or stigmatized, concerns of not being believed, feelings of shame or embarrassment, concerns about negative consequences for the perpetrator, and fear of others finding out personal details of their lives[22]. Overcoming the challenge of the "isolated incident" narrative is another barrier to reporting for many survivors who believe their experience will not be taken seriously because it only happened to them, when in fact, most perpetrators of sexual violence are serial perpetrators who have harmed or will harm other people[23]. To overcome this challenge, reporting protocols may include directives to alert victims if other people have made allegations against the same perpetrator, as this can facilitate survivor participation in the reporting and investigation process and help identify serial perpetrators. Delaying or avoiding reporting incidents of sexual misconduct is common and does not reflect anything about the veracity or severity of the claim, but rather reflects the lack of availability, accessibility, and cultural acceptance of disclosing sexual misconduct.

23. Based on the above cited research, an institution's inadequate and/or unlawful response to interpersonal violence (including, but not limited to: Title IX oversight, failure to provide accommodations, and failure to enforce disciplinary measures) falls under the widely accepted definition of Institutional Betrayal; and thus, such oversight may inflict further harm and trauma above and beyond the precipitating interpersonal violence.

### Relevant facts and data: Redressing and preventing Institutional Betrayal

24. After a decade of research on Institutional Betrayal, researchers are now drawing parallels from the Supreme Court ruling that found creating a hostile environment constitutes sexual harassment (Meritor Savings Bankv. Vinson, 1986) to the hostile environment created by Institutional Betrayal in the broader scope of traumatic experiences such as interpersonal violence[2]. The institutional responsibility to address Institutional Betrayal lies in expanding the scope of harm beyond individual perpetrators and victims to recognizing the systemic nature of sexual harassment, sexual assault, stalking, and other forms of interpersonal violence when they occur within an institution or system that has the power and responsibility to prevent and respond to such harms in a supportive way.

PLAINTIFFS_00001520

25. The first step to addressing Institutional Betrayal is to recognize institutions that are at high-risk for perpetrating Institutional Betrayal. Psychological and organizational research has identified common institutional factors that contribute to the hostile environment that perpetrates Institutional Betrayal, as outlined below. "Institutional-level policies, practices, and cultures that can serve to condone, hide, or normalize trauma" include[2]:

    a) <u>Membership requirements</u>: Clearly-defined group identities with inflexible requirements for membership often precede institutional betrayal (e.g., joining the military requires rigorous training and strict adherence to behavioral and physical standards, belonging to a religious identity might require rituals such as baptism and adherence to moral standards, and participating on an athletic team requires unique uniforms, designated spaces, practices and measures of success). These requirements can then easily be used to "other" or discredit victims of trauma who come forward with allegations of wrongdoing.

    b) <u>Prestige</u>: When institutions or their leaders hold an elevated role within the community or society, their potential to perpetrate or facilitate abuse can be obscured. This prestige is harnessed to create trust and dependency in its members, and "it is this very trust and dependency that leads to a conflict when abuse is occurring: To stay in the institution means enduring more abuse, but to report the abuse would mean potentially losing an important relationship."

    c) <u>Priorities</u>: Institutional betrayal may remain unchecked when performance or reputation is valued over, or considered separately from, the well-being of its members.

    d) <u>Institutional denial</u>: Institutional Betrayal often follows when an institution's standard response to allegations of wrongdoing is to cast doubt on the veracity or importance of the reports, particularly when this institutional denial is predicated on the "othering" of the individual making the allegations against the institution as nonconforming.

    e) <u>Barriers to change</u>: Many institutions continue to operate in this manner due to at least three barriers to change: 1) lack of language around the issues that continually arise (e.g., a "crime without a name"), 2) maintaining unawareness of injustices (e.g., abuse that is "common knowledge" but unaddressed), and 3) the institution's own unaddressed experiences of trauma (e.g., "cultural trauma" such as punitive policies, a system being overwhelmed by reports of sexual misconduct).

26. In order to minimize the occurrence of Institutional Betrayal at high-risk institutions, measures of *Institutional Support* as an antidote to Institutional Betrayal have been studied[15]. Institutional Support is defined as outcomes where the help-seeking experience of trauma survivors result in adequate and integrated assistance and support. <u>Institutional support occurs when, following a traumatic experience, an institution does ANY of the following</u>[15,21]:

    a) Actively supports the victim with either formal or informal resources (e.g., counseling, academic services, meetings or phone calls);

    b) Apologizes for what happened to the victim;

    c) Believes the victim's report;

    d) Allows the victim to have a say in how the report is handled;

    e) Ensures the victim is treated as an important member of the institution;

    f) Meets the victim's needs for support and accommodations;

    g) Creates an environment where this type of experience is safe to discuss; and/or,

    h) Creates an environment where this type of experience is recognized as a problem.

27. Research has found that the two most common forms of Institutional Support experienced by campus sexual violence survivors are *creating an environment where this type of experience was recognized as a problem* and *creating an environment where this type of experience was safe to discuss*[7] and experiencing this <u>Institutional Support resulted in survivors gaining confidence, regaining a sense of control, and</u>

PLAINTIFFS_00001521

demonstrating improved mental health[15]. Just as Institutional Betrayal can negatively impact post-traumatic health outcomes, Institutional Support can positively impact post-traumatic health outcomes.

28. Based on the above risk factors for Institutional Betrayal and measures of Institutional Support, further recommendations for how to prevent and/or redress Institutional Betrayal include increasing transparency of institutional policies and procedures, emphasizing institutional values of protecting and helping members, trauma-informed training for all Responsible Employees, adequate funding and staffing for the Title IX office, clarification on roles and responsibilities of employees and students related to their reporting obligations, prevention and education programming, implementation of centralized reporting which includes a focus on coordinated institutional responses and/or opportunities for restorative justice, academic accommodations, counseling, and advocacy [2,7,15]. Regarding campus sexual violence, Institutional Betrayal is most likely to occur when a sexual assault survivor reports to the Title IX office or campus police, compared to disclosing to confidential resources such as counseling centers, student health centers, victim advocates, resource centers, or faculty and staff members, implicating Title IX offices and campus police as important targets for intervention[15].

29. A 2022 research study published in the *Violence Against Women* journal outlines specific actions universities can take to prevent and address campus sexual violence: "Prioritize funding to address campus sexual violence; implement a research agenda that utilizes the expertise already found on campus; conduct annual campus climate surveys and make the results public to stakeholders; fund an independent Title IX Office that includes a director and full staff, with independence connoted through a direct reporting line to the President or Provost of the university; appropriately fund and staff a violence resource center on campus that is complete with culturally competent resources; advertise campus resources so they are known to all members; and avoid blanket mandated reporting and one-time trainings. Finally, given the high rates of both institutional betrayal and institutional support, universities can solicit anonymous feedback from students who access campus resources. This information can be used to correct isolated and systemic institutional betrayals at the policy level while highlighting, bolstering, and rewarding institutional support across campus. This may be particularly important for morale and validation for university staff who are doing good work with student survivors regularly. Finally, in the decision-making process of implementing policy changes that address campus sexual violence for all university members—including those who are most marginalized on campus and in society—perhaps the most important thing to remember is that university policies and members have the power to do good"[7].

**Professional conclusions and opinions**

***Systemic factors at Louisiana State University (LSU) contributing to Institutional Betrayal***

30. In reviewing the risk factors for institutions at high risk for Institutional Betrayal (see paragraph 25), LSU matches the profile for a high-risk institution, specifically these institutional factors that lay the foundation for the hostile environment that perpetuates Institutional Betrayal:
    a) Membership requirements: LSU has clearly-defined group identities with requirements for membership at both an institutional level (e.g., academic requirements for admission) and at the level of the Athletics Department (e.g., recruitment and training for student-athletes, adhering to physical and behavioral standards, participating on an athletic team requires unique uniforms, designated spaces, practices and measures of success). Becoming a member of LSU as a student and/or an athlete comes with a certain identity, sense of pride, community, trust, and resources

PLAINTIFFS_00001522

that, while not problematic alone, becomes harmful when the Institution uses that trust in membership to abuse its power or revokes aspects of that membership when responding inadequately to allegations of wrongdoing, furthering the harm victims incur. State Senator Regina Barrow explained how uniquely harmful this can be: "When a young person shows up for college, they go there so hopeful, bright-eyed, bushy-tailed, and many of them have come from small areas and they go there trusting so many people. And when they end up with someone that they feel they can trust, who is an adult, an administrator, a coach, and they violate that trust, some of them can't recover from that" (State Senate testimony transcript timestamp 5:45:30).

b) <u>Prestige</u>: LSU as an institution and as an athletic entity, particularly the LSU football program, holds an elevated role within the community, which can easily obscure the potential to perpetrate or facilitate abuse through action or inaction. This type of prestige was described by former President Tom Galligan in the State Senate hearing when he referred to the head football coach of the LSU football team as "probably the most powerful person in the whole state of Louisiana" (State Senate testimony transcript timestamp 7:11:30). Prestige in itself may not be harmful, but the documented prestige of the football program (ranking #7 in the nation) and the expenses and resources allocated to the football program can be harnessed to create trust and dependency in its members that leads to a conflict when abuse is occurring: to report abuse occurring by members of the football program or other programs in the Athletics Department means going up against a well-resourced and respected entity that has the power to remove privileges and resources from those making complaints, leading to the type of betrayal in which "the victim no longer feels like a valued member of the institution," "continued membership is difficult for the victim," and the victim is "punished or retaliated against the victim in some way (e.g., loss of privileges or status)." This type of culture of retaliation was also documented by several plaintiffs, described individually in more detail below.

c) <u>Priorities</u>: LSU has demonstrated that academic and athletic performance and reputation is prioritized and valued over the well-being and safety of its members. When very little resources are given to the Title IX Office (at times having only one single employee) in comparison to the Athletics Department, it is clear where the priorities lie, and this leads to high risk for Institutional Betrayal, particularly the type of betrayal that "suggests a victim's experience might affect the reputation of the institution." Louisiana State Senator Katrina Jackson questioned former LSU President Tom Galligan on LSU's priorities: "When I took at your athletic budget and other budgets at LSU, I think this is going to come down to a priority issue and probably funding [the Title IX Office] with the monies that LSU already have…I just believe that there's funding at LSU to take care of all this because it's a priority issue at this point" (State Senate testimony transcript timestamp 5:41:30). Scott Schneider of Husch Blackwell also addressed this issue in the State Senate hearing: "People can say what their values are, but at the end of the day [LSU's head football coach] was the highest paid public employee in the state of Louisiana…there are literally more people processing videos in the football operations than there are the entire university's Title IX office" (State Senate testimony transcript timestamp 7:22:30).

d) <u>Institutional denial</u>: Institutional Betrayal often follows when an institution's standard response to allegations of wrongdoing is to cast doubt on the veracity or importance of the reports, particularly when this institutional denial is predicated on the "othering" of the individual making the allegations against the institution as nonconforming. LSU exhibited this type of denial specifically when co-head tennis coach Julia Sell responded to reports of interpersonal violence with disbelief (see Plaintiffs Owens and Lewis below) and generally in the multiple documented Responsible Employees failing to report disclosures of violence.

31. Not only does LSU fit the bill for a high-risk institution, but several documented occurrences are consistent with specific manifestations of Institutional Betrayal. First, the Husch Blackwell report found

PLAINTIFFS_00001523

that LSU's "Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX mandates" and that "institutional reporting policy and training have been unclear for years." Specifically, having LSU's Title IX Office inadequately staffed (at times including one single employee) and training well below industry standard leaving members undereducated about their rights and obligations with respect to sexual misconduct and discrimination "creates an environment in which interpersonal violence seems common or like no big deal," "creates an environment in which interpersonal violence seems more likely to occur," and "does not take proactive steps to prevent interpersonal violence," three occurrences of Institutional Betrayal as outlined in paragraph 13 above. Former LSU President Tom Galligan testified that "there was no culture of punishment at LSU. There was no notice at the time as to what would happen. The policies were very unclear. There were directions within departments to report title ix issues to places they should not have been reported" (State Senate testimony transcript timestamp 3:59:30). In addition to the understaffing and under-training of LSU's Title IX Office and Responsible employees, the university's relationship with local law enforcement has been inadequate, which former LSU President Tom Galligan described in the State Senate hearing outlining how LSU's Title IX Coordinator drafted an MOU with law enforcement about "about investigation protocols, information sharing, training, and more" but "I don't think they've ever signed it," which a State representative described as "insulting on so many levels" (State Senate testimony transcript timestamp 3:39:00).

32. A 2017 internal audit found that "published contact information for the Title IX Campus Coordinators is incomplete and/or not widely communicated" and "campus Title IX websites are difficult to find through regular navigation or the use of keyword searches," both of which constitute occurrences of Institutional Betrayal via "making it difficult to report interpersonal violence." State Representative Freeman spoke to this continuing to be an issue in 2021: "I went on that Title IX Website. I understand there's confusion about what to do, what number are students supposed to call? Because I didn't see any phone number or 24/7 [hotline]….You're not communicating with [students] about where they go, and that's just wrong" (State Senate testimony transcript timestamp 4:48:30).

33. As outlined by LSU's own Title IX policy, the employees listed as Defendants in this case are considered to be "Responsible Employees" who must notify the Title IX Coordinator of any reported or witnessed sexual misconduct, harassment, or relationship violence. The documented failures to adhere to this policy undermines the process in place which is meant to streamline reports and unburden victims of violence from having to navigate convoluted reporting processes themselves. Former LSU President Tom Galligan testified that, "The most serious misstep. And this is noted in the Husch Blackwell report, is failing to report by employees when they didn't understand they were responsible or they didn't comply with the regulation. That's the most serious misstep. Another misstep is failure to keep students properly apprised of the process and what's going on, which is perceived as delay or inaction. Another possible misstep is it helps a student to report the conduct to the police, but they don't report the same conduct to Title IX, because reporting to the police is not reporting to Title IX. Another potential misstep is failing to quickly intervene or take other appropriate intermediate measures" (State Senate testimony transcript timestamp 3:46:30). These instances of LSU Responsible Employees failing to notify the Title IX Coordinator and of other missteps in adhering to Title IX policy are consistent with several of the measurable manifestations of Institutional Betrayal, including: "Making it difficult to report the interpersonal violence," "Covering up the interpersonal violence or reports of such," "Responding inadequately to reports of interpersonal violence," and "Mishandling a victim's case."

34. The Husch Blackwell report found that "various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator" and a single athletics employee reviewed each report of sex discrimination and decided whether the report was to be sent to the Title IX Coordinator. In addition to this being a violation of reporting processes as outlined in paragraph 33 above, this is also an example of LSU handling Title IX complaints against student-athletes differently than

complaints against non-athletes, and perpetuates Institutional Betrayal by "suggesting the victim's experience might affect the reputation of the institution (particularly the athletic reputation)," "creating an environment where the victim no longer feels like a valued member of the institution," and "creating an environment where continued membership is difficult for the victim." These occurrences of Institutional Betrayal can cause further harm to victims of interpersonal violence who witness their institution valuing its own reputation and athletic program success over the safety and well-being of its other members. Plaintiffs Richardson, Robertson, Brennan, Owens, and Lewis documented experiencing this type of Institutional Betrayal and were likely further harmed as such.

35. The LSU Athletics Department's knowledge of student-athletes engaging in sexual violence without any consequences is precisely the type of Institutional Betrayal that "creates an environment in which interpersonal violence seems more likely to occur." When known perpetrators are allowed to continue accessing the institution without consequence for misconduct, it not only creates danger by putting other members at risk for additional violence or harassment but also sends the message that the institution does not care about interpersonal violence, which in itself is harmful to victims who not only fear abuse and harassment, but fear that there is no support for them when it occurs. In the same vein, the LSU employees who were not held accountable for failing to uphold their mandated reporting duties also sends the message that the institution does not care about interpersonal violence and that there is no support or justice for survivors at LSU. This was the subject of much debate in the State Senate hearing when former LSU President Tom Galligan communicated that he felt conflicted in how to discipline these employees. When questioned "where has the accountability been for those people involved and what does that look like?" Galligan responded, "we have disciplined two folks who are currently at the university. We suspended one person for 30 days without pay and another person for 21 days without pay (State Senate testimony transcript timestamp 3:59:00). Galligan explained that "The only thing I'm conflicted about is..the appropriate discipline. Should we fire somebody? That's the only thing I'm conflicted about" (State Senate testimony transcript timestamp 5:29:30). While Scott Schneider of Husch Blackwell testified that it is industry standard for "every university employee, except a niche of confidential resources, are mandatory reporters of sex harassment and dating violence. And if you don't make a mandatory report, the university is compelled to terminate you. There's no gray area" (State Senate testimony transcript timestamp 5:53:00). State Senator Peterson questioned Galligan on Miriam Segar's 21-day suspension: "So when she leaves for 21 days…and then she comes back, she's been trained now. And what about these ladies and these stories? So you're conflicted about whether she should be at LSU in a trusting position, forget all the regulations, forget the policies. She listened to stories and ignored them like that…We have to be fair to the people who have been abused. That's our job. As a leader, we have to take care of those that have been disadvantaged. Those that have been wronged. Those that have been abused. That's what our job is. We don't have to protect the powerful. And that's what the problem is around here" (State Senate testimony transcript timestamp 7:03:30-7:05:30). Plaintiff Richardson testified at the State Senate hearing that this lack of adequate discipline was harmful: "The message you have sent us women is that our painful experience and lack of justice is equivalent to the responses of a survey of words that says you will do better. And at most a 30-day suspension, that's not a solution. That's not even a Band-Aid for this large disturbing issue. That's a slap in the face to the women who have experienced this" (State Senate testimony transcript timestamp 6:24:30).

36. As indicated by the above examples, LSU's systemic practices are consistent with several of the twelve specific manifestations of Institutional Betrayal (as outlined in paragraph 13) and LSU's characteristics and culture are aligned with each of the common institutional risk factors for Institutional Betrayal (see paragraph 25). Several Louisiana state legislators and other stakeholders testified before the State Senate about this culture of Institutional Betrayal at LSU, as illustrated by the following testimony transcripts:

a) "What we really want to get them to help us with is our culture, is how can we get to where it's our culture that you don't do this, or if you hear about it, you, you can't sleep at night until you report it, cuz that's the culture (Galligan at 3:55:00).

b) "We have a total of 21 campus leaders and out of 21, only one is a woman. That is absolutely shameful in 2021. We basically have a sign on these campuses that say, women need not apply. And out of all four systems, we have a total of 65 supervisors and only 15 are women. That is absolutely shameful. No wonder the culture is so messed up" (speaker 20 at 3:54:30).

c) "Does that sound like the culture is changing?..If we're talking about the line being drawn in the sand, then you fire these individuals and you clean house, you clean house of all of those who are protecting the culture…that is what it means to change the culture" (speaker 7 at 6:01:00).

d) "What's come to light is that a culture was allowed to exist that did not care about our children…And I know what happens when [victims] feel that no one answered their calls for help. If we fail to deliver justice for these victims, they are victimized again, and we will be the ones responsible for that" (speaker 5 at 06:07:00).

e) "I am here to hopefully convey the culture on LSU campus that makes survivors of sexual assault feel like they have no value or support on our campuses…Someone that I saw as a powerful leader on campus sexually assaulted me…I know you sit there and ask why didn't I report it? Why didn't I get help? Why didn't I seek out resources on campus? I didn't get help because I knew that LSU would protect my abuser. I knew that survivors were never believed and that survivors were always treated as the problem. I knew that a figurehead was more important to LSU than the experiences of a survivor. I knew that the culture on LSU campus stacked all odds against survivors, getting justice: (Current LSU student Ricky Bryant at 6:12:00)

f) "I think that if we have a culture here where people are not held accountable, and there are no consequences, then victims feel like they can't come forward" (speaker 14 at 06:50:30).

37. It is highly likely that these practices and cultures inflicted additional harm upon LSU members who were victims of interpersonal violence, including the plaintiffs of this case. Specific occurrences of Institutional Betrayal against each plaintiff are outlined below.

***Specific complaints consistent with Institutional Betrayal***

38. **Plaintiff Calise Richardson's complaint describes instances of at least 11 of the 12 manifestations of Institutional Betrayal, outlined below:**

i. *Making it difficult to report the interpersonal violence; and*

ii. *Creating an environment where continued membership is difficult for the victim:*

a. When Richardson disclosed to Associate Athletics Director of Football Recruiting and Alumni Relations Sharon Lewis that she had been physically attacked by football player John Coe, Lewis suggested setting up a meeting with Coe and his coach instead of reporting this incidence of violence to the Title IX Office as mandated. Additionally, Richardson testified that Soil-Cormier said she "needed to apologize…for what happened between [Doe] and I" (deposition transcript page 136:12-137:8) in a harmful response that places the blame of an assault on the victim. When a Responsible Employee responds to a disclosure of violence such as Richardson's without following proper reporting obligations or offering resources for help, and instead suggests the victim meet with her perpetrator to "iron things out" or to apologize to others in the institution, this makes reporting violence and continuing to remain a member of the institution extremely difficult if victims believe disclosing violence may mean they have to try to make amends with

their perpetrator and others without any official recourse. This response, or lack-of-response, can inflict harm on its own, separate from the harm Richardson incurred from the precipitating violence. This inappropriate response leads to the creation of a hostile environment where violence is more likely to happen because it is not being properly investigated or responded to.

iii. *Creating an environment in which interpersonal violence seems common or like no big deal; and*

iv. *Creating an environment in which interpersonal violence seems more likely to occur; and*

v. *Covering up the interpersonal violence:*

    a. Soil-Cormier did not report either incident disclosed by Richardson to the Title IX office, a clear example of Institutional Betrayal in which the institution responds as if this violence is inevitable or not serious, creating a hostile environment where violence is more likely to happen because no reports are being made to address these issues, which in itself is a form of covering up the interpersonal violence by attempting to insulate knowledge of violence within the Athletics Department. Richardson testified that Soil-Cormier and Lewis "never mentioned Title IX or compliance" (deposition transcript page 193:11-19). This type of Institutional Betrayal can cause further harm to victims by degrading their sense of safety and trust in the institution and severely limiting their options for recourse and support.

vi. *Not taking proactive steps to prevent interpersonal violence:*

    a. When Richardson disclosed violence by John Doe, the Athletics Department already knew that other allegations of violence had been made against John Doe. Harboring a known potential threat to safety by not properly reporting these disclosures or training members on how to recognize and respond to sexual misconduct puts others at risk by not taking steps to prevent future harm from occurring. Additionally, when survivors become aware that LSU knew about these acts of violence and did not protect themselves or others from harm, that inflicts further harm of Institutional Betrayal above and beyond the harm of the original violence. Richardson testified that, "I definitely wanted my boss to step in and do something…anything to protect me" (deposition transcript page 97:17-98:6), in a clear declaration of Richardson's experience of Institutional Betrayal at LSU.

vii. *Responding inadequately to reports of interpersonal violence:*

    a. Neither were Richardson's disclosures of violence reported to the Title IX Office nor did they lead to LSU providing her with resources, support, accommodation, or information about reporting options. Richardson testified that Soil-Cormier and Lewis "never asked…if I needed any other resources" (deposition transcript page 193:11-19), a clear theme of Institutional Betrayal of "failing to provide adequate support (e.g., not being made aware of or experiencing a lack of availability to counseling resources, academic accommodations, or advocacy services)" that directly impedes victim's recovery process and compounds harm.

viii. *Denying the victim's experience in some way:*

    a. Soil-Cormier responded to one disclosure with questions about why Richardson let Doe into her apartment: Richardson testified that she told Soil-Cormier about the assault because she "was scared to get in trouble and didn't want him to get me fired," and Soil-Cormier responded, "if you didn't want to have sex, why would you let him in your bed?" (deposition transcript page 96:16-97:6). Richardson testified that Soil-Cormier and Lewis responded to another disclosure by saying "if you feel like this is enough—big enough to ruin his life, we will help you file a police report" and, "When I had said I was scared of [Coe], they both chuckled and asked why" (deposition transcript page 136:12-137:8), all examples of a common theme of Institutional Betrayal in which the institution "responds with a minimizing or dismissive response (e.g., victim-blaming, stating the survivor should have said "no" more clearly, etc.)" that denies what the victim is disclosing happened was serious or true, which is in itself harmful. Richardson testified about how harmful this moment was for her by describing feeling "extremely invalidated and gaslit as a victim. And I

think I just wanted someone to give a damn and say that how I was treated was wrong and bad and to hold them accountable," and in response to being questioned about how she felt gaslit, Richardson reiterated, "The laughing when I said I was scared of him, just the way they reacted, the—if you feel like this is big enough to ruin his life, we'll help you file a police report, that's very manipulative" (deposition transcript page 204:14-205:22), another declaration of Richardson's experience of Institutional Betrayal at LSU.

ix.   *Punishing or retaliating against the victim in some way (e.g., loss of privileges or status); and*

x.   *Creating an environment where the victim no longer feels like a valued member of the institution:*

    a.   Following two disclosures of having experienced interpersonal violence at the hands of two football players, Richardson faced retaliation by not being scheduled to work her usual events, and then being let go from her job entirely and being denied other work positions. As Richardson testified, "I was told that I would no longer be working events that [Coe] was at, and so I was punished for what happened between him and I" (deposition transcript page 126:5-15). Richardson also testified that Sharon Lewis "had said that coach wanted me fired because of that" (deposition transcript page 187:11-15). Not only could this loss of opportunities have been retaliatory, they also functioned to alienate Richardson from being a valued member of the institution, two more examples of Institutional Betrayal in which LSU likely caused further harm.

    b.   In the case of John Doe, Richardson described him as "gold to everyone" at LSU and said she "knew nothing was going to happen, and I feared retaliation" (deposition transcript page 101:20-102:11), a clear example of LSU creating the type of environment where victims like Richardson are not valued as members of the institution. In this environment, it is extremely common for victims to not file reports or seek resources within the institution because they fear retaliation or do not feel valued enough to think they will receive help (see paragraph 22). As Richardson testified, she "was scared of retaliation, was scared that literally everyone in Louisiana loves [Doe] and how they treat him, so I didn't feel safe and comfortable to ask for support, especially from anything associated to LSU" (page 151:17-152:7).

xi.   *Mishandling the victim's case:*

    a.   When Richardson disclosed Coe's abuse to her mentor, Ausberry responded by telling her she had to report the abuse to Segar. Segar was not part of the Title IX Office, where a report should be directed, and there was no reason Richardson needed to disclose her experience to anyone else. Pressuring disclosure by coercing, intimidating, or compelling a survivor to report their assault instead of offering resources, options for making a report if desired, or outlining one's own mandated reporting obligations, is a common theme of Institutional Betrayal that causes further harm by taking autonomy out of a survivor's hands.

    b.   When Richardson's Title IX case was opened, LSU employee Sharon Lewis was listed as the respondent instead of Coe. The investigation found that Lewis did violate Title IX policy by not reporting, but no finding was reported on Coe's abuse. This appeared as an attempt to protect Coe's identity or as an institutional disregard for the seriousness of the claims of abuse, which is another form of Institutional Betrayal where the institution values the safety and privacy of the perpetrator over the safety and privacy of the victim and causes further harm to victims.

    c.   When neither Coe nor Lewis (who was found in violation of Title IX) received any consequences in Richardson's case, this was another incidence of Institutional Betrayal where the institution mishandled a case by not enforcing any sanctions for violating its own policies. This type of disregard for the safety and well-being of its members can cause further harm to victims. Richardson described her reaction to the results of the investigation as, "I remember leaving extremely upset, sad, hurt, angry. And I felt like I had put myself through that very draining and traumatic Title IX investigation and brought all this back up again for nothing to happen. So I felt

PLAINTIFFS_00001528

very defeated" (deposition transcript page 243:1-10), a description that highlights how the mishandling of the case can be harmful for victims.

    d. Richardson testified that, "I've never thought it has been [Coe] versus me. I thought it's been me versus the institution. So I think Sharon took the institution and LSU football side" (deposition transcript page 222:13-17) and "after everything that I had experienced and after trying to tell someone and how people who I viewed at that point represented LSU and how it happened, no, I was not trusting anything LSU were to offer me. I was not trusting any police department or anything that was in Baton Rouge or Louisiana associated with LSU, anything or anyone associated with LSU" (deposition transcript page 243:3-20), in a clear declaration of experiencing Institutional Betrayal at LSU that could have reasonably contributed to Richardson's documented PTSD and anxiety (see paragraph 18).

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of abuse is enough to cause further harm to a victim above and beyond the harm caused by the abuse, but to experience multiple accounts of eleven different types of Institutional Betrayal, as Richardson did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Richardson documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone at the institution responded with any of the manifestations of Institutional Support outlined in paragraph 26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, allowing the victim to have a say in how the report is handled, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Richardson endured from her abuse at LSU may have been mitigated rather than compounded by LSU.*

**39. Plaintiff Ashlyn Robertson's complaint describes instances of at least 9 of the 12 manifestations of Institutional Betrayal, outlined below:**

    i. *Creating an environment in which interpersonal violence seems common or like no big deal:*

        a) Robertson stated that her boyfriend disclosed her rape to his football coach, Orgeron, who responded by saying "every girlfriend has sex with other guys" (deposition transcript page 135:10-20), which is a minimizing and dismissive response to a disclosure of rape that makes rape seem like no big deal. Orgeron neglected his mandated reporting duty and did not report this disclosure to the Title IX Office. This inappropriate response leads to the creation of a hostile environment where violence seems common or like no big deal and is a form of Institutional Betrayal that causes harm above and beyond the harm of the interpersonal violence.

    ii. *Creating an environment in which interpersonal violence seems more likely to occur; and*

    iii. *Not taking proactive steps to prevent interpersonal violence:*

        a) Following Robertson's disclosure, John Doe went on to assault at least two other students. The Athletics Department knew of all of these allegations of violence against John Doe, yet did not take any steps to protect the community from his behavior, creating an environment where interpersonal violence is more likely to occur. One common proactive step that LSU failed to take was to make Doe's victims aware that other students had made allegations against him, which is known to facilitate survivor participation in the reporting and investigation of their assaults by overcoming the challenge of the "isolated incident" narrative (see paragraph 22). As Robertson stated, "I believe that if I would had known that other women had allegations against him that I wouldn't have felt so alone and that I would have proceeded with the investigation" (deposition transcript page 129:15-16 and 129:19-130:3). LSU did not take this proactive step that could have prevented further violence by fully supporting the victims to participate in a proper investigation.

PLAINTIFFS_00001529

This creates an environment where interpersonal violence seems more likely to occur instead of creating an environment where survivors are given the tools to support one another, which is healing in and of itself and can prevent future violence because perpetrators know that their victims will have support and can corroborate each other's experiences. Robertson believed that "the closure that would have came from us banning together, me banning with other women together, to take down a perpetrator, I believe that after that would have happened that I would have got help" (deposition transcript page 189:14-23).

b) Harboring a known potential threat to safety by not properly reporting or investigating these disclosures, not taking the proactive steps of training members on how to recognize and respond to sexual misconduct, nor creating environments where survivors can support one another, puts others at risk by not taking steps to prevent future harm from occurring. Additionally, when survivors become aware that LSU knew about these acts of violence and did not protect others from harm, that inflicts further harm of Institutional Betrayal above and beyond the harm of the original violence by shattering a sense of trust or safety once held in the institution.

iv.   *Making it difficult to report the interpersonal violence:*

a) When Robertson went to the LSU Student Health Center to receive medical attention for rape-related injuries, a nurse discouraged her from pursuing an investigation against John Doe by stating "He is like a god around here," and Robertson said, "she didn't believe that things would get done correctly" (deposition transcript page 123:13-124:5). This is a form on institutional betrayal that can inflict harm on its own by degrading a survivor's autonomy by attempting to influence their decision to report and making it difficult to report violence.

b) An additional barrier that Robertson experienced which made it difficult to report is that LSU did not make her aware that other women had come forward with similar allegations against John Doe. It is common practice for institutions to make victims aware that other people have made reports about the same perpetrator because it is widely known that victims are more likely to participate in an investigation if they know they will have the support of other victims instead of facing it alone. As Robertson stated, "I felt alone, and I did not want to be that girl that cried rape against [John Doe]" (deposition transcript page 168:12-19).

v.   *Covering up the interpersonal violence or reports of such:*

a) John Doe's name was not included in any of the records of Robertson's rape, despite the LSU employees responsible for these records knowing John Doe's identity. Other Responsible Employees who knew of this incident did not report it to Title IX at all, clear examples of Institutional Betrayal in which the institution covers up the interpersonal violence by excluding important information from reports or not reporting at all.

b) While including John Doe's identity in a report would not have changed what happened between Doe and Robertson, "It would have," as Robertson stated, "kept a paper trial of all the women he abused" (deposition transcript page 132:3-8), and potentially led to the allegations being appropriately investigated, as Robertson stated, "If I would have known now that those other girls -- that it happened to them shortly after it happened to me, I wouldn't have held my tongue. I wouldn't have been quiet. I would have reached back out and pursued an investigation" (deposition testimony transcript page 187:1-10). Covering up this information is a type of Institutional Betrayal that can cause further harm to victims by degrading their sense of safety and trust in the institution and severely limiting their options for recourse and healing. Robertson stated that knowing John Doe's name was documented "would lead to closure for me" (deposition transcript page 197:24-198:3). It is harmful, separately from the original violence, to become aware that a trusted institution was covering up information that could have prevented others from being harmed, that could have given the affected individual more information to

make informed decisions about how to proceed with their case, and that could have provided them with the closure needed for their recovery.

vi. *Responding inadequately to reports of interpersonal violence; and*

vii. *Creating an environment where continued membership is difficult for the victim:*

    a) Despite multiple responsible employees in the Athletics Department becoming aware of her disclosure of being raped by John Doe, no one from LSU told Robertson that she could request a change in housing accommodations, nor did anyone offer support, resources, clear information about reporting options, or other interim measures to ensure that Robertson could safely continue her education. This inadequate response, coupled with the status on campus of John Doe being "like a god around here" (deposition transcript page 123:13-124:5) and "this famous football player at LSU" (deposition transcript page 168:12-19), would make continued membership in the institution extremely difficult for any rape survivor, especially one like Robertson who had a to share an apartment building with her assailant. This is a clear theme of Institutional Betrayal of "failing to provide adequate support (e.g., not being made aware of or experiencing a lack of availability to counseling resources, academic accommodations, or advocacy services)" that directly impedes victim's recovery process and compounds harm.

viii. *Mishandling the victim's case:*

    a) John Doe's name was concealed in Robertson's Title IX record. Because John Doe's identity was not included in Robertson's records, she was never contacted when two other reported assaults by John Doe were received, as Robertson described in testimony: "No one reached back out to me to let me know that his name had came up in any more investigations, any more allegations. But if I knew that there were other women, then I definitely would have proceeded with the investigation" (transcript page 123:13-124:5). This appears as an attempt to protect Doe's identity or as an institutional disregard for the seriousness of the claims of abuse, which is another form of Institutional Betrayal where the institution values the safety and privacy of the perpetrator over the safety and privacy of the victim, which in itself is harmful.

    b) Even when Robertson indicated she did not want to proceed with a Title IX investigation, she should have still been offered accommodations, support, and resources to help her continue her education in the aftermath of the assault. These measures are not dependent on pursing an investigation and constitute another example of the Institutional Betrayal of mishandling a victim's case.

ix. *Punishing or retaliating against the victim in some way (e.g., loss of privileges or status):*

    a) Robertson could no longer continue her education at LSU, likely directly or indirectly due to the Institutional Betrayal outlined above. As Robertson stated, "My incarceration stemmed from my time at LSU and from my trauma…there was never any closure for me on that. I think a part of my addiction was running from that problem that I had at LSU. I mean, I was hardly ever there. I stopped going to class. I hardly was at my apartment complex" (deposition transcript page 183:7-20). Substance misuse and negative impacts on work or school are well-documented outcomes of sexual assault that are exacerbated by Institutional Betrayal (see paragraph 18) and current recommendations implore academic institutions to not punished student-survivors for behavior or misconduct linked to their trauma but instead create a plan to support the student[20]. Had Robertson received support from LSU in the aftermath of her assault, she could have reasonably avoided these outcomes of trauma and Institutional Betrayal. That LSU will not release Robertson's transcript that will allow her to continue her education at another school until she repays her TOPS scholarship could reasonably be interpreted as a form of punishment, as the injuries Robertson incurred as a result of LSU's neglect of her post-assault support prevented her from completing her education, and caused further harm and hardship. As Robertson stated, "I believe [LSU] bear[s] responsibility for what could have happened after the fact, not the fact that

he raped me, because that is his responsibility…After the fact, I think LSU bears the responsibility, yes" (deposition transcript pages 184:23-185:5), which is a clear declaration of Robertson's experience of betrayal from LSU.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of violence is enough to cause further harm to a victim above and beyond the harm caused by the violence, but to experience multiple accounts of nine different types of Institutional Betrayal, as Robertson did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Robertson documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone at the institution responded with any of the manifestations of Institutional Support outlined in paragraph 26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, allowing the victim to have a say in how the report is handled, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Robertson endured from her assault at LSU may have been mitigated rather than compounded by LSU.*

40. **Plaintiff Samantha Brennan's complaint describes instances of at least 9 of the 12 manifestations of Institutional Betrayal, outlined below:**

   i. *Creating an environment in which interpersonal violence seems more likely to occur, and*
   ii. *Not taking proactive steps to prevent interpersonal violence:*
      a. When Brennan experienced John Doe's sexual harassment, the Athletics Department was already aware of at least one rape allegation against Doe from another LSU student, and yet had not taken any measures to investigate that case or protect the community from further harm by Doe, creating an environment where interpersonal violence is more likely to occur.
      b. Harboring a known potential threat to safety by not properly reporting or investigating these disclosures and not taking the proactive steps of training members on how to recognize and respond to sexual misconduct puts others at risk by not taking steps to prevent future harm from occurring. Additionally, when survivors become aware that LSU knew about these acts of violence and did not protect others from harm, that inflicts further harm of Institutional Betrayal above and beyond the harm of the original violence. LSU did not make Brennan aware that anyone else had come forward with allegations against John Doe. It is common practice for institutions to alert victims that other people have made reports about the same perpetrator because it is widely known that victims are more likely to participate in an investigation if they know they will have the support of other victims instead of facing it alone. As Brennan stated, "I thought I was the only person and this was the only thing that had happened…now that I know there were other allegations the school was aware of. I mean, if Sharon Lewis, Miriam Segar, and everyone else would have done their job at the beginning, Calise wouldn't have been -- like this stuff wouldn't have happened" (deposition transcript page 166:2-167:2), a clear declaration of Brennan's experience of Institutional Betrayal at LSU.
   iii. *Covering up the interpersonal violence or reports of such:*
      a. When Brennan requested her own police report, she was only provided a one-page summary that did not include John Doe's name, did not provide detail of what happened to her, and contained inaccuracies. When she tried to obtain a full copy of the report, Brennan was told she would need to file a subpoena. To any victim of harassment such as Brennan, this could reasonably be interpreted as an attempt to cover up her own report of misconduct which is a form of Institutional Betrayal that can inflict further harm by degrading survivors' sense of safety and trust

in the institution and severely limiting their options for recourse and healing. Brennan testified that this "sent a lot of red flags to me, and it made it seem like LSU was trying to get rid of it or cover it up" (deposition transcript page 204:11-13). Brennan also testified to how this affected her: "Now finding out that they knew about so many other people, I would have been afraid of them. They did a lot to try to keep this report from flagging other reports and names out of documents. They could do a lot more to try not to have issues in their department" (deposition transcript page 180:24-185:11), a clear declaration of Brennan's experience of Institutional Betrayal at LSU.

iv.    *Responding inadequately to reports of interpersonal violence, and*

v.    *Creating an environment where continued membership is difficult for the victim:*

    a.    No one from LSU offered Brennan support, resources, clear information about reporting options, her rights, or other interim measures to ensure that she could safely continue her education. As Brennan testified, "I wouldn't really say there were any measures, other than asking me if I wanted to pursue an investigation" (deposition transcript page 177:9-16) and "I don't know what any of those things [her rights under LSU Cares, Title IX, or the Lighthouse] really are, so correct, I don't know my rights" (deposition transcript page 212:3-8). This inadequate response would make continued membership in the institution extremely difficult for any survivor of sexual harassment or assault. This is a clear theme of Institutional Betrayal of "failing to provide adequate support (e.g., not being made aware of or experiencing a lack of availability to counseling resources, academic accommodations, or advocacy services)" that directly impedes victim's recovery process and compounds harm.

    b.    Further, while no apparent measures were taken to support or protect Brennan after Doe's harassment and while John Doe became a star football player after several disclosures of sexual violence, Brennan could not maintain a position on LSU's football recruiting team or even attend class without being presented with reminders of her harassment and reminders that Doe was free to continuing harming Brennan and others. This would reasonably create an environment where continuing to work and attend school would be extremely difficult, causing further harm. Brennan testified that "If this incident did not happen, absolutely, I would have continued with my job there" (deposition transcript page 113:16-114:8, 18-23).

vi.    *Making it difficult to report the interpersonal violence, and*

vii.    *Mishandling the victim's case:*

    *a.*    Brennan was told that Defendant Segar was a student advocate, in a clear misrepresentation of her role in the Athletics Department. Advocates are generally considered to be confidential resources for survivors of relationship violence and sexual misconduct who have received specific training in counseling, advocacy, and assistance to victims. This misrepresentation was a violation of trust and Institutional Betrayal that reasonably could cause further harm by creating confusion and withholding actual advocacy services.

    *b.*    Brennan testified to "Sharon Lewis asking me if I wanted to handle this officially or unofficially" (deposition transcript page 63:24-64:6), which is an inappropriate response that obfuscates the established protocol for responding to reports of sexual misconduct. Brennan testified that she "got a text saying all of the higher-ups knew" (deposition transcript page 170:12-19) but was not officially made aware of who was interviewed or what the official procedure was. Brennan was never given information about the Title IX reporting process nor contacted from anyone in the Title IX Office, other clear manifestations of the Institutional Betrayal of mishandling a victim's case.

viii.    *Creating an environment in which interpersonal violence seems common or like no big deal, and*

ix.    *Creating an environment where the victim no longer feels like a valued member of the institution:*

PLAINTIFFS_00001533

b) Despite LSU's knowledge of John Doe taking and distributing a nonconsensual nude photograph of Brennan, and of at least two rape allegations against John Doe, he became LSU's star football player who was revered and cheered on by Brennan's classmates and the Athletics Department. Brennan testified to the difficulties of "having to be in an environment that 100,000 people cheered on this football games" (deposition transcript page 166:2-167:2). This institutional disregard for the seriousness of the claims of violence is another form of Institutional Betrayal where the institution values its reputation over the safety and well-being of victims of violence. This type of Institutional Betrayal would make any victim feel less valued by LSU and create an environment where sexual misconduct seems common or like no big deal, both of which can inflict further harm on victims.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of sexual harassment is enough to cause further harm to a victim above and beyond the harm caused by the harassment itself, but to experience multiple accounts of nine different types of Institutional Betrayal, as Brennan did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Brennan documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone at the institution responded with any of the manifestations of Institutional Support outlined in* paragraph *26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, allowing the victim to have a say in how the report is handled, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Brennan endured from her sexual exploitation at LSU may have been mitigated rather than compounded by LSU.*

41. **Plaintiff Abby Owens' complaint describes multiple instances of at least 10 of the 12 manifestations of Institutional Betrayal, outlined below:**

i. *Creating an environment in which interpersonal violence seems more likely to occur, and*
ii. *Not taking proactive steps to prevent interpersonal violence:*
   a. When the Athletics Department received reports of John Doe's rape of Owens, they were already aware of others who had reported abuse by Doe and yet had not taken any measures to investigate those cases or protect the community from further harm by Doe, creating an environment where interpersonal violence is more likely to occur.
   b. Harboring a known potential threat to safety by not properly reporting or investigating these disclosures and not taking the proactive steps of training members on how to recognize and respond to sexual misconduct puts others at risk by not taking steps to prevent future harm from occurring. Owens testified to not receiving any training that addressed Title IX (deposition transcript page 18:19-21), which likely hindered her ability to receive the help she needed after her rape. Additionally, when survivors become aware that LSU knew about these acts of violence and did not protect others from harm, that inflicts further harm of Institutional Betrayal above and beyond the harm of the original violence.
iii. *Making it difficult to report the interpersonal violence, and*
iv. *Responding inadequately to reports of interpersonal violence:*
   a. After LSU Athletics Department received a report of Owens' rape by John Doe, Owens was never contacted by anyone at the Title IX Office to offer support, resources, information about the reporting and investigation process, or interim measures that Owens could take that would allow her to safely return to school to continue her education, a clearly inadequate response to this report of violence and a manifestation of Institutional Betrayal that likely inflicted further harm on Owens by "failing to provide adequate support (e.g., not being made aware of or experiencing a

PLAINTIFFS_00001534

lack of availability to counseling resources, academic accommodations, or advocacy services)" that directly impedes victim's recovery process and compounds harm.

   b. Owens testified that "I didn't know that Title IX was a thing" and "I did not know what [Lighthouse] was" (deposition transcript page 88:24-89:1-3, 6-8). Owens was not aware of the existence of the Title IX Office despite the Athletics Department and Title IX receiving reports of her being raped by John Doe, indicating a culture at LSU in the Athletics Department where reporting misconduct is difficult because members of the institution are not properly trained or educated on LSU's sexual misconduct policy. When Owens found out years later that the Title IX Office and Lighthouse program existed at the time of her rape and were supposed to provide her with support but did not, this is a form of Institutional Betrayal that could inflict further harm. Owens expressed that "I should have been told about the Title IX office and about what my options were and what my resources were, and I wasn't" (deposition transcript page 213:12-18), in an example of Institutional Betrayal where it is the withholding of information and resources that is harmful and shatters trust in the institution.

   v. *Covering up the interpersonal violence or reports of such*, and

   vi. *Mishandling the victim's case*:

   a. Owens' father disclosed her rape to co-head tennis coach Julia Sell, who neglected her mandated reporting obligations by not reporting to the Title IX Office, thereby insulating John Doe from being investigated and covering up yet another report of violence against Doe. Owens expressed her belief that Sell had motivation "to protect like LSU athletics" (deposition transcript page 214:6-9), a clear declaration of experiencing Institutional Betrayal at LSU.

   b. When Owens later contacted the Title IX Office for a copy of her report, the Title IX Office indicated that the Athletics Department did not provide the name of the assailant, in another example of insulating John Doe from being investigated and held responsible for his actions. Owens testified that something she expected LSU to have done that it didn't do was, "Everyone said that the reason an investigation wasn't done or whatever was because you guy didn't have the name. But like how easy is it to get the name?" (deposition transcript page 208:10-17), a declaration of experiencing Institutional Betrayal by LSU.

   b. LSU never opened a Title IX investigation following reports of Owens' rape and failed to keep records related to Owens reports. Owens testified to contacting the Title IX office "to see if like we could get more information on what was told to them or like if there was a report…and [Jennie] said, no, like there is no report" (deposition transcript page 204:22-205:9). This type of Institutional Betrayal can cause further harm to victims by degrading their sense of safety and trust in the institution and severely limiting their options for recourse, closure, and healing.

   vii. *Denying the victim's experience in some way:*

   a. When Owens' father disclosed the rape to co-head tennis coach Julia Sell, she responded that she did not believe Owens had been raped, a clear example of Institutional Betrayal in which the institution responds to reports of violence with a minimizing or dismissive response instead of taking the accusations seriously. Owens testified to this account, stating, "My dad basically told her that I was raped by an LSU football player. I don't think he said his name at that point. And she said, I don't believe her" (deposition transcript page 79:19-24) and she spoke of resentment against Julia Sell referring to "when she said, I don't believe her, to my dad" (deposition transcript page 174:9-14), a clear declaration of Institutional Betrayal that continues to effect Owens. Commonly referred to as "the second rape," "the second assault," or "secondary victimization," it is common for survivors of sexual trauma to describe responses of disbelief such as Sell's as just as harmful or even worse than the original violence and such responses extend or exacerbate the trauma of the original assault[14](also see paragraph 17), which aligns with Owens description of the impact of Sell's comment.

viii. *Creating an environment where continued membership is difficult for the victim*.
   a. LSU and the Athletics Department's negligence in allowing John Doe to remain on campus without investigating the several abuse allegations against him or offering any support to the victims who made reports reasonably made continued membership at LSU extremely difficult for any of Doe's victims whom he still had access to at LSU, including Owens who left LSU during her senior year, causing further harm and hardship. Owens testified that she made the decision to leave LSU "after finding out like that Julia had said that" and "I didn't want to potentially be around [John Doe]" (deposition transcript page 89:9-22), highlighting the effect that Julia Sell's disbelief had on Owens and the perceived danger of Doe's presence on campus, both examples of Institutional Betrayal that likely caused further harm and made continued membership difficult or impossible at LSU.

ix. *Creating an environment where the victim no longer feels like a valued member of the institution, and*
x. *Punishing or retaliating against the victim in some way (e.g., loss of privileges or status):*
   a. Owens was not allowed to re-join the tennis team following her leave. This decision by Julia and Mike Sell to keep her off the team came after Owens' father disclosed the rape to Julia Sell who said she did not believe Owens. This could reasonably be interpreted as a form of retaliation and an environment where Owens no longer felt like a valued member of the institution, inflicting further harm on Owens in the aftermath of violence.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of sexual violence is enough to cause further harm to a victim above and beyond the harm caused by the harassment itself, but to experience multiple accounts of ten different types of Institutional Betrayal, as Owens did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Owens documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone at the institution responded with any of the manifestations of Institutional Support outlined in* paragraph *26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, allowing the victim to have a say in how the report is handled, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Owens endured from experiencing sexual violence at LSU may have been mitigated rather than compounded by LSU.*

42. **Plaintiff Elisabeth Andries' complaint describes multiple instances of at least 9 of the 12 manifestations of Institutional Betrayal, outlined below:**

i. *Creating an environment in which interpersonal violence seems common or like no big deal, and*
ii. *Responding inadequately to reports of interpersonal violence:*
   a. Andries scheduled an appoint with the Lighthouse Program after her sexual assault where she communicated, "I didn't want to report the name. I just want to report the incident and see my options. And they basically told me that if I didn't want to press charges, there wasn't really much to do if I didn't want to the give the name and whatnot" (deposition transcript page 54:19-55:3), which is a clearly inadequate response to a disclosure of sexual misconduct. Anyone disclosing sexual misconduct should first and foremost be given information about all of their options whether or not they choose to file a report, should be offered counseling and other supports including access to academic accommodations. This inadequate response likely not only hindered Andries' in recovering from the trauma of her assault but was also likely harmful in itself due to the effects of this type of Institutional Betrayal that shatters once-held hope and trust that the institution was there to support students.
   b. Andries utilized the Student Advocacy and Accountability (SAA) for assistance with filing a Title IX report for sexual assault and for requesting accommodations from LSU Disability Services to deal

with panic attacks she was having because the person who sexually assaulted her, John Roe, was in her class that semester. The SAA employee that Andries met with never contacted Andries' professor as promised to explain the accommodation that Andries needed to minimize her time in the classroom with her assailant Roe. Andries testified that she met with her professor who asked why she was missing classes, and "I said, "Oh, didn't student advocacy call you to explain my situation with Title IX?" And he was shocked and said, "This is the first time I'm hearing any of that" (deposition transcript page 133:12-24). This lack of regard for a reasonable request for accommodation after a sexual assault highlights the environment at LSU that does not take interpersonal violence seriously and which responds inadequately to reports of such, a clear theme of Institutional Betrayal of "failing to provide adequate support (e.g., not being made aware of or experiencing a lack of availability to counseling resources, academic accommodations, or advocacy services)" that directly impedes victim's recovery process and compounds harm. When Andries found out from her professor that nobody ever told him about her accommodation request, that failure as a form of Institutional Betrayal likely caused even further harm.

iii. *Making it difficult to report the interpersonal violence:*

   a. When Andries wanted to make a Title IX report regarding a sexual assault she experienced from a classmate, she could not find any information about LSU's Title IX Office, an institutional failure of LSU to educate its members about their rights and obligations with regard to harassment and discrimination on campus that constitutes Institutional Betrayal and placed an undue burden on Andries in the aftermath of her assault, causing further hardship. Andries testified that "I had googled "Title IX LSU." Not much came up, so I went to—I assumed it would be with the student accountability office because I felt that was the closest wording, "accountability," to something like that" (deposition transcript page 66:3-6, 66:23-67:8). Andries then testified that SAA did no explain her rights, but that "I got this just from reading Title IX policies across different campuses, was that I was supposed to be given the right to do private studies, which is why I requested for it. It was never offered to me. So I had begun to realize that they were not entirely following all of Title IX's proper procedures" (page 129:25-130:10), which demonstrates the difficulty survivors at LSU face in just knowing where to go to report interpersonal violence and where to obtain information about their rights, which constitutes a form of Institutional Betrayal.

iv. *Covering up the interpersonal violence or reports of such*:

   c. When Andries provided Defendant Sanders with the name of another student who was assaulted by Roe, Sanders never reported this disclosure to the Title IX Office or any entity, concealing information regarding potential other acts of violence by Roe. Andries testified that, "I asked Emma Vincent, I believe, a month or two later in October, and she told me that she was never contacted by anyone" (deposition transcript page 102:20-24). Andries testified that LSU not contacting another potential witness or victim "did not affect me personally, but it may have affected the case" and answered affirmatively to the question "the more accusations there are by the -- more people, the more likely someone is to receive disciplinary action?" (deposition transcript page 193:12-14, 193:21-194:11), which is related to overcoming the challenge of the "isolated incident" narrative (see paragraph 22). This type of Institutional Betrayal can cause further harm to victims by degrading their sense of safety and trust in the institution and severely limiting their options for recourse and healing.

v. *Punishing or retaliating against the victim in some way (e.g., loss of privileges or status):*

   a. When Roe was found responsible for sexually assaulting Andries, LSU issued both Andries and Roe a mutual no-contact order. Issuing a no contact order against Andries who was not found responsible for any wrongdoing is a punitive measure that could reasonably be interpreted as retaliation for reporting an assault. While Roe appealed this decision, Andries was never given opportunity to respond to or appeal this disciplinary measure be taken against her.

    b.   After Roe's final appeals were denied and his disciplinary measures set, he was still allowed to remain on campus and the SAA office communicated to Andries that she would need to change her schedule if she did not want to be in class with Roe, as she testified, "They told me since I was the uncomfortable one, I would have to rearrange my schedule around his" (deposition transcript page117:22-118:8), which could be reasonably interpreted as a form of punishment. Placing undue burden on victims of violence to protect themselves when it is the institution that has knowledge of all student schedules and the power to issue accommodations such as class schedule changes which reasonably should be shouldered by the student found responsible of violating the Title IX policy and not the student who was violated is a clear example of retaliatory Institutional Betrayal:

vi.   *Mishandling the victim's case:*

    a.   When Andries was contacted by a Title IX investigator to meet for an interview regarding the assault she reported, a graduate student was who met her and not the Title IX investigator employee. The graduate student never contacted the witnesses to the assault that Andries provided, a clear mishandling of this case. Andries was not given an explanation about why her case was being handled by a graduate student, but could reasonably be interpreted as a lack of investment by the institution into seriously investigating claims of harassment and violence. Additionally, Andries testified that Roe was given an extension to appeal because "Jennie states that she was out of office, but there was no explanation to why anyone else couldn't have answered the questions for him or any explanation to why -- not informing us before why there was an extension given" and "if I was passed on to a graduate student, why couldn't he also be passed on to someone else" (deposition transcript page 93:1-3, 6-20), which constitutes a from of Institutional betrayal in which Andries was not given the same consideration as Roe in how her case was handled.

    b.   When Andries inquired about a no-contact order against her assailant, John Roe, Defendant Stewart, LSU's Title IX Coordinator, said there was no reason to issue a no-contact order since Andries and Roe hadn't spoken recently. Andries testified, "She said that since he hadn't directly tried to contact me personally since 2017, that there was no issue to put one out there" (deposition transcript page 77:22-25). Instead of issuing a no-contact order, Andries was given language to initiate a "peer-to-peer" no-contact request, which she did not do because of "being scared contacting him in general since the last interaction was questionably violent and just not wanting to reach out to him at all" (deposition transcript page 82:10-18). Placing the burden on a victim of violence to contact their perpetrator to obtain the safety measures they need to continue their education is unreasonable, trauma-uninformed, and places the victim at further risk for harm. This disregard for survivor safety and negligence of duty to provide reasonable accommodations and interim measures to ensure Andries could safely continue her education is a clear example of Institutional Betrayal that likely inflicted even further harm.

    c.   When Andries professor made his own report to the Title IX Office after Andries disclosed her assault to him, the Title IX Office never contacted her professor or Andries herself regarding this new report. As Andries testified, "Roberto Champney submitted a student-in-distress report to LSU. And as it says in the report, that was never followed up" (deposition transcript page 202:9-18).

    d.   When John Roe was found in violation of the Title IX Policy, he submitted an appeal two weeks after an already extended deadline and the Title IX Office still accepted the appeal. Andries was not provided with a copy of the appeal, nor given an opportunity to respond to it, nor given any updates on the status of the appeals process or why an extension had been granted, which Andries testified that "from what Caroline informed me, [Ms. Stewart] told her that was non of our business" referring to the reason for the extension. This led to confusion, as Andries testified,

"There was a numerous amount of extensions to be appealed by [Roe] given with little to no communication, whether an extension had been given or if he had appealed. It's -- it's very hard for me to remember which ones were extended, which ones -- I know all of them were appealed, but how many extensions were given, which dates he actually appealed it, things like that. There were so many, I honestly couldn't keep track of it" (deposition transcript page 89:4-14). Andries testified that "I believe it's required to give the individuals a copy of the appeal… If I was given the chance to know that he filed an appeal, I would have been given the opportunity to also respond to an appeal" (deposition transcript page 202:9-18), in a clear description of LSU mishandling Andries case.

e. When Roe then appealed the disciplinary decision which stayed his deferred suspension and allowed him to remain on campus, nobody told Andries that her assailant would still be on campus, information that is relevant to victim safety. When Andries saw Roe on at a football game on campus when she thought he was not supposed to be there, she reported this to LSU, and testified that "I believe my father called the school as well when I didn't get a clearcut answer…And then I believe, after my father had called, they explained they had forgotten to take out his student ticket rights or pause his student IDs" (deposition transcript page 116:5-117:14). This mishandling of Andries case put her and others in danger and likely caused further harm of Institutional Betrayal when she could see that LSU was not upholding its responsibility to protect her from harm.

f. When Defendant Sanders requested to meet with Andries to discuss the appeals and sanctioning process after Roe had been found responsible for violating the Title IX Policy, he asked inappropriate and unnecessary questions, as Andries testified, "He reread my entire assault case back to me, which I felt was very triggering, and also proceeded to ask questions, whether if I take drugs and things along that… My -- my attire for that night, if -- in one report, I said the middle back of the bus, and then in the next, I said the back of the bus, so which one really is it? Asking multiple -- which drugs I take and clarifying which ones and going through that and other things" and Andries "asked him why he was asking if the investigation was over. He then got defensive and said, "I'm just trying to -- to figure out a proper assessment." (deposition transcript page 98:1-24). These types of questions are extremely trauma un-informed, asking what a victim was wearing or whether they were on drugs can be reasonably interpreted to infer that the victim's behavior was the cause of the assault, which in this context is a form of Institutional Betrayal that can cause further harm above and beyond the assault itself. Questioning Andries about saying "back of the bus" in one report and "middle back of the bus" in another appears to be an attempt to discredit her account as being inconsistent, but it is extremely common for trauma survivors to not be able to recall certain details of a traumatic event such as the specific location on a bus where an assault occurred because of the way that trauma memories get stored in the brain. During a traumatic experience like sexual assault, the brain shifts into "survival mode" that can be thought of as a survival reflex to trauma. In this reflexive state of "survival mode," memory storage can be affected due to stress hormones that get released during trauma, including adrenaline, cortisol, opioids (natural morphine), and oxytocin (the feel-good chemical). The primary purpose of these hormones is to survive the immediate threat (adrenaline and cortisol facilitate fight-or-flight) and to minimize pain and suffering (opioids and oxytocin block the sensation of pain). High levels of these hormones can affect memory storage during a traumatic experience. Memories stored during trauma are not stored like other memories. Instead of being stored in a sequential manner (e.g., "first this happened and then this happened"), trauma memories are stored in discrete, fragmented chunks of information. Because the brain is diverting most of its resources to immediate survival, it may only store information that is highly relevant to immediate survival, which primarily includes sensory information like smells or sounds, and not

PLAINTIFFS_00001539

details like times and dates or even locations. Someone may remember a very specific color of carpet in a room where they experienced a traumatic event, but not remember the day or even the year it happened. This is because the date didn't matter to their survival at the time so the brain didn't use its precious survival energy to encode that into its memory storage. This phenomenon of fragmented memory storage during trauma leads to difficulty recalling traumatic memories later, which has presented challenges to criminal or judicial investigation work. When investigators or attorneys ask a trauma survivor to recall certain details of a traumatic experience, the survivor's inability or hesitation to recall details—and the fragmented nature of their statements—may seem suspicious or like they're making it up as they're going along, but this is a common effect of recalling traumatic memories because of the effects of trauma in how those memories were stored in the brain initially. So, while it may be counter-intuitive to think of a traumatic experience as something someone could "forget" or not remember clearly, decades of research on the neurobiology of trauma elucidate stress hormone mechanisms that explain why traumatic memories can be difficult or impossible to recall in the same way other memories are recalled. These disruptions in traumatic memory recall are exacerbated by stressful or triggering situations in which trauma survivors are asked to face their perpetrator, recount details of their trauma, or are presented with direct or indirect reminders of their trauma. However, research indicates that when survivors do recall pieces of information about a traumatic experience, what they remember is generally accurate. The manner in which Defendant Sanders was questioning Andries was undoubtedly triggering, harmful, and as Andries testified, "All I remember when leaving that meeting was being extremely angry and felt completely disrespected" (deposition transcript page 98:1-24), in a clear declaration of Andries experience with Institutional Betrayal at LSU.

vii. *Not taking proactive steps to prevent interpersonal violence; and*

viii. *Creating an environment where the victim no longer feels like a valued member of the institution:*

   a. After Roe was found responsible for violating LSU's Title IX Policy by sexually assaulting Andries, the SAA office attempted to contact Roe to ask him to change his schedule so he was not in the same class with Andries but Roe never responded. SAA did not take any other actions, did not contact Andries to make her aware that her and Roe were registered for the same class, and then told Andries she was the one who needed to change her schedule if she didn't want to be in class with her assailant. Andries testified that this left her with no choice but to take classes online because "we had four out of five of my classes together, which since it's a senior-level industrial engineering classes, you don't have many options on different times and things like that," and "I tended to avoid campus as much as possible. I was taking classes online since I was forced to do so" (deposition transcript pages 117:15-19, 117:22-118:8), a clear declaration of the Institutional Betrayal that Andries experienced at LSU which created an environment where interpersonal violence was not being preventd and in which she no longer felt like a valued member.

   b. The sanction that Roe received for sexually assaulting Andries included a deferred suspension, but nobody ever told Andries that a deferred suspension mean Roe would still be allowed to remain on campus. When Andries saw Roe at a football game after he was suspended, she testified that, "According to what I understood out of the suspensions, he wasn't allowed to go to any said football games or any campus events and had to withdraw entirely. So I reported it to them and -- to LSU. And I remember them saying that he had appealed something else or something along those lines. And so it was still in the interim rights, and that's why he was able to go" (deposition transcript page 116:5-117:14). This lack of regard for survivor safety and placing the burden on survivors to avoid their assailants without offering any protective measures or accommodations is a form of Institutional Betrayal that contributes to creating an environment where victims are not

valued members of the institution and exposes Andries and others to further victimization by not taking proactive steps to prevent interpersonal violence from known offenders.

ix.   *Creating an environment where continued membership is difficult for the victim.*

    a.  Even though Roe was found in violation of LSU's Title IX Policy, Andries had concerns that if he was suspended and then later returned to LSU, she would still have to be in the same classes with him. The SAA official who Andries sought help from for this concern did not offer any solutions or reassurance that accommodations could be made for Andries to continue her education safely. This concern came to fruition when in the following semester, Andries walked into her first day of class and saw Roe was also in the class, and she had a panic attack and had to exit the room. Andries testified that "Either I would show up and have to leave within -- before even class started or in the middle of it from having a panic attack or just the fear of going in there" (deposition transcript page 64:18-25). This is a clear description of a common post-trauma response in which the brain detects a cue reminiscent of a past traumatic event (in this case, the presence or possibility of the presence of a person who, in Andries words, "had assaulted me successfully once and attempted a second time" (deposition transcript page 64:18-25) and responds as if that trauma is happening again, with one of the survival responses such as flight, fight, freeze, or fawn. A trauma survivor may experience these trauma cues as floods of emotions or flashes of visualizations that are completely overwhelming as if the trauma is happening all over again. When triggered, there is an intense activation of the visual cortex of the brain and a deactivation of the verbal area, so when someone is in this state, they often cannot describe what's going on or what they're feeling, and they experience it as just a flood of sensations like fear, panic, or shutting down. Survivors often describe this as if they are "re-living" their trauma, and in this state, they are often unable to communicate or follow directions because their brain is only focused on survival. These types of trauma responses are a mechanism of the brain to try to protect against future harm, but which are highly disruptive to an individual's day-to-day life and make it nearly impossible to do something such as participate in a classroom where this trauma cue is present. In response to the question "So you could have continued to attend the classes even though [Roe] was in the room?" Andries testified "Considering the semester previous where I had panic attacks constantly, no, I would not have been able to have sat in class with him" (deposition transcript page 120:10-14). It is unreasonable to expect a sexual assault survivor to be able participate in a classroom with her assailant present as the brain would constantly be focused on survival in that environment in the presence of a known threat and would be incapable of focusing on educational instruction. These effects of trauma can be reasonably accommodated by offering changes in scheduling, resources, and other forms of support from the institution. The lack of accommodation from LSU for Andries whose assailant was found in violation of the institution's own sexual misconduct policy but yet who LSU still allowed to remain in the same class with his victim created an environment where continued membership at LSU would be reasonably extremely difficult for Andries and interfered with her ability to continue her education, causing further harm and hardship.

    b.  Considered together, all of the above conditions could have reasonably created an environment where continued membership at LSU was difficult for Andries, who testified "I had a difficult time with some of my professors as well as the Title IX things and feeling unsafe on campus just from the assault in general because I had withdrawn from activities and failed out and things like that. And I trusted Tracy to help me with this process," who Andries testified to losing trust in after "she told me that because we're both students, we have equal rights for the classes and since I'm uncomfortable, I would have to move mine" (deposition transcript page 128:19-129:1, 5-11), and "I think after the multiple appeals and not being told, I started to feel distrust with everyone throughout the process just from kind of being pushed to the side during all of it. And especially

after I got told since I was the uncomfortable one, I began to not trust anything that had happened before or after that" (deposition transcript page 132:18-24), in a clear declaration of the Institutional Betrayal Andries experienced at LSU that likely caused further harm.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of sexual violence is enough to cause further harm to a victim above and beyond the harm caused by the harassment itself, but to experience multiple accounts of nine different types of Institutional Betrayal, as Andries did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Andries documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Particularly egregious is LSU's refusal to accommodate Andries in being able to attend classes without her assailant and placing the burden on her to avoid him even at the expense of her own education. Had the institution responded with manifestations of Institutional Support outlined in* paragraph 26 above *such as ensuring the victim is treated as an important member of the institution and meeting the victim's needs for support and accommodations, the harm Andries endured from experiencing sexual violence at LSU may have been mitigated rather than compounded by LSU.*

43. **Plaintiff Jade Lewis' complaint describes multiple instances of at least 10 of the 12 manifestations of Institutional Betrayal, outlined below:**

   i. *Creating an environment in which interpersonal violence seems common or like no big deal; and*
   ii. *Covering up the interpersonal violence or reports of such:*

   a. Julia Sell did not report the violence disclosed by Lewis' teammates and Lewis' father to the Title IX office, nor did she speak with Lewis about the disclosures. When Lewis herself reported Coe's violence to team athletic trainers, they did not report this disclosure to Title IX or any entity. When Coe admitted the violence himself to Defendant Ausberry, he did not report the violence to the Title IX Office or any entity. Lewis testified that "I don't recall them ever offering to go to the police. It was all kind of, like, internal... it was definitely "always try to keep internal," is the vibe I got" (deposition transcript page 227:1-14).

   b. Lewis testified to the environment in the Athletics Department that treats interpersonal violence like it's common or inevitable: "It kind of felt like he knows it's a habit and a culture and he just knows that's the system...Behavior by football and basketball players...Abusive, criminal, sexual, whatever you want to call it...he made it seem like he knows football is this way...he definitely made it seem like football is just that way" (deposition transcript page 242:3-17). And when referring to comments about being blamed for Coe being banned from the weight room, Lewis testified that "Andre Sale told me that and said that, like, basically football is saying -- football coaches and football players saying that it's, like, my fault. And I think that just goes to show the mentality and the culture of football" (deposition transcript page 290:4-13). Lewis further testified that "I think, again, it just stems from football culture and just their behavior and what the coaches allow. You know, I think that's -- that's where -- that's the root of the issue. You know, it's not blaming the girl. It's not -- it's, you know, Drake, who, you know, abused me and multiple others for years, along with many other student athletes on the football team who did the same thing. You know, I just think it's a culture issue" (page 292:21-296:7), clear declarations of how Lewis experienced the Institutional Betrayal of LSU creating an environment in which interpersonal violence seems common or like no big deal.

   c. These are clear examples of Institutional Betrayal in which the institution responds as if this violence is inevitable or not serious, creating a hostile environment where violence is more likely to happen because no reports are being made to address these issues, which in itself is a form of covering up the interpersonal violence by attempting to insulate knowledge of violence within the Athletics Department. This type of Institutional Betrayal can cause further harm to victims by

PLAINTIFFS_00001542

degrading their sense of safety and trust in the institution and severely limiting their options for recourse and healing.

iii. *Creating an environment in which interpersonal violence seems more likely to occur; and*

iv. *Not taking proactive steps to prevent interpersonal violence:*

    b. When Responsible Employees in the Athletics Department were made aware of the violence Lewis was experiencing from Coe, the department was already aware of Coe's prior abuse of Plaintiff Richardson and yet had not taken any measures to investigate or protect the community from further harm by Coe, creating an environment where interpersonal violence is more likely to occur. Lewis testified that what she wanted was for "LSU to be like, hey, this is not okay behavior" (deposition transcript page 240:3-10), but when LSU did nothing to address Coe's behavior, this created an environment where interpersonal violence seems more likely to occur.

    a. Harboring a known potential threat to safety by not properly reporting or investigating these disclosures and not taking the proactive steps of training members on how to recognize and respond to sexual misconduct and relationship violence puts others at risk by not taking steps to prevent future harm from occurring. Additionally, when survivors become aware that LSU knew about these acts of violence and did not protect others from harm, that inflicts further harm of Institutional Betrayal above and beyond the harm of the original violence.

v. *Responding inadequately to reports of interpersonal violence;*

    a. For two years, the only disciplinary action taken against Coe despite multiple Title IX investigations, an LSU police dispatch, and multiple witnesses corroborating the violence Lewis was experiencing from Coe was banning Coe from the weight room for one summer, which did nothing to protect Lewis or other women from his violence. Lewis testified that is was difficult to take advantage of resources like counseling when LSU was not properly protecting her from Coe: "I think at the time, I felt that [the counseling] was useless, and I probably just, like, didn't want to talk about it with all these different people... it was made available to me, but you know, I was still in it, you know. Kind of tough" (deposition transcript page 238:5-21), which reflects the fact that services like counseling are often considered to not be useful to survivors of domestic violence who are still currently experiencing violence because when a survivor is "still in it," all of their energy is focused on surviving and trying to avoid being harmed, and in that state, it is difficult to experience the benefits of psychological counseling to process the effects of the abuse. The first priority should always be immediate safety, and then after safety is reached, can a survivor benefit from services like counseling.

    b. Lewis testified that, "I think he should have had a punishment already back then, the first time, not the fifth time -- fourth time...like, give it one attempt, but the second time, you're done. Like, one time, like, some sort of punishment, whatever they think is logical. Have a good sit down. Like, give him some, like, seminars, like, you know, therapy, whatever. Try and get to the root of it. And, you know, if he does it again, then it needs to go to the police; simple" (deposition transcript page 288:22-289:11), in a clear declaration of Lewis' experience of Institutional Betrayal at LSU.

    c. Finally, two years after the initial disclosures of Coe's violence against Lewis, Coe was expelled from LSU. This extremely slow and inadequate response to reports of interpersonal violence not only left Lewis and others vulnerable to continued harm for years, but was also a form of Institutional Betrayal that likely inflicted further harm by leaving Lewis alienated with no support from the institution that had the power and responsibility to protect her from a violent environment.

vi. *Punishing or retaliating against the victim in some way (e.g., loss of privileges or status):*

    a. When LSUPD came to Lewis' apartment after reports of him strangling and hitting Lewis, no disciplinary action was taken against Coe for physically attacking Lewis, but Lewis was

PLAINTIFFS_00001543

immediately charged with violating the residential life policy by having a candle in her room when LSUPD arrived and was placed on academic probation. Lewis testified that when she was interviewed by the Title IX Office, "I was more interviewed about giving him the key and a candle in my room" (deposition transcript page 152:25-153:4) instead of about the instances of abuse by Coe. This uneven application of responses to violations of campus conduct policies that focused on Lewis candle and not on Coe's abuse, could reasonably be interpreted as retaliation against Lewis for the multiple reports against Coe that had been made and caused further harm to Lewis by highlighting that it is not just that LSU does not have the capacity to respond to policy violations, but that it specifically does not respond to interpersonal violence.

b.  When football coaches made comments to Lewis indicating that they blamed her for Coe being banned from the weight room, these types of victim-blaming responses that attempt to hold the victim accountable for the perpetrators' behavior are harmful and retaliatory and constitute a from of Institutional Betrayal because they came from Responsible Employees at LSU. Lewis testified to the State Senate that "As the abuse worsened, I was hesitant to co cooperate further with law enforcement of LSU, believing my reports would not offer protection and instead would make me more vulnerable to beatings and ongoing harassment and retaliation from the staff and members of the football team" (State Senate testimony transcript timestamp 6:18:30).

c.  Lewis also testified to the State Senate that she was "threatened with deportation by the LSU police chief" (State Senate testimony transcript timestamp 6:16:00), a clear form of retaliatory intimidation.

vii.  *Mishandling the victim's case:*

a.  When a Title IX report was finally made about the violence Lewis was experiencing from Coe, Lewis never received a report detailing the findings of the investigation. Lewis testified that "this report seems very fake" when later read a section that says "Lewis assured me that she and Drake have only ever shared a consensual sexual relationship" (deposition transcript page 282:21-283:4). Lewis was never offered interim measures to protect her from Coe's violence who continued to abuse her while the Title IX investigation was ongoing.

b.  When Lewis reported retaliation to Defendant Segar, Segar did not address the retaliation, nor offer Lewis support, nor report the retaliation to the Title IX Office.

c.  When Coe was finally arrested by LSUPD and charged with felony dating violence, Lewis was never provided any notification about the disciplinary actions imposed on Coe.

d.  When interviewed by police, Responsible Employees, tennis coaches Mike and Julia Sell and athletic trainer Donovan White misrepresented when they first learned of Coe's abuse.

e.  When LSU expelled Coe for violating the Title IX Policy, LSU never notified Lewis of the actions they took against Coe.

f.  The examples above outline a pervasive mishandling of Lewis' case by withholding information important to her safety from Lewis, withholding support and accommodations, not addressing retaliation, and concealing facts about the case, all of which constitute the Institutional Betrayal of mishandling a victim's case that cause further harm.

viii.  *Denying the victim's experience in some way:*

c.  When Lewis' father disclosed to Julia Sell that Coe punched Lewis in the stomach, Sell responded that this could not be possible, a clear example of Institutional Betrayal in which the institution responds to reports of violence with a minimizing or dismissive response instead of taking the accusations seriously, which in itself is harmful. Lewis described how her parents "have been traumatized with this situation" (State Senate testimony transcript timestamp 6:19:30).

ix.  *Creating an environment where the victim no longer feels like a valued member of the institution:*

a.  When the criminal case against Coe was pending, Julia Sell instructed Lewis' teammates to stay away from Lewis, which isolated her from support she needed and created an environment where

Lewis was no longer treated as a valued member of the institution, causing further harm and hardship.

x.   *Creating an environment where continued membership is difficult for the victim:*

a.   After the initial Title IX investigation in which Coe admitted to abusing Lewis, Coe was still allowed to continue playing football and no measures were taken to protect Lewis. Coe continued to abuse her after the conclusion of the Title IX investigation. LSU's lack of response to protect Lewis or offer her resources or accommodations undoubtedly created an environment where continued membership at LSU was extremely difficult for Lewis and caused further harm. Lewis testified that her father noticed a change in her and "he just felt, like, I have changed and just, like, you know, that I was different and that,  like, someone was, you know, affecting me and things like that… wouldn't say he was blaming it on [Coe]. I think, you know, he just thinks LSU is, like -- I was changed there. I wouldn't say -- I would say LSU" (deposition transcript page 181:25-182:5, 183:6-19), in a clear declaration of how Institutional Betrayal at LSU affected Lewis.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of abuse is enough to cause further harm to a victim above and beyond the harm caused by the abuse, but to experience multiple accounts of ten different types of Institutional Betrayal, as Lewis did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Lewis documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone at the institution responded with any of the manifestations of Institutional Support outlined in* paragraph *26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, allowing the victim to have a say in how the report is handled, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Lewis endured from her abuse at LSU may have been mitigated rather than compounded by LSU.*

44.  **Plaintiff Kennan Johnson's complaint describes multiple instances of at least 7 of the 12 manifestations of Institutional Betrayal, outlined below:**

i.   *Creating an environment in which interpersonal violence seems more likely to occur:*

a.   Institutional Betrayal often refers to harm that occurs via institutional failure to prevent or respond supportively to wrongdoings that occur within the institution, often between members of the institution where the institution failed to intervene or provide redress. In cases where it is someone in a leadership position at the institution who is perpetrating abuse, harassment, or violence, the Institutional Betrayal is more direct. As co-head coach of the women's tennis team at LSU, Julia Sell was not only a powerful and influential employee at LSU but was also an embodiment of the Institution itself, especially to the players she coached like Johnson who revered LSU and was fulfilling a lifelong dream to play on the LSU tennis team. As Johnson testified, "all I wanted to do was play tennis for LSU. That had been my dream since I was three. I literally cried on my unofficial visit. I cried in the video they made on LSU. I wanted to be there so badly. So there was absolutely, in my mind, nothing -- like I didn't want to miss, I didn't want to not have my scholarship, I didn't want to not be able to play" (deposition transcript page 169:12-170:12). When Johnson began to experience harassment and abuse from Sell based on her weight and sexual orientation, because this was coming from a leader at LSU itself, this could reasonably constitute a form of Institutional Betrayal in which the institution creates an environment where interpersonal violence (such as harassment) is more likely to occur because it is coming from a leader at the institution itself. In response to a question about whether people on the team feared Julia Sell, Johnson testified, "I definitely did. I know at -- personally, I believe -- I can't speak

PLAINTIFFS_00001545

for everybody else, but I believe that everybody at some point definitely has or did" (deposition transcript page 88:21-89:3), in a clear declaration of Johnson's experience of Institutional Betrayal at LSU.

ii. *Creating an environment in which interpersonal violence seems common or like no big deal, and*

iii. *Responding inadequately to reports of interpersonal violence, and*

iv. *Not taking proactive steps to prevent interpersonal violence:*

    *a.* When Johnson told Sell of the abuse that Plaintiff Lewis was experiencing from Coe, Sell ignored the information and Johnson testified that Sell told her "that she was going to handle it and that I needed -- if I focused -- if I was more worried about my tennis, that I'd be like a better tennis player" (deposition transcript page 194). Johnson testified that Sell also "told us to stay away from Jade and to basically like alienate her and stay away from her" (deposition transcript page 181:11, 19-22). This example of not taking reports of violence seriously and valuing athletic performance over the well-being of students, is a form of Institutional Betrayal that likely dissuaded Johnson from disclosing her own abuse, causing further harm and exposing more people to a heightened risk environment where known perpetrators had unfettered access to women in the Athletics Department.

    *b.* Johnson also testified to the environment at LSU where people feared Coe after knowing of his violence and of LSU's inaction in responding to reports of such: "I was scared of him if he was out and we were like in a bar environment, because he was very like aggressive" (deposition transcript page 184:12-20).

v. *Making it difficult to report the interpersonal violence:*

    *a.* The Title IX trainings that Johnson attended never addressed that harassment based on someone's sexual orientation or weight constitutes sex discrimination, and as Johnson testified, "[the Title IX training] was very brief though" (deposition transcript page 82:24-25). Therefore, Johnson was not aware of the official recourse she could take in the form of filing a report with the Title IX Office because her education on her rights under Title IX was insufficient at LSU, making it difficult to report the harassment she was experiencing, another form of Institutional Betrayal that likely cause further harm.

vi. *Creating an environment where the victim no longer feels like a valued member of the institution; and,*

vii. *Creating an environment where continued membership is difficult for the victim:*

    a. Sell told Johnson that her sexual orientation made other teammates uncomfortable or distracted and blamed Johnson when her fellow teammates did not play well. As Johnson testified, "she told me that I needed to keep who I was and my lifestyle out of the locker room so I didn't offend the girls. So like obviously that's affecting how I'm going to be. I'm not going to be able to be myself" (deposition transcript page 98:11-23), and "especially after she made that comment to me, like I kind of had to not be myself anymore in a way. So I just -- it was like going into the closet all over again almost" (deposition transcript page 208:17-20, 209:1-9). This type of Institutional Betrayal is particularly harmful among LGBTQ and racial/ethnic minority students, as they demonstrate even more severe negative health outcomes after experiencing abuse and Institutional Betrayal (see paragraph 18).

    b. Additionally, Johnson testified, "there was definitely a lot of anxiety and fear and just like unsettledness, unsettledness in her presence" (deposition transcript page 94:7-21) and "I physically like sometimes could not even play [because I was worried she would be disappointed in how I played]" (deposition transcript page 96:8-12).

    c. Additionally, Johnson had hoped to go to graduate school, but testified that Sell "told me no, I was kind of like defeated, and so I just didn't even bother with it" and "in my opinion, most coaches would want to help you out and help you continue like your -- I guess your schooling" (deposition transcript page 136:21-137:3), in another declaration of the Institutional Betrayal that

Johnson experienced at LSU that created an environment where she no longer felt like a valued member of the institution.

d.  Johnson also testified that Sell harassed her based on her weight, and "I was having to weigh in and told if I didn't lose a certain amount of weight or I didn't meet a certain weight goal, that I was going to have extra fitness. And so I never like really felt confident in my game or in myself because I felt like there was always something that needed to be changed or I needed to be fixed or something like that" (deposition transcript page 153:11-22). And she testified that this treatment was leading to what most professionals would recognize as disordered eating: "I was not practicing well and I was getting -- I was feeling like really sick a lot of times and not being able to make it through practice or workouts. And a lot of times I was going to practice not having eaten anything and sometimes didn't eat for days, and then when I would try to eat, I couldn't keep it down just so I could make my weight" (deposition transcript page 154:15-20, 156:9-13). While some fitness requirements are standard parts of an athletic program, threatening to withdraw scholarship awards or playing time could reasonably create an environment where someone doesn't feel like a valued member of the institution and where continued membership is difficult, as Johnson testified, "while I might have needed to lose some weight, holding my scholarship or me playing for the week over my head I don't think is very fair, especially if I'm one of your better players" (deposition transcript page 159:16-22) and "I feel like mentally, like I feel like my depression and anxiety and stuff like that definitely got worse. I think I definitely have an issue like when it comes to eating or overeating" (deposition transcript page 292:1-8).

e.  The above instances undoubtedly created an environment where Johnson did not feel like a valued member of the institution and which made continued membership difficult, as she had to continually endure abuse and hide her identity in order to play tennis and maintain her scholarship. Johnson testified that she thought Sell's agenda with this behavior was to "instill the fact that she was in control of me" (deposition transcript page 174:7-11), a declaration of Johnson's experience of Institutional Betrayal at LSU. This type of Institutional Betrayal is harmful above and beyond the harm inflicted by the abuse itself, as it also separated Johnson from what should have been her peer social support network to help her navigate and cope with the abuse. Johnson testified that "I just felt very ostracized, and I really did feel like it was because of my sexuality at times… It was just a very stressful and very like emotional time for me. It was a place that I dreamed of going to that turned out to be just miserable. And it's like something I can't get back. And I don't think that I reached my full potential. And I left LSU hating tennis, not feeling secure in myself, and not feeling confident in myself. And I'm not pursuing tennis anymore because of the way that I was treated…" (deposition transcript page 200:15-17, 201:3-202:1) and "if Julia wasn't there, I would have been a much better tennis player. And I don't think I would have quit or graduated hating a sport that I've been playing since I was three" (deposition transcript page 213:20-214:1) and "I went into a very deep depression and was slightly -- not slightly. I was suicidal just because of everything I'd dealt with…after that, I just lost the love and passion for tennis" (deposition transcript page 214:8-215:1) and "I shouldn't feel anxious. I shouldn't feel like I'm unwelcome. And that's how I felt and I know other players who felt the same way" (deposition transcript page 290:10-24), in clear declarations of how the Institutional Betrayal Johnson experienced at LSU affected and continues to affect her.

*Conclusion: To experience harassment and abuse from a leader in a trusted institution is a direct form of Institutional Betrayal that can cause further harm to a victim above and beyond the harm caused by the abuse itself because it shatters a sense of safety and regard for that institution as a safe and just place, and it shatters a sense of personal identity that one held by being a member of the institution. This was likely the case for Johnson whose lifelong dream was to play tennis for LSU but who then experienced*

*multiple accounts of seven different types of Institutional Betrayal. This would be extraordinarily harmful to anyone, but particularly to Johnson who was experiencing harassment based on her sexual orientation. Research has documented that sexual minority students are more likely to experience Institutional Betrayal and incur greater harm to their physical and psychological well-being than heterosexual students, including greater depression, anxiety, and disordered eating[9]. Researchers have studied the role of sexual orientation in institutional betrayal by using an expanded form of the Institutional Betrayal Questionnaire (see paragraph 14) to include the questions "Did an institution play a role by responding differently to the situation based on your sexual orientation?"; "Did an institution play a role by creating an environment in which you felt discriminated against based on your sexual orientation?"; and "Did an institution play a role by expressing a biased or negative attitude toward you and/or the situation based on your sexual orientation?" and found that sexual minority students experience greater levels of Institutional Betrayal, which accounts for the increased depression and PTSD and concluded that Institutional Betrayal should be investigated as a form of increased environmental threat to sexual minority individuals[6]. The emotional and physical distress and economic loss that Johnson documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had someone else at the institution responded with any of the manifestations of Institutional Support outlined in paragraph 26 above (e.g., supporting the victim with formal or informal resources, apologizing for what happened to the victim, ensuring the victim is treated as an important member of the institution, meeting the victim's needs for support and accommodations, etc.), the harm Johnson endured from her abuse at LSU may have been mitigated rather than compounded by LSU.*

45. **Plaintiff Jane Doe's complaint describes multiple instances of at least 7 of the 12 manifestations of Institutional Betrayal, outlined below:**

 i. *Not taking proactive steps to prevent interpersonal violence; and*
 ii. *Creating an environment in which interpersonal violence seems common or like no big deal; and*
 iii. *Responding inadequately to reports of interpersonal violence:*
   a. When Doe reported the harassment she'd been experiencing from Poe, a fellow dorm resident, to the Title IX Office and stated that she did not feel safe in her dorm, Doe was moved to a different dorm across campus. The Title IX Office did not offer to move Poe out of the dorm, which would have been a reasonable interim measure, and instead placed the burden on the victim to move while leaving Poe with access to other students instead of taking proactive steps to prevent future occurrences of harassment.
   b. When Doe stated to the Title IX official that she wanted a no-contact order against Poe, she was never given any further information about the no-contact order process and no no-contact order was put in place, an inadequate response that created an environment in which this harassment seemed like no big deal and that didn't take proactive steps to prevent future occurrences of harassment.
   c. Doe was not offered any other support or resources in response to her disclosure of sexual harassment, such as advocacy services or academic accommodations. These inadequate responses are clear forms of Institutional Betrayal that likely inflicted further harm on Doe.
 iv. *Covering up the interpersonal violence or reports of such:*
   a. When Doe requested a copy of her case file, she was sent a file that did not contain any notes from her multiple interviews with the Title IX officials and which contained two Sexual Misconduct and Sexual Harassment Complaint Forms that incorrectly stated that Doe had not taken any action to stop Poe's behavior. These exclusions and inaccuracies could reasonably be interpreted

as an attempt to cover up the harassment Doe was experiencing and instead place the blame on her for not stopping it, a form of Institutional Betrayal that is harmful in itself.

v.   *Mishandling the victim's case:*

    a.  During the Title IX Office investigation of Doe's harassment, she was interviewed four times by four different people, having to repeat her accounts of the harassment she'd experienced in an unnecessarily burdensome and painful process. During the interview process, Doe would often cry and the interviewers would press on as if nothing was wrong. This is contrary to established trauma-informed interviewing procedures which are designed to not re-traumatize a victim and includes formulating questions in a way that does not assign guilt or responsibility (National Center for Victims of Crime, 2020. https://www.ncvctta.org/post/interviewing-and-engagement-techniques-for-law-enforcement) and the type of interviewing techniques endured by Doe likely caused harm above and beyond the harm she had incurred from the original sexual harassment. Doe testified that she was uncomfortable in these interviews and "I was very upset and I felt -- I felt like they weren't -- I felt like -- I don't know how to say it. Like it felt more like they were grilling me kind of for answers, and it felt like I was being blamed a lot and kind of like I was inconveniencing them" (deposition transcript page 73:15-74:7). Former LSU President Tom Galligan testified to this part of LSU's Title IX process in a State Senate hearing that "there were multiple levels and multiple investigations, which can be incredibly invasive and re-victimizing" (State Senate testimony transcript timestamp 3:45:00).

    b.  The Title IX Office did not offer any support or resources to Doe during the investigation process, nor did they send Doe a formal resolution on her case or communicate if Poe was ever interviewed or disciplined. None of the witnesses Doe identified were interviewed. Doe was told that she was not entitled to information about whether Poe was disciplined, which is inaccurate information under Title IX guidance.

    c.  Doe was told that her experience did not fall under the scope of LSU's Title IX Policy, which was inaccurate as her experience was a clear example of sexual harassment. These ways in which the Title IX Office mishandled Doe's case are examples of Institutional Betrayal that likely caused further harm.

vi.   *Denying the victim's experience in some way:*

    e.  When the Title IX investigators interviewed Doe and questioned her version of events and asked why she had kissed Poe before his abuse began, this is a clear theme of Institutional Betrayal of "responding with a minimizing or dismissive response (e.g., victim-blaming, stating the survivor should have said "no" more clearly, etc.)" that denies what the victim is disclosing was serious or true, which is in itself harmful.

vii.   *Creating an environment where continued membership is difficult for the victim:*

    a.  Due to the re-traumatizing nature of Doe's Title IX investigation process, LSU's refusal to communicate with Doe what, if any, action was taken against her harasser, and LSU's negligence in not offering Doe support or resources throughout the process, Doe had no way of knowing whether she was safe from Poe's harassment on campus, which undoubtedly made LSU an environment where continued membership was difficult for Doe, another form of Institutional Betrayal. Doe testified that "I had a lot of depression about filing the Title IX report, wishing I had never done it. I was really depressed because I felt like I went through all of it for nothing" (deposition transcript page 98:10-14), in a clear declaration of her experience of Institutional Betrayal at LSU. Doe went on to describe how this experience continues to affect her: "I got diagnosed with binge-eating disorder, and I did not have a binge-eating disorder before this occurred. I wouldn't actually attribute it to [Poe]; I would attribute it to the treatment I got from Title IX" (deposition transcript page 120:9-17).

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of sexual violence is enough to cause further harm to a victim above and beyond the harm caused by the harassment itself, but to experience multiple accounts of seven different types of Institutional Betrayal, as Doe did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Doe documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Particularly egregious is LSU's refusal to communicate with Doe the status of her case and negligence in taking any measures to support Doe in being able to continue to receive her education without fear of harassment from Poe, which likely directly resulted in her decision to leave LSU. Had the institution responded with manifestations of Institutional Support outlined in* paragraph *26 above such as ensuring the victim is treated as an important member of the institution and meeting the victim's needs for support and accommodations, the harm Doe endured from experiencing sexual harassment and stalking at LSU may have been mitigated rather than compounded by LSU.*

46. **Plaintiff Corinn Hovis' complaint describes multiple instances of at least 6 of the 12 manifestations of Institutional Betrayal, outlined below:**

   i. *Responding inadequately to reports of interpersonal violence; and*
   ii. *Creating an environment where the victim no longer feels like a valued member of the institution:*

   a. LSU Disability Services refused to reinstate Hovis' Lighthouse accommodations from the previous semester because those accommodations are only for six months. Disability Services did not inquire or perform any assessments to determine if Hovis needed disability services, and Hovis testified that not having these accommodations became an issue as "The semester was very rough. I really -- I was struggling very bad, very bad, deep depression hole, as I like to call it. It was really hard to get out of bed. It was really hard to take care of myself and take care of my hygiene" (deposition transcript page 91:13-24). Expecting that the debilitating effects of a traumatic experience such as rape would resolve within six months is contrary to everything known about the neurobiology of trauma, as Hovis testified, "I think it's absolutely crazy to assume that sexual assault only lasts for six months and then it's up. Like no. Like this is a lifelong thing. I'm almost three years into this and I'm still dealing with it" (deposition transcript page 104:7-15). The effects of rape that interfere with a survivors day-to-day life commonly take years or even decades to resolve because of the lasting changes that happen in the nervous system during a traumatic experience that have to actively be un-done with ongoing support interventions such as counseling, medication, social support, and institutional accommodations from work and school. The resurfacing of physical and psychological effects of trauma during the anniversary period of a traumatic experience is also a common documented occurrence that can present for the remainder of a trauma survivor's lifetime and includes significant increases in trauma-related symptoms around the time of a traumatic experience's anniversary date[24]. Not reinstating a reasonable request for accommodations due to the traumatic experience of rape is beyond inadequate and also creates an environment where the victim no longer feels like a valued member of the institution, which exemplifies a manifestation of Institutional Betrayal that can inflict further harm above and beyond that already endured by the original trauma. Hovis testified that it would have been helpful if LSU providing accommodations by "considering the time of assignments, I feel like if consideration for absences was like actually taken seriously, it just doesn't feel like it is, by like professors and stuff, that would have been nice" (deposition transcript page 169:25-170:8).

   iii. *Mishandling the victim's case; and*
   iv. *Creating an environment in which interpersonal violence seems common or like no big deal; and*

v. *Not taking proactive steps to prevent interpersonal violence; and*

vi. *Creating an environment where continued membership is difficult for the victim:*

    a. During the investigation of Hovis' report, she testified that the investigator "asked me, What were you wearing the night of your incident? And at the time, I didn't know any better and I sent him a picture… as time has gone on, that has rubbed me really the wrong way" (deposition transcript page 80:20-22, 81:2-13). These types of questions are extremely trauma un-informed, asking what a victim was wearing can be reasonably interpreted to infer that the victim's behavior was the cause of the assault, which in this context is a form of Institutional Betrayal that can cause further harm above and beyond the assault itself.

    b. Hovis testified that "The Title IX process is very, very, very traumatic. Like going through that was absolutely -- it's almost just as traumatizing as going through the incident. Like that -- it was so, so grueling going through that" (deposition transcript page 126:25-127:12) and "This was like a six-, seven-month process. It took awhile. It was a whole semester I essentially lost" (deposition transcript page 128:23-129:10). While Loe was responsible for the harm of the original assault, it is common for victims to incur separate harm above and beyond that when they encounter systems that are operating in a trauma un-informed way including experiencing Institutional Betrayal. As Hovis testified, "I wouldn't be here, obviously, if [Loe] hadn't happened. But a lot of it had to do with school and accommodations and feeling like I was helpless in my classes and doing the Title IX process that was absolutely mentally draining and just as traumatic. And so, yes, is he -- is he responsible for a lot -- like is he responsible for starting all this? Yes. But there's been multiple parties that have been involved since that -- since that night" (deposition transcript page 150:15-17, 150:22-151:10). Commonly referred to as "the second rape," "the second assault," or "secondary victimization," it is common for survivors of sexual trauma to describe the re-traumatizing, unnecessarily prolonged or repetitive reporting or investigative processes as just as harmful or even worse than the original violence and such processes extend or exacerbate the trauma of the original assault[14] (also see paragraph 17), which aligns with Hovis' description of the impact of LSU's Title IX process and which likely created an environment where continued member at LSU was difficult for Hovis.

    c. When Loe twice violated the no-contact order set in place from his Title IX violation, LSU did not do anything to enforce the no-contact order nor take any disciplinary action against Loe for violating it. Not only is this a mishandling of this Title IX case but also sends the message that LSU does not take interpersonal violence including rape seriously, it does not take proactive steps to prevent interpersonal violence, and undoubtedly created an environment where continued membership at LSU was extremely difficult for Hovis who saw no protection from her rapist given by LSU, likely inflicting further harm due to this Institutional Betrayal. As Hovis testified, "'I'm not comfortable being on campus knowing he's a student here. I just didn't feel like that was taken very seriously" (deposition transcript page 135:24-136:16), and Hovis testified that when she was seeing a counselor at the LSU Student Health Center, "I just felt like I wasn't being taken seriously" (deposition transcript page 164:23-165:6), clear declarations of her experience of Institutional Betrayal at LSU where it felt like an environment in which interpersonal violence seems common or like no big deal.

*Conclusion: To experience even one form of Institutional Betrayal in response to a disclosure of sexual violence is enough to cause further harm to a victim above and beyond the harm caused by the violence itself, but to experience multiple accounts of six different types of Institutional Betrayal, as Hovis did, would be extraordinarily harmful to anyone, and the emotional and physical distress and economic loss that Hovis documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Particularly egregious is LSU's refusal to accommodate Hovis' reasonable accommodations beyond six months, which anybody working in mental health or disability services should*

PLAINTIFFS_00001551

*know is an arbitrary time limit that is contrary to the neurobiology of trauma science. Had the institution responded with manifestations of Institutional Support outlined in* paragraph *26 above such as ensuring the victim is treated as an important member of the institution and meeting the victim's needs for support and accommodations, the harm Hovis endured from experiencing sexual violence at LSU may have been mitigated rather than compounded by LSU.*

47. **Plaintiff Sarah Beth Kitch's complaint describes multiple instances of at least 5 of the 12 manifestations of Institutional Betrayal, outlined below:**

   i. *Creating an environment in which interpersonal violence seems common or like no big deal:*

   a. When Kitch reported Moe's abuse years later to LSU in hopes to generate a record that would assist future students from being victimized, she testified that the Title IX officials informed her that "It's good that you didn't report then, no one would have done anything and it would have only caused you trouble. And I thought that fit my assessment of the university's lack of seriousness on these issues. And I felt some settledness that even the Title IX lady thought I hadn't made a misstep in not reporting it earlier" (deposition transcript page 124:12-25), which embodies the type of Institutional Betrayal in which interpersonal violence seems common or like no big deal and likely caused further harm to Kitch. Kitch testified to this environment when describing another professor who "had free rein," "was berating students," and "I thought that if this is the environment, there's no way anyone will do anything to help me. Even if they tried, apparently there wasn't much institutional resource or will to contain Mulcahy, so I didn't expect there would be more institutional resource or will to protect me" (deposition transcript page 48:24-25, 56:21-57). Kitch testified that she didn't think LSU took its Title IX Policy seriously: "I'd taken LSU's Title IX training and I worked in the hall with Kevin Mulcahy, so none of that seemed very serious to me" (deposition transcript page 97:4-10) and "the environment that LSU created for me quickly overcame their official PowerPoint statement that they really cared about sexual harassment in the workplace" (deposition transcript page 97:20-98:8), a clear declaration of the Institutional Betrayal Kitch experienced where interpersonal violence seemed like no big deal at LSU.

   ii. *Creating an environment in which interpersonal violence seems more likely to occur:*

   a. Institutional Betrayal often refers to harm that occurs via institutional failure to prevent or respond supportively to wrongdoings that occur within the institution, often between members of the institution where the institution failed to intervene or provide redress. In cases where it is someone in a leadership position at the institution who is perpetrating abuse, harassment, or violence, the Institutional Betrayal is more direct. As a professor and dissertation advisor to Kitch, Moe was not only an influential employee in the Political Science program but also had significant power over Kitch as one of a handful of people responsible for granting her PhD and all future career prospects. Kitch testified that Moe had power over whether she received a fellowship: "he put my name in the hat, which meant I would or wouldn't get it. If he didn't sponsor me, I wouldn't get it; if he did, I probably would... I can't emphasize enough to you how important this good old boys club, like others, is in the world of political theory" (deposition transcript page 29:10-24) and that "my impression of the department was that [Moe] is a giant in this field...I understood that if I said anything that jeopardized my relationship to [Moe], I would take the fall in the department" (deposition transcript page 46:14-47:7), exemplifying the environment at LSU where interpersonal violence was more likely to occur because of perceived retaliation victims would receive. When Kitch began to experience harassment and abuse from Moe based on her sex, because this was coming from a leader at LSU itself, this could reasonably constitute a form of Institutional Betrayal in which the institution creates an environment where interpersonal violence (such as harassment) is more likely to occur because it is coming from a leader at the institution itself.

PLAINTIFFS_00001552

iii. *Making it difficult to report the interpersonal violence:*

    a. After experiencing sexual harassment and abuse from her dissertation advisor, Kitch was not fully aware of her reporting options to the Title IX Office. Kitch testified that the content of the LSU Title IX training she took "said that one of the reasons that you shouldn't harass people is that it decreases productivity. And that left me with the impression that LSU didn't understand really what the problem with sexual harassment was, and I didn't trust that there would be anyone who I could talk to" (deposition transcript page 94:4-18) and "my assumption was that if I were going to report, I would report to my chair. And I thought, if I try to make any other kind of report, if I try to make any report at all, it will jeopardize me" (deposition transcript page 95:20-96:12). It is the responsibility of LSU to adequately train its members on their rights and obligations under Title IX and LSU's documented failure to do so (see paragraph 31 under "Systemic Factors at LSU…") likely made it difficult for Kitch to report the harassment she was experiencing and causing further harm.

iv. *Covering up the interpersonal violence or reports of such; and*

v. *Mishandling the victim's case:*

    a. When Kitch reported Moe's abuse to the Title IX Office, she never received any follow-up contact about her report and no investigation was initiated, a clear mishandling of the case which effectively covered up reports of abuse from a Responsible Employee at LSU, a form of Institutional Betrayal which could have inflicted further harm. Kitch testified to how after making the report to the Title IX Office, she found herself "doubled over and just weeping and thinking like, It's not that hard to not harass people, why did you do this" (deposition transcript page 125:11-15), a clear declaration of how the Institutional Betrayal Kitch experienced at LSU continues to affect her.

*Conclusion: To experience harassment and abuse from a leader in a trusted institution is a direct form of Institutional Betrayal that can cause further harm to a victim above and beyond the harm caused by the abuse itself because it shatters a sense of safety and regard for that institution as a safe and just place, and it shatters a sense of personal identity that one held by being a member of the institution. This was likely the case for Kitch who was pursuing a PhD from LSU but who then experienced multiple accounts of five different types of Institutional Betrayal, which would be extraordinarily harmful to anyone. The emotional and physical distress and economic loss that Kitch documents are all likely directly or indirectly related to the Institutional Betrayal she experienced by LSU. Had anyone at the institution responded with any of the manifestations of Institutional Support outlined in paragraph 26 above (e.g., apologizing for what happened to the victim, ensuring the victim is treated as an important member of the institution, creating an environment where this type of experience is recognized as a problem etc.), the harm Kitch endured from her abuse at LSU may have been mitigated rather than compounded by LSU.*

PLAINTIFFS_00001553

**Final conclusions**

In conclusion, the LSU athletic department, Title IX Office, and University broadly exhibits characteristics and practices that are consistent with Institutional Betrayal in response to reports of sexual misconduct, harassment, and relationship violence. Indirectly, this Institutional Betrayal likely exacerbated and prolonged each plaintiff's trauma-related symptoms including anxiety; depression; dissociation; memory issues; sleep issues; avoiding people and places that elicit trauma reminders; negative impacts on work, school, and relationships; higher incidences of irritable bowel syndrome, chronic pain, chronic fatigue, and substance misuse; and more through the institutional barriers to accessing mental health services, medical support, legal recourse, and other accommodations needed for trauma recovery. Directly, this Institutional Betrayal likely inflicted additional harm on each plaintiff by creating and maintaining environments where interpersonal violence was more common (e.g., because the abuse was coming directly from LSU Responsible Employees or because the institution responded inadequately to reports of violence and allowed known perpetrators to have unfettered access to vulnerable members of the institution), by shattering plaintiffs' sense of safety, trust, and identity in LSU, by making plaintiffs endure re-traumatizing reporting and investigative processes, and by contributing to long-term economic loss via lack of appropriate accommodations in the post-trauma recovery period. Research has found that survivors of sexual violence experience "rape as an economic crime" and may need up to three years of accommodations to recover from the traumatic effects of fear, anxiety, PTSD symptoms, depression, ability to concentrate, and time needed for counseling that affect survivors' ability to attend work or school; however, timely access to counseling and other supportive services can help prevent a downward economic spiral[25]. It is crucial to *both* offer redress to victims *and* take steps to prevent future Institutional Betrayal. As Scott Schneider from Husch Blackwell testified in the Louisiana State Senate, "I know everybody wants to focus on who's going to be responsible and accountable, and trust me, I'm getting there's a ton of people that are accountable…[but] I worry that if we don't address some of the structural issues, that in five years, we're going to right back where we are now…to do this work well requires resources, requires really smart, sophisticated, trauma-informed, emotionally intelligent people that have good processes in place" (State Senate testimony transcript timestamp 5:49:30). It would be well-advised for LSU to take steps to address and prevent Institutional Betrayal, as outlined in paragraphs 28-29 above, and to offer redress to victims who have experienced Institutional Betrayal by LSU, which undoubtedly includes all plaintiffs in this case.

I CERTIFY THAT THE ABOVE STATEMENTS ARE TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Further Affiant sayeth not.

*Apryl E. Pooley*  1/3/2023

_____

AFFIANT, APRYL POOLEY

PLAINTIFFS_00001554

## References

1. Smith CP, Freyd JJ. Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma. *J Trauma Stress*. 2013;26(February):119-127. doi:10.1002/jts.

2. Smith CP, Freyd JJ. Institutional Betrayal. *American Psychologist*. 2014;69(6):575-587.

3. Monteith LL, Bahraini NH, Matarazzo BB, Soberay KA, Smith CP. Perceptions of Institutional Betrayal Predict Suicidal Self-Directed Violence Among Veterans Exposed to Military Sexual Trauma. *J Clin Psychol*. 2016;72(7):743-755. doi:10.1002/jclp.22292

4. Smith CP, Freyd JJ. Insult, then Injury: Interpersonal and Institutional Betrayal Linked to Health and Dissociation. *J Aggress Maltreat Trauma*. 2017;26(10):1117-1131. doi:10.1080/10926771.2017.1322654

5. Reffi AN, Pinciotti CM, Orcutt HK. Psychometric Properties of the Institutional Betrayal Questionnaire, Version 2: Evidence for a Two-Factor Model. *J Interpers Violence*. 2021;36(11-12):5659-5684. doi:10.1177/0886260518805771

6. Smith CP, Cunningham SA, Freyd JJ. Sexual violence, institutional betrayal, and psychological outcomes for LGB college students. *Transl Issues Psychol Sci*. 2016;2(4):351-360. doi:10.1037/tps0000094

7. Gómez JM. Gender, Campus Sexual Violence, Cultural Betrayal, Institutional Betrayal, and Institutional Support in U.S. Ethnic Minority College Students: A Descriptive Study. *Violence Against Women*. 2022;28(1):93-106. doi:10.1177/1077801221998757

8. Pinciotti CM, Orcutt HK. Institutional Betrayal: Who Is Most Vulnerable? *J Interpers Violence*. 2021;36(11-12):5036-5054. doi:10.1177/0886260518802850

9. Smidt AM, Rosenthal MN, Smith CP, Freyd JJ. Out and in Harm's Way: Sexual Minority Students' Psychological and Physical Health after Institutional Betrayal and Sexual Assault. *J Child Sex Abus*. 2021;30(1):41-55. doi:10.1080/10538712.2019.1581867

10. Brewin CR, Andrews B, Valentine JD. Meta-analysis of risk factors for posttraumatic stress disorder in trauma-exposed adults. *J Consult Clin Psychol*. 2000;68(5):748-766. doi:10.1037/0022-006X.68.5.748

11. Lowe SR, Galea S, Uddin M, Koenen KC. Trajectories of Posttraumatic Stress Among Urban Residents. *Am J Community Psychol*. 2014;53(0):159-172. doi:10.1126/scisignal.2001449.Engineering

12. Andrews B, Brewin CR, Rose S. Gender, social support, and PTSD in victims of violent crime. *J Trauma Stress*. 2003;16(4):421-427. doi:10.1023/A:1024478305142

13. Orchowski LM, Untied AS, Gidycz C a. Social reactions to disclosure of sexual victimization and adjustment among survivors of sexual assault. *J Interpers Violence*. 2013;28:2005-2023. doi:10.1177/0886260512471085

14. Campbell R, Wasco SM, Ahrens CE, Sefl T, Barnes HE. Preventing the "Second Rape:" Rape Survivors' Experiences with Community Service Providers. *J Interpers Violence*. 2001;16(12):1239-1259.

15. Sall K, Littleton H. Institutional Betrayal: A Mixed Methods Study of College Women's Experiences With On-Campus Help-Seeking Following Rape. *Journal of Trauma and Dissociation*. Published online 2022. doi:10.1080/15299732.2022.2079795

16. Andresen FJ, Monteith LL, Kugler J, Cruz RA, Blais RK. Institutional betrayal following military sexual trauma is associated with more severe depression and specific posttraumatic stress disorder symptom clusters. *J Clin Psychol*. 2019;75(7):1305-1319. doi:10.1002/jclp.22773

PLAINTIFFS_00001555

17.  Lee JY, Micol RL, Davis JL. Intimate Partner Violence and Psychological Maladjustment: Examining the Role of Institutional Betrayal Among Survivors. *J Interpers Violence*. 2021;36(15-16):7505-7522. doi:10.1177/0886260519836783

18.  Goldsmith RE, Freyd JJ, DePrince a. P. Betrayal Trauma: Associations With Psychological and Physical Symptoms in Young Adults. *J Interpers Violence*. 2012;27:547-567. doi:10.1177/0886260511421672

19.  Bernstein RE, Delker BC, Knight JA, Freyd JJ. Hypervigilance in college students : Associations with betrayal and dissociation and psychometric properties in a brief hypervigilance scale. *Psychological Trauma*. 2015;7(5):448-455. doi:10.1037/tra0000070

20.  Nesbitt S, Carson S. *The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout*.; 2021. Accessed November 14, 2022. https://www.knowyourix.org/thecostofreporting/

21.  Rosenthal MN, Smidt AM, Freyd JJ. Still Second Class: Sexual Harassment of Graduate Students. *Psychol Women Q*. 2016;40(3):364-377. doi:10.1177/0361684316644838

22.  Walsh WA, Banyard VL, Moynihan MM, Ward S, Cohn ES. Disclosure and service use on a college campus after an unwanted sexual experience. *Journal of Trauma and Dissociation*. 2010;11(2):134-151. doi:10.1080/15299730903502912

23.  Foubert JD, Clark-Taylor A, Wall AF. Is Campus Rape Primarily a Serial or One-Time Problem? Evidence From a Multicampus Study. *Violence Against Women*. 2020;26(3-4):296-311. doi:10.1177/1077801219833820

24.  Bruce MJ, Matsuo H. "Burned into my Brain:" Trauma Anniversary Reactions Examined from a Qualitative Perspective. *J Loss Trauma*. Published online 2022. doi:10.1080/15325024.2022.2079204

25.  Loya RM. Rape as an Economic Crime: The Impact of Sexual Violence on Survivors' Employment and Economic Well-Being. *J Interpers Violence*. Published online 2014. doi:10.1177/0886260514554291

PLAINTIFFS_00001556

# APRYL POOLEY, PHD ➲ Expert Trauma Consultant & Trainer

## Profile

- **Expert trauma consultant and trainer** with 10+ years of research and practice-based experience in the neurobiology of trauma and crime victim advocacy services.

- **Proven leader** in developing training content based on best-practices and data-informed areas of need, with emphasis on creating accessible, engaging, interactive, online learning.

- **Driven by evidence-based solutions** to challenges and needs, highly adaptable to changing circumstances, autonomous and self-motivated with demonstrated ability to work as a team, outstanding written and verbal communication skills, strong teaching and training skills for diverse audiences.

- **Trauma survivor-centered** work is rooted in principles of intersectionality, accessibility, and social justice.

## Expertise

- ➔ Neurobiology of trauma and PTSD
- ➔ Mind-body approaches in healing trauma
- ➔ Trauma-informed service delivery
- ➔ Intergenerational trauma
- ➔ Adverse childhood experiences
- ➔ Vicarious trauma and compassion fatigue
- ➔ Intersectionality and trauma
- ➔ Advocacy training and technical assistance
- ➔ Crime victim services

## Professional Experience in Trauma and Advocacy Training

**Director of Training & Technical Assistance,** *Michigan Victim Advocacy Network* **(2018-present)**

- Developed statewide trainings for crime victim advocates with self-paced online training modules and live, virtual, interactive workshops including Trauma Across the Lifespan, Advocacy Tools for Healing Trauma, Doing Advocacy Remotely: Conveying Empathy by Phone and Text, Introduction to Trauma-Informed Advocacy, and Building Confidence in Your Advocacy Skills: Effective Communication.

- Organized and provided structure to a complex syllabus of information, coordinated content contributions and feedback from other recognized experts in relevant fields, planned training delivery, evaluation, and continuing education credit awards. Synthesized training evaluation summary reports to inform future training development needs.

- 2,000+ Michigan advocates trained with >90% training satisfaction and increase in knowledge and skill.

- Developed statewide strategic planning tools for sexual assault programs and multi-disciplinary teams.

- Curated a dynamic web-based resource library for Michigan crime victim advocates.

**Continuing Medical Education trainer,** *MyMichigan Health System* **(Jan 2022-present)**

- Developed a 5 CME credit online and in-person course for physicians, advanced practice providers, and behavioral health service providers on the neurobiology of trauma and trauma-informed practice.

- Courses: "*Understanding the Neurobiology of Trauma to Interrupt the Cycle of Trauma and Addiction,*" "*Trauma-Informed Care as Substance Abuse Treatment and Prevention,*" and "*Building a Trauma-Informed Practice: Recognizing and Responding to Trauma to Promote Health and Well-being.*"

**Ad-hoc Peer Reviewer (2019-present)**

- Served as a peer-reviewer for academic journals publishing research related to trauma, interpersonal violence, and behavioral endocrinology including *Journal of Interpersonal Violence*, *Psychology of Sport and Exercise*, *Physiology & Behavior*, *Psychoneuroendocrinology*, *Nutritional Neuroscience*, *Endocrine Connections*, *PLOS ONE*, and *Psychiatry Research*.

## Other Selected Trauma Trainings Developed

- Everyone Has Stress: Understanding Your Emotions, *Refugee Development Center* (2022)

- Healing Trauma Through Yoga, *Peoples Yoga* (2021)

- Inside Out: Understanding Your Developing Brain, *Refugee Development Center* (2021)

- Trauma, the Developing Brain, and Adolescent Behavior, *MSU Adolescent Diversion Project* (2020)

PLAINTIFFS_00001557

42

- Building Safe & Resilient Communities in Response to Child Sexual Abuse, *MSU Teal Talks* (2019)
- Healing the Brain, Body, & Community, *MSU Moving Through Trauma exhibit* (2019)
- Understanding Child Sexual Trauma and Grooming, *Firecracker Foundation* (2019)
- The Disconnect: Neuroscience of Trauma and Yoga, *Kintla Yoga Therapy* (2016-2018)
- Combatting Rape Culture in Academic Settings, *MSU Council of Graduate Students* (2016)

## Research and Consulting in Trauma

**Evaluation Contractor,** *Michigan Public Health Institute, Okemos MI* **(2018)**

- Developed a rape prevention education survey for statewide data collection. Convened stakeholders, coordinated survey contractors, drafted IRB protocol, conceptualized analysis of survey data to answer prioritized research questions. Results presented at the 2019 National Sexual Assault Conference.

**Co-investigator: "Exploring the Use of Neurofeedback in Mitigating Symptoms of TBI in Survivors of Intimate Partner Violence,"** *Michigan State University* **(2018)**

- Advised on developing outcome measures to determine the efficacy of neurofeedback in trauma treatment, conducted a thorough literature review, analyzed and interpreted EEG data collected from survivors. Co-authored manuscript published in *Journal of Aggression, Maltreatment, and Trauma.*

**Co-investigator: "Therapeutic Efficacy of Yoga in Individuals with Varied Traumatic Stress Histories,"** *Michigan State University, Kintla Yoga Therapy* **(2018)**

- Advised on developing outcome measures to determine the efficacy of yoga in trauma treatment, advised on ethical study design, conducted literature review, analyzed trauma symptom surveys. Co-authored manuscript published in the journal *Brain, Body, and Cognition*.

**Research Associate:** *Michigan State University Neuroscience Program* **(2017-2018)**

- Drafted, submitted, and obtained private grant funding from Cohen Veterans Biosciences to lead a research project to determine how sex hormones and early-life developmental processes influence the traumatic stress response. Authored two manuscripts published the journal *Biology of Sex Differences*.

## Leadership, Volunteer, and Mentoring Experience

**Youth mentor,** *Refugee Development Center, Lansing MI* **(2019-present)**

- Engaged refugee-resettled youths in life skills mentoring to aid in adapting to life in the United States, including after-school tutoring sessions, community activity outings, and obtaining resources such as library cards and public transportation.

**Health Policy Research Scholars (HPRS) mentor**, *Johns Hopkins University* **(2019-present)**

- Served as a graduate-student mentor through a Robert Wood Johnson Foundation funded leadership development program for doctoral students from underrepresented backgrounds. Advised on methods for applying research to advance health and equity through public policy and coached on professional development tools such as resume building and interview role-playing.

**Board of Directors**, *The Firecracker Foundation* **(2018-present)**

- Served on the board of directors of a nonprofit providing services and advocacy to children and families affected by child sexual abuse. Advised and coordinated organization policies, mission, and programs including yoga therapy, mental health therapy, caretaker support groups, medical advocacy teams, and community education and training. Served as President of the Board from Jan-Dec 2019.

## Education and Certification

**PhD in Neuroscience ● MICHIGAN STATE UNIVERSITY — Lansing, MI (2017)**

- Dissertation research on sex and gender differences in the traumatic stress response. Published 3 peer-reviewed research papers and presented results at 8 national and international conferences.

**BS and MS in Biological Sciences ● EASTERN ILLINOIS UNIVERSITY — Charleston, IL (2008, 2011)**

- Master's thesis research on the influence of sex hormones on the repair of damaged brain cells. Published 2 peer-reviewed research papers.

EXHIBIT A

43

## Consulting and training services fee schedule

| SERVICE | RATE | | |
|---|---|---|---|
| | CORPORATE | GOVERNMENT | EDUCATIONAL/NONPROFIT |
| **Phone/virtual consultation** | $150/hr | $125/hr | $100/hr |
| **Training/workshop development** | | | |
| In-person delivery | $275/hr | $250/hr | $225/hr |
| Virtual delivery | $250/hr | $225/hr | $200/hr |
| Preparation | $150/hr | $125/hr | $100/hr |
| **Expert witness testimony** | | | |
| In-person testimony | $400/hr | | $275/hr |
| Virtual testimony | $350/hr | | $250/hr |
| Preparation | $350/hr | | $200/hr |
| **Keynote speaker** | $2000-$5000/engagement | | |
| **EXPENSES** | **RATE** | | |
| **Travel** | Per diem expenses per federal CONUS rates or actual costs. Additional travel fee applies for distances requiring more than 2 hours of round trip travel time. | | |
| **Reimbursable (e.g. workbooks, assessment tools, other materials, etc.)** | Cost or negotiated rate. | | |

PLAINTIFFS_00001559

EXHIBIT A

# APRYL E. POOLEY, PH.D.

Phone: 
███████████.edu
www.aprylpooley.com

Michigan State University
Psychology Department
East Lansing, MI 48824

## SUMMARY OF QUALIFICATIONS

### 13 years of experimental and applied research experience

| | |
|---|---|
| Quantitative data analysis | *(ANOVA, regression, SEM, LCA)* |
| Qualitative data analysis | *(life/health history, trauma exposure/symptom surveys)* |
| Biological trauma/stress responses | *(cortisol, EEG, gene/protein expression, epigenetics)* |
| Grant management | *(progress updates, deliverables, budget, report/present findings)* |
| Lab management | *(legal/ethical compliance, training/supervision, budget/ordering)* |
| Measurement development | |
| Federal and private grant writing | |
| Data visualization and technical, public, and academic reporting | |

### 8 years of sexual/relationship violence prevention/intervention programming experience

| | | |
|---|---|---|
| Neurobiology of trauma | Mandatory reporting | Rape culture |
| Supporting survivor needs | Perpetrator tactics | Prevention |

### Content expertise

| | |
|---|---|
| Neurobiology of trauma/PTSD | Sex differences in trauma response |
| Sexual and domestic violence | LGBTQ issues and trauma |
| Crime victim behavior | Crime victim services |
| Trauma-informed service delivery | Intersectionality and trauma |
| Trauma effects on child development | Trauma-informed yoga therapy |
| Gender roles and trauma | Child sexual abuse |
| Campus sexual assault | Institutional betrayal |

### Computer/software skills

Advanced: Excel, Word, Powerpoint, SPSS, Qualtrics, Mentimeter, Zoom
Intermediate: Photoshop, video editing, Audacity
Beginner: Website development, HTML programming, SAS

## CURRENT PROFESSIONAL POSITIONS

| | |
|---|---|
| Aug 2018-pres | **Director of Training and Technical Assistance,** MI Victim Advocacy Network Michigan State University, Psychology Department |
| Jan 2018-pres | **Member,** MSU Research Consortium on Gender-Based Violence |
| Dec 2018-pres | **Member,** MSU Center for Gender in Global Context |

PLAINTIFFS_00001560

## EDUCATION

| | |
|---|---|
| 2011-2017 | **PhD in Neuroscience**, Michigan State University<br>Dissertation: "Traumatic stress responses in rats reveal fundamental sex differences that mirror PTSD in men and women" |
| 2009-2011 | **MS in Biological Sciences**, Eastern Illinois University<br>Thesis: "Estrogen Promotes Neurite Outgrowth in Olfactory Epithelial Explant Cultures Through the Estrogen Receptor" |
| 2004-2008 | **BS in Biological Sciences**, Eastern Illinois University<br>Graduated with University Honors<br>Area of concentration: pre-medicine |

## SERVICE POSITIONS

*Boards/councils*

| | |
|---|---|
| Jan 2018-pres | **Board of Directors,** The Firecracker Foundation, Lansing, MI<br>Nonprofit providing services and advocacy to children and families affected by child sexual abuse. Coordinate yoga, individual therapy, caretaker support groups, medical advocacy teams, and community education and training to support the mission of the organization. Served as President of the Board from Jan-Dec 2019. |
| Jun 2015-2016 | **Executive Board,** Council of Graduate Students Sexual Assault Committee<br>Michigan State University, East Lansing, MI<br>Held educational events, recommended training for responding to sexual trauma survivors, created campus-wide syllabus language to communicate instructor mandatory reporting responsibilities and reporting options |
| Mar 2015-2016 | **Neuroscience Graduate Student Council,** Graduate Employee Union Steward<br>Michigan State University, East Lansing, MI<br>Attend bi-weekly Graduate Employee Union meetings, keep Neuroscience Program student employees updated on union and contract issues, serve on contract bargaining team negotiator |

*Ad-hoc journal reviewer*

| | |
|---|---|
| July 2022-pres | *Psychology of Sport and Exercise* |
| June 2021-pres | *Physiology & Behavior* |
| Dec 2020-pres | *Psychoneuroendocrinology* |
| April 2018-pres | *Nutritional Neuroscience* |
| Aug 2018-pres | *Endocrine Connections* |
| Aug 2018-pres | *Journal of Interpersonal Violence* |
| April 2019-pres | *PLOS ONE* |
| Sep 2019-pres | *Psychiatry Research* |

PLAINTIFFS_00001561

## CONTINUING EDUCATION

Apr-Nov 2021 | **Intro to Online Training and Large Online Trainings with Impact**
Four-hour trainings from Training for Change offering tools on how to facilitate online trainings and on how to maximize the impact of online trainings with large audiences with a focus on accessibility and participant-centered practices.

June 2019 | **National Institute for SART leaders**
A 2½ day Sexual Violence Justice Institute program designed for coordinators, team leaders, and state and territorial level leaders who coordinate or support local teams responding to sexual violence.

Sep 2018 | **Addressing the Housing Needs of Sexual Violence Survivors**
Two-day Michigan Victim Advocacy Network training to recognize the unique housing and voluntary services needs and barriers of all sexual violence survivors and to respond to those needs with empower trauma-informed, actively anti-oppressive and survivor-centered services.

Nov 2017 | **US Bureau of Justice Assistance Sexual Assault Kit Initiative**
"The Neurobiology of Trauma" workshop by Dr. Rebecca Campbell on how the brain and body react to major traumas, emphasizing understanding victim behavior and memory formation during trauma and in the immediate aftermath, with implications for cold case investigations and victim notifications.

Oct 2017 | **Michigan Coalition to End Domestic and Sexual Violence Expert Witness**
Trained as an expert witness to provide criminal and civil testimony in sexual and domestic violence court hearings.

## EXPERIMENTAL RESEARCH PROJECTS

2017-2018 | **Research Associate**, Michigan State University Neuroscience Program
Project: Determine how sex hormones (e.g. testosterone, estrogen) influence the traumatic stress response and how early-life developmental processes set the stage for differences in how males and females respond to trauma
Funding agency: Cohen Veterans Bioscience

2011-2017 | **Doctoral research**, Michigan State University
Project: Characterized how sex/gender influences traumatic stress responses at behavioral, physiological, cellular, and genetic/epigenetic levels
Advisors: Dr. Cynthia Jordan and Dr. Marc Breedlove

PLAINTIFFS_00001562

|   |   |
|---|---|
| Skills: | Single prolonged stress and predator exposure rat models of PTSD, acoustic startle test, dexamethasone suppression test, cFos and glucocorticoid receptor immunohistochemistry, stereology, Western blot, assessments of depressive- and anxiety-like behaviors in rats, gonadal hormone manipulation and replacement, male and female rat gonadectomy |

2009-2011   **Master's research**, Eastern Illinois University
Project: Determine how sex hormones (e.g. testosterone, estrogen) influence the repair and regeneration of damaged neurons
Advisor: Dr. Britto Nathan
Skills:   Post-natal and adult rat brain tissue dissection, neuronal cell culture, immunocytochemical staining, fluorescent microscopy, polymerase chain reaction

## APPLIED RESEARCH AND EVALUATION PROJECTS

Aug-Dec 2018   **Evaluation Contractor,** Michigan Public Health Institute (MPHI)
Role: Review existing measures related to sexual violence prevention topics, draft rape prevention education survey protocol for statewide data collection, convene stakeholders to provide feedback on survey protocol, work with survey contractors to determine appropriate survey sample and data collection strategies/timeline, conceptualize analysis of survey items to answer research questions, draft MPHI IRB protocol for statewide survey process. The results of this research were presented at the 2019 National Sexual Assault Conference.

Apr-Dec 2018   **Co-investigator/Data analyst**, "Exploring the Use of Neurofeedback in Mitigating Symptoms of TBI in Survivors of Intimate Partner Violence"
Co-Investigators: Dessie Clark, M.Ed, Michigan State University, E. Lansing, MI
Joshua Brown, LCSW, BCN, Fort Bend Women's Center, Houston, TX
Role: Analyze and interpret EEG data, co-author reports, advise on developing relevant outcome measures. The results of this project were published in the *Journal of Aggression, Maltreatment, and Trauma*.

Jan 2018-pres   **Co-investigator/Data analyst**, "Therapeutic Efficacy of Yoga in Individuals with Varied Traumatic Stress Histories"
Service provider/co-investigator: Kintla Striker, Kintla Yoga LLC, East Lansing
Role: Analyze and interpret self-report surveys on trauma, life, and health histories, co-author reports, advise on developing relevant outcome measures, advise on study design standards (e.g. ethics, consent). The results of this project were published in the journal *Brain, Body, and Cognition*.

PLAINTIFFS_00001563

Apryl E. Pooley · 48

2016-2018    **Co-investigator/Data analyst**, "Agape Group Intervention for At-Risk Teens"
Service Providers/co-investigators: Justin Charping, MA, LPC
Ty Warczinsky, MRE, CPS, Gratiot County Michigan Child Advocacy Association
Role: Advise on relevant measures for evaluating the effectiveness of the
group therapy intervention, analyze student/parent/teacher survey data, co-
author reports, advise on study design standards (e.g. ethics, consent)

**CONSULTING AND TRAINING**

June 2022    **Refugee Development Center (RDC) training**, Lansing, MI
Developed and delivered a half-day workshop for adults and teens on how to
recognize and respond to stress responses with simple mind-body tools such
as breathing and grounding exercises. The workshop also incorporated
language development skills for English learners of all ages and skill levels.

Jan-May 2022    **Continuing Medical Education Trainer,** My-Michigan Health, Univ. of MI
Developed and delivered a series of virtual and in-person trainings awarding a
total of 5 CME credits to physicians and advanced practice providers and
behavioral health & human service professionals. Trainings included
*Understanding the Neurobiology of Trauma to Interrupt the Cycle of Trauma
and Addiction*, *Trauma-Informed Care as Substance Abuse Treatment and
Prevention*, and *Building a Trauma-Informed Practice: Recognizing and
Responding to Trauma to Promote Health and Well-being*.

Nov 2021    **Healing Trauma Through Yoga training,** Peoples Yoga, Lansing, MI
Developed and delivered a half-day training integrating the science and lived
experience of trauma and yoga to offer tools on practicing trauma-informed
yoga for yoga teachers and students.

June 2021    **Refugee Development Center (RDC) training,** Lansing, MI
Developed and delivered a half-day workshop on adolescent brain
development, trauma, and emotional regulation for youths receiving services
at the nonprofit Refugee Development Center. The workshop offered youth-
centered tools for learning to recognize and regulate trauma reactions though
breathing and grounding exercises, understanding how adolescent brain
changes affect behavior and decision-making, and encouraging connection
through peer and mentor support.

Apr-Oct 2020    **Adolescent Diversion Program (ADP) Teaching/Training**, Michigan State Univ.
Delivered lectures on how trauma impacts development and behavior to
students in the ADP program who work with youth involved in the juvenile
justice system. Developed an online training module for students to use for
further skills development.

PLAINTIFFS_00001564

Nov 2019-pres   **Health Policy Research Scholars (HPRS) Mentor,** Robert Wood Johnson Fnd. HPRS is a leadership development opportunity for doctoral students from underrepresented populations and/or disadvantaged backgrounds. Scholars are paired with a professional mentor to coach them in applying their research to advance health and equity, and their innovation helps build a Culture of Health, one that enables everyone in America to live longer, healthier lives.

### SEXUAL ASSAULT AND RELATIONSHIP VIOLENCE EDUCATION/OUTREACH

Nov 2019   **Speaker,** Michigan State University "We Can Begin Again: Moving Through Trauma" exhibition, East Lansing, MI. Presented "Healing the Brain, Body, and Community"

Oct 2019   **Workshop presenter,** The Firecracker Foundation and Michigan State Univ Museum public training, East Lansing, MI. Presented "Building Safe and Resilient Communities in Response to Child Sexual Abuse"

Apr 2019   **Advisor and content contributor,** "Finding Our Voice: Sister Survivors Speak" MSU Museum exhibit, East Lansing, MI

Mar 2019   **Workshop presenter,** The Firecracker Foundation volunteer training, Holt, MI Presented "Understanding Child Sexual Trauma and Grooming"

Feb 2019   **Workshop presenter**, Kintla Yoga Therapy training workshop, Lansing, MI Presented on the neurobiology of trauma in a foundations for mental health practitioners workshop

Jan 2019   **Expert Panelist**, Finding Our Voice: Sister Survivors Speak, MSU Museum Speaker Series. Public discussion: "Understanding Trauma: Scientific, Clinical, and Interpretive Perspectives on Sexual Violence"

Oct 2018   **Speaker**, Diversity in STEM Series, MSU College of Natural Science Presented on researching the neurobiology of trauma: does personal experience, politics, and identity inform or bias the science?

Oct 2018   **Speaker**, Diversity in STEM Series, MSU College of Natural Science Presented on the reciprocal relationship between STEM research and advocacy in the work to end sexual violence

Apr 2018   **Speaker**, Survivor Empowerment Day, Michigan Capitol, Lansing, MI Spoke on using legislative efforts to aid in sexual assault prevention/response

Feb-Dec 2018   **Presenter/program developer**, MSU Sexual Assault Program workshops

|            | MI State Univ., E. Lansing, MI. Developed 5 workshops with team of service providers to offer MSU community upon request (topics: rape culture myths and facts, neurobiology of trauma, perpetrator tactics, supporting survivors) |
|------------|---|
| Aug 2016   | **Workshop presenter**, Kintla Yoga Therapy teacher training, Lansing, MI<br>Presented on the neurobiology of trauma at a certification class to provide yoga therapy to trauma survivors |
| Apr 2016   | **Speaker/workshop facilitator**, Graduate Student Sexual Assault Committee<br>"Critical Conversations Series," MI State Univ., E. Lansing, MI<br>"Fireside Stories: Talking About Resilience and Recovery" |
| Apr 2016   | **Speaker/workshop facilitator**, Graduate Student Sexual Assault Committee<br>"Critical Conversations Series," MI State Univ., E. Lansing, MI<br>"Joining the Journey: Partners with a History of Relationship Violence" |
| Mar 2016   | **Speaker/workshop facilitator**, Graduate Advocacy Conference<br>MI State Univ., E. Lansing, MI<br>"Combatting Rape Culture in Academic Settings" |
| Feb 2016   | **Speaker/workshop facilitator**, Graduate Student Sexual Assault Committee<br>"Critical Conversations Series," MI State Univ., E. Lansing, MI<br>"Risky Relationships: Lending a Hand When You See One"<br>Program: "The Escalation Workshop" by One Love |
| Nov 2015   | **Expert panelist**, Affirmative Consent Town Hall, MI State Univ., E. Lansing, MI<br>Discussion on affirmative consent education in sexual violence prevention |
| Apr 2015   | **Moderator**, Center for Gender in Global Context Undergraduate Research Showcase, MI State Univ., E. Lansing, MI<br>"Sexual Assault on College Campuses: Current Initiatives, Future Challenges" |
| Apr 2015   | **Speaker**, MSU Mental Health Awareness Week<br>MI State Univ., E. Lansing, MI<br>Addressing the effects of trauma in academic settings |
| Mar 2015   | **Expert panelist**, "State of Higher Education Town Hall"<br>MI State Univ., E. Lansing, MI<br>Fielded discussion on campus sexual assault policies |
| Mar 2015   | **Speaker**, TEDxMSU, MI State Univ. E. Lansing, MI<br>"The Human Element in Recovery from Mental Illness and Addiction" |

PLAINTIFFS_00001566

| Feb 2015 | **Expert panelist**, "Mandatory Reporting Responsibilities of MSU Employees Town Hall," MI State Univ., E. Lansing, MI |
|---|---|
| Feb 2015 | **Expert panelist**, "Student Senate Sexual Assault Roundtable" MI State Univ., E. Lansing, MI |

## SCIENCE EDUCATION/OUTREACH

| June 2018 | **Panelist**, Optimizing Mentoring Relationships to Promote Diversity and Research Excellence, MI State Univ. Graduate School, E. Lansing, MI |
|---|---|
| Mar 2017 | **Presenter**, Brain Awareness Week demonstration Whitehills Elementary School, E. Lansing, MI |
| Mar 2017 | **Presenter**, Brain Awareness Week demonstration Marble Elementary School, E. Lansing, MI |
| Mar 2016 | **Booth developer/leader**, "Brainatarium" at MSU Neuroscience Fair MI State Univ., E. Lansing, MI |
| Mar 2016 | **Presenter**, Brain Awareness Week demonstration Cornel Elementary School, Okemos, MI |
| Nov 2015 | **Booth developer/leader**, "Brainatarium" at MSU Women in Engineering Girl Scout STEM Day, MI State Univ., E. Lansing, MI |
| Sep 2015 | **Speaker**, MSU Lyman Briggs College senior seminar MI State Univ., E. Lansing, MI How to extend "diversity in science" initiatives beyond race/gender to include disability, sexual orientation, gender identity, age, etc |
| Mar 2015 | **Booth developer/leader**, "Brainatarium" at MSU Neuroscience Fair MI State Univ., E. Lansing, MI |
| Mar 2015 | **Presenter**, Brain Awareness Week demonstration Cornel Elementary School, Okemos, MI |
| Mar 2015 | **Booth developer/leader**, "Brainatarium" at MSU Graduate Women in Science Girls Math and Science Day, MI State Univ., E. Lansing, MI |
| Mar 2015 | **Speaker**, MSU Lyman Briggs College Women in Science Meeting MI State Univ., E. Lansing, MI Overcoming challenges in science for minority/marginalized populations |

PLAINTIFFS_00001567

| Jun 2014 | **Instructor**, MSU 4H Exploration Days neuroscience class<br>MI State Univ., E. Lansing, MI |
|---|---|
| Mar 2013 | **Booth leader**, Neuroscience Fair, Grand Rapids Public Museum, MI |
| Nov 2012 | **Instructor,** MSU Brain Bee workshop, MI State Univ., E. Lansing, MI |
| Mar 2012 | **Presenter,** Brain Awareness Week demonstration<br>MI State Univ., E. Lansing, MI |

## TEACHING EXPERIENCE

*Graduate Teaching Assistant, Michigan State University*
**Nervous System Development (NEU 416)**, Fall 2016
**Psychology and Biology of Human Sexuality (NEU 310)**, Summer 2017, Spr. 2016, Summer 2016
**Introduction to Neuroscience II (NEU 302)**, Spring 2017, Spring, 2015, Spring 2014
> For all above: Lectured on areas of my expertise (brain control of emotion, addiction, PTSD, stress, sexual abuse/assault, sexual orientation). Held out-of-class review sessions, met one-on-one with students, graded assignments and exams, wrote exam questions. Designed and evaluated a special project for students enrolled to receive honors credit for the course.

*Graduate Teaching Assistant, Eastern Illinois University*
**Animal Physiology (BIO 3520)**, Spring 2011
**Human Physiology (BIO 2091)**, Spring 2011, Fall 2009
**General Biology (BIO 1100)**, Fall 2010
**Endocrinology (BIO 5406)**, Spring 2010
**Genetics (BIO 3200)**, Spring 2010, Fall 2009
> For all above: Organized and supervised the 3-hour laboratory sections of the above courses. Responsibilities included setting up labs, introducing and teaching lab goals and techniques, supervising use of lab equipment, grading lab reports and assignments/exams from the lecture sections of the corresponding course.

*Undergraduate Teaching Assistant, Eastern Illinois University*
**Human Anatomy (BIO 2200)**, Spring 2008
> Organized and supervised the 3-hour laboratory section of the above course. Responsibilities included using models and human cadavers to teach anatomy lessons, developing lab practical exams, and dissecting/preparing cadavers for use

## MENTORING EXPERIENCE

*Mentor for undergraduate research, Michigan State University*
Jan 2016-2018   **Mentee: Susheela Sreedhar**

PLAINTIFFS_00001568

Apryl E. Pooley · 53

Mentored in designing and carrying out a project examining the effect of social support on the traumatic stress response

Jan-May 2016    **Mentee: Alla Kedzierski**
One-semester individual introduction to neuroscience research with a primary focus on assessing anxiety and depression behaviors

Jun 2014-2017    **Mentee: Rebecca "Cassie" Benjamin**
Beckman Scholars Program, Dean's Research Scholar
Mentored in designing and carrying out a two-year project examining effects of predator stress in male and female rats

Jan-May 2014    **Mentee: Grace Kamau**
One-semester individual introduction to neuroscience research

## HONORS AND AWARDS

Apr 2017    **MSU Graduate Office Merit Fellowship** ($1320)
Jan 2017    **MSU College Nat. Sci. Dissertation Completion Fellowship** ($6000)
May 2016    **MSU College Nat. Sci. Dissertation Continuation Fellowship** ($6000)
May 2016    **MSU Graduate Office Merit Fellowship** ($1250)
May 2015    **MSU College Nat. Sci. Dissertation Continuation Fellowship** ($6000)
Apr 2015    **MSU Graduate School Travel Award** ($500)
Nov 2014    **MSU Neuroscience Program Travel Award** ($750)
May 2014    **MSU College Nat. Sci. Dissertation Continuation Fellowship** ($6000)
Apr 2014    **MSU Neuroscience Program Travel Award** ($750)

## PROFESSIONAL MEMBERSHIPS

International Society for Traumatic Stress Studies
Society for Neuroscience
Organization for the Study of Sex Differences
Society for Behavioral Neuroendocrinology
International Behavioral Neuroscience Society

## PUBLICATIONS

*Peer-reviewed journal articles*

**Pooley AE**, Striker, Sam J., Striker, Kintla (2019) Therapeutic efficacy of yoga in individuals with varied traumatic stress histories. *Brain, Body, Cognition, 8*(1).

Brown J, Clark DL, **Pooley AE** (2019) Exploring the Use of Neurofeedback Therapy in Mitigating Symptoms of Traumatic Brain Injury in Survivors of Intimate Partner Violence. *Journal of Aggression, Maltreatment, and Trauma*, *28*(6).

PLAINTIFFS_00001569

**Pooley AE**, Benjamin RC, Sreedhar S, Eagle AL, Robison AJ, Mazei-Robison MS, Breedlove SM, Jordan CJ (2018) Sex differences in the traumatic stress response: The role of adult gonadal hormones. *Biology of Sex Differences, 9*(32).

**Pooley AE**, Benjamin RC, Sreedhar S, Eagle AL, Robison AJ, Mazei-Robison MS, Breedlove SM, Jordan CJ (2018) Sex differences in the traumatic stress response: PTSD symptoms in women recapitulated in female rats. *Biology of Sex Differences, 9*(31).

**Pooley, AE**, Luong M, Hussain A, Nathan BP (2015) Neurite outgrowth promoting effect of 17-β estradiol is mediated through estrogen receptor alpha in an olfactory epithelium culture. *Brain Research*, *1624*: 19-27.

Hussain A, Luong M, **Pooley A**, and Nathan BP (2013). Isoform-Specific Effects of ApoE on Neurite Outgrowth in Olfactory Epithelium Culture. *J. of Biomedical Science, 20*(49).

Jia C, Hayoz S, Hutch CR, Iqbal TR, **Pooley AE**, and Hegg C (2013). An IP3R3- and NPY-Expressing Microvillous Cell Mediates Tissue Homeostasis and Regeneration in the Mouse Olfactory Epithelium. *PLoS ONE,* 8(3):e58668

*Dissertation/thesis*

**Pooley, AE** (2017). Traumatic stress responses in rats reveal fundamental sex differences that mirror PTSD in men and women. Dissertation. Michigan State University: East Lansing, MI.

**Pooley, AE** (2011). Estrogen Promotes Neurite Outgrowth in Olfactory Epithelial Explant Cultures Through the Estrogen Receptor. Master's thesis. Eastern Illinois University: Charleston, IL.

*Books*

Breedlove, S. M. (2017). *Foundations of neural development*. Sunderland, MA: Sinauer Associates. (editor and content development contractor)

## CONFERENCE PRESENTATIONS

**Pooley A.E.** Breedlove, S.M., and Jordan, C.L. Sex differences in the traumatic stress response: PTSD symptoms in women recapitulated in female rats. Annual Society for Behavioral Neuroendocrinology Meeting. Toronto, ON. July 2018 (Presented Poster)

**Pooley A.E.** Breedlove, S.M., and Jordan, C.L. Sex differences in rat traumatic stress responses recapitulate sex differences in men and women with PTSD. Organization for the Study of Sex Differences Meeting. Atlanta, GA. April 2018 (Presented Poster)

**Pooley A.E.** Robison, A.J., Mazei-Robison, M.S., Eagle, A.L., Breedlove, S.M., and Jordan, C.L. Sex-specific phenotypes in a rat model of post-traumatic stress disorder (PTSD). Annual Society for Neuroscience Conference. San Diego, CA. November 2016 (Presented Poster)

EXHIBIT A

Case 3:22-cv-00013-MOC-WBD Document 438-1   09/18/23   Page 55 of 55

Apryl E. Pooley · 55

**Pooley A.E.**, Breedlove S.M., and Jordan, C.L. Sex-specific phenotypes in a rat model of post-traumatic stress disorder (PTSD). 4th Annual MSU Conference on Women's Health Research. East Lansing, MI. Nov. 2015. (Presented Poster)

**Pooley A.E.** Robison, A.J., Mazei-Robison, M.S., Eagle, A.L., Breedlove, S.M., and Jordan, C.L. Sex-Specific Phenotypes in a Rat Model of Post-Traumatic Stress Disorder (PTSD). Annual Society for Behavioral Neuroendocrinology Meeting. Asilomar, CA June 2015 (Presented Poster)

Benjamin, R.C., **Pooley A.E.**, Breedlove, S.M., and Jordan, C.L. Sex-Specific Phenotypes in a Predator Exposure Model of Post-Traumatic Stress Disorder (PTSD). Annual Society for Behavioral Neuroendocrinology Meeting. Asilomar, CA June 2015 (Undergraduate mentee-presented poster)

**Pooley A.E.** Robison, A.J., Mazei-Robison, M.S., Eagle, A.L., Breedlove, S.M., and Jordan, C.L. The Single Prolonged Stress (SPS) Model of Posttraumatic Stress Disorder (PTSD) Induces a PTSD-like Phenotype in Male Rats but a Depressive-Like Phenotype in Female Rats. Annual Society for Neuroscience Conference. Washington, D.C. November 2014. (Presented Poster)

**Pooley A.E.**, Breedlove S.M., and Jordan, C.L. Sex-specific phenotypes in a rat model of post-traumatic stress disorder (PTSD). 3rd Annual MSU Conference on Women's Health Research. East Lansing, MI. Oct. 2014. (Presented Poster)

**Pooley A.E.**, Breedlove S.M., and Jordan, C.L. Sex Differences in the Single Prolonged Stress Model of Posttraumatic Stress Disorder. Uniformed Services University Center for the Study of Traumatic Stress Annual Amygdala, Stress, and PTSD Conference. Bethesda, MA. April 2014. (Presented Poster)

PLAINTIFFS_00001571