```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF LOUISIANA
 3

    ABBY OWENS, SAMANTHA BRENNAN,
 4  CALISE RICHARDSON, JADE LEWIS,
    KENNAN JOHNSON, ELISABETH        CASE NO.
 5  ANDRIES, JANE DOE, ASHLYN        3:21-CV-00242
    ROBERTSON, CORINN HOVIS, AND
 6  SARAH BETH KITCH
 7  VS.
 8  BOARD OF SUPERVISORS OF
    LOUISIANA STATE UNIVERSITY AND
 9  AGRICULTURAL AND MECHANICAL
    COLLEGE, AND VERGE AUSBERRY,
10  MIRIAM SEGAR, JENNIE STEWART,
    AND JONATHAN SANDERS, IN THEIR
11  INDIVIDUAL CAPACITIES
12    * * * * * * * * * * * * * * * * * * * * * * *
13           *** CONFIDENTIAL TRANSCRIPT ***
14         *** SUBJECT TO PROTECTIVE ORDER ***
15         The deposition of SARAH BETH KITCH, taken in
16    connection with the captioned cause, pursuant to
17    the following stipulations before RITA A. DEROUEN,
18    Certified Court Reporter, at Phelps Dunbar, 400
19    Convention Street, Suite 1100, Baton Rouge,
20    Louisiana 70802 on October 12, 2022, beginning at
21    8:58 am.
22
23         COURT REPORTERS OF LOUISIANA, L.L.C.
              9522 Brookline Avenue, Suite 217
24             Baton Rouge, Louisiana  70809
         PHONE (225) 201-9650 * FAX (225) 201-9651
25          E-mail:  depos@courtreportersla.com

                                          Page 1
```

Plaintiffs' Exh 3 page 1 of 58

1        Q.  So you said at some point you contacted

2    the Title IX office and that the person with whom

3    you spoke offered some comments to you.

4            First of all, when did you contact the

5    Title IX office?

6        A.  I contacted them when I moved -- it was

7    while I lived in Columbia, so it was late summer,

8    early fall of 2018 or 2019.  I have it in the

9    records, but I can't recall exactly right now

10    which of those it was.

11            I might guess it was that -- well, it was

12    one of those, because the issue of my finishing

13    the dissertation-to-book project became pressing

14    now that I had beat all the odds and landed a

15    tenure track job.  It's really hard to get a

16    tenure track job; I got one.

17            The journey to getting there was I had to

18    -- I did the Princeton post doc, and then I took a

19    VAP, a visiting assistant professor, position in

20    rural Illinois, which was a very demanding

21    position to take.

22            And once I got the tenure track position

23    out of that, I had to go back to the

24    dissertation-to-book project.  And it was in that

25    process that I started to realize how damaged that

Page 99

1    project was because of ███████'s actions and

2    because I hadn't been able to find a way -- I

3    didn't feel I had power to ask for help.

4         Q.   Okay.   You said you -- it was in this

5    process that you realized how damaged the project

6    was.   What made you come to that realization?

7         A.   Well, it kind of broke up from the depths

8    slowly.   When I was in Princeton, I was pregnant

9    with Cecilia Joy.   I remember walking with John

10   down Nassau, the main street in Princeton.

11        And we were working with an editor who

12   helps grad students to produce their documents for

13   job interviews.   You have a research statement, a

14   teaching statement, a letter of application,

15   examples of teaching effectiveness, all of these

16   pieces that you produce.

17        And in the letter, you have a series of

18   structured paragraphs.   Your letter of application

19   starts with your educational achievements to date,

20   then you talk about your research, then you talk

21   about your teaching, then you talk about what

22   courses you could teach.   Finally, you talk about

23   connections you might have or rights within the

24   department to which you're applying, and then you

25   sign off.

                                        Page  100

Court Reporters of Louisiana                   225-201-9650
A Veritext Company                        www.veritext.com
Plaintiffs' Exh 3 page 3 of 58

1        So the editor would comment on each of

2    these paragraphs to tighten the document.  This is

3    your like one shot -- you might be in a pile of

4    200 -- to make your pitch for yourself.

5        And in the process of revision, I felt

6    always really good about the teaching paragraphs.

7    I had had success as a teacher.  I felt very

8    comfortable with my record as a teacher.  I had

9    good reviews.

10        But when she would comment on the

11    dissertation paragraph, the research paragraph, I

12    had a disproportionate response to her edits.  Her

13    edits would be like, Clarify this sentence or

14    simplify, or don't use the word "and," it makes it

15    clunky.  And it would evoke in me this very scared

16    reaction.

17        And as John and I were walking, I remember

18    crying about her edits on this paragraph and then

19    realizing that I've had so many things edited in

20    my life.  It wasn't the edits.  But at that time,

21    I was about to deliver a baby, on a post doc with

22    a husband who is also an academic.  I couldn't

23    confront the possibility that I couldn't turn that

24    dissertation into a tenurable book.  There was too

25    much to lose.

Page 101

Court Reporters of Louisiana            225-201-9650
A Veritext Company                 www.veritext.com
Plaintiffs' Exh 3 page 4 of 58

1          So then the next year in DeKalb, Illinois,

2     I was teaching and I was trying to work on the

3     dissertation-to-book project.  But there I started

4     to accept, to be able to say to John how much

5     ███████'s actions had damaged my confidence as a

6     scholar, and my going back to the project reminded

7     me of the physical violation, it reminded me of my

8     insecurity, like my feeling unsafe in that

9     relationship.

10         And then when I got to Mizzou, I thought,

11    I just have to finish it because I have a

12    two-year-old to feed.  She was 18 months when we

13    got there.  And like I -- I had secured a tenure

14    track position.  Less than one in eight humanities

15    grad students secure a full-time position, much

16    less a tenure track position.

17         I had beaten those odds.  I had landed at

18    an institution that was ranked equal to or above

19    the institution that I came from, and you like

20    only ever move down.  The goal is to get your

21    Ph.D. from the highest ranked institution because

22    you're only going to move down after that.

23         But I had landed at a place that was

24    ranked above my home institution, like I had won

25    the sweep stakes.  I had worked really hard for

                              Page 102

```
1    it, and I had gotten there, and I had to turn that
2    dissertation into a tenurable project; but then,
3    when I tried to, I couldn't.
4         I would pull out the files, lose my
5    capacity to speak, feel very distressed, alone,
6    feel very betrayed.  And then at some point I
7    realized that I couldn't continue the project and
8    that I would have to create a new project.  But by
9    that time, I didn't think I could start from
10   scratch and create a new book while my tenure
11   clock was ticking.
12        The goal of writing the dissertation as a
13   dissertation-to-book project is -- and especially
14   for women, and especially for women who want to
15   have children, is that you do all that before the
16   baby comes or you do all that while you're in grad
17   school so that you can use that work later.
18        In my field, it's not uncommon for women
19   to postpone having children until they get tenure,
20   and I didn't want to do that.  So I was counting
21   on the work I had done, as is customary in my
22   field, in the dissertation to become the book
23   project.
24        And at Mizzou, I realized that I would not
25   be able to finish that project, which is another
```

Page 103

1    way of saying, at Mizzou, I realized that my
2    career was imperiled, was over if I couldn't pull
3    it off, and I didn't think I could pull off either
4    the dissertation-to-book project or it starting
5    from scratch and creating a new project, not in
6    those circumstances, not while I was still
7    watching my career burn to the ground.
8        Q.  Was your career burning to the ground at
9    that point?
10       A.  Well, my department chair called me in and
11   she said, Where is your book project?
12           And I said, I have to tell you that I was
13   a victim of harassment, sexual harassment at LSU.
14   I haven't been able to go back to that project,
15   but don't worry, I'll come up with something else.
16           I thought for a short period it's too much
17   to lose this.  John and I had lived in Princeton,
18   lived in rural Illinois.  We had paid for summer
19   moves that weren't paid for before the Mizzou
20   move; that was paid for.
21           We had taken out loans because, even if
22   you teach in the summer, you can't make that much.
23   And you don't get paid between May and September.
24   Like we had just invested a lot.
25           Academia is an expensive profession.  Kate

Page 104

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 7 of 58

1    Bowler is at Duke, and she says that -- she was
2    the first person I used who used that phrase, and
3    I thought, That is so true.  She just describes it
4    as an expensive profession.
5           And what she describes is that you invest
6    about ten years of time and money, and then it's
7    worth it.  And right when I got to the tenure
8    mark, right when it would have been like, Okay,
9    now that I have a project that I'm revising, it's
10   going to be my tenure project but I know what it
11   is, I see what it is, right when that investment
12   should have paid off, I couldn't find a way
13   forward in light of the harm that I had suffered
14   and the fact that there had not been a way to ask
15   for help in that harm.
16       Q.   When you were at Princeton and talking to
17   the outside adviser, is what I'll refer to that
18   person as, did -- were you working on the
19   dissertation-to-book project at that time?
20       A.   I'll be glad to answer your question.  Who
21   do you mean by "outside adviser"?
22       Q.   So you mentioned that you and John were
23   walking, you were pregnant with Cecilia --
24       A.   Oh, yes, the editor.
25       Q.   I couldn't remember the term you used.

Page 105

1      A.   That's okay.  Lots of advisers in this

2    life path.

3          No, I was working on Martin Luther King,

4    Jr.  I did not find myself able to go back to the

5    dissertation-to-book project.  But I had post doc.

6    I needed to have a job talk.  I needed to have an

7    article that I could say, Hey, this is what I'm

8    working on.

9          So I -- after Ferguson, my students had

10   been interested in reading African-American

11   political thought, and I jumped in with them.  I

12   taught a course on MLK at LSU, and then I was

13   continuing -- I decided maybe I could pull

14   something out of that for the post doc.

15         So when I was at Princeton, I worked on

16   the MLK project, not on the dissertation-to-book

17   project, for the reasons I've described to you.

18      Q.  Did you work on the dissertation-to-book

19   project at all after you graduated?

20      A.   I mean, I would try.  I would pull the

21   papers out and I would look at the manuscript and

22   think about how I might should revise it, but I

23   could never carry that out.

24      Q.  And so when you got to Mizzou -- when did

25   you start at Mizzou?

Page 106

Court Reporters of Louisiana                   225-201-9650
A Veritext Company                        www.veritext.com
Plaintiffs' Exh 3 page 9 of 58

1        A.   August of 2018.

2        Q.   So I know you said that you -- less than

3    one in eight is what you said, I think?

4        A.   Uh-huh.

5        Q.   Receive a tenure track position?

6        A.   A full-time position, much less a tenure

7    track position, yes.

8        Q.   So at that time, was it disclosed to you

9    or communicated to you that the expectation is

10   that you would have a publication, or tell me

11   what --

12       A.   Yes.   The instructions were to make a

13   footprint in your field according to the standards

14   of your field.   So my tenure home was in the

15   Truman School of Public Affairs.   The Truman

16   School is a multidisciplinary school.   So the

17   standard was to do what is customary in each

18   scholar's own field.   And in my field, that is

19   turning your dissertation into a book project.

20       Q.   So you couldn't have used the MLK

21   political theory that you had worked on at

22   Princeton for the Mizzou job?

23       A.   That's a good question.   I would have

24   needed four such articles, but I didn't have a

25   program -- like I -- my question about King, the

                              Page 107

Court Reporters of Louisiana          225-201-9650
A Veritext Company               www.veritext.com
Plaintiffs' Exh 3 page 10 of 58

1    research I had done on King, was designed to be

2    one article length, not a book length.

3          Because at the time that I was at

4    Princeton, I still thought, I have to pull off

5    this book project.  So I wasn't designing a new

6    book project at Princeton.

7          I was trying to fill the gap, have a

8    research project, have a job talk based on

9    that -- you present your research in your

10    interview to whoever is interviewing you, whatever

11    departments are interviewing you.

12          So I did not design a new program of

13    tenurable material.  My intention was to

14    accomplish the dissertation-to-book project.

15    Q.  Did you ever take what you had written on

16    the dissertation-to-book project -- was it in a

17    format to send to a publisher for review?

18    A.  No.  It was not revised in a way -- so

19    when you go to publishers, you write a proposal,

20    this is what is in my book, like this is what my

21    book is going to be about.  So you have an outline

22    of chapters.  And I had a proposal, but then you

23    have to actually turn the dissertation into that

24    product, and that was the step that I could not

25    accomplish.

Page 108

1      Q.  And your proposal, to the extent you

2    recall -- I'm sure you do, you worked on it a long

3    time -- how many chapters did you envision in your

4    book?

5      A.  Five or six.

6      Q.  And how many were you able to actually

7    draft?

8      A.  They were all drafted in the dissertation,

9    but I couldn't revise any of them.

10     Q.  So let's go to your -- the conversation

11    that you've had -- well, let's go back.

12          You're hired in August of 2018 from

13    Mizzou.  And is there a deadline in place as to

14    when the dissertation-to-book project has to be

15    completed as far as your employment is concerned?

16     A.  Yes.  So there's a tenure clock.  And I

17    don't remember my initial tenure date, but it's in

18    my offer letter.  Like I can't right now remember

19    it.  But at the time, you could look at it and

20    see, okay, you're going to have your annual

21    review, your second review.

22          Your third-year review is your big review

23    where they check your progress.  And then after

24    that, you begin to seriously prepare your

25    tenurable materials.  So your book needs to be in

Page 109

Plaintiffs' Exh 3 page 12 of 58

```
 1    press.  And you can see in the contract letter
 2    what the tenure schedule is.
 3         Q.  Okay.  I'm going to show you the contract
 4    letter.  I'm marking it as Exhibit Number 4.
 5              (Exhibit 4 was marked.)
 6         A.  It may be in the MOU, the memorandum of
 7    understanding.  But it's defined.
 8    BY MS. GREEN:
 9         Q.  It is defined.  We might just need some
10    help with deciphering things.
11              So this is what was produced to us in
12    discovery.  The request I will make is, if you
13    have a copy that is better, that would be great,
14    because I don't want you to guess as to what the
15    contents of the letter are.
16         A.  I'll tell you what it is.  It's right
17    here.
18         Q.  I assumed so, but I could not really read
19    it.
20         A.  I'll look for it.
21         Q.  So you can tell me from your -- as best of
22    your recollection what it is.
23              MS. GREEN:
24                   And then, Karen, if we could get a
25                   better copy of it.
```

                                          Page  110

Court Reporters of Louisiana        225-201-9650
A Veritext Company            www.veritext.com
Plaintiffs' Exh 3 page 13 of 58

1              MS. TRUSZKOWSKI:

2                   I'm going to check on that right now.

3              MS. GREEN:

4                   Perfect.  This is Exhibit 4.

5              MS. McDIARMID:

6                   And this is what it looks like on the

7              computer too.  It's not just a printer

8              problem.

9         A.   Oh, no.  So you can see it says -- sorry,

10    Zoom people, as I come close -- "initial

11    appointment."  So it's just saying my initial

12    appointment year and then -- so that top line is

13    the initial appointment year.

14              And then it says, "Your tenure clock will

15    begin" -- this is the paragraph at the bottom of

16    the first page.  "Your tenure clock will begin.

17    Your home will reside in the Truman School of

18    Public Affairs.  As a tenure track faculty member,

19    your tenure clock will begin on September 1, 2018.

20              "During each year of your probationary

21    period, which, under the academic tenure

22    regulations, may not exceed a total of six years,

23    your performance in teaching scholarly activity

24    and service will be expected to demonstrate that

25    your appointment should be renewed for another

                                        Page  111

Court Reporters of Louisiana                225-201-9650
A Veritext Company                    www.veritext.com
Plaintiffs' Exh 3 page 14 of 58

```
 1    year.
 2            "Your progress will be evaluated annually
 3    and the results of your evaluation shared with
 4    you.  An internal third-year or mid-probationary
 5    review, including peer-reviewed components, is an
 6    important assessment of your progress toward
 7    tenure."
 8    BY MS. GREEN:
 9        Q.  Okay.  So your -- when you reference the
10    meeting with your chair, the meeting was the
11    annual review that is referenced in the paragraph
12    you just read, correct?
13        A.  That's the first annual review, yes.
14        Q.  All right.  So tell me what happened.  You
15    said that you mentioned it to your chair in the
16    first annual review.  And what response did you
17    receive?
18        A.  She asked if I could produce documentation
19    to support what I had said.
20        Q.  And what did you do in response to
21    her -- or what did you say in response to her
22    question?
23        A.  I said that I didn't have any specific
24    documentation, but that if she wanted someone to
25    write a letter for my tenure file explaining why I
```

Page 112

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
**Plaintiffs' Exh 3 page 15 of 58**

1    had not made progress, I could ask someone to do

2    that.

3        Q.  And did you ask someone to do that?

4        A.  Yes.  Cecil Eubanks knew that I came to

5    him to do adviser work, and so I called him and I

6    told him why I had come to him and asked him if he

7    would be willing to write a statement affirming

8    that he had taken over as my adviser, and he said

9    he was willing.

10       Q.  Is that -- okay.  So the call with

11   Professor Eubanks happened after your annual

12   review?  I'm just trying to figure out --

13       A.  As I recall, yes.

14       Q.  And was that the first time that you told

15   Dr. Eubanks what had happened with Dr. █████?

16       A.  The first time that I told Eubanks was in

17   the context of my tenure clock at Mizzou.  I don't

18   recall if it was late summer '18 or late summer

19   '19.  But it was after my first annual review that

20   I asked him to write the letter.

21           And I may have mentioned to him in late

22   summer '18 that this happened, but we didn't

23   discuss it.  He's very discreet.  He doesn't press

24   for anything.  Very respectful of a student's

25   sense of boundaries.  So we didn't discuss it, to

                              Page 113

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 16 of 58

1    my recollection, until I was like, Here's the kind
2    of letter that they say they need, that my chair
3    in the Truman School says she needs, would you
4    feel comfortable confirming these things.
5        Q.  You asked for the letter in 2018 -- 2019
6    after the review, correct, the annual review?
7        A.  To my memory, that's correct.  You should
8    have the letter.
9        Q.  But you think you might have mentioned
10   what happened between you and Dr. ██████ in 2018?
11       A.  That part is fuzzy to me.  I don't
12   remember if I, for the first time, disclosed
13   things to Eubanks in 2019 or if, when I got to
14   Mizzou and I felt the pressure to finish the
15   project, if I broached the subject with him then.
16           Our fullest conversations related to the
17   letter were in the context of me asking for the
18   letter.
19       Q.  I'm going to show you a document marked as
20   Exhibit 5.
21           (Exhibit 5 was marked.)
22   BY MS. GREEN:
23       Q.  I'll just ask, is this the letter?
24       A.  This is the letter.
25           Yes, fall of '18.  So I told them when I

                                        Page 114

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 17 of 58

1    got there, kind of under the pressure of this has

2    to -- like I have to produce this book.  That

3    makes sense.  And then we talked about it fully in

4    the context of his writing this letter.

5        Q.  So when you talked to him, Professor

6    Eubanks, in the fall of 2018, at that point, you

7    had -- had you decided that really you could not

8    turn the dissertation into a book?

9        A.  No.  At that point, I had decided I had

10   better figure out how to do it because I had a

11   mortgage to pay and a child to feed and I thought,

12   maybe there's a way -- and what Eubanks and I

13   discussed was maybe there's a way to take like the

14   two or three chapters that feel most my own and

15   drop the one or two chapters that felt the worst.

16            And I thought that might work, but the

17   whole project seemed tainted when I attempted that

18   strategy.

19       Q.  So when you talked to Professor Eubanks in

20   2018, you were trying to figure out if there was

21   some portion of the dissertation that you could

22   use for the book?

23       A.  Yes.

24       Q.  And then, at some point after that, you

25   realized it would -- you were not going to be able

Page  115

Court Reporters of Louisiana                225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 18 of 58

```
1    to use any portion --
2        A.  Correct.
3        Q.  -- that you had written before?
4        A.  Correct.  And my hope was that I could
5    pull something out of that.  So, for example,
6    there's a chapter on language in public affairs,
7    and I thought maybe I can pull something out of
8    the dissertation that will make that work.
9            But then the other chapters that I
10   mentioned are new things that I was working on in
11   hopes of creating a new project.  But eventually I
12   realized that I probably couldn't, with
13   confidence, create a new project and be confident
14   that I would make it in time.  It would be a
15   gamble, and I realized that it would be a gamble.
16       Q.  So I'm asking this question clearly
17   because I don't do what you do, so forgive me if
18   it doesn't make any sense.
19       A.  It's all good.
20       Q.  Was there any portion of what you had
21   written that could be used in your MLK piece?
22       A.  No.
23       Q.  And why is that?
24       A.  Because the dissertation that I wrote was
25   specifically and very closely engaged with British
```

Page 116

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 19 of 58

1    literary figures who were trying to understand the
2    totalitarianisms of 20th century.
3            They wanted to understand how Hitler came
4    to power, how Stalin came to power, how regular
5    people got swept up in cooperating with those
6    things.
7            The project for King was to understand
8    what were the moral and religious resources that
9    allowed and enabled -- that enabled King to do
10   what he did.
11           And those are just two different projects.
12       Q.   After Professor Eubanks agreed to write
13   the letter and wrote the letter for you, what did
14   you do next?
15       A.   So he wrote the letter, and I applied for
16   a tenure extension.  I hoped that the University
17   of Missouri might give me a two-year extension.
18   That might have given me time.  But they returned
19   and gave me a one-year extension, and I wasn't
20   confident that that was enough time to create a
21   new project.
22           And at this point I was -- I just felt
23   very undone, disabled intellectually and
24   emotionally as I wrestled with -- well, with many
25   of the questions you've asked me here.  Was there

                                        Page  117

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 20 of 58

1    a way I could have saved this?  Maybe I just

2    needed to work harder, maybe I just needed to be

3    tougher.

4          And I had worked really hard and been

5    really tough throughout my career, and I couldn't

6    figure out why that wasn't working for me here

7    until I recognized the trauma of someone who I

8    trusted, someone who held my career in his hands,

9    approaching me in a sexual way and having no way

10   to remedy that situation.

11       Q.  I believe timing-wise, at that point, you

12   had started seeing your therapist; is that

13   correct?

14       A.  Correct.

15       Q.  Did you talk to her at all about your

16   ability to continue with the dissertation-to-book

17   project?

18       A.  Not till later.  We had other issues to

19   discuss, things related to my -- for example, my

20   dad's reaction to me not going to law school

21   caused me a great deal of distress.  So I was

22   focused on those things.

23          And I really hoped I could pull it off.  I

24   thought, if I talk about it in a way that

25   indicates I can't do it, then I'm working against

                                        Page 118

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 21 of 58

1    myself.  I just have to believe that I can do it.

2    And so I tried to carry that.

3         Q.  Did your dad's reaction to you not going

4    to law school have any impact on your ability to

5    write?

6         A.  It was difficult.  It did make writing

7    hard for a few weeks at the start of maybe the

8    2014 semester.  But it was not the same thing as

9    being, as I felt, betrayed and helpless in the

10   relationship that I had with ███████ as my adviser.

11        So, yes, it was difficult, and these two

12   things compounded each other in a certain way.  I

13   had chosen the path of being a doctoral student at

14   LSU, and it had cost me a lot to choose it, and

15   then I had to see it through.  It was the path

16   that I wanted.  I didn't know it would come with

17   sexual harassment at the level that it came at.

18        And so I felt a lot of pressure to figure

19   these things out, and I felt very alone because I

20   couldn't find a way to tell anyone without

21   jeopardizing myself.

22        Q.  So you requested -- you said you requested

23   a two-year extension but you were granted a

24   one-year extension?

25        A.  I requested an extension.  There are lots

                                    Page  119

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 22 of 58

1   of taboos and unwritten faux pass in academic

2   life.  So I requested an extension.  I thought, if

3   I requested a two-year extension, that wouldn't

4   look good, so just request an extension, the

5   provost office will look at it, they'll decide.

6        If I ask for too much, that's going to

7   look bad in my case, so just show them the

8   evidence and hope that what they grant is enough.

9   And when they came back with one year, I did not

10  have confidence that I could pull it off.

11       Q.  Did you think you couldn't pull it off

12  because one year was just too short of a period of

13  time?

14       A.  At this point, I felt so wounded in my

15  academic career and I thought, How am I going to

16  let this project fall apart and be creative and

17  come up with something new.  I simply felt

18  traumatized, and I didn't have confidence that I

19  could pull off a new project in that amount of

20  time.  I felt really undone and very distressed.

21       Q.  Did you submit a statement in support of

22  your request for the tenure extension?

23       A.  I did.  You should have that.

24       Q.  Okay.  I do.  I'll show you what I've

25  marked as Exhibit 6.

Page  120

```
 1                  (Exhibit 6 was marked.)
 2             MS. GREEN:
 3                  Most of these things we've already
 4             discussed.  And I just want you to know,
 5             after we finish this, though, we're going
 6             to take a break.
 7             MS. TRUSZKOWSKI:
 8                  Oh, good.  Thank you.
 9        BY MS. GREEN:
10             Q.  So, Dr. Kitch, is this the statement that
11        you submitted in support of your request?
12             A.  It is.
13             Q.  Most of this we've already discussed, but
14        I do want to ask a few questions to -- just
15        because I want to make sure that I understand what
16        you're saying.
17                  So you mentioned this earlier, and we
18        didn't complete the thought, so let's go ahead and
19        complete it now.
20                  On the second page of the letter, at the
21        end of the second paragraph, there's a reference
22        to you calling the Title IX office in the fall of
23        2019.
24             A.  Yes.
25             Q.  Tell me about that conversation.
```

Page 121

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
**Plaintiffs' Exh 3 page 24 of 58**

1      A.   So in the fall of 2019, I had recently had

2    my first annual review with my chair in Truman

3    School and the director of the institute that I

4    worked for.

5         And one of the things that they wanted was

6    documentation, some kind of paper trail.  And I

7    didn't have a lot of documentation because my top

8    goal had been to handle the cost of the situation

9    myself, the emotional toll myself.  So I asked

10   Eubanks for a letter.

11        And then once I got that far into it, I

12   thought that I may have been irresponsible by not

13   reporting, because I had cousins and friends who

14   were still at LSU.  I had great affection for my

15   students at LSU and the students who had come

16   after them.

17        And so then I thought I should try to

18   report this.  Now that it's all in the open what's

19   happened to my project, I don't have anything to

20   lose on that front.  So I decided to call the

21   Title IX office.  I felt like I had already lost

22   whatever was at stake in terms of people -- me

23   handling the situation without others finding out

24   and without it impacting my career, since it was

25   already impacting my career.

Page 122

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 25 of 58

1        As I prepared this, asking Eubanks for a

2   letter and thinking about how to pitch my tenure

3   extension, I thought, Now I can report, everything

4   is in the open, and if it's going to hurt my

5   career, that's already out there and so now I can

6   just report.

7        So I called LSU's Title IX office and I

8   told them I had a case to report.  I don't

9   remember if I reported it like on the first call

10  that I made or if I had to call back.  I remember

11  walking up and down on the pavers in our front

12  yard in Missouri and talking to the woman on the

13  phone.

14        She asked what happened.  I told her.  It

15  was difficult to tell her.  I had -- other than

16  letting -- thinking about how to tell my directors

17  at Mizzou, I hadn't talked with a stranger about

18  it.  And I felt weak for being affected by

19  ███████'s action.  I felt dumb for not figuring out

20  how to overcome it by myself.  And I felt all of

21  those things as I answered this woman's questions.

22        I didn't take notes.  I assumed that she

23  was taking notes.  And it was as much as I could

24  do to get it out.  So then she was very

25  sympathetic.  She told me that she had suffered

Page  123

Court Reporters of Louisiana
A Veritext Company
225-201-9650
www.veritext.com
Plaintiffs' Exh 3 page 26 of 58

1    harassment and that she understood.  She told me
2    that -- she was older, a little bit older at
3    least.  She told me that she understood that
4    harassment of this kind had been more accepted in
5    another day.
6         And she told me -- well, she asked me why
7    I had called then, and I said I called in case
8    there were other cases that might be linked to it
9    and just to -- to register that this had happened
10   on the academic side of LSU and I wanted there to
11   be a record.
12        And she asked why I hadn't reported
13   earlier, and I told her that I -- what I told you,
14   I thought it would imperil my standing as a grad
15   student.  And then she said, It's good that you
16   didn't report then, no one would have done
17   anything and it would have only caused you
18   trouble.
19        And I thought that fit my assessment of
20   the university's lack of seriousness on these
21   issues.  And I felt some settledness that even the
22   Title IX lady thought I hadn't made a misstep in
23   not reporting it earlier, and if the Title IX lady
24   thought I had made a good decision, that was
25   probably the best decision I could have made.

Page 124

Plaintiffs' Exh 3 page 27 of 58

1      Q.  So do you know -- it seems like you made

2   more than one call; is that correct?

3      A.  I seem to recollect that I called once to

4   say I wanted to make a report, and then maybe I

5   set up an appointment to make the report, maybe

6   someone wasn't in the office.  I think I called

7   twice.  I think I talked to two different people.

8   Again, I assumed that they were making a record.

9   I didn't take careful notes.  It was an extremely

10  difficult time for me.

11          I remember, after making the call, sitting

12  in this tan rocking chair that John and I had in

13  our living room and just being doubled over and

14  just weeping and thinking like, It's not that hard

15  to not harass people, why did you do this.

16     Q.  So you said you spoke to two different

17  people.  Do you -- you clearly recall the details

18  of one conversation.

19          Do you recall the details of the other

20  conversation?

21     A.  No, not in detail.

22     Q.  Do you know the name of the -- either of

23  the individuals who took your calls?

24     A.  I didn't -- I wrote down Jennie Stewart's

25  name at the time.  And maybe the other woman was

Page  125

Plaintiffs' Exh 3 page 28 of 58

1    named Chevon Gates.  I, again, didn't take notes.

2    It was like -- it felt like showing up at the

3    emergency room.  My job is just to tell what I

4    know and someone else will be the professional who

5    makes the record.

6         Q.  So you didn't take notes, and you're not

7    sure if it was Jennie Stewart or Chevon Gates?

8         A.  The person that I ultimately told the

9    story to I don't think was Jennie Stewart; I think

10   it was Chevon Gates.

11        Q.  And Ms. Gates told you that it was good

12   that you didn't report it while you were a

13   student?

14        A.  The woman that I spoke with, if it was

15   Chevon Gates, the woman that I spoke with told me

16   that it was good that I didn't report it while I

17   was a student.  She said, No one would have done

18   anything and it would have only caused you

19   trouble.

20        Q.  Were those the only two communications

21   that you had with the Title IX office?

22        A.  Yes, to my recollection.  I thought my job

23   was to call and report, and I did that.

24        Q.  Do you know if LSU -- or the Title IX

25   office took any action after you called and

Page 126

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 29 of 58

1    reported?

2        A.   To my recollection, in the call, the woman

3    I spoke with told me there was no action to take,

4    that they might look into records, but that there

5    was nothing else to do because, by this point,

6    ████████ was retired.

7        Q.   I think you mentioned earlier Dr. Stoner

8    maybe asking you to chair a panel?

9        A.   That's right.  Good memory.

10       Q.   Based on -- when did Dr. -- he was retired

11   in the spring of 2015?

12       A.   Correct.

13       Q.   So he was gone at the time of your report?

14       A.   Yes.

15       Q.   All right.  Let's skip over -- let's go

16   back to Exhibit 6.  At the bottom, the last full

17   paragraph, there's a reference to post-traumatic

18   stress disorder.  I'm sorry, I'm on page 2.

19       A.   Yes.

20       Q.   Were you diagnosed with this condition?

21       A.   I had symptoms of it.  I was not given an

22   evaluation of it until a little later, but I

23   recognized the symptoms of it.

24       Q.   Who evaluated the symptoms?

25       A.   Katherine Volk gave me an evaluation.  She

Page 127

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 30 of 58

1   let me know that she could do it as my therapist,

2   but if it needed to be like an expert outside

3   thing, that I would have to ask someone else.

4         But I think she and I were both -- I was

5   interested.  I can't speak for her, but I was

6   interested in trying to survey the damage, so I

7   asked her to evaluate me.

8      Q.  And when did she evaluate you?

9      A.  I lived -- I was walking in Montrose, so I

10   lived in Montrose.  It was in 2021, probably --

11   probably the summer, maybe the fall, I don't

12   recall exactly.

13         But she asked me the questions, and then

14   afterward she indicated that she was concerned,

15   like asked if I could be around people for the

16   next little bit, and suggested that I be extra

17   cautious after recounting and taking the panel.

18      Q.  After recounting and taking the panel?

19      A.  After recounting the stories that I've

20   told you here and taking the PTSD survey,

21   instrument.

22      Q.  And that occurred in the summer of 2021?

23      A.  Yes, or fall.  Somewhere in there.

24      Q.  On page 3, the second paragraph, there's a

25   reference to lost time -- or time lost.

Page 128

Court Reporters of Louisiana         225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 31 of 58

1        A.    Uh-huh.

2        Q.    How did you determine the time that you

3    lost?

4        A.    Well, I thought about the amount of time

5    that I had spent starting to formulate the topics.

6    So I formally chose the topic, but before that, I

7    had been reading the works and attending to these

8    themes in a very close way.  And then I thought

9    about the time I'd actually spent writing the

10   prospectus, writing the dissertation, and I added

11   those things up.

12       Q.    So you included the time for the

13   prospectus defense and the dissertation defense?

14       A.    And writing the prospectus and coming up

15   with the idea.

16       Q.    So why did you include those -- that time

17   even though the prospectus and the dissertation

18   are requirements of graduation?

19       A.    Because, as I mentioned to you, it's

20   customary in my field to use the work that you've

21   done in grad school toward your tenure case, like

22   that's where you're really shaping the thing

23   that's going to be your first scholarly tenure

24   cornerstone.

25       Q.    If we go down to the first paragraph on

                                        Page 129

1    that page, the very last sentence.

2        A.   Yes.

3        Q.   Did you complete a manuscript in 2021?

4        A.   Didn't even start it.

5        Q.   Why not?

6        A.   Well, I had an article going on Heschel,

7    which is how I decided, maybe I'll turn this into

8    a book project that can save my tenure case.  And

9    then I designed a structure of the work, which you

10   see here in paragraph 4 on page 3.  And as you see

11   here, I'm pitching the structure of the work,

12   here's what the project will look like.

13            But when I sent this letter in and I got a

14   one-year extension, I lost confidence that I could

15   actually write a whole book in that amount of

16   time.  The amount of research that I would need to

17   be able to do, I wouldn't have any teaching

18   release in this time, so I would continue to teach

19   at regular pace.

20            It did not seem feasible to me to do the

21   really intense work of research that I would need

22   to sustain a project like this in the amount that

23   they extended my tenure.

24       Q.   I'll show you two exhibits and then we'll

25   take a break after we finish this line.

Page 130

Court Reporters of Louisiana          225-201-9650
A Veritext Company            www.veritext.com
Plaintiffs' Exh 3 page 33 of 58

```
1              (Exhibit 7 was marked.)

2              (Exhibit 8 was marked.)

3    BY MS. GREEN:

4         Q.  Two documents marked as Exhibits 7 and 8.

5         A.  Yes, these look familiar.

6         Q.  So is Exhibit 7 a letter that you

7    submitted in support of your request for an

8    extension?

9         A.  Yes.  So my directors wrote this letter

10   together, and I submitted it in support of my

11   request.

12        Q.  Did your directors -- so I have a question

13   just based on the -- what you just told me about

14   the time period to request as far as an extension.

15             Did your directors discuss with you that

16   they were -- they thought a one-year extension was

17   reasonable?  I see the letter says they were --

18        A.  One year.  No, they didn't.  I, again,

19   thought if I asked for two years it would look

20   bad.  And the best I could do is present to them

21   the amount of time that I'd lost in the letter,

22   the supporting letter, which is more than one

23   year.

24             But I -- all I could do was present that

25   evidence to them, and then they wrote this letter
```

Page 131

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 34 of 58

```
 1    in support.  And then, as you see, the associate
 2    provost wrote back approving that request.
 3              MS. GREEN:
 4                  At this point, I think it's a good
 5              time for us to take a break.
 6              (A break was taken from 12:41 p.m. to
 7              1:45 p.m.)
 8    BY MS. GREEN:
 9         Q.  Dr. Kitch, before the break, we were
10    discussing your request for an extension at Mizzou
11    and the grant of that extension.
12         A.  Yes.
13         Q.  Are you still employed in that position?
14         A.  No.
15         Q.  When did your employment in that position
16    end?
17         A.  May of 2020.
18         Q.  And did you leave that position
19    voluntarily?
20         A.  I did.
21         Q.  Why?
22         A.  Because I didn't have confidence in
23    creating a credible tenure case.
24         Q.  And was that confidence, or the lack of
25    confidence, based on what we discussed earlier
```

Page 132

1    about the dissertation-to-book project?

2        A.  Yes.

3        Q.  Where did you work after you left the

4    Mizzou position?

5        A.  I served as an adjunct for the University

6    of Houston.  But that wasn't until the spring, so

7    let me back up.

8            I worked as an editor doing remote editing

9    work, and I adjuncted for -- I think I adjuncted

10   an Ashland University course that fall, fall of

11   '20.  And then in spring of '21, I adjuncted three

12   UH courses, a Mizzou course, and an Ashland

13   course.  So I adjuncted five classes in the

14   spring.

15       Q.  I'm going to show you what we'll mark as

16   Exhibit 9.  You've referenced it many times, so I

17   think it's probably easier if we attach it.  It's

18   your CV.

19       A.  Is it the CV?  Finally.  The record of

20   things.

21           (Exhibit 9 was marked.)

22   BY MS. GREEN:

23       Q.  So this is your CV that was produced to us

24   in discovery.  My question is:  Is this up to

25   date?  Does this have all of your publications and

Page 133

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 36 of 58

```
 1    other credentials as of the date of the
 2    production?
 3        A.   That's a good question.  This was up to
 4    date at the time of production, yes.  I have
 5    a -- let's see.  I have a new job since this one.
 6    I teach at St. Agnes Academy in Houston.  I'm a
 7    history teacher there.
 8        Q.   And when did you begin at St. Agnes?
 9        A.   Fall of '21.
10        Q.   Is it a high school?
11        A.   It's a high school.
12        Q.   Is that a full-time position?
13        A.   It is.
14        Q.   And what is your current salary?
15        A.   Sorry, numbers in the midst of this.  I am
16    at about 67-.
17        Q.   Are you reviewing notes?  What are you
18    reviewing?
19        A.   This is just the documents we discussed
20    earlier, what do I have, what did I review.  So
21    this is the pages from the claim.  This is my list
22    of damages that I gave to the attorneys.  This is
23    my statement on damages.  These are the three
24    documents you asked me about at the beginning of
25    our time together.
```

Page 134

1      Q.   Sure.   I just wanted to make sure that
2   those are the same things we were reviewing.
3      A.   Sure.   I am at about -- I started at 65-,
4   I got a small raise, so I'm at about 66- right
5   now, if I remember correctly.
6      Q.   Okay.   And one question I have for you,
7   because we -- your position ended in May of 2020
8   at Mizzou, and then I know for a time -- were
9   you -- you mentioned several adjunct professor
10   positions.
11           Were you teaching remotely --
12      A.   Yes.
13      Q.   -- because of COVID?
14      A.   I was teaching remotely because that's --
15   because of COVID, but also because that was the
16   kind of adjunct that was available.
17      Q.   So two questions.   First, are you
18   interested in a tenure position?
19      A.   Yes.
20      Q.   Second question is:   Do you believe that
21   you are able to turn a dissertation, not
22   necessarily the one that you wrote at LSU, but are
23   you able to turn some dissertation into a book?
24      A.   At this point, I don't have the time to
25   research or write.   I'm a full-time high school

                                        Page 135

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 38 of 58

1    teacher.  I get up at 5:30.  I'm on campus -- I

2    drop off carpool, I'm on campus, I teach, I come

3    home, we do homework.  And it's not an academic

4    life.

5           I spend each day engaging with 100 high

6    school girls.  Each day brings me 100 of them.

7    And my mandate there is to lecture from the

8    department material, to give the department tests,

9    to give the department activities, and that's -- I

10   mean, it's nonstop.

11          So there's no time to do research.  I

12   wrote one chapter this spring.  I spent what was,

13   at the time, a fifth of my maternity leave, two

14   days, to pull together a conference presentation.

15   And then over the summer, I turned that

16   presentation into a book chapter.

17          But it's -- if I were to push that, it

18   could take -- if I were to turn that into a bigger

19   project, I would need serious time to research.

20   So what I have right now is I wrote a chapter

21   about teaching and teaching about suffering.

22          And I had done some experiential research,

23   and I had used kind of the last things that I was

24   working on at Mizzou for that chapter.  If I were

25   to try to develop that into a project, I would

Page 136

1    need serious time that my current life does not

2    afford.

3        Q.  And so what you turned into a

4    presentation, is that at all related to the MLK

5    project that you talked about earlier?

6        A.  Related in a certain thematic sense.  MLK

7    is very concerned about what should we do with

8    suffering and how does suffering shape our lives,

9    shape our participation in politics.

10        The chapter that I wrote in the spring was

11    about how we can talk with students about

12    suffering.  So if we're teaching about the

13    Holocaust or we're teaching about civil rights, I

14    noticed that suffering comes up often in the

15    curriculum but that teachers are often not trained

16    to help students engage that suffering.

17        So the chapter is to try to help teachers

18    know how to talk with students about the suffering

19    that we find in history class.

20        Q.  So some similarities, but not necessarily

21    part of what you were --

22        A.  Yeah, you couldn't put them in the same

23    book, but if you were going to have a dinner

24    conversation about suffering, you could refer to

25    both of them, but you couldn't put them in the

Page 137

Court Reporters of Louisiana        225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 40 of 58

1    same book.

2         Q.   Is it your plan, when you have time, to

3    work on a book that may be published?

4         A.   I would love to.  I don't, right now,

5    foresee that time.  But I would love to.  I do

6    have an idea for a project.

7         Q.   And is that project different than the MLK

8    project or the one that you've just described?

9         A.   It would be rooted in the project that I

10   just described.  It's more of a dream at this

11   point.  But it would be potentially a piece on

12   suffering and pedagogy.  I think that that

13   captures many themes in the work that I've done

14   over the past few years.  So I just, when I have

15   an idea, try to put it into that framework.

16        Q.   You haven't written since your -- the two

17   days that you used your maternity leave?

18        A.   Well,  ████████████████████  in the

19   spring, I had some days off.  And then in the

20   summer, I wrote during those days just waiting.

21   So I wrote a little bit then about suffering.  It

22   seemed to all kind of line up.  I picked a good

23   topic for the time, and I turned that in at the

24   end of July.

25             So I have kind of one chapter that

Page 138

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 41 of 58

1    collects what I had finished doing at Mizzou and
2    puts that in conversation with what I've seen in
3    the high school classroom.
4           A chapter on the academic scale is
5    basically of no value.  So you have a book, you
6    have articles that are peer-reviewed, and then
7    those things are worth something, that will get
8    you a job.  A chapter cannot get you a job because
9    they know like your friend was like, Hey, I heard
10   you talk about that, want to put it in my book?
11          So it's an edited volume on liberal
12   education, what kind of education do students need
13   to learn how to be responsible people in our new
14   technology, new democracy, new all of the things
15   that are going on.  And so they invited me to
16   contribute this chapter.
17          But you can't -- chapters are looked down
18   upon in academic life.  Like if I had a tenure
19   job, I would have never spent time on a chapter.
20   That's a waste of time in this academic framework.
21      Q.  Other than -- okay.  So we've talked
22   about -- I want to talk about the individuals that
23   you told about Dr. ████, and specifically the
24   kiss, when he kissed you.  All right.
25          So we've talked about Professor Eubanks;

                                      Page 139

Court Reporters of Louisiana          225-201-9650
A Veritext Company                  www.veritext.com
**Plaintiffs' Exh 3 page 42 of 58**

1    didn't have a prior connection with other than

2    that he employed me, like the first person not

3    related to LSU and not a personal friend of mine

4    who I told about the harassment at LSU.

5         He recruited me to the University of

6    Missouri and was the director of the institute

7    that housed part of my academic life.  And so I

8    let him know about the distress I was in as an

9    employee to an employer.

10        Q.  So Professor Dyer will know what you told

11   him about your time at LSU?

12        A.  Yes.

13        Q.  And the dissertation-to-book project?

14        A.  Yes.

15        Q.  Does he have any other knowledge regarding

16   the allegations in this lawsuit?

17        A.  Not that I -- not outside of the two

18   things that you've mentioned.  He is a scholar on

19   constitutional law, so I don't know what he keeps

20   up with in terms of media or Title IX cases

21   generally.  Title IX is not his specialty.

22        Q.  All right.  Let's talk about the damages

23   that you're seeking in this lawsuit.  Your

24   interrogatory responses -- or answers, I'm sorry,

25   list past lost wages, including lost maternity

Page 156

Plaintiffs' Exh 3 page 43 of 58

1   benefits.

2          Why are you seeking lost maternity

3   benefits?

4      A.   When I worked at the University of

5   Missouri, I had paid maternity leave.  My current

6   job at the time of the interrogatory had no fully

7   paid maternity leave, and that's a serious chunk

8   of change if you need it.

9          I worked hard to get the kind of job that

10  could make motherhood and professional life

11  consonant.  In fact, one of the reasons that I

12  went into this field was that -- when I was a very

13  young grad student, I would go to conferences.

14         And there were not very many women there,

15  but when they were there, I would go over and talk

16  to them and ask, Do you have kids, how do you make

17  it work.  I knew that I would need to work.

18         My mom had been a stay-at-home mom, she

19  had home-schooled.  But I knew I would need to

20  work.  But it was a really big deal to me to find

21  a way to be available as a mom and to do something

22  significant with the time that I had to be at

23  work, and I thought that this was the best way I

24  could find, academic life was the best way I could

25  find to be available to children and to do

Page 157

Court Reporters of Louisiana          225-201-9650
A Veritext Company                   www.veritext.com
Plaintiffs' Exh 3 page 44 of 58

1    professional work.

2        Q.  Do you have paid maternity leave now at

3    St. Agnes Academy?  Is that one of the benefits

4    available to you now?

5        A.  A couple months ago they introduced a

6    12-week maternity leave that is paid.  But I

7    already spent the previous year -- you have to

8    spend all of your -- under the previous policy,

9    which held through June, you had to spend all of

10   your sick leave in order to have maternity leave.

11        Like you had ten days of sick leave, and

12   those were divided into thirds, and they paid

13   two-thirds of a day and you paid one-third of a

14   day to make that stretch over six weeks.  So I was

15   very careful to not take sick days unless

16   absolutely necessary in light of those were the

17   maternity leave days and I -- well, I thought I

18   would be entering my third trimester now.

19        Q.  So there is a 12-week paid maternity

20   leave, correct?

21        A.  When I went on -- taking my few days off

22   ██████████████████, they announced that there will

23   be a 12-week paid leave.

24        Q.  And is that policy that you've described

25   somehow integrated with the sick leave policy or

Page 158

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 45 of 58

1    not?

2         A.   They have been careful not to clarify.

3         Q.   So we're unsure?

4         A.   Unsure.

5              I just talked with the head of diversity,

6    and she's not sure either.  Nobody knows.  We'll

7    see.  Somebody's got to have a baby.

8         Q.   You're claiming future lost wages and lost

9    earning capacity.  What are you seeking -- the

10   number that's in the interrogatories is

11   $2,420,000.

12             I guess question one is:  How did you

13   calculate that number?

14        A.   I thought about what I was making at

15   Mizzou, which was good money for a humanities

16   professor.  I thought about what I was making at

17   St. Agnes.  I thought about how long I expected to

18   be able to have a career in this field.  If my

19   career is ten years shorter than my mentors', I'd

20   still be working till I was 75.  So I calculated

21   the difference over time.

22        Q.   What was your salary at Mizzou?

23        A.   About 80-.

24        Q.   And you expect -- your calculation is

25   based on the presumption that you'll work until

Page  159

1    age 75?

2        A.  I would think so.  Nobody in my family

3    retires before that, they either die or they keep

4    working.  My granny retired at 86 -- I guess 83,

5    83.

6        Q.  You're seeking educational expenses.  It

7    says loss of investment.  What does that mean?

8        A.  Well, the things that I've described to

9    you today that one has to do to get an academic

10   job include investing a decade of grueling hours

11   and time on the expectation that, if I put in this

12   decade, it will make the next several decades

13   better.

14            That time includes time spent in the

15   office.  It includes the 200 academic jobs I

16   applied to.  It includes the amount of time that I

17   spent reading and writing and researching to

18   become excellent in my field.

19       Q.  Does this include the time that you were

20   working on your prospectus and dissertation?

21       A.  That is part of my education, yes.

22       Q.  So how did you determine your, for lack of

23   a better way to describe it, hourly rate?

24       A.  I don't think I calculated an hourly rate

25   for that.  But you could ask my attorneys how they

                                        Page 160

Court Reporters of Louisiana          225-201-9650
A Veritext Company                    www.veritext.com
Plaintiffs' Exh 3 page 47 of 58

1    might calculate an hourly rate for that.

2        Q.   Okay.   Tell me about the past medical

3    expenses that you're seeking -- that's listed for

4    which you're seeking reimbursement.

5        A.   Because I wanted to be careful not to

6    highlight this experience so that it wouldn't bust

7    open and then turn out to be all true, have the

8    impact that I was afraid it would have, I didn't

9    talk with my family doctor about my experiences or

10   symptoms.

11            I talked some with Katherine Volk, but

12   always trying to not let that become as big as I

13   thought it might be.   And I refused any -- when

14   Katherine Volk would recommend, for example, any

15   kind of, Do you think an antidepressant would

16   help, I was very much opposed.   So I tried to

17   minimize any -- I tried to minimize medical

18   interaction as much as I could.

19       Q.   Are you taking any antidepressants?

20       A.   No.   In the semester that I was adjuncting

21   after I left Mizzou, Katherine Volk recommended

22   that, but I declined.

23       Q.   So did you incur any medical expenses

24   other than Dr. Volk in connection with the

25   allegations in this lawsuit?

                                   Page 161

Plaintiffs' Exh 3 page 48 of 58

1    A.   I have to check my records on that.   I
2   don't feel confident with those numbers in this
3   context right now.
4    Q.   What about future medical expenses?   Your
5   interrogatory responses say they'll be quantified
6   at a future date.
7        Let me -- so my question is:   As we sit
8   here today, do you have a better understanding of
9   what your -- what you anticipate to be your future
10   medical expenses?
11    A.   I anticipate that Katherine will have some
12   billable hours for me.   And other than that, I
13   can't say what the future holds.
14    Q.   What is Dr. Volk's -- or Ms. Volk's hourly
15   rate?
16    A.   Something like $100 an hour.   And
17   sometimes I've had an insurance that she can
18   accept and sometimes I haven't.
19    Q.   Is that just because of your jobs?
20    A.   Yes.   In the academic world, you get
21   whatever insurance comes with your university or
22   your school.
23    Q.   Are you currently covered by insurance?
24    A.   I am currently covered by insurance, yes.
25    Q.   And does -- I'm sorry.

Page 162

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 49 of 58

1       A.   Not as good as my Mizzou insurance.

2       Q.   Does that insurance cover your sessions

3    with Ms. Volk?

4       A.   With a copay.

5       Q.   Do you know what the copay is?

6       A.   I think it's $25 a session.

7       Q.   Are you able -- does Dr. Kitch, your

8    husband, have coverage by virtue of his job?

9       A.   He does.

10      Q.   Are you able to participate in that plan?

11      A.   No.   My company, my school, did not allow

12   participation until a couple weeks ago.   But then,

13   of course, their timelines aren't lined up.   So I

14   can't jump on to his insurance when mine is open.

15   So I'm compelled to accept the insurance from

16   St. Agnes.

17      Q.   Is Cecelia Joy able to be covered under

18   her Dad's coverage?

19      A.   She is.

20      Q.   You have a claim for loss of enjoyment of

21   life and loss of consortium.   First, what is your

22   basis for your loss of enjoyment of life claim?

23      A.   That's a good question.   So since I was a

24   very young woman, I have been very interested in

25   how to have a life where I could work and be

Page 163

Court Reporters of Louisiana           225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 50 of 58

1    available as a mom.  It was really important to me
2    to find a field where my time at work felt
3    valuable, felt meaningful, and where that wouldn't
4    become all-consuming, where I could have a life
5    outside of work.
6            And the best way I could find to do that
7    was in the academic world.  And when people said
8    it's really, really hard to get a tenured track
9    job, you've got to work really, really hard and
10   then be lucky on top of that, I was like, I'll
11   just work harder than other people, that's fine, I
12   can do it, if that's what it takes.
13           And so I made that investment on the
14   understanding that the time that I put in would
15   pay off later in being able to spend time with my
16   daughter if I -- the kid who turned out to be my
17   daughter, she came into the world.
18           The tenure track is not a perfect job, but
19   it provides a reward for a decade of intense
20   effort, and that reward is flexibility of time.
21   That reward is being able to have some autonomy
22   over what you spend your time on.
23           You have to do service hours, you have to
24   be on committees, you have to fill out paperwork,
25   you have to do all those things, but you get to

                                        Page 164

Court Reporters of Louisiana          225-201-9650
A Veritext Company               www.veritext.com
Plaintiffs' Exh 3 page 51 of 58

1    decide what you write about, publish about.  You
2    get to decide what kind of conferences you go to.
3    And that was very important to me as a young
4    woman, to create that possibility in case I got to
5    become a mother.
6            There are other jobs at universities.
7    There are staff jobs, there are lecturer jobs.
8    Lecturer jobs don't pay what tenure track jobs pay
9    even though you -- so a lecturer teaches four
10   quarters a semester and does service.
11           A tenure track professor teaches two
12   courses a semester, researches, and does service.
13   So a lecturer doesn't have to research for
14   promotion, but a lecturer gets paid considerably
15   less than a tenure track faculty member.
16           Then there are staff jobs, which rarely,
17   but sometimes, pay comparably to tenure track
18   faculty, but they are conventional work hours,
19   full days, year round.  While academics typically
20   do work in the summer to prepare for courses, to
21   go to conferences, to work on publications, the
22   benefit to me of the tenure track is that you get
23   to structure your days, and that's not something
24   you can do with a staff job.
25           So the tenure track is exceptional -- it's

Page 165

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 52 of 58

1    exceptionally difficult to get to it.  I intended

2    to get to it, I aimed to get to it, because I

3    thought it would help me be a more available mom.

4         And I spent years toiling, before I knew

5    John, before I was married, before I had a CV, on

6    the hope that I was building a life that we could

7    enjoy better because I had worked my butt off for

8    a decade.

9         Q.  Does your current job afford you

10   flexibility?

11        A.  No.

12        Q.  And why is that?

13        A.  Well, it's a high school teaching

14   position.  So in the academic world, I could say,

15   These are the two classes I'm teaching, this is

16   the time of day I'm teaching them at.  And maybe

17   you have to negotiate about who teaches what time

18   slot, but you have a good deal of choice over what

19   you teach and when you teach it, and you can

20   structure your week in a way that allows you to do

21   your classwork, do your research, do your service

22   in hours that fit with little people's lives, with

23   little children's lives.

24        In my current job, I have a rotating

25   schedule and my day is essentially scheduled for

Page 166

Court Reporters of Louisiana          225-201-9650
A Veritext Company                www.veritext.com
Plaintiffs' Exh 3 page 53 of 58

1  me all day, every day; this is what you will say,

2  this is what you will teach, this is the test you

3  will give, this is the PowerPoint you will read,

4  go and do it.

5         So there's no flexibility in what I teach,

6  there's no flexibility in when I teach, there is

7  no flexibility in how I teach, which is a really

8  painful part.  I spent my entire life up until

9  these last couple years training to do something

10 at a high level.

11        I developed over 20 college courses on

12 anything from democracy to race in America to

13 ancient and medieval political thought to why food

14 matters and the ethics of eating.  And I developed

15 those classes so that I could spend time doing

16 something I thought was valuable.

17        I developed those classes out of hours and

18 hours and hours of intense study and conversation

19 and observation.  And now I get a set of

20 PowerPoints, which are essentially copied out of a

21 conventional textbook, and my job is to read off

22 the information out of PowerPoints that were

23 created by people who have less experience than I

24 do.

25        It's a humiliating thing to be standing in

Page 167

Plaintiffs' Exh 3 page 54 of 58

1    the front of a classroom compelled to read off

2    poor-quality PowerPoints when I trained and

3    sacrificed for a very different life.

4        Q.   Putting aside the salary differential that

5    you've already identified, would you be happier

6    with a university job as a lecturer or another

7    staff job?

8        A.   Those are good questions.  I think so.

9        Q.   Have you applied for any of those jobs?

10       A.   I have.

11       Q.   When did you apply for those jobs?

12       A.   A few weeks ago.

13       Q.   So it's possible -- or have you received a

14   response to those applications?

15       A.   I have -- well, one of them.  One of them,

16   they haven't looked at applications yet, they

17   won't for some weeks.  The other one they have.

18   My boss at Mizzou, Justin Dyer, one of my two

19   bosses there, left Mizzou, went to the University

20   of Texas, and is looking to fill a staff role.

21        He knows why I have a gap in my CV.  He's

22   supportive of me.  He's not thrown by the gap in

23   the way that other people who look at the CV might

24   be thrown by the gap in the CV.  So he took my

25   application seriously, and I am currently

Page 168

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com
Plaintiffs' Exh 3 page 55 of 58

1    considering a verbal offer for a staff job.

2         And one of the difficult things is right

3    now I have a not great academic schedule job,

4    which has a few weeks off in the summer where

5    you're still working but it's flexible, but this

6    would be a staff job, this would be all day, every

7    day, year round, without flexibility in the

8    schedule, as I understand it.

9         It's a staff job, so it's not a tenure

10   track job.  It's not the same schedule.  It's not

11   the same lifestyle.  But my current job is pretty

12   bad.  So I don't know.  It's a tough choice.

13        Q.  So it's something that -- the verbal offer

14   is something that you're considering right now?

15        A.  I am considering it.  My current job is

16   the kind of job that's available to people like

17   me, but it's excruciating.

18        Q.  Is the verbal offer, the salary for the

19   job that's the verbal offer, is it comparable to

20   what you're receiving at St. Agnes?

21        A.  It is more than what I am receiving at

22   St. Agnes.  It is adjusted for inflation and cost

23   of living.  Maybe near my assistant professor

24   position at Mizzou but without the benefits of

25   schedule, which was a key piece of what I was

Page 169

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com
Plaintiffs' Exh 3 page 56 of 58

1    working for all those years.

2        Q.  When do you -- or how long do you have to

3    consider the job offer?

4        A.  I don't know.

5        Q.  You also have a claim for loss of

6    consortium.  What's the basis of that claim?

7        A.  That means loss of professional world?

8        Q.  I can't answer your question.

9        A.  Can you define "consortium"?

10       Q.  I can't do that either, I'm sorry.

11            MS. TRUSZKOWSKI:

12                If you don't know the answer, Sarah,

13            it's okay.

14       A.  I'm unsure about the legal jargon, so I

15    can't answer your question directly.  But you can

16    ask me another question, I'd be glad to try.

17    BY MS. GREEN:

18       Q.  Have the allegations that you have

19    asserted in your complaint impacted your

20    relationship with John?

21       A.  He's been willing to sacrifice anything he

22    ever built for me to be all right.

23       Q.  And what do you mean by that?

24       A.  When I -- so in academia there's a problem

25    called the two-body problem, where two of you

                                        Page 170

Plaintiffs' Exh 3 page 57 of 58

1    thought, I think I'll earn a living reading books

2    and teaching people, and then there are two of you

3    who need to be employed.

4         And some couples resolve this by living

5    and working in different states, but that wasn't

6    going to be the path for me and John.  So we tried

7    to figure out how to make it work together.  And

8    our basic strategy throughout is that we both work

9    as hard as we can to figure out how to land the

10   best position we can, and then the other person

11   can try to make something good out of whatever

12   leverage the first one has established.

13        So when John knew that I was leaving

14   Mizzou, his chances to get a lecturer position

15   went down considerably.  If one of you has a

16   tenure track, they don't give the other person a

17   job, but over time you can work your way in.

18   Sometimes it takes a little bit to find the right

19   opportunity to work your way into.  And he was

20   willing to give that up when I needed to leave.

21        He didn't plan to teach high school boys,

22   but he chose that life when it became clear that

23   we would need to find another way to make a living

24   together.  And that is how he came to spend his

25   days talking to 15-year-old males.

Page 171

Court Reporters of Louisiana                225-201-9650
A Veritext Company                    www.veritext.com
Plaintiffs' Exh 3 page 58 of 58