```
                   UNITED STATES DISTRICT COURT

                   MIDDLE DISTRICT OF LOUISIANA


ABBY OWENS, ET AL                    CIVIL ACTION NO. 21-242

VERSUS
                                     JUDGE WENDY B. VITTER
LOUISIANA STATE
UNIVERSITY, ET AL                    MAGISTRATE JUDGE JOHNSON


                       *** CONFIDENTIAL ***


* * * * * * * * * * * * * * * * * * * * * * * * * * *

               TRANSCRIPT OF THE DEPOSITION OF:

                       ELISABETH ANDRIES,

TAKEN ON BEHALF OF BOARD OF SUPERVISORS OF LOUISIANA

STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL

COLLEGE, REPORTED IN THE ABOVE ENTITLED AND NUMBERED

CAUSE BY YOLANDA J. PENA, CERTIFIED COURT REPORTER FOR

THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * *



           REPORTED AT THE LAW OFFICES OF:

           PHELPS DUNBAR LLP

           400 CONVENTION STREET, SUITE 1100

           BATON ROUGE, LOUISIANA  70802



      COMMENCING AT 9:07 A.M., ON SEPTEMBER 23, 2022.
```

```
 1      College that my school partnered with.
 2           Q.    So when you started taking classes in August
 3      of 2016, you already had college credits, correct?
 4           A.    Yes.
 5           Q.    When did you complete your college studies?
 6           A.    May 2021.
 7           Q.    All right.  We'll come back and talk more
 8      about your college career.  Let's skip and talk about
 9      employment for a little bit.
10                 Did you work while you were in college?
11           A.    Yes.
12           Q.    Tell me where you worked, please.
13           A.    A bit of a list.  My first job -- let's see.
14      I believe my first job was at the National Center For
15      Disaster Fraud on LSU's campus.  I worked for French
16      Truck Coffee on Government Street.  I worked for the
17      13th Gate Haunted House as a seasonal actor.  I worked
18      at Mid Center Beer Garden, and I worked two months at
19      one point for another campus job.  It involved coding.
20      It was just one or two months.
21           Q.    Your campus job involved coding, did you say?
22           A.    Yes.
23           Q.    Was that in connection with your major?
24           A.    Yes.
25           Q.    And what was your major?
```

```
 1         Q.   During any of those times, did ▮▮▮▮ do
 2   anything to you that made you uncomfortable?
 3         A.   Yes.  He was always very touchy with me and
 4   all the other girls.
 5         Q.   What do you mean by "very touchy"?
 6         A.   He would grab you and slide his hand into
 7   inappropriate places until you basically pushed him off
 8   or told him to stop.
 9         Q.   What inappropriate places?
10         A.   Chest area or anywhere around the butt or
11   frontal part of that.
12         Q.   And when he did that to you, how would you
13   respond?
14         A.   I would push him off.
15         Q.   Would he say anything in response to you
16   pushing him away?
17         A.   No.  He just stopped for that night, then try
18   again the next time.
19         Q.   At any point, did you tell ▮▮▮▮ that you
20   weren't going to hang out with him anymore because of
21   the way he was treating you?
22         A.   Not directly.  But I did have to kick him out
23   of my house in July of 2017 -- June or July.  It was
24   during summer school.  I picked him up from a bar,
25   which would happen a lot.  Since I was in school and
```

```
 1    was it called The Cottages at the time.
 2         Q.   Could [redacted] not have gone to the
 3    fraternity house that night?
 4         A.   I'm not entire sure what the reason was that
 5    he didn't want to go or couldn't go.
 6         Q.   And is it correct that you didn't have any
 7    roommates or your roommates weren't at home that night?
 8         A.   They weren't at home at that moment in time.
 9         Q.   All right.  So tell me -- I know you said you
10    had to kick him out.  Tell me what [redacted] did once you
11    returned to your apartment?
12         A.   I remember I threw a pillow and blanket on
13    the couch, and I went upstairs to my room, which was up
14    the stairs to the right.  He came up and just laid on
15    the bed to talk.  And since I hadn't had anything to
16    drink, we were just talking and chatting, and then he
17    reached over and tried to go under my shirt again.  I
18    immediately pushed him off the bed, told him to get
19    out.  I'm not sure if he spent the night that night on
20    the couch or if he had left at that exact moment, but
21    when I woke up the next day, he was gone.
22         Q.   So when [redacted] came upstairs and laid on your
23    bed, did that make you uncomfortable?
24         A.   Slightly, but it wasn't uncomfortable until he
25    tried to reach over and grab me.
```

1      Q.   Was it correct that ▓▓▓▓▓ hadn't tried to
2   contact you since 2017?
3      A.   Other than the incident with my husband, no.
4   That is correct.
5      Q.   I'm going to play catch up a little bit.  I'll
6   show you a document that's Bates numbered 1496.  It's
7   BOS, so it's actually something that the board
8   produced.
9              MS. MCDIARMID:  It's just one page?
10             MS. GREEN:  Yes.  This is Exhibit 2.
11      (Exhibit No. 2 was marked for identification.)
12  BY MS. GREEN:
13     Q.   Okay.  Ms. Andries, I'll represent to you that
14  this is a document that's generated from what you
15  report.  You mentioned earlier about you actually
16  making a report in 2019.
17     A.   Uh-huh.
18     Q.   My question for you is would you review the
19  responses to the questions and let me know if this is
20  consistent with what you submitted.
21     A.   Yes, it is.  It is consistent with that.
22     Q.   Okay. All right.  I'll show you what we're
23  going to mark as Exhibit 3.
24             MS. GREEN:  It's Bates numbered -- this
25             is several documents -- or a document with

```
 1              several pages.  Starting Bates number BOS
 2              3071, ending BOS 3086.
 3         (Exhibit No. 3 was marked for identification.)
 4    BY MS. GREEN:
 5         Q.   Ms. Andries, do you -- first of all, at the
 6    top of the page, this is addressed to you.  And it
 7    says, "Sent electronically to," and there's an email
 8    address.  Was that your email address when you were at
 9    LSU?
10         A.   Correct.
11         Q.   Do you recall receiving this document?
12         A.   I believe it was an attachment in the email.
13         Q.   Okay.  So you received this via email?
14         A.   Yes.
15         Q.   Did you receive it via Maxient communication?
16    Do you remember?
17         A.   I don't remember.
18         Q.   Okay.  But you did receive it?
19         A.   Yeah.  Through my LSU email, yes.
20         Q.   This letter is from            , the lead
21    investigator, correct?
22         A.   Correct.
23         Q.   So at the time, did -- after you reviewed this
24    letter, did you have any questions about the process?
25         A.   Not after I -- well, other than the one of how
```

1     long the investigation would take and the time length,
2     not entirely, no.
3         Q.   Okay.  Sure.  I'm going to show you a document
4     that I'm marking as Exhibit 4.
5              MS. GREEN:  It's BOS 3147 to 3148.
6              Actually -- yes, I'm going to actually give
7              you these because this is -- we're going to
8              look at these together.  This is Bates number
9              BOS 2622.  All of which will be Exhibit 4.
10        (Exhibit No. 4 was marked for identification.)
11    BY MS. GREEN:
12        Q.   Okay.  Again, Ms. Andries, do you -- is this
13    your email address on these communications?  That's
14    your correct LSU email address, correct?
15        A.   Correct.
16        Q.   Do you remember getting -- let's look at the
17    first email, which is on 2622.  Try to keep them
18    together.  It's also on 348 -- 3148.
19             Do you remember getting this email from
20    ▓▓▓▓▓▓▓▓▓▓ on March 11th of 2019?
21        A.   This is the email that I had sent.
22        Q.   I'm sorry.  Sorry.  Yes, this is the email
23    that you had sent.  So in there you indicate -- let's
24    look at the one that's on 34 -- 3147 and 3418.  These
25    are the two that you sent.

| | |
|---|---|
| 1 | A. I contacted ▮▮▮▮▮, and I believe my |
| 2 | father called the school as well when I didn't get a |
| 3 | clearcut answer. |
| 4 | Q. Okay. And I'm sorry. You said the response |
| 5 | that was given to you was that -- was ▮▮▮▮▮, |
| 6 | in fact, supposed to be at the football game? |
| 7 | A. It wasn't entirely clear. I can't remember if |
| 8 | it was before or after this, but there was one moment |
| 9 | when they told me interim rights were still in act and |
| 10 | that's why he was allowed on campus for things. And |
| 11 | then I believe, after my father had called, they |
| 12 | explained they had forgotten to take out his student |
| 13 | ticket rights or pause his student IDs, something along |
| 14 | those lines. |
| 15 | Q. So did you see ▮▮▮▮▮ on campus after -- |
| 16 | anytime after that football game? |
| 17 | A. I tended to avoid campus as much as possible. |
| 18 | I was taking classes online since I was forced to do |
| 19 | so, yeah. |
| 20 | Q. And when was that? |
| 21 | A. The fall of 2019. |
| 22 | Q. And why were you forced to take classes |
| 23 | online? |
| 24 | A. Since school had started in August and this |
| 25 | was still within the interim rights, we had four out of |

| | |
|---|---|
| 1 | five of my classes together, which since it's a |
| 2 | senior-level industrial engineering classes, you don't |
| 3 | have many options on different times and things like |
| 4 | that.  And so they contacted him as well and asked him |
| 5 | to give up some of the classes, which of course ▇ |
| 6 | did not respond at all.  So they told me since I was |
| 7 | the uncomfortable one, I would have to rearrange my |
| 8 | schedule around his. |
| 9 | Q.   During the classes that you had together, |
| 10 | would you -- did ▇ contact you or try to |
| 11 | interact with you? |
| 12 | A.   No. |
| 13 | Q.   And you didn't sit next to him, correct? |
| 14 | A.   No.  I ended up not going to any of the |
| 15 | classes because they sat me down, I believe, a few days |
| 16 | before school started and tried to get me to rearrange |
| 17 | it, as well when school had started, so I missed about |
| 18 | two weeks of class. |
| 19 | Q.   And when you say they sat you down, just tell |
| 20 | me who -- |
| 21 | A.   ▇ and ▇ -- I'm forgetting |
| 22 | her last name, but she was an engineering counselor. |
| 23 | Q.   I'm sorry.  And you said they sat you down and |
| 24 | said what? |
| 25 | A.   Since I was the uncomfortable one, I would |

1  have to move my schedule around his since we were
2  students and we had equal rights.
3      Q.   Did you meet with ▮▮▮▮▮▮▮ and ▮▮▮▮▮
4  before the semester started?
5      A.   So it would only have been a few days before.
6      Q.   And during that meeting, did you review your
7  schedules?
8      A.   Yes.  They -- ▮▮▮ had already taken both of
9  ours to see how many.  That's how I found out I had
10 four out of five of them and sat down with the
11 engineering counselors so that we could go through the
12 flow chart that the engineering department usually puts
13 out to see what would affect my graduation or not.
14     Q.   So when you were working through the class
15 schedules, it was to make sure you stayed on track as
16 far as graduation is concerned?
17     A.   Correct.
18     Q.   And did you stay on track as far as graduation
19 is concerned?
20     A.   Yes.  But I had to fight to stay in those
21 classes and take them online.
22     Q.   What do you mean when you say you had to fight
23 to stay in the classes?
24     A.   So the way that a lot of the engineering
25 classes are is that there are specific ones for

1  had failed, and so I found out through a fellow friend
2  in 2019, I believe, that you are able to post-actively
3  withdraw if you can give proper cause.  And the cause
4  that I went ahead with, since it was easier to talk
5  about, was the fibroadenoma one, so the lump in the
6  chest.  And so I went with that process through the
7  engineering department, and I got approved to
8  retroactively drop that semester.
9       Q.   You said the cause that was easier to talk
10  about.  Explain that to me.
11       A.   From my perspective, I had two options:
12  to bring up the fact that I acknowledge my assault for
13  the first time and wanted to talk about it publicly, or
14  the fibroadenoma one, which was the medical procedure I
15  had later that summer.  To me, it seemed much easier to
16  tell a board of judges and write about the fibroadenoma
17  than it was my assault.
18       Q.   So you didn't -- the only issue you addressed
19  was your medical condition, not the assault?
20       A.   Yes, for the retroactive drop.
21       Q.   I'll show you a document that we're going to
22  mark as Exhibit 24 -- 25.  It's two pages, BOS 2954 and
23  2955 -- no.  I'm sorry, just 2954.
24            (Exhibit No. 25 was marked for identification.)
25                 MS. GREEN:  I'm going to add two

```
 1      you -- or anybody from SAA explain to you about your
 2      rights versus ▇▇▇▇▇▇▇ rights?
 3                   MS. HASH:  Objection.
 4           A.   From what I know, I did not get this from SAA.
 5      I got this just from reading Title IX policies across
 6      different campuses, was that I was supposed to be given
 7      the right to do private studies, which is why I
 8      requested for it.  It was never offered to me.  So I
 9      had begun to realize that they were not entirely
10      following all of Title IX's proper procedures.
11      BY MS. GREEN:
12           Q.   When did you request private study?
13           A.   The August of -- the end of August, during the
14      emails with ▇▇▇▇▇▇▇.
15           Q.   Okay.  And did ▇▇▇▇▇▇▇ tell you that it
16      wasn't available?
17           A.   No.  No one had -- I asked for options.  And
18      whenever they presented me my new schedule, I had asked
19      about the private studies and how that is an option for
20      interim rights for victims.  And they had acted very
21      shocked when I brought that up and said, usually,
22      that's not allowed.
23           Q.   And is this in your email communications with
24      Ms. Gray?
25           A.   No.  It's in one of the first meetings I had.
```

1           Do you recognize this email?
2      A.   Yes.
3      Q.   Is this consistent with your prior
4  testimony --
5      A.   Yes.
6      Q.   -- of receiving notice that Mr. ▮▮▮ would
7  return to LSU?
8      A.   Yes.
9      Q.   So in the email, Ms. ▮▮▮▮▮▮ indicates that
10 Ms. ▮▮▮ is actually looking at your schedule or can
11 assist you in scheduling your classes and answer any
12 questions you might have; is that correct?
13     A.   Yes.
14     Q.   Did you communicate with Ms. ▮▮▮▮▮ about
15 your schedule -- I'm sorry, Ms. ▮▮▮ about your
16 schedule?
17     A.   I believe so.
18     Q.   Did you -- do you recall having any
19 difficulties with scheduling for this particular
20 semester, the coming semester?
21     A.   No.  The only concern was something along
22 senior design because both parties would have to watch.
23 Like, the Senior Design 1 and 2 would watch each
24 other's presentations.  And I do know the head of the
25 engineering department promised me that he wouldn't be

```
 1   today, it was mentioned that  ████  was going to try to
 2   set up a meeting which included both you and
 3   ████████████.  Did that meeting ever happen?
 4        A.   I don't believe so.
 5        Q.   Okay.
 6             MR. FAHRENHOLT:  Those are all the
 7        questions I have, so thank you.
 8                       EXAMINATION
 9   BY MR. PATIN:
10        Q.   Ms. Andries, hi.  My name is Darren Patin.  I
11   represent Verge Ausberry, who's been named as a
12   defendant in this matter.  I just want to ask some
13   quick questions just to clear up what I believe I know.
14             French Truck Coffee location, where you
15   worked, it was not on campus, was it?
16        A.   No.
17        Q.   Where was it located?
18        A.   Government Street.
19        Q.   Obviously, the Red Eye in New Orleans is not
20   on campus, correct?
21        A.   No, not on campus.
22        Q.   The event was not an LSU-sponsored event; it
23   was a sorority/fraternity event, the bus ride?
24             MS. HASH:  Objection.
25        A.   It was a fraternity event.
```

1  smoked pot, done heroin, cocaine, things along that
2  matter.  He also -- I then responded with "Do you also
3  need to know what I was wearing?"  And he said yes.  I
4  was wearing a Bernie Sanders costume.
5      Q.   That's good.
6      A.   Okay.
7      Q.   Ultimately, though, you understood -- and I
8  believe you testified about this earlier -- you were
9  informed, though, that as Mr. ▮▮▮▮ went through the
10 various appeals processes, the entire finding that he
11 was responsible could be overturned.  Correct?
12          MS. HASH:  Objection.
13     A.   That was during the panel, not during
14 ▮▮▮▮ ▮▮▮▮'s part of process.
15 BY MR. LARGE:
16     Q.   Right.  And I'm kind of focusing on the
17 "eventually that could happen in the long process."
18          MS. HASH:  Objection --
19     A.   After --
20          MS. HASH:  -- to the extent it's a
21     question.
22 BY MR. LARGE:
23     Q.   You want me to restate it?
24     A.   No.  Well, considering ▮▮▮▮ ▮▮▮▮'s
25 part, because this is what we're talking about, it was

```
 1                    REPORTER'S CERTIFICATE

 2          I, YOLANDA J. PENA, Certified Court Reporter in
     and for the State of Louisiana, Registered
 3   Professional Reporter, and as the officer before whom
     this testimony was taken, do hereby certify that
 4   ELISABETH ANDRIES, after having been duly sworn by me
     upon authority of R.S. 37:2554, did testify as set
 5   forth in the foregoing 247 pages.
            I further certify that said testimony was reported
 6   by me in the Stenotype reporting method, was prepared
     and transcribed by me or under my direction and
 7   supervision, and is a true and correct transcript to
     the best of my ability and understanding.
 8          I further certify that the transcript has been
     prepared in compliance with transcript format
 9   guidelines required by statute or by rules of the
     board and that I have been informed about the complete
10   arrangement, financial or otherwise, with the person
     or entity making arrangements for deposition services.
11          I further certify that I have acted in compliance
     with the prohibition on contractual relationships, as
12   defined by Louisiana Code of Civil Procedure Article
     1434, and in rules and advisory opinions of the board.
13          I further certify that I am not an attorney or
     counsel for any of the parties, that I am neither
14   related to nor employed by any attorney or counsel
     connected with this action, and that I have no
15   financial interest in the outcome of this matter.
            This certificate is valid only for this
16   transcript, accompanied by my original signature and
     original raised seal on this page.
17
            Prairieville, Louisiana, this 12th day of October,
18   2022.

19

20

21

22   _____
     YOLANDA J. PENA, CCR, RPR
23   CCR NO. 2017002, RPR NO. 907346

24

25
```