**Wang Law, LLC**
Lin-Chi Wang, Attorney

741 N. 31st St.
Allentown, PA 18104
484-340-6269 ☎
linchi@wanglawllc.com ✉
wanglawllc.com ⊗

## Report of Lin-Chi Wang, Title IX Expert and Attorney

I have been retained by Elizabeth K. Abdnour ("Counsel"), attorney for the Plaintiffs, to provide an expert opinion in the current matter before this court of *Abby Owens, et al, v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, et al*, No.: 3:21-cv-00242. Counsel compensated me at a rate of $250/hour to review documents (listed below) and prepare this written report.

### I.  Qualifications as Title IX Expert

I am a licensed attorney in Michigan and Pennsylvania with specialized experience in interpreting and implementing Title IX compliance requirements at institutions of higher education. I currently operate a solo practice focused on comprehensive Title IX and anti-discrimination compliance services for schools and workplaces.

My experience with interpreting and implementing Title IX compliance requirements is extensive. Since I founded my solo practice in October 2021, I have engaged with over 25 schools, including public and private colleges and universities and K-12 districts across the nation, providing Title IX compliant investigations, hearing officer services, advisor services, policy review, training, and consulting. In the past four years, I have prepared and submitted expert witness reports in *Jane Doe v. Board of Regents of the University of Nebraska, et al*, No. 4:21-cv-3049 and *J.W., a minor, by and through her parents and guardians, M.W. and J.W. v. South Brunswick School District, et al*.

Prior to founding my solo practice, I served as Director of Equity & Title IX Coordinator at Muhlenberg College, a multifaceted role where I oversaw the response and investigation of all institutional reports and complaints of identity-based discrimination and harassment, Title IX sexual harassment, sexual misconduct, intimate partner violence, stalking, and retaliatory harassment as prohibited by the college's policies; I served as the primary first responder and institutional investigator for such reports and complaints; I co-coordinated Clery compliance with the Director of Campus Safety; I presented over 50 trainings to students, staff, and faculty on various aspects of the College's anti-discrimination policies and procedures and prevention strategies; and, I consolidated and rewrote the college's anti-discrimination policies and

1 of 49

procedures in 2018-2019 and spearheaded the approval and education process accompanying the change.

Prior to serving as a Title IX Coordinator, I served as an institutional civil rights investigator in the Office of Institutional Equity at Michigan State University (MSU). In that position, I processed, investigated, and adjudicated over 220 informal and formal reports and complaints discrimination, harassment, sexual misconduct, relationship violence, stalking, and retaliation. I presented over 40 trainings to various student groups, athletes, coaches, faculty, staff, and administrators on the university's sexual misconduct and anti-discrimination policies. While at MSU, the university was under intense scrutiny of its Title IX process, having entered into a resolution agreement with the Office of Civil Rights in 2015 following multiple Title IX complaints. The university underwent additional federal administrative investigations in 2017 and 2018 following the investigation and employment termination of Larry Nassar. I was assigned and investigated and adjudicated the internal Title IX-related complaints of Dr. Nassar in 2016. Serving as an investigator under these conditions meant that I had to ensure I deeply understood Title IX law and guidance and that I operated with utmost critical thought, independence, and discretion.

Throughout my various positions, I received specialized training on Title IX law and practice, conducting prompt, impartial, and objective Title IX investigations, duties as a Title IX Coordinator, Clery Act compliance at institutions of higher education, sexual assault trauma-informed interviewing, and sexual harm restorative justice facilitation.

Attached is a copy of my resume.[1]

## II.    Assignment

Counsel requested that I review documents that they sent to me and provide an opinion on the following question:

> In your expert opinion, did LSU meet industry standards and practice in connection with Title IX compliance in response to all reports made by Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan Johnson, Elisabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, and Sarah Beth Kitch?

---

[1] Attachment 1.

2 of 49

### III.    Opinion

It is my expert opinion that LSU did not meet industry standards and practice in connection with Title IX compliance in response to reports by and about each Plaintiff in this matter. My opinion is explained in detail below.

### IV.    Documents Reviewed and Considered in Forming Opinion

***Documents Provided by Counsel***

1. *Jane Doe v. Board of Regents of the University of Nebraska, et al* Complaint ("Complaint").
2. Husch Blackwell Louisiana State University Title IX Review, March 21, 2021 ("HB Report").
3. Jacoby, Kenny; Armour, Nancy; and, Luther, Jessica. "LSU mishandled sexual misconduct complaints against students, including top athletes." USA TODAY, November 16, 2020, updated January 28, 2021, https://bit.ly/3WDjQCO ("USA TODAY Article").
4. Transcript of Sharon Lewis Deposition (October 27 and 28, 2022).
5. Transcript of Miriam Segar Deposition (November 1 and 2, 2022).
6. Transcript of Verge Ausberry Deposition (November 3 and 4, 2022).
7. Transcript of Jennie Stewart Deposition (November 9, 2022).
8. Transcript of Donovan White Deposition (November 15, 2022).

***Other Documents Reviewed and Referenced in this Report***

1. U.S. Department of Education, Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, effective January 19, 2001, rescinded on August 26, 2020 ("2001 Guidance").[2]
2. U.S. Department of Education, Office of Civil Rights, Dear Colleague Letter: Sexual Violence, effective April 4, 2011, rescinded on September 22, 2017 ("2011 DCL").[3]
3. U.S. Department of Education, Office of Civil Rights, Questions and Answers on Title IX and Sexual Violence, effective April 29, 2014, rescinded on September 22, 2017 ("2014 Q&A")[4]

---

[2] Attachment 2.
[3] Attachment 3.
[4] Attachment 4.

4. U.S. Department of Education, Office of Civil Rights, Q&A on Campus Sexual Misconduct, effective September 22, 2017, rescinded on August 26, 2020 ("2017 Q&A").[5]

## V.    Involved Individuals

Given the number of individuals involved in this matter and various references to individuals in each of the documents, I relied on the following chart to ensure I referenced the appropriate individuals in this report:

| Name in Complaint | Name in HB Report | Name in USA Today Article |
|---|---|---|
| Abby Owens | Complainant 2 (p. 96) | Anonymous/ women's tennis player |
| Samantha Brennan | Samantha Brennan | Samantha Brennan |
| Calise Richardson | Complainant 1 (p. 55) | n/a |
| Jade Lewis | Jade Lewis/Lewis | Anonymous/ ██ girlfriend/ women's tennis player |
| Kennan Johnson | n/a | n/a |
| Elisabeth Andries | Elisabeth Andries | Elisabeth Andries |
| Jane Doe | n/a | n/a |
| Ashlyn Robertson | Complainant 1 (p. 93) | Anonymous/ friend of member of LSU diving |
| Corinn Hovis | Complainant (p. 127) | Anonymous/ woman |
| Sarah Beth Kitch | n/a | n/a |
| John Coe | ██████ | ██████ |
| John Roe | Respondent A (p. 101) | Fraternity Member |
| John Doe | ██████ | ██████ |
| John Poe | n/a | n/a |
| John Loe | Respondent H (p. 127) | ██████ |

---

[5] Attachment 5.

Plaintiffs' Exh A page 4 of 184

| John Moe | n/a | n/a |
|----------|-----|-----|

## VI.    Title IX Requirements and PM-73 Language

In my training and experience as a Title IX investigator and Title IX Coordinator, I received training on and regularly consulted guidance documents from the U.S. Department of Education, Office of Civil Rights, to ensure compliance and application of best practices. My colleagues in the field of Title IX heavily relied on Title IX guidance documents to determine Title IX compliant practices and when discussing how best to address particular issues related to Title IX. Some of the Title IX guidance documents in effect and applicable to LSU during the incidents described below detailed the following general requirements:

> Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:
>
> > (A) Disseminate a notice of nondiscrimination;
> > (B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX; and
> > (C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.
>
> These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination.

2011 DCL, p. 6.

> The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner. The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. *It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator. The notice must be widely distributed* to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant

5 of 49

persons. OCR recommends that the notice be ***prominently posted on school Web sites and at various locations throughout the school or campus and published in electronic and printed publications*** of general distribution that provide information to students and employees about the school's services and policies. ***The notice should be available and easily accessible on an ongoing basis***.

2011 DCL, pp. 6-7. (Emphases added.)

As stated in the 2001 Guidance, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint; and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

2011 DCL, p. 9; see also 2017 Q&A, p. 3 detailing the same requirements.

[S]chools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials. Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

Plaintiffs' Exh A page 6 of 184

2001 Guidance, p. 13.

> All persons involved in implementing a recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures.

2011 DCL, p. 12.

> A Title IX coordinator's core responsibilities include ***overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints***. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the ***training, authority, and visibility necessary to fulfill these responsibilities***.
> …
> A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.
>
> If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

2014 Q&A, pp. 10-11. (Emphases added.)

In addition, **LSU's Title IX policy, PM-73**, promised the following applications to complaints of sex discrimination and sexual misconduct:

> <u>Notification of Complaints</u> ***Any person who receives a complaint under this policy shall promptly notify the Campus Title IX Coordinator***, who shall be

responsible for notifying LSU Title IX Coordinator and any campus administrators, who may be involved in the resolution process. Any supervisor, who witnesses or receives a report or complaint, shall notify the Campus Title IX Coordinator.

<u>Interim Measures</u> At any time after becoming aware of a complaint, the Title IX Coordinator may recommend that interim protections or remedies for the parties involved or witnesses be provided by appropriate LSU officials. These protections or remedies for the parties involved or witnesses will be provided by appropriate University officials. ***Remedies may include separating the parties, placing limitations on contact between the parties, interim suspension***, or making alternative workplace, classroom, course scheduling, dining, or student housing arrangements.

…

V. <u>PROCESSING OF COMPLAINT</u>

A. <u>Initial Review</u>

The Campus Title IX Coordinator shall conduct or supervise the initial review of the complaint, with such assistance, as needed and/or appropriate under the circumstances, from other campus administrators with responsibilities relevant to the nature of the complaint. A responding or complaining student or employee has the right to one advisor of choice at any stage of this process. The ***initial review of the complaint shall be concluded as quickly as possible, within a reasonable amount of time required to complete the review in a manner that is adequate, reliable, and impartial***.

…

B. <u>Resolution Procedures</u>

The University has both an informal and formal resolution procedure for alleged violations of this policy. Both procedures will be implemented by individuals who have received training on issues related to sex discrimination and sexual misconduct. The complainant and the responding student or employee has the right to one advisor of choice at any stage of the Informal Resolution or Formal Resolution processes.

As set forth below, an informal resolution procedure is available under certain circumstances. After the initial review or a full investigation, if the investigator finds that reasonable cause exists to believe that this Policy has been violated, the Campus Title IX Coordinator or designee will determine whether the informal resolution procedure is appropriate. If it is not appropriate, a full investigation is required.

If the Campus Title IX Coordinator or designee determines that informal resolution is appropriate, the complainant and responding person shall be advised of the informal resolution procedure. If both consent in writing, the informal resolution procedure will be followed, without further investigation, unless and until informal resolution is unsuccessful.

***A determination that there is not reasonable cause to believe that this Policy has been violated can be made only after full investigation.*** Such determination is subject to the approval of the Campus Title IX Coordinator or designee. In such case, the complainant, by written request, may have that determination reviewed by the LSU Title IX Coordinator, whose decision shall be final.

…

2. <u>Formal Resolution</u>: If any party is unsatisfied with the outcome of the informal resolution process or if LSU, the accused, and/or the complainant have not consented to and/or determined that informal resolution is inappropriate or insufficient, the formal procedure will be utilized.

In such cases, at the recommendation of the Campus Title IX Coordinator and after an initial review, a trained investigator will conduct a full investigation into the facts and circumstances of the complaint. The investigation may include in-person interviews with all parties involved and interviews of any direct witnesses. Both parties will be given the opportunity to identify witnesses to be interviewed. The investigator may also collect and review any documents or other relevant information to include but not limited to photographs, video recordings, or other social media. All parties to the complaint will be provided written notice regarding the details of the alleged violation of this Policy prior to the initiation of the full investigation. All parties will have an opportunity to identify pertinent evidence to be considered by the investigator. The investigator will present a written investigative summary, based on a preponderance of the evidence

Plaintiffs' Exh A page 9 of 184

standard, and will submit the summary to the Campus Title IX Coordinator and the LSU Title IX Coordinator, who will notify the appropriate Campus offices. Any such investigation shall be conducted by the Campus Title IX Coordinator or a trained person, authorized and assigned as an investigator by the Campus Title IX Coordinator, including, but not limited to, trained employees from human resource management department or the, student services or student life department, or other qualified University employees.

The complainant and the individual who is the subject of the complaint will be notified in writing of the results of the investigation. Information obtained regarding the complaint will be treated as confidentially as possible (as set forth herein) with only those with a legitimate educational interest being informed of the complaint and the outcome of the investigation.

…

C. RESOLUTION/DISCIPLINARY ACTION LSU will take appropriate action against any person found to be in violation of this policy….

HB Report, Exhibit A, PM-73. (Emphases added.)

## VII.   Overall Analysis and Basis of Opinion

Following review of the documents provided in this matter, I felt it was important to first highlight some of the systemic and structural issues at LSU relating to its Title IX operations and practices that impacted its campus community as a whole, and to each of the Plaintiffs. In my opinion, LSU was generally not able to meet its Title IX obligations to take prompt and effective action to end Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, and for the Title IX Coordinator to identify and address patterns or systemic problems, given the following systemic and structural issues.

In my opinion, major issues included:

1. Failure to establish an independent and centralized Title IX office that was appropriately and sufficiently trained and staffed in order for LSU to take prompt and effective action to end Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, and for the Title IX Coordinator identify and address patterns or systemic problems, where:

a. For a nationally-recognized university with a campus of approximately 34,000 students, LSU effectively did not have an established Title IX office until LSU's first full-time Title IX Coordinator, Defendant Stewart, was hired 2016, whose core responsibility was overseeing the school's response to Title IX reports and complaints for all students, employees, and third parties (if within the jurisdiction of the school), and identifying and addressing any patterns or systemic problems revealed by such reports and complaints, who also served as the sole full-time Title IX staff member until 2018, and was severely under-staffed and under-resourced;

b. Defendant Stewart did not have proper supervisory authority over LSU's Title IX campus coordinators, did not have prior experience in conducting Title IX investigations, did not review the full-time Title IX investigator's reports, and also served as the Title IX appeal officer, hampering her obligation as Title IX Coordinator to ensure that LSU's response to all Title IX reports and complaints were prompt, adequate, reliable, and impartial; to implement effective prevention efforts; and, to track, identify, and address patterns;

c. In addition to serving as Title IX Coordinator, Defendant Stewart was assigned to be the Campus Coordinator for LSU's Baton Rouge campus and Clery Coordinator for all LSU System campuses, and in 2018, was assigned to serve as LSU's ADA Coordinator, which were additional job responsibilities for which she did not have the capacity to handle;

d. Soon after Defendant Stewart was hired, she identified deficiencies in the Title IX structure at LSU and in 2016 gave a presentation to members of LSU leadership to make the case that the Title IX office needed more dedicated full-time staff and resources, and failure to do so could lead to ""litigation damages, reputation costs, lost enrollment, media address and harm to folks who have chosen LSU", and in response, Defendant Stewart was given a part-time graduate assistant, and in 2018, one full-time Title IX investigator was finally hired;

e. According to a 2021 review conducted by NASA, "The University fails to provide the Title IX Coordinator with the resources, including capacity and access to senior leadership, necessary to coordinate their institution's Title IX compliance."

f. Defendant Stewart largely agreed with the recommendations set forth in the HB report, and in response to the recommendation that "the most important recommendation from this review is that the University's Title IX office is not appropriately staffed and this needs to be corrected promptly", Defendant Stewart stated, "Absolutely. We were getting the bare minimum done."[6]

---

[6] HB Report, pp. 7-12, 138-139; Stewart Transcript, pp. 31, 70-73, 80, 253.

11 of 49

2. Failure to appropriately train employees, and specifically, administrators and supervisors, on their mandatory reporting responsibilities as "responsible employees" under LSU's Title IX and Sexual Misconduct Policy, Permanent Memorandum No. 73 ("PM-73"), which led to mandatory reports going unreported, contrary to Title IX guidance, where:

   a. LSU did not enforce or monitor annual, required sexual misconduct prevention training for its employees that informed employees of their duty to report sexual misconduct violations, despite Defendant Stewart raising concerns and directing responsible employees to make reports directly to the Title IX office, such as the LSU police department and staff in athletics;

   b. Employees who were interviewed by HB "indicated there was minimal awareness of… [its] reporting requirement"; meanwhile, the Athletics department had its own mandatory reporting policy for employees, despite a directive from LSU leadership to report all Title IX concerns to the Title IX Coordinator; and, internal assessments identified confusion and ambiguity, in general, of responsible employee understanding and designations.[7]

3. Failure to widely disseminate and make information easily accessible to students and employees about the Title IX office as a resource at the University, the name and contact information of the Title IX Coordinator and deputy coordinators, how and where to report incidents of sexual and/or gender violence, and, the Title IX Policy itself, PM-73, contrary to Title IX guidance, where, according to the 2016 LSU Presidential Task Force recommendation on improving Title IX policies, practices, and procedures, LSU needed to "take steps to enhance clarity and accessibility of LSU's policies, their interplay, and the complaint process"; according to an internal assessment conducted by LSU's Office of Internal Audit in 2017, "Published contact information for Title IX Campus Coordinators is incomplete and/or not widely communicated"; in another internal assessment conducted by Morgan Lewis in 2019, areas identified as need for "enhancement" included, "'(1) awareness of LSU's Title IX Office; (2) awareness of appropriate reporting avenues; (3) communication of investigation and adjudication timing/deadlines; (4) offered resources and support services; (5) training and prevention; and (6) education and wellness initiatives for LSU's student athletes'"; and, the HB Report found that LSU's Title IX website was "exceptionally difficult to navigate."[8]

4. Failure by University administrators to coordinate Title IX training and response with Athletics, hampering the Title IX Coordinator's ability to be informed of all Title IX reports and complaints in order to respond promptly and track patterns, where, according to the HB Report, "Since at least 2012, Athletics has been doing its own training disconnected from the Title IX Office and the broader University community" and Defendant Stewart "was clear that it was her preference to present training directly to

---

[7] HB Report, 18-27, 29-35, 143-144; Stewart Transcript, pp. 54-55, 108-09, 142.
[8] HB Report, p. 39, 45, 146, Exhibit B.

Athletics staff and student-athletes" or, at minimum, be present and visible at all athletics trainings so that students and athletics employees knew who she was; and, the Athletics department implemented its own mandatory reporting policy for Athletics employees requiring that they make reports to Defendant Segar, yet, Defendant Segar was "never officially delegated those responsibilities" and Defendant Stewart, when she became Title IX Coordinator, specifically directed the Athletics Director to instruct athletics employees to report directly to her.[9]

5. Failure to properly document reports and complaints received by LSU, contrary to Title IX guidance on the Title IX Coordinator's responsibility to coordinate recordkeeping in order to monitor incidents, where, according to an internal assessment conducted by LSU's Office of Internal Audit in 2017 of Title IX investigations, "Lack of documentation to evidence that [parties] were . . . notified of the initiation of an investigation and the resulting outcome" and "No formal or consistent procedures for documenting complaints received and tracking their disposition"; and, according to HB, "our review above illustrates some of the many significant ways Title IX matters can be handled inappropriately because there is inadequate recordkeeping" and recommended that the "Title IX office must develop a comprehensive record-keeping system" to which Defendant Stewart agreed, saying, "the record-keeping must be improved, yes. I absolutely agree with that. We were getting the bare-bones minimum done."[10]

In my training and experience, for a school the size of LSU with approximately 34,000 students, LSU should have had, in addition to a full-time Title IX Coordinator, 3-4 full-time Title IX investigators, and a full-time administrative assistant, at minimum. For comparison's sake, when I worked as a Title IX and Civil Rights investigator at Michigan State University ("MSU"), a large, public, university similar to LSU, with approximately 50,000 students, the Title IX office had one full-time Title IX Coordinator, one full-time Director of Investigations, 8-9 full-time investigators, three full-time administrative assistants, and one full-time supportive measures coordinator. The investigators were also tasked with conducting the investigations of other complaints of discrimination at the university; however, the majority of reports and complaints received were Title IX-related. On the other end of the spectrum, when I worked as a Title IX Coordinator at Muhlenberg College ("MC"), a small, private college with approximately 2200 students, my full-time position was as Title IX Coordinator, equity compliance officer, and primary investigator, with investigation assistance from trained campus safety officers and external investigators, and I also had a dedicated administrative assistant.

When determining the appropriate number of employees to staff a Title IX office, the most important consideration, in addition to considering the population and size of the campus, is

---

[9] HB Report, pp. 29-35, 142-143; 145; Segar Transcript, Day 1, p. 26; Stewart Transcript, pp. 54-55, 121.
[10] HB Report, pp. 44, 142; Stewart Transcript, p. 255.

whether the school is able to take prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim[11] and for the Title IX Coordinator to oversee "all Title IX complaints and [identify] and [address] any patterns or systemic problems that arise during the review of such complaints" with the current staff and resources.[12] The conclusion for LSU was clear given the number of internal assessments conducted and concerns raised within LSU, including from its own Title IX Coordinator in 2016, and from the numerous consequential mistakes made with each of Plaintiffs, detailed below: the Title IX office was ineffective in meeting its obligation to promptly and effectively end Title IX harassment, prevent it from recurring, and remedy the effects on the victim.

In addition to lack of sufficient staffing within the Title IX office, the Title IX Coordinator, Defendant Stewart, was given inappropriate authority and responsibilities as the Title IX Coordinator. Defendant Stewart needed appropriate authority to coordinate Title IX compliance and efforts at LSU. As LSU's Title IX Coordinator, Defendant Stewart should have been given authority to coordinate, mandate, and ensure enforcement and monitoring of Title IX responsible employee training and student training. Defendant Stewart should have been given supervisory authority over all of the deputy Title IX coordinators and Title IX investigators to ensure, enforce, and monitor consistent and appropriate training and implementation of PM-73 and Title IX practice. It was also improper for Defendant Stewart to serve as the appeal officer for Title IX matters because it meant that Defendant Stewart could not supervise the Title IX investigation process or reports when she had a designated decision-maker role. The additional role of also serving as LSU's ADA Coordinator was not an inherent conflict, but it did mean that Defendant Stewart's capacity was spread thin to the point that she would not meet all of her responsibilities as Title IX Coordinator.

Furthermore, in my experience, implementation of awareness and robust training programs on mandatory reporting and Title-IX related reporting and resources, always brought in an increase of reports for some time. This happened when I was at MSU and MC, as well as among peer institutions that increased their awareness and training efforts. The effect is common sense: those who were previously unaware of their mandatory reporting obligations bring forward reports that they realize they should have reported, and those who were previously unaware of the existence or role of the Title IX office bring forward reports to be addressed, or at the very least, documented. LSU's failure to appropriately train its responsible employees, failure to widely inform its campus community, and failure to coordinate training and information with Athletics inevitably meant that Title IX-related incidents were not getting reported to the Title IX office. Failure to appropriately train and coordinate also meant that LSU did not give its campus

---

[11] 2001 Guidance, ii.
[12] 2011 DCL, p. 7

community members who wanted or needed to report, a chance to have their incidents addressed by the university. Ultimately, this meant that the LSU Title IX Coordinator could not meet its compliance requirement to identify and address any patterns or systemic problems that arise during the review of such complaints, which occurred with some of the Plaintiffs and discussed in further detail below. And, had effective awareness and training been implemented, without a properly trained and staffed Title IX office, they would not have had an ability to appropriately and timely respond to all of the mandatory reports.

Moreover, LSU could not take prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, or identify and address patterns or systemic problems, when reports and complaints were not being documented properly. In my training and experience, all communications, including emails, phone calls, text messages, other forms of communication, meetings, interviews, and reports, related to a Title IX report, were documented. The training I received, and in trainings that I present, the best practice is to document date, time, and location, how information was received, and "all information received", including identities of all individuals involved, from the reporter, to the Parties, witnesses, and any other individuals who may have had contact with the Parties. All of this information was important and necessary to ensure that the institution has done its due diligence in ending or attempting to end Title IX-related harassment, preventing it from recurring, remedying the effects of the harassment on the victim, in identifying and addressing patterns or systemic problems, and to be able to justify decisions that may not go in a party's favor, for example, a decision to not investigate a complaint. LSU's failure to properly document reports and complaints significantly impacted many of the Plaintiffs in this matter, and in some of the situations, if reports had been properly documented, it could have prevented future harm to additional Plaintiffs. These situations are discussed in detail below.

The field of Title IX work continues to evolve as guidance documents and regulations have changed, and one of the enduring principles, in my experience, is when we are made aware of a better approach or of an area that needs improvement, we adjust our policy and practices. As discussed in the HB report, perhaps the detail that bothers me the most, is that LSU leadership was aware of their deficiencies related to their Title IX office and response as early as 2015 through the various external and internal reviews initiated by LSU, and from feedback from its own community members. LSU had many opportunities to adjust and make changes and improvements to its Title IX office and response, as it did with other departments on campus, and it repeatedly failed to do so until the harm was too great.

**VIII.    Analysis and Basis of Opinion for Each Plaintiff**

I discussed LSU's actions below chronologically as they pertained to each Plaintiff. The facts I relied upon in forming my opinion were focused on LSU's responses or actions, or lack thereof, to internal disclosures and/or reports made by or about each Plaintiff. The details of each incident of sexual harassment, sexual assault, gender violence, and/or other form of sex discrimination involving each Plaintiff are included below to provide context as needed to understand LSU's responses or actions, or lack thereof, to each report.

Should I receive new, additional, or different factual information as it pertains to each Plaintiff, my opinion may change.

### A.  Plaintiff Sarah Beth Kitch

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. Plaintiff Kitch enrolled at LSU, at eighteen (18) years old as a political science PhD student in fall of 2009. John Moe was Plaintiff Kitch's professor in the program and advisor for her dissertation.[13] John Moe was fifty-nine (59) years older than Plaintiff Kitch.

2. While she was a student at LSU, Plaintiff Kitch experienced pervasive sexual harassment from John Moe, including inappropriate sexual comments, requests for sexual favors, and expressing interest in a sexual relationship with Plaintiff Kitch. In 2013, John Moe forcibly kissed Plaintiff Kitch when she went to John Moe's house after he called for her help.[14]

3. Plaintiff Kitch did not report John Moe's sexual harassment when she was a student because she was not aware she could report to the Title IX office, she feared being dismissed from the program because John Moe was Plaintiff Kitch's advisor on her dissertation committee, and the department enabled a culture of sexual harassment of female students by male professors.[15]

---

[13] Complaint, p. 84.
[14] Id. at 85.
[15] Id.

**Plaintiffs' Exh A page 16 of 184**

4. Plaintiff Kitch graduated from LSU in 2014 and continued to experience negative impacts from John Moe's sexual harassment throughout her career.[16]

5. In 2019, Plaintiff Kitch decided to report John Moe's sexual harassment to LSU so that LSU would have a record should future reports be made by students. However, Plaintiff Kitch was discouraged from making the report by LSU's Title IX staff members; Plaintiff Kitch was told that no one would do anything, and she would face consequences for reporting. Plaintiff Kitch did not receive documentation about her contacts with the Title IX office.[17]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Kitch***

Without knowing more about LSU's Title IX office and LSU's Title Policy when Plaintiff Kitch was a student, I am not able to comment in detail about LSU's actions when Plaintiff Kitch was experiencing John Moe's sexual harassment. However, if LSU's Title IX office was operating in the same manner as it was in 2015-19 when students could not find information about LSU's Title IX office or resources on the internet, and when the Title IX office did not train mandatory reporters or train students on what and who mandatory reporters were, Plaintiff Kitch would not have known about resources available to her. Plaintiff Kitch would not have known who LSU's Title IX Coordinator was, she would not have known about the Title IX office or what they do, she would not have known about mandatory reporters or who she could report to or talk to in confidence about the sexual harassment she was experiencing, and Plaintiff Kitch would not have known that the Title IX office could assist her with academic accommodations and other possible interim measures. If that was the case, LSU failed to meet industry standards and practice in connection with Title IX compliance as to Plaintiff Kitch as Plaintiff Kitch could not have known about her rights and options as to the sexual harassment and sexual assault she experienced at the time.

In addition, when Plaintiff Kitch did make a report to the LSU Title IX office in 2019, she was discouraged by Title IX staff members from making the report, which is wholly inappropriate. In all Title IX training I have received and given, it is not the Title IX office's role, and thereby the Title IX office staff members' roles, to encourage or discourage a particular individual from reporting. The Title IX office exists as a resource to inform community members about the Title IX policy, Title IX process, individuals rights' as they pertain to Title IX-related conduct, connect community members to appropriate resources, and receive, review, and process reports and complaints. If the Title IX staff members determined that Plaintiff Kitch's report did not fall

---

[16] Id. 86-87.
[17] Id. at 88.

**Plaintiffs' Exh A page 17 of 184**

within their jurisdiction to investigate, they should have taken in Plaintiff Kitch's report, documented it, and issued a preliminary determination letter to Plaintiff Kitch explaining their reasons for not investigating.

Furthermore, as already discussed, any reports made to the Title IX office, whether informal or formal, should be documented. One of the purposes of the Title IX office is to track potential patterns of sexual harassment, and the proper way to do so is to ensure the campus community is aware of the existence and purpose of the Title IX office and for the Title IX office to document all information in all of the reports it receives in order to conduct a pattern check when it receives a new report. According to an established guidance from U.S. Department of Education at the time, 2001 Guidance, "Coordination of recordkeeping… will… ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them."[18] Having a record to prevent future occurrences of sexual harassment by John Moe was Plaintiff Kitch's very goal in making a report to the LSU Title IX office in 2019, and Plaintiff Kitch's report should have been documented, at the very least, according to Title IX guidance and best practices.

For the reasons detailed above, LSU failed to meet industry standards and practice in connection with Title IX compliance by discouraging Plaintiff Kitch from making a report and failing to document Plaintiff Kitch's disclosure to the Title IX office in 2019.

### B.  Plaintiffs Calise Richardson and Jade Lewis

My analysis of LSU's response to Plaintiffs Richardson and Lewis of their experiences involving John Coe is combined below because it involved the same perpetrator.

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1.  Plaintiff Richardson enrolled at LSU in the fall of 2014. She was hired in the same semester for a position on LSU's football recruitment staff.[19]
2.  In fall of 2015, Plaintiff Richardson was raped by a football recruit after the recruit pressured her to let him stay at her apartment. Plaintiff Richardson did not report the rape to the school because she believed felt she would not be supported given how she was treated as a recruiter and

---

[18] 2001 Guidance, p. 21
[19] Complaint, p. 22.

what she experienced was expected of recruiters, which was please and service recruits and to show them a "good time."[20]

3. In the summer of 2016, Plaintiff Richardson and John Coe, a highly recruited LSU football player, began dating. In October 2016, while at a bar, John Coe non-consensually groped and physically pushed Plaintiff Richardson to the ground and she threw a drink at him. John Coe's football teammates restrained him from attacking Plaintiff Richardson further, and John Coe was kicked out of the bar. When Plaintiff Richardson left the bar later than night, John Coe appeared and ran at her and John Coe's teammates had to restrain him again. Later that night, John Coe appeared uninvited at Plaintiff Richardson apartment, and she had to call his teammates to come get him away from her.[21]

4. The following day, Plaintiff Richardson received a call from her supervisor, Sharon Lewis, about the incident with John Coe the night before. Sharon Lewis was informed by one of the football coaches about an incident between Plaintiff Richardson and John Coe. Sharon Lewis asked Plaintiff Richardson why she threw a drink at John Coe. Plaintiff Richardson told Sharon Lewis that John Coe had physically attacked her. Sharon Lewis asked Richardson if she wanted to set up a meeting with John Coe, Sharon Lewis, and John Coe's coach to "iron things out." Plaintiff Richardson declined. Sharon Lewis disputes that Plaintiff Richardson disclosed that John Coe physically attacked her and that she offered to set up a meeting to "iron things out."[22]

5. There is no evidence that Sharon Lewis reported Plaintiff Richardson's disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police in October of 2016. Plaintiff Richardson was not offered support or resources, or information about her rights as to the attack. Sharon Lewis disputes that Plaintiff Richardson disclosed John Coe's abuse when she spoke to HB investigators, and testified that she did inform Defendant Ausberry and Defendant Segar about what she knew of the incident, specifically, that Plaintiff Richardson threw a drink at John Coe because she saw him with another girl at the bar. Defendant Ausberry and Defendant Segar denied that Sharon Lewis informed them.[23]

---

[20] Id. at 23-24, 33.
[21] Id. at 25; HB Report, p. 56.
[22] Id. at 25-26; HB Report, p. 57; S. Lewis Transcript, Day 1, pp. 163-171, 179-181.
[23] HB Report, p. 60; S. Lewis Transcript, Day 1, pp. 163-171, 179-181; Segar Transcript, Day 1, p. 210; Ausberry Transcript, Day 1, pp. 267-269.

6. The following week, Plaintiff Richardson met with Sharon Lewis and Associate Director of Recruiting Operations Keava Soil-Cormier and again disclosed John Coe's assault of her at the bar and subsequent stalking and another attempted attack by John Coe. Sharon Lewis and Keava Soil-Cormier told Plaintiff Richardson she could call the police if Plaintiff Richardson felt like it was "big enough to ruin John Coe's career at LSU", though Sharon Lewis denied that she said this.[24]

7. Sharon Lewis told HB investigators that she called Defendant Segar and made a report following this meeting with Plaintiff Richardson.[25]

8. There is no evidence that Keava Soil-Cormier reported Plaintiff Richardson's disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police following this meeting. There is no evidence that Defendant Segar made a report to the Title IX office. There is no evidence that Sharon Lewis, Keava Soil-Cormier, or Defendant Segar offered or informed Plaintiff Richardson of any other support, resources, or her rights. Sharon Lewis and Keava Soil-Cormier dispute that Plaintiff Richardson disclosed John Coe's abuse when they spoke to HB investigators.[26]

9. **Plaintiff Jade Lewis** enrolled as an LSU student and tennis athlete beginning spring semester of 2017. In January 2017, Plaintiff Lewis began a romantic relationship with John Coe. Soon after they began dating, John Coe perpetrated violence upon Plaintiff Lewis, physically, psychologically, and emotionally.[27]

10. On or around May 19, 2017, while Plaintiff Lewis was at John Coe's house, he became angry and punched Plaintiff Lewis in the stomach. Plaintiff Lewis saw an LSU team athletic trainer Donovan White and/or Sean Carter in May of 2017 due to pain from John Coe's punch to her stomach, and Plaintiff Lewis "disclosed John Coe's abuse" to White and/or Carter. That same day, a teammate of Plaintiff Lewis' also made a comment to White about John Coe's repeated violent assaults on Plaintiff Lewis.[28]

11. There is no evidence that White and/or Carter reported Plaintiff Lewis' disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police in May of 2017. There is no

---

[24] Complaint, pp. 26-27; S. Lewis Transcript, Day 1, p. 250.
[25] HB Report, p. 60.
[26] Id.
[27] Id. at p. 58.
[28] Id. at p. 59.

20 of 49

evidence showing that anyone in a position of authority at LSU offered Plaintiff Lewis support or resources in May of 2017. White denied knowing about John Coe's assaults on Plaintiff Lewis in 2017.[29]

12. A teammate of Plaintiff Lewis' told a reporter at USA Today that she personally reported John Coe's abuse of Plaintiff Lewis to Julia Sell (LSU's tennis coach), at least six to seven months prior to June 2018.[30] A teammate of Plaintiff Lewis' reported to HB investigators that she knew of John Coe's abuse of Plaintiff Lewis, but did not report it to Ms. Sell.[31]

13. There is no evidence that Julia Sell reported John Coe's abuse of Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in 2017.

14. In June and July of 2017, Plaintiff Lewis' father, David Lewis, contacted Mike Sell (LSU's tennis coach), and during these calls, Mr. Lewis disclosed John Coe's abuse of Plaintiff Lewis.[32] Mr. Lewis' account was reviewed by HB investigators and determined to be unsupported by evidence that they gathered[33]

15. There is no evidence that Mike Sell reported John Coe's abuse of Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in June or July of 2017. There is no evidence showing that anyone in a position of authority at LSU offered Plaintiff Lewis support or resources in June or July of 2017.

16. On April 14, 2018, Defendant Ausberry received a text message from John Coe where John Coe texted that Plaintiff Lewis hit John Coe and John Coe hit Plaintiff Lewis in the stomach.[34]

17. There is no evidence that Defendant Ausberry reported John Coe's disclosure of a dating violence involving Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in April of 2018. Neither John Coe nor Plaintiff Lewis were offered support or resources or informed of their rights in April of 2018. Defendant Ausberry admitted that he did not report John Coe's text or subsequent phone call with John Coe about the text.[35]

18. On April 25, 2018, Plaintiff Lewis went to see LSU athletic trainers to get examined for the pain she was experiencing due to being punched in the

---

[29] White Transcript, p. 28.
[30] USA Today article; HB Report, p. 67.
[31] HB Report, p. 67.
[32] Complaint, pp. 59-60; HB Report, p. 68.
[33] HB Report, pp. 72-73.
[34] HB Report, p. 73.
[35] Ausberry Transcript, Day 2, pp. 38-41.

Plaintiffs' Exh A page 21 of 184

stomach by John Coe on or about April 3, 2018. Defendant Segar, White, and Senior Athletic Trainer Micki Collins ("Collins") asked Plaintiff Lewis how she had gotten hurt and Plaintiff Lewis disclosed that John Coe had punched her multiple times over the course of the past year.[36]

19. On April 26, 2018, Defendant Segar submitted an on-line Sexual Misconduct and Sexual Harassment (PM-73) Complaint Form. This report was routed to Associate Dean of Students & Director of Student Advocacy and Accountability Defendant Jonathan Sanders and the Title IX Coordinator, Defendant Stewart.[37]

20. On April 27, 2018, the report was assigned to LSU's Title IX Investigator Scott to investigate.[38]

21. On May 21, 2018, Investigator Scott interviewed Plaintiff Lewis as part of LSU's Title IX investigation. According to Investigator Scott's notes, Plaintiff Lewis did not want to move forward with the case.[39] No known interim or supportive measures were put in place during this time for either Plaintiff Lewis or John Coe. According to Defendant Stewart, in hindsight, if the case came to her presently, she would institute a no-contact and interim suspension of John Coe.[40]

22. On May 31, 2018, John Coe sent Plaintiff Lewis the following threatening text messages: "You might as well come over right now. I'm really about to beat you. I'm not joking. Idc anymore."; "I'm gonna punch you. Come over. I might kill you. You're so stupid. Idc at this point. Hurry up. The longer I wait the more angry I get."; "Fucking stop talking to me you stupid cunt . . . Just kill yourself. You literally have nothing to live for." These text messages were not reported to LSU.[41]

23. On June 5, 2018, Investigator Scott interviewed John Coe, wherein John Coe admitted to punching Plaintiff Lewis in the stomach. The day after John Coe's interview, Investigator Scott concluded his report by noting that John Coe would be put in mandatory counseling and Defendant Segar would inform football Coach Orgeron of the situation.[42]

---

[36] Complaint, pp. 60-61.
[37] Complaint, p. 61; HB Report, p. 76.
[38] HB Report, p. 77.
[39] Id.
[40] Stewart Transcript, p. 196.
[41] Id. at pp. 77-78.
[42] Complaint, p. 61.

22 of 49

24. John Coe only attended one of his five mandatory counseling sessions and no one was responsible for ensuring that he completed the mandatory counseling sessions.[43]

25. Plaintiff Lewis did not receive a written report detailing the findings of the Title IX investigation.[44]

26. In early to mid-June 2018, John Coe physically assaulted Plaintiff Lewis on three separate occasions, once hitting her and slamming her against a car, strangling her in a car another time, and strangling, hitting, and ripping an earring out of her ear at her apartment.[45] In the third instance, which occurred on June 18, 2018, Plaintiff Lewis' roommate called the police and police were dispatched to Plaintiff Lewis' apartment. No arrests were made.[46]

27. On June 18, 2018, Defendant Segar submitted another PM-73 report about John Coe's abuse of Plaintiff Lewis.[47]

28. On June 20, 2018, Plaintiff Lewis was charged with a residential housing violation for having a candle in her room, which was discovered when police were called to her residence for the dating violence incident on June 18, 2018.[48] Plaintiff Lewis was found responsible for the violation on June 22, 2018 and placed on academic probation.[49]

29. On July 11, 2018, Defendant Sanders interviewed John Coe about the June 18, 2018 incident and John Coe denied physically assaulting Plaintiff Lewis.[50]

30. On July 25, 2018, Defendant Sanders interviewed Plaintiff Lewis about the June 18, 2018 incident. Plaintiff Lewis denied that John Coe physically assaulted her.[51]

31. Three witnesses were also interviewed by Defendant Sanders and they all provided information of John Coe's physical abuse of Plaintiff Lewis.[52]

32. The outcome of the investigation was that John Coe was banned from the weight room in summer of 2018 and LSU did not implement any other formal disciplinary action against John Coe.[53]

---

[43] Id.; HB Report, p. 79; Stewart Transcript, p. 194; Segar Transcript, Day 1, p. 133.
[44] Complaint, p. 61.
[45] Id. at pp. 62-63.
[46] Id. at 63.
[47] HB Report, p. 79.
[48] Id. at 81.
[49] Complaint, p. 64.
[50] Id.; HB Report, p. 81.
[51] HB Report, p. 82.
[52] Complaint, pp. 64-65; HB Report, p. 83.
[53] Complaint, p. 65.

23 of 49

33. Plaintiff Lewis received comments from some football coaches that summer blaming her for John Coe being banned from the weight room. Plaintiff Lewis reports the comments to Defendant Segar and Defendant Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment."[54]

34. On August 13, 2018, Defendant Segar submitted another PM-73 report about John Coe's abuse of Plaintiff Lewis after Plaintiff Lewis reached out to Defendant Segar about wanting to be truthful about John Coe's abuse.[55]

35. On August 14, 2018, Defendant Segar submitted another PM-73 report because John Coe reached out to Defendant Segar expressing concern for Plaintiff Lewis' mental health and personal safety.[56]

36. On August 15, 2018. Investigator Scott and Mr. Sanders interviewed a teammate of Plaintiff Lewis' and also interviewed Plaintiff Lewis.[57]

37. On August 16, 2018, Plaintiff Lewis reported John Coe's abuse of her to the LSU Police Department ("LSUPD").[58]

38. On August 17, 2018, John Coe was arrested by the LSUPD for dating violence. Defendant Sanders issued an interim suspension to John Coe, though John Coe was still allowed to attend classes on campus.[59]

39. On August 30, 2018, John Coe was placed on interim suspension in which he was not allowed to be on campus.[60]

40. On September 10, 2018, the Title IX office reached out to John Coe to schedule an interview.

41. On September 15, 2018, LSUPD arrested John Coe again after a witness reported to police that John Coe repeatedly slapped Plaintiff Lewis in the face around her left eye. The next day, John Coe withdrew from LSU.[61]

42. In fall of 2018, **Plaintiff Richardson** learned about John Coe's abuse of Plaintiff Lewis and approximately a week after John Coe was arrested, Plaintiff Richardson told Defendant Ausberry about John Coe's abuse of Plaintiff Richardson. Defendant Ausberry reported Plaintiff Richardson's disclosure to Defendant Segar.[62]

43. On or around October 1, 2018, Plaintiff Richardson also made a disclosure about John Coe's abuse to an employee in LSU Athletics Department for

---

[54] Id.
[55] HB Report, p. 83.
[56] Id. at p. 84.
[57] Id. at po. 84-85.
[58] Id. at 86.
[59] Id.
[60] Id.
[61] Id. at 87.
[62] Complaint, 31.

Life Skills, Brenton Sumler, where Plaintiff Richardson was working at the time, and Mr. Sumler accompanied Plaintiff Richardson to LSU Cares, where Plaintiff Richardson made a report, and the same day, the Title IX office opened a complaint and assigned the case to Investigator Scott.[63]

44. On October 3, 2018, Investigator Scott interviewed Plaintiff Richardson about her report. Sharon Lewis was named as the respondent for the matter being investigated by Investigator Scott; not John Coe.[64]

45. On November 16, 2018, Investigator Scott made a finding that Sharon Lewis violated LSU's Title IX Policy because she did not report Plaintiff Richardson's disclosure of John Coe's abuse. Investigator Scott reviewed his finding with Plaintiff Richardson and informed Plaintiff Richardson that Sharon Lewis would not be disciplined or sanctioned.[65]

46. The Title IX office did not investigate John Coe's abuse of Plaintiff Richardson.[66]

47. On or around July 18, 2019, LSU expelled John Coe for violating the LSU Code of Student Conduct and the LSU Title IX Policy. **Plaintiff Lewis** was never informed of actions that LSU took against John Coe.[67]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Calise Richardson and Jade Lewis***

In addition to the overall failures by LSU identified above, LSU made the following material mistakes as to Plaintiffs Richardson and Lewis, discussed in detail below:

1. LSU employees failed to make mandatory reports of dating violence incidents disclosed to them;

2. LSU employees failed to offer Plaintiffs information about their rights and resources available to them in a timely manner;

3. LSU employees failed to implement interim measures in an appropriate and timely manner;

4. LSU employees failed to document incidents properly;

5. LSU employees failed to conduct a proper investigation and follow their policy, which led to inappropriate and ineffective disciplinary action for John Coe;

6. LSU employees' failures and mistakes led to continuation of violence and harm to the Plaintiffs.

---

[63] Id.
[64] Id. at 32.
[65] Id. at 33.
[66] Id.
[67] Complaint, p. 67.

25 of 49

Such failures prevented LSU from taking prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the Plaintiffs, and prevented the Title IX Coordinator the ability to identify and address patterns or systemic problems.

The first missteps as to Plaintiff Richardson was Sharon Lewis calling a meeting with Plaintiff Richardson instead of simply reporting the incident and letting those who are specially trained in these types of incidents to respond. Nevertheless, Sharon Lewis, and later, Sharon Lewis and Keava Soil-Cormier, both Athletics and LSU employees, met with Plaintiff Richardson and then failed to report the incident between Plaintiff Richardson and John Coe in October of 2016 as mandatory reporters. Though Sharon Lewis testified that she did inform Verge Ausberry and Miriam Segar of the incident, Keava Soil-Cormier was also a responsible employee and had an independent obligation to report. The failure to report to the Title IX office led to Plaintiff Richardson having a lack of knowledge of resources available to her at LSU. Had the incident been reported to the Title IX office, and if the Title IX office responded appropriately, they would have informed Plaintiff Richardson of her rights and resources at the University to address the incident. According to the 2011 DCL, effective at the time of Plaintiff Richardson's disclosure, "Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps… schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement."[68] No steps were taken to ensure Plaintiff Richardson was aware of her rights and resources.

As identified in the HB Report, LSU required "responsible employees" to report potential Title IX violations to the Title IX Coordinator or other appropriate school designee, but did not provide appropriate training to responsible employees, did not monitor responsible employee reporting, and did not notify students who responsible employees were. Review of documents show that the Athletics department had its own reporting mandates and required that employees in the Athletics department make reports of sexual harassment, misconduct, or sexual assault to Defendant Segar or the Assistant Athletics Director HR, contrary to Defendant Stewart's directive that they report directly to her as the Title IX Coordinator. This reporting requirement within Athletics was determined without an official designation by LSU's President or Title IX Coordinator.

---

[68] 2011 DCL, pp. 15-16.

Plaintiffs' Exh A page 26 of 184

Regardless, Plaintiff Richardson's disclosure did not make it to the Title IX office, whether it was a failure by Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry, or Defendant Segar, violating the reporting requirement within Athletics and in LSU's PM-73 policy.

Significantly, had Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry and/or Defendant Segar made a report to the Title IX Coordinator in October of 2016 about the incident with Plaintiff Richardson and John Coe, and if that report was appropriately documented with the identities if the individuals involved, even if Plaintiff Richardson chose to do nothing, the Title IX office would have had documentation of a prior potential dating violence and stalking incident when they ultimately received Plaintiff Lewis' report of John Coe's abuse in 2018.

As previously stated, it is part of the Title IX Coordinator's responsibility to oversee "all Title IX complaints and [identify] and [address] any patterns or systemic problems that arise during the review of such complaints."[69] This is another reason why it was so crucial that responsible employees at LSU were appropriately trained on their reporting responsibility. In my experience as a Title IX staff member and Title IX Coordinator, the majority of reports received by the Title IX office about student incidents were from mandatory reporters/responsible employees who worked closely with students, such as student affairs personnel, resident assistants, and athletics employees. Often, when the Title IX office would reach out to identified Complainants in those reports to provide information about their rights and resources, the Complainants declined to move forward with the school's process. Then, unless there was evidence of a pattern, threats, violence, or use of a weapon in the report, the report would be documented and closed with no further action, and the Complainant would be notified of the same so they were aware of the school's action and decision and of their option to pursue action through the school's internal process should they decide to in the future. Additionally, with every new report, a pattern check would always be conducted with both parties, if identified, to not only check for a potential pattern of misconduct by a Respondent, but to check if a Complainant was identified more than once. If a Complainant was identified more than one time, it would indicate to the school that the Complainant may need additional support or resources, which the Title IX office would reach out to offer.

Unfortunately, similar material reporting mistakes were made with Plaintiff Lewis when Donovan White and/or Sean Carter, LSU Athletics employees, failed to report Plaintiff Lewis' disclosure of being punched in the stomach by John Coe in May of 2017, if it was, in fact, disclosed in May of 2017; when Julia Sell, LSU's women's tennis coach, failed to report John Coe's abuse of Plaintiff Lewis in 2017 after a disclosure from a teammate; when Mike Sell, LSU's women's tennis coach, failed to report John Coe's abuse of Plaintiff Lewis in the summer

---

[69] 2011 DCL, p. 7.

of 2017 after a disclosure from Plaintiff Lewis' father; and, when Defendant Ausberry, an employee and administrator with LSU's Athletics department, failed to report dating violence disclosure from John Coe in April of 2018. All of these employees also failed to inform Plaintiff Lewis and John Coe of resources available to them, respectively, at LSU, which was a training failure if they did not know. All of these failures to report delayed LSU's ultimate response to Plaintiff Lewis.

When the first mandatory report to the Title IX office was made about John Coe's abuse, with Plaintiff Lewis, on April 26, 2018, the Title IX office, appropriately, initiated an investigation, but material mistakes continued to occur. First, the Title IX office did not issue any interim or supportive measures to Plaintiff Lewis, which was a required consideration under Title IX compliance mandates at the time, and would have been highly appropriate in Plaintiff Lewis' and John Coe's situation.

According to the 2011 DCL, "Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation."[70] In my training and experience under the 2011 DCL, it would have been highly appropriate for LSU to issue a no-contact order to John Coe, seriously consider an interim suspension given the violent nature of John Coe's admission of punching Plaintiff Lewis in the stomach, as well as interim ineligibility to participate in football. Defendant Stewart, in hindsight, also agreed. Unfortunately, this is not what LSU's Title IX office did, and instead, the Title IX office did not issue any interim or supportive measures.

The investigation was also delayed without a known explanation, contrary to the Title IX mandate that schools must respond promptly to sexual harassment and take steps to prevent recurrence of sexual harassment.[71] In my training and experience, that includes considering, when a report comes in, whether the alleged sexual harassment is ongoing, the severity of the alleged conduct, and the likelihood of it recurring without intervention from the school. In Plaintiff Lewis' situation, Investigator Scott should have interviewed Plaintiff Lewis immediately to learn more about what happened and whether interim action was necessary given the physically violent nature of John Coe's admitted abuse and that Plaintiff Lewis and John Coe were in a known, present, dating relationship. Those two factors alone were enough to indicate to

---

[70] 2011 DCL, p. 15.
[71] 2001 Guidance, p. 9; 2011 DCL, pp. 9, 14.

28 of 49

the school that there was a possibility of recurrence of violence and the Title IX office should have moved quickly on implementing interim measures and commencing the investigation.

In addition, the Title IX office's failure to provide a written outcome to Plaintiff Lewis following the Title IX investigation was also a material mistake and contrary to PM-73. According to 2011 DCL, "Both parties **must** (emphasis added) be notified, in writing, about the outcome of both the complaint and any appeal, i.e., whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently."[72]

The way in which the Title IX office treated the April 2018 Title IX investigation into Plaintiff Lewis' report, with no investigation report or formal finding, appears as though they decided to handle it informally. However, they did not follow their PM-73 process on informal resolution. Plaintiff Lewis was not informed of the informal resolution process and did not consent to informal resolution in writing, as required in PM-73. The Title IX office also did not follow their formal resolution process.

LSU made the following additional material mistakes as to Plaintiff Lewis and Plaintiff Richardson:

- Failing to issue an appropriate sanction for a finding of dating violence to prevent recurrence of dating violence following the Title IX investigation involving Plaintiff Lewis in April of 2018;
- Failing to ensure that the John Coe completed all of the mandatory counseling sessions following the investigation in April of 2018 to prevent recurrence of dating violence;
- Failing to implement interim and supportive measures, again, following another report of dating violence in June of 2018 to protect Plaintiff Lewis and prevent recurrence of dating violence;
- Charging Plaintiff Lewis with a residential housing violation for having a candle in her room, discovered when police were at her residence for the dating violence incident, prior to completion of the dating violence investigation and contrary to Title IX interim and supportive measures considerations and practices to protect the victim, remove barriers to reporting, and apply amnesty for minor violations when discovered during a Title IX-related investigation;
- Failing to issue an appropriate sanction to John Coe for a finding of dating violence to prevent recurrence of dating violence toward Plaintiff Lewis following the Title IX investigation in the summer of 2018;

---

[72] 2011 DCL, p. 13

- Failing to make a report of retaliation after Plaintiff Lewis told Defendant Segar she was receiving comments from football staff blaming her for John Coe getting banned from the weight room in the summer of 2018 to protect Plaintiff Lewis and prevent recurrence of retaliation and dating violence.
- Failing to notify Plaintiff Richardson of her right to commence an investigation into John Coe's abuse of her, and failure to commence an investigation into John Coe's abuse of Plaintiff Richardson after it was reported to the Title IX office in October of 2018, further violating Title IX documentation mandates and its PM-73 policy.

Crucially, had a mandatory report been made for Plaintiff Richardson and John Coe's incident back in October of 2016, and had it been properly documented or investigated by the Title IX office with Plaintiff Richardson's and John Coe's names, when Plaintiff Lewis' report was made in 2018, the Title IX office should/would have conducted a pattern check and would have seen that a previous incident involving John Coe was reported. In my training and experience, the Title IX office would then have more than reasonable justification to implement immediate measures to stop any potential ongoing violence, such as an interim suspension, and formally investigate Plaintiff Lewis' incident and Plaintiff Richardson's incident if it was not previously investigated, to determine if there was, in fact, a pattern of behavior that needed to be addressed.

LSU's failures and mistakes as to Plaintiff Richardson's and Plaintiff Lewis' situations detailed above were contrary to industry standards and practice in connection with Title IX compliance and its own PM-73.

### C. Plaintiffs Ashlyn Robertson, Abby Owens, Samantha Brennan, and Calise Richardson

My analysis of LSU's response to Plaintiffs Robertson, Owens, Brennan, and Richardson of their experiences involving John Doe is combined below because it involved the same perpetrator.

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. On January 22, 2016, **Plaintiff Ashlyn Robertson**, an LSU student at the time, hosted a party at her off-campus apartment complex and several members of the LSU football team attended, including John Doe who was a highly recruited football player. During the party, Plaintiff Robertson

30 of 49

went to her room to lay down. While Plaintiff Robertson was passed out in her room, John Doe entered her room and raped her.[73]

2. Plaintiff Robertson experienced flashbacks of John Doe spitting on her and penetrating her vaginally and anally. Plaintiff Robertson suffered vaginal and anal trauma from the rape.[74]

3. Plaintiff Robertson's friends on the football team told her that John Doe bragged about having sex with her.

4. On January 26, 2016, Defendant Segar learned of Plaintiff Robertson's rape after receiving a report from LSU's diving coach who learned about it after Plaintiff Robertson disclosed to a friend who was on the LSU swimming and diving team.[75] Defendant Segar passed along the report to Deputy Title IX Coordinator, Gaston Reinoso, but did not include John Doe's identity even though it was known to her.[76]

5. On February 1, 2016, Associate Vice President and Dean of Students Mari Fuentes-Martin ("Dean Fuentes-Martin") emailed Plaintiff Robertson to ask if she wanted to proceed with a Title IX investigation. On February 5, 2016, Robertson emailed Dean Fuentes-Martin back stating that she did not want to proceed with a Title IX investigation. A Title IX investigation was not opened.[77]

6. Defendant Segar and Dean Fuentes-Martin knew John Doe's identity in February of 2016, yet, there was no documentation of John Doe's identity; only that Plaintiff Robertson was raped.[78]

7. On July 9, 2016, **Plaintiff Samantha Brennan**, an LSU student and recruiter for LSU's football team, met John Doe at the bar. John Doe drove Plaintiff Brennan home that night. Plaintiff Brennan woke up naked in her apartment, her living completely disheveled. Plaintiff Brennan had no memory of what happened the night before with John Doe, but assumed they engaged in sexual activity and found John Doe's wallet on her couch.[79]

8. On July 22, 2016, Plaintiff Brennan learned that John Doe had a picture of Plaintiff Brennan naked that he took without her consent while she was incapacitated on the night of July 9, 2016.[80] The same day, Plaintiff

---

[73] Complaint, p. 35.
[74] Id. at 36.
[75] Id.
[76] HB Report, p. 94.
[77] Id. at 36.
[78] Id.
[79] Complaint, p. 40.
[80] Id. at 40-41.

31 of 49

Brennan met with Sharon Lewis and Defendant Segar at Sharon Lewis' request. Sharon Lewis told Plaintiff Brennan she heard about the nude photograph, John Doe denied being at Plaintiff Brennan's apartment, and Sharon Lewis wanted to hear Plaintiff Brennan's side of the story. Sharon Lewis asked Plaintiff Brennan if she wanted to report the matter to the police or whether she wanted it handled internally. Plaintiff Brennan indicated she wanted it handled internally. Nevertheless, Defendant Segar took Plaintiff Brennan to the LSUPD to file a report.[81]

9. On July 25, 2016, Dean Fuentes-Martin emailed LSUPD about Plaintiff Brennan's report and was told by LSUPD that Plaintiff Brennan did not want her information shared beyond the police department. Dean Fuentes-Martin consulted with Defendant Stewart, and they agreed the report would be documented, but no further action would be taken to "respect the wishes of the Complainant" unless there "are other factors (pattern, predations, threats, weapons, violence)."[82]

10. Plaintiff Brennan was never contacted by anyone from the LSU Title IX office and was not offered support or resources or informed of her rights.[83]

11. On June 28, 2016, **Plaintiff Abby Owens**, an LSU student and LSU tennis athlete, met John Doe while out drinking at the bar. John Doe bought Plaintiff Owens shots at the bar and drove her home. At Plaintiff Owens' apartment, John Doe orally and vaginally raped Plaintiff Owens. Plaintiff Owens did not disclose or report the rape at the time.[84]

12. In the fall of 2016, **Plaintiff Robertson** told her new boyfriend, an LSU football player, that she had been raped by John Doe. Plaintiff Robertson's boyfriend told his coach, Ed Orgeron, about the rape.[85]

13. There is no evidence that Ed Orgeron reported the disclosure of rape to anyone in athletics administration, LSU's Title IX office, or to the police in fall of 2016. Ed Orgeron denied learning about Plaintiff Robertson's to HB investigators.[86]

14. In the fall of 2016, **Plaintiff Calise Richardson**, an LSU student and recruiter for the LSU football team, went to a bar with her friends, including John Doe. After the bar, John Doe asked to stay over at Plaintiff Richardson's apartment and Plaintiff Richardson agreed. When they woke up the next morning, while joking around and without warning, John Doe

---

[81] Id. at 41-42
[82] HB Report, p. 99.
[83] Complaint, p. 42.
[84] Id. at 45.
[85] Id. at 38.
[86] HB Report, p. 96, fn. 194.

got on top of Plaintiff Richardson and attempted to rape Plaintiff Richardson. Plaintiff Richardson told John to stop multiple times. John Doe became angry and threatened to ruin her life, get her fired, and said she would regret it.[87]

15. Within a day of John Doe's attempted rape of Plaintiff Richardson, she told her supervisor, Keava Soil-Cormier, about John Doe's attempted rape of Plaintiff Richardson and his threats to get her fired. Keava Soil-Cormier asked Plaintiff Richardson why she would let John Doe in her apartment if she did not want to have sex with him, and asked Plaintiff Richardson's coworkers in the recruiting office about what happened between Plaintiff Richardson and John Doe.[88]

16. Plaintiff Richardson was never contacted by anyone from the LSU Title IX office and was never offered support or resources or informed of her rights related to her disclosure of John Doe's attempted rape of her.

17. In April of 2017, while at a rehabilitation facility, **Plaintiff Owens** disclosed she had been raped by John Doe. About a week later, a rehabilitation center official reported the rape to LSU Athletics and informed Plaintiff Owens and her parents that it was reported. No one from LSU reached out to Plaintiff Owens regarding the report.[89]

18. In late April 2017, Plaintiff Owens' father attended a tennis match where Julia Sell, Plaintiff Owens' LSU tennis coach, was also in attendance. Plaintiff Owens' father told Julia Sell Plaintiff Owens was raped.[90]

19. Julia Sell reported Plaintiff Owens' father's disclosure of Plaintiff Owens' rape to Defendant Segar who made a report to Defendant Stewart via a phone call sometime in spring of 2017.[91]

20. Plaintiff Owens was never offered support or resources or informed of her rights in spring of 2017 or after.[92]

21. On May 20, 2019, Plaintiff Owens called LSU's Title IX Office and asked for a copy of her report.[93]

22. On May 22, 2019, Defendant Stewart told Plaintiff Owens that she had heard about Plaintiff Owens' rape but had decided not to move forward

---

[87] Complaint, p. 28
[88] Id.
[89] Id.
[90] Id.
[91] HB Report, p. 98.
[92] Complaint, p. 45-46.
[93] Id.

33 of 49

with an investigation because the Athletics Department did not give her the name of the assailant.[94]

23. Plaintiff Owens learned later in 2020 that the Title IX office did not have a written record of Plaintiff Owens' rape. Defendant Stewart also told Plaintiff Owens that if she wanted to know who the rape was reported to, she would have to ask the rehabilitation facility since they were the ones that initially reported it to LSU.[95]

**Analysis of Opinion that LSU Failed to Comply with Title IX as related to Ashlyn Robertson, Abby Owens, Samantha Brennan, and Calise Richardson**

The manner in which LSU responded to Plaintiff Robertson's disclosure of rape was initially appropriate. A responsible employee, and per the athletics' internal policy, though contrary to Defendant Stewart's directive, LSU's diving coach, made a mandatory report to Defendant Segar, and Defendant Segar made a mandatory report to a Deputy Title IX Coordinator. It's unclear why Defendant Segar reported to the Deputy Title IX Coordinator instead of the Title IX Coordinator, Defendant Stewart. Nevertheless, the mandatory report was made and Dean Fuentes-Martin, another Deputy Title IX Coordinator, reached out to Plaintiff Robertson to inform Plaintiff Robertson of her rights and resources. Ultimately, Plaintiff Robertson declined to move forward with an internal investigation and the case was documented and closed. This was a good example of mandatory reports at LSU should have been made, following their internal policies, though their internal policies conflicted at the time.

However, a material mistake was made when John Doe's identity was not documented in Plaintiff Robertson's case. As previously discussed in this report, if the school does not appropriately document all information in a report that's been received, the Title IX Coordinator is unable to monitor and identify students or employees who have multiple complaints filed against them or who have been repeated targets, or address any patterns or systemic problems that arise, among other issues, as required by Title IX guidance. John Doe's identify was known to LSU when Plaintiff Robertson's rape was reported and it should have been documented.

As to Plaintiff Brennan, a mandatory report in her situation was not made appropriately. As soon as Sharon Lewis learned about Plaintiff Brennan's nude photograph, Sharon Lewis should have made a mandatory report to Defendant Stewart. It was improper for Sharon Lewis and Defendant Segar to meet with Plaintiff Brennan to learn more about what happened and what she wanted done because they were not designated employees with specialized experience and training to

---

[94] Id.
[95] Id. at 47.

Plaintiffs' Exh A page 34 of 184

inquire further and provide an appropriate response. Furthermore, neither of them made a mandatory report to the Title IX Coordinator, a violation of the LSU's reporting mandate.

Additionally, in my training and experience, it almost always left up to the survivor whether they wanted to make a police report about their own sexual assault. (There were rare exceptions, such as evidence of pattern, predation, threats, violence, and larger community impact.) When Plaintiff Brennan told Sharon Lewis and Defendant Segar that she wanted the situation handled internally, Sharon Lewis and Defendant Segar should have informed Plaintiff Brennan that they were required to make a mandatory report to the Title IX office, that someone from the Title IX office would reach to Plaintiff Brennan with information about her rights and resources, and provide her with information about where to report to police should Plaintiff Brennan decide later that she did, in fact, want to make a police report.

Somehow, the Title IX office did learn of Plaintiff Brennan's situation given that deputy Title IX coordinator, Dean Fuentes-Martin, corresponded with LSUPD about Plaintiff Brennan's report. As soon as Dean Fuentes-Martin learned of Plaintiff Brennan's report, she should have reached out to Plaintiff Brennan, in the same manner that she did with Plaintiff Robertson, with information about her rights and responsibilities, and Plaintiff Brennan could have declined to move forward with the Title IX process, as Plaintiff Robertson had. It is best practice for the Title IX Coordinator or appropriate designee to reach out to a Complainant as soon as the Complainant is identified to offer information about their rights and resources. However, Dean Fuentes-Martin did not reach out to Plaintiff Brennan and failure to do so left Plaintiff Brennan with no information about her rights under the Title IX process, no opportunity to pursue the Title IX process, and no information about additional resources available to her, contrary to Title IX requirements. Additionally, had Plaintiff Robertson's previous rape report been properly documented, Plaintiff Brennan's report would and should have triggered an immediate formal investigation into a potential pattern of misconduct by John Coe and potentially prevented the attempted rape of Plaintiff Richardson.

Mandatory reporting mistakes also occurred with Plaintiff Richardson's disclosure of her attempted rape by John Doe to Keava Soil-Cormier. Keava Soil-Cormier did not make a mandatory report of Plaintiff Richardson's disclosure and, therefore, the Title IX office never received a report to document and track, and Plaintiff Richardson was never informed of her rights and resources. Significantly, had a mandatory report been made about Plaintiff Richardson's disclosure of her attempted rape by John Doe to the Title IX office, and had the previous reports been properly documented, Plaintiff Richardson's should have triggered an immediate formal investigation into a potential pattern of misconduct by John Coe.

35 of 49

As for Plaintiff Owens' reported rape, Julia Sell did make an appropriate mandatory report after learning about Plaintiff Owens' rape from Plaintiff Owens' father, and Defendant Segar made a mandatory report to the Title IX Coordinator, Defendant Stewart. Nevertheless, no one reached out to Plaintiff Owens, as Dean Fuentes-Martin had done with Plaintiff Robertson, to provide Plaintiff Owens with information about her rights and resources. If it's true that Defendant Segar did not provide Defendant Stewart with John Coe's name at the time, the appropriate approach would have been for Defendant Stewart to inquire further with Defendant Segar or Julia Sell about whether they knew who the perpetrator was, or if they did not know, for a Title IX staff member to reach out to Plaintiff Owens, and in addition to informing Plaintiff Owens of her rights and resources, and, invite Plaintiff Owens to an intake meeting in which the Title IX staff member would ask Plaintiff Owens who the perpetrator was. To not even try to learn the identity of the perpetrator after receiving the report, in addition to failing to reach out to Plaintiff Owens, was irresponsible.

LSU had four opportunities to properly document, address, and respond to reports of sexual misconduct by John Coe. When LSU received the second report about John Coe, they had justification then to initiate the formal Title IX process, with or without the Plaintiffs' desire to engage in the Title IX process, to determine if there was a pattern of sexual misconduct. Failure to do so was not only contrary to industry standards and practice in connection with Title IX compliance and PM-73, it also allowed John Doe to continue to engage in harm against additional students without consequence.

### D.  Plaintiff Elisabeth Andries

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. In October of 2016, Plaintiff Andries, an LSU engineering student at the time, was invited by John Roe, an LSU engineering student at the time, to go on a Halloween bus trip hosted by John Roe's fraternity. During the trip, Plaintiff Andries became intoxicated and was taken back to the bus. John Roe nonconsensually groped Plaintiff Andries' breasts while on the bus. Plaintiff Andries shook her head and said "no" and "stop" multiple times while John Roe groped her. Plaintiff Andries had bruises all over her chest the next day.[96]

---

[96] Complaint, p. 49.

**Plaintiffs' Exh A page 36 of 184**

2. In July of 2017, Plaintiff Andries let John Roe stay over at her apartment after picking him up at a bar and John Roe and nonconsensually groped Plaintiff Andries again. Plaintiff Andries told John Roe to stop and kicked him out of her apartment. Thereafter, Plaintiff Andries began avoiding John Roe.[97]

3. In the fall of 2017, Plaintiff Andries disclosed John Roe's assault of her to her LSU therapist. Plaintiff Andries' therapist recommended LSU's Lighthouse Program to Plaintiff Andries for sexual violence support and services.[98]

4. On the first day of spring 2019 semester classes, Plaintiff Andries walked into her industrial engineering class with Professor Champney and saw John Roe sitting in class. Soon thereafter, Plaintiff Andries sought disability accommodations because she was having panic attacks from seeing John Roe in class. While at the LSU Disability Services office, Plaintiff Andries was asked why she needed accommodations and when Plaintiff Andries disclosed the reason, she was advised to make a report to LSU's Title IX office. Plaintiff Andries googled "LSU Title IX" but could not find any information about the Title IX Office.[99]

5. On March 7, 2019, Plaintiff Andries instead went to the Student Advocacy and Accountability ("SAA") office for help and reported John Roe's sexual assault of her to Associate Director and Assistant Dean for Student Advocacy and Accountability, Tracy Blanchard ("Dean Blanchard"). Dean Blanchard reported Plaintiff Andries' report to the Title IX office on March 8, 2019. Dean Blanchard told Plaintiff Andries she would reach out to her Professor Champney to explain Plaintiff Andries' class attendance due to the situation.[100]

6. On March 15, 2019, Plaintiff Andries had her interview with the Title IX office. Plaintiff Andries requested a no-contact order and provided witnesses during her interview. One of those witnesses also experienced a sexual assault by John Roe. The Title IX office did not interview any of Plaintiff Andries' witnesses.[101]

7. On April 2, 2019, Defendant Stewart informed Plaintiff Andries that she would not issue a no-contact order because Plaintiff Andries had not talked to John Roe since July of 2017.[102]

---

[97] Id. at 50.
[98] Id.
[99] Complaint, p. 51.
[100] Id. at p. 52.
[101] Id.
[102] Id.

37 of 49

8.  On April 8, 2019, Plaintiff Andries met with Professor Champney to discuss her grades and she learned that Dean Blanchard did not reach out to him to explain why she would not be in class. Plaintiff Andries told Professor Champney about the situation and on April 24, 2019, Professor Champney made a report to the Title IX office about his concern with Plaintiff Andries' well-being. The Title IX office did not follow up with Professor Champney and Plaintiff Andries' did not know he made a report.[103]

9.  On June 3, 2019, the Title IX investigation concluded that John Roe was responsible for violating LSU's Title IX Policy and Plaintiff Andries was notified on June 4, 2019 with a six-sentence letter.[104]

10. John Roe appealed the decision and requested an extension to submit his appeal from June 19, 2019 to June 28, 2019. His extension request was granted. John Roe submitted his appeal on July 11, 2019 and it was accepted by the Title IX office. Plaintiff Andries was not given updates on the status of the appeal, was not given an opportunity to see John Roe's appeal, and was not given an opportunity to respond to John Roe's appeal.[105]

11. On July 22, 2019, Defendant Stewart upheld the investigator's decision in John Roe's appeal and the matter was referred to SAA for a sanction determination.[106] During the meeting, Defendant Sanders asked Plaintiff Andries detailed questions about the sexual assault, such as whether Plaintiff Andries was "on drugs" during the assault and where exactly she was on the bus when she was assaulted.[107]

12. Plaintiff Andries was not informed of the status of her Title IX case prior to the start of fall 2019 semester despite meeting with Dean Blanchard on August 29, 2019 to discuss what Plaintiff Andries was supposed to do if she and John Roe were in a class together again, to which Dean Blanchard offered no advice or assistance.[108]

13. At the beginning of the fall 2019 semester, Plaintiff Andries walked into one of her classes and saw John Roe sitting there. Plaintiff Andries had a panic attack and immediately left class.[109]

---

[103] Id. at p. 53.
[104] Id.
[105] Id. at 53-54.
[106] HB Report, p. 108.
[107] Complaint, p. 54.
[108] Id.
[109] Id. at 55.

38 of 49

14. On August 30, 2019, Plaintiff Andries met with Dean Blanchard again. Plaintiff Andries asked Dean Blanchard why John Roe was in her lab class. Dean Blanchard told Plaintiff Andries that SAA had reached out to John Roe and asked him to change his schedule, but he never responded. Dean Blanchard also told Plaintiff Andries that she and John Roe were both students, so they had "the same rights."[110]

15. On September 5, 2019, Plaintiff Andries received a copy of the disciplinary letter SAA sent to John Roe, which stated that SAA had issued a mutual no-contact order between John Roe and Plaintiff Andries, that John Roe was required to attend counseling and an anger management course, and that John Roe was issued a deferred suspension effective September 5, 2019, through May 31, 2021.[111]

16. John Roe was given the opportunity to appeal SAA's decision and he submitted his appeal on or around September 27, 2019.[112]

17. Plaintiff Andries was not notified that John Roe had an opportunity to appeal, that he appealed SAA's decision, and that the sanctions as outlined in the letter she received on September 26, 2019 would be stayed until a decision on his appeal was issued.[113]

18. On October 12, 2019, Plaintiff Andries saw John Roe at an LSU football game. On October 14, 2019, Plaintiff Andries called SAA and asked why John Roe was on campus and able to purchase a football ticket given that he was supposed to be on suspension. Plaintiff Andries learned that John Roe had submitted another appeal.[114]

19. A few days later, Plaintiff Andries' father called SAA and was told that learned that Plaintiff Andries was not told about the appeal because "it wouldn't affect [her] at all so it wasn't [her] business."[115]

20. On November 16, 2020, Dean Blanchard sent Plaintiff Andries an email stating that John Roe would be back on campus for spring 2021 classes. Dean Blanchard told Plaintiff Andries that she would have to change her schedule if she did not want to be in class with John Roe.[116]

---

[110] Id.
[111] Id.; HB Report, p. 113.
[112] Id. at 56.
[113] Id.
[114] Id.
[115] Id.
[116] Id. at 57.

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Elisabeth Andries***

LSU made some similar mistakes and some different from the other Plaintiffs discussed above as to Plaintiff Andries.

First, in my training and experience, confidential support services on campus, such as counseling and health services, are trained and given information, such as flyers or business cards, about the Title IX office should an incident of sexual harassment be disclosed when confidential support services are rendered. It's a common practice because these offices may receive more disclosures than other offices due the nature of the service they are providing, and they are confidential, which means they are not required to make mandatory reports to the Title IX office. Employees in these support offices are encouraged to inform students of their right to make a report to the Title IX office should they decide to. In my experience, there were times when a counselor would call the Title IX office or walk over to provide support to the student who disclosed and indicated they wanted to make a report to the Title IX office. Plaintiff Andries' LSU therapist did not suggest or inform Plaintiff Andries of her option to make a report to the Title IX office, which is another example of the Title IX office's isolation from the campus community at large.

When Plaintiff Andries eventually found the Title IX office to make a report about her sexual assault, an investigation commenced appropriately. However, it's my opinion that the Title IX office and SAA handled interim measures for Plaintiff Andries improperly. According to the 2017 Q&A:

> Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending. Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, *restrictions on contact between the parties* (emphasis added), changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations…. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

2017 Q&A, pp. 2-3.

40 of 49

In my training and experience, it was a common practice for a no-contact order to be issued to the parties pending a formal Title IX investigation, particularly if the students were required to be in spaces on campus together, such as living in the same residence hall or enrollment in the same class. The latter was the case for Plaintiff Andries and John Roe. It would have been reasonable, appropriate, and justified, to issue a no-contact in Plaintiff Andries' situation.

Additionally, Plaintiff Andries relied on assurances from Dean Blanchard from SAA that Dean Blanchard would notify her professor of her need for academic accommodations. It's unknown whether Dean Blanchard had received training on considering and issuing interim measures. Nevertheless, Dean Blanchard failed to follow through on her assurance, and Dean Blanchard should have shared with Defendant Stewart that Plaintiff Andries requested academic accommodations so that Defendant Stewart could monitor the academic accommodations should Plaintiff Andries' needs change, as per the 2017 Q&A. Indeed, there was an indication that Plaintiff Andries may have been in need of additional support when Professor Champney made a report to the Title IX office regarding his concerns with Plaintiff Andries. Yet, neither Professor Champney nor Plaintiff Andries received a response from the Title IX office about Professor Champney's report; another material mistake made by the Title IX office.

There were missteps made during the investigation, as well, when Plaintiff Andries' witnesses were not interviewed and no explanation was provided to Plaintiff Andries as to why her witnesses were not interviewed. This contradicts best practice to interview relevant witnesses identified by a party, or provide an explanation in the final investigation report explaining why an identified witness was not interviewed. Additionally, PM-73 states that a complainant should provide as much information to the school as possible about the alleged violation, including "The name(s) of other student(s) or employee(s) who might have been subject to the same or similar conduct." Plaintiff Andries provided the name of a witness who also experienced a sexual assault by John Roe. Yet, the investigator failed to interview that witness, contrary to LSU's own policy and best practice.

Upon conclusion of the Title IX investigation, Plaintiff Andries and John Roe should each have received an investigation report summarizing the evidence gathered, as mandated in the 2017 Q&A:

> The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.
> _

41 of 49

Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. 26This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.27 For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.

2017 Q&A, pp. 4, 6.

In my training and experience, following the conclusion of the investigation, both parties would receive the same copy of the final investigation report, which summarized all relevant exculpatory and inculpatory evidence gathered during the investigation, including statements of interviews conducted, documentary evidence, and descriptions of any other relevant evidence gathered, and an analysis and finding for investigations in which a determination of responsibility was made. The report was accompanied by a notice that included information about next steps, the party's right to appeal and timelines for next steps and appeal. For Plaintiff Andries to only receive a six-sentence outcome letter following the conclusion of the investigation was a deprivation of her right to receive a full investigation report and to understand and be able to prepare for next steps, including the sanctioning process and appeal process.

The following additional Title IX process mistakes made by LSU as to Plaintiff Andries included:

- Defendant Sanders asking Plaintiff Andries inappropriate questions during the sanction determination meeting. The purpose of the sanction decision is to decide "how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education."[117] Defendant Sanders' questions should have focused on the impact John Roe's assault had on Plaintiff Andries, such as the impact it had on Plaintiff Andries life and education at LSU. Defendant Sanders' questions about the factual details were inappropriate and not trauma-informed.

---

[117] 2017 Q&A, p.6.

42 of 49

- Allowing John Roe to submit an appeal after he missed the extended deadline. John Roe's appeal should have been denied as untimely.
- Failure to keep Plaintiff Andries apprised of status of the Title IX process following the investigation outcome. Plaintiff Andries should have been notified and received a copy of John Roe's first and second appeal and given an opportunity to submit a response. Plaintiff Andries should have received a written decision about the outcome of the appeal.
- Failure to issue an appropriate sanction to John Roe proportionate to the finding of misconduct that removed and redressed the hostile environment for Plaintiff Andries. John Roe should never have been allowed to enroll in the same classes as Plaintiff Andries for the remainder of Plaintiff Andries' time at LSU given his finding of responsibility and, at the very least, a no-contact order should have been in place for the remainder of Plaintiff Andries and John Roe's enrollment at LSU as long as they were both enrolled at the same time. LSU had a duty to take steps to "eliminate the hostile environment"[118] for Plaintiff Andries, and LSU failed to do so with ineffective sanctions.
- Failure to monitor Plaintiff Andries' Title IX matter and check in with Plaintiff Andries prior to the start of the fall of 2019 semester. Dean Blanchard inappropriately informed Plaintiff Andries that she and John Roe had the "same rights" and therefore LSU could not ensure that John Roe would be in the same class as her. Given John Roe's finding of responsibility, LSU had a duty to ensure that any hostile environment caused by John Roe's misconduct was remedied. That would have appropriately included a no-contact order accompanying the disciplinary sanction since both Plaintiff Andries and John Roe were both still on campus.

Plaintiff Andries' access to education at LSU was disrupted because LSU failed to appropriately issue interim measures, follow its Title IX formal process appropriately, and issue sanctions proportionate to the finding to restore Plaintiff Andries' access to education at LSU. These actions by LSU failed to meet industry standards and practice in connection with Title IX compliance and its own PM-73 policy.

### E.  Plaintiff Kennan Johnson

***Factual Background***

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1.  In fall of 2017, Plaintiff Johnson joined the LSU women's tennis team as a scholarship recipient. Soon after she started playing tennis for LSU, she

---

[118] 2017 Q&A, p. 6.

43 of 49

experienced disparaging comments from her coach, Julia Sell, about Plaintiff Johnson's weight and sexual orientation. Julia Sell would make Plaintiff Johnson weigh in every week and tell Plaintiff Johnson she had to lose a certain number of pounds every week. Julia Sell told Plaintiff Johnson to keep her "lifestyle" out of the locker room and that Plaintiff Johnson's sexual orientation could make her teammates uncomfortable and distracted.[119]

2. Plaintiff Johnson was negatively impacted physically and psychologically by Julia Sell's behavior toward her and it disrupted Plaintiff Johnson's ability to play tennis well at LSU.[120]

3. Plaintiff Johnson did not make a report about Julia Sell's harassment because she was not aware she could report Julia Sell's conduct to the Title IX office, and she was also afraid of losing her scholarship.[121]

### *Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Kennan Johnson*

In is my opinion that Plaintiff Johnson's experience of enduring Julia Sell's harassment of her weight and sexual orientation without options to address it was a result of LSU's failure to properly train students and employees of the definition Title IX sex discrimination and provide students with appropriate information about their rights and resources. Plaintiff Johnson's lack of knowledge about her rights and resources and sense of helplessness was predictable and preventable. Failure to appropriately inform students of their rights and resources under Title IX was a pervasive problem throughout LSU according to the Complaint, HB Report, and USA Today article. Additionally, LSU failed to widely disseminate information about the Title IX Coordinator, the Title IX office's contact information, and the Title IX Policy, contrary to industry standards and practice in connection with Title IX compliance.

### F.  Plaintiff Jane Doe

### *Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. In October of 2018, Plaintiff Doe and John Poe, both students at LSU, met at a football game and formed a friendship. Soon after they started

---

[119] Complaint, pp. 69-72.
[120] Id.
[121] Id. at 73.

44 of 49

spending more time together, John Poe began to harass Plaintiff Doe. John Poe would get angry and call Plaintiff Doe derogatory names when Plaintiff Doe refused to spend time with him or perform sexual favors. In November of 2018, Plaintiff Doe blocked John Poe's number and blocked him on social media. However, John Poe's harassment continued through spring of 2019 and in one instance, John Poe groped Plaintiff Doe while she was out with a friend.[122]

2. Plaintiff Doe texted her former Resident Assistant about John Poe's harassment and she was advised to report it to the Title IX office. The same day, a Title IX office staff member went to Plaintiff Doe's dorm room to interview her about the allegations, and Plaintiff Doe stated that she did not feel safe and wanted to move out of her dorm room.

3. Plaintiff Doe was moved to a dorm building across campus that same day and was told she had three days to decide if she wanted to stay there and get a no-contact order.

4. Plaintiff Doe said she wanted a no-contact order but was not given further information about getting a no-contact order and she did not receive a copy of a no-contact order.

5. The Title IX Office initiated an investigation, which included four separate interviews for Plaintiff Doe by four different interviewers, and Plaintiff Doe had to repeat her account to each new interviewer.

6. Plaintiff Doe felt that the interviewers were condescending towards her, asked inappropriate questions, and intimidated her to the point that she cried, and the interviewers continued on as if nothing was wrong. The interviewers did not offer support or resources to Plaintiff Doe.[123]

7. On May 23, 2019, Plaintiff Doe met with Assistant Director of SAA Daniel DeLuca to discuss the status of her Title IX case. Plaintiff Doe was told by Director Deluca that her claim did not fall under Title IX. Director DeLuca then proceeded to interview Plaintiff Doe again about the basis of her claim.[124]

8. Plaintiff Doe never received an update from the Title IX office regarding a resolution to her case, was not told if John Poe was interviewed or disciplined, and the witnesses she identified were never interviewed.[125]

9. On March 10, 2021, Plaintiff Doe requested a copy of her file from LSU to determine if John Poe was found responsible or disciplined for his

---

[122] Complaint, pp. 74-75.
[123] Id. at 76.
[124] Id. at 77.
[125] Id. at 77.

45 of 49

harassment of her. In response, Plaintiff Doe received a copy of her file which contained a copy of LSU's Title IX Policy, notes from her interview with Director Deluca on May 23, 2019, and two Sexual Misconduct and Sexual Harassment (PM73) Complaint Forms dated March 21, 2019, and August 30, 2019, which incorrectly stated that Plaintiff Doe had not taken any action to stop John Poe's behavior. When Plaintiff Doe sought more information about whether John Poe was disciplined, Director Deluca said he could not give Plaintiff Doe any further information due to the Family Education Rights Protection Act ("FERPA").[126]

10. Plaintiff Doe stopped attending classes, was expelled from her classes, and lost her scholarship due to the negative impacts of Joe Loe's harassment and lack of support or accommodations from LSU.[127]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Jane Doe***

Similar to the experience of other Plaintiffs discussed above, LSU improperly handled Plaintiff Doe's Title IX investigation after a mandatory report was made.

Plaintiff Doe was appropriately moved to a different residence hall as an interim measure and given the option to get a no-contact order. It's unclear why LSU did not implement a no-contact order after Plaintiff Doe requested one; they should have. A no-contact order would have been an appropriate interim measure in Plaintiff Doe's case given the nature of the harassment, the recent timing of the harassment, and the commencement of a Title IX investigation.

In addition, during the investigation, it was improper for investigators to be condescending, intimidating, ask inappropriate questions, and then fail to offer Plaintiff Doe support or resources when she was visibly upset in the interview. In my training and experience as a Title IX investigator, it was not the Title IX investigator's role to be intimidating or exert power over the interviewee. Title IX guidance provides that an investigator must be a "person free of actual or reasonably perceived conflicts of interest and biases for or against any party…. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation."[128] Being condescending, intimidating, and asking inappropriate questions is indicative of perceived or actual bias against the interviewee, and was improper.

As for the other mistakes made, for the same reasons already discussed above as to other Plaintiffs, LSU deprived Plaintiff Doe of her rights under PM-73 and Title IX when they failed to

---

[126] Id. at 78.
[127] Id. at 78-79.
[128] 2017 Q&A, p.4.

46 of 49

inform Plaintiff Doe of the status of the Title IX investigation, provide her with an investigation report that summarized all relevant inculpatory and exculpatory evidence and stated the outcome, and her right and option to appeal the outcome. Any investigation that occurred should have been documented. Failure to do any of the foregoing amounted to a material deprivation of Plaintiff Doe's rights under PM-73 and Title IX industry standards and practices.

### G. Plaintiff Corinn Hovis

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. On January 24, 2020, Plaintiff Hovis, a student at LSU at the time, and John Loe, a highly recruited quarterback on LSU's football team, met at a bar in Tigerland. John Loe asked Plaintiff Hovis to go back to his residence that night and Plaintiff Hovis agreed though she was heavily intoxicated. John Loe took Plaintiff Hovis to an SUV and she black out almost immediately. John Loe raped Plaintiff Hovis while she was incapacitated in the SUV. Thereafter, John Loe's friend drove Plaintiff Hovis back to her residence hall.[129]

2. Later that night, Plaintiff Hovis subsequently reported to a Resident Assistant that she believed she was drugged and sexually assaulted that night, and Plaintiff Hovis also decided to file a report with LSUPD who forwarded her report to Baton Rouge Police Department ("BRPD") because the incident had occurred off campus. BRPD did not take a statement from Plaintiff Hovis. LSUPD took Plaintiff Hovis and her roommate to the hospital so she could obtain a Sexual Assault Nurse Examiner ("SANE") exam. The SANE found that Hovis's cervix was bruised. Meanwhile, LSU Residential Life personnel made a report to the Title IX office.[130]

3. On January 31, 2020, Defendant Stewart met with Plaintiff Hovis to explain her reporting options and Plaintiff Hovis decided to move forward with the Title IX investigation process. Plaintiff Hovis was offered support and accommodation assistance.

4. Investigator Scott conducted a Title IX investigation, which included interviews with Plaintiff Hovis, John Loe, and four witnesses.[131] On March

---

[129] Complaint, p. 81.
[130] Id.
[131] Id. at 82; HB Report, p. 128.

47 of 49

6, 2020, Investigator Scott concluded that John Loe violated the Title IX Policy by sexually assaulting Plaintiff Hovis on January 24, 2020.

5. In June of 2020, LSU suspended John Loe from May 10, 2020, to May 31, 2021 and issued a no contact directive ordering him to have no communication or contact with Plaintiff Hovis.

6. John Loe violated the no-contact directive twice by having his girlfriend contact Plaintiff Hovis on two occasions in May 2020. The no contact violation was reported to Defendants Stewart and Sanders, but no disciplinary action was taken against John Loe.

7. On August 6, 2020, John Loe transferred to another university to play football.

8. Plaintiff Hovis failed one of her classes and did poorly in other classes due to the negative impacts of the rape and the Title IX process. Plaintiff Hovis sought academic assistance through the Lighthouse Program and Disability Services. However, Plaintiff Hovis was forced to retake and pay for the class she failed, and was denied an extension of accommodations.[132]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Corinn Hovis***

Unlike the other Plaintiffs, LSU appeared to have made many appropriate decisions related to Plaintiff Hovis' Title IX report up to the failure to investigate the alleged no contact violation. Plaintiff Hovis made a voluntary report with LSUPD; she was assisted by LSUPD in getting a SANE at the hospital; the mandatory report to the Title IX office was made properly by the resident assistant; Defendant Stewart met with Plaintiff Hovis and appropriately informed Plaintiff Hovis of her rights and resources; a Title IX investigation was initiated and completed in a timely manner; and, sanctions were issued (though, in my opinion, expulsion is the proper sanction for a finding of rape).

Nevertheless, LSU made errors in failing to investigate the report of no contact violations and issuing disciplinary action if a no contact violation if violation was found, and failing to monitor and assist Plaintiff Hovis in removing barriers to her education at LSU as a result of her rape. Title IX requires that schools "took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, ***remedy its effects*** (emphasis added)."[133] If Plaintiff Hovis' academic struggles were due to the effects of the rape and Title IX process, which in my experience was a common experience for survivors, LSU should have properly trained its support

---

[132] Complaint, p. 83.
[133] 2001 Guidance, p. iii.

offices to work with the Title IX office in issuing accommodations and other assistance for students that were involved in a Title IX investigation. Plaintiff Hovis should have received academic assistance through the advocacy and support of the Title IX office, she should have been granted extensions, and she should not have had to pay for the class she failed.

LSU's failure to support Plaintiff Hovis after the Title IX investigation deprived Plaintiff Hovis of her right to receive remedies of the effects of her rape and resulting Title IX investigation, contrary to industry standards and practice in connection with Title IX compliance.

## IX.    Conclusion

As explained in detail in this report, it is my expert opinion that LSU failed to meet industry standards and practice in connection with Title IX compliance and its own PM-73 policy as to each of the Plaintiffs. My opinion is based on the documents provided and reviewed, as referenced in this report, and my training, knowledge, and experience as an independent, Title IX professional. If presented with new, additional, or different information, my opinion may change.

This report was prepared exclusively for the use of the Court, legal counsel to the parties involved in this matter, and others who have a right to the information contained herein in the context of the subject legal proceeding. It is confidential and is not to be distributed to or relied upon by others. I reserve the right to amend, modify or supplement this report based upon the receipt of new or additional information as I have been informed by counsel that discovery is ongoing in this case.

Date: January 6, 2023

Signature:

Plaintiffs' Exh A page 49 of 184

# ATTACHMENT 1

**Wang Law, LLC**
Lin-Chi Wang, Attorney

741 N. 31st St.
Allentown, PA 18104
484-340-6269 ☎
linchi@wanglawllc.com ✉
wanglawllc.com ⊕

## PROFESSIONAL EXPERIENCE

**WANG LAW, LLC,** Allentown, PA, October 2021 - present
*Founder and Attorney*
- Nationwide solo civil rights law practice focused on Title IX, Title VI, Title VII, and anti-discrimination compliance, policy and practice, consulting, training, investigations, and adjudications for schools and workplaces.
- Represent individuals involved in a school or workplace investigation.
- Confidential counseling for leaders and managers on complex decision-making related to anti-discrimination, sexual harassment, Title VI, Title VII, and/or Title IX matters.
- Approved sexual misconduct investigator for United Educators (UE)
- Speaking engagements:
  - Title IX Investigative Report Writing (October 2021)
  - Title IX Emergency Removal in the K-12 Environment (March 2022)
  - Demystifying the Title IX Process (March 2022)
  - Title IX Investigative Interviewing and Report Writing Basics (November 2022)

**MUHLENBERG COLLEGE,** Allentown, PA, June 2018 – August 2021
*Director of Equity & Title IX Coordinator, and Associate Dean of Students*
- Led the Equity & Title IX office at the college in service of all faculty, staff, and students.
- Implemented and oversaw all efforts at the institution related to civil rights and equal opportunity compliance, including Title IX, working closely with the Vice President of Student Affairs, Provost, and Vice President of Human Resources.
- Enforced the institution's nondiscrimination policy in responding to reports and coordinating resolution processes of possible policy violations.
- Served as primary investigator and conducted prompt, unbiased, and equitable investigations of formal complaints made under the policy.
- Presented trainings and led education and awareness efforts related to protected category discrimination, sexual misconduct, intimate partner violence, and stalking for students, faculty, staff, and athletics.
- Co-coordinated Clery compliance with Director of Campus Safety/Chief of Police.
- Co-coordinated the bias education and response team with the Associate Provost of Faculty Diversity Initiatives.
- Assisted with crisis response as part of College's leadership team.
- Oversaw sexual and gender violence prevention efforts and supervised the Assistant Director of Prevention Education for sexual and gender violence.
- Drafted and facilitated approval process of the College's anti-discrimination policies and processes, including Title IX, in 2018-19.
- Professional trainings received:
  - ATIXA Civil Rights Investigator Training (2018)
  - National Association of College and University Attorneys Annual Conference (2018)
  - NACUA Title IX Coordinator Training (2019)

1 of 3

- ○ Cozen O'Connor Title IX Coordinator, Investigator, and Decision-Maker training (2020)
- ○ Clery Center: Clery Act Training Seminar (2020)
- ○ USD Center for Restorative Justice: Restorative Justice for Campus Sexual Harm Intensive Facilitator Training (2021)

**MICHIGAN STATE UNIVERSITY**, East Lansing, MI, March 2016 – June 2018
*Title IX & Equity Investigator*
- Conducted investigations and made findings of claims of sexual misconduct, relationship violence, stalking, sexual exploitation, discrimination or harassment based on a protected category, and retaliation involving students, faculty, staff, and third parties pursuant to the University's Relationship Violence and Sexual Misconduct and Anti-Discrimination policies.
- Developed and conducted trainings that enhanced equity, diversity, and inclusion efforts at the university and promoted better understanding of prohibited discrimination and harassment for students, faculty, administration, and employees at the university.
- Provided advice and expertise to the campus community on university policies governing civil rights, education, privacy, employment, and labor law.
- Worked collaboratively with campus partners in the Office of General Counsel, human resources, student conduct, campus police, Office of International Students and Scholars, Resource Center for Persons with Disabilities, university housing, and counseling and advocacy services to address incidents and discuss preventative programming.
- Professional trainings received:
  - ○ Clery Act compliance (2016)
  - ○ American Association for Access, Equity and Diversity Annual Conference (2016)
  - ○ Sexual assault trauma-informed interviewing with Tom Tremblay (2017)
  - ○ Neurobiology of sexual assault trauma with Dr. Rebecca Campbell (2017)
  - ○ American Bar Association Labor and Employment Law Annual Conference (2018)

**WHITE SCHNEIDER, PC,** Okemos, MI, March 2014 – March 2016
*Associate Attorney*
- Represented clients in civil and criminal proceedings, primarily focused on labor and employment law, at administrative hearings, arbitrations, District Courts, Circuit Courts, the Michigan Court of Claims, and the Michigan Court of Appeals. Wrote memos, motions, briefs, and orally argued issues under Title VI, Title VII, ADA, and state discrimination laws; the Family Medical Leave Act; Freedom of Information Act; the National Labor Relations Act; and the following Michigan laws: Teachers' Tenure Act; the Public Employment Relations Act; the Revised School Code sections 1248 & 1249; Employment Security Act; Administrative Code.

**THE HONORABLE JUDGE CHARLES FILICE**, Lansing, MI, February 2013 – March 2014 *Judicial Law Clerk*
- Provided support to the Judge through serving as liaison between the Judge, attorneys, parties, law enforcement, and departments within the court; ensured an efficient flow of cases by effectively communicating with lawyers, court staff, members of agencies  and the public and by thoroughly understanding all civil and criminal proceedings.
- Mediated in pro per landlord-tenant cases.

**LEGAL SERVICES OF EASTERN MICHIGAN**, Flint, MI, October – December 2012
*Advocate*
- Researched, drafted memos, and provided legal advice to indigent clients on a range of legal issues, including  domestic relations, landlord-tenant, consumer, public benefits, and creditor-debtor laws.

Plaintiffs' Exh A page 52 of 184

**MICHIGAN STATE UNIVERSITY, COLLEGE OF LAW, LEGAL CLINIC**, East Lansing, MI, August 2011-May 2012
*Small Business & Non-Profit Student Clinician Attorney*

## LICENSURE

- State Bar of Michigan, Active member (P77014)
- Pennsylvania Bar Association, Active member (293001)

## EDUCATION

**MICHIGAN STATE UNIVERSITY COLLEGE OF LAW,** May 2012, Juris Doctor, *cum laude*, East Lansing, MI

**UNIVERSITY OF FLORIDA,** December 2006, Master of Music, Gainesville, FL

**UNIVERSITY OF MICHIGAN,** May 2004, Bachelor of Music, University Honors, Ann Arbor, MI

## PROFESSIONAL MEMBERSHIPS

- Association of Workplace Investigators, Member
- Association of Title IX Administrators, Member

Plaintiffs' Exh A page 53 of 184

# ATTACHMENT 2

Plaintiffs' Exh A page 54 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

# TITLE IX



**January 2001**

**U.S. Department of Education**
**Office for Civil Rights**

Plaintiffs' Exh A page 55 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the Federal Register "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  Gebser v. Lago Vista Independent School District (Gebser), 524 U.S. 274 (1998), and Davis v. Monroe County Board of Education (Davis), 526 U.S. 629 (1999). The Court held in Gebser that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages. See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding. The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092). A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance. In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance. In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being. Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn. As with the 1997 guidance, the revised guidance applies to students at every level of education. School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 58 of 184

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well-publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

Plaintiffs' Exh A page 58 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

**Harassment by Teachers and Other School Personnel**

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees.  These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students.  The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students.  In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing.  We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services."  However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23   Page 60 of 184

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment. We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping. Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways. The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program. Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists. We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created. We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages. We disagree. First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

v

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.  In determining whether harassment is actionable, both Davis and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing Oncale)), and the Davis Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action.  A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students.  Other commenters, by contrast, commended OCR for recognizing that Gebser and Davis did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point. While Gebser and Davis made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the Davis Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

### Effective Response

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools.  We disagree.  Effectiveness has always been the measure of an adequate response under Title IX.  This does not mean a school must overreact out of fear of being judged inadequate.  Effectiveness is measured based on a reasonableness standard.  Schools do not have to know beforehand that their response will be effective.  However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.

## The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX.  The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

Plaintiffs' Exh A page 61 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent).  Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record.  Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser.  This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim.  It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation.  In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4]  The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions.  The Department is in the process of developing a consistent approach and specific factors for implementing this provision.  OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d).  A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients).  The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

Plaintiffs' Exh A page 62 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record. The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges. The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion. They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process. They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations. We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

Plaintiffs' Exh A page 63 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS[1] BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

Plaintiffs' Exh A page 64 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2] The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3] This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding. It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

# II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6] Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program. Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7] Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment. However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

# III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities. The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions. The "education program or activity" of a school includes all of the school's operations.[8] This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

3

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]  A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]  The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

4

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered. The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex. If it does, the second issue is the nature of the school's responsibility to address that conduct. As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

## A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34] Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct. Harassment of this type is generally referred to as hostile environment harassment.[36] This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment. Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. OCR considers the conduct from both a subjective[38] and objective[39] perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40] Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- The degree to which the conduct affected one or more students' education.  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program. For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- The type, frequency, and duration of the conduct.  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46] Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- The number of individuals involved. Sexual harassment may be committed by an individual or a group. In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment. For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred. Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50] Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

- Other incidents at the school. A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment. Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists. Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

### 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome. Conduct is unwelcome if

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]  Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]  For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]  Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection.  Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]  The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so.  Similarly, certain types of disabilities could affect a student's ability to do so.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

Plaintiffs' Exh A page 72 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

## 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed.  The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

10

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63] Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth-grade student in a school hallway. Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways. Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class. In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

of aid, benefits, or services to students. However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program. Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX. If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program. The school, therefore, has engaged in its own discrimination. It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively. (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

## 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67] As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations. On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68] In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program. As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70] For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes. However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back. (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

12

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79]  (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.")  These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations.  By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied.  If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84]  (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR.  This is true in cases

14

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23    Page 78 of 184

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence). This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85] Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

## VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86] As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

16

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

## B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases, a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that a confidentiality request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees. Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused. The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment. There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant. Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual. In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action. In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school. Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student. If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response. These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter. If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome. If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation. If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place. Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations. However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it. Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment. Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98] Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100] Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints. However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment. Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

19

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]  The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]  Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]  While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]  Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]  OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]  Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution. The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment. Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

# XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]). In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117] In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

<u>Example 1</u>: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

Plaintiffs' Exh A page 85 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

Answer: Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

Example 2: A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must a school do in response?

Answer: Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

Plaintiffs' Exh A page 86 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

(professor's spanking of university student may constitute sexual conduct under Title IX); Doe v. Petaluma, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim);  Denver School Dist. #2, OCR Case No. 08-92-1007 (same to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); Nashoba Regional High School, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also Shoreline School Dist., OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); Dartmouth Public Schools, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); San Francisco State University, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); Analy Union High School Dist., OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987).  See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance.  (See section on "Harassment by Teachers and Other Employees.")  See Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees.  (See section on "Harassment by Teachers and Other Employees.")  For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10]  Cf. John Does 1 v. Covington County Sch. Bd., 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

25

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that sex discrimination consisting of same-sex sexual harassment can violate Title VII's prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997 guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds, 171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65, 1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other students, including both boys and girls, sufficient to raise a claim under Title IX); John Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by a male teacher.)  It can also occur in certain situations if the harassment is directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334, 1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment, but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex, court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee.)  In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g., pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both.  Thus, in Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband.  In both cases, according to the court, the remarks were based on sex in that they were made with an intent to demean each member of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct. 733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23    Page 91 of 184

may be actionable even if the harassment is not sexual in nature); Hicks, 833 F.2d at 1415; Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] Davis, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); Franklin, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See Sexual Harassment Guidance, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, id. at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

28

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated– – "... if the victim does not subjectively perceive the environment to be abusive, the

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 93 of 184

---

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  510 U.S. at 21-22.

[39] See <u>Davis</u>, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); <u>Elgamil v. Syracuse University</u>, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing <u>Harris</u>); <u>Booher v. Board of Regents</u>, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See <u>Oncale</u>, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing <u>Harris</u>, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., <u>Ellison</u>, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, <u>Patricia H. v. Berkeley Unified School Dist.</u>, 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See <u>Davis</u>, 526 U.S. at 651, citing both <u>Oncale</u>, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., <u>Davis</u>, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); <u>Doe v. Petaluma</u>, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); <u>Modesto City Schools</u>, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); <u>Weaverville Elementary School</u>, OCR Case No. 09-91-1116 (students left school due to the harassment).  <u>Compare with</u> <u>College of Alameda</u>, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] <u>Doe v. Petaluma</u>, 830 F.Supp. at 1566.

[43] See <u>Waltman v. Int'l Paper Co.</u>, 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); <u>Monteiro v. Tempe Union High School</u>, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing <u>Waltman</u>; see also <u>Hall</u>, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., <u>Elgmil</u> 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); <u>Andrews</u>, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); <u>Moylan v. Maries County</u>, 792 F.2d 746, 749 (8th Cir. 1986).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[45] 34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf.</u> <u>Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf.</u> <u>Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf.</u> <u>Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

31

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 96 of 184

---

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b). Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination. Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader.  That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 98 of 184

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gesber, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gesber, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

35

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment –– to inform the school community that harassment will not be tolerated.  Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e).  The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent.  Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b).  This requirement has been part of the Title IX regulations since their inception in 1975.  Thus, schools have been required to have these procedures in place since that time.  At the elementary and secondary level, this responsibility generally lies

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] <u>Fenton Community High School Dist. #100</u>, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally <u>Meritor</u>, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  <u>See</u> note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] <u>Id.</u>

[106] See <u>Meritor</u>, 477 U.S. at 72-73.

[107] <u>University of California, Santa Cruz</u>, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  <u>See</u> <u>University of Maine at Machias</u>, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in <u>Cape Cod Community College</u>, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

Plaintiffs' Exh A page 100 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated. While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way. However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors. The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution. See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982). However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 102 of 184

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones.)

# ATTACHMENT 3

Rescinded: This document has been formally rescinded by the Department and
remains available on the web for historical purposes only.



# UNITED STATES DEPARTMENT OF EDUCATION

## OFFICE FOR CIVIL RIGHTS

### THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:*
http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf.
OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.
[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

**Plaintiffs' Exh A page 104 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.

[4] *Id.* at 5-5.

[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.

[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.

[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.

[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance,* and in the 2010 Dear Colleague Letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g.*, *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as…severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

**Plaintiffs' Exh A page 106 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance.* Recipients should then implement changes as needed.

(A) _Notice of Nondiscrimination_

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

    (B)  *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

### (C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

*Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

(A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

(B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

**Plaintiffs' Exh A page 112 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including in any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). The *2001 Guidance* noted (on page vi) that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. *See Steadman v. SEC*, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23   Page 115 of 184

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

(C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

occurred in a classroom during school hours with a single complainant.

   (D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.*, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

### Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

**Education and Prevention**

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]

- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).

[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:

*Counseling and Training*

- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  - the school's Title IX responsibilities to address allegations of sexual harassment or violence
  - how to conduct Title IX investigations
  - information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*

- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  - what constitutes sexual harassment or violence
  - what to do if a student has been the victim of sexual harassment or violence
  - contact information for counseling and victim services on and off school grounds
  - how to file a complaint with the school
  - how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 121 of 184

Page 18 – Dear Colleague Letter: Sexual Violence

- o what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o understand how and to whom to report any incidents
  - o know the connection between alcohol and drug abuse and sexual harassment or violence
  - o feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.
[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

**Plaintiffs' Exh A page 121 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

### Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

# ATTACHMENT 4

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE FOR CIVIL RIGHTS

### THE ASSISTANT SECRETARY

### Questions and Answers on Title IX and Sexual Violence[1]

Title IX of the Education Amendments of 1972 ("Title IX")[2] is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance (hereinafter "schools", "recipients", or "recipient institutions") must comply with Title IX.[3]

On April 4, 2011, the Office for Civil Rights (OCR) in the U.S. Department of Education issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence ("DCL").[4] The DCL explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with the requirements of Title IX.[5] Specifically, the DCL:

- Provides guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police) and address sexual violence.

---

[1] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf. The Office for Civil Rights (OCR) issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.
[2] 20 U.S.C. § 1681 *et seq.*
[3] Throughout this document the term "schools" refers to recipients of federal financial assistance that operate educational programs or activities. For Title IX purposes, at the elementary and secondary school level, the recipient generally is the school district; and at the postsecondary level, the recipient is the individual institution of higher education. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office.
[4] Available at http://www.ed.gov/ocr/letters/colleague-201104.html.
[5] Although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.

- Discusses proactive efforts schools can take to prevent sexual violence.

- Discusses the interplay between Title IX, the Family Educational Rights and Privacy Act ("FERPA"),[6] and the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act ("Clery Act")[7] as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator.

- Provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.

The DCL supplements OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, issued in 2001 (*2001 Guidance*).[8] The *2001 Guidance* discusses in detail the Title IX requirements related to sexual harassment of students by school employees, other students, or third parties. The DCL and the *2001 Guidance* remain in full force and we recommend reading these Questions and Answers in conjunction with these documents.

In responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects. In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.

Authorized by

  /s/

Catherine E. Lhamon                              April 29, 2014
Assistant Secretary for Civil Rights

---

[6] 20 U.S.C. §1232g; 34 C.F.R. Part 99.
[7] 20 U.S.C. §1092(f).
[8] Available at http://www.ed.gov/ocr/docs/shguide.html.

ii

Plaintiffs' Exh A page 125 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**Notice of Language Assistance**
**Questions and Answers on Title IX and Sexual Violence**

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

Plaintiffs' Exh A page 126 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**TABLE OF CONTENTS**

Notice of Language Assistance ............................................................................................iii

A.  A School's Obligation to Respond to Sexual Violence ................................................. 1

A-1.  What is sexual violence?.................................................................................1

A-2.  How does Title IX apply to student-on-student sexual violence? .........................................1

A-3.  How does OCR determine if a hostile environment has been created? ...........................1

A-4.  When does OCR consider a school to have notice of student-on-student sexual violence? ...................................................................2

A-5.  What are a school's basic responsibilities to address student-on-student sexual violence? ...................................................................2

A-6.  Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children? ...............................................................................3

B.  Students Protected by Title IX ............................................................................. 5

B-1.  Does Title IX protect all students from sexual violence?.....................................5

B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?...............................5

B-3.  What issues may arise with respect to students with disabilities who experience sexual violence? ...........................................................................6

B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence? ...........................................................7

B-5.  How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school? .....................................................................9

C.  Title IX Procedural Requirements ....................................................................... 9

C-1.  What procedures must a school have in place to prevent sexual violence and resolve complaints? ...........................................................................9

C-2.  What information must be included in a school's notice of nondiscrimination? .............10

C-3.  What are a Title IX coordinator's responsibilities?............................................. 10

C-4.  Are there any employees who should not serve as the Title IX coordinator? ..................11

C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?.................................................12

C-6.  Is a school required to use separate grievance procedures for sexual violence complaints?...........................................................................14

Plaintiffs' Exh A page 127 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

D.  **Responsible Employees and Reporting** ................................................................**14**

    D-1.  Which school employees are obligated to report incidents of possible sexual violence to school officials? ........................................................ 14

    D-2.  Who is a "responsible employee"? ...................................................... 15

    D-3.  What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence? ........................ 16

    D-4.  What should a responsible employee tell a student who discloses an incident of sexual violence? ........................................................ 16

    D-5.  If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials? ........................................................ 17

E.  **Confidentiality and a School's Obligation to Respond to Sexual Violence** ..........................**18**

    E-1.  How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence? ........................ 18

    E-2.  What factors should a school consider in weighing a student's request for confidentiality? ........................................................ 21

    E-3.  What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence? ................ 22

    E-4.  Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"? ........................................................ 24

F.  **Investigations and Hearings** ................................................................**24**

    F-1.  What elements should a school's Title IX investigation include? ...................... 24

    F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation? .......................... 27

    F-3.  How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation? ........................................................ 28

    F-4.  Is a school required to process complaints of alleged sexual violence that occurred off campus? ........................................................ 29

    F-5.  Must a school allow or require the parties to be present during an entire hearing? ........ 30

v

**Plaintiffs' Exh A page 128 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23    Page 129 of 184

F-6. May every witness at the hearing, including the parties, be cross-examined? ................. 31

F-7. May the complainant's sexual history be introduced at hearings? .................................... 31

F-8. What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation? ........................................... 31

G. **Interim Measures** ..................................................................................................... **32**

G-1. Is a school required to take any interim measures before the completion of its investigation? ......................................................................................................... 32

G-2. How should a school determine what interim measures to take? .................................. 33

G-3. If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure? .................................. 33

H. **Remedies and Notice of Outcome** ............................................................................. **34**

H-1. What remedies should a school consider in a case of student-on-student sexual violence? ................................................................................................................... 34

H-2. If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options? ........................... 36

H-3. What information must be provided to the complainant in the notice of the outcome? ................................................................................................................. 36

I. **Appeals** ...................................................................................................................... **37**

I-1. What are the requirements for an appeals process? .......................................................... 37

I-2. Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient? ............... 38

J. **Title IX Training, Education and Prevention** ................................................................. **38**

J-1. What type of training on Title IX and sexual violence should a school provide to its employees? .......................................................................................................... 38

J-2. How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence? ......................................................................... 39

J-3. What type of training should a school provide to employees who are involved in implementing the school's grievance procedures? ................................................. 40

J-4. What type of training on sexual violence should a school provide to its students? .......... 41

Plaintiffs' Exh A page 129 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**K. Retaliation** .......................................................................................................**42**

   K-1. Does Title IX protect against retaliation? ......................................... 42

**L. First Amendment** ...........................................................................................**43**

   L-1. How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution? ........................................................................................... 43

**M. The Clery Act and the Violence Against Women Reauthorization Act of 2013** ......................**44**

   M-1. How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs? ...................... 44

   M-2. Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act? ....................................... 44

**N. Further Federal Guidance** .................................................................................**45**

   N-1. Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance? ........................................................................................ 45

   N-2. Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence? ................................................. 45

**Plaintiffs' Exh A page 130 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

A.  **A School's Obligation to Respond to Sexual Violence**

**A-1.  What is sexual violence?**

**Answer:**  Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, other students, or third parties. All such acts of sexual violence are forms of sex discrimination prohibited by Title IX.

**A-2.  How does Title IX apply to student-on-student sexual violence?**

**Answer:**  Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, *i.e.* creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.[9]

**A-3.  How does OCR determine if a hostile environment has been created?**

**Answer:**  As discussed more fully in OCR's *2001 Guidance*, OCR considers a variety of related factors to determine if a hostile environment has been created; and also considers the conduct in question from both a subjective and an objective perspective. Specifically, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. Indeed, a single or isolated incident of sexual violence may create a hostile environment.

_____

[9] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13.  The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 643 (1999).

Plaintiffs' Exh A page 131 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**A-4.  When does OCR consider a school to have notice of student-on-student sexual violence?**

**Answer:**  OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence. See question D-2 regarding who is a responsible employee.

A school can receive notice of sexual violence in many different ways. Some examples of notice include: a student may have filed a grievance with or otherwise informed the school's Title IX coordinator; a student, parent, friend, or other individual may have reported an incident to a teacher, principal, campus law enforcement, staff in the office of student affairs, or other responsible employee; or a teacher or dean may have witnessed the sexual violence.

The school may also receive notice about sexual violence in an indirect manner, from sources such as a member of the local community, social networking sites, or the media. In some situations, if the school knows of incidents of sexual violence, the exercise of reasonable care should trigger an investigation that would lead to the discovery of additional incidents. For example, if school officials receive a credible report that a student has perpetrated several acts of sexual violence against different students, that pattern of conduct should trigger an inquiry as to whether other students have been subjected to sexual violence by that student. In other cases, the pervasiveness of the sexual violence may be widespread, openly practiced, or well-known among students or employees. In those cases, OCR may conclude that the school should have known of the hostile environment. In other words, if the school would have found out about the sexual violence had it made a proper inquiry, knowledge of the sexual violence will be imputed to the school even if the school failed to make an inquiry. A school's failure to take prompt and effective corrective action in such cases (as described in questions G-1 to G-3 and H-1 to H-3) would violate Title IX even if the student did not use the school's grievance procedures or otherwise inform the school of the sexual violence.

**A-5.  What are a school's basic responsibilities to address student-on-student sexual violence?**

**Answer:**  When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E). If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its

Plaintiffs' Exh A page 132 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[10] The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. For additional information on interim measures, see questions G-1 to G-3.

If a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately. For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes, the school may need to permit the complaining student to retake the classes without an academic or financial penalty (in addition to any other remedies) in order to address the effects of the sexual violence.

**A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children?**

**Answer:**  Yes. Although this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against

---

[10] Throughout this document, unless otherwise noted, the term "complainant" refers to the student who allegedly experienced the sexual violence.

Plaintiffs' Exh A page 133 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. But in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Early signs of inappropriate behavior with a child can be the key to identifying and preventing sexual abuse by school personnel.

A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL. Recipients should refer to OCR's *2001 Guidance* for further information about Title IX obligations regarding harassment of students by school employees. In addition, many state and local laws have mandatory reporting requirements for schools working with minors. Recipients should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations.

With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual. When a school is on notice that a school employee has sexually harassed a student, it is responsible for taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects. Indeed, even if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

A school should take steps to protect its students from sexual abuse by its employees. It is therefore imperative for a school to develop policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. For example, this could include implementing codes of conduct, which might address what is commonly known as grooming – a desensitization strategy common in adult educator sexual misconduct. Such policies and procedures can ensure that students, parents, and

Plaintiffs' Exh A page 134 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

school personnel have clear guidelines on what are appropriate and inappropriate interactions between adults and students in a school setting or in school-sponsored activities. Additionally, a school should provide training for administrators, teachers, staff, parents, and age-appropriate classroom information for students to ensure that everyone understands what types of conduct are prohibited and knows how to respond when problems arise.[11]

## B.  Students Protected by Title IX

**B-1.  Does Title IX protect all students from sexual violence?**

**Answer:**  Yes. Title IX protects all students at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; male and female students; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins.

**B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?**

**Answer:**  A school's obligation to respond appropriately to sexual violence complaints is the same irrespective of the sex or sexes of the parties involved. Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex. A school must investigate and resolve allegations of sexual violence involving parties of the same sex using the same procedures and standards that it uses in all complaints involving sexual violence.

Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. Indeed, lesbian, gay, bisexual, and transgender (LGBT) youth report high rates of sexual harassment and sexual violence. A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it

---

[11] For additional informational on training please see the Department of Education's Resource and Emergency Management for Schools Technical Assistance Center – Adult Sexual Misconduct in Schools: Prevention and Management Training, available at http://rems.ed.gov/Docs/ASM_Marketing_Flyer.pdf.

**Plaintiffs' Exh A page 135 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence.

If a school's policies related to sexual violence include examples of particular types of conduct that violate the school's prohibition on sexual violence, the school should consider including examples of same-sex conduct. In addition, a school should ensure that staff are capable of providing culturally competent counseling to all complainants. Thus, a school should ensure that its counselors and other staff who are responsible for receiving and responding to complaints of sexual violence, including investigators and hearing board members, receive appropriate training about working with LGBT and gender-nonconforming students and same-sex sexual violence. See questions J-1 to J-4 for additional information regarding training.

Gay-straight alliances and similar student-initiated groups can also play an important role in creating safer school environments for LGBT students. On June 14, 2011, the Department issued guidance about the rights of student-initiated groups in public secondary schools under the Equal Access Act. That guidance is available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html.

**B-3. What issues may arise with respect to students with disabilities who experience sexual violence?**

**Answer:** When students with disabilities experience sexual violence, federal civil rights laws other than Title IX may also be relevant to a school's responsibility to investigate and address such incidents.[12] Certain students require additional assistance and support. For example, students with intellectual disabilities may need additional help in learning about sexual violence, including a school's sexual violence education and prevention programs, what constitutes sexual violence and how students can report incidents of sexual

---

[12] OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. *See* 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context. The Department of Education's Office of Special Education Programs in the Office of Special Education and Rehabilitative Services administers Part B of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. 1400 *et seq.* and 34 C.F.R. part 300. IDEA provides financial assistance to states, and through them to local educational agencies, to assist in providing special education and related services to eligible children with disabilities ages three through twenty-one, inclusive.

Plaintiffs' Exh A page 136 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

violence. In addition, students with disabilities who experience sexual violence may require additional services and supports, including psychological services and counseling services. Postsecondary students who need these additional services and supports can seek assistance from the institution's disability resource office.

A student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services. At the elementary and secondary education level, this may trigger a school's child find obligations under IDEA and the evaluation and placement requirements under Section 504, which together require a school to evaluate a student suspected of having a disability to determine if he or she has a disability that requires special education or related aids and services.[13]

A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner that is accessible to students and employees with disabilities, for example, by providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training. See question J-4 for more detailed information on student training.

**B-4. What issues arise with respect to international students and undocumented students who experience sexual violence?**

**Answer:** Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status.[14] A school should ensure that all students regardless of their immigration status, including undocumented students and international students, are aware of their rights under Title IX. A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner accessible to students who are English language learners. OCR recommends that a school coordinate with its international office and its undocumented student program coordinator, if applicable, to help communicate information about Title IX in languages that are accessible to these groups of students. OCR also encourages schools to provide foreign national complainants with information about the U nonimmigrant status and the T nonimmigrant status. The U nonimmigrant status is set

---

[13] *See* 34 C.F.R. §§ 300.8; 300.111; 300.201; 300.300-300.311 (IDEA); 34 C.F.R. §§ 104.3(j) and 104.35 (Section 504). Schools must comply with applicable consent requirements with respect to evaluations. *See* 34 C.F.R. § 300.300.
[14] OCR enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination by recipients of federal financial assistance on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

Plaintiffs' Exh A page 137 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23    Page 138 of 184

aside for victims of certain crimes who have suffered substantial mental or physical abuse as a result of the crime and are helpful to law enforcement agency in the investigation or prosecution of the qualifying criminal activity.[15]  The T nonimmigrant status  is available for victims of severe forms of human trafficking who generally comply with a law enforcement agency in the investigation or prosecution of the human trafficking and who would suffer extreme hardship involving unusual and severe harm if they were removed from the United States.[16]

A school should be mindful that unique issues may arise when a foreign student on a student visa experiences sexual violence. For example, certain student visas require the student to maintain a full-time course load (generally at least 12 academic credit hours per term), but a student may need to take a reduced course load while recovering from the immediate effects of the sexual violence. OCR recommends that a school take steps to ensure that international students on student visas understand that they must typically seek prior approval of the designated school official (DSO) for student visas to drop below a full-time course load. A school may also want to encourage its employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence to approach the DSO on the student's behalf if the student wishes to drop below a full-time course load. OCR recommends that a school take steps to ensure that its employees who work with international students, including the school's DSO, are trained on the school's sexual violence policies and that employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence are aware of the special issues that international students may encounter. See questions J-1 to J-4 for additional information regarding training.

A school should also be aware that threatening students with deportation or invoking a student's immigration status in an attempt to intimidate or deter a student from filing a Title IX complaint would violate Title IX's protections against retaliation. For more information on retaliation see question K-1.

---

[15] For more information on the U nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/questions-answers-victims-criminal-activity-u-nonimmigrant-status.

[16] For more information on the T nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status.

Plaintiffs' Exh A page 138 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**B-5. How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?**

**Answer:** The appropriate response will differ depending on the level of control the school has over the alleged perpetrator. For example, if an athlete or band member from a visiting school sexually assaults a student at the home school, the home school may not be able to discipline or take other direct action against the visiting athlete or band member. However (and subject to the confidentiality provisions discussed in Section E), it should conduct an inquiry into what occurred and should report the incident to the visiting school and encourage the visiting school to take appropriate action to prevent further sexual violence. The home school should also notify the student of any right to file a complaint with the alleged perpetrator's school or local law enforcement. The home school may also decide not to invite the visiting school back to its campus.

Even though a school's ability to take direct action against a particular perpetrator may be limited, the school must still take steps to provide appropriate remedies for the complainant and, where appropriate, the broader school population. This may include providing support services for the complainant, and issuing new policy statements making it clear that the school does not tolerate sexual violence and will respond to any reports about such incidents. For additional information on interim measures see questions G-1 to G-3.

**C. Title IX Procedural Requirements**

*Overview*

**C-1. What procedures must a school have in place to prevent sexual violence and resolve complaints?**

**Answer:** The Title IX regulations outline three key procedural requirements. Each school must:

(1) disseminate a notice of nondiscrimination (see question C-2);[17]

(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX (see questions C-3 to C-4);[18] and

---

[17] 34 C.F.R. § 106.9.

[18] *Id.* § 106.8(a).

Plaintiffs' Exh A page 139 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints (see questions C-5 to C-6).[19]

These requirements apply to all forms of sex discrimination and are particularly important for preventing and effectively responding to sexual violence.

Procedural requirements under other federal laws may also apply to complaints of sexual violence, including the requirements of the Clery Act.[20] For additional information about the procedural requirements in the Clery Act, please see http://www2.ed.gov/admins/lead/safety/campus.html.

*Notice of Nondiscrimination*

**C-2.  What information must be included in a school's notice of nondiscrimination?**

**Answer:**  The notice of nondiscrimination must state that the school does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner. The notice must state that questions regarding Title IX may be referred to the school's Title IX coordinator or to OCR. The school must notify all of its students and employees of the name or title, office address, telephone number, and email address of the school's designated Title IX coordinator.[21]

*Title IX Coordinator*

**C-3.  What are a Title IX coordinator's responsibilities?**

**Answer:**  A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all

---

[19] *Id.* § 106.8(b).

[20] All postsecondary institutions participating in the Higher Education Act's Title IV student financial assistance programs must comply with the Clery Act.

[21] For more information on notices of nondiscrimination, please see OCR's Notice of Nondiscrimination (August 2010), available at http://www.ed.gov/ocr/docs/nondisc.pdf.

Page 10 – Questions and Answers on Title IX and Sexual Violence

**Plaintiffs' Exh A page 140 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1   10/02/23   Page 141 of 184

reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities.

Because the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school, this individual (when properly trained) is generally in the best position to evaluate a student's request for confidentiality in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students. A school may determine, however, that another individual should perform this role. For additional information on confidentiality requests, see questions E-1 to E-4. If a school relies in part on its disciplinary procedures to meet its Title IX obligations, the Title IX coordinator should review the disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX as discussed in question C-5.

In addition to these core responsibilities, a school may decide to give its Title IX coordinator additional responsibilities, such as: providing training to students, faculty, and staff on Title IX issues; conducting Title IX investigations, including investigating facts relevant to a complaint, and determining appropriate sanctions against the perpetrator and remedies for the complainant; determining appropriate interim measures for a complainant upon learning of a report or complaint of sexual violence; and ensuring that appropriate policies and procedures are in place for working with local law enforcement and coordinating services with local victim advocacy organizations and service providers, including rape crisis centers. A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.

If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

**C-4. Are there any employees who should not serve as the Title IX coordinator?**

**Answer:** Title IX does not categorically preclude particular employees from serving as Title IX coordinators. However, Title IX coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating

Plaintiffs' Exh A page 141 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest.

*Grievance Procedures*

**C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?**

**Answer:** Title IX requires that a school adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination, including sexual violence. In evaluating whether a school's grievance procedures satisfy this requirement, OCR will review all aspects of a school's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

(1)   notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

(2)   application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;

(3)   provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;

(4)   designated and reasonably prompt time frames for the major stages of the complaint process (see question F-8);

(5)   written notice to the complainant and alleged perpetrator of the outcome of the complaint (see question H-3); and

(6)   assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

Plaintiffs' Exh A page 142 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 143 of 184

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the school processes complaints, a school's Title IX grievance procedures should also explicitly include the following in writing, some of which themselves are mandatory obligations under Title IX:

(1)   a statement of the school's jurisdiction over Title IX complaints;

(2)   adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment;

(3)   reporting policies and protocols, including provisions for confidential reporting;

(4)   identification of the employee or employees responsible for evaluating requests for confidentiality;

(5)   notice that Title IX prohibits retaliation;

(6)   notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

(7)   notice of available interim measures that  may be taken to protect the student in the educational setting;

(8)   the evidentiary standard that must be used (preponderance of the evidence) (*i.e.*, more likely than not that sexual violence occurred) in resolving a complaint;

(9)   notice of potential remedies for students;

(10)  notice of potential sanctions against perpetrators; and

(11)  sources of counseling, advocacy, and support.

For more information on interim measures, see questions G-1 to G-3.

The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions. Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

Plaintiffs' Exh A page 143 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

A school's procedures and practices will vary in detail, specificity, and components, reflecting differences in the age of its students, school size and administrative structure, state or local legal requirements (*e.g.*, mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

**C-6. Is a school required to use separate grievance procedures for sexual violence complaints?**

**Answer:** No. Under Title IX, a school may use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to resolve sexual violence complaints. However, any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), including applying the preponderance of the evidence standard of review. As discussed in question C-3, the Title IX coordinator should review any process used to resolve complaints of sexual violence to ensure it complies with requirements for prompt and equitable resolution of these complaints. When using disciplinary procedures, which are often focused on the alleged perpetrator and can take considerable time, a school should be mindful of its obligation to provide interim measures to protect the complainant in the educational setting. For more information on timeframes and interim measures, see questions F-8 and G-1 to G-3.

**D.  Responsible Employees and Reporting**[22]

**D-1. Which school employees are obligated to report incidents of possible sexual violence to school officials?**

**Answer:** Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known. As explained in question C-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or

---

[22] This document addresses only Title IX's reporting requirements. It does not address requirements under the Clery Act or other federal, state, or local laws, or an individual school's code of conduct.

Plaintiffs' Exh A page 144 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

complaint was initially filed with another individual or office, subject to the exemption for school counseling employees discussed in question E-3.

**D-2.  Who is a "responsible employee"?**

**Answer**:  According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.[23]

A school must make clear to all of its employees and students which staff members are responsible employees so that students can make informed decisions about whether to disclose information to those employees. A school must also inform all employees of their own reporting responsibilities and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.

Whether an employee is a responsible employee will vary depending on factors such as the age and education level of the student, the type of position held by the employee, and consideration of both formal and informal school practices and procedures. For example, while it may be reasonable for an elementary school student to believe that a custodial staff member or cafeteria worker has the authority or responsibility to address student misconduct, it is less reasonable for a college student to believe that a custodial staff member or dining hall employee has this same authority.

As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The

---

[23] The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998), and *Davis*, 524 U.S. at 642. The concept of a "responsible employee" under OCR's guidance for administrative enforcement of Title IX is broader.

Page 15 – Questions and Answers on Title IX and Sexual Violence

**Plaintiffs' Exh A page 145 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 146 of 184

school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. For additional information on a school's responsibilities to address student-on-student sexual violence, see question A-5. For additional information on training for school employees, see questions J-1 to J-3.

**D-3.  What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence?**

**Answer:** Subject to the exemption for school counseling employees discussed in question E-3, a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.

To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures. For more information on appropriate training for school employees, see question J-1 to J-3.

**D-4.  What should a responsible employee tell a student who discloses an incident of sexual violence?**

**Answer**: Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report the names of the alleged perpetrator and student involved in the alleged sexual violence, as well as relevant facts regarding the alleged incident (including the date, time, and location), to the Title IX coordinator or other appropriate school officials, (ii) the student's option to request that the school maintain his or her confidentiality, which the school (*e.g.*, Title IX coordinator) will consider, and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services (*e.g.*, sexual assault resource centers, campus health centers, pastoral counselors, and campus mental health centers). As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request

**Plaintiffs' Exh A page 146 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1   10/02/23   Page 147 of 184

and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

**D-5.** **If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials?**

**Answer:** As discussed in questions D-1 and D-2, for Title IX purposes, whether an individual is obligated under Title IX to report alleged sexual violence to the school's Title IX coordinator or other appropriate school designee generally depends on whether the individual is a responsible employee.

The duties and responsibilities of RAs vary among schools, and, therefore, a school should consider its own policies and procedures to determine whether its RAs are responsible employees who must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee.[24] When making this determination, a school should consider if its RAs have the general authority to take action to redress misconduct or the duty to report misconduct to appropriate school officials, as well as whether students could reasonably believe that RAs have this authority or duty. A school should also consider whether it has determined and clearly informed students that RAs are generally available for confidential discussions and do not have the authority or responsibility to take action to redress any misconduct or to report any misconduct to the Title IX coordinator or other appropriate school officials. A school should pay particular attention to its RAs' obligations to report other student violations of school policy (*e.g.*, drug and alcohol violations or physical assault). If an RA is required to report other misconduct that violates school policy, then the RA would be considered a responsible employee obligated to report incidents of sexual violence that violate school policy.

If an RA is a responsible employee, the RA should make every effort to ensure that *before* the student reveals information that he or she may wish to keep confidential, the student understands the RA's reporting obligation and the student's option to request that the school maintain confidentiality. It is therefore important that schools widely disseminate policies and provide regular training clearly identifying the places where students can seek confidential support services so that students are aware of this information. The RA

---

[24] Postsecondary institutions should be aware that, regardless of whether an RA is a responsible employee under Title IX, RAs are considered "campus security authorities" under the Clery Act. A school's responsibilities in regard to crimes reported to campus security authorities are discussed in the Department's regulations on the Clery Act at 34 C.F.R. § 668.46.

Page 17 – Questions and Answers on Title IX and Sexual Violence

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 148 of 184

should also explain to the student (again, before the student reveals information that he or she may wish to keep confidential) that, although the RA must report the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location to the Title IX coordinator or other appropriate school designee, the school will protect the student's confidentiality to the greatest extent possible. Prior to providing information about the incident to the Title IX coordinator or other appropriate school designee, the RA should consult with the student about how to protect his or her safety and the details of what will be shared with the Title IX coordinator. The RA should explain to the student that reporting this information to the Title IX coordinator or other appropriate school designee does not necessarily mean that a formal complaint or investigation under the school's Title IX grievance procedure must be initiated if the student requests confidentiality. As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

Regardless of whether a reporting obligation exists, all RAs should inform students of their right to file a Title IX complaint with the school and report a crime to campus or local law enforcement. If a student discloses sexual violence to an RA who is a responsible employee, the school will be deemed to have notice of the sexual violence even if the student does not file a Title IX complaint. Additionally, all RAs should provide students with information regarding on-campus resources, including victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. RAs should also be familiar with local rape crisis centers or other off-campus resources and provide this information to students.

### E.   Confidentiality and a School's Obligation to Respond to Sexual Violence

**E-1.   How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence?**

**Answer:**  Students, or parents of minor students, reporting incidents of sexual violence sometimes ask that the students' names not be disclosed to the alleged perpetrators or that no investigation or disciplinary action be pursued to address the alleged sexual violence. OCR strongly supports a student's interest in confidentiality in cases involving sexual violence. There are situations in which a school must override a student's request

Plaintiffs' Exh A page 148 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

for confidentiality in order to meet its Title IX obligations; however, these instances will be limited and the information should only be shared with individuals who are responsible for handling the school's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, a school should ensure that the information is maintained in a secure manner. A school should be aware that disregarding requests for confidentiality can have a chilling effect and discourage other students from reporting sexual violence. In the case of minors, state mandatory reporting laws may require disclosure, but can generally be followed without disclosing information to school personnel who are not responsible for handling the school's response to incidents of sexual violence.[25]

Even if a student does not specifically ask for confidentiality, to the extent possible, a school should only disclose information regarding alleged incidents of sexual violence to individuals who are responsible for handling the school's response. To improve trust in the process for investigating sexual violence complaints, a school should notify students of the information that will be disclosed, to whom it will be disclosed, and why. Regardless of whether a student complainant requests confidentiality, a school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. For additional information on interim measures see questions G-1 to G-3.

For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate

---

[25] The school should be aware of the alleged student perpetrator's right under the Family Educational Rights and Privacy Act ("FERPA") to request to inspect and review information about the allegations if the information directly relates to the alleged student perpetrator and the information is maintained by the school as an education record. In such a case, the school must either redact the complainant's name and all identifying information before allowing the alleged perpetrator to inspect and review the sections of the complaint that relate to him or her, or must inform the alleged perpetrator of the specific information in the complaint that are about the alleged perpetrator. *See* 34 C.F.R. § 99.12(a) The school should also make complainants aware of this right and explain how it might affect the school's ability to maintain complete confidentiality.

Page 19 – Questions and Answers on Title IX and Sexual Violence

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary. See question K-1 regarding retaliation.

If the student still requests that his or her name not be disclosed to the alleged perpetrator or that the school not investigate or seek action against the alleged perpetrator, the school will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. As discussed in question C-3, the Title IX coordinator is generally in the best position to evaluate confidentiality requests. Because schools vary widely in size and administrative structure, OCR recognizes that a school may reasonably determine that an employee other than the Title IX coordinator, such as a sexual assault response coordinator, dean, or other school official, is better suited to evaluate such requests. Addressing the needs of a student reporting sexual violence while determining an appropriate institutional response requires expertise and attention, and a school should ensure that it assigns these responsibilities to employees with the capability and training to fulfill them. For example, if a school has a sexual assault response coordinator, that person should be consulted in evaluating requests for confidentiality. The school should identify in its Title IX policies and procedures the employee or employees responsible for making such determinations.

If the school determines that it can respect the student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to respond to the complaint consistent with the request. Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual allegation of sexual violence, other means may be available to address the sexual violence. There are steps a school can take to limit the effects of the alleged sexual violence and prevent its recurrence without initiating formal action against the alleged perpetrator or revealing the identity of the student complainant. Examples include providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; providing training and education materials for students and employees; changing and publicizing the school's policies on sexual violence; and conducting climate surveys regarding sexual violence. In instances affecting many students, an alleged perpetrator can be put on notice of allegations of harassing behavior and be counseled appropriately without revealing, even indirectly, the identity of the student complainant. A school must also take immediate action as necessary to protect the student while keeping the identity of the student confidential. These actions may include providing support services to the student and changing living arrangements or course schedules, assignments, or tests.

Plaintiffs' Exh A page 150 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**E-2.** **What factors should a school consider in weighing a student's request for confidentiality?**

**Answer:** When weighing a student's request for confidentiality that could preclude a meaningful investigation or potential discipline of the alleged perpetrator, a school should consider a range of factors.

These factors include circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (e.g., whether there have been other sexual violence complaints about the same alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators). These factors also include circumstances that suggest there is an increased risk of future acts of sexual violence under similar circumstances (e.g., whether the student's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group). Other factors that should be considered in assessing a student's request for confidentiality include whether the sexual violence was perpetrated with a weapon; the age of the student subjected to the sexual violence; and whether the school possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence).

A school should take requests for confidentiality seriously, while at the same time considering its responsibility to provide a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. For example, if the school has credible information that the alleged perpetrator has committed one or more prior rapes, the balance of factors would compel the school to investigate the allegation of sexual violence, and if appropriate, pursue disciplinary action in a manner that may require disclosure of the student's identity to the alleged perpetrator. If the school determines that it must disclose a student's identity to an alleged perpetrator, it should inform the student prior to making this disclosure. In these cases, it is also especially important for schools to take whatever interim measures are necessary to protect the student and ensure the safety of other students. If a school has a sexual assault response coordinator, that person should be consulted in identifying safety risks and interim measures that are necessary to protect the student. In the event the student requests that the school inform the perpetrator that the student asked the school not to investigate or seek discipline, the school should honor this request and inform the alleged perpetrator that the school made the decision to go forward. For additional information on interim measures see questions G-1 to G-3. Any school officials responsible for

**Plaintiffs' Exh A page 151 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 152 of 184

discussing safety and confidentiality with students should be trained on the effects of trauma and the appropriate methods to communicate with students subjected to sexual violence. See questions J-1 to J-3.

On the other hand, if, for example, the school has no credible information about prior sexual violence committed by the alleged perpetrator and the alleged sexual violence was not perpetrated with a weapon or accompanied by threats to repeat the sexual violence against the complainant or others or part of a larger pattern at a given location or by a particular group, the balance of factors would likely compel the school to respect the student's request for confidentiality. In this case the school should still take all reasonable steps to respond to the complaint consistent with the student's confidentiality request and determine whether interim measures are appropriate or necessary. Schools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence. Hence, a student who initially requests confidentiality might later request that a full investigation be conducted.

**E-3. What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence?**

**Answer:** OCR does not require campus mental-health counselors, pastoral counselors, social workers, psychologists, health center employees, or any other person with a professional license requiring confidentiality, or who is supervised by such a person, to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. Although these employees may have responsibilities that would otherwise make them responsible employees for Title IX purposes, OCR recognizes the importance of protecting the counselor-client relationship, which often requires confidentiality to ensure that students will seek the help they need.

Professional counselors and pastoral counselors whose official responsibilities include providing mental-health counseling to members of the school community are not required by Title IX to report *any* information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee.[26]

---

[26] The exemption from reporting obligations for pastoral and professional counselors under Title IX is consistent with the Clery Act. For additional information on reporting obligations under the Clery Act, see Office of Postsecondary Education, *Handbook for Campus Safety and Security Reporting* (2011), available at http://www2.ed.gov/admins/lead/safety/handbook.pdf. Similar to the Clery Act, for Title IX purposes, a pastoral counselor is a person who is associated with a religious order or denomination, is recognized by that religious

**Plaintiffs' Exh A page 152 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors. They include all individuals who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers, or health centers ("non-professional counselors or advocates"), including front desk staff and students. OCR wants students to feel free to seek their assistance and therefore interprets Title IX to give schools the latitude not to require these individuals to report incidents of sexual violence in a way that identifies the student without the student's consent.[27] These non-professional counselors or advocates are valuable sources of support for students, and OCR strongly encourages schools to designate these individuals as confidential sources.

Pastoral and professional counselors and non-professional counselors or advocates should be instructed to inform students of their right to file a Title IX complaint with the school and a separate complaint with campus or local law enforcement. In addition to informing students about campus resources for counseling, medical, and academic support, these persons should also indicate that they are available to assist students in filing such complaints. They should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary.

In order to identify patterns or systemic problems related to sexual violence, a school should collect aggregate data about sexual violence incidents from non-professional counselors or advocates in their on-campus sexual assault centers, women's centers, or

---

order or denomination as someone who provides confidential counseling, and is functioning within the scope of that recognition as a pastoral counselor. A professional counselor is a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification. This definition applies even to professional counselors who are not employees of the school, but are under contract to provide counseling at the school. This includes individuals who are not yet licensed or certified as a counselor, but are acting in that role under the supervision of an individual who is licensed or certified. An example is a Ph.D. counselor-trainee acting under the supervision of a professional counselor at the school.

[27] Postsecondary institutions should be aware that an individual who is counseling students, but who does not meet the Clery Act definition of a pastoral or professional counselor, is not exempt from being a campus security authority if he or she otherwise has significant responsibility for student and campus activities. See fn. 24.

Plaintiffs' Exh A page 153 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 154 of 184

health centers. Such individuals should report only general information about incidents of sexual violence such as the nature, date, time, and general location of the incident and should take care to avoid reporting personally identifiable information about a student. Non-professional counselors and advocates should consult with students regarding what information needs to be withheld to protect their identity.

**E-4.  Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"?**

**Answer:**  No. OCR wants students to feel free to participate in preventive education programs and access resources for survivors. Therefore, public awareness events such as "Take Back the Night" or other forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint. The school should instead respond to these disclosures by reviewing sexual assault policies, creating campus-wide educational programs, and conducting climate surveys to learn more about the prevalence of sexual violence at the school. Although Title IX does not require the school to investigate particular incidents discussed at such events, the school should ensure that survivors are aware of any available resources, including counseling, health, and mental health services. To ensure that the entire school community understands their Title IX rights related to sexual violence, the school should also provide information at these events on Title IX and how to file a Title IX complaint with the school, as well as options for reporting an incident of sexual violence to campus or local law enforcement.

**F.  Investigations and Hearings**

*Overview*

**F-1.  What elements should a school's Title IX investigation include?**

**Answer:**  The specific steps in a school's Title IX investigation will vary depending on the nature of the allegation, the age of the student or students involved, the size and administrative structure of the school, state or local legal requirements (including mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

For the purposes of this document the term "investigation" refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions

Plaintiffs' Exh A page 154 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 155 of 184

the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.[28] Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures. For additional information on training, see question J-3.

When investigating an incident of alleged sexual violence for Title IX purposes, to the extent possible, a school should coordinate with any other ongoing school or criminal investigations of the incident and establish appropriate fact-finding roles for each investigator. A school should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event. If the investigation includes forensic evidence, it may be helpful for a school to consult with local or campus law enforcement or a forensic expert to ensure that the evidence is correctly interpreted by school officials.  For additional information on working with campus or local law enforcement see question F-3.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without additional remedies, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. If a school typically processes complaints of sexual violence through its disciplinary process and that process, including any investigation and hearing, meets the Title IX requirements discussed above and enables the school to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, then the school may use that process to satisfy its Title IX obligations and does not need to conduct a separate Title IX investigation. As discussed in question C-3, the Title IX coordinator should review the disciplinary process

---

[28] This answer addresses only Title IX's requirements for investigations. It does not address legal rights or requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws.

Plaintiffs' Exh A page 155 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

to ensure that it: (1) complies with the prompt and equitable requirements of Title IX; (2) allows for appropriate interim measures to be taken to protect the complainant during the process; and (3) provides for remedies to the complainant and school community where appropriate. For more information about interim measures, see questions G-1 to G-3, and about remedies, see questions H-1 and H-2.

The investigation may include, but is not limited to, conducting interviews of the complainant, the alleged perpetrator, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing student and personnel files; and gathering and examining other relevant documents or evidence. While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.[29] Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.

- The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

- If the school provides for an appeal, it must do so equally for both parties.

- Both parties must be notified, in writing, of the outcome of both the complaint and any appeal (see question H-3).

---

[29] As explained in question C-5, the parties may have certain due process rights under the U.S. Constitution.

Page 26 – Questions and Answers on Title IX and Sexual Violence

**Plaintiffs' Exh A page 156 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

*Intersection with Criminal Investigations*

**F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation?**

**Answer:**  A criminal investigation is intended to determine whether an individual violated criminal law; and, if at the conclusion of the investigation, the individual is tried and found guilty, the individual may be imprisoned or subject to criminal penalties. The U.S. Constitution affords criminal defendants who face the risk of incarceration numerous protections, including, but not limited to, the right to counsel, the right to a speedy trial, the right to a jury trial, the right against self-incrimination, and the right to confrontation. In addition, government officials responsible for criminal investigations (including police and prosecutors) normally have discretion as to which complaints from the public they will investigate.

By contrast, a Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards are not required. Further, while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

Of course, criminal investigations conducted by local or campus law enforcement may be useful for fact gathering if the criminal investigation occurs within the recommended timeframe for Title IX investigations; but, even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation.

A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so either during or after the school's internal Title IX investigation. Title IX does not require a school to report alleged incidents of sexual violence to law enforcement, but a school may have reporting obligations under state, local, or other federal laws.

Plaintiffs' Exh A page 157 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**F-3. How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation?**

**Answer:** A school should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, it is important for a school to understand that during this brief delay in the Title IX investigation, it must take interim measures to protect the complainant in the educational setting. The school should also continue to update the parties on the status of the investigation and inform the parties when the school resumes its Title IX investigation. For additional information on interim measures see questions G-1 to G-3.

If a school delays the fact-finding portion of a Title IX investigation, the school must promptly resume and complete its fact-finding for the Title IX investigation once it learns that the police department has completed its evidence gathering stage of the criminal investigation. The school should not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges. OCR recommends that a school work with its campus police, local law enforcement, and local prosecutor's office to learn when the evidence gathering stage of the criminal investigation is complete. A school may also want to enter into a memorandum of understanding (MOU) or other agreement with these agencies regarding the protocols and procedures for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. Any MOU or other agreement must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably, and must comply with the Family Educational Rights and Privacy Act ("FERPA") and other applicable privacy laws.

The DCL states that in one instance a prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances. OCR understands that this example may not be representative and that the law enforcement agency's process often takes more than ten days. OCR recognizes that the length of time for evidence gathering by criminal investigators will vary depending on the specific circumstances of each case.

Plaintiffs' Exh A page 158 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

*Off-Campus Conduct*

**F-4.   Is a school required to process complaints of alleged sexual violence that occurred off campus?**

**Answer:** Yes. Under Title IX, a school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.

A school must determine whether the alleged off-campus sexual violence occurred in the context of an education program or activity of the school; if so, the school must treat the complaint in the same manner that it treats complaints regarding on-campus conduct. In other words, if a school determines that the alleged misconduct took place in the context of an education program or activity of the school, the fact that the alleged misconduct took place off campus does not relieve the school of its obligation to investigate the complaint as it would investigate a complaint of sexual violence that occurred on campus.

Whether the alleged misconduct occurred in this context may not always be apparent from the complaint, so a school may need to gather additional information in order to make such a determination. Off-campus education programs and activities are clearly covered and include, but are not limited to: activities that take place at houses of fraternities or sororities recognized by the school; school-sponsored field trips, including athletic team travel; and events for school clubs that occur off campus (*e.g.*, a debate team trip to another school or to a weekend competition).

Even if the misconduct did not occur in the context of an education program or activity, a school must consider the effects of the off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity because students often experience the continuing effects of off-campus sexual violence while at school or in an off-campus education program or activity. The school cannot address the continuing effects of the off-campus sexual violence at school or in an off-campus education program or activity unless it processes the complaint and gathers appropriate additional information in accordance with its established procedures.

Once a school is on notice of off-campus sexual violence against a student, it must assess whether there are any continuing effects on campus or in an off-campus education program or activity that are creating or contributing to a hostile environment and, if so, address that hostile environment in the same manner in which it would address a hostile environment created by on-campus misconduct. The mere presence on campus or in an

Page 29 – Questions and Answers on Title IX and Sexual Violence

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 160 of 184

off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment. A school should also take steps to protect a student who alleges off-campus sexual violence from further harassment by the alleged perpetrator or his or her friends, and a school may have to take steps to protect other students from possible assault by the alleged perpetrator. In other words, the school should protect the school community in the same way it would had the sexual violence occurred on campus. Even if there are no continuing effects of the off-campus sexual violence experienced by the student on campus or in an off-campus education program or activity, the school still should handle these incidents as it would handle other off-campus incidents of misconduct or violence and consistent with any other applicable laws. For example, if a school, under its code of conduct, exercises jurisdiction over physical altercations between students that occur off campus outside of an education program or activity, it should also exercise jurisdiction over incidents of student-on-student sexual violence that occur off campus outside of an education program or activity.

_Hearings_[30]

**F-5. Must a school allow or require the parties to be present during an entire hearing?**

**Answer:** If a school uses a hearing process to determine responsibility for acts of sexual violence, OCR does not require that the school allow a complainant to be present for the entire hearing; it is up to each school to make this determination. But if the school allows one party to be present for the entirety of a hearing, it must do so equally for both parties. At the same time, when requested, a school should make arrangements so that the complainant and the alleged perpetrator do not have to be present in the same room at the same time. These two objectives may be achieved by using closed circuit television or other means. Because a school has a Title IX obligation to investigate possible sexual violence, if a hearing is part of the school's Title IX investigation process, the school must not require a complainant to be present at the hearing as a prerequisite to proceed with the hearing.

---

[30] As noted in question F-1, the investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards in cases involving allegations of sexual violence.

**Plaintiffs' Exh A page 160 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ    Document 447-1    10/02/23   Page 161 of 184

**F-6.   May every witness at the hearing, including the parties, be cross-examined?**

**Answer:**  OCR does not require that a school allow cross-examination of witnesses, including the parties, if they testify at the hearing. But if the school allows one party to cross-examine witnesses, it must do so equally for both parties.

OCR strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence. Allowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment. A school may choose, instead, to allow the parties to submit questions to a trained third party (*e.g.,* the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.

**F-7.   May the complainant's sexual history be introduced at hearings?**

**Answer:**  Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted. Further, a school should recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence. The school should also ensure that hearings are conducted in a manner that does not inflict additional trauma on the complainant.

*Timeframes*

**F-8.   What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation?**

**Answer:**  As noted in the DCL, the 60-calendar day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable as required by Title IX.

Plaintiffs' Exh A page 161 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process.

Because timeframes for investigations vary and a school may need to depart from the timeframes designated in its grievance procedures, both parties should be given periodic status updates throughout the process.

### G. Interim Measures

### G-1. Is a school required to take any interim measures before the completion of its investigation?

**Answer:** Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate. The school should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. If a school does not offer these services on campus, it should enter into an MOU with a local victim services provider if possible.

Even when a school has determined that it can respect a complainant's request for confidentiality and therefore may not be able to respond fully to an allegation of sexual violence and initiate formal action against an alleged perpetrator, the school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the

Plaintiffs' Exh A page 162 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 163 of 184

complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred.

**G-2.  How should a school determine what interim measures to take?**

**Answer:**  The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. A school should consider a number of factors in determining what interim measures to take, including, for example, the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant (*e.g.*, civil protection orders).

In general, when taking interim measures, schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case.

**G-3.  If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?**

**Answer:**  No. Interim measures are determined by a school on a case-by-case basis. If a school determines that it needs to offer counseling to the complainant as part of its Title IX obligation to take steps to protect the complainant while the investigation is ongoing, it must not require the complainant to pay for this service.

Plaintiffs' Exh A page 163 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

### H.  Remedies and Notice of Outcome[31]

**H-1.  What remedies should a school consider in a case of student-on-student sexual violence?**

**Answer:**  Effective remedial action may include disciplinary action against the perpetrator, providing counseling for the perpetrator, remedies for the complainant and others, as well as changes to the school's overall services or policies. All services needed to remedy the hostile environment should be offered to the complainant. These remedies are separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of the school's investigation. In any instance in which the complainant did not take advantage of a specific service (*e.g.*, counseling) when offered as an interim measure, the complainant should still be offered, and is still entitled to, appropriate final remedies that may include services the complainant declined as an interim measure. A refusal at the interim stage does not mean the refused service or set of services should not be offered as a remedy.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without more, likely will not be sufficient to satisfy its Title IX obligation to eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. Additional remedies for the complainant and the school community may be necessary. If the school's student disciplinary procedure does not include a process for determining and implementing these remedies for the complainant and school community, the school will need to use another process for this purpose.

Depending on the specific nature of the problem, remedies for the complainant may include, but are not limited to:

- Providing an effective escort to ensure that the complainant can move safely between classes and activities;

---

[31] As explained in question A-5, if a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to be subjected to a hostile environment. In this case, in addition to the remedies discussed in this section, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

Plaintiffs' Exh A page 164 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Ensuring the complainant and perpetrator do not share classes or extracurricular activities;

- Moving the perpetrator or complainant (if the complainant requests to be moved) to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;

- Providing comprehensive, holistic victim services including medical, counseling and academic support services, such as tutoring;

- Arranging for the complainant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty; and

- Reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the sexual violence and the misconduct that may have resulted in the complainant being disciplined.[32]

Remedies for the broader student population may include, but are not limited to:

- Designating an individual from the school's counseling center who is specifically trained in providing trauma-informed comprehensive services to victims of sexual violence to be on call to assist students whenever needed;

- Training or retraining school employees on the school's responsibilities to address allegations of sexual violence and how to conduct Title IX investigations;

- Developing materials on sexual violence, which should be distributed to all students;

- Conducting bystander intervention and sexual violence prevention programs with students;

- Issuing policy statements or taking other steps that clearly communicate that the school does not tolerate sexual violence and will respond to any incidents and to any student who reports such incidents;

---

[32] For example, if the complainant was disciplined for skipping a class in which the perpetrator was enrolled, the school should review the incident to determine if the complainant skipped class to avoid contact with the perpetrator.

Page 35 – Questions and Answers on Title IX and Sexual Violence

Plaintiffs' Exh A page 165 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Conducting, in conjunction with student leaders, a campus climate check to assess the effectiveness of efforts to ensure that the school is free from sexual violence, and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students if, for example, the sexual violence created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Developing a protocol for working with local law enforcement as discussed in question F-3.

When a school is unable to conduct a full investigation into a particular incident (*i.e.*, when it received a general report of sexual violence without any personally identifying information), it should consider remedies for the broader student population in response.

**H-2. If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options?**

**Answer:** If there are limited sections of required courses offered at a school and both the complainant and perpetrator are required to take those classes, the school may need to make alternate arrangements in a manner that minimizes the burden on the complainant. For example, the school may allow the complainant to take the regular sections of the courses while arranging for the perpetrator to take the same courses online or through independent study.

**H-3. What information must be provided to the complainant in the notice of the outcome?**

**Answer:** Title IX requires both parties to be notified, in writing, about the outcome of both the complaint and any appeal. OCR recommends that a school provide written notice of the outcome to the complainant and the alleged perpetrator concurrently.

For Title IX purposes, a school must inform the complainant as to whether or not it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant or any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the school has taken to eliminate the hostile environment, if the school finds one to exist, and prevent recurrence. The perpetrator should not be notified of the individual remedies offered or provided to the complainant.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Sanctions that directly relate to the complainant (but that may also relate to eliminating the hostile environment and preventing recurrence) include, but are not limited to, requiring that the perpetrator stay away from the complainant until both parties graduate, prohibiting the perpetrator from attending school for a period of time, or transferring the perpetrator to another residence hall, other classes, or another school. Additional steps the school has taken to eliminate the hostile environment may include counseling and academic support services for the complainant and other affected students. Additional steps the school has taken to prevent recurrence may include sexual violence training for faculty and staff, revisions to the school's policies on sexual violence, and campus climate surveys. Further discussion of appropriate remedies is included in question H-1.

In addition to the Title IX requirements described above, the Clery Act requires, and FERPA permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases (as opposed to all harassment and misconduct covered by Title IX) not just those sanctions that directly relate to the complainant.[33]

## I.  Appeals

### I-1.  What are the requirements for an appeals process?

**Answer:**  While Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. If a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties. The specific design of the appeals process is up to the school, as long as the entire grievance process, including any appeals, provides prompt and equitable resolutions of sexual violence complaints, and the school takes steps to protect the complainant in the educational setting during the process. Any individual or body handling appeals should be trained in the dynamics of and trauma associated with sexual violence.

If a school chooses to offer an appeals process it has flexibility to determine the type of review it will apply to appeals, but the type of review the school applies must be the same regardless of which party files the appeal.

---

[33] 20 U.S.C. § 1092(f) and 20 U.S.C. § 1232g(b)(6)(A).

Page 37 – Questions and Answers on Title IX and Sexual Violence

Plaintiffs' Exh A page 167 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**I-2.  Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient?**

**Answer:**  The appeals process must be equal for both parties. For example, if a school allows a perpetrator to appeal a suspension on the grounds that it is too severe, the school must also allow a complainant to appeal a suspension on the grounds that it was not severe enough. See question H-3 for more information on what must be provided to the complainant in the notice of the outcome.

**J.  Title IX Training, Education and Prevention**[34]

**J-1.  What type of training on Title IX and sexual violence should a school provide to its employees?**

**Answer:**  A school needs to ensure that responsible employees with the authority to address sexual violence know how to respond appropriately to reports of sexual violence, that other responsible employees know that they are obligated to report sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual violence. A school should ensure that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential. A school should provide training to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors. Training for employees should include practical information about how to prevent and identify sexual violence, including same-sex sexual violence; the behaviors that may lead to and result in sexual violence; the attitudes of bystanders that may allow conduct to continue; the potential for revictimization by responders and its effect on students; appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language; the impact of trauma on victims; and, as applicable, the person(s) to whom such misconduct must be reported. The training should also explain responsible employees' reporting obligation, including what should be included in a report and any consequences for the failure to report and the procedure for responding to students' requests for confidentiality, as well as provide the contact

---

[34] As explained earlier, although this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act.

Plaintiffs' Exh A page 168 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 169 of 184

information for the school's Title IX coordinator. A school also should train responsible employees to inform students of: the reporting obligations of responsible employees; students' option to request confidentiality and available confidential advocacy, counseling, or other support services; and their right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement. For additional information on the reporting obligations of responsible employees and others see questions D-1 to D-5.

There is no minimum number of hours required for Title IX and sexual violence training at every school, but this training should be provided on a regular basis. Each school should determine based on its particular circumstances how such training should be conducted, who has the relevant expertise required to conduct the training, and who should receive the training to ensure that the training adequately prepares employees, particularly responsible employees, to fulfill their duties under Title IX. A school should also have methods for verifying that the training was effective.

**J-2. How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence?**

**Answer:** Title IX requires a school to take prompt and effective steps reasonably calculated to end sexual harassment and sexual violence that creates a hostile environment (*i.e.*, conduct that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program and activity). But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

OCR therefore recommends that a school train responsible employees to report to the Title IX coordinator or other appropriate school official any incidents of sexual harassment or sexual violence that may violate the school's code of conduct or may create or contribute to the creation of a hostile environment. The school can then take steps to investigate and prevent any harassment or violence from recurring or escalating, as appropriate. For example, the school may separate the complainant and alleged perpetrator or conduct sexual harassment and sexual violence training for the school's students and employees. Responsible employees should understand that they do not need to determine whether the alleged sexual harassment or sexual violence actually occurred or that a hostile environment has been created before reporting an incident to the school's Title IX coordinator. Because the Title IX coordinator should have in-depth knowledge of Title IX and Title IX complaints at the school, he or she is likely to be in a better position than are other employees to evaluate whether an incident of sexual

**Plaintiffs' Exh A page 169 of 184**

Rescinded: This document has been formally rescinded by the Department and
remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 170 of 184

harassment or sexual violence creates a hostile environment and how the school should respond. There may also be situations in which individual incidents of sexual harassment do not, by themselves, create a hostile environment; however when considered together, those incidents may create a hostile environment.

**J-3.** **What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?**

**Answer:** All persons involved in implementing a school's grievance procedures (*e.g.*, Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurobiological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds.

In rare circumstances, employees involved in implementing a school's grievance procedures may be able to demonstrate that prior training and experience has provided them with competency in the areas covered in the school's training. For example, the combination of effective prior training and experience investigating complaints of sexual violence, together with training on the school's current grievance procedures may be sufficient preparation for an employee to resolve Title IX complaints consistent with the school's grievance procedures. In-depth knowledge regarding Title IX and sexual violence is particularly helpful. Because laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience.

**Plaintiffs' Exh A page 170 of 184**

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**J-4.   What type of training on sexual violence should a school provide to its students?**

**Answer:**  To ensure that students understand their rights under Title IX, a school should provide age-appropriate training to its students regarding Title IX and sexual violence. At the elementary and secondary school level, schools should consider whether sexual violence training should also be offered to parents, particularly training on the school's process for handling complaints of sexual violence. Training may be provided separately or as part of the school's broader training on sex discrimination and sexual harassment. However, sexual violence is a unique topic that should not be assumed to be covered adequately in other educational programming or training provided to students. The school may want to include this training in its orientation programs for new students; training for student athletes and members of student organizations; and back-to-school nights. A school should consider educational methods that are most likely to help students retain information when designing its training, including repeating the training at regular intervals. OCR recommends that, at a minimum, the following topics (as appropriate) be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;
- the school's definition of consent applicable to sexual conduct, including examples;
- how the school analyzes whether conduct was unwelcome under Title IX;
- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;
- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;
- the school's grievance procedures used to process sexual violence complaints;
- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;
- effects of trauma, including neurobiological changes;
- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;
- strategies and skills for bystanders to intervene to prevent possible sexual violence;
- how to report sexual violence to campus or local law enforcement and the ability to pursue law enforcement proceedings simultaneously with a Title IX grievance; and
- Title IX's protections against retaliation.

The training should also encourage students to report incidents of sexual violence. The training should explain that students (and their parents or friends) do not need to determine whether incidents of sexual violence or other sexual harassment created a

Plaintiffs' Exh A page 171 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 172 of 184

hostile environment before reporting the incident. A school also should be aware that persons may be deterred from reporting incidents if, for example, violations of school or campus rules regarding alcohol or drugs were involved. As a result, a school should review its disciplinary policy to ensure it does not have a chilling effect on students' reporting of sexual violence offenses or participating as witnesses. OCR recommends that a school inform students that the school's primary concern is student safety, and that use of alcohol or drugs never makes the survivor at fault for sexual violence.

It is also important for a school to educate students about the persons on campus to whom they can confidentially report incidents of sexual violence. A school's sexual violence education and prevention program should clearly identify the offices or individuals with whom students can speak confidentially and the offices or individuals who can provide resources such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. It should also identify the school's responsible employees and explain that if students report incidents to responsible employees (except as noted in question E-3) these employees are required to report the incident to the Title IX coordinator or other appropriate official. This reporting includes the names of the alleged perpetrator and student involved in the sexual violence, as well as relevant facts including the date, time, and location, although efforts should be made to comply with requests for confidentiality from the complainant. For more detailed information regarding reporting and responsible employees and confidentiality, see questions D-1 to D-5 and E-1 to E-4.

**K.  Retaliation**

**K-1.  Does Title IX protect against retaliation?**

**Answer:** Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary. At a minimum, this includes making sure that the complainant and his or her parents, if the complainant is in elementary or secondary school, and witnesses know how to report retaliation by school officials, other students, or third parties by making follow-up inquiries to see if there have been any new incidents or acts of retaliation, and by responding promptly and appropriately to address continuing or new problems. A school should also tell complainants and witnesses that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation, but will also take strong responsive action if it occurs.

**L.   First Amendment**

**L-1.   How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?**

**Answer:**  The DCL on sexual violence did not expressly address First Amendment issues because it focuses on unlawful physical sexual violence, which is not speech or expression protected by the First Amendment.

However, OCR's previous guidance on the First Amendment, including the 2001 Guidance, OCR's July 28, 2003, Dear Colleague Letter on the First Amendment,[35] and OCR's October 26, 2010, Dear Colleague Letter on harassment and bullying,[36] remain fully in effect. OCR has made it clear that the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. Therefore, when a school works to prevent

---

[35] Available at http://www.ed.gov/ocr/firstamend.html.
[36] Available at http://www.ed.gov/ocr/letters/colleague-201010.html.

Plaintiffs' Exh A page 173 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers.

Title IX protects students from sex discrimination; it does not regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX. Title IX also does not require, prohibit, or abridge the use of particular textbooks or curricular materials.[37]

**M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013**

**M-1.  How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs?**

**Answer:**  Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. For additional information about the Clery Act and its regulations, please see http://www2.ed.gov/admins/lead/safety/campus.html.

**M-2.  Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?**

**Answer:**  No. The Violence Against Women Reauthorization Act has no effect on a school's obligations under Title IX or the DCL. The Violence Against Women Reauthorization Act amended the Violence Against Women Act and the Clery Act, which are separate statutes. Nothing in Section 304 or any other part of the Violence Against Women Reauthorization Act relieves a school of its obligation to comply with the requirements of Title IX, including those set forth in these Questions and Answers, the 2011 DCL, and the *2001 Guidance*. For additional information about the Department's negotiated rulemaking related to the Violence Against Women Reauthorization Act please see http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html.

---

[37] 34 C.F.R. § 106.42.

Page 44 – Questions and Answers on Title IX and Sexual Violence

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

### N.  Further Federal Guidance

**N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance?**

**Answer:**  Anyone who has questions regarding this guidance, or Title IX should contact the OCR regional office that serves his or her state. Contact information for OCR regional offices can be found on OCR's webpage at https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. If you wish to file a complaint of discrimination with OCR, you may use the online complaint form available at http://www.ed.gov/ocr/complaintintro.html or send a letter to the OCR enforcement office responsible for the state in which the school is located. You may also email general questions to OCR at ocr@ed.gov.

**N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence?**

**Answer:**  Yes. OCR's policy guidance on Title IX is available on OCR's webpage at http://www.ed.gov/ocr/publications.html#TitleIX. In addition to the April 4, 2011, Dear Colleague Letter, OCR has issued the following resources that further discuss a school's obligation to respond to allegations of sexual harassment and sexual violence:

- Dear Colleague Letter: Harassment and Bullying (October 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf

- *Sexual Harassment: It's Not Academic* (Revised September 2008), http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf

- *Revised Sexual Harassment Guidance: Harassment of Students by Employees, Other Students, or Third Parties* (January 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Case 3:21-cv-00242-WBV-SDJ   Document 447-1   10/02/23   Page 176 of 184

In addition to guidance from OCR, a school may also find resources from the Departments of Education and Justice helpful in preventing and responding to sexual violence:

- Department of Education's Letter to Chief State School Officers on Teen Dating Violence Awareness and Prevention (February 28, 2013)
  https://www2.ed.gov/policy/gen/guid/secletter/130228.html

- Department of Education's National Center on Safe Supportive Learning Environments
  http://safesupportivelearning.ed.gov/

- Department of Justice, Office on Violence Against Women
  http://www.ovw.usdoj.gov/

Plaintiffs' Exh A page 176 of 184

# ATTACHMENT 5

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

**September 2017**

**Q&A on Campus Sexual Misconduct**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

Question 1:

What is the nature of a school's responsibility to address sexual misconduct?

Answer:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[2] 2001 Guidance at (VII).

[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

2

Plaintiffs' Exh A page 179 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

Plaintiffs' Exh A page 180 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

### INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

4

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

## DECISION-MAKING AS TO RESPONSIBILITY

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.

[22] 34 C.F.R. § 668.46(k)(2)(iii).

[23] 34 C.F.R. § 668.46(k)(2)(iv).

5

Plaintiffs' Exh A page 182 of 184

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

## DECISION-MAKING AS TO DISCIPLINARY SANCTIONS

<u>Question 9</u>:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

<u>Answer</u>:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

## NOTICE OF OUTCOME AND APPEALS

<u>Question 10</u>:

What information should be provided to the parties to notify them of the outcome?

<u>Answer</u>:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. *See* 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. *See* 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

6

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

**EXISTING RESOLUTION AGREEMENTS**

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

*Note:* The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").

7