**Wang Law, LLC**
Lin-Chi Wang, Attorney

741 N. 31st St.
Allentown, PA 18104
484-340-6269 ☎
linchi@wanglawllc.com ✉
wanglawllc.com ⊛

## Report of Lin-Chi Wang, Title IX Expert and Attorney

I have been retained by Elizabeth K. Abdnour ("Counsel"), attorney for the Plaintiffs, to provide an expert opinion in the current matter before this court of *Abby Owens, et al, v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, et al*, No.: 3:21-cv-00242. Counsel compensated me at a rate of $250/hour to review documents (listed below) and prepare this written report.

### I.    Qualifications as Title IX Expert

I am a licensed attorney in Michigan and Pennsylvania with specialized experience in interpreting and implementing Title IX compliance requirements at institutions of higher education. I currently operate a solo practice focused on comprehensive Title IX and anti-discrimination compliance services for schools and workplaces.

My experience with interpreting and implementing Title IX compliance requirements is extensive. Since I founded my solo practice in October 2021, I have engaged with over 25 schools, including public and private colleges and universities and K-12 districts across the nation, providing Title IX compliant investigations, hearing officer services, advisor services, policy review, training, and consulting. In the past four years, I have prepared and submitted expert witness reports in *Jane Doe v. Board of Regents of the University of Nebraska, et al*, No. 4:21-cv-3049 and *J.W., a minor, by and through her parents and guardians, M.W. and J.W. v. South Brunswick School District, et al*.

Prior to founding my solo practice, I served as Director of Equity & Title IX Coordinator at Muhlenberg College, a multifaceted role where I oversaw the response and investigation of all institutional reports and complaints of identity-based discrimination and harassment, Title IX sexual harassment, sexual misconduct, intimate partner violence, stalking, and retaliatory harassment as prohibited by the college's policies; I served as the primary first responder and institutional investigator for such reports and complaints; I co-coordinated Clery compliance with the Director of Campus Safety; I presented over 50 trainings to students, staff, and faculty on various aspects of the College's anti-discrimination policies and procedures and prevention strategies; and, I consolidated and rewrote the college's anti-discrimination policies and

PLAINTIFFS_00002000

procedures in 2018-2019 and spearheaded the approval and education process accompanying the change.

Prior to serving as a Title IX Coordinator, I served as an institutional civil rights investigator in the Office of Institutional Equity at Michigan State University (MSU). In that position, I processed, investigated, and adjudicated over 220 informal and formal reports and complaints discrimination, harassment, sexual misconduct, relationship violence, stalking, and retaliation. I presented over 40 trainings to various student groups, athletes, coaches, faculty, staff, and administrators on the university's sexual misconduct and anti-discrimination policies. While at MSU, the university was under intense scrutiny of its Title IX process, having entered into a resolution agreement with the Office of Civil Rights in 2015 following multiple Title IX complaints. The university underwent additional federal administrative investigations in 2017 and 2018 following the investigation and employment termination of Larry Nassar. I was assigned and investigated and adjudicated the internal Title IX-related complaints of Dr. Nassar in 2016. Serving as an investigator under these conditions meant that I had to ensure I deeply understood Title IX law and guidance and that I operated with utmost critical thought, independence, and discretion.

Throughout my various positions, I received specialized training on Title IX law and practice, conducting prompt, impartial, and objective Title IX investigations, duties as a Title IX Coordinator, Clery Act compliance at institutions of higher education, sexual assault trauma-informed interviewing, and sexual harm restorative justice facilitation.

Attached is a copy of my resume.[1]

## II.    Assignment

Counsel requested that I review documents that they sent to me and provide an opinion on the following question:

> In your expert opinion, did LSU meet industry standards and practice in connection with Title IX compliance in response to all reports made by Abby Owens, Samantha Brennan, Calise Richardson, Jade Lewis, Kennan Johnson, Elisabeth Andries, Jane Doe, Ashlyn Robertson, Corinn Hovis, and Sarah Beth Kitch?

---

[1] Attachment 1.

PLAINTIFFS_00002001

### III.    Opinion

It is my expert opinion that LSU did not meet industry standards and practice in connection with Title IX compliance in response to reports by and about each Plaintiff in this matter. My opinion is explained in detail below.

### IV.    Documents Reviewed and Considered in Forming Opinion

*Documents Provided by Counsel*

1. *Jane Doe v. Board of Regents of the University of Nebraska, et al* Complaint ("Complaint").
2. Husch Blackwell Louisiana State University Title IX Review, March 21, 2021 ("HB Report").
3. Jacoby, Kenny; Armour, Nancy; and, Luther, Jessica. "LSU mishandled sexual misconduct complaints against students, including top athletes." USA TODAY, November 16, 2020, updated January 28, 2021, https://bit.ly/3WDjQCO ("USA TODAY Article").
4. Transcript of Sharon Lewis Deposition (October 27 and 28, 2022).
5. Transcript of Miriam Segar Deposition (November 1 and 2, 2022).
6. Transcript of Verge Ausberry Deposition (November 3 and 4, 2022).
7. Transcript of Jennie Stewart Deposition (November 9, 2022).
8. Transcript of Donovan White Deposition (November 15, 2022).

*Other Documents Reviewed and Referenced in this Report*

1. U.S. Department of Education, Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, effective January 19, 2001, rescinded on August 26, 2020 ("2001 Guidance").[2]
2. U.S. Department of Education, Office of Civil Rights, Dear Colleague Letter: Sexual Violence, effective April 4, 2011, rescinded on September 22, 2017 ("2011 DCL").[3]
3. U.S. Department of Education, Office of Civil Rights, Questions and Answers on Title IX and Sexual Violence, effective April 29, 2014, rescinded on September 22, 2017 ("2014 Q&A")[4]

---

[2] Attachment 2.
[3] Attachment 3.
[4] Attachment 4.

PLAINTIFFS_00002002

4. U.S. Department of Education, Office of Civil Rights, Q&A on Campus Sexual Misconduct, effective September 22, 2017, rescinded on August 26, 2020 ("2017 Q&A").[5]

## V.    Involved Individuals

Given the number of individuals involved in this matter and various references to individuals in each of the documents, I relied on the following chart to ensure I referenced the appropriate individuals in this report:

| Name in Complaint | Name in HB Report | Name in USA Today Article |
|---|---|---|
| Abby Owens | Complainant 2 (p. 96) | Anonymous/ women's tennis player |
| Samantha Brennan | Samantha Brennan | Samantha Brennan |
| Calise Richardson | Complainant 1 (p. 55) | n/a |
| Jade Lewis | Jade Lewis/Lewis | Anonymous/ ▮▮▮▮ girlfriend/ women's tennis player |
| Kennan Johnson | n/a | n/a |
| Elisabeth Andries | Elisabeth Andries | Elisabeth Andries |
| Jane Doe | n/a | n/a |
| Ashlyn Robertson | Complainant 1 (p. 93) | Anonymous/ friend of member of LSU diving |
| Corinn Hovis | Complainant (p. 127) | Anonymous/ woman |
| Sarah Beth Kitch | n/a | n/a |
| John Coe | ▮▮▮▮▮ | ▮▮▮▮▮ |
| John Roe | Respondent A (p. 101) | Fraternity Member |
| John Doe | ▮▮▮▮▮ | ▮▮▮▮▮ |
| John Poe | n/a | n/a |
| John Loe | Respondent H (p. 127) | ▮▮▮▮▮ |

---

[5] Attachment 5.

PLAINTIFFS_00002003

| John Moe | n/a | n/a |

## VI.    Title IX Requirements and PM-73 Language

In my training and experience as a Title IX investigator and Title IX Coordinator, I received training on and regularly consulted guidance documents from the U.S. Department of Education, Office of Civil Rights, to ensure compliance and application of best practices. My colleagues in the field of Title IX heavily relied on Title IX guidance documents to determine Title IX compliant practices and when discussing how best to address particular issues related to Title IX. Some of the Title IX guidance documents in effect and applicable to LSU during the incidents described below detailed the following general requirements:

> Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:
>
> > (A) Disseminate a notice of nondiscrimination;
> > (B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX; and
> > (C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.
>
> > These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination.

2011 DCL, p. 6.

> The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner. The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. *It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator. The notice must be widely distributed* to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant

5 of 49

PLAINTIFFS_00002004

persons. OCR recommends that the notice be ***prominently posted on school Web sites and at various locations throughout the school or campus and published in electronic and printed publications*** of general distribution that provide information to students and employees about the school's services and policies. ***The notice should be available and easily accessible on an ongoing basis***.

2011 DCL, pp. 6-7. (Emphases added.)

As stated in the 2001 Guidance, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint; and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

2011 DCL, p. 9; see also 2017 Q&A, p. 3 detailing the same requirements.

[S]chools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials. Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

PLAINTIFFS_00002005

2001 Guidance, p. 13.

> All persons involved in implementing a recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures.

2011 DCL, p. 12.

> A Title IX coordinator's core responsibilities include ***overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints***. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the ***training, authority, and visibility necessary to fulfill these responsibilities***.
>
> …
>
> A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.
>
> If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

2014 Q&A, pp. 10-11. (Emphases added.)

In addition, **LSU's Title IX policy, PM-73**, promised the following applications to complaints of sex discrimination and sexual misconduct:

> <u>Notification of Complaints</u> ***Any person who receives a complaint under this policy shall promptly notify the Campus Title IX Coordinator***, who shall be

PLAINTIFFS_00002006

responsible for notifying LSU Title IX Coordinator and any campus administrators, who may be involved in the resolution process. Any supervisor, who witnesses or receives a report or complaint, shall notify the Campus Title IX Coordinator.

<u>Interim Measures</u> At any time after becoming aware of a complaint, the Title IX Coordinator may recommend that interim protections or remedies for the parties involved or witnesses be provided by appropriate LSU officials. These protections or remedies for the parties involved or witnesses will be provided by appropriate University officials. ***Remedies may include separating the parties, placing limitations on contact between the parties, interim suspension***, or making alternative workplace, classroom, course scheduling, dining, or student housing arrangements.

…

V. <u>PROCESSING OF COMPLAINT</u>

A. <u>Initial Review</u>

The Campus Title IX Coordinator shall conduct or supervise the initial review of the complaint, with such assistance, as needed and/or appropriate under the circumstances, from other campus administrators with responsibilities relevant to the nature of the complaint. A responding or complaining student or employee has the right to one advisor of choice at any stage of this process. The ***initial review of the complaint shall be concluded as quickly as possible, within a reasonable amount of time required to complete the review in a manner that is adequate, reliable, and impartial***.

…

B. <u>Resolution Procedures</u>

The University has both an informal and formal resolution procedure for alleged violations of this policy. Both procedures will be implemented by individuals who have received training on issues related to sex discrimination and sexual misconduct. The complainant and the responding student or employee has the right to one advisor of choice at any stage of the Informal Resolution or Formal Resolution processes.

PLAINTIFFS_00002007

As set forth below, an informal resolution procedure is available under certain circumstances. After the initial review or a full investigation, if the investigator finds that reasonable cause exists to believe that this Policy has been violated, the Campus Title IX Coordinator or designee will determine whether the informal resolution procedure is appropriate. If it is not appropriate, a full investigation is required.

If the Campus Title IX Coordinator or designee determines that informal resolution is appropriate, the complainant and responding person shall be advised of the informal resolution procedure. If both consent in writing, the informal resolution procedure will be followed, without further investigation, unless and until informal resolution is unsuccessful.

***A determination that there is not reasonable cause to believe that this Policy has been violated can be made only after full investigation.*** Such determination is subject to the approval of the Campus Title IX Coordinator or designee. In such case, the complainant, by written request, may have that determination reviewed by the LSU Title IX Coordinator, whose decision shall be final.

…

2. <u>Formal Resolution</u>: If any party is unsatisfied with the outcome of the informal resolution process or if LSU, the accused, and/or the complainant have not consented to and/or determined that informal resolution is inappropriate or insufficient, the formal procedure will be utilized.

In such cases, at the recommendation of the Campus Title IX Coordinator and after an initial review, a trained investigator will conduct a full investigation into the facts and circumstances of the complaint. The investigation may include in-person interviews with all parties involved and interviews of any direct witnesses. Both parties will be given the opportunity to identify witnesses to be interviewed. The investigator may also collect and review any documents or other relevant information to include but not limited to photographs, video recordings, or other social media. All parties to the complaint will be provided written notice regarding the details of the alleged violation of this Policy prior to the initiation of the full investigation. All parties will have an opportunity to identify pertinent evidence to be considered by the investigator. The investigator will present a written investigative summary, based on a preponderance of the evidence

PLAINTIFFS_00002008

standard, and will submit the summary to the Campus Title IX Coordinator and the LSU Title IX Coordinator, who will notify the appropriate Campus offices. Any such investigation shall be conducted by the Campus Title IX Coordinator or a trained person, authorized and assigned as an investigator by the Campus Title IX Coordinator, including, but not limited to, trained employees from human resource management department or the, student services or student life department, or other qualified University employees.

The complainant and the individual who is the subject of the complaint will be notified in writing of the results of the investigation. Information obtained regarding the complaint will be treated as confidentially as possible (as set forth herein) with only those with a legitimate educational interest being informed of the complaint and the outcome of the investigation.

…

C. RESOLUTION/DISCIPLINARY ACTION LSU will take appropriate action against any person found to be in violation of this policy….

HB Report, Exhibit A, PM-73. (Emphases added.)

## VII.    Overall Analysis and Basis of Opinion

Following review of the documents provided in this matter, I felt it was important to first highlight some of the systemic and structural issues at LSU relating to its Title IX operations and practices that impacted its campus community as a whole, and to each of the Plaintiffs. In my opinion, LSU was generally not able to meet its Title IX obligations to take prompt and effective action to end Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, and for the Title IX Coordinator to identify and address patterns or systemic problems, given the following systemic and structural issues.

In my opinion, major issues included:

1. Failure to establish an independent and centralized Title IX office that was appropriately and sufficiently trained and staffed in order for LSU to take prompt and effective action to end Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, and for the Title IX Coordinator identify and address patterns or systemic problems, where:

PLAINTIFFS_00002009

a. For a nationally-recognized university with a campus of approximately 34,000 students, LSU effectively did not have an established Title IX office until LSU's first full-time Title IX Coordinator, Defendant Stewart, was hired 2016, whose core responsibility was overseeing the school's response to Title IX reports and complaints for all students, employees, and third parties (if within the jurisdiction of the school), and identifying and addressing any patterns or systemic problems revealed by such reports and complaints, who also served as the sole full-time Title IX staff member until 2018, and was severely under-staffed and under-resourced;

b. Defendant Stewart did not have proper supervisory authority over LSU's Title IX campus coordinators, did not have prior experience in conducting Title IX investigations, did not review the full-time Title IX investigator's reports, and also served as the Title IX appeal officer, hampering her obligation as Title IX Coordinator to ensure that LSU's response to all Title IX reports and complaints were prompt, adequate, reliable, and impartial; to implement effective prevention efforts; and, to track, identify, and address patterns;

c. In addition to serving as Title IX Coordinator, Defendant Stewart was assigned to be the Campus Coordinator for LSU's Baton Rouge campus and Clery Coordinator for all LSU System campuses, and in 2018, was assigned to serve as LSU's ADA Coordinator, which were additional job responsibilities for which she did not have the capacity to handle;

d. Soon after Defendant Stewart was hired, she identified deficiencies in the Title IX structure at LSU and in 2016 gave a presentation to members of LSU leadership to make the case that the Title IX office needed more dedicated full-time staff and resources, and failure to do so could lead to ""litigation damages, reputation costs, lost enrollment, media address and harm to folks who have chosen LSU", and in response, Defendant Stewart was given a part-time graduate assistant, and in 2018, one full-time Title IX investigator was finally hired;

e. According to a 2021 review conducted by NASA, "The University fails to provide the Title IX Coordinator with the resources, including capacity and access to senior leadership, necessary to coordinate their institution's Title IX compliance."

f. Defendant Stewart largely agreed with the recommendations set forth in the HB report, and in response to the recommendation that "the most important recommendation from this review is that the University's Title IX office is not appropriately staffed and this needs to be corrected promptly", Defendant Stewart stated, "Absolutely. We were getting the bare minimum done."[6]

---

[6] HB Report, pp. 7-12, 138-139; Stewart Transcript, pp. 31, 70-73, 80, 253.

PLAINTIFFS_00002010

2. Failure to appropriately train employees, and specifically, administrators and supervisors, on their mandatory reporting responsibilities as "responsible employees" under LSU's Title IX and Sexual Misconduct Policy, Permanent Memorandum No. 73 ("PM-73"), which led to mandatory reports going unreported, contrary to Title IX guidance, where:

    a. LSU did not enforce or monitor annual, required sexual misconduct prevention training for its employees that informed employees of their duty to report sexual misconduct violations, despite Defendant Stewart raising concerns and directing responsible employees to make reports directly to the Title IX office, such as the LSU police department and staff in athletics;

    b. Employees who were interviewed by HB "indicated there was minimal awareness of… [its] reporting requirement"; meanwhile, the Athletics department had its own mandatory reporting policy for employees, despite a directive from LSU leadership to report all Title IX concerns to the Title IX Coordinator; and, internal assessments identified confusion and ambiguity, in general, of responsible employee understanding and designations.[7]

3. Failure to widely disseminate and make information easily accessible to students and employees about the Title IX office as a resource at the University, the name and contact information of the Title IX Coordinator and deputy coordinators, how and where to report incidents of sexual and/or gender violence, and, the Title IX Policy itself, PM-73, contrary to Title IX guidance, where, according to the 2016 LSU Presidential Task Force recommendation on improving Title IX policies, practices, and procedures, LSU needed to "take steps to enhance clarity and accessibility of LSU's policies, their interplay, and the complaint process"; according to an internal assessment conducted by LSU's Office of Internal Audit in 2017, "Published contact information for Title IX Campus Coordinators is incomplete and/or not widely communicated"; in another internal assessment conducted by Morgan Lewis in 2019, areas identified as need for "enhancement" included, "'(1) awareness of LSU's Title IX Office; (2) awareness of appropriate reporting avenues; (3) communication of investigation and adjudication timing/deadlines; (4) offered resources and support services; (5) training and prevention; and (6) education and wellness initiatives for LSU's student athletes'"; and, the HB Report found that LSU's Title IX website was "exceptionally difficult to navigate."[8]

4. Failure by University administrators to coordinate Title IX training and response with Athletics, hampering the Title IX Coordinator's ability to be informed of all Title IX reports and complaints in order to respond promptly and track patterns, where, according to the HB Report, "Since at least 2012, Athletics has been doing its own training disconnected from the Title IX Office and the broader University community" and Defendant Stewart "was clear that it was her preference to present training directly to

---

[7] HB Report, 18-27, 29-35, 143-144; Stewart Transcript, pp. 54-55, 108-09, 142.
[8] HB Report, p. 39, 45, 146, Exhibit B.

PLAINTIFFS_00002011

Athletics staff and student-athletes" or, at minimum, be present and visible at all athletics trainings so that students and athletics employees knew who she was; and, the Athletics department implemented its own mandatory reporting policy for Athletics employees requiring that they make reports to Defendant Segar, yet, Defendant Segar was "never officially delegated those responsibilities" and Defendant Stewart, when she became Title IX Coordinator, specifically directed the Athletics Director to instruct athletics employees to report directly to her.[9]

5.  Failure to properly document reports and complaints received by LSU, contrary to Title IX guidance on the Title IX Coordinator's responsibility to coordinate recordkeeping in order to monitor incidents, where, according to an internal assessment conducted by LSU's Office of Internal Audit in 2017 of Title IX investigations, "Lack of documentation to evidence that [parties] were . . . notified of the initiation of an investigation and the resulting outcome" and "No formal or consistent procedures for documenting complaints received and tracking their disposition"; and, according to HB, "our review above illustrates some of the many significant ways Title IX matters can be handled inappropriately because there is inadequate recordkeeping" and recommended that the "Title IX office must develop a comprehensive record-keeping system" to which Defendant Stewart agreed, saying, "the record-keeping must be improved, yes. I absolutely agree with that. We were getting the bare-bones minimum done."[10]

In my training and experience, for a school the size of LSU with approximately 34,000 students, LSU should have had, in addition to a full-time Title IX Coordinator, 3-4 full-time Title IX investigators, and a full-time administrative assistant, at minimum. For comparison's sake, when I worked as a Title IX and Civil Rights investigator at Michigan State University ("MSU"), a large, public, university similar to LSU, with approximately 50,000 students, the Title IX office had one full-time Title IX Coordinator, one full-time Director of Investigations, 8-9 full-time investigators, three full-time administrative assistants, and one full-time supportive measures coordinator. The investigators were also tasked with conducting investigations of other complaints of discrimination at the university; however, the majority of reports and complaints received were Title IX-related. On the other end of the spectrum, when I worked as a Title IX Coordinator at Muhlenberg College ("MC"), a small, private college with approximately 2200 students, my full-time position was as Title IX Coordinator, equity compliance officer, and primary investigator, with investigation assistance from trained campus safety officers and external investigators, and I also had a dedicated administrative assistant.

When determining the appropriate number of employees to staff a Title IX office, the most important consideration, in addition to considering the population and size of the campus, is

---

[9] HB Report, pp. 29-35, 142-143, 145; Segar Transcript, Day 1, p. 26; Stewart Transcript, pp. 54-55, 121.
[10] HB Report, pp. 44, 142; Stewart Transcript, p. 255.

PLAINTIFFS_00002012

whether the school is able to take prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim[11] and for the Title IX Coordinator to oversee "all Title IX complaints and [identify] and [address] any patterns or systemic problems that arise during the review of such complaints" with the current staff and resources.[12] The conclusion for LSU was clear given the number of internal assessments conducted and concerns raised within LSU, including from its own Title IX Coordinator in 2016, and from the numerous consequential mistakes made with each of Plaintiffs, detailed below: the Title IX office was ineffective in meeting its obligation to promptly and effectively end Title IX harassment, prevent it from recurring, and remedy the effects on the victim.

In addition to lack of sufficient staffing within the Title IX office, the Title IX Coordinator, Defendant Stewart, was given inappropriate authority and responsibilities as the Title IX Coordinator. Defendant Stewart needed appropriate authority to coordinate Title IX compliance and efforts at LSU. As LSU's Title IX Coordinator, Defendant Stewart should have been given authority to coordinate, mandate, and ensure enforcement and monitoring of Title IX responsible employee training and student training. Defendant Stewart should have been given supervisory authority over all of the deputy Title IX coordinators and Title IX investigators to ensure, enforce, and monitor consistent and appropriate training and implementation of PM-73 and Title IX practice. It was also improper for Defendant Stewart to serve as the appeal officer for Title IX matters because it meant that Defendant Stewart could not supervise the Title IX investigation process or reports when she had a designated decision-maker role. The additional role of also serving as LSU's ADA Coordinator was not an inherent conflict, but it did mean that Defendant Stewart's capacity was spread thin to the point that she would not meet all of her responsibilities as Title IX Coordinator.

Furthermore, in my experience, implementation of awareness and robust training programs on mandatory reporting and Title-IX related reporting and resources, always brought in an increase of reports for some time. This happened when I was at MSU and MC, as well as among peer institutions that increased their awareness and training efforts. The effect is common sense: those who were previously unaware of their mandatory reporting obligations bring forward reports that they realize they should have reported, and those who were previously unaware of the existence or role of the Title IX office bring forward reports to be addressed, or at the very least, documented. LSU's failure to appropriately train its responsible employees, failure to widely inform its campus community, and failure to coordinate training and information with Athletics inevitably meant that Title IX-related incidents were not getting reported to the Title IX office. Failure to appropriately train and coordinate also meant that LSU did not give its campus

---

[11] 2001 Guidance, ii.
[12] 2011 DCL, p. 7

PLAINTIFFS_00002013

community members who wanted or needed to report, a chance to have their incidents addressed by the university. Ultimately, this meant that the LSU Title IX Coordinator could not meet its compliance requirement to identify and address any patterns or systemic problems that arise during the review of such complaints, which occurred with some of the Plaintiffs and discussed in further detail below. And, had effective awareness and training been implemented, without a properly trained and staffed Title IX office, they would not have had an ability to appropriately and timely respond to all of the mandatory reports.

Moreover, LSU could not take prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the victim, or identify and address patterns or systemic problems, when reports and complaints were not being documented properly. In my training and experience, all communications, including emails, phone calls, text messages, other forms of communication, meetings, interviews, and reports, related to a Title IX report, were documented. The training I received, and in trainings that I present, the best practice is to document date, time, and location, how information was received, and "all information received", including identities of all individuals involved, from the reporter, to the Parties, witnesses, and any other individuals who may have had contact with the Parties. All of this information was important and necessary to ensure that the institution has done its due diligence in ending or attempting to end Title IX-related harassment, preventing it from recurring, remedying the effects of the harassment on the victim, in identifying and addressing patterns or systemic problems, and to be able to justify decisions that may not go in a party's favor, for example, a decision to not investigate a complaint. LSU's failure to properly document reports and complaints significantly impacted many of the Plaintiffs in this matter, and in some of the situations, if reports had been properly documented, it could have prevented future harm to additional Plaintiffs. These situations are discussed in detail below.

The field of Title IX work continues to evolve as guidance documents and regulations have changed, and one of the enduring principles, in my experience, is when we are made aware of a better approach or of an area that needs improvement, we adjust our policy and practices. As discussed in the HB report, perhaps the detail that bothers me the most, is that LSU leadership was aware of their deficiencies related to their Title IX office and response as early as 2015 through the various external and internal reviews initiated by LSU, and from feedback from its own community members. LSU had many opportunities to adjust and make changes and improvements to its Title IX office and response, as it did with other departments on campus, and it repeatedly failed to do so until the harm was too great.

PLAINTIFFS_00002014

## VIII. Analysis and Basis of Opinion for Each Plaintiff

I discussed LSU's actions below chronologically as they pertained to each Plaintiff. The facts I relied upon in forming my opinion were focused on LSU's responses or actions, or lack thereof, to internal disclosures and/or reports made by or about each Plaintiff. The details of each incident of sexual harassment, sexual assault, gender violence, and/or other form of sex discrimination involving each Plaintiff are included below to provide context as needed to understand LSU's responses or actions, or lack thereof, to each report.

Should I receive new, additional, or different factual information as it pertains to each Plaintiff, my opinion may change.

### A. Plaintiff Sarah Beth Kitch

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. Plaintiff Kitch enrolled at LSU, at eighteen (18) years old as a political science PhD student in fall of 2009. John Moe was Plaintiff Kitch's professor in the program and advisor for her dissertation.[13] John Moe was fifty-nine (59) years older than Plaintiff Kitch.
2. While she was a student at LSU, Plaintiff Kitch experienced pervasive sexual harassment from John Moe, including inappropriate sexual comments, requests for sexual favors, and expressing interest in a sexual relationship with Plaintiff Kitch. In 2013, John Moe forcibly kissed Plaintiff Kitch when she went to John Moe's house after he called for her help.[14]
3. Plaintiff Kitch did not report John Moe's sexual harassment when she was a student because she was not aware she could report to the Title IX office, she feared being dismissed from the program because John Moe was Plaintiff Kitch's advisor on her dissertation committee, and the department enabled a culture of sexual harassment of female students by male professors.[15]

---

[13] Complaint, p. 84.
[14] Id. at 85.
[15] Id.

PLAINTIFFS_00002015

4. Plaintiff Kitch graduated from LSU in 2014 and continued to experience negative impacts from John Moe's sexual harassment throughout her career.[16]

5. In 2019, Plaintiff Kitch decided to report John Moe's sexual harassment to LSU so that LSU would have a record should future reports be made by students. However, Plaintiff Kitch was discouraged from making the report by LSU's Title IX staff members; Plaintiff Kitch was told that no one would do anything, and she would face consequences for reporting. Plaintiff Kitch did not receive documentation about her contacts with the Title IX office.[17]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Kitch***

Without knowing more about LSU's Title IX office and LSU's Title Policy when Plaintiff Kitch was a student, I am not able to comment in detail about LSU's actions when Plaintiff Kitch was experiencing John Moe's sexual harassment. However, if LSU's Title IX office was operating in the same manner as it was in 2015-19 when students could not find information about LSU's Title IX office or resources on the internet, and when the Title IX office did not train mandatory reporters or train students on what and who mandatory reporters were, Plaintiff Kitch would not have known about resources available to her. Plaintiff Kitch would not have known who LSU's Title IX Coordinator was, she would not have known about the Title IX office or what they do, she would not have known about mandatory reporters or who she could report to or talk to in confidence about the sexual harassment she was experiencing, and Plaintiff Kitch would not have known that the Title IX office could assist her with academic accommodations and other possible interim measures. If that was the case, LSU failed to meet industry standards and practice in connection with Title IX compliance as to Plaintiff Kitch as Plaintiff Kitch could not have known about her rights and options as to the sexual harassment and sexual assault she experienced at the time.

In addition, when Plaintiff Kitch did make a report to the LSU Title IX office in 2019, she was discouraged by Title IX staff members from making the report, which is wholly inappropriate. In all Title IX training I have received and given, it is not the Title IX office's role, and thereby the Title IX office staff members' roles, to encourage or discourage a particular individual from reporting. The Title IX office exists as a resource to inform community members about the Title IX policy, Title IX process, individuals rights' as they pertain to Title IX-related conduct, connect community members to appropriate resources, and receive, review, and process reports and complaints. If the Title IX staff members determined that Plaintiff Kitch's report did not fall

---

[16] Id. 86-87.
[17] Id. at 88.

PLAINTIFFS_00002016

within their jurisdiction to investigate, they should have taken in Plaintiff Kitch's report, documented it, and issued a preliminary determination letter to Plaintiff Kitch explaining their reasons for not investigating.

Furthermore, as already discussed, any reports made to the Title IX office, whether informal or formal, should be documented. One of the purposes of the Title IX office is to track potential patterns of sexual harassment, and the proper way to do so is to ensure the campus community is aware of the existence and purpose of the Title IX office and for the Title IX office to document all information in all of the reports it receives in order to conduct a pattern check when it receives a new report. According to an established guidance from U.S. Department of Education at the time, 2001 Guidance, "Coordination of recordkeeping… will… ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them."[18] Having a record to prevent future occurrences of sexual harassment by John Moe was Plaintiff Kitch's very goal in making a report to the LSU Title IX office in 2019, and Plaintiff Kitch's report should have been documented, at the very least, according to Title IX guidance and best practices.

For the reasons detailed above, LSU failed to meet industry standards and practice in connection with Title IX compliance by discouraging Plaintiff Kitch from making a report and failing to document Plaintiff Kitch's disclosure to the Title IX office in 2019.

### B.  Plaintiffs Calise Richardson and Jade Lewis

My analysis of LSU's response to Plaintiffs Richardson and Lewis of their experiences involving John Coe is combined below because it involved the same perpetrator.

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. Plaintiff Richardson enrolled at LSU in the fall of 2014. She was hired in the same semester for a position on LSU's football recruitment staff.[19]
2. In fall of 2015, Plaintiff Richardson was raped by a football recruit after the recruit pressured her to let him stay at her apartment. Plaintiff Richardson did not report the rape to the school because she believed felt she would not be supported given how she was treated as a recruiter and

---

[18] 2001 Guidance, p. 21
[19] Complaint, p. 22.

PLAINTIFFS_00002017

what she experienced was expected of recruiters, which was please and service recruits and to show them a "good time."[20]

3.  In the summer of 2016, Plaintiff Richardson and John Coe, a highly recruited LSU football player, began dating. In October 2016, while at a bar, John Coe non-consensually groped and physically pushed Plaintiff Richardson to the ground and she threw a drink at him. John Coe's football teammates restrained him from attacking Plaintiff Richardson further, and John Coe was kicked out of the bar. When Plaintiff Richardson left the bar later than night, John Coe appeared and ran at her and John Coe's teammates had to restrain him again. Later that night, John Coe appeared uninvited at Plaintiff Richardson apartment, and she had to call his teammates to come get him away from her.[21]

4.  The following day, Plaintiff Richardson received a call from her supervisor, Sharon Lewis, about the incident with John Coe the night before. Sharon Lewis was informed by one of the football coaches about an incident between Plaintiff Richardson and John Coe. Sharon Lewis asked Plaintiff Richardson why she threw a drink at John Coe. Plaintiff Richardson told Sharon Lewis that John Coe had physically attacked her. Sharon Lewis asked Richardson if she wanted to set up a meeting with John Coe, Sharon Lewis, and John Coe's coach to "iron things out." Plaintiff Richardson declined. Sharon Lewis disputes that Plaintiff Richardson disclosed that John Coe physically attacked her and that she offered to set up a meeting to "iron things out."[22]

5.  There is no evidence that Sharon Lewis reported Plaintiff Richardson's disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police in October of 2016. Plaintiff Richardson was not offered support or resources, or information about her rights as to the attack. Sharon Lewis disputes that Plaintiff Richardson disclosed John Coe's abuse when she spoke to HB investigators, and testified that she did inform Defendant Ausberry and Defendant Segar about what she knew of the incident, specifically, that Plaintiff Richardson threw a drink at John Coe because she saw him with another girl at the bar. Defendant Ausberry and Defendant Segar denied that Sharon Lewis informed them.[23]

---

[20] Id. at 23-24, 33.
[21] Id. at 25; HB Report, p. 56.
[22] Id. at 25-26; HB Report, p. 57; S. Lewis Transcript, Day 1, pp. 163-171, 179-181.
[23] HB Report, p. 60; S. Lewis Transcript, Day 1, pp. 163-171, 179-181; Segar Transcript, Day 1, p. 210; Ausberry Transcript, Day 1, pp. 267-269.

PLAINTIFFS_00002018

6. The following week, Plaintiff Richardson met with Sharon Lewis and Associate Director of Recruiting Operations Keava Soil-Cormier and again disclosed John Coe's assault of her at the bar and subsequent stalking and another attempted attack by John Coe. Sharon Lewis and Keava Soil-Cormier told Plaintiff Richardson she could call the police if Plaintiff Richardson felt like it was "big enough to ruin John Coe's career at LSU", though Sharon Lewis denied that she said this.[24]

7. Sharon Lewis told HB investigators that she called Defendant Segar and made a report following this meeting with Plaintiff Richardson.[25]

8. There is no evidence that Keava Soil-Cormier reported Plaintiff Richardson's disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police following this meeting. There is no evidence that Defendant Segar made a report to the Title IX office. There is no evidence that Sharon Lewis, Keava Soil-Cormier, or Defendant Segar offered or informed Plaintiff Richardson of any other support, resources, or her rights. Sharon Lewis and Keava Soil-Cormier dispute that Plaintiff Richardson disclosed John Coe's abuse when they spoke to HB investigators.[26]

9. **Plaintiff Jade Lewis** enrolled as an LSU student and tennis athlete beginning spring semester of 2017. In January 2017, Plaintiff Lewis began a romantic relationship with John Coe. Soon after they began dating, John Coe perpetrated violence upon Plaintiff Lewis, physically, psychologically, and emotionally.[27]

10. On or around May 19, 2017, while Plaintiff Lewis was at John Coe's house, he became angry and punched Plaintiff Lewis in the stomach. Plaintiff Lewis saw an LSU team athletic trainer Donovan White and/or Sean Carter in May of 2017 due to pain from John Coe's punch to her stomach, and Plaintiff Lewis "disclosed John Coe's abuse" to White and/or Carter. That same day, a teammate of Plaintiff Lewis' also made a comment to White about John Coe's repeated violent assaults on Plaintiff Lewis.[28]

11. There is no evidence that White and/or Carter reported Plaintiff Lewis' disclosure of John Coe's abuse to anyone in athletics administration, LSU's Title IX office, or to the police in May of 2017. There is no

---

[24] Complaint, pp. 26-27; S. Lewis Transcript, Day 1, p. 250.
[25] HB Report, p. 60.
[26] Id.
[27] Id. at p. 58.
[28] Id. at p. 59.

PLAINTIFFS_00002019

evidence showing that anyone in a position of authority at LSU offered Plaintiff Lewis support or resources in May of 2017. White denied knowing about John Coe's assaults on Plaintiff Lewis in 2017.[29]

12. A teammate of Plaintiff Lewis' told a reporter at USA Today that she personally reported John Coe's abuse of Plaintiff Lewis to Julia Sell (LSU's tennis coach), at least six to seven months prior to June 2018.[30] A teammate of Plaintiff Lewis' reported to HB investigators that she knew of John Coe's abuse of Plaintiff Lewis, but did not report it to Ms. Sell.[31]

13. There is no evidence that Julia Sell reported John Coe's abuse of Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in 2017.

14. In June and July of 2017, Plaintiff Lewis' father, David Lewis, contacted Mike Sell (LSU's tennis coach), and during these calls, Mr. Lewis disclosed John Coe's abuse of Plaintiff Lewis.[32] Mr. Lewis' account was reviewed by HB investigators and determined to be unsupported by evidence that they gathered.[33]

15. There is no evidence that Mike Sell reported John Coe's abuse of Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in June or July of 2017. There is no evidence showing that anyone in a position of authority at LSU offered Plaintiff Lewis support or resources in June or July of 2017.

16. On April 14, 2018, Defendant Ausberry received a text message from John Coe where John Coe texted that Plaintiff Lewis hit John Coe and John Coe hit Plaintiff Lewis in the stomach.[34]

17. There is no evidence that Defendant Ausberry reported John Coe's disclosure of a dating violence involving Plaintiff Lewis to anyone in athletics administration, LSU's Title IX office, or to the police in April of 2018. Neither John Coe nor Plaintiff Lewis were offered support or resources or informed of their rights in April of 2018. Defendant Ausberry admitted that he did not report John Coe's text or subsequent phone call with John Coe about the text.[35]

18. On April 25, 2018, Plaintiff Lewis went to see LSU athletic trainers to get examined for the pain she was experiencing due to being punched in the

---

[29] White Transcript, p. 28.
[30] USA Today article; HB Report, p. 67.
[31] HB Report, p. 67.
[32] Complaint, pp. 59-60; HB Report, p. 68.
[33] HB Report, pp. 72-73.
[34] HB Report, p. 73.
[35] Ausberry Transcript, Day 2, pp. 38-41.

PLAINTIFFS_00002020

stomach by John Coe on or about April 3, 2018. Defendant Segar, White, and Senior Athletic Trainer Micki Collins ("Collins") asked Plaintiff Lewis how she had gotten hurt and Plaintiff Lewis disclosed that John Coe had punched her multiple times over the course of the past year.[36]

19. On April 26, 2018, Defendant Segar submitted an on-line Sexual Misconduct and Sexual Harassment (PM-73) Complaint Form. This report was routed to Associate Dean of Students & Director of Student Advocacy and Accountability Defendant Jonathan Sanders and the Title IX Coordinator, Defendant Stewart.[37]

20. On April 27, 2018, the report was assigned to LSU's Title IX Investigator Scott to investigate.[38]

21. On May 21, 2018, Investigator Scott interviewed Plaintiff Lewis as part of LSU's Title IX investigation. According to Investigator Scott's notes, Plaintiff Lewis did not want to move forward with the case.[39] No known interim or supportive measures were put in place during this time for either Plaintiff Lewis or John Coe. According to Defendant Stewart, in hindsight, if the case came to her presently, she would institute a no-contact and interim suspension of John Coe.[40]

22. On May 31, 2018, John Coe sent Plaintiff Lewis the following threatening text messages: "You might as well come over right now. I'm really about to beat you. I'm not joking. Idc anymore."; "I'm gonna punch you. Come over. I might kill you. You're so stupid. Idc at this point. Hurry up. The longer I wait the more angry I get."; "Fucking stop talking to me you stupid cunt . . . Just kill yourself. You literally have nothing to live for." These text messages were not reported to LSU.[41]

23. On June 5, 2018, Investigator Scott interviewed John Coe, wherein John Coe admitted to punching Plaintiff Lewis in the stomach. The day after John Coe's interview, Investigator Scott concluded his report by noting that John Coe would be put in mandatory counseling and Defendant Segar would inform football Coach Orgeron of the situation.[42]

---

[36] Complaint, pp. 60-61.
[37] Complaint, p. 61; HB Report, p. 76.
[38] HB Report, p. 77.
[39] Id.
[40] Stewart Transcript, p. 196.
[41] Id. at pp. 77-78.
[42] Complaint, p. 61.

PLAINTIFFS_00002021

24. John Coe only attended one of his five mandatory counseling sessions and no one was responsible for ensuring that he completed the mandatory counseling sessions.[43]

25. Plaintiff Lewis did not receive a written report detailing the findings of the Title IX investigation.[44]

26. In early to mid-June 2018, John Coe physically assaulted Plaintiff Lewis on three separate occasions, once hitting her and slamming her against a car, strangling her in a car another time, and strangling, hitting, and ripping an earring out of her ear at her apartment.[45] In the third instance, which occurred on June 18, 2018, Plaintiff Lewis' roommate called the police and police were dispatched to Plaintiff Lewis' apartment. No arrests were made.[46]

27. On June 18, 2018, Defendant Segar submitted another PM-73 report about John Coe's abuse of Plaintiff Lewis.[47]

28. On June 20, 2018, Plaintiff Lewis was charged with a residential housing violation for having a candle in her room, which was discovered when police were called to her residence for the dating violence incident on June 18, 2018.[48] Plaintiff Lewis was found responsible for the violation on June 22, 2018 and placed on academic probation.[49]

29. On July 11, 2018, Defendant Sanders interviewed John Coe about the June 18, 2018 incident and John Coe denied physically assaulting Plaintiff Lewis.[50]

30. On July 25, 2018, Defendant Sanders interviewed Plaintiff Lewis about the June 18, 2018 incident. Plaintiff Lewis denied that John Coe physically assaulted her.[51]

31. Three witnesses were also interviewed by Defendant Sanders and they all provided information of John Coe's physical abuse of Plaintiff Lewis.[52]

32. The outcome of the investigation was that John Coe was banned from the weight room in summer of 2018 and LSU did not implement any other formal disciplinary action against John Coe.[53]

---

[43] Id.; HB Report, p. 79; Stewart Transcript, p. 194; Segar Transcript, Day 1, p. 133.
[44] Complaint, p. 61.
[45] Id. at pp. 62-63.
[46] Id. at 63.
[47] HB Report, p. 79.
[48] Id. at 81.
[49] Complaint, p. 64.
[50] Id.; HB Report, p. 81.
[51] HB Report, p. 82.
[52] Complaint, pp. 64-65; HB Report, p. 83.
[53] Complaint, p. 65.

PLAINTIFFS_00002022

33. Plaintiff Lewis received comments from some football coaches that summer blaming her for John Coe being banned from the weight room. Plaintiff Lewis reports the comments to Defendant Segar and Defendant Segar told Plaintiff Lewis, "That's what happens when the cops come to your apartment."[54]

34. On August 13, 2018, Defendant Segar submitted another PM-73 report about John Coe's abuse of Plaintiff Lewis after Plaintiff Lewis reached out to Defendant Segar about wanting to be truthful about John Coe's abuse.[55]

35. On August 14, 2018, Defendant Segar submitted another PM-73 report because John Coe reached out to Defendant Segar expressing concern for Plaintiff Lewis' mental health and personal safety.[56]

36. On August 15, 2018. Investigator Scott and Mr. Sanders interviewed a teammate of Plaintiff Lewis' and also interviewed Plaintiff Lewis.[57]

37. On August 16, 2018, Plaintiff Lewis reported John Coe's abuse of her to the LSU Police Department ("LSUPD").[58]

38. On August 17, 2018, John Coe was arrested by the LSUPD for dating violence. Defendant Sanders issued an interim suspension to John Coe, though John Coe was still allowed to attend classes on campus.[59]

39. On August 30, 2018, John Coe was placed on interim suspension in which he was not allowed to be on campus.[60]

40. On September 10, 2018, the Title IX office reached out to John Coe to schedule an interview.

41. On September 15, 2018, LSUPD arrested John Coe again after a witness reported to police that John Coe repeatedly slapped Plaintiff Lewis in the face around her left eye. The next day, John Coe withdrew from LSU.[61]

42. In fall of 2018, **Plaintiff Richardson** learned about John Coe's abuse of Plaintiff Lewis and approximately a week after John Coe was arrested, Plaintiff Richardson told Defendant Ausberry about John Coe's abuse of Plaintiff Richardson. Defendant Ausberry reported Plaintiff Richardson's disclosure to Defendant Segar.[62]

43. On or around October 1, 2018, Plaintiff Richardson also made a disclosure about John Coe's abuse to an employee in LSU Athletics Department for

---

[54] Id.
[55] HB Report, p. 83.
[56] Id. at p. 84.
[57] Id. at po. 84-85.
[58] Id. at 86.
[59] Id.
[60] Id.
[61] Id. at 87.
[62] Complaint, 31.

PLAINTIFFS_00002023

Life Skills, Brenton Sumler, where Plaintiff Richardson was working at the time, and Mr. Sumler accompanied Plaintiff Richardson to LSU Cares, where Plaintiff Richardson made a report, and the same day, the Title IX office opened a complaint and assigned the case to Investigator Scott.[63]

44. On October 3, 2018, Investigator Scott interviewed Plaintiff Richardson about her report. Sharon Lewis was named as the respondent for the matter being investigated by Investigator Scott; not John Coe.[64]

45. On November 16, 2018, Investigator Scott made a finding that Sharon Lewis violated LSU's Title IX Policy because she did not report Plaintiff Richardson's disclosure of John Coe's abuse. Investigator Scott reviewed his finding with Plaintiff Richardson and informed Plaintiff Richardson that Sharon Lewis would not be disciplined or sanctioned.[65]

46. The Title IX office did not investigate John Coe's abuse of Plaintiff Richardson.[66]

47. On or around July 18, 2019, LSU expelled John Coe for violating the LSU Code of Student Conduct and the LSU Title IX Policy. **Plaintiff Lewis** was never informed of actions that LSU took against John Coe.[67]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Calise Richardson and Jade Lewis***

In addition to the overall failures by LSU identified above, LSU made the following material mistakes as to Plaintiffs Richardson and Lewis, discussed in detail below:

1. LSU employees failed to make mandatory reports of dating violence incidents disclosed to them;
2. LSU employees failed to offer Plaintiffs information about their rights and resources available to them in a timely manner;
3. LSU employees failed to implement interim measures in an appropriate and timely manner;
4. LSU employees failed to document incidents properly;
5. LSU employees failed to conduct a proper investigation and follow their policy, which led to inappropriate and ineffective disciplinary action for John Coe;
6. LSU employees' failures and mistakes led to continuation of violence and harm to the Plaintiffs.

---

[63] Id.
[64] Id. at 32.
[65] Id. at 33.
[66] Id.
[67] Complaint, p. 67.

PLAINTIFFS_00002024

Such failures prevented LSU from taking prompt and effective action to end the Title IX-related harassment, prevent it from recurring, and remedy the effects of the harassment on the Plaintiffs, and prevented the Title IX Coordinator the ability to identify and address patterns or systemic problems.

The first missteps as to Plaintiff Richardson was Sharon Lewis calling a meeting with Plaintiff Richardson instead of simply reporting the incident and letting those who are specially trained in these types of incidents to respond. Nevertheless, Sharon Lewis, and later, Sharon Lewis and Keava Soil-Cormier, both Athletics and LSU employees, met with Plaintiff Richardson and then failed to report the incident between Plaintiff Richardson and John Coe in October of 2016 as mandatory reporters. Though Sharon Lewis testified that she did inform Verge Ausberry and Miriam Segar of the incident, Keava Soil-Cormier was also a responsible employee and had an independent obligation to report. The failure to report to the Title IX office led to Plaintiff Richardson having a lack of knowledge of resources available to her at LSU. Had the incident been reported to the Title IX office, and if the Title IX office responded appropriately, they would have informed Plaintiff Richardson of her rights and resources at the University to address the incident. According to the 2011 DCL, effective at the time of Plaintiff Richardson's disclosure, "Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps… schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement."[68] No steps were taken to ensure Plaintiff Richardson was aware of her rights and resources.

As identified in the HB Report, LSU required "responsible employees" to report potential Title IX violations to the Title IX Coordinator or other appropriate school designee, but did not provide appropriate training to responsible employees, did not monitor responsible employee reporting, and did not notify students who responsible employees were. Review of documents show that the Athletics department had its own reporting mandates and required that employees in the Athletics department make reports of sexual harassment, misconduct, or sexual assault to Defendant Segar or the Assistant Athletics Director HR, contrary to Defendant Stewart's directive that they report directly to her as the Title IX Coordinator. This reporting requirement within Athletics was determined without an official designation by LSU's President or Title IX Coordinator.

---

[68] 2011 DCL, pp. 15-16.

PLAINTIFFS_00002025

Regardless, Plaintiff Richardson's disclosure did not make it to the Title IX office, whether it was a failure by Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry, or Defendant Segar, violating the reporting requirement within Athletics and in LSU's PM-73 policy.

Significantly, had Sharon Lewis, Keava Soil-Cormier, Defendant Ausberry and/or Defendant Segar made a report to the Title IX Coordinator in October of 2016 about the incident with Plaintiff Richardson and John Coe, and if that report was appropriately documented with the identities if the individuals involved, even if Plaintiff Richardson chose to do nothing, the Title IX office would have had documentation of a prior potential dating violence and stalking incident when they ultimately received Plaintiff Lewis' report of John Coe's abuse in 2018.

As previously stated, it is part of the Title IX Coordinator's responsibility to oversee "all Title IX complaints and [identify] and [address] any patterns or systemic problems that arise during the review of such complaints."[69] This is another reason why it was so crucial that responsible employees at LSU were appropriately trained on their reporting responsibility. In my experience as a Title IX staff member and Title IX Coordinator, the majority of reports received by the Title IX office about student incidents were from mandatory reporters/responsible employees who worked closely with students, such as student affairs personnel, resident assistants, and athletics employees. Often, when the Title IX office would reach out to identified Complainants in those reports to provide information about their rights and resources, the Complainants declined to move forward with the school's process. Then, unless there was evidence of a pattern, threats, violence, or use of a weapon in the report, the report would be documented and closed with no further action, and the Complainant would be notified of the same so they were aware of the school's action and decision and of their option to pursue action through the school's internal process should they decide to in the future. Additionally, with every new report, a pattern check would always be conducted with both parties, if identified, to not only check for a potential pattern of misconduct by a Respondent, but to check if a Complainant was identified more than once. If a Complainant was identified more than one time, it would indicate to the school that the Complainant may need additional support or resources, which the Title IX office would reach out to offer.

Unfortunately, similar material reporting mistakes were made with Plaintiff Lewis when Donovan White and/or Sean Carter, LSU Athletics employees, failed to report Plaintiff Lewis' disclosure of being punched in the stomach by John Coe in May of 2017, if it was, in fact, disclosed in May of 2017; when Julia Sell, LSU's women's tennis coach, failed to report John Coe's abuse of Plaintiff Lewis in 2017 after a disclosure from a teammate; when Mike Sell, LSU's women's tennis coach, failed to report John Coe's abuse of Plaintiff Lewis in the summer

---

[69] 2011 DCL, p. 7.

PLAINTIFFS_00002026

of 2017 after a disclosure from Plaintiff Lewis' father; and, when Defendant Ausberry, an employee and administrator with LSU's Athletics department, failed to report dating violence disclosure from John Coe in April of 2018. All of these employees also failed to inform Plaintiff Lewis and John Coe of resources available to them, respectively, at LSU, which was a training failure if they did not know. All of these failures to report delayed LSU's ultimate response to Plaintiff Lewis.

When the first mandatory report to the Title IX office was made about John Coe's abuse, with Plaintiff Lewis, on April 26, 2018, the Title IX office, appropriately, initiated an investigation, but material mistakes continued to occur. First, the Title IX office did not issue any interim or supportive measures to Plaintiff Lewis, which was a required consideration under Title IX compliance mandates at the time, and would have been highly appropriate in Plaintiff Lewis' and John Coe's situation.

According to the 2011 DCL, "Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation."[70] In my training and experience under the 2011 DCL, it would have been highly appropriate for LSU to issue a no-contact order to John Coe, seriously consider an interim suspension given the violent nature of John Coe's admission of punching Plaintiff Lewis in the stomach, as well as interim ineligibility to participate in football. Defendant Stewart, in hindsight, also agreed. Unfortunately, this is not what LSU's Title IX office did, and instead, the Title IX office did not issue any interim or supportive measures.

The investigation was also delayed without a known explanation, contrary to the Title IX mandate that schools must respond promptly to sexual harassment and take steps to prevent recurrence of sexual harassment.[71] In my training and experience, that includes considering, when a report comes in, whether the alleged sexual harassment is ongoing, the severity of the alleged conduct, and the likelihood of it recurring without intervention from the school. In Plaintiff Lewis' situation, Investigator Scott should have interviewed Plaintiff Lewis immediately to learn more about what happened and whether interim action was necessary given the physically violent nature of John Coe's admitted abuse and that Plaintiff Lewis and John Coe were in a known, present, dating relationship. Those two factors alone were enough to indicate to

---

[70] 2011 DCL, p. 15.
[71] 2001 Guidance, p. 9; 2011 DCL, pp. 9, 14.

PLAINTIFFS_00002027

the school that there was a possibility of recurrence of violence and the Title IX office should have moved quickly on implementing interim measures and commencing the investigation.

In addition, the Title IX office's failure to provide a written outcome to Plaintiff Lewis following the Title IX investigation was also a material mistake and contrary to PM-73. According to 2011 DCL, "Both parties *must* (emphasis added) be notified, in writing, about the outcome of both the complaint and any appeal, i.e., whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently."[72]

The way in which the Title IX office treated the April 2018 Title IX investigation into Plaintiff Lewis' report, with no investigation report or formal finding, appears as though they decided to handle it informally. However, they did not follow their PM-73 process on informal resolution. Plaintiff Lewis was not informed of the informal resolution process and did not consent to informal resolution in writing, as required in PM-73. The Title IX office also did not follow their formal resolution process.

LSU made the following additional material mistakes as to Plaintiff Lewis and Plaintiff Richardson:
- Failing to issue an appropriate sanction for a finding of dating violence to prevent recurrence of dating violence following the Title IX investigation involving Plaintiff Lewis in April of 2018;
- Failing to ensure that the John Coe completed all of the mandatory counseling sessions following the investigation in April of 2018 to prevent recurrence of dating violence;
- Failing to implement interim and supportive measures, again, following another report of dating violence in June of 2018 to protect Plaintiff Lewis and prevent recurrence of dating violence;
- Charging Plaintiff Lewis with a residential housing violation for having a candle in her room, discovered when police were at her residence for the dating violence incident, prior to completion of the dating violence investigation and contrary to Title IX interim and supportive measures considerations and practices to protect the victim, remove barriers to reporting, and apply amnesty for minor violations when discovered during a Title IX-related investigation;
- Failing to issue an appropriate sanction to John Coe for a finding of dating violence to prevent recurrence of dating violence toward Plaintiff Lewis following the Title IX investigation in the summer of 2018;

---

[72] 2011 DCL, p. 13

PLAINTIFFS_00002028

- Failing to make a report of retaliation after Plaintiff Lewis told Defendant Segar she was receiving comments from football staff blaming her for John Coe getting banned from the weight room in the summer of 2018 to protect Plaintiff Lewis and prevent recurrence of retaliation and dating violence.
- Failing to notify Plaintiff Richardson of her right to commence an investigation into John Coe's abuse of her, and failure to commence an investigation into John Coe's abuse of Plaintiff Richardson after it was reported to the Title IX office in October of 2018, further violating Title IX documentation mandates and its PM-73 policy.

Crucially, had a mandatory report been made for Plaintiff Richardson and John Coe's incident back in October of 2016, and had it been properly documented or investigated by the Title IX office with Plaintiff Richardson's and John Coe's names, when Plaintiff Lewis' report was made in 2018, the Title IX office should/would have conducted a pattern check and would have seen that a previous incident involving John Coe was reported. In my training and experience, the Title IX office would then have more than reasonable justification to implement immediate measures to stop any potential ongoing violence, such as an interim suspension, and formally investigate Plaintiff Lewis' incident and Plaintiff Richardson's incident if it was not previously investigated, to determine if there was, in fact, a pattern of behavior that needed to be addressed.

LSU's failures and mistakes as to Plaintiff Richardson's and Plaintiff Lewis' situations detailed above were contrary to industry standards and practice in connection with Title IX compliance and its own PM-73.

### C. Plaintiffs Ashlyn Robertson, Abby Owens, Samantha Brennan, and Calise Richardson

My analysis of LSU's response to Plaintiffs Robertson, Owens, Brennan, and Richardson of their experiences involving John Doe is combined below because it involved the same perpetrator.

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. On January 22, 2016, **Plaintiff Ashlyn Robertson**, an LSU student at the time, hosted a party at her off-campus apartment complex and several members of the LSU football team attended, including John Doe who was a highly recruited football player. During the party, Plaintiff Robertson

PLAINTIFFS_00002029

went to her room to lay down. While Plaintiff Robertson was passed out in her room, John Doe entered her room and raped her.[73]

2. Plaintiff Robertson experienced flashbacks of John Doe spitting on her and penetrating her vaginally and anally. Plaintiff Robertson suffered vaginal and anal trauma from the rape.[74]

3. Plaintiff Robertson's friends on the football team told her that John Doe bragged about having sex with her.

4. On January 26, 2016, Defendant Segar learned of Plaintiff Robertson's rape after receiving a report from LSU's diving coach who learned about it after Plaintiff Robertson disclosed to a friend who was on the LSU swimming and diving team.[75] Defendant Segar passed along the report to Deputy Title IX Coordinator, Gaston Reinoso, but did not include John Doe's identity even though it was known to her.[76]

5. On February 1, 2016, Associate Vice President and Dean of Students Mari Fuentes-Martin ("Dean Fuentes-Martin") emailed Plaintiff Robertson to ask if she wanted to proceed with a Title IX investigation. On February 5, 2016, Robertson emailed Dean Fuentes-Martin back stating that she did not want to proceed with a Title IX investigation. A Title IX investigation was not opened.[77]

6. Defendant Segar and Dean Fuentes-Martin knew John Doe's identity in February of 2016, yet, there was no documentation of John Doe's identity; only that Plaintiff Robertson was raped.[78]

7. On July 9, 2016, **Plaintiff Samantha Brennan**, an LSU student and recruiter for LSU's football team, met John Doe at the bar. John Doe drove Plaintiff Brennan home that night. Plaintiff Brennan woke up naked in her apartment, her living completely disheveled. Plaintiff Brennan had no memory of what happened the night before with John Doe, but assumed they engaged in sexual activity and found John Doe's wallet on her couch.[79]

8. On July 22, 2016, Plaintiff Brennan learned that John Doe had a picture of Plaintiff Brennan naked that he took without her consent while she was incapacitated on the night of July 9, 2016.[80] The same day, Plaintiff

---

[73] Complaint, p. 35.
[74] Id. at 36.
[75] Id.
[76] HB Report, p. 94.
[77] Id. at 36.
[78] Id.
[79] Complaint, p. 40.
[80] Id. at 40-41.

PLAINTIFFS_00002030

Brennan met with Sharon Lewis and Defendant Segar at Sharon Lewis' request. Sharon Lewis told Plaintiff Brennan she heard about the nude photograph, John Doe denied being at Plaintiff Brennan's apartment, and Sharon Lewis wanted to hear Plaintiff Brennan's side of the story. Sharon Lewis asked Plaintiff Brennan if she wanted to report the matter to the police or whether she wanted it handled internally. Plaintiff Brennan indicated she wanted it handled internally. Nevertheless, Defendant Segar took Plaintiff Brennan to the LSUPD to file a report.[81]

9.  On July 25, 2016, Dean Fuentes-Martin emailed LSUPD about Plaintiff Brennan's report and was told by LSUPD that Plaintiff Brennan did not want her information shared beyond the police department. Dean Fuentes-Martin consulted with Defendant Stewart, and they agreed the report would be documented, but no further action would be taken to "respect the wishes of the Complainant" unless there "are other factors (pattern, predations, threats, weapons, violence)."[82]

10. Plaintiff Brennan was never contacted by anyone from the LSU Title IX office and was not offered support or resources or informed of her rights.[83]

11. On June 28, 2016, **Plaintiff Abby Owens**, an LSU student and LSU tennis athlete, met John Doe while out drinking at the bar. John Doe bought Plaintiff Owens shots at the bar and drove her home. At Plaintiff Owens' apartment, John Doe orally and vaginally raped Plaintiff Owens. Plaintiff Owens did not disclose or report the rape at the time.[84]

12. In the fall of 2016, **Plaintiff Robertson** told her new boyfriend, an LSU football player, that she had been raped by John Doe. Plaintiff Robertson's boyfriend told his coach, Ed Orgeron, about the rape.[85]

13. There is no evidence that Ed Orgeron reported the disclosure of rape to anyone in athletics administration, LSU's Title IX office, or to the police in fall of 2016. Ed Orgeron denied learning about Plaintiff Robertson's to HB investigators.[86]

14. In the fall of 2016, **Plaintiff Calise Richardson**, an LSU student and recruiter for the LSU football team, went to a bar with her friends, including John Doe. After the bar, John Doe asked to stay over at Plaintiff Richardson's apartment and Plaintiff Richardson agreed. When they woke up the next morning, while joking around and without warning, John Doe

---

[81] Id. at 41-42
[82] HB Report, p. 99.
[83] Complaint, p. 42.
[84] Id. at 45.
[85] Id. at 38.
[86] HB Report, p. 96, fn. 194.

PLAINTIFFS_00002031

got on top of Plaintiff Richardson and attempted to rape Plaintiff Richardson. Plaintiff Richardson told John to stop multiple times. John Doe became angry and threatened to ruin her life, get her fired, and said she would regret it.[87]

15. Within a day of John Doe's attempted rape of Plaintiff Richardson, she told her supervisor, Keava Soil-Cormier, about John Doe's attempted rape of Plaintiff Richardson and his threats to get her fired. Keava Soil-Cormier asked Plaintiff Richardson why she would let John Doe in her apartment if she did not want to have sex with him, and asked Plaintiff Richardson's coworkers in the recruiting office about what happened between Plaintiff Richardson and John Doe.[88]

16. Plaintiff Richardson was never contacted by anyone from the LSU Title IX office and was never offered support or resources or informed of her rights related to her disclosure of John Doe's attempted rape of her.

17. In April of 2017, while at a rehabilitation facility, **Plaintiff Owens** disclosed she had been raped by John Doe. About a week later, a rehabilitation center official reported the rape to LSU Athletics and informed Plaintiff Owens and her parents that it was reported. No one from LSU reached out to Plaintiff Owens regarding the report.[89]

18. In late April 2017, Plaintiff Owens' father attended a tennis match where Julia Sell, Plaintiff Owens' LSU tennis coach, was also in attendance. Plaintiff Owens' father told Julia Sell Plaintiff Owens was raped.[90]

19. Julia Sell reported Plaintiff Owens' father's disclosure of Plaintiff Owens' rape to Defendant Segar who made a report to Defendant Stewart via a phone call sometime in spring of 2017.[91]

20. Plaintiff Owens was never offered support or resources or informed of her rights in spring of 2017 or after.[92]

21. On May 20, 2019, Plaintiff Owens called LSU's Title IX Office and asked for a copy of her report.[93]

22. On May 22, 2019, Defendant Stewart told Plaintiff Owens that she had heard about Plaintiff Owens' rape but had decided not to move forward

---

[87] Complaint, p. 28
[88] Id.
[89] Id.
[90] Id.
[91] HB Report, p. 98.
[92] Complaint, p. 45-46.
[93] Id.

PLAINTIFFS_00002032

with an investigation because the Athletics Department did not give her the name of the assailant.[94]

23. Plaintiff Owens learned later in 2020 that the Title IX office did not have a written record of Plaintiff Owens' rape. Defendant Stewart also told Plaintiff Owens that if she wanted to know who the rape was reported to, she would have to ask the rehabilitation facility since they were the ones that initially reported it to LSU.[95]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Ashlyn Robertson, Abby Owens, Samantha Brennan, and Calise Richardson***

The manner in which LSU responded to Plaintiff Robertson's disclosure of rape was initially appropriate. A responsible employee, and per the athletics' internal policy, though contrary to Defendant Stewart's directive, LSU's diving coach, made a mandatory report to Defendant Segar, and Defendant Segar made a mandatory report to a Deputy Title IX Coordinator. It's unclear why Defendant Segar reported to the Deputy Title IX Coordinator instead of the Title IX Coordinator, Defendant Stewart. Nevertheless, the mandatory report was made and Dean Fuentes-Martin, another Deputy Title IX Coordinator, reached out to Plaintiff Robertson to inform Plaintiff Robertson of her rights and resources. Ultimately, Plaintiff Robertson declined to move forward with an internal investigation and the case was documented and closed. This was a good example of mandatory reports at LSU should have been made, following their internal policies, though their internal policies conflicted at the time.

However, a material mistake was made when John Doe's identity was not documented in Plaintiff Robertson's case. As previously discussed in this report, if the school does not appropriately document all information in a report that's been received, the Title IX Coordinator is unable to monitor and identify students or employees who have multiple complaints filed against them or who have been repeated targets, or address any patterns or systemic problems that arise, among other issues, as required by Title IX guidance. John Doe's identify was known to LSU when Plaintiff Robertson's rape was reported and it should have been documented.

As to Plaintiff Brennan, a mandatory report in her situation was not made appropriately. As soon as Sharon Lewis learned about Plaintiff Brennan's nude photograph, Sharon Lewis should have made a mandatory report to Defendant Stewart. It was improper for Sharon Lewis and Defendant Segar to meet with Plaintiff Brennan to learn more about what happened and what she wanted done because they were not designated employees with specialized experience and training to

---

[94] Id.
[95] Id. at 47.

PLAINTIFFS_00002033

inquire further and provide an appropriate response. Furthermore, neither of them made a mandatory report to the Title IX Coordinator, a violation of the LSU's reporting mandate.

Additionally, in my training and experience, it almost always left up to the survivor whether they wanted to make a police report about their own sexual assault. (There were rare exceptions, such as evidence of pattern, predation, threats, violence, and larger community impact.) When Plaintiff Brennan told Sharon Lewis and Defendant Segar that she wanted the situation handled internally, Sharon Lewis and Defendant Segar should have informed Plaintiff Brennan that they were required to make a mandatory report to the Title IX office, that someone from the Title IX office would reach to Plaintiff Brennan with information about her rights and resources, and provide her with information about where to report to police should Plaintiff Brennan decide later that she did, in fact, want to make a police report.

Somehow, the Title IX office did learn of Plaintiff Brennan's situation given that deputy Title IX coordinator, Dean Fuentes-Martin, corresponded with LSUPD about Plaintiff Brennan's report. As soon as Dean Fuentes-Martin learned of Plaintiff Brennan's report, she should have reached out to Plaintiff Brennan, in the same manner that she did with Plaintiff Robertson, with information about her rights and responsibilities, and Plaintiff Brennan could have declined to move forward with the Title IX process, as Plaintiff Robertson had. It is best practice for the Title IX Coordinator or appropriate designee to reach out to a Complainant as soon as the Complainant is identified to offer information about their rights and resources. However, Dean Fuentes-Martin did not reach out to Plaintiff Brennan and failure to do so left Plaintiff Brennan with no information about her rights under the Title IX process, no opportunity to pursue the Title IX process, and no information about additional resources available to her, contrary to Title IX requirements. Additionally, had Plaintiff Robertson's previous rape report been properly documented, Plaintiff Brennan's report would and should have triggered an immediate formal investigation into a potential pattern of misconduct by John Coe and potentially prevented the attempted rape of Plaintiff Richardson.

Mandatory reporting mistakes also occurred with Plaintiff Richardson's disclosure of her attempted rape by John Doe to Keava Soil-Cormier. Keava Soil-Cormier did not make a mandatory report of Plaintiff Richardson's disclosure and, therefore, the Title IX office never received a report to document and track, and Plaintiff Richardson was never informed of her rights and resources. Significantly, had a mandatory report been made about Plaintiff Richardson's disclosure of her attempted rape by John Doe to the Title IX office, and had the previous reports been properly documented, Plaintiff Richardson's should have triggered an immediate formal investigation into a potential pattern of misconduct by John Coe.

35 of 49

PLAINTIFFS_00002034

As for Plaintiff Owens' reported rape, Julia Sell did make an appropriate mandatory report after learning about Plaintiff Owens' rape from Plaintiff Owens' father, and Defendant Segar made a mandatory report to the Title IX Coordinator, Defendant Stewart. Nevertheless, no one reached out to Plaintiff Owens, as Dean Fuentes-Martin had done with Plaintiff Robertson, to provide Plaintiff Owens with information about her rights and resources. If it's true that Defendant Segar did not provide Defendant Stewart with John Coe's name at the time, the appropriate approach would have been for Defendant Stewart to inquire further with Defendant Segar or Julia Sell about whether they knew who the perpetrator was, or if they did not know, for a Title IX staff member to reach out to Plaintiff Owens, and in addition to informing Plaintiff Owens of her rights and resources, and, invite Plaintiff Owens to an intake meeting in which the Title IX staff member would ask Plaintiff Owens who the perpetrator was. To not even try to learn the identity of the perpetrator after receiving the report, in addition to failing to reach out to Plaintiff Owens, was irresponsible.

LSU had four opportunities to properly document, address, and respond to reports of sexual misconduct by John Coe. When LSU received the second report about John Coe, they had justification then to initiate the formal Title IX process, with or without the Plaintiffs' desire to engage in the Title IX process, to determine if there was a pattern of sexual misconduct. Failure to do so was not only contrary to industry standards and practice in connection with Title IX compliance and PM-73, it also allowed John Doe to continue to engage in harm against additional students without consequence.

### D. Plaintiff Elisabeth Andries

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. In October of 2016, Plaintiff Andries, an LSU engineering student at the time, was invited by John Roe, an LSU engineering student at the time, to go on a Halloween bus trip hosted by John Roe's fraternity. During the trip, Plaintiff Andries became intoxicated and was taken back to the bus. John Roe nonconsensually groped Plaintiff Andries' breasts while on the bus. Plaintiff Andries shook her head and said "no" and "stop" multiple times while John Roe groped her. Plaintiff Andries had bruises all over her chest the next day.[96]

---

[96] Complaint, p. 49.

PLAINTIFFS_00002035

2. In July of 2017, Plaintiff Andries let John Roe stay over at her apartment after picking him up at a bar and John Roe and nonconsensually groped Plaintiff Andries again. Plaintiff Andries told John Roe to stop and kicked him out of her apartment. Thereafter, Plaintiff Andries began avoiding John Roe.[97]

3. In the fall of 2017, Plaintiff Andries disclosed John Roe's assault of her to her LSU therapist. Plaintiff Andries' therapist recommended LSU's Lighthouse Program to Plaintiff Andries for sexual violence support and services.[98]

4. On the first day of spring 2019 semester classes, Plaintiff Andries walked into her industrial engineering class with Professor Champney and saw John Roe sitting in class. Soon thereafter, Plaintiff Andries sought disability accommodations because she was having panic attacks from seeing John Roe in class. While at the LSU Disability Services office, Plaintiff Andries was asked why she needed accommodations and when Plaintiff Andries disclosed the reason, she was advised to make a report to LSU's Title IX office. Plaintiff Andries googled "LSU Title IX" but could not find any information about the Title IX Office.[99]

5. On March 7, 2019, Plaintiff Andries instead went to the Student Advocacy and Accountability ("SAA") office for help and reported John Roe's sexual assault of her to Associate Director and Assistant Dean for Student Advocacy and Accountability, Tracy Blanchard ("Dean Blanchard"). Dean Blanchard reported Plaintiff Andries' report to the Title IX office on March 8, 2019. Dean Blanchard told Plaintiff Andries she would reach out to her Professor Champney to explain Plaintiff Andries' class attendance due to the situation.[100]

6. On March 15, 2019, Plaintiff Andries had her interview with the Title IX office. Plaintiff Andries requested a no-contact order and provided witnesses during her interview. One of those witnesses also experienced a sexual assault by John Roe. The Title IX office did not interview any of Plaintiff Andries' witnesses. [101]

7. On April 2, 2019, Defendant Stewart informed Plaintiff Andries that she would not issue a no-contact order because Plaintiff Andries had not talked to John Roe since July of 2017.[102]

---

[97] Id. at 50.
[98] Id.
[99] Complaint, p. 51.
[100] Id. at p. 52.
[101] Id.
[102] Id.

PLAINTIFFS_00002036

8.  On April 8, 2019, Plaintiff Andries met with Professor Champney to discuss her grades and she learned that Dean Blanchard did not reach out to him to explain why she would not be in class. Plaintiff Andries told Professor Champney about the situation and on April 24, 2019, Professor Champney made a report to the Title IX office about his concern with Plaintiff Andries' well-being. The Title IX office did not follow up with Professor Champney and Plaintiff Andries' did not know he made a report.[103]

9.  On June 3, 2019, the Title IX investigation concluded that John Roe was responsible for violating LSU's Title IX Policy and Plaintiff Andries was notified on June 4, 2019 with a six-sentence letter.[104]

10. John Roe appealed the decision and requested an extension to submit his appeal from June 19, 2019 to June 28, 2019. His extension request was granted. John Roe submitted his appeal on July 11, 2019 and it was accepted by the Title IX office. Plaintiff Andries was not given updates on the status of the appeal, was not given an opportunity to see John Roe's appeal, and was not given an opportunity to respond to John Roe's appeal.[105]

11. On July 22, 2019, Defendant Stewart upheld the investigator's decision in John Roe's appeal and the matter was referred to SAA for a sanction determination.[106] During the meeting, Defendant Sanders asked Plaintiff Andries detailed questions about the sexual assault, such as whether Plaintiff Andries was "on drugs" during the assault and where exactly she was on the bus when she was assaulted.[107]

12. Plaintiff Andries was not informed of the status of her Title IX case prior to the start of fall 2019 semester despite meeting with Dean Blanchard on August 29, 2019 to discuss what Plaintiff Andries was supposed to do if she and John Roe were in a class together again, to which Dean Blanchard offered no advice or assistance.[108]

13. At the beginning of the fall 2019 semester, Plaintiff Andries walked into one of her classes and saw John Roe sitting there. Plaintiff Andries had a panic attack and immediately left class.[109]

---

[103] Id. at p. 53.
[104] Id.
[105] Id. at 53-54.
[106] HB Report, p. 108.
[107] Complaint, p. 54.
[108] Id.
[109] Id. at 55.

PLAINTIFFS_00002037

14. On August 30, 2019, Plaintiff Andries met with Dean Blanchard again. Plaintiff Andries asked Dean Blanchard why John Roe was in her lab class. Dean Blanchard told Plaintiff Andries that SAA had reached out to John Roe and asked him to change his schedule, but he never responded. Dean Blanchard also told Plaintiff Andries that she and John Roe were both students, so they had "the same rights."[110]

15. On September 5, 2019, Plaintiff Andries received a copy of the disciplinary letter SAA sent to John Roe, which stated that SAA had issued a mutual no-contact order between John Roe and Plaintiff Andries, that John Roe was required to attend counseling and an anger management course, and that John Roe was issued a deferred suspension effective September 5, 2019, through May 31, 2021.[111]

16. John Roe was given the opportunity to appeal SAA's decision and he submitted his appeal on or around September 27, 2019.[112]

17. Plaintiff Andries was not notified that John Roe had an opportunity to appeal, that he appealed SAA's decision, and that the sanctions as outlined in the letter she received on September 26, 2019 would be stayed until a decision on his appeal was issued.[113]

18. On October 12, 2019, Plaintiff Andries saw John Roe at an LSU football game. On October 14, 2019, Plaintiff Andries called SAA and asked why John Roe was on campus and able to purchase a football ticket given that he was supposed to be on suspension. Plaintiff Andries learned that John Roe had submitted another appeal.[114]

19. A few days later, Plaintiff Andries' father called SAA and was told that learned that Plaintiff Andries was not told about the appeal because "it wouldn't affect [her] at all so it wasn't [her] business."[115]

20. On November 16, 2020, Dean Blanchard sent Plaintiff Andries an email stating that John Roe would be back on campus for spring 2021 classes. Dean Blanchard told Plaintiff Andries that she would have to change her schedule if she did not want to be in class with John Roe.[116]

---

[110] Id.
[111] Id.; HB Report, p. 113.
[112] Id. at 56.
[113] Id.
[114] Id.
[115] Id.
[116] Id. at 57.

PLAINTIFFS_00002038

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Elisabeth Andries***

LSU made some similar mistakes and some different from the other Plaintiffs discussed above as to Plaintiff Andries.

First, in my training and experience, confidential support services on campus, such as counseling and health services, are trained and given information, such as flyers or business cards, about the Title IX office should an incident of sexual harassment be disclosed when confidential support services are rendered. It's a common practice because these offices may receive more disclosures than other offices due the nature of the service they are providing, and they are confidential, which means they are not required to make mandatory reports to the Title IX office. Employees in these support offices are encouraged to inform students of their right to make a report to the Title IX office should they decide to. In my experience, there were times when a counselor would call the Title IX office or walk over to provide support to the student who disclosed and indicated they wanted to make a report to the Title IX office. Plaintiff Andries' LSU therapist did not suggest or inform Plaintiff Andries of her option to make a report to the Title IX office, which is another example of the Title IX office's isolation from the campus community at large.

When Plaintiff Andries eventually found the Title IX office to make a report about her sexual assault, an investigation commenced appropriately. However, it's my opinion that the Title IX office and SAA handled interim measures for Plaintiff Andries improperly. According to the 2017 Q&A:

> Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending. Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, *restrictions on contact between the parties* (emphasis added), changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations…. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

2017 Q&A, pp. 2-3.

PLAINTIFFS_00002039

In my training and experience, it was a common practice for a no-contact order to be issued to the parties pending a formal Title IX investigation, particularly if the students were required to be in spaces on campus together, such as living in the same residence hall or enrollment in the same class. The latter was the case for Plaintiff Andries and John Roe. It would have been reasonable, appropriate, and justified, to issue a no-contact in Plaintiff Andries' situation.

Additionally, Plaintiff Andries relied on assurances from Dean Blanchard from SAA that Dean Blanchard would notify her professor of her need for academic accommodations. It's unknown whether Dean Blanchard had received training on considering and issuing interim measures. Nevertheless, Dean Blanchard failed to follow through on her assurance, and Dean Blanchard should have shared with Defendant Stewart that Plaintiff Andries requested academic accommodations so that Defendant Stewart could monitor the academic accommodations should Plaintiff Andries' needs change, as per the 2017 Q&A. Indeed, there was an indication that Plaintiff Andries may have been in need of additional support when Professor Champney made a report to the Title IX office regarding his concerns with Plaintiff Andries. Yet, neither Professor Champney nor Plaintiff Andries received a response from the Title IX office about Professor Champney's report; another material mistake made by the Title IX office.

There were missteps made during the investigation, as well, when Plaintiff Andries' witnesses were not interviewed and no explanation was provided to Plaintiff Andries as to why her witnesses were not interviewed. This contradicts best practice to interview relevant witnesses identified by a party, or provide an explanation in the final investigation report explaining why an identified witness was not interviewed. Additionally, PM-73 states that a complainant should provide as much information to the school as possible about the alleged violation, including "The name(s) of other student(s) or employee(s) who might have been subject to the same or similar conduct." Plaintiff Andries provided the name of a witness who also experienced a sexual assault by John Roe. Yet, the investigator failed to interview that witness, contrary to LSU's own policy and best practice.

Upon conclusion of the Title IX investigation, Plaintiff Andries and John Roe should each have received an investigation report summarizing the evidence gathered, as mandated in the 2017 Q&A:

> The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.
> –

41 of 49

PLAINTIFFS_00002040

Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final. 26This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.27 For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.

2017 Q&A, pp. 4, 6.

In my training and experience, following the conclusion of the investigation, both parties would receive the same copy of the final investigation report, which summarized all relevant exculpatory and inculpatory evidence gathered during the investigation, including statements of interviews conducted, documentary evidence, and descriptions of any other relevant evidence gathered, and an analysis and finding for investigations in which a determination of responsibility was made. The report was accompanied by a notice that included information about next steps, the party's right to appeal and timelines for next steps and appeal. For Plaintiff Andries to only receive a six-sentence outcome letter following the conclusion of the investigation was a deprivation of her right to receive a full investigation report and to understand and be able to prepare for next steps, including the sanctioning process and appeal process.

The following additional Title IX process mistakes made by LSU as to Plaintiff Andries included:
- Defendant Sanders asking Plaintiff Andries inappropriate questions during the sanction determination meeting. The purpose of the sanction decision is to decide "how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education."[117] Defendant Sanders' questions should have focused on the impact John Roe's assault had on Plaintiff Andries, such as the impact it had on Plaintiff Andries life and education at LSU. Defendant Sanders' questions about the factual details were inappropriate and not trauma-informed.

---

[117] 2017 Q&A, p.6.

42 of 49

PLAINTIFFS_00002041

- Allowing John Roe to submit an appeal after he missed the extended deadline. John Roe's appeal should have been denied as untimely.
- Failure to keep Plaintiff Andries apprised of status of the Title IX process following the investigation outcome. Plaintiff Andries should have been notified and received a copy of John Roe's first and second appeal and given an opportunity to submit a response. Plaintiff Andries should have received a written decision about the outcome of the appeal.
- Failure to issue an appropriate sanction to John Roe proportionate to the finding of misconduct that removed and redressed the hostile environment for Plaintiff Andries. John Roe should never have been allowed to enroll in the same classes as Plaintiff Andries for the remainder of Plaintiff Andries' time at LSU given his finding of responsibility and, at the very least, a no-contact order should have been in place for the remainder of Plaintiff Andries and John Roe's enrollment at LSU as long as they were both enrolled at the same time. LSU had a duty to take steps to "eliminate the hostile environment"[118] for Plaintiff Andries, and LSU failed to do so with ineffective sanctions.
- Failure to monitor Plaintiff Andries' Title IX matter and check in with Plaintiff Andries prior to the start of the fall of 2019 semester. Dean Blanchard inappropriately informed Plaintiff Andries that she and John Roe had the "same rights" and therefore LSU could not ensure that John Roe would be in the same class as her. Given John Roe's finding of responsibility, LSU had a duty to ensure that any hostile environment caused by John Roe's misconduct was remedied. That would have appropriately included a no-contact order accompanying the disciplinary sanction since both Plaintiff Andries and John Roe were both still on campus.

Plaintiff Andries' access to education at LSU was disrupted because LSU failed to appropriately issue interim measures, follow its Title IX formal process appropriately, and issue sanctions proportionate to the finding to restore Plaintiff Andries' access to education at LSU. These actions by LSU failed to meet industry standards and practice in connection with Title IX compliance and its own PM-73 policy.

### E. Plaintiff Kennan Johnson

***Factual Background***

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. In fall of 2017, Plaintiff Johnson joined the LSU women's tennis team as a scholarship recipient. Soon after she started playing tennis for LSU, she

---

[118] 2017 Q&A, p. 6.

PLAINTIFFS_00002042

experienced disparaging comments from her coach, Julia Sell, about Plaintiff Johnson's weight and sexual orientation. Julia Sell would make Plaintiff Johnson weigh in every week and tell Plaintiff Johnson she had to lose a certain number of pounds every week. Julia Sell told Plaintiff Johnson to keep her "lifestyle" out of the locker room and that Plaintiff Johnson's sexual orientation could make her teammates uncomfortable and distracted.[119]

2. Plaintiff Johnson was negatively impacted physically and psychologically by Julia Sell's behavior toward her and it disrupted Plaintiff Johnson's ability to play tennis well at LSU.[120]

3. Plaintiff Johnson did not make a report about Julia Sell's harassment because she was not aware she could report Julia Sell's conduct to the Title IX office, and she was also afraid of losing her scholarship.[121]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Kennan Johnson***

In is my opinion that Plaintiff Johnson's experience of enduring Julia Sell's harassment of her weight and sexual orientation without options to address it was a result of LSU's failure to properly train students and employees of the definition Title IX sex discrimination and provide students with appropriate information about their rights and resources. Plaintiff Johnson's lack of knowledge about her rights and resources and sense of helplessness was predictable and preventable. Failure to appropriately inform students of their rights and resources under Title IX was a pervasive problem throughout LSU according to the Complaint, HB Report, and USA Today article. Additionally, LSU failed to widely disseminate information about the Title IX Coordinator, the Title IX office's contact information, and the Title IX Policy, contrary to industry standards and practice in connection with Title IX compliance.

### F. Plaintiff Jane Doe

***Factual Background***

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. In October of 2018, Plaintiff Doe and John Poe, both students at LSU, met at a football game and formed a friendship. Soon after they started

---

[119] Complaint, pp. 69-72.
[120] Id.
[121] Id. at 73.

PLAINTIFFS_00002043

spending more time together, John Poe began to harass Plaintiff Doe. John Poe would get angry and call Plaintiff Doe derogatory names when Plaintiff Doe refused to spend time with him or perform sexual favors. In November of 2018, Plaintiff Doe blocked John Poe's number and blocked him on social media. However, John Poe's harassment continued through spring of 2019 and in one instance, John Poe groped Plaintiff Doe while she was out with a friend.[122]

2. Plaintiff Doe texted her former Resident Assistant about John Poe's harassment and she was advised to report it to the Title IX office. The same day, a Title IX office staff member went to Plaintiff Doe's dorm room to interview her about the allegations, and Plaintiff Doe stated that she did not feel safe and wanted to move out of her dorm room.

3. Plaintiff Doe was moved to a dorm building across campus that same day and was told she had three days to decide if she wanted to stay there and get a no-contact order.

4. Plaintiff Doe said she wanted a no-contact order but was not given further information about getting a no-contact order and she did not receive a copy of a no-contact order.

5. The Title IX Office initiated an investigation, which included four separate interviews for Plaintiff Doe by four different interviewers, and Plaintiff Doe had to repeat her account to each new interviewer.

6. Plaintiff Doe felt that the interviewers were condescending towards her, asked inappropriate questions, and intimidated her to the point that she cried, and the interviewers continued on as if nothing was wrong. The interviewers did not offer support or resources to Plaintiff Doe.[123]

7. On May 23, 2019, Plaintiff Doe met with Assistant Director of SAA Daniel DeLuca to discuss the status of her Title IX case. Plaintiff Doe was told by Director Deluca that her claim did not fall under Title IX. Director DeLuca then proceeded to interview Plaintiff Doe again about the basis of her claim.[124]

8. Plaintiff Doe never received an update from the Title IX office regarding a resolution to her case, was not told if John Poe was interviewed or disciplined, and the witnesses she identified were never interviewed.[125]

9. On March 10, 2021, Plaintiff Doe requested a copy of her file from LSU to determine if John Poe was found responsible or disciplined for his

---

[122] Complaint, pp. 74-75.
[123] Id. at 76.
[124] Id. at 77.
[125] Id. at 77.

PLAINTIFFS_00002044

harassment of her. In response, Plaintiff Doe received a copy of her file which contained a copy of LSU's Title IX Policy, notes from her interview with Director Deluca on May 23, 2019, and two Sexual Misconduct and Sexual Harassment (PM73) Complaint Forms dated March 21, 2019, and August 30, 2019, which incorrectly stated that Plaintiff Doe had not taken any action to stop John Poe's behavior. When Plaintiff Doe sought more information about whether John Poe was disciplined, Director Deluca said he could not give Plaintiff Doe any further information due to the Family Education Rights Protection Act ("FERPA").[126]

10. Plaintiff Doe stopped attending classes, was expelled from her classes, and lost her scholarship due to the negative impacts of Joe Loe's harassment and lack of support or accommodations from LSU.[127]

***Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Jane Doe***

Similar to the experience of other Plaintiffs discussed above, LSU improperly handled Plaintiff Doe's Title IX investigation after a mandatory report was made.

Plaintiff Doe was appropriately moved to a different residence hall as an interim measure and given the option to get a no-contact order. It's unclear why LSU did not implement a no-contact order after Plaintiff Doe requested one; they should have. A no-contact order would have been an appropriate interim measure in Plaintiff Doe's case given the nature of the harassment, the recent timing of the harassment, and the commencement of a Title IX investigation.

In addition, during the investigation, it was improper for investigators to be condescending, intimidating, ask inappropriate questions, and then fail to offer Plaintiff Doe support or resources when she was visibly upset in the interview. In my training and experience as a Title IX investigator, it was not the Title IX investigator's role to be intimidating or exert power over the interviewee. Title IX guidance provides that an investigator must be a "person free of actual or reasonably perceived conflicts of interest and biases for or against any party…. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation."[128] Being condescending, intimidating, and asking inappropriate questions is indicative of perceived or actual bias against the interviewee, and was improper.

As for the other mistakes made, for the same reasons already discussed above as to other Plaintiffs, LSU deprived Plaintiff Doe of her rights under PM-73 and Title IX when they failed to

---

[126] Id. at 78.
[127] Id. at 78-79.
[128] 2017 Q&A, p.4.

PLAINTIFFS_00002045

inform Plaintiff Doe of the status of the Title IX investigation, provide her with an investigation report that summarized all relevant inculpatory and exculpatory evidence and stated the outcome, and her right and option to appeal the outcome. Any investigation that occurred should have been documented. Failure to do any of the foregoing amounted to a material deprivation of Plaintiff Doe's rights under PM-73 and Title IX industry standards and practices.

### G. Plaintiff Corinn Hovis

*Factual Background*

I considered the following relevant facts, taken as true, excerpted from the documents I reviewed:

1. On January 24, 2020, Plaintiff Hovis, a student at LSU at the time, and John Loe, a highly recruited quarterback on LSU's football team, met at a bar in Tigerland. John Loe asked Plaintiff Hovis to go back to his residence that night and Plaintiff Hovis agreed though she was heavily intoxicated. John Loe took Plaintiff Hovis to an SUV and she black out almost immediately. John Loe raped Plaintiff Hovis while she was incapacitated in the SUV. Thereafter, John Loe's friend drove Plaintiff Hovis back to her residence hall.[129]

2. Later that night, Plaintiff Hovis subsequently reported to a Resident Assistant that she believed she was drugged and sexually assaulted that night, and Plaintiff Hovis also decided to file a report with LSUPD who forwarded her report to Baton Rouge Police Department ("BRPD") because the incident had occurred off campus. BRPD did not take a statement from Plaintiff Hovis. LSUPD took Plaintiff Hovis and her roommate to the hospital so she could obtain a Sexual Assault Nurse Examiner ("SANE") exam. The SANE found that Hovis's cervix was bruised. Meanwhile, LSU Residential Life personnel made a report to the Title IX office.[130]

3. On January 31, 2020, Defendant Stewart met with Plaintiff Hovis to explain her reporting options and Plaintiff Hovis decided to move forward with the Title IX investigation process. Plaintiff Hovis was offered support and accommodation assistance.

4. Investigator Scott conducted a Title IX investigation, which included interviews with Plaintiff Hovis, John Loe, and four witnesses.[131] On March

---

[129] Complaint, p. 81.
[130] Id.
[131] Id. at 82; HB Report, p. 128.

PLAINTIFFS_00002046

6, 2020, Investigator Scott concluded that John Loe violated the Title IX Policy by sexually assaulting Plaintiff Hovis on January 24, 2020.

5. In June of 2020, LSU suspended John Loe from May 10, 2020, to May 31, 2021 and issued a no contact directive ordering him to have no communication or contact with Plaintiff Hovis.

6. John Loe violated the no-contact directive twice by having his girlfriend contact Plaintiff Hovis on two occasions in May 2020. The no contact violation was reported to Defendants Stewart and Sanders, but no disciplinary action was taken against John Loe.

7. On August 6, 2020, John Loe transferred to another university to play football.

8. Plaintiff Hovis failed one of her classes and did poorly in other classes due to the negative impacts of the rape and the Title IX process. Plaintiff Hovis sought academic assistance through the Lighthouse Program and Disability Services. However, Plaintiff Hovis was forced to retake and pay for the class she failed, and was denied an extension of accommodations.[132]

### *Analysis of Opinion that LSU Failed to Comply with Title IX as related to Plaintiff Corinn Hovis*

Unlike the other Plaintiffs, LSU appeared to have made many appropriate decisions related to Plaintiff Hovis' Title IX report up to the failure to investigate the alleged no contact violation. Plaintiff Hovis made a voluntary report with LSUPD; she was assisted by LSUPD in getting a SANE at the hospital; the mandatory report to the Title IX office was made properly by the resident assistant; Defendant Stewart met with Plaintiff Hovis and appropriately informed Plaintiff Hovis of her rights and resources; a Title IX investigation was initiated and completed in a timely manner; and, sanctions were issued (though, in my opinion, expulsion is the proper sanction for a finding of rape).

Nevertheless, LSU made errors in failing to investigate the report of no contact violations and issuing disciplinary action if a no contact violation if violation was found, and failing to monitor and assist Plaintiff Hovis in removing barriers to her education at LSU as a result of her rape. Title IX requires that schools "took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, ***remedy its effects*** (emphasis added)."[133] If Plaintiff Hovis' academic struggles were due to the effects of the rape and Title IX process, which in my experience was a common experience for survivors, LSU should have properly trained its support

---

[132] Complaint, p. 83.
[133] 2001 Guidance, p. iii.

PLAINTIFFS_00002047

offices to work with the Title IX office in issuing accommodations and other assistance for students that were involved in a Title IX investigation. Plaintiff Hovis should have received academic assistance through the advocacy and support of the Title IX office, she should have been granted extensions, and she should not have had to pay for the class she failed.

LSU's failure to support Plaintiff Hovis after the Title IX investigation deprived Plaintiff Hovis of her right to receive remedies of the effects of her rape and resulting Title IX investigation, contrary to industry standards and practice in connection with Title IX compliance.

## IX. Conclusion

As explained in detail in this report, it is my expert opinion that LSU failed to meet industry standards and practice in connection with Title IX compliance and its own PM-73 policy as to each of the Plaintiffs. My opinion is based on the documents provided and reviewed, as referenced in this report, and my training, knowledge, and experience as an independent, Title IX professional. If presented with new, additional, or different information, my opinion may change.

This report was prepared exclusively for the use of the Court, legal counsel to the parties involved in this matter, and others who have a right to the information contained herein in the context of the subject legal proceeding. It is confidential and is not to be distributed to or relied upon by others. I reserve the right to amend, modify or supplement this report based upon the receipt of new or additional information as I have been informed by counsel that discovery is ongoing in this case.

Date: January 6, 2023

Signature:

PLAINTIFFS_00002048