Case 3:21-cv-00242-WBY-SDJ   Document 367-1 *SEALED* 07/10/23   Page 1 of 50
Case 3:21-cv-00242-WBY-SDJ   Document 470-1   10/13/23   Page 1 of 50

09/26/2022
Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, SAMANTHA BRENNAN,
CALISE RICHARDSON, JADE LEWIS,
KENNAN JOHNSON, ELISABETH          CASE NO.
ANDRIES, JANE DOE, ASHLYN          3:21-CV-00242
ROBERTSON, CORINN HOVIS, AND
SARAH BETH KITCH

VS.

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE, AND VERGE AUSBERRY,
MIRIAM SEGAR, JENNIE STEWART,
AND JONATHAN SANDERS, IN THEIR
INDIVIDUAL CAPACITIES

* * * * * * * * * * * * * * * * * * * * * * * *

*** CONFIDENTIAL TRANSCRIPT ***

*** SUBJECT TO PROTECTIVE ORDER ***

The deposition of SAMANTHA BRENNAN, taken in

connection with the captioned cause, pursuant to

the following stipulations before RITA A. DEROUEN,

Certified Court Reporter, at Phelps Dunbar, 400

Convention Street, Suite 1100, Baton Rouge,

Louisiana 70802 on September 26, 2022, beginning

at 9:06 am.

COURT REPORTERS OF LOUISIANA, L.L.C.
9522 Brookline Avenue, Suite 217
Baton Rouge, Louisiana  70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-mail:  depos@courtreportersla.com

# EXHIBIT A

Case 3:21-cv-00242-WBY-SDJ    Document 367-1 *SEALED* 07/10/23    Page 2 of 50    09/26/2022
Case 3:21-cv-00242-WBY-SDJ    Document 470-1    10/13/23    Page 2 of 50

Page 15

1        A.   Yes.

2        Q.   And did you drive your car?

3        A.   Yes.

4        Q.   So she was a passenger in your car?

5        A.   Yes.

6        Q.   Okay.  All right.  And so where did you go

7   that night?

8        A.   We went to Bogie's.

9        Q.   Okay.  And just for the record, Bogie's is

10   a bar?

11        A.   Yes.

12        Q.   Did you go anywhere besides Bogie's that

13   night?

14        A.   Not that I recall.

15        Q.   You don't recall going to Fred's?

16        A.   I don't remember.  It's possible.

17        Q.   Okay.  All right.  And Bogie's is a place

18   that you had been before that night or was that

19   your first time?

20        A.   I think I had been once prior to that.

21        Q.   So at this time -- okay.  So for the

22   record, you were born ████ of 1995, right?

23        A.   Yes.

24        Q.   So at this time, we're in September -- I'm

25   sorry, not September, July of 2016.  So at this

**EXHIBIT A**

1    Q.   Okay.   And how did you procure the fake
2    ID?
3    A.   Working at bars.   The bouncers would
4    confiscate them and then give them to the other
5    employees.
6    Q.   Okay.   And then you would affix a picture
7    to it or do something?
8    A.   No.   I just used someone else's picture.
9    Q.   Okay.   All right.   And let's see.   So
10   you're at the bar and you -- let's back up a bit.
11         How long had you been at LSU at this
12   point?
13   A.   I think just a couple months.   I'd lived
14   in Louisiana longer than I was a student at LSU.
15   Q.   Okay.   All right.   So let's look at
16   paragraph 291.   It says, "At the bar, Brennan ran
17   into another friend who worked for the media
18   department of the LSU football team."
19   A.   Yes.
20   Q.   Okay.   So the friend that's referenced in
21   that paragraph, is that ██████████?
22   A.   Yes.
23   Q.   Okay.   How long had you known ████ at that
24   time?
25   A.   Just a month or two probably.

# EXHIBIT A

Case 3:21-cv-00242-WBY-SDJ   Document 367-1 *SEALED* 07/10/23   Page 4 of 50
Case 3:21-cv-00242-WBY-SDJ   Document 470-1   10/13/23   Page 4 of 50

09/26/2022
Page 19

1    Q.  And so how well would you know him?  Were
2  you very close?
3    A.  No.
4    Q.  Okay.  How did you meet him?
5    A.  Through football recruiting.  He worked
6  for the media department.
7    Q.  Okay.  Do you recall if you had his phone
8  number at that time?
9    A.  I don't know.
10    Q.  Do you know if he had your phone number?
11    A.  I don't know.
12    Q.  Okay.  All right.  And so we then go to
13  paragraph 292, wherein it says that this friend,
14  who we now know to be ███████████, introduced you
15  to John Doe.
16       For the record, the person that we're
17  referring as to John Doe is ███████████,
18  correct?
19    A.  Yeah.
20    Q.  Had you ever met ███████████ prior to
21  that evening?
22    A.  No.
23    Q.  Had you heard about him before meeting him
24  that night?
25    A.  Yes.

# EXHIBIT A

1    Q.   Okay.   Did you know he was a football
2  player?
3    A.   Yes.
4    Q.   Did you know what position he played on
5  the team?
6    A.   Yes.
7    Q.   Okay.   Were you aware of any rumors
8  concerning him in the recruiting office?
9    A.   Yes.
10    Q.   Okay.   And what were the rumors that you
11  were aware of?
12    A.   That he -- his father was shot when he was
13  younger and he had kind of grown up with anger
14  issues.
15    Q.   Okay.   And anything besides that?
16    A.   No.
17    Q.   And let me back up.   I mean, I said in the
18  recruiting office.   But were you aware of any
19  other rumors beyond just the recruiting office?
20    A.   No.
21    Q.   Okay.   You weren't aware of any
22  relationships or any girls that he had dated or
23  seen in any respect?
24    A.   Not that I recall.
25    Q.   Okay.   Did you realize at the time that he

**EXHIBIT A**

1    lived in the same apartment complex as you?

2        A.  Yes.

3        Q.  Okay.  Had you seen him around the

4    apartment before?

5        A.  Not that I recall.

6        Q.  Now, still staying in paragraph 292, it

7    says Doe drove you home that night.

8        A.  Yes.

9        Q.  Okay.  And that is a true statement?

10       A.  Yes.

11       Q.  Okay.  Now, let me try to get some idea of

12   the time frame here.  So what time did you and

13   ████  arrive at Bogie's?

14       A.  I don't know.

15       Q.  Okay.  What time would the bar open?

16       A.  I also don't know.

17       Q.  Okay.  When you went to bars, was there a

18   general time you would try to arrive?

19       A.  Probably 9:00 or 10:00.

20       Q.  9:00 or 10:00.  And the bar would probably

21   close around 2:00?

22       A.  Probably.

23       Q.  Okay.  When you went to bars, would you

24   normally stay till it closes or would you leave

25   earlier than that?

# EXHIBIT A

Case 3:21-cv-00242-WBY-SDJ    Document 367-1 *SEALED* 07/10/23    Page 7 of 50   09/26/2022
Case 3:21-cv-00242-WBY-SDJ    Document 470-1    10/13/23    Page 7 of 50
Page 25

```
 1   you had driven there --
 2        A.   Yes.
 3        Q.   -- to the bar?
 4             Did you have any plan on how to get home
 5   if you had too much to drink to drive?
 6        A.   Uber.
 7        Q.   In an Uber, okay.  But you did not Uber to
 8   get home that evening?
 9        A.   Correct.
10        Q.   And I think you said this earlier, but I
11   just want to clarify.  So ███████████ drove you
12   home?
13        A.   Yes.
14        Q.   And he drove your car home?
15        A.   Correct.
16        Q.   Okay.  And what about █████ what happened
17   with regard to █████ Did he leave at the same
18   time as you and ███████
19        A.   Yes.
20        Q.   Okay.  So did he have his own vehicle?
21        A.   He drove ███████.
22        Q.   Okay.  So he drove ████████ vehicle back
23   to the same apartment complex where you lived, you
24   and ███████ both lived?
25        A.   Yes.
```

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 8 of 50    09/26/2022
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 8 of 50
Page 26

1      Q.  And how does ▮▮▮ then get back to

2  wherever he lives?

3      A.  I don't know.

4      Q.  Okay.  So you're not sure how ▮▮▮ --

5      A.  (The witness shook head.)

6      Q.  But did ▮▮▮ ever come to your apartment?

7      A.  No.

8      Q.  Okay.  All right.  All right.  While you

9  were at the bar with ▮▮▮ I know you didn't

10  really remember dancing or anything like that.

11  Was there any type of touching, kissing, anything

12  like that?

13      A.  I don't think so.

14      Q.  Okay.  So there was nothing, let's say, of

15  the romantic sort that happened?

16      A.  No.

17      Q.  Okay.  And so, at some point, did you and

18  ▮▮▮ end up in your apartment?

19      A.  Yes.

20      Q.  Okay.  And so he drove your car, you were

21  in your car.  Were you sick?  Do you know if you

22  threw up or anything like that?

23      A.  Yes.

24      Q.  Where did you throw up?

25      A.  In my car.

# EXHIBIT A

1    Q.   Oh, I'm sorry.

2    A.   In my bedroom.

3    Q.   Of your bedroom.  Okay.  All right.

4         And when you woke up, you were in your

5    bed?

6    A.   Yes.

7    Q.   Okay.  All right.  And so you woke up.  I

8    think we agree you woke up at some point on

9    July 10th.

10        Was it daylight when you woke up?

11   A.   Yes.

12   Q.   Okay.  So it was probably at least

13   6 o'clock in the morning, would you say?

14   A.   At least.

15   Q.   Okay.  Or was there a lot of daylight?

16   Was it like full -- like full daylight outside,

17   would you say, or was it still kind of dawn-ish?

18   A.   I don't remember.

19   Q.   Okay.  All right.  Did you feel hungover?

20   A.   Not that I recall.

21   Q.   All right.  And so it says in

22   paragraph 294 of the second amended complaint that

23   you woke up naked, and this led you to believe

24   that you had sex the night before; is that

25   correct?

# EXHIBIT A

1    A.   That's correct.

2    Q.   Now, other than being naked, were there

3  any other signs that led you to believe that you

4  had had sex the night before?

5    A.   There was a handprint on my butt.

6    Q.   Okay.  Was there -- so was it based -- was

7  the impression because of pressure, would you say,

8  or was it like some sort of ink?

9    A.   Not ink.

10    Q.   I'm just trying to get a sense.  Okay.

11    A.   Yes, like pressure.

12    Q.   Like it had been slapped?

13    A.   Yes.

14    Q.   Okay.  And I take it this was something

15  new to you?

16    A.   Yes.

17    Q.   Right.  Okay.  Anything besides that?

18    A.   Not that I recall.

19    Q.   And, of course, we talked about the

20  disheveled living room.  The furniture

21  arrangement, it was out of sync with how it

22  normally is?

23    A.   Yes.

24    Q.   I take it there were no clothing items

25  for, let's say, ███████ or any male person?

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ  Document 367-1 *SEALED* 07/10/23  Page 11 of 50
Case 3:21-cv-00242-WBV-SDJ  Document 470-1  10/13/23  Page 11 of 50  09/26/2022
Page 47

1  some point; is that -- well, when you woke up, he

2  wasn't there?

3      A.  Correct.

4      Q.  All right.  So according to the text he

5  sent you, he's indicating, I mean, by the fact

6  that he came back, he must have left at some

7  point, right?

8      A.  I think I recall the situation, but I

9  can't say for certain what happened.

10      Q.  Okay.  Now I'm curious.  The -- your

11  apartment, does it -- like do the doors lock

12  automatically when somebody exits?  At the time --

13  I know you're not there anymore, but at the time,

14  if somebody exited the apartment unit, would the

15  door automatically lock or would it have to be

16  locked from the inside?

17      A.  It would have to be locked from the inside

18  or a key on the outside.

19      Q.  Okay.  So if he left of his own volition

20  at some point in the night, I mean, he would have

21  had to lock it, I guess, in order to then return

22  and not be able to gain entry?

23      A.  I don't believe he came and left.  If I

24  remember correctly, he went to his apartment

25  first.  I told him he could come to my apartment

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 12 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 12 of 50   09/26/2022

Page 48

1   and I left my door unlocked.  And I think that

2   that's what he meant.  I don't think he came and

3   left.

4       **Q.  Okay.  Well, then, I'm really confused.**

5   **Okay.  So that text where he says he came back**

6   **last night -- he came by last night, that was**

7   **before you -- the two of you had gotten together?**

8       A.  No.

9       Q.  Okay.

10      A.  He dropped me off at my apartment, parked

11  my car.  I went to my room, he went to his.

12      Q.  Okay.

13      A.  I presume I invited him to my apartment,

14  so I left the door unlocked.  And he's saying he

15  came back to my place last night.

16      Q.  Okay.

17      A.  But we did not walk into my apartment

18  together.

19      **Q.  I see.  Okay, very good.  And that helps**

20  **putting this in the proper context.**

21      A.  Again, I don't remember that 100 percent

22  certain.  This was years ago.  But if I recall

23  correctly -- also, clearly drinking a lot -- that

24  is what I believe happened.

25      **Q.  Okay.  So just looking at this text, he**

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 13 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 13 of 50    09/26/2022

Page 49

1   sent this text to you for the first time July 10th

2   at 11:44 a.m., and he's looking for his wallet.

3   You say you found it.

4       A.  Yes.

5       Q.  And, "Can you keep it until I see you?

6   Thanks," he says.

7           You say, "Yeah, of course."

8           And then he says, "I came back to your

9   apartment last night."

10           And then you indicated, you know, you were

11   passed out -- must have been passed out.

12           And then he asked where you are.  And then

13   he says, "I'll come get it in a bit."

14           And then you say, "My apartment."

15           Okay.  I'm sorry, it repeats on the next

16   page so I got -- but okay.  And then you say,

17   "Okay, I'm probably leaving in 15 to 20 minutes."

18           And then he asked where you're going.

19           You're going to get your car detailed, you

20   say.

21           Is that because you had thrown up in your

22   vehicle the night before?

23       A.  Correct.

24       Q.  Okay.  All right.  And then he tells you

25   -- or he asks if it's okay if he gives your number

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 14 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 14 of 50

09/26/2022
Page 50

1   to a friend who is going to come pick up the
2   wallet?
3       A.  Yes.
4       Q.  Okay.  So there was no text exchange with
5   him at all until this one, July 10th at 11:44 that
6   morning?
7       A.  Correct.
8       Q.  Okay.  All right.  So anyway -- but you
9   said earlier that the two of you did not arrive
10  together at your apartment, he came later?
11      A.  We got to the building --
12      Q.  To the building of the complex.
13      A.  -- of the apartment at the same time, but
14  to my actual apartment unit, that was not
15  together.
16      Q.  Okay.  So you must have given him your
17  apartment number at some point?
18      A.  Yes.
19      Q.  Okay.  All right.  So when he says, "I
20  came back to your apartment last night," I mean, I
21  guess we don't really know what he means by that?
22      A.  I don't know.
23      Q.  Okay.  All right.  So you said earlier
24  you've never -- you didn't really see ███ around
25  the apartment complex after the events of July 9th

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 15 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 15 of 50    09/26/2022

Page 57

1  Lewis.

2      Q.  Okay.  So you approached Ms. Lewis?

3      A.  I believe so.

4      Q.  Okay.  And this was the same -- well, we

5  know by the time of the text that this was

6  July 22nd.  Okay.  So 10:10 a.m. is when this

7  stream starts.

8          So you were already in her office by

9  10:10 that morning?

10     A.  I don't know when the next text happened

11  exactly.

12     Q.  Well -- and I apologize, that is true.

13  But at some point in this exchange, you were in

14  her office?

15     A.  Yes.

16     Q.  What hours did you work in recruiting at

17  that point, do you recall?

18     A.  I don't.

19     Q.  Was there a certain number of hours you

20  would work a week?

21     A.  I don't recall.

22     Q.  Okay.  And do you recall like what time of

23  day you would show up for work?

24     A.  No.

25     Q.  Or what time you would leave?

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 16 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 16 of 50   09/26/2022

Page 58

```
 1      A.  No.

 2      Q.  Okay.  All right.  But at some point, fair

 3  to say, you were in the office of Sharon Lewis on

 4  that date?

 5      A.  Correct.

 6      Q.  Okay.  So you initiated the conversation

 7  with Ms. Lewis?

 8      A.  I don't know for sure.

 9      Q.  But you went to her office?

10      A.  I was in her office.

11      Q.  You were not summoned?

12      A.  That's what I don't know.

13      Q.  Okay.

14      A.  I can't remember the order of all of that,

15  all of the meetings.  I just know certain meetings

16  happened, I don't remember how or the order

17  exactly.

18      Q.  Okay.  All right.  So what was -- what was

19  discussed at that meeting with Sharon?  And I'm

20  just talking about a meeting with only Sharon.

21      A.  I told her that it came to my attention

22  that morning that a nude photo was taken and

23  shared and the only person that could have taken

24  it was ████████████.

25          And this is where I know I had a couple of
```

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 17 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 17 of 50    09/26/2022

Page 59

1  conversations with Sharon, but I believe in that

2  one she was very kind of harsh and distant.  And I

3  can't remember if I left and came back or if she'd

4  already spoken with ███████ because she had told

5  me at one point that ███████ claims he was never

6  in my apartment.

7     Q.  Okay.

8     A.  And I remember very clearly saying, Well,

9  that's funny, since I have text messages from him

10 asking for his wallet back from my apartment.  And

11 then Sharon Lewis's demeanor completely changed

12 and it was, as I said previously, more of a

13 protective mama bear instinct towards me came over

14 her.

15    Q.  Okay.  But it's your understanding that

16 she may have had some discussion with ███████

17 before speaking with you?

18    A.  At some point, yes, because I remember

19 that specific conversation of ███████ claiming

20 that he was never in my apartment.

21    Q.  Okay.  And you mentioned the text exchange

22 with ███████  Did you show it to her on your own

23 phone possibly?

24    A.  Yes, uh-huh.

25    Q.  And you explained kind of her reaction and

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 18 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 18 of 50   09/26/2022

Page 60

1    everything?

2        A.   (The witness nodded head.)

3        Q.   So at that point, you said her demeanor

4    changed.   What was the, I guess, plan of action at

5    that point from Ms. Lewis's perspective?

6        A.   She said she was going to have to go talk

7    to other people.   I don't recall exactly what she

8    said and how it ended.   I know at one point she

9    told me she had told Les Miles and that she would

10   get -- kind of follow back up with me.

11       Q.   Okay.   Now, at some point, you're in a

12   meeting with both Sharon Lewis and Miriam Segar;

13   is that correct?

14       A.   Yes.

15       Q.   Okay.   And do you recall that was the same

16   day as the initial meeting only with Sharon?

17       A.   It was the same day.

18       Q.   Okay.   All right.   And so -- and that is

19   expressed in paragraph 299 of your second amended

20   complaint, "Met with Sharon Lewis and Defendant

21   Segar at Sharon Lewis's request."

22       A.   Correct.

23       Q.   And that's your understanding, is that

24   Ms. Lewis, I guess, summoned you to that meeting?

25       A.   Correct.

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 19 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 19 of 50   09/26/2022
Page 61

1    Q.   Okay.  All right.  So at that point, you

2    meet Ms. Segar.  Had you ever had any involvement

3    with Ms. Segar before that day?

4    A.   I had not.

5    Q.   Did you know who she was at all?

6    A.   No.

7    Q.   Okay.  So at some point, you say here that

8    you believe that she was some sort of victim's

9    advocate.  I'm looking at 302, paragraph 302.

10         But was anything ever stated that you

11   recall specifically saying that she was a victim's

12   advocate?

13   A.   Can you say that question one more time?

14   Q.   Was there any statement that you recall

15   specifically wherein it was stated that Miriam

16   Segar was a victim's advocate?

17   A.   Not specifically.

18   Q.   Okay.  So you have the discussion of what

19   happened with the photo with Ms. Segar and

20   Ms. Lewis, right?

21   A.   Yes.

22   Q.   So I guess you basically tell them

23   everything that you recalled at that point?

24   A.   Correct.

25   Q.   And do you know -- so the text exchange

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 20 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 20 of 50   09/26/2022
Page 62

1    that you had, though, with ███████ you're pretty

2    certain that that referred to the meeting only

3    with Ms. Lewis, not the meeting with Ms. Lewis and

4    Ms. Segar?

5        A.   Correct.

6        Q.   Okay.  And about how long did the meeting

7    last with -- well, first off, how long did the

8    meting last, do you recall, with Ms. Lewis only?

9        A.   I do not recall.

10       Q.   Okay.  And then the second meeting with

11   Ms. Segar and Ms. Lewis, do you recall how long

12   that was?

13       A.   I do not.

14       Q.   Okay.  Now, you do state various

15   allegations here in your complaint about what you

16   wanted or what you expected as far as the result

17   of this conversation, what you were willing to do;

18   is that fair to say?

19            And you can look at this if you need to.

20   I mean, it's right there before you.  But did

21   you -- at this point in time, did you want to go

22   to the police?

23       A.   I was very confused and I wasn't sure what

24   I wanted.

25       Q.   Okay.  Do you recall telling them that you

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 21 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 21 of 50    09/26/2022

Page 63

1    did not want to go to the police at the time?

2        A.   No.

3        Q.   You don't recall making statements that

4    you did not want to go to the police?

5        A.   I do not recall those statements.

6        Q.   Okay.  Okay.  So it says, in

7    paragraph 308, "Sharon Lewis asked Brennan if she

8    wanted to initiate a police investigation or if

9    she wanted LSU to handle it internally."

10           Okay.  Paragraph 309, "Brennan told Sharon

11   Lewis that she wanted LSU to handle it

12   internally."

13           Then you say, at paragraph 310, "Defendant

14   Segar ignored Brennan's request and took Brennan

15   to the LSU Police Department to file a report."

16           So those are the allegations from your

17   second amended complaint.  Are those accurate?

18       A.   Not completely.  And I had -- after this

19   complaint was given to me, I had already e-mailed

20   my attorneys and let them know that this was not

21   completely accurate.

22       Q.   Okay.  So, okay, that's good to know.  I

23   appreciate your candor.

24           So what was the accurate representation of

25   what happened?

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 22 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 22 of 50    09/26/2022

Page 64

1    A.   I expected, I guess, to be shut down.
2    I've seen and heard, you know, movies that they
3    don't obviously want this to get out.  So I was a
4    little bit nervous and very confused.  And I
5    remember Sharon Lewis asking me if I wanted to
6    handle this officially or unofficially.

7    **Q.   Okay.**

8    A.   I was not sure what that meant.  I would
9    say officially, I assumed, presumed, that it was,
10   you know, an investigation and, you know, reports
11   and everything.

12        And I assumed unofficially would probably
13   mean that he was going to run like 100 killers at
14   practice that week.  But I wasn't sure.  But I
15   elected to do it unofficially.

16        But that is where Miriam Segar and Sharon
17   Lewis offered that I could go to the police and
18   file a police report if I wished.

19   **Q.   Was there indication by either one of them**
20   **that they thought a crime had been committed by**
21   **what he did?**

22   A.   If they encouraged me to make a police
23   report, I would assume that they had thought it
24   was police-worthy.

25   **Q.   Okay.  And was that a fair estimation in**

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 23 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 23 of 50   09/26/2022

Page 65

1   your mind, that it was police-worthy?

2        A.   Yes.

3        Q.   Okay.  All right.  And so let's see.  And

4   you said some of these allegations were not

5   correct, but I just want to focus in.

6             It says at 310, paragraph 310, "Defendant

7   Segar ignored Brennan's request and took Brennan

8   to LSU Police Department to file a report."

9             Kind of making it -- I mean, the way it

10  leads, to me, it's kind of like you were coerced

11  into going to the police department; is that

12  correct?

13       A.   That is not correct --

14       Q.   Okay.  So you were not --

15       A.   -- from my recollection.

16       Q.   Okay, very good.  And I'm sorry to talk

17  over you.

18            So Miriam Segar did not force you to go to

19  the police department?

20       A.   No.  I would say she encouraged.

21       Q.   Okay.  So in your mind, was she

22  supportive?

23       A.   Yes.

24       Q.   Okay.  And how did you get to the police

25  department?

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 24 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 24 of 50
Page 66

1    A.  I can't quite remember if we drove

2    separately or together, but I know a car is how I

3    got there, and Ms. Segar came with.

4    **Q.  Okay.  And when you had the meeting -- and**

5    **I apologize, I should have covered this earlier.**

6    **The meeting was held where?  The two**

7    **meetings, the meeting with Sharon and the meeting**

8    **with both of them after that, what building were**

9    **those held in?**

10   A.  It was in the Football Operations Building

11   in Sharon Lewis's office.

12   **Q.  Both meetings were in Sharon's office?**

13   A.  Yes.

14   **Q.  Okay.  Okay.  So then at some point,**

15   **either separately or together, but Ms. Segar**

16   **escorts you to the police department, LSU Police**

17   **Department?**

18   A.  Correct.

19   **Q.  Okay.  All right.  Was she able to go in**

20   **with you to make your report?**

21   A.  I believe she walked in with me, but they

22   wouldn't allow her in the interrogation room, I

23   guess, is what they kind of brought me to.

24   Because I remember sitting there alone in a

25   concrete box.

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 25 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 25 of 50    09/26/2022

Page 67

1    Q.  Goodness, okay.  Did you have to wait a

2    while before an officer came in to interview you?

3    A.  I don't believe it was very long.  I mean,

4    he wasn't there waiting for me when I got in

5    there, but I think it was pretty quick.

6    Q.  Okay.  But you did have to wait for some

7    period of time before the officer arrived?

8    A.  Yeah.  I remembered feeling like I was the

9    one in trouble, not making a police report.

10   Q.  Okay.  So let's look at that next

11   paragraph, 311.  It says, "Brennan met with LSU

12   P.D. officer who attempted to coerce her into

13   pressing charges against John Doe."

14        So I guess I need to just make sure and

15   clarify, is that an accurate statement?  Were you

16   coerced -- did they attempt to coerce you into

17   pressing charges?

18   A.  I wouldn't use the word "coerce"; I would

19   also use the word "encourage."

20   Q.  Okay.  Would you say there's a pretty big

21   distinction between "coercion" and

22   "encouragement"?

23   A.  Yes.

24   Q.  Okay.  So the LSU Police Department

25   officer who was taking the report, I mean, was

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 26 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 26 of 50    09/26/2022

Page 68

1    this him being in a supportive role?

2        A.   Yes.

3        Q.   Did you appreciate that?

4        A.   I did.  Again, I thought I would be shut

5    down and try to make my statements be quiet and go

6    away.  So I was very surprised.

7        Q.   Okay.  And I apologize if I didn't say

8    this earlier, but what Miriam Segar did as far as

9    encouraging you to go to the police department,

10    did you find that was also -- were you

11    appreciative of that?

12        A.   I was, and I believe I texted her a thank

13    you.

14        Q.   And as it so happens, that was going to be

15    my next exhibit, so I appreciate the segue.

16            Okay.  So Exhibit 5 is going to be a text

17    exchange with Miriam Segar.

18            (Exhibit 5 was marked.)

19    BY MR. CODY:

20        Q.   So do you have it in front of you?

21        A.   I do.

22        Q.   Okay.  All right.  So does this appear to

23    be the text exchange that was just referenced?

24        A.   Yes.

25        Q.   Okay.  And so for the record, this is with

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ     Document 367-1 *SEALED* 07/10/23     Page 27 of 50
Case 3:21-cv-00242-WBV-SDJ     Document 470-1     10/13/23     Page 27 of 50     09/26/2022

Page 69

```
 1   Miriam, it says it at the top.  And the time
 2   stamp -- there's two different time stamps,
 3   3:16 p.m., July 22nd, at the top, and the message
 4   is, "This is Miriam with Athletics."  Okay?
 5           And then it looks like your response to
 6   that was then at 4:29 p.m. on the same day.  You
 7   say, "Thanks again so much.  I really appreciate
 8   everything you did today."
 9           And then Miriam responds and says, "No
10   problem.  Let me know if you need anything."
11           Okay.  So that's an accurate
12   representation of the exchange that you had with
13   Ms. Segar on that day?
14       A.  Yes.
15       Q.  Okay.  So you were, in fact, appreciative
16   of what she had done?
17       A.  I was.
18       Q.  And at the beginning of that text exchange
19   it says, "This is Miriam with Athletics."
20           What did that mean to you?
21       A.  That she worked with athletics.
22       Q.  Okay.  So -- and you didn't know exactly
23   what her role is, it's safe to say, at the time of
24   the meeting with her, I suppose?
25       A.  Not that I recall.
```

**EXHIBIT A**

1    Q.   Okay.  But you just said that, you know,
2  you assumed, based on this, that she was with
3  athletics?

4    A.   Based on her words.

5    Q.   Okay.  So -- and that could be the
6  athletics department?

7    A.   Could be.

8    Q.   Okay.  But she gives no indication here of
9  being some sort of victim's advocate; is that
10  true?

11    A.   True.

12    Q.   All right.  And she closes with saying,
13  "Let me know if you need anything."

14      So after this, I mean, you were
15  appreciative of what she did for you, you said
16  earlier.  So if you needed something after this
17  date, you could have reached out to Ms. Segar.

18      You had her phone number here in your
19  contacts, I guess, or you could have gone back to
20  this exchange, correct?

21    A.   Correct.

22    Q.   Okay.  But you did not?

23    A.   I did not.

24    Q.   Okay.  Now, you state in paragraph 301 --
25  so we're backing up a little bit here -- yeah,

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 29 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 29 of 50    09/26/2022

Page 74

1   also corrected that with my attorneys.

2       **Q.  Okay.  And I think we'll get to that in**

3   **just a bit.**

4       A.  Yes, I have never claimed rape.

5       **Q.  And I appreciate, again, the candor.**

6   **Thank you.**

7           **All right.  So let's look next at the**

8   **police report.  And so I'm going to mark this as**

9   **Exhibit 6.**

10          (Exhibit 6 was marked.)

11      A.  Can I make a clarification on my last --

12  BY MR. CODY:

13      **Q.  Yes, of course.**

14      A.  I did do an interview with a reporter that

15  laid out facts that did allude that I was raped.

16  So if that gets brought into light, I do want to

17  say that that might say it, but I have not pursued

18  it elsewhere, if that makes sense.

19      **Q.  Okay.  And I think I'm going to**

20  **probably -- that's going to be in my questions**

21  **later.**

22          **But just right now, since you brought it**

23  **up, if that statement was, in fact, in something**

24  **to a reporter, like an e-mail to a reporter or**

25  **something like that, you agree that that's**

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 30 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 30 of 50    09/26/2022

Page 75

 1  inaccurate?

 2      A.   I would say that, based on Louisiana law,

 3  I was not able to consent to any sexual relations,

 4  but I can't for certain say sexual relations

 5  occurred.

 6      Q.   And I appreciate the legal theory.

 7      A.   I don't remember.

 8      Q.   But I just -- you know, before -- well,

 9  you did not previously allege rape?

10      A.   Correct.

11      Q.   In any of the accounts that you had had,

12  other than the one that you mentioned a moment

13  ago, you did not say that he had actually raped

14  you?

15      A.   Correct.

16      Q.   Okay.  All right.  Okay.  So at this

17  point, I think you should have Exhibit 6 in front

18  of you.

19      A.   I do.

20      Q.   And I know you have, maybe not for a

21  while, but you did obtain this.  So does this

22  appear to be the police report for LSU P.D.?

23      A.   It does.

24      Q.   Okay.  All right.  So you're familiar with

25  this document?

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ Document 367-1 *SEALED* 07/10/23 Page 31 of 50
Case 3:21-cv-00242-WBV-SDJ Document 470-1 10/13/23 Page 31 of 50 09/26/2022
Page 79

1    So you had a chance to review that with

2  your attorney?

3    A.   I did.

4    Q.   Okay.  And so it says -- and, you know,

5  I'm paraphrasing here, but you have the document

6  in front of you.

7    So basically, you met with Sergeant Bodine

8  and you stated that a coworker saw a nude picture

9  of you.  And I asked you before we broke if that

10  was ████████  or somebody else?

11    A.   I, in here, read that it's saying that I

12  heard a nude photo was floating around, not saw.

13    Q.   Okay.  And I'm just reading the -- I mean,

14  and it may be clarified farther down, and I'm just

15  looking at that first few lines, "who stated a

16  coworker saw a nude picture of her that was being

17  passed around."

18    A.   Oh, okay.

19    Q.   But are you aware of anybody -- are you

20  aware of actually who saw the picture?

21    A.   I'm not 100 percent sure.

22    Q.   Okay.  Okay.  And so you arrived that

23  morning, the report goes on to say, at the

24  Football Operations Building.  You were approached

25  by several friends, okay, saying they heard a nude

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 32 of 50    09/26/2022
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 32 of 50
Page 80

1  picture of you was floating around.

2      So you mentioned ██████ but who were the

3  other people included in "several friends"?

4      A.  I use the word "friends" lightly.

5      Q.  Okay.

6      A.  But probably ██████ ██████ I know her

7  and I discussed it.  I don't recall who else I

8  would be talking about.

9      Q.  Okay.  So ██████ ██████ ██████ we don't

10 remember her last name, but nobody else that you

11 would put in that category of people that

12 approached you, whether friends or not?

13     A.  I don't have any other recollection.

14     Q.  Okay.  Okay.  All right.  But it does go

15 on to say none of the friends who approached you

16 actually saw the image.  And as far as you know,

17 ██████ didn't see it.  And what about ██████

18     A.  At this point, I don't recall.  I know

19 that after I went to the police station, more

20 people had seen it, but I don't know at what point

21 they had seen it or been told.  This was just the

22 initial, what I knew that day.

23     Q.  And when you say you know that more people

24 had seen it after you went to the police station

25 and filed your report, what's your basis for that

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ     Document 367-1 *SEALED* 07/10/23     Page 33 of 50
Case 3:21-cv-00242-WBV-SDJ     Document 470-1     10/13/23     Page 33 of 50   09/26/2022

Page 82

```
 1   Bodine the events of that night and you
 2   indicate -- and I'm looking at the last line of
 3   the second paragraph -- "She was too intoxicated
 4   to drive home, so ███ and ███ decided they
 5   would drive her and her vehicle back to her
 6   apartment."
 7         And I think you said earlier that that is
 8   accurate with regard to your memory, right?
 9      A.  Yes.
10      Q.  Okay.  All right.  And it says in the next
11   paragraph that "███ drove your vehicle and ███
12   followed."
13         And that is also accurate, correct?
14      A.  That is accurate.
15      Q.  All right.  Now, if you go farther down
16   into that third paragraph, about four lines down,
17   it says, "She believes ███ and her fooled around
18   in her apartment, especially on the couch."
19         And I know that, you know, of course, this
20   is like six years ago.  I mean, the events of
21   this -- I mean, nobody's memory is going to be
22   crystal clear, certainly.
23         But would this be an accurate description,
24   do you believe, of what happened on, I guess, the
25   wee hours of July 10th?
```

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 34 of 50 09/26/2022
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 34 of 50

Page 83

```
 1        A.   Yes.
 2        Q.   Okay.  All right.  So to continue on, now
 3   it says farther down, I guess another four lines
 4   down from where we just read, "She did not feel as
 5   if she was assaulted."  And I think that's also
 6   consistent with what you said earlier.
 7             Do you believe that's an accurate
 8   statement, "She does not feel she was assaulted"?
 9        A.   I don't feel like I was.
10        Q.   Right.  Okay.  And it explains about how
11   you found ██████ wallet in your couch cushion.
12   And then it goes on to describe the picture, the
13   nude photo, okay.
14             And it says, "The picture that was being
15   passed around was of her naked standing in a
16   doorway inside of her apartment."
17             Now, this description -- I mean, obviously
18   the officer hasn't seen it, I'm assuming, right?
19        A.   I would assume as well.
20        Q.   Okay.  And you were -- you either --
21   you're not sure if you saw it or not at this
22   point?
23        A.   I believe I had not.  I believe I was just
24   told about it.
25        Q.   So this description that you're providing,
```

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 35 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 35 of 50   09/26/2022

Page 84

1    that was secondhand from whoever did see it?

2         A.   Correct.

3         Q.   All right.   But it says "standing in a

4    doorway inside of her apartment."   Did it -- this

5    doesn't explain exactly -- I mean, was -- was your

6    head or the person's head visible in the shot?

7    Was there anything like that?   It doesn't say

8    here, but --

9         A.   The person, as in me?

10        Q.   The person, as in the object of the

11   photograph.

12        A.   I was in the photo, my full body.

13        Q.   So you're certain of that?

14        A.   Yes.   I had later seen it.

15        Q.   At the time of this report, you were not

16   certain; is that fair to say?

17        A.   Right.   I don't believe I had been shown

18   it at this point.

19        Q.   But later you did actually see the

20   picture?

21        A.   Yes.   Because I remember wondering like

22   did I like somehow pose for this, and I wanted to

23   see it to see if I had or not.   And once I saw it,

24   it confirmed that I was very caught off guard,

25   like I was not actively allowing this picture to

## EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 36 of 50    09/26/2022
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 36 of 50

Page 86

1  was just one photograph, though, correct?

2      A.  Correct.

3      Q.  All right.  And did you have a -- and, you

4  know, we have to -- I don't have the benefit of

5  having seen it, so I have to rely on your memory,

6  but was there a surprised look on your face or

7  anything like that in the picture?

8      A.  No.  I wasn't -- from what I recall, I

9  wasn't actively like looking at the camera.

10     Q.  Okay.  And do you believe it was taken

11 like with a conventional camera or with a phone

12 with a camera?

13     A.  A phone.

14     Q.  Okay.  But you would have been facing

15 the -- where the -- the onlooker with the camera,

16 I suppose?

17     A.  Yes.

18     Q.  Okay.  But you don't recall him

19 ever -- you know, seeing ███████████ with the

20 phone taking a picture of you?

21     A.  Correct.

22     Q.  Okay.  So if he did so, he did so with

23 some sort of like kind of clandestine means, I

24 suppose?  He was, you know, not obvious about it?

25     A.  Right.

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 37 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 37 of 50    09/26/2022

Page 89

```
 1         So yeah, still looking at this report,
 2  there is a page attached to it, it's called LSU
 3  Sexual Violence Confidentiality Notice and Waiver.
 4  And that's Bates stamped 10.
 5         And it appears to have -- and you tell me,
 6  but is that your signature at the bottom?
 7     A.  Yes.
 8     Q.  And that's your name and your phone number
 9  and your e-mail address?
10     A.  Yes.
11     Q.  And it's dated July 22, 2016?
12     A.  Yes.
13     Q.  Okay.  And so at this point, is it fair to
14  say you did not want your information to be
15  shared, you wanted to remain anonymous?
16     A.  Correct.
17     Q.  Okay.  And, again, I mean, you wanted time
18  to think about it.  I mean, this wasn't the final
19  word on this issue, whether you were going to
20  pursue it or not; is that fair?
21     A.  Right.
22     Q.  Okay.  Now, after the -- this report was
23  taken, and that -- again, that was Sergeant
24  Bodine, I believe -- there was a follow-up
25  conducted by a Detective Jeffery Melchior, if I'm
```

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 38 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 38 of 50    09/26/2022

Page 90

1    pronouncing it correctly.  And it looks like it's

2    on Bates Plaintiffs Number 8 of the report.  And

3    it's pretty brief.  But that -- is that accurate

4    to your recollection?

5              First off, this is part of the report, but

6    you recall seeing this?

7        A.  I recall seeing this page or -- what's

8    your question?

9        Q.  Do you recall seeing this page?

10       A.  Yes.

11       Q.  Okay.  And, unfortunately, we don't have

12   any type of time stamp or anything with this

13   supplement.  And I'm calling it a supplement

14   because the narrative title says, "Supplement 2

15   added by Detective J. Melchior," toward the top.

16             But do you have any recollection of when

17   this contact that's described in this supplemental

18   report, when that occurred?

19       A.  Not exactly, but I recall it happening.

20       Q.  Okay.  So you do recall a conversation --

21   well, and I'm just trying to make sure, was this a

22   face-to-face conversation or telephone?

23       A.  It was a phone call.

24       Q.  A phone call, okay.  And so you do

25   recall -- and I guess did he initiate the call?  I

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 39 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 39 of 50    09/26/2022

Page 91

1    mean, I think it says "made contact."  He made the

2    contact, right?

3        A.  Correct.

4        Q.  Okay.  And so he was following up with you

5    about -- you know, after your initial report,

6    which we know was on July 22nd?

7        A.  Yes.

8        Q.  Okay.  Based on the dates we have here and

9    everything.

10           And we just don't know when this was.

11    Let's just try to get some idea.  So you think it

12    was still July when you had this, or was it

13    already into August, perhaps?

14       A.  I don't know for sure.

15       Q.  Okay.  Were you still at LSU when he

16    reached out to you?

17       A.  I think so.

18       Q.  Okay.  So -- and we'll get into this

19    later, but you -- about a month later, you had

20    left LSU?  At least by a month later you had left

21    LSU, correct?

22       A.  Temporarily.

23       Q.  Okay, yeah.  But you were out of town,

24    say, August 22nd?

25       A.  Yes, around that time.

## EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 40 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 40 of 50    09/26/2022

Page 92

1    Q.  All right.  But you don't recall if you
2    were still in town or had left or out of town at
3    the time that he initiated this contact?
4    A.  If I had to guess, I believe it was when I
5    was still at LSU, but I can't say for certain.
6    Q.  Okay.  All right.  So it says here he made
7    contact to follow up.  During the contact, it
8    talks briefly about the case.  It says here that
9    you were preparing to return home.  Okay.  So that
10   actually probably gives us some context then.
11       So at some point, you said you went back
12   briefly to home.  And you were saying home at that
13   point was Minnesota?
14   A.  Yes.
15   Q.  Okay.  So you were getting ready to go to
16   home, Minnesota.  And so you must have still been
17   at LSU, I guess it's safe to say?
18   A.  I would agree.
19   Q.  Okay.  And then it says you still wished
20   to not pursue charges against the accused and also
21   wished to remain anonymous.  And it says, "As it
22   relates to LSU Care, Title IX, Lighthouse,
23   et cetera."
24       Okay.  Now, you know, I know this was six
25   years ago, but do you recall exactly the

**EXHIBIT A**

1  discussion about not pursuing the charges even at

2  this point, this follow-up report?

3      A.  Say that again, please.

4      Q.  Do you recall a specific discussion with

5  Detective Melchior about not pursuing charges on

6  whatever date this was?

7      A.  I remember he was very encouraging to --

8  if I remember correctly, to press charges.  Like

9  everybody was very encouraging.  And I had the

10 feeling that like there was a unanimous decision

11 that I -- like nobody tried to keep me from

12 pressing charges.  But that's all I really recall

13 about that conversation.

14     Q.  And when you say "nobody" -- so we've got

15 a few different defendants in this lawsuit.  And I

16 mentioned specifically Miriam Segar, but Verge

17 Ausberry is also a defendant in this lawsuit.

18         Are you aware of him ever trying to

19 dissuade you?  Did you have any interaction at all

20 with Verge Ausberry?

21     A.  I had no idea who he was.

22     Q.  Okay.  So there was no attempt by Verge

23 Ausberry to dissuade you from pursuing charges?

24     A.  I don't believe I've ever talked to him.

25     Q.  And what about -- we have other

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 42 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 42 of 50

Page 94

1   defendants -- Jennie Stewart?

2        A.   I had never heard of her until this

3   lawsuit came to be.

4        Q.   Okay.   And what about Jonathan Sanders?

5        A.   Same, I had never heard of him.

6        Q.   Okay.   And anybody else affiliated with

7   LSU at all that you can think of that tried to

8   discourage, dissuade, prevent you from pursuing

9   charges against ████████ █████

10       A.   Yes.   My coworker, ██████ and █████

11   Dudley.

12       Q.   Okay.   So those were student workers?

13       A.   Yes.

14       Q.   But anybody affiliated with the actual,

15   you know, administration?

16       A.   No.

17       Q.   Okay, very good.   And we'll get into that

18   shortly, what you just alluded to.

19            All right.   So we talked about the

20   discussion about whether to pursue charges when

21   you had this interaction with Detective Melchior.

22            And do you recall at all about insisting

23   that you would still remain anonymous at that

24   time?

25       A.   I know I had that waiver that I had to

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 43 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 43 of 50    09/26/2022

Page 95

1  sign initially, but I don't recall.  And the

2  follow-up question to that, but I -- that doesn't

3  mean it didn't happen, I just don't remember.

4      Q.  And in that same sentence, I'm looking at

5  the first paragraph of this Supplement Number 2,

6  it says, "Anonymous as it relates to LSU Care,

7  Title IX, Lighthouse, et cetera."

8          Do you remember any specific discussion

9  about LSU Care?

10     A.  I don't know specifically LSU Care.  I

11  know that I was offered to go to like a clinic and

12  get checked out, checked for STDs, stuff like

13  that.

14     Q.  Okay.  And who offered to take you -- or

15  for you to go to a clinic?

16     A.  I don't remember if it was Mr. Bodine or

17  Melchior, one of -- somebody at the police

18  department.

19     Q.  So definitely somebody with the police

20  department.  Okay.

21     A.  Yes.

22     Q.  Were you concerned about potentially

23  having an STD?

24     A.  I was naive thinking it wouldn't happen to

25  me.  So not really at the time.

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 44 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 44 of 50   09/26/2022

Page 96

1    Q.  And just for clarification, are you aware
2  of any STD contracted from this event?
3    A.  I did not have an STD contracted from this
4  event.
5    Q.  And with regard to those other things that
6  are specifically listed at the end of that
7  paragraph, Title IX, was there a discussion of
8  Title IX with Detective Melchior that you can
9  recall?
10    A.  I don't recall.
11    Q.  Okay.  And what about with regard to the
12  Lighthouse?
13    A.  I don't recall.
14    Q.  Okay.  But could it have happened and
15  maybe your recollection just isn't 100 percent
16  today?
17    A.  It could have happened.
18    Q.  Okay.  All right.  And so then we go on to
19  the second paragraph.  And it says that you
20  advised, after returning home, you planned to
21  reflect on everything, and then advise that if you
22  decided to pursue charges or seek help, that you
23  would notify Detective Melchior directly; is that
24  accurate?
25    A.  Yes.

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 45 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 45 of 50    09/26/2022
Page 97

1    Q.  Okay.  And it looks like he indicates that
2    he gave you his contact information and reiterated
3    that LSU P.D. and the University were here for
4    you.
5         Is that -- do you recall him saying that
6    or any discussion of being there for you or
7    anything of that nature?
8    A.  I do not recall.
9    Q.  Could it have happened?
10   A.  It could have happened.
11   Q.  Okay.  When he called you, did he call you
12   on your cell phone, do you know?
13   A.  Yes.
14   Q.  Okay.  Did you have like a landline at
15   all, or was it only a cell phone back then?
16   A.  Just a cell phone.
17   Q.  Okay.  So any telephone communication with
18   you would have been through cell phone?
19   A.  Correct.
20   Q.  Okay.  Do you know if you still have --
21   well, let me back up.
22        Were there any text messages that you can
23   recall with Detective Melchior?
24   A.  Not that I recall.
25   Q.  What about any text messages with Sergeant

**EXHIBIT A**

1  told your attorneys that was incorrect?

2      A.  Yes.  It's in here.  I believe it's in

3  reference to the board of advisers or regents,

4  that they were aware that I was raped.  But I made

5  clear that that was a typo and a clerical error.

6      Q.  Okay.  And that's fair.

7          I want to turn your attention to

8  paragraph 192, which appears on page 28 of the

9  second amended complaint.  And it's at the bottom

10  of page 28.

11          MS. TRUSZKOWSKI:

12              You said 192?

13          MR. CODY:

14              Yes.  Paragraph 192, pa█████████

██████████████████████

██████████████████████████████d this is really

17  allegations regarding Calise Richardson.  But here

18  it says, "At this point in time, the athletics

19  department had received at least two other rape

20  accusations against John Doe," who we know to be

21  ████████████, "from both Plaintiffs Brennan and

22  Robertson."

23          And just as you said a moment ago, I mean,

24  this would not be an accurate statement with

25  regard to yourself?

**EXHIBIT A**

```
 1        A.  I have not claimed that I was raped.
 2        Q.  Okay, very good.  Okay.  Let's see.  And
 3   moving on, okay, so if we look at paragraph 298 --
 4   so we're jumping back to the section that involves
 5   your claims.  Okay?
 6             All right.  So it says here, "The
 7   photograph was taken without Brennan's consent
 8   while she was incapacitated on the night of
 9   July 9, 2016."
10             All right.  Now, we heard a moment ago in
11   your own words you have seen the picture, not at
12   the time of the initial police report at least,
13   but you have since seen the picture.
14             Were you incapacitated at the time it was
15   taken?
16        A.  I -- can you --
17        Q.  When I hear "incapacitated" and there's
18   drinking involved, I'm thinking passed out drunk,
19   probably lying on the floor.
20        A.  I was not passed out or lying on the
21   floor.
22        Q.  So you were -- you were standing?
23        A.  I was standing.
24        Q.  And you were in the doorway of your
25   bathroom, I think you said?
```

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 48 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 48 of 50    09/26/2022
Page 105

```
 1       A.  Yes.
 2       Q.  Were you getting ready for something?
 3   Were you doing anything in the bathroom that you
 4   can think of?  I don't want to intrude too much, I
 5   just want to -- I mean, so you were able to walk?
 6       A.  Yes.
 7       Q.  You were able to stand up?
 8       A.  Yes.
 9       Q.  So if you were ditzy or something from
10   alcohol, I mean, you were at least able to
11   ambulate around your apartment?
12       A.  Correct.
13       Q.  Okay.  All right.  And so when it says
14   "incapacitated," I guess -- I mean, do you think
15   that "incapacitated" is a proper description of
16   how you were at the time the picture was taken?
17       A.  Based on your definition of
18   "incapacitated," no.
19       Q.  And I don't want to put words in your
20   mouth.  I mean, I just want to understand and
21   appreciate I guess what -- you know, does that
22   truly capture how you were at the time it was
23   taken?
24           And you already said you were surprised by
25   it or unaware of it, right?
```

**EXHIBIT A**

Case 3:21-cv-00242-WBV-SDJ    Document 367-1 *SEALED* 07/10/23    Page 49 of 50
Case 3:21-cv-00242-WBV-SDJ    Document 470-1    10/13/23    Page 49 of 50    09/26/2022

Page 106

1    A.  I did say that, yes.

2    Q.  Okay.  And I just want to know that -- I

3    mean, you know, you were aware somewhat of your

4    surroundings at the time it was taken?

5    A.  Somewhat, yes.

6    Q.  Enough to be able to ambulate around your

7    apartment.

8        Do you recall falling down at all?

9    A.  I do not recall.

10    Q.  Okay.  All right.  So let's talk about

11    what happened after the police report.  So you're

12    still at LSU.  So we're talking late July of 2016.

13        At some point, you make a decision to

14    leave LSU; is that right?

15    A.  Just to go home, or to unenroll in the

16    University?

17    Q.  Well, that's what I'm trying to

18    understand.  So at some point you went home just

19    for a visit, I guess, in August?

20    A.  I was between apartments.  My lease was

21    ending at one and another one was starting.  And

22    thankfully I missed the Great Flood of 2016 in

23    that time.

24    Q.  You were fortunate.

25    A.  So I think it was meant to be.

# EXHIBIT A

Case 3:21-cv-00242-WBV-SDJ   Document 367-1 *SEALED* 07/10/23   Page 50 of 50
Case 3:21-cv-00242-WBV-SDJ   Document 470-1   10/13/23   Page 50 of 50

09/26/2022
Page 115

```
 1   of you going to file the police report against
 2   ██████████.
 3        A.  Yes.
 4        Q.  Okay.  Were there any other ways that you
 5   feel like you were subjected to a hostile work
 6   environment at the recruiting office?
 7        A.  No.
 8        Q.  Okay.  And in paragraph 779, right below
 9   that, it states that you were "subjected to
10   additional harassment by failing to take action
11   against ██████ even while already aware ██████ had
12   assaulted Richardson."  779, is that accurate?
13            Well, first off, did what I read, is that
14   what it says, but then is that an accurate
15   statement?
16        A.  I thought -- I thought Calise Richardson's
17   incident happened after mine with ██████
18        Q.  And that was going to be my next question.
19   That was my understanding too.
20            So this is not an accurate statement?
21        A.  I would agree that that would not be, to
22   my knowledge, since I believe Calise's incident
23   with ██████ was after mine, not prior.
24        Q.  Okay, very good.  Thank you.
25        A.  But I would say that that would be
```

# EXHIBIT A