UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * * * *

ABBY OWENS, ET AL.
VERSUS
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERISTY AND
AGRICULTURAL AND MECHANICAL COLLEGE, ET AL.

CASE NO.:3:21-cv-00242          DIVISION: WBV-SDJ
JUDGE WENDY B. VITTER    MAGISTRATE JUDGE JOHNSON
JURY DEMANDED

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF MIRIAM SEGAR

TAKEN AT THE OFFICE OF SHOWS, CALI & WALSH
628 ST. LOUIS STREET,
BATON ROUGE, LOUISIANA 70802
ON NOVEMBER 1, 2022
BEGINNING AT 9:26 A.M.

REPORTED BY:
KRISTINA MARIE CARTER, CCR
CERTIFIED COURT REPORTER

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ   Document 470-6   10/13/23   Page 2 of 16
Case 3:21-cv-00242-WBV-SDJ   Document 367-6 *SEALED* 07/10/23   Page 2 of 16   11/01/2022
Page 242

01   A.     I reported to Jennie, in that instance, directly to

02   ask her how to put something in when I didn't have

03   any information about it, any details and I could

04   not talk to the student at the time.

05   **Q.     Okay.  Do you recall ever taking any complainants to**

06   **the police?**

07   A.     I did, yes.

08   **Q.     Okay.  What do you recall about that?**

09   A.     I remember taking Samantha Brennan to the police

10   station.

11   **Q.     How did that come about?**

12   A.     Sharon called me.  I went over to the football

13   operations building.  And when I got there, met with

14   Samantha.  And she expressed her concern that there

15   was a picture that she believed may be her that, at

16   the time, she thought it was a nude top, a picture

17   of her top, but she hadn't seen it.

18         And she asked -- what she really wanted was for

19   me -- she -- she told me she believed ████████ ████████

20   took the picture.  I asked her why she thought it

21   was ████████  and she said because he left his wallet

22   in my apartment.

23         I asked her if there was any unwanted sexual

24   contact, aggression, and she said, no, that's not

25   what happened, but I don't -- I don't want him to

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 3 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 3 of 16    11/01/2022
Page 243

01  circulate the picture.  I'm understanding -- people

02  are telling me he has a picture.  And she asked me

03  to talk to ███████ and she really just wanted him to

04  delete the picture.

05       And I expressed to her that I felt like talking

06  to ███████ may actually exacerbate the problem if

07  he, in fact, had the picture because I wouldn't --

08  he could delete it, he could tell us he didn't have

09  it.  I had no access to his phone, I couldn't make

10  him give me his phone, and that I felt like the best

11  course of action is for her to go to the police,

12  where they could actually do forensics on the phone,

13  give her her rights under the state law and talk to

14  her about Title 9 resources and all the things from

15  campus perspective.

16       She eventually agreed to do that.  And I did

17  tell her, as well, that even if she -- you know, the

18  police -- even if she just wanted the conversation

19  to occur, a police officer having the conversation

20  with ███████ was very different than me having the

21  conversation with ███████ And then, you know, she

22  -- she agreed to go.  And so, in that instance, I

23  brought her to the police station.

24  **Q.    When you say police, are you talking -- are you**

25  **referring to campus police?**

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ   Document 470-6   10/13/23   Page 4 of 16
Case 3:21-cv-00242-WBV-SDJ   Document 367-6 *SEALED* 07/10/23   Page 4 of 16   11/01/2022

Page 264

01  but do you know what I'm talking about, do you --

02  A.    I --

03  Q.    -- recall that?

04  A.    I do.

05  Q.    Okay.  Is what we just reviewed one of the things

06  that your lawyer was referring to in that letter --

07  A.    Yes.

08  Q.    -- with regard to ███████ ███████ and the statement?

09  A.    Yes.

10  Q.    Okay.  Anything else you can think of?

11  A.    There's a lot of stuff in there that I don't believe

12  is accurate.

13  Q.    Okay.  Well, let's take it one at a time.  What

14  else?  And you don't have to, you know, verbatim,

15  but just what you recall.

16  A.    I think that they took liberties of assuming things

17  and tried to say they weren't doing an investigation

18  but they were just reporting various things.  They

19  didn't follow-up well on anything.  They -- they

20  made assumptions about even reporting with Student

21  1.

22          And, you know, they made reference to not --

23  you know, that I didn't put a name in the Word

24  document, but, you know, the lead person said, yes,

25  I gave the name.  And then, they made a comment like

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 5 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 5 of 16    11/01/2022
Page 265

01  because Segar left it out, it didn't get put in the

02  system as if I could have put it in the system

03  myself, which I had no access to the system.

04          They made, I just think, assumption about what

05  my capabilities or role was within that.  So, that's

06  another example of them assuming that I could have

07  put it into the -- you know, in the Maxient, the

08  system that they used.

09          I think there were -- they weren't complete, so

10  I don't -- I don't feel like they -- I feel like

11  they decided, at some point, the direction that this

12  report was going to go, and then, they just did what

13  they could to point things in that direction as

14  opposed to actually taking more time and

15  determining, you know.

16          And surprising to me, it seems like no one is

17  happy with the Husch Blackwell report.  Even your

18  plaintiffs testified to that, which, you know, I --

19  I obviously didn't know that until I heard that.

20  But that surprised me a little, I guess, and maybe

21  for some of the same reasons.

22          I feel like they just weren't complete and they

23  didn't bother to check details or facts and things

24  that could have been easily mitigated, corrected,

25  understood in a way that would have resulted in a

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 6 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 6 of 16
11/01/2022
Page 266

01  more thorough report.

02  Q.    But I want to just take this a little bit -- so with

03  regard to Student 1 and putting the name into the

04  report, is it your testimony that -- and this is

05  ████████  ██████  thing; is that correct?

06  A.    So, when we've identified Student 1 all day, it's

07  been someone that worked in the football office.

08  Are you referring to one of your clients as Student

09  1?

10  Q.    Yes.

11  A.    Okay.  I just want to make sure we're talking about

12  the same person.

13  Q.    I know.  I know.  It's a little bit -- well, I guess

14  let me ask you this.  So, what you were just

15  referring to -- yes, you're right, it is confusing.

16  What you were just referring to, from the Husch

17  Blackwell report, were you referring to one of our

18  clients?

19  A.    Yes.

20  Q.    Okay.  All right.  And are you referring to -- and

21  who is that?

22  A.    I think she goes by Robertson now.  Ashlyn Mize, I

23  think, was the name she had at LSU.

24  Q.    Okay.  So, in the Husch Blackwell report, it was

25  said that, when you made the report, you didn't put

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 7 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 7 of 16    11/01/2022

Page 267

01    the name of the alleged assailant in the system; is

02    that correct?

03    A.    Yes.

04    Q.    Okay.  And do you dispute that?

05    A.    I dispute that I had access to the system where I

06    could have put the name in and I was held

07    accountable for that.  I think it was unfair because

08    I called the HR person because, at the time, it was

09    early on in all this and I wanted to make sure who I

10    needed to go to and what phase.  And he's like,

11    nope, it's a student.  Go to student.

12          I went to Mari.  I had the conversation

13    verbally.  Did a summary report for them.  Submitted

14    it to the head of Title 9, all the people that I had

15    talked to.  Enclosed a detailed document of what

16    I've -- what's been alleged and even provided

17    follow-up information when they couldn't find a

18    phone number.  And I did everything in my power to

19    report.

20          And at the time, I don't -- I think the reason

21    no one asked who are these people is because

22    everybody knew the people because I had already told

23    them who the people were.  And if the names didn't

24    get put in, that's not something that I really could

25    have done.  And no one, at the time, asked me, well,

**EXHIBIT D**

01    put their names in.  You know, redo this for us or

02    send us the names in an email or whatever.

03          Like, that wasn't -- so, I felt like I did

04    everything that I could have done at the time.  And

05    so, I -- I don't -- you know, I -- I thought that

06    was an unfair conclusion that they came to.  And

07    they assumed that I had access to the system to put

08    this name in and I didn't, but they never asked.

09    Q.    Okay.  I think I'm following.  And so, let me just

10    make sure I understand for -- like, the precise

11    reporting.  So, at the time of that report, you did

12    not have -- there was not the online reporting

13    system like with the Jade Lewis reports we've seen

14    where you are typing in -- it's clear you're typing

15    in things to make these complaints; is that correct?

16    A.    That's correct.

17    Q.    Okay. All right.  Thanks.  So, that's helpful.  And

18    so, you -- so, then, now, with that background in

19    mind, can you walk me through what you did with

20    regard to Ashlyn -- to the complaint related to

21    Ashlyn.

22    A.    Do you want me to start from the very beginning, or

23    just --

24    Q.    Yes.

25    A.    Okay.

## EXHIBIT D

Case 3:21-cv-00242-WBV-SDJ    Document 470-6   10/13/23   Page 9 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 9 of 16    11/01/2022
Page 269

01  Q.      Yes.

02  A.      I don't remember the exact date.  I think it's in

03  part of the production documents because I have a

04  summary of everything and I think you guys should

05  have it.

06          But I received a phone call from one of our

07  coaches that I believe a parent of one of our

08  student athletes had called him about something her

09  daughter had shared with her -- so, it's, you know,

10  four people removed -- about a concern with a friend

11  that had had an interaction/encounter with football

12  student athletes.

13          I asked the coach and I think it was a phone

14  call, like, this mom just called me.  She said that

15  she -- he didn't -- I don't think he had any

16  details.  And he -- he brought -- I got the student

17  to come in and meet with me.  The student -- not the

18  student, not Ashlyn.  Her friend.

19          The student athlete came in.  Met with her.

20  Asked her to let me know -- you know, basically

21  said, look, your mom called the coach.  Can you tell

22  me what your mom -- like what -- what happened, what

23  -- what your knowledge is.

24          She shared the information that I, you know,

25  ended up reporting forward.  She first -- she told

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 10 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 10 of 16    11/01/2022
Page 271

```
01   as an attachment to Jim Marchand and, I believe,

02   Mari Fuentes.  I think Bob Barton was copied on it.

03   And I don't -- I don't remember if there was

04   somebody else on the email.  But, yes, this was an

05   attachment.

06   Q.    Okay.  And then, to orient us in time, that means as

07   of January 2016, or at least through January 29,

08   that online reporting system had not been set up;

09   correct?

10   A.    If it was, I wasn't told, notified, didn't use it at

11   this time because I didn't know about it.

12   Q.    Okay.  At the time that you filled out these notes,

13   did you know who the -- there's a reference in here

14   to the student athlete; right, and then, there's a

15   reference to the student.  You knew who the student

16   athlete was because you met with her; correct?

17   A.    Yes.

18   Q.    And then, it says (quoted as read), "Shared that her

19   friend."  Did you know who the friend was?

20   A.    Yes.

21   Q.    And then, did you know who the two male student

22   athletes were?

23   A.    Yes.

24   Q.    Okay.  So, why was that not put into these notes

25   that were sent to the people that you just said you
```

# EXHIBIT D

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23  Page 11 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 11 of 16    11/01/2022

Page 272

01  emailed them to?

02  A.      Because I had previously given all the names and

03  gone over the entire -- the scenarios of what

04  happened.  I sent the notes to commemorate the

05  conversations, the time frame, and what occurred.

06          And at the time, we really didn't put -- we

07  tried not to put student athlete names whether we

08  were filing -- and students -- whether we were

09  filing a report with -- for an NCAA violation or

10  whatever, a summary, we didn't often -- we didn't

11  always include it because of public records requests

12  and different things.

13          So, it was that was just how we did it back

14  then and -- and this is what I referenced.  I did

15  give the names.  It was confirmed in the Husch

16  Blackwell report that I shared the names.  And my

17  accountability in the Husch Blackwell report was

18  that I didn't put it in the online system.

19          And my, I guess, complaint about that is I

20  didn't have access, at the time, to go on the back

21  side and add these names.  I was never asked to put

22  -- go back to your document, put the names in.  And

23  I felt like I reported and that I did everything

24  that I could in this circumstance.

25  Q.      Okay.  Thank you.  Were you ever instructed or

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23  Page 12 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 12 of 16    11/02/2022
Page 301

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ABBY OWENS, ET AL

                CASE NO.: 3:21-cv-00242
                DIVISION WBV-SDJ
VERSUS           JUDGE WENDY B. VITTER
                MAG. JUDGE JOHNSON
                JURY DEMANDED

BOARD OF SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL
COLLEGE, ET AL

    * * * * * * * * * * * * * * * * * * * * * * *


DAY 2 OF THE DEPOSITION OF

MIRIAM SEGAR


TAKEN AT SHOWS CALI & WALSH, 628 ST. LOUIS

STREET, BATON ROUGE, LOUISIANA 70802, ON

NOVEMBER 2, 2022, BEGINNING AT 9:04 A.M.


REPORTED BY:
    JENNIFER W. PICKETT
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 29011

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ   Document 470-6   10/13/23   Page 13 of 16
Case 3:21-cv-00242-WBV-SDJ   Document 367-6 *SEALED* 07/10/23   Page 13 of 16   11/02/2022

Page 348

 1  Q    And you write to him on June 25th "the
 2       football team has a mandatory meeting at
 3       7 P.M. tonight with an outside consultant
 4       on sexual harassment and Title IX.  Would
 5       you be able to start the drug testing
 6       meeting tonight at 8?"  So, who was the
 7       outside counsel you were referring to
 8       here?
 9  A    The outside counsel?
10  Q    Consultant, I'm sorry, outside
11       consultant.
12  A    So, we've had different speakers come in
13       and I don't know if this was Elaine
14       Pasqua, who at one point came in and did
15       conversations with the athletic
16       department.  We had Rachel Baribeau that
17       came in and talked about topics like
18       this.  I don't recall, looking at this,
19       which one specifically it was.
20  Q    So, the Beebe Group was just for staff;
21       is that correct?
22  A    No, it was for student athletes as well.
23       This was really just additional
24       information and training that college,
25       like knowing they're college students.  I

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 14 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 14 of 16    11/02/2022
Page 349

1      think Elaine Pasqua's was, I can't
2      remember the exact title but it was
3      something along the -- I remember her
4      pulling out a banana and talking about
5      putting on a condom and talking about
6      getting consent and what consent was.
7      Rachel Baribeau's presentation, she came
8      a few different times but the first time
9      she talked about, I think she challenged
10     them.  I think her words were be a king,
11     be somebody's king, like treat women with
12     respect.  She talked about a personal
13     story and experience she had where she
14     felt like the person she was with that
15     she cared about wasn't  a king for her
16     and she challenged them to be the right
17     person, do the right things and shared
18     some personal experiences of different
19     domestic situations she had faced.  We
20     had speakers like that that would come in
21     over the timeframe.  And they would
22     present to football but they would also
23     present to the general student population
24     so it wasn't just football.
25   Q    And do you recall who specifically was

**EXHIBIT D**

Case 3:21-cv-00242-WBV-SDJ    Document 470-6    10/13/23    Page 15 of 16
Case 3:21-cv-00242-WBV-SDJ    Document 367-6 *SEALED* 07/10/23    Page 15 of 16

11/02/2022

Page 359

1   A    No.  I remember talking to Mr. Sanders

2        about the hazing law change when it did

3        and about the different aspects that we

4        needed to educate on and I knew that we

5        needed to add some information to the

6        Beebe training.

7   **Q    All right.  I'm going to show you what**

8        **we're going to mark as 17, which I'm not**

9        **sure any -- well let me just ask you**

10       this.  Do you recognize this?  (Slide

11       show attached as Exhibit 17.)

12  A    It looks like the slide show.

13  **Q    When you say the slideshow, what do you**

14       **mean by that?**

15  A    The slides that are used in the

16       presentation.

17  **Q    To students?**

18  A    This one says students and student

19       athletes and then there would have been

20       probably a different one for staff.

21  **Q    And is PFA Consulting the Beebe Group?**

22  A    They changed their name, yes.

23  **Q    Do you recall when this was from?**

24  A    The year, you mean?  I don't.

25  **Q    When you said they would come for a week-**

# EXHIBIT D

Case 3:21-cv-00242-WBV-SDJ   Document 470-6   10/13/23   Page 16 of 16
Case 3:21-cv-00242-WBV-SDJ   Document 367-6 *SEALED* 07/10/23   Page 16 of 16   11/02/2022
Page 360

1      long training, you said that earlier, do

2      you mean they would offer trainings on

3      five different days so you could get

4      everybody or was it actually a week-long

5      training for all student athletes?

6   A   It was every athlete or team was assigned

7      a time and then as the days would go on,

8      I would check and like oh, these three

9      kids missed and I would call the coach,

10      they need to come to this one or that one

11      and we would try to whittle down so we

12      made sure we got everybody to attend and

13      if there was a group or people that

14      missed because of maybe they were sick or

15      they -- they would be kept on a list to

16      come in the next trainings.  So, we had

17      them come in usually three times a year

18      but two times a year for the longer

19      amount of days so that we could get the

20      most staff trained.

21   Q   Staff trained or students trained?

22   A   Both.

23   Q   And again, they were giving the same

24      presentation multiple times over multiple

25      days to try to get as many people as they

**EXHIBIT D**