# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ABBY OWENS, ET AL.**                    **CIVIL ACTION NO. 3:21-CV-00242**

**VERSUS**                               **JUDGE WENDY B. VITTER**

**LOUISIANA STATE UNIVERSITY,**          **MAGISTRATE JUDGE BRENNAN**
**ET AL.**

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 2: SAMANTHA BRENNAN

NOW INTO COURT, through undersigned counsel, comes defendant the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board" or "LSU"), and submits this memorandum in support of its Motion for Summary Judgment. Plaintiff Samantha Brennan ("Brennan") asserted various Title IX claims. Brennan does not allege sexual assault but rather alleges that John Doe, on his personal cell phone, took a nude picture of her standing up while they were in her off-campus apartment.[1] Following this Court's ruling on the Board's motion to dismiss, Brennan's only remaining claim is for Title IX heightened risk (pre-assault violation). This claim fails as a matter of law for the reasons below.

## I.    BACKGROUND.

In July 2016, Samantha Brennan was an LSU student and student worker in LSU's football department. (R. Doc. 182, ¶ 289; Brennan 230)[2] She met John Doe on July 9, 2016 at an off-campus bar. (R. Doc. 182, ¶ 290; Brennan 18-19) Doe drove Brennan home to her off-campus

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.
[2] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Ashlyn Mize Robertson, Calise Richardson, Miriam Segar, Jennie Stewart, and 30(b)(6) of the Board are attached to the Board's motion as Exhibits A-F respectively. The declarations of Segar and Jonathan Sanders are also attached to the Board's motion as Exhibits G and H, respectively. Citations to the depositions will be by the last name of the deponent and the page or exhibit number. Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume. Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

apartment complex where Doe also lived.  (Brennan 20-21, 25)  Doe dropped her off, but Brennan left her apartment door unlocked for Doe to return. (Brennan 47-48, 198)  She believes Doe returned to her apartment later that evening and that they "fooled around." (Brennan 48, 82, 198-199)  Brennan woke up the next morning and at first made the assumption that she had sex with Doe, but she does not know whether that happened or not.  (R. Doc. 182, ¶¶ 293-294; Brennan 30-31)  She testified that "I can't for certain say sexual relations occurred." (Brennan 74-75)

Brennan does not consider that she was sexually assaulted or raped. (Brennan 74-75, 83; Brennan Exh. 6)  Instead, she complains that Doe took a picture of her standing naked in her apartment. (R. Doc. 182 ¶ 297; Brennan 83-84)  The only two people whom she learned had seen the picture were a male friend (who also rode home with Doe and Brennan after the bar) and his girlfriend.  (Brennan 147, 149, 151)  Brennan believes Doe took the photograph that night. (R. Doc. 182, ¶ 298; Brennan 288)[3]  Brennan was unsure to what extent the photo was shared with anyone else.  (Brennan 79-80, 151,194-95)

Brennan reported her concerns about the photo to her supervisor, Sharon Lewis. (Brennan 58-59)  Lewis reported the situation to Miriam Segar, Senior Associate Athletic Director.  (Segar 242) Segar and Lewis met with Brennan the same day.  (Brennan 57-58, 60)  In the meeting, Brennan "expected…to be shut down" because she believed LSU would not want "this to get out." (Brennan 64)  However, Brennan acknowledged that her expectation was wrong.  Instead, she found Segar to be "supportive." (Brennan 65, 114-115; Brennan Exh. 8, p. 5)

Segar felt that Brennan wanted her to speak with Doe and make Doe delete the picture from his phone.  (Segar 243)  Segar did not think Segar should go to Doe directly because she did

---

[3] Brennan claims the picture was taken "without Brennan's consent while she was incapacitated," but she testified that she was "standing up" for the picture.  (R. Doc. 182, ¶ 298; Brennan 202)  She also testified that, while she was intoxicated, she was able to stand and walk and was aware of her surroundings.  (Brennan 104-106)

PD.41633350.1

not want to compromise any evidence of his wrongdoing. *Id.* Segar had no authority to take Doe's personal phone and would not be able to control or verify whether Doe deleted evidence. *Id.* Therefore, Segar strongly suggested that Brennan report the matter to the police who could conduct a forensic examination of Doe's phone and preserve evidence. *Id.*

Brennan agreed to meet with the LSU police ("LSUPD"), and Segar accompanied Brennan to the police department to make the report. (Brennan 64-66) Brennan was very appreciative of Segar's support. (Brennan 65-68) Once at the LSUPD, Brennan said she was again "very surprised" that the LSUPD was supportive and did not attempt to shut down her report. (Brennan 68)

The police interviewed Brennan, who indicated she had not yet seen the picture and could not say for sure that it was of Brennan. (Brennan 83-84, 98-99; Brennan Exh. 6) The police created a report that became part of the police records, and the report accurately recounted Brennan's information. (Brennan 74; Brennan Exh. 6) As Segar expected, the LSUPD talked to Brennan about Title IX and asked Brennan whether she would want to file a report with Title IX. (Brennan Exh. 6) The police also gave Brennan a Sexual Violence Confidentiality Notice and Waiver, which gave Brennan the option to waive confidentiality and allow the police to contact Student Affairs, the Lighthouse Program, and the Title IX office to share her concerns. *Id.* Brennan signed the form but declined to allow a waiver that would give the police access to LSU's resources for victims of sexual violence. (Brennan 89; Brennan Exh. 6)

Later that same day, Brennan texted Segar and thanked her, writing: "Thanks again so much I really appreciate everything you did today!" (Brennan 68-69; Brennan Exh. 5) Segar replied immediately, saying "No problem.. (sic) Let me know if [you] need anything." (Brennan 68-70; Brennan Exh. 5) Months later, Brennan recounted the event to someone, saying: "I was

really surprised how supportive everyone was, especially Ms. Sharon.  I would have thought they would have tried to shut me down, but her and an advocate [Segar] were the ones who encouraged me to go to the police and the advocate [Segar] came with me."  (Brennan 152-153; Brennan Exh. 8, p. 5)

After Brennan's initial police meeting, LSUPD Detective Jeffery Melchior followed up with Brennan by phone to check whether she wanted to move forward with her complaint. (Brennan 89-92; Brennan Exh. 6)  Brennan again advised that she did not want to do so at that time.  *Id*.  Brennan advised that she would think about the situation and let Detective Melchior know if she changed her mind.  (Brennan 92; Brennan Exh. 6)  Plaintiff recalls that the officer was "very encouraging" of her to press charges.  (Brennan 93)  Brennan said, "everybody was very encouraging . . . like nobody tried to keep me from pressing charges." (Brennan 93)  Brennan recalls also being offered the opportunity to undergo a physical exam, which she declined. (Brennan 95)  She does not dispute the police report account that Brennan was offered Title IX, Lighthouse and other resources. (Brennan 94-97, 289-290; Brennan Exh. 6)

Three days after Brennan's report to Segar and Lewis, Mari Fuentes-Martin, Associate Vice President and Dean of Students, reached out to LSUPD about the potential report and learned that Brennan (whose name was unknown to Fuentes-Martin) instructed LSUPD that she did not want her report disclosed to the Title IX office.  (Sanders Decl. ¶ 10, Exh. 5)  Fuentes-Martin stated she thought the nude picture allegation "might" be a PM-73 case (the scope of which is broader than Title IX).  *Id*.  However, based on the limited information known by the Title IX office at the time (because Brennan did not authorize disclosure to Title IX), Fuentes-Martin and Jennie Stewart, Title IX Coordinator, documented the case as "information only", and closed the case to "respect

the wishes of the Complainant." *Id.*  Stewart indicated that if other factors became known in the future, then they would take a different approach.  *Id.*

The only other plaintiff who alleges sexual misconduct by Doe prior to Brennan is Mize.[4] The Board adopts by reference Mize's relevant facts contained in Summary Judgment No. 1, Section I of the Board's related memorandum by reference.[5]

## II.     STANDARD OF REVIEW.

The Board adopts by reference the Standard of Review discussion in Summary Judgment No. 1, Section II.

## III.    BRENNAN'S REMAINING HEIGHTENED RISK CLAIM FAILS AS A MATTER OF LAW.

### A.  <u>Brennan Fails to Meet the Elements of a Heightened Risk Claim.</u>

Brennan's "heightened risk" claim fails. *See* discussion in Section III.C. of Summary Judgment No. 1, which is adopted herein by reference.

Under a pre-assault Title IX heightened risk theory, a plaintiff must prove: (1) the defendant had actual knowledge of a substantial risk that sexual abuse would occur; (2) the harasser was under the defendant's control; (3) the harassment was based on the victim's sex; (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit; and (5) the defendant was deliberately indifferent to the harassment.[6] Brennan cannot meet these elements.

#### a.  Element One: Brennan Cannot Establish Actual Knowledge

---

[4] Although plaintiff Owens alleges she was assaulted by Doe in June 2016, she did not disclose the assault until April 2017, so Owens' allegations are irrelevant to Brennan's heightened risk claim.  (R. Doc. 182, ¶ 340)  Also, while the Complaint alleges that Richardson's "attempted rape" occurred prior to Brennan's experience (R. Doc. 182, ¶ 315), the parties acknowledge that timing is wrong, because Richardson knew of Brennan's allegations before Doe's "attempted rape" of Richardson. (Brennan 115, Richardson II 23)  Richardson's issue with Doe occurred in December 2016, so it is also irrelevant to Brennan's heightened risk claim. (Richardson 90-91)

[5] For efficiency, the Board will hereafter refer to the related memorandum as Summary Judgment No. 1.

[6] *Roe v. Cypress-Fairbanks*, 53 F.4th 334, 341 (5th Cir. 2022) (internal citations omitted); R. Doc. 340, p. 39.

The Board adopts by reference the authorities cited in Summary Judgment No. 1, Section III.C.a. "[P]laintiffs seeking to prove actual knowledge must clear a high bar."[7] "[A]ctual knowledge [ ] means that the school must have actual, not constructive, knowledge of sexual harassment."[8] Specifically, in a case like this one, where the "pre-assault" behavior is at issue, a school must have knowledge "that there is a substantial risk that sexual abuse would occur."[9] "The knowledge requirement cannot be satisfied by showing that the school should have known there was a substantial risk of abuse."[10]

LSU lacked knowledge of a substantial risk of sexual assault by Doe prior to Brennan's incident. Unfortunately, Mize's decision not to participate in an investigation or provide any information whatsoever deprived LSU of "actual knowledge" of any prior sexual misconduct by Doe. *See* Summary Judgment No. 1, Section I. Mize provided no account to LSU of her alleged assault by Doe or even that Doe was her perpetrator. (Mize 133-134, 206) Segar only learned of Mize's alleged assault through Mize's friend, who witnessed nothing, and according to Mize, there were no witnesses to what occurred that night. (Segar 268-269; Mize 103) Thus, at most, LSU knew of a possibility of an alleged sexual assault, but constructive knowledge is not enough to meet Brennan's burden.[11] Indeed, the second-hand report that Segar received from Student A included that Mize had been assaulted by two men that night. (Segar Decl. ¶ 7) In her deposition, Mize denied knowledge of a second person, which demonstrates the lack of reliability of the hearsay report Segar received in 2016. (Mize 110-112) Mize, as the only person with knowledge

---

[7] *Kelly v. Allen Indep. Sch. Dist.*, 602 F. App'x 949, 953 n.3 (5th Cir. 2015).
[8] *Roe*, 53 F.4th at 341 (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017)).
[9] *Id.* (quoting *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020)) (internal quotations omitted).
[10] *M.E.*, 840 F. App'x at 775.
[11] *See Roe*, 53 F.4th at 341.

6

of what occurred, deprived LSU of "actual knowledge" when she chose not to participate in the

Title IX process:

> Q: And there isn't any description of events that happened that night that you ever gave to LSU, whether in an email, verbally, a written statement, or anything like that, to assist them in an investigation, correct?
>
> A: No. I did not want an investigation.  I did not give them any information.

(Mize 133-134)

Not only were Mize's circumstances unknown (and unverified) to Title IX, Mize's

potential sexual assault was entirely different from Brennan's photo.  Brennan is the only plaintiff

who alleged that Doe took their nude picture.  (R. Doc. 182, ¶¶ 297-298)  Unlike Mize, Brennan

does not allege she was sexually assaulted or raped by Doe. (Brennan 103-104)  Thus, her

allegations are entirely different from Mize's experience.  Unrelated conduct is insufficient to

show actual knowledge of a substantial risk.[12] The second-hand complaint regarding Mize, without

any details, could not give LSU actual knowledge that Doe might take a nude picture of Brennan.

Importantly, as of this date, neither Owens or Richardson had reported any conduct by Doe.  (R.

Doc. 182, ¶¶ 182, 187, 340)

### b.  Element Two: Doe was not Under the Board's Control in this Context.

Title IX liability can only attach to student-on-student harassment when an educational

institution exercises substantial control over both the harasser and the context in which the known

harassment occurs.[13]  "[B]ecause the harassment must occur 'under' 'the operations of' a funding

recipient, the harassment must take place in a context subject to the school district's control."[14] Per

the Supreme Court, "[t]he statute's plain language confines the scope of prohibited conduct based

---

[12] *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 364 (5th Cir. 2020).

[13] *Davis*, 526 U.S. at 645.

[14] *Id.* (quoting 20 U. S. C. § 1681(a); § 1687 (defining "program or activity") (other citations omitted).

on the recipient's degree of control over the harasser and the environment in which the harassment occurs."[15] Thus, Title IX does not cover student-on-student harassment that occurs off-campus, outside of a school program /activity, and outside of a context that is under the school's "substantial control."[16]

The conduct Brennan alleges occurred at her off-campus apartment, and the photo was allegedly taken on Doe's personal cell phone over which LSU had no authority. (Brennan 25-26, 86; Segar 242-243)  Brennan acknowledged that she met Doe at an off-campus bar, not through any LSU activity. (Brennan 15, 19)  Courts in other circuits have consistently held that student-on-student sexual harassment that occurs off campus is not under the control of the university unless it is at an off-campus facility that the university controls.[17]  Although a school may exercise substantial disciplinary control over a student beyond the campus boundaries, it does not follow that the school exercises substantial control over conduct occurring in a private, off-campus apartment complex, where students happen to live.[18]  Brennan cannot show the Board exercised substantial control over Doe's use of his personal phone at an off-campus apartment in a context that had no affiliation to LSU other than that the participants happened to attend LSU.

---

[15] *Id.* at 644-645.

[16] *See id.* Conversely, student misconduct that "occurs during school hours and on school grounds" is a context in which the funding recipient retains substantial control. *Id.* at 646.

[17] *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (no control over rape which occurred during a private party at an off-campus apartment); *Garrett v. Univ. of South Fla. Board of Trustees*, 824 F. App'x 959, 960, 965 (11th Cir. 2020) (no control over sexual assault occurring at off-campus apartment); *Samuelson v. Oregon State University*, 725 F. App'x 598, 599 (9th Cir. 2018) (no control where rape occurred at an off-campus party); *Doe v. Univ. of Missouri*, 2022 WL 4043458, at *15 (W.D. Mo. Aug. 30, 2022) (where almost all interactions occurred off campus, no control over harassment, even where school had very close disciplinary control over the student athlete at issue); *but see Wreckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1167-1168 (D. Kan. 2017) (control existed over off-campus fraternity house); *Simpson v. University of Colo. Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007) (control existed over recruiting activities off campus).

[18] In *Doe v. Board of Supervisors of the Univ. of La. Sys.*, 2023 WL 143171, at *12 (M.D. La. Jan. 10, 2023), the court was "not persuaded" by the "one case" cited by the defendant to show that off-campus student-on-student sexual assault is not actionable under Title IX.  Here, though, the Board submits more robust authorities showing that off-campus activity is not covered under Title IX in this context.  In addition, the *Doe* case involved different facts.  There, the court focused on the fact that the plaintiff initially met the perpetrator for study sessions in the library on campus, which locations were only available because the assailant was an LSU student.  *Id.* at *10.  Here, Brennan met the alleged perpetrator at an off-campus bar.  (Brennan 15, 18-19)

8

### c.  Element Four, Part I: The Alleged Conduct was not Severe, Pervasive and Objectively Offensive

The single photo alleged by Brennan does not meet the Title IX standard for being "severe, pervasive, *and* objectively offensive" harassment.[19]  Title IX cases "are based on unwelcome sexual advances so severe and pervasive as to interfere with a student's educational atmosphere and opportunities."[20] Under *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, the Supreme Court made clear that the initial single incident is not sufficient to result in liability under Title IX. The Supreme Court expressly required that the harassment be pervasive to avoid imposing liability for a "single instance," even if that single instance is severe.[21] "A 'single instance of sufficiently severe one-on-one peer harassment' cannot have such a systemic effect [of denying equal access to an education] in light of 'the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.'"[22]  The Fifth Circuit has stated that only those claims involving "pervasive" and "widespread" conduct with the "systemic effect of denying the victim equal access to an educational program or activity" are actionable, finding that sexual harassment cannot be based on a single incident.[23]

In a factually similar case, *Ariel B. ex rel. Deborah B. v. Fort Bend Independent School District*, the court examined a single incident in which a male student allegedly pulled down another student's top and touched her breast while another male student took a photograph.[24]  The court found that the alleged incident on one occasion, "although inappropriate and offensive, . . .

---

[19] *Davis*, 526 U.S. at 652 (emphasis added).

[20] *Lewis v. La. St. Univ.*, 2021 WL 5752239, at *19 (M.D. La. Dec. 2, 2021) (citations omitted).

[21] *Davis*, 526 U.S. at 652-53.  *But see Roe*, 53 F.4th at 342-343 (acknowledging circuit split on "whether 'a single instance of sufficiently severe one-on-one peer harassment' could ever rise to the level of 'pervasive' harassment'" and noting that three circuits (6th, 8th, and 9th) have held there must be "**multiple** incidents of harassment; one incident of harassment is not enough" (emphasis in original) (citations omitted)).

[22] *Hill v. Cundiff*, 797 F.3d 948, 972 (11th Cir. 2015)  (quoting *Davis*, 526 U.S. at 652–53).

[23] *Carmichael v. Galbraith*, 574 F. App'x 286, 289-290 (5th Cir. 2014) (citing *Davis*, 526 U.S. at 652-654).

[24] 428 F.Supp. 2d 640, 648 (S.D. Tex. 2006).

[did] not rise to the level of severe and pervasive sexual harassment that would trigger Title IX protections."[25]  Likewise, the single act of taking Brennan's photo was not sufficiently severe or pervasive.  Fortunately, Brennan knew of only two people who saw the photograph, and no one teased or harassed her about the photograph.  (Brennan 118, 147, 149, 151)

### d.  Element Four, Part II: Plaintiff Cannot Meet her High Burden of Showing Deliberate Indifference That Caused Harassment.

#### i.  No Deliberate Indifference.

Plaintiff also cannot show that the Board was deliberately indifferent to prior sexual misconduct by Doe.  As this Court has acknowledged, "deliberate indifference in the Title IX context is a 'high bar' and requires the defendant's response to be 'clearly unreasonable in light of the known circumstances.'"[26]  "Title IX does not require flawless investigations or perfect solutions."[27]  Rather, the school's response, or lack thereof, must be "clearly unreasonable in light of the known circumstances."[28]  This standard is high in order to ensure institutions are liable for their own official decisions and not for their students' independent actions.[29]  The institution's conduct "must amount to an intentional choice, not merely an unintentionally negligent oversight."[30]  Fifth Circuit precedent establishes that "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference," and

---

[25] *Id*. at 667; *cf. Doe v. Town of Stoughton*, 2013 WL 6195794, at *2 (D.Mass. Nov. 25, 2013) (finding jury could conclude plaintiff experienced harassment where one or more of plaintiff's nude photographs were circulated to multiple parties and a high number of students harassed plaintiff about the photos on an almost daily basis over the course of multiple months).

[26] R. Doc. 340, p. 28 (quoting *Roe*, F.4th at 341 (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist*., 647 F.3d 156, 167 (5th Cir. 2011))).

[27] *Sanches*, 647 F.3d at 170 (citation omitted).

[28] *Davis*, 526 U.S. at 648.

[29] *Davis*, 526 U.S. at 643 (quoting *Gebser*, 524 U.S. at 290-91).

[30] *James v. Harris Cnty*., 577 F.3d 612, 617–18 (5th Cir. 2009) (quoting *Rhyne v. Henderson Cnty*., 973 F.2d 386, 392 (5th Cir. 1992)); *see Ramos v. Webb Consol. Indep. Sch. Dist*., 724 F. App'x 338, 340 (5th Cir. 2018) (applying same in Title IX context).

10

neither do negligent delays, botched investigations of complaints, or responses that could have been improved.[31]

LSU's handling of Mize's situation, the only conduct by Doe prior to Owens' incident, negates Owens' deliberate indifference element. The undisputed facts show the following response to to Mize:

- January 26, 2016:

  o Within one hour of receiving the report from Student A, Segar met with Student A in person to obtain details about the potential issue. Student A insisted that the alleged victim did not want to report. (Segar Decl., ¶ 7, Exh. 5)

  o Segar notified Student Affairs of the concern. *Id*.

  o Segar emailed Student A and shared detailed information on the LSU Lighthouse program and the LSU Policy on Sexual Misconduct. *Id*

  o Segar reached out to Fuentes-Martin to update her on the situation. *Id*

- January 27, 2016:

  o Segar spoke with Fuentes-Martin, and they discussed that they needed an account from the alleged victim about what happened.  (Segar 267)

  o Segar again met with Student A to ask if she spoke with the alleged victim about resources and reporting the incident.  Student A was adamant that the alleged victim [Mize] did not want assistance and did not want to report.  Segar asked Student A to again speak with the alleged victim about reporting to the university or to the police.  (Segar Decl., ¶ 7, Exh. 5; Mize 105, 108)  The friend said she would do so. (Segar Decl., ¶ 7, Exh. 5)

---

[31] *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (internal citations omitted).

PD.41633350.1

- January 28, 2016:

  - Student A reported to Segar by text that "she [Mize] really isnt' wanting to have anything to do with it." (Segar Decl., ¶ 7, Exh. 5)

- January 29, 2016:

  - Fuentes-Martin asked Lighthouse representative, Sierra Fowler, to reach out to Mize." *Id*.

- February 1, 2016:

  - Fuentes-Martin reached out to Mize by email, saying she wanted to discuss all of the services provided by LSU to address Mize's concerns, to offer medical and psychological care, to offer academic support, and to discuss options for investigating the incident. Fuentes-Martin asked Mize to schedule a date and time to meet with Fuentes-Martin and provided Mize with her phone number and email address. (Mize Exh. 2)

- February 5, 2016:

  - Mize finally responded, at which time Mize apologized for her delay, stated that she had thought about everything and weighed her options, and she did not want to move forward with an investigation. Mize assured Fuentes-Martin that she had met with the Lighthouse Program and knew all of the resources available to Mize. (Mize 118-119; Mize Exh. 3)

  - Fuentes-Martin responded to Mize and asked Mize to come back to Fuentes-Martin if she changed her mind. (Mize 123-124; Mize Exh. 3)

Mize never returned to Fuentes-Martin or to anyone else to file a complaint against Doe or to provide any details for an investigation. (Mize 124)

As shown, Segar and Fuentes-Martin endeavored to provide, and did provide, Mize with information about the services and resources available at LSU for victims of sexual assault. Their communications with Mize conveyed their interest in obtaining information from Mize and moving forward with an investigation. Segar's persistent communications with Student A demonstrate that Segar did not want to let the situation drop. Similarly, Fuentes-Martin's communications conveyed her interest in hearing from Mize. Fuentes-Martin stated:

- "I would like to encourage you to schedule an appointment with me so we can discuss this matter further.

- "Please know that LSU is concerned for all of its student's [sic] and wishes to provide support and services through difficult challenges."

- "I urge you to contact my office at (225) 578-XXXX to schedule a date and time that you can meet and discuss further."

- "If you have any questions or just need to get further support and resources, please contact me either by phone or email at mari@lsu.edu."

(Mize Exh. 2) These statements are the antithesis of "indifference."

Moreover, Mize's own testimony refutes any deliberate indifference by LSU. Mize testified that she had no issue with LSU's response at the time:

Q: At the time that you – at the time that LSU was interacting with you to offer resources and ask you to participate in investigations, is there anything you think they did wrong at that point in time?

A: At that point in time, no.

(Mize 133) Instead, Mize testified, "I was responsible for my decisions to use or not use the resources, . . ." (Mize 184)

At all times, LSU acted in a manner that respected Mize's wishes but attempted to gain her cooperation. The institution is not liable for a plaintiff who chooses not to participate in the Title IX process.[32]

Brennan argues that LSU was deliberately indifferent by not including Doe's name in the internal Maxient report regarding Mize, suggesting that Segar concealed Doe's name. The undisputed evidence shows that Segar communicated Doe's name to Fuentes-Martin. (Segar I 264-68, 271-72; SEGAR 000344)  Although Segar did not include his name in her write-up of the events, she did not conceal it from Title IX.  (Segar 267)  Brennan can cite no Title IX obligation **requiring** the presence of Doe's name in the internal, online submission.  Even if including Doe's name in the reporting system would have been a better practice, Title IX liability is **not** premised on whether LSU violated best practices.[33]  The Supreme Court "has never held 'that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.'"[34]

This alleged failure to include Doe's name in the online report (particularly when Mize was unwilling to give an account of the incident) falls far short of the legal standard for Title IX liability.  The Fifth Circuit has made clear that erroneous actions do not amount to deliberate indifference.[35]  Schools may avoid liability by responding reasonably to a risk of harm, even if the response is unsuccessful.[36]

---

[32] *Roskin-Frazee v. Columbia Univ.*, 474 F.Supp. 3d 618, 627 (S.D.N.Y. 2019) (finding no deliberate indifference where university respected privacy of student who clearly communicated to university employees that she did not want to report the alleged assault and withheld information); *JD1 v. Canisius Coll.*, 2022 WL 2308902, at *9 (W.D.N.Y. June 27, 2022) ("[W]here a plaintiff withholds the facts of any specific sexual assault and indicates that she does not wish to have it reported, the institution cannot be liable for honoring her request for privacy and taking no further action.") (internal quotations omitted).

[33] *See Sanches,* 647 F.3d at 170 (internal citations omitted).

[34] *Id*. at 169 (quoting *Gebser*, 524 U.S. at 292)

[35] *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (internal citations omitted).

[36] *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 359 (5th Cir. 2020) (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000)).

14

## ii.  No Causation.

*Davis* also requires a causation showing—a plaintiff must show that a school's alleged "deliberate indifference subject[ed] its students to harassment."[37] Evidence that a plaintiff was subjected to harassment because of deliberate indifference is a necessary causation element for a Title IX claim.[38]  Critical to this inquiry is what occurred **after** the school's actual knowledge.[39]

Brennan cannot show that she was subjected to severe harassment **because of** any alleged indifference.  As of the date of Brennan's photo, LSU had no accuser account, no witnesses, and no information that would support imposing discipline on Doe.  Brennan cannot causally connect Doe's name not appearing in Maxient to her alleged harm, particularly where Fuentes-Martin, Deputy Title IX Coordinator for Students, played a role in both Mize and Brennan's situations and had the knowledge of the alleged perpetrators that Brennan claims LSU lacked.  Therefore, although Doe's name did not appear in Mize's report, Fuentes-Martin, who processed Brennan's anonymous report from the police, knew that Doe was the accused in both Brennan's situation and in Mize's third-hand account that reached LSU.  Accordingly, Brennan cannot show that the absence of Doe's name in Mize's Maxient report put Brennan at a heightened risk of harm.

Similarly, Brennan lacks evidence that any discipline to Doe following Mize's incident would have stopped Brennan from meeting him at an off-campus bar, leaving her door unlocked for him, "fooling around" with him, and being photographed. (Brennan 48-50, 104-106, 198-199) Even if Brennan speculates that discipline administered to Doe would have resulted in his removal from campus, Brennan did not meet Doe on campus, so her "unfettered access" argument is inapplicable.  (Brennan 18-19)

---

[37] *Davis*, 526 U.S. at 644 (internal citations omitted).
[38] *Id*.; *Doe I v. Baylor Univ*., 240 F.Supp. 3d 646, 660 (W.D. Tex. 2017).
[39] *Doe v. Univ. of Kentucky*, 959 F.3d 246, 251 (6th Cir. 2020*); Kollaritsch v. Michigan State Univ. Board of Trustees*, 944 F.3d 613, 622 (6th Cir. 2019).

15

### e. Plaintiff Fails her Burden of Showing a Deprivation of Educational Benefits.

Finally, Brennan must show the existence of an injury, in that the harassment deprived her of "access to the educational opportunities or benefits."[40] To satisfy this requirement, the harassment must have had a "concrete, negative effect" on Brennan's **education**.[41] Brennan claims that she left LSU because of lack of self-worth based on the nude photograph, LSU's lack of response, and the subsequent public support of Doe. (R. Doc. 182, ¶ 317) Brennan's testimony refutes her claim. First, she testified that only two people saw the photograph. (Brennan 118, 147, 149, 151) Next, she testified that she had no complaint with how LSU responded to her situation. (Brennan 166) Lastly, while she said she could not go to class because she did not want to "hear classmates cheer on John Doe," she testified that she attended LSU football games that fall, while Doe was a player. (R. Doc. 182, ¶ 316, Brennan 174-175, 167-168, 305) Indeed, other than not enrolling for classes, Brennan did not remove herself from the LSU area. She testified that she lived in housing near campus, worked in a bar near campus, and attended games. (Brennan 132, 174-175, 167-168, 305) Notably, Brennan had only attended one semester of classes at LSU (Spring 2016), after which she was placed on formal scholastic warning due to her 1.98 GPA, which preceded the alleged photograph in July 2016. (Sanders Decl. ¶ 8, Exh. 3)[42] In any event, Brennan cannot show concrete evidence that Doe taking a nude photograph of her standing up caused her to suffer a deprivation of educational benefits.

---

[40] *Davis*, 526 U.S. at 650.

[41] *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020) (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015)) (emphasis added).

[42] Brennan also gave inconsistent testimony about whether the cost of out-of-state tuition drove her to leave classes. She testified that in August of 2016 (one month after the photograph), she was planning to leave LSU because of the cost of out-of-state tuition. (Brennan 120-25; Brennan Exh. 7) Brennan planned to take a year off from school in order to acquire residency in Louisiana so she could return to LSU as a resident at a lower tuition cost. *Id*. However, elsewhere in her deposition, she testified that she had a college fund and tuition expenses were not an issue. (Brennan 134)

**B.  No Other Heightened Risk Theory is Available to Brennan.**

Collectively, Plaintiffs seem to base their heightened risk claims on allegations that LSU created a heightened risk of sexual misconduct by maintaining a "general custom or official policy" of deliberate indifference to reports of Title IX violations, seemingly merging two claims.  *See, e.g.*, R. Doc. 182, ¶ 926.  Notwithstanding, the Board also addresses Plaintiffs' insufficient "official policy" allegations.

### a.  The Fifth Circuit Does not Recognize Heightened Risk Based on an Official Policy.

The Fifth Circuit has not recognized a claim for Title IX heightened risk based on an official policy, and this Court's ruling on the Board's motion to dismiss does not suggest that an official policy claim remains in this case.  *See* discussion in Summary Judgment No. 1, Section III.D, adopted herein.

### b.  Brennan Cannot Establish an Official Policy of Deliberate Indifference to Reports of Sexual Misconduct.

Brennan cannot establish that the Board "maintained a policy of deliberate indifference to reports of sexual misconduct."[43]  *See* discussion in Summary Judgment No. 1, Section III.D, adopted herein, including the discussion of LSU's PM-73 policy.  The Board's policies were promulgated to students and staff alike before and after Brennan's alleged harassment.[44]  ( Board 30(b)(6) I 29, 52-54; Board 30(b)(6) II 259-261; Stewart 38-41)  Despite PM-73, Plaintiffs' Complaint generally references the following deficiencies: (i) an alleged failure to report complaints, conduct investigations, and establish grievance procedures; (ii) training; and (iii) LSU's response to a 2017 Internal Audit, all of which fail to satisfy Brennans' burden. (R. Doc.

---

[43] *See Karasek v. Regents of the Univ. of Cal..,* 956 F.3rd 1093, 1112 (9th Cir. 2020).

[44] *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, Civ. A. No. H-18-2850, 2020 WL 7043944, at *11 (S.D. Tex. Dec. 1, 2020), aff'd in part, rev'd in part by *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334 (5th Cir. 2022).

PD.41633350.1

182, ¶¶ 922, 923, 926)  However, Brennan has not pointed to any specific, non-conclusory policy, let alone one that caused her harm.  *See* discussion in Summary Judgment No. 1, Section III.D, adopted herein.

###### i.    General Reference to Failure to Report Complaints, Initiate/Conduct Investigations and Grievance Procedures.

Brennan's Complaint generally references shortcomings in reporting, investigations and grievance procedures with no facts to tie those general categories to her claims. (R. Doc. 182 ¶¶ 926, 931)  The evidence is undisputed that Brennan had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative.  (Board 30(b)(6) 51-52)  Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points.  Board 30(b)(6) II 259-261; Stewart 38-41)  Brennan reported the alleged conduct to Sharon Lewis and Segar, Segar brought her to the police, and the information regarding her report, albeit anonymously at her request, made it to Title IX within three days of her report.  (Sanders Decl. ¶ 10, Exh. 5)  Brennan declined LSU's Title IX process, which is her right.  (Brennan Exh. 6)  Thus, Brennan can offer no evidence of failures in reporting complaints received by authorized persons, investigations, and grievance procedures, that can constitute an official policy **and** that can be causally connected to any harm that Brennan allegedly suffered.  Indeed, Brennan testified that she did not really have any complaint with how she was treated, stating: "So I wouldn't say that there was an initial lack of response from LSU with me. . . ." (Brennan 166)  Brennan cannot prove that LSU maintained a general policy of deliberate indifference to reports of sexual misconduct.

To the extent Brennan alleges an official policy of not recording information in Maxient, Mize is the only plaintiff who alleges this occurred.  Indeed, Doe's name appeared in the LSU

police record for Brennan as well as the Maxient report that disclosed Brennan's allegation (but left Brennan's identity anonymous, as she requested).  (Brennan Exh. 6; Brennan 190-191; Sanders Decl. ¶ 10, Exh. 5)  The fact that Doe's name appeared in the records associated with Brennan's allegation demonstrates that no such policy existed.  Moreover, Student A's name is also missing from the Maxient record, demonstrating no "policy" to omit the alleged accused's name.  (Segar Decl., ¶ 7, Exh. 5) Therefore, Brennan can show no official policy arising from the absence of Doe's name in Mize's Maxient report.

### ii.    Training.

Plaintiff cannot establish an official policy of deliberate indifference with relation to training. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX.  (Board 30(b)(6) I 33, 36-37)  In addition to the campus-wide training, Athletics administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39, 41-43)  Like other students, Brennan and her alleged harasser, Doe, received MyStudentBody training. (Sanders Decl. ¶ 3)  Because of his role as a student athlete, Doe received **additional** training through the Dan Beebe Group/Protection for All. (Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl. ¶ 5, Exh. 2)  Brennan received additional training because of her role as a student worker in football.  (Segar Decl. ¶ 5, Exh. 3) Brennan cannot show an official policy of deliberate indifference to training, nor can she causally link any alleged lack of training to her injuries.  She lacks evidence that any additional training on Title IX reporting or otherwise **prior to Brennan's assault** would have led to a different result. (*See* Board 30(b)(6) 40-41)

### iii.    Internal Audit.

*See* discussion in Summary Judgment No. 10, Section III.C.b.iii, which is adopted herein by reference.  The 2017 Internal Audit and LSU's response are irrelevant to Brennan's claims, since her alleged harassment occurred **before** the audit.[45]  Brennan lacks any evidence from the 2017 Audit findings of the Board failing to train responsible employees.  Brennan also lacks any basis for claiming an official policy, and she lacks any causal connection to any harm that Brennan allegedly suffered.

### c.   Element Two: Brennan Cannot Show a Known or Obvious Risk.

Not only can Brennan not establish an "official policy" of deliberate indifference, she also cannot show that the risk of sexual misconduct that would result from such policy was "known or obvious."[46]  The third-hand account of an intoxicated alleged sexual assault of Mize does not create a "known" risk that Doe would take a photograph of Brennan standing up nude in her apartment and the two of them had been "fooling around."   (Brennan 198, 203)   Although Plaintiffs collectively have pointed to other general allegations of sexual misconduct, they have no evidence of widespread, systemic conduct that would put LSU on notice **at that time** of a particularized risk of sexual misconduct in the context that Brennan alleges.[47]

### d.   Element Three: Brennan Has not Shown That the Alleged Misconduct Took Place in a Context Subject to the School's Control.

For the reasons set forth in Section II.A.b, the Board did not control the circumstances of Brennan's alleged harassment.

---

[45] *Tackett v. Univ. of Kan.*, 234 F.Supp. 3d 1100, 1107 (D. Kan. 2017) (finding no institutional liability for heightened risk of sexual assault where alleged policies "played no part in plaintiff's rape").

[46] *See, e.g.*, *Doe v. Texas A&M Univ.*, 2022 WL 5250294, at *6 (S.D. Tex. Oct. 6, 2022).

[47] *See e.g.*, *C.T. v. Liberal Sch. Dist.*, 562 F.Supp. 2d 1324, 1340 (D. Kan. June 10, 2008) (finding that weight training program at volunteer coach's home did not "bear the element of encouragement of misconduct" nor did it "create [ ] a risk of abuse that would have been obvious to school officials"); *Tackett*, 234 F.Supp. 3d at 1108 (rejecting argument for institutional liability based on the school's authority over its athletes and that it "should have known" of the heightened risk of assault at popular off-campus apartment complex for football players "based on the stereotypical assumption that football players are more prone to commit sexual assault" because such argument is based on theories of respondent-superior and constructive notice, both of which the Supreme Court rejected in *Gebser*, 524 U.S. at 282).

### e. Element Four: Brennan Cannot Show Causation.

An official policy or custom must have caused the alleged assault, as opposed to "simply misconduct that happened to occur [at the school] among its students.'"[48]  The standard for official policy liability under Title IX cannot "mean that recipients can avoid liability only by purging their schools of actionable peer harassment."[49]  For the reasons set forth in Section III.A.d.ii, no causal link exists between a purported policy of the Board and the harm Brennan alleges.  Plaintiff's generalized statements relating to training, LSU's 2017 audit, and failure to report complaints or to engage in investigations could not have prevented Brennan's harm.  Brennan and Doe each received LSU's training on Title IX. (Sanders Decl, ¶ 3; Segar Decl., ¶ 5, Exh. 2)  Nor can Brennan establish that the absence of Doe's name into an internal system (to which record Brennan was not privy) placed Brennan at a heightened risk of her photograph being taken.  Additional employee training or different investigation or reporting, or even campus discipline, would not have changed these off-campus circumstances.[50]

### C. Brennan's Heightened Risk Claim is Prescribed.

The Board adopts by reference the discussion set forth in Summary Judgment No. 1, Section III.B.  Brennan's photo incident allegedly took place on July 9, 2016, yet she did not file suit until almost five years later, on April 26, 2021.  (R. Doc. 1, R. Doc. 182, ¶¶ 290-294)  Therefore, Brennan can only survive prescription challenges if her claim accrued at a later, timely date.  Brennan fails to show her claim accrued at a later date, and her claim must be dismissed.

### a. The Husch Blackwell Report is Irrelevant to the Timeliness of Plaintiff's Claims.

---

[48] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1174 (10th Cir. 2007).
[49] *Davis*, 526 U.S. at 650.
[50] *Tackett,* 234 F.Supp.3d at 1107 (finding no institutional liability for heightened risk of sexual assault where alleged policies "played no part in plaintiff's rape).

21

*See* discussion in Summary Judgment No. 1, Section III.B.a, which is adopted herein by reference.

Brennan cannot point to any findings in the Husch Blackwell Report that connect her photograph to LSU's actions. The only Doe-related information in the Husch Blackwell Report that predated Brennan was the absence of Doe's name in the Maxient system for Mize. (R. Doc. 1-1, p. 97) This fact is merely tangential and not a salient fact that would support or delay accrual of Brennan's claim.[51] Indeed, the Husch Blackwell Report merely questioned whether the inclusion of Doe's name in Maxient would have impacted disciplinary charges against Doe should subsequent events occur. (R. Doc. 1-1, p. 102) In other words, would the presence of Doe's name in the Mize situation lead to discipline of Doe **after** Brennan's situation? Either way, that speculative inquiry relates to post-assault discipline, not evidence to support Brennan's pre-assault heightened risk claim. Further, even if Doe's name had been included, Brennan would not have been privy to the Maxient information **pre-harassment**.

Likewise, Brennan alleges she learned from the Husch Blackwell Report that "LSU, including specifically Defendant Segar, had actual knowledge of other survivors that had reported abuse by Doe, meaning LSU had specific knowledge of a heightened risk of assault by John Doe." (R. Doc. 182, ¶ 325) For the reasons above, LSU did not have "actual knowledge" of Mize's alleged sexual assault by Doe. The Husch Blackwell Report revealed no **pre-assault, salient** information that could have affected Brennan's knowledge of her heightened risk claim.

### b. Brennan's Claim Accrued in 2016.

Brennan pleads that the alleged photograph was taken on July 9, 2016. (R. Doc. 182, ¶ 298) This allegation reached Segar by July 22, 2016, and Segar and LSUPD offered Brennan

---

[51] *See King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 762-763 (5th Cir. 2015).

PD.41633350.1

resources and a Title IX investigation in July 2016.  (R. Doc. 182, ¶ 299; Brennan 60-68)  Within

that time frame, Brennan twice declined a Title IX investigation.  (Brennan Exh. 6)  As of that

date, Brennan had received notice of available resources, been informed by email of LSU's

resources for victims of sexual assault, had been taken to the LSUPD to file a complaint, and been

asked to report the incident with Title IX.  She also knew of the previous training she had received

prior to the alleged harassment. *Id.*  Further, as of July 22, 2016, Brennan knew of her injury, knew

of the perpetrator, and knew how LSU responded. (R. Doc. 340, p. 18)  These post-reporting

offerings, when viewed alongside the training she previously received, put Brennan on notice of

LSU's alleged "policy of deliberate indifference," if one existed.  Brennan knew the salient

information related to her claim in July of 2016, and any "tangential" information she may have

later learned does not delay her accrual.  She has offered no reason she could not have further

investigated her claims in 2016.[52] Therefore, her April 26, 2021 lawsuit is untimely.

## IV.    CONCLUSION

For these reasons above, Brennan's claim fails as a matter of law.

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

BY:    /s/ *Susan W. Furr*
Shelton Dennis Blunt Bar Roll No.
21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.
30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436

---

[52] Brennan testified that she sought counsel in 2020 and was told that her claim was untimely. (Brennan 193)

PD.41633350.1

Michael B. Victorian Bar Roll No.
36065
II City Plaza | 400 Convention Street,
Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 346 0285
Facsimile: 225 381 9197
Email: dennis.blunt@phelps.com
Email: susie.furr@phelps.com
Email: karleen.green@phelps.com
Email: jessica.huffman@phelps.com
Email: molly.mcdiarmid@phelps.com
Email: greg.stevens@phelps.com
Email: michael.victorian@phelps.com

ATTORNEYS FOR THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE

## **CERTIFICATE OF SERVICE**

I do hereby certify that on June 30, 2023, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ Susan W. Furr
Susan W. Furr

PD.41633350.1