UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, SAMANTHA BRENNAN,
CALISE RICHARDSON, JADE LEWIS,
KENNAN JOHNSON, ELISABETH          CASE NO.
ANDRIES, JANE DOE, ASHLYN          3:21-CV-00242
ROBERTSON, CORINN HOVIS, AND
SARAH BETH KITCH

VS.

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE, AND VERGE AUSBERRY,
MIRIAM SEGAR, JENNIE STEWART,
AND JONATHAN SANDERS, IN THEIR
INDIVIDUAL CAPACITIES

* * * * * * * * * * * * * * * * * * * * * * * *

*** CONFIDENTIAL TRANSCRIPT ***

*** SUBJECT TO PROTECTIVE ORDER ***

The deposition of SAMANTHA BRENNAN, taken in

connection with the captioned cause, pursuant to

the following stipulations before RITA A. DEROUEN,

Certified Court Reporter, at Phelps Dunbar, 400

Convention Street, Suite 1100, Baton Rouge,

Louisiana 70802 on September 26, 2022, beginning

at 9:06 am.

COURT REPORTERS OF LOUISIANA, L.L.C.
9522 Brookline Avenue, Suite 217
Baton Rouge, Louisiana  70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-mail:  depos@courtreportersla.com

**EXHIBIT G**

1  to a friend who is going to come pick up the

2  wallet?

3  　　　A.　Yes.

4  　　　Q.　Okay.  So there was no text exchange with

5  him at all until this one, July 10th at 11:44 that

6  morning?

7  　　　A.　Correct.

8  　　　Q.　Okay.  All right.  So anyway -- but you

9  said earlier that the two of you did not arrive

10  together at your apartment, he came later?

11  　　　A.　We got to the building --

12  　　　Q.　To the building of the complex.

13  　　　A.　-- of the apartment at the same time, but

14  to my actual apartment unit, that was not

15  together.

16  　　　Q.　Okay.  So you must have given him your

17  apartment number at some point?

18  　　　A.　Yes.

19  　　　Q.　Okay.  All right.  So when he says, "I

20  came back to your apartment last night," I mean, I

21  guess we don't really know what he means by that?

22  　　　A.　I don't know.

23  　　　Q.　Okay.  All right.  So you said earlier

24  you've never -- you didn't really see ███ around

25  the apartment complex after the events of July 9th

**EXHIBIT G**

1    or July 10th?

2        A.  Correct.

3        Q.  Okay.  And did you ever speak with him on

4    the phone after that -- those dates?

5        A.  No, not that I recall.

6        Q.  Okay.  Did you ever see him while you were

7    out at bars after July 10th?

8        A.  Not that I recall.

9        Q.  So are you aware of any attempts he might

10   have made to try to contact you after July 10th?

11       A.  I'm not aware.

12       Q.  Okay.  Okay.  So let's then go to

13   paragraph 297 of the complaint.  And it says that

14   on July 22, 2016, your coworker told you that

15   █████   had taken a nude photo of you and had shared

16   it with the football team; is that right?

17       A.  Yes.

18       Q.  Okay.  So this is about 12 days later.

19   12 days from the last -- anything with █████

20   █████   correct?

21       A.  Correct.

22       Q.  Okay.  All right.  And the coworker that

23   this refers to, is that █████   Hopefully I'm

24   pronouncing the name correctly.

25       A.  I believe so.

**EXHIBIT G**

1    everything?

2        A.  (The witness nodded head.)

3        Q.  So at that point, you said her demeanor

4    changed.  What was the, I guess, plan of action at

5    that point from Ms. Lewis's perspective?

6        A.  She said she was going to have to go talk

7    to other people.  I don't recall exactly what she

8    said and how it ended.  I know at one point she

9    told me she had told Les Miles and that she would

10   get -- kind of follow back up with me.

11       Q.  Okay.  Now, at some point, you're in a

12   meeting with both Sharon Lewis and Miriam Segar;

13   is that correct?

14       A.  Yes.

15       Q.  Okay.  And do you recall that was the same

16   day as the initial meeting only with Sharon?

17       A.  It was the same day.

18       Q.  Okay.  All right.  And so -- and that is

19   expressed in paragraph 299 of your second amended

20   complaint, "Met with Sharon Lewis and Defendant

21   Segar at Sharon Lewis's request."

22       A.  Correct.

23       Q.  And that's your understanding, is that

24   Ms. Lewis, I guess, summoned you to that meeting?

25       A.  Correct.

**EXHIBIT G**

1  did not want to go to the police at the time?

2      A.  No.

3      Q.  You don't recall making statements that

4  you did not want to go to the police?

5      A.  I do not recall those statements.

6      Q.  Okay.  Okay.  So it says, in

7  paragraph 308, "Sharon Lewis asked Brennan if she

8  wanted to initiate a police investigation or if

9  she wanted LSU to handle it internally."

10      Okay.  Paragraph 309, "Brennan told Sharon

11  Lewis that she wanted LSU to handle it

12  internally."

13      Then you say, at paragraph 310, "Defendant

14  Segar ignored Brennan's request and took Brennan

15  to the LSU Police Department to file a report."

16      So those are the allegations from your

17  second amended complaint.  Are those accurate?

18      A.  Not completely.  And I had -- after this

19  complaint was given to me, I had already e-mailed

20  my attorneys and let them know that this was not

21  completely accurate.

22      Q.  Okay.  So, okay, that's good to know.  I

23  appreciate your candor.

24      So what was the accurate representation of

25  what happened?

**EXHIBIT G**

1    A.  I expected, I guess, to be shut down.

2   I've seen and heard, you know, movies that they

3   don't obviously want this to get out.  So I was a

4   little bit nervous and very confused.  And I

5   remember Sharon Lewis asking me if I wanted to

6   handle this officially or unofficially.

7    **Q.  Okay.**

8    A.  I was not sure what that meant.  I would

9   say officially, I assumed, presumed, that it was,

10  you know, an investigation and, you know, reports

11  and everything.

12      And I assumed unofficially would probably

13  mean that he was going to run like 100 killers at

14  practice that week.  But I wasn't sure.  But I

15  elected to do it unofficially.

16      But that is where Miriam Segar and Sharon

17  Lewis offered that I could go to the police and

18  file a police report if I wished.

19   **Q.  Was there indication by either one of them**

20  **that they thought a crime had been committed by**

21  **what he did?**

22   A.  If they encouraged me to make a police

23  report, I would assume that they had thought it

24  was police-worthy.

25   **Q.  Okay.  And was that a fair estimation in**

**EXHIBIT G**

1  your mind, that it was police-worthy?

2     A.  Yes.

3     Q.  Okay.  All right.  And so let's see.  And

4  you said some of these allegations were not

5  correct, but I just want to focus in.

6       It says at 310, paragraph 310, "Defendant

7  Segar ignored Brennan's request and took Brennan

8  to LSU Police Department to file a report."

9       Kind of making it -- I mean, the way it

10  leads, to me, it's kind of like you were coerced

11  into going to the police department; is that

12  correct?

13     A.  That is not correct --

14     Q.  Okay.  So you were not --

15     A.  -- from my recollection.

16     Q.  Okay, very good.  And I'm sorry to talk

17  over you.

18       So Miriam Segar did not force you to go to

19  the police department?

20     A.  No.  I would say she encouraged.

21     Q.  Okay.  So in your mind, was she

22  supportive?

23     A.  Yes.

24     Q.  Okay.  And how did you get to the police

25  department?

**EXHIBIT G**

1    A.   I can't quite remember if we drove

2  separately or together, but I know a car is how I

3  got there, and Ms. Segar came with.

4    Q.   Okay.  And when you had the meeting -- and

5  I apologize, I should have covered this earlier.

6        The meeting was held where?  The two

7  meetings, the meeting with Sharon and the meeting

8  with both of them after that, what building were

9  those held in?

10    A.   It was in the Football Operations Building

11  in Sharon Lewis's office.

12    Q.   Both meetings were in Sharon's office?

13    A.   Yes.

14    Q.   Okay.  Okay.  So then at some point,

15  either separately or together, but Ms. Segar

16  escorts you to the police department, LSU Police

17  Department?

18    A.   Correct.

19    Q.   Okay.  All right.  Was she able to go in

20  with you to make your report?

21    A.   I believe she walked in with me, but they

22  wouldn't allow her in the interrogation room, I

23  guess, is what they kind of brought me to.

24  Because I remember sitting there alone in a

25  concrete box.

# EXHIBIT G

1  this him being in a supportive role?

2      A.  Yes.

3      Q.  Did you appreciate that?

4      A.  I did.  Again, I thought I would be shut

5  down and try to make my statements be quiet and go

6  away.  So I was very surprised.

7      Q.  Okay.  And I apologize if I didn't say

8  this earlier, but what Miriam Segar did as far as

9  encouraging you to go to the police department,

10  did you find that was also -- were you

11  appreciative of that?

12      A.  I was, and I believe I texted her a thank

13  you.

14      Q.  And as it so happens, that was going to be

15  my next exhibit, so I appreciate the segue.

16          Okay.  So Exhibit 5 is going to be a text

17  exchange with Miriam Segar.

18          (Exhibit 5 was marked.)

19  BY MR. CODY:

20      Q.  So do you have it in front of you?

21      A.  I do.

22      Q.  Okay.  All right.  So does this appear to

23  be the text exchange that was just referenced?

24      A.  Yes.

25      Q.  Okay.  And so for the record, this is with

**EXHIBIT G**

1  Miriam, it says it at the top.  And the time

2  stamp -- there's two different time stamps,

3  3:16 p.m., July 22nd, at the top, and the message

4  is, "This is Miriam with Athletics."  Okay?

5       And then it looks like your response to

6  that was then at 4:29 p.m. on the same day.  You

7  say, "Thanks again so much.  I really appreciate

8  everything you did today."

9       And then Miriam responds and says, "No

10  problem.  Let me know if you need anything."

11       Okay.  So that's an accurate

12  representation of the exchange that you had with

13  Ms. Segar on that day?

14     A.  Yes.

15     Q.  Okay.  So you were, in fact, appreciative

16  of what she had done?

17     A.  I was.

18     Q.  And at the beginning of that text exchange

19  it says, "This is Miriam with Athletics."

20       What did that mean to you?

21     A.  That she worked with athletics.

22     Q.  Okay.  So -- and you didn't know exactly

23  what her role is, it's safe to say, at the time of

24  the meeting with her, I suppose?

25     A.  Not that I recall.

**EXHIBIT G**

1  also corrected that with my attorneys.

2      Q.  Okay.  And I think we'll get to that in

3  just a bit.

4      A.  Yes, I have never claimed rape.

5      Q.  And I appreciate, again, the candor.

6  Thank you.

7          All right.  So let's look next at the

8  police report.  And so I'm going to mark this as

9  Exhibit 6.

10         (Exhibit 6 was marked.)

11     A.  Can I make a clarification on my last --

12  BY MR. CODY:

13     Q.  Yes, of course.

14     A.  I did do an interview with a reporter that

15  laid out facts that did allude that I was raped.

16  So if that gets brought into light, I do want to

17  say that that might say it, but I have not pursued

18  it elsewhere, if that makes sense.

19     Q.  Okay.  And I think I'm going to

20  probably -- that's going to be in my questions

21  later.

22         But just right now, since you brought it

23  up, if that statement was, in fact, in something

24  to a reporter, like an e-mail to a reporter or

25  something like that, you agree that that's

**EXHIBIT G**

1    Q.   Okay.  All right.  And at this time, you

2    do say you had not seen the picture, so you're not

3    fully sure if it was even you.

4         Now, since that time, you have seen the

5    picture, you said?

6    A.   Correct.

7    Q.   And so this -- yeah.  So, I mean, you're

8    certain at this point that it was you?

9    A.   (The witness nodded head.)

10   Q.   Okay.  And you go on to say you are not

11   sure if you wanted to pursue criminal charges at

12   this time and would like to think about it.

13   A.   Correct.

14   Q.   Okay.  So -- and, again, you know, we know

15   from talking about the earlier meeting with Miriam

16   Segar and Sharon Lewis that, you know, you needed

17   some support in order to go to the police office,

18   it wasn't something you wanted to do initially; is

19   that fair?

20   A.   Correct.

21   Q.   And still, even at this point, you

22   weren't -- you were kind of on the fence then

23   about actually pressing charges against ███████

24   A.   Right.

25   Q.   And, of course, here you had not seen the

**EXHIBIT G**

1        So yeah, still looking at this report,

2   there is a page attached to it, it's called LSU

3   Sexual Violence Confidentiality Notice and Waiver.

4   And that's Bates stamped 10.

5        And it appears to have -- and you tell me,

6   but is that your signature at the bottom?

7        A.   Yes.

8        Q.   And that's your name and your phone number

9   and your e-mail address?

10       A.   Yes.

11       Q.   And it's dated July 22, 2016?

12       A.   Yes.

13       Q.   Okay.  And so at this point, is it fair to

14   say you did not want your information to be

15   shared, you wanted to remain anonymous?

16       A.   Correct.

17       Q.   Okay.  And, again, I mean, you wanted time

18   to think about it.  I mean, this wasn't the final

19   word on this issue, whether you were going to

20   pursue it or not; is that fair?

21       A.   Right.

22       Q.   Okay.  Now, after the -- this report was

23   taken, and that -- again, that was Sergeant

24   Bodine, I believe -- there was a follow-up

25   conducted by a Detective Jeffery Melchior, if I'm

**EXHIBIT G**

1   pronouncing it correctly.  And it looks like it's

2   on Bates Plaintiffs Number 8 of the report.  And

3   it's pretty brief.  But that -- is that accurate

4   to your recollection?

5           First off, this is part of the report, but

6   you recall seeing this?

7       A.  I recall seeing this page or -- what's

8   your question?

9       Q.  Do you recall seeing this page?

10      A.  Yes.

11      Q.  Okay.  And, unfortunately, we don't have

12  any type of time stamp or anything with this

13  supplement.  And I'm calling it a supplement

14  because the narrative title says, "Supplement 2

15  added by Detective J. Melchior," toward the top.

16          But do you have any recollection of when

17  this contact that's described in this supplemental

18  report, when that occurred?

19      A.  Not exactly, but I recall it happening.

20      Q.  Okay.  So you do recall a conversation --

21  well, and I'm just trying to make sure, was this a

22  face-to-face conversation or telephone?

23      A.  It was a phone call.

24      Q.  A phone call, okay.  And so you do

25  recall -- and I guess did he initiate the call?  I

**EXHIBIT G**

1    mean, I think it says "made contact."  He made the

2    contact, right?

3         A.  Correct.

4         Q.  Okay.  And so he was following up with you

5    about -- you know, after your initial report,

6    which we know was on July 22nd?

7         A.  Yes.

8         Q.  Okay.  Based on the dates we have here and

9    everything.

10            And we just don't know when this was.

11    Let's just try to get some idea.  So you think it

12    was still July when you had this, or was it

13    already into August, perhaps?

14         A.  I don't know for sure.

15         Q.  Okay.  Were you still at LSU when he

16    reached out to you?

17         A.  I think so.

18         Q.  Okay.  So -- and we'll get into this

19    later, but you -- about a month later, you had

20    left LSU?  At least by a month later you had left

21    LSU, correct?

22         A.  Temporarily.

23         Q.  Okay, yeah.  But you were out of town,

24    say, August 22nd?

25         A.  Yes, around that time.

# EXHIBIT G

1    Q.  All right.  But you don't recall if you
2  were still in town or had left or out of town at
3  the time that he initiated this contact?

4    A.  If I had to guess, I believe it was when I
5  was still at LSU, but I can't say for certain.

6    Q.  Okay.  All right.  So it says here he made
7  contact to follow up.  During the contact, it
8  talks briefly about the case.  It says here that
9  you were preparing to return home.  Okay.  So that
10  actually probably gives us some context then.

11       So at some point, you said you went back
12  briefly to home.  And you were saying home at that
13  point was Minnesota?

14    A.  Yes.

15    Q.  Okay.  So you were getting ready to go to
16  home, Minnesota.  And so you must have still been
17  at LSU, I guess it's safe to say?

18    A.  I would agree.

19    Q.  Okay.  And then it says you still wished
20  to not pursue charges against the accused and also
21  wished to remain anonymous.  And it says, "As it
22  relates to LSU Care, Title IX, Lighthouse,
23  et cetera."

24       Okay.  Now, you know, I know this was six
25  years ago, but do you recall exactly the

**EXHIBIT G**

1    discussion about not pursuing the charges even at

2    this point, this follow-up report?

3        A.  Say that again, please.

4        Q.  Do you recall a specific discussion with

5    Detective Melchior about not pursuing charges on

6    whatever date this was?

7        A.  I remember he was very encouraging to --

8    if I remember correctly, to press charges.  Like

9    everybody was very encouraging.  And I had the

10   feeling that like there was a unanimous decision

11   that I -- like nobody tried to keep me from

12   pressing charges.  But that's all I really recall

13   about that conversation.

14       Q.  And when you say "nobody" -- so we've got

15   a few different defendants in this lawsuit.  And I

16   mentioned specifically Miriam Segar, but Verge

17   Ausberry is also a defendant in this lawsuit.

18           Are you aware of him ever trying to

19   dissuade you?  Did you have any interaction at all

20   with Verge Ausberry?

21       A.  I had no idea who he was.

22       Q.  Okay.  So there was no attempt by Verge

23   Ausberry to dissuade you from pursuing charges?

24       A.  I don't believe I've ever talked to him.

25       Q.  And what about -- we have other

# EXHIBIT G

1    defendants -- Jennie Stewart?

2        A.  I had never heard of her until this

3    lawsuit came to be.

4        Q.  Okay.  And what about Jonathan Sanders?

5        A.  Same, I had never heard of him.

6        Q.  Okay.  And anybody else affiliated with

7    LSU at all that you can think of that tried to

8    discourage, dissuade, prevent you from pursuing

9    charges against ███████  ███████

10       A.  Yes.  My coworker, ██████  and ██████

11    ██████

12       Q.  Okay.  So those were student workers?

13       A.  Yes.

14       Q.  But anybody affiliated with the actual,

15    you know, administration?

16       A.  No.

17       Q.  Okay, very good.  And we'll get into that

18    shortly, what you just alluded to.

19            All right.  So we talked about the

20    discussion about whether to pursue charges when

21    you had this interaction with Detective Melchior.

22            And do you recall at all about insisting

23    that you would still remain anonymous at that

24    time?

25       A.  I know I had that waiver that I had to

**EXHIBIT G**

1  sign initially, but I don't recall.  And the

2  follow-up question to that, but I -- that doesn't

3  mean it didn't happen, I just don't remember.

4  **Q.  And in that same sentence, I'm looking at**

5  **the first paragraph of this Supplement Number 2,**

6  **it says, "Anonymous as it relates to LSU Care,**

7  **Title IX, Lighthouse, et cetera."**

8  **Do you remember any specific discussion**

9  **about LSU Care?**

10  A.  I don't know specifically LSU Care.  I

11  know that I was offered to go to like a clinic and

12  get checked out, checked for STDs, stuff like

13  that.

14  **Q.  Okay.  And who offered to take you -- or**

15  **for you to go to a clinic?**

16  A.  I don't remember if it was Mr. Bodine or

17  Melchior, one of -- somebody at the police

18  department.

19  **Q.  So definitely somebody with the police**

20  **department.  Okay.**

21  A.  Yes.

22  **Q.  Were you concerned about potentially**

23  **having an STD?**

24  A.  I was naive thinking it wouldn't happen to

25  me.  So not really at the time.

**EXHIBIT G**

1    Q.  And just for clarification, are you aware

2  of any STD contracted from this event?

3    A.  I did not have an STD contracted from this

4  event.

5    Q.  And with regard to those other things that

6  are specifically listed at the end of that

7  paragraph, Title IX, was there a discussion of

8  Title IX with Detective Melchior that you can

9  recall?

10    A.  I don't recall.

11    Q.  Okay.  And what about with regard to the

12  Lighthouse?

13    A.  I don't recall.

14    Q.  Okay.  But could it have happened and

15  maybe your recollection just isn't 100 percent

16  today?

17    A.  It could have happened.

18    Q.  Okay.  All right.  And so then we go on to

19  the second paragraph.  And it says that you

20  advised, after returning home, you planned to

21  reflect on everything, and then advise that if you

22  decided to pursue charges or seek help, that you

23  would notify Detective Melchior directly; is that

24  accurate?

25    A.  Yes.

**EXHIBIT G**

1    Q.  Okay.  And it looks like he indicates that

2    he gave you his contact information and reiterated

3    that LSU P.D. and the University were here for

4    you.

5          Is that -- do you recall him saying that

6    or any discussion of being there for you or

7    anything of that nature?

8    A.  I do not recall.

9    Q.  Could it have happened?

10   A.  It could have happened.

11   Q.  Okay.  When he called you, did he call you

12   on your cell phone, do you know?

13   A.  Yes.

14   Q.  Okay.  Did you have like a landline at

15   all, or was it only a cell phone back then?

16   A.  Just a cell phone.

17   Q.  Okay.  So any telephone communication with

18   you would have been through cell phone?

19   A.  Correct.

20   Q.  Okay.  Do you know if you still have --

21   well, let me back up.

22          Were there any text messages that you can

23   recall with Detective Melchior?

24   A.  Not that I recall.

25   Q.  What about any text messages with Sergeant

# EXHIBIT G

1    Bodine?

2        A.   No.   I've never had his contact

3    information that I recall.

4        Q.   But you had, at least based on this -- I

5    mean, is it accurate to say you had Detective

6    Melchior's contact information?

7        A.   Yes.

8        Q.   And he had yours?

9        A.   Yes.

10       Q.   Okay.  Very good.  So let's see.  I think

11   we are pretty much done with -- let me just make

12   sure.  This is a few pages.  Oh, wait one second.

13   Okay.  Let me -- yeah, I don't want to get ahead

14   of myself.

15            So at what point did you see your picture?

16       A.   I would say either later that day or

17   within the immediate following days.

18       Q.   Okay.  And when we're saying that -- okay.

19   So the day -- July 22nd, we're kind of -- so that

20   was the day of the disclosure, right?

21       A.   Yes.

22       Q.   The day that you went, you talked to

23   Sharon, then Sharon and Miriam, and then went to

24   the police department.  So a few days after that?

25       A.   I would say within a few days I was shown

**EXHIBIT G**

1   the picture.

2       Q.   Okay.

3       A.   Of that date.

4       Q.   All right.  So at the time of this

5   supplemental report that we just went over, is it

6   a good chance that you had seen the picture at

7   that point?

8       A.   At the point that I made this report, I

9   had not seen the picture.

10      Q.   The initial narrative report?

11      A.   Yes.

12      Q.   And I'm asking about the follow-up report,

13  the Supplement Number 2 that we just went over

14  with Detective Melchior on a different date.

15      A.   I don't know if I had seen it at that

16  point.

17      Q.   Okay.  And that's fair.  We don't have a

18  time stamp here.  I'm not clear on when this

19  occurred, and that's why I was trying to see if

20  you had any knowledge of exactly when.

21           But it does say it looks like you're

22  getting ready -- you're preparing to return home

23  at this point when this narrative -- this

24  supplement was prepared.

25           So if we were to establish that you, you

**EXHIBIT G**

1    A.   Yeah, because my lease at the University

2 House, I think is what it was called, that old

3 apartment where ███████  ███████  lived, I think it

4 changed apartment names like 25 times.

5    Q.   Really?

6    A.   Yes.

7    Q.   So where --

8    A.   It's continually changing names, from what

9 I've gathered.

10    Q.   And just for the record, that's the one

11 that's right there on Chimes?  Or what's the

12 address for that apartment?  It's by like where

13 Cane's -- or, well, I don't know.

14        Where was the apartment you were at

15 before?

16    A.   It was right on campus.  She might know if

17 she can talk.  I don't know.

18    Q.   It's fine.  It's fine.

19    A.   She went to it.

20    Q.   Where was Wildwood located?

21    A.   I remember it was by a McDonald's.  It

22 wasn't as close to campus as University House was.

23 But I don't remember what road that was on either.

24 It's been a long time since I've been back.

25    Q.   Okay.  So you come back to Baton Rouge

**EXHIBIT G**

1    see what you said," I guess is what he says.

2        And then you say in response, "I was

3    really surprised how supportive everyone was,

4    especially Ms. Sharon.  I would have thought they

5    would have tried to shut me down, but her and an

6    advocate were the ones who encouraged me to go to

7    the police and the advocate came with me."

8        A.  Yes.

9        Q.  Okay.  So again, at this point, I mean,

10    you're saying that you did -- you know,

11    that -- when you're saying "advocate," you're

12    meaning Miriam Segar, but you're saying that she

13    and Sharon were supportive, and that surprised

14    you?

15        A.  Correct.

16        Q.  So even in 2017, that was still your

17    recollection of the events?

18        A.  Yes.

19        Q.  Okay.

20        A.  I am still surprised that they were as

21    supportive as they were.

22        Q.  Okay.  And he seems to know who Miriam is.

23    If we continue on, you say, "Miriam was the

24    advocate."

25        "Oh, she loves me," he says.  "I've had

**EXHIBIT G**

1    number 40.

2        A.   Okay.

3        Q.   So it's the last sentence of Response to

4    Request for Admission Number 4.  It says, "Brennan

5    was not aware of her rights under LSU Cares,

6    Title IX, or the Lighthouse."

7        A.   I don't know what any of those things

8    really are, so correct, I don't know my rights.

9        Q.   You've seen your police report, you've

10   obtained your police report at this point?

11       A.   Yes.

12       Q.   And before you produced these -- or

13   prepared these responses.  So you -- I mean, you

14   recall it's noted in the police report, in the

15   supplemental police report, that there was a

16   discussion of those rights, that you did not want

17   -- you wanted to remain anonymous as to LSU Cares,

18   Title IX, or the Lighthouse?

19       A.   I wanted to remain anonymous is accurate.

20       Q.   Okay.  Okay.  And do you not recall ever

21   doing -- responding to the discovery from the

22   Board of Supervisors?

23       A.   I would have to relook at it.

24       Q.   Do you also remember doing initial

25   disclosures in this case?

# EXHIBIT G