UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

**STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO
MOTION FOR SUMMARY JUDGMENT NO. 3: CALISE RICHARDSON**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with its Motion for Summary Judgment No. 3: Calise Richardson, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") contends that the following are material facts which present no genuine issue:[1]

1. Calise Richardson enrolled at LSU in 2014. (Richardson 24)[2]

2. In Fall 2016, Richardson says she began dating Coe "for a few months." (Richardson 163-164)  Coe lived in her apartment complex.  (Richardson 89, 185)

3. At the time, she believed she was in a healthy relationship with him, even though she said he was physically abusive to her and cheated on her.  (Richardson 166, 169-171)

4. Their dating relationship ended after an incident at JL's bar (an off-campus bar) (the "JL's Incident") in the fall of 2016.  (Richardson 164, 166)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.
[2] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Sharon Lewis, Keava Soil-Cormier, Jeffrey Scott, Abby Owens, Ashlyn Mize, Samantha Brennan, 30(b)(6) of the Board, and Miriam Segar are attached to the Board's motion as Exhibits A through I, respectively.  The declarations of Segar and Jonathan Sanders are also attached to the Board's motion as Exhibits J and K, respectively.  Citations to the depositions will be by the last name of the deponent and the page or exhibit number.  Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume.  Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

1

5. At the bar, Richardson observed Coe kissing another woman and became angry. (Richardson 178-179) Coe approached her and tried to touch and/or kiss her. (Richardson 179, 182; (Richardson II 29)

6. Richardson "swiped him off" and told Coe to leave her alone. (Richardson 179, 182) She said Coe pushed her, and fell to the ground. (Richardson 179, 267)

7. Richardson yelled profanities at Coe, and Coe yelled profanities at Richardson. (Richardson 180, 183)

8. Richardson threw a drink at Coe. (Richardson 179)

9. Coe reported to his position coach that Richardson had been aggressive toward him. (Richardson 187; Richardson II 80; S. Lewis 163-164; Soil-Cormier 40-41)

10. As a result, Coe's coach informed Sharon Lewis, Associate Athletic Director, of the situation and asked Lewis to fire Richardson. (Richardson 187; S. Lewis 163-164) Lewis did not do so. (Richardson 189)

11. Instead, Lewis called Richardson to her office with Keava Soil-Cormier, Football Recruiting Analyst, to find out what happened. (Richardson 187-188)

12. Richardson acknowledges that she may have laughed when telling them the story of what happened. (Richardson II 30)

13. Lewis confirmed that Richardson laughed about throwing the drink, and neither Lewis nor Soil-Cormier perceived that Richardson was reporting physical abuse by Coe. (S. Lewis 161, 171-172; Soil-Cormier 119)

14. Others reported to Sharon Lewis that Richardson was the aggressor in the situation and that they had difficulty keeping Richardson in the car because she wanted to return to fight with Coe. (S. Lewis 166, 195)

15. In her discussion with Richardson, Lewis asked whether Richardson wanted to file a police report about the JL's Incident. (Richardson 192, 194; Richardson II 74) Lewis also said, "Whatever punishment you see fit, that's what we will do." (Richardson 192-193; Richardson II 74)

16. Richardson never filed criminal charges against Coe because she said she was "in love" with him and wanted to protect Coe. (Richardson 173, 193) Richardson and Coe ceased their "dating" relationship after the JL's incident in Fall 2016. (Richardson 164, 166; Richardson II 41)

17. After the JL's Incident, Richardson experienced **no other physical altercations** by Coe. (Richardson II 14)

18. Richardson left to study abroad for the Spring semester of 2017, and when she returned, she restarted sexual conduct with Coe. (Richardson 154-155, 186; Richardson II 15)

19. Their sexual relationship was on and off. (Richardson 163-164) Coe did not physically coerce Richardson to have sex with him. (Richardson Vol. 2 p. 20)

20. Despite their periodic sexual encounters, they never became "exclusive" again, and Richardson continued to see other people while sometimes having sex with Coe. (Richardson 164-166)

21. She said this continued until Coe's arrest in 2018. (Richardson 164; Exh. 32) In fact, she had made plans to have sex with Coe on the evening he was arrested. (Richardson 207-208)

22. When Richardson engaged in sex with Coe, she knew he was dating Jade Lewis. (Richardson 177) Richardson said she had "inklings" that Coe was harming Lewis, but

3

Richardson never reported Coe and never said anything to Lewis about Coe. (Richardson 174, 177)

23. Only after Lewis brought criminal charges against Coe (two years later) did Richardson report Coe's conduct to LSU's Title IX office. (Richardson 212-214)

24. At least a year after the JL's Incident, as part of her counseling, Richardson became angry about how Sharon Lewis handled the meeting with Richardson about that incident. (Richardson 203-205)

25. During counseling at the LSU Health Center, Richardson decided she wanted to hold Sharon Lewis accountable for her response to the JL's Incident. (Richardson 203-205)

26. However, Richardson waited until after Coe was arrested twice in 2018 (for his conduct toward Jade Lewis) to report her own experience with Coe to the Title IX office. (Richardson 208, 212-214; Richardson Exh. 24)

27. Richardson went to Title IX because she said she was "walking around with the guilt that . . . I didn't report it. . . ." (Richardson 212-213) Richardson felt it was partly "[Richardson's] fault that Jade got abused." (Richardson 212-213) Richardson was upset with Sharon Lewis because she said Lewis "knew and did nothing." (Richardson 221)

28. Therefore, she filed her Title IX report in Fall 2018, claiming Sharon Lewis failed to take action after the JL's Incident in 2016. (Richardson 213, 221-222)

29. The Title IX office conducted an investigation. (Richardson 270-271, Richardson Exh. 24) It also offered Richardson counseling services, but Richardson said she was already attending counseling through LSU. (Richardson 216)

4

30. Title IX advised Richardson of the Lighthouse Program, but she did not utilize that resource. (Richardson 253)

31. The Title IX office also offered academic accommodations, which she accepted. (Richardson 216)

32. Investigator Scott with Title IX interviewed Richardson two days later regarding her report of Sharon Lewis's alleged failure to report Richardson's 2016 complaint about Coe. (Richardson 256, 271-272; Richardson Exhs. 19, 24-25)

33. In less than 60 days, Scott completed his investigation and concluded that Sharon Lewis should have reported the JL's Incident to Title IX. (Richardson 271, Richardson Exh. 24; Scott 48-49).

34. Sharon Lewis demonstrated her willingness to report concerns that she perceived as sexual misconduct in other instances, such as in her prompt reporting to Segar of Samantha Brennan's complaint. (S. Lewis 249)

35. Plaintiff had no classes with Coe after the JL's incident, and she never spoke with Coe again after her Title IX report. (Richardson II 16, Richardson 208-209)

36. Richardson claims attempted rape by Doe in December 2016. (R. Doc. 182, ¶¶ 187-188) Richardson became friends with Doe during her junior year at LSU. (Richardson 86-87)

37. They both lived at the same off-campus apartment complex. (Richardson 89) (Coe, Owens, Brennan, and Mize also lived in the same apartment complex. (Richardson 89; Owens 14-15; Brennan 133; Mize 15-16))

38. In December 2016, Doe was kicked out of his apartment, and Richardson let him "crash" at her apartment. (Richardson 90-91) Richardson allowed Doe to stay in her bed with her, which she had done a couple of times before. (Richardson 94)

39. The next day, they were hanging out in her room and started to "play fight," which she said was normal for them. (Richardson 91)

40. They began kissing and then Doe pulled her pants down and his own pants down enough that "their genitals were exposed" and tried to "insert himself." (Richardson 91-92) Richardson told him to "stop or something like that," and Doe did not listen right away. (Richardson 91)

41. She then yelled at him to stop again, and he stopped. (Richardson 91-93) He got angry at her for stopping him. (Richardson 91-92) They both yelled at each other, then she asked him to leave, and he left. (Richardson 92-93)

42. Richardson does not recall the specifics of what she was yelling, but she thinks she tried to explain that she cared about him as a person and friend but did not want to "cross that line in [their] friendship." (Richardson 93)

43. This occurred during the day in December 2016, while both Richardson and Doe were sober, and with no witnesses. (Richardson 92, 99)

44. Richardson told her friend that she felt Doe got his feelings hurt because she rejected him. (Richardson II 24)

45. The next day, Richardson says she told her supervisor, Keava Soil-Cormier, that Doe "tried to have sex" and that Richardson did not want to have sex. (R. Doc. 182, ¶ 191; Richardson 96; Soil-Cormier 115-117) She said Doe got angry and said he was going

6

to try to get Richardson fired and was "going to tell everybody about the real me." (Richardson 96)

46. Richardson told Soil-Cormier that Richardson was sharing what happened with Soil-Cormier because Richardson "was scared to get in trouble and didn't want [Doe] to get [Richardson] fired." (Richardson 96-97, 100)

47. Richardson was not asking Soil-Cormier to do anything. (Richardson 97)

48. Soil-Cormier only recalls Richardson telling her that Doe and Richardson were "messing around" and that "somewhere in-between she wanted it to stop and then it stopped." (Soil-Cormier 115-116) Richardson told her that Doe was angry and left. (Soil-Cormier 116)

49. Richardson did not report the incident with Doe to anyone else. (Richardson 101) She did not want to file a police report because she believed that "in Baton Rouge, Louisiana, at LSU, [Doe] was gold to everyone. And so I felt like I knew nothing was going to happen . . . ." (Richardson 101-102)

50. Plaintiff had no classes with Doe after the incident. (Richardson II 16)

51. Although Richardson went to the Title IX office in Fall 2018 (nearly two years later) to complain about Sharon Lewis not reporting the JL's Incident with Coe in Fall 2016, Richardson did not report anything about Doe's alleged conduct in December 2016. (Richardson 101-102) Nor did she report that Soil-Cormier allegedly failed to report Doe's conduct to Title IX. (Richardson 101-102)

52. Richardson was the first plaintiff to assert allegations against Coe. (R. Doc. 182, ¶¶ 152-156) LSU received no prior reports to LSU of similar behavior by Coe. (Board 30(b)(6) 47)[3]

53. Ashlyn Mize never provided any underlying facts to LSU regarding her potential assault by Doe. (Mize 116-120 124, 133-134; Mize Exh. 3)

54. Brennan reported her photo incident with Doe to Segar and LSUPD, but Brennan was unwilling to participate in a Title IX investigation or to press criminal charges. (Brennan 74; Brennan Exh. 6)

55. Brennan alleged no sexual assault by Doe. Rather, Brennan accused Doe of taking a nude picture of her standing up. (R. Doc. 182, ¶ 297)

56. Richardson's alleged incidents with Coe and Doe occurred at an off-campus bar and at her off-campus apartment, respectively. (R. Doc. 182, ¶¶ 152-155, 184, 187)

57. As soon as Brennan reported the photo to her Sharon Lewis, Lewis promptly reported the situation to Miriam Segar, Senior Associate Athletic Director. (S. Lewis 249; Segar 242) Segar and Lewis then met with Brennan the same day. (Segar 242)

58. Brennan said that in the meeting, she "expected . . . to be shut down" because she believed LSU wouldn't want "this to get out." (Brennan 63-64) However, Brennan acknowledged that her expectation was wrong. (Brennan 65, 68-69) She found Segar to be "supportive." (Brennan 65)

59. Segar perceived that Brennan wanted Segar to speak with Doe and make him delete the picture from his phone. (Segar 242-243) However, Segar was concerned about compromising evidence of his wrongdoing if she went to Doe herself. (Segar 243)

---

[3] The Board adopts by reference the facts set forth in Section III.A.a of Summary Judgment No. 2.

60. Segar said she had no authority to confiscate Doe's personal phone and no ability to verify whether Doe might have deleted the photo. *Id.* Therefore, Segar strongly urged Brennan to report the matter to the police who could conduct a forensic examination of Doe's phone and preserve evidence. (Segar 243)

61. Once Brennan agreed to meet with the LSU police ("LSUPD"), Segar accompanied Brennan to the police department to make the report. (Brennan 66) At the LSUPD, Brennan said she was again "very surprised" that the LSUPD was supportive and did not attempt to shut down her report. (Brennan 65-66)

62. As Segar expected, the LSUPD talked to Brennan about Title IX and asked Brennan whether she wanted to file a report with the Title IX office, which Brennan declined. (Brennan 89, 96, 212; Brennan Exh. 6) The police interviewed Brennan, who indicated she had not yet seen the picture and could not say for sure that it was of Brennan. (Brennan 87, 98-99; Brennan Exh. 6)

63. The police created a report that became part of the police records. (Brennan 74; Brennan Exh. 6) The police also gave Brennan a Sexual Violence Confidentiality Notice and Waiver, which allowed her the option to waive confidentiality and allow the police to contact Student Affairs, the Lighthouse Program, and the Title IX office to share her concerns. (Brennan Exh. 6)

64. Brennan signed the form but declined to allow a waiver to give the police access to LSU's resources for victims of sexual misconduct. (Brennan 89)

65. Later that same day, Brennan texted Segar and thanked her, writing: "Thanks again so much I really appreciate everything you did today!" (Brennan 68; Brennan Exh. 5)

66. Segar replied immediately, saying "No problem. Let me know if need anything." *Id.*

9

67. Months later, Brennan recounted the event to someone, saying: "I was really surprised how supportive everyone was, especially Ms. Sharon. I would have thought they would have tried to shut me down, but her and an advocate [Segar] were the ones who encouraged me to go to the police and the advocate [Segar] came with me." (Brennan 153)

68. After Brennan's initial encounter with the police, Sergeant Melchior, followed up with her by phone to see whether she wanted to move forward with her complaint. (Brennan 89-93) Brennan again advised that she did not want to do so. (Brennan 92; Brennan Exh. 6) She said she would let him know if she changed her mind. (Brennan 96)

69. Brennan recalls that the officer was "very encouraging of her to press charges." (Brennan 93) Brennan said "everybody was very encouraging . . . like nobody tried to keep me from pressing charges." (Brennan 93) Brennan recalls also being offered the opportunity to undergo a physical exam, which she declined. (Brennan 95)

70. She does not dispute the police report statement that Brennan was offered Title IX, Lighthouse and other resources. (Brennan 94-97)

71. Nothing further happened between Doe and Brennan. (Brennan 50-51)

72. Three days after Brennan's report to Segar and Lewis, Mari Fuentes-Martin, Associate Vice President and Dean of Students, reached out to LSUPD about the potential report and learned that Brennan (whose name was unknown to Fuentes-Martin) instructed LSUPD that she did not want her report disclosed to the Title IX office. (Sanders Decl., ¶ 10, Exh. 5)

73. Fuentes-Martin stated she thought the nude picture allegation "might" be a PM-73 case (the scope of which is broader than Title IX). *Id.* However, based on the limited

information known by the Title IX office at the time (because Brennan did not authorize disclosure to Title IX),

74. Fuentes-Martin and Jennie Stewart, Title IX Coordinator, documented the case as "information only", and closed the case to "respect the wishes of the Complainant." *Id.* Stewart indicated that if other factors became known in the future, then they would take a different approach. *Id.*

75. Richardson complains that, in Mize's situation, Segar did not include Doe's name in the Maxient system (LSU's reporting system). (R. Doc. 182, ¶ 930(b)) However, Segar communicated Doe's name to Fuentes-Martin, who played a role in both Mize and Brennan's situations and had the knowledge of the accused perpetrator. (Segar I 264-68, 271-72; Segar Decl. ¶ 7, Exh. 5)

76. Student A's name is also missing from the Maxient record. (Segar Decl., ¶ 7, Exh. 5)

77. Doe's name appeared in the Maxient report that disclosed Brennan's allegation. (Brennan Exh. 6; Brennan 190-191; Sanders Decl. ¶ 10, exh. 5)

78. Richardson testified that she had sex with another male student (not Doe or Coe), despite warnings from her friend and Richardson's own knowledge that the male student was accused of raping another student because he had sex with her while she was intoxicated. (Richardson II 43-46)

79. Following Fall 2016, Richardson's grades improved from prior semesters, with grade point averages from 3.05 to 3.56. (Richardson 275-276; Richardson Exh. 26) By contrast, her grades before Fall 2016 spanned from 2.14 to 3.0. *Id.*

80. Richardson could report Title IX claims through multiple mechanisms, including to a Title IX representative, as Richardson ultimately did in 2018. (Board 30(b)(6) 49-52)

81. Likewise, information about how to contact the Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (*Id.* at 53-54)

82. Richardson made a complaint in 2018 to Title IX, mentioning Coe and nothing about an "attempted rape" by Doe. (Richardson 101, 256, 271; Richardson Exhs. 19, 24)

83. By the time of Richardson's Title IX report, neither Doe or Coe were still enrolled at LSU. (Sanders Decl., ¶ 11; R. Doc. 182, ¶ 544)

84. Richardson and her alleged assaulters, Coe and Doe, received LSU Title IX training. (Sanders Decl. ¶ 3) Because of their roles as student athletes, Coe and Doe received **additional** training through the Dan Beebe Group/Protection for All. (Segar Decl., ¶ 5, Exh. 2)

85. Richardson received the same training because of her role as a student worker in football. (Richardson II 9; Richardson Exh. 31; Segar Decl., ¶ 4, Exh. 1)

86. Richardson scheduled an LSU Lighthouse speaker to present to her sorority on sexual assault and LSU's resources. (Richardson 236; Richardson Exh.10)

87. Richardson received and completed a training course on sexual assault, some of which training LSU mandated that students complete as a prerequisite to registering for classes. (Sanders Decl., ¶ 3; Richardson II 9-10, Richardson Exh. 31; Board 30(b)(6) 40-41)

88. Richardson's alleged harassment took place in 2016, yet she did not file suit until over four years later, on April 26, 2021. (R. Doc. 1)

PD.42457863.1

89. Richardson knew in 2018 of Coe's arrests for assaulting Jade Lewis. (Richardson 194, 196, 207-208)  Her knowledge of Coe's abuse of Lewis prompted Richardson to report to Title IX in 2018.  (Richardson 212-213)

90. While Richardson was at LSU, she heard that Mize had a relationship with Doe and that Mize felt Doe had raped or sexually assaulted her.  (Richardson 119-121)

91. In addition to the other plaintiffs, Richardson said that "all throughout college" she heard other rumors about Doe being violent and getting angry when people rejected him.  (Richardson 122-123)

92. She also was aware of Brennan's situation with Doe prior to Richardson's alleged attempted rape in December 2016 because Richardson saw Brennan crying in a bathroom, and Brennan said she was crying because Doe allegedly shared a naked photo of her.  (Richardson 115-116)

93. While Richardson was at LSU and prior to her departure in December 2018, Richardson was aware of both Brennan's and Mize's situations with Doe. (Richardson 25, 115-116, 122-123)

94. LSU also had no knowledge of Abby Owens' encounter with Doe prior to Richardson's incident with Doe.[4]

95. Richardson was upset with the results of her Title IX claim regarding Sharon Lewis in October 2018. (R. Doc. 182, ¶¶ 234-236)

96. Richardson knew by Doe's departure in 2018 that the Title IX office had never reached out to her and that Soil-Cormier had not reported Doe. (Sanders Decl., ¶ 11; Richardson 118-122 Richardson II 22-24)

---

[4] As of December 2016, Abby Owens' father had not yet reported that Owens claimed to have been raped.  (R. Doc. 182, ¶ 340; Owens 77)

13

PD.42457863.1

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

BY:   /s/ *Susan W. Furr*
Shelton Dennis Blunt Bar Roll No. 21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.: 30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436
Michael B. Victorian Bar Roll No.: 36065
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 346 0285
Facsimile: 225 381 9197
Email: dennis.blunt@phelps.com
Email: susie.furr@phelps.com
Email: karleen.green@phelps.com
Email: jessica.huffman@phelps.com
Email: molly.mcdiarmid@phelps.com
Email: greg.stevens@phelps.com
Email: michael.victorian@phelps.com

ATTORNEYS FOR THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr

14

PD.42457863.1