# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.** | **CIVIL ACTION NO. 3:21-CV-00242** |
| **VERSUS** | **JUDGE WENDY B. VITTER** |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **MAGISTRATE JUDGE JOHNSON** |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 5: JADE LEWIS

NOW INTO COURT, through undersigned counsel, comes defendant (the "Board" or "LSU"), and submits this memorandum in support of its Motion for Summary Judgment. Plaintiff Jade Lewis ("Lewis") complains of domestic violence (not sexual assault) by John Coe, which incidents LSU endeavored to resolve through Title IX and other offices but faced difficulty due to Lewis' reluctance to report her abuse.[1]  This Court dismissed all claims, except for Lewis' Title IX heightened risk claim (pre-assault violation), which should be dismissed as a matter of law.

## I.    FACTUAL BACKGROUND.

Lewis played tennis for LSU for only one semester—Spring 2017—before entering the professional tennis circuit.[2] (Lewis 125, 172)  In or around April 2018, Lewis returned to LSU, but she was no longer eligible to play tennis due to her receipt of compensation from her professional career. (Lewis 10, 170, 191-192)

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.

[2] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Sharon Lewis, Keava Soil-Cormier, Jeffrey Scott, Calise Richardson, Jonathan Sanders, Miriam Segar, Samantha Brennan, Verge Ausberry, Michael Sell, Donovan White, the 30(b)(6) of the Board, and Kennan Johnson are attached to the Board's motion as Exhibits A through M, respectively. The declarations of Segar and Jonathan Sanders are also attached to the Board's motion as Exhibits N and O, respectively.  Citations to the depositions will be by the last name of the deponent and the page or exhibit number.  Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume.  Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

PD.41319953.2

As mentioned, Lewis asserts domestic violence by Coe, not sexual assault.  (Lewis 24-25)[3] Lewis first met Coe via text message in January 2017, and they immediately met up off-campus and began a sexual relationship.  (Lewis 11-15; R. Doc. 182, ¶ 456)  According to Lewis, Coe was manipulative and controlling, and he became physically abusive.  (Lewis 138-139; R. Doc. 182, ¶ 457) Lewis recounts the following assaults:

**May 19, 2017.**  Lewis' Complaint identifies the date of her first assault as May 19, 2017. (R. Doc. 182, ¶ 462) Lewis said she was **"fully leaving LSU"** and "was all packed up" and needed all of her things before her flight in a day or two.  (Lewis 42)  This testimony and the date of May 19, 2017, coincide with Lewis departing LSU for her professional tennis career.  When she went to Coe's apartment, she kicked a hole in Coe's bedroom door, and then Coe punched her in the stomach.  (Lewis 42-44)  In her Complaint, Lewis said she reported this incident to LSU athletic trainers Donovan White and/or Sean Carter. (R. Doc. 182, ¶ 465) She also alleges that one of her teammates reported her abuse to White or Carter that same day. (R. Doc. 182, ¶ 467)

In her deposition, however, Lewis testified differently about whether she was fully leaving LSU a day or two later for her professional career or for the NCAA women's tennis tournament. (Lewis 157) She explains that she disclosed the incident to trainer Donovan White, while practicing before leaving for the tournament.  (Lewis 158, 167)  Lewis acknowledged in her deposition to "just keep in mind I might get the timeline a little wrong, . . ." (Lewis 45) Regardless of which version of her story is true, Lewis believes White did not understand the "severity" of her situation.  (Lewis 165)  She believes White perceived that she was describing "playful" conduct with Coe.  (Lewis 165)  White confirmed that he did not believe Lewis disclosed any physical

---

[3] She testified that she might not have always wanted to have sex with Coe, but she feared that he would make her leave if she did not do so. (Lewis 25)

abuse in May 2017. (White 41, 53)  Lewis did not report anything else to LSU at this time. (Lewis 167)

Lewis left LSU in May 2017 to pursue her professional tennis career and did not return until April 2018 (after which she was ineligible to return to college tennis). (Lewis 125, 170) During her year away from LSU, Lewis continued to be "very attached to Coe." (Lewis 172)

**April 3, 2018.**  Lewis alleges that her second physical assault by Coe occurred on April 3, 2018, while Lewis was not yet an enrolled student (following her tennis career). (Segar II 415-417)  She said Coe punched her in her stomach, fracturing her ribs.  (R. Doc. 182, ¶¶ 477-478; Lewis 45-46) Several weeks later, on April 25, 2018, Lewis went to LSU's athletic trainers, including Donovan White, due to her lingering pain from the assault, and she reported that Coe had assaulted her. (R. Doc. 182, ¶¶ 483-485; Lewis 61, White 39-41)  The trainers promptly reported the incident to Miriam Segar, Senior Associate Athletic Director, who promptly reported Coe's abuse to the Title IX office. (R. Doc. 182, ¶ 486; Lewis 219; Lewis Exh. 2; Segar II 413-416; Segar Exh. 22)

While Lewis alleges in her Complaint that no "LSU employee offered Plaintiff Lewis any support, resources, accommodations, or interim measures, and no Title IX investigation was initiated," her testimony reveals otherwise. (R. Doc. 182, ¶ 482; Lewis 215-229)  On April 26, 2018, Segar met with Lewis and encouraged Lewis to utilize domestic abuse resources and made an appointment for Lewis with an LSU Psychologist.  (Lewis Exh. 2; Lewis 228)  Lewis chose not to utilize the Lighthouse services.  (Lewis 228)  Segar advised Lewis to contact the police if she felt threatened.  (Segar II 415)  Lewis indicated to Segar that she was in a relationship with Coe and did not believe he would be violent again.  (Lewis 226; Lewis Exh. 2)  On May 14, 2018, Jeffrey Scott, LSU Title IX investigator, wrote to Lewis and advised her that he was investigating

3

her case and advised Lewis in writing of the resources available, including Lighthouse (for assistance with filing a report, seeking outside assistance, or confidential counseling), the Office of Disability Services (for academic accommodations), C.A.R.E. (for intervention and assistance to students in distress or crisis), and referred her to the additional resources on LSU's website. (Lewis Exh. 1, Lewis I 214-217)  Despite being encouraged by LSU to go to the police, Lewis did not want to do so. (Lewis 220-229; Lewis Exh. 2; Segar II 416)

After delays from Lewis in scheduling the interview, Segar drove Lewis to meet with Scott for an interview. (Lewis 229-230; Lewis Exh. 3; Segar II 424-425)  In the interview, Lewis said she did not want Coe to get into trouble.  (Lewis 231-232; Lewis Exh. 3)  Lewis did not ask for Coe to be kept away from her; instead, she simply wanted someone to tell Coe that his conduct was not okay.  (Lewis 231-231, 240; Lewis Exh. 3) At the end of the interview, Scott again provided Lewis with a Title IX handbook and highlighted the services available to her. (Lewis 231-232; Lewis Exh. 3)  Lewis had no issue with how Scott treated her. (Lewis 241)

Scott then interviewed Coe about the incident.  (Lewis 243-244; Lewis Exh. 4)  Segar helped Scott organize this meeting with Coe because Coe was not responding.  (Segar II 423-424) In the meeting, Scott reviewed and explained Title IX and the PM-73 obligations to Coe, and Coe said he understood.  (Lewis Exh. 4)  Coe admitted that Lewis and Coe got into an argument, and that after she hit Coe, he punched Lewis in the stomach. *Id*. Coe reported that he has asked Lewis to stop calling and texting him, but she still shows up at his apartment. *Id*. Scott advised Coe to limit his contact with Lewis and placed Coe in mandatory counseling with an LSU mental health professional. (R. Doc. 182, ¶ 491; Lewis 243; Lewis Exh. 4) As mentioned, Lewis intended to continue contact with Coe.

4

Lewis accepted the counseling services from LSU therapist, Dr. Lakeitha Poole for a little while, and she felt Dr. Poole treated her well during the therapy sessions. (Lewis 232, 236) However, Lewis stopped after five to ten sessions with Dr. Poole, choosing not to continue and not to seek any other available services from LSU. (Lewis 237-238)

**June 18, 2018**. Almost immediately thereafter, Segar learned fourth-hand of another assault by Coe in June 2018, this time at Lewis' on-campus apartment. (Lewis 71-72; R. Doc. 182, ¶¶ 505-506) Lewis' roommate heard Lewis and Coe arguing (but did not see the assault) and called the LSU Police, who responded immediately. (R. Doc. 182, ¶ 509; Lewis 72, 276; Lewis Exh. 8) Upon their arrival, the police separated Lewis and Coe and interviewed them. (Lewis 75, 276, Lewis Exh. 8) Lewis lied to the police and said Coe did not physically harm her. (Lewis 75-77, 79) Lewis also gave a similar written statement to the police that she admits was intentionally false. (Lewis 281) Lewis was injured from the altercation, so she wore a hoodie to disguise her injuries from police view. (Lewis 76-77, 79) The police did not observe any evidence of physical violence. (Lewis Exh. 8) Based on Lewis' false statements that the altercation was verbal and not physical, the police did not pursue charges. *Id*. They instructed Coe not to return to the apartment that night and to make sure both parties were calm before meeting again. *Id*. The police followed up with Lewis a week later for further investigation. *Id*. Lewis again lied and denied that Coe had abused her. (Lewis 282-283)

Segar learned of this incident from Lewis' roommate's coach and called Lewis. (Segar II 427; Lewis 269; Lewis Exh. 6) Again, Lewis lied and said that Coe did not harm her. (Lewis 269; Lewis Exh. 6) Instead, she said she hit her ear on the bed, causing bleeding. *Id.* Lewis told Segar she was in a committed relationship with Coe and did not plan to stop seeing him. *Id*. Segar promptly reported to the Title IX office and expressed her concern "for escalation of domestic

violence," stating: "This is the second incident I have reported with these same 2 individuals. I am concerned about higher level of escalation and potential injury." (*Id.*; Segar II 428)

At this point, Jonathan Sanders in the Student Advocacy and Accountability ("SAA") office worked with the Title IX office to try to learn the truth of what was happening with Lewis and Coe. (Sanders 70-71; Lewis Exh. 17) Sanders suggested that he meet with Lewis to see if she would be truthful about what was occurring with Coe. (Sanders 71-72). Sanders initiated charges related to the police report through the Code of Student Conduct process, but Sanders' efforts did not yield any new results. (Sanders 71, 75-77, 80-82; Lewis Exh. 7)[4]  Lewis again lied and said the arguments involved no physical violence. (Sanders 72, 74; Lewis 272-273; Lewis Exh. 17)

Based on Lewis' continued denials to the police, to Title IX, SAA, and Segar, LSU had no evidence on which to take action against Coe for this occurrence.  (Sanders 73-74)  Per Stewart in the Title IX office, what action to take was a delicate balancing act:

> This was well outside the bounds of what we'd seen with other individuals who are waffling. Also, we note that at the time, the most dangerous time for a person leaving dating in domestic violence is the time that they leave. It's the most highly lethal. . . moving through the investigation balancing the harm that can come by a reluctant complainant, too. . . Yes, a report should be made to LSUPD subjectively from my point of view but accounting for what kind of danger is my action potentially going to cause beyond this or someone who doesn't want it, that's the balancing test. And it was an extraordinarily taxing process. (Stewart 190-193)

Per Lewis, Coe was barred from weight room privileges and was removed from the football team at this time.  (Lewis 268, 286)  Lewis criticized the decision, saying that, based on the false information she provided, LSU did not have grounds to suspend Coe from the team at this time. (Lewis 287-288)  She testified: "If they knew the truth, then yes. But based on what they knew, this one incident, it doesn't make sense." (Lewis 288)  Instead, Lewis believed that after one

---

[4] Lewis was separately and unrelatedly cited by Residential Life for having a candle in her dorm room. While she suggests this candle situation was punitive based on her report, the citation was purely coincidental. The Title IX office and SAA knew nothing of the candle violation or citation. (Sanders 67-68, 79-80; Scott 62)

incident, LSU should have had "a good sit down" and "give[n] him some therapy," both of which occurred. (Lewis 289)

**<u>August 2018: Arrest and Criminal Investigation.</u>**  It was not until August 2018 that Lewis finally told the truth about what occurred.  (Lewis 296; Sanders 74; Segar II 437) She did so because she said "it was just getting tough because I lied . . .  I just couldn't keep up – I couldn't, you know, keep up with what I had said and it was just getting a bit challenging." (Lewis 297)  On August 12, 2018, Lewis texted Segar and asked to meet the following day.  (Lewis 299; Lewis Exh. 9; Segar II 437)  When they met, Lewis disclosed to Segar that she wanted to be truthful with LSU about her abuse by Coe.  (Lewis 296-297, Lewis Exh. 9; Segar II 439)  Lewis said she was breaking up with Coe, so she had no reason to cover for him any longer. (Segar II 437; Lewis Exh. 9)  Lewis expressed interest in filing for a protective order, and Segar encouraged her to file a police report and seek a protective order. (Lewis 296-297; Lewis Exh. 9; Segar II 439) Segar encouraged her to be truthful and to provide complete information. (Segar II 437-438; Lewis Exh. 9) Lewis said she first wanted to answer questions truthfully to LSU staff, and she provided text messages and photos of bruises and scratches and threatening text messages Lewis received from Coe.  (R. Doc. 182, ¶ 535; Lewis 301)[5]  Segar forwarded the information to the Title IX office and asked that the case be handled "with high priority" based on Segar's concerns for Lewis' safety. (Lewis Exh. 9)

Separately, Coe also reported to Segar's office on August 14, 2018, to express concern for Lewis' mental health and safety. (Segar II 441; Segar Exh. 26)  Coe provided text messages from

---

[5] One incident Lewis reported at this time was an assault that occurred earlier that summer. (Lewis 78) In her deposition, she testified that Coe was angry at her for making dinner plans with friends.  (Lewis 78)  She said Coe drove her into "the hood" and threw her phone out of the car, then left her there for under five minutes. (Lewis 62-66)  Once back in the car, she said Coe strangled her for the entire ride to her apartment.  (Lewis 66) Lewis did not call the police, nor did she report this to LSU until her meeting with Segar in August 2018. (Lewis 70, 78)

PD.41319953.2

Lewis threatening to harm herself. [6] (Segar II 442) Segar reported Coe's concern to the Title IX office and instructed Lewis and Coe to cease contact with the other. (Segar II 444; Exh 26)

On August 16, 2018 (promptly after speaking with Lewis), Segar submitted the evidence and a complaint of abuse to the LSU police. (R. Doc. 182, ¶ 537; Lewis Exh. 12) Segar also accompanied Lewis to give her story to the police. (Lewis 230)  Lewis confirmed that the information in the initial report by the police was consistent with what she reported to Segar on August 16, 2018. (Lewis 321; Lewis Exh. 12)  As shown from the police records, Segar was integral to reporting Coe's abuse to the police.

In addition, Segar also filed a Title IX complaint regarding the information Lewis provided, and Lewis confirmed the accuracy of the information in the Title IX report.  (Lewis 299; Exh. 9) As a result of Lewis' disclosures, Coe was arrested and charged with felony dating violence the following day.  (R. Doc. 182, ¶ 539)  The police took Coe into custody on August 17, 2018. (Lewis 320-321; Exh. 12).  Coe was already suspended from the football team, and he received an interim suspension from LSU on August 18, 2018.   (Lewis 108-109; Sanders 100, 102, 104-106) Nevertheless, the night of Coe's release from police custody (in August 2018), Lewis was waiting for him at his apartment.  (Lewis 82)  Lewis stayed with Coe thereafter.  (Lewis 105)

**Post-arrest conduct in August/September 2018.**  As mentioned, Lewis consistently went to Coe's off-campus apartment while he was "on house arrest" and watched TV and had sex with Coe. (Lewis 105-107)  She said they could not be seen together because of the court's protective order.  (Lewis 106)  Unfortunately, Coe continued to assault Lewis by pushing her into a couch, causing a lump on her shin, and by slapping her and causing a black eye. (Lewis 79, 108)  Both incidents occurred at Coe's off campus apartment. (Lewis 83, 108) Lewis did not report the

---

[6] Lewis confirmed that she wrote the text messages to Coe and that she cut herself because "[Coe] was just absolutely awful to [her]." (Lewis 311)

PD.41319953.2

assaults to LSU. (Lewis 107, 113) She testified that at this time "[Coe] already got in trouble . . ." (Lewis 112) Lewis also did not report these incidents to the police until later. (Lewis 106-107) However, her friend reported the abuse, causing the police to contact Lewis. (Lewis 111) Lewis again lied to the police and denied that the black eye was caused by Coe. (Lewis 111-112; 364-365) In spite of Lewis' lies, the police again arrested Coe on September 16, 2018. (R. Doc. 182, ¶ 544) **Coe withdrew from LSU the following day and never re-enrolled.** (R. Doc. 182, ¶ 544) Coe pled guilty to two counts of battery and one count of violation of a protective order. (R. Doc. 182, ¶ 546) Even though Coe never returned, LSU ultimately expelled Coe on July 18, 2019, as a result of the Lewis-related reports. (R. Doc. 182, ¶¶ 545, 552)

**Post-Expulsion Conduct.**[7]    Coe continued to abuse Lewis at off-campus locations, but Lewis never again reported any issues regarding Coe to LSU. (Lewis 113; Lewis II 365, 366, 392-393, 453-454) She did not report these incidents to LSU "probably [because she] was just embarrassed that I keep going and going . . . and again, you know, it wasn't really -- it was now in the hands of the police, not LSU." (Lewis 107-109) She felt "[i]t was all a legal issue at that point, so any issue kind of just went to the cops or the handler of the [criminal] case." (Lewis 113)

Lewis could not see Coe between his second arrest in September of 2018 and January of 2019. (Lewis I 114-115) However, Lewis visited Coe at his aunt's house in January 2019, spent the night with Coe, and began having sex with him immediately. (Lewis I 115-119) Lewis saw Coe secretly, sometimes sneaking through a window at Coe's aunt's house. (Lewis 121-122; *see* Lewis II 409, 448, Exh. 30) Lewis claims Coe was physically abusive to her beginning again in the summer of 2019, but she reported none of the assaults to the police or LSU. (Lewis 119-120, 122-125) Lewis regularly saw Coe from January of 2019 until she moved back to New Zealand

---

[7] The conduct detailed in this section is for background only because Coe was expelled from LSU, eliminating any possibility that LSU had control over the "context of the harasser." *See* section III.A.b.

PD.41319953.2

in June of 2020. (Lewis 120) She maintained contact with Coe until November of 2020, when she learned he was expecting a child with another woman. (Lewis 130-131)

Lewis graduated from LSU in December 2020 with a degree in Sports Administration and a minor in business. (Lewis II 422; Sanders Decl. ¶ 9, Exh. 4)

## II.    STANDARD OF REVIEW.

*See* Standard of Review discussion in Memorandum in Support of Motion for Summary Judgment No. 1, Section II.[8]

## III.    LEWIS' REMAINING HEIGHTENED RISK CLAIM FAILS AS A MATTER OF LAW.

### A.    Lewis Fails to Meet the Elements of a Heightened Risk Claim.

*See* discussion of heightened risk in Summary Judgment No. 1, Section III.C, which is adopted herein by reference.  Under a pre-assault Title IX heightened risk theory, a plaintiff must prove: (1) the defendant had actual knowledge of a substantial risk that sexual abuse would occur; (2) the harasser was under the defendant's control; (3) the harassment was based on the victim's sex; (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit; and (5) the defendant was deliberately indifferent to the harassment.[9] Lewis fails these elements.

#### a.    Element One: Lewis Cannot Establish Actual Knowledge

Actual knowledge is a high bar which requires a showing that an appropriate person had actual, not constructive, knowledge of sexual harassment.[10]  *See* discussion of actual knowledge in Summary Judgment 1, Section III.B, which is adopted herein by reference.

---

[8] For efficiency, the Board will hereafter refer to the related memorandum simply as Summary Judgment No. 1.
[9] *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (internal citations omitted); R. Doc. 340, p. 39.
[10] *Roe*, 53 F.4th at 341.

PD.41319953.2

### i. No Actual Knowledge Before Coe's First Assault of Lewis.

Lewis began a sexual relationship with Coe in January 2017. (Lewis 11-15)  As of that date, the only information known to anyone at LSU regarding prior misconduct by Coe was Richardson's discussion with Sharon Lewis and Keava Soil-Cormier two months earlier about an incident at JL's off-campus bar between Richardson and Coe.

Richardson's version of Coe's conduct varies from saying that Coe threw a drink at her to saying Coe pushed her to the ground (Richardson 179, 192, 267), and Richardson admits that she cannot specifically remember what she told Lewis and Soil-Cormier had happened.[11]  (Richardson 190-191)  In that meeting, Sharon Lewis and Soil-Cormier did not perceive Richardson to be making a claim of physical abuse by Coe.  (S. Lewis 161; Soil-Cormier 119)  Liability cannot exist unless an appropriate person draws the inference that a substantial risk of harm exists.[12]  They described Richardson's demeanor as laughing it off and defensive about having herself thrown a drink at Coe.  (S. Lewis 171-172; Soil-Cormier 92)  Richardson acknowledges that she may have laughed when telling them the story of what happened. (Richardson II 30)  Richardson's account about the single dispute at a bar did not give LSU actual knowledge of a "substantial risk" that Coe would engage in domestic violence toward Lewis.[13] [14]

---

[11] Although Richardson also claims she told Sharon Lewis and Soil-Cormier that Coe was abusive in the past, her deposition testimony refutes this, as she acknowledges she merely told them "exactly what . . .happened that night." (Richardson 191) Richardson also testified that Sharon Lewis and Soil-Cormier "never asked" if what happened that night was the only time. (Richardson 261)

[12] *Roe*, 53 F.4th at 341.

[13] *See Pierce v. Houston Comm. Coll. Sys.*, 2022 WL 2659027, at *7 (S.D. Tex. July 9, 2022) (finding no actual knowledge where plaintiff testified that she did not communicate her concerns to the Dean or anyone else in the office and she told receptionist that she had an "urgent, personal, sensitive matter" to address with the Dean, but never told her that she wanted to see the Dean because her advisor had sexually harassed her).

[14] Incidentally, for purposes of the actual knowledge element, Sharon Lewis and Soil-Cormier are not "appropriate persons." An appropriate person is "an official of the recipient entity with authority to take corrective action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).  The obligation to report harassing conduct **does not** qualify an employee as having the ability to take corrective action. *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 361 n.38 (5th Cir. 2020) (citing *Plamp v. Mitchell Sch. Dist. No. 17–2*, 565 F.3d 450, 459 (8th Cir. 2009) ("After all, each teacher, counselor, administrator, and support-staffer in a school building has the authority, if not the duty, to report to the school administration or school board potentially discriminatory conduct. But that authority does not amount to

11

## ii.  No Actual Knowledge in May 2017.

Lewis' Complaint focuses her heightened risk claim on LSU's response to "reports of John Coe's dating violence in May 2017" only, (R. Doc. 182, ¶ 931) so the Board will also focus on her allegation of a May 2017 "report." (R. Doc. 182, ¶¶ 462-474)  The undisputed facts do not establish any "knowledge" by LSU in May 2017 of abuse between Lewis and Coe.

Per Lewis' testimony, she only disclosed the May 2017 incident to Donovan White.  (Lewis 158, 162-166)  Accepting Lewis' testimony as true that she made a report to White, she further testified that White was under the impression that she was describing playful conduct: "I don't really think he [White] realized the severity of it. Like, he probably just thought it was, like, a playful something. Like, he probably didn't, like, realize that I did get . . . punched." (Lewis 165-167) She admitted she had no visible signs of injury. (Lewis 165-167) Thus, per her testimony, White did not have "actual knowledge" of a substantial risk by Coe in May 2017 because he did not know the "underlying facts" and did not understand what had occurred.[15] (Lewis 105)  Lewis made no other reports to anyone at LSU about the incident, nor did any coaches or trainers indicate they observed she was injured. (Lewis 167-169)

Lewis speculates in her Complaint that a teammate may have reported her May 2017 abuse to White (R. Doc. 182, ¶ 467), and she also alleges that "upon information and belief" one of her

---

an authority to take a corrective measure or institute remedial action within the meaning of Title IX. Such a holding would run contrary to the purposes of the statute."); *Santiago v. Puerto Rico*, 655 F.3d 61, 75 (1st Cir. 2011) ("The empty allegation that a school employee 'failed to report' harassment to someone higher up in the chain of command who could have taken corrective action is not enough to establish institutional liability.  Title IX does not sweep so broadly as to permit a suit for harm-inducing conduct that was not brought to the attention of someone with the authority to stop it.") (internal citations omitted). The bulk of employees are not covered for purposes of a school's "notice" under Title IX. *Doe*, 964 F. 3d at 361. The official must have authority to both "repudiate the conduct *and* eliminate the hostile environment." *Id.* (citations omitted) (emphasis in original). Whether an employee has the power to reformulate the sexual harassment policies is a key inquiry. *See id.* (citations omitted).  Plaintiff cannot show that Lewis or Soil-Cormier meet this definition.

[15] *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997); *Kelly v. Allen Indep. Sch. Dist.*, 602 F. App'x 949, 953 n.3 (5th Cir. 2015) (applying standard to student-on-student harassment).

teammates reported her abuse to Julia Sell between May 2017 and August 2018. (R. Doc. 182, ¶ 459) However, in her deposition, Lewis acknowledges that she has no evidence of whether or when her teammates reported anything. (Lewis 153-156) Lewis believes three teammates, "Luba, Joana, and Kennan" made reports about her assaults to Julia Sell, but she believes Luba talked to Sell **after** Lewis disclosed her April 2018 assault (so not at the time of the May 2017 incident). (Lewis 151-153) Regarding "Joana," Lewis testified that she has never spoken to Joana about whether she reported Lewis' abuse to Sell. Instead, she speculates that: "I think Joana also told Donovan or Sean Carter that I got hit, possibly, because I think they asked her. I don't know. . . if I am thinking correctly . . . I don't have a specific recollection . . . I might be wrong." (Lewis 154-156)[16] Then, she testified that she is not even sure Joana was present on the day of this supposed conversation. (Lewis 162-165)

Regarding Kennan Johnson, Lewis testified that Johnson said she talked to the coaches, but Lewis acknowledged "I'm just speculating, so I have no idea." (Lewis 154) Johnson testified that it is possible she only spoke with Julia Sell about Jade Lewis in 2018 (so not at the time of the May 2017 incident). (Johnson 194-195, 259, 262-263)[17] Thus, Lewis' allegation that anyone disclosed her May 2017 assault to LSU is unsupported.[18]

---

[16] Lewis also testified that Joana "switches her story a bit," so Lewis said she is "not a hundred percent," what Joana might have disclosed. (Lewis 153)

[17] Johnson sent Julia Sell a text message about Jade Lewis, but she believes she sent that after the news report that Coe had been arrested. (Johnson 262-263)

[18] Initially, Lewis testified her father told her he knew about the May 2017 punch immediately after Lewis lost a tennis match in Germany on the pro tennis circuit (after she left LSU). (Lewis 188) Conversely, she testified that neither her father or her mother ever discussed the alleged punch with her and did not seek any assistance for her such as counseling or therapy. (Lewis 187-191) Lewis alleges in her Complaint that her father expressed concern to Mike Sell "about his daughter's relationship with Coe" in Summer 2017 and said Coe punched Lewis. (R. Doc. 182, ¶¶ 471-472) Even if this account were true, Lewis left LSU in May 2017 to be a professional player and was no longer a student in Summer 2017. (Lewis 155, 187, 221; M. Sell 39-45, 94-96) She testified: "I mean, I left, so it's kind of like, well what do you do?" (Lewis 155)

PD.41319953.2

Instead, LSU's "knowledge" began in April 2018. (Lewis 219; Segar II 413-416) Once Lewis reported the April 2018 event, LSU began the arduous process of trying to address domestic violence amid Lewis' misinformation. Even then, LSU's "actual knowledge" was hindered by the lies Lewis admits she told.

### b. Coe was not Under the Board's Control in This Context.

Title IX liability attaches to student-on-student harassment when an educational institution exercises substantial control over the harasser and the context in which the known harassment occurs.[19] "[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the school district's control."[20] Per the Supreme Court, "[t]he statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."[21] Thus, Title IX does not cover student-on-student harassment that occurs off-campus, outside of a school activity, and outside of a context under the school's "substantial control."[22]

Lewis fails to show that the Board exercised substantial control over Coe in the context of Coe's many off-campus assaults other than perhaps the one on-campus assault at Lewis' dorm in June 2018, which assault Lewis repeatedly denied occurred to the police, Title IX, SAA, and Segar. (Lewis 286-287) Otherwise, LSU lacked "substantial control" over the conduct occurring off its premises that had no relation to university activities.[23]

---

[19] *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).
[20] *Id.* (quoting 20 U. S. C. § 1681(a); § 1687 (defining program or activity).
[21] *Id.* at 644-645.
[22] *See id.* Conversely, student misconduct that "occurs during school hours and on school grounds" is a context in which the funding recipient retains substantial control. *Id* at 646.
[23] Although LSU investigated Lewis' off-campus incidents as potential violations of PM-73, PM-73 encompasses broader conduct than Title IX.

14

Once Coe withdrew from LSU in September of 2018, LSU also had no control over Coe or his off-campus conduct because he was no longer a student.  Although LSU learned of some other possible injuries to Lewis after Coe withdrew, liability cannot attach to these instances.

### c. Element Three: The Alleged Conduct is Not Actionable Under Title IX.

Moreover, the conduct at issue does not fall within the purview of Title IX.  Title IX does not address all instances of student-on-student violence or harassment.  Instead, Title IX prohibits discrimination "on the basis of sex."[24]  According to Lewis's own testimony, Coe was physically violent with her, but he never sexually assaulted her.  (Lewis 24)  Title IX provides no remedy for interpersonal violence between students, and it does not follow that all incidents of domestic violence can result in a Title IX violation.[25]  Per the Fifth Circuit, incidents of "personal animus" are insufficient to show actionable sexual harassment.[26]  "Given the inherently sexual nature of rape and sexual assault, it is reasonable to conclude from such incidents that the perpetrator was motivated, at least in part, by victim's sex."[27]  However, domestic violence is not inherently sexual.  While domestic violence *might* be motivated by the victim's sex, "it can also be motivated by other reasons, such as personal animus or jealousy."[28]  Indeed, PM-73 only covers gender-based violence.  (*See* Sanders Decl. ¶ 4; Exh. 1)  Consistently, Lewis admits she never reported "sexual abuse" as opposed to "physical abuse" to LSU. (Lewis II 387)[29]

---

[24] 20 U.S.C. § 1681(a).

[25] *Lopez v. Regents of Univ. of Cal.*, 5 F.Supp. 3d 1106, 1124-1125 (N.D. Cal. 2013).

[26] *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011).

[27] *Lopez*, 5 F.Supp.3d at 1125. Similarly, in *Bell ex rel. Bell v. Board of Educ. of Cnty. of Fayette*, 290 F. Supp. 2d 701, 706 (S.D.W.Va. 2003), the court rejected a claim that was based in part on allegation that the alleged molester previously had broken a student's ribs.  The court reasoned that "physical assault is not based on sex." *Id*. at 706.

[28] *Lopez*, 5 F.Supp.3d at 1124*; see also Sanches*, 647 F.3d at 165 (affirming summary judgment against a Title IX plaintiff because there was "nothing in the record to suggest that [the perpetrator] was motivated by anything other than personal animus").

[29]  Moreover, damages are not available under Title IX unless the intentional conduct violates the "clear terms of the statute." *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)  As a result, a university may be held liable only for violations that were unambiguously communicated to it by Congress.  The Department of Education's 2020 regulations now include "dating violence" in the definition of sexual harassment. 34 CFR § 106.31. However, the Department of Education makes clear that the regulations are not to be applied retroactively.  *See* United

### d. Element Four, Part II: Plaintiff Cannot Meet her High Burden of Showing Deliberate Indifference that Caused Harassment.

#### i. No Deliberate Indifference.

Plaintiff also cannot show the Board was deliberately indifferent to prior sexual misconduct by Coe or Doe. As this Court acknowledged, "deliberate indifference in the Title IX context is a 'high bar' and requires the defendant's response to be 'clearly unreasonable in light of the known circumstances.'"[30] "This standard is high in order to ensure institutions are liable for their own official decisions and not for their students' independent actions.[31] The institution's conduct "must amount to an intentional choice, not merely an unintentionally negligent oversight."[32] Fifth Circuit precedent establishes that "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference," and neither do negligent delays, botched investigations of complaints, or responses that could have been improved.[33]

The undisputed facts refute a finding of deliberate indifference. As a preliminary issue, Plaintiff must accept some responsibility for the outcomes from LSU to the extent LSU could only act upon information that Plaintiff provided. Plaintiff concedes that in many instances, she gave false information to LSU in situations where truthful information could have caused different results. (Lewis 75-77, 79, 272-273, 288, 297) LSU does not intend to blame a victim of domestic

---

States Dep't of Educ., Office for Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment*, p. 10, (July 2021) (Updated June 28, 2022) https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf ("[A] school must follow the requirements of the Title IX statute and the regulations that were in place at the time of the alleged incident."). The subsequent acts undertaken by the Department of Education indicate that, prior to 2020, the clear terms of Title IX were limited to sex discrimination and do not encompass general acts of physical violence. Nothing in the plain text of Title IX or its legislative history places educational institutions on notice that they could be held liable for acts of interpersonal violence between students. *See* Summary Judgment No. 3, n.23.
[30] R. Doc. 340, p. 28 (quoting *Roe*, 53 F.4th at 341) (quoting *Sanches*, 647 F.3d at 167).
[31] *Davis*, 526 U.S. at 643 (quoting *Gebser,* 524 U.S. at 290-91).
[32] *James v. Harris Cnty.*, 577 F.3d 612, 617–18 (5th Cir. 2009) (quoting *Rhyne v. Henderson Cnty*., 973 F.2d 386, 392 (5th Cir. 1992)); *see Ramos v. Webb Consol. Indep. Sch. Dist.*, 724 F. App'x 338, 340 (5th Cir. 2018) (applying same in Title IX context).
[33] *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (internal citations omitted).

violence for their hesitation to report the violence, but at the same time, LSU cannot be responsible for false information that Lewis provided.

Lewis also cannot fault LSU for its actions taken in connection with a process in which Lewis declined to participate. LSU endeavored to act in a manner that respected Plaintiff's wishes. Per Stewart, the Title IX office's typical process "gives a great deal of deference to a reluctant complainant. . . [n]ot to move forward in a process that that person doesn't desire because of the compounding harm it can cause."  (Stewart 195-196)  In her interactions with LSU employees, Lewis made it clear that she did not want to report or cooperate with the process.  Despite Lewis' reluctance, Title IX staff still reached out to her in attempts to encourage her to come forward and point her in the direction of supportive resources.  It was Lewis, not LSU, who withheld facts of many assaults, and repeatedly indicated that she did not wish to engage in the processes. The institution is not liable for a plaintiff who chooses not to participate in the Title IX process.[34]

Despite Lewis being a reluctant complainant, LSU endeavored to obtain information to effectively address this very difficult situation.

- Jeffrey Scott, who had experience with domestic abuse cases, was assigned to investigate the domestic violence case against Coe. (Scott 37, 38, 42) He interviewed Lewis and others and advised Lewis in writing of all resources that LSU provided. (Lewis 229-230, 241-242; Lewis Exh. 3) Scott referred Lewis to the Lighthouse program because of his fear for her safety. Lighthouse would provide Lewis with much needed support. As Lewis admits, she lied to Scott about what occurred. (Lewis Exh. 18; Scott 57-58)

- Segar offered Lewis resources related to dating violence, assistance reporting to the police, free counseling, and drove Lewis to her appointment at the Title IX office. (Lewis 228-230; Exh. 2)

---

[34] *Roskin-Frazee v. Columbia Univ.*, 474 F.Supp. 3d 618, 627 (S.D.N.Y. 2019) (finding no deliberate indifference where university respected privacy of student who clearly communicated to university employees that she did not want to report the alleged assault and withheld information); *JD1 v. Canisius Coll.*, 2022 WL 2308902, at *9 (W.D.N.Y. June 27, 2022) ("[W]here a plaintiff withholds the facts of any specific sexual assault and indicates that she does not wish to have it reported, the institution cannot be liable for honoring her request for privacy and taking no further action.") (internal quotations omitted).

- Scott and Stewart in Title IX partnered with Sanders in SAA to encourage Lewis to disclose if she was being abused by Coe, and Lewis would not do so. (Sanders 71-72, 74; Lewis Exh. 17)[35]

- After the June 2018 event where the campus police were called by Lewis' roommate, and Lewis denied physical violence by Coe, Sanders moved forward with the Code of Conduct process to bring Lewis in for questioning and see whether she would be truthful. (Sanders 70-74) Lewis still denied any abuse by Coe. (Sanders 74)

- In August 2018 when Lewis finally told Segar that she was ready to be truthful, Segar promptly escorted Lewis to the police to tell her story.[36] (Lewis 230)

- Even still, Lewis again returned to Coe. (Lewis 82) Nevertheless, LSU moved forward with an interim suspension and ultimately expelled Coe from the university. (R. Doc. 182, ¶¶ 545, 552)

LSU did not ignore Lewis' report or fail to act upon it, and LSU is not held to the standard of a perfect response.[37] Stewart accurately captured the difficulty of this domestic violence situation, suggesting that while it is easy in hindsight to make conclusions at the end of a process about what could have gone better, the situation they faced with Lewis and Coe, including Lewis' unwillingness to report her assaulter was incredibly challenging:

> Yeah, absolutely we would do things differently. Did we do what we thought was reasonable in balancing the harm we knew and the potential harm to be caused, did we do that in good faith at the time, yes absolutely.

(Stewart 195)

> I think the situation was extraordinary. I think institutions collectively are limited in the response. Can we expel somebody, can we no-contact order, right. Right, but this was an extraordinary need that went beyond that. So, could any institution meet the needs of this circumstances? I think not. How were we compared to other institutions as I talked without revealing personal information

---

[35] Sanders said his training taught him about "a cycle of violence that often times folks can find themselves in and I think that's in my opinion maybe where Jade was, where she was reluctant to get help. Perhaps it might be worse for her if she was to do so." (Sanders 82-83) Sanders wanted to communicate with her to let her know that the situation is "tough" and "it may be challenging to tell the truth," but "[he] was concerned about her safety and was just trying to assist her in the best way we could." (Sanders 83) Sanders felt that "we have to do something, right? So let's at least try to get her in to talk about this situation to see if she'll be truthful. . . ." (Sanders 75).

[36] "[I]n 'a situation where there is some indication that the incident may have been consensual, and where there is the potential for criminal charges if it was an assault, it is not "clearly unreasonable" to rely on the investigative expertise of a law enforcement agency.'" *I. L. v. Houston Indep. Sch. Dist.*, 776 F. App'x 839, 843-44 (5th Cir. 2019).

[37] *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011).

with my SEC coordinator counterparts at the time? This was extraordinary as
well so no, there were things I would do differently. Were we ill-equipped? I
think universities generally are ill-equipped for this level.

(Stewart 212-213)  Courts must assess the reasonableness of a school's response to an allegation
of harassment only "**in light of the known circumstances**."[38]  The many efforts to help Lewis by
LSU's staff, including Stewart, Sanders, Scott, and Segar demonstrate the antithesis of
indifference.

## ii. No Causation.

Not only was there no deliberate indifference, but such deliberate indifference also did not
cause the harm. A plaintiff must show that a school's "deliberate indifference subject[ed] its
students to harassment."[39]  Lewis cannot meet her causation standard. The summary judgment
evidence, including Lewis' own admissions, shows that despite having been instructed by multiple
persons, including her friends, parents, and LSU employees, to stay away from Coe, she ignored
those instructions and continued a relationship with Coe. (Lewis 166; Lewis II 449-450) She
cannot show that any one different action by LSU in addressing her situation would have caused
her to avoid the injuries she suffered from Coe.  No action by LSU could have stopped their off-
campus meetings. Indeed, criminal charges against him and a protective order barring them from
being near each other were ineffective.  (Lewis 100-101, 106, 125)  Even after his expulsion from
LSU, she continued to see him wherever he lived. (Lewis 130; Lewis II 451). A no-contact order
would have made no difference, particularly if a protective order did not do so. Colleges have
limited ability to protect students from off-campus violence, and it is too tenuous to suggest that

---

[38] *Davis*, 526 U.S. at 648 (emphasis added).
[39] *Id.* at 646-645.

19

LSU had a duty to protect Lewis from someone she could not protect herself from. Plaintiff cannot show that LSU's alleged deliberate indifference, as opposed to Coe himself, caused her injuries.[40]

### e. Element Five: Plaintiff Fails her Burden of Showing a Deprivation of Educational Benefits.

Finally, Lewis must show the existence of an injury, in that the harassment deprived her of "access to the educational opportunities or benefits."[41] To satisfy this requirement, the harassment must have had a "concrete, negative effect" on Lewis' education.[42] In her Complaint, Lewis only claims she was deprived of educational benefits because she temporarily withdrew from LSU in 2017. (R. Doc. 182, ¶ 790) However, that was always her plan. She testified that when she "signed the contract" with LSU, she knew she was only staying for a semester before going pro. (Lewis 189) Afterward, Lewis returned and earned her bachelor's degree. (Lewis II 421-22)

## B. No Other Heightened Risk Theory is Available to Lewis.

*See* discussion in Summary Judgment No. I, Section III.D.a, adopted herein by reference.

### a. Lewis Cannot Establish an Official Policy of Deliberate Indifference to Reports of Sexual Misconduct.

*See* discussion in Summary Judgment No. 1, section III.D.b, which is adopted herein by reference. Lewis cannot establish that the Board "maintained a policy of deliberate indifference to reports of sexual misconduct" that applied to Lewis.[43] Lewis offers no single specific, non-conclusory LSU policy that applied to Lewis' unique situation and to which she can link her injuries from Coe. In some places she blames LSU for allowing Coe "unfettered access to the student body." (R. Doc. 182, ¶ 931(g)) But conversely, she blames LSU for suspending Coe from the team because she did not believe LSU had sufficient information after the June 2018 incident

---

[40] *See generally Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022).
[41] *Davis*, 526 U.S. at 650.
[42] *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020) (citation omitted).
[43] *See Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020).

(based on her false information) to suspend him. (Lewis 286-289)  She believed Coe should only have been talked to and sent to therapy, both of which occurred. (Lewis 286-289)

Unlike the challenged "policies" in *Simpson* and *Karasek* relating to encouraging sex in football recruiting and informally resolving sexual assault claims to reduce the need for disclosure, Lewis has not pointed to any purported policy that caused her harm.[44] The undisputed evidence show LSU's many efforts to resolve her suspected domestic abuse, including numerous Title IX reports, numerous interviews of Lewis, and full cooperation with law enforcement. Lewis was not reporting incidents of domestic violence that LSU ignored. Rather, by her own admission, she was consistently denying violence to the LSU police, Title IX, SAA, and Segar. (Lewis 297) The Board's efforts to gain cooperation from Lewis refute an official policy of deliberate indifference.

> ### i.    General Reference to Failure to Report Complaints, Initiate/Conduct Investigations and Grievance Procedures.

*See* discussion and authorities cited in Summary Judgment No. 1, Section III.D.a.i, adopted herein.  In Lewis' case, her roommate, Segar, the police, and others made reports on her behalf, demonstrating that LSU's reporting mechanisms were in place, when utilized. Lewis did not use them. Lewis cannot prove that LSU acted with "deliberate indifference" to specific allegations, much less that LSU maintained a general policy of deliberate indifference to reports of sexual misconduct.[45]

To the extent Lewis relies on Sharon Lewis' prior actions regarding plaintiff Richardson to show a "policy of deliberate indifference," that was just **one instance,** at most, of allegedly

---

[44] *Karasek*, 956 F.3d at 1112; *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1174 (10th Cir. 2007).

[45] Lewis alleges she was never notified of the actions LSU took against Coe; however, letters were addressed and sent to Lewis utilizing her correct email address with information about each investigation. (R. Doc. 182, ¶553; Lewis II 372, Lewis Exh. 19) Lewis received communication about Coe's interim suspension from LSU via email to her LSU email address. (*Id.*) Lewis also received communication about Coe's expulsion from LSU via email to her LSU email address. (Lewis Vol. II 372; Lewis Exh. 20)

PD.41319953.2

failing to report behavior that Sharon Lewis did not believe was covered by Title IX. It was hardly a "policy of deliberate indifference." Indeed, in the case of Plaintiff Brennan, Sharon Lewis was quick to report sexual misconduct, negating any intent to hide complaints. (Brennan 58-59; Segar 242) The same is true with Ausberry. Ausberry failed to report a text message he received from Coe, in which Coe disclosed that he hit Lewis. (Ausberry 342) Coe sent the text message on April 14, 2018, and, fortunately, LSU otherwise received notice of the incident shortly after on April 25, 2018. (Lewis 219; Lewis Exh. 2; Segar II 413-416) Thus, Ausberry's failure to report did not keep the report from being made.[46] Lewis was not an LSU student at the time of the assault, so the reporting obligations were unclear to Ausberry, although he agrees he should have reported it. (Segar II 407-408, 437-437; Ausberry 317-318) Ausberry's mistake in not reporting, in light of the circumstances (that Lewis was not a student at the time), was not "clearly unreasonable" so as to constitute deliberate indifference.[47] Notably, that same year, Ausberry quickly passed along information he received from Plaintiff Richardson regarding Coe, demonstrating he was not deliberately indifferent to her report of physical abuse. (Ausberry 262-263) These incidents demonstrate two isolated instances where employees were, at most, uncertain or mistaken about their reporting obligations. Although each was a mandatory reporter, such status does not impute their knowledge to the Board. *See* note 14. Title IX does not require perfection, and one erroneous action does not establish an official policy of deliberate indifference.[48]

ii.    **Training.**

---

[46] While this was a failure on Ausberry's part, it was short-lived because LSU received the information and acted on it. Further, the text message provided no information that Coe did not also disclose to Scott. Coe told Scott that he punched Lewis in the stomach. (Lewis 243-244; Lewis Exh. 4) Therefore, Ausberry's inaction did not impact Lewis.
[47] *Davis*, 526 U.S. at 648.
[48] *Sanches*, 647 F.3d at 170.

PD.41319953.2

*See* Summary Judgment No. 1, Section III.D.b.ii, adopted herein. Like other students, Lewis and her alleged assaulter, Coe, received LSU's training. Sanders Decl., ¶ 3) Because of their roles as student athletes, Lewis and Coe received **additional** training through the Dan Beebe Group/Protection for All. (Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl.¶ 5, Exhs. 2-3) At several junctures, as indicated above, Lewis was offered resources and policies. Coe received training and persisted in his abuse of Lewis, and Lewis received training and persisted in her relationship with Coe, testifying that she loved him until 2020. (Lewis II 447) Lewis cannot show an official policy of deliberate indifference to training, nor can she show that more training on Title IX **prior to Lewis' assault** would have led to a different result. (*See* Board 30(b)(6) I 40-41)

### iii.  Internal Audit

*See* discussion in Summary Judgment No. 10, Section III.C.b.iii, adopted herein.

### b.  Element Two: Lewis Cannot Show a Known or Obvious Risk.

Lewis also cannot show that the risk of physical violence resulting from such policy was "known or obvious."  *See* discussion in Section III.A.a above.  Although Plaintiffs collectively have pointed to other general allegations of sexual misconduct, they have no evidence of widespread, systemic conduct that created a "known risk" of physical violence by Coe and that would have precluded Lewis' alleged harm.[49]

### c.  Element Three: Lewis Has Not Shown that the Alleged Misconduct took Place in a Context Subject to the School's Control.

*See* Section III.A.b. The Board did not control the circumstances of Lewis' alleged assaults.

### d.  Element Four: Lewis Cannot Show Causation.

---

[49]*See e.g.*, *C.T. v. Liberal Sch. Dist.*, 562 F.Supp. 2d 1324, 1340 (D. Kan. June 10, 2008) (finding that program did not "bear the element of encouragement of misconduct" nor did it "create [ ] a risk of abuse that would have been obvious to school officials."); *Tackett v. Univ. of Kan.*, 234 F.Supp. 3d 1100, 1108 (D. Kan. 2017) (rejecting argument for institutional liability based on the school's authority over its athletes and that it "should have known" of the heightened risk of assault at popular off-campus apartment complex for football players "based on the stereotypical assumption that football players are more prone to commit sexual assault").

An official policy or custom must have caused the alleged assault, as opposed to "simply misconduct that happened to occur [at the school] among its students.'"[50] Official policy liability under Title IX cannot "mean that recipients can avoid liability only by purging their schools of actionable peer harassment."[51] Lewis cannot show that her generalized statements relating to training, LSU's 2017 audit, and failure to report complaints or to engage in investigations would have prevented her harm. Likewise, as shown in Section III.A.d.ii, Lewis cannot establish any causal link between a purported "policy of deliberate indifference" of the Board and the harm she alleges. Indeed, Lewis continued her relationship with Coe long after he was expelled from LSU. Lewis cannot show that LSU caused this situation. In Segar's words:

> [I]t's sad to me that there was an arrest where I had hoped things would stop and they would be separated and they would stay separated because of court order and to me finally something had happened right. Like he's arrested, she's not supposed to see him, something legal because she – like when she said I'm finally ready to tell the truth, she wouldn't tell the truth all the time. She would say one thing maybe a friend and something different to me and something different, so we never – it was just really hard. And so, for me when the police, when he actually got arrested, I had hoped that would end this pattern, . . . and it was sad to me that even though there was a restraining order, even though she wasn't supposed to go there, she still went there and it made me said and it didn't really change anything.

(Segar 154-155) Plaintiff cannot show that additional training or different investigation or reporting would have changed these circumstances.[52]

## C. **Lewis's Heightened Risk Claim is Prescribed.**

The Board adopts by reference the discussion set forth in Summary Judgment No. 1, Section II.B. Lewis alleged harassment by Coe at LSU from 2017 to August 2018 (when Coe was suspended), yet she did not file suit until years later, on April 26, 2021. (R. Doc. 1) She can only

---

[50] *Simpson v. Univ. of Co. Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007).

[51] *Davis*, 526 U.S. at 650.

[52] *Tackett v. Univ. of Kan.*, 234 F.Supp.3d 1100 (D. Kan. 2017) (finding no institutional liability for heightened risk of sexual assault where alleged policies "played no part in plaintiff's rape).

survive prescription challenges if the claim accrued at a later, timely date. The Husch Blackwell Report did not delay accrual of her claim. As shown above, the only pre-assault information she learned from the Husch Blackwell Report was the drink incident with Richardson two months earlier.  She cannot show that, had she learned of the Richardson situation in the two months before she met and started dating Coe, she would avoided Coe, nor can she show that knowledge of LSU's response to Richardson's situation would have made any difference to Lewis.  Indeed, discipline to Coe for that incident would not have affected Lewis meeting Coe off-campus and beginning their relationship.  Thus, information about Richardson's situation, in the scheme of Lewis' lengthy period of abuse, is merely tangential.

Lewis was also well aware in 2017 that she was at a "heightened risk" of assault by interacting with Coe.  Her injuries were known, and LSU's responses (the supposed action connected to her injuries), were known to her, yet she did not take timely legal action.  By August 2018, Lewis continued to suffer injuries, knew of LSU's response through her many interactions with Title IX, SAA, and football staff, knew the resources available to her, knew the training she received, and had turned her situation over to criminal authorities.  These extensive interaction with LSU put her on notice of any purported "policy of indifference," if one existed.  Undoubtedly, one factor preventing Lewis from filing suit was her abusive relationship, from which she did not extricate herself until well after both she and Coe left LSU.  However, Lewis' subjective hesitation due to these circumstances which ended in 2020 is irrelevant to toll prescription.

## IV.    CONCLUSION

For these reasons above, Lewis' heightened risk claim fails as a matter of law.

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL**

PD.41319953.2

BY:    /s/ *Susan W. Furr*

Shelton Dennis Blunt Bar Roll No. 21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.: 30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436
Michael B. Victorian Bar Roll No.: 36065
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 346 0285
Facsimile: 225 381 9197
Email: dennis.blunt@phelps.com
Email: susie.furr@phelps.com
Email: karleen.green@phelps.com
Email: jessica.huffman@phelps.com
Email: molly.mcdiarmid@phelps.com
Email: greg.stevens@phelps.com
Email: michael.victorian@phelps.com

ATTORNEYS FOR THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic copy of the same to Plaintiffs' counsel.

/s/ *Susan W. Furr*
Susan W. Furr

PD.41319953.2