# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ABBY OWENS, ET AL.**                    **CIVIL ACTION NO.  3:21-CV-00242**

**VERSUS**                                **JUDGE WENDY B. VITTER**

**LOUISIANA STATE UNIVERSITY,**           **MAGISTRATE JUDGE JOHNSON**
**ET AL.**

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 9: KENNAN JOHNSON

NOW INTO COURT, through undersigned counsel, comes defendant, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board"), and submits this memorandum in support of its Motion for Summary Judgment.[1]  Plaintiff Kennan Johnson ("Plaintiff" or "Johnson") asserted various Title IX[2] claims.  Johnson does not claim sexual assault.  Rather, she claims emotional abuse by her tennis coach, Julia Sell.  Following this Court's ruling on the Board's motion to dismiss, Johnson's only remaining claim is for Title IX heightened risk (pre-assault violation).  (R. Doc. 340, p. 44)  This claim fails as a matter of law for the reasons below.

## I.    FACTUAL BACKGROUND

As mentioned, Johnson's sole claim is of emotional abuse by her tennis coach, Julia Sell ("J. Sell").[3]  (R. Doc. 182, ¶¶ 563-592)  Johnson was a student at LSU from Fall 2016 to her

---

[1] The Board accepts Plaintiff's facts as true for purposes of this motion and memorandum only.

[2] 20 U.S.C. § 1681, *et seq.*

[3] Relevant portions of the deposition transcripts and exhibits of Plaintiff, Miriam Segar, Jennie Stewart, Julia Sell and the 30(b)(6) of the Board are attached to the Board's motion as Exhibits A, B, C, D and E, respectively.  The declarations of Segar and Jonathan Sanders are attached to the Board's motion as Exhibit F and G, respectively.  Citations to the depositions will be by the last name of the deponent and the page or exhibit number.  Deposition transcripts with more than one volume will include a Roman numeral to identify the cited volume.  Citations to the declarations will be by the witness's last name and paragraph or exhibit number.

graduation in Spring 2019.  (Johnson 18, 81; R. Doc. 182, ¶¶ 560, 594)  Johnson joined the LSU tennis team after having been suspended from the tennis teams at the University of Central Florida (for a physical altercation with another student) and the University of Oregon (for violating team rules). (Johnson 23, 41-43, 66-67)  After leaving Oregon, Johnson reached out to J. Sell, LSU's tennis coach, about transferring to LSU.[4]  (J. Sell 186-187; Johnson 72-74)

Johnson was ineligible under NCAA rules to play tennis for her first year, but thereafter J. Sell allowed Johnson to join the LSU team and gave Johnson a tennis scholarship for each remaining year of eligibility.  (Johnson 70-71, 80-81; J. Sell 189-190; R. Doc. 182, ¶¶ 561-562)

Johnson describes her relationship with J. Sell as "hit or miss" (also, "nice one day and cold the next"); she believed J. Sell's mood changed depending on whether the team was winning.  (Johnson 87-88, 95-96, 174)  Johnson felt that the better players remained on J. Sell's good side.  (Johnson 89, 92-93)  However, Johnson also believed that everyone was on J. Sell's "bad side" at some point.  (Johnson 90-91)  The players whom J. Sell did not recruit (including Johnson) felt J. Sell was harder on them.  (Johnson 92-93)  In addition, Johnson believed she started off "behind" because she had been kicked off two other teams.  (Johnson 89)[5] With that said, Johnson felt there were some weeks in which J. Sell "adored" her.  (Johnson 93)  Notably, Johnson testified that she always had a good relationship with Mike Sell ("M. Sell"), who also served as LSU tennis coach with J. Sell.[6]  (Johnson 87, 257)

---

[4] Johnson testified that she first met J. Sell when she was about twelve years old, and, according to Johnson, J. Sell told Johnson she was not a good enough player to play at LSU.  (R. Doc. 182, ¶ 559; Johnson 18)

[5] Johnson understood that she was more of a risk to bring in at LSU because she had already been kicked off of two teams.  (Johnson 80) Johnson appreciated J. Sell's efforts to try to get her the year of eligibility and to get Johnson admitted at LSU.  (Johnson 80)

[6] In fact, Johnson testified that M. Sell was one of the few people who got her through LSU.  (Johnson 200-202)

Johnson claims emotional abuse by J. Sell based on allegations that J. Sell would tell Johnson she had to lose weight.[7]  (R. Doc. 182, ¶ 564)  Johnson testified that she met with a nutritionist regarding her weight, but others did so as well. (Johnson 165-166, 170)[8]  Johnson found that the more she weighed, the harder it was to recover and be quick during matches.  She testified that her weight also made her more prone to injury.[9] (Johnson 157-158)

Johnson felt that J. Sell held her scholarship over her head, but she acknowledges that J. Sell gave Johnson a scholarship each year.  (R. Doc. 182, ¶ 569; Johnson 81)  She alleges that J. Sell "emotionally abuse[d] Johnson" by promising to move Johnson up to singles if she played well, but then would move her down or keep her at doubles even when Johnson performed well. (R. Doc. 182, ¶ 576)  Per Johnson, these statements constantly made Johnson feel "not good enough to be a member of the team."  (R. Doc. 182, ¶ 570; *see* R. Doc. 182, ¶ 596)

Johnson also claims J. Sell made inappropriate comments about her sexuality, but per Johnson's sworn testimony, J. Sell made only one negative comment about Johnson's sexual orientation.  (R. Doc. 182, ¶¶ 585-586; Johnson 205-206)  Specifically, Johnson claims that one

---

[7] While Johnson contends that NCAA rules prohibit J. Sell from discussing her weight, Johnson has not asserted any NCAA violation.  Rather, her claims are for Title IX sexual abuse. However, Johnson admits that any alleged concerns expressed about her weight were not tied to her gender:

> Q:  What do you think her agenda was?
>
> A:  To instill the fact that she was in control of me.  Because if she wanted me to lose weight, I feel like, again, she wouldn't have thrown my scholarship or playing in my face.
>
> Q:  Is it possible that those were efforts to incentivize you to lose weight so that you could play better?
>
> A:  Yeah, I mean, anything's possible, I guess.  (Johnson 174)

Johnson conceded: "You need to be in good shape to perform the highest of your ability, I respect that."  (Johnson 169)  Lastly, she testified that other girls had to see a nutritionist, either to get their weight up or down—all were female and none were homosexual. (Johnson 105, 166, 170)

[8] It is possible she told J. Sell when she went to LSU that she had been seeing a nutritionist and wanted to continue doing the same thing at LSU.  (Johnson 72; *see* J. J. Sell 193-194)

[9] In fact, Johnson sustained injuries to her knee, shoulder, back, biceps, wrist, foot strain, and a concussion while attending LSU. (Johnson 138-140)  From time to time, she missed matches and training based on these on and off injuries. (Johnson 141-142)

day J. Sell asked Johnson "to keep her lifestyle" out of the locker room.  (R. Doc. 182, ¶ 586; Johnson 205-206)[10]

While Johnson claims that J. Sell's conduct constituted emotional "abuse," Johnson never made any report to LSU about J. Sell's conduct.  (R. Doc. 182, ¶¶ 563, 576; Johnson 180, 283)

## II.    STANDARD OF REVIEW

The Board adopts by reference the Standard of Review discussion set forth in Section II of Summary Judgment No. 1.[11]

## III.    JOHNSON'S REMAINING HEIGHTENED RISK CLAIM FAILS AS A MATTER OF LAW.

### A. Johnson's Heightened Risk Claim is Prescribed.

The Board adopts by reference the prescription discussion set forth in Section III.B. of Summary Judgment No. 1.  Johnson's alleged harassment took place during the period 2017 to Spring 2019 when she graduated, yet she did not file suit until approximately two years later, on April 26, 2021.  (Johnson 18, 265; R. Doc. 1; R. Doc. 182, ¶ 594)  As this Court has recognized, Title IX claims are subject to Louisiana's one-year prescriptive period. (R. Doc. 340, p. 8) Therefore, Johnson can only survive prescription challenges if the claim accrued at a later, timely date.  Johnson failed to show her claim accrued at a later date, and her claim must be dismissed.

#### a.    The Husch Blackwell Report is Irrelevant to Johnson's Timeliness Issue.

*See* discussion in Section III.B.a of Summary Judgment No. 1, which is adopted herein by reference. As in *King-White v. Humble Indep. Sch. Dist.,* 803 F.3d 754, 762 (5th Cir. 2015),

---

[10] Johnson assumes Elyse Lavender, another player on the team, said something to J. Sell about Johnson's sexual orientation and that was why J. Sell said something to Johnson. (Johnson 102, 205-206)  However, as discussed below, Johnson also acknowledges that her relationship with fellow teammate, Taylor Bridges, created distractions in the locker room, and thus, this could be the basis for the alleged comment.  (Johnson 99)

[11] For efficiency, the Board will hereafter refer to the Memorandum in Support of Motion for Summary Judgment No. 1. as "Summary Judgment No. 1."

PD.41653199.1

Johnson cannot show any findings in the Husch Blackwell Report of sexual misconduct by J. Sell prior to Johnson's alleged experience.  Importantly, the Husch Blackwell report did not even mention Johnson's own allegations against J. Sell. (Johnson 289; R. Doc. 1-2)[12] Johnson seems to acknowledge the post-incident nature of her claims in her Complaint, where she alleges generally, not in the heightened risk context, that she merely learned from the Husch Blackwell Report that: (1) "LSU and its employees failed to train Johnson on the resources available to her **as a survivor,** even though these same people knew the Athletics Department was an environment with a higher risk of sexual misconduct"; and (2) "LSU's Title IX Policy is meant to prevent the specific emotional distress that Johnson endured."  (R. Doc. 182, ¶ 595 (emphasis added))  The first allegation relates to **post-assault** information, which is irrelevant to her heightened risk claim. The second allegation merely suggests that Johnson was ignorant of the purpose of Title IX, a federal law, which does nothing to support her claim that the Husch Blackwell Report somehow disclosed information that was otherwise unavailable.[13]

Because the Husch Blackwell Report revealed no **pre-assault** sexual misconduct that could have affected Johnson's knowledge, she cannot avoid prescription on her heightened risk claim.

### b. Plaintiff's Claims Accrued in 2019.

Johnson's claim accrued as of her graduation in Spring 2019.  (Johnson 18; R. Doc. 182, ¶ 594)  By that date, Johnson knew of the previous training she had received prior to the alleged abuse.  (Johnson 81-84, 86; Johnson Exhs. 9, 10)  She also knew of the entirety of J. Sell's conduct toward her.  (Johnson 81, 285-286; R. Doc. 182, ¶¶ 563-579, 585-587)  Johnson also knew of the

---

[12] Johnson was not interviewed by Husch Blackwell, and she only appears to be referenced, not by name, in connection with her conversation regarding Jade Lewis's alleged assault.  (Johnson 289; R. Doc. 1-2)
[13] The Husch Blackwell report only referenced sexual orientation in the context of referencing the PM-73 Policy Committee recommendations that included adding "sexual orientation" to PM-73.  (R. Doc. 1-2, pp. 41, 207) However, PM-73 (2014 version) already included sexual orientation. (R. Doc. 1-2, p. 152)

Title IX process, having already engaged in it in January 2019 regarding her altercation with Taylor Bridges, a teammate who Johnson briefly dated. (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12) At that time, Johnson knew that an altercation in a same sex relationship implicated LSU's Title IX process. (Johnson Exh. 12) Johnson was also informed of LSU's resources for victims of sexual assault and was advised of support services. (Johnson 131-132; Johnson Exh. 11) Indeed, Johnson was offered and utilized counseling services at LSU. (Johnson 131-132, 142-146; Johnson Exh. 11) At no time during that Title IX process or after did Johnson complain about any conduct by J. Sell.[14] (Johnson 283) She otherwise never made any Title IX complaints for which she can criticize LSU's response. (Johnson 127-130, 180-181) Johnson's experience with Title IX, when viewed alongside the training she previously received, put Johnson on notice of LSU's alleged "policy of deliberate indifference," if one ever existed. Johnson knew the salient information related to her claim, at the latest, in Spring 2019, and any "tangential" information she may have later learned does not delay her accrual.[15] (Johnson 18; R. Doc. 182, ¶ 594) Johnson has alleged nothing that would have precluded her from timely investigating her claims. Therefore, her April 26, 2021 lawsuit is untimely.

### B.  A Heightened Risk Claim is Unavailable to Johnson.

Johnson's Title IX heightened risk claims—relating to her weight, sexual orientation, and tennis performance—do not amount to actionable claims under Title IX. Unlike other Plaintiffs herein, Johnson's allegations are of teacher-on-student conduct, not student-on-student. The Fifth Circuit has never recognized a heightened risk of sexual assault claim for cases involving teacher-

---

[14] Johnson claims that she did not report J. Sell's alleged conduct based on her fear of losing her scholarship. (Johnson 91-92, 287) However, she testified that J. Sell only said on one occasion that she did not know if she was going to resubmit Johnson's scholarship, and J. Sell ultimately submitted the scholarship. (Johnson 161)

[15] *See King-White,* 803 F.3d at 763.

on-student harassment.[16] In *Poloceno v. Dallas Indep. Sch. Dist.*, the Court unequivocally communicated that it has "**never** recognized or adopted" a heightened risk claim under Title IX based on a general heightened risk of sex discrimination, and "**decline[d] to do so,**" **especially in cases that do <u>not</u> involve a student-on-student assault.**[17] In *Poloceno*, a female student claimed that her physical education teacher was discriminating against female students by requiring excessive physical exercise, claims that did not stem from student-on-student sexual harassment or assault.[18] The Fifth Circuit explained its decision not to recognize the heightened risk theory, noting that "cases from our sister circuits that recognize the 'heightened risk' analysis limit this theory of liability to contexts in which **students** committed sexual assault on **other students**, circumstances not present here."[19]

Since *Poloceno*, no court within this circuit has extended a heightened risk claim to the context of teacher-on-student harassment. The leading Fifth Circuit case on heightened risk, *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334 (5th Cir. 2022), only recognized heightened risk in the context of student-on-student assault.[20]  Consistent with *Roe*, this Court emphasized in its Order and Reasons on the Board's motion to dismiss that heightened risk has only been recognized in the context of student-on-student assault. (R. Doc. 340, pp. 37, 41)  Johnson's case, similar to *Poloceno*, involves allegations between a coach and a student and arises out of non-sexual conduct, so the claim is unavailable.

---

[16] *See Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359, 363 (5th Cir. 2020).

[17] *Id.* (emphasis added); *Doe #1 v. Bd. of Supvs. of Louisiana State Univ. and Agricultural and Mechanical College*, 2022 WL 16701930, at *15-16 (M.D. La. Nov. 3, 2022).

[18] *Poloceno,* 826 F. App'x at 361.

[19] *Id.* (emphasis added); *Aguiluz v. Univ. of Texas Health Science Center at San Antonio*, 2021 WL 148057, at *5 (W.D. Tex. Jan. 15, 2021) ("The Fifth Circuit, however, has declined to adopt a Title IX theory of liability based on a general 'heightened risk' of sex discrimination, especially where the case doesn't involve a student-on-student assault." (citation omitted)).

[20] *Roe,* 53 F.4th 334.

**C. Johnson Fails to Meet the Elements of a Heightened Risk Claim.**

Johnson's "heightened risk" claim fails for other reasons. *See* discussion of heightened risk in Section III.C. of Summary Judgment No. 1, which is adopted herein by reference.

Under a pre-assault Title IX heightened risk theory, a plaintiff must prove: (1) the defendant had actual knowledge of a substantial risk that sexual abuse would occur; (2) the harasser was under the defendant's control; (3) the harassment was based on the victim's sex; (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit; and (5) the defendant was deliberately indifferent to the harassment.[21]   (R. Doc. ¶ 340, p. 38 n.194)  Johnson fails the first, third, fourth and fifth elements.

**a.  Element One: Johnson Cannot Establish Actual Knowledge.**

Johnson cannot show that an appropriate person had knowledge that she faced a substantial risk of sexual harassment. "[P]laintiffs seeking to prove actual knowledge must clear a high bar."[22] "[A]ctual knowledge [] means that the school must have actual, not constructive, knowledge of sexual harassment."[23]   Specifically, in a case like this one, where "pre-assault" behavior is at issue, a school must have knowledge "that there is a substantial risk that sexual abuse would occur."[24] A school can escape liability if it can show (1) "that it did not know of the underlying facts indicating

---

[21] *Roe*, 53 F.4th at 341.  The Board acknowledges that *Roe* involved a student-on-student claim, not a teacher-on-student claim like Kitch is purporting to assert.  *Id.* The Board denies that a heightened risk claim is available to Kitch. (*Id.*; *see* Section III.B)  In an abundance of caution, the Board evaluates Kitch's claim under the framework set forth in *Roe*.  (*See* R. Doc. 340, p. 38, n.194)  For the reasons set forth herein, Kitch's claims fail under *Roe* or a teacher-on-student deliberate indifference framework (which claim was dismissed).

[22] *Kelly v. Allen Indep. Sch. Dist.*, 602 F. App'x 949, 953 n.3 (5th Cir. 2015).

[23] *Roe*, 53 F.4th at 341 (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 650 (1999)); *K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017).

[24] *Roe,* 53 F.4th at 341 (quoting *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020)) (internal quotations omitted).

a sufficiently substantial danger and that it was therefore unaware of a danger," or (2) "that it knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."[25]

Here, Johnson was the **first** plaintiff to assert sexual allegations against J. Sell (R. Doc. 182, ¶ 563)  Johnson can offer no prior reports to LSU of sexual misconduct by Sell.  Thus, she cannot show any "substantial risk" which LSU was aware of and should have acted on before Johnson's alleged assault.  Moreover, not only do the incidents at issue not constitute "actionable sexual harassment," but no appropriate person had actual knowledge that Johnson faced any substantial risk of sexual harassment by J. Sell.[26]  Plaintiff cites to J. Sell's knowledge of her own behavior toward Johnson to constitute LSU's knowledge.  (R. Doc. 182, ¶ 932(b))  The Supreme Court rejected such logic in *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998), concluding that knowledge by the wrongdoer does not constitute the requisite "actual knowledge."[27]

Johnson relies on other Plaintiffs' experiences and claims that LSU was "aware" that J. Sell violated Title IX by refusing support measures to survivors and refusing to report disclosures of sexual assault, but such allegations have nothing to do with Johnson's claim.  (R. Doc. 182, ¶ 932(a))  There must be "actual knowledge of the precise instance of abuse giving rise to the case

---

[25] *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997) (citation and internal brackets omitted); *Kelly*, 602 F. App'x at 953 n.3 (applying standard to student-on-student harassment).

[26] Johnson does not have first-hand knowledge of J. Sell allegedly harassing anyone else based on sexual orientation, much less whether anyone ever reported such conduct to LSU. (Johnson 105)  While Johnson testified she believes Keri Frankenberger, who played on the tennis team under J. Sell prior to Johnson, was also harassed by J. Sell based on Frankenberger's sexual orientation, Johnson never witnessed any such alleged harassment.  (Johnson 90, 211-213)  Johnson's belief is based solely on things Frankenberger allegedly told her.  (Johnson 211-213)  Significantly, Frankenberger never reported any alleged harassing conduct by J. Sell to LSU.  (Segar Decl., ¶ 9; Board 30(b)(6) I 66-67)

[27] *Gebser,* 524 U.S. at 290-291. Additionally, it must be an "appropriate person" that had the "actual knowledge." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358-359 (5th Cir. 2020) (citations omitted).  An appropriate person is "an official of the recipient entity with authority to take corrective action." *Gebser*, 524 U.S. at 290.  The obligation to report harassing conduct does not qualify an employee as having the ability to take corrective action. *Doe,* 964 F.3d at 361 n.38.

at hand."[28]  It is insufficient to generally claim that a school "should have known" about the alleged sexual harassment.[29]  Thus, Johnson's citations to J. Sell's alleged conduct toward other Plaintiffs, namely Abby Owens and Jade Lewis, have no bearing on Johnson's entirely distinct claims.

No one complained of sexual assault by J. Sell before Johnson's complaint.  Johnson testified that she never told anyone else, much less an "appropriate person," about the alleged sexual abuse by J. Sell.  (Johnson 180, 283)  Accordingly, LSU had no actual knowledge of any "substantial risk" which LSU was aware of and should have acted on before Johnson's alleged assault.  Therefore, Johnson fails to show actual knowledge.[30]

### b. Element Three: The Alleged Discrimination was Not "On the Basis of Sex."

Title IX prohibits discrimination "on the basis of sex."[31]  "[H]arassment 'on the basis of sex is the sine qua non of a Title IX sexual harassment case,'" and a plaintiff's failure to plead that element entitles a defendant to summary judgment.[32]  All of the alleged incidents about which Johnson complain fall outside of Title IX.  First, weight is not "based on sex," and thus, is not a protected class under Title IX.[33]

Similarly, J. Sell's purported preferences based on attitude and tennis performance are not sex-based.[34]  Offensive behavior based on personal animus or other reasons unrelated to sex will not suffice.[35]  For instance, in *Sanches v. Carrollton-Farmers Branch Independent School District*,

---

[28] *A.W. v. Humble Indep. Sch. Dist.*, 25 F.Supp. 3d 973, 992 (S.D. Tex. 2014) (citation omitted).

[29] *M.E.,* 840 F. App'x at 775.

[30] *See Roe*, 53 F.4th at 341.

[31] 20 U.S.C. § 168(a).

[32] *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.,* 647 F.3d 156, 165-66 (5th Cir. 2011) (quoting *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir. 2002)).

[33] *See Patterson v. Hudson Area Sch.*, 724 F.Supp. 2d 682, 691 (E.D. Mich. 2010) (weight-based comments calling student "man-boobs" after student had gained 40 pounds were not sex based).

[34] *See, e.g., Sanches,* 647 F.3d at 165-166 (finding that alleged harassment was not based on sex, and thus, not actionable, as "[t]here is nothing in the record to suggest that [the harasser] was motivated by anything other than personal animus").

[35] *Id.* at 165-166.

a female student called another female student a "ho," and engaged in other inappropriate conduct, including threatening to beat up the plaintiff and spreading rumors about the plaintiff.[36]   The undisputed evidence revealed that the alleged offender was mad at the plaintiff for dating the offender's former boyfriend and because the offender believed plaintiff's mother got her into trouble with the school.[37]   Accordingly, the Fifth Circuit held that the conduct was neither based on sex, nor did it qualify as harassment, but rather was conduct based personal animus.[38]   The court reasoned that the conduct was more properly described as bullying or teasing than sexual harassment, which is not actionable under Title IX.[39]

Here, as in *Sanches,* the conduct about which Johnson complains was not based on sex. Johnson testified to many reasons why she believes J. Sell treated players harshly, if at all, including the player's performance, whether J. Sell was in a bad mood due to a loss, whether the player had a good attitude, and whether J. Sell recruited the player.  (Johnson 87-89, 93-98, 174, 277)  Johnson further testified that she was "behind the eight ball to begin with" because of "how I got to LSU," *i.e.*, having been kicked off of two other teams.  (Johnson 89)  According to Johnson, many players, not just Johnson, had issues with J. Sell. (Johnson 90-92)  While Johnson attempts to establish sexual orientation discrimination as one such reason, the law at the time forecloses any such claim.

During the time period pertinent to Johnson's claims (2017 to Spring 2019), Title IX's reference to "on the basis of sex" did not encompass discrimination based on sexual orientation (or gender identity).[40]  Instead, courts held that Title IX, unlike Title VII, "operates in binary terms

---

[36] *Id.* at 165-166.
[37] *Id.* at 165.
[38] *Id.* at 165.
[39] *Id.* at 165-66.
[40] *Neese v. Becerra,* 2022 WL 16902425, at *7-10 (N. D. Tex. Nov. 11, 2022).

PD.41653199.1

—male and female—when it references 'on the basis of sex.'"[41]    While the Department of Education, President Biden, and the Department of Justice have since included sexual orientation in their efforts beginning in approximately **2020**, those efforts post-date all of Johnson's alleged incidents.[42]    Changes to Title IX do not apply retroactively, and thus, "a school must follow the requirements of the Title IX statute and the regulations that were in place at the time of the alleged incident."[43]    The incidents at issue here occurred between Spring 2017 and Spring 2019.  (Johnson 18, 81; R. Doc. 182, ¶¶ 562, 594)  At that time, sexual orientation was not covered by Title IX.

---

[41] *See id*., at *8; *see Wolfe v. Fayetteville, Arkansas Sch. Dist.,* 648 F.3d 860, 868 (8th Cir. 2011) (name-calling, including "faggott," "homo," and "queer-bait," and rumors falsely labeling plaintiff a homosexual were not "*per se* indications of harassment on the basis of sex," and affirming district court's rejection of proposed jury instruction to the effect that "[h]arassment may be sex-based . . . when it includes spreading rumors or name-calling that falsely labeled [plaintiff] as a homosexual in an effort to debase his masculinity or when [plaintiff] did not meet his peers' stereotyped expectations of masculinity"); *Hoffman v. Saginaw Public Schools,* 2022 WL 2450805, at *8, 11 (E.D. Mich. June 27, 2012) (noting that "discrimination based on sexual orientation is not" actionable under federal law (citation omitted)); *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F.Supp. 2d 601, 622-623 (E.D.N.Y. 2011) ("harassment or discrimination based upon sexual orientation is not prohibited under . . . Title IX) (citations omitted)); *Rodriguez v. Alpha Institute of South Florida, Inc.,* 2011 WL 5103950, at *5 (S.D. Fla. Oct. 27, 2011) (granting summary judgment to defendant on Title IX claim because most of harassing comments made to plaintiff were about his sexual orientation and "sexual orientation is not protected under Title IX" (citing 20 U.S.C. § 1681(a)).

[42] In 2020, the Supreme Court in *Bostock v. Clayton County,* held that a claim based on sexual orientation discrimination was viable under Title VII. 140 S.Ct. 1731 (2020). Shortly thereafter, the Department of Education issued a notice stating that they would extend the holding to Title IX claims, President Biden issued an executive order declaring that his administration would apply *Bostock's* interpretation to Title IX, and the DOJ issued guidance instructing federal agencies to apply *Bostock's* definition of sex discrimination to Title IX. *See* Executive Order 14021, Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity (Mar. 8, 2021), https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf (noting that it is the policy of the Biden "Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including . . . discrimination on the basis of sexual orientation or gender identity," and stating that such guarantee is codified in Title IX);United States Dep't of Educ., Office for Civil Rights, Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostick v. Clayton County, 86 FR 32637 (June 22, 2021) (noting that the Department of Education "interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity"); Department of Justice Title IX Legal Manual, Title IX Cover Addendum Post-Bostock (Aug. 12, 2021), https://www.justice.gov/crt/title-ix#:~:text=Title%20IX%20prohibits%2C%20with%20certain,in%20education%20 programs%20or%20activities (noting "Department's position that Title IX's prohibition on sex discrimination includes discrimination based on gender identity, intersex traits, and sexual orientation").

[43] United States Dep't of Educ., Office for Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment* (July 2021) (Updated June 28, 2022), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf (Subsequent Title IX amendments are not retroactive. "[A] school must follow the requirements of the Title IX statute and the regulations that were in place at the time of the alleged incident.").

Even if a claim for discrimination based on sexual orientation was recognized during the pertinent time period, Johnson's own testimony undercuts her claims. Johnson testified that many players, not just Johnson, were worried about disappointing J. Sell. (Johnson 96)  Those other players were heterosexual, negating the suggestion that J. Sell's conduct was based on sexuality. (Johnson 105)  Johnson also testified that J. Sell preferred players with good attitudes and who played well. (Johnson 87, 89, 93-94, 96-97)  By contrast, Johnson said she had "tiffs" with just about everyone on the team at one point or another over tennis and that she threw her tennis racquet in a trash can and "broke a racquet or two." (Johnson 103-104, 217)[44]  Consistent with her view that J. Sell was harsher when the players played poorly, Johnson testified that J. Sell often made players, not just Johnson, run extra fitness when the players would lose a match. (Johnson 93-94, 98-99) Johnson felt this behavior was toxic, but the fact that it applied to all players suggests it was not based on Johnson's sexuality. (Johnson 98-99) Moreover, her description of J. Sell's competitive nature suggests J. Sell's motive, as with all coaches, was to win, not to discriminate. (Johnson 87-88)

Johnson's testimony regarding her relationship with J. Sell further negates her sexual orientation claim. For example, J. Sell recruited Johnson to LSU, knowing Johnson's sexual orientation. (Johnson 106-108; J. Sell 195-196)  J. Sell also told Johnson that her sexuality made

---

[44] Johnson describes herself as an "emotional" person, stating that "if I'm not a zero, I'm a ten." (Johnson 147, 227) Johnson testified that her emotions got her into trouble on the tennis court. (Johnson 215-217, 277-278) In one tournament near the end of her tennis career, Johnson got emotional after losing a game. (Johnson 215-216)  She acknowledges she may have given J. Sell the impression that she stopped trying in her match, including that she put her tennis bag in the trash can and broke one or two racquets. (Johnson 216-217) Johnson agreed it would make "100 percent" sense to pull Johnson from the singles match if she had stopping trying in the doubles match. (Johnson 216-217) In fact, after this match, Johnson was pulled from the singles event. (Johnson 216) On another occasion, Johnson testified that J. Sell told her to meet J. Sell at the indoor courts and said "You might want to bring tissues, because I'm going to make you cry." (Johnson 277; Johnson Exh. 40)  In that conversation, J. Sell talked to Johnson about her attitude. (Johnson 277-278)  She told Johnson that she needed "to continue to work on it, because when [Johnson] got angry it affects others." (Johnson 277)  Johnson agrees that her actions sometimes affected how others played. (Johnson 277-278)

PD.41653199.1

no difference to J. Sell. (Johnson 106-107) Similarly, when Johnson was having difficulties with Johnson's mother due to Johnson's sexuality, J. Sell asked Johnson's LSU counselor to reach out to Johnson because J. Sell was worried Johnson felt pressured by the discussions with her mother. (Johnson 149-150; Johnson Exh. 13, p. 11) Finally, Johnson's social media posts and text messages suggest she felt very supported by J. Sell up to the time she was graduating. (Johnson 222-226, 264; Johnson Exhs. 16-23) For example, in social media posts and text messages, Johnson stated that she was "Soooo thankful for these two amazing human beings," referring to Julia and Michael Sell; thanked the Sells for putting up with Johnson's emotions and "vouching" for Johnson to play on LSU's team; and thanked them for never giving up on Johnson. (Johnson 222-231; Johnson Exhs. 16-18, 20-23) Johnson also admitted that she had a lot of confidence issues, and Mike and Julia Sell helped her through those and kept her from crumbling. (Johnson 226)

Johnson's only purported evidence of sexual orientation harassment stems from the alleged comment about keeping her lifestyle out of the locker room and from the fact that at one point Johnson dated one of the other players on the team, Taylor Bridges. (Johnson 106, 205-206, 117-120) Johnson said J. Sell never commented negatively about Johnson's relationship with Bridges; Johnson just believed from J. Sell's "body language" that J. Sell was not happy that the two teammates were dating. (Johnson 118, 120) Even if Johnson's conjecture was correct, it would be logical for a coach to be concerned about a dating relationship between players on a small athletic team and the resulting friction to and with the other players on the team. In fact, Johnson admits that her relationship with Bridges caused friction. (Johnson 118-122) For example, Johnson testified that other teammates felt like Johnson and Bridges were not "branch[ing] out" with the other team members. (Johnson 119) As an additional example, at away tennis

14

tournaments, other players complained to J. Sell that they could not use their hotel room because Johnson and Bridges were engaging in sexual conduct in the shared hotel room. (J. Sell 199-200; Johnson 121-122)

Johnson lacks evidence to support her supposition regarding J. Sell's feelings about Johnson's dating relationship with Bridges. Neither M. Sell or J. Sell ever said they did not want Johnson dating Bridges. (Johnson 118)  Other than checking on Bridges and Johnson periodically to make sure they were okay with the relationship, there is nothing else J. Sell said to Bridges and Johnson about the fact they were dating. (Johnson 120)  Per Johnson, J. Sell showed concern "because [the relationship] was bringing drama into the locker room, which I understand, because we're dating and we're on the same team." (Johnson 99)  Johnson describes that she and Bridges were "toxic for each other." (Johnson 115)  She said that "[b]eing together on the team was rough for us," and "it became one of those things like we saw each other too much.  So there were those little arguments where like some of the girls on the team were like, You need to just not [date]." (Johnson 118)  Everybody on the team told them at one point that they needed to break up, which Johnson said was "common sense" (Johnson 120-121)  She said there was a "lot of tension in the locker room, which then affected the girls," and Bridges and Johnson did not socialize with the other girls on the team.  (Johnson 119-121)[45]  Thus, Johnson admits the relationship created locker room issues for reasons that were unrelated to her sexual orientation.

Per Johnson's sworn testimony, J. Sell made only one negative comment about Johnson's sexual orientation. Johnson claims that one day J. Sell asked Johnson "to keep her lifestyle" out of

---

[45] Similarly, Johnson testified that Jade Lewis' abusive relationship with John Coe was stressful for the team, demonstrating the impact that dating relationships among players can have on other players, even when both persons are not on the same team or the same gender. (Johnson 189)

the locker room. (R. Doc. 182, ¶ 586; Johnson 205-206, 208)[46]  Johnson suspects the comment was made because another player, who Johnson believes is homophobic, said something to J. Sell. (Johnson 205-206)[47]   Johnson describes the player as "sheltered" and "homeschooled," and someone who did not participate in team dinners or hang out with the teammates. (Johnson 203-205)  While J. Sell denies any such statement, this factual issue is immaterial to the motion because this single comment is not actionable under Title IX, as discussed below.  (J. Sell 196-197)

> ### c. Element Four, Part I: The Alleged Conduct was not Severe and Pervasive.

Johnson's claim also fails because the alleged conduct does not rise to a level of severity that deprives a student of access to educational opportunities.[48]  Title IX cases must be "based on unwelcome sexual advances so severe and pervasive as to interfere with a student's educational atmosphere and opportunities."[49] As the Supreme Court made clear in *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ*, the initial single incident is not sufficient to result in liability under Title IX; instead, the harassment must also be pervasive, even if that single instance is severe.[50] The Fifth Circuit has also stated that only those claims involving "pervasive" and "widespread" conduct with the "systemic effect of denying the victim equal access to an educational program or activity" are actionable, finding that sexual harassment cannot be based on a single incident as a matter of law.[51]  "The standard is not subjective; instead it is whether the harassment was severe,

---

[46] As discussed, Johnson acknowledges that her relationship with fellow teammate, Bridges, also created issues in the locker room, and thus, could have precipitated the alleged comment by J. Sell.  (Johnson 99, 119-121)

[47] Notably, Johnson disclosed to J. Sell shortly after arriving at LSU that Johnson had been in a toxic dating relationship with a woman at the University of Oregon.  (Johnson 106-108)  Johnson indicated that J. Sell already knew Johnson was homosexual since she first met Johnson.  (Johnson 106-107; J. Sell 195-196)  J. Sell responded that it did not matter to J. Sell that Johnson was homosexual.  (Johnson 107)

[48] *See Sanches*, 647 F.3d at 167.

[49] *Lewis v. Louisiana State Univ.*, 2021 WL 5752239, at *19 (M.D. La. Dec. 2, 2021).

[50] *Davis,* 52 U.S. at 652-53; *but see Roe,* 53 F.4th at 342-343 (acknowledging circuit split on "whether 'a single instance of sufficiently severe one-on-one peer harassment' could ever rise to the level of 'pervasive' harassment'" and noting that three circuits (6th, 8th, and 9th) have held there must be "**multiple** incidents of harassment; one incident of harassment is not enough" (emphasis in original) (citations omitted)).

[51] *Carmichael v. Galbraith*, 574 F. App'x 286, 289-290 (5th Cir. 2014) (citing *Davis*, 526 U.S. at 652-654).

pervasive, and **objectively** unreasonable."[52] The conduct alleged by Johnson was neither severe, pervasive, or objectively offensive.

J. Sell's only comment regarding Johnson's "lifestyle" was made on a single occasion and never again. (Johnson 205-206, 208, 213)   Significantly, although it is an objective standard, Johnson's own testimony reveals that she did not even feel the alleged conduct was subjectively offensive.  In particular, Johnson testified that this single comment by J. Sell was merely "kind of offensive." (Johnson 200, 206) Johnson's own feelings demonstrate that this was not the type of severe, pervasive, and objectively unreasonable harassment contemplated by *Davis.*[53]

> ### d. Element Four, Part II: Plaintiff Cannot Meet her High Burden of Showing Deliberate Indifference That Caused Harassment.
>
> #### i. No Deliberate Indifference.

*See* discussion and authorities in Summary Judgment No. 1, Section III.C.d.i.  "[D]amages may not be recovered  . . . unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf **has actual notice of**, **and is deliberately indifferent to**, the teacher's misconduct."[54]  Plaintiff cannot show that the Board was deliberately indifferent to prior sexual misconduct by J. Sell.

As shown, as the only Plaintiff who was allegedly subject to sexual misconduct by J. Sell, Plaintiff fails to meet her high burden of showing **prior** deliberate indifference to reports of sexual misconduct committed by J. Sell.  The evidence is undisputed that Johnson cannot show any prior

---

[52] *Sanches,* 647 F.3d at 167 (emphasis in original).
[53] *See also Henderson v. Bd. of Supvs. of Southern Univ. and A&M College*, 2022 WL 875592, at *5 (M.D. La. Mar. 23, 2022) (general allegations that student suffered "ruthless cyber bullying" by his classmates regarding his sexual orientation did not rise to the level of severe, pervasive, and objectively offensive harassment contemplated by Title IX).  Not only do the alleged comments regarding Johnson's physicality and performance made by a coach to an athlete fall outside of Title IX, they are also are not severe or objectively offensive. Indeed, these are the types of comments that one expects to occur in an athletic setting.  *See Sanches,* 647 F.3d at 167 (noting that complained of conduct "is the sort of unpleasant conflict that takes place every day" between coaches and players; "it is not the proper stuff of a federal harassment claim").
[54] *Gebser,* 524 U.S. at 277 (emphasis added).

reports, nor did Johnson make any reports.  (Johnson 283; Board 30(b)(6) I 66-67; Johnson cannot show any prior reports, nor did Johnson make any reports.  (Johnson 283; Board 30(b)(6) I 66-67; Segar Decl. ¶ 9)   Thus, LSU could not have been deliberately indifferent to prior sexual misconduct.

### ii.  No Causation.

*Davis* also requires a causation showing—that the alleged "harassment" is causally linked to the school's deliberate indifference.[55]  Critical to the inquiry is what occurred after the school's **actual** knowledge.[56]  Johnson cannot meet the *Davis* standard of showing that she was subjected to severe, pervasive, and objectively offensive harassment **because of** the alleged deliberate indifference.

### e.  Element Five: Plaintiff Fails her Burden of Showing a Deprivation of Educational Benefits.

Finally, Johnson must show the existence of an injury, in that the harassment deprived her of "access to the educational opportunities or benefits."[57] Johnson has not alleged any educational opportunities that she was denied.[58]

Johnson graduated from LSU on schedule in Spring 2019. (Johnson 18; R. Doc. 182, ¶ 594)  While she alleges that J. Sell's conduct "negatively impacted her grades,"  her transcript shows her grades fluctuated up and down, with **no** indication her grades during her first year (when she was not playing on the tennis team)—2.67 and 2.12—were notably higher than her grades

---

[55] *Davis*, 526 U.S. at 644.

[56] *Doe v. Univ. of Kentucky*, 959 F.3d 246, 251 (6th Cir. 2020*); Kollaritsch v. Michigan State Univ. Board of Trustees*, 944 F.3d 613, 622 (6th Cir. 2019).

[57] *Id*. at 650.

[58] Johnson claimed the harassment caused her to become "too ill" to play tennis or maintain her grades and caused her "severe emotional distress."  (R. Doc. 182, ¶ 805) Allegations that a plaintiff "sustained damages in the form of embarrassment, humiliation, mental anguish, and emotional distress" are insufficient to show a concrete, negative effect on education. *Henderson v. Bd. of Supvs. of Southern Univ. and A&M College*, 2023 WL 2614620, a*11 (M.D. La. Mar. 23, 2023) (collecting cases).

18

during her time on the tennis team—2.35, 2.9, 3.5, 2.13, 3.5. (Johnson 200; Johnson Exh. 14; R. Doc. 182, ¶ 596)[59]  Indeed, Johnson testified that her grades were good when she was at LSU. (Johnson 291)  Moreover, when asked about lost educational opportunities, Johnson testified that missing out on graduate school, not her grades, was her only lost educational opportunity:

> Q:  Did you -- are there any educational opportunities that you feel like you were denied while at LSU?
>
> A: Grad school.  That's pretty much it.
>
> Q:  And you didn't apply to grad school, correct?
>
> A:  No.

(Johnson 291) Johnson also alleged that J. Sell would not write Johnson a letter of recommendation for graduate school.  (Johnson 132)  Johnson speculates J. Sell would not do so because "she didn't like me," but Johnson testified that J. Sell never told her that she did not like Johnson.  (Johnson 136)  Given that Johnson did not apply to graduate school, she cannot say she was deprived of attending graduate school. (Johnson 132-133)

**D.  <u>No Other Heightened Risk Theory is Available.</u>**

Collectively, Plaintiffs seem to base their heightened risk claims on allegations that LSU created a heightened risk of sexual misconduct by maintaining a "general custom or official policy" of deliberate indifference to reports of Title IX violations, seemingly merging two standards.[60] Since the behavior described by Johnson does not amount to actionable sexual harassment under Title IX, she cannot show she was affected by any official policy. Notwithstanding, the Board also addresses Plaintiff's insufficient "official policy" allegations.

**a.  The Fifth Circuit Does not Recognize Heightened Risk Based on an Official Policy.**

---

[59] Johnson's Complaint suggests she may have been hospitalized during school, but she testified that she was hospitalized after graduating.  (Johnson 214; R. Doc. 182, ¶ 596)

[60] For example, Plaintiff frequently references "deliberate indifference" and "actual knowledge," and makes no reference of "intentional discrimination" (the official policy standard).  *See, e.g.* R. Doc. 182, ¶ 926.

The Fifth Circuit has not recognized a claim for Title IX heightened risk based on an official policy, and this Court's ruling on the Board's motion to dismiss does not suggest that an official policy claim remains in this case. (*See* R. Doc. 340) *See* discussion in Section III.D.a in Summary Judgment No. 1, which discussion is adopted herein by reference.

<div style="margin-left: 2em;">

**b. Johnson Cannot Establish an Official Policy of Deliberate Indifference to Reports of Sexual Misconduct.**

</div>

*See* discussion in Section III.D.b in Summary Judgment No. 1, which discussion is adopted herein by reference. Johnson cannot establish that the Board "maintained a policy of deliberate indifference to reports of sexual misconduct."[61] Johnson has not pointed to a single specific, non-conclusory policy, let alone one that caused her any harm. Notably, Johnson's facts bear no similarity to other cases that have found heightened risk based on an official policy of deliberate indifference. Such cases turn on a pattern of actions, not a deficient policy.[62]

It is undisputed that the Board's written official policy, Permanent Memorandum 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203; Stewart Exh. 2) PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy." (*Id.*) The Board's policies were promulgated to students and staff alike before and after Johnson's alleged issues with J. Sell. (Johnson 81-86; Johnson Exhs. 9, 10; Board

---

[61] *See Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020).
[62] *See Doe 1 v. Baylor University,* 240 F.Supp.3d 646, 662 (W.D. Tex. 2017).

30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 259-261; Stewart 38-41)[63] Despite PM-73, Plaintiffs' Complaint generally references the following deficiencies: (i) an alleged failure to report complaints, conduct investigations, and establish grievance procedures; (ii) training; and (iii) LSU's response to a 2017 Internal Audit, all of which fail to satisfy Plaintiffs' burden. (R. Doc. 182, ¶¶ 922, 923, 926)

### i. General Reference to Failure to Report Complaints, Initiate/Conduct Investigations and Grievance Procedures.

Plaintiff's Complaint generally references shortcomings in reporting, investigations and grievance procedures with no specifics to tie those general categories to her claims. (R. Doc. 182, ¶ 926, 931) As discussed above, Johnson lacks evidence that an employee failed to comply with Title IX. The evidence is undisputed that employees, non-employees, and students, including Johnson, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative, or through Maxient. (Board 30(b)(6) I, 49-52) Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (*Id.* 53-54) Johnson can come forward with no evidence of failures in reporting, investigations, and grievance procedures, that can constitute an official policy and that can be causally connected to any harm that Johnson allegedly suffered.

In fact, Johnson participated in the Title IX process in January 2019 when she made a report to Miriam Segar, Senior Associate Athletic Director, that her teammate and girlfriend, Taylor Bridges, slapped her. (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12)[64] Per Johnson, Taylor hit Johnson during an argument (after Johnson disclosed she had kissed another

---

[63]*See Roe,* 2020 WL 7043944, at *11.
[64] Johnson was not injured in the altercation. (Johnson 126-7) Johnson testified that Bridges hit Johnson other times, but Johnson did not report such conduct. (Johnson 126-127, 180, 283)

girl).  (Johnson 125)  Johnson was drunk during the altercation.  (Johnson 125-126)  Afterward, Johnson called her mom, who told her to contact J. Sell.  (Johnson 117)  Johnson reported this incident to J. Sell and J. Sell wanted Johnson to report the situation to Segar, which Johnson did.  (Johnson 127-128)

Segar met with Bridges and Johnson separately, and both indicated they felt safe, that they were okay to continue practicing and traveling together on the team, and that they did not need any accommodations.  (Johnson Exh. 12; Johnson 131-132)  Johnson was informed that the alleged conduct was unlawful and that "in addition to the Title IX process, she could file a police report and press legal charges regarding the interaction."  (Johnson 131; Johnson Exh. 12)  Both women indicated they did not want to move forward with the Title IX process.  (Johnson Exh. 12; Johnson 131)  Johnson felt she had the full opportunity to report this incident to Title IX, and she had no problems with how Segar responded to the incident.  (Johnson 132, 304-305)  At no time during this process did Johnson complain to Segar or the Title IX office about J. Sell, nor at any other time.  (Johnson 180, 283)  This was the only report she ever made to Miriam Segar or Title IX.  (Johnson 180, 283)

### ii.    Training.

The Board provided training beginning in at least 2014, which training took place on an annual basis.  (Board 30(b)(6) I 30-32, 36-37)  For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX.  (R. Doc. 30(b)(6) I 33, 36-37)  In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks.  (Board 30(b)(6) I 38-39, 41-43)  Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention.  (Board 30(b)(6) I

39, 42-44)  Johnson and her alleged harasser, J. Sell, received training.  (Johnson 81-86; Johnson Exhs, 9, 10; J. Sell 83-88; Sanders Decl. ¶¶ 3, 5; Segar ¶¶ 5, 6, Exh. 3,4; Board 30(b)(6) 88)  In addition, Johnson admits that, "[a]s an athlete, Johnson was required to go to Title IX trainings," (R. Doc. 182, ¶ 593; *see* Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl. ¶ 5, Exh. 3)  Johnson also acknowledged that she received and completed a training course on sexual assault, which training LSU mandated that students complete as a prerequisite to registering for classes. (Johnson 84)  Johnson cannot show an official policy regarding training that affected Johnson.

Likewise, Johnson also cannot causally link any alleged lack of training to her injuries. There is no evidence that any additional training on Title IX reporting or otherwise prior to the incidents about which Johnson now complains would have led to a different result.  (*See* Board 30(b)(6) I 40-41)

### iii.    Internal Audit

*See* discussion in Section III.D.b.iii of Summary Judgment No. 10, which is adopted herein by reference. Johnson lacks any evidence from the 2017 Audit findings of the Board failing to train responsible employees. Johnson also lacks any basis for claiming an official policy, and she lacks any causal connection to any harm she allegedly suffered.

### c.   Element Two: Johnson Cannot Show a Known or Obvious Risk.

Not only can Johnson not establish an "official policy" of deliberate indifference, she also cannot show that the risk of sexual misconduct that would result from such policy was "known or obvious."[65]  As indicated above, Johnson never made a report of sexual misconduct regarding J. Sell while at LSU.  (Johnson 283)  LSU has also never received a report regarding sexual orientation harassment in the women's tennis program, by Julia Sell, whether from Plaintiff or

---

[65] *See, e.g.*, *Doe v. Texas A&M University*, 2022 WL 5250294, at *6 (S.D. Tex. Oct. 6, 2022).

otherwise.  (Board 30(b)(6) I 66-67)[66]  Although Plaintiffs collectively have pointed to other general allegations of sexual misconduct, they have no evidence of widespread, systemic conduct that would put LSU on notice of a particularized risk of sexual misconduct in the context that Johnson alleges.[67]  Johnson's generalized allegations of widespread, systemic conduct do not meet her burden.

### d.  Element Four: Johnson Cannot Show Causation.

Not only was the conduct not reported to LSU, but there is no connection between the training and any hostile environment or failure to remedy.  An official policy or custom must have caused the alleged assault, as opposed to "simply misconduct that happened to occur [at the school] among its students.'"[68]  The standard for official policy liability under Title IX cannot "mean that recipients can avoid liability only by purging their schools of actionable peer harassment."[69]  For the reasons set forth in Section III.C., Johnson cannot establish any causal link between a purported policy of the Board and the harm she alleges.  Plaintiff's generalized statements relating to training, LSU's 2017 audit, and failure to report complaints or to engage in investigations could not have prevented Johnson's harm.  Johnson and J. Sell each received training.  (Segar Decl, ¶¶ 5, 6, Exh. 3, 4; Sanders Decl., ¶¶ 3, 6)  While Johnson alleges she was not aware of Title IX policies, she cannot link what allegedly occurred to her with J. Sell to any conduct by LSU. She cannot show

---

[66] *See id.* (finding no *Karasek/Simpson* liability where there were no allegations that TAMU received reports of sexual misconduct by similarly situated students, that TAMU failed to address or actively concealed reports of sexual misconduct, that TAMU received reports of sexual misconduct committed by plaintiffs' assailants, or that TAMU had an official policy or custom that created a heightened risk of assault in plaintiffs' program).

[67] *See e.g.*, *C.T. v. Liberal Sch. Dist.*, 562 F.Supp. 2d 1324, 1340 (D. Kan. 2008) (finding that weight training program at volunteer coach's home did not "bear the element of encouragement of misconduct" nor did it "create [] a risk of abuse that would have been obvious to school officials"); *Tackett*, 234 F.Supp. 3d at 1108 (rejecting argument for institutional liability based on the school's authority over its athletes and that it "should have known" of the heightened risk of assault at popular off-campus apartment complex for football players "based on the stereotypical assumption that football players are more prone to commit sexual assault" because such argument is based on theories of respondent-superior and constructive notice, both of which the Supreme Court rejected in *Gebser*, 524 U.S. at 282).

[68] *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1174 (10th Cir. 2007).

[69] *Davis*, 526 U.S. at 650.

24

any direct causal connection between LSU's conduct and Johnson's allegations regarding J. Sell's behavior.  Johnson never reported her frustrations with J. Sell to the Title IX office when she reported the conduct with Bridges, nor did she make any reports to Title IX thereafter, despite having received training and received a response and resources from the Title IX office.  (Johnson 81-86, 283; Johnson Exhs. 9, 10)  Johnson cannot credibly show that additional training would have changed her circumstances.[70]

## IV.    CONCLUSION

For these reasons above, Johnson's heightened risk claim fails as a matter of law.

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:    */s/ Susan W. Furr*
Shelton Dennis Blunt Bar Roll No. 21230
Susan W. Furr Bar Roll No. 19582
Karleen J. Green Bar Roll No. 25119
Jessica Coco Huffman LA Bar No.: 30445
Molly McDiarmid Bar Roll No. 36426
Gregory T. Stevens Bar Roll No. 29436
Michael B. Victorian Bar Roll No.: 36065
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 346 0285
Facsimile: 225 381 9197
Email: dennis.blunt@phelps.com
Email: susie.furr@phelps.com
Email: karleen.green@phelps.com
Email: jessica.huffman@phelps.com
Email: molly.mcdiarmid@phelps.com
Email: greg.stevens@phelps.com
Email: michael.victorian@phelps.com

---

[70]*Tackett,* 234 F.Supp. 3d at 1107 (D. Kan. 2017) (finding no institutional liability for heightened risk of sexual assault where alleged policies "played no part in plaintiff's rape").

ATTORNEYS FOR THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND
MECHANICAL COLLEGE

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading was filed on

June 30, 2023, with the Court's CM/ECF system. Undersigned counsel will send an electronic

copy of the same to Plaintiffs' counsel.

/s/  *Susan W. Furr*
Susan W. Furr