```
 1                UNITED STATES DISTRICT COURT
 2                MIDDLE DISTRICT OF LOUISIANA
 3
 4
    ABBY OWENS, SAMANTHA BRENNAN,
 5  CALISE RICHARDSON, JADE LEWIS,
    KENNAN JOHNSON, ELISABETH       CASE NO.
 6  ANDRIES, JANE DOE, ASHLYN       3:21-CV-00242
    ROBERTSON, CORINN HOVIS, AND
 7  SARAH BETH KITCH
 8  VS.
 9  BOARD OF SUPERVISORS OF
    LOUISIANA STATE UNIVERSITY AND
10  AGRICULTURAL AND MECHANICAL
    COLLEGE, AND VERGE AUSBERRY,
11  MIRIAM SEGAR, JENNIE STEWART,
    AND JONATHAN SANDERS, IN THEIR
12  INDIVIDUAL CAPACITIES
13    * * * * * * * * * * * * * * * * * * * * * * *
14           *** CONFIDENTIAL TRANSCRIPT ***
15          *** SUBJECT TO PROTECTIVE ORDER ***
16        The deposition of CORINN HOVIS, taken in
17   connection with the captioned cause, pursuant to
18   the following stipulations before RITA A. DEROUEN,
19   Certified Court Reporter, at Phelps Dunbar, 400
20   Convention Street, Suite 1100, Baton Rouge,
21   Louisiana 70802 on September 28, 2022, beginning
22   at 9:39 am.
23         COURT REPORTERS OF LOUISIANA, L.L.C.
              9522 Brookline Avenue, Suite 217
24            Baton Rouge, Louisiana  70809
         PHONE (225) 201-9650 * FAX (225) 201-9651
25          E-mail:  depos@courtreportersla.com
```

Court Reporters of Louisiana                225-201-9650
A Veritext Company                          www.veritext.com

1    level were you?

2        A.   The highest one.  You have to have like a

3    27, I think.

4        Q.   What portion of your college expenses are

5    paid by TOPS?

6        A.   I think it's roughly around $10,000 or

7    something, something along those lines.  It's

8    roughly $10,000, with the highest amount.

9        Q.   So you started at LSU in the fall of 2019?

10       A.   (The witness nodded head.)

11       Q.   And I understand you have completed your

12   undergraduate studies?

13       A.   Uh-huh.

14       Q.   When did you complete that?

15       A.   This past May.

16       Q.   May of 2022?

17       A.   Yes.

18       Q.   So you did this in three years?

19       A.   I did.  I was an honors AP student, so I

20   came in with 24 credit hours.  So I came in as a

21   sophomore essentially.

22       Q.   You entered college with those credits?

23       A.   Yes.

24       Q.   So when you started college, it was your

25   anticipation that you would receive your degree in

1    three years?

2          A.   That was the goal.

3          Q.   And you were able to attain that goal?

4          A.   Yes.

5          Q.   And we'll talk about that.

6          A.   Yes.

7          Q.   But you --

8          A.   I did.  I did it.  I'm very proud of

9    myself.

10          Q.   Now, following your graduation from LSU,

11    you -- you're still at LSU?

12          A.   Uh-huh.  I'm a grad student.

13          Q.   You're in graduate school now.

14               What are you studying?

15          A.   Social work.  School of social work.

16          Q.   And do I correctly understand that you

17    would have started that program in the fall of

18    2021 -- I take that back.

19          A.   It's a -- it's actually a one-year

20    master's program.

21          Q.   It's just a one-year program?

22          A.   Uh-huh.  Because I got to do -- with the

23    bachelor's, you get to do it in one year versus

24    two.  It's kind of confusing.

25          Q.   When did you start that?

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

```
1            A.  In August.
2            Q.  This past -- August of 2022?
3            A.  Yes.
4            Q.  It's a one-year program?
5            A.  One-year program.
6            Q.  So you anticipate completing that in this
7       year, 2023?
8            A.  May of 2023, yes.
9            Q.  And what degree will that be?
10           A.  Master's.  Master's.
11           Q.  In?
12           A.  Social work.  A master's of social work.
13           Q.  Once you receive that degree, do you
14      anticipate any further education?
15           A.  I would love to get a Ph.D. at some point.
16      I think that would be really awesome.  That will
17      be a little further in the future.
18           Q.  So your plan right now is not to
19      immediately go into that?
20           A.  No.  I want to get some clinical work in
21      beforehand.
22           Q.  All right.  You started LSU in the fall of
23      2019, correct?
24           A.  Yes.
25           Q.  Where do you live?
```

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

1    okay.

2        Q.  Absolutely.

3            MR. PHAYER:

4                Let's take a break.  Let's take ten

5            minutes.

6            (A break was taken from 10:52 a.m. to

7            11:01 a.m.)

8    BY MR. PHAYER:

9        Q.  And you said it was hard reading?

10       A.  Very, yeah.

11       Q.  After the night that this occurred, have

12   you ever met with ███████████ again?

13       A.  No.

14       Q.  Have you ever spoken with ██████████

15   again?

16       A.  He reached out to me via Snapchat, but

17   I -- I did not engage.  I didn't speak to him.  I

18   think there was -- like the day after that night,

19   he had like messaged me on Snapchat, and then

20   that's whenever I removed him.  I removed him from

21   Snapchat.

22       Q.  Do you remember what his communication

23   was?

24       A.  No.  It was probably something like, Hey,

25   or whatever.

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

```
1    have to like go through it again -- not go through
2    it again, but they have to review it and decide
3    that -- like is his appeal -- is it justified, did
4    they mess up or whatever.
5         Q.  Do you recall whether or not in this
6    process Ms. Stewart had to review Jeff Scott's
7    conclusions and make a decision one way or the
8    other?
9         A.  I'm pretty sure she did.  After he made
10   his findings and then ████ appeals it -- appealed
11   those findings, I think at that point it went to
12   Jennie and she looked it over and was like, I'll
13   have to see if it was true -- like if it was
14   justified or not or whatever.
15        So I'm pretty sure she looked it over
16   after he appealed it, and she was the one that
17   made that decision.
18        Q.  Do you recall what that decision was?
19        A.  That it was true, he sexually assaulted...
20        Q.  So it's your understanding that Jennie
21   Stewart ultimately agreed with Jeff Scott's
22   conclusion?
23        A.  Yes, that's what I'm trying to say.
24        Q.  And, again, I may have asked you this.
25   When Scott completed his investigation, he advised
```

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com

1       A.   LSU grad school, school of social work.

2       Q.   Did you apply to any other schools?

3       A.   No, I didn't.

4       Q.   Are you still on TOPS?  Does that still

5   apply?

6       A.   For me, yes, because I did undergrad in

7   three -- this was why I was like -- I needed to

8   graduate in three years.  I did undergrad in three

9   years.  I still have two more semesters of TOPS

10  eligibility.  Those two semesters I could put

11  towards grad school, if I was going to pursue grad

12  school, which I did.  So now TOPS is paying for my

13  grad school, for my one year of grad school.

14  Yeah.

15      Q.   I guess at some point while the Title IX

16  investigation was going on -- you've told me you

17  had no further communications with ███████████

18  after that night?

19      A.   No, not with him directly.  I did have

20  people contact me.

21      Q.   That's what I'm leading into.

22      A.   Okay.

23      Q.   You did receive texts, I'm aware of a

24  couple at least that you received from -- I'm

25  going to say, if this is the correct name -- ███

Page 108

```
 1   ███████.
 2         Does that ring a bell?
 3      A.  Yeah.  It was Instagram DMs.  One was from
 4   her and then the other one I assumed was also from
 5   her.  It was an anonymous football account.
 6      Q.  And these were the communications where
 7   she's saying, I'm ███████████ on-and-off-again
 8   girlfriend, please have mercy on him, don't pursue
 9   that?
10      A.  Yes.
11         MS. TRUSZKOWSKI:
12            I'm sorry, did you say ███████████?
13         MR. PHAYER:
14            ███████████ ███████████  ████████
15            ██████.  I've been worried about that all
16            week.
17   BY MR. PHAYER:
18      Q.  So you received these communications.  You
19   never responded?
20      A.  No.
21      Q.  And I believe you turned them over to
22   Jennie Stewart and Jonathan Sanders that I'm aware
23   of?
24      A.  Yes.  I think I also sent them to
25   Ms. Susan at Lighthouse just to keep her updated
```

Page 109

1    with what was going on.

2        Q.   And do you recall their reaction?

3        A.   I am pretty sure they were like -- because

4    I had a no-contact, I had a no-contact order in.

5    So him, nor anyone associated with him, was

6    supposed to contact me.  That was my understanding

7    of it.

8            And so I sent them over, and they were

9    like, I'm so sorry that you had to deal with this

10   or whatever, we're going to work on it or we're

11   going to do something or whatever.

12       Q.   Did the communications stop?

13       A.   So I had the first one, and I sent it to

14   them, and then I had the second one.  And then

15   after that, people stopped, yeah.  I stopped

16   getting DMs from people.

17       Q.   Do you feel that those communications --

18   that that person was communicating with you at the

19   request of ███████████?

20       A.   Yeah.

21       Q.   Or do you know?

22       A.   I don't know.  I mean, I can assume all I

23   want but...

24       Q.   Do you feel that any of the people, you

25   know, either Jennie Stewart, Jonathan Sanders, or

Page 110

1    Ms. Susan responded to those -- when you brought
2    those communications to their attention, did they
3    respond appropriately?
4        A.  I mean, as far as I know, nothing
5    happened.  Like I had a no-contact.  He was not
6    supposed to contact me.  Like there are
7    repercussions if you contact me or have --
8        Q.  If ███████████ contacted you?
9        A.  If ███████████ contacts me or somebody
10   in relation to him contacts me, repercussions.
11   And as far as I know, nothing happened.
12       Q.  As opposed to what?
13       A.  Nothing.  Like he didn't get in trouble.
14   A slap on the wrist.  I don't know.
15       Q.  Do you know if anybody at LSU had
16   information or confirmation that it was ██████
17   ████████ who was instigating those communications?
18       A.  No, I don't know.
19           MR. PHAYER:
20               Can we take a break?  Is it about time
21           for a lunch break?
22           (A break was taken from 11:50 a.m. to
23           12:35 p.m.)
24   BY MR. PHAYER:
25       Q.  We're back on the record.

                                        Page 111

1    was -- like the anxiety that induce -- like was

2    induced by it plus like -- then that spiraled into

3    like a depression on top of already having to deal

4    with the actual event itself and like that guilt

5    and shame that, you know, you feel in that

6    situation.

7        Q.  But that was inherent in the process,

8    correct, it's not something that Jennie Stewart

9    did?

10       A.  Yeah, yes.

11       Q.  So the stress and anxiety that you

12   experienced during the -- while the Title IX

13   process was going on, that was not something that

14   could be blamed on Jennie Stewart?

15       A.  The -- no.  The department that she

16   is -- the department that she's in charge of,

17   which is Title IX department, that's what I'm

18   trying to get at.

19       Q.  Are you saying that the Title IX

20   department did something wrong?

21       A.  The Title IX process, I guess.  The

22   process, that, that's what I'm saying.

23       Q.  Do you think there was any way for this

24   process to play out wherein you would not have

25   experienced any added stress or anxiety?

Page 130

1      A.  I don't know.  I don't know.  I don't

2  know.

3          MS. TRUSZKOWSKI:

4              I'm going to object to that question.

5              Calls for speculation.  She has no way of

6              knowing that.

7  BY MR. PHAYER:

8      Q.  Is there -- other than shortening the

9  process, is there anything you can think of that

10 the Title IX department could have done that would

11 have lessened your stress and anxiety level?

12     A.  I don't know.  I don't know what the

13 parameter -- like I don't know the parameters of,

14 like, this.  All I know is LSU's Title IX.

15 Like -- anyway, that's all I have.

16     Q.  There was something -- an area I

17 questioned you about earlier about the

18 communications from ███████.

19     A.  Yes.

20     Q.  Do you feel that Jennie Stewart did not

21 respond appropriately when you notified her about

22 those communications?

23     A.  From what I know, nothing was done after

24 those communications.  I do not know if her or if

25 Jonathan Sanders reached out to ███████.  I

                                      Page 131

1    don't know if they reprimanded him or he got -- he

2    was reprimanded, I guess is the word I'm looking

3    for, if he was reprimanded in any way for that.

4         I was never made aware of it.  From what I

5    know, though, nothing came of it, nothing changed,

6    nothing was different.

7         Q.  So you don't know one way or the other

8    whether either Jennie Stewart or Jonathan Sanders

9    or anybody at LSU contacted ████████ about

10   those ████████ communications?

11        A.  No, I have no idea.

12        Q.  You do know that they stopped after two,

13   don't you?

14        A.  After two, yeah.  But after the first one,

15   it should have stopped.

16        Q.  And I think you told me earlier you don't

17   know whether or not ████████ instigated

18   those -- those communications from ████████?

19        A.  No, I don't know for certain, no.

20        Q.  Is it your contention that Jennie Stewart

21   or Jonathan Sanders or LSU was somehow responsible

22   for having not allowed those to occur at the very

23   inception of them?

24        MS. TRUSZKOWSKI:

25             Objection; that's a

                              Page 132

1           mischaracterization.  She did not say
2           that.
3    BY MR. PHAYER:
4        Q.  You can answer the question.
5           MS. TRUSZKOWSKI:
6               You can go ahead and answer, yes.
7        A.  Can you repeat the question.
8           MR. PHAYER:
9               Read the question back, please.
10          THE COURT REPORTER:
11              Question:  "Is it your contention that
12          Jennie Stewart or Jonathan Sanders or LSU
13          was somehow responsible for having not
14          allowed those to occur at the very
15          inception of them?"
16          MR. PHAYER:
17              Strike the question.  It's a bad
18          question.  Let me rephrase it.
19   BY MR. PHAYER:
20       Q.  Do you feel that -- let me limit it to
21   Jennie Stewart.  Do you feel that Jennie Stewart
22   somehow should have prevented those communications
23   from ever getting to you in the first place?
24       A.  I guess maybe ███ didn't understand this
25   no contact thing, like it wasn't just him; he

                                        Page 133

1    can't contact me, but people related, like
2    involved with him, also can't contact me.
3          Then I guess maybe that's on them to relay
4    that to █████ and then █████ responsibility from
5    there, I guess.
6          Q.  Do you know whether that was ever
7    communicated to █████?
8          A.  No, that wasn't my side of the...
9          Q.  You don't know one way or the other?
10         A.  No.  That wasn't me.  That wasn't my side,
11   my stuff.
12         Q.  Do you feel that Jennie Stewart did
13   anything -- you know, once you made your Title IX
14   complaint and the process started, do you feel
15   that Jennie Stewart did anything to try to
16   dissuade you or talk you out of pursuing your
17   claim?
18         A.  No.
19         Q.  Did Jennie Stewart ever do anything during
20   the Title IX process to limit your ability to
21   describe what happened that night and to pursue
22   your claim?
23         A.  To limit my ability to -- I'm sorry, can
24   you rephrase it or repeat it.
25         Q.  Again, I know you're not a lawyer.  You

Court Reporters of Louisiana          225-201-9650
A Veritext Company              www.veritext.com

1    didn't know anything about Title IX, you know.

2         Q.  I'm going to show you a document.  I don't

3    have a Bates number.  It's a screenshot of -- I

4    guess it's a text, an iMessage exchange between

5    your mother and Jennie Stewart.

6             Do you know if you've ever seen any

7    written communications passing between your mother

8    and Jennie Stewart?

9         A.  No, I've never seen any.

10        Q.  I'd ask you to take a moment to look at

11   your mother's communication to Jennie and Jennie's

12   response.

13        A.  There you go, there's your answer.

14        Q.  Have you seen this before?

15        A.  No, I haven't.  That's very sweet of my

16   mom.

17        Q.  Are the sentiments your mother expressed

18   in this communication with Jennie, are they

19   consistent with what you understand your mother's

20   feelings to be about the process?

21        A.  I guess.  I don't know the -- yeah, sure.

22        Q.  Let me ask you about this.  I'm going to

23   read this into the record.

24             The message from your mother on November

25   19, 2020, 6:40 a.m., reads as follows, "Good

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

1    morning, Jennie.  It's Karrie Hovis, Corinn's mom.

2    I wanted to reach out and say thank you.  We

3    appreciate everything you did to help us through

4    Corinn's case.

5           "The news has been harsh about how the

6    university handles Title IX cases.  I can't speak

7    for other victim's parents, but for us, you went

8    over and above to help us navigate the process.

9    Corinn is doing so well and we attribute that to

10   how you helped her through this situation.  Thank

11   you again."

12          And Jennie responded, "Hi, Karrie.  I so

13   appreciate you taking the time to message me.

14   This is so heartening to me.  It is a tough time."

15          So have you ever discussed with your

16   mother how she felt about how the process played

17   out?

18      A.   No.  I mean, I do know that they -- her

19   and Jennie had a lot of conversations though,

20   because my mom had a lot of questions.  So, I

21   mean, I guess it doesn't surprise me that she says

22   that.

23          MR. PHAYER:

24          We'll mark that as Exhibit 7.

25          (Exhibit 7 was marked.)

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

1    have any problems with how that portion of the

2    process worked?

3         A.   I don't -- I mean, like I didn't agree

4    with his outcome, but I essentially just hopped on

5    a Zoom meeting and we just talked and that was it.

6         Q.   What do you mean, you didn't agree with

7    his outcome?

8         A.   His outcome was only a yearlong

9    suspension.  And I knew that I was going to be

10   walking around campus again, and I was like, a

11   year from now, if this guy is on campus, I don't

12   know how I'm going to walk around campus like

13   that, you know.

14        I was really -- I was really hoping that

15   it would just be expulsion.

16        Q.   But he never returned to campus?

17        A.   No.  Because he transferred.  He ended up

18   transferring, which, I mean, worked out in my

19   favor.

20        Q.   And you were home because of COVID from

21   March to August of 2020?

22        A.   Yeah.  And that -- COVID saved me on it.

23   Like that saved me in a sense, not being on

24   campus.

25        Q.   Other than disagreeing with the outcome,

Page 166

1   do you have problems with anything that

2   Mr. Sanders did?

3       A.   No -- I mean, I don't know what

4   happened -- if he took action with the no-contact

5   stuff.  So, I mean, if that -- from what I know,

6   he didn't, and I have a problem with that, yeah.

7       Q.   Okay.  But you don't know whether he did?

8       A.   I don't know whether he did or not, no.

9       Q.   All you know is that the contact did,

10  indeed, stop?

11      A.   After the second time.

12      Q.   Other than the accommodation issues that

13  we've discussed relating to disability services,

14  do you have any problems with the way that

15  disability services responded to you?

16      A.   Other than what I've already discussed,

17  I'm not going to rehash that.

18      Q.   Other than that?

19      A.   No.

20      Q.   I think you've mentioned that you were

21  rubbed the wrong way by Mr. Jeffrey Scott's

22  question to you about what you were wearing that

23  night.

24      A.   Uh-huh.

25      Q.   Other than that, do you have any problems

Page 167

From:          Jennie L. Stewart
To:            Dennis Phayer
Subject:       Screenshot 2022-07-25 at 1.00.49 PM
Date:          Monday, July 25, 2022 1:01:52 PM
Attachments:   Screenshot 2022-07-25 at 1.00.49 PM.png

Text from Kari Hovis, mother of Corinn Hovis

**1:00** 

 4                    

iMessage
Nov 19, 2020, 6:40 AM

Good morning, Jennie.  It's
Karrie Hovis, Corinn's mom.  I
wanted to reach out and say
thank you.   We appreciate
everything you did to help us
through Corinn's case.  The
news has been harsh about how
the university handles title IX
cases.  I can't speak for other
victims parents, but for us, you
went over and above to help us
navigate the process.  Corinn is
doing so well, and we attribute
that to how you helped her
through this situation.  Thank


EXHIBIT
7
9-29-22 Hovis

you again!

Nov 20, 2020, 2:15 PM



Hi Karrie, I so appreciate you taking the time to message me. This was so heartening to me. It is a tough time.

Delivered



Sent from my iPhone