# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**ABBY OWENS, et al.**
*Plaintiffs*

**v.**

**BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND
MECHANICAL COLLEGE**
*Defendant*

**Case No.: 21-242**

**Division WBV-SDJ**

**JUDGE WENDY B. VITTER**

**MAGISTRATE JUDGE JOHNSON**

### OPPOSING STATEMENT OF MATERIAL FACTS TO MOTION FOR
### SUMMARY JUDGMENT NO. 1: ASHLYN MIZE ROBERTSON

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion for Summary Judgment No. 1, Plaintiff Ashlyn Mize Robertson, through undersigned counsel, submits responses to the Board's Statement of Undisputed Material Facts:

1. Mize was a student at LSU from Fall 2015 through September 2017, when she withdrew after being arrested and incarcerated for selling drugs, among other crimes. (Mize 32, 43-44, 126-127)

**Qualified.** Mize was arrested due to her addiction and subsequent incarceration that stemmed from her abuse at LSU. (Mize 183).

2. During her entire time at LSU, Mize lived alone in off-campus housing. (Mize 15-17).

**Qualified.** Mize lived in an apartment complex just off campus that was once called "The Standard." Mize lived there for her first couple years at LSU during which the name of the apartment complex changed. The summer before her third year, Mize moved to a different apartment complex. (Mize 15-16).

3. Mize claims that, in January 2016, she hosted a party at her off-campus apartment, at which she drank to intoxication. (Mize 66-67)

**Admitted.**

4. She recalls going to her room and passing out on her bed. (Mize 67-68) She recalls that several football players, who were also intoxicated, remained in her kitchen. (Mize 67, 73) She cannot recall how many men were there.  (Mize 69)

**Qualified.** While Mize cannot recall who remained in her apartment when she went into her bedroom, Mize does recall that there was no one else in her bedroom when she passed out. (Mize 73).

5. One of the men was John Doe, although Mize said she did not invite him. (Mize 67, 73) Doe as well as others who were at the party lived in Mize's same off-campus apartment complex. (Mize 71; R. Doc. 182, ¶ 243)

**Qualified.** In 2016, John Doe was considered a "bona fide star" on the LSU football team. (HB Report Page 92)**.** Mize did not invite Doe to the party. When Doe arrived, Mize began asking other people who had invited him. Mize told Doe that she did not like him because he was arrogant. Doe told Mize that he would "make her" like him. Mize did not want to be around Doe any longer, so she went into her room and passed out. (Mize 67-68).

6. Over the course of the next few days, Mize concluded she had been sexually assaulted by Doe while she was passed out in her apartment that night. (Mize 68, 76-77)

**Qualified**. The following morning, Mize woke up to find trauma in her vaginal and anal areas. At first, she could not remember what happened. However, that morning she noticed that Doe's phone number was in her phone. (Mize 68). Mize testified that she "absolutely did not" put Doe's number in her phone. (Mize 80). Mize quickly began to worry that something had happened

to her because she knew that she had been unable to give consent. (Mize 76). Over the next few days, Mize began to have flashbacks of that night. She was able to remember Doe on top of her, making a comment about her not being "wet," spitting on her, and penetrating both her vaginal and anal areas. (Mize 76). She realized Doe had raped her (77-78).

7. Mize did not want to report the conduct to the police. (Mize 96-97) Instead, Mize disclosed her belief to her friend ("Student A"), and she asked Student A not to tell anyone. (Mize 82)

**Qualified.** Mize disclosed the rape to Student A the following day and asked her not to tell anyone. (Mize 82, 104). Mize did not want to report the rape to the police because of Doe's status at LSU and she did not want to have to "deal with the trauma of retelling it" and her rape becoming "public knowledge." She just wanted to forget it happened. (Mize 96-97).

8. Despite her request, Student A reported the incident to Student A's mother. (Mize 106)

**Admitted.**

9. Student A's mother called Student A's diving coach to share the information, and the diving coach promptly relayed the information to Miriam Segar, Senior Associate Athletic Director, on January 26, 2016. (Segar I 268-269; Segar Decl. ¶ 7, Exh. 5)

**Admitted.**

10. One hour later, Segar met with Student A to obtain details. (Segar I 268-269, 271; Segar Decl. ¶ 7, Exh. 5) Student A relayed to Segar that the assaulted individual [Mize] did not want to make a report. (Mize 117; Segar Decl. ¶ 7, Exh. 5; see also Mize 109, 115)

**Admitted.**

11. Student A informed Segar that Mize said she "hooked up" with two men, Doe and another person. (Segar Decl., ¶ 7, Exh. 5) Mize said it is possible she told Student A that she

"hooked up" with two students and then the next day explained that it was rape. (Mize 110-111) Mize does not know who the second person was, or whether, in fact, there was a second person. (Mize 111)

**Qualified.** When Student A reported the rape to Segar, she affirmatively stated that Mize was sexually assaulted by Doe, that she saw bruising on Mize's upper arms, and that Mize was very upset about the incident and "wanted it to be over." Student A said when Mize *initially* spoke to her about the incident the following morning, she indicated that she may have had sex with Doe and someone else. (HB Report Page 93). Mize testified that she does not remember telling Student A that she had sex with two men and does not know who the second man would have been. (Mize 110-111). The morning after the rape, Mize was concerned that something had happened to her because she knew that she was unable to give consent the night before (Mize 76). Over the next few days, Mize remembered the assault and that Doe had raped her. As her memories returned, she shared what occurred with Student A. (Mize 76-78, 104).

12. Later that same day, Segar followed up with Student A by email, this time including information for Student A to "share with the individual you are concerned about [Mize]." (Mize Exh. 1; Segar Decl. ¶ 7, Exh. 5) That email advised, among other things, of the individual victim's rights to report to law enforcement and to report to LSU in order to allow the university to conduct an investigation. Id.

**Admitted.**

13. Mize does not recall Student A informing her of the resources that Segar included in the email, but she acknowledges that Student A encouraged Mize to visit LSU's health center, which Mize understood would be confidential. (Mize 84, 109-110, 113-114)

**Admitted.**

14. Mize went to the health center, but she said too much time had passed for a rape test to be performed. (Mize 83-84, 103) There, Mize learned she had a sexually transmitted disease, which Mize attributes to Doe (although she could not say whether she had sex with another person that night). (Mize 83-84, 102, 112)

**Qualified.** Mize went to the Health Center within the week following the rape. Mize was diagnosed with chlamydia. Mize attributes the chlamydia to the rape because she had never had sex without a condom previously and she did not have symptoms yet, indicating that the infection was fairly new. (Mize 83-84). Most importantly, while Mize does not recall having sex with anyone else that night, she does recall Doe raping her. (Mize 76-78, 111).

15. On January 27, 2016, Segar shared the information she received from Student A with Mari Fuentes-Martin, Associate Vice President and Dean of Students, including the names of the students allegedly involved (Mize and Doe). (Segar I 267-268, 271-272; Segar Decl. ¶ 7, Exh. 5) Segar also again met with Student A, asking if Student A had spoken with Mize about her available resources and about reporting the incident. (Segar Decl. ¶ 7, Exh. 5) Student A indicated that she had, and she reiterated that Mize was adamant about not wanting assistance or wanting to report. (Segar Decl. ¶ 7, Exh. 5; see also Mize 109, 116)

**Admitted.**

16. Segar again offered to meet with Mize. (Segar Decl. ¶ 7, Exh. 5) Segar followed up with Student A on January 28 and 29, 2016, attempting to encourage Mize to accept LSU's help. (Segar Decl. ¶ 7, Exh. 5) Student A once again communicated that Mize "really isn't wanting to have anything to do with it." (Segar Decl. ¶ 7,. Exh. 5)

**Qualified.** Mize can neither admit nor deny as she has no firsthand knowledge of discussions between Student A and Segar. Mize acknowledges that Segar testified as such.

17. From this point, Fuentes-Martin began communicating with Mize. (Segar I 278) On February 1, 2016, Fuentes-Martin reached out to Mize by email, saying, among other things:    .

. . My role as Deputy Title IX Coordinator for student cases is to ensure that we address immediate remedies for your safety and well-being. First and foremost, I want to discuss all of the services provided on and off campus to address your medical concerns as well as the availability of counseling. Secondly, we want to provide you with academic support and ensure that you are able to successfully continue with your studies at LSU. Lastly, I would like to discuss your options to investigate this incident which can be done administratively within LSU as a policy violation under Permanent Memorandum 73 (PM-73-Sexual Misconduct) which I have attached. I would like to encourage you to schedule an appointment with me so we can discuss this matter further. Please know that LSU is concerned for all of its student's [sic] and wishes to provide support and services through difficult challenges.  I urge you to contact my office at (225) 578-XXXX to schedule a date and time that you can meet and discuss further. If you have any questions or just need to get further support and resources, please contact me either by phone or email at mari@lsu.edu. (Mize 116; Mize Exh. 2)

**Admitted.**

18. In the meantime, on February 2, 2016, Mize met with someone in the LSU Lighthouse Program. (Mize 119-120)

**Qualified.** Mize briefly spoke with Sierra Fowler at the Lighthouse Program the same day that she visited the Health Center. Mize recalls that they spoke for five minutes about tutoring. (Mize 114, 119).

19. The Lighthouse Program is a free and confidential university resource which provides interpersonal violence prevention, support, and advocacy to the LSU campus community. (Sanders

Decl., ¶ 5) The program assists student-survivors of sexual assault, interpersonal violence, stalking, and harassment with information and assistance for accessing critical services such as medical care, evidence collection and preservation, counseling and mental health care, academic accommodations, and with filing reports with investigative offices.  (Id.)

**Qualified.**  Mize acknowledges that Sanders testified as such.  Mize can neither confirm nor deny the functions of Lighthouse as she does not have firsthand knowledge of such.

20. Mize did not need academic support (even though it was offered to her), and she sought no other support. (Mize 116-117).

**Qualified.** Mize testified that "At the time, I-I didn't need support." (Mize 116-117). Mize did not state that she sought no other support. (Mize 116-117)

21. On February 5, 2016, Mize responded to Fuentes-Martin's email: I apologize for responding this late but I wanted to think about everything and look at all of my options.  I have decided I would not like an investigation to be performed.  I have met with Ms. Sierra Fowler and I know all of the resources that are available to me. I plan to use them if needed. I appreciate yours and LSU's support through this situation. (Mize 118-119; Mize Exh. 3).

**Qualified.** Mize did indicate that she did not want to proceed with an investigation. At the time, Mize was scared and believed that she was alone in her experience. She knew that the rape was brought to LSU's attention, but she did not want to keep reliving it. (Mize 115, 117, 129). Further, Mize was aware of Doe's status at the University, and she did not want to be known as the "girl who cried rape against" Doe. Mize's feelings were confirmed by a woman who worked at the Health Center. When Mize explained why she did not want to move forward with an investigation, the woman told Mize that she understood because Doe "is like a God around here." The woman indicated that "things would not get done correctly." Mize (122-123). Mize testified

that had she known that Doe assaulted others, she would have pursued an investigation. (Mize 129-130, 186).

22. Although Mize expressed unwillingness to participate in an investigation, Fuentes Martin asked her to contact Fuentes-Martin if she changed her mind: I'm glad you responded to me and I'm thankful that you took the time to meet with Seirra [sic]. We are all here to help you and will respect your decision not to proceed. I would like to leave the door open to future discussions with you should the need arise. I wish you the best in your endeavors. (Mize 124; Mize Exh. 3)

**Admitted.**

23. Mize never returned to Fuentes-Martin or to anyone else to file a complaint against Doe or to provide details for an investigation. (Mize 124-125, 123-134) Doe also never committed another sexual act against Mize. (Mize 132)

**Qualified.** While Doe did not commit another sexual act against Mize, he did engage in threatening and intimidating behavior. Around a month after the incident, Mize was "hanging out" with friends, ████████████████████ in their apartment. Doe came to the apartment and when █████ realized who it was, he told Mize to go to his room. Doe realized that someone was hiding in the bedroom, so he began banging on the door. Mize thought Doe was going to bang the door down, so she took a deep breath and opened the door. Doe asked her why her friends are always flipping him off and he told her that she needed to control her friends. He then angrily told Mize that he had a gun with her name on it. (Mize 86-90). On another day, Mize arrived at a party in her apartment complex. Doe was standing close to the door with two women. Doe looked at Mize and said, "there's that bitch right there." Mize immediately left. (Mize 101). During finals week that semester, Mize went to her car and found a Styrofoam cup with a protein shake busted

on her car. The cup had Doe's name written on it. (Mize 101-102). Merely being in the same building as Doe, passing him in the hallway, or seeing him in the elevator "retraumatized" Mize all over again. (Mize 132).

24. Mize claims that she was assaulted on January 22, 2016, yet she did not file suit until five years later, on April 26, 2021.  (Mize 62-63; R. Doc. 1; R. Doc. 182, ¶ 243)

**Qualified.** Prior to 2021, Mize felt alone. She believed she was the only one that Doe had assaulted. (Mize 129, 186). Mize did not learn about Samantha Brennan's, Abby Owens', and Calise Richardson's experiences with Doe, nor had Mize communicated with any of the Plaintiffs in this case, until the Husch Blackwell Report came out in 2021. (Mize 128, 169-170). Mize also did not learn about LSU's systemic failures concerning Title IX, the basis for her claims, until she read the Husch Blackwell Report in 2021. (Mize 170, 193; PLAINTIFFS_000170-71).

25. As of February 5, 2016, Mize had met with the Lighthouse Program, received notice of available resources, been informed by email of LSU's resources for victims of sexual assault, and been asked to report the incident. (Mize 116, 118-120; Mize Exhs. 2, 3) She also knew of the previous training she had received prior to the alleged assault. (Mize 162) Further, as of February 5, 2016, Mize knew of her injury, knew of the perpetrator, and knew how LSU responded. (Mize 118-119, 124; Mize Exh. 3; see also R. Doc. 340, p. 18)

**Qualified.** While Mize did know that Doe raped her in 2016, she did not know the extent of LSU's failures in its response to her report until 2021 when she read the Husch Blackwell Report and learned that LSU omitted Doe's name from the internal report, among other things. Further, Mize did not learn about LSU's systemic failures – the basis for her claims, until reading the Husch Blackwell Report in 2021. (Mize 128, 170, 193; PLAINTIFFS_000170-71).

26. Mize was the first plaintiff to assert sexual assault allegations against Doe. (R. Doc. 182, ¶¶ 242-250). LSU received no prior reports of sexual assault by Doe.

**Qualified.**  Mize can neither admit nor deny as she has no personal knowledge as to whether LSU received any other earlier reports concerning Doe.

27. Mize does not believe LSU bears responsibility for what Doe did to her in January 2016.  She believes "that is his responsibility." (Mize 184-185)

**Qualified.** Mize does not believe that LSU bears responsibility for Doe raping her; however, she does believe that LSU bears responsibility for what happened following the rape. (Mize 184-185). LSU protected Doe. (Mize 129).

28. Mize's grades did not drop until Spring 2017, when she began selling drugs and started a relationship with a drug dealer who did not attend LSU. (Mize 28-33, 143; Mize Exh. 4) This was well over a year after the alleged incident with Doe.

**Qualified.** By April and May 2016, a few months following the rape, Mize began drinking heavily and using marijuana at least once a day. (Mize 22-23). Mize testified that she was addicted to both alcohol and marijuana. (Mize 24). Soon, her drug abuse progressed to cocaine, methamphetamine, ecstasy, heroin, and prescription drugs including Xanax, Vyvanse, and pain medications. (Mize 25-26, 43-44). Eventually, Mize stopped attending classes, leading to a drop in her grades. Mize testified that "part of her addiction was running from" what occurred at LSU. She stopped attending classes and was "hardly" at her apartment. She "ran and ran and ran and ran." (Mize 183). Mize was arrested twice in 2017 and 2018 and spent some time in jail. (Mize 41, 154). While the impacts of her abuse can be seen over time, her addiction and subsequent incarceration stemmed from her time at LSU. (Mize 183)

29. In the two semesters following the incident, her semester GPA dropped only .2 (from 3.221 to 3.011) and improved the next semester (to 3.228). (Mize Exh. 4)

**Admitted.**

30. Mize chose not to use any of the educational resources offered to her. (Mize 116-117) She said she "didn't really need academic support." (Mize 117)

**Qualified.** Initially, at the time, Mize did not believe that she needed academic support. However, shortly after she began abusing alcohol and drugs to cope with her abuse. Mize explained that, because of her addiction, she did not want help from anyone. (Mize 117, 124-125).

31. Mize's mother withdrew her from school when she was arrested. (Mize 126-127)

**Admitted.**

32. Mize testified that LSU does not bear responsibility for her arrest and subsequent withdrawal.  (Mize 185)

**Qualified.** Mize accepts responsibility for her actions related to her addiction and her subsequent arrest and withdrawal. (Mize 183). She does not believe that LSU bears any direct responsibility for her actions. However, she does believe that her addiction, and the actions that came from the addiction, stemmed from both the rape and what LSU did not do for her afterward. (Mize 185). LSU protected Doe. (Mize 129).

33. The Board's written official policy, Permanent Memorandum 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203; Stewart Exh. 2)

**Qualified.** Mize can neither admit nor deny the purpose of PM-73 as she has no first-hand knowledge of its purpose, and the document speaks for itself. Mize acknowledges that Stewart testified as such.

34. PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy." (Id.)

**Qualified.** Mize can neither admit nor deny the purpose of PM-73 as she has no firsthand knowledge of its purpose, and the document speaks for itself. Mize acknowledges that Stewart testified as such.

35. The Board's policies were promulgated to students and staff alike before and after Mize's assault. (Mize 112; Mize Exh. 1; Board 30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 259-261; Stewart 38-41)

**Qualified.** Mize can neither admit nor deny she has no firsthand knowledge regarding the promulgation of Board policies. Mize acknowledges that the Board and Stewart testified as such.

36. Employees, non-employees, and students, including Mize, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative, or through Maxient. (Board 30(b)(6) I 49-52) Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (Id. 53-54)

**Qualified.** Mize can neither admit nor deny she has no firsthand knowledge regarding LSU's mechanisms for reporting. Mize acknowledges that the Board and Stewart testified as such.

37. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37)

**Qualified.**  Mize can neither admit nor deny she has no firsthand knowledge regarding when or what training took place or how it was administered.   Mize acknowledges that the Board testified as such.

38. In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39, 41-43) Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) I 39, 42-44)

**Qualified.**  Mize can neither admit nor deny she has no firsthand knowledge regarding the training of said entities.   Mize acknowledges that the Board and Stewart testified as such.

39. Like other students, Mize and her alleged assaulter, Doe, received MyStudentBody training. (Mize 162; Sanders Decl. ¶ 3) Because of his role as a student athlete, Doe received additional training through the Dan Beebe Group/Protection for All. (Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl.,¶ 5, Exh. 2)

**Qualified.**  Mize can neither admit nor deny if Doe received training as she has no firsthand knowledge of said event.   Mize acknowledges that the Sanders and Segar testified as such.

40. The 2017 Internal Audit and LSU's response occurred before Mize's alleged assault.[3]

**Qualified.**  Mize can neither admit nor deny she has no first-hand knowledge regarding the 2017 audit and when it occurred.

41.  Although Mize did not report her alleged incident to LSU, her friend did, causing no delay in reporting. (Mize 106, 109, 116; Segar I 268-269; Segar Decl., ¶ 7, Exh. 5)

**Qualified.**  Mize's friend did report right away, so there was no delay in reporting by a student to LSU.  Mize can neither confirm nor deny whether there was a delay in reporting within LSU once her friend made the report to LSU as she has no independent knowledge of such.

42. Then, having received a third-hand report, LSU promptly reached out to Mize to advise her of her Title IX resources and to investigate. (Mize 116, 124; Mize Exh.2) However, Mize chose not to report her claims, which is her right. (Mize 109, 116, 124, 133-134)

**Qualified.** Mize did indicate that she did not want to proceed with an investigation. At the time, Mize was scared and believed that she was alone in her experience. She knew that the rape was brought to LSU's attention, but she did not want to keep reliving it. (Mize 115, 117, 129). Further, Mize was aware of Doe's status at the University, and she did not want to be known as the "girl who cried rape against" Doe. Mize's feelings were confirmed by a woman who worked at the Health Center. When Mize explained why she did not want to move forward with an investigation, the woman told Mize that she understood because Doe "is like a God around here." The woman indicated that "things would not get done correctly." Mize (122-123). Mize testified that had she known that Doe assaulted others, she would have pursued an investigation. (Mize 129-130, 186).

43. The following occurred on January 26, 2016: o Within one hour of receiving the report from Student A, Segar met with Student A in person to obtain details about the potential issue. Student A insisted that the alleged victim did not want to report. (Segar Decl., ¶ 7, Exh. 5)  o Segar notified Student Affairs of the concern. Id.  o Segar emailed Student A and shared detailed

information on the LSU Lighthouse program and the LSU Policy on Sexual Misconduct. Id   o Segar reached out to Fuentes-Martin to update her on the situation. Id

**Qualified.** When Student A reported the rape to Segar, she affirmatively stated that Mize was sexually assaulted by Doe, mentioned Doe by name, said she saw bruising on Mize's upper arms, and said Mize was very upset about the incident and "wanted it to be over." (Mize 206; PLAINTIFFS_000168). Mize has no knowledge of the timing of when Segar met with Student A or what Segar did after meeting with her.

44. The following occurred on January 27, 2016: o Segar spoke with Fuentes-Martin, and they discussed that they needed an account from the alleged victim about what happened. (Segar 267)  o Segar again met with Student A to ask if she spoke with the alleged victim about resources and reporting the incident. Student A was adamant that the alleged victim [Mize] did not want assistance and did not want to report. Segar asked Student A to again speak with the alleged victim about reporting to the university or to the police. (Segar Decl., ¶ 7, Exh. 5; Mize 105, 108) The friend said she would do so. (Segar Decl., ¶ 7, Exh. 5)

**Admitted.**

45. The following occurred on January 28, 2016: o Student A reported to Segar by text that "she [Mize] really isnt' wanting to have anything to do with it." (Segar Decl., ¶ 7, Exh. 5)

**Admitted.**

46. The following occurred on January 29, 2016: o Fuentes-Martin asked Lighthouse representative, Sierra Fowler, to reach out to Mize." Id.

**Qualified.** Mize can neither admit nor deny she has no firsthand knowledge regarding what Fuentes-Martin did. Mize acknowledges that Segar testified as such.

47. The following occurred on February 1, 2016: o Fuentes-Martin reached out to Mize by email, saying she wanted to discuss all of the services provided by LSU to address Mize's concerns, to offer medical and psychological care, to offer academic support, and to discuss options for investigating the incident. Fuentes-Martin asked Mize to schedule a date and time to meet with Fuentes-Martin and provided Mize with her phone number and email address. (Mize Exh. 2)

**Admitted.**

48. The following occurred on February 5, 2016: o Mize finally responded, at which time Mize apologized for her delay, stated that she had thought about everything and weighed her options, and she did not want to move forward with an investigation. Mize assured Fuentes-Martin that she had met with the Lighthouse Program and knew all of the resources available to Mize. (Mize 118-119; Mize Exh. 3) o Fuentes-Martin responded to Mize and asked Mize to come back to FuentesMartin if she changed her mind. (Mize 123-124; Mize Exh. 3)

**Admitted.**

49. Segar and Fuentes-Martin endeavored to provide, and did provide, Mize with information about the services and resources available at LSU for victims of sexual assault. Their communications with Mize conveyed their interest in obtaining information from Mize and moving forward with an investigation.

**Qualified.** Information may have been communicated, but Mize was not in a frame of mind to absorb the information. She knew that the rape was brought to LSU's attention, but she did not want to keep reliving it. (Mize 115, 117, 129). Further, Mize was aware of Doe's status at the University, and she did not want to be known as the "girl who cried rape against" Doe. Mize's feelings were confirmed by a woman who worked at the Health Center. When Mize explained why

she did not want to move forward with an investigation, the woman told Mize that she understood because Doe "is like a God around here." The woman indicated that "things would not get done correctly." Mize (122-123). Mize testified that had she known that Doe assaulted others, she would have pursued an investigation. (Mize 129-130, 186). Mize can neither admit nor deny what Segar and Fuentes-Martin endeavored to do or what their interests were as she has no knowledge as to such.

50. Fuentes-Martin's communications conveyed her interest in hearing from Mize. Fuentes-Martin stated: □ "I would like to encourage you to schedule an appointment with me so we can discuss this matter further. □ "Please know that LSU is concerned for all of its student's [sic] and wishes to provide support and services through difficult challenges." □ "I urge you to contact my office at (225) 578-XXXX to schedule a date and time that you can meet and discuss further." □ "If you have any questions or just need to get further support and resources, please contact me either by phone or email at mari@lsu.edu."(Mize Exh. 2)

**Qualified.** Mize knew that the rape was brought to LSU's attention, but she did not want to keep reliving it. (Mize 115, 117, 129). Further, Mize was aware of Doe's status at the University, and she did not want to be known as the "girl who cried rape against" Doe. Mize's feelings were confirmed by a woman who worked at the Health Center. When Mize explained why she did not want to move forward with an investigation, the woman told Mize that she understood because Doe "is like a God around here." The woman indicated that "things would not get done correctly." Mize (122-123). Mize testified that had she known that Doe assaulted others, she would have pursued an investigation. (Mize 129-130, 186). Mize can neither admit nor deny what Fuentes-Martin's interest was as she has no knowledge as to such.

51. Mize had no issue with LSU's response at the time. (Mize 133)

**Qualified.** Mize did not learn about LSU's systemic failures concerning Title IX – the basis for her claims, including the fact that LSU "significantly" erred when they omitted Doe's name from the written report, until she read the Husch Blackwell Report in 2021. (Mize 170, 193; PLAINTIFFS_000170-71).

52. Segar communicated Doe's name to Fuentes-Martin. (Segar I 264-68, 271-72; SEGAR 000344). Although Segar did not include his name in her write-up of the events, she did not conceal it from Title IX.  (Segar 267)

**Qualified.** Doe's name is not mentioned in any of the Title IX records concerning Mize. Segar initially indicated that Fuentes Martin "did not want to put it in writing." However, when asked about this, Fuentes Martin indicated that she was "surprised" that Doe's name was not noted in the records. LSU erred when omitting Doe's name in the records because when Doe was accused of subsequent sexual misconduct by other students, Mize's initial report was not "considered or revisited." (PLAINTIFFS_000170-71).   Mize can neither admit nor deny what Segar communicated to Fuentes-Martin verbally as she has no knowledge as to such.

## ADDITIONAL FACTS

1. Supplemental Opposing Statement of Material Facts as to Opposition to Motions No. 1-10 is incorporated herein by reference.

2. Willie Allen, Mize's former boyfriend, reported the rape to Coach Orgeron. (Mize 126). At the time, there was a rumor that Willie was considering transferring to another university. Coach Orgeron asked Willie if he wanted to transfer because his girlfriend (Mize) was having sex with other men. Willie informed Coach Orgeron that Mize had been

raped. Coach Orgeron responded and stated that "every girlfriend has sex with other guys." (Mize 135)

3. Following the rape, as part of the trauma response, Mize began to engage in hypersexual activity. She did not know it at the time, though she later learned in counseling, that her behavior was a way to regain the power that had been taken away from her during the rape. (Mize 137).

4. Mize has since undergone a series of treatments through multiple rehabilitation programs to regain her sobriety and get her life back on track. (Mize 93, 147-148, 179-180). Mize is now sober and is attending Georgia State University to complete her bachelor's degree. (Mize 13-14).

5. Opposing Statement of Material Facts to Motion for Summary Judgment No. 2: Samantha Brennan, No. 3: Calise Richardson, and No. 4: Jade Lewis are incorporated herein by reference.

6.  Plaintiff lived in apartment complex off campus called "The Standard." Mize at 15.

7. On January 16, 2016, John Doe raped her vaginally and anally after he came to her apartment uninvited while she had other friends from the football team over. Mize at 62-63, 67-68, 71.

8. About a month after the incident, Doe threatened Plaintiff and told her he had a gun with her name on it. Mize Dep. at 86-89.

9. On another occasion, she went to a party in another apartment in the complex and found Doe at the party when she arrived; he called her a bitch, and she immediately left. Mize at 101.

10. Around May 2016, Plaintiff found a protein shake had been thrown on her car, and the cup had Doe's initials on it. Mize at 101-102.

11. After Doe raped Plaintiff in January 2016, she confided in her friend ████ whose mother contacted the LSU Swimming and Diving coach; the coach reported the incident to Associate Athletic Director Miriam Segar. PLAINTIFFS_000168-000170.

12. Segar met with ████ who told Segar that Doe had sexually assaulted Plaintiff and that Plaintiff had visible bruises on her body. PLAINTIFFS_000168; Mize at 206.

13. Plaintiff went to the LSU Health Center and told a nurse that Doe had raped her:

> I told her that the university had reached out to me about an investigation, but I did not want an investigation against him because of who he was and that I didn't want my name to be plastered throughout LSU as the girl who cries rape against [John Doe].... And she responded with, "I totally understand. I don't blame you. He is like a god around here." And…she didn't believe that things would get done correctly.

Mize Dep. at 123:15-25.

14. Plaintiff did not want to have to relive the rape throughout the Title IX process. Mize at 117.

15. If Plaintiff had known that she was not Doe's only victim, she believes she would have moved forward with reporting. Mize at 129-30, 183.

16. Despite knowing Doe's identity, Segar improperly did not include his name in the file or in any of her reports on the incident as a means to evade Louisiana public records laws, which Husch Blackwell identified as an error. PLAINTIFFS_000170-000171.

17. Plaintiff believes that LSU wanted to protect Doe. Mize at 129.

18. As a result of Doe's harassment, Plaintiff became so distressed that she began abusing drugs and was later incarcerated. Mize at 44-45, 54, 154, 157.

Respectfully Submitted,

*/s/ Catherine E. Lasky*

| | |
|---|---|
| Karen Truszkowski | Catherine E. Lasky (La. Bar 28652) |
| *Pro Hac Vice* | Endya L. Hash (La. Bar 38260) |
| Temperance Legal Group | Katie Lasky Law |
| 503 Mall Court #131 | 619 Homedale Street |
| Lansing, Michigan 48912 | New Orleans, Louisiana 70124 |
| P: (844) 534-2560 | P: (504) 584-7336 |
| F: (800) 531-6527 | F: (504) 375-2221 |
| karen@temperancelegalgroup.com | katie@katielaskylaw.com |
| | endya@katielaskylaw.com |

Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the above and foregoing pleading has been served on all

parties via counsel of record by electronic mail this 31st day of July 2023.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour