

# MEMORANDUM

| | |
|---|---|
| **DATE:** | May 15, 2013 |
| **CLIENT/ MATTER NO:** | 0905/05005 |
| **TO:** | File |
| **FROM:** | Vicki M. Crochet |
| **RE:** | Student Complaint - Athletic Department |

The attached legal opinion and proposed policies and procedures were hand delivered and discussed in a meeting on May 15, 2013. Those reviewing the attachments were: Garret "Hank" Danos (Chair of the Board of Supervisors), Robert "Bobby" Yarborough (Board Chairman Elect), Stanley Jacobs (Chairman of the Board - Athletic Committee), Shelby McKenzie (LSU Lead Legal Counsel), Joe Alleva (Vice Chancellor and Director of Athletics), and Miriam Segar (Senior Associate A.D./Senior Woman Administrator). Also present at the meeting and participating in the discussion were Vicki Crochet and Bob Barton of Taylor Porter.

Following a comprehensive discussion of the attachments, all copies of the attachments were returned to Taylor Porter to maintain in its file. The handwritten notation on the opinion reflects a clarification discussed at the meeting.

After review and discussion of the investigation, those present agreed to and accepted the findings and recommendations of counsel, with the recognition that any further investigation or remedial action was likely to endanger the student's confidentiality which repeatedly has been requested by the student and her father since the initial report. Also, those present agreed that this was appropriate administrative action that could and should be taken without further review by the full Board.

VMC:mm

641062.1

BOS-029864

May 15, 2013

<div style="border: 1px solid black; display: inline-block; padding: 4px;">**HAND DELIVERED**</div>

Re:    Student Complaint

Near the end of February 2013, a student employee in the Athletic Department reported recent interactions with XXX that made her uncomfortable enough to quit her part-time position. As a result of what this student (referred to in this letter as Student No. 2) reported to her supervisors, officials in the Athletic Department's administration were contacted and they subsequently interviewed the student.   After some initial fact-finding, Miriam Segar, Senior Associate AD/Senior Woman Administrator and Joe Alleva, Vice Chancellor and Director of Athletics, contacted our office about the student's report. Shortly thereafter, the Chancellor asked Taylor Porter to investigate the situation with the assistance of Ms. Segar.

Subsequently, Bob Barton, Miriam Segar and Vicki Crochet coordinated the investigation of the student's report.   We interviewed Student No. 2.   We also interviewed a former student employee (referred to in this correspondence as Student No. 1) who had reported concerns about her interactions with XXX in the summer of 2012; and other employees and students in the Athletic Department who might have knowledge of the situation involving both students and XXX.

<u>**Investigation:**</u>



Student No. 2 ██████████ was hired ████████████ to work in recruiting after being interviewed by XXX and others. Her supervisor was Sharon Lewis. Student No. 2 reported that shortly after she started work, she began to receive Facebook messages from XXX. ████████████ ████ ████ ████ ████ ████ ████ ████ ████ In March 2013, Student No. 2 had a discussion with XXX in his office regarding her future plans. No one else was present in the office.  She indicated that she was interested in sports marketing and claims that XXX indicated that she may be able to work for him on his personal business when she graduated.  Student No. 2 contends that XXX told her to enter her number in his personal phone but to use an alias and that he would do the same with her number. After this meeting, XXX and Student No. 2 began texting each other and making plans to meet again. The texts were initiated by XXX at the outset and then by both subsequently.

Ultimately, Student No. 2 met XXX off campus; got into his vehicle; and the two of them rode around talking.  Student No. 2 contends that XXX suggested that they go to a hotel together and mentioned his condo as another meeting place.  He also complimented her on her appearance and said he was attracted to her. Student No. 2 says that XXX drove his vehicle behind the Athletic Complex, parked the car, ████████████████ and kissed her twice.

May 15, 2013
Page 2

XXX agrees that he did Facebook message and text Student No. 2. He contends that this was an outgrowth of her interest in sports marketing and that nothing inappropriate was discussed. XXX strongly believes that it is part of his role to mentor students (not only student athletes). He says that the purpose of his meeting with Student No. 2 was to talk with her more about her career aspirations and to tell her about a sports agent he had seen on a recent trip. He indicates that he met Student No. 2 off campus and took her for a drive because he had expected her to meet with him earlier at his office and when she did not arrive at the Athletic Building he left work. The student then contacted him about meeting and rather than return to the Athletic Building he suggested that they meet and go for a ride. XXX denies suggesting meeting at a motel or the condo and strongly denies ███████████████ or kissing her. He contends that they discussed her career, his recent trip and says that she asked him about his interests and marriage.

When we met with Student No. 2, she was accompanied by her father ████████████████ ███████████████████████████ Both Student No. 2 and her father have strongly emphasized the importance of her identity remaining confidential. We have continued to have contact with both Student No. 2 and her father.

During the course of our investigation we obtained the following additional information:

1.  Numerous Athletic Department employees indicate that following the National Championship game XXX became more "hands on" about many things in the Athletic Department, including the student employees. In 2012 he participated in recruiting and interviewing female student employees. According to the employees who supervise the student employees, XXX made it clear that he wanted these employees to have a certain "look" (attractive, blond, fit). He also made their supervisors feel that existing student employees who did not meet this criteria should be given fewer hours or terminated.

2.  Prior to Student No. 2's complaint, LSU had become aware of a concern expressed by another student employee (Student No. 1). Student No. 1 was also employed in Football Operations. Student No. 1 reported that she had had a phone call and other interactions with XXX that made her uncomfortable. This arose in the context of Student No. 1 babysitting XXX's children (this was contrary to directions given to student employees; they are advised at hire that they could not be both a student employee and a babysitter for any coach). Student No. 1 was concerned because on an occasion when she was supposed to babysit the children and XXX ended up staying with the children instead, he asked her to join them when they went to a movie. LSU also became aware that Student No. 1 had stayed in XXX's condo when there had been some problem with her apartment (this was at the suggestion of XXX's wife). A window was broken during her stay and XXX made the student uncomfortable when he asked her to accompany him to check on the window's repair.

    As a result of the concerns expressed by Student No. 1, Mr. Alleva met with XXX and told him that he was no longer to have any one-on-one meetings or interactions with student employees (XXX agrees he was told this) and that he should not text or call them (XXX denies this). Additionally, department-wide training which included every

BOS-029866

May 15, 2013
Page 3

Athletic Department employee (and specifically XXX) was also conducted on various subjects, including sexual harassment.

3. We have learned that XXX has texted at least one other former student employee using his personal cell phone (Mr. Alleva, Ms. Segar and XXX's administrative assistant do not have this phone number). The student was not uncomfortable but thought that it was unusual. Troubling is the fact that other department employees told her not to respond to the texts as a way of addressing the situation. They implied that others had similar experiences.

4. In addition to Student No. 1, Student No. 2 and XXX, we have interviewed the full-time employee supervisors of the student employees as well as other female full-time students in the department. We have also interviewed a former student employee who was reported to have received texts from XXX. We have not interviewed every student employee working with Student No. 2. The reason for this is twofold: (1) we do not have any indication that any other student employee has had a similar experience; and (2) we are concerned about the ability to maintain Student No. 2's confidentiality if we did this.

In our conversations with Student No. 2's father and in a separate meeting he had with XXX's counsel (this meeting took place as a result of XXX lawyer's request and we made it clear to the father that the university was not asking her to meet with XXX's lawyer),

XXX has retained two attorneys to represent him in connection with this situation. His local counsel is Ed Hardin, a labor and employment lawyer practicing at the Kean Miller law firm. He has also retained Peter Ginsberg from New York, New York. We have met several times with Mr. Hardin and Mr. Ginsberg to discuss the claims made by Student No. 2 and to explore ways to address the concerns raised by Student No. 2, as well as LSU's concerns.

**Legal Standards:**

LSU has two policies prohibiting sexual harassment. PS-73 applies to employees and PS-95 applies to students. Because Student No. 2 falls into both categories (student and employee) the complaint has been investigated under the auspices of both policies with Taylor Porter assuming the role usually undertaken by the Human Resources Department. LSU's Associate Vice Chancellor, Human Resources has been notified of the complaint and we have confirmed that he is aware of no other similar complaint regarding XXX.

LSU policies define sexual harassment in accordance with applicable law. The policies prohibit both "hostile environment" harassment and "quid pro quo" harassment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

May 15, 2013
Page 4



BOS-029868

May 15, 2013
Page 5



May 15, 2013
Page 6



It is important to note that at the time of her complaints and during this investigation, Student No. 1 could not articulate exactly what had occurred which she found troubling or inappropriate. After learning of Student No. 2's alleged experiences, Student No. 1 told Student No. 2 that she had been "cornered" and touched by XXX but she denied this when we interviewed her. Student No. 1's demeanor and inconsistent, vague statements are such that she does not appear to be a reliable source of information.

Student No. 2 and her father feel strongly that LSU had notice that XXX has engaged in problematic behavior in the past as a result of what they believe to be the experiences of Student No. 1. ████████████████████████████████████████████████

It is important to note that following the reports from Student No. 1 steps were taken to address her concerns (unclear though they were). XXX was instructed to have no one-on-one contact with students and not to call, message or text student employees. He was also told that student employees could not babysit for him. Additionally, XXX was told that he could no longer be involved in hiring students.

Student No. 2 claims that she was subjected to an unwanted touching. ████████████████ ████████████████████████████████████

Both Student No. 1 and Student No. 2, as well as Student No. 2's father, have strongly emphasized their desire to have their concerns addressed, while at the same time maintaining their confidentiality. Student No. 2 is particularly concerned that her identity not be known

BOS-029870

May 15, 2013
Page 7

We are unable to determine what occurred in the car between XXX and Student No. 2.

However, there can be little doubt that the conduct, if true, is inappropriate and unacceptable. Even accepting XXX's version of events, it appears that he has shown poor judgment in placing himself (and the student employee) in a situation in which the student employee might be uncomfortable and/or he can be subject to such complaint.

XXX, of course, has an Employment Agreement, dated July 1, 2006, which was most recently amended on January 1, 2013. Under the Employment Agreement, XXX can be disciplined in only very limited circumstances.

Of the for cause provisions in the Employment Agreement, only the general "catch all" provisions would arguably apply to this situation. In general, these provisions require XXX to comport himself at all times "in accordance with the high moral, ethical and academic standards" of the University and not participate in any "serious misconduct which brings XXX into public disrepute sufficient to impair XXX's ability to continue in his position without adverse impact on the University's football program or reputation."

Section 13.D provides that the University may suspend XXX without remuneration for up to 90 days for any one or more of the acts or omissions representing grounds for termination for cause.

Under Section 13.A.ii of the Employment Agreement, XXX is entitled to liquidated damages if he is terminated by the University without cause. Those liquidated damages are not owed if the termination is determined to be for cause.

We do not believe under existing law and the terms of the contract there is cause to discipline and/or terminate the contract. Further complicating the situation is the fact that Student No. 2 is adamant that her identity remain confidential and she would likely be an unwilling witness if contested issues arose related to LSU's relationship with XXX.

<u>Recommendations:</u>

We do recommend that remedial steps be taken to address some of the problematic behaviors which have occurred. This includes a written directive to XXX prohibiting him from having one-on-one direct contact with student employees; requiring him to use his LSU-issued cell phone for any communication with employees; prohibiting social media messaging, texting and phone calls to student employees, and instructing him that he is not to be involved in hiring student employees. We also recommend that XXX be required to attend counseling to help him understand how to establish appropriate boundaries with students and student employees. XXX should also authorize the counselor to confirm to LSU that he is participating in the counseling.

May 15, 2013
Page 8

Similarly, written guidelines should be established for student employees and their supervisors so that they are aware that these rules apply to their employment in the Athletic Department.

These recommendations are consistent with what Student No. 2 and her family have indicated they believe is appropriate.

XXX's lawyers are very reluctant to have any written directive or other document generated regarding the resolution of this complaint. However, because past attempts to sensitize XXX to the consequences of his behavior have been unsuccessful, we recommend that there be such a written directive. At the same time, we are acutely sensitive to the confidentiality concerns of XXX, Students Nos. 1 and 2, and the University (as well as anyone else involved in the investigation). Though in the face of a public records request we believe LSU could successfully take the position that such a document is protected from production by the privacy rights of the individuals involved, there is no guarantee that such a document might not have to be produced either as a result of a public records request or other legal proceeding. In order to attempt to minimize the possibility of this, we suggest that the written directive to XXX (as described above) be sent by our law firm to the law firm representing XXX. Each law firm would maintain copies of the document in its files. The directive to XXX's lawyer will reference the Department wide and Football Operations specific policies and LSU's expectation that XXX comply with them. It will also reference the counseling commitment.

Sincerely,

BOS-029872

Dear Head Coaches

On October 30, 2012, the NCAA Division I Board of Directors adopted legislation that changes the landscape of addressing NCAA bylaw violations. Notably, NCAA Division I Bylaw 11.1.2.1 now provides that an institution's head coach is presumed to be responsible for the actions of all assistant coaches and administrators who report, directly or indirectly, to the head coach. A head coach shall promote an atmosphere of compliance within his or her program and shall monitor the activities of all assistant coaches and administrators involved with the program who report, directly or indirectly, to the head coach. Therefore, pursuant to Bylaw 11.1.2.1, a head coach is presumed responsible for major/Level I and Level II violations (e.g., academic fraud, recruiting inducements, etc.) occurring within his or her program unless the head coach can show that he or she promoted an atmosphere of compliance and monitored his or her staff appropriately and sufficiently.

In response to the new NCAA compliance issues concerning Bylaw 11, which becomes fully effective on August 1, 2013, please direct your immediate attention to the enclosed Head Coaches Statement which you are required to review and sign as part and parcel of your employment duties as a head coach for Louisiana State University. Execution of the statement is mandatory for all LSU head coaches. The terms and conditions set forth in the Head Coaches Statement are mandatory and non-negotiable. Once you have had a chance to review and sign the enclosed Head Coaches Statement    contact the President, Athletics Director, and Compliance Office to begin implementing the communication and monitoring policies set forth therein.

Please note that the ultimate determination of whether a head coach has exercised proper control over his her program rests with the NCAA Committee on Infractions, and a failure to promote an atmosphere of compliance and/or failure to monitor determination will consider the unique facts and circumstances of each case. As you are already aware, you are obligated to cooperate fully with representatives of the NCAA, the Department of Athletics, and University counsel in reference to any investigation.

Should you have any questions regarding the enclosed Head Coaches Statement or the terms and conditions set forth therein, please contact me immediately.

Sincerely,


Joe Alleva

BOS-029873

*LOUISIANA STATE UNIVERSITY*
*HEAD COACHES STATEMENT*

## NCAA Bylaw 10.1 Unethical Conduct.

Unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member (e.g., coach, professor, tutor, teaching assistant, student manager, student trainer) may include, but is not limited to, the following:

(a) Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution;

(b) Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or an enrolled student-athlete;

(c) Knowing involvement in offering or providing a prospective or an enrolled student-athlete an improper inducement or extra benefit or improper financial aid;

(d) Knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation;

(e) Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or a representative of an agent or advisor (e.g., "runner");

(f) Knowing involvement in providing a banned substance or impermissible supplement to student-athletes, or knowingly providing medications to student-athletes contrary to medical licensure, commonly accepted standards of care in sports medicine practice, or state and federal law. This provision shall not apply to banned substances for which the student-athlete has received a medical exception per Bylaw 31.2.3.5; however, the substance must be provided in accordance with medical licensure, commonly accepted standards of care and state or federal law;

(g) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or an institution's admissions office regarding an individual's academic record (e.g., schools attended, completion of coursework, grades and test scores);

(h) Fraudulence or misconduct in connection with entrance or placement examinations;

(i) Engaging in any athletics competition under an assumed name or with intent to otherwise deceive; or

(j) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or the institution's athletics department regarding an individual's amateur status."(Revised: 1/16/10)

## 11.1.2.1 - Responsibility of Head Coach.

An institution's head coach is presumed to be responsible for the actions of all assistant coaches and administrators who report, directly or indirectly, to the head coach. An institution's head coach shall promote an atmosphere of compliance within his or her program and shall monitor the activities of all assistant coaches and administrators involved with the program who report directly or indirectly to the coach.

### *Communications*

The President and the Athletics Director will meet with all Head Coaches annually to discuss the Institution's expectations for NCAA rules compliance. The meeting will address the following:

- Institutional expectations for NCAA rules compliance;
- Institutional responsibilities for timely reporting of all violations or concerns of possible violations;
- Institutional expectations of regular compliance training and education;
- President's and Athletics Director's philosophy and expectations on rules compliance;
- Rules compliance resources for each sports program;

LOUISIANA STATE UNIVERSITY
HEAD COACHES STATEMENT

- Each sports program's shared responsibility with compliance staff;
- Continued dialogue with Athletics Director and Director of Compliance to discuss the institution's and sports programs' compliance environment and expectations.

The Compliance Office will meet with the Head Coach annually to discuss expectations for NCAA rules compliance. The meeting will address the following:

- Compliance Office's philosophy and expectations on rules compliance;
- Compliance Office's resources for the sports program;
- A discussion of the Compliance Office's and sports program's expectations for submitting rules interpretations and waiver requests and resolution of any disagreements over the submission of such requests;
- Sports program's shared responsibility with the Compliance Office;
- Expectations for reporting actual and suspected NCAA rules violations or concerns (e.g., immediate action, reporting lines, and confidential and/or anonymous reporting);
- Establishment of a plan for continuing dialogue between the coaching staff and Compliance Office to discuss the institution's and sports program's compliance environment and expectations;
- Establishment of a plan for ongoing dialogue between the coaching staff and Compliance Office to discuss key issues facing the sports program (e.g., agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters)

The President, Athletics Director, Director of Compliance, and Head Coach will meet annually to discuss the institution's and sports program's compliance environment and expectations.

### _Monitoring_

The Head Coach will be proactive in identifying potential NCAA rules violations and will work collaboratively with the Compliance Office to ensure compliance with all NCAA rules and regulations.

In consultation with the Compliance Office, the Head Coach will create written procedures to fully ensure that his/her coaching staff, including all those with duties concerning the management of the sports program in any fashion (i.e., assistant coaches, managers, directors of operations, volunteers, student assistants, trainers, etc.) have responsibility for monitoring compliance with NCAA rules.

In consultation with the Compliance Office, the Head Coach will:

- Assign a sports program liaison to the Compliance Office;
- Assign sports program members to monitor specific areas of compliance (e.g., contacts, telephone calls, official and unofficial visits, initial eligibility, amateurism, complimentary tickets, and boosters);
- Regularly evaluate the coaching staff to ensure their specific area of responsibility is monitored and that those responsibilities are executed in a timely fashion;
- Ensure that the coaching staff has adequate and ongoing compliance training and that there is a plan in place for discussion of important information;
- Determine reporting lines for resolving actual and potential NCAA rules issues;
- Determine reporting lines to alert Compliance Office of issues involving prospective student-athletes and current student-athletes (i.e., agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters);
- Regularly solicit feedback from the coaching staff concerning their areas of compliance and the sports program's overall compliance environment to ensure that the rule monitoring systems are functioning properly and efficiently;
- Ensure that the coaching staff immediately notifies the Compliance Office when concerns and/or red flags related to potential NCAA rules violations occur.

**LOUISIANA STATE UNIVERSITY**
**HEAD COACHES STATEMENT**

*I affirm that the NCAA guidelines mandate my responsibility regarding compliance with all NCAA rules and regulations. I assume responsibility regarding the above statements and policies. I further understand that an atmosphere of compliance remains the duty of the Head Coach and that neither the Compliance Office nor its staff is responsible for my awareness of or adherence to NCAA rules and regulations. I have reviewed the provisions of Bylaws 10 & 11 respectively and do attest to the fact that I have responsibility for monitoring my staff members and promoting an atmosphere that fosters compliance with NCAA rules and regulations. I further acknowledge that my complete cooperation with any investigation of a possible NCAA rules violation is a condition of my employment with Louisiana State University.*

| | |
|---|---|
| *Name (Please Print)* | |
| *Signature:* | *Date:* |
| *Director of Athletics Signature* | *Date:* |
| *Compliance Office  Signature:* | *Date:* |

All Athletic Department Full, Part-Time and Student Employees:

Attached are written policies and procedures that are applicable to all LSU Athletic Department full, part-time, and student employees. Please review the enclosed policies and procedures, and return a signed copy to Senior Athletics Director, Miriam Segar, on or before July 1, 2013. Execution of this document is mandatory for all full, part-time, and student employees of the LSU Athletic Department.

Should you have any questions or concerns regarding these policies and procedures, please do not hesitate to contact either me or Miriam Segar.

Sincerely,

Joe Alleva

*LOUISIANA STATE UNIVERSITY*
*ACKNOWLEDGEMENT OF POLICIES AND PROCEDURES*
*ALL ATHLETIC DEPARTMENT STAFF*

**Set forth below are policies and procedures that are applicable to all LSU Athletic Department full, part-time, and student employees. Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.    No personal phones may be used for business related purposes. This includes using a personal phone for telephone and text/email communication between any employee and student employees.

2.    No employee may drink alcohol while traveling and representing LSU during team related events/functions.

3.    In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified. After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CPI-2) within five (5) days of filing the verbal report. In addition, the employee will immediately notify LSU Police, the Vice Chancellor and Director of Athletics. All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement. If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

4.    No athletics department employee's relative will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area. This includes student employees.

5.    All employees (including coaches) who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

6.    Report any personal arrests, DWI, misdemeanors or other similar legal matters to [ Sr. Associate Athletics Director Student Services, Miriam Segar, ] within 24 hours of occurrence. If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

7.    All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately. Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) or who are traveling representing LSU and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing.

8.    No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with student employees.

9.    No employee shall have one-on-one personal meetings with a student employee. No coach or assistant coach may hire a student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

*I affirm that I have read, fully understand, and agree to comply with the policies and procedures set forth above, and that my failure to do so may be cause for LSU to take disciplinary or other appropriate employment action against me.*

Name (Please Print):

| Signature | Date |
|---|---|

BOS-029878

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

All LSU Football Operations Full, Part-Time, and Student Employees:

Attached are written policies and procedures that are applicable to all LSU Football Operations full, part-time, and student employees. Please review the enclosed policies and procedures, and return a signed copy to Senior Athletics Director, Miriam Segar, on or before July 1, 2013. Execution of this document is mandatory for all full, part-time, and student employees of LSU Football Operations.

Should you have any questions or concerns regarding these policies and procedures, please do not hesitate to contact either me or Miriam Segar.

Sincerely,

Joe Alleva

BOS-029879

LOUISIANA STATE UNIVERSITY
ACKNOWLEDGEMENT OF POLICIES AND PROCEDURES
ALL FOOTBALL OPERATIONS STAFF

**Set forth below are policies and procedures that are applicable to all LSU Football Operations full, part-time, and student employees. Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.      No personal phones may be used for business related purposes. This includes using a personal phone for telephone and text/email communication between any employee and student employees.

2.      No employee may drink alcohol while traveling and representing LSU during team related events/functions.

3.      In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified. After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CP1-2) within five (5) days of filing the verbal report. In addition, the employee will immediately notify LSU Police, the Vice Chancellor and Director of Athletics. All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement. If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

4.      No athletics department employee's relative will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area. This includes student employees.

5.      All employees (including coaches) who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

6.      Report any personal arrests, DWI, misdemeanors or other similar legal matters to [ Sr. Associate Athletics Director Student Services, Miriam Segar, ] within 24 hours of occurrence. If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

7.      All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately. Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) or who are traveling representing LSU and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing.

8.      No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with student employees.

9.      No employee shall have one-on-one personal meetings with a student employee. No coach or assistant coach may hire a student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

**LOUISIANA STATE UNIVERSITY**
**ACKNOWLEDGEMENT OF POLICIES AND PROCEDURES**
**ALL FOOTBALL OPERATIONS STAFF**

10.     Coaches/Assistant Coaches are prohibited from having one-on-one contact with student employees. This includes in-person meetings, text, social media, email, and phone calls with a student employee. Full time staff members are available to assist Coaches/Assistant Coaches. If a Coach/Assistant Coach needs assistance from a student employee, this will be arranged through the student employee's supervisor, a full time administrative staff member. Coaches should not make any direct request of a student employee.

11.     Coaches/Assistant Coaches shall not exchange personal contact information with a student employee.

12.     Coaches/Assistant Coaches will have no direct or indirect role in hiring student employees or selecting student volunteers. Student employees in Football Operations must be available to work 10 hours per week minimum in order to be hired as a student employee.

*I affirm that I have read, fully understand, and agree to comply with the policies and procedures set forth above, and that my failure to do so may be cause for LSU to take disciplinary or other appropriate employment action against me.*

*Name (Please Print):*

| *Signature:* | *Date:* |
|---|---|

BOS-029881



# TAYLOR PORTER

ATTORNEYS AT LAW

August 29, 2013

**VIA HAND DELIVERY:**                           **VIA FEDERAL EXPRESS:**

A. Edward Hardin, Jr.                             Peter R. Ginsberg
Kean Miller LLP                                   Peter R. Ginsberg Law, LLC
II City Plaza                                     12 East 49th Street, 30th Floor
400 Convention Street, Suite 700                  New York., NY 10017
Baton Rouge, Louisiana 70802

Gentlemen:

Our firm represents Louisiana State University ("LSU"). LSU has authorized us and your client's supervisor, Joe Alleva, to provide these directives to Les Miles ("Miles"). Although we acknowledge that you do not agree, LSU considers these directives to be conditions of Miles' employment and also may consider failure to comply with these directives to be cause for his termination. This is being provided to you as legal counsel for Miles and LSU considers delivery of this letter to you the same as delivery and notice to Miles.

LSU has investigated certain claims made against Miles. Since essential facts are disputed by those involved, LSU was unable to substantiate any legal violation. However, LSU has concluded that Miles engaged in behavior which showed poor judgment.

To address this concern, LSU hereby provides notice to Miles of the following:

1.  Attached to this letter as Exhibit 1 is a document entitled "Louisiana State University Athletic Department Policies and Procedures, All Football Operations Employees" which applies to all Football Operations employees. Miles is expected to comply with all of these policies and procedures and to sign an acknowledgment that he has received and will comply with them.

2.  In addition to the policies and procedures described in Exhibit 1, the following apply specifically to Miles:

    a.  Neither Miles nor anyone acting on his behalf may hire a Football Operations and/or Athletic Department student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

BOS-029882

A. Edward Hardin, Jr.
Peter R. Ginsberg
August 29, 2013
Page 2

        b.    Miles may not send personal texts, make personal phone calls, send personal email or use social media to communicate with any student employee of Football Operations and/or the Athletic Department.

        c.    Miles will promptly review and sign the Louisiana State University "Head Coach Statement" and "List of All Telephones Owned or Used by Staff Member," as required by those documents attached to this letter as Exhibit 2 and Exhibit 3, respectively.

3.    LSU reiterates the provisions of Miles' employment contract.

4.    LSU requires and Miles agrees that he will attend and participate, at his own expense (including all travel expense), in a minimum of eight (8) one-hour training sessions with Ann Marie Painter, Perkins Coie LLP. In connection with these sessions:

        a.    Miles will participate in sessions in excess of eight (8) one-hour sessions if recommended by Ms. Painter.

        b.    Miles will authorize LSU through its undersigned counsel to provide information to Ms. Painter regarding the specific reasons for the sessions.

        c.    Miles will authorize Ms. Painter to confirm to LSU through its undersigned counsel that Miles has attended and participated in all required sessions, as well as any additional sessions, deemed necessary by Ms. Painter, and that he has complied with all of Ms. Painter's recommendations.

        d.    Miles will attend and participate in four (4) sessions prior to December 31, 2013 and will complete the remaining sessions no later than May 30, 2014.

        e.    Miles agrees to follow the directions and recommendations of Ms. Painter. He will participate in all required activities or plans recommended to him by Ms. Painter and/or any other individual approved by Ms. Painter.

5.    The original and all copies of this letter will be maintained in the files of your law offices and undersigned counsel's law offices only. Miles, his counsel, LSU, and its counsel, agree to keep this letter (and its contents) confidential unless compelled to divulge it by final order of a court of competent jurisdiction; any such order shall be contested by LSU's counsel and, at Miles' option, Miles' undersigned counsel. Should your office, Miles, our office, or LSU receive a public records request, subpoena, court order or other legal process seeking this document, the recipient of the request shall provide notice and

BOS-029883

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

A. Edward Hardin, Jr.
Peter R. Ginsberg
August 29, 2013
Page 3

a copy of the request to the other party and counsel for the other party within twenty-four (24) hours of receiving the request. Neither you, undersigned counsel, Miles, or LSU will release this document without a final order of a court of competent jurisdiction requiring such release.

Sincerely,

TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P.

Robert W. Barton
Vicki M. Crochet

Joe Alleva, Athletic Director

I acknowledge that I have read this letter.

Date: 9-10-13

Les Miles

BOS-029884

## LOUISIANA STATE UNIVERSITY
### FOOTBALL OPERATIONS POLICIES AND PROCEDURES

**Set forth below are policies and procedures that are applicable to LSU Football Operations full-time and part-time employees as described. Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.      LSU employees who have been issued an LSU phone may not use personal phones for business-related purposes. This includes using a personal phone for telephone and text/email communication between employees and Athletic Department student employees. All employees who have been issued an LSU phone shall declare all personal phones on the form entitled "List of All Telephones Owned or Used by Staff Member," attached to this statement.

2.      No coaches and/or medical staff may drink alcohol while traveling and representing LSU during team related events/functions. Exceptions may be granted by the Athletics Director for extended trips that include special events.

3.      No employee will actively send/receive texts, emails or other electronic messages while driving student-athletes.

4.      In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified. After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CP1-2) within five (5) days of filing the verbal report. In addition, the employee will immediately notify LSU Police and the Director of Athletics. All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement. If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

5.      No athletics department employee's relative (including relatives by marriage) will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area. This includes student employees.

6.      All coaches and strength and conditioning employees who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

7.      Employees will report any personal arrests, DWI, felony, misdemeanors or other similar legal matters to his/her immediate administrative supervisor within 24 hours of occurrence.

8.      If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

9.      All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately. Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing. Student-athletes in travel status representing LSU must not consume alcohol and/or illicit drugs. Violations of this policy must be reported immediately to Sr. Associate Athletics Director Student Services, Miriam Segar.

**EXHIBIT**

**1**

## LOUISIANA STATE UNIVERSITY
### FOOTBALL OPERATIONS POLICIES AND PROCEDURES

10. No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with any student employees of Football Operations or the Athletic Department. Exceptions must be requested in writing and may only be approved by the Athletic Director.

11. No employee shall have one-on-one personal meetings with an Athletic Department student employee, with the exception of the following persons: Senior Associate Athletics Director, Student Services; Senior Associate Athletics Director, Compliance; Compliance Director; and Human Resource Manager.

12. No employee may hire a Football Operations student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

13. Coaches/Assistant Coaches are prohibited from having one-on-one contact with student employees. This includes in-person meetings, text, social media, email, and phone calls with a student employee. Full time staff members are available to assist Coaches/Assistant Coaches. If a Coach/Assistant Coach needs assistance from a student employee, this will be arranged through the student employee's supervisor, a full-time administrative staff member. Coaches should not make any direct request of a student employee.

14. Coaches/Assistant Coaches shall not exchange personal contact information with a student employee.

15. Coaches/Assistant Coaches will have no direct or indirect role in hiring student employees or selecting student volunteers.

16. Any employee, student employee, or volunteer who becomes aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar.

*I affirm that I have read, fully understand, and agree to comply with the policies and procedures set forth above, and that my failure to do so may be cause for LSU to take disciplinary or other appropriate employment action against me.*

Name (Please Print):

Signature:                                   Date: 9 – 10 · 13

**LOUISIANA STATE UNIVERSITY**
*HEAD COACH STATEMENT*

**NCAA Bylaw 10.1 Unethical Conduct.**
Unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member (e.g., coach, professor, tutor, teaching assistant, student manager, student trainer) may include, but is not limited to, the following:

(a) Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution;

(b) Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or an enrolled student-athlete;

(c) Knowing involvement in offering or providing a prospective or an enrolled student-athlete an improper inducement or extra benefit or improper financial aid;

(d) Knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation;

(e) Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or a representative of an agent or advisor (e.g., "runner");

(f) Knowing involvement in providing a banned substance or impermissible supplement to student-athletes, or knowingly providing medications to student-athletes contrary to medical licensure, commonly accepted standards of care in sports medicine practice, or state and federal law. This provision shall not apply to banned substances for which the student-athlete has received a medical exception per Bylaw 31.2.3.5; however, the substance must be provided in accordance with medical licensure, commonly accepted standards of care and state and federal law;

(g) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or an institution's admissions office regarding an individual's academic record (e.g., schools attended, completion of coursework, grades and test scores);

(h) Fraudulence or misconduct in connection with entrance or placement examinations;

(i) Engaging in any athletics competition under an assumed name or with intent to otherwise deceive; or

(j) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or the institution's athletics department regarding an individual's amateur status."(Revised: 1/16/10)

---

**11.1.2.1 - Responsibility of Head Coach.**
An institution's head coach is presumed to be responsible for the actions of all assistant coaches and administrators who report, directly or indirectly, to the head coach. An institution's head coach shall promote an atmosphere of compliance within his or her program and shall monitor the activities of all assistant coaches and administrators involved with the program who report directly or indirectly to the coach.

---

*Communications*

The President and the Athletics Director will meet with all Head Coaches annually to discuss the Institution's expectations for NCAA rules compliance. The meeting will address the following:

- Institutional expectations for NCAA rules compliance;
- Institutional responsibilities for timely reporting of all violations or concerns of possible violations;
- Institutional expectations of regular compliance training and education;
- President's and Athletics Director's philosophy and expectations on rules compliance;
- Rules compliance resources for each sports program;

**EXHIBIT**
**2**

BOS-029887

---

**LOUISIANA STATE UNIVERSITY**
**HEAD COACH STATEMENT**

---

- Each sports program's shared responsibility with compliance staff;
- Continued dialogue with Athletics Director and Director of Compliance to discuss the Institution's and sports program's compliance environment and expectations.

The Compliance Office will meet with the Head Coach annually to discuss expectations for NCAA rules compliance. The meeting will address the following:

- Compliance Office's philosophy and expectations on rules compliance;
- Compliance Office's resources for the sports program;
- A discussion of the Compliance Office's and sports program's expectations for submitting rules interpretations and waiver requests and resolution of any disagreements over the submission of such requests;
- Sports program's shared responsibility with the Compliance Office;
- Expectations for reporting actual and suspected NCAA rules violations or concerns (e.g., immediate action, reporting lines, and confidential and/or anonymous reporting);
- Establishment of a plan for continuing dialogue between the coaching staff and Compliance Office to discuss the institution's and sports program's compliance environment and expectations;
- Establishment of a plan for ongoing dialogue between the coaching staff and Compliance Office to discuss key issues facing the sports program (e.g., agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters)

The President, Athletics Director, Director of Compliance, and Head Coach will meet annually to discuss the Institution's and sports program's compliance environment and expectations.

*Monitoring*

The Head Coach will be proactive in identifying potential NCAA rules violations and will work collaboratively with the Compliance Office to ensure compliance with all NCAA rules and regulations.

In consultation with the Compliance Office, the Head Coach will create written procedures to fully ensure that his/her coaching staff, including all of those with duties concerning the management of the sports program in any fashion (i.e., assistant coaches, managers, directors of operations, volunteers, student assistants, trainers, etc.) have responsibility for monitoring compliance with NCAA rules.

In consultation with the Compliance Office, the Head Coach will:

- Assign a sports program liaison to the Compliance Office;
- Assign sports program staff members to monitor specific areas of compliance (e.g., contacts, telephone calls, official and unofficial visits, initial eligibility, amateurism, complimentary tickets, and boosters);
- Regularly evaluate the coaching staff to ensure their specific area of responsibility is monitored and that those responsibilities are executed in a timely fashion;
- Ensure that the coaching staff has adequate and ongoing compliance training and that there is a plan in place for discussion of important information;
- Determine reporting lines for resolving actual and potential NCAA rules issues;
- Determine reporting lines to alert Compliance Office of issues involving prospective student-athletes and current student-athletes (i.e., agents, recruiting, initial eligibility, pre-enrollment amateurism, continuing eligibility, and boosters);
- Regularly solicit feedback from the coaching staff concerning their areas of compliance and the sports program's overall compliance environment to ensure that the rule monitoring systems are functioning properly and efficiently;
- Ensure that the coaching staff immediately notifies the Compliance Office when concerns and/or red flags related to potential NCAA rules violations occur.

**LOUISIANA STATE UNIVERSITY**
**HEAD COACH STATEMENT**

The "Head Coach Compliance Checklist" attached to this statement must be maintained and completed by every Head Coach and should assist each Head Coach ensure compliance with the requirements of this statement.

*I affirm that the NCAA guidelines mandate my responsibility regarding compliance with all NCAA rules and regulations. I assume responsibility regarding the above statements and policies. I further understand that an atmosphere of compliance remains the duty of the Head Coach and that neither the Compliance Office nor its staff is responsible for my awareness of or adherence to NCAA rules and regulations. I have reviewed the provisions of Bylaws 10 & 11 respectively and do attest to the fact that I have responsibility for monitoring my staff members and promoting an atmosphere that fosters compliance with NCAA rules and regulations. I further acknowledge that my complete cooperation with any investigation of a possible NCAA rules violation is a condition of my employment with Louisiana State University.*

| | |
|---|---|
| **Name (Please Print):** Les Miles | |
| **Signature:** | **Date:** 9-10-13 |
| **Director of Athletics Signature:** | **Date:** |
| **Compliance Office Signature:** | **Date:** |

pg. 1



## LOUISIANA STATE UNIVERSITY
## HEAD COACH COMPLIANCE CHECKLIST

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| *HEAD COACH:* | *SPORT:* | |
| *Signature:* | *Date:* | |
| *Compliance Office Signature:* | *Date:* | |

# I. COMMUNICATIONS

| TASKS | DATE COMPLETED | COACH'S INITIALS | COMPLIANCE DIRECTOR'S INITIALS |
|---|---|---|---|
| A. Head Coach has met with the President and Athletics Director to discuss the Institution's expectations for NCAA's rules compliance. The meeting addressed; institutional expectations for NCAA rules compliance; institutional responsibilities for timely reporting of all violations or concerns of possible violations; institutional expectations of regular compliance training and education; President's and Athletics Director's philosophy and expectations on rules compliance; rules compliance resources for Head Coach's Program; the Program's shared responsibility with the Compliance staff; and the establishment of continued dialogue between the Head Coach, Athletics Director, and Director of Compliance to discuss the Institution's and the Program's compliance environment and expectations. | | | |
| B. Head Coach has met with the Compliance Office to discuss expectations for NCAA rules compliance. That meeting addressed; the Compliance Office's philosophy and expectations on rules compliance; the Compliance Office's resources for the Head Coach's Sports Program; a discussion of the Compliance Office's and the Program's expectations for submitting rules interpretations and waiver requests and resolution of any disagreements over the submission of such requests; the Program's shared responsibility with the Compliance Office; expectations for reporting actual and suspected NCAA rules violations or concerns; the establishment of a plan for continuing dialogue between the coaching staff and the Compliance Office to discuss the Institution's and the Program's compliance environment and expectations; and the establishment of a plan for ongoing dialogue between the coaching staff and Compliance Office to discuss key issues facing the Program. | | | |

BOS-029890

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
Case 3:21-cv-00242-WBV-SDJ    Document 480-22    10/13/23    Page 28 of 33
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

pg 2



## LOUISIANA STATE UNIVERSITY
## HEAD COACH COMPLIANCE CHECKLIST
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## II. MONITORING

| TASKS | DATE COMPLETED | COACH'S INITIALS | COMPLIANCE DIRECTOR'S INITIALS |
|---|---|---|---|
| A. The Head Coach has assigned a Sports Program liaison to the Compliance Office. That person is (insert name and title of Sports Program liaison) _____ The Head Coach has assigned the following staff members of his Program to monitor the specified areas of compliance:<br><br>• **Sport Program Laison:** _____<br>• Contacts: _____<br>• Telephone Calls: _____<br>• Official and Unofficial Visits: _____<br>• Initial Eligibility: _____<br>• Amateurism: _____<br>• Complimentary Tickets: _____<br>• Boosters: _____ | | | |
| B. The Head Coach has regularly evaluated the coaching staff to insure the cited areas of responsibility are monitored regularly and in a timely fashion. | | | |
| C. The Head Coach has insured that the coaching staff has adequate and ongoing compliance training and that there is plan in place for discussion of important information. | | | |
| D. The Head Coach has determined reporting lines for resolving actual and potential NCAA rules issues. | | | |
| E. The Head Coach has determined reporting lines to alert the Compliance Office of issues involving perspective student-athletes and current student-athletes. | | | |
| F. The Head Coach regularly solicits feed-back from the coaching staff concerning their areas of compliance and the Program's overall compliance environment to insure that the rule monitoring systems are functioning properly and efficiently. | | | |
| G. The Head Coach has instructed and will insure that the coaching staff immediately notifies the Compliance Office when concerns and/or red flags related to potential NCAA rules violations occur. | | | |

Proposed Penalty Matrix
(WORKING DRAFT)
Version No. 6 (July 12, 2012)

| Violation Level I | Violation Level II | Competition Penalties: Postseason Ban  *Competition penalties may be used singularly or in combination | | |
|---|---|---|---|---|
| Aggravation | | 2 to 4 years | | |
| Standard | Aggravation | 1 to 2 years | | |
| Mitigation | Standard | 0 to 1 year | | |
| | Mitigation | 0 | | |

| Violation Level I | Violation Level II | Financial Penalties: Fine (Percent of total budget for sport program) | Financial Penalties: Negate revenue from sport program for years in which violations occurred | Financial Penalties: Reduce or eliminate NCAA monetary distribution for sports sponsorship and/or grants-in-aid |
|---|---|---|---|---|
| Aggravation | | $5,000 plus 3 to 5% | Impose this penalty if greater than percent of budget fine + $5,000. | Alternative financial penalty. |
| Standard | Aggravation | $5,000 plus 1 to 3% | | Alternative financial penalty. |
| Mitigation | Standard | $5,000 plus 0 to 1% | | Alternative financial penalty. |
| | Mitigation | $5,000* | | Alternative financial penalty. |
| | | * A minimum $5,000 financial penalty will be imposed to ensure the penalty will be at least as significant as the fine imposed for a Level III violation. | | |

| Violation Level I | Violation Level II | Scholarship Reductions of Involved Sport(s) Program(s)* | | |
|---|---|---|---|---|
| Aggravation | | 25 to 50% | * For cases in which financial aid overages have occurred, a minimum 2-for-1 reduction in financial aid awards shall apply up to at least 20% of the team financial aid limit. | |
| Standard | Aggravation | 12.5 to 25% | | |
| Mitigation | Standard | 0 to 12.5% | | |
| | Mitigation | 0 to 5% | | |

BOS-029892

Proposed Penalty Matrix
(WORKING DRAFT)
Version No. 6 (July 12, 2012)

| Violation Level I | Violation Level II | Show-Cause Order | Restrictions | |
|---|---|---|---|---|
| | | 5 to 10 years | All athletically related duties | |
| Aggravation | | | | |
| Standard | Aggravation | 2 to 5 years | All or partial coaching and recruiting duties (including game suspensions) | |
| Mitigation | Standard | 1 to 2 years | All or partial coaching and recruiting duties (including game suspensions) | |
| | Mitigation | 0 to 1 years | All or partial coaching and recruiting duties (including game suspensions) | |
| Violation Level I | Violation Level II | Head Coach Restrictions (game suspensions via show cause for 11.1.2.1) | | |
| Aggravation | | 50 to 100% | | |
| Standard | Aggravation | 30 to 50% | | |
| Mitigation | Standard | 0 to 30% | | |
| | Mitigation | 0 to 10% | | |
| Violation Level I | Violation Level II | Recruiting Visit Restrictions | Recruiting Communication Restrictions | Off-Campus Recruiting Restrictions |
| Aggravation | | 25 to 50% | 25 to 50% | 25 to 50% |
| | | 14- to 26-week ban on unofficial visits (No scheduled unofficial visits and no complimentary tickets.) | 14- to 26-week ban on communication with all prospects | Sports with no limits: 14- to 26-week ban on all contacts and evaluations |
| | | 25 to 50% cuts in official paid visits (Based on the average number provided during the previous 4 years.) | | 25 to 50% cuts in Recruiting Person Days (RPD) or Evaluation Days (ED) |
| | | Football: 15 to 28 visits (need to account for unused visits from the previous year, if any). Basketball: 4 to 6 visits. Baseball: 7 to 13 visits. | | MBB: 34 to 65 (RPD) WBB: 26 to 50 (RPD) MFB: 11 to 21 Fall; 44 to 84 Spring (ED) WSB: 13 to 25 (ED) WVB: 21 to 40 (ED) |

Page 2

BOS-029893

Proposed Penalty Matrix
(WORKING DRAFT)
Version No. 6 (July 12, 2012)

| Violation Level I | Violation Level II | Recruiting Visit Restrictions | Recruiting Communication Restrictions | Off-Campus Recruiting Restrictions |
|---|---|---|---|---|
| Standard | Aggravation | 12.5 to 25 %<br>7- to 13-week ban on unofficial visits<br>(No scheduled unofficial visits and no complimentary tickets.)<br><br>12.5 to 25% cuts in official paid visits<br>(Based on the average number provided during the previous 4 years.)<br><br>Football: 8 to 14 visits (need to account for unused visits from the previous year, if any).<br>Basketball: 2 to 3 visits.<br>Baseball: 4 to 7 visits. | 12.5 to 25 %<br>7- to 13-week ban | 12.5 to 25 %<br>No limit sports:<br>7- to 13-week ban<br><br>MBB: 17 to 33 (RPD)<br>WBB: 13 to 25 (RPD)<br>MFB: 6 to 11 Fall; 22 to 42 Spring (ED)<br>WSB: 7 to 13 (ED)<br>WVB: 11 to 20 (ED) |
| Mitigation | Standard | 0 to 12.5%<br>0 to 6-week ban on unofficial visits<br>(No scheduled unofficial visits and no complimentary tickets.)<br><br>0 to 12.5% cuts in official paid visits<br>(Based on the average number provided during the previous 4 years.)<br><br>Football: 0 to 7 visits (need to account for unused visits from the previous year, if any).<br>Basketball: 0 to 2 visits.<br>Baseball: 0 to 4 visits. | 0 to 12.5%<br>0 to 6-week ban | 0 to 12.5%<br>No limit sports:<br>0 to 6-week ban<br><br>MBB: 0 to 17 (RPD)<br>WBB: 0 to13 (RPD)<br>MFB: 0 to 6 Fall; 0 to 21 Spring (ED)<br>WSB: 0 to 7 (ED)<br>WVB: 0 to 10 (ED) |

BOS-029894

Proposed Penalty Matrix
(WORKING DRAFT)
Version No. 6 (July 12, 2012)

| Violation Level I | Violation Level II | Recruiting Visit Restrictions | Recruiting Communication Restrictions | Off-Campus Recruiting Restrictions |
|---|---|---|---|---|
| | Mitigation | 0 to 5%<br><br>0 to 3-week ban on unofficial visits (No scheduled unofficial visits and no complimentary tickets.)<br><br>0 to 5% cuts in official paid visits (Based on the average number provided during the previous 4 years.)<br><br>Football: 0 to 3 visits<br>Basketball: 0 to 1 visit<br>Baseball: 0 to 2 visits | 0-5%<br>0 to 3-week ban | 0 to 5%<br>No limit: sports: 0 to 3-week ban<br><br>MBB: 0 to 7 (RPD)<br>WBB: 0 to 5 (RPD)<br>MFB: 0 to 3 Fall; 0 to 9 Spring (ED)<br>WSB: 0 to 3 (ED)<br>WVB: 0 to 4 (ED) |
| **Violation Level I** | **Violation Level II** | **Probation** | | |
| Aggravation | | 6 to 10 years | | |
| Standard | Aggravation | 2 to 6 years | | |
| Mitigation | Standard | 0 to 2 years | | |
| | Mitigation | 0 years | | |

NCAA/07/12/12/JRL:ujw

BOS-029895



# List of All Telephones Owned or Used By Staff Member



Name:    **Les Miles**

Sport::    Football

Position:    Head Coach

| Type of Phone: | Phone Number : | I make recruiting calls on this phone | | I receive recruiting calls on this phone | |
|---|---|---|---|---|---|
| Office Phone: | ▮▮▮▮ | Yes | (No) | Yes | (No) |
| LSU Cell Phone: | ▮▮▮▮ | (Yes) | No | (Yes) | No |

**PERSONAL PHONES:**    *Please add Area Codes if number is not in (225) code .*

| Home Phone: | ▮▮▮▮ | Yes | (No) | Yes | (No) |
|---|---|---|---|---|---|
|  | ▮▮▮▮ | Yes | (No) | Yes | (No) |
|  | «Missing merge field» | Yes | No | Yes | No |
|  | «Missing merge field» | Yes | No | Yes | No |

## CERTIFICATION AND AUTHORIZATION
## TO
## RELEASE PHONE RECORDS   As limited below and upon written notice to Les Miles

*as of the date below.*

"By signing below, I hereby certify that the telephone numbers listed above represent ALL of the telephones used or owned by the undersigned Coach. I further certify that all information contained in this form is accurate and complete. I understand that all phones listed as being used for recruiting calls are subject to review under NCAA legislation."

| Staff Member Signature: | *[signature]* | Date Signed: | 9.10.13 |
|---|---|---|---|

**EXHIBIT**
**3**

BOS-029896