UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, ET AL

                CASE NO.: 3:21-cv-00242
                DIVISION WBV-SDJ

VERSUS          JUDGE WENDY B. VITTER
                MAG. JUDGE JOHNSON
                JURY DEMANDED

LOUISIANA STATE UNIVERSITY, ET AL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEO CONFERENCE DEPOSITION OF

JEFFREY SCOTT

TAKEN VIA ZOOM, BATON ROUGE, LOUISIANA, ON

NOVEMBER 18, 2022, BEGINNING AT 9:03 A.M.

REPORTED BY:
    JENNIFER W. PICKETT
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 29011

```
 1  Q   So, your understanding was that you're
 2      going to be the lead investigator but
 3      you're not going to be the only
 4      investigator?
 5  A   Eventually, yes.
 6  Q   Did they eventually hire other
 7      investigators to help you?
 8  A   No.
 9  Q   How did that work out for you being the
10      only investigator?
11  A   It was a pretty heavy workload being the
12      only investigator responsible for nine
13      campuses and probably 50,000 individuals.
14  Q   Did anyone -- let me back up.  Earlier
15      you said you left because there were some
16      frustrations at LSU.  Was that one of the
17      frustrations that you were talking about?
18  A   Yes, that was one of them.
19  Q   Did anybody ever say to you, Mr. Scott
20      we're trying to hire some new people.  We
21      can't find anyone or we're not looking
22      right now -- I mean what was being
23      communicated to you while you're carrying
24      what is admittedly a large caseload?
25  A   I think that Ms. Stewart was always very
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | supportive and trying to hire more                          |
| 2  |   | investigators.  We were always lobbying                     |
| 3  |   | for more investigators.                                     |
| 4  | Q | But the entire time that you were there,                    |
| 5  |   | from March of 2018 to May of '21, were                      |
| 6  |   | you always the only investigator?                           |
| 7  | A | Yes.                                                         |
| 8  | Q | You said that you were responsible for                      |
| 9  |   | all nine campuses; is that correct?                         |
| 10 | A | Yes.                                                         |
| 11 | Q | And approximately 50,000 students?                          |
| 12 | A | Yes.  I would estimate that with the                        |
| 13 |   | number of campuses.                                         |
| 14 | Q | I assume your office or your main                           |
| 15 |   | location was in Baton Rouge; is that                        |
| 16 |   | correct?                                                     |
| 17 | A | Yes.                                                         |
| 18 | Q | Did you have to travel a lot to the other                   |
| 19 |   | campuses or how often were you on the                       |
| 20 |   | road to go to other campuses?                               |
| 21 | A | Not too often.  Most of the                                 |
| 22 |   | investigations were on the main campus.                     |
| 23 |   | I had a few investigations involving some                   |
| 24 |   | of the other campuses.                                      |
| 25 | Q | Aside from the investigator role, did you                   |

```
 1  A   Yeah, I believe we did talk about it.
 2      When I became aware of it I may have said
 3      something to her.  I don't remember a
 4      specific conversation or any specifics
 5      but I probably said something to her like
 6      I didn't know this existed.
 7  Q   Do you remember what her response was to
 8      that?
 9  A   No, I'm not too sure if she knew, either.
10  Q   You're not sure if Jennie knew either?
11  A   Yeah, I don't remember her response but I
12      told her what my feelings were.  When I
13      saw it I was like wow, I didn't know this
14      existed.
15  Q   What were your concerns about it at that
16      point?
17  A   It was just a concern that it -- to me it
18      violated the policy of mandatory
19      reporters reporting directly to the Title
20      IX office once they had knowledge of a
21      potential Title IX violation.
22  Q   When you found out about that process,
23      that policy, did you feel like that
24      compromised you as an investigator in the
25      Title IX department?
```

```
 1  A   I don't think so.  I was just surprised
 2      that that existed.  I didn't go any
 3      further on whether it compromised any of
 4      my investigations.
 5  Q   Thank you, Mr. Scott.  I appreciate your
 6      --
 7  A   You're welcome.
 8  Q   -- Being patient with me when we tried to
 9      clarify those.  Albert, I'm all set if
10      you want to go ahead.
11              CROSS EXAMINATION
12  BY MR. VAN-LARE:
13  Q   Thank you very much, Karen.  Good
14      afternoon, Mr. Scott.
15  A   Good afternoon.
16  Q   My name is Albert Van-Lare and I am one
17      of the attorneys representing Ms. Sharon
18      Lewis in this case.  I will ask you a
19      couple of questions.  Karen already read
20      to you what the ground rules are but I'd
21      just like to supplement that a little
22      bit.  If I ask you a question and you
23      answer it, I'm going to take it that you
24      understood the question.  If I ask you a
25      question that is not comprehensible to
```