UNITED STAES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ABBY OWENS, ET AL.

                    CASE NO.: 3:21-cv-00242

                    DIVISION WBV-SDJ

VERSUS               JUDGE WENDY B. VITTER

                    MAG. JUDGE JOHNSON

                    JURY DEMANDED

BOARD OF SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL
COLLEGE, ET AL

   * * * * * * * * * * * * * * * * * * * * * *


DAY 1 OF THE DEPOSITION OF

JENNIE STEWART


TAKEN AT PHELPS DUNBAR, 400 CONVENTION

STREET, BATON ROUGE, LOUISIANA 70801, ON

NOVEMBER 9, 2022, BEGINNING AT 9:03 A.M.



REPORTED BY:
    JENNIFER W. PICKETT
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 29011

```
 1          2014 about you really do need to do this,
 2          I and then two colleagues were asking the
 3          question about who does this work?  Who
 4          is doing this work on our campus?  So,
 5          I'd worked in and around the area.
 6   Q   Who were those two colleagues that you
 7          were asking those questions with?
 8   A   My direct supervisor, the associate dean
 9          of students and director of student
10          advocacy and accountability, Matt
11          Gregory, who's now at Texas Tech, and
12          also the associate vice-chancellor of
13          student life and dean of students, Doctor
14          KC White.
15   Q   And where's Doctor White now?
16   A   Doctor White is now at Northern Alabama's
17          -- I'm not sure if it's vice-president,
18          vice-chancellor overseeing the student
19          affairs division.
20   Q   So, when you three were asking those
21          questions, who were you asking questions
22          to?
23   A   I think in part up our directors chain,
24          up to the vice-chancellor of student
25          affairs.  KC was also asking in the
```

JENNIE STEWART

```
 1              leadership roles at the table she sat in.
 2              We were discussing in our care team as
 3              well, which was a multi-departmental team
 4              that I led, asking to see what needs were
 5              met, where were they met and where were
 6              the gaps in that.
 7    Q    And at that time what was your
 8              understanding of the Title IX structure
 9              at LSU?
10    A    Initially there were some services but we
11              didn't have a formalized structure until
12              there was the naming of Jim Marchand as
13              the Title IX coordinator for the system
14              and then Gaston Reinoso as the campus
15              coordinator.
16    Q    And remind me of when that occurred?
17    A    I believe that was 2013, '14.  Sometime
18              around that date.
19    Q    Got it.  Of the folks that you were
20              personally talking to, what were the
21              responses when you were asking those
22              questions about do we need some more
23              robust services here and more robust
24              programming around Title IX?
25    A    Questions centered on primarily that
```

1       Title IX coordinator role to see who was

2       coordinating the efforts and our answer

3       was at that point that we did not have

4       someone in that role.

5  Q   Okay, so it was after that that Jim

6       Marchand was put in that role; is that

7       right?

8  A   That's correct.

9  Q   I believe he had another role and if you

10      could remind me of that, that would help

11      me.

12  A   Yes.  He served in the office of general

13      counsel.  I'm not sure of his title but

14      he was an attorney for LSU.

15  Q   So, then at some point obviously there

16      was a decision made that there needed to

17      be a full-time Title IX coordinator; is

18      that right?

19  A   Correct.

20  Q   Do you remember how that decision came

21      about?

22  A   I wasn't at the table for that.  I

23      believe that that was at a level higher

24      than I was.

25  Q   Were you the person that became the first

1  A    On appeal because I was the appellate

2       person.  That was something that I did

3       but my role was not in the initial

4       investigative piece, no.

5  Q    So, you had mentioned that in 2018 -- you

6       had started in February 2016 as the Title

7       IX coordinator and Clery coordinator;

8       correct?

9  A    That is correct.

10 Q    And then in 2018 you had also had

11      additional responsibilities added as the

12      ADA and Section 504 coordinator; is that

13      correct?

14 A    Correct.

15 Q    If you know, how was it decided that

16      those additional responsibilities were

17      going to be added to your job

18      description?

19 A    I believe when it was noticed that the

20      person who held that role was departing

21      for retirement there was a conversation

22      with Tom Skinner, who at that time was my

23      supervisor and indicated that we would

24      meet to find a place for ADA 504 since

25      that role would no longer be filled and I

```
 1          don't recall specifically the words but
 2          it was decided there then that I would
 3          take that on an interim basis.
 4   Q   Had that role prior to you taking it on
 5          been a full-time, dedicated position?
 6   A   No.
 7   Q   And what were the prior person's other
 8          responsibilities, if you know?
 9   A   The person directly preceding me is the
10          only person that I'm aware of who filled
11          that role.  I don't know who did that
12          before but it was the associate vice-
13          chancellor for HR.  It was that person's
14          role.
15   Q   Do you know why that role would not
16          continue handling those responsibilities?
17   A   I don't recall.
18   Q   Did you volunteer to take on those
19          additional roles?
20   A   I did not offer myself, no.  But when it
21          was asked of me I agreed.
22   Q   Did you have any concerns about how that
23          might affect your workload, taking on
24          those additional roles?
25   A   Yes.
```

1   Q   Tell me about that.

2   A   Sure.  The workload was immense to begin

3       with and I had identified that we were in

4       need of more full-time, dedicated staff

5       already on the Title IX front, much less

6       Clery and then later ADA.  But in the

7       conversation with Mr. Skinner, we

8       identified that this was a short-term,

9       we've got to find a permanent solution

10      and I didn't know that we had other

11      options at that time but the plan was

12      that that would be moved elsewhere.

13  Q   Was that ever moved elsewhere?

14  A   It was not.

15  Q   Do you know why?

16  A   I think we didn't have a place for that

17      to be, the historical -- what I inherited

18      was the other duties as assigned so I

19      think in looking at available resources

20      of the institution, creating a new stand-

21      up position wasn't something that was

22      believed to be at our disposal at that

23      time.

24  Q   Was it something that you ever raised

25      with anybody?

```
 1   A   I did.

 2   Q   Tell me about that.

 3   A   Sure.  Tom and I talked about it from the

 4        very beginning and he said yeah, this is

 5        a big load.  We've got to find a place

 6        for this.  At the same time he was

 7        building up a severely understaffed

 8        General Counsel office so I think it was

 9        a matter of stopping bleeding in a number

10        of places.  He never disagreed with the

11        need at all but I think there were many

12        demands that he was fulfilling and then

13        he departed end of 2019, so a year and a

14        half in.

15   Q   When he left who became your supervisor?

16   A   For a short time Trey Jones was named as

17        our General Counsel and I believe that

18        was a period of less than a month until a

19        new General Counsel was named in Winston

20        Decuir.

21   Q   During your time as Title IX coordinator,

22        was your supervisor always the General

23        Counsel?

24   A   Yes.

25   Q   At some point you stopped being the Title
```

1        IX coordinator; correct?

2  A    That is correct.

3  Q    And when did that occur?

4  A    That was in April of 2021.  Jane Cassidy

5        had been named of a newly-formed office,

6        the Office of Civil Rights and Title IX,

7        and she and I -- at that point there were

8        three of us.  There was Jane, myself and

9        Jeff Scott to build this office out and

10       Jane said the first thing we need to do

11       is get people.  We need job descriptions,

12       we need Clery, ADA, Title IX.  These are

13       going to be distinct roles and at that

14       point I believe I may have been the

15       longest-serving Title IX coordinator in

16       the SEC and I said to Jane I've run my

17       course with this.  If we're doing job

18       descriptions, may I choose which one I

19       take and she said let me check on that.

20       She checked with whomever she needed to

21       check, I wasn't privy to, and she came

22       back and the answer was yes, that I could

23       select and I said then I choose to move

24       forward with the ADA 504 role.

25  Q    What made you decide that?

```
1   Q   Do you recall if you ever took any
2           training when you were in SAA that was
3           promulgated by the university that would
4           have been similar -- prior to 2016?  I'm
5           sorry.
6   A   There was a CSA training that I took.
7           That was a Dolores Stafford product.
8   Q   What does CSA stand for?
9   A   Campus Security Authority under Clery.
10  Q   So, not Title IX-specific; correct?
11  A   No, not specific -- related but not
12          specific.
13  Q   Let's talk about athletics.  You had
14          referenced that.  What involvement did
15          you have in ensuring that either students
16          or staff within athletics were trained
17          about Title IX?
18  A   The second week of my work in February of
19          2016, I was pulled into a meeting where
20          the Dan Beebe Group was presenting.
21          Their work had preceded my time in there
22          so I was getting up to speed where they
23          were on defining the product that they
24          were -- I'm sorry, not defining,
25          refining.  The product they were to
```

```
 1          deliver to employees and student athletes
 2          in athletics.
 3    Q   What was the purpose of you being in this
 4          meeting; do you remember?
 5    A   Because it included areas of Title IX-
 6          related content so Tom Skinner, Dan
 7          Layzell and Joe Alleva were at that
 8          meeting and they pulled me into that as
 9          well.
10    Q   What contributions did you provide in
11          that meeting, if you can recall?
12    A   At that very first meeting it was
13          understanding of what was going on,
14          getting me up-to-speed at that point.
15          But there were subsequent meetings on
16          content that were dry-runs essentially
17          for invested parties to provide feedback
18          about the content from the Dan Beebe
19          Group.
20    Q   What were your thoughts on the training
21          that was being provided by the Beebe
22          Group?
23    A   It was broad.  It included human
24          relations risks, so it wasn't specific to
25          Title IX, though it did include it.  And
```

JENNIE STEWART

```
 1        later, sometime before COVID -- I can't
 2        recall the year specifically but -- we
 3        invited Mike -- I can't recall his last
 4        name -- from Dan Beebe to present to my
 5        case management group for Title IX plus a
 6        few other folks who were in our work
 7        employees to review the content.  We had
 8        an evaluative tool about the content of
 9        it as related just through the scope of
10        Title IX and we provided that feedback
11        through athletics.
12    Q   What feedback did you provide if you can
13        recall?
14    A   I haven't looked at that in quite some
15        time so I can't speak to it but it did
16        indicate that there were some needs and
17        amendments for clarity and to indicate
18        that reporting was to happen outside of
19        athletics to the Title IX coordinator,
20        not within.
21    Q   So, your understanding was that what they
22        were presenting was that they should
23        report within; is that correct?
24    A   No, I don't think that's correct.  I
25        think there was a lack of clarity where
```

```
 1        the messages go to the Title IX office.
 2        We wanted that to be front, center and
 3        clear and it wasn't.  The message was not
 4        to the contrary, it was just not robust
 5        and clear.
 6   Q    When you provided that feedback, was your
 7        feedback implemented?
 8   A    Stephanie Rempe was at the university
 9        newly during the time.  And I think that
10        going through that piece she, Miriam and
11        I sat down and we went through all the
12        feedback that we received from the group
13        I'd assembled and they were very open to
14        hearing it, concerned about it and wanted
15        to move swiftly on it.
16   Q    Do you know -- (connection issues)
17   A    I'm sorry, I'll ask for a repeat, there
18        was an interruption.
19   (Connection discussion)
20   Q    Sure.  So, my question was, do you know
21        specifically if that training was updated
22        to make it clear that folks should be
23        reporting to the Title IX office?
24   A    It was my understanding that was what was
25        going to happen.  Some time in 2020 I was
```

```
 1           directly is the way to report.
 2   Q    Who was disagreeing with you?
 3   A    Winston Decuir disagreed with me.  It was
 4           his proposal to let athletics stand as a
 5           separate effectively institution for
 6           campus coordinator and that no reports --
 7           it was unreasonable to expect that
 8           everybody was going to report directly,
 9           that those should still go to Miriam.
10   Q    So, was there any resolution after this
11           meeting in October of 2020?
12   A    No.  No there wasn't.  There was still
13           disagreement.  I was still holding to the
14           position it'd come directly.
15   Q    So, as far as you know, during the time
16           that you were the Title IX coordinator no
17           directive was ever provided to athletics
18           to tell them to report directly to your
19           office?
20   A    I'll say this.  There were directives.
21           Tom Skinner, I and then-president
22           Alexander went to the president's
23           cabinet, which included then-sitting AD,
24           Joe Alleva and the directive was -- I
25           believe this may have been early in my
```

```
 1        tenure.  I can't speak specifically the
 2        year.  It was sometime between my
 3        starting and COVID when Tom was still
 4        here.  There were some concerns about
 5        reports not coming, that they should be
 6        reported elsewhere, up the food chain and
 7        Tom and then-president Alexander sent
 8        directly deans and vice-presidents, let
 9        me be clear.  Every one of you is
10        responsible for ensuring that your people
11        know where to report.  That reporting
12        place is to the Title IX coordinator, no
13        bones about it.  It does not go up to
14        someone else for review.  If someone
15        needs help in doing a report perhaps for
16        their first time, assist them in doing
17        their role by helping them report
18        directly; is that clear?  The answer was
19        yes.  Yes, that is clear.
20   Q    And you said Joe Alleva was in that
21        meeting; correct?
22   A    Yes, he was.  And then --
23   Q    Go ahead.  I'm sorry.
24   A    I later learned that sometime in 2020
25        that shortly afterward there was an email
```

```
 1        circulated contrary to that, that
 2        indicated reporting to Miriam.
 3   Q    Got it.  And that email was circulated by
 4        Joe Alleva; correct?
 5   A    Had his name on it when I read it, yes.
 6   Q    So, when you first -- I'm trying to get
 7        the timeline down.  I'm going back to the
 8        Beebe Group, the training that was
 9        provided by them.  When did you first
10        raise concerns after -- so let me just
11        clarify, let me try and summarize here.
12        So, you first reviewed the Beebe training
13        sometime in 2016 or 2017; is that right?
14   A    2016, yes.
15   Q    At that time you provided feedback that
16        it needed to be more clear that reporting
17        needed to come directly to your office;
18        is that correct?
19   A    Correct.
20   Q    And it was your understanding or at least
21        you didn't have any reason to think
22        otherwise that that occurred; is that
23        correct?
24   A    I'm sorry, to be clear that what didn't
25        occur?
```

1   Q   So, it was your understanding after you

2       provided the feedback that this training

3       needs to advise people to report directly

4       to my office.  It needs to be clear.

5       After you provided that feedback it was

6       your understanding that that training was

7       updated to provide that information; is

8       that right?

9   A   That's my belief, yes.

10  Q   What caused you to believe that?

11  A   So going forward, I had said I understand

12      the Beebe theory is that there are small

13      group meetings within teams, perhaps even

14      position for a large team or for

15      employees in certain roles but I want to

16      see this presentation outside of

17      presenting to a constituency.  So, the

18      next year I was included in seeing a part

19      of the presentation for two

20      constituencies in athletics, so I said

21      people need to see a face.  They need to

22      see a person.  I don't have to be the

23      full deliverer but they have to know that

24      I'm a real person.  People go to who they

25      know.  So, I was invited to participate

```
1            for two of the presentations -- not in-
2            full because of perhaps of the chilling
3            effect of things that were outside my
4            area but yes, I participated there.
5    Q   When did you have those two times that
6            you participated?  When did those two
7            dates occur if you can recall, just
8            approximate is fine?
9    A   I can't recall.  I'm narrowing the dates.
10           It was not in my first year.  It would
11           have been on a second go-round and it was
12           while Tom was still there so that puts it
13           somewhere between '17 and '19.
14   Q   During the time that you participated,
15           were you providing the information that
16           folks should report directly to your
17           office?
18   A   Yes.
19   Q   So then in 2020, you get this call from
20           Mike and he says I'm coming to campus
21           tomorrow.  I'm going to present and then
22           you learn at that point that those
23           materials in 2020 were not providing that
24           information; is that correct?
25   A   Correct to the extent that it was Dan
```

```
 1              Beebe and not Mike then, in 2020.
 2   Q    I'm sorry.  Got it.  Okay.  And so, do
 3        you know, you may not, why that
 4        information was no longer being provided?
 5   A    I did not know why.  I went directly to
 6        my supervisor and said this is a concern
 7        apparently presenting tomorrow and this
 8        is inaccurate.   There were phone calls
 9        of well maybe we can indicate that you
10        can report to Miriam or let them also
11        know but make sure that you report to
12        Title IX, too.  And I said no.  The
13        message is report to Title IX.  If we're
14        putting someone else in the mix, then
15        that's not what we should be doing.  If
16        someone else feels that they need to
17        decompress, if someone feels that they
18        need help in doing that, that's okay but
19        we're not sending a mixed message.
20   Q    What was the response to that?
21   A    The response that I got was well, I think
22        it's really important that people have
23        options and coaches are not going to
24        report directly.  It was a re-visit of
25        the October conversation about that there
```

JENNIE STEWART

```
 1            needed to be someone in athletics that
 2            people in athletics could utilize.
 3   Q   You said this was a re-visit of the
 4            October conversation so was it near the
 5            end of 2020 then that you had this
 6            conversation with Dan and raised the
 7            issues?
 8   A   If I recall correctly.  I don't recall
 9            the date but I remember that being
10            subsequent to because the presentation
11            was the next day.
12   Q   Who were you having this conversation
13            with?
14   A   Winston Decuir, my supervisor.
15   Q   Is he still your supervisor?
16   A   No, ma'am.
17   Q   Do you have any idea -- was that coming
18            to him from athletics or was that coming
19            from him, himself?  You may not know the
20            answer to that.
21   A   I don't know that answer.
22   Q   I think I heard somebody else.
23   A   I think there was a cough in our room.
24   Q   No worries, just wanted to make sure I'm
25            getting what anybody else wanted to say
```

```
 1          provide copies of everything to everybody

 2          after we're done today.  I was just going

 3          till the last minute last night getting

 4          everything prepared.  So, we'll do it

 5          online here and then I'll provide copies

 6          after.  So this PowerPoint, did you

 7          review what was included in the Husch

 8          Blackwell report?  You said you reviewed

 9          the whole thing so can you just confirm

10          for me that you reviewed this PowerPoint

11          and that it's accurate?  This is the

12          PowerPoint that you provided in your

13          presentation?

14    A     From what I've seen of the two slides

15          you've shown, yes.

16    Q     I'll go through it real slowly so you can

17          look at it.

18    A     Yes, that's correct.  Thank you.

19    Q     Absolutely.  Thank you.  I appreciate

20          your looking through it.  Tell me who you

21          gave this presentation to?

22    A     I was intended to present to the

23          president, President Alexander at the

24          time, Dan Layzell, who was the vice-

25          president of finance and administration
```

1      and then my supervisor, who is the

2      general counsel in legal affairs, Tom

3      Skinner.  At the last minute I believe

4      the president was unable to attend but we

5      proceeded with Mr. Skinner and Doctor

6      Layzell.

7  Q   What prompted you to prepare this

8      presentation?

9  A   At the point I had ad hoc investigators,

10     other duties as assigned from all of the

11     campuses -- I believe there were forty-

12     two different people.  Some people would

13     come in and out.  Of course, changes in

14     family, changes in work duties would mean

15     that somebody else wasn't able to serve

16     on the team any longer.  And I thought

17     there's no way that this is a sustainable

18     model of managing an influx and outflow

19     of forty-two people.  The other piece was

20     that although these were wonderful

21     people, this was not a model where people

22     were dedicating their full-time expertise

23     towards this issue.  I knew coming in,

24     other campuses had people who did this

25     work full-time and that that was what we

```
 1              needed to be able to guide other campuses
 2              and to be able to do the work on the A&M
 3              campus.
 4    Q    When you say there were forty-two people,
 5              what were those forty-two people's roles?
 6    A    Meaning their full-time role or what role
 7              they were serving for Title IX?
 8    Q    For Title IX?
 9    A    They were serving as investigators,
10              deputy coordinators -- I'm sorry,
11              investigators and deputy coordinators.
12    Q    And those were who you were referring to
13              as ad hoc investigators; correct?
14    A    Yes.
15    Q    You don't have to go through all forty-
16              two but in general what were the other
17              positions that these folks held full-
18              time?
19    A    There were folks who were full-time staff
20              in residential life, career center, the
21              graduate school -- this is specific to
22              the A&M campus -- primarily from student
23              affairs, that's where the lion's share
24              were pulled from.  We also had some from
25              human resource management but it was
```

```
 1        primarily human service related areas.
 2   Q    Do you happen to know what training had
 3        these folks received in how to perform
 4        Title IX investigations?
 5   A    Yes.  In either late 2015 or early 2016,
 6        prior to my taking the role, there was a
 7        training on the A&M campus conducted for
 8        all of the campuses.  It was by ATIXA and
 9        it was an investigator training.
10   Q    How long was that training?
11   A    I don't know.  I didn't attend.  But my
12        understanding was it was more than one
13        day for sure.  Do you mind if we break
14        soon?
15   Q    Of course.  Yes, absolutely.  I'm happy
16        to break.  How much time would you like
17        to take?
18   A    Just five is fine.
19   Q    All right, we'll do five minutes then.
20                   MR. PHAYER:
21                        Let's take ten minutes.
22                   MS. ABDNOUR:
23                        Okay.  Ten minutes sounds
24                   good.
25   (Off the record.)
```

```
 1        real-time, an investigative process,
 2        supported measures process working with
 3        humans is very different than Monday-
 4        morning quarterbacking.  So yeah, I think
 5        that.
 6   Q    Was there anything important that you
 7        shared with them that wasn't included in
 8        the report?
 9   A    I don't think there are any major points
10        that I addressed that were not included.
11   Q    I'm going to go through it with you now
12        and I've got certain portions highlighted
13        to make it easier for both of us here.
14        So, the first section that I want to
15        touch on -- it starts on what's marked as
16        page ten of the report.  In the PDF it's
17        showing as page twelve.  And this is
18        where they're summarizing when you came
19        in to fill the role as a full-time
20        position, taking it over from Jim
21        Marchand, who was doing it sort of on a
22        part-time basis it seemed.  And here it's
23        basically summarizing that there were
24        some concerns that you had with respect
25        to whether the University was complying
```

```
 1          with the 2011 Dear Colleague letter from
 2          the U.S. Department of Education and so
 3          my question for you here is did you start
 4          raising concerns right after the 2011
 5          Dear Colleague letter or -- in terms of
 6          needing a full-time Title IX coordinator
 7          -- or was that later on that you started
 8          raising those concerns?
 9   A      The conversations that I mentioned with
10          Doctor KC White and Doctor Matt Gregory,
11          those started while I was in my role in
12          SAA.  The conversations about who does
13          this, who does this in its entirety, who
14          does pieces of this, where are we
15          deficient -- so, I can't recall when
16          those conversations started but it was in
17          response to the Dear Colleague letter.
18   Q      So, is it fair to say that you and your
19          colleagues were raising concerns for at
20          least a couple of years prior to the
21          university creating that position?
22   A      Agreed.
23   Q      And they also identify here that they had
24          concerns about you reporting directly to
25          the general counsel.  Is that something
```

JENNIE STEWART

```
 1         raise it internally?
 2  A   I think in light of greater conversations
 3         about the full scope of the load, not
 4         just that as a single, stand-alone
 5         conversation.
 6  Q   When Jeff was doing his investigations
 7         and putting together his reports, what
 8         role did you have in that process?
 9  A   We processed a lot together because there
10         were two of us.  So, he would come in and
11         tell me I got this person in, I didn't
12         get this person in, I think I need to get
13         this person, this person's been
14         identified but it doesn't seem there's
15         something substantive, so we were doing a
16         lot of status checks.  We had a weekly
17         check-in, just the two of us.  And then
18         we also had a case management meeting
19         standing once a week with our greater
20         team.
21  Q   Did you provide any direct oversight of
22         the reports and by that I mean did you
23         review any portion of the reports before
24         they were finalized?
25  A   Sometimes I did if he needed other eyes
```

JENNIE STEWART

```
 1          on it.  Sometimes he would have questions
 2          and I want to run this by you, can you
 3          take a look at this, but generally he
 4          said I'm completed with my process I said
 5          okay, well when will the report be done,
 6          has that been sent out.  So no, I wasn't
 7          reviewing reports regularly unless there
 8          was a request for that.
 9    Q     Was there anybody else that was reviewing
10          reports regularly?
11    A     No, but sometimes he would make requests
12          in our general counsel office, if there
13          was need for review.  So, I think that
14          there -- it was not a regular request but
15          had been a request at some points.
16    Q     But there was no procedure in place to
17          have the reports reviewed before they
18          were finalized?
19    A     No.
20    Q     So, is it accurate to say that there were
21          some reports that were investigated
22          entirely by Jeff, the reports were
23          produced entirely by Jeff, the findings
24          were produced entirely by Jeff and then
25          they were sent to the parties without
```

JENNIE STEWART

```
 1        anyone ever looking at them other than
 2        Jeff?
 3   A    Likely.  Yes.
 4   Q    What training did Jeff receive once he
 5        started in your office.  He came on, he
 6        hadn't had any direct experience in
 7        higher ed or a Title IX office.  What
 8        training was provided to him at that
 9        point?
10   A    He did training through the same avenues.
11        He and I were often partners in training.
12        If one was attending something the other
13        was as well because we were such a
14        limited staff.  NACUA, ATIXA, ASCA,
15        Courtney Bullard, I'm sorry I can't
16        remember her organization, she was often
17        one we utilized as well for webinars,
18        trainings, et cetera.
19   Q    Was he ever sent to a comprehensive Title
20        IX investigator training, something
21        similar to the multi-day ATIXA training
22        that you went to?
23   A    I don't recall.
24   Q    You're not sure or you don't think he
25        did?
```

```
 1   A    I can't recall.  I'm sorry.  I don't
 2        remember to be able to answer your
 3        question.
 4   Q    No problem.  I want to look now at the
 5        bottom of page eleven there.  There's a
 6        footnote 36 and it looks like the Husch
 7        Blackwell report is referencing a fifth
 8        responsibility that you had that we
 9        hadn't talked about before, that you were
10        assigned the role of director of digital
11        resources and content accessibility in
12        August 2019; is that accurate?
13   A    It is.  Yes.  We had a DOE Office of
14        Civil Rights complaint about
15        accessibility of our digital resources,
16        specifically our websites and in response
17        to that a committee was convened to
18        review that.  I became part of that when
19        I assume the ADA 504 role and then when
20        we decided that we needed some kind of
21        review, so well you're the ADA 504
22        coordinator, do this.  But one of the
23        outcomes of our committee, which was very
24        robust and exhaustive, was the
25        determining need for a position
```

```
 1        specifically as the director of digital
 2        resources and content.  That was the
 3        recommendation of this committee.  We
 4        identified that this work was not ad hoc
 5        other duties as assigned, that this was
 6        dedicated work.  We left off there and I
 7        maintained that role by right of me being
 8        the ADA 504 coordinator until that was
 9        filled in January of 2022.
10   Q    So, there was a committee that said this
11        should not be your responsibility
12        anymore.  This should be a new role and
13        what happened was a new one was created
14        and given to you; is that right?
15   A    Right.  So, the associate pro -- Doctor
16        Matt Lee -- he had served in a provost
17        role, sometimes interim and such, but in
18        academic affairs.  He and I worked to
19        craft the job description.  We
20        benchmarked against places that were
21        doing this well, places that had a
22        structure for this.  We crafted the
23        description, we put it forward in 2019
24        and the answer was sorry, we can't fund
25        this.
```

JENNIE STEWART

```
 1        you working?
 2   A    It was limited because in 2014 I became a
 3        mom.  So, there was some good limit
 4        imposed by the little lady who needed to
 5        eat and to be picked up.  But I would go
 6        to my regular work hours and then I would
 7        review reports or have conversations,
 8        communicate with staff members after-
 9        hours and weekends so it was certainly
10        exceeding those in-office hours.
11   Q    I'm going to go now to, let's see -- I
12        think a lot of the stuff we already
13        covered as well so I'm not going to make
14        you go through this twice. I want to talk
15        to you about this piece, we're on page
16        sixteen of the Husch Blackwell report and
17        we're -- this is where there was some
18        discussion in the report of
19        communications between LSUPD and your
20        office.  So, the first paragraph that I
21        have highlighted there -- it looks like
22        Husch Blackwell had asked the chief of
23        LSUPD about reporting to your office and
24        he was saying that they won't do so
25        without a waiver from the victim.  The
```

```
 1          next paragraph, though, identifies that
 2          they think -- that Husch Blackwell thinks
 3          and then it looks like your office and
 4          the general counsel's office thought that
 5          their interpretation was incorrect and
 6          that they should have been reporting
 7          everything to your office.  So, tell me
 8          about that.  That sounds like that was
 9          probably something that was ongoing
10          during your entire time as Title IX
11          coordinator; is that accurate?
12     A    That is accurate.
13     Q    So what -- this seems like it was just
14          sort of a log jam or something.  Tell me
15          about if you ever raised concerns to
16          anybody about the fact that LSUPD was not
17          reporting incidents to your office?
18     A    Yes.  I inherited the concern and there
19          had been a written -- I don't know if it
20          would be considered an opinion when Jim
21          Marchand was in the role and indicated
22          that it was an erroneous interpretation
23          by our police department about this piece
24          and that information should be shared.
25          Then when it came to me, the issue wasn't
```

```
 1            resolved and I raised it with Tom Skinner
 2            and he had pulled together folks to sit
 3            at the table about this.  Some folks from
 4            general counsel under his supervision,
 5            LSUPD, and we talked about it and there
 6            was no resolution.  The stance was well
 7            we'll just have people sign the waiver if
 8            they want to and I said that that's not
 9            it.  This is not an option.  This is a
10            requirement.  These are responsible
11            employees. So, it just persisted with no
12            resolution and I probably badgeringly so,
13            would write to the chief when something
14            might become known to us later indicating
15            this is one of the things that you should
16            have known and I never got a response
17            from him.
18    Q   Help me understand the organizational
19            structure of -- wouldn't the president or
20            the general counsel's office have had the
21            authority to tell him you need to do
22            this?
23    A   Well, I think one of the challenges that
24            was presented was that they could be
25            told, meaning general counsel, PD or
```