**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ABBY OWENS, et al.** <br> *Plaintiffs* | **Case No.: 21-242** |
| | **Division WBV-SDJ** |
| **v.** | |
| | **JUDGE WENDY B. VITTER** |
| **BOARD OF SUPERVISORS OF** <br> **LOUISIANA STATE UNIVERSITY** <br> **AND AGRICULTURAL AND** <br> **MECHANICAL COLLEGE** <br> *Defendant* | **MAGISTRATE JUDGE JOHNSON** |

**OPPOSING STATEMENT OF MATERIAL FACTS TO MOTION FOR**
**SUMMARY JUDGMENT NO. 3: CALISE RICHARDSON**

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion

for Summary Judgment No. 3, Plaintiff Calise Richardson, through undersigned counsel, submits

responses to the Board's Statement of Undisputed Material Facts:

1. Calise Richardson enrolled at LSU in 2014. (Richardson 24)2

**Admitted.**

2. In Fall 2016, Richardson says she began dating Coe "for a few months."  (Richardson

163-164)  Coe lived in her apartment complex.  (Richardson 89, 185)

**Qualified.**  Richardson started seeing Coe in the summer of 2016.  (Richardson 164 3-4)

3. At the time, she believed she was in a healthy relationship with him, even though she

said he was physically abusive to her and cheated on her.  (Richardson 166, 169-171)

**Qualified.**  Richardson thought it was a healthy relationship at the time.  Later she realized

that it was not a healthy relationship. (Richardson 166 7-18)

4. Their dating relationship ended after an incident at JL's bar (an off-campus bar) (the

"JL's Incident") in the fall of 2016.  (Richardson 164, 166)

1

**Admitted.**

5. At the bar, Richardson observed Coe kissing another woman and became angry. (Richardson 178-179)  Coe approached her and tried to touch and/or kiss her.  (Richardson 179, 182; (Richardson II 29)

**Admitted.**

6. Richardson "swiped him off" and told Coe to leave her alone.  (Richardson 179, 182) She said Coe pushed her, and fell to the ground. (Richardson 179, 267)

**Admitted.**

7. Richardson yelled profanities at Coe, and Coe yelled profanities at Richardson. (Richardson 180, 183)

**Admitted.**

8. Richardson threw a drink at Coe.  (Richardson 179)

**Qualified.**  Richardson threw a drink at Coe after Coe lunged at her.  (Richardson 179 17-20)

9. Coe reported to his position coach that Richardson had been aggressive toward him. (Richardson 187; Richardson II 80; S. Lewis 163-164; Soil-Cormier 40-41)

**Admitted.**

10. As a result, Coe's coach informed Sharon Lewis, Associate Athletic Director, of the situation and asked Lewis to fire Richardson.  (Richardson 187; S. Lewis 163-164)  Lewis did not do so.  (Richardson 189)

**Admitted.**

11. Instead, Lewis called Richardson to her office with Keava Soil-Cormier, Football Recruiting Analyst, to find out what happened.  (Richardson 187-188)

**Qualified.** Sharon Lewis also wanted Coe and Coe's coach in that meeting.  Sharon Lewis later decided that Coe and Coe's coach should not be in the meeting. (Richardson 188 1-5)

12. Richardson acknowledges that she may have laughed when telling them the story of what happened.  (Richardson II 30)

**Qualified.**  Richardson acknowledged that she may have laughed as a trauma response. (Richardson II 30 13-14)

13. Lewis confirmed that Richardson laughed about throwing the drink, and neither Lewis nor Soil-Cormier perceived that Richardson was reporting physical abuse by Coe.  (S. Lewis 161, 171-172; Soil-Cormier 119)

**Qualified.**  Richardson admits throwing a drink, but she can neither admit or deny the perceptions of Sharon Lewis or Soil-Cormier.

14. Others reported to Sharon Lewis that Richardson was the aggressor in the situation and that they had difficulty keeping Richardson in the car because she wanted to return to fight with Coe.  (S. Lewis 166, 195)

**Qualified.**  Richardson admits that Sharon Lewis testified as such.  However, Richardson can neither admit nor deny as to reports to Sharon Lewis as Richardson has no personal knowledge of those events.

15. In her discussion with Richardson, Lewis asked whether Richardson wanted to file a police report about the JL's Incident. (Richardson 192, 194; Richardson II 74)  Lewis also said, "Whatever punishment you see fit, that's what we will do."  (Richardson 192193; Richardson II 74)

**Admitted.**

3

16. Richardson never filed criminal charges against Coe because she said she was "in love" with him and wanted to protect Coe.  (Richardson 173, 193) Richardson and Coe ceased their "dating" relationship after the JL's incident in Fall 2016. (Richardson 164, 166; Richardson II 41)

**Qualified.**  Richardson also stated she did not file criminal charges against Coe because she was afraid of retaliation.  (Richardson 173 12-22)

17. After the JL's Incident, Richardson experienced no other physical altercations by Coe. (Richardson II 14)

**Admitted.**

18. Richardson left to study abroad for the Spring semester of 2017, and when she returned, she restarted sexual conduct with Coe.  (Richardson 154-155, 186; Richardson II 15)

**Admitted.**

19. Their sexual relationship was on and off. (Richardson 163-164)  Coe did not physically coerce Richardson to have sex with him.  (Richardson Vol. 2 p. 20)

**Qualified.** Richardson did not consider their interactions to be sex.  Richardson stated "So no, I don't call hooking up, I don't classify it as us being in a relationship or having sex, just like I wouldn't classify rape as sex. I don't classify an abusive relationship as hooking up." (Richardson II 6-10)

20. Despite their periodic sexual encounters, they never became "exclusive" again, and Richardson continued to see other people while sometimes having sex with Coe.  (Richardson 164-166)

**Admitted.**

21. She said this continued until Coe's arrest in 2018.  (Richardson 164; Exh. 32)  In fact, she had made plans to have sex with Coe on the evening he was arrested.  (Richardson 207-208)

4

**Admitted.**

22. When Richardson engaged in sex with Coe, she knew he was dating Jade Lewis. (Richardson 177) Richardson said she had "inklings" that Coe was harming Lewis, but Richardson never reported Coe and never said anything to Lewis about Coe.  (Richardson 174, 177)

**Qualified.** Richardson did not say anything to Jade Lewis because Richardson did not want to get Jade Lewis "in trouble" with Coe. (Richardson 177 10-18)

23. Only after Lewis brought criminal charges against Coe (two years later) did Richardson report Coe's conduct to LSU's Title IX office.  (Richardson 212-214)

**Qualified.**  Richardson reported to the Title IX office when she did because Brenton Sumler was the first person to give her guidance as to how to report to Title IX.  (Richardson 213 1-17)

24. At least a year after the JL's Incident, as part of her counseling, Richardson became angry about how Sharon Lewis handled the meeting with Richardson about that incident. (Richardson 203-205)

**Admitted.**

25. During counseling at the LSU Health Center, Richardson decided she wanted to hold Sharon Lewis accountable for her response to the JL's Incident.  (Richardson 203-205)

**Qualified.**  Richardson wanted to also hold Coe accountable. (Richardson 204 14-22  205)

26. However, Richardson waited until after Coe was arrested twice in 2018 (for his conduct toward Jade Lewis) to report her own experience with Coe to the Title IX office. (Richardson 208, 212-214; Richardson Exh. 24)

**Admitted.**

27. Richardson went to Title IX because she said she was "walking around with the guilt that . . . I didn't report it. . . ." (Richardson 212-213)  Richardson felt it was partly "[Richardson's] fault that Jade got abused."  (Richardson 212-213)  Richardson was upset with Sharon Lewis because she said Lewis "knew and did nothing."  (Richardson 221)

**Admitted.**

28. Therefore, she filed her Title IX report in Fall 2018, claiming Sharon Lewis failed to take action after the JL's Incident in 2016.  (Richardson 213, 221-222)

**Admitted.**

29. The Title IX office conducted an investigation. (Richardson 270-271, Richardson Exh. 24)  It also offered Richardson counseling services, but Richardson said she was already attending counseling through LSU.  (Richardson 216)

**Qualified**.  Richardson was offered counseling services and did decline those services as Richardson had sought therapy on her own volition.  (Richardson 216 5-7)

30. Title IX advised Richardson of the Lighthouse Program, but she did not utilize that resource.  (Richardson 253)

**Qualified.**  Richardson stated she does not recall if she met with Lighthouse. (Richardson 253 14-19)

31. The Title IX office also offered academic accommodations, which she accepted. (Richardson 216)

**Admitted.**

32. Investigator Scott with Title IX interviewed Richardson two days later regarding her report of Sharon Lewis's alleged failure to report Richardson's 2016 complaint about Coe. (Richardson 256, 271-272; Richardson Exhs. 19, 24-25)

**Admitted.**

33. In less than 60 days, Scott completed his investigation and concluded that Sharon Lewis should have reported the JL's Incident to Title IX. (Richardson 271, Richardson Exh. 24; Scott 48-49).

**Admitted.**

34. Sharon Lewis demonstrated her willingness to report concerns that she perceived as sexual misconduct in other instances, such as in her prompt reporting to Segar of Samantha Brennan's complaint. (S. Lewis 249)

**Qualified.** Richardson cannot admit nor deny as to Sharon Lewis's willingness to report concerns of sexual misconduct or her perceptions of whether something was sexual misconduct as Richarson has no personal knowledge regarding Sharon Lewis's intent.

35. Plaintiff had no classes with Coe after the JL's incident, and she never spoke with Coe again after her Title IX report.   (Richardson II 16, Richardson 208-209)

**Qualified.** Although Richardson did not have classes with Coe, Richardson had to assure that her classes were not a time that she risked running into Coe. (Richardson II 7-16)

36.    Richardson claims attempted rape by Doe in December 2016. (R. Doc. 182, ¶¶ 187188) Richardson became friends with Doe during her junior year at LSU.  (Richardson 86-87)

**Admitted.**

37. They both lived at the same off-campus apartment complex.  (Richardson 89)  (Coe, Owens, Brennan, and Mize also lived in the same apartment complex. (Richardson 89; Owens 14-15; Brennan 133; Mize 15-16))

**Qualified.**  Upon information and belief, it is accurate that the other named parties lived in the same apartment complex.

38. In December 2016, Doe was kicked out of his apartment, and Richardson let him "crash" at her apartment. (Richardson 90-91) Richardson allowed Doe to stay in her bed with her, which she had done a couple of times before. (Richardson 94)

**Admitted.**

39. The next day, they were hanging out in her room and started to "play fight," which she said was normal for them. (Richardson 91)

**Admitted.**

40. They began kissing and then Doe pulled her pants down and his own pants down enough that "their genitals were exposed" and tried to "insert himself." (Richardson 91-92) Richardson told him to "stop or something like that," and Doe did not listen right away. (Richardson 91)

**Admitted.**

41. She then yelled at him to stop again, and he stopped. (Richardson 91-93) He got angry at her for stopping him. (Richardson 91-92) They both yelled at each other, then she asked him to leave, and he left. (Richardson 92-93)

**Admitted.**

42. Richardson does not recall the specifics of what she was yelling, but she thinks she tried to explain that she cared about him as a person and friend but did not want to "cross that line in [their] friendship." (Richardson 93)

**Admitted.**

43. This occurred during the day in December 2016, while both Richardson and Doe were sober, and with no witnesses. (Richardson 92, 99)

**Admitted.**

44. Richardson told her friend that she felt Doe got his feelings hurt because she rejected him. (Richardson II 24)

**Admitted.**

45. The next day, Richardson says she told her supervisor, Keava Soil-Cormier, that Doe "tried to have sex" and that Richardson did not want to have sex. (R. Doc. 182, ¶ 191; Richardson 96; Soil-Cormier 115-117)  She said Doe got angry and said he was going to try to get Richardson fired and was "going to tell everybody about the real me."  (Richardson 96)

**Admitted.**

46. Richardson told Soil-Cormier that Richardson was sharing what happened with Soil Cormier because Richardson "was scared to get in trouble and didn't want [Doe] to get [Richardson] fired."  (Richardson 96-97, 100)

**Admitted.**

47. Richardson was not asking Soil-Cormier to do anything.  (Richardson 97)

**Qualified.**  Richardson did not expressly ask Soil-Cormier to do anything, but Richardson subconsciously wanted Soil-Cormier to do something as she was Richardson's boss. (Richardson 97 20-23 98 1-6)

48. Soil-Cormier only recalls Richardson telling her that Doe and Richardson were "messing around" and that "somewhere in-between she wanted it to stop and then it stopped." (Soil-Cormier 115-116)  Richardson told her that Doe was angry and left.  (Soil-Cormier 116)

**Qualified.**  Richardson acknowledges that is Soil-Cormier's testimony.  Richardson cannot admit or deny what Soil-Cormier recalls as she lacks knowledge of such.

49. Richardson did not report the incident with Doe to anyone else.  (Richardson 101) She did not want to file a police report because she believed that "in Baton Rouge, Louisiana, at

LSU, [Doe] was gold to everyone. And so I felt like I knew nothing was going to happen . . . ." (Richardson 101-102)

**Qualified.** Richardson also stated she did not report Doe to the police because she feared retaliation. (Richardson 102 1-2)

50. Plaintiff had no classes with Doe after the incident. (Richardson II 16)

**Admitted.**

51. Although Richardson went to the Title IX office in Fall 2018 (nearly two years later) to complain about Sharon Lewis not reporting the JL's Incident with Coe in Fall 2016, Richardson did not report anything about Doe's alleged conduct in December 2016. (Richardson 101-102) Nor did she report that Soil-Cormier allegedly failed to report Doe's conduct to Title IX. (Richardson 101-102)

**Admitted.**

52. Richardson was the first plaintiff to assert allegations against Coe. (R. Doc. 182, ¶¶ 152-156) LSU received no prior reports to LSU of similar behavior by Coe. (Board 30(b)(6) 47)3

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events. Richardson acknowledges that the Board testified as such.

53. Ashlyn Mize never provided any underlying facts to LSU regarding her potential assault by Doe. (Mize 116-120 124, 133-134; Mize Exh. 3)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events. Richardson acknowledges that Mize testified as such.

54. Brennan reported her photo incident with Doe to Segar and LSUPD, but Brennan was unwilling to participate in a Title IX investigation or to press criminal charges. (Brennan 74; Brennan Exh. 6)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

55. Brennan alleged no sexual assault by Doe.  Rather, Brennan accused Doe of taking a nude picture of her standing up. (R. Doc. 182, ¶ 297)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

56. Richardson's alleged incidents with Coe and Doe occurred at an off-campus bar and at her off-campus apartment, respectively.  (R. Doc. 182, ¶¶ 152-155, 184, 187)

**Qualified.**  Richardson acknowledges that the bar was off campus. However, the apartment complex was occupied by LSU athletes as was considered to be  LSU housing.

57. As soon as Brennan reported the photo to her Sharon Lewis, Lewis promptly reported the situation to Miriam Segar, Senior Associate Athletic Director.   (S. Lewis 249; Segar 242) Segar and Lewis then met with Brennan the same day. (Segar 242)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.    Richardson acknowledges that Sharon Lewis and Segar testified as such.

58. Brennan said that in the meeting, she "expected . . . to be shut down" because she believed LSU wouldn't want "this to get out." (Brennan 63-64)  However, Brennan acknowledged that her expectation was wrong. (Brennan 65, 68-69) She found Segar to be "supportive." (Brennan 65)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

59. Segar perceived that Brennan wanted Segar to speak with Doe and make him delete the picture from his phone.  (Segar 242-243) However, Segar was concerned about compromising evidence of his wrongdoing if she went to Doe herself. (Segar 243)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

60. Segar said she had no authority to confiscate Doe's personal phone and no ability to verify whether Doe might have deleted the photo.  Id.  Therefore, Segar strongly urged Brennan to report the matter to the police who could conduct a forensic examination of Doe's phone and preserve evidence. (Segar 243)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Segar testified as such.

61. Once Brennan agreed to meet with the LSU police ("LSUPD"), Segar accompanied Brennan to the police department to make the report.  (Brennan 66)  At the LSUPD, Brennan said she was again "very surprised" that the LSUPD was supportive and did not attempt to shut down her report. (Brennan 65-66)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

62. As Segar expected, the LSUPD talked to Brennan about Title IX and asked Brennan whether she wanted to file a report with the Title IX office, which Brennan declined. (Brennan 89, 96, 212; Brennan Exh. 6)  The police interviewed Brennan, who indicated she had not yet seen the picture and could not say for sure that it was of Brennan. (Brennan 87, 98-99; Brennan Exh. 6)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

63. The police created a report that became part of the police records. (Brennan 74; Brennan Exh. 6)  The police also gave Brennan a Sexual Violence Confidentiality Notice and Waiver, which allowed her the option to waive confidentiality and allow the police to contact Student Affairs, the Lighthouse Program, and the Title IX office to share her concerns.  (Brennan Exh. 6)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

64. Brennan signed the form but declined to allow a waiver to give the police access to LSU's resources for victims of sexual misconduct.  (Brennan 89)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

65. Later that same day, Brennan texted Segar and thanked her, writing: "Thanks again so much I really appreciate everything you did today!" (Brennan 68; Brennan Exh. 5)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

66. Segar replied immediately, saying "No problem. Let me know if need anything."  Id.

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Segar testified as such.

67. Months later, Brennan recounted the event to someone, saying: "I was really surprised how supportive everyone was, especially Ms. Sharon.  I would have thought they would have tried to shut me down, but her and an advocate [Segar] were the ones who encouraged me to go to the police and the advocate [Segar] came with me."  (Brennan 153)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

68. After Brennan's initial encounter with the police, Sergeant Melchior, followed up with her by phone to see whether she wanted to move forward with her complaint. (Brennan 89-93) Brennan again advised that she did not want to do so.  (Brennan 92; Brennan Exh. 6)  She said she would let him know if she changed her mind.  (Brennan 96)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

69. Brennan recalls that the officer was "very encouraging of her to press charges." (Brennan 93) Brennan said "everybody was very encouraging . . . like nobody tried to keep me from pressing charges."  (Brennan 93) Brennan recalls also being offered the opportunity to undergo a physical exam, which she declined. (Brennan 95)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified to as such.

70. She does not dispute the police report statement that Brennan was offered Title IX, Lighthouse and other resources. (Brennan 94-97)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

71. Nothing further happened between Doe and Brennan. (Brennan 50-51)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.   Richardson acknowledges that Brennan testified as such.

72. Three days after Brennan's report to Segar and Lewis, Mari Fuentes-Martin, Associate Vice President and Dean of Students, reached out to LSUPD about the potential report and learned that Brennan (whose name was unknown to Fuentes-Martin) instructed LSUPD that she did not want her report disclosed to the Title IX office.  (Sanders Decl., ¶ 10, Exh. 5)

14

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

73. Fuentes-Martin stated she thought the nude picture allegation "might" be a PM-73 case (the scope of which is broader than Title IX).  Id.  However, based on the limited information known by the Title IX office at the time (because Brennan did not authorize disclosure to Title IX),

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

74. Fuentes-Martin and Jennie Stewart, Title IX Coordinator, documented the case as "information only", and closed the case to "respect the wishes of the Complainant."  Id.  Stewart indicated that if other factors became known in the future, then they would take a different approach.  Id.

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

75. Richardson complains that, in Mize's situation, Segar did not include Doe's name in the Maxient system (LSU's reporting system). (R. Doc. 182, ¶ 930(b)) However, Segar communicated Doe's name to Fuentes-Martin, who played a role in both Mize and Brennan's situations and had the knowledge of the accused perpetrator. (Segar I 26468, 271-72; Segar Decl. ¶ 7, Exh. 5)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

76. Student A's name is also missing from the Maxient record.  (Segar Decl., ¶ 7, Exh. 5)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

77. Doe's name appeared in the Maxient report that disclosed Brennan's allegation. (Brennan Exh. 6; Brennan 190-191; Sanders Decl. ¶ 10, exh. 5)

**Qualified.** Richardson can neither admit nor deny this allegation as she has no personal knowledge of the events.

78. Richardson testified that she had sex with another male student (not Doe or Coe), despite warnings from her friend and Richardson's own knowledge that the male student was accused of raping another student because he had sex with her while she was intoxicated. (Richardson II 43-46)

**Admitted.**

79. Following Fall 2016, Richardson's grades improved from prior semesters, with grade point averages from 3.05 to 3.56.  (Richardson 275-276; Richardson Exh. 26)  By contrast, her grades before Fall 2016 spanned from 2.14 to 3.0.  Id.

**Admitted.**

80.  Richardson could report Title IX claims through multiple mechanisms, including to a Title IX representative, as Richardson ultimately did in 2018.  (Board 30(b)(6) 49-52)

**Admitted.**

81. Likewise, information about how to contact the Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points.  (Id. at 53-54)

**Admitted.**

82. Richardson made a complaint in 2018 to Title IX, mentioning Coe and nothing about an "attempted rape" by Doe. (Richardson 101, 256, 271; Richardson Exhs. 19, 24)

**Admitted.**

83. By the time of Richardson's Title IX report, neither Doe or Coe were still enrolled at LSU. (Sanders Decl., ¶ 11; R. Doc. 182, ¶ 544)

**Qualified.** Richardson believes this to be accurate, but she has no definite knowledge that these dates are accurate.

84. Richardson and her alleged assaulters, Coe and Doe, received LSU Title IX training. (Sanders Decl. ¶ 3) Because of their roles as student athletes, Coe and Doe received additional training through the Dan Beebe Group/Protection for All. (Segar Decl., ¶ 5, Exh. 2)

**Qualified.** Richardson acknowledges she received some training in Title IX. She can neither admit nor deny if Doe and Coe had such training as she has no personal knowledge of those events.

85. Richardson received the same training because of her role as a student worker in football. (Richardson II 9; Richardson Exh. 31; Segar Decl., ¶ 4, Exh. 1)

**Admitted.**

86. Richardson scheduled an LSU Lighthouse speaker to present to her sorority on sexual assault and LSU's resources. (Richardson 236; Richardson Exh.10)

**Admitted.**

87. Richardson received and completed a training course on sexual assault, some of which training LSU mandated that students complete as a prerequisite to registering for classes. (Sanders Decl., ¶ 3; Richardson II 9-10, Richardson Exh. 31; Board 30(b)(6) 40-41)

**Admitted.**

88. Richardson's alleged harassment took place in 2016, yet she did not file suit until over four years later, on April 26, 2021. (R. Doc. 1)

**Qualified.** Richardson did not file suit before 2021 as she was not aware until after the release of the Husch Blackwell report of the systemic problems regarding sexual assault and Title IX at LSU.

89. Richardson knew in 2018 of Coe's arrests for assaulting Jade Lewis. (Richardson 194, 196, 207-208) Her knowledge of Coe's abuse of Lewis prompted Richardson to report to Title IX in 2018. (Richardson 212-213)

**Admitted.**

90. While Richardson was at LSU, she heard that Mize had a relationship with Doe and that Mize felt Doe had raped or sexually assaulted her. (Richardson 119-121)

**Qualified.** Richardson acknowledges that she heard rumors that Doe had assaulted another woman. Richardson did not know that woman was Mize. In furtherance, Richardson has no personal knowledge that Mize had a relationship with Doe.

91. In addition to the other plaintiffs, Richardson said that "all throughout college" she heard other rumors about Doe being violent and getting angry when people rejected him. (Richardson 122-123)

**Admitted.**

92. She also was aware of Brennan's situation with Doe prior to Richardson's alleged attempted rape in December 2016 because Richardson saw Brennan crying in a bathroom, and Brennan said she was crying because Doe allegedly shared a naked photo of her. (Richardson 115-116)

**Admitted.**

18

93. While Richardson was at LSU and prior to her departure in December 2018, Richardson was aware of both Brennan's and Mize's situations with Doe. (Richardson 25, 115-116, 122-123)

**Admitted.**

94. LSU also had no knowledge of Abby Owens' encounter with Doe prior to Richardson's incident with Doe. 4

**Qualified.** Richardson can neither admit nor deny what LSU did or did not know as she has no personal knowledge of same.

95. Richardson was upset with the results of her Title IX claim regarding Sharon Lewis in October 2018. (R. Doc. 182, ¶¶ 234-236)

**Admitted.**

96. Richardson knew by Doe's departure in 2018 that the Title IX office had never reached out to her and that Soil-Cormier had not reported Doe. (Sanders Decl., ¶ 11; Richardson 118-122 Richardson II 22-24)

**Admitted.**


## ADDITIONAL FACTS

1. Opposing Statement of Material Facts as to Opposition to Motion for Summary Judgment No. 1: Ashlyn Mize Robertson, No. 2: Samantha Brennan, No. 4: Abby Owens, and No. 5: Jade Lewis, and Supplemental Opposing Statement of Material Facts to as to Opposition to Motions No. 1-10 are incorporated herein by reference.

2. LSU had always felt like a "second home" to Plaintiff; she "grew up going to LSU football games" and has "had season tickets [her] whole life, as her father is an LSU alumnus. Richardson I Dep. 57:5-12.

3. Richardson began her education at LSU as a freshman in the fall of 2014 and worked for the recruiting staff of LSU's football team from approximately September 2014 to January 2017. Richardson I Dep. 41; Richardson Dep. Ex. 19.

4. During Richardson's freshman year at LSU, she was raped by an LSU football player while she was drunk. Richardson I Dep. 82.

5. During her time working in the LSU football recruiting office, Plaintiff learned from friends that women in her job position had been known for being "easy-access targets" for sexual assault by football players. Richardson II Dep. 59:13-15.

6. LSU wide receivers coach Tony Ball ("Ball") told Plaintiff multiple times "to show [the recruits] a really good time" in a sexually suggestive tone. Richardson II Dep. 36:18-37:20, 54:8-9.

7. During her employment, an explicit video of another LSU student was being circulated around campus. Richardson I Dep. 131-132.

8. In the office, Football Recruiting Analyst Keava Soil-Cormier made light of this situation and even commented negatively on the student's appearance in the video, which was unwelcome to Plaintiff. Richardson I Dep. 132.

9. Football coach Will Wright obtained Plaintiff's phone number without her consent and contacted her on multiple occasions to spend personal time with her, which was unwelcome to her. Richardson II Dep. 61.

10. Plaintiff was raped during her second year at LSU by a football recruit. Richardson I Dep. 84.

11. Plaintiff felt LSU was treating her "like a piece of meat" or "like a dangling carrot" for football athletes. Richardson II Dep. 54:16-24, 57:6-9.

12. Plaintiff consistently received unwelcome and even threatening messages from recruits, current and former LSU football players and coaches, family members of coaches, and former LSU athletes; Residence Life Coordinator Kimberly Davis even gave Plaintiff's number to one of the unwelcome contacts. Richardson I Dep. 339, 343.

13. Plaintiff believes the culture at LSU is one in which female student workers were "literally there to serve the players. [They were] nice little appetizers for [football players]." Richardson I Dep. 346:13-23, 348:4-353:6.

14. On several occasions, her supervisors Assistant Athletic Director for Football Recruiting Sharon Lewis, Soil-Cormier, and Associate Head Football Coach Frank Wilson asked Plaintiff personal questions about her dating and sexual history, which was unwelcome to her. Richardson II Dep. 35, 66.

15. Plaintiff observed that "there was no 'zero tolerance'" exercised by LSU toward reports of Title IX violations by football players. Richardson II Dep. 62:22.

16. John Coe was a highly recruited athlete who played on the LSU football team as a wide receiver from 2016 to 2017. PLAINTIFFS_000129. "[A]t LSU, [John Coe] was gold to everyone." Richardson I Dep. 101:21-22.

17. In summer 2016, Richardson and John Coe began an "exclusive committed relationship." Richardson I Dep. 163:5-164:4; Richardson Dep. Ex. 19.

18. While Plaintiff believed her relationship with Coe to be "healthy" at the time, with resources and counseling she later realized it was "a traditional abusive relationship." Richardson I Dep. 166:7-11, 166:23-167:1.

19. Coe was extremely controlling, jealous, rough and mentally, verbally, and physically abusive. Richardson I Dep. 166.

20. Coe controlled what Plaintiff wore and did not allow her to go to the bars unless he was present with her, becoming angry if she disobeyed his orders. Richardson I Dep. 169.

21. Coe blamed Plaintiff for his bad practices or games, shamed her for past sexual experiences, called her a "whore," and complained that her clothes were "inappropriate." Richardson I Dep. 167:16-23, 168:22-169:1.

22. Coe physically assaulted Plaintiff by pinning her "up against the wall or [choking her] against the wall," pushing her, pinning her down, crushing her, and attempting to punch her. Richardson I Dep. 171:4-19.

23. Any time Plaintiff tried to assert her independence, Coe would belittle and shame her. Richardson I Dep. 170; Richardson Dep. Ex. 33.

24. Even when Plaintiff discovered that Coe was cheating on her during their exclusive relationship or engaged in reproductive coercion, she was too afraid to confront Coe in fear of his physical abuse. Richardson I Dep. 170.

25. In fall 2016, Plaintiff went to J.L.'s bar in Tigerland with friends from the football team. Richardson I Dep. 178-179; Richardson Dep. Ex. 19. There, she saw John Coe kissing another woman at the bar; Coe maintained direct eye contact with Plaintiff throughout the kissing. Richardson I Dep. 179.

26. Coe then came over to Richardson, grabbed her hips and buttocks without her consent, and attempted to kiss her. Richardson I Dep. 179, 182. Plaintiff pulled away and told Coe not to touch her. Richardson I Dep. 179.

27. Coe shoved Plaintiff to the ground. Richardson I Dep. 179; Richardson Dep. Ex. 19. In response, Plaintiff threw a drink at him. Richardson I Dep. 179.

28. Coe then "squared up and charged and was swinging," and had to be restrained by five football players as "he just kept trying to push through them and swing" at Plaintiff. Richardson I Dep. 179:21-180:2; Richardson Dep. Ex. 19.

29. Bouncers removed Coe from the bar. Richardson I Dep. 180; Richardson Dep. Ex. 19. While Plaintiff remained inside the bar, bystanders told her Coe was outside waiting for her, saying, "I'm going to kill her, I'm going to kill her, I'm going to get her." Richardson I Dep. 180:7-13.

30. When Plaintiff believed it was safe to exit the bar, Coe "came running toward [Plaintiff,] swinging wildly," and was again "restrained by football players. Richardson Dep. Ex. 19.

31. Later that night, John Coe appeared uninvited at Richardson's apartment complex, acting aggressively and threatening. Richardson I Dep. 184-185.

32. The following day, Plaintiff received a call from Sharon Lewis about the incident with John Coe at J.L.'s. Richardson I Dep. 186-187; Richardson Dep. Ex. 19. Lewis said Coe had reported to a coach that Plaintiff has been "acting crazy at the bar" and that Coe had been "minding his business" when Plaintiff "just randomly came up and threw a drink at him." Richardson I Dep. 187:5-10. Lewis said the coach wanted Plaintiff fired. Richardson I Dep. 187.

33. Lewis also "called around and asked some people who were there" to confirm that Coe's story was true, conducting "her own investigation." Richardson I Dep. 187:19-23, 188:18-20. Plaintiff told Lewis what had actually happened. Richardson I Dep. 191.

34. Lewis asked Plaintiff to meet with her and Soil-Cormier the following week, and Plaintiff agreed. Richardson I Dep. 188; Richardson Ex. 19. Plaintiff again shared what happened with Coe during the meeting. Richardson I Dep. 192.

35. Lewis and Soil-Cormier minimized Plaintiff's assault by telling Plaintiff she could report the police if Plaintiff felt like this was "big enough to ruin [John Coe's] life." Richardson I Dep. 192:13-20; Richardson Dep. Ex. 19.

36. Plaintiff said she "was scared" of Coe, but Lewis and Soil-Cormier laughed at Plaintiff and questioned why she was afraid of him. Richardson I Dep. 193:15-21; Richardson Dep. Ex. 19.

37. Lewis and Soil-Cormier did nothing to help Plaintiff. Richardson I Dep. 204. Neither Lewis nor Soil-Cormier mentioned "Title IX or compliance" and they did not ask Plaintiff if she needed resources.  Richardson I Dep. 192:21-22, 193:11-14; Richardson Dep. Ex. 19.

38. Plaintiff was asked what Coe's punishment should be, and Plaintiff asked that Coe be required to attend therapy, because of a "policy that, based on certain behaviors, coaches in athletic departments can mandate for their student athletes to see counseling." Richardson I Dep. 192:21-22,193:4-14, 200:3-12. Plaintiff has since realized that "giving the victim…the opportunity to decide another student's punishment [was] extremely inappropriate and manipulative."  Richardson I Dep. 205:13-22.

39. Later, Coe threatened to ruin Plaintiff's reputation and get her fired. Richardson II Dep. 22.

40. Coe harassed Plaintiff in the weight room. Richardson II Dep. 16.

41. Plaintiff was forced to schedule her classes during football practice times to avoid Coe. Richardson II Dep. 14, 16. Due to her continued fear of her abuser's presence on campus, Plaintiff's grades drastically declined. Richardson Dep. Ex. 33.

42. Doe "was a highly recruited running back from Baton Rouge who committed to attend LSU in 2015." PLAINTIFFS_000167. Richardson first met John Doe in fall 2016 while he was a recruit.  Richardson I Dep. 86-87.

43. Doe and Richardson were strictly friends. Richardson I Dep. 87-89. Both lived at "The Standard" apartment complex. Richardson I Dep. 89.

44. On at least one occasion, Doe pinned Plaintiff against the wall, choking her and yelling at her.  Richardson I Dep. 87-89, 302, 303.

45. That same semester, Plaintiff went out to the bars with her friends, including John Doe. Richardson I Dep. 90, 99. John Doe said he had been kicked out of his apartment for vandalism and asked if he could stay at Plaintiff's apartment. Richardson I Dep. 90-91. Plaintiff allowed him to stay over.  Richardson I Dep.  91, 94.

46. The next morning, Richardson and John Doe began to joke around when suddenly, Doe kissed Plaintiff.  Richardson I Dep. 91.

47. John Doe then attempted to rape her. Richardson I Dep. 91-92. Plaintiff told John Doe to stop multiple times; it was not until Plaintiff began to yell that Doe became angry and was yelling at Plaintiff that he would "ruin [her] life" and calling her a "dumb bitch," when Plaintiff was simply trying to explain that she did not want to have sex with him because she "care[d] about him as a person and a friend and…didn't want to cross that line in [their] friendship." Richardson I Dep. 91:19-92:1, 93:1-15.

48. Later that day, Plaintiff called Soil-Cormier to tell her about John Doe's attempted rape and his threats to "get [Plaintiff] fired." Richardson I Dep. 96:16-97:3, 100:1-7.

49. Plaintiff told Soil-Cormier about John Doe's attempted rape because she "wanted [Soil-Cormier] to step in and do…anything to protect [Plaintiff]" as Plaintiff's supervisor. Richardson I Dep. 97:20-98:6.

50. Soil-Cormier responded by asking why Plaintiff would let John Doe in her apartment if she did not want to have sex with him, implying that the attempted rape was Plaintiff's fault. Richardson I Dep. 97.

51. Instead of making a report to the Title IX office, Soil-Cormier asked one of Plaintiff's coworkers what happened between Plaintiff and John Doe in front of other coworkers. Richardson I Dep. 107. This led to rumors spreading about Plaintiff and caused dissension with one of her coworkers who was dating John Doe at the time. Richardson I Dep. 107, 109.

52. Soil-Cormier even encouraged Plaintiff to apologize to Doe's girlfriend for his abuse. Richardson I Dep. 136.

53. After the assault, John Doe publicly harassed and humiliated Plaintiff by telling other football players athletics workers that she was a "whore." Richardson I Dep. 114:18-21. Doe texted Plaintiff "calling her names, threatening [her] [and arguing] about the meaning of someone staying stop and no." Richardson I Dep. 94:19-95:6; Richardson Dep. Ex. 33.

54. When Doe learned Plaintiff had reported the attempted rape to Soil-Cormier, he called her a "dumb bitch." Richardson I Dep. 95:7-10.

55. John Doe continued to physically intimidate Plaintiff whenever he saw her in public spaces, getting in her face, and yelling at her to "get out of his space." Richardson I Dep. 95:7-12, 98:18-99:6.  John Doe would go to bouncers and "try to kick [her] kicked out" of bars. Richardson I Dep. 95:15-17.

56. Even after blocking his phone number, Doe continued to contact Plaintiff through alternative phone numbers. Richardson II Dep. 13.  Plaintiff did not feel safe reporting John Doe's assault because of his positive reputation in the State of Louisiana. Richardson I Dep. 152.

57. On August 16, 2018, Coe was arrested and charged with felony dating violence. BOS-002117.

58. On or around September 16, 2018, LSU police arrested John Coe a second time after detectives learned he was continuing to see and physically assault Plaintiff Lewis in violation of court orders. BOS-032685-032686.

59. The next day, John Coe withdrew from LSU.82 Shortly thereafter, Deputy Athletics Director Verge Ausberry asked what Plaintiff thought about John Coe's recent arrest. Richardson I Dep. 213, 217

60. In tears, Plaintiff stated that she one "hundred percent believe[d]" that Coe was capable of causing abuse to others, "because [he was] also abusive to [her]." Richardson I Dep. 217:22-218:3, 297:3; Richardson Dep. Ex. 20.

61. Ausberry asked Plaintiff about the 2016 incident at J.L.'s, which Plaintiff had never disclosed to Ausberry. Richardson I Dep. 220.

62. Ausberry said he had not known Plaintiff was involved with Coe until she was in a meeting with Senior Associate Athletic Director Miriam Segar, and that Plaintiff's "name had come up" when the individuals in the Athletics compliance office were discussing Coe's assault. Richardson I Dep. 218:8-18.

63. Plaintiff told Ausberry that Sharon Lewis and Soil-Cormier failed to report the incident to Title IX when Plaintiff had initially reported the abuse. Richardson I Dep. 221-223; Richardson Dep. Ex. 19.

64. Ausberry told Plaintiff she needed to report Coe's abuse to Segar, and Plaintiff received a phone call from Segar within the next week. Richardson I Dep. 218-219, 269, Richardson Dep. Ex. 19, 22. Plaintiff left Segar a voicemail, but Segar never responded. Richardson I Dep. 270; Richardson Dep. Ex. 19.

65. In March 2019, John Coe pleaded guilty to two counts of battery and one count of violating a protective order against Plaintiff Lewis. Jade Lewis II Dep. 372.

66. Plaintiff Richardson was "walking around with the guilt that…[she had] just left [her report] with [Sharon Lewis] and trusted that maybe they would do what's right." Richardson I Dep. 212:14-23.

67. On September 28, 2018, Plaintiff told her boss, Skills Manager Brenton Sumler, that she believed that the reason behind Coe's arrest, his assault of Plaintiff Lewis, must be true "because he did it to [Richardson]" too. Richardson I Dep. 213:12-19, 214:5-9; Richardson Dep. Ex. 19.

68. Plaintiff revealed the details of the incident at J.L.'s to Sumler, as well as the subsequent meeting that she had with Sharon Lewis and Soil-Cormier. Richardson I Dep. 214.

69. Sumler took Plaintiff to the Title IX office to file a report on Coe's assault. Richardson I Dep. 213, 252; Richardson Dep. Ex. 19. Plaintiff was offered counseling and accommodations, and a Title IX investigation was finally initiated on October 1, 2018, nearly two years after her first report to Sharon Lewis. Richardson I Dep. 213; Richardson Dep. Ex. 16, 18, 19, 24.

70. Sharon Lewis was named as the respondent in the investigation instead of John Coe, and Title IX never opened an investigation into John Coe. Richardson Dep. Ex. 24. The investigation left Plaintiff feeling "extremely upset, sad, hurt, angry…[and] very defeated." Richardson I Dep. 273:4-10.

71. After Coe was released from jail, he texted Plaintiff asking her to hang out, and she declined. Richardson I Dep. 208. Coe continued to harass Plaintiff via text through 2020. Richardson I Dep. 209, 211.

72. Even after blocking his phone number, Coe continued to contact Plaintiff through alternative phone numbers. Richardson II Dep. 13. Whenever Plaintiff would see Coe out at the bars following his arrest, she "would always leave." Richardson I Dep. 211:13-14.

73. Finally, although the November 16, 2018 Title IX investigation report found "sufficient evidence to prove that Respondent Sharon Lewis violated LSU's PM-73 policy in that as a Responsible Person she failed to report a potential violation of LSU's Title IX and Sexual Misconduct Policy PM-73," it was not until on or around July 18, 2019 that LSU expelled John Coe for violating the LSU Code of Student Conduct and the LSU Title IX Policy due to his abuse of Plaintiff Lewis. Richardson Dep. Ex. 24; Jade Lewis II Dep. 372.

74. The abuse John Coe and John Doe inflicted upon her and LSU's subsequent repeated failure to properly respond, while also firing Plaintiff Richardson from her position within LSU's Athletic Department, has completely distorted Plaintiff's previous lifelong passion for football and sports, causing a change in career trajectory. Richardson I Dep. 315.

75. While Plaintiff's Title IX investigation was ongoing in 2018, her grades were "suffering" and her professors had "expect[ed] better from" her. Richardson Dep. Ex. 17.

76. Plaintiff was removed from her position in Athletics following her report of the assault. Richardson II Dep. 121-122.

77. Plaintiff's relationships with her family and friends have been torn apart. Richardson I Dep. 318.

78. Plaintiff sought counseling and even abused drugs to cope with the trauma she endured. Richardson I Dep. 319-320; Richardson Dep. Ex. 28.

79. Plaintiff began experiencing increased anxiety when trying new tasks and is constantly vigilant and anxious. Richardson I Dep. 312-313.

80. Plaintiff was diagnosed with PTSD, depression, and anxiety; and even developed Diabetes, Type II and gastrointestinal issues. Richardson II Dep. 7; Richardson Dep. Ex. 17, 28, 31.

81. Plaintiff had to adopt an emotional support animal to feel safe in her own home. Richardson I Dep. 309.

82. Plaintiff suffered significant economic damages including being forced to move from the apartment where Coe and Doe had abused her, as well as having to decline a scholarship to LSU for graduate school. Richardson I Dep. 305, 309-310.

83. Plaintiff's graduation was delayed by one full semester. Richardson I Dep. 310:21-311:1.

84. From the March 2021 Husch Blackwell Report, Plaintiff learned the following: Plaintiff's report of John Coe's abuse, which was received by Sharon Lewis, Keava Soil-Cormier, Verge Ausberry, Ya'el Lofton, and Dameyunne Craig was never reported to the Title IX office; Lewis simply left the matter to be handled by Craig because "this was the way athletics handled things." PLAINTIFFS_000135.

85. Plaintiff learned from the March 2021 Husch Blackwell Report that an investigation into LSU's failures was completed by Morgan Lewis and that the report revealed a "general

misunderstanding regarding proper reporting processes and lack of evidence of intentional withholding of information of failure to report" which was never shared with the Title IX Office and no employees were disciplined as a result. PLAINTIFFS_000150-000151.

86. Plaintiff also learned from the March 2021 Husch Blackwell Report that Segar intentionally redacted John Doe's name from Ashlyn Mize Robertson's report to the Title IX office. PLAINTIFFS_000170.

87. Plaintiff did not know about Sharon Lewis' appeal of her Title IX complaint until the release of the Husch Blackwell report. Richardson II Dep. 27.

88. The Report exposed that Soil-Cormier, Segar, and Ausberry all made inconsistent reports about what happened to Plaintiff. Richardson II Dep. 28; Richardson I Dep. 29.

Respectfully Submitted,

/s/ Catherine E. Lasky

Karen Truszkowski
*Pro Hac Vice*
Temperance Legal Group
503 Mall Court #131
Lansing, Michigan 48912
P: (844) 534-2560
F: (800) 531-6527
karen@temperancelegalgroup.com

Catherine E. Lasky (La. Bar 28652)
Endya L. Hash (La. Bar 38260)
Katie Lasky Law
619 Homedale Street
New Orleans, Louisiana 70124
P: (504) 584-7336
F: (504) 375-2221
katie@katielaskylaw.com
endya@katielaskylaw.com


Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour