**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ABBY OWENS, et al.**<br>*Plaintiffs* | **Case No.: 21-242** |
| | **Division WBV-SDJ** |
| **v.** | |
| | **JUDGE WENDY B. VITTER** |
| **BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE**<br>*Defendant* | **MAGISTRATE JUDGE JOHNSON** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT NO. 4: ABBY OWENS**

Plaintiffs, through undersigned counsel, respectfully submit this Opposition to Defendant's Motion for Summary Judgment No. 4: Abby Owens ("Motion") (ECF No. 472) filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board"). Several genuine issues of material fact exist for jury determination as to whether Plaintiff Samantha Brennan ("Plaintiff") has sufficient evidence to prove suffering a deprivation of educational opportunity and/or benefits as a result of the Board's unofficial policy of ignoring sexual misconduct at Louisiana State University ("LSU"), and/or the Board's deliberate indifference to the heightened risk created at LSU by John Doe.[1] Further, genuine issues of material fact exist for jury determination as to whether Plaintiff has filed suit timely. Thus, Defendant's Motion should be denied.

## I.  STANDARD OF REVIEW

*See* Opposition No. 1, Sec. I, incorporated herein by reference.

---

[1] John Doe is a pseudonym.

## II.    **RELEVANT FACTS**

### A.  **The Board's mismanagement of sexual misconduct at LSU**

When Plaintiffs filed their Complaint in 2021, they knew from the Husch Blackwell report,[2] and from their own experiences, that Louisiana State University ("LSU") had failed them. However, they did not know how deeply the dysfunction ran.  As they started gathering information through the discovery process in this case, they learned that every system upon which they should have been able to rely to protect them from sexual misconduct, and to respond appropriately should such misconduct occur, was rigged against them because of LSU's years-long pattern of conduct aimed at covering up and ignoring sexual misconduct at LSU.  They learned that LSU had an institutional policy of deliberate indifference to sex discrimination, which created a heightened risk of sex discrimination to each of them, as outlined below.

When the Husch Blackwell report was released in March 2021, LSU leaders—including current and former members of the Board—quickly stepped up to claim ownership of their role in allowing the harms their institution caused to survivors. Interim Title IX Coordinator Jane Cassidy said, "We now know with great clarity that our system to protect one another from sexual harassment and violence has failed…."[3]  Board president Rémy Voisin Starns issued a statement saying, "I…want to apologize to the survivors. Our university did not do right by you. We see that

---

[2] "…[T]he University retained Husch Blackwell to conduct an independent review of various Title IX-related incidents, including the items identified in the story, with the goal of answering at least three broad questions:
1. Whether the University and its employees handled the matters identified by the USA Today article in a manner consistent with obligations under Title IX,3 widely recognized best practices, and University policy;
2. Whether Title IX-related misconduct involving LSU student athletes has been systematically siloed in the University's Athletics Department and not shared with the University's Title IX Office; and
3. Whether the University is appropriately handling Title IX-related matters which are reported to its Title IX Office." PLAINTIFFS_000074.
[3] BOS-000076, BOS-002492.

now, and we are here to tell you that it's not okay."[4] Former Board Member (2010-2020) James

Stephen Perry said:

> …There are clearly departmental, structural, training, funding and prioritization failures and issues…. I was also shocked to read about horrific actions of other student-athletes in the years that followed as well as other failures to protect students at the University. There can be no question that LSU failed in its duties and that there were structural, communication, chain of command and individual performance failures….
>
> [M]any violations and threats against women students both inside of and outside of the Athletics Department never even reached the Title IX office. That is incomprehensible….[5]

Interim President Tom Galligan admitted, "[T]here was no culture of punishment at LSU. There

was no notice at the time as to what would happen. The policies were very unclear. There were

directions within departments to report title IX issues to places they should not have been

reported."[6] He went on:

> The most serious misstep. And this is noted in the Husch Blackwell report, is failing to report by employees when they didn't understand they were responsible or they didn't comply with the regulation. That's the most serious misstep. Another misstep is failure to keep students properly apprised of the process and what's going on, which is perceived as delay or inaction."[7]

Galligan also said, "…whether through our actions or inactions, our institution betrayed the very

people we are sworn to protect. Our job is to protect our students and support them in their times

of need. It has become clear we haven't always fully lived up to our commitment."[8]

Now, though, at the point when LSU is faced with the possibility of having to make whole

those who suffered due to its failures, the Board asks this Court to ignore the overwhelming

evidence of its liability and deny Plaintiffs their day in court. Despite its leaders' stated public

---

[4] BOS-029930.
[5] BOS-000054-000055.
[6] PLAINTIFFS_00001523.
[7] PLAINTIFFS_00001524.
[8] BOS-002491.

promises and admissions of contrition, an excerpt from Plaintiff Corinn Hovis' deposition encapsulates the Board's true position—that survivors are to blame for their own sexual abuse:

> Q. Do you consider yourself at all to bear any of the responsibility for what happened that night?
> A. For being raped?
> Q. Yes.
> A. No.[9]

For the reasons outlined in this and the other Memoranda in Opposition to Defendant's Motions for Summary Judgment filed herewith, this Court must deny the Board's unsupported motions and permit Plaintiffs' claims to go to the jury convened for the trial of this case.

### 1. LSU ignored Louisiana law on sexual misconduct reporting.

In 2015, the Louisiana Legislature enacted the Campus Accountability and Safety Act ("Act 172"), which required educational institutions and their local law enforcement agencies to enter into memoranda of understanding to ensure they were communicating with each other about information related to sexual misconduct on campus.[10] Until 2021, LSU and the LSU Police Department ("LSUPD") failed to comply with Act 172 and enter into this mandatory memorandum.[11] Despite years of knowing about this failure, LSU did nothing to bring LSUPD into compliance with the law.[12] Somehow, LSU Senior Associate Athletics Director, Miriam Segar, a central figure in many of the events at issue in this litigation, wrongly believed that the memorandum was being enforced and that LSUPD was reporting sexual misconduct to the Title IX office.[13] But Plaintiffs have seen no evidence that she took any action to confirm that was the case or to ensure LSU's compliance with Act 172.

---

[9] Hovis Dep. 151:11-16.
[10] PLAINTIFFS_000092.
[11] PLAINTIFFS_000093; BOS-029859; Stewart Dep. 107.
[12] Stewart Dep. 109; 30b6 I Dep. 116-17.
[13] Segar Dep. 244.

### 2. *LSU ignored its Title IX Coordinator and underfunded its Title IX office.*

Prior to 2014, LSU did not have a Title IX reporting program.[14] In 2014, for the first time ever, LSU rolled out a newly minted Title IX Policy, PM-73, and named a Title IX Coordinator, a requirement under federal law since at least 2001.[15] Initially, one of two attorneys in LSU's general counsel's office, Jim Marchand, was named to the role, despite the fact that an attorney for a University also serving as Title IX Coordinator created a known conflict of interest.[16] Thereafter, in 2016, Jennie Stewart was appointed as Marchand's successor as Title IX Coordinator; she was the first person to hold the role on a full-time basis.[17] However, even after Stewart became Title IX Coordinator, she continued to be supervised by the University's General Counsel's office, under the title of "staff attorney."[18]

In her role as Title IX Coordinator, Stewart repeatedly raised concerns about LSU's failure to comply with Act 172 to LSU General Counsel Tom Skinner and the LSUPD Chief, but she was consistently ignored.[19] In 2016, Stewart gave a comprehensive presentation to Skinner and Dan Layzell, LSU's Vice President of Finance and Administration, outlining how she believed LSU needed to restructure its Title IX office and response program.[20] President F. King Alexander was also supposed to attend the presentation, but backed out the last minute.[21] Stewart's presentation identified a need for approximately seven to eight additional staff members in order for her office to function properly.[22] Rather than hiring full time investigators, however, LSU sent an email to

---

[14] Segar Dep. 185, 228.
[15] Stewart 20; 34 C.F.R. § 106.8(a); "The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations." U.S. Dept. of Ed., *Revised Sexual Harassment Guidance* at 34 EN 75 (2001).
[16] PLAINTIFFS_000083; Stewart 21; PLAINTIFFS_00002109.
[17] Stewart Dep. 21-22, 31.
[18] BOS-031795.
[19] Stewart Dep. 108-109.
[20] Stewart Dep. 63-66; PLAINTIFFS_000117-000118; PLAINTIFFS_000305-000316.
[21] Stewart Dep. 64.
[22] PLAINTIFFS_000118.

staff in November 2016 encouraging employees to volunteer to become investigators, on top of their current roles and responsibilities.[23] Only one of the necessary positions Stewart had requested was ever filled—almost a year and a half later, in 2018.[24] Jeffrey Scott, the lone hire, was tasked with "being the only investigator responsible for nine campuses and probably 50,000 individuals," from March 2018 to May 2021.[25] Instead of giving Stewart the additional staff and support she requested, LSU began giving her more titles and roles to fill, further diminishing her ability to serve as an effective Title IX Coordinator.[26] In 2019, an internal committee found that it was inappropriate for Stewart to be responsible for so many divergent roles.[27] LSU ignored the recommendation.[28] This situation continued until 2021, when Husch Blackwell found:

> …[I]t is hard to see how someone could be successful with all of these roles (Title IX, Clery [Act], and the ADA) even with a large complement of support staff. On that score, though, the Title IX Office is comprised of Stewart, Scott, and one graduate assistant. The Title IX Office does not even have a designated administrative support person.[29]

Because the Title IX office was so under resourced, there was no process for oversight of the investigation process throughout Stewart's entire five-year tenure as Title IX Coordinator.[30]

In 2016, Stewart became aware that the LSU Athletics Department ("Athletics") was performing trainings that provided its employees with information about Title IX-related topics via an outside consulting firm, the Beebe Group ("the Beebe training").[31] This training was not recognized as a Title IX training by LSU Human Resources or the Title IX office, and its training

---

[23] BOS-032663.
[24] PLAINTIFFS_000118.
[25] Scott Dep. 14:11-13, 15.
[26] Stewart Dep. 31-35; PLAINTIFFS_000086.
[27] Stewart Dep. 104-105.
[28] Stewart Dep. 105.
[29] PLAINTIFFS_000086.
[30] Stewart Dep. 101-103.
[31] Stewart Dep. 48- 49, 56.

materials did not reference the Title IX Coordinator.[32]  Stewart had concerns about the content of the Beebe training, including but not limited to the fact that it did not clearly explain employee reporting obligations.[33] Stewart provided her feedback to Athletics in 2016 and was advised that the information provided on reporting was going to be updated and clarified.[34] However, training materials do not indicate that any changes were made until 2020, and those changes were minimal.[35]

In 2020, Stewart learned that Athletics had never actually made the changes she recommended to the Beebe Group concerning these trainings and was still advising employees to report to Miriam Segar within Athletics, rather than the Title IX office as specified in the PM-73, which she raised with her supervisor, Winston DeCuir, Jr., LSU's General Counsel.[36]  DeCuir refused to direct Athletics to comply with the PM-73.[37]

Stewart repeatedly expressed frustration at being ignored and undermined, at one point sharing concerns of potential sex discrimination by DeCuir.[38] And then, somehow, despite all her efforts, Stewart received an "unsuccessful" rating in her performance review—a review conducted by DeCuir himself; two Athletics directors, Verge Ausberry and Miriam Segar, who were suspended for their Title IX-related failures, did not receive unsuccessful ratings in their performance reviews.[39]

---

[32] BOS-030264; Sharon Lewis II Dep. 500.
[33] Stewart Dep.  49-51.
[34] Stewart Dep. 50-51, 56-57.
[35] See BOS-027330, BOS-027356, BOS-027360, BOS-027278, BOS-027409.
[36] Stewart Dep. 58-60.
[37] Stewart Dep. 58-60.
[38] Stewart192, Stewart375, Stewart417.
[39] 30b6 I Dep. 158-160.

### 3. *LSU ignored known problems with sexual misconduct response in Athletics.*

From at least 2013, LSU Athletics ran its program unmoored from the conventional institutional oversight and safeguards that one might find at other institutions. That year, two separate students came forward with allegations that Les Miles, LSU's celebrated former football coach, had sexually harassed and retaliated against them.[40]  Miles is also reported to have sexually harassed Assistant Athletic Director of Football Recruiting and Alumni Relations, Sharon Lewis.[41] LSU, through its attorneys at Baton Rouge law firm Taylor Porter, ensured the complaints were buried.[42]  Even Miriam Segar thought things went too far: "I was very concerned that our staff in football brought the young woman, who allegedly told them I'm uncomfortable, to sit down with Les Miles. I thought that was very poor judgment. I thought it was reckless."[43] And when Athletics Director Joe Alleva finally fired Miles in 2016, it was not for sexual misconduct, but because he started the football season with a 2-2 record; Alleva celebrated Miles, saying had done a "tremendous job" and was a "great ambassador for our University."[44] Concerning these matters, Husch Blackwell wrote, "It is difficult to meaningfully determine the full extent of the impact [Miles' sexual harassment] and the University's handling of it had on the climate within the Athletics Department—both in terms of creating a culture which tolerated sexual misconduct and dissuaded employees from reporting that misconduct."[45]

---

[40] PLAINTIFFS_000123; Sharon Lewis II Dep. 468-471.
[41] Sharon Lewis II Dep. 459-62.
[42] PLAINTIFFS_000122-125; BOS-029864-96; *Lewis v. Bd. of Supervisors of La. State Univ.*, No. 21-198-SM-RLB at 15 (M.D. La. Mar. 14, 2023): "Plaintiff has provided evidence establishing, on a *prima facie* basis, the Board intentionally concealed the [Les Miles] Memo to File, Student Complaint Memo, and Attachments beginning on May 15, 2013, at Taylor Porter's law offices."
[43] Segar Dep. 94:12-16.
[44] PLAINTIFFS_000127.
[45] PLAINTIFFS_000127.

In September 2014, former LSU Human Resources Director A.G. Monaco was tasked with rolling out LSU's newly minted Title IX Policy, PM-73.[46] Monaco reached out to Athletics Director Joe Alleva twice to schedule a meeting to go over the new policy.[47] But Alleva ignored Monaco and sent Segar to meet with Monaco instead.[48]

In 2016, the LSU President's Cabinet held a meeting about concerns that sexual misconduct was not being properly reported to the Title IX office by Athletics.[49] At that meeting, Alleva was directed to ensure that employees in Athletics made reports directly to Jennie Stewart, as Title IX Coordinator.[50] Regardless, Alleva soon after sent an email to the entire Athletics department instructing them to go to Segar or Human Resources representative Wendy Nall with any reports of sexual misconduct, in violation of the requirements outlined in LSU's Title IX policy.[51] Despite the clear instructions from the meeting with the President's Cabinet and the plain text of the PM-73, Alleva claimed he believed "that was totally within the realm of acceptable procedure at the time."[52] Alleva testified at his deposition that he was under this impression because of information he received from an attorney at Taylor Porter.[53] In other words, despite the PM-73's instruction to consult with LSU's Title IX Coordinator concerning such matters, Alleva was still going to Taylor Porter for Title IX advice, rather than the Title IX Coordinator.[54]

Alleva, who had no Title IX training himself, put Segar in the role of accepting Title IX reports for Athletics, without knowing what Title IX training she had, if any.[55] Segar, meanwhile,

---

[46] BOS-031972; *see generally* PLAINTIFFS_000225-000235.
[47] BOS-031972
[48] BOS-031972
[49] Stewart Dep. 54-55.
[50] Stewart Dep. 55-56.
[51] PLAINTIFFS_000268-000271.
[52] Alleva Dep. 59:1-19.
[53] Alleva Dep. 60.
[54] Alleva Dep. 31.
[55] Alleva Dep. 17.

knowingly withheld the identities of student-athlete perpetrators from her reports of sexual misconduct to the Title IX office.[56]  Two years later, in 2018, Alleva sent another memorandum to LSU's head coaches, again directing them to report sexual misconduct to Segar.[57]  Sharon Lewis, LSU's Assistant Athletic Director of Football Recruiting and Alumni Relations, was instructed to make all reports to Segar and did not even know the University had a Title IX Coordinator.[58]  Even Title IX staff knew Athletics had its own Title IX reporting policy.[59]  They also knew Athletics' practice of referring reports to Segar was a violation of the PM-73.[60]

### 4. LSU failed to ensure its employees were properly trained.

LSU did not implement mandatory Title IX training for employees until 2015.[61] After training was implemented, LSU paid no attention to the content of the trainings, whether employees actually completed the trainings, or what employees were told would happen if they did not attend.[62] Further, until 2021, there was no process for ensuring that employees were actually paying attention to the trainings via quizzes and check-ins.[63] The Board does not know how many employees completed the "mandatory" training prior to 2021.[64] Through April 2023, there was no policy regarding compliance with mandatory training and no one designated to monitor or remedy failure to complete the required training; LSU had no idea if there was any consequence for employees who did not take it.[65]

---

[56] Segar Dep. 270-272.
[57] BOS-002297-002299.
[58] Sharon Lewis II Dep. 433-436, 457-458, 507, 509.
[59] Scott Dep. 30.
[60] Scott Dep. 100-101.
[61] 30b6 I Dep. 134.
[62] 30b6 I Dep. 138.
[63] 30b6 I Dep. 140-142.
[64] 30b6 I Dep. 143.
[65] 30b6 I Dep. 145.

In fact, many high-level LSU athletics employees did not take the training: Alleva only took it one year;[66] Ausberry[67] did not take it at all from around 2016 to 2020; Segar missed at least one year;[68] Sharon Lewis did not take it at all until 2020;[69] tennis coach Julia Sell did not take it from 2016 to at least 2020;[70] and tennis coach Mike Sell did not take it at all until 2020 or 2021.[71] None of these employees received discipline or even a warning for their failure to complete the "mandatory" training.[72] Without some means of ensuring meaningful participation in the program by stakeholders, the training was rendered effectively useless.

   5. ***LSU ignored the information it collected about problems in its Title IX and sexual misconduct response program.***

In 2011, and again in 2014, before even becoming Title IX Coordinator, Jennie Stewart and her colleagues raised concerns about LSU's Title IX issues, including but not limited to employees' confusion about reporting duties and lack of clarity on reporting procedures.[73] In 2016, Interim President Tom Galligan convened task forces at each campus to review Title IX response, policies, and procedures.[74] The "PM-73 and Related Policies Workgroup" issued a report outlining 17 recommendations based on its findings, which included that LSU's Title IX policies were confusing; that LSU employees did not understand their reporting obligations; that LSU was in violation of Louisiana's Act 172; and that the Title IX Coordinator reporting to the General

---

[66] 30b6 I Dep. 83.
[67] 30b6 I Dep. 84-86.
[68] 30b6 I Dep. 86-87.
[69] 30b6 I Dep. 87.
[70] 30b6 I Dep. 88.
[71] 30b6 I Dep. 88.
[72] 30b6 I Dep. 138-145.
[73] Stewart Dep. 19-21, 84-85.
[74] PLAINTIFFS_000113-000114; PLAINTIFFS_000275.

Counsel's office created a potential conflict.[75] LSU ignored the report and recommendations, which "went nowhere."[76]

Sometime between 2015 and 2017, LSU initiated an audit of Athletics to evaluate its Title IX performance, but Athletics Director Joe Alleva does not know what was reviewed.[77] The final report from the audit was never provided to Husch Blackwell or produced in discovery in this case, and no evidence was provided to Plaintiffs to demonstrate that the results of the audit were reviewed or implemented.[78]

In 2017, LSU's Office of Internal Audit also conducted a review of LSU's sexual misconduct reporting and response program and issued a report on its findings.[79] The report noted that Title IX policy violations were not being properly documented; individuals going through the investigation process were not being properly notified of the initiation or outcome of the investigation; that employees did not understand their reporting obligations; and that LSU's policies and procedures were conflicting, confusing, and not in compliance with federal requirements.[80] Husch Blackwell found no information indicating what LSU did to review or implement the report's recommendations and none was provided to Plaintiffs.[81]

In 2018, Vice President of Student Affairs Kurt Kepler convened a committee "to review information pertaining to Student Risk Assessment related to Sexual Misconduct and provide…an overview of specific risks, current mitigating strategies, assessment of current strategies, and recommendations to improve our mitigating strategies."[82] The committee issued a report finding

---

[75] PLAINTIFFS_000114-000117; PLAINTIFFS_000277-000303.
[76] PLAINTIFFS_000117.
[77] Alleva Dep. 13; PLAINTIFFS_000112.
[78] PLAINTIFFS_000112; *see generally* PLAINTIFFS_000104-000106.
[79] PLAINTIFFS_000119; PLAINTIFFS_000237-000244.
[80] PLAINTIFFS_000119; PLAINTIFFS_000237-000244.
[81] PLAINTIFFS_000119.
[82] BOS-032523.

numerous deficiencies including that new employees were not being provided Title IX training; that LSU was not maintaining necessary evidence for Title IX investigations; and that the "LSU app" did not include any information on sexual misconduct or Title IX.[83] To Plaintiffs' knowledge, no actions were taken in response to this report.

Also in 2018, LSU hired consulting firm Baker Tilly to conduct an "Athletics Risk Assessment," which found that one of the top risks in athletics was "Title IX" and "Failure to Report an Incident of Concern."[84] Husch Blackwell found no information indicating what LSU did to address these concerns and nothing was produced in discovery to Plaintiffs indicating yet again that the Board ignored the recommendations of the experts it hired.[85]

In 2019, the Board itself hired law firm Morgan, Lewis & Bockius LLP to "conduct a privileged and confidential review of LSU's Title IX policies and practices as they apply to LSU's Athletics Department on its A&M-Baton Rouge Campus."[86] Despite its "overly optimistic picture of the state of the University's Title IX compliance efforts,"[87] Morgan Lewis still identified concerns including, yet again, employee confusion about their reporting obligations.[88] Husch Blackwell found no information indicating what LSU did to address these concerns; further, the report was never shared with the Title IX Office or Athletics.[89]

In summary, there is ample evidence supporting the conclusion that "LSU failed to meet industry standards and practice in connection with Title IX compliance and its own PM-73 policy as to each of the Plaintiffs,"[90] and summary judgment is inappropriate on that basis alone.

---

[83] BOS-032524.
[84] PLAINTIFFS_000119.
[85] PLAINTIFFS_000119.
[86] PLAINTIFFS_000119.
[87] PLAINTIFFS_000120.
[88] PLAINTIFFS_000120-000121.
[89] PLAINTIFFS_000119.
[90] PLAINTIFFS_00002048.

**B.  Plaintiff's experiences at LSU.**

*See* Opposition No. 1, Sec. II.B. and Opposition No. 2, Sec. II.B., incorporated herein by reference.

Owens began her education at LSU as a freshman in the fall of 2013.[91] She was recruited by Julia Sell and given a "full ride" to play for LSU's tennis team.[92] John Doe was a highly recruited athlete who played on the LSU football team as a running back from 2015 to 2018.[93] Plaintiff had known of John Doe as a popular football player, but Owens first met Doe at a Tigerland[94] bar called J.L.'s on the night of June 28, 2016.[95] When Owens arrived at J.L.'s, she was already intoxicated, and Doe bought Owens even more drinks.[96] After plying Plaintiff with shot of liquor, and with full knowledge that she was too intoxicated to consent, Doe raped Plaintiff.[97]

As a result of the assault, Plaintiff's alcohol and substance addiction worsened. In April 2017, Plaintiff was intoxicated at a tennis game, and LSU required that she submit to a rehabilitation clinic before she returned to the tennis team.[98] While in treatment, Plaintiff disclosed John Doe's rape for the first time.[99] The rehab center reported the rape to LSU and to Plaintiff's father.[100]

In the summer of 2017, Plaintiff was considering whether to return to LSU, her father told her he had talked to Coach Julia Sell about the rape, and Sell had denied that Plaintiff could have

---

[91] Owens Dep. 13.
[92] Owens Dep. 13:14-15.
[93] PLAINTIFFS_000167.
[94] *See* Opposition No. 10, Sec. III.A.2., incorporated herein by reference, for a more thorough description of Tigerland.
[95] Owens Dep. 24-25, 42-44.
[96] Owens Dep. 44.
[97] Owens Dep. 40.
[98] Owens Dep. 19-20, 27.
[99] Owens Dep. 40:12-18.
[100] Owens Dep. 86.

been raped.[101] Once Plaintiff learned of Julia Sell's dismissiveness of her rape, she realized she could not return to LSU because she had no support from her coach and she did not want to be around Doe or "in the place where all of [her] traumas happened."[102] Owens was forced to give up her scholarship and transfer out of LSU.[103]

It turned out that Owens was just one of several female students Doe sexually assaulted.[104] Despite having actual knowledge of Doe's assault, and at least one other assault committed by Doe, LSU failed to initiate any Title IX investigation into his assault of Owens.[105] Further, despite having actual knowledge of Doe's rape of Plaintiff from her father Dan's report to Julia Sell and the treatment center's report to the athletics administration, LSU failed to create a Title IX report documenting the rape.[106] LSU made "zero effort" to follow up with Plaintiff on the multiple reports it received about her assault.[107]  LSU never offered Plaintiff any supportive services or told her "what [her] options were and what [her] resources were."[108] In fact, Plaintiff did not even know "Title IX was a thing" until years after her assault when she was advised by a reporter to request a copy of her Title IX report.[109]

---

[101] Owens Dep. 89, 127; Declaration of Dan Owens; Segar Dep. 391:14-392:13: "Q: What is she referring to, Owen's [sic] father disclosing to Juli[a]? What did you understand she was referring to? A: When Abigail Owens' father talked with Coach Julia Sell at the SEC women's tennis tournament in 2017. Q: What was your understanding of what he told Julia Sell? A: What was shared with me by Julia was that the father told her that, well, had thanked her for her help with Abby and then at some point in the conversation said that he had learned that Abby had been assaulted by a football player. Q: Did Julia give you the name of that football player? The father did not disclose the name to Julia and Julia didn't have a name to give to me. Q: When did Julia make this report to you? A: She called me. I don't know if it was the same night or the day after but in the timeframe that it was reported to her."
[102] Owens Dep. 89:20-23.
[103] Owens Dep. 89.
[104] *See*, *e.g.*, Mize 62-63, Mize 67-68, 71.
[105] PLAINTIFFS_000169; Mize 129-30.
[106] Owens Dep. 200, 205 (Plaintiff was told by Title IX Coordinator Jennie Stewart that "there is no [Title IX] report.").
[107] Owens Dep. 208.
[108] Owens Dep. 213:3-18.
[109] Owens Dep. 200:1-5, 15-18; 208:22-23; 213:3-18 (the reporter told Plaintiff "there should have been a Title IX report filed" and what a mandatory reporter was.).

### III.    LAW AND ARGUMENT

*See* Opposition No. 1, Sec. III, incorporated herein by reference.

**A.  Perpetrator-based Heightened Risk Claim**

*See* Opposition No. 2, Sec. III.A., incorporated herein by reference.

LSU is liable for violating Title IX by created a heightened risk of sexual misconduct by responding with deliberate indifference to sexual misconduct by a particular perpetrator by failing to appropriately address multiple sexual assaults perpetrated by John Doe. Because competent summary evidence establishes each element of Plaintiff Owens' claim under a Perpetrator-based Heightened Risk theory, material questions of fact remain for determination by the jury, and summary judgment is therefore inappropriate on these claims.

> **1.    A genuine issue of material fact exists as to whether the Board had actual knowledge that a substantial risk of sexual abuse would occur.**

*See* Objection No. 2, Sec. III.A.1., incorporated herein by reference.

> **2.    A genuine issue of material fact exists as to whether Plaintiff's harasser was under LSU's control.**

*See* Opposition No. 2, Sec. III.A.2., incorporated herein by reference.

There is a genuine dispute of fact over whether LSU could "exercise substantial control over both the perpetrator of the dating violence [John Doe] and the context in which the known" assault(s) occurred.[110] These questions of fact cannot be determined at summary judgment, but rather must be reserved for the jury following trial on the merits.

First, LSU plainly had sufficient control to remove John Doe from campus, as demonstrated by its Title IX and student conduct policies.[111]  This is evidence that the University

---

[110] *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).
[111] *See* PLAINTIFFS_000225- 000235,  PLAINTIFFS_000357-000370, and BOS-033947-BOS-033970.

did, in fact, exercise substantial control over Mr. Doe. Likewise, as the University's Title IX Coordinator admitted, the University had the authority to issue "No Contact Orders" and other discipline and could have used those orders to address the violence perpetrated by John Doe on and off campus, further suggesting that LSU had the ability to exercise control over the circumstances in which the assaults occurred.[112]

LSU also had control over the context in which Plaintiff and John Doe interacted, which is not merely restricted to location, but also includes broader school environment and whether the school brought the parties together.[113] Plaintiff moved to Baton Rouge to attend LSU with a full scholarship to play on LSU's tennis team.[114] Before she met John Doe, Plaintiff knew of him generally as a popular LSU football player, but she first met him in person at a popular LSU bar.[115] Thus, LSU created the context of University life in which Plaintiff and John Doe met, similar to the *Chen v. Albany Unified School District* and *Hurley* cases, and a reasonable juror could easily determine that the Board had control sufficient to create liability under Title IX.

### 3. A genuine issue of material fact exists as to Plaintiff's harassment was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to an educational opportunity or benefit.

*See* Opposition No. 1, Sec. III.C.4., incorporated herein by reference.

---

[112] Stewart Dep. 192.
[113] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1173 (10th Cir. 2007); *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 721-722 (9th Cir. 2022); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 687-89 (4th Cir. 2018); *see also DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX, 2020 WL 10357074 (D. Ariz. Feb. 7, 2020), at *8 (holding University exercised control over context of a perpetrator's off-campus harassment because his "violence against women…not only threatened the safety of [his victims] but threatened the safety of the larger University community").
[114] Owens Dep. 13.
[115] Owens Dep. 42-44.

A university is liable for damages under Title IX if it "subjects" a student, or makes a student "vulnerable to," harassment that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[116]

After plying Plaintiff with alcohol, and with full knowledge that she was too intoxicated to consent, Doe raped Plaintiff.[117] Not only was Doe's conduct in raping Doe severe and objectively offensive, but it was also not an isolated occurrence. Doe had already raped at least one other student that semester.[118]

The abuse profoundly interfered with Plaintiff's education and her access to related opportunities and benefits. After the rape, Plaintiff's alcohol and substance addiction worsened to the point where she had to check into rehabilitation.[119] In or around the summer of 2017, Plaintiff made the difficult decision to leave LSU because she did not want to be around Doe or "in the place where all of [her] traumas happened."[120] Plaintiff transferred to a different school but, in doing so, lost approximately thirty credit hours, which significantly delayed her graduation.[121]

LSU argues that because Plaintiff had trauma and mental health concerns prior to her experiences at LSU, LSU cannot be held responsible for harms caused to her.[122]  However, the eggshell skull or eggshell plaintiff rule is a widely accepted doctrine.[123]  Under this doctrine, a defendant is liable for all injuries caused by his tortious conduct, even if the plaintiff suffers an unusually high level of damage due to a pre-existing vulnerability. The rule is supported by the axiom that a defendant must take a plaintiff as he finds him. "If a tortfeasor inflicts a graver loss

---

[116] *Davis*, 526 U.S. at 633.
[117] Owens Dep. 47, 53.
[118] Mize Dep. 62-63, 67-68, 71.
[119] Owens Dep. 19-20, 27.
[120] Owens Dep. 89:9-22, 229:5-6: ("I left because it was an unsafe environment for me.").
[121] Owens Dep. 173.
[122] *See* Motion No. 4 at 3.
[123] William L. Prosser, W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, *Prosser and Keeton on Torts*, § 43 at 292 (5th ed. 1984).

on his victim than one would have expected because the victim had some pre-existing vulnerability, that is the tortfeasor's bad luck; you take your victim as you find him. That is the famous 'eggshell skull' rule of tort law…."[124]

In *Doe v. ABC School*, the Louisiana Court of Appeals held that a defendant in a personal injury case must compensate the victim for the full extent of their injuries, regardless of whether the defendant's conduct aggravates a preexisting condition.[125] In *Schwartzberg v. Guillory*, the court offered a framework to determine when a defendant is liable and for what in personal injury cases.[126] The plaintiff bears the burden of proving a causal link between the incident at issue and the injury sustained as well as the victim's current status.[127] The test for determining if the plaintiff proved, through medical and other testimony, that it is more probable than not that his injuries were caused by the accident.[128] Causation is "not necessarily contingent on the substance of expert medical testimony."[129] Expert medical testimony is only required when the conclusion regarding medical causation is not common knowledge.[130] A defendant takes his victim as he finds him and is responsible for all consequences of his tortious conduct, even when the conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for all aggravations.[131] Here, not

---

[124] *Schmude v. Tricam Industries, Inc*., 556 F.3d 624, 628, 2009 WL 367210 (7th Cir. 2009).
[125] *Doe v. ABC Sch.*, 316 So. 3d 1086 (La. Ct. App. 2020) (citing *Schwartzberg v. Guillory*, 2016-0753 (La. App. 1st Cir. 2/17/17, 213 So. 3d 1266, 1270)).
[126] *Id.* at **3, 1270.
[127] *Id.*
[128] *Id*. (citing *Bennett v. La. Farm Bureau Cas. Ins. Co.*, 43,216 (La. App. 2nd Cir. 4/30/08, 983 So. 2d 966, 972)).
[129] *Id.* at **4, 1270-71.
[130] *Id.* at **4, 1271 (citing to *Newsome v. New Orleans Saints*, 2008-311 (La. App. 5 Cir. 10/14/08, 996 So. 2d 637, 640)).
[131] *Id.* at **4, 1270 (citing to *Robinson v. Tolbert*, 40,488 (La. App. 2nd Cir. 1/20/06, 9820 So. 2d 346, 348)). The Fifth Circuit has extended the eggshell skull rule to apply in §1983 excessive force cases. In *Darden v. City of Fort Worth, Tex.*, 800 F.3d 722, 728 (2018), the Fifth Circuit held that the plaintiff's preexisting medical conditions increased the risk of death during a struggle. The medical expert concluded that the excessive use of force was the direct and only cause of the plaintiff's death. Even though the plaintiff had preexisting medical conditions, the defendants are still liable for the aggravated results. In *Hall v. Bennett*, 362 So.3d 1090, 1086 (2023) (citing *Housley v. Cerise*, 597 So. 2d 71 (La. Ct. App. 1992), *Davis v. Wheeler*, 53,233 (La. App. 2 Cir. 3/4/20), 293 So. 3d 1124), the Fifth Circuit determined if before the accident there was a preexisting condition and those symptoms continue to

only did Plaintiff have a pre-existing condition that was exacerbated by actions and inactions attributable to LSU, but that pre-existing condition also made her even more vulnerable to abuse, both by her perpetrator and by her school.

Therefore, a reasonable jury could find that the harassment Plaintiff suffered was so severe, pervasive, and offensive that it prevented her from accessing educational opportunities and benefits and, accordingly, summary judgment is inappropriate here.

### 4. A genuine issue of material fact exists as to whether the Board was deliberately indifferent to the harassment.

*See* Opposition No. 2, Sec. III.A.4., incorporated herein by reference.

Title IX required LSU to "adequately . . . respond" whenever it had "actual knowledge" of sex-based abuses.[132]  LSU knew Doe had raped another female student in January—Plaintiff Robertson—but LSU did nothing, and Segar did not put his name in her report to the Title IX office, which the Husch Blackwell report identified as an error and which allowed him to then go on and rape Plaintiff a few months later.[133]

Despite its obligations to do so, LSU failed to adequately respond to Plaintiff's reported rape. Despite having actual knowledge of Doe's rape of Plaintiff from her father's report to Julia Sell,[134] in addition to the treatment center's report to the athletics administration,[135] the University failed to create a Title IX report documenting the rape.[136] LSU made "zero effort" to follow up

---

manifest themselves after the accident, the plaintiff is entitled to full damages with medical evidence to show "a reasonable possibility of causal connection between the accident and the disabling condition."  Additionally, "a defendant takes his victim as he finds her and is responsible for all natural and probable consequences of his tortious conduct." *Id.*, citing *Wainwright v. Fontenot*, 774 So. 2d 70 (La. 2000); *Davis v. Wheeler, supra*.

[132] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288-90 (1998).
[133] PLAINTIFFS_000168-000171.
[134] Declaration of Dan Owens.
[135] PLAINTIFFS_000172.
[136] Owens Dep. 200, 205 (Plaintiff was told by Title IX Coordinator Jennie Stewart that "there is no [Title IX] report.").

with Plaintiff on the multiple reports it received about her assault.[137] LSU never offered Plaintiff

any supportive services or told her "what [her] options were and what [her] resources were."[138] In

fact, Plaintiff did not even know "Title IX was a thing" until years after her assault when she was

advised by a reporter to request a copy of her Title IX report.[139]

A reasonable juror could find that the University's failure to properly respond to Plaintiff

and prior victim's reports of rape by the same perpetrator amounted to deliberate indifference and,

thus, that the University is liable for failing to meet its Title IX obligations.[140] Therefore, summary

judgment is inappropriate, and the Board's Motion should be denied.

### B. Policy-based Heightened Risk Claim

*See* Opposition No. 1, Sec. III.D, incorporated herein by reference.

> ### 1. *A genuine issue of material fact exists as to whether the Board maintained a policy of deliberate indifference to reports of sexual misconduct.*

*See* Opposition No. 1, Sec. III.D.1., incorporated herein by reference.

Despite multiple reports to LSU employees, no Title IX report was ever created

documenting Plaintiff's assault.[141] No one from LSU ever followed up with Plaintiff or anyone at

the treatment center where she first reported the assault to gather the necessary information to

create a report.[142] LSU never offered Plaintiff any supportive measures.[143] Plaintiffs have been

provided no evidence that LSU investigated the rape or disciplined Doe.

---

[137] Owens Dep. 208:18-21.

[138] Owens Dep. 213:3-18.

[139] Owens Dep. 200:1-5, 15-18; 208:22-23; 213:3-18 (the reporter told Plaintiff "there should have been a Title IX report filed" and what a mandatory reporter was.).

[140] *Murrell v. School Dist. No 1*, 186 F.3d 1238, 1248 (10th Cir. 1999); *see also Davis*, 526 U.S. at 654.

[141] Owens Dep. 205:6. ("[Title IX Coordinator Jennie Stewart] ... said[] ... there is no [Title IX] report...").

[142] Owens Dep. 208.

[143] Owens Dep. 213.

**2. *A genuine issue of material fact exists as to whether the Board's policy of deliberate indifference created a heightened risk of sexual harassment that was known or obvious.***

*See* Opposition No. 1, Sec. III.D.2., incorporated herein by reference.

**3. *A genuine issue of material fact exists as to whether this occurred in a context subject to the Board's control.***

*See* Section III.A.2. above, incorporated herein by reference.

**4. *A genuine issue of material fact exists as to whether, as a result, Plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived her of access to the educational opportunities or benefits provided by LSU.***

*See* Opposition No. 6, Sec. III.B.3., incorporated herein by reference.

Due to the Board and its employees' failure to protect Plaintiff, she suffered significant harm. Plaintiff had to take time off from school to check into a rehabilitation program due to how severe her addiction became.[144] She ultimately left LSU because she did not want to be around Doe or "in the place where all of [her] traumas happened."[145] Plaintiff eventually graduated from a different school, but her graduation date was significantly delayed because she lost approximately thirty credit hours due to the transfer.[146]

**C. A genuine issue of material fact exists as to whether Plaintiff's claims were timely filed.**

*See* Opposition No. 1, Sec. III.B., incorporated herein by reference.

---

[144] Owens Dep. 229-230.
[145] Owens Dep. 89:9-22, 229:5-6: ("I left because it was an unsafe environment for me.").
[146] Owens Dep. 173.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment No. 4, as it relates to Abby Owens.

Respectfully Submitted

*/s/ Catherine E. Lasky*

| | |
|---|---|
| Karen Truszkowski | Catherine E. Lasky (La. Bar 28652) |
| *Pro Hac Vice* | Endya L. Hash (La. Bar 38260) |
| Temperance Legal Group | Katie Lasky Law |
| 503 Mall Court #131 | 619 Homedale Street |
| Lansing, Michigan 48912 | New Orleans, Louisiana 70124 |
| P: (844) 534-2560 | P: (504) 584-7336 |
| F: (800) 531-6527 | F: (504) 375-2221 |
| karen@temperancelegalgroup.com | katie@katielaskylaw.com |
| | endya@katielaskylaw.com |

Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour