**HUSCH BLACKWELL**

# Louisiana State University Title IX Review

March 3, 2021

PLAINTIFFS_000074

# TABLE OF CONTENTS

I.      Background ................................................................................................................ 4

II.     Summary of Institutional Policies and Personnel ................................................ 6
        A.      LSU's Title IX Policy and Office Structure ............................................... 7
        B.      Student Advocacy and Accountability........................................................ 13
        C.      The Lighthouse Program............................................................................. 15
        D.      Human Resource Management ................................................................... 15
        E.      LSU Police Department .............................................................................. 15

III.    Summary of LSU Employee Reporting Policies ................................................... 18
        A.      Applicable Guidance.................................................................................. 18
        B.      LSU Employee Reporting Policies ............................................................ 21
        C.      Employee Title IX Training........................................................................ 23

IV.     Internal and External Risk Management Assessments Relating to Title IX.................... 36
        A.      Communications from Community Members ...................................... 37
        B.      2016-17 Dan Beebe Group Assessment ................................................... 37
        C.      Presidential Task Force............................................................................. 38
        D.      Presentation by Title IX Coordinator........................................................ 42
        E.      2017 Internal Audit Report ....................................................................... 44
        F.      2018 Baker Tilly Athletics Risk Assessment............................................ 44
        G.      2019 Morgan Lewis Review....................................................................... 44
        H.      March 2, 2021 NASA Review ................................................................... 46

V.      Tone at the Top in Athletics........................................................................................ 47

VI.     Summary of Files Connected to USA Today Article ............................................ 53
        A.      ███████████████ ................................................................. 54
        B.      ███████████████ ................................................................................ 92
        C.      Respondent A.............................................................................................. 101
        D.      Respondent B ............................................................................................. 114
        E.      Respondent C ............................................................................................. 116
        F.      Respondent D............................................................................................. 117
        G.      Respondent E............................................................................................. 119
        H.      Respondent F ............................................................................................. 120
        I.      Respondent G............................................................................................. 124
        J.      Respondent H............................................................................................. 127
        K.      Respondent I .............................................................................................. 129

VII.    Summary of Information from Other Case File Reviews ................................. 131

VIII.   Community Input Summary ........................................................................................ 133

IX.     Recommendations........................................................................................................ 136

i

PLAINTIFFS_000075

President Galligan:

As you know, in November 2020, *USA Today* published an article titled "LSU mishandled sexual misconduct complaints against students, including top athletes"[1] which chronicles a number of incidents where Louisiana State University[2] purportedly mishandled reports of sexual and related misconduct.

In response to this article, the University retained Husch Blackwell to conduct an independent review of various Title IX-related incidents, including the items identified in the story, with the goal of answering at least three broad questions:

1. Whether the University and its employees handled the matters identified by the *USA Today* article in a manner consistent with obligations under Title IX,[3] widely recognized best practices, and University policy;

2. Whether Title IX-related misconduct involving LSU student athletes has been systematically siloed in the University's Athletics Department and not shared with the University's Title IX Office; and

3. Whether the University is appropriately handling Title IX-related matters which are reported to its Title IX Office.

Additionally, to the extent information gleaned over the course of our review uncovered concerns, you asked Husch Blackwell to make recommendations (informed by community input) designed to address those concerns with the overarching goal of meaningfully improving LSU's efforts to prevent and effectively respond to sex-based misconduct and creating a Title IX program that the University community could have confidence in.

Husch Blackwell began its review in late November 2020. We appreciate the cooperation and assistance we have received from various members of the University community to our myriad requests for information. Since being retained, Husch Blackwell has interviewed nearly 50 current and former University employees, students, witnesses, and other University community stakeholders.

---

[1] Kenny Jacoby, *LSU mishandled sexual misconduct complaints against students, including top athletes*, USA TODAY, November 16, 2020, https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against-██████████████other-students/6056388002/. Throughout this report, we refer to this article as the "*USA Today* article."

[2] Throughout this report, we refer to Louisiana State University as "LSU" or the "University." All references to LSU or University are limited to the Baton Rouge campus.

[3] The University requested Husch Blackwell to assess whether the University's handling of Title IX-related matters was consistent with institutional Title IX obligations. The contours of those obligations have evolved over the approximately 50 years since Title IX became law and changed considerably when the Trump Administration promulgated new Title IX regulations which became effective in August 2020. A comprehensive review of the University's compliance with the Clery Act was outside the scope of our review. Nevertheless, Clery Act compliance is a significant piece of any institution's overall federal compliance obligations, and there is considerable overlap between Title IX and Clery compliance. With that as backdrop, we have identified Clery Act compliance concerns throughout this report.

HB: 4848-0171-9519.1

PLAINTIFFS_000076

As part of the review, we also requested and reviewed various policies, documents, and communications, including, but not limited to:

- Policies and procedures relating to Title IX compliance for students and employees, including:
    - o Permanent Memorandum 73 – Title IX and Sexual Misconduct Policy (revised 2014, 2015, 2020)
    - o Policy Statement 73 – Sexual Harassment (last revised 2016)
    - o Policy Statement 95 – Sexual Harassment of Students (last revised April 2016)
    - o Student Code of Conduct (2018)
- Athletics Department staff and student employee policies and procedures
- Title IX training materials for all University employees from 2015 to present
- Organizational charts for University offices with Title IX compliance functions
- Documents and communications relating to Title IX Office staffing and resources
- Personnel files for employees with Title IX responsibilities
- Personnel files for selected employees relating to discipline for violations of the University's Title IX policy
- Documents and information relating to previous Department of Education Office of Civil Rights compliance reviews and resolution agreements from 2015 to present
- Documents, communications, and information relating to reviews of Title IX compliance by internal and external providers
- Reporting forms and other communications and documentation of Title IX complaints
- Current and previous versions of the Student Code of Conduct
- Over 60 Title IX investigation case files from 2015 to present[4]
- Communications between the Title IX Office and parties to investigations
- Meeting agendas and notes from the LSU CARE and Title IX Case Management Teams

Our recommendations are also based, in part, on feedback provided by a diverse group of University stakeholders, including representatives from:

- Title IX Office
- Student Advocacy and Accountability
- Student Government, Department of Safety, "We're Committed" Program
- LSU Care Team
- Athletics Administration
- LSU Police Department
- Office of the District Attorney, 19th Judicial District, East Baton Rouge Parish
- Tigers Against Sexual Assault (TASA)
- The Lighthouse Program
- Sexual Trauma Awareness and Response (STAR)[5]
- Title IX Case Management Team
- Football Operations
- Office of the President
- Office of General Counsel

---

[4] Some of these files were reviewed in detail, others were used to resolve discrete disputed facts, and others were reviewed for a high-level case file review to test the University's compliance with specific aspects of Title IX's investigative and adjudicative requirements and identify any trends or patterns present within the University's Title IX system.

[5] See https://star.ngo/.

2

PLAINTIFFS_000077

- Former University Administrators and Employees
- Current and Former LSU Students & Parents

At your request, we also held several weeks of community outreach sessions during which LSU students and employees had an opportunity to meet individually or in a focus group session with Husch Blackwell representatives. Husch Blackwell conducted over 25 of these sessions during which we were able to hear and benefit from the perspective of many other stakeholders, including survivors, individuals accused of misconduct, employees from a variety of University departments, and a diverse group of students. We are especially grateful for the participation and input of the leadership and members of Tigers Against Sexual Assault ("TASA") and the "We're Committed" committee of the LSU Student Government's Department of Safety whose members participated in several conversations with Husch Blackwell. The University owes a significant debt of gratitude to the many voices who contributed to the recommendations contained in this report. The University also needs the LSU community to rally and assist the school in tackling the challenges identified throughout this review.

This report outlines the results of our review. In preparing this report, we have been guided by your request (and our desire) to honestly relay the facts and to provide a candid assessment of how the University handled what can be exceptionally complicated matters. Regarding the latter, we are mindful that "it is easy to be wise after the event" and we have tried to avoid second-guessing decisions that were reasonable at the time and were made without the benefits of hindsight. With that said, where decisions were unreasonable, unlawful, or not consistent with institutional policy, we have said so throughout this report.

Several notes of caution are warranted. The scope of this review was remarkably broad and required us to discuss incidents that may have taken place several years ago. This presented unique challenges as occasionally interviewees had understandable difficulty recalling specifics from several years ago and documentation may not have been preserved. When such uncertainty exists, we note it in the report.

Additionally, while we conducted numerous interviews, we undoubtedly could have conducted even more. With that said, we have endeavored to meet with all witnesses we believed had information which would materially impact this report and the conclusions reached in this report. We balanced our investigative efforts with the University's understandable sense of urgency to obtain our assessment and begin the arduous work of creating a Title IX program that the University can have confidence.

Regarding the three questions mentioned above, we offer the following summary responses:

1. The University did not handle various items identified in the *USA Today* article in a manner consistent with obligations under Title IX, widely recognized best practices, and/or University policy. The basis for this opinion is explained in Section VI below.

2. Various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator. We are especially concerned about a lack of reporting prior to November 2016 for reasons discussed below. It is worth noting, though,

HB: 4848-0171-9519.1

PLAINTIFFS_000078

that our concerns about reporting are not limited to Athletics. Institutional reporting policy and training have been unclear for years. This is discussed more thoroughly in Section III below.

3. The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates. We have identified concerns that the Office has at times not handled those matters reported to it appropriately. Again, while the *USA Today* article focused primarily on Athletics, we found deficiencies in a variety of different matters. This is discussed in more detail in Section II below.

As noted throughout this report, there was a lack of effective leadership at the University with respect to Title IX. In concluding this, we are mindful of the enormous challenges placed on the University's administration by seemingly incessant budget cuts foisted upon it over the years. While expectations for higher education have increased over the last 20 years in fairly remarkable ways (especially around compliance), resources have certainly not kept pace, especially in Louisiana. With that said, the University was slow to adopt Title IX policies, hire personnel, or meaningfully address concerns identified by community members and internal and external reviews. This is discussed in more detail in Section IV below.

We close our report with recommendations for creating and maintaining a compliant Title IX program the University community can have confidence. There is considerable work that needs to be done. While our recommendations for improvement are guided by our own expertise, as you requested, they have also been informed by the numerous University stakeholders who have taken the time to meet with us and share their thoughts and at times gut-wrenching accounts. We earnestly appreciate their willingness to share their experiences and insights with us. We are also hopeful that this report and its recommendations will assist the University in the difficult work ahead.

I.    **Background**

Sexual violence on college campuses is a pervasive and seemingly well-entrenched public health problem with research consistently indicating that more than 1 in 4 undergraduate women have experienced sexual assault while they were students.[6] While incidence of sexual violence varies by campus,[7] research clearly and compellingly shows that sexual violence is systematically underreported.[8] The causes of systematic underreporting are complicated, and underreporting is

---

[6] David Cantor et al., Westat, *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct* (Oct. 20, 2019), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf. This statistic is included here to demonstrate the high incidence of sexual assault on college campuses. It is in no way meant to exclude or ignore males or those of other genders who have been victims of sexual misconduct. We know the terrible reality is that sexual misconduct affects people of all demographics.

[7] For example, research supports the proposition that the incidence rate of sexual violence was higher on campuses with National Collegiate Athletic Association (NCAA) Division I athletic programs as compared to Division II, III and campuses with no athletics. Rebecca L. Stotzer and Danielle MacCartney, "The role of institutional factors on on-campus reported rape prevalence," J. INTERPERS. VIOLENCE (Apr. 21, 2015), available at https://journals.sagepub.com/doi/10.1177/0886260515580367.

[8] Bonnie S. Fisher et al., "Acknowledging sexual victimization as rape: Results from a national-level study," JUSTICE Q. (Aug. 19, 2006), available at https://www.tandfonline.com/doi/abs/10.1080/07418820300095611.

4

PLAINTIFFS_000079

partially a product of a host of cultural factors. A significant percentage of students participating in various surveys throughout the country, however, have indicated that they did not report sexual violence because they "did not think anything would be done about it" or that others, especially those in positions of authority, would not believe them.[9]

There is also considerable evidence supporting the proposition that survivors of sexual violence do not report misconduct because they fear retaliation in a variety of forms—adverse employment and educational consequences, further violence, social stigma, etc. It should go without saying that this fear of retaliation is undoubtedly heightened when a perpetrator is a celebrated member of the campus community.

With respect to the dynamics of dating and domestic violence, the research has made at least two critically important observations when assessing interventions. First, abuse evolves into a pattern, which often escalates in intensity.[10] Second, and perhaps counterintuitively, it is not uncommon for victims of relationship violence to refuse to participate in interventions aimed at holding perpetrators accountable for abuse.[11] Indeed, victims of relationship violence often will remain in abusive relationships for a bevy of reasons.[12] These dynamics (*i.e.*, nonparticipating victims and potentially rapid escalations in violence) make effective institutional response to relationship violence exceptionally challenging but also especially necessary.

With that as backdrop, the following broad principles undergird this report:

1. Survivor reports of sexual violence constitute a small fraction of the actual incidents of sexual violence on a university campus. Survivor reports of sexual violence involving "star" student athletes and other "high status" members of a university community likely constitute an even smaller fraction. **In the statistically unlikely event a student does come forward with a report of sexual violence, it is critical that the report be referred to a University's Title IX Office which, in turn, must handle the report with care, including protecting the due process rights of students accused of misconduct**.

2. Responding with care and appropriately to reports of Title IX-related matters, and especially allegations of dating and domestic violence, is resource intensive. Doing this remarkably demanding and complicated work well requires highly skilled practitioners and those practitioners must have adequate resources.

3. Institutional failure to respond appropriately to allegations of sexual misconduct creates a variety of harms for the survivors. Failing to respond appropriately also reinforces

---

[9] Bonnie S. Fisher et al, National Institute of Justice, Department of Justice, *The Sexual Victimization of College Women* (2000), https://www.ncjrs.gov/pdffiles1/nij/182369.pdf.
[10] *See e.g.*, Dee L.R.Graham, et al., *Loving to Survive: Sexual Terror, Men's Violence, and Women's Lives (Feminist Crosscurrents, 3)*, New York University Press (1994); KD O'Leary et al., "A. Prevalence and stability of physical aggression between spouses: a longitudinal analysis," J. Consult. Clin. Psychol. (1989), https://pubmed.ncbi.nlm.nih.gov/2785126/.
[11] *See e.g.*, Graham, D. , & Rawlings, E., "Bonding with abusive dating partners: Dynamics of the Stockholm Syndrome," *Dating Violence, Young Women in Danger* 119–135 ( B. Levy, ed. 1991).
[12] Michael A. Anderson et al., *"Why Doesn't She Just Leave?": A Descriptive Study of Victim Reported Impediments to Her Safety*, J. OF FAMILY VIOLENCE 18, 151–155 (2003).

HB: 4848-0171-9519.1

PLAINTIFFS_000080

justifications for victims to not come forward in the first place. This is a tragedy in its own right but can also create a fertile ground for serial perpetrators. Failing to respond appropriately to allegations of sexual misconduct can also create a variety of harms for those accused of misconduct. Community members wrongly found responsible for sexual misconduct can be negatively impacted for years. Even those appropriately cleared by an institution may be viewed with skepticism in a university community that has no confidence in the institution's process for resolving reports.

## II.    Summary of Institutional Policies and Personnel

Title IX of the Education Amendments of 1972 ("Title IX") prohibits sex discrimination in an institution's education programs and activities.[13] In addition, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act" or "Clery")—as amended by the 2013 Reauthorization of the Violence Against Women Act—requires institutions participating in federal financial aid programs to maintain and disclose campus crime statistics and security information and also includes mandates for institutional policies, procedures, and educational programming for prevention of and response to sex-based crimes.[14] Sex-based harassment and violence—including sexual harassment, sexual assault, dating and domestic violence, and stalking—are forms of prohibited sex discrimination which trigger institutional obligations under Title IX and the Clery Act.

Title IX's prohibition on sex discrimination applies to all campus community members (*i.e.*, students and employees) and includes other participants in institutional programs and activities, such as visitors or vendors. In its most basic form, Title IX requires schools that receive federal funds to appropriately respond to and redress reports of sex discrimination occurring in their programs and activities. In addition to the myriad harms created by sex discrimination, as aptly put by former LSU President F. King Alexander in September of 2015: "A university that tolerates, inadequately addresses or is deliberately indifferent toward sexual harassment may be subject to loss of federal funds and/or may be liable for money damages under Title IX of the Civil Rights Act."[15]

The U.S Department of Health, Education, and Welfare, which became the U.S. Department of Education ("ED" or the "Department") in 1979 and its Office for Civil Rights ("OCR") initially issued regulations implementing Title IX in 1975.[16] From a high-level perspective, these regulations required covered educational institutions to:

1.    Disseminate a notice of non-discrimination (*i.e.*, a Title IX policy);

2.    Designate at least one employee to coordinate efforts to comply with and carry out its responsibilities under Title IX (*i.e.*, a Title IX Coordinator); and

---

[13] *See* 20 U.S.C. § 1681 *et seq.*
[14] 20 U.S.C. § 1092(f); 34 C.F.R. § 668.46.
[14] 20 U.S.C. § 1092(f); implementing regulations at 34 C.F.R. § 668.46.
[15] Elizabeth Vowell, *LSU Faculty Senate takes on firing of tenured professor*, WAFB.COM (September 2, 2015), https://www.wafb.com/story/29946514/lsu-faculty-senate-takes-on-firing-of-tenured-professor/.
[16] *See* 34 C.F.R. § 106.1 *et seq.*

6

PLAINTIFFS_000081

3.      Adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints of sex discrimination.[17]

While enforcement of Title IX by the Department has waxed and waned depending on the administration in power, OCR has periodically released guidance documents regarding its standards for administrative enforcement of Title IX. While such guidance documents do not have the same force as the statute or a regulation, they do reflect OCR's position regarding Title IX administrative enforcement and are designed to guide institutions of higher education in developing their policies and procedures.

## A.    LSU's Title IX Policy and Office Structure

Although federal law has required institutions to designate a Title IX Coordinator since 1975,[18] enforcement of Title IX and the formal designation of employees responsible for Title IX compliance was not robust until 2011 when the Department under the Obama administration— among other actions—issued what has been dubbed the "2011 Dear Colleague Letter."[19] This guidance document expanded on previous guidance[20] and provided specific items that must be (or were strongly recommended to be) included in an institution's policy and procedures related to sexual harassment and sexual violence. While controversial in some quarters, the 2011 Dear Colleague Letter is universally recognized as a significant tool which compelled institutions to prioritize compliance with Title IX. It included the following specific mandates relevant to this review:

---

[17] *Id.* §§ 106.8, 106.9.

[18] *See id.* at § 106.8. The Department's 1975 regulations are available at https://www2.ed.gov/policy/rights/reg/ocr/edlite-34cfr106.html.

[19] U.S. Dep't Ed. Office for Civil Rights, "Dear Colleague Letter: Sexual Violence" (2011). A copy of the 2011 Dear Colleague Letter, which was rescinded by the Department in September 2017, is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[20] The most significant guidance prior to the 2011 Dear Colleague Letter was the 2001 Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" document issued by the Bush administration in 2001. U.S. Dep't Ed. Office for Civil Rights, "Revised Sexual Harassment Guidance" (66 Fed. Reg. 5512, Jan. 19, 2001) at 13 (footnotes omitted) (the "2001 Guidance"). Issued by the George W. Bush administration, the 2001 Guidance made clear that "sexual harassment" was covered by Title IX's prohibition against sex discrimination and described an institution's responsibilities to prevent and address sexual harassment. The 2001 Guidance also established the Department's standard for administrative enforcement of Title IX: "If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence." More specifically, the 2001 Guidance stated that a school "has notice if a responsible employee 'knew, or in the exercise of reasonable care should have known,' about the harassment." A "responsible employee" includes "any employee who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." The 2001 Guidance also required schools to ensure that certain employees were adequately trained regarding reporting and responding to incidents of sex discrimination. A copy of the 2001 Guidance, which was rescinded by the Department in September 2020, can be found at: http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

7

PLAINTIFFS_000082

- Reaffirmed that prohibited "sexual harassment" includes "unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature," including "sexual violence" and "gender-based harassment."

- Reaffirmed the Department's "constructive knowledge" standard for administrative enforcement as follows: "If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

- Stressed the broad responsibilities of the Title IX Coordinator, including the responsibility to "oversee[] all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints"; to "be available to meet with students as needed"; and "not have other job responsibilities that may create a conflict of interest."

- Established an institution's obligation to ensure that "all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence" and "instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents."

- Outlined the standard of evidence (preponderance of the evidence), certain procedural requirements for investigations and hearings, and requiring training for Title IX Coordinators, investigators, and adjudicators.

- Recommended institutions "implement preventive education programs and make victim resources, including comprehensive victim services, available."

Despite the 2011 Dear Colleague Letter's clarion call for institutions to implement and increase infrastructure for Title IX offices, LSU did not have a formally designated Title IX Coordinator until 2014[21] when the University assigned Jim Marchand, one of two attorneys in the Office of General Counsel, to fill the Title IX Coordinator role for the entire LSU System on an "interim" basis. In addition, at that time, the University formally designated Gaston Reinoso, Assistant Vice President for Human Resource Management, as the LSU A&M Campus[22] Title IX Coordinator and Deputy Coordinator for Human Resource Management.[23] Significantly, both of these designations were "other duties as assigned" roles. Additionally, for many years, the University

---

[21] According to LSU's sexual harassment policy documents preceding 2014, "The Dean of Students and the Associate Vice President of Human Resource Management are responsible for administration of the University's policy on sexual harassment." *See* PS-95 at 4.

[22] "LSU A&M" refers to the official name of LSU's Baton Rouge campus, "Louisiana State University and Agriculture and Mechanical College."

[23] In addition, KC White, Dean of Students, was designated as the Deputy Title IX Coordinator for Students at the time.

HB: 4848-0171-9519.1

PLAINTIFFS_000083

has utilized (and continues to utilize) the services of an outside law firm, Taylor Porter, to advise on Title IX issues.

In interviews with Husch Blackwell, University employees explained that these roles were assigned following the Department's issuance of additional Title IX guidance in 2014.[24] Significant developments in this 2014 Guidance included:

- "A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of **all** complaints raising Title IX issues throughout the school." (Emphasis added).

- Reaffirmed that the Title IX Coordinator role should be free from conflict, and noting: "Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest."

- Expanded guidance regarding the identity of "responsible employees," including requirements for an institution to "make clear to all of its employees and students which staff members are responsible employees." This is discussed in more detail in Section III.A. below.[25]

Given this clear guidance, it is notable that a System Title IX Coordinator role was assigned to Marchand, who—as deputy general counsel—"pose[d] a serious risk of a conflict of interest," in contradiction of the Department's guidance. In addition, Reinoso's designation as the A&M "Campus Coordinator" on top of managing his full-time responsibilities as AVP for Human Resource Management controverted the Department's admonishment that "[d]esignating a *full-time* Title IX coordinator will minimize the risk of a conflict of interest," and arguably did not set appropriate expectations regarding the Title IX Coordinator's vast responsibilities to effectively oversee the school's response to "all complaints raising Title IX issues throughout the school" and to "identify[] and address[] any patterns or systemic problems."

---

[24] U.S. Dep't Ed. Office for Civil Rights, "2014 Questions and Answers on Title IX and Sexual Violence" ("2014 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. This guidance was rescinded by the Department in September 2017.

[25] In addition, the 2014 Guidance also outlined more robust requirements for institutional grievance procedures and policy elements for resolving complaints of sex discrimination, including guidance on implementing "interim measures" for impacted individuals.

HB: 4848-0171-9519.1

PLAINTIFFS_000084

Along with these Title IX Coordinator designations, the University with assistance from Taylor Porter promulgated the first version of Permanent Memorandum 73 ("PM-73") in June 2014. PM-73 (2014) was intended to implement the mandates in the Department's 2014 guidance and replaced previous sexual harassment policies PS-73 and PS-95. PM-73 (2014) appears to have memorialized for the first time in institutional policy the designation of "Title IX Coordinators," providing that "The President shall designate the LSU Title IX Coordinator who shall be responsible for the implementation, enforcement, and coordination of Title IX for LSU. The Chancellor of each Campus shall designate a Campus Title IX Coordinator with designated responsibilities to oversee on-campus Title IX compliance."

PM-73 was revised in 2015[26] in response to changes in state law relating to sexual misconduct in public entities, including public institutions of higher education[27] and the Louisiana Board of Regents' associated guidance, including a "Uniform Policy on Sexual Misconduct."[28] This 2015 policy signed by then-President F. King Alexander remained in place until the University's recent revision in August 2020 implementing the 2020 Trump Administration Title IX regulations.[29]

The University continued with Marchand in the role of Title IX Coordinator for the LSU System and Reinoso serving as Campus Coordinator for the A&M campus until February 2016,[30] when Jennie Stewart—who had been working in the Office of the Dean of Students since 2009—was selected to fill three simultaneous institutional roles: (1) Title IX Coordinator for the LSU System, (2) Campus Coordinator for LSU's Baton Rouge campus, and (3) Clery Coordinator for all LSU System campuses.

Stewart's 2016 designation was the University's first attempt at a "full-time" Title IX Coordinator—nearly five years after the 2011 Dear Colleague Letter. In this role, Stewart reported directly to the University's Office of General Counsel.[31] This arrangement was problematic in light of the Department's clear guidance that "designating the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest." While Stewart did not "serve" as the University's general counsel, the Office of General Counsel's direct

---

[26] In addition to the state law changes noted here, the Department of Education also issued two additional guidance documents relevant to staffing and supporting the Title IX Coordinator role: (1) the 2015 Dear Colleague Letter on Title IX Coordinators, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf, and (2) the 2015 Title IX Resource Guide, https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

[27] *See* https://www.nola.com/entertainment_life/health_fitness/article_71d3c22f-88b9-57dc-9115-020ab06feb4e.html

[28] *See* https://www.regents.la.gov/assets/docs/2015/02/BOR-Sexual-Misconduct-Policy-2-24-15.pdf.

[29] The University's current policy is available at https://www.lsu.edu/administration/policies/pmfiles/pm-73.pdf.

[30] Mari Fuentes Martin was hired as Dean of Students in 2016 replacing White as Deputy Title IX Coordinator for students. Shortly after her hire, Fuentes-Martin took over responsibility for Title IX student case management, and she maintained that responsibility until 2019. Fuentes Martin said she was shocked at the lack of infrastructure and resources devoted to Title IX when she arrived at LSU. She organized investigator training in the fall of 2015, and she grew the pool of part-time investigators and advocated for and secured a stipend for investigators. Staff that we spoke to said that Fuentes-Martin professionalized the investigation and case management process.

[31] The Office of General Counsel was renamed the LSU Office of Legal Affairs and General Counsel in April 2017. In addition, Lindsay Madatic in the University's Employee Relations department of Human Resource Management replaced Reinoso as Deputy Title IX Coordinator for employees.

HB: 4848-0171-9519.1

PLAINTIFFS_000085

supervision of Stewart presented conflict of interest concerns, a fact that has been recognized repeatedly by the University but never addressed.

When asked about her role and responsibilities, Stewart explained that each of the System's nine campuses had a Title IX Campus Coordinator who is designated by the Chancellor.[32] She reported that she did not have supervisory authority over other campus coordinators, but they reported Title IX information to her and she was tasked with regularly advising and supporting each of the campuses on Title IX's requirements and complaint resolution. Stewart described the System's Title IX operations up until 2018 as having "no central investigative piece"—with at one time 42 different investigators with varying degrees of training over the nine campuses. These investigators were campus staff and faculty members who performed investigative responsibilities on an "other duties as assigned" basis.

In 2018, there were two modest developments. First, the University hired Jeff Scott to serve as "Lead Title IX Investigator" for the LSU System in March 2018.[33] While there was a transition period during which the pool of investigators continued to assist with Title IX complaint resolution across the LSU campuses, Scott assumed responsibility for investigating *all* Title IX complaints for LSU students at all nine campuses.[34] Scott indicated that he receives assistance from Deputy Coordinators to do some of the "legwork" prior to him opening investigations. Investigations of complaints against employees continued to be handled by the University's "Employee Relations" department of Human Resource Management.[35]

Second, Stewart received a fourth job responsibility when she was designated as the ADA Coordinator for the A&M campus in May 2018.[36] This position standing alone is often its own full-time job at other campuses as large as LSU's. Suffice it to say that it is hard to see how someone could be successful with all of these roles (Title IX, Clery, and the ADA) even with a large complement of support staff. On that score, though, the Title IX Office is comprised of Stewart, Scott, and one graduate assistant. The Title IX Office does not even have a designated administrative support person.

---

[32] Since 2015, the LSU A&M Chancellor position and the LSU System president position have been consolidated into one "LSU President" position. *See* https://www.lsu.edu/president/history.php/.

[33] Scott has over 25 years of administrative and criminal investigative experience, including a background as a FBI Special Agent, NCAA enforcement investigator, and an HR investigator for a public-school district. This was Scott's first position as a full-time Title IX investigator, though.

[34] Scott noted that when he was hired, it was with the understanding there would be two investigators working with him, but this did not happen.

[35] Of note, the University does not have a central investigative office for investigating and adjudicating reports of discrimination, including discrimination on the basis of other protected categories such as race, color, national origin, religion, and disability. Such complaints are currently handled by the Student Advocacy and Accountability office for complaints against students and the Employee Relations department of Human Resource Management for employees.

[36] Stewart received this designation following resolution of an OCR complaint brought against the University regarding digital accessibility in 2017. The resolution agreement was finalized and signed by President Alexander in April 2018. Significantly, in August 2019, Stewart received a fifth job responsibility when she assumed the responsibilities of Director of Digital Resources & Content Accessibility on a "temporary" basis. This position was created pursuant to the 2018 OCR resolution agreement. Given OCR enforcement, increases in private actions related to digital accessibility, and ever-increasing development of online learning resources, this was also a significant addition to Stewart's job responsibilities.

HB: 4848-0171-9519.1

PLAINTIFFS_000086

PM-73 was revised again in August 2020,[37] prompted by the Trump Administration Department of Education's new Title IX regulations.[38] The 2020 regulations represent a significant shift in the Department's enforcement regime with a particular emphasis on the rights of individuals accused of sex discrimination.[39]

Violations of PM-73 can be reported through several avenues,[40] including online directly to the Office of the Title IX Coordinator,[41] through Student Advocacy and Accountability's "LSU Cares" portal,[42] through the University's Human Resource Management "Title IX and Sexual Misconduct" page,[43] and through various reporting forms on the LSUPD website.[44] For all online reporting options other than LSUPD, reports submitted through these sites automatically populate in case management program Maxient[45] (for student reports) or Ethics Point (for employee reports), which generate notifications to the Campus Title IX Coordinator and deputies. Students can also submit a request for support and resources through "The Lighthouse Program," a confidential interpersonal violence prevention and advocacy program.[46] In addition, community members can call, email, or speak in person with representatives from each of these offices. A brief summary of the offices referenced here is included below.

Once a report or complaint of sex discrimination is received by the Title IX Office, Stewart conducts an initial assessment to determine whether there is sufficient information to take additional action. If Stewart determines that a PM-73 complaint should be opened, the case is assigned to Scott for investigation.[47]

Prior to August 2020, Title IX investigators would conduct an investigation which culminated in a finding with respect to responsibility for the alleged policy violation. Because of the 2020 Regulations, the Title IX investigation now ends with Scott compiling an investigative report summarizing the evidence which is then sent to the University's Student Advocacy and Accountability Office for adjudication.

Stewart and Scott also oversee a "Title IX Case Management Team" which was already in place when Stewart began her role in 2016. This case management team meets once a week to discuss the status of pending Title IX cases and is currently composed of representatives from the Title IX Office (Stewart and Scott), The Lighthouse Program, LSUPD, the Office of the Dean of Students

---

[37] The policy is available at https://www.lsu.edu/administration/policies/pmfiles/pm-73.pdf.
[38] The 2020 regulations can be found at https://www.ecfr.gov/cgi-bin/text-idx?SID=69a8d5e1a8a4e43ee9%201685c254404%202c2&mc=true&node=pt34.1.106&rgn=div5.
[39] In addition to issuing the 2020 regulations, the Trump Administration also withdrew nearly all previous Department Guidance relating to Title IX as of August 2020. *See* https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/respolicy.html?page=3&offset=20.
[40] An overview of employee mandatory reporting requirements is provided in Section II below.
[41] *See* https://www.lsu.edu/titleix/.
[42] *See* https://www.lsu.edu/saa/lsu-cares/index.php. The LSU Cares serves as a gateway to LSU's online reporting system for a variety of concerns, including sex discrimination and misconduct.
[43] *See* https://www.lsu.edu/hrm/policies_and_procedures/Title_IX_item71081.php.
[44] *See* https://www.lsu.edu/police/contact/complaint-resolution.php ("Victim & Survivor Services").
[45] Maxient is an industry-leading centralized reporting and recordkeeping system.
[46] *See* https://lsu.edu/shc/wellness/the-lighthouse-program/index.php.
[47] For those complaints that fall within PM-73 and involve employees, Stewart notifies the appropriate Human Resources representative to respond to the complaint.

HB: 4848-0171-9519.1

PLAINTIFFS_000087

(including representatives from Student Advocacy and Accountability and the CARE Team, discussed below), and Residential Life. University administrators affiliated with the team universally described the Title IX case load as "overwhelming" and the current staffing as "unsustainable."

In addition to these responsibilities, and as discussed in more detail in Section III.C. below, Stewart and Scott are also responsible for providing department and community Title IX trainings. To date, Stewart continues to serve as the LSU System Title IX Coordinator, the A&M Campus Coordinator, the Clery Coordinator, the Section 504/ADA Coordinator, and the Director of Digital Resources & Content Accessibility. Scott continues to serve as the sole investigator for student cases for all nine LSU System campuses.

Besides the Title IX Office, several other University offices and departments are tasked with Title IX compliance. These are briefly discussed below.

## B. Student Advocacy and Accountability

Student Advocacy and Accountability ("SAA") is housed in the University's Office of the Dean of Students within the Division of Student Affairs.[48] SAA's mission is to "promote academic integrity and appropriate standards of conduct for the university."[49] In furtherance of that charge, "SAA is responsible for investigating alleged violations of university policy/standards and for implementing the accountability process as outlined in the LSU Code of Student Conduct. This is accomplished through educational outreach, accountability meetings, university hearing panels, and behavioral interventions for individual students and student organizations."[50]

Jonathan Sanders has been the Associate Dean of Students and Director of Student Advocacy & Accountability since the fall of 2016. Tracy Blanchard is the Assistant Dean of Students and the Associate Director of Student Advocacy & Accountability. In these roles, Sanders and Blanchard fulfill various responsibilities related to Title IX.

First, SAA is responsible for adjudicating student complaints pursuant to the process set forth in the Student Code of Conduct. Prior to August 2020, this process entailed (1) an administrative conference during which Sanders conducted an additional investigation to determine appropriate sanctions; (2) an option to request additional review of Sanders' determination to a University Hearing Panel ("UHP"), which served as a "rehearing" of the Title IX finding and Sanders' administrative determination; (3) an "appeal" to the Dean of Students; and (4) an appeal for "discretionary" review by the President.[51]

This process was recently updated and continues to be reevaluated in light of the Department's August 2020 Title IX regulations. According to Sanders, cases not meeting the 2020 Regulation's definitional and jurisdictional requirements (i.e., "Sexual Misconduct" as opposed to Title IX "Sexual Harassment") continue to be handled pursuant to the process outlined in the SAA's 2018

---

[48] See https://www.lsu.edu/studentaffairs/departments/orgcharts/lsu_sa_org_chart_feb_2020.pdf.
[49] https://www.lsu.edu/saa/about/aboutsaa.php.
[50] Id.
[51] A detailed description of the University's process up until August 2020 is included in Section II of this report.

13

PLAINTIFFS_000088

Handbook. For cases meeting the 2020 Regulations' definitional and jurisdictional requirements, upon receipt of Scott's investigative report, the case is referred to an "Administrative Law Judge" who presides over a hearing along with two other panelists. The outcome of this hearing can be appealed to the Dean of Students whose decision on the outcome is final.

Sanctions are meted out according to an "outcomes guide," which provides a range of disciplinary outcomes such as "disciplinary probation,"[52] "deferred suspension,"[53] "suspension,"[54] or "expulsion."[55] Disciplinary outcomes can also include remedial measures such as referrals to mental health/psychological services, educational interventions, and no contact directives.

Second, Tracy Blanchard manages the University's "CARE Team," a behavioral intervention and case management group with multidisciplinary representation focused on identifying and supporting students of concern or students who may be in crisis, stress, or distress.[56] Consistent with best practices for these teams, CARE is comprised of staff across the University, including the Dean of Students, SAA, Academic Affairs, Office of Multicultural Affairs, Residence Life, LSU Police, Disability Services, Student Health Center, and Financial Aid & Scholarships.[57] Notably, Athletics is not represented on the University's CARE Team.

In addition to full and fair investigation and adjudication processes, a critical aspect of Title IX and Clery compliance is the provision of interim measures and support services for parties to a report.[58] Both Sanders and Blanchard handle requests for interim measures and support services jointly with Stewart. Blanchard handles requests for academic accommodations (*e.g.*, managing conflicting class schedules and communicating with faculty members regarding appropriate extensions and excused absences) and housing concerns through the CARE Team. Sanders is responsible for assessing the need for and implementation of interim measures relating to health and safety, including interim suspension and no-contact orders.

---

[52] "Disciplinary probation is a status for a specified period of time during which any further violation of the Code or University policy jeopardizes the status of the Student or RSO [Registered Student Organization] with the University" which may limit a student's ability to participate in certain programs and activities and loss of privileges such as access to residential or recreational facilities. Code of Conduct at 20.

[53] "Deferred suspension is a status for a specified period of time during which any subsequent finding of Responsibility for a violation of the Code or University policy shall include the Outcome of suspension for the Student or RSO. Deferred suspension will include loss of privileges as detailed under disciplinary probation with restrictions. Deferred suspension." *Id.*

[54] "Suspension is the physical separation from the University for Misconduct." *Id.*

[55] "Expulsion is the permanent separation of a Student from the University without the possibility of readmission." *Id.*.

[56] *See* https://www.lsu.edu/saa/students/advocacy/Lsucareteam.php.

[57] *Id.*

[58] The Clery Act specifically requires institutions to provide victims of dating violence, domestic violence, sexual assault, and stalking with information in writing about options for, available assistance in, and how to request changes to academic, living, transportation, and working accommodations, as well as other protective measures.. 34 C.F.R. § 668.46(b)(11)(iv), (v). These options must be provided if requested and reasonably available, regardless of whether or not the person chooses to report to campus police or local law enforcement. *Id.* The institution's policy also must describe the range of protective measures available during the disciplinary process. *Id.* § 668.46(k)(1)(iv)

HB: 4848-0171-9519.1

PLAINTIFFS_000089

### C.    The Lighthouse Program

Housed in the Office of Wellness and Health Promotion in the Student Health Center, the Lighthouse Program is a free and confidential University resource which provides interpersonal violence prevention, support, and advocacy to the LSU campus community. The program assists student-survivors of sexual assault, interpersonal violence, stalking, and harassment with obtaining information about and assistance accessing critical services such as obtaining medical care, evidence collection and preservation, obtaining counseling and mental health care, coordinating academic accommodations, and filing reports with investigative offices. The program also coordinates training and information for "Lighthouse Advocates," who are specifically trained University personnel located throughout campus to assist and support LSU students.

It is helpful to note that in our review of the case files provided and in conversations with community members, the Lighthouse Program and its Director, Susan Bareis, were universally praised as excellent—but also under-resourced and potentially underutilized—resources.

### D.    Human Resource Management

As noted above, the University has designated an employee in the University's Office of Human Resource Management as a Deputy Title IX Coordinator for Employees. Employee-on-employee complaints are referred to a representative from the University's Human Resource Management department for investigation and adjudication. According to Stewart, Human Resources also coordinates requests for support and interventions for employee cases. In addition, Human Resources coordinates the University's required annual (online) employee training for Title IX and other state-mandated ethics requirements.

### E.    LSU Police Department

The LSU Police Department ("LSUPD") is the University's law enforcement department and a reporting option for victims of interpersonal violence and stalking. We interviewed Chief Bart Thompson, who has worked for the LSU Police Department for 11 years and has been the Chief of LSUPD for approximately two years. Officer Marshall Walters has primary responsibility for coordinating with the Title IX Office.

Chief Thompson said LSUPD prides itself on consistency and that LSUPD "does everything it can" to provide supports to victims. To that end, Chief Thompson said that LSUPD ensures communication to victims about various support services, explaining resources such as STAR, Lighthouse and LSU Cares. Chief Thompson also noted that one of the department's investigating officers participates in the University's Care Team meetings. LSUPD's website includes links to "LSU CARES Reporting," "Title IX and Sexual Misconduct" and "See Something, Say Something." In addition, the website includes various links to victim and survivor services.

We also interviewed Officer Kim Bass who is one of two officers devoted exclusively to community outreach. LSUPD's outreach division has been in operation for approximately four years, and officers assigned to community outreach work with students and student organizations on issues related to safety and security. Officer Bass also oversees a Rape Aggression Defense

HB: 4848-0171-9519.1

PLAINTIFFS_000090

(RAD) class and smaller Equalizer Women's Self Defense classes, hosted for shorter blocks of time than the RAD class to increase opportunities for students to participate.

We asked LSUPD about practices related to reporting incidents to the Title IX Office, and Chief Thompson explained that LSUPD will not report a matter to Title IX without a waiver from the victim indicating the victim's desire to have the matter reported. Chief Thompson explained this is the practice because of an interpretation of state law prohibiting the sharing of victim information without victim consent.

Based on a citation included on LSUPD's "Sexual Violence Confidentiality Notice and Waiver Form," we understand Chief Thompson's position to be that Louisiana Revised Statute 46:1844, "Basic rights for victim and witness," prohibits LSUPD from sharing information regarding reports of sexual assault and violence with the University's Title IX Office without a "waiver."[59] Husch Blackwell reviewed this statute and other applicable law and agree with conclusions from the Title IX Office and the Office of General Counsel that LSUPD's interpretation is incorrect. As the Office of General Counsel has explained, "Sharing the identity of victims of sexual misconduct with the Title IX Office is not 'public disclosure' under La. R.S. 46:1844(W)(l)(a). The statute does not prohibit the private confidential disclosure of information from one University department to another University department in order to fulfill requirements of the Title IX regulations."[60]

LSUPD's practice was also inconsistent with Department guidance[61] (up until August 2020) and institutional policy (beginning in 2014 to the present) establishing that University law enforcement officers are considered "responsible employees" required to "promptly notify the Title IX Campus Coordinator" of incidents of sexual misconduct.[62]

---

[59] Section 46:1844 provides as follows:

> In order to protect the identity and provide for the safety and welfare of crime victims who are . . . victims of sex offenses . . . , *notwithstanding any provision of law to the contrary*, all public officials and officers and public agencies, including but not limited to all law enforcement agencies, . . . , shall not publicly disclose the name, address, contact information, or identity . . . of victims of sex offenses . . . . The confidentiality of the identity of . . . the victim of a sex offense . . . may be waived by the victim.

LA R.S. § 46:1844(W)(1)(a).

[60] Notably, subsection (3) of this provision provides that "all public officials, officers, and public agencies . . . charged with the responsibility of knowing the name, address, contact information, and identity . . . of crime victims of a sex offense . . . as a necessary part of their duties"—*e.g.*, a Title IX Coordinator—"shall have full and complete access to this information regarding . . . a victim of a sex offense or a human trafficking-related offense," so long as that official "take[s] measures to prevent the public disclosure" of the victim's information.

[61] *See* 2001 Guidance at 13 (defining "responsible employee" as "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility"); 2014 Guidance at 2 (stating that "OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence" and defining responsible employee to include to "campus law enforcement"); 2017 Guidance at 2 (noting that "[o]ther employees may be considered "responsible employees" and will help the student connect to the Title IX Coordinator" and citing the 2001 Guidance).

[62] As discussed in more detail in Section III below, since 2014 the University's Title IX policy, PM-73, contains a "responsible employee" definition which does not exclude members of campus law enforcement.

HB: 4848-0171-9519.1

PLAINTIFFS_000091

Although the Department's 2020 Regulations eliminated the broad "responsible employee" reporting requirement, the regulations continue to attribute "actual knowledge" of an incident of sexual harassment triggering institutional responses to include notice to "any official of the recipient who has authority to institute corrective measures on behalf of the recipient."[63] Campus law enforcement officials meet this definition. Significantly, once the institution is on notice of an incident of sexual violence, "The **Title IX Coordinator** must promptly contact the complainant to discuss the availability of supportive measures" and "explain to the complainant the process for filing a formal complaint."[64] The Title IX Coordinator cannot fulfil this mandate if an institutional department does not share reports of sexual violence.

In addition, the University's current Title IX policy maintains the responsible employee reporting requirement as an institutional mandate, and, again, law enforcement officers are not excepted.[65] The policy makes clear: "To the extent a conflict exists between State or local law and Title IX, the obligation to comply with Title IX is not obviated or alleviated by any State or local law. To the extent other LSU or campus-based policies may conflict with this policy, the provisions of this policy shall supersede and govern."[66]

Moreover, the Louisiana legislature passed the "Campus Accountability and Safety Act" in 2015.[67] Among the mandates included in this comprehensive statute is a provision entitled "Coordination with local law enforcement," which requires:

> Each institution and law enforcement and criminal justice agency located within the parish of the campus of the institution shall enter into a memorandum of understanding to clearly delineate responsibilities and share information in accordance with applicable federal and state confidentiality laws, including but not limited to trends about sexually-oriented criminal offenses occurring against students of the institution.[68]

This statute outlines several elements for the memorandum of understanding, including the following elements:

> (1) Delineation and sharing protocols of investigative responsibilities.

> (2) Protocols for investigations, including standards for notification and communication and measures to promote evidence preservation.

---

[63] 34 C.F.R. § 106.30(a).

[64] 34 C.F.R. § 106.44(a) (emphasis added).

[65] *See* PM-73 (2020) at Appendix 1 (establishing requirement for "responsible employees" to "promptly notify the Title IX Campus Coordinator" of "incidents of Sexual Misconduct"), Appendix 8 (defining "responsible employee as ("Any employee given the duty of reporting actual notice of incidents of sexual violence or any other misconduct prohibited by this policy. Responsible Employees do not include victims' advocates, mental health counselors, or LSU Ombudsperson.").

[66] *Id.* at Appendix 7.

[67] *See* La. R.S. § 17:3399.11–17:3399.17.

[68] La. R.S. § 17:3399.14(A). The must "be updated every two years." *Id.* § 17:3399.14(B).

HB: 4848-0171-9519.1

PLAINTIFFS_000092

(3) Agreed-upon training and requirements for the parties to the memorandum of understanding on issues related to sexually-oriented criminal offenses for the purpose of sharing information and coordinating training to the extent possible.

(4) A method of sharing general information about sexually-oriented criminal offenses occurring within the jurisdiction of the parties to the memorandum of understanding in order to improve campus safety.[69]

The University and LSUPD have never agreed to a memorandum of understanding due largely to the "disagreement" regarding this reporting issue. As discussed in our recommendations, this issue should be promptly resolved.

## III.    Summary of LSU Employee Reporting Policies

Throughout our interviews, LSU students and employees, including individuals mentioned in the *USA Today* and subsequent articles, expressed concerns that reports of sex discrimination were not going to the University's Title IX Office. The University's Athletics Department, in particular, has been criticized for purportedly not reporting such incidents appropriately.

Suffice it to say that centralized reporting and recordkeeping are critical components of an effective Title IX program. Media reports have asserted that "Federal laws and LSU's own policies require university officials to . . . report [allegations of sexual misconduct] to the Title IX office for investigation. . . ." As discussed below, it is slightly more nuanced than that.

The following is an overview of the University's policies, procedures, and training relating to reporting incidents of sex discrimination. The subsequent discussion in this report about individual cases discusses how constituent parts of the University have complied—or not complied—with institutional policy, procedures, and training.

### A.    Applicable Guidance

Since at least 2001, the Department of Education has required schools to ensure that certain employees are adequately trained regarding reporting and responding to incidents of sex discrimination:

A school has notice [of sex discrimination triggering an institutional duty to respond] if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment. A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility. **Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate**

---

[69] *Id.* § 17:3399.14(C).

HB: 4848-0171-9519.1

PLAINTIFFS_000093

> **school officials. Training for employees should include practical information about** how to identify harassment and, as applicable, **the person to whom it should be reported.**[70]

In 2014, the Department of Education issued additional guidance regarding institutional "responsible employees," stating:

> **A school must make clear to all of its employees and students which staff members are responsible employees** so that students can make informed decisions about whether to disclose information to those employees. **A school must also inform all employees of their own reporting responsibilities** and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.[71]

According to this 2014 Guidance, once a designated "responsible employee" becomes aware of a Title IX-related incident:

> **a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee**, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. **A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.**[72]

While there were several changes to Department of Education policy on Title IX enforcement under the Trump Administration, these responsible employee reporting guidelines remained in place until August 2020.[73]

---

[70] 2001 Guidance at 13 (footnotes omitted) (emphasis added); *see also* 2011 DCL 4; 2014 Guidance at 2, 14–16; 2017 Guidance U at 2 (citing 2001 Guidance at (V)(C)).

[71] 2014 Guidance at 15 (emphasis added).

[72] *Id.* at 16 (emphasis added).

[73] The Department of Education formally rescinded the 2017 Guidance in August 2020, following the effective date of its 2020 regulations. The 2020 Regulations provide that an institution is on notice of an incident of sexual harassment when it has "actual knowledge," which means "notice of sexual harassment or allegations of sexual harassment *to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures* on behalf of the recipient." 34 C.F.R. 106.30(a) (emphasis added). The definition of "actual knowledge" expressly states that "[t]he mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the recipient." *Id.*

HB: 4848-0171-9519.1

PLAINTIFFS_000094

From a practical standpoint, the importance of ensuring that reports of sex discrimination make their way to the Title IX Coordinator is rooted in the Title IX Coordinator's responsibility to ensure that the University handles claims of sex discrimination appropriately, including identifying and addressing patterns or systemic problems revealed by such reports and complaints of sex discrimination.[74] By way of example, if the University is seeing a significant uptick in reports from a particular department, this should sound the alarm for the Title IX Coordinator to consider providing targeted training or other interventions for that department.

Along those same lines, it is not uncommon for victims of sex discrimination or relationship violence to make a report but request that an institution not investigate the report. In deciding whether such a request should be honored, Title IX Coordinators weigh several factors, including:

- "circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (*e.g.*, **whether there have been other sexual violence complaints about the same alleged perpetrator**, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators)";
- "circumstances that suggest there is an **increased risk of future acts of sexual violence under similar circumstances** (e.g., **whether the student's report reveals a pattern of perpetration** (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group)";
- "whether the sexual violence was perpetrated with a weapon";
- "the age of the student subjected to the sexual violence"; and
- "whether the school possesses other means to obtain relevant evidence (*e.g.*, security cameras or personnel, physical evidence)."[75]

If reports or other relevant information are siloed from the Title IX Coordinator, the Title IX Coordinator's assessment of these factors can be compromised and a decision to honor a request from a reporter to not move forward with an investigation could compromise the safety of the University community.

Perhaps because of this, guidance from the Department of Education in place from 2014 to 2017 advised that "the Title IX coordinator must be informed of *all* reports and complaints raising Title IX issues, *even if the report or complaint was initially filed with another individual or office* or if the investigation will be conducted by another individual or office."[76] This guidance made clear: "the Title IX coordinator must have knowledge of *all* Title IX reports and complaints at the school."[77]

---

[74] 34 C.F.R. § 106.8(a); *see also* 2014 Guidance at 9–10.
[75] 2014 Guidance at 21 (emphasis added).
[76] *Id.* at 10–11 (emphasis added).
[77] *Id.* at 11.

HB: 4848-0171-9519.1

PLAINTIFFS_000095

Similarly, the Clery Act[78] requires institutions to compile certain crime statistics which are published on an annual basis so that community members are fully informed about the incidence of crime on campus and can make informed decisions on maintaining their personal safety.[79] Among the Clery Act's many mandates are requirements for institutions of higher education to identify and designate appropriate "Campus Security Authorities" ("CSA") who, in turn, are legally required to report Clery Act crimes, including dating violence, domestic violence, sexual assault, and stalking to the appropriate Clery personnel.[80] In addition to potentially being counted in "Annual Security Reports" issued to the University community, these reports may also trigger institutional obligations to issue important "Timely Warnings" to the University community.[81]

Under the Clery Act, a crime is "reported"—and thus triggers compliance obligations—when it is brought to the attention of a CSA. The number of CSAs at institutions can vary substantially, but generally CSAs are those involved with campus security and other officials with significant responsibility for student and campus activities.[82] It is critical that CSAs are informed of their CSA status, their reporting obligation, and to whom such reports should be made. While CSA training is not required under the Clery Act, it is encouraged by the Department and is consistent with best practice. Some program review reports have suggested that the Department does not believe CSAs can adequately perform their duties without some type of training.

For all of these reasons, it is essential that employees clearly understand their reporting responsibilities when they become aware of an incident of sex-based misconduct.

## B.    LSU Employee Reporting Policies

As noted above, the University initially adopted PM-73, "Title IX and Sexual Misconduct Policy" in June 2014. PM-73 was revised in December 2015, and remained in effect until the University's most recent Title IX policy revision in August 2020. Apparently in an attempt to ensure that reports of sex discrimination made their way to the University's Title IX Coordinator, PM-73 included language regarding "responsible persons." As discussed below, that "responsible person" policy

---

[78] 20 U.S.C. § 1092(f).

[79] These include the crimes of dating violence, domestic violence and stalking.

[80] 34 C.F.R. §§ 668.46(a) ("Campus security authority"), 668.46(c) (2)(i).

[81] Clery requires institutions to notify the campus community of (1) any significant emergency or dangerous situation currently occurring or imminently threatening the campus ("emergency notifications"), and (2) reported Clery crimes committed on the institution's Clery Geography that represent a serious or continuing threat to students and employees ("timely warnings"). *Id.* § 668.46(e). As it relates to the issuance of timely warnings, institutions must have policies for making timely warning reports to members of the campus community regarding the occurrence of Clery Act crimes, including (a) the circumstances for which a warning will be issued, (b) the individual or office responsible for issuing the warning, and (c) the manner in which the warning will be disseminated. *Id.*

[82] While the Clery statutory and regulatory framework has not changed since the VAWA amendments in 2013, there has been recent evolution related to guidance from ED. The *Handbook for Campus Safety and Security Reporting* ("Clery Handbook") has historically been consulted by institutions for guidance regarding Clery compliance. Significant updates were made to the handbook in June 2016 that clarified existing standards, outlined new standards, and described VAWA requirements in more detail. In October 2020, however, ED rescinded the Clery Handbook and replaced it with a 13-page Appendix to the Federal Student Aid Handbook. In its notification about the recission and replacement of the Clery Handbook, ED referenced that institutions may still consult the Handbook for guidance, while also explaining that reliance on the Handbook had potentially resulted in broader interpretations of critical Clery components such as defining Clery Geography and designating Campus Security Authorities.

HB: 4848-0171-9519.1

PLAINTIFFS_000096

language was poorly crafted and confusing. Also discussed below, this is not the first time this concern has been identified for the leadership of the University.

Section IV(B) of PM-73 (2015) starts by making the seemingly obvious point that any student or employee who "believes that he or she has been subjected to sexual misconduct or any other violation of this policy" has a "right to report the conduct to the Campus Title IX Coordinator **or to any other responsible person**, which includes but is not limited to the campus administrator with responsibility for human resource management, student conduct or the department head of the relevant academic department."[83] Section IV(C) further indicates that "Any responsible person who receives actual notice of a complaint under this policy *shall* promptly notify the Campus Title IX Coordinator, who shall be responsible for notifying the LSU Title IX Coordinator and any campus administrators, who may be involved in the resolution process." It concludes: "Any supervisor, or other responsible party who witnesses or receives a report or complaint, shall notify the Campus Title IX Coordinator."[84]

What is unclear, though, is who is an "any other responsible person."

To that end, PM-73, in somewhat circular fashion, defines "responsible person" as:

> Any employee who has the authority to take action to redress sexual violence or who has been given the duty of reporting incidents of sexual violence or any other misconduct prohibited by this policy by students or employees to the Title IX coordinator or other appropriate school designee. Responsible Persons do not include victims' advocates, mental health counselors, or clergy.[85]

The text of PM-73 specifically identifies three job categories as "responsible persons": (1) "the campus administrator with responsibility for human resource management," (2) "student conduct,"[86] or (3) "the department head of the relevant academic department."[87] In quintessential legalese, the policy then notes that this list is not exhaustive—*i.e.*, "responsible person . . . **includes but is not limited** to the campus administrator with responsibility for human resource management, student conduct or the department head of the relevant academic department."

PM-73 also states that "[a]ny supervisor . . . who witnesses or receives a report or complaint" is obligated to "notify the Campus Title IX Coordinator."[88]

Finally, the policy's definition of "responsible person" includes employees "**given the duty** of reporting incidents . . . to the Title IX coordinator or other appropriate school designee." (emphasis added). However, it fails to identify which employees have been "given [this] duty" or how that duty is given, and the language permitting responsible persons to report to an "other appropriate

---

[83] Exhibit A (PM-73 (2015)) at IV(B) (emphasis added).
[84] *Id.* at IV(C) (emphasis added).
[85] *Id.* at II ("Responsible Person").
[86] It is not clear whether the drafters intended this provision to mean "the campus administrator with responsibility for . . . student conduct" or simply, "student conduct."
[87] *Id.* at IV(B).
[88] *Id.* at IV(C).

HB: 4848-0171-9519.1

PLAINTIFFS_000097

school designee" directly conflicts with Section IV(C)'s mandate to "notify the Campus Title IX Coordinator."[89]

It is also worth noting that although LSU does maintain lists of designated individuals with CSA reporting responsibilities, we were unable to locate a policy where the University makes clear who those employees are and what they are supposed to do. Interviews with employees across the University also indicated that there is minimal awareness of CSA designations or reporting requirements.

Thus, it is important to note at the outset that despite contemporaneous assertions to the contrary, LSU has never had a clear written policy requirement that **all** employees must report incidents potentially implicating the Title IX policy to the Title IX Coordinator.[90] In addition, even for employees identified as responsible employees in PM-73, the ultimate reporting directives in various sections of the policy are conflicting and unclear. This lack of clarity is a clear error and inconsistent with Department guidance in place during this time period.

### C.    Employee Title IX Training

LSU certainly does not have a monopoly on ambiguous or unclear institutional policies. This is a problem for institutions of higher education across the country. Those ambiguities, though, are often cleared up in related trainings. Here, however, the University has several training programs which are uncoordinated and not monitored for consistency or compliance with University policy and applicable state and federal laws.

Husch Blackwell has identified at least three offices which have provided Title IX training: the University's Human Resource Management office, the Title IX Office,[91] and Athletics. These training programs are discussed below.

#### 1.    Human Resource Management: "Preventing Sexual Misconduct" Training

Since at least 2016, the University's Human Resources office has provided annual, "required" training to University employees regarding sexual harassment.

---

[89] Other institutions addressed this issue by more explicitly stating that all employees—unless designated as confidential—are required to report incidents of sexual misconduct of which they become aware.

[90] As noted above, PM-73 was primarily drafted by Jim Marchand (who served as "Interim Title IX Coordinator" from approximately 2014 until early 2016) and LSU's outside counsel. When asked about the intent of this "responsible person" definition at the time it was drafted, Marchand initially stated that employees were required to report incidents of sex discrimination "to the Title IX Coordinator," but added that it would also be appropriate for a subordinate employee to "report it to someone who then would report to the Title IX Coordinator," noting, "anyone *can* report to the Title IX Coordinator, but from a practical standpoint, some employees—like a maintenance worker—may feel more comfortable reporting to their supervisor." Similarly, there has never been clarity about the consequences for failing to make a required report. Marchand noted that the policy had no explicit penalty for failing to make a report under PM-73, but added that that the violation would likely be processed on par with a "comparable duty violation."

[91] We note that the Title IX Office often collaborates with officials in the University's Office of Student Advocacy and Accountability when presenting on the University's Title IX reporting and resolution processes, including presentations with and by the Lighthouse program.

23

PLAINTIFFS_000098



This training is purportedly mandatory for all University employees; however, the University did not track employee compliance for the annual trainings until 2020. Information from LSU's Human Resource Management department indicated that, beginning in 2020, the University established the capacity to run reports of employee noncompliance for managers. Again, though, there is no central office or individual within Human Resources or the Title IX Office tasked with monitoring compliance, and there are currently no consequences for failure to comply with the "mandatory" training requirement.[92] Put simply, plenty of University employees have failed to take the "mandatory" sex harassment training.

Although discussed in greater detail in Section IV below, here we note that the University was previously advised about problems with enforcing compliance with this baseline required training. A 2017 internal audit report specifically recommended that "LSU Administration" should "[e]xplore learning management systems or other methods to efficiently monitor employee compliance with required annual training," because "[t]raining provided to LSU A&M employees is not monitored."[93]

Title IX Coordinator Stewart reported that the University's Human Resources training has remained the same since it was initially developed in 2016. Section One of the online module covers fundamental Title IX concepts, including an overview and history of Title IX and related federal statutes and definitions and activities for understanding and recognizing conduct prohibited by the University's Title IX policy (including sex discrimination, sexual assault, domestic/dating violence, sexual harassment, sexual misconduct, and retaliation). Section Two of the module discusses LSU employees' "responsibility to report an offense if you have witnessed, know about it or were told about it," in addition to providing a summary of the University's Title IX investigative process. Section Two also covers "important terms," including "Campus Security Authority," "Responsible Person," and "Title IX Coordinator."

A "Campus Security Authority" is defined in the training as "someone who is responsible for campus security and has significant responsibility for student and campus activities." Relevant here, "[e]xamples include"

---

[92] Representatives from Human Resources have indicated that they are "working on implementing" a sanction for failure to comply.
[93] Exhibit B.

HB: 4848-0171-9519.1

PLAINTIFFS_000099

- Campus police
- Administrator who oversees student housing
- A student center, or student extracurricular activities
- Team coach
- Faculty advisor to a student group
- Student resident advisor
- Student who monitors access to dormitories

Significantly, though, there is no information or narrative notes indicating what a person designated as a Campus Security Authority is obligated to do upon receiving a report, and there is no written policy memorializing these designations.

A "Responsible Person" is then defined as "any employee who has the authority and responsibility to take action to redress sexual violence or misconduct as prohibited by this policy,"[94] referring to PM-73. However, the training slide for this definition then includes the following edict: "**At LSU, all employees have the duty to report a violation if they've been made aware of an incident.**" While this is certainly clearer and preferable, it does not align with actual University policy.

The training also notes "[e]xamples of Responsible Persons include: a Faculty Advisor, a Staff Member, [and] a Resident Advisor."



The HR training also defines "Title IX Coordinator" as "an employee who shall be responsible for the implementation, enforcement and coordination of Title IX for all LSU campuses. They are responsible for overseeing Title IX compliance for the entire University." The training notes that "Jennie Stewart . . . will serve as the **Title IX Coordinator**, handling all Title IX issues that arise on the Baton Rouge A&M Campus along with the other campuses in the University System." In addition, "Lindsay Madatic, in Human Resource Management, will serve as the Deputy Title IX Coordinator for all employees."

---

[94] The policy excludes "victims' advocates, mental health counselors, or clergy."

HB: 4848-0171-9519.1

PLAINTIFFS_000100



The following slide reiterates the significance of employee reporting requirements:



The narrative notes to this slide state add another wrinkle of confusion though: "As an employee you have the responsibility to report an offense if you have witnessed, know about it or were told about it. LSU expects you to report and cooperate with the appropriate parties when reporting a sexual misconduct complaint to the Campus Title IX Coordinator **or to any LSU responsible employee**. In return, LSU is committed to upholding their piece of the responsibility." (Emphasis added).

The training provides additional instruction for employees on their reporting options and requirements:

HB: 4848-0171-9519.1

PLAINTIFFS_000101



The narrative notes for this slide are as follows:

**I have or have witnessed a complaint**: It is important to report the violation immediately so the University can respond appropriately. If you think the violation may be criminal, contact LSUPD or appropriate law enforcement. **You are able to promptly report the conduct, for employee matters contact the Campus Title IX Coordinator or the Office of Human Resource Management. For student matters, contact Student Advocacy and Accountability.**

**I receive a complaint:** If a student or another employee tells you about a violation or you are aware of or witness a violation, you should act immediately. Gather the basic facts and contact information of the victim and report it to the appropriate party. **You are able to promptly report the conduct, for employee matters contact the Campus Title IX Coordinator or the Office of Human Resource Management. For student matters, contact Student Advocacy and Accountability.** <u>**Remember, failure of a supervisor to report an incident of sexual misconduct involving a person within that supervisor's purviews shall be in violation of the Title IX Policy.**</u> (Emphasis added).



HB: 4848-0171-9519.1

PLAINTIFFS_000102



**2. Title IX Office**

In addition to the HR training, Stewart reported that her office often provides training to several departments and academic units on an "as-requested" basis.

For example, in 2018, the Title IX Office presented a "New Graduate Student Orientation Training," which—relevant here— provides a new definition of "Responsible Person" as "Anyone who works with students (PM-73)." The presentation indicates that such "Responsible Person" with "Actual notice . . . shall promptly (24 hours) notify Campus Coordinator **_or_** any other administrator who may be involved in resolution process," with a reference to "Jennie's designees" at "PM 73, pg 7 C." (Emphasis added).



Notably, though, there are no "designees" on page 7, section C of PM-73—the provision simply directs "[a]ny responsible person who receives actual notice of a complaint" to "promptly notify the Campus Title IX Coordinator, who shall be responsible for notifying the LSU Title IX Coordinator *and any campus administrators, who may be involved in the resolution process.*"

HB: 4848-0171-9519.1

PLAINTIFFS_000103

Again, like PM-73's "or other appropriate school designee" language, the training directive for "responsible persons" to "notify [the] Campus Coordinator *or* any other administrator who may be involved in [the] resolution process" is an unclear mandate which conflicts with other directives in the policy—namely Section IV(C)'s provision stating "Any responsible person who receives actual notice of a complaint . . . *shall* promptly notify the Campus Title IX Coordinator."

The Title IX Office's training also discusses what "Responsible Persons" must report, including "PM 73 Sexual Misconduct" (sexual assault, sexual harassment, dating violence, domestic violence, stalking, and retaliation) and "Title IX – but not PM 73," which includes "Pregnancy or Parenting," "Sex (or perceived sex)," and "Athletics"—presumably referring to Title IX's mandates with respect to gender equity in Athletics. The training indicates that reporting requirements "appl[y] to on and off campus conduct, non-affiliates in our programs," noting "[c]an't suspend a non-student but can limit access."[95]

Notably, since December 2020, Title IX training materials presented to University offices appear to be clearer and more consistent with respect to employee reporting requirements. The following materials serve as examples:

- Lighthouse Advocate Training (February 4, 2021) (continuing to utilize the term "Responsible Employees" and advising employees to "[r]eport directly [to Title IX] not through supervisory chain")
- Staff Senate (January 20, 2021) (defining "Responsible Employee" as "Anyone in contact with students who isn't privileged and in a privileged role" and who "must report directly to portal for TIX Coordinator")
- Cox Athletics Tutoring Staff (January 11, 2021) ("You are a Responsible Reporting Official and required to report to the Title IX Office for information learned in your role as a tutor.")
- Football Recruiting and Alumni Relations Student Employees (December 9, 2020) ("You are a Responsible Reporting Official and required to report to the Title IX Office for information learned in your role as an employee.").

### 3.    Athletics

Since at least 2012, Athletics has been doing its own training disconnected from the Title IX Office and the broader University community. Stewart reported that Senior Associate Athletics Director Miriam Segar "has been the primary contact" for Title IX training in Athletics. While many interviewees believed Segar was the "Athletics Title IX Coordinator," she has never been officially delegated those responsibilities. Stewart was clear that it was her preference to present training directly to Athletics staff and student-athletes, but that her efforts on this front had been rebuffed until Scott Woodward became Athletics Director in April 2019.

Segar noted that "around 2012," the Athletics Department "started focusing on education," and in 2013, the Athletics Department used Taylor Porter to present on the topic of workplace harassment.

---

[95] Another slide indicates that "Reports are about situations of concern regardless of the affiliation of the parties."

HB: 4848-0171-9519.1

PLAINTIFFS_000104

Beginning in 2016, the Athletics Department also engaged its own outside consultant, the "Dan BeeBe Group," (recently re-branded to "Protection for All") to provide separate training to Athletics Department students and employees regarding rights and obligations with respect to incidents and reports of sex-based misconduct.[96] None of this training was coordinated with the University's Title IX Coordinator, and Athletics did not maintain records of this training material.[97]

The Dan Beebe Group provided copies of training materials utilized in sessions with various Athletics constituencies from 2016 to the present and participated in an interview. We note that this training encompasses "human relations" risks outside of Title IX concerns, such as NCAA compliance, student-athlete wellness and abuse, and other ethical concerns specific to athletics operations. In an interview with Husch Blackwell, Mike McCall (a partner with the Beebe Group) explained that the goal of their training was to provide an overview of the various "human relations risks" associated with athletics, emphasize and provide information regarding the many reporting options for these various risk areas, and provide an independent, neutral forum for answering participant concerns regarding prohibited or otherwise "risky" conduct.

While this training has been praised by participants as engaging and informative, concerns have been expressed from the Title IX Office and other stakeholders that the training added an additional layer of confusion regarding options and expectations for students and employees to report Title IX-specific misconduct.

For example, in a 2016 presentation to coaches and staff, the Beebe training identified three "Reporting options": "Supervisor or manager; supervisor's supervisor or manager"; "Any member of Athletics Department administration"; and "Athletics Department Human Resources / Assistant AD." In a different slide, the materials later list "Resources" for students to include, amidst several other offices, the "University Title IX Coordinator/Campus Coordinator; Title IX Deputy Coordinator for Students/LSU Dean of Students; or Deputy Title IX Coordinator for Employees/LSU Office for HRM." Similarly, in a presentation to students for the 2017-18 academic year, the training again delineates "Athletics reporting options" from "University-wide resources," which is problematic because "Title IX" is listed as a reporting option outside of Athletics.[98]

---

[96] According to former Athletics Director Joe Alleva, "The goal [of the Beebe training] was to provide potential victims, and any reporters, with as many resources as possible to foster a culture of compliance and safety for the community."
[97] This training, which was not coordinated with the University's Title IX Coordinator, was touted by former LSU President Alexander in 2016 as a "proactive" step in response to the Baylor University Title IX scandal. *See* Allen, Rebekah. "LSU athletes to receive required sexual harassment and sensitivity training as rape scandals rock national athletic programs." *The Advocate*, July 4, 2016.
[98] Usefully, though, another slide provides several "resources" for victims of sexual misconduct.

HB: 4848-0171-9519.1

PLAINTIFFS_000105

# Athletics reporting options

- Coaches
- Any member of Athletics Department administration, including but not limited to:
  - Sport Administrator/Supervisor
  - Senior Woman Administrator (SWA), Sr. Associate AD
  - Athletics Chief Financial Officer (CFO), Sr. Associate AD
  - Sr. Associate Athletics Director Compliance and Planning
  - Executive Director of the Academic Center for Student-Athletes
  - Deputy Director of Athletics (two people currently holding this same title)
  - Director of Athletics
- Athletics Department Assistance Program (ADAP)
- NCAA Faculty Athletics Representative (FAR)



# University-wide resources

- Office of the Dean of Students (ODOS); Student Advocacy & Accountability (SAA)
- Title IX – sexual misconduct
  - University Title IX Coordinator/Campus Coordinator
  - Title IX Deputy Coordinator for Students/LSU Dean of Students
- Confidential:
  - Athletic Department Sport Psychology & Counseling Services
  - University Student Health Center (counseling)
- LSU CARES (through DOS)



Again, we understand that this training was intended to cover a broad range of ethical, professional, and legal obligations and concerns. Regardless, as the sole in-person training provided to Athletics students and employees, the presentation of information regarding employee obligations to report sexual misconduct directly to the Title IX Office should have been clearer. Here, we note that the Beebe Group, as an outside provider, reasonably relied on policies and information shared by Athletics administration, including the Athletics directives to report matters of sex-based misconduct to Segar (discussed below). The lack of coordination with and oversight by the Title IX Office exacerbated this misstep.

31

HB: 4848-0171-9519.1

PLAINTIFFS_000106

After receiving the Beebe training (from 2016 through 2018), Athletics Department staff were required to sign a "Coaches and Staff Acknowledgement Form" which provided:

> Should any employee observe or be personally subjected to harassment, discrimination, retaliation, bullying, emotional abuse, hazing, sexual misconduct or other misconduct, the Athletics Department and University offer multiple avenues of internal complaint as well as other resources provided during training. Employees are not required to confront anyone who is the source of the complaint or anyone closely associated with the persons who are the source of the complaint. However**, I understand I have a responsibility to inform an uninvolved member of the Athletics Department or University administration, or otherwise utilize available avenues of reporting, so prompt action may be taken to stop misconduct and prevent future occurrences**. . . .[99]

A similar acknowledgement was provided to student-athletes and student-workers who received the BeeBe Training.

Notably, again, instead of opting for the clear directive for personnel to make complaints of "harassment, discrimination, retaliation . . . [or] sexual misconduct" to the University's Title IX Coordinator, the acknowledgment directs Athletics staff to "inform an uninvolved member of the Athletics Department or University administration . . . ."

When asked whether Athletics employees were aware of an obligation to report sex discrimination directly to the Title IX Coordinator, Segar stated, "I think staff were told to notify me for reporting purposes." She emphasized that it was "never presented that I would investigate or adjudicate . . . but the impression was definitely, tell me so I can handle it." Segar clarified that the mandate for all employees to report directly to the Title IX Coordinator has been made clear since Scott Woodward became Athletics Director in 2019, and that when she receives reports or information implicating a Title IX-related incident now, she assists the student or employee with placing a report directly to the Title IX Coordinator.

In addition to having its own training, beginning in 2013, the University Athletics Department under former Athletics Director Joe Alleva promulgated a series of departmental policies which did little to stem any confusion and instead likely compounded it. These directives required Athletics Department employees to report the following incidents to Segar:

> 8.    If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.
>                             . . .

---

[99] Exhibit C (Coaches and Staff Acknowledgement Form).

HB: 4848-0171-9519.1

PLAINTIFFS_000107

13.     Any employee, student employee, or volunteer who becomes aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar.[100]

This Athletics policy makes no explicit reference to "Title IX," "PM-73," or sex-based misconduct, including sexual harassment, sexual assault, stalking, domestic violence, and dating violence.

Football Operations (which is its own department within Athletics) issued its own nearly identical policy, which also included guidelines regarding contact with student workers and recruits within Football Operations.[101] Again, the document makes no explicit reference to "Title IX," "PM-73," or sex-based misconduct, including sexual harassment, sexual assault, stalking, domestic violence, and dating violence.

Additionally, in approximately September 2013, the Athletic Department issued an "Acknowledgement of Policies and Procedures All Football Operations Staff." Provision 6 of this document directs staff to:

> "Report any personal arrests, DWI, misdemeanors or other similar legal matters **to [Sr. Associate Athletics Director Student Services, Miriam Segar**,] within 24 hours of occurrence. If an employee becomes aware that a student-athlete is arrested, engaged in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participate in a hazing activity**, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified** immediately but no later than 24 hours after the event occurs."[102]

The Athletic Department policies and procedures also prompted confusion among the Department's Athletics Training staff. The Athletics Training Department responded by issuing a "Training Room Clarification – Policy Addendum", which provided additional guidance to athletic training staff, including the following:

> Personal exchanges between staff members and students should be extremely limited and should always be witnessed by another staff member. **Documenting the interaction is very important and expected. When personal counseling may be indicated referrals should be made to the appropriate departmental and/or campus resources.** On any occasion that personal interaction occurs, **the staff member must bring the matter to the attention of Head Athletic Trainer**, Jack Marucci.[103]

Finally, beginning in 2013, the Athletics Department also issued a document entitled "Student Employee Policies and Procedures," which were "provided to ensure consistency in expectations

---

[100] Exhibit D ("Athletic Department Policies and Procedures").
[101] *See* Exhibit E ("Football Operations Policies and Procedures") at ¶¶ 8, 16.
[102] Exhibit F (emphasis added).
[103] Exhibit G (Training Room Clarification – Policy Addendum) (emphasis added).

PLAINTIFFS_000108

of student employees among the various departments" and "are not intended to be all inclusive, but a basic guide outlining minimum standards."[104] Relevant here, student-workers were instructed "to report any suspected or known violations of LSU or NCAA policies to my supervisor and/or the Athletic Administration Compliance Office";[105] however, the document makes no reference to reporting violations of "Title IX," "PM-73," or sex-based misconduct, including sexual harassment, sexual assault, stalking, domestic violence, and dating violence. Notably, student-workers "are prohibited from having one-on-one personal meetings with any coach/assistant coach or Athletic Department employee, with the exception of the following persons: Senior Associate Athletics Director, Student Services; Senior Associate Athletics Director, Compliance; Compliance Director; and Human Resource Manager."[106] Similar to the guidance issued to all Athletics employees and Football Operations staff, student workers who "become aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar."[107]

None of these myriad Athletics-related reporting policies, forms, and acknowledgements even mention the University's Title IX Coordinator, much less require Athletics employees to report sex-based misconduct to the University's Title IX Coordinator. It is worth noting here that numerous Athletics Department interviewees noted they had no idea who Title IX Coordinator Jennie Stewart was up until recently. This is alarming in its own right, but especially because, according to Segar, Athletics began issuing these policies and procedures[108] largely in response to incidents involving at least two Athletics student-workers and former Head Football Coach Les Miles. The known facts underlying this incident and the University's response are discussed in section V of this report.

Even after Stewart was hired as the University's Title IX Coordinator, on June 8, 2016, former Athletics Director Alleva was informing Athletics staff to make reports of sex-based misconduct directly to Segar or Assistant Athletics Director for Human Resources Wendy Nall, as opposed to directly to Stewart:

> As we have discussed many times in staff and other meetings, as a university employee, it is your responsibility to report any potential issues of which you are aware. I want to stress that you as a staff member absolutely should **not** attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials. **Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these**

---

[104] Exhibit H (Student Employee Policies and Procedures).
[105] Id. at ¶ 11.
[106] Id. at ¶ 13.
[107] Id. at 16.
[108] Shortly after these documents were issued, several employees throughout Athletics and Football Operations refused to sign their acknowledgement of the Football Operations Policies and Procedures. Joe Alleva, who at the time served as the University's Athletics Director and Vice Chancellor, issued a letter "to make clear that regardless of whether or not [employees] sign the acknowledgment, as an employee of the Athletic Department, you remain subject to all of the policies and procedures as outlined." Mr. Alleva issued a second letter to additional Athletics employees who failed to sign acknowledgement of the policies and procedures in September 2014.

PLAINTIFFS_000109

**individuals have been trained in Title IX law and university protocol for investigation and can help facilitate the proper reporting that is required by law and University policy.**[109]

Alleva's email concluded: "If you have any questions about this directive, please contact me directly or, alternatively, contact Miriam Segar or Wendy Nall."[110] No one from the Title IX Office was copied on the message.[111] Although Alleva has asserted that "The Title IX Office knew of the Athletic Department's policies and procedures and did not recommend any changes," Stewart stated that she was not consulted regarding or made aware of this directive.

In February 2018, Alleva sent another communication to all LSU Athletics staff, including individualized memos to head coaches for all athletic teams, to "remind all of you of your responsibility to immediately report any knowledge you have of inappropriate conduct, sexual harassment or sexual assault."[112] Again, the letter directed Athletics employees not to the Title IX Coordinator but instead to Segar who then could forward the issue "to the appropriate personnel on campus."[113]

Stewart reiterated that this February 2018 letter was a direct contradiction of the University's employee training directives in place at the time. Stewart also said that Alleva's letter contradicted directives from herself, former President Alexander, and former General Counsel Tom Skinner during a meeting called by President Alexander on July 31, 2018, in which all direct reports to the President (including Alleva as Vice Chancellor), were present and told that all reports of sex-based misconduct should be reported to the Title IX Coordinator. We were not provided with any documentation from the University memorializing this verbal directive.

When asked about her understanding of why she was tasked with the responsibility of receiving and reporting all Title IX complaints in the Athletics Department, Segar stated that she "thought [she] was a Deputy Title IX Coordinator for Athletics" until "fairly recently," when Stewart informed her she was not a deputy other than for "equity issues in participation" only. Segar explained that the "message" to employees was "you can't solve these problems on your own" and "we do not handle these things in house," so Athletics employees "were told to report to me" to make the reporting process easier. Segar stated she understood "it was more of a risk to me" to have this responsibility, but expressed confidence that "I reported everything." Segar also noted, "My name is on all the reports submitted to Title IX from Athletics—no one [from Title IX] ever questioned the practice."

We note again that since Scott Woodward took over direction of the Athletics Department in 2019, community members, students, and employees within Athletics have indicated that the situation has improved. With respect to directives and training regarding Athletics employee reporting

---

[109] Exhibit I (Email from J. Alleva to Athletics Staff re LSU Policies & Procedures Reminder dated June 8, 2016) (emphasis added).
[110] *Id.*
[111] Ironically, Athletics employees reported that this particular edict was a response to the Baylor Title IX controversy where among the primary concerns was the fact that their athletics department was too involved in handling Title IX-related matters.
[112] Exhibit J (2018 Alleva Email to All Athletics Employees)
[113] *Id.*

PLAINTIFFS_000110

requirements, all Athletics employees interviewed stated their current understanding that they are required to report directly to the Title IX Office and not to any other Athletics employee or administrator. Recent training by the Beebe Group also accurately reflects requirements for employees to report to Title IX, and Woodward has ensured that the Title IX Office had an opportunity to present directly to members of the Athletics Department.

### 3.    Other Departments

For what it is worth, Athletics is not the only department in the University which had its own separate reporting policy or practice. While we did not canvas the entire University for policies and communications along these lines, several participants in our community interview sessions noted that similar edicts were issued by their supervisors across the institution.[114]

For example, we met with a group of former and current students and employees in one academic department who reported that their department chair instructed all members of the department to communicate concerns or reports to the chair "and to no one else," implemented a "gag order" in mandating that once reported to the chair, the matter could not be discussed with anyone else, and retaliated against individuals who questioned or disregarded this mandate.

In a similar instance, members from a specific academic department indicated a Dean had directed faculty and staff to report sexual misconduct incidents directly to the Dean. In addition, we met with a faculty member who reported being required by University administration to sign what was effectively a non-disclosure agreement prior to proceeding to investigating their complaint against a high-ranking supervisor.[115] The parallels between these instances, in particular, and the issues with respect to reporting and responding to instances of sex discrimination in Athletics throughout this report are remarkable and problematic.

## IV.    Internal and External Risk Management Assessments Relating to Title IX

Many of the issues identified throughout this report have been flagged previously in other reviews of the University's Title IX operations. Specifically, over the last five years, there have been at least five reviews (three from external consultants and firms, one from the University's Office of Internal Audit, and one from a University task force) conducted by the University which have touched on Title IX issues. Additionally, various community interviewees noted that they too have expressed concerns about the University's Title IX processes.

In September 2016, the newly hired Stewart also began sounding the alarm to University leadership that the University's Title IX staffing was woefully behind peer institutions and that she needed additional resources and staff to avoid a bevy of potential harms including "litigation, damages, reputation costs, lost enrollment, [unfavorable] media, harm to folks who've chosen LSU."

As discussed below, University leadership's response to these red flags was lackluster.

---

[114] Issues regarding noncompliant reporting practices by LSUPD are discussed in Section II.E. above.

[115] Other instances were discussed but are not detailed here in order to preserve the confidentiality of the participants.

HB: 4848-0171-9519.1

PLAINTIFFS_000111

### A.    Communications from Community Members

By way of example, on June 4, 2015, an LSU law professor sent a letter to President Alexander and all of the University's Title IX personnel documenting her reasonable concerns with the way in which the University mishandled a Title IX complaint she filed as well as specific concerns with the legality of various provisions in PM-73.[116] In the letter, the professor "respectfully request[ed] that you immediately amend PM-73 and any related policies to correct these deficiencies" and "also request[ed] that you embark upon a wholesale review of LSU's various Title IX and other antidiscrimination policies in order to identify and correct any other problems." The letter then correctly identified specific problems with PM-73 including that "PM-73 Fails to Provide for the 'Prompt and Equitable' Resolution of Complaints" and that "PM-73 does not to contain any timeframes, whatsoever, relative to formal resolution procedures. Nor does it require LSU to provide any such timeframes." The law professor correctly noted that "these defects are unlawful, inexcusable, and must be remedied" and noted very specific concerns with the lack of timeliness in processing her complaint of sex discrimination. As part of this review, we have been unable to find any documentation memorializing how these concerns were assessed or addressed by the leadership of the University.

In addition to this account, conversations in our investigative interviews and community outreach sessions have detailed other instances in which diverse community members—including students, faculty, staff, and community organizations—have shared their frustration and disappointment in the University's response to community efforts to raise awareness regarding issues of sexual misconduct. These frustrations were aimed largely at Alexander whom community members felt did not prioritize this issue or meaningfully engage with individuals raising concerns.

In addition, as discussed more in Section VIII below, several community members and student organizations (particularly diversity and affinity groups) expressed concerns that the University did not have an equity or civil rights office to independently investigate complaints and advocate for better resolution of discrimination concerns.

### B.    2016-17 Dan Beebe Group Assessment

Several months later, the Dan Beebe Group "was engaged by the Tiger Athletic Foundation at Louisiana State University to conduct an Independent Assessment of human relations risks, including misconduct prevention policies and programs applicable" to both the "Louisiana State University's Athletics Department **and** Louisiana State University." A 77-page report was submitted to Tom Skinner, the University's General Counsel, in "draft" form on March 29, 2016. A "final" version was not located as part of this review, and it is our understanding from representatives of the Beebe Group that a final version was not requested by the University.

While the Beebe Group report is replete with solid recommendations on various topics, for purposes of the Husch Blackwell review, the following are especially notable:

- "DBG recommends that future training sessions for student-athletes and other students affiliated with the Athletics Department should address sexual misconduct reporting

---

[116] This was connected to a series of events in LSU's Law Center which received considerable media attention.

HB: 4848-0171-9519.1

PLAINTIFFS_000112

processes, including the designated Deputy Title IX Coordinator for Athletics and other responsible persons within athletics, or the broader University (Campus Title IX Coordinator, Dean of Students/Student Advocacy & Accountability; or LSU PD)."

- "The Title IX policy . . . states that those reporting violations may report to 'any other responsible person', however, **DBG suggests identifying and clarifying 'any other [responsible] person' as applicable to those within the Athletics Department and on campus.**" (Emphasis added).

- "Pages 8 and 9 of PM-73 provide an overview of the investigation process. The document states: 'Any such investigation shall be conducted by a trained person, authorized and assigned as an investigator by the Campus Title IX Coordinator, including, but not limited to, trained employees from human resource management department or the student services or student life department, or other qualified University employees. The Campus Title IX Coordinator will notify the appropriate Campus offices as necessary.' **To encourage early reporting and prompt resolution, DBG suggests that all employees and students affiliated with the Athletics Department should be trained and educated on the offices and persons designated on the Baton Rouge campus to respond to violations of PM-73. It is DBG's experience that the more specific information that is provided about the verified positions and offices on campus, the more likely issues will be reported and resolved in a timely manner.**" (Emphasis added).

Representatives from the Beebe Group met with University leadership to discuss the report and recommendations shortly after the draft was submitted in March 2016. After this meeting, however, it is not clear what, if anything, was done to consider implementing the Beebe Group's recommendations by the leadership of the University. We note, however, that a copy of the Beebe assessment appears to have been provided to the University's internal auditor sometime in 2017, as the September 2017 Internal Audit Report discussed below noted that "suggestions relevant to this audit were incorporated into our recommendations."[117]

## C.    Presidential Task Force

On August 30, 2016, President Alexander issued a "Presidential Charge" to create a "task force" of students, faculty, and staff "to review our current policies, practices, and procedures as they relate to Title IX and to provide recommendations to the President that reflect campus needs and are informed by nationally-recognized benchmarked practices."[118] This was the specific charge:

---

[117] Exhibit B (2017 Internal Audit Report)
[118] Exhibit K.

HB: 4848-0171-9519.1

PLAINTIFFS_000113

I charge each campus task force with the following:

1. Examine current education and prevention practices regarding sexual misconduct (sexual harassment, sexual assault, stalking, dating violence, domestic violence, retaliation, etc.);
2. Examine current support networks and services for victim/survivors of sexual misconduct;
3. Examine current practices surrounding PM-73;
4. Examine policies and practices surrounding pregnant and parenting community members (students and employees);
5. Examine policies and practices surrounding GLBTQ issues;
6. Examine any other related Title IX issues that arise as a result these task forces.*

\* with the exclusion of sports equity

Each task force was then tasked with submitting a report to the President by July 1, 2017. According to the Presidential Charge, "[t]his report shall include any implemented changes, recommendations for change and identified needs to promote environments of integrity, civility, dignity and respect for all members."

In accordance with this charge, the "PM-73 and Related Policies Workgroup" (which included the law professor mentioned above) submitted a report in February 2017.[119] That report included 17 recommendations. Among the most notable for purposes of this review were the following:

### Recommendation 2: Clarity and Accessibility

**Recommendation:** Take steps to enhance clarity and accessibility of LSU's policies, their interplay, and the complaint process.

**Rationale:** PM-73 is a fourteen-page document that is rather difficult to understand. To some extent, this is unavoidable. The workgroup noted that policies at other institutions face similar problems. Nonetheless, every effort should be made to enhance clarity and readability. Further, LSU should take additional steps to help members of the LSU community better understand their rights, responsibilities, and the various procedures relating to Title IX. The workgroup recommends implementing user-friendly approaches to help enhance clarity and accessibility.

In particular, the workgroup recommends the following steps:

- LSU policies should also advise parties of their rights under applicable state and federal law, and include links to appropriate websites (such as the EEOC and the Department of Education).

- LSU should employ flowcharts and similar imagery to more clearly illustrate the concepts covered by PM-73.

---

[119] Exhibit L.

HB: 4848-0171-9519.1

PLAINTIFFS_000114

- LSU should have user-friendly guides for understanding the various types of complains and procedures that may arise under Title IX.

- All of the foregoing should be available on LSU's website in a centralized and easily located place.

**Appendix 2** includes links to websites at other institutions that the workgroup found helpful. Without commenting on or endorsing the particular policy positions taken by these sources, the workgroup noted that these types of materials should be developed by and implemented at LSU.

****

## Recommendation 6: Mandatory Reporting Obligations

**Recommendation:** Better describe the reporting obligations of various members of the LSU community. Expand the persons excluded from "responsible person" to clearly apply to lawyers, doctors, and others in a legally recognized confidential relationship.

**Rationale.** PM-73 defines "responsible person" at p. 4 as "any employee who was the authority to take action to redress sexual violence or who has been given the duty of reporting incidents of sexual violence or any other misconduct prohibited by this policy…" On p. 7, PM-73 explains that "any responsible person who receives actual notice of a complaint" is to report such complaint to the Title IX coordinator. The language in these provisions is somewhat confusing and could be improved in several ways.

First, it is the workgroup's understanding that a "responsible person" means any LSU employee who is not specifically exempted from the definition. But, that interpretation is not necessarily clear from the language on p. 4.

Second, on p. 7, PM-73 requires a responsible person to make a report when he receives "actual notice of a complaint." That same paragraph then requires "any supervisor, or other responsibly party who witnesses or receives a report or complaint" to notify the Title IX coordinator. The language used is somewhat inconsistent and confusing. As a result there is a fair amount of confusion among members of the LSU community regarding their reporting obligations.

****

## Recommendation 12: ACT 172

**Recommendation:** Review PM-73 and related policies to ensure compliance with Act 172 of the 2015 Legislative Session, including the Campus Accountability and Safety Act (La. Rev. Stat. 17:3399.11 *et seq.*).

HB: 4848-0171-9519.1

PLAINTIFFS_000115

**Rationale.** Act 172 of the 2015 Legislative Session sets forth a number of requirements that relate to PM-73. LSU appears to have already taken some steps to comply with the Act—yet some challenges remain. In particular, the workgroup notes the following concerns:

- ACT 172 requires LSU to adopt an inter-campus transfer policy. The workgroup was unable to locate any such document.

- ACT 172 requires LSU enter into a Memorandum of Understanding with law enforcement. The workgroup was unable to locate any such document.

- ACT 172 requires LSU to promulgate a Campus Security Policy. The workgroup was unable to locate any such document.

\*\*\*\*

## Recommendation 14: Title IX Coordinators

**Recommendation:** Ensure that steps are taken to ensure that the Title IX coordinators maintain impartiality—such as appropriate job descriptions and avoiding conflicts of interests.

**Rationale**: The Department of Education has often emphasized the importance of Title IX Coordinators. For example, the April 24, 2015 Dear Colleague Letter explains that the Title IX coordinator should not have "other job responsibilities that may create a conflict of interest." The letter goes on to explain that: "For example, designating a disciplinary board member, general counsel, dean of students, superintendent, principal, or athletics directors as the Title IX coordinator may pose a conflict of interest." The workgroup identified several problems with LSU's current Title IX coordinator structure.

First, it is not immediately clear from the organizational charts available from the LSU website who the various Title IX coordinators report to. The organizational charts (and any related governing documents) should be revised to make it clear that the various Title IX coordinators do not have conflicting responsibilities.

Second, at least one Title IX coordinator's physical office is apparently located in the General Counsel's office. Even if that coordinator does not report to the general counsel—which would clearly be inappropriate—the physical location of the office may give rise to the appearance of a conflict of interest. The Title IX coordinators should have offices that are physically located in neutral and accessible locations on campus.

Third, at least two Title IX coordinators appear to have conflicting job responsibilities. LSU's website lists Maria Fuentes Martin as both the LSU Dean

41

PLAINTIFFS_000116

of Students and the Title IX Deputy Coordinator for Students—a conflict expressly contemplated by the 2015 Dear Colleague Letter. LSU's website also lists Gaston Reinoso as the Title IX Deputy Coordinator for Employees. It appears, however, that Mr. Reinoso may have other job responsibilities in the office of Human Resources Management that might conflict with his duty as Title IX coordinator.

According to the law professor who sat on this task force, the report and recommendations "went nowhere." As part of this review, we have been unable to find any documentation memorializing how this Task Force report was assessed or addressed by the leadership of the University.

### D.    Presentation by Title IX Coordinator

During her first six months as Title IX Coordinator, Stewart spent time observing the Title IX operations of the various campuses under her purview. She also benchmarked what her peers at comparable institutions were doing. According to Stewart, she "realized quickly how far behind we were" and on September 23, 2016, she gave a presentation titled "Title IX Structure and Needs" to Alexander, Skinner and Daniel T. Layzell, the University's Chief Financial Officer at the time.[120] The following slides are especially notable and speak for themselves:



---

[120] Exhibit M.

HB: 4848-0171-9519.1

PLAINTIFFS_000117

## Needs Analysis

- 1 for 8-12,000 (this is the number folks are finding as the standard, Rick Olshak, Scott Lewis)
- Enterprise need 5-6
- Housed in BR (1 lead, 4-5 investigators)
- Dispatched to campuses to work with Campus Coordinators, as needed
- Title IX Office – later may include other civil rights issues (ADA, especially)

## Risks/Benefits

- Ad hoc is a stop gap
- Continuity and consistency
  - Student and employee experience
  - Across campuses
- Specialists
- Best trained and best practiced
- Necessary time to dedicate
- Avoid potential costs
  - Litigation, damages, reputation costs, lost enrollment, media address, harm to folks who've chosen LSU

## Proposed Structure and Investment

- 1 lead investigator $65,000  (first hire)
- 4/5 investigators  (@$50 each, range $45-55K) $200-250,000
- Initial Training $4k/investigator $20,000
- Travel (for investigation) $10,000 (high estimate)
- 2 Grad assistants  (@ $1,700/mo/10 mos)  $34,000
  - Training, education and outreach
  - Data Collection, Data Analysis and Research (benchmarking, case law)
- Total Minimum Request $329,000
- Other costs – ongoing training (webinars, seminars)

According to Stewart, President Alexander said words to the effect of: "We don't disagree with any of this . . . it gives us a good idea of where we need to go." Stewart immediately started drafting a job description for a "lead investigator." That position was not filled for another 19 months when Jeffrey Scott was hired. That appears to be the only additional resource that came from this presentation.

43

HB: 4848-0171-9519.1

PLAINTIFFS_000118

### E.     2017 Internal Audit Report

In September 2017, LSU's Office of Internal Audit issued a report titled "Oversight and Prevention of Sexual Misconduct."[121] The audit's scope was "an evaluation of controls to educate the campus community, investigate allegations, and assign responsibility for ensuring compliance with Title IX obligations." The report included nine recommendations, and several findings. The following are especially notable for purposes of this review:

- "Implement a standard mechanism to consistently record complaints of potential PM-73 violations and track their disposition."
    - o     "Lack of documentation to evidence that [parties] were . . . notified of the initiation of an investigation and the resulting outcome"
    - o     "No formal or consistent procedures for documenting complaints received and tracking their disposition"

- "Obligations of Responsible Employees"
    - o     "[I]t appears that additional procedures may be required to ensure 'responsible employees' have been identified and understanding their reporting obligations under Title IX"

This audit report was sent to President Alexander, Skinner, and Stewart. It is again not clear what, if anything, was done to review or consider implementing the audit report's recommendations by the leadership of the University.

### F.     2018 Baker Tilly Athletics Risk Assessment

In 2018, consulting firm Baker Tilly conducted an "Athletics Risk Assessment." The only document provided to Husch Blackwell from that "assessment" is a PowerPoint deck summarizing the review and the findings. According to one slide, Baker Tilly conducted "a meeting with various members of the Athletic Department [and] members of the campus . . . . to identify ten risks on the Heat Map."[122] According to the slide deck, "[m]embers of the Athletic Department met for several days to discuss each item on the Heat Map and ways to mitigate problems." Notably, one of the top risks identified in 2018 was "Title IX" and, in particular, "Failure to Report an Incident of Concern" concerning an athlete. Again, it is not clear what, if anything, was done to address this concern by the leadership of the University.

### G.     2019 Morgan Lewis Review

Finally, in conducting interviews as part of its review, Husch Blackwell learned that in April 2019, "the Board of Trustees" of LSU retained former U.S. Attorney Kenneth Polite and his firm, Morgan, Lewis & Bockius LLP, "to conduct a privileged and confidential review of LSU's Title IX policies and practices as they apply to LSU's Athletics Department on its A&M-Baton Rouge Campus." A "draft" report summarizing the findings was sent to Skinner on September 16, 2019.

---

[121] Exhibit B.

[122] "Enterprise risk management" was a trendy risk-management framework at the time and "heat maps" were used as a tool to present the results of a risk assessment process.

HB: 4848-0171-9519.1

PLAINTIFFS_000119

As part of its review, Morgan Lewis interviewed twelve LSU employees and three student-athletes. The firm also reviewed various institutional policies and "approximately six (6) Title IX investigation files, all involving student-athletes from LSU's A&M Campus."[123]

The Morgan Lewis report provided an overly optimistic picture of the state of the University's Title IX compliance efforts. According to Morgan Lewis, "LSU has a good structure in place to receive and investigate/resolve PM-73 complaints, as well as substantial resources and support services for those involved in the PM-73 complaint, investigation, and adjudication process." As noted throughout this report, we disagree with this assessment.

With that said, the Morgan Lewis report identified areas where there was "room for enhancement": "(1) awareness of LSU's Title IX Office; (2) awareness of appropriate reporting avenues; (3) communication of investigation and adjudication timing/deadlines; (4) offered resources and support services; (5) training and prevention; and (6) education and wellness initiatives for LSU's student athletes." The review then makes a series of recommendations to address this "room for enhancement."

One of the recommendations from the Morgan Lewis report was to "[i]mpose discipline upon employees who do not report PM-73 prohibited conduct properly." The report correctly noted in a footnote that:

> [14]    Miriam Segar can continue to be a resource for people within the Athletics Department with respect to potential Title-IX issues, but because she does not have an official title within LSU's Title IX office with respect to sexual misconduct reports, employees need to understand that reporting to Miriam Segar does not satisfy their mandatory reporting obligations.

Husch Blackwell, though, was able to locate a track-changed version of this report which included the following suggested edit:

- Impose discipline upon employees who do not report PM-73 prohibited conduct properly.
    - This should only be implemented once there has been sufficient training and education around the proper reporting practice. As explained above, we do not find a basis to discipline any of the employees with whom we spoke because of the general misunderstanding regarding proper reporting processes and lack of evidence of intentional withholding of information or failure to report.

The report also made the following specific recommendation:

---

[123] Husch Blackwell requested the source materials for this review but was not provided this information.

HB: 4848-0171-9519.1

PLAINTIFFS_000120

To encourage and better ensure proper reporting of PM-73 prohibited conduct, we recommend that LSU:

- Treat all LSU employees, including student-employees, as "responsible employees" under PM-73 and, therefore, require that they report any conduct prohibited by PM-73 of which they become aware.[13]  The most effective way to ensure proper reporting is to require each responsible employee to make the report himself/herself.

- Widely communicate to all employees that they are considered "responsible employees" and, thus, obligated to report any PM-73 prohibited conduct directly to the Campus Title IX Coordinator, not their direct supervisor or someone holding a higher position, by (1) revising the definition of "responsible employee" in PM-73 to clearly state that all employees, except those explicitly identified as having confidentiality obligations, are "responsible employees" and, therefore, are required to report any PM-73 prohibited conduct; (2) revising PM-73 to clearly list all reporting avenues (as well as with how to contact them, whether they are a mandatory reporter or confidential reporting option, and whether they are available to employees and/or students; and (3) incorporating this into all PM-73 related trainings, education, programs, and/or presentations.

We agree with these recommendations. Again, though, it is not clear what, if anything, was done to address the concerns identified in the report by the leadership of the University. Remarkably, the report, which was done in part to assess the University's Title IX policies and practices as they apply to LSU's Athletics Department, was never shared with the University's Title IX Office or the Athletics Department.

## H.    March 2, 2021 NASA Review

Immediately prior to the submission of our final report, on March 2, 2021, the National Aeronautics and Space Administration (NASA) provided the University with its review of the "University's compliance with basic Title IX procedural requirements as well as an assessment of LSU's efforts to ensure equal opportunity regardless of sex within the NASA-funded Department of Physics and Astronomy."

NASA concluded:

Based on an evaluation of the data provided by LSU and from interviews and observations during the onsite review, NASA finds LSU is not in compliance with its obligations under Title IX as stated below:

- The University fails to provide the Title IX Coordinator with the resources, including capacity and access to senior leadership, necessary to coordinate their institution's Title IX compliance; and

- The University has adopted and published inconsistent grievance procedures that fail to provide for prompt and equitable resolution of sexual harassment complaints.

NASA has proposed a resolution agreement to the University to address its concerns. The proposed agreement is consistent with our recommendations below.

HB: 4848-0171-9519.1

PLAINTIFFS_000121

## V.    Tone at the Top in Athletics

Numerous studies have demonstrated the seemingly obvious: workplaces in which employees perceive that sexual harassment is not taken seriously are those in which it is more likely to occur.[124] "Experimental evidence indicates that men are more likely to engage in sexual harassment if such behavior is modeled or encouraged by others, which helps explain why organizational culture is so strongly linked to sexual violence prevalence."[125] Leaders within organizations play a pivotal role in shaping the reality of sexual misconduct in an organization. Put simply, the social science research is unambiguous that the proverbial "tone at the top" can make an enormous difference in the incidence rate of sexual misconduct within an organization as well as a willingness to recognize it as unacceptable and ultimately report it.

Before discussing the matters mentioned in the *USA Today* article, it is important to address a report of sex harassment that Husch Blackwell learned about over the course of its review through employee interviews. There were no University records regarding this matter housed in either the University's Title IX Office or in LSU's Human Resources department.

The only person in the entire University who has ever been disciplined in any form for failing to make a report under PM-73 is Athletics Department employee Sharon Lewis, a long-time Football Operations employee and current Associate Athletic Director for Football Recruiting and Alumni Relations.[126] This is ironic because Lewis has lodged several reports of sex harassment throughout her tenure.

In May 2019, Lewis provided a statement to Lindsay Madatic, the University's Deputy Title IX Coordinator for Employees, in an appeal of an institutional finding that she purportedly failed to make a required PM-73 report. That statement chronicled significant alleged misconduct committed by the then-most powerful person in the Athletics Department (and perhaps the University), LSU Football Coach Les Miles, from approximately 2009 until Miles' departure in 2016. Miles has denied all allegations of misconduct, and we are not in a position to offer an opinion on whether the allegations against him are true or not. Instead, the issue is whether the University responded to this report against a powerful member of the University and Athletics Department in a manner consistent with then-existing legal guidance, well recognized best practices, and institutional policy. The answer is "no."

Lewis' report speaks for itself, but among the allegations levelled is that, after losing the 2012 National Championship game, Miles attempted to sexualize the staff of student workers in the football program by, for instance, allegedly demanding that he wanted "blondes with the big boobs" and "pretty girls." According to Lewis, he also allegedly took a more direct role in the hiring of those student workers. Lewis' account was corroborated by several witnesses in our

---

[124] *See e.g.*, Louise F. Fitzgerald, et al., "But Was It Really Sexual Harassment?: Legal, Behavioral, and Psychological Definitions of the Workplace Victimization of Women," *Sexual Harassment: Theory, Research, and Treatment* 5–28 (1997); Chelsea R. Willness, et al., "A Meta-analysis of the Antecedents and Consequences of Workplace Sexual Harassment" PERSONNEL PSYCHOLOGY (2007).

[125] Chloe Grace Hart et al., "Leader Messaging and Attitudes toward Sexual Violence," SOCIUS (Nov. 2018), https://journals.sagepub.com/doi/full/10.1177/2378023118808617.

[126] This incident is described in more detail in Section VI.A.3–4 below.

PLAINTIFFS_000122

review. According to Lewis, she repeatedly expressed her concerns to various Athletics administrators and she felt those reports "went nowhere."

In 2012, Miles had just completed his eighth season as head football coach and in late January 2013, the University announced that it had negotiated a new contract with Miles which included significantly increasing his annual salary. That contract was presented to the LSU Board of Supervisors for approval in February 2013. At the time, Miles was the highest-paid public employee in Louisiana and scheduled to make $4.3 million per year.

In her interview, Lewis stated that around this time her "worst nightmare happened" when an Athletics Department student worker ("Student 1") came to her "very upset about something that happened when she was alone with Coach Miles." According to Lewis, Student 1 requested her assistance in confronting Miles regarding the allegations. Another longtime Football Operations employee was present for the meeting and recalled, from her perspective, that Student 1 was "completely traumatized" by the alleged incident: "This child had a dead stare . . . she just kept saying, over and over, 'You know what you did to me.'" Sharon Lewis echoed this, describing the interaction between Student 1 as "emotional" and "traumatic."

Following this encounter, Lewis immediately reported the incident to Segar. According to two Athletics employees interviewed as part of our review, Student 1 met with Segar, but "the University never did anything about it." There is no record of this student's concern being investigated in a manner consistent with then-University policy. There are also no records or other evidence of Student 1 being provided with notice of her rights and options in response to the complaint, or perhaps more importantly, any supportive resources other than the support of Sharon Lewis and Coordinator of Football Operations and assistant to Head Coach Ya'el Lofton.[127] Lofton and Lewis stated that after this incident, Student 1 "fell off the face of the Earth" and did not "know what happened to her after that."[128]

Following this incident, Athletics leadership (including then Athletics Director Joe Alleva) issued directives to Miles to refrain from contact with student workers and also engaged Taylor Porter to provide training to all Athletics employees on a variety of compliance topics, including sexual harassment.[129]

Despite these measures, in February 2013, a second student worker (identified as "Student 2") "[r]eported inappropriate contact and text messages with Miles" to Lewis, which were documented in her communications to Human Resources. In turn, Lewis immediately reported the incident and provided the text messages to Senior Associate Athletics Director Segar.

---

[127] According to Lewis, following this confrontation with Miles, Lewis "took [Student 1] to Miriam and [Assistant Athletics Director for Human Resources] Wendy Nall." After Student 1 "told her story," Lewis "was dismissed from the meeting and told she had "fulfilled her role to report up" and Segar and/or Nall "will handle it." Lewis stated that sometime after this meeting, Segar "called [Lewis] recommending that [Student 1] be moved out of the building" and "can no longer work in football," directing Lewis to "put [Student 1] somewhere else in Athletics." In interviews with Husch Blackwell, Segar stated that, from her perspective, Student 1 "had already addressed it directly with coach" by "talk[ing] to him about it," and although the student "was upset," she communicated she " did not want to do anything about it."

[128] Student 1 ultimately graduated from LSU in 2015.

[129] Husch Blackwell was provided with a copy of these training materials as part of this review.

48

PLAINTIFFS_000123

Student 2's report of sex discrimination was clearly not handled in a manner consistent with then University policy. Instead, Student 2's report prompted Segar and then-Athletics Director Alleva[130] to conduct initial fact-finding, which was reported to the University's outside law firm, Taylor Porter (which did considerable legal work for the Athletics Department and essentially served as "outside general counsel" for the University at the time). Then-interim LSU Chancellor Williams Jenkins asked Taylor Porter to investigate the allegations with Segar's assistance. This designation raises conflict of interest concerns as it is not clear how the firm could have been neutral in the investigation.[131] There was also no provision in the applicable Title IX policy for these sorts of investigations to be outsourced to third parties.

During the course of their investigation, Taylor Porter learned that numerous Athletic Department employees indicated that Miles became more hands on about many things in the Athletic Department, including the selection of student employees, following his team's loss in the 2012 National Championship game. In particular, according to witnesses interviewed by Husch Blackwell, Miles allegedly participated in recruiting and interviewing female student employees and "wanted them to have a certain look." At least three witnesses recalled Miles labelling the student workers as "a.m. and p.m. girls"—a designation which Miles also openly gave to female full-time Football Operations staff. Several other employees recalled Miles referring to the student-workers as looking like a "bad bowling team." Employees interviewed as part of Husch Blackwell's review stated that "only certain ones were allowed to be in the head coach's office, not everyone. And most of them were either blonde, they were *all* attractive, but most of them that came through here were blonde." Another individual recalled Miles saying "many times," "I want the blondes not the brunettes working in this office." As one witness explained, "It makes me want to vomit, because it was kind of that every year it got a little worse and a little worse and for a while, after a while it almost became normal that we can't hire anybody that's fat and ugly." Notably, there is no record of these reports of sex discrimination in the University's files and there is no record of these reports ever being investigated.

During Taylor Porter's investigation, Miles denied anything inappropriate happened. It is important to note that complicating matters was the fact that Student 2 and her father were adamant that her confidentiality be protected. LSU's outside counsel ultimately concluded that Student 2's allegations, even if true, would not constitute prohibited sexual harassment under applicable law.

We disagree. In any event, the investigation ultimately concluded that accepting Miles' version of events, he had acted inappropriately and was required to attend training.

On May 15, 2013, the results of this investigation were communicated to three members of the Board of Supervisors (Garret Danos, Stanley Jacobs, and Robert Yarborough), Shelby McKenzie

---

[130] According to written responses submitted to Husch Blackwell in connection to this review, "The Athletic Department did not engage Taylor Porter to investigate the allegations against Les Miles," and Alleva "assume[s] the University's President and/or the University's Board of Supervisors engaged Taylor Porter to investigate the allegations against Les Miles."

[131] This investigation was conducted after the Department of Education's April 4, 2011 Dear Colleague Letter which, among other things, noted that "a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

HB: 4848-0171-9519.1

PLAINTIFFS_000124

(who is described as "LSU Lead Legal Counsel"),[132] Alleva, and Segar. After a discussion of the investigation, these representatives accepted Taylor Porter's findings and recommendations and did not take further action.

Again, there was no file of this matter at the University. Instead, the report regarding the investigation was intentionally stored offsite at LSU's outside counsel's office and with Miles' attorneys. It is our understanding that Miles also entered into a release agreement with Student 2, the terms of which we are not privy.[133]

Despite representations that he accepted this outcome, Alleva has stated that he "recommended to the University's President, to the University's Board of Supervisors, and to the University's attorneys, to terminate Les Miles for cause." Significantly, on April 19, 2013, Alleva sent the following email to Chancellor Jenkins and counsel:

> As we move closer to deciding how to handle the results of our investigation I want to recommend at minimum a few items… a written reprimand outlining his inappropriate behavior and the consequences for it occurring again, some sort of counseling, and a reduction to any bonuses paid to him equal to the attorney fees incurred as a result of his inappropriate behavior….I also believe the full board needs to made aware of the situation before any decisions are made. I think his continued employment needs to be seriously considered. When reviewing the use of a secret personal phone, the text messages, the fact that I had already advised him against such behavior, the evening meeting off campus, etc. it gives me great concern for the future. This issue can or will have serious impact on our university and athletic department.

We have been unable to locate a response to this email.

On June 21, 2013, Alleva sent the following email to counsel and incoming LSU President F. King Alexander:

> Bob and King, thanks for call today…one more time I want us to think about which scenario is worse for LSU.  Explaining why we let him go or explaining why we let him stay. Proactive or reactive…I always believe that people are innocent until proven guilty and in this case I believe he is guilty of insubordination, inappropriate behavior, putting the university, athletic dept and football program at great risk.  I think we have cause. I specifically told him not to text, call or be alone with any student workers and he obviously didn't listen.  I know there are many possible outcomes and much risk either way, but I believe it is in the best interest in the long run to make a break.  The court of public opinion would  favor us.  The court room? On July 2nd  we will know more but the facts will remain the same….thanks.

---

[132] According to interviews with University employees, McKenzie served as LSU's interim general counsel as the University's former "Office of General Counsel" transitioned to the "Office of Legal Affairs." McKenzie is also a long-time Taylor Porter attorney.
[133] Student 2 ultimately transferred to another institution to complete her undergraduate degree.

HB: 4848-0171-9519.1

PLAINTIFFS_000125

We have been unable to locate a response to this email.

In the meantime, following the investigation, Sharon Lewis became so distressed by the "lack of support from Administration" that she had a "mental breakdown" and received mental-health treatment that LSU Athletics paid for. Following the report, Lewis also claimed that Coach Miles and various members of the Athletics Department staff became hostile towards her. That alleged retaliation was reported by Lewis but was never investigated by the leadership of the University.

Of note, immediately prior to his tenure at LSU, Miles served as the Head Football Coach at Oklahoma State University ("OSU") from 2001–2004. On September 13, 2013, Sports Illustrated published a story about the OSU football program which described "Orange Pride," OSU's "hostess program."[134] While such programs had a long history, public scandals at other schools beginning in 2004 resulted in the elimination or significant limitation of hostess program activities due to "suspicions about sexual interactions."[135] The *Sports Illustrated* article indicated that:

> Oklahoma State not only kept Orange Pride intact, but by 2004, multiple sources told SI, the group also became a key contributor to the program's rise. Membership in the organization more than tripled; there was a greater emphasis on attracting prettier and more outgoing women; and more than a dozen Cowboys who played from 2001 to '11 told SI that a small number of Orange Pride members had sexual relations with them or with other prospects during recruiting visits.[136]

Although no person interviewed in the *Sports Illustrated* piece had "direct knowledge of a coach or athletic department staff member instructing a hostess to have sex with a recruit," the article indicated that some "Oklahoma State football personnel played a central role in vetting Orange Pride candidates, with Les Miles, . . . interviewing some applicants."[137] These allegations were corroborated in the article by interviews with female Orange Pride members.[138]

One "former staff member" also stated in the article that "he and at least one other staff member under Miles were aware that a few Orange Pride members were having sex with recruits."[139] Notably, *Sports Illustrated* also reported that "multiple sources told SI that the group underwent a significant transformation after Miles replaced Bob Simmons in late 2000"—"its culture also changed," referring to Orange Pride members "sleeping with" a recruit "on the spot."[140]

---

[134] SI Staff, *Special Report on Oklahoma State Football: Part 4 – The Sex*, SPORTS ILLUSTRATED, September 13, 2013, https://www.si.com/college/2013/09/13/oklahoma-state-part-4-sex. As the *Sports Illustrated* article explained, "Hostess programs have been part of college football since the 1960s. Friendly, often attractive students greet recruits, usher them and their parents around campus and promote the virtues of the school."

[135] In 2004, the NCAA passed legislation that, in part, prohibited "the use of alcohol, drugs, *sex* and gambling in recruiting." *Id.* (emphasis added).

[136] *Id.*

[137] *Id.* When asked about his involvement in Orange Pride and alleged sexual activities occurring in the program, Miles stated: "I am not aware of this ever happening and am quite sure that no staff member was aware of recruits sleeping with this group of students or any other students."

[138] *Id.*

[139] *Id.*

[140] *Id.* The *Sports Illustrated* article also notes, "In December 2008, The New York Times reported that hostesses at LSU sat on the laps of recruits. (The Tigers' coach then, as now, is Les Miles.)"

51

PLAINTIFFS_000126

Despite these allegations being published just months after the University's "resolution" of the student complaints—during which the University's leadership became aware of staff concerns that Miles was allegedly sexualizing LSU's student worker staff in a manner similar to the allegations in the *Sports Illustrated* report—we have found no evidence indicating that the University conducted an investigation into these concerns.[141]

Miles continued to serve as LSU's Head Football Coach for three years. Miles was fired by Alleva on September 25, 2016 after starting the season with a 2-2 record. At the time, Alleva described the termination: "Decisions like this are never easy ones to make. Coach Miles has done a tremendous job here and he's been a great ambassador for our University, which makes this even more difficult."

It is difficult to meaningfully determine the full extent of the impact this incident and the University's handling of it had on the climate within the Athletics Department—both in terms of creating a culture which tolerated sexual misconduct and dissuaded employees from reporting that misconduct. It certainly was not positive.

Perhaps better than any organizational psychologist could, one long-time Football staff member made a number of insightful remarks about some of the damage created by this episode on the culture of the Athletics Department:

> It just baffles me, though, that for so long, this went on and that kinda became the normal, right? And you just don't talk about it and you don't say anything, you just kinda go, 'cuz we're protecting LSU, we're protecting our brand, we're protecting our head coach, we're protecting this, we love LSU so we're gonna be loyal to LSU so we're gonna do what we can to help it and try to fix it. But you know, nobody wants a big blowup to where oh, there's a big scandal, you know? I always felt like we always had to be protective, you know? You want to protect LSU. You don't want there to be any big blowup or scandal or, you know, much less anything like that, right?
>
> ***
>
> I felt like maybe if the University had done more when the first child had happened, maybe that would have helped clean up a lot of other stuff that maybe wouldn't have happened further down the line with not just him, with even players and anything like that. Because sometimes if people see somebody getting in trouble and it's made a big deal out of it, they're not as apt to go, "well, I can keep doing that because nobody gets in trouble around here, even the head coach didn't get in trouble for doing it." So we didn't set a very good precedent by not handling the stuff the way we did, you know? That has allowed things to happen since then that maybe might not have, you know? If something—it would have been stopped and, you know, somebody made an example out of . . . .

---

[141] In written responses to questions posed by Husch Blackwell in this review, Alleva stated that "Upon reading the SI report, I assigned the Athletic Department's Compliance Staff to review the practices and culture within our football program to ensure adherence with NCAA and Title IX standards."

PLAINTIFFS_000127

\*\*\*

To think that that was almost normal for us and because we had been involved in that so long, until you step back and look at it and go, my God, what did we—what were we doing, you know? But that's how—that's the progression it came to.

\*\*\*

It just became normal, which is sick now that you think about it. The fact that that became normal to us was crazy, you know? But it was always, like, nobody ever really wanted to . . . rock the boat . . . and then—poor Sharon [Lewis] though. I mean, like I said, she had most of the brunt of it because she was over the girls. . . .We were so beat down and caught up in that mess, we didn't realize how bad we were, you know?! That's what upsets me.

## VI.    Summary of Files Connected to *USA Today* Article

As noted throughout this report, Husch Blackwell's review was initiated in response to an article published by *USA Today* on November 16, 2020.[142] The article identifies three LSU student cases that were allegedly mishandled by the University and includes detailed witness statements and information obtained from documents provided by those witnesses and/or obtained through public information requests to the University. The students in those three cases are ██████████, ██████, ██████, and Respondent A.[143]

In addition, the article noted that "██████ and ██████ included, at least nine LSU football players have been reported to police for sexual misconduct and dating violence since coach Ed Orgeron took over the team four years ago, records show. But the details of how LSU handled complaints against the other seven, including two who played key roles on its 2020 national championship team, remain largely secret." These seven matters are discussed below.

Husch Blackwell requested and obtained copies of records associated with each of these matters. In addition, Husch Blackwell conducted interviews with each of the publicly identified survivors referenced in the *USA Today* article and subsequent reporting. We also communicated and met confidentially with other victims and witnesses affiliated with these cases and interviewed current and former University employees with knowledge of the cases.[144] The following provides a detailed discussion of the allegations raised by the *USA Today* article as well as our assessment of

---

[142] Kenny Jacoby, *LSU mishandled sexual misconduct complaints against students, including top athletes*, USA TODAY, November 16, 2020, https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against-████████████-other-students/6056388002/

[143] Respondent A was not publicly identified in the *USA Today* article or subsequent reporting. In addition, the individuals reporting sexual misconduct against Respondent A (Elizabeth Andries and ████████████████) requested in interviews with Husch Blackwell that he not be publicly identified out of fear of retaliation. Husch Blackwell has honored this request throughout the report.

[144] We had to make our best judgement about reaching out to victims who did not contact us and were not already publicly named, balancing our need to gather information for the assessment and our desire to respect their privacy and not cause further trauma.

PLAINTIFFS_000128

the University's response to these matters. As demonstrated below, while some of these matters were handled well, many were not. When incidents were handled poorly, we have been forthright in identifying the missteps. Having a thoughtful understanding of the errors and the causes of those errors is critical in informing our recommendations below.

### A.    ███████████

For reasons mentioned above, dating and domestic violence cases are perhaps the most complicated matters Title IX offices are tasked to address. Handling these matters well, especially at an institution as large and complex as LSU, requires extensive resources, consistent and meticulous recordkeeping, constant and open lines of communication between separate institutional offices, constant communications with the victim, seasoned practitioners who understand the unique dynamics of these matters, and—perhaps most importantly—a sense of urgency. All of these were lacking when ███████ enrolled at LSU.

███████ was a highly recruited high school football player who committed to LSU on January 2, 2016 and enrolled at LSU during the summer of 2016. Described by LSU as "one of the most athletic players perhaps to ever wear an LSU football uniform,"[145] ███████ actually played sparingly in his first two seasons with LSU (he caught a total of four passes in his two seasons with LSU) but was purportedly "poised for a breakout season in 2018."[146] During his enrollment and immediately thereafter, however, ███████ was accused of abusing at least three female LSU students. He was not expelled from the University until July 18, 2019. The following describes the University's response to ███████ abuse. The myriad problems with the University's handling of Title IX matters are on painful display in its handling of this matter.

### 1.    Recruitment

LSU was a return home for ███████ who grew up in Baton Rouge but attended and graduated from IMG Academy in Florida. Notably, ███████ attended four different high schools in four different states prior to enrolling at LSU.[147] Despite these transfers, it does not appear that anyone at LSU reviewed whether there were disciplinary issues at any of these schools which triggered his departures.[148]

With that said, there were two athletics-related flags on ███████ enrollment. First, a bylaw of the Southeastern Conference (SEC) required institutions to certify the academic credentials of any prospective student athlete who had transferred high schools during their senior year.[149] In addition, a representative from IMG Academy disclosed to LSU that ███████ education at the private school had been paid for by Baton Rouge businessman, ███████████. This was potentially

---

[145] https://lsusports.net/sports/football/roster/███████████0996.

[146] *Id.*

[147] ███████ attended Saint Stanislaus College in Mississippi from October 22, 2012 until August 12, 2013. He then enrolled at Baton Rouge's The Dunham School where he withdrew on January 21, 2014. He then transferred to Fork Union Military Academy in Virginia from January 20, 2014 until August 3, 2015. Ultimately, he graduated from IMG Academy in Florida on June 3, 2016.

[148] In addition, the University's enrollment application in place at the time did not request students to self-disclose any prior disciplinary history.

[149] *See* SEC Bylaw 14.1.2.2 (d)(1).

PLAINTIFFS_000129

significant from an NCAA-compliance standpoint because ███████ was an LSU Athletics booster.

The institutional review of these flags culminated in a brief report finding that "████ credentials were valid and accurate." The report provided additional context for the relationship between ████ and ████████:

### Notes

6th Grade- started playing basketball with ████████. Soon started spending time after school at the Bernhards and later when his mother started going through personal struggles, the ██████s because his **permanent guardians** (not sure is any documents were signed) and ████moved into their home. He refers to his family to include his mother ████████ and his guardians ██ and █████████ – (Herald Tribune Article)

Before IMG Academy, ███attended Dunham High School.

Again, there is nothing in this report suggesting any sort of inquiry into why ████ left his previous institutions. Regardless, in accordance with the SEC's Bylaws, on August 11, 2016, President Alexander certified that "I have personally reviewed and approved . . . the decision made by this institution" to admit ██████.

## 2.    Report of Abuse Involving Complainant 1

Complainant 1[150] enrolled at LSU in the fall of 2014. She ultimately graduated in the fall of 2018. When she first enrolled, Complainant 1 had an interest in a career in athletics and was hired by Director of Football Recruiting Sharon Lewis in the fall of 2014 for a position on LSU's football recruitment staff under then Coach Les Miles. In that role, Complainant 1 "helped in the recruiting process in general" which included "a lot of admin stuff, preparing for events with the recruits." On game days, she "would . . . host the families and the recruits" and provide hospitality to the families and recruits. Complainant 1 was directly supervised by Assistant Director of Recruiting Operations Keava Soil-Cormier. Soil-Cormier reported directly to Lewis.

Complainant 1 also met Executive Deputy Athletics Director Verge Ausberry her freshman year and he "filled a mentor/friend role" for her. During her sophomore year, she started babysitting for Ausberry at his home.[151]

Complainant 1 said that she started dating ████during the summer of 2016 when he first arrived on campus. They met through a mutual friend and Complainant 1 thought ████"seemed like a really nice guy, very charismatic, very goofy." According to Complainant 1, though, "pretty soon into [their] relationship, ████started abusing her "verbally and emotionally . . . but it was very subtle." She described that initial abuse and its escalation as:

---

[150] Complainant 1 was interviewed as part of this review on December 14, 2020 and January 15, 2021.
[151] We note that this arrangement violated Athletics and Football Operations Policies and Procedures in place at the time, which stated: "No employee may hire a Football Operations student employee to perform personal work (babysit, run errands) or work on non-LSU matters."

PLAINTIFFS_000130

just jealousy of not wanting other guys to talk to me. Saying little comments of like "oh, I don't like when you wear that, it makes you look like a whore." What friends I could go out with or if I could go out without him to the bars. And then I would say the turning point was—it was like even before school started. And it was after a football practice. And one of the older boys on the team who was the same position as ██████ said some comments about who I'd been with my freshman year on the team and I guess it got into ██████'s head because then he—that night had—you know, a comeback. And we were at his apartment[152] and [he] just started yelling and that was when he first got physically aggressive. I tried to leave and restraining me to leave and pinning me against the wall and—so that was, I guess, kind of how it started.

Complainant 1 noted that this incident in the Summer of 2016 "opened the floodgate" and started a "cycle of him apologizing and being really sweet and then we would get into another fight and it would kind of go like that." She estimated that ██████ physically abused her at least ten times. Their relationship was "off and on, up and down, toxic, up until [██████'] first arrest with Jade [Lewis] in 2018."[153]

During the Fall of 2016, after a football game, Complainant 1 said there was a public incident between her and ██████ at a Tigerland bar (JL's Place):

So it was after a football game. And so we all go out and I had gone out with a couple of my friends and some of the guys on the team. . . And ██████ and I] were fighting that night. We weren't on the best of terms. And I walk into the bar and I didn't know he was—I knew he was going out, but I didn't know where he was going. There's six or seven bars to kind of choose from.

So I walk in and we make eye contact and he's making out with some other girl while maintaining the eye contact with me and then walks over to me and . . . tries to grab me and kiss me and . . . grabs my butt and is kind of like groping me in that sense. I . . . kind of grab his hands and push him off and, like, don't touch me, don't touch me like that or whatever. And that's when he two-hand pushes me and I fall back on the bar—or on the floor. And then I get up and I reacted and threw my drink on him. And that's when we just kind of started yelling at each other and he lunged at me and kept swinging and, you know, luckily there [were] people there. You know, it was after a game so there was a bunch of teammates and they held him back. There was probably four or five and then I had one of the teammates holding me back. And ██████'s just continuously trying to swing and push through. And . . . I'm yelling back and . . . I'm also in his face and not walking away at that moment and, you know, are you really going to hit me? You're really going to hit me in public? Like, you stupid bitch. And just really angry.

---

[152] ██████ was living off-campus in a local apartment at the time.
[153] ██████ was first arrested on August 8, 2018.

56

PLAINTIFFS_000131

And so we do get separated and they removed ███ from the bar and we decided to kind of—you know, let's stay here. Let's have a good rest of the night.

And so when it was time to leave, it was kind of—we thought, oh, ███ is gone. We haven't—you know, we don't see him. It's safe to go. And so I was riding home—or one of the drivers was one of the teammates. And so he was like, let's walk to the car. Like, I'll walk with you. And so we started walking and then all of a sudden, ███comes charging again through the parking lot and yelling and swinging and trying to get me. And again, people had to keep us apart and I just kind of get ushered to the car and we leave.

In an interview with reporters, Complainant 1 described the incident this way:

███ was there, and Complainant 1 said she saw him kissing another woman when she arrived. Complainant 1 said she brushed ███ off when he approached her, which made him angry. "He two-hand pushed me, and I flew back and fell on the floor of the bar," Complainant 1 said.

They threw drinks at each other and were yelling, and teammates had to restrain him, she said. The bar manager kicked ███ out, while she stayed behind.

When she left that night accompanied by another player, ███ "comes out of nowhere and charges me," Complainant 1 said. Again, teammates restrained him, she said. ███ showed up at her apartment that night, she said, and she had to call teammates to come get him.[154]

Complainant 1 and ███ "lived in the same [off-campus] apartment complex" and ███ lived "down the hall from [Complainant 1] at this point." Later that night, ███ "comes banging on my door, all angry and so I call some of the teammates to come get him."

According to Complainant 1, ███ preemptively informed his position coach, Dameyune Craig,[155] about what happened, but Complainant 1 said ███ "story was kind of 'I was just having a good time and Complainant 1 is an angry girlfriend or whatever it was and came in and just randomly threw a drink on me and I left . . . It was all Complainant 1's fault.'" Craig, in turn, informed Complainant 1's supervisor Lewis about the incident. It is worth noting that even this version of the report triggered an obligation under then-existing Athletics policy for Craig to notify Segar of this incident. Segar says she never was notified about it and we have been unable to locate any University records suggesting Craig made a report.

According to Complainant 1, Lewis "found out what players were there that night or called around and kind of talked to some of the players and did a little bit of her own investigation." Lewis

---

[154] Kenny Jacoby, Nancy Armour, and Jessica Luther, *LSU knew in 2018 that officials kept allegations against athletes in-house. It did nothing.*, USA TODAY, December 15, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/12/15/lsu-knew-officials-skirted-title-ix-policy-failed-to-report-sexual-misconduct-███-2018/3859884001/

[155] Craig is currently employed at Texas A&M. He has not responded to requests to be interviewed.

HB: 4848-0171-9519.1

PLAINTIFFS_000132

indicated to Complainant 1 that "some of the players backed up ████ and some of them backed up me." Lewis then allegedly asked Complainant 1 if she wanted to set up a meeting between Complainant 1, ████, and Craig to "talk about everything." Complainant 1 "didn't feel comfortable with that."

Instead, Complainant 1 proposed a meeting between herself, Lewis, Soil-Cormier, and Craig. "But when I got there that week, it was just me, Keava and Sharon, which was definitely better." During that meeting, Complainant 1 said Lewis asked for "my side of it and never asked if this is the only time or has this happened before." Notably, Lewis suggested "calling the police;" however, according to Complainant 1, Lewis framed that possibility as: "if you feel like this is worth ruining his future, we can totally call the police." Lewis purportedly also indicated, "████ career at LSU will be over, but we can totally call the police if that's what you feel like he deserves after this."

At that point, Complainant 1 "was still what I felt like was in love with ████" and declined the offer to call the police. According to Complainant 1, Lewis indicated "whatever punishment you see fit, that's what we'll do. We'll leave it up to you." Complainant 1 responded, "I just want him to get the help he needs and I wanted him to go to therapy." Complainant 1's request was motivated in part because ████ purportedly disclosed to her that he had been abused as a child.

According to Complainant 1, at no point did Lewis or Soil-Cormier offer any counselling or assistance for Complainant 1, including any resources provided by the Title IX Office. They "never even asked how I was." In a "cry for help," Complainant 1 indicated she told both Lewis and Soil-Cormier that she "was scared of" ████. Despite that, she said no one followed up with her and "life just went back to normal."

In a newspaper article, Complainant 1 also said, "I told [Lewis and Soil-Cormier], 'He lives down the hallway of me at my apartment. I'm scared of him.' And, I remember it so vividly: They laughed . . . Like, 'Are you serious?' So dismissively. I wasn't ready to tell people about my (abusive) relationship, but I was asking for some type of help, and they laughed it off."[156] As part of this review, both Lewis and Soil-Cormier adamantly deny this. A third party interviewed as part of this review and who witnessed this meeting also sides with Lewis and Soil-Cormier and said Complainant 1 did not say she feared for her safety.

In 2018, after seeing an article regarding ████ arrest, Complainant 1 felt like she was "drowning." At that time, she was working in the Athletics Administration building and described making a disclosure to Ausberry:

> ████ and I were still somewhat involved. And so I was just very emotional about it and Verge and I somehow got on that topic about Jade and what had just happened and I had told Verge, you know that this had happened between ████ and I, too. And that he is capable of doing whatever Jade said he has done. And that's—that

---

[156] Jacoby, K., Armour, N, and Luther, J. "LSU knew in 2018 that officials kept allegations against athletes in-house. It did nothing," USA Today, December 15, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/12/15/lsu-knew-officials-skirted-title-ix-policy-failed-to-report-sexual-misconduct-████-2018/3859884001/.

HB: 4848-0171-9519.1

PLAINTIFFS_000133

was when he first had told me, like, about oh, like this is a compliance. He's like—
you could—you know, told me about Miriam [Segar] and then it was like the next
day or the day after is when I got a random phone call and voice mail from Miriam.
And then I immediately . . . called her back. And then I just never heard from her
again.

Complainant 1 noted that when she made the disclosure, Ausberry "stopped the conversation" and
said "I don't want to know all the details . . . this needs to go to someone else." Complainant 1
does not "remember if [Ausberry] told me to contact Miriam. I feel like if he did, I would have
contacted Miriam. But all I know is after that conversation is when Miriam had contacted me."[157]

In his interview as part of this review, Ausberry confirmed the substance of this conversation with
Complainant 1. He also said he reported this to Segar which likely explains why Segar reached out
to Complainant 1.

The first time LSU's Title IX Office became aware of any incidents between ███ and
Complainant 1 was in October 2018. At that point, Complainant 1 described having a "breakdown"
in her internship supervisor's (Brenton Sumler) office and was not sure what to do. After asking
how she could support her, Sumler (who Complainant 1 described as "an amazing man and
awesome at what he does" [158]) walked Complainant 1 to the Title IX Office. The Title IX Office
then provided Complainant 1 with resources and academic support "because I was definitely
struggling with school." She also "got into counseling at LSU."

### 3.     October 2018 Title IX Investigation of Sharon Lewis

In addition to providing resources to Complainant 1, beginning in October 2018, the Title IX
Office initiated an investigation into "allegations of a failure to report violations of University
Policies on Sexual Misconduct . . . concerning LSU employee Sharon Lewis toward LSU student
Complainant 1." Given that others—including Soil-Cormier and Craig—were purportedly aware
of the incident between Complainant 1 and ███ and failed to report it to the Title IX Office, it is
difficult to understand why Lewis was the only respondent in this investigation. While the
University's Sharon Lewis investigation is a bit of a detour from the allegations of abuse involving
███, a detailed discussion is helpful here because that investigation in late 2018 is fraught with
many of the same missteps that we have seen in other files we have reviewed.

As part of the Title IX Office's investigation into Lewis, Complainant 1 was interviewed by
Investigator Jeff Scott on October 3, 2018. The information she provided in that interview is
materially consistent with the information she provided as part of this review and summarized
above. Of note, Scott's interview notes attribute the following to Complainant 1: "[Complainant
1] disclosed that while she was dating ███ that about a month into their relationship he became
angry and pinned her up against the wall—he would grab her by the neck and hold her down on

---

[157] Complainant 1 also indicated that "Verge cares about ███. I don't think his methods are right, but I think he
views ███ as kind of a son and wanted to help him."
[158] Sumler left LSU in August 2019 and currently works as the Director of Student Athlete Experience & Well Being
at the University of Oklahoma.

HB: 4848-0171-9519.1

PLAINTIFFS_000134

the bed . . . She stated she was embarrassed and never told anyone because she really liked him and wanted to help him."

Sharon Lewis was interviewed by Scott on November 5, 2018. According to the notes summarizing that interview, Lewis acknowledged that she knew Complainant 1 and ████ were dating. According to Lewis, she met with Complainant 1 in 2016 to investigate a report Craig made to her. Specifically, "Coach Dameyune Craig came to her because players had informed him of [Complainant 1]'s behavior at Tiger Land—[Complainant 1] reportedly threw [a] drink at ████ and he threw [a] drink back at her—he had to be [restrained] by players—she was restrained by her girlfriends." Craig purportedly "told [Lewis] he talked to ████ and ████ denied it—he also talked with other player witnesses." In turn, Lewis then "talked to other players also and they all gave the same story." It is not clear from the investigative report what this "same story" was.

During her Title IX interview, Lewis said she "called [Complainant 1] in along with Keava [Soil-Cormier] [Assistant Director of Recruiting Operations] and Ya'el Lofton [Coordinator of Football Operations]," during which Complainant 1 said ████ "never hit her." Lewis "said she asked if [Complainant 1] felt threatened" and Complainant 1 purportedly "said 'no.'" According to Lewis, Complainant 1 "admitted to throwing [a] drink at ████ [because] he was with another girl." According to Lewis, "because [there was] no physical altercation or sexual assault," "she let [Craig] handle" the situation because "this was the way athletics handled things." Scott's notes of the Lewis interview indicate that Lewis said "she was not sure if she reported [the incident between Complainant 1 and ████ to Miriam or Verge."

In her interview as part of Husch Blackwell's review Lewis adamantly denied saying this. Instead, she emphasized that she reported the incident via phone to Miriam Segar moments after the meeting occurred. Regardless, it was clearly not reported to the Title IX Office until Sumler brought Complainant 1 to the Title IX Office.

Soil-Cormier was not interviewed as part of the University's Title IX investigation into Lewis. Given that she was purportedly in the meeting between Lewis and Complainant 1, this was an error.[159] She was interviewed as part of the Husch Blackwell review. Soil-Cormier stated that she was in the meeting between Complainant 1 and Lewis and was adamant that she was never made aware by Complainant 1 that ████ had abused her but was aware of "an incident at Tigerland where Complainant 1 threw a drink on" ████ "I remember Sharon asking her, do you want to go the police?" When pressed on why Complainant 1 would need to go to the police if **she** was the aggressor and the one who threw the drink on ████, Soil-Cormier responded unconvincingly, "Um, I'm not exactly sure, maybe because they had separated and just—just a suggestion to bring it up."

---

[159] In an interview with Husch Blackwell, Scott indicated that "with hindsight," he realizes he "probably" should have met with Soil-Cormier during his initial investigation. From Scott's perspective, Lewis had admitted to receiving information implicating PM-73, Segar and Ausberry had both denied receiving a report from Lewis regarding Complainant 1, and Scott reviewed the University's Title IX records and "did not find a single report from Lewis" in the system. Scott stated that at the time, he was not aware of the Athletics directive for all employees to report directly to Segar.

HB: 4848-0171-9519.1

PLAINTIFFS_000135

Regardless, following the meeting with Complainant 1, Soil-Cormier said she witnessed Lewis "pick up the phone" and contact Segar. She does not remember, though, what Lewis told Segar.

Coordinator of Football Operations Ya'el Lofton also participated in the meeting between Lewis, Soil-Cormier, and Complainant 1. Again, it was an error for her to have not been interviewed as part of the Title IX investigation into Lewis' failure to report.

In an interview with Husch Blackwell, Lofton recalled hearing Complainant 1 describe the incident as follows:

> Dameyune Craig called Sharon wanting somebody fired . . . . So apparently they had a conversation, it was [Complainant 1] he wanted fired because apparently she had done something to one of his players. At that time, I really didn't know what was going on, so Sharon called me in there and she said, um, Coach, uh, Craig has called. He wants us to fire [Complainant 1]. I'm like how can he tell us to fire our student workers? What's going on? And she said, well, I'm not firing her because I don't know what's going on. . . .

> [Complainant 1] was called in. Sharon had me come in there. She said what happened? [Complainant 1] said he was with another girl or something at the bar. Um, [Complainant 1] was mad because I think he was kinda still seeing her, he was seeing other people, which a lot of players see a lot of girls, right? But you don't ever want to get 'em all in the same place at the same time. So she got mad. She saw him—she threw her drink at him and, uh, apparently some of the other players were there. The girls got her out, the players got him and then she left. That's kinda all I knew, right? And that's kinda all she provided me to in that original meeting. And she was saying why would I—and we're like, we're not gonna fire her for throwing a drink on somebody, you know?

Reflecting on the meeting Lofton recalled that Complainant 1 "was almost mad that she was called in about" the incident, because it was her "business" and not related to her job in the Football office. She also emphasized:

> But, um, never in that meeting did [Complainant 1] ever say anything about anything other than just her throwing a drink on █████ Now since then, I've heard all kinds of other stuff that she said that happened to her that she never said when I was in there, ever. She just was not real happy that we were calling her in once again about throwing a drink on someone.

Miriam Segar was interviewed by Scott on November 8, 2018. According to notes documenting that interview, Segar said Lewis "never reported any Title IX/Sexual Misconduct issue to her." Notably, in an interview as part of this review, Segar denies saying this, clarifying that Scott "worded that wrong" because Lewis "obviously reported things." Segar continued to deny, though, that Lewis reported the Complainant 1 incident to her.

61

PLAINTIFFS_000136

Verge Ausberry was interviewed by Scott the following day. According to Scott's interview notes, Ausberry "stated he has been a mentor to Complainant 1." She purportedly "came to him a few weeks ago in tears asking if she could talk with him. She told him about how Sharon had fired her while she was in Europe and [she] felt it was unfair." Complainant 1 purportedly "told Verge that she felt Sharon had fired her over [an] incident between her and ███████ at Tigerland in Fall 2016—[Complainant 1] told Verge it involved ████ throwing a drink at her." She also purportedly "told Verge that she felt responsible for ████'s behavior." Ausberry "stated he immediately told her that he didn't want to hear anymore and that she needed to speak with Miriam Segar since it sounded like a dating issue and that it dealt with ████ which he already knew there was an investigation."

In Scott's interview notes, Ausberry stated he gave Complainant 1 "Miriam's phone number and told her that she really needed to disclose this information to Miriam." According to Ausberry, "this was the first time he had heard there was any issue between ████ and Complainant 1" and "stated Sharon did not tell him about this situation" in 2016.

Following interviews with only Complainant 1, Lewis, Segar, and Ausberry, the Title IX Office concluded **"**that there is sufficient evidence to prove that Respondent Sharon Lewis violated LSU's PM-73 policy in that as a Responsible Person she failed to report a potential violation of LSU's Title IX and Sexual Misconduct Policy PM-73." The rationale for this conclusion is confusing:

> This determination is derived from the fact that both the Complainant and the Respondent admit to a meeting commencing whereby the conversation surrounded an allegation of dating violence between the Complainant and another LSU student athlete. The Respondent, a Responsible Person, admitted to a cursory inquiry involving questioning of potential witnesses to this allegation. The Respondent could not recall if she reported this information to the appropriate school designee.[160] The Title IX Office had no record of this allegation ever being reported. Two Material Observers deny that the Respondent ever reported this information to them.
>
> . . .
>
> The Respondent completed the Human Relations Risk Training conducted by the Dan Beebe Group for the years 2016, 2017 and 2018 and signed her respective acknowledgement form. The acknowledgement form states: "Employees are not required to confront anyone who is the source of the complaint or anyone closely associated with the persons who are the source of the complaint. However, I understand I have a responsibility to inform an uninvolved member of the Athletics

---

[160] This language about "appropriate school designee" is likely a reference to PM-73's definition of "Responsible Person," which states "Any employee who has the authority to take action to redress sexual violence or who has been given the duty of reporting incidents of sexual violence or any other misconduct prohibited by this policy by students or employees to the Title IX coordinator *or other appropriate school designee*." Exhibit A (PM-73 (2015) at II ("Responsible Person"). As discussed in section III of this report, however, this "Responsible Person" policy is internally contradictory and confusing. In addition, there are no identified "other appropriate school designee[s]" in PM-73; therefore, from Lewis' perspective, the Athletics directive to report to Segar (as outlined in Section III of this Report) was the applicable reporting policy.

62

PLAINTIFFS_000137

Department or University administration, or otherwise utilize available avenues of reporting, so prompt action may be taken to stop misconduct and prevent future occurrences."

A review of Human Resource Management (HRM) training records revealed that The Respondent has never self-enrolled and taken the [University's] annual sexual misconduct training, "*Preventing Sexual Misconduct Training for Employees.*"

This finding was communicated to Lewis on November 20, 2018.

### 4.    Lewis' Appeal of Title IX Office Finding

On December 6, 2018, Lewis appealed this determination and her appeal statement provided more detail about her version of the conversation with Complainant 1 and conflicts in significant ways with statements attributed to her by Scott in his investigation.

First, Lewis noted that Craig told her that "Complainant 1 threw a drink at ▆▆▆▆▆▆▆ at a bar in Tigerland and that ▆▆▆▆ threw a drink back at her." Craig also purportedly told Lewis "that he was reporting this incident to Verge Ausberry."[161] After receiving this report from Craig, Lewis said she then "contacted Complainant 1 on or around October 3, 2016 to confirm the incident." No explanation is provided for why she needed to "confirm the incident." Lewis' appeal claimed that Complainant 1 "admitted to being the aggressor in the situation by throwing the drink at ▆▆▆▆▆▆ first and instigating the situation." This was purportedly prompted by Complainant 1 being "upset at the fact that ▆▆▆▆ was in the bar with another girl." Despite the fact that Complainant 1 was purportedly the "aggressor" in this incident with ▆▆▆▆, she was never disciplined by her supervisors, Soil-Cormier and Lewis.[162]

Lewis was adamant throughout her appeal document and in her interviews as part of the Husch Blackwell review that: "[n]ever did Complainant 1 tell . . . me that she was afraid of ▆▆▆▆▆▆▆, or that any physical violence had ever occurred with him in this event or at any other time." With that said, Lewis explained in her appeal that following her meeting with Complainant 1, Lewis called Segar "to give her the information that had just been [relayed] to me in a meeting with Complainant 1 and Keava Soil-Cormier where Complainant 1 [relayed] that an incident had occurred with ▆▆▆▆▆▆." Soil-Cormier purportedly witnessed this call with Segar. According to Complainant 1, she contacted Segar "because she is the LSU Athletic designated reporter for Title IX complaints." Lewis then claimed that Scott's summary of her interview was "false" and that she "told Scott I called Miriam Segar and reported the incident to her and that I reported the incident to Verge Ausberry."[163] Lewis also claimed that she is "very mindful" about reporting because she had "been reprimanded in the past for not telling Miriam Segar directly . . . ."

---

[161] Ausberry credibly denied Craig told him about this.

[162] In contrast, Lewis did discipline Complainant 1 on February 10, 2017 for "giving out the private cell phone number of ▆▆▆▆▆▆ to an angry female student who called and harassed ▆▆▆▆." On May 6, 2017, Complainant 1 was terminated by Lewis and, according to Lewis, this had "nothing at all to do with ▆▆▆▆▆▆" Rather, "[s]he was terminated due to mandatory downsizing and violating office privacy rules."

[163] No one attended the meeting with Scott, and the interview was not recorded.

63

HB: 4848-0171-9519.1

PLAINTIFFS_000138

Regarding the latter, Lewis indicated that she had "been instructed by both Miriam Segar and Verge Ausberry to report all Title IX incidents to them directly and then they will report them to the higher authority, in this case, the Campus Title IX Coordinator." Lewis contended that this was "a process put into place a few years ago from other incidents that occurred related to Title IX offenses by individuals in the LSU Athletic Department," a reference to the Les Miles situation discussed above. She also claimed she had "actually been reprimanded openly by Verge Ausberry" regarding "a recent Title IX incident involving ▮▮▮▮▮▮▮ where Verge Ausberry repeatedly told [Lewis] to tell Miriam Segar first and no one else." This incident is discussed in more detail in Section VI.B.4. below.

Lewis also contended that Segar's statement as memorialized in Scott's investigative report that Lewis "never reported any Title IX/Sexual Misconduct issues" to Segar was false. In addition to reporting the Complainant 1/▮▮▮▮ incident to Segar, Complainant 1 claimed that she purportedly reported incidents involving at least three other employees, including "Les Miles" and "Verge Ausberry."[164] Again, in interviews with Husch Blackwell, Segar stated she did not tell Scott that Lewis had never reported Title IX matters to her and acknowledged Lewis had made "many" reports of conduct potentially violating PM-73 to Segar, including the incidents involving Samantha Brennan and Les Miles. Put another way, Scott's summary of his interview with Segar appears to be incorrect.

On January 15, 2019, LSU's Title IX Coordinator denied Lewis's appeal contending that even if all that Complainant 1 reported was "limited to the throwing of a drink in the bar," that was sufficient to trigger a mandatory report under PM-73. Because she was the appeal officer, the Title IX Coordinator provided no supervision over Scott's initial investigation due to the potential conflict of interest.

Inexplicably, the Title IX Coordinator concluded that this "report could have been made **through Miriam Segar, Verge Ausberry**, or directly through the Title IX Coordinator or Deputy Coordinators" (emphasis added).[165] According to Stewart, though, there was "no evidence" that such a report was made. However, at that point, Lewis had identified by name two witnesses who purportedly saw her report the matter to Segar. Neither were interviewed by the Title IX Office. This determination was then "forwarded to Human Resource Management for adjudication."

On January 23, 2019, Lewis submitted an appeal of this finding to Lindsay Madatic. In it, Lewis reiterated that "she 'called' not emailed Miriam Segar on or about Monday, October 3, 2016 to give Segar the information that had just been [relayed] to Lewis in a meeting with [Complainant 1] and Keava Soil-Cormier. . . ." This time, Lewis described what Complainant 1 relayed as Complainant 1 "throwing a drink at ▮▮▮▮." Lewis once again asserted that "Soil-Cormier was in Lewis' office as a witness to the call Lewis made to Segar." Despite that, notably, no one in the Title IX Office interviewed Soil-Cormier which Lewis describes as "a huge error." We agree it was an error.

---

[164] We have been unable to locate any documentation regarding Lewis' reports relating to Miles or Ausberry in the University's Title IX or Human Resources records. We did locate a case file for the third employee Lewis identified in her appeal and can confirm that that incident was investigated and discipline meted out in that case.

[165] We note that this statement is inconsistent with Stewart's statements to Husch Blackwell throughout the review regarding the appropriate process for Title IX complaints.

HB: 4848-0171-9519.1

PLAINTIFFS_000139

Additionally, Lewis noted that after she "made the complaints against the former coach [*i.e.*, Les Miles] sexually harassing her female student workers, Lewis was instructed by Segar to report all Title IX complaints directly to her and to no one else . . . ." Lewis also noted that when she complained about Title IX-related incidents, she purportedly "encountered great resistance from Segar and Ausberry . . . ." She also asked that Segar and Ausberry be investigated by the Title IX Office for failing to make mandatory reports. Despite this being reported to a Deputy Title IX Coordinator, the University has not investigated these allegations. She then relayed in her Title IX appeal that she "reported a Title IX complaint to Segar against Verge Ausberry" and that there "are several witnesses who have seen Ausberry yell and scream at Lewis, call her profanities, and do other acts of harassment." Again, despite this being reported to a Deputy Title IX Coordinator, the University never investigated this allegation.[166]

During her interview with Husch Blackwell, Segar confirmed that after the Miles incident, Lewis had reported alleged "harassment" and other inappropriate treatment by Athletics officials, including a specific complaint against Ausberry. During the interview, Segar read from notes summarizing Lewis' complaints, stating that from her perspective, "it wasn't a Title IX issue." In addition, Segar acknowledged that Lewis was not "super comfortable" around Miles and "did not have a good relationship" with him because Miles "knew that she was aware of the allegations against him." Segar further acknowledged assuring Lewis that "her job was protected," and also acknowledged arranging counseling for Lewis because she "was emotional" about the way in which the University handled the Miles investigation. Segar confirmed that she did not report any of these complaints to the Title IX Office or to Human Resources for resolution. This was an error.

Stewart forwarded Lewis' appeal to representatives from LSU Human Resources "Employee Relations" Department (including Deputy Title IX Coordinator for Employees Lindsay Madatic) for "next steps" and also to the University's in-house legal counsel in January 2019.

Over the next several months, Lewis and her attorney continued to communicate with Human Resources regarding Lewis' appeal. In May 2019, Lewis provided a detailed account of incidents she had reported to Miriam Segar and/or Verge Ausberry implicating PM-73. These included the comments regarding Miles alleged inappropriate comments and conduct directed at the two student complainants described above. None of this was investigated by the University.

---

[166] In interviews with Husch Blackwell, Football Operations employees confirmed witnessing Ausberry "hollering" and "screaming" at Lewis repeatedly over the course of the last several years. As one employee put it, "there's just certain things that Verge does to Sharon. I don't know if they think—and I don't understand it—That stuff would never be done to me, you know? The day—if Verge Ausberry ever hollered or screamed at me on the telephone like I've heard him done to Sharon . . . ." When asked whether Lewis yelled or otherwise acted unprofessionally to Ausberry, this same employee noted that "when he would start doing that, she would talk loud to him, but it was never—I never witnessed Sharon doing anything of being overly screaming. . . . I never heard Sharon scream and holler like that at Verge, never, ever.

Ausberry denied treating Lewis inappropriately, instead describing their relationship as "brother-sister" and "love-hate." Ausberry stated that he had on at least one occasion had "a very hot conversation" with Lewis regarding Lewis' non-compliance with a directive, during which Lewis "blew up on me" and was "crying, howling, and cursing," to which Ausberry responded with anger and a raised voice. Ausberry recalled that after this incident, Lewis "called Miriam [Segar], and said she wanted to report me for harassment." According to Ausberry, Segar instructed Ausberry to "just leave [Sharon] alone" after this incident.

HB: 4848-0171-9519.1

PLAINTIFFS_000140

In September 2019, correspondence between Lewis' attorney and Executive Director of Employee Relations Jennifer Normand indicated that Lewis was still seeking to remove the PM-73 finding from her disciplinary record, which Normand indicated was being reviewed by the Office of General Counsel (which supervises the Title IX Office). Ultimately, Normand (in consultation with a University attorney) communicated to Lewis that Lewis' discipline was "remove[d] . . . from the file" "based on the information Lewis provided" in her appeal. There is no additional rationale or finding included in the correspondence.

Despite having the discipline "removed," Lewis continued to seek to have the finding of responsibility for the PM-73 violation removed from her record, reiterating (through her attorney) her belief that:

> It was established that Sharon was required to report up all violations and it was established that she did report the specific violation up to Miriam Segar and Verge Ausberry. It was established that they did not report those violations to the Title IX coordinator. It was also established that Sharon was not to report Title IX violations herself, but to report them to Miriam and Verge so how in the world was she found to not have reported a Title IX violation. It makes no sense. And during that investigation why weren't Miriam and Verge found not to have reported the specific violation she and the alleged victim reported to Verge.

The correspondence also noted that Lewis would continue "sitting down with [Normand] and/or writing down everything that has been happening there as it relates to our prior discussions," referencing Lewis' description of the Miles harassment allegations and Lewis' continuing concerns regarding mistreatment by Athletics officials. There is no indication of how Title IX, the Office of Legal Affairs, or the Office of Human Resource Management resolved Lewis' request to remove the finding, no indication that anyone at the University formally investigated Lewis' complaints regarding her working environment and potential retaliation, and no investigation of any other Athletics official—including Segar or Ausberry—for failure to report a Title IX concern under PM-73.

The Lewis investigation illustrates a host of basic problems that we have also seen in our review of other matters by the Title IX Office and which are discussed at length throughout this report.

## 5.    Reports of Abuse of Jade Lewis

We ultimately agree with the University's determination that the incident between Complainant 1 and ████ (even if it were just "drink throwing") should have been reported to the Title IX Office. Despite all of the murkiness surrounding the Lewis investigation, there is no question that the incident was not timely reported to the Title IX Office. There is also no question that Jade Lewis was abused by ████████ in May 2017 and from April 2018 until at least August 2018. Assessed in this section of the report is who at LSU knew what about ████ abuse of Lewis (and when) and whether employees of the University responded appropriately.

HB: 4848-0171-9519.1

PLAINTIFFS_000141

### a.    May 2017 Abuse and University Knowledge

It is worth emphasizing that many of the *victims* discussed throughout this report were also LSU student athletes or Athletics employees. For instance, Lewis was a highly recruited tennis player who enrolled at the University in January 2017. According to all individuals we interviewed, she intended to play a semester of tennis at LSU and then become a professional tennis player in May 2017. In her sole semester of collegiate tennis, she had a remarkably successful season and was awarded SEC Freshman Tennis Player of the Year.

Her last match with LSU was at the NCAA Singles Tournament in May 2017 at which point she left Baton Rouge to become a professional tennis player. She posted the following on her Instagram account at the time:



On May 19, 2017—two days prior to her travelling to attend the NCAA Singles Tournament, Jade reported to a tennis teammate that ▉▉ punched her. According to phone records, her teammate texted ▉▉: "I told you this ▉▉, hitting her was not a smart decision," to which ▉▉ responded, "Idc" and "She broke into my house." Jade's teammate later texted, "Did you hit her again though? Like weeks ago?" ▉▉ responded, "Yes." The conversation continued with the teammate texting, "Why did you punch her ▉▉? You are better than that," to which ▉▉ responded, "You don't understand."

The teammate, who requested to remain anonymous, told us in an interview that she was deeply uncomfortable with the escalation in Jade and ▉▉' relationship and took steps to "block" ▉▉ from her phone. She also strongly encouraged Jade to report the information to the police or the school and "to get help," but "Jade refused." The teammate stated she "didn't know how much [LSU tennis coach Julia Sell] knew" about this May 2017 incident, but stated that she had never directly told Julia that ▉▉ abused Jade. Jade's teammate also reported having a "very good relationship with the Sells, even today" and stated her belief that if Julia Sell had become aware of any alleged violence, she would have handled it appropriately (due largely to her own experience sharing information with Julia Sell).

In the *USA Today* article, a teammate (who was anonymous in the article) said "she personally reported ▉▉' abuse to Julia Sell" at least "six to seven months before" June 2018. This would have been November or December of 2017. We have been unable to definitively identify the person who made these statements, and they have not identified themselves to Husch Blackwell for an interview. None of the witnesses we have interviewed regarding this matter, though, said they informed the Sells about abuse prior to Jade's return to Baton Rouge in March 2018.

HB: 4848-0171-9519.1

PLAINTIFFS_000142

In addition, Lewis stated in the *USA Today* article that "she told a team athletic trainer, Donavon White, that ███ punched her in the stomach in May 2017 . . . ." In an interview with Husch Blackwell, Lewis again stated that she informed White in May 2017 because she was "sore at practice, like in my stomach," which prompted her to "tell Donavan" that "███ had punched me in the stomach." Lewis stated that White's response was, "Nothing. Absolutely nothing." She added, "I told him that it had happened because I remember clearly that in April of 2018, he said to me, he goes didn't this already happen last year? I'm gonna have to report it because it's already happened."

We interviewed White on January 5, 2021. White explained that he was employed as a graduate assistant in LSU's Athletic Training Department and in the summer of 2017, he staffed the football team. The tennis team's full-time trainer at the time was Sean Carter. In "late April/early May" 2017, Carter left LSU, and White "transitioned" to staffing the tennis team shortly thereafter. White stated that he "probably officially met Jade" in April 2017, during this transition. White also stated that he knew "of" ███ due to his time with the football team, but he denied having any knowledge that Lewis and ███ were in a dating relationship at that time. White also denied that he knew of any abuse between ███ and Lewis prior to "spring of 2018, after she had left and come back" and "was trying to get her eligibility again." We found White's account credible and consistent with other accounts regarding Lewis' communications about her injuries during this time. We also note that, in April 2018 (as discussed below), White did immediately report ███' abuse when he learned about it then.

Beginning in June 2017 through February 9, 2018, Lewis participated in professional tennis tournaments throughout the world. Despite the May 2017 incident of abuse, however, in March 2018, she elected to return to Baton Rouge. She initially moved in with ███, but after communicating with the Sells and Segar, the University placed her in University housing on March 21, 2018. Jade began classes during LSU's "spring intersession" on May 14, 2018.

One of the disputed facts we have been tasked with addressing is whether Jade's father, David Lewis, reported the May 2017 incident of abuse to tennis coach Mike Sell during the summer of 2017.[167]

In a statement to police investigators dated August 19, 2018, David Lewis reported:

> Mr. Lewis had contacted Ms. J. Lewis' tennis coach, Mike Sell (LSU Tennis coach - female team), on two separate occasions. Mr. Lewis called Mr. Sell in June and July of 2017, [and] during these phone calls Mr. Lewis explained that Ms. J. Lewis was being physically abused by Mr. ███. According to Mr. Lewis, Mr. Sell said, "I don't believe that," and in the second call he was told again about the relationship and abuse at which time Mr. Sell had said, "Couldn't be possible, wouldn't be possible." Mr. Lewis went on to explain that he knew his daughter was coming back to LSU at this time and wanted to alleviate and stop the abuse by notifying the coach.

---

[167] Our assessment of that issue is discussed below. The assessment is complicated by the fact that this matter is from several years ago and has already received considerable media attention.

PLAINTIFFS_000143

During an interview as part of this review, David Lewis' account was slightly, but materially, different. Lewis stated that, in June 2017, he told Mike Sell that "there's something going on with Jade, it's toxic, she's behaving strange, it's just not right." Lewis clarified that Mike Sell initially contacted him in June to discuss an unrelated NCAA compliance investigation for the University. According to David Lewis:

> We had a couple of conversations there in June. And—but it certainly came out in that conversation about there's something going on with Jade, it's toxic, she's behaving strange, it's just not right. And he denied it. "No, no, no. He's a superstar, he's—there's no way, you know, there's no way that basically that guy could mix with your daughter. It's just he's a big time foot—he's a big time football player."

David Lewis did not specifically state that he told Mike Sell that ▮▮▮ was physically abusing Jade during the June 2017 phone call(s). Instead, David Lewis described being understandably focused on his concern that his daughter was behaving strangely, including "red flags" with Lewis' relationship with ▮▮▮, which he allegedly communicated to Mike Sell. David Lewis also described concerns regarding the Sells' alleged attempts to encourage Jade Lewis to renege on plans to play professionally.

Over the course of this investigation, we were provided a string of emails between David Lewis and Mike Sell from June 13, 2017. Significantly, there is no mention by David Lewis to Michael Sell of any abuse and Lewis appears to be solely concerned that Jade wanted to stop playing professionally and return to play college tennis. Lewis tells Sell that because of various financial commitments, Jade is "ineligible for college tennis now anyway."

In his interview with Husch Blackwell, David Lewis also stated that in July 2017, Jade confided in her sister, Carolina (who is now deceased), that ▮▮▮ punched her prior to the NCAA Tournament. According to David Lewis, Carolina confronted ▮▮▮ over the phone. Lewis described Carolina's conversation this way:

> So Carolina calls Davis and, uh, and Carolina ended up telling my wife and I that, ▮▮▮—because Carolina was very concerned about Jade's behavior. She was, you know, we noticed it but she was telling us something's—that's not our Jade. That's not my sister. That's not Jade. She's—something's up.

> So she called ▮▮▮, or it was a Snapchat or whatever, whatever means they use these days, and, uh, long and the short of it was, uh, we know that, um, ▮▮▮ was abusive towards Jade. Called her a fucking cunt. And called me, to Carolina, he called—your father's a dick. Which I don't even know the guy, but he's still calling me a dick to our—to—to, uh, Carolina. And then during that time, then it started to come out. Because Jade had told Carolina that she was punched before the NCAAs but again, like a lot of bystanders, or, you know, they—they keep these things to themselves. But uh, that's when we became aware of it that, uh-huh, now we know that, you know, she was assaulted.

David Lewis stated that Lewis' sister relayed this conversation to them "around July the 24 or 25."

69

PLAINTIFFS_000144

According to David Lewis, this prompted him to contact Mike Sell in July 2017. He described the conversation in our interview this way:

> And that's when I called Mike Sell in July, when we found out. I went through—we went through text messages with my wife's—just now, earlier, because she was in Italy at the time, towards the end of July—it was actually July the 25th, 2017. . . . I was in Germany waiting for Jade because Jade was up in Finland playing . . . a couple of tournaments with a coach. And I had to stay in Germany to pick her up when she came back from Finland. So I was in Germany at the time and I was calling the Sells and then we found out this—then—she was abused. So that's when I called Sell. We're having a few conversations about—and Sell was telling me she's still eligible, she's still eligible. I said she's turned pro. She's playing club tennis. She's taking money. She's got sponsors. You know, all this stuff. And now she's still pro, she's still pro. It doesn't matter even if she's—she's still eligible. She's still an amateur.

> And it was like, Mike, you know, we've just found out what's happened as well, and, you know—so after that conversation, that was the end of it. Never spoke to him again in my life because we knew what they were doing. It became a tug of war.

David Lewis provided two pieces of documentary evidence relating to the alleged July 2017 phone call. The first is a July 26, 2017 exchange between himself and the Director of Tennis at a facility in Hilton Head, South Carolina, Denny Bianco. In it, Bianco asked about whether Jade was "ok" because she had retired in the third set of a tennis match in Europe. David Lewis responded as follows:



HB: 4848-0171-9519.1

PLAINTIFFS_000145

He also produced the following texts between himself and his wife from July 25, 2017.



In the texts to his wife, David Lewis noted that he "just sent Mike Sell a text that I have **more** disturbing news about LSU and _____" (Emphasis added). The alleged text between Mike Sell and David Lewis was not provided as part of this review.

In his interview with Husch Blackwell, Mike Sell confirmed that had phone conversations with David Lewis in June and July of 2017, but stated that Lewis' descriptions of the "substance of the calls are completely inaccurate." Regarding the June 2017 conversations, Sell stated that Mr. Lewis called to ask if Sell "had heard from Jade" because "Jade wants to come back to school" and "wants to come back to Baton Rouge." From Sell's perspective, David Lewis was unhappy about this development because he "wanted to keep the narrative of [Jade] playing pro tennis alive" regardless of "whether Jade wants to or not." Sell also recalled that Jade Lewis "called me a lot that summer," saying she was "unhappy" and "wants to come back to school." Sell described these conversations as Jade asking, "how do I take control of my career," to which Sell responded "she has to do it," referring to having a direct conversation with her father. Sell also noted that he communicated to Jade that she would need to "talk with Compliance about maintaining

HB: 4848-0171-9519.1

PLAINTIFFS_000146

eligibility." Sell also recalled an in-person meeting with Jade in August 2017 in a "hotel lobby in New York," during which she reiterated that she "did not want to play in the pro tour," "wants to come back to LSU," and was seeking advice regarding "how do I talk to my dad about this."

Mike Sell also specifically denied making any statements to the effect of "couldn't be true, wouldn't be true" or "wouldn't be possible" at any point in his conversations with David Lewis, describing this as a "fabrication." Sell added that over the several months that Jade was playing on the pro tour, Mr. Lewis described ███ as a "distraction" to Jade and emphasized that he "did not want her coming back [to LSU] for a boy." Sell stated again that at no point did David Lewis communicate that ███ was "abusing" Jade. Sell noted that at the time ███ was not a "big time" football player, stating that he had no awareness of ███ at all.

Weighing all of this information and documentation, we first find that there is insufficient evidence to conclude that David Lewis communicated that Jade Lewis was being abused by ███ in June 2017, as indicated by David Lewis' August 2018 statement memorialized in the LSUPD report. Although Mr. Lewis may have expressed concerns regarding Jade and ███ relationship in June 2017, Mr. Lewis acknowledged that he was not aware of any physical violence by ███ until his older daughter relayed that information to him on or about July 25, 2017. Accordingly, David Lewis' August 2018 statement that he told Mike Sell that Jade "was being physically abused by Mr. ███" "on two separate occasions" in June and July of 2017 is inconsistent with the information he provided as part of this review because any reports in June would have predated when David Lewis and his wife became aware of the abuse.

Additionally, David Lewis explained in his police interview that he told Mike Sell about this abuse (even though Jade was no longer enrolled at LSU and was in another country at the time of the purported report) because at that point "he knew his daughter was coming back to LSU . . . and wanted to alleviate and stop the abuse by notifying the coach." This is curious because at that time, Jade had turned professional and we have found no indication that she had any definitive plans to return to LSU in June or July; although, she had expressed to the Sells that she was miserable on the professional tour and wanted to return. Additionally, it prompts a question: if David Lewis wanted Mike Sell to know about the abuse so that it would stop, why wouldn't Lewis have reported the incident to someone else at the LSU campus or the police when Mike Sell purportedly ignored him?

Similarly, Jade Lewis returned to Baton Rouge in March 2018 and actually moved in with ███. We have struggled with David Lewis' account that he flagged this issue in July 2017, was ignored by Mike Sell, and then never raised the issue immediately prior to Jade's actual return to campus and (███ apartment) eight months later.

Mike Sell has credibly denied David Lewis' assertion regarding reports of physical violence by ███ against Jade. As noted above, Sell also pointed out that ███ was not even someone he knew at the time. ███ was not a prominent member of the football team and had only played in three games prior to July 2017 (he had one reception that entire year). We have been unable to identify any motive for Mike Sell, the tennis coach, to protect a "star football player" who was abusing one of his star tennis players, especially since ███ was clearly not a star football player.

HB: 4848-0171-9519.1

PLAINTIFFS_000147

Put simply, we have concluded that there is insufficient evidence to conclude that David Lewis reported to Mike Sell in June or July of 2017 that █████ had abused Jade Lewis.

### b.     April 3, 2018 Abuse

It is undisputed, though, that █████ abuse of Jade Lewis continued a couple of weeks after Jade returned to Baton Rouge in March 2018. Specifically, on April 3, 2018, Jade Lewis was hit by █████. At that point, Lewis was not an LSU student.[168]

On April 14, 2018, █████ had the following text exchange with Executive Deputy Athletics Director Verge Ausberry:

| | |
|---|---|
| █████: | This Jade girl is crazy |
| Ausberry: | Who is that? |
| Ausberry: | The Tennis Player? |
| █████: | Yes |
| Ausberry: | What happened? |
| █████: | She's trying to go to compliance for me hitting her, she's trying to get me kick off the team. I went over there to get my stuff. She got mad that I wouldn't talk to her. She started to hit me. And I hit her in the stomach.(which is not good) and I walked out… then when we were out. She starts punching (I didn't touch her) me in the bar and so I got her kicked out. And she tried to call the police at the bag. |
| █████: | Now because I don't want to be with her. She's trying to talk now… that happened like two weeks okay |

These text messages were only discovered because the Louisiana Attorney General's office conducted a forensic digital analysis of █████ cellular phone as part of a subsequent criminal investigation into █████' abuse of Lewis. During his interview with Husch Blackwell, Ausberry provided some context, indicating that █████ had complained to him that he wanted Lewis to move out of his apartment, but she refused.

After receiving these text messages, Ausberry's phone records showed that he did not immediately call Segar or the Title IX Office. Instead, he spoke with █████ for six minutes. In an interview with *The Advocate* newspaper, Ausberry said that "when he confronted █████ about his text, █████ assured him he had not hit his girlfriend, saying they were simply arguing about her refusing to leave." That assertion is not credible as █████ explicitly says in the text exchange that "I hit her in the stomach" and acknowledges this "is not good." As discussed below, █████ also subsequently admitted to the Title IX Office that he hit Lewis.

In the newspaper article, Ausberry also said he advised █████ to call the police. According to Ausberry, "When █████ told me on the phone that he did not hit her, that's the information I had

---

[168] According to University records, Lewis began a course during the "spring intercession" on May 14, 2018.

HB: 4848-0171-9519.1

PLAINTIFFS_000148

at the time. That's why I made the decision I made at that time. Now, hindsight 20/20, figuring out what's going on in today's world, yes, I would have picked up the phone and said, 'You know what? We're going to call 911 and figure it out.'"[169] This explanation is not credible.

During his interview as part of this review, Ausberry said that prior to this text exchange, ███ had told him that "a white man was harassing" ███ on at least two occasions. Ausberry identified this "white man" as Jade's father, David Lewis. When ███ reported this alleged "harassment" to Ausberry, Ausberry stated that he recommended ███ "call the police," which ███ declined to do. Ausberry shared this anecdote presumably to bolster his position that he again told ███ to "call the police" in response to the information purportedly relayed to him in the April 14, 2018 texts and phone call.

Ausberry also said that at the time, he did not believe that Jade Lewis was an LSU student and had never been informed that incidents involving non-students triggered reporting obligations under PM-73.[170] In any event, in addition to not calling the police, it is undisputed that Ausberry never reported the matter to Segar or the Title IX Office. This was an error.[171] At a minimum, Athletics policy noted it was "imperative" for employees to report incidents of student athletes engaging "in misconduct unbecoming of a student-athlete" to Segar. Dating violence—a crime—certainly qualified. In addition, Ausberry acknowledged being familiar with Lewis and her affiliation with the University in his interview with Husch Blackwell. A prudent employee and administrator would have taken steps to report this information to appropriate authorities to at least conduct a welfare check given the seriousness of the information relayed in the text messages.

---

[169] Andrea Gallo and Brooks Kubena, *LSU official might have broken federal law after* ███ *admitted he hit girlfriend,* The Advocate, November 18, 2020, https://www.theadvocate.com/baton_rouge/sports/lsu/article_bfa592b6-29ae-11eb-94d1-2377391922ad.html

[170] The "jurisdiction" statement in PM-73 (2015) indicates that "LSU shall have discretion to extend jurisdiction over conduct that occurs off campus when the conduct adversely or significantly affects the learning environment or LSU community and would be a violation of this policy and/or any applicable campus policy or code of conduct, if the conduct had occurred on campus. In determining whether or not to extend jurisdiction, LSU may consider, among other factors, . . . if the alleged conduct by the student or employee: 1. Involved violence or produced a reasonable fear of physical harm; and/or 2. Involved any other members of the LSU community or any academic work, records, documents, or property of LSU."

[171] We believe the University should consider appropriate discipline for Ausberry. Ultimately, it is the University's responsibility to determine what is "appropriate" discipline for this failure to report. For the sake of clarity, we view the failure to report as a significant error by Ausberry. The failure could have led to catastrophic consequences. At the same time, and while we understand the anger in the University community regarding this matter, we believe it is imperative that Ausberry be treated fairly. To that end, Ausberry is a long-time and valued employee of the University. His contributions to the University and to the University's African American community in particular are laudable. Additionally, Ausberry's failure to report should be viewed in context – as discussed above, there was a clear lack of leadership in providing clarity about institutional reporting obligations. This was a long-recognized problem at the University that was never meaningfully addressed. One of our primary recommendations below is designed to finally address this. Finally, we are also mindful that there was a previous review conducted of this specific matter which concluded that "we do not find a basis to discipline any of the employees with whom we spoke because of the general misunderstanding regarding proper reporting processes . . . ." While we believe there is a basis, in fairness to Ausberry, we agree that discipline should take into account this "general misunderstanding."

74

PLAINTIFFS_000149

c.    **Information Shared from East Baton Rouge District Attorney**

It bears noting that the disclosure of these texts in the November 2020 *USA Today* article was not a surprise to LSU. The East Baton Rouge District Attorney specifically shared the texts and other information regarding the ████ criminal case with former President Alexander and then-University General Counsel Tom Skinner in November 2018. The texts and other information were shared in meetings between the leadership of the University, LSUPD, and personnel from the District Attorney's office tasked with investigating the ████ case.

In addition, the District Attorney went so far as to prepare "detailed timelines of the various allegations against Mr. ████" which included "contacts [between] LSU staff and witnesses, the alleged victim, and Mr. ████" That 57-page document was specifically shared with General Counsel Skinner on November 8, 2018 because the District Attorney understood "the need for you and LSU to have some basic information to conduct any investigation that you feel appropriate based on the information that you have from your meetings with the LSUPD and my office." The cover correspondence from the District Attorney also noted, "My office has no jurisdiction over any potential Title IX investigation but feel obligated to provide what information that we can in a limited fashion to you at this point in order for you to review and make appropriate decisions."

Of note in the shared materials is the following disclosure:

> 4/14/2018- ████████ text messaged Verge Ausberry, "She's trying to go to compliance for me hitting her, she's trying to get me kicked off the team. I went over there to get my stuff. She got mad that I wouldn't talk to her. She started to hit me. And I hit her in the stomach.( which is not good ) and I walked out... then when we were out. She starts punching (I didn't touch her) me in the bar and so I got her kicked out. And she tried to call the police at the bag."

> 4/14/2018- Verge Ausberry (cell- 225-939-2017) called ████████ at 4:36 p.m. The call lasted for 6 minutes and 1 second.

However, despite being provided with this information, no Title IX investigation regarding Ausberry's failure to report ████ admission of dating violence against Jade Lewis was immediately initiated by the General Counsel, who oversaw the Title IX Office. This, despite the fact, that the Title IX Office was in the midst of a haphazard investigation into Sharon Lewis' purported "failure to report violations of University Policies on Sexual Misconduct" regarding Davis' alleged abuse against Complainant 1. This information was also not shared with the University's Title IX Coordinator, who Skinner supervised.

Instead, as noted above, the University's review of the information and evidence contained in this report was apparently handed off to the Morgan Lewis law firm in April 2019—five months after the University was provided the information. The final Morgan Lewis report was delivered on September 16, 2019. A draft of an earlier version of the report discovered as part of this investigation contains the following insert regarding whether to discipline "any of the employees with whom [Morgan Lewis] spoke," which included Ausberry:

HB: 4848-0171-9519.1

PLAINTIFFS_000150

- Impose discipline upon employees who do not report PM-73 prohibited conduct properly.
  - This should only be implemented once there has been sufficient training and education around the proper reporting practice. As explained above, we do not find a basis to discipline any of the employees with whom we spoke because of the general misunderstanding regarding proper reporting processes and lack of evidence of intentional withholding of information or failure to report.

As noted previously, this report was not shared with the Title IX Office, not investigated by any University office, and Ausberry was not disciplined following the report.

**d.    Segar's First Report to Title IX Regarding** ████

In any event, it was not until April 26, 2018, almost two weeks after the Ausberry-████text exchange, that a report of abuse was made to the University's Title IX Office. Fortunately, there was no escalation in violence in the almost two weeks between the date Ausberry was put on notice that ████ hit Lewis and when the report was made. On April 26, 2018, Miriam Segar appropriately submitted an on-line Sexual Misconduct and Sexual Harassment (PM73) Complaint Form. This report was routed to Associate Dean of Students & Director of Student Advocacy and Accountability Jonathan Sanders and the Title IX Coordinator, Stewart.

The report noted that "████and Lewis are in a dating relationship" and that it "was reported by Lewis to the team athletic trainer and to me that she was punched in the stomach/rib area by ████ on April 3, 2018."[172] The report noted that this was the first time this incident had been reported to "Athletics Administration"—however (presumably unknown to Segar), it had been reported to Ausberry, the Executive Deputy Director of Athletics, almost two weeks prior.

According to Segar's report, more than three weeks after being punched by ████, Lewis's ribs were still "very swollen" and she had been unable to sleep because of the pain.[173] In her report, Segar noted "Lewis reported that ████was first abusive to her in Spring 2017 when he was upset and punched her in the stomach" and that the April 3 incident was "the second time she had been physically abused by ████." According to the report, Lewis "indicated that ████ is very possessive of her and doesn't like her to leave the apartment and always wants to know where she is."

The report noted that Lewis was "encouraged to cease contact" with ████and "file a report with LSU Police." Lewis "indicated that she was still in a relationship with ████and did not want to

---

[172] Another issue we briefly explored during this review is whether LSU's medical staff appropriately documented Lewis' examination and treatment following her April 25 report. Lewis was treated by Dr. Carey Winder, a staff physician. White was present during the examination. During our interview, White stated that medical records for students are typically recorded in a program called "EMR." During Lewis' examination, White recalled typing some notes, but stated that this was done in a "Microsoft Word document" and not the University's central database because, at the time, Lewis was not an active athlete. Both Husch Blackwell and the Baton Rogue police department requested a copy of these notes, but the University was unable to produce them, and a forensic examination of the device by law enforcement did not produce the record.

[173] We emphasize that had Ausberry reported ████ text message to the Title IX Office or the police when he received it, Lewis could have received more timely medical care.

76

HB: 4848-0171-9519.1

PLAINTIFFS_000151

report the incident to police." The report closed that the "[i]ncident is concerning for [the] safety and welfare of the student."[174]

The next day, the Title IX case was assigned to Scott, who noted that this was one of the first—if not the first—Title IX cases he handled in his new role as Lead Investigator at the University. Susan Bareis of Lighthouse also "reached out to Jade for Lighthouse Support."

In a quote in a newspaper article, a former University official said, "As soon as the Office of General Counsel became aware of the allegations that ███████ was being abusive toward Jade Lewis, we conducted a textbook investigation involving the District Attorney's Office, our Title IX office, LSUPD and Student Affairs. We moved ███████ from campus as fast as we could and we tried to give Jade as much support as we possibly could."[175] While this case was remarkably complicated, for the reasons discussed in detail below, this simply was not a "textbook investigation" and ███████ was not "moved . . . from campus as fast as [LSU] could."

Instead, despite Segar's April 26, 2018 report indicating that the April 3 incident was the second alleged act of dating violence committed against Lewis, and despite Segar expressing concern for Lewis' safety and welfare, the University's Title IX Office did not interview Lewis until May 21, 2018 (almost a month after Segar's report). This is the short note summarizing that interview:

> **Interviews with Complainant Jade Lewis:**
> **Interview was conducted by Jeffrey Scott with the Complainant on 5/21/2018.**
> Meeting held with Lewis in the Title IX Office. Lewis stated she did not want ███████ to get into trouble. She just wants someone to talk to him and let him know what he did was wrong. She is a reluctant complainant and decides she does not want to move forward with the case. Lewis provided with additional support resources.

Scott then waited until May 23, 2018 to reach out to Miriam Segar to schedule an "informal interview" with ███████. Scott "spoke with Miriam Segar" who said "she will be out of town till Monday the 28th" and that the interview would be scheduled upon her return. It is unclear why Segar's attendance was necessary to schedule an interview with ███████ (who had been accused of a serious act of dating violence) or why the interview scheduling was being facilitated through Segar. Ultimately, the Title IX interview with ███████ was not scheduled until June 5, 2018. This delay was unreasonable given the seriousness of the situation.

Underscoring the latter point, on May 31, 2018 (*i.e.*, after Segar's Title IX report but before Scott interviewed ███████), ███████ sent Lewis the following texts threatening to "beat," "punch" and "kill" Lewis:

- "You might as well come over right now. I'm really about to beat you. I'm not joking. Idc anymore."

---

[174] Lewis was technically not a student at this point. With that said, unlike Ausberry, we believe Segar made the correct decision in making a report regarding this matter to the Title IX Office.
[175] Andrea Gallo, *In* ███████ *abuse case, SEC and LSU president were warned two years ago about school's inaction,* The Advocate, December 2, 2020, https://www.theadvocate.com/baton_rouge/sports/lsu/article_fd6afef0-34b3-11eb-805d-07786b992ee1.html

HB: 4848-0171-9519.1

PLAINTIFFS_000152

- "I'm gonna punch you. Come over. I might kill you. You're so stupid. Idc at this point. Hurry up. The longer I wait the more angry I get."
- "Fucking stop talking to me you stupid cunt . . . Just kill yourself. You literally have nothing to live for." [176]

While the University was not aware of these texts and escalating threats, they highlight the necessity of urgency when investigating allegations of relationship violence, even where the reporter is a reluctant participant.

During his June 5 interview with Scott, which took place "in the Athletic Office," ███ described his relationship with Lewis as "volatile." He claimed Lewis "has occasionally gotten very physical with him" and that she purportedly "even busted in his apartment door." ███ contended that he "had to fight her off of him."

Regarding the April 3, 2018 incident, ███ claimed he "went to her apartment to get his belongings" and they "got into an argument because she wanted him to stay." ███ contended that Lewis "kept hitting him on the back and head." Remarkably, ███ **admitted** to the Title IX investigator that he "turned and punched [Lewis] in the stomach." After punching Lewis, ███ said he "left the apartment." Regarding the allegations of earlier abuse, ███ stated that he "did not recall punching Lewis before" and "maintained this was the first time."

Throughout this interview, ███ maintained that **he** was the actual victim of abuse and "stated there have been several occasions where he could have reported Lewis for being violent but chose not to." According to Scott's notes, the interview closed with Scott thanking ███ for meeting and advising "him of student support services . . . ." He was also told that he should have "limited contact with Lewis." While Scott did not have the text messages above, there is no evidence that he asked to see any of ███ text messages with Lewis. Despite the allegations of earlier abuse, the severity of Lewis' injuries, ███' acknowledgement that their relationship was "volatile," and ███' admission that he "punched" Lewis, the University took no interim action to suspend ███ and also did not issue a no contact or other protective order to separate ███ and Lewis. [177] This was an error.

Instead, the approach was too passive -- the following note closing this dating violence case was entered the day after ███ interview:

| **Interview** | IN PERSON WITH STUDENT |
|---|---|
| *Jeffrey Scott* | Tuesday June 5, 2018 at 1:49pm |

Interviewed ███ in the Athletic Office. Met with Miriam Segar afterwards and agreed that ███ would be placed in mandatory counseling. Segar also stated she would inform Coach Orgeron.

---

[176] These were found in the forensic review of Lewis' phone.
[177] When asked about this decision, Jonathon Sanders—the Director of Student Advocacy and Accountability and decision-maker regarding interim suspensions—stated that they were reluctant to issue a no contact order to the parties because Lewis "didn't want a no contact—she wanted to contact ███ . . .we knew she would violate the order and we didn't want to have to charge her . . . ." As discussed below, though, they did charge her with other alleged offenses during this time.

HB: 4848-0171-9519.1

PLAINTIFFS_000153

When asked whether she had ever "inform[ed] Coach Orgeron" of the development, Segar stated she did not "know whether I specifically talked to Coach about ███, other than to say here are the issues, they are being investigated." Orgeron similarly did not recall any specific communication with Segar regarding the outcome of this investigation or the counseling directive, although he did recall an instance where Segar called him to report something along the lines of, "Coach, ████ needs to stay away from that girl," referring to Lewis. As discussed below, this task of trying to keep ████ and Lewis apart was given to assistant football coach Mickey Joseph.

We believe the mandatory counseling edict, standing alone, was insufficient under the circumstances. Nevertheless, the Title IX Office did not even monitor whether ████ was attending "mandatory counseling." Instead, ████ was referred to an "in-house counselor" in the Athletics Department. ████ attended one appointment on June 8, 2018 and failed to show for scheduled appointments on June 15, June 22, July 13, and July 20.

There is also no indication about how the Title IX Office arrived at the decision to not move forward with discipline against ████ considering that: ████ admitted to punching Lewis; her injuries were so severe that she had "very swollen" ribs weeks after being punched; this was not the first incident of alleged abuse against Lewis; and Segar's expression of concern for Lewis' safety. While we recognize the complexity of the situation—namely, Lewis was a reluctant participant in the process and continued to initiate contact with ████—at the risk of being repetitive, we believe it was clear error to not interimly suspend ████ from the University at this point and move forward with disciplinary proceedings against him. The failure of the Athletics Department to report the earlier incident involving Complainant 1 compounded the error.

### e.    Segar's Second Report to Title IX

Perhaps not surprisingly, less than two weeks after the Title IX Office closed the matter, on June 18, 2018, Segar made another PM-73 report involving ████[178] The incident is described as follows:

---

[178] On June 19, 2018, a tennis player reported to Julia Sell that she was "concerned for Jade." The tennis player purportedly told Sell "that she had to go to Jades (sic) apartment at 2:00am where the cops were called because Jade was in a fight with her boyfriend, ████ She said Jade complains that he is abusive and hits her but lied to the police about what happened." Sell immediately shared this information with Segar. The following day, Julia Sell also "followed up with Jade about the cops being called to her apartment." She "asked what happened" and Lewis "said it was a big misunderstanding and that her and ████ were just arguing." Lewis "said she was good." In an interview with Husch Blackwell, Sell indicated that this was the first time she became aware of physical abuse between ████ and Lewis. She also stated that several other players reported concerns regarding the relationship during this time frame, all of which she relayed to Segar "on a nearly daily basis."

HB: 4848-0171-9519.1

PLAINTIFFS_000154

In early morning hours of Monday, June 18 @ approximately 2:00am, ████████ went to WCA apartments to Jade Lewis room. Jade had previously provided ████ a key and he entered the apartment with the key and went to her room. Jade was expecting ████ as the two had been texting prior to his arrival. Jade was upset with ████ because he had been in Miami, FL over the weekend and posted some things on social media with other girls. Jade indicated that although she knew ████ was coming over she asked him to leave once he arrived and didn't want to hear his excuses about the weekend.
████████ reported being awaken by Jade's scream and hearing her repeatedly say things like "stop- No-- Leave" . She also heard rustling in the room and Jade screamed another time. She called 911 and requested that the police come to help her roommate. Upon arrival the police separated the three individuals to gather statements. ████ reported that after the police left, Jade returned to the apartment and thanked her for calling the police and told her that ████ was drunk and that she was scared and that he had grabbed her neck and arms.
Jade told me that ████ did not hit or harm her and that she was telling him she didn't want to talk and asked him to leave but understood why her roommate called police. When asked if she was injured in any way, Jade told me that during the interaction with ████ that she had hit her ear on the bed causing her earring to fall out and bleed.

Despite the incident taking place in the University's on-campus West Campus Apartments building, it was reported as having taken place "off-campus."[179]

**INCIDENT AND CASE INFORMATION**

| | | |
|---|---|---|
| **Report Number** | **Role**<br>Victim | |
| **Incident Date**<br>2018-04-03 | **Incident Time** | **Incident Location**<br>Off-Campus |
| **Reported Date**<br>2018-04-26 | **Referral Source**<br>Staff | **Reported By**<br>Miriam Segar msegar@lsu.edu |
| **Case Created Date**<br>2018-04-27 | **Assigned To**<br>Jeffrey Scott<br>(LSU TIX Lead Investigator) | **Home Office**<br>Office of the Dean of Students |
| **Access Restriction**<br>No group-based restriction | | |

The University did not issue a Clery Timely Warning (despite having a practice of sending such warnings for dating violence cases)[180] for this incident, and it is not clear whether the incident was counted in the University's Clery statistics.

In this report, which was assigned to Stewart, Segar rightfully noted that she is "concerned about higher level of escalation and potential injury" and "for escalation of domestic violence." Additionally, around this time, various LSU tennis players were expressing concerns not only for Lewis' safety but about the possibility for spillover violence which could impact them as well.

In any event, despite this being the third incident of dating violence reported to the Title IX Office regarding ████ and the dire concerns expressed by Segar about "escalation and potential injury,"

---

[179] As we note in other areas of the report, our review did not include an analysis of the University's Clery crime statistics, but the accurate designation of the location of crimes (*i.e.* in or outside of "Clery Geography") is a critical step in crime statistic compilation and reporting.
[180] *See, e.g.*, https://lsu.edu/police/alerts/2017/1028-domesticviolence.php.

80

PLAINTIFFS_000155

the University waited over two weeks (until July 3, 2018) to even charge ▮▮▮▮ with potential violations of the LSU Code of Student Conduct. In contrast, on June 20, 2018, Residential Life staff members charged **Lewis** with "Violating, attempting to violate, or assisting in the violation of any Health and Safety related policy outlined within the LSU Residential Life Living on Campus Handbook"—because she had a candle in her room. She was found responsible for this violation two days later.

When asked about the decision to charge a victim of dating violence with housing violations instead of charging ▮▮▮▮ for violating PM-73, Sanders stated that "Jade didn't want to get ▮▮▮▮ in trouble." Because "she wasn't cooperating," Sanders "knew we would have hard time reaching the preponderance standard" even though ▮▮▮▮ **admitted** in his interview with Scott that he hit Lewis. According to Sanders, although "Jade didn't want to move forward" with a PM-73 case, "we did have control over residential life. . . . So we charged them with res life violations." Sanders stated that "we thought we could at least address the residence life issues—the fact that he had a key . . . it was a way to engage, to try and address the behavior with ▮▮▮▮" Sanders added, "at the time, we didn't know about all the other stuff" and his team was "trying to understand other ways to address the situation outside of PM-73 because she did not want to come forward."[181]

For many reasons, we believe this decision was misguided. First, Sanders' contention that the University "didn't know about all the other stuff" at the time SAA charged Lewis with residential life violations is incorrect—the June 20 charging letter is dated two days after the June 18 report. It is also after ▮▮▮▮ admitted to Scott that he punched Lewis. In addition, and regardless, disciplining a victim of dating violence for having a candle in her room—which was discovered through an investigation into a report of dating violence—sends a troubling message to victims of abuse and misconduct which does not encourage reporting to the University.[182]

It is not clear though what, if any, interventions were made to ensure Lewis' safety—albeit that any such interventions may ultimately have been ineffective given Lewis' lack of cooperation and continued voluntary contact with ▮▮▮▮.[183] It is remarkable, though, that ▮▮▮▮ was not interimly suspended based on the severity of the alleged conduct and ▮▮▮▮ previous admission that he had punched Lewis in the stomach.

Following Segar's June 18, 2018 report, ▮▮▮▮ was simply required to meet with a Student Advocacy & Accountability hearing officer on July 11, 2018. ▮▮▮▮ was interviewed by Sanders who provided the following short summary of the interview:

---

[181] Lewis and ▮▮▮▮ were referred as students of concern to the University's CARE Team. Sanders indicated that the decision to charge the parties with residential life violations was made in those conversations.

[182] We note that beginning in 2018 the University's Code of Conduct implemented an "amnesty" policy in place to address such concerns. *See* Code of Conduct (2018) at 3.4 ("Student safety is of utmost importance to the University. To encourage Students to make responsible decisions, the University recognizes the need for amnesty from University sanctions in certain situations. . . . Amnesty is intended to promote action when an emergency situation is present. . . . The decision to grant amnesty will be determined by the Dean of Students and/or SAA on a case-by-case basis.").

[183] Throughout this time, Lewis' account vacillated between acknowledging the harm ▮▮▮▮ was inflicting on her and then changing her position to say that she had made her previous allegations up. As noted above, this is a frustrating, but not uncommon, phenomenon for victims of relationship violence.

HB: 4848-0171-9519.1

PLAINTIFFS_000156

**Interview was conducted by Jonathan Sanders with Respondent on 7/11/2018.**
Sanders met with ████ and his advisor Mickey Joseph, who is his coach. ████ shared that he was from
Baton Rouge and went to Dunham High School until his senior year, when he then transferred to IMG
Academy in Florida for his senior year. ████ shared that he takes a lot of online courses at LSU. ████
shared that he and Lewis had been off and on for over a year. He said this drives her crazy as she wants to
be in a relationship and ████ does not. He said he was young and just wanted to have fun. He said they
have gotten into two big arguments and these were verbal arguments. ████ said he went over to her
apartment the night of 4/18/2018, because she wanted her stuff back (bags) because she was upset he was
in Miami taking pictures with other girls while on a boat. He shared that ████ is not friends with
Lewis. ████ said he had a key to Lewis' apartment, but didn't want one. ████ said he refused but he was
dropping her off at the airport for a trip and she told him to take the key in case she needed him to access
her apartment while she was gone. He said he thinks this was her trying to get him to trust her. ████
shared that when he got to the apartment that night, Lewis didn't want to come to the door. He said she
didn't want her stuff back so she could come over later and retrieve her items. So he opened the door to
give her stuff back. ████ shared they were in a verbal argument regarding his trip to Miami. ████ shared
that she was being emotional while they were both sitting on the bed and she hit her ear and ripped her
earring on the bed post. He said he was sitting at the foot of the bed when that occurred. He denied ever
hitting her or being physical with her. ████ shared that when Lewis came back from trying to go pro in
tennis back in March, she just showed up at his place and actually lived on his couch for a week until his
mother notified one of the coaches and they got her out of there. He said he tries to stay away from her,
but one of his roommates is friends with Lewis and brings her over to his apartment. Mickey Joseph chimed
in and said he was going to talk to the other player that brings her to ████ apartment and ask him to not
do that.

Around this time, as alluded to above, ████ position coach, Mickey Joseph, was put in perhaps
the impossible position of ensuring that ████ had no contact with Lewis and vice versa. During
his interview as part of this review, Joseph made plain this was a position he was deeply
uncomfortable being put in. Lewis' coach, Julia Sell, reported receiving a similar instruction from
Segar and described feeling exasperated and overwhelmed with the task, which included managing
the concerns of Lewis' teammates as well as the safety of Lewis herself. We agree that this was an
inappropriate request for the University to make of the students' coaches. Instead, the University's
reasonable concerns about keeping ████ and Lewis apart—or more aptly, protecting the safety of
the campus community—should have been facilitated through LSUPD, Residence Life, and/or
SAA.

Two weeks after interviewing ████ on July 25, 2018, Sanders finally interviewed Jade Lewis. In
his report summarizing his interview with Lewis, Lewis mentioned the April incident with ████
but purportedly "said she did not want to pursue Title IX options . . . ." She also "shared that she
ended the relationship Monday, July 23, 2018 . . . ."

During her interview with Sanders, Lewis was "adamant that she and ████ were not in a physical
altercation" on June 18. "She said he never touched her that evening" and "said that ████ did not
hit her or choke her as stated by [Lewis' roommate]. She said it was only a verbal argument."

The report closed by Lewis saying that "she and her parents had a falling out and she does not
speak to them." Lewis also shared that "her parents do not know about this situation and she
doesn't want them to know."

82

HB: 4848-0171-9519.1

PLAINTIFFS_000157

Three other students were also interviewed as part of this investigation, including Lewis' roommate at the time. During the roommate's interview, she shared that a second witness (one of ████' teammates) had told the roommate that "████ choked Lewis." The second witness "also shared that ████ hits Lewis." According to Lewis' roommate, ████' teammate "shared that ████ choked Lewis once while they were in the car" and "said that Lewis' lips turned purple." He also told her that "████ dropped off Lewis in a dangerous part of town and then came back and picked her up."

Regarding the night in question, Lewis' roommate "shared that she woke up about 1:30 am and heard Lewis scream, 'No..Stop…Get Off Me . . .'" "She also heard thrashing in the room" which prompted her to call the police. The roommate "said she heard ████ say 'Shut up' right before police arrived." "When Lewis came back she shared with [the roommate] that she was strangled and that ████ was hitting her." The roommate also "shared that Lewis had red marks around her neck." She "said that Lewis shared that ████ was so drunk and that he just came in and hit her." According to the roommate, Lewis was not forthcoming with the police when they arrived at their apartment. Despite all of this, ████ was not suspended on an interim basis and there was no tangible intervention by the University.

The third witness, one of Lewis' teammates ("Teammate 1"), shared that she was close friends with Lewis. Teammate 1 "shared that the night of [the] incident, Lewis called her when the police were at her apartment and told her to come over." When she arrived, Teammate 1 told Sanders "Lewis' neck was red and her ear was bloody from her earring." She shared pictures of Lewis' neck with Sanders. While she "has never witnessed any violence between the two," Teammate 1 believed it occurred. According to Sanders' notes, Teammate 1 "said that Lewis shared with her that she lied to police as she didn't want to get ████ in trouble," and "that Lewis is obsessed with ████ and doesn't think she will ever get over him."

### f.    Segar's Third and Fourth Reports to Title IX

On August 13, 2018, Segar submitted another PM73 report to LSU's Title IX Office:

Describe the incident(s)/event(s) including date, times, locations, and any potential witness(es) to the behavior.
**Jade Lewis contacted me via text message on Sunday, August 12 asking to meet with me on Monday, August 13. We set a meeting for 8:00 am and she told me that she requested the meeting to let me know that she wanted to be truthful with the University and Athletics Department about the abuse she has suffered from ████. She indicated she was coming forward now because she decided to break up with him had no reason to cover for him any longer. She expressed fear over retaliation as she indicated that ████ has told her that his guardian (████████) would have her deported (she is international) and kicked out of LSU if she told about their violent relationship. Jade expressed interest in obtaining a restraining order. I explained that a restraining order could only be obtained through filing a police report and appealing to a judge for a court order, but encouraged her to talk with the police. She indicated she wanted to first speak with the University staff and truthfully answer questions about incidents. She indicated that she has text messaging and pictures that document the circumstances and she would be willing to share with University. Also said that there are other friends of hers that have witnessed events and are aware of circumstances. I encouraged her to be truthful and provide complete information to campus.**

Segar closed the report noting that she was concerned for Lewis' safety and "want[s] to make sure the case is handled with high priority and documented fully." She also "[e]ncouraged Jade to report incidents to police and press formal charges."

HB: 4848-0171-9519.1

PLAINTIFFS_000158

The following day, Segar submitted another report:

Describe the incident(s)/event(s) including date, times, locations, and any potential witness(es) to the behavior.
██████████ reported to my office on Tuesday, August 14 at approximately 9:30am to report his concern for Jade Lewis' mental health and personal safety. He indicated that Jade showed up at his WCA assignment (during preseason camp) at approximately 10:00 pm on Wednesday, August 8 and tried to enter his WCA residence. He did not see her or speak to her but she attempted to gain access and was stopped by █████████ and █████████████. On Thursday, August 9 /Friday, August 10 @ 1:00am Lewis showed up to his off campus apartment and was drunk and asked to have sex with him. ████████ indicated that he called her friend █████████████ to come get her and did not let her into the apartment. ████████ has blocked her from social media but she continues to try to contact him through others. He indicated his reason for reporting this was his fear for her personal safety and indicated that she has attempted to harm herself by cutting her wrist in the past. He said wanted her to get assistance. I asked if he was fearful for his personal safety and he said no. I have attached copies of text messages he gave me.

Despite these reports, again, there was no immediate intervention by the Title IX Office or the University. This was a clear error. Instead, on August 15, Scott and Sanders interviewed another teammate of Lewis ("Teammate 2"), who—among other things—noted that "she saw Lewis crying from being hit by ██████" on April 3, 2018. The teammate "shared that Lewis said ██████ hit her because Lewis and [Teammate 1] spent the night at █████████████ s apartment the night before . . . ." She also "shared that she saw ██████ push Lewis in Tigerland one night."

That same day, Scott and Sanders met again with Lewis because "Lewis said she wanted to tell the truth and was not truthful the first time they met." During this meeting, "Lewis shared that she was punched in the stomach in May 2017, and this was the first incident of violence from ██████." This purportedly "occurred at the Standard/ U-House." Significantly, according to the interview notes, "Lewis stated she never mentioned this incident to anyone nor did she report it to anyone"[184] and "left LSU to go pro in tennis shortly after this incident."

She then shared that:

> one evening in April 2018, her, [Teammate 1], and [Teammate 2] spent the night at █████████████ s place after leaving the bars. ██████ was upset and came to her apartment at WCA the next day. Lewis said that ██████ fractured her rib. Lewis shared that they got into an argument and she grabbed his back as he was walking out of the apartment to let him know he should not be upset. Lewis shared that is when ██████ turned around and punched her in the stomach. After this occurred, Lewis walked outside to go to [another student's] place for assistance and this is when her friends pulled up and she let them know what had just happened. There is a picture of her stomach with a fist mark uploaded to the case file that [Teammate 1] and [Teammate 2] shared as they took the picture right after it occurred.

> Lewis shared that one evening she was going to get sushi with [██████ Teammate] and [Teammate 1]. She thinks this was June 11 or 12th. She said that ██████ pulled up and she got into his car. She then shared that [██████ Teammate] pulled up next to ██████ and didn't see Lewis in the car and asked ██████ if he wanted to grab sushi

---

[184] This further contradicts her claim in the *USA Today* article that she told White in May 2017.

HB: 4848-0171-9519.1

PLAINTIFFS_000159

with he, Lewis, and [Teammate 1]. Lewis shared this made ███ angry so he pulled the door shut and drove her to the ghetto about 20 minutes away from campus. He then took her phone and put it outside and asked her if she wanted to get it. She said she did not. She then got out to get her phone and ███ drove off. She said she then called ████ Teammate] to pick her up. ████ then came back to pick her up and had her get into the back seat. ████ then…grabbed her neck as he is driving. They headed back to her apartment. Lewis said she was crying and ran into her apartment. She said that ████ then came back and they talked on her bed for an hour. She said that ████ Teammate] was at her apartment then as he was staying with her for a couple of days.

Lewis shared that ████ had her location at all times as she shared it with him on Find My Friends App, but he did not share his location with her.

Lewis shared that ████ Teammate] has never used the key for her apartment besides June 18th. She said ████ was extremely intoxicated when he came back from Miami and she could smell it on him. He had her Louis Vuitton duffle bag as he wanted to take it to Miami. She said she was arguing with him since he was with girls in Miami and told him that she was going to ████ (sic). Lewis shared that ████ walked in and punched her in the stomach as soon as he walked into her bedroom. She said she was laying down at the time. She said that ████ was strangling her the whole time. Lewis shared that ████ was grabbing her neck, but she could still breathe. She said she thinks it was so she couldn't leave. She said her earring was ripped out, but doesn't know how. Lewis shared that she touched her ear and it was bleeding. When Lewis noticed her ear bleeding, this is when someone knocked on her door and they could hear the radios. ████ went to check to see who it was and Lewis went into the bathroom to clean the blood off of her. She was only wearing a t-shirt so she put on a hoodie so they couldn't see her neck. She said she was not truthful with police. Then ████ drove home after meeting with police. Lewis said that ████ dad found out and took his car away for a couple of days.

Lewis shared that when she met on July 25, 2018, ████ was back on the football team.

Lewis said that [student] (football), [student] (tennis), and ████ Teammate] (Football) witnessed ████ pushing her in Tigerland up against a car one night. Lewis also shared that around the end of April or first of May, [Teammate 2] saw ████ push her one night in Tigerland.

Lewis said that she went over to ████ on August 5, 2018, when she was intoxicated and was inside for a bit and then she left and he wouldn't let her back in. She was sitting outside his door and [Teammate 2] came to get her.

HB: 4848-0171-9519.1

PLAINTIFFS_000160

Lewis shared that she has text messages from ████ threatening her but doesn't want to share with us. Lewis shared that she showed the[m] to Miriam Segar in LSU Athletics.

Lewis said she has seen ████ a couple of times lately and neither one has spoken to the other. Lewis said she wants this to go away and doesn't want anything to happen to ████ She said that ████ has threatened her and said his dad will take her to court if she talks and will get her kicked out of LSU and deported.

### g.    Lewis Reports to Police

On August 16, 2018, Lewis reported to the LSU Police Department that ████ had "on several occasions struck her causing serious bodily injuries." She provided "photos of the injuries." In bizarre fashion, that same day, Lewis was informed that **she** was being held responsible for violating Residential Life policies regarding alcohol because she was drinking wine in her apartment.

Notably, the District Attorney's Office also located the following text exchange between Segar and ████ where Segar appears to be assisting ████ with his student conduct matter involving Lewis:

> 8/17/2018- Miriam Segar text messaged ████ saying, "Need to work on your statement to include personal circumstances/issues. When can you come by? Add that to your statement." ████ responded, "I'm not sure but I'll add more to it."

On August 17, 2018, ████ was arrested by the LSU Police Department for Second Degree Battery – Dating Violence. ████ was quickly released on bond—and one of the conditions of his bond was that he was ordered to have no contact with Lewis. It bears noting that the LSUPD's investigation into this matter was exceptionally thorough and well done.

On August 18, 2018, media reports began running regarding ████' arrest.[185] Almost a week after ████ was arrested and only after there was media attention regarding the matter, Sanders finally issued ████ "an interim suspension under the Code of Student Conduct." Pursuant to the interim suspension, though, ████ was still allowed to attend classes on campus.

On that same day, though, in what had become a well-established pattern, Lewis sent the following text to Joseph:

---

[185] *See e.g.*, Glenn Guilbeau, *LSU's Orgeron mum on* ████' *battery charge of woman; attorney says alleged victim recants*, The Daily Advertiser, August 18, 2018, https://www.theadvertiser.com/story/sports/college/lsu/2018/08/18/lsus-████-charged-battery-woman-amid-alleged-pattern/1030894002/

HB: 4848-0171-9519.1

PLAINTIFFS_000161

8/18/2018- Jade Lewis text messages Coach Mickey Joseph saying, "Good morning its Jade Lewis I wanted to speak with you about ███ I apologize for everything I know that I can't take things back but I want to fix things. I felt pressured to be dishonest about ███ hitting me. The pictures that I gave the school were of photos and ███ wasn't the cause of any of my bruising it was from tennis and a few were from partying he never hit me ever. I was hurt about him not talking to me and constantly being with other girls so in a way I wanted to hurt him. I feel terrible about what I did please forgive me."

It bears noting that when ███ was arrested, the Sells and Jade Lewis exchanged the following texts:



In violation of the terms of the interim suspension and his bond conditions, on August 26, 2018, Lewis went to ███ apartment where they "got into an argument." During the argument, Lewis was purportedly "pushed into a couch by ███ and injured her lower leg area." According to Lewis, this happened "when she went to leave the apartment."

### h.    Interim Discipline Is Implemented

A week later, on August 30, 2018 (or over four months after Segar's initial report), Sanders finally placed ███ on a comprehensive interim suspension. This interim suspension was issued "due to the potential threat your behavior may pose to the LSU campus community . . . ." It barred ███ from participating "in academic coursework, campus activities, or appear[ing] on University property without written permission from Student Advocacy & Accountability." Other than sending ███ a letter, though, we have been unable to identify any concrete steps the University took to ensure ███ complied with the edict. According to Maxient records, this full interim suspension was approved during a "Title IX case management meeting with Tom Skinner . . . ."

It was not until September 10, 2018 that the Title IX Office reached out to ███ to schedule an investigatory interview. In the Affidavit for ███ arrest, on September 15, 2018, "LSU Police

87

investigators also received information from a witness that another battery occurred between █████ and the victim where the victim was hit in the left eye several times" at ████' off-campus apartment. While Lewis "would not admit to █████ hitting her," LSUPD investigators "could observe that the victim's left eye was swollen." She said that when she woke up, she "noticed she had a black eye" but "did not know how it happened." A third-party witness advised the detectives that "the eye injury was caused by █████ after he slapped [Lewis] repeatedly in the face around her left eye." █████ was arrested for a second time on September 15, 2018.

The day after his arrest, █████' attorney, Marci Blaize, submitted a request for █████ to resign from the University. As a result, the Title IX Office "temporarily closed" the Title IX case, and placed a hold on █████' transcript "until he meets with Title IX investigator to complete the investigation."

On January 2, 2019, █████ pleaded guilty to three misdemeanors: two counts of battery on a dating partner and one count of violation of a protective order. Lewis refused to participate in the prosecution of the case.

### i.      Incidents Following Criminal Investigation

Six months later, on June 3, 2019, Segar reported yet another incident involving injuries to Lewis. This time, however, "Lewis told her [academic advisor] that she had been hit by a softball player." From Lewis' perspective, the parties got into a "verbal exchange" after the softball player ("Complainant 3")—who also had a relationship with █████—provoked Lewis by making a comment to the effect of "you put everyone in jail." From Complainant 3's perspective, however, Lewis instigated the altercation when she "walked past [Complainant 3] and 'bumped' into her." Complainant 3 explained:

> Jade was "stalking" █████ that evening and attempting to follow him from bar/bar. She said that while in the bar that evening, Jade had walked past her and "bumped" into her. She said that she noticed █████ leave the bar and saw Jade following him outside. Once outside she saw Jade chasing him through the parking lot and yelling and pushing him. She saw Jade punch █████ in the face multiple times and saw male friends of █████ pulling him away from her. Jade began walking in her direction on the sidewalk and they exchanged words. Complainant 3 said Jade Lewis swung at her and she grabbed her arm and pushed her. She said Jade attempted to hit her twice and both times she grabbed her by the arm to stop her. She does not remember punching Jade and said that her actions were in self-defense only.

Sanders followed up with Lewis, Complainant 3, and █████. Sanders later reported that █████ "confirmed that Jade followed him out of the bar that evening and began hitting him." Because "people were holding him back," █████ "didn't see the incident with [Complainant 3] but believes Jade went after her when she told her to stop hitting █████." According to Sanders, this information corroborated two other witness accounts.

It is unclear what action the University took in response to this incident, as this is the last entry in the case file.

HB: 4848-0171-9519.1

PLAINTIFFS_000163

On June 27, 2019, ███ "showed up" in Sanders' office with Complainant 3. ███ stated he was on campus—despite being barred from campus due to his interim suspension—because he "wanted his hold removed." The following day, Sanders contacted ███ to tell him that he had "a hold due to a pending matter with Title IX."

The next day, ███ contacted the SAA office "in reference to the hold on his transcripts." At that time, ███ "ma[d]e arrangements to meet with Title IX Office to finalize case." He was interviewed by Jeff Scott on July 3, during which made the following statements:

> ███ stated that he accepted a plea deal in January 2019, to two counts of battery on a dating partner and one count of violation of a protective order. ███ admitted that he did punch Lewis in the stomach on 4/3/2018, after an argument. ███ stated that the pictures showing a fist mark on Lewis's side did not come from him. ███ stated on 8/26/2018, he and Lewis got into an argument in his apartment. ███ said when Lewis went to leave his apartment, he pushed her onto the couch causing a small cut and she bruised her lower leg. ███ denied he ripped an earring out of Lewis' ear and denied ever choking Lewis. ███ stated on 6/18/2018, the LSUPD was called to Lewis' apartment, but there was not physical altercation and no arrest was made. ███ state on 9/15/2018, he "indirectly" violated a protective order when Lewis came over to his apartment and he let her inside. ███ stated he did not recall an incident when he and Lewis were in his vehicle and he supposedly threw her out in a dark neighborhood.

> At the conclusion of the interview, Scott "explained to ███ and Blaize that the preponderance of evidence supported a violation of PM-73 for Dating Violence against ███" ███ and his attorney accepted the finding and agreed to waive the 10-day Title IX appeal period.

███ was expelled from the University on July 18, 2019. As communicated to ███ in the case resolution form, "Expulsion is the permanent separation of a Student from the University without the possibility of readmission. **You are not allowed on University property**. If you need to be on campus during the business day for official University business, you must receive approval from the Dean of Students in advance. **Expulsion will be recorded on the Student's academic transcript**."

While this was the correct outcome, due to an internal recordkeeping error, the required transcript notation on ███ academic records did not take effect. This was an error. The practical effect of this oversight was that ███ was able to request his transcript without the appropriate notation and transfer to Southern University in Baton Rouge later that fall.[186]

---

[186] Jim Kleinpeter, *Former LSU wide receiver* ███ *enrolled at Southern, coach Dawson Odums says,* The Advocate, October, 15, 2019, https://www.theadvocate.com/baton_rouge/sports/lsu/article_beeb7242-ef98-11e9-b751-e3ed55bb5d7d.html

HB: 4848-0171-9519.1

PLAINTIFFS_000164

### j.    November 18, 2020 Twitter Post

Of note, on November 18, 2020, following the publication of the *USA Today* article, Lewis posted the following photo on her Twitter account:

A recent *USA Today* article has called out numerous LSU officials for their knowledge of the sexual violence experienced by my teammate and I, alongside many other female LSU students, and covered up by LSU administration.

The LSU Women's Tennis coach, Julia Sell, released a statement claiming she had no knowledge of the allegations made by my teammate and I. This statement is a blatant lie. Four members of the LSU Tennis Team separately made Coach Sell aware of these events between May 2017 and August 2018. These women would be willing to confirm this information and corroborate my story, as one already has in the USA Today article. Additionally, my parents called during that time span to express their concern, and my coaches brushed them off. Lastly, I would like to add that during the criminal case regarding the allegations I made, Coach Sell instructed the tennis team to stay away from me. These were my teammates and closest friends at the time, and I needed their support.

I was betrayed by Coach Sell, and I will not stand by and allow her to deny knowledge of what I went through, when in reality she knew the full truth and simply chose to stand by. As details of the sexual misconduct within LSU continue to come to light, my hope is that LSU Athletics changes course and decides to be transparent and remorseful rather than continuing to create cover-ups and false narratives.

Regarding Lewis' statement that four separate members of the tennis team made Julia Sell aware of the abuse "between May 2017 and August 2018," we reiterate our finding that no witness interviewed as part of this review, including the three teammates Lewis identified from this post during our interview with her, have stated that they directly told any LSU employee, including Julia Sell, about the May 2017 abuse. One of the students identified by Lewis was not enrolled at LSU until January 2018, another did not join the team until August 2017. As discussed above, the third teammate did become aware of the May 2017 abuse after ███ texted her about the incident, but the teammate made clear in an interview that she did not relay this information to Julia Sell.[187]

It is undisputed, though, that several teammates, including the teammates Lewis references in this post, did report the April and June 2018 incidents to Sell. It is similarly undisputed that Sell appropriately reported those incidents to Miriam Segar, as instructed by Athletics policy at the time, and that those reports made it to the Title IX Office.

Lewis' claim that "during the criminal case regarding the allegations I made, Coach Sell instructed the tennis team to stay away from me" is somewhat misleading. For context, as alluded to above, many of Lewis' teammates expressed concerns about being impacted by violence because they wanted to support Lewis, but she continued to have contact with ███ and he was volatile. In a conversation with the team during the criminal prosecution, Sells acknowledged the difficulty of the situation and noted that "a lot" of players approached her "with concerns and thoughts."

---

[187] Husch Blackwell conducted outreach to all other students on the 2017 LSU Tennis roster, many of whom did not respond or expressly declined to participate in the investigation.

HB: 4848-0171-9519.1

PLAINTIFFS_000165

She went on: "Every concern that I have heard for the last few weeks is coming out of unbelievable just care and love and respect. Not just for your teammates but for Jade. And we all love Jade. We all want Jade to be safe. Okay? Nobody is telling anybody don't hang out with Jade. Be friends okay . . . So for those of you hanging around with Jade you know it is a concern to your teammates. They're worried about you. They're not just worried about Jade. They're worried about you. Okay?"

She ended the meeting with the entire team acknowledging that the situation is not

> going away anytime soon and one of the biggest things that you guys need to understand is that I'm not an expert on domestic violence. Neither are you guys. You are not lawyers. You are not psychiatrists. Okay. The best thing we can do to help Jade is get her to professionals. Get her to accept the help that's all around her so that professionals can help her through this. None of us are qualified. None of us are qualified to properly advise her. Right? Be her friend there for her. Choose whatever avenue you want to go but if you really want to help her the best thing you can do for her is get her to a professional. Okay? That is the biggest message that I can send to you on she needs to speak to professionals.

### 6.    Abuse of Complainant 3

After being expelled and barred from LSU's campus, ████ continued to have contact with LSU students. On November 23, 2019, Segar made another report to the Title IX Coordinator regarding a third victim:

> [Complainant 3] is a current LSU student who has a relationship with ████. ████ is a former LSU student who was expelled from LSU for past violent behavior. Davis and [Complainant 3] have had and on/off relationship for last several months. Complainant 3 and one of her teammates, . . . were at a party on Saturday, November 23, 2019, and Complainant 3's car was towed and they needed a ride home. Complainant 3 called ████ to ask him to provide the ride to their apartment. ████ brought the girls to [teammate's] apartment and Complainant 3 and ████ began having an argument. Complainant 3 exited the car slamming the door. ████ got out of the car and approached Complainant 3. More words were exchanged and ████ forcefully shoved Complainant 3 to the ground scraping her back, arms and legs when she landed on concrete. The scrapes were prominent and viewed on 11/25/2019 during the meeting I had with Complainant 3. Complainant 3 at this time does not want to report the incident to the police or University. She has already spoken to an LSU Athletics staff counselor about the incident.

Understandably, Segar reported feeling "[f]rustrated that [Complainant 3] has not made the choice to stay away from ████. Encouraged her to contact police. Encouraged her to notify parents." Segar stated she also "[d]iscussed her need to consider returning home or transferring as a way to be proactive with her safety."

HB: 4848-0171-9519.1

PLAINTIFFS_000166

7.       **Conclusion**

Throughout this discussion of the Lewis-████ case, we have been candid about the many missteps we believe University personnel made. The reality is that the University was not equipped to handle a case this complicated. Equally clear is that these are precisely the sort of cases Title IX offices must be prepared to respond to. We make recommendations below about how the University can improve in this regard.

However, we do not think it would be fair to those personnel (nor would it be an honest, nuanced account of what happened) to ignore the fact that Lewis repeatedly frustrated various University and other interventions which could have mitigated harm. These include Lewis providing ████ with a key to her apartment and repeatedly initiating contact with him despite the advice of administrators, coaches, and her friends and teammates. This also includes the untruthful accounts she provided to the University's student conduct personnel and police department when both of those entities could have assisted her. We are troubled by her August 18, 2018 text message where she recanted her allegations of abuse and falsely asserted that she "felt pressured [by Segar] to be dishonest about ████ hitting me." We acknowledge and understand that the cycle of abuse is a tragic and common aspect of interpersonal violence that is challenging to navigate, and we do not include this information to cast blame on Lewis. These issues, though, had an impact on the University's ability to effectively intervene.

While there were numerous University missteps, even under the best of circumstances, there are limits to what can reasonably be expected of higher education institutions in situations of this nature. Ultimately, the most appropriate and effective intervention was something LSU had little control over—████ needed to be prosecuted and jailed.

We reiterate that ultimately there is no question that the University was ill equipped to effectively respond to this situation.

B.      ████████████

████████████ was a highly recruited running back from Baton Rouge who committed to attend LSU in 2015. While ████ played during the 2015 football season, he became a bona fide star during the 2016 season which culminated in him being named to the Associated Press All-SEC team. Despite battling injuries, ████ also had a successful 2017 season and on January 10, 2018 declared that he was leaving LSU to participate in the 2018 NFL draft.

While he was projected to be a first-round draft pick, ████ fell to the late second round. Explanations for his fall in the draft were murky. At least two media reports, though, referred to "a couple [unspecified] off-the-field incidences (sic) at LSU that were unreported" and "another investigation out there that could be potentially embarrassing for the kid and the team that drafts him . . . ."[188]

---

[188] Jared Dubin, ████████ *on draft-day fall: 'Things came out of nowhere and weren't true'*, CBS Sports, April 28, 2018, https://www.cbssports.com/nfl/news/████████-on-draft-day-fall-things-came-out-of-nowhere-and-werent-true/

HB: 4848-0171-9519.1

PLAINTIFFS_000167

███was reportedly befuddled by these rumors: "It did surprise me because a lot of the things came out of nowhere and weren't true. I just didn't understand why me, out of all people, because I'm great to everybody, I have a great personality and I just didn't understand why everything just hit so hard with me out of everybody."[189]

In August 2020, ███ was released by the team that drafted him, the Washington Football Team, after he was arrested on multiple counts relating to alleged domestic violence. ███ was charged with one count of strangulation, one count of destruction of property and three counts of assault and battery. The strangulation charge stemmed from an incident that allegedly occurred in ███'s home in March where ███ allegedly strangled his girlfriend until she was unconscious. In a February 2020 incident, ███ allegedly pushed his girlfriend to the ground in the bedroom of his home which purportedly caused an injury to her left thumbnail.

The third assault and battery charge stems from an incident in April when ███ pushed the woman onto the ground outside of his Virginia home. The destruction of property charge came when ███ took the woman's phone and threw it in the street, where it shattered. The woman purportedly took pictures of the injuries she suffered in all three of the incidents.

███ through counsel, denied all of the allegations and in late January 2021, prosecutors decided not to move forward with a felony charge of strangulation.[190] He is scheduled for trial on misdemeanor charges in mid-March 2021.[191]

While at LSU, ███ was accused of misconduct that implicated the University's Title IX policies at least three times. For reasons discussed in more detail below, none of those accusations of misconduct were investigated by the University and ███ was never disciplined for any of these reports. It bears noting that ███'s attorney has adamantly denied that ███ engaged in sexual misconduct while at LSU.

### 1.    Report by Complainant 1

On January 26, 2016, an LSU Swimming and Diving coach contacted Miriam Segar requesting an in-person meeting. During that meeting, the coach reported receiving a call from a parent of student-athlete, Witness 1, and that Witness 1 told her that Witness 1's friend, Complainant 1, confided in her about being sexually assaulted.

Segar immediately met with Witness 1 to get more details. Witness 1 shared that Complainant 1 told her that she was sexually assaulted by ███ "at off campus apartments, University House." According to Witness 1, Complainant 1 originally called Witness 1 on Saturday morning, January 23, 2016, indicating she "hooked-up" with ███ and another football player, but the following afternoon confided that she had been sexually assaulted by ███. Notably, Witness 1 "reported seeing bruising on [Complainant 1's] upper arms and that [Complainant 1] was very upset about the incident and ashamed it occurred and continued to say she wanted it to be over."

---

[189]    https://bleacherreport.com/articles/2773171-███-reportedly-had-shouting-match-in-pre-nfl-draft-meeting-with-eagles
[190] https://wtop.com/washington-football/2021/01/felony-charge-dropped-against-ex-nfl-player-███
[191] *Id.*

HB: 4848-0171-9519.1

PLAINTIFFS_000168

Later that afternoon, Segar reported the incident to then-Assistant Vice President, Human Resource Management and Deputy Title IX Coordinator, Gaston Reinoso. Reinoso informed Segar that Associate Vice President and Dean of Students and Deputy Title IX Coordinator Maria Fuentes-Martin handled student cases and that Segar should contact Fuentes-Martin to discuss the issue. Segar sent an email reporting the information to Fuentes-Martin later that night. She also sent an email to Witness 1 which she hoped Witness 1 would share with Complainant 1 which included "information on the LSU Lighthouse program which is a resource for victims of sexual assault" and "the LSU Policy on Sexual Misconduct."

On Wednesday, January 27, 2016, Segar and Fuentes-Martin conferred and Fuentes-Martin indicated "that [the] most important thing is to offer assistance to" Complainant 1. Segar confirmed "that information was sent to [Witness 1] to provide to [Complainant 1] and encourage her to seek assistance." Following that meeting, Segar again met with Witness 1 "to ask if she spoke to [Complainant 1] about resources and reporting the incident." Witness 1 "indicates that she told [Complainant 1] that some LSU staff were aware of the issue and encouraged her to report the incident and at minimum get medical assistance and some counseling." Witness 1 "reported that [Complainant 1] was adamant about not wanting assistance and not wanting to report." Segar then "offered to meet with [Complainant 1] to discuss her rights of receiving assistance, reporting through University and/or reporting to police." Witness 1 "agreed to talk again with" Complainant 1.

Segar and Witness 1 exchanged texts over the next couple of days where Witness 1 indicated that Complainant 1 "really isn't wanting to have anything to do with it." Witness 1 "reported frustration with not knowing what to do next."

The University's internal Title IX documentation shows that Segar made a written "PM-73 or Title IX" report January 29, 2016 and that the report was "assigned to Jacob Brumfield." On January 29, 2016, Fuentes-Martin noted that then-System Title IX Coordinator Marchand "suggested that I reach out [to Complainant 1] to encourage her [to] contact me as the Title IX person."

On February 1, 2016, Fuentes-Martin reached out to Complainant 1 via email:

Ms. Miriam Segar recently sent you an e-mail offering my name and contact information for an incident which you may need help with. My role as Deputy Title IX Coordinator for student cases is to ensure that we address immediate remedies for your safety and well-being. First and foremost, I want to discuss all of the services provided on and off campus to address your medical concerns as well as the availability of counseling. Secondly, we want to provide you with academic support and ensure that you are able to successfully continue with your studies at LSU. Lastly, I would like to discuss your options to investigate this incident which can be done administratively within LSU as a policy violation under Permanent Memorandum 73 (PM-73-Sexual Misconduct) which I have attached. I would like to encourage you to schedule an appointment with me so we can discuss this matter further. Please know that LSU is concerned for all of its student's and wishes to provide support and services through difficult challenges.

I urge you to contact my office at (225) 578-7799 to schedule a date and time that you can meet and discuss further. If you have any questions or just need to get further support and resources, please contact me either by phone or email at mari@lsu.edu.

HB: 4848-0171-9519.1

PLAINTIFFS_000169

Four days later, Complainant 1 responded:

> Hello Ms. Maria,
>
> I apologize for responding this late but I wanted to think about everything and look at all of my options. I have decided I would not like an investigation to be performed. I have met with Ms. Seirra Fowler and I know all of the resources that are available to me. I plan to use them if needed. I appreciate yours and LSU's support through this situation.
>
> Thank you for your time,

Sierra Fowler was the Director of LSU's Lighthouse Program at the time.

Fuentes-Martin responded:

> I'm glad that you responded to me and I'm thankful that you took the time to meet with Seirra. We are all here to help you and will respect your decision not to proceed. I would like to leave the door open to future discussions with you should the need arise. I wish you the best in your endeavors.
> Respectfully,
> Mari
>
> Sent from my iPhone

Fuentes-Martin then emailed Brumfield about "touch[ing] base with Seirra (sic) to see if there isn't any further follow up needed on our end." Brumfield followed up that he had spoken with Fowler and "she confirmed there are no expressed needs from us."[192]

There is nothing in the file materials documenting how the University arrived at its decision to not move forward with an investigation; although, given the circumstances, this was a reasonable decision. However, and significantly, none of the Title IX records regarding this incident mention ███████ as the respondent. When asked why ████████'s name was not included in the written report Segar initially submitted to Fuentes Martin, Segar stated, she "didn't want to put it in writing" because "I got a lot of public information requests" and "didn't think it was super secure." She added, "I just wanted to call and talk to people." In an interview with Husch Blackwell, Fuentes Martin confirmed that Segar verbally identified ████████ to her, and Fuentes Martin was "surprised that ████████'s name was not in the file."

---

[192] In a newspaper article where she discusses the alleged assault, Complainant 1 also noted:

> "When a nurse at the health center asked if she planned to pursue a complaint against ████████, the woman said no. 'I don't want to be that girl that everyone looks at and says, 'Oh, she's lying,'" the woman said. "Also, I was kind of scared to go forward with it because he was so violent." The nurse's response reaffirmed to the woman that, even if she made a complaint to LSU, nothing would come of it. "He's like a god around here," the woman recalled the nurse, an LSU employee, saying. "It probably would get pushed under the rug."

https://www.usatoday.com/story/sports/ncaaf/sec/2020/08/19/ex-washington-nfl-player-████████-accused-rape-while-lsu/3391053001/. When interviewed as part of this review, Complainant 1 was unable to identify who this nurse was.

HB: 4848-0171-9519.1

PLAINTIFFS_000170

This was an error.[193] Because of this omission, when ▮▮▮was accused of subsequent misconduct by other students as discussed below, this initial report was not considered or revisited.[194]

### 2.    Report by Complainant 2

Complainant 2 was interviewed as part of this review on December 14, 2020. In a newspaper article, she described an assault by ▮▮▮▮ five months after Complainant 1's report:

> [Complainant 2] met ▮▮▮▮ for the first time in late June 2016 at a bar near LSU . . . She had been drinking before she arrived, she said, and at the bar, bought her several Patrón shots. She was "extremely" intoxicated, she said. Her memory of the night is fuzzy. "I was very drunk," she said. "Way too drunk to give consent in the first place."
>
> ****
>
> The woman made it to her apartment, where she lived alone. She and ▮▮▮▮went separate ways. Sometime after,▮▮▮▮texted her, asking if he could come over, she said. She said she allowed him to come over but told him nothing was going to happen.
>
> ****
>
> That night,▮▮▮▮forced [Complainant 2] to perform oral, then vaginal sex, she said. When she woke up in the morning, he was gone, she said. She told a few close friends that ▮▮▮▮had taken advantage of the situation, though she did not explicitly describe it as rape at the time, she said.[195]

Complainant 2 indicated that her abuse of alcohol increased because of this assault, and on April 5, 2017, her substance abuse challenges ultimately compelled her to check herself into rehab. She was driven to this Lafayette rehabilitation facility by her coach, Julia Sell. Complainant 2's father texted Julia Sell thanking her "and Mike both for everything you're doing to help us out and help

---

[193] We believe the University should consider issuing appropriate discipline to Segar.

[194] In a newspaper article, Complainant 1 also relayed that her boyfriend at the time was an LSU football player. This player transferred from LSU in June 2017. At the time of his transfer, he said "I have nothing but love and respect for Coach O and all of my brothers at LSU." In the *USA Today* article, Complainant 1 said she informed her boyfriend of the assault and he steered clear of▮▮▮▮because "I probably would have lost my (expletive) on him." In that same article, the boyfriend purportedly said LSU head football coach Ed Orgeron brought up the subject of his then-girlfriend and▮▮▮▮"about a year after the alleged assault, telling the athlete he shouldn't be bothered by it." Orgeron purportedly said, 'Everybody's girlfriend sleeps with other people." Orgeron credibly denied the allegation in his interview with Husch Blackwell. Instead, he had learned that the player was considering transferring. In trying to figure out why he wanted to transfer, Orgeron said he learned that player's "girlfriend was cheating on him and the team was teasing him." Orgeron stated that when he spoke to the player, "it was what I would have told my son. I said, 'you're not the only person who has this problem, there is a solution.'" Orgeron made clear: "No one ever told me ▮▮▮▮ was accused of raping [the player's] girlfriend." We have tried several times to reach the player on the phone number we were provided, but each time our calls went to a voicemail that had not been programmed to receive messages.

[195] Jacoby, K., Armour, N. "Two women say ex-Washington RB ▮▮▮▮▮▮raped them at LSU when he was a freshman," USA Today, August 19, 2020.

PLAINTIFFS_000171

[Complainant 2] out." He "especially" wanted to thank them for "taking her to Lafayette this morning."

The following week, Complainant 2 sent a card to Julia Sell where she noted, among other things, that "I really don't have a way to fully put in words how thankful I am that you've done everything and beyond to get me the help that I need and have been right by my side throughout all of this. It means the world to me."

Complainant 2's treatment was paid for by LSU. According to Segar, this is a standard practice for LSU Athletics and records confirm that LSU's payment was made upon her arrival at the treatment facility.

About a week into her treatment, Complainant 2 told a counselor that "she felt she was raped by an athlete at school." According to records reviewed by Husch Blackwell, Complainant 2 indicated at the time that this was the first time she ever disclosed this incident to anyone and there is no explicit mention of █████ in the treatment records. At that time (approximately April 12, 2017), she said she also informed her family and friends. Both Complainant 2 and her father believe that a rehab center employee may have reported the alleged rape to LSU, but we have been unable to find evidence corroborating this.

Around that time, though, it is undisputed that Complainant 2's father met with Julia Sell during the Southeastern Conference women's tennis championships which was held from April 19–23, 2017 in Nashville. During this meeting, Complainant 2's father wanted to thank Sell for taking his daughter to rehabilitation. In addition, Complainant 2's father said that he told Julia Sell that his daughter "was raped by one of LSU's football players." At the time, Complainant 2's father "did not know [the football player's] name." Complainant 2's father said Sell responded, "I don't believe her. She's a liar."

In an interview with Husch Blackwell, Julia Sell acknowledged that she met with Complainant 2's father but contends he told her that the counseling staff were "exploring the possibility that she was raped." She adamantly denied ever saying, "I don't believe that." She also adamantly denied calling Complainant 2 a "liar." During her interview, Julia Sell indicated that Complainant 2's father was not upset following their meeting during the April 2017 SEC tournament and actually cheered for LSU in a match they played against Texas A&M. Complainant 2's father disputed this.

As part of this review, we interviewed friends of Complainant 2's father who had contact with him following his meeting with Sell. Each relayed that Complainant 2's father shared Julia Sell's "I don't believe her" response with them. They described him as upset, angry, and stunned. One witness actually saw Complainant 2's father talking to Julia Sell and described him as "so upset afterwards" and that Complainant 2's father was "in tears."

While we do not know with certainty what transpired between Complainant 2's father and Julia Sell during this conversation which occurred over three years ago, we find his account of the conversation credible. We have been unable to identify any motive for Complainant 2's father to have been untruthful about this account. There are also witnesses to him being upset following the conversation. The conversation also marked a turning point in his relationship with Julia Sell—as

HB: 4848-0171-9519.1

PLAINTIFFS_000172

noted above, just weeks prior he had sent texts to the Sells thanking them for everything they were doing to help his daughter.

Notably, though, Sells **did** report the conversation she had with Complainant 2's father to Miriam Segar who, in turn, reported it to Title IX Coordinator Stewart. That report, though, was again not made by Segar through the University's online recordkeeping system. Instead, Stewart said that during the "early spring semester 2017," Segar called Stewart and told her that Complainant 2 "was inpatient for substance abuse" and that Complainant 2's father "had said to one of the Coach Sells (at a tournament out of town) 'his daughter was possibly assaulted' per one of the treatment professionals currently serving" Complainant 2.

According to Stewart, there was allegedly "no mention of what type of assault" and "Miriam and I discussed that if it came to light it was sexual assault, dating/domestic violence then Athletics would share with me." Stewart also did not create any records in Maxient regarding the Sells' and Segar's verbal report. This was an error.

According to Stewart, no one from the Title IX Office reached out directly to Complainant 2 or to her father to inquire further because she "was inpatient at the time and we didn't have access or find it appropriate while she was receiving inpatient care." However, even when Complainant 2 left the rehabilitation facility on April 26, 2017 (less than a week after Segar's report to Stewart), no one from Athletics or, more importantly, the Title IX Office reached out to her to gather additional information about this assault. This was an error. Around the same time, Complainant 2 withdrew from LSU.

### 3.    Report by Samantha Brennan

On July 22, 2016, LSU Athletics department student worker Samantha Brennan reported to Sharon Lewis and Miriam Segar that ██████████ had approximately two weeks earlier taken a nude picture of her without her consent. Notably, in a text with a fellow student, Brennan noted she "was really surprised how supportive everyone was, especially Ms. Sharon. I would have thought they would have tried to shut me down but her and an advocate were the ones who encouraged me to go to the police and the advocate came with me."

The following is a portion of the police report summarizing Brennan's report:

HB: 4848-0171-9519.1

PLAINTIFFS_000173



In a follow-up conversation with the LSU Police Department, Brennan informed the detective assigned to the case that "she still wished to not pursue charges against ▉ and also wished to remain anonymous as it relates to LSU CARE, Title IX, Lighthouse, etc."

On July 25, 2016, Fuentes-Martin emailed LSUPD Sergeant Marshall Walters that she believed Brenann's report "could be a PM73 case" and asked if Brennan "was provided info regarding Lighthouse and option to pursue [the] complaint via code of conduct since she isn't sure about criminal route." Fuentes-Martin concluded, "I don't want to drop this case especially as the respondent is an athlete."

Walters responded that Brennan "was provided with all resource information and declined to seek any help at this time." He also noted that Brennan "was adamant that her information not be shared beyond the police department . . . ."

On July 27, 2016, Director of Residence Life and Education Jonathon Hyde emailed Fuentes-Martin and Stewart seeking their guidance regarding how to proceed. Fuentes-Martin suggested recording the case "in Maxient as a PM73 case, but as information only. This will mean that we were aware, know the name of the suspect, but will not conduct an investigation as per the victim's request." This is precisely what should have been done with the initial report involving ▉ discussed above. Her email closes, "I think this will wrap up the case. Thoughts?"

Stewart responded, "Yes, I agree with the approach. Absent prior consistent concerns, patterned behavior or elevated risks, I think the right approach is to respect the wishes of the Complainant. If there are other factors (pattern, predations, threats, weapons, violence) then our approach may be different."

HB: 4848-0171-9519.1

PLAINTIFFS_000174

While Stewart outlined the correct analytical framework, at that point, significantly, the "name of the suspect" █████ had not been recorded in Maxient regarding Complainant 1's previous complaint against Guice. Had it, the decision about whether to pursue disciplinary charges against █████ may have been different.

Brennan stated she "quietly" left LSU during the Fall 2016. She stated: "I couldn't handle a million fans cheering █████ on, knowing what he'd done."

### 4.    December 2017 Superdome Incident

On December 9, 2017, █████ attended a high school football game at the New Orleans Superdome. Following the game, the Athletics Department received a report that Guice had "aggressively Sexually Harassed" a 70-year old Superdome security guard.

In her appeal of the PM-73 violation and in interviews with Husch Blackwell, Lewis stated that on or about December 13, 2017, a woman and/or her purported legal representative began calling the Football Operations office demanding to speak with Coach Orgeron regarding an alleged incident of sexual harassment involving █████. Lewis stated that she immediately sent a text message to Segar and Ausberry relaying the information, and provided screen shots of her text messages to Segar which were included in her appeal of the PM-73 failure to report finding.

Although Lewis reported the incident to Segar on December 13, the Title IX Office did not receive information regarding the report until December 19, when the alleged victim and/or her representative called the Student Advocacy and Accountability office directly. According to the SAA incident report, the alleged victim:

> Stated that she was working security at the superdome on December 9th for the high school football games. At 3:30pm she was sitting on a shair at her post when █████ and several other men approached her. He began saying that he "likes older women" and asked if she would have sex with him. She waas shocked and told him that was not funny. He continued to gesture at his private area and grab himself in front of her saying that "older women are my thing" and that they could just "go off and do it" somewhere. She told him that she is a grandmother and 70 years old and that he shouldn't talk to people that way. The other men began to laugh. She tried to tell him how disgusting it was that he would treat her that way but he kept talking about sex as he got into an elevator and left.
>
> She reported to her supervisor and that person called the Coach at LSU. He said that █████ was probably just kidding around and that █████ came from a broken home. She said that she did not care and that he should be punished for his behavior. She said that he did it with such ease that she felt like he had done this before. The coach asked what she wanted, "an apology?" She told him that she wanted █████ to sit out from a game - the bowl game. He dismissed her and no one has returned her calls or done anything.

Husch Blackwell was not able to identify the "Coach" referenced in this report.[196]

Sanders then reached out to Segar who indicated that "she was aware of the information" and that they "were notified about a week ago." Despite that, Segar did not report the matter to the Title IX Office. This was an error if for no other reason than LSU's Title IX policy applied to "off campus" conduct in certain situations.[197]

---

[196] In an interview with Husch Blackwell, Head Coach Orgeron denied having any direct communications with the alleged victim, stating that "[Segar] told us about the incident" and that Segar, Ausberry, and the University's "Taylor Porter attorney" "did an investigation." Orgeron was "not sure what happened."
[197] *See* PM-73 (2015) at I(A).

HB: 4848-0171-9519.1

PLAINTIFFS_000175

Segar also shared that "the President's office was aware of the situation," but there are no records indicating that the President's Office reported the matter to the Title IX Office. Segar said Athletics consulted with "their attorney" (Taylor Porter) and they "don't see an LSU athletics connection to the behavior if it was true." First, that was not the standard for assessing whether a report should have been made. Second, this was a call for the Title IX Coordinator to make. Segar also said Athletics conducted its own investigation into the matter, *i.e.*,—"they spoke to ███████ and he denied this occurred." "She also shared that they also spoke to [a fellow football player] who was identified as being present and [he] shared that this did not occur."

Sanders also forwarded the report to Stewart who ultimately said she did not "believe this is a PM-73 Title IX case based on the information presented." While this may have been a reasonable decision, there is no explanation for how this conclusion was reached. Stewart consulted with her supervisor, General Counsel Tom Skinner, who purportedly supported this decision. Sanders' Maxient report regarding the matter closed, "Issue is being overseen under the direction of Tom Skinner and to please call him if there are any questions."

████████played his final game for LSU on January 1, 2018 at the Citrus Bowl. Despite at least four reports of sexual misconduct during his short tenure with the University, he was never put through the University's disciplinary process. There also are no records that he was ever notified of these reports or that the University even intervened to provide him some targeted training.[198]

## C.    Respondent A

Respondent A enrolled at the University in Fall 2016 and was a member of an LSU fraternity. Although he was not publicly identified, the November 20, 2020 *USA Today* article included statements by LSU student Elizabeth Andries alleging Respondent A sexually assaulted her on a bus returning to Baton Rouge from a Halloween party in New Orleans in October 2016.[199] In

---

[198] Additionally, in April 2017, representatives from STAR sent a letter to President Alexander, Orgeron and others flagging a troubling tweet from████████which expressed support for a high school classmate who had just been indicted in the rape of an LSU student. STAR never received a response to that letter.

[199] https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against████████other-students/6056388002/. According to the *USA Today* article, Andries and ████████ reported the following issues with the University's response to their reports of Respondent A's alleged misconduct:

- "The Title IX case dragged on for more than six months, during which LSU rarely gave the women updates, twice extended the frat member's deadlines to appeal without notifying them, and denied their requests for protection from him during the case, according to the women and their emails with school officials."
- Andries, in particular, described the University's "resfus[al]" to make appropriate academic accommodations for her to ensure she did not share classes with Respondent A, and "asked the school to notify her professor about the case, to explain her absences." Ms. Andries felt that neither request was handled appropriately, as she was required to "to sit and stay in" the class with the Respondent, and LSU did not communicate with her professor regarding her need for an accommodation.
- "LSU also declined to issue a no-contact order between her and the frat member; because they hadn't been talking, 'there isn't any communication to cease,' a Title IX employee said in an email to Andries. Instead, LSU gave her a template for a letter that she could send him directly, instructing him not to contact her."
- "[E]ven after finding him responsible twice, LSU refused to switch him out of the classes that he and Andries were set to share during the upcoming, fall 2019 semester, emails show. Instead, Andries said she was told

HB: 4848-0171-9519.1

PLAINTIFFS_000176

addition, the article made reference to "another female student [who] had already reported the same man for sexually assaulting her in almost the exact same way, the same night, on the same bus trip." Although this student remained anonymous in the *USA Today* article, she has since publicly identified herself as ██████████[200] We had the opportunity to interview Andries and ████████ regarding their account. Their consolidated Title IX case is summarized and analyzed below.

On October 28, 2016, Andries and ████████ attended an off-campus party hosted by Respondent A's fraternity in New Orleans. According to Andries' statement in the investigative report, Respondent A's fraternity made buses available to sorority members to transport them to the party. Andries stated that Respondent A "invited her to the party," and Andries noted that she had a friendly relationship with Respondent A at the time. "Before the party, however, [Respondent A] started talking to others about how he was going to 'get it' with Andries during the trip." Upon learning of these comments, Andries stated that "she was very clear that she was not interested in a physical or romantic relationship with [Respondent A]."

On the night of the incident, Andries "recalled that she disappeared from the party and stayed in a bathroom for two hours," during which she "threw up 'a lot.'" Andries "still felt sick" on the bus for the trip home and "remembered focusing on a cup she was holding in case she had to throw up again." When Andries "made it back to the bus for the trip home to Baton Rouge," she "still felt sick." According to Andries, at some point Respondent A "came close to her and pushed her to the window of the bus." Andries "stated that she said 'no' repeatedly," but Respondent "felt under" her shirt anyway. "When she woke up the next morning, Andries had bruises on her chest."[201]

████████ described a similar encounter with Respondent A in a Title IX report she filed in March 2019. The report indicated that, like Andries, ████████ "was invited on [the fraternity's] fall bus trip" in October 2016. ████████ stated that she did "not remember much of the party . . . but my memory of the end of the party and the ride back to Baton Rouge is very clear." ████████ recalled making it back to the bus to ride home, where she "lost consciousness." ████████'s account continued:

> I passed out on the seat of the bus by myself. When I regained consciousness, my body was limp and propped up on the wall, and [Respondent A] was sitting next to me and groping me. He had one hand around me and cupping my breast, and the

---

- that she would have to be the one to switch, because she was 'the uncomfortable one,' and he had the same rights as her."
- "At a football game two weeks after the ruling, Andries saw the frat member in the student section. . . . When the women told LSU, they said, the school informed them that it had granted the frat member another extension, and that he was allowed to remain on campus."

The article also described concerns with the sanctions initially imposed by Sanders as inadequate, along with concerns that Sanders did not appropriately consider additional information submitted for the hearing—including identification of a third potential victim.

[200] *See* https://lailluminator.com/2020/11/20/guest-column-lsu-has-good-sexual-misconduct-policies-it-needs-to-follow-them/; https://www.theadvocate.com/baton_rouge/news/article_ac81d9d6-4148-11eb-ba2e-abbc43bea5c5.html.

[201] Andries initially continued a friendship with Respondent A, but the friendship ended after he again allegedly attempted to "touch her" without her consent on a second occasion in July 2017.

PLAINTIFFS_000177

other hand up my skirt, grabbing and tugging on my upper and inner thighs. For a moment I did not react because I was confused. I did not understand what had happened to lead this man, who I had only briefly talked to a few hours earlier, to think I was interested. Once I realized that I did not remember him coming to sit next to me nor did I ever tell him he could touch me, I wanted to get away, but I could hardly move or speak. Finally, while I could not move my body, I was able to clearly and sternly say, "Get off of me." [Respondent A] continued to grope me, and drunkenly muttered something like, "No, no, baby, it's ok. We're going back to my place. It's ok." He also said something about his couch, but I'm not sure what or why, though I have guesses. Still unable to move and now panicking, I said, "Get, the fuck, off me. Or I will punch you." That finally got [Respondent A] off of me, and he ran off to what looked like the back of the bus.

███████'s report stated that she was "embarrassed" about the incident and initially did not report it, but "decided to report after hearing about what [Respondent A] did to my friend in her dorm,[202] what [Respondent A] did to the other girl on the bus that same night,[203] and what he did to Elisabeth Andries."

After discovering that ███████ had also "been approached by [Respondent A] on the bus from New Orleans when Andries was passed out," Andries decided to "file a Lighthouse report in spring 2018"—although she did not give Respondent A's name at this time.

In the spring of 2019, however, Andries discovered that she had a class with Respondent A, who had the same major. As described in the *USA Today* article, Andries "tried to ignore him in the class they had together . . . but couldn't."[204] Instead, Andries "started to suffer chronic panic attacks."[205] In addition, Andries "realized that [Respondent A's] behaviors were occurring with other women." These factors prompted Andries to submit a formal Title IX report to the University on February 21, 2019. The report, submitted through an online "Request an Accountability Advisor" online form, simply stated: "I want to file a Title IX case against the student who sexually assaulted me."

At the outset, Andries' case is emblematic of a significant issue identified through witness interviews and community outreach: LSU students—irrespective of Athletics or other organizational affiliation—do not have clear guidance on where or how to submit a report directly to the Title IX Office. The "Request an Accountability Advisor" form has no connection to the Title IX Office and routes to officials in Student Advocacy and Accountability, which is why Tracy Blanchard, Associate Director and Assistant Dean for Student Advocacy and Accountability, received notice of the communication.

---

[202] This refers to an alleged incident reported by ███████ during her Title IX investigation but not investigated in relation to ███████'s case.
[203] This refers to an unknown third individual whom ███████ heard about but was not able to identify.
[204]    https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against-███████-other-students/6056388002/
[205] *Id.*

HB: 4848-0171-9519.1

PLAINTIFFS_000178

1.    **Title IX Investigation**

Andries initially spoke by phone with Blanchard on February 26 to coordinate a time for meeting, but Andries and Blanchard did not meet until March 7, 2019.[206] During the March 7 meeting, Andries "reported a previous assault by another student (three years prior)," referring to the alleged assault by Respondent A in October 2016. Andries stated "[s]he wants to move forward with the Title IX process given that she is now in a class with him and she feels ready to participate in this process."

During our interview, Andries stated that during her meeting with Blanchard, she requested an academic accommodation for the class she shared with Respondent A. She also requested a no-contact order. Blanchard's notes from the February 26 phone call confirm that Blanchard "offered to reach out to her faculty or look at class alternatives if needed." There are no additional notes in Andries' Maxient file indicating that this outreach occurred, and there are no records in Andries' case file of any emails to or from Andries regarding this request. As discussed in more detail below, Andries stated that she received no academic accommodations coordinated by Student Advocacy and Accountability or the Title IX Office during the Spring 2019 semester. This was an error.

The Title IX Office initiated outreach to Andries on March 8, 2019. , a graduate assistant in the Title IX Office at the time, interviewed Andries on March 15, 2019. During that interview, Andries recounted the details of the alleged October 2016 assault. She also identified ███████, providing her "full name" and indicating that "███████ was more than willing to share her story" that she too had been assaulted by Respondent A. Andries also identified another friend who "would know names of other students who had similar experiences with" the Respondent. Neither the "friend" nor ███████ were promptly contacted for interviews.[207]

Baffled by the lack of outreach, ███████ submitted her own report to the Title IX Office on March 20, 2019. Despite now being identified as both a potential witness and a potential victim, ███████ was not contacted by the Title IX Office until May 8, 2019. It is worth noting that ███████ was studying abroad at the time; nevertheless, this is an unreasonably long delay.

In the meantime, on April 24, one of Andries' professors in the College of Engineering submitted a Title IX incident report for a "Student[] in Crisis, Distress, or Exhibit Concerning Behavior." The report stated:

> This student has had difficulty attending class during the semester. Today she came to my office and provided a letter from LSU Mental Health Services . . . concerning what she has been going through in relation to a situation with another student who is attending the same class . . . . The letter she provided indicates that she has been working with Student Advocacy and Accountability regarding a "safety concern" and she did mention that the matter involved "[T]itle IX" when she described her

---

[206] Andries' case file notes indicate that Blanchard "was out sick" on February 26, 2019, and that Blanchard followed up with Andries two days later on February 28 with additional availability for meetings. It is not clear from the file what accounted for the delay between that correspondence and Blanchard's initial meeting with Andries.

[207] As noted below, there is no indication in the investigative report or communications in the case file regarding whether the Title IX office ever contacted Andries' other friend or other potential witnesses she identified. In addition, and even more problematic, the Title IX Office did not contact ███████ until May 8, 2019.

104

PLAINTIFFS_000179

difficulties attending class. I did not want to inquire more out of concern for her well being and privacy but I wanted to make sure that she is receiving the best support she can get.

I offered to adjust the due dates for assignments that she may have missed and offer whatever flexibility she might need to get through the semester. Based on her letter it appears she is receiving support form SAA and LSU MHS but I think she might need additional support academically so that she is not negatively impacted further. I suggested that she might want to speak with one of the counselors in Student Services within the College of Eng. to inquire about other potential accommodations (e.g., obtaining an "incomplete" grade to give her more time to finish her semester and minimize the potential negative impact on her academic grades). I reached out to . . . one of the counselors in SS at CoE who suggested that the CARE team might be appropriate for this situation.

There are no follow-up communications with the professor in Andries' case file, and again, there are no records of follow-up communications or meetings from SAA or Title IX with Andries regarding her requests for academic accommodations and a no-contact order. Based on representations in the *USA Today* article and interviews with relevant University officials, we believe that Blanchard communicated with Andries regarding her requests for Title IX accommodations, but these communications were not memorialized or documented in Andries' case file and thus not available for our review. Given Title IX's baseline mandate for the University to ensure that individuals reporting sex discrimination maintain access to educational programs and activities, this lack of communication and oversight regarding Andries' requests for assistance obtaining academic accommodations is a clear error.[208]

Scott eventually interviewed ███████ on May 20, 2019. Scott's interview summary begins by noting that ███████ "had nothing further to add to her initial statement in her complaint." The contents of Scott's summary of his interview with ███████ are nearly identical to ███████'s written statement submitted to the Title IX Office in her incident report. ███████ also identified several potential witnesses in her interview, including two other potential victims (not including Andries), a "fraternity president" whom she informed of the incident, and another LSU student also present on the bus who "clearly saw ███████ was unconscious." There is no indication that Scott or ████ attempted to contact any of these potential witnesses. This is a clear error.

That same day, Respondent A was notified of the complaints against him. This was nearly three months after Andries' report and investigative interview, and two months after ███████'s report. Although the notice letter stated "you may have been involved in and/or have knowledge of a situation that was a potential violation of these policies on October 28, 2016," the letter contained no information regarding the alleged victims or the nature of the alleged 2016 violations.[209]

---

[208] As noted in our recommendations, this case management function is ordinarily delegated to a case manager or at the very least a secretary to assist with ensuring that such communications with the parties are documented appropriately in a case file. LSU's Title IX Office has no such secretary or case manager.

[209] According to the final investigative report, Respondent A was charged with "Sexual Misconduct," including "Sexual Assault" and "Non-Consensual Sexual Contact."

HB: 4848-0171-9519.1

PLAINTIFFS_000180

Scott interviewed Respondent A on May 20, 2019, shortly after the notice letter was transmitted. Scott's summary of this interview is just one paragraph long:

> [Respondent A] stated he vaguely recalled the bus trip to New Orleans in 10/2016. [Respondent A] said he recalled that he was in control of the music on the bus, so he mainly sat in the front of the bus to be close to the controls. [Respondent A] recalled on the way back from New Orleans, everyone on the bus was very drunk and he walked around and talked to a few people. [Respondent A] stated he briefly talked to Andries because they were good friends at the time. [Respondent A] denied that ever [sic] made any advances toward Andries or anyone else on the bus. [Respondent A] stated after talking to Andries and a few others, he went back and sat at the front of the bus so he could control the music. [Respondent A] stated any allegations of him groping women are totally untrue. [Respondent A] said he wished he could remember more but all he recalls is the bus trip and him being in control of the music. [Respondent A] once again adamantly denied ever groping or touching anyone inappropriate.

There is no indication that Respondent A identified any additional witnesses or information for Scott's consideration at that time in the investigative report or in Scott's interview notes.

The final investigative report was completed on June 3, 2019. Of note, again, there are no records indicating that the investigators contacted any third-party witnesses in this matter, including the potential witnesses or victims identified by the parties in their initial reports or interviews. This is notable considering that the alleged assaults occurred on a crowded bus. There is also no indication that investigators conducted any follow-up interviews with any party, or requested any documentary evidence, such as text or social media messages.

Although ▆▆▆▆▆▆▆▆▆▆ ' written summary of Andries' account was sufficiently detailed and well-written, as noted above, the summary of Scott's interview with ▆▆▆▆▆▆ appears to be a "copy and paste" of her initial report. Based on the timing of ▆▆▆▆▆▆ 's interview (May 20) and the final report (June 3), it seems likely that preparation of the report was rushed and not reviewed by a colleague or supervisor.[210]

Ultimately, Scott found "that [Respondent A] did violate LSU's PM-73 policy regarding sexual misconduct, to include Non-Consensual Sexual Contact." This statement of finding is problematic as it does not clearly identify the specific policy violation or outline the facts the investigator relied on to support this finding. Significantly, the "Rationale" is only two sentences: "This determination was rendered on the credibility of the testimony provided by all interviewed parties, to include the detailed consistencies between the accounts of the Complainants involved. This testimony lends credence to a pattern of behavior exhibited by the Respondent." Because the investigator's finding appears to hinge on the credibility of the parties alone, and not any other corroborating witnesses or evidence, the absence of any meaningful analysis of the facts supporting the investigator's credibility analysis in the investigative report is not consistent with best practice.

---

[210] We note again that Scott did not have any colleagues to provide this support to in the Title IX Office, other than a graduate assistant. Scott and Stewart expressed concerns regarding Stewart's ability to review Scott's investigative reports because of the conflict of interest created by designating Stewart as an appeal officer.

HB: 4848-0171-9519.1

PLAINTIFFS_000181

Despite these concerns in the written product, however, we note that Andries and ██████ repeatedly emphasized their positive experience with Scott throughout the process. ██████, for example, stated, "Jeff Scott was the only person I liked throughout the whole process . . . he made me feel respected and heard." Similarly, Andries remarked, "he was very nice and I thought he did his job very well from what he—because he explained everything. That was kind of the only person who told me what was going on."

Andries and ██████ stated that they did not review the complete investigative report, but that Scott did "read back" their statements to them and also read the finding to them "over the phone," which they were comfortable with. Respondent A also "[m]et with [Scott] and reviewed report/results."

### 2.      Appeal to Title IX Coordinator

Under the University's Title IX Policy at the time:

> Either party may appeal the findings of the formal resolution process in accordance with existing University policies detailing appeal procedures for students or for employees. **Appeals must be submitted in writing to the Campus Title IX Coordinator or designee within ten (10) business days upon receipt**, by the appealing complainant or the appealing respondent, **of notification of the outcome of the formal resolution process**.

Because Respondent A received notice of the final investigative report and outcome on June 5, 2019, a written appeal would have been due to Stewart on or about June 19. In an interview with Husch Blackwell, Stewart recalled that Respondent A "asked for an extension to review the case file and submit an appeal," which Stewart granted because Stewart was out on leave from June 7 until June 17, 2019.

According to Respondent A's Maxient report, the Title IX Office received a written appeal document on July 11, 2019. The untimely appeal reasserts Respondent A's denial of engaging in any misconduct, including denials of being "handsy" and "attempt[ing] to feel up [Andries'] shirt while on the bus ride," adding "nor would it have been possible" based on the clothing Andries was allegedly wearing at the time. Significantly, Respondent A further noted that, "While there were several individuals intoxicated, they were milling around on the bus. There would have been several witnesses to this fraudulent claim." As noted above, we agree that it was an error to not interview additional witnesses as part of the investigation, especially given the nature and public location of the alleged misconduct.

Moreover, Respondent A asserted that "Prior to this investigation, I did not even know who ██████ was," adding, "When questioned about the incident, it was the first time that I was made aware of who she was."

Finally, Respondent A's appeal also contended ██████, specifically, was not credible because she "stated that I went to take a test in the testing center the semester after the alleged incident, yet the only exam that I have taken in the Himes testing center was my first circuits exam during June

PLAINTIFFS_000182

2018. I have never taken an exam in Himes prior to that, nor after." In addition, Respondent A stated, "I was never contacted by fraternity president, nor any individuals on the executive board about the alleged incident," emphasizing that "May 20th, 2019 was the first time I had ever heard of the incident in question."

There is no evidence that either Andries or ████████ were provided a copy of Respondent A's written appeal and afforded the opportunity to respond. Instead, a case note in the Complainants' Maxient report states that on June 21, 2019, "Respondent in case has indicated with to [sic] appeal. Has until Friday, June 28 to submit any documentation. . . . *Pinged Susan [Baries] for notification*." (Emphasis added). There are no notes or communications in the Complainants' files indicating that Baries or Title IX provided notification, and both ████████ and Andries told Husch Blackwell that they never saw an appeal document from Respondent A and "had no idea why he appealed this thing."

████████ recalled confronting Stewart regarding her decision to "extend the deadline" for Respondent A to submit his appeal. According to ████████, "She said it was because she was out of town." This "vague" response frustrated ████████, who "had done my research" and was attempting to "track the deadlines." ████████ stated that when pressed for additional explanation as to the delay, Stewart ultimately told her, "I don't have to justify my decisions to you." When asked about this encounter in an interview with Husch Blackwell, Stewart recalled the Complainants' frustration with the appeal deadlines, and stated that she communicated that "this was not a blanket granting" (of the extension) and said she had made the decision "based on a fact-specific determination."

In her interview, Stewart accepted responsibility for this oversight, acknowledging that it was a "mistake" and adding that she "certainly understands why the Complainants were unhappy with the decision and with me." While we agree with Stewart that this was a mistake, we emphasize that this is precisely the sort of small but significant aspect of Title IX case management that can define a participant's experience with the process, and we are skeptical that any individual tasked with the responsibilities assigned to Stewart—including significant responsibilities outside of Title IX—could manage effectively without adequate support—*i.e.*, a case manager.

According to the case notes in the Maxient file, "Appeal outcomes notification [were] sent to student via email from Jennie" on July 26, 2019—nearly a month after the appeal submission documents were due. Because Respondent A's written appeal was due on June 28 and was not received until July 11, the appeal should have been denied as untimely. Stewart's July 22 "Outcome Notification" letter stated: "After a thorough review of the appeal and the records used to render the original decision, I have determined the information supports a finding of a violation of PM-73." In support of the decision, Stewart essentially restated the analysis in Scott's investigative report, writing: "The Complainants exhibited a high degree of credibility through the process, including consistent accounts of the concerns in question. The detailed accounts shared by the Complainants indicate a likelihood of patterned conduct engaged in by the Respondent."

Pursuant to the process in place at the time, the "Title IX" case was closed and referred to Student Advocacy and Accountability for resolution.

HB: 4848-0171-9519.1

PLAINTIFFS_000183

### 3.    Student Accountability Process

On August 8, Sanders sent correspondence to Andries and Schroeder regarding a "Request to Meet." The letter stated:

> My name is Jonathan Sanders and I work with the University on **investigating cases** that involve potential violations of LSU's policies and/or the LSU Code of Student Conduct. Information has been shared that you may have been involved in and/or have knowledge of an incident(s) involving **a potential violation** of these policies on October 28, 2016. Specifically, it is alleged that **you may have been sexually assaulted** by another student. (Emphasis added)

Sanders also sent an "initial charge letter" to the Respondent, which contained similar language.

Sanders met with Respondent A and his attorney advisor on August 14, 2019. During this meeting, the Respondent "shared that he thought he was being asked about someone else and didn't know he was being accused so he could prepare in advance." Respondent A also re-submitted the written statement initially provided to Stewart in his "Title IX appeal" in support of his case. There is no record of this "statement" being provided to either Complainant during the course of the SAA process.[211]

Sanders then met with █████████ and Andries on August 22. In our interviews with █████████ and Andries, the Complainants described discomfort and anger regarding their communications and interaction with Sanders. Andries explained:

> I met with Jonathan Sanders for the first time and . . . so he . . . reevaluates . . . he . . . makes you go through the whole report again and tries to find . . . inaccuracies or something. I don't know what the point of him was. He said it was still, determined as punishment, but I remember he was asking me questions. He was like, "so at one time you said you were in the back of the bus and in the other time you said you were in the middle back, so which one was it?" And I was, like, I don't think it matters. I was,—I thought the investigation was over, I thought you didn't have to ask me these questions. And he was like, well, it's my job to figure out the punishment. . . . and then he asked me if I was on other drugs or on anything else other than alcohol? And I looked at him and I was like, would it have mattered at this point? And he was just like, well, I find it hard to believe that, you were on a public bus with people. And I was like, well, me too. That's the sad news of frat parties, I guess. I was just like, I don't know what to tell you, this is already over. Um, and then he told me to give him . . . if I had any more information I could present it and I thought I had old texts of him being . . . creepy—so I was like, oh, let me see, but I had deleted those for obvious reasons. And then I was like, well, I know he assaulted a friend of mine. Let me ask her if she wants to come forward.

---

[211] Following this meeting, Sanders requested information regarding Respondent A's contention that he had not interacted with ███████ in a University testing center, and ultimately concluded that ███████ and Respondent A had not been in the testing center together on the date that ████████ alleged. The significance of this fact and its bearing on Sanders' sanctioning determination is not clear, however.

HB: 4848-0171-9519.1

PLAINTIFFS_000184

So I ran into her and, um, and asked her and she was like, yeah, well I don't want to go through your whole process of what you're going through, but if you give my information to him, and . . . skip that, like to where you are, no problem, if they contact me, I'll report it. And so I gave them all of her information and then he never contacted her. Because I asked her once it ended if he contacted her. I asked her and she was like, I never heard anything from him.

Andries stated that after this interaction, "I got really angry towards it. Well, I—I don't really get angry, I got very stern, I guess the word choice would be. But I really was just, . . . why does that matter? I just don't understand why you're asking me these questions. I thought the investigation was over. Like, there is no need for him to ask . . . read through the whole report and then ask stupid questions like that, like he's a detective or something. Honestly, it just—that whole interaction was very frustrating."

Under the Student Code of Conduct in place at the time, after a "Title IX investigation" is complete, the "Title IX case" is closed and referred SAA for additional investigation, adjudication, and sanctions. According to the Code, this process begins with the "Initiation of Accountability Process," at which point SAA receives a referral and opens a new case.[212] Once SAA receives the referral:

> An SAA Official may investigate any alleged or potential misconduct. This investigation can include meetings with a complainant, interviews of other persons with knowledge pertaining to the facts and circumstances, and other types of information collection. The investigation can begin before or after a Notification Letter is issued.[213]

According to interviews with representatives from the Title IX Office and SAA, this additional investigation process was utilized regardless of the underlying misconduct—such as a Title IX investigation in which a complete investigation had already been conducted and appealed. As evidenced in Andries' and ███████'s case and also emphasized by other students in our comparator file reviews and community interviews, this is a byzantine practice which at best confused student participants and at worst pointlessly prolonged case resolution and potentially re-traumatized the parties. It also required additional institutional resources for an area that was already understaffed.

---

[212] Code of Conduct (2018) at 11.

[213] *Id.* After this SAA "investigation," SAA may take several actions, including "[t]ake no action"; [r]equest to meet the Charged Student or RSO through an Accountability Meeting, and if found Responsible, issue an Accountability Outcome"; [r]efer the Charge to a UHP; and "[h]old the referral for further inquiry." *Id.* The Code advises that "[m]ost Student cases begin with an Accountability Meeting between a SAA Official and the Charged Student." "For the matter to be resolved administratively," though, the student "must agree to accept the recommendation of the SAA Official by doing the following":

    1.    Accept Responsibility for the conduct and the Outcome in writing;
    2.    Waive the right to have the case considered by a UHP; or
    3.    Take no action and allow the deadline for requesting a UHP to expire.

*Id.* at 12. Alternatively, the "SAA Official may refer a matter directly to a UHP for resolution." *Id.*

HB: 4848-0171-9519.1

PLAINTIFFS_000185

In the meantime, at the beginning of the fall 2019 semester, Andries discovered that she was again assigned to share several classes with Respondent A. According to Andries, the University again failed to appropriately address her requests for academic accommodations—namely, for Respondent A to be removed from Andries' classes. From Andries' perspective:

> And so, multiple appeals go by, whatever, and so now it's August and the first week of school started and they reached out to me and said that they need to meet me because I had three of my five classes with him, which actually I had four, which I didn't find out about the fourth one until I walked in and he was in there. So that was a fun first week of class. Um, but yeah, no, so they made me—they, um, got someone from the College of Engineering, . . . , who was super helpful and nice . . . . I'm gonna say the College of Engineering did great. Everyone else did terrible.

Ultimately, Andries ended up working directly with her professors in the College of Engineering to move her classes around, including creating an "independent study" so that she "could still graduate on time." While Andries was appreciative of the College's assistance, she was still understandably angry because by this point, "I've already missed the first week of class." Andries also stated she "didn't want to move all this stuff with my senior design project, because I planned my five years to make my last year really easy and now you're telling me I have to take all these hard classes with the, like, hardest thing of engineering . . . ." Andries thought that Blanchard may have "reached out to Respondent A" to "tell him to move his classes," but Respondent A "didn't answer and . . . they told me that since I'm the uncomfortable one, I had to move out."[214]

We note that Department of Education guidance in place at the time required (and continues to require) institutions to "fairly assess[] the need for a party to receive interim measures," but "not rely on fixed rules or operating assumptions that favor one party over another."[215] In addition, interim measures are required to "be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving *any* student of her or his education."[216] Determinations regarding removal of a responding party from an educational program or activity pending final resolution of a Title IX complaint are among the most challenging decisions for an institution to make throughout the Title IX process, and we express no opinion regarding the University's determination not to remove Respondent A from the parties' shared classes in this case.

---

[214] ▮▮▮▮ described observing Andries "giving up" and "feeling overwhelmed and defeated" in trying to obtain academic accommodations, so ▮▮▮▮ "read everything I could about interim measures, fully prepared myself, and went to Jennie's office" to advocate for Andries. ▮▮▮▮ stated this meeting occurred sometime in the late summer/early fall semester. From ▮▮▮▮'s perspective, Stewart did not handle the meeting well, and although ▮▮▮▮ "tried to give her the benefit of the doubt because it's clear she's overworked and had been on leave," "it was not a good environment." Ultimately, according to ▮▮▮▮, Stewart denied Andries' request to remove Respondent A from their shared classes because "that would violate his rights." ▮▮▮▮ admonished that at this point in the investigation, Scott had already found Respondent A responsible for sexually assaulting Andries and herself, and could not understand why that finding did not justify interim action. After this meeting, ▮▮▮▮—who "went in pretty confident"—"left the building" and "cried in public."

[215] 2017 Guidance at 3.

[216] *Id.* (Emphasis added).

HB: 4848-0171-9519.1

PLAINTIFFS_000186

On September 5, 2019, Sanders issued a "Memorandum for Victim" to ███████ and Andries. Despite being found responsible for sexually assaulting two students, Sanders issued the following sanctions:

- "Anger Management and/or Healthy Relationships" assessment by Student Health Center Office of Wellness & Health Promotion
- "Commitment to Community" Course
- Deferred Suspension effective September 5, 2019 through May 31, 2021;[217] and
- No Contact Directive.

Here we note that the University has sanctioning guidelines in the form of an "Outcomes Guide."[218] Unlike other sanctioning rubrics for peer institutions which outline potential sanctions for sexual misconduct based on the severity of the alleged conduct in addition to factors such as incidence, acknowledgement of responsibility, and the desires of the victim, the SAA Outcome Guide recommends discipline according to the number of violations:

**10.2U- Sexual Misconduct**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
|  | Deferred Suspension or Suspension; or Expulsion; Class-only restriction; Referral to Mental Health/ Psychological Services; EDMC Moodle Module; No Contact Directive | Suspension or Expulsion<br><br>No Contact Directive | Expulsion |

While all of the potential sanctions are listed as an option for a "1st violation" of "Sexual Misconduct," these guidelines do not provide a framework for assessing which sanction is appropriate in a particular case. In Andries and ██████████'s case, though, Respondent A was found responsible for two violations of the Sexual Misconduct policy—one against Andries and one against ████████. Accordingly, the minimum sanction that should have been imposed under this guidance is suspension.

████████ and Andries were outraged by Sanders' proposed "Outcome." ████████ elected to "decline" the Outcome, and requested the next step in LSU's exceptionally complicated process, a UHP "rehearing."[219] Significantly, though, this decision came with risk because the UHP "rehearing" not only opened up reconsideration of Sanders' sanctions, but also allowed the Respondent to have the underlying findings re-adjudicated—despite already having the Title IX investigative finding, the Title IX appeal, and Sanders' re-investigation and determination. ████████ and Andries correctly emphasized the unfairness of this process. ████████ explained:

---

[217] "Deferred suspension is a status for a specified period of time during which any subsequent finding of Responsibility for a violation of the Code or University policy shall include the Outcome of suspension for the Student or RSO. Deferred suspension will include loss of privileges as detailed under disciplinary probation with restrictions. Deferred suspension is designated on a Student's academic transcript in cases of Academic Misconduct." Code of Conduct at 20.

[218] Exhibit N (Outcomes Guide).

[219] Under the Code, "If a Charged Student declines the SAA Outcome or the SAA Official declines to issue an Outcome, the matter will be referred to a UHP. **A UHP is a rehearing, not an appeal of the Outcome.**" *Id.* Although this language is emphasized in the Code, it is not apparent to Husch Blackwell the significance of this distinction.

PLAINTIFFS_000187

"It's like the process was designed to wear us down—to make us give up." But for ███████, "there was nothing to lose at that point" because "the 'sanctions' Sanders gave him were worthless."

Andries, however, did not formally challenge the Outcome, although she did attend and participate in the hearing process. She explained: "At that point, it was already three appeals deep that I was, like, I don't—I don't know where this ends. I don't know where it started. And it was just . . . the appeals I really can't even count."

After ███████ provided notice of her appeal of Sanders' outcome, the case was set for a hearing on September 25, 2019. At this point, nearly seven months had passed since Andries' initial report. In preparation for the hearing, the parties were permitted to submit additional information and evidence.

On September 26, 2019 the University Hearing Panel issued its "Outcome" in the case, again (for the fourth time) finding Respondent A "Responsible" for "Sexual Misconduct" and "Violating a Rule of the University," as defined by the Code. The UHP's sanctions included "Suspension" from September 25, 2019 until May 31, 2020, in addition to a No-Contact Directive and a requirement to "submit documentation for attending counseling to discuss healthy relationship . . . prior to readmittance to LSU."

Remarkably, this was not the end of the process. Instead, Respondent A had another opportunity to "appeal" this "Outcome."[220] On September 27, 2019, he submitted an appeal to the Dean of Students. None of the information submitted in Respondent A's appeal met the University's criteria for an appeal,[221] and the University appropriately denied it on October 16, 2019.

Once again, however, neither Andries nor ███████ received notice or a copy of the Respondent's appeal. On October 14, Andries' father contacted SAA "to understand the appeals process and when the decision would be ma[d]e." Andries' father also reported that Andries saw [Respondent A] at a game and was not notified that he was still on campus, which was a shock to Andries

---

[220] Under the Code, after an "Outcome" is determined by a UHP, the parties may "appeal." "Only Outcomes of a UHP can be appealed," and both respondents and complainants "entitled to be informed of Accountability Outcomes" may appeal. Code of Conduct (2018) at 22. The "Appellate Process" is as follows:

> On appeal, a finding of responsibility may be upheld or overturned in whole or in part. An appeal must be submitted in writing to the Dean of Students within five business days after the Student, RSO or complainant (when permitted) is notified of the UHP Outcome or new information becomes known to the Student, RSO, or complainant. The written document must identify the specific actions or Outcomes being contested. All submissions must include one of the aforementioned criteria as the basis for appeal. Once the Dean of Students receives the request for an appeal, any Outcome issued by the UHP is suspended pending final resolution of the appeal by the Dean. Upon receipt of the written appeal, the SAA Official will submit a written position statement to the Dean within five business days.

*Id.*

[221] *See id.* (stating that appeals "will only be considered on the following grounds: A. Evidence of bias by the UHP; B. Significant departure from the procedures, definitions, or standards in the Code; or C. New information has become available since the UHP.").

HB: 4848-0171-9519.1

PLAINTIFFS_000188

because she had no knowledge of the appeal and believed that Respondent A was suspended and prohibited from accessing campus.[222]

█████████ graduated from LSU in May 2020. Andries has continued to pursue her degree. On November 16, 2020, however—the same day that the *USA Today* article was published—the University communicated to Andries that Respondent A was re-admitted to the University and scheduled to begin classes for the spring of 2021, which would necessitate additional coordination to ensure she did not share a class with him.

### D.    Respondent B

The *USA Today* article identified "defensive lineman Respondent B" as an LSU football player "accused of dating violence" who was "arrested" and "not charged in court."[223]

In March 2016, an LSU professor filed an Academic Intervention Team[224] report expressing concerns about one of her students. Two days later, that professor prepared a follow-up memorandum to the Dean of Students noting that the student "mentioned having acquired a black eye over the weekend, causing her eye to be swollen shut" but "did not explain the circumstances of this injury, though she said she could explain when meeting with me . . . later in the week (that meeting is still in the process of being scheduled)."

Two days later, Eddie St. Vil, SAA's Senior Case Manager and Threat Assessment Specialist, followed up with the professor by phone "to discuss, provide, and inform her of resources that are available given the student's situation. Specifically, Lighthouse, STAR, the Women's Center, Mental Health and myself. [The professor] is scheduled to meet with [the student] this morning (3/17/16) at 11am but does not believe that [the student] will show up. If [the student] does show up, [the professor] will call me to debrief the interaction."

The professor did meet with the student and reported back to St. Vil that the meeting with the student "was very productive and went a lot better than anticipated." The student was reluctant to discuss what happened to her eye however. The professor nevertheless "walked [the student] to meet with [Lighthouse] and has scheduled a meeting for March 18." The professor also shared with St. Vil "that she is afraid that [the student's] boyfriend and father of her child is a football

---

[222] Of note, a charged student in the SAA conduct process "retain[s] rights as a Student or RSO while the charges are being considered, and, if found Responsible, *until the Student or RSO has exhausted all rights of appeal as established in this Code.* Code of Conduct (2018) at 8 (emphasis added).

[223]    https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against-████████████████████other-students/6056388002/.

[224] According to the LSU Center for Academic Success website:

> The Academic Intervention Team (AIT) provides timely and appropriate intervention for students facing circumstances that may impede their academic success.

> We identify students with issues impeding academic progress and intrusively provide an intervention on the student's behalf based on the student's unique needs. The committee's efforts are designed to raise the level of retention and persistence to graduation.

https://www.lsu.edu/cas/about/services/ait.php.

HB: 4848-0171-9519.1

PLAINTIFFS_000189

player and she does not want that to prohibit the services and resources available to [the student]."
Respondent B was not specifically mentioned.

On April 1, 2016, Stewart "suggested initiating a 'little I' investigation—an inquiry to determine
whether or not there is a PM-73 policy violation." Consistent with the University's practice at the
time, an investigator was assigned and set a meeting, but the student failed to attend. The last note
in the Title IX file regarding this report noted, "the new meeting is scheduled for Friday, 4/22/2016
at 3 p.m." It is not clear from the file materials whether that meeting, in fact, took place or what
the results of the "little i investigation" were.

Approximately six months later, on September 26, 2016, Baton Rouge media reported that LSU
defensive tackle Respondent B had been booked with "domestic abuse battery/child endangerment
and false imprisonment" following a fight with the student at Indigo Park apartments.[225] According
to arrest records, the pair was "fighting over infidelity." The student "said as she tried to leave the
apartment with their 10-month-old [child], Respondent B twice grabbed her – once by her hair and
a second time by the shoulder – and tossed her backwards." The student also "said Respondent B
refused to let her leave the apartment." An investigator wrote that the student had "a swollen lip
and marks near her throat." Respondent B purportedly "had a cut lip" and the student was also
booked with domestic abuse battery/child endangerment as a result.

On that same day, Segar reported to Title IX Deputy Fuentes-Martin that Respondent B "had been
arrested for domestic violence and that [his] partner was also an LSU student." The following day,
Segar contacted Fuentes-Martin and informed her that the "DA's office had dropped the charges
as there wasn't clear and convincing evidence of what occurred." Fuentes-Martin told Segar that
the University's "administrative process would begin with investigators contacting the parties
involved."

The next day, LSU Lighthouse reached out to the student to offer her services. Title IX investigator
Jacob Brumfield also requested an interview with her which was tentatively set for October 3.
Brumfield then "reached out" to Respondent B on September 28, 2016 requesting a meeting.
Respondent B did not respond to emails or cell calls.

On October 3, 2016, the University's Title IX investigators contacted LSUPD requesting all police
records associated with the incident. LSUPD Captain Walters "responded that he could not provide
any information and that any information that would be provided to him would be a 'law
enforcement only' release."

On October 4, 2016, Brumfield sent a follow up correspondence to Respondent B again requesting
a meeting. Respondent B did not respond. On October 12, 2016, Brumfield then asked Ken Miles,
Executive Director of LSU Cox Communications for Student Athletes, to reach out to Respondent
B and have him respond to the emails. The next day, Respondent B responded:

---

[225] https://www.wbrz.com/news/lsu-s-████████-arrested-monday-morning/

HB: 4848-0171-9519.1

PLAINTIFFS_000190

**Jacob E Brumfield**

| | |
|---|---|
| From: | █████████████ |
| Sent: | Thursday, October 13, 2016 1:20 PM |
| To: | Jacob E Brumfield |
| Subject: | Re: Please Contact (LSU Dean of Students' Office) |

Hey this is ████ I would not like to attend this.

Thanks!!

---

Brumfield's interview with the student lasted "about 15 minutes." She "was not forthcoming with information due to her not being able to say much 'legally.'" She did state that news accounts of the incident were "false." The student told Brumfield that "she was safe" and that she did not currently live with Respondent B. She also verified that there was no protective order in place and that she did not want LSU to issue Respondent B a "no contact order."

Ultimately, the Title IX investigation determined that "there is insufficient evidence to say whether Respondent B has violated LSU's PM-73 policy in terms of domestic violence." As part of the rationale for the conclusion, the closing report noted that the "Complainant [] has stated that her testimony was falsely attributed in the newspaper article. That statement aligns with the dropping of criminal charges against Respondent B by the 19th Judicial District Court District Attorney's Office on September 27, 2016." Respondent B was reinstated to the LSU Football team shortly thereafter.[226]

The investigation closed by recommending "a re-examination of this incident given any new information." The matter was never re-examined and Respondent B declared for the NFL draft on January 1, 2017.

### E.    Respondent C

The *USA Today* article identified Respondent C as an LSU football player "who was accused of recording a woman during sex without her knowledge and sharing the video with others." Our review of a case file relating to these allegations confirmed that on March 4, 2017, a student-athlete allegedly had a consensual sexual interaction with Respondent C in Respondent C's apartment. According to the student-athlete, on March 13, 2017, a fellow student showed her a screenshot of video taken during the sexual encounter. Understandably upset, on March 25, 2017, the student-athlete discussed the situation with her coach. The student-athlete and her coach then reported the incident to Miriam Segar on April 5, 2017. The following day, Segar submitted a report to the Title IX Office. LSUPD was also notified.

---

[226] *See* https://www.theadvocate.com/baton_rouge/sports/lsu/article_f35ecfa0-8589-11e6-9d02-0b1fc2ba5cce.html.

116

PLAINTIFFS_000191

On April 7, 2017, Director of Residential Life and Education Jonathon Hyde reached out to the student-athlete to set up a meeting for Title IX purposes. The letter sent to her focused on resources available to her. About two weeks later, LSUPD met with the student-athlete again and she "advised that at this time she does not want a criminal investigation or any of her information released."

The student-athlete was interviewed by Title IX investigators on April 20, 2017. Ultimately, she concluded that she did "not wish to proceed with an investigation and [had] reservations." The last communication in the Title IX file is a letter to the student-athlete dated April 28, 2017, which notifies the student-athlete that the investigation will be closed because she is "reluctant to participate," but providing additional information about available resources.

While the determination not to proceed with an investigation appears reasonable under these circumstances, the case file does not contain information about how the University arrived at its decision to honor the student-athlete's request for confidentiality. We note that this is a consistent problem throughout the case files Husch Blackwell reviewed, and emphasize that it is critical for employees charged with Title IX roles to meticulously document such determinations to ensure clarity in an individual case record and also to ensure that the University has all relevant information to make determinations about repeat offenders in the future.

## F.     Respondent D

Respondent D was a highly recruited football player and enrolled at LSU in June 2017. Respondent D was referenced in the *USA Today* article as being accused of rape and not disciplined by the University. A review of Respondent D' Title IX case file indicates that a fellow student-athlete alleged Respondent D engaged in non-consensual sexual intercourse with her on June 11, 2017.

The Complainant reported this incident to Miriam Segar on June 12, 2017. Segar then immediately and appropriately submitted a Sexual Misconduct and Sexual Harassment Complaint Form to the Title IX Coordinator on the same date at 12:50pm. The Complaint Form described Complainant's report, including that she and Respondent D had consensual sexual intercourse in April 2017 and between the dates of June 2 and 9, 2017. Complainant alleged that on June 10, 2017, Respondent D came to her apartment and had vaginal and anal sex with her without her consent. The report stated that during this encounter Respondent D received a phone call from another student he answered and told him "I am fucking" when asked what he was doing. The phone was knocked to floor and he was on speaker phone. Complainant was not aware if the caller could hear her and Respondent D or how long phone was on. Complainant received a SANE exam and met with Baton Rouge Police to file a report. Respondent D did not deny that sexual intercourse occurred but stated that it was consensual.

LSUPD's involvement with this report and investigation is unclear from the file. The file includes an email from Officer Clay Cain to Captain Marshall Walters on June 11, 2017 indicating that Cain spoke to a Baton Rouge Police Department Sergeant and that BRPD was taking the lead on the criminal investigation, but Respondent D had not been arrested. Captain Walters emailed Deputy Title IX Coordinator Mari Fuentes-Martin on June 13, 2017 and advised her that a criminal investigation was ongoing.

117

HB: 4848-0171-9519.1

PLAINTIFFS_000192

Ultimately, Respondent D was never arrested. In early July 2017, the Baton Rouge Police Department issued a statement regarding the case, "Due to several inconsistencies in the victim's narrative/disclosures and a lack of cooperation concerning evidence and further interview there was no probable cause for arrest found at this time."

While the criminal investigation was ongoing, though, the Title IX Office correctly continued with its investigation. The assigned Title IX Investigators, Jacob Brumfield and Gwendolyn Ferrell, met with Complainant on June 12, 2017 for an interview, only a few hours after the initial report was received.

From the file materials reviewed, it appears Complainant was provided with appropriate support services. The University also immediately issued a no-contact directive to Respondent D on June 15, 2017. Complainant was copied on this communication.

Investigators interviewed the Complainant, Respondent D and three witnesses. The file includes exceptionally detailed and thoughtful notes from all the interviews. The parties were provided with the opportunity to review and comment on the investigator notes prior to a final report being issued. There is also solid communication between the investigators and Complainant regarding the status of the process.

The Final Investigation Report and the file do not indicate that Investigators requested or considered any electronic or documentary evidence, such as copies of text messages. In addition, the Final Investigation Report states the following with respect to Complainant's medical records: "Investigators note that the forensic rape kit that was conducted by medical personnel on 6/11/2017 may yet lend information important to the understanding of this case. Investigators welcome new information from the Complainant as the rape kit results become available."

It is not clear what, if anything, they did to attempt to secure this forensic rape kit. Nor is it clear whether the investigators considered interviewing the student who called Respondent D on the night in question or why that witness was not interviewed.

Ultimately, the investigators found Respondent D not responsible, concluding there was "insufficient evidence to say whether  Respondent D has violated LSU's PM-73 policy in terms of sexual assault."

The only rationale and analysis included in the report is as follows:

> Investigators note that both the Complainant and Respondent acknowledge that anal and vaginal sex occurred where the Respondent penetrated the Complainant, but that both parties have different understanding of whether consent was given. The Complainant states that consent was never given and that her protests went unheeded. The Respondent states that sexual activity was welcomed and encouraged and that he stopped when anal sex became painful for the Complainant.

No explanation is provided for how the investigators assessed the relative credibility of the parties.

HB: 4848-0171-9519.1

PLAINTIFFS_000193

A notice of outcome letter was sent to the parties on August 8, 2017 from Fuentes-Martin, informing the parties that there was insufficient evidence to conclude that a violation occurred and notifying parties of their right to appeal the finding. Complainant did not appeal the filing.

While not mentioned in the *USA Today* article, we were also provided another case file regarding allegations by Complainant against another football player.

### G.    Respondent E

Respondent E was a highly recruited football player who enrolled at LSU in 2016 and declared for the NFL draft in mid-December 2019.

On April 17, 2017, Complainant reported being sexually harassed by Respondent E. Complainant reported that Respondent E approached her several times making sexually suggestive comments and gestures. Complainant alleged that Respondent E said, "there goes that bitch" when he approached her on campus. She reported that Respondent E also said, "I know you're nasty, I can tell by the way you walk." Complainant also claimed that Respondent E made oral sex and masturbation gestures toward her.

Complainant reported Respondent E's conduct to Miriam Segar who immediately submitted a report to the Title IX Office. In that report, Segar stated that she provided Complainant with information describing campus resources.

Complainant's complaint was opened for investigation and assigned to two investigators (Josh Dean and Lynn Livingston) on April 19, 2017. In addition, LSU's Lighthouse Program initiated contact with Complainant to provide resources that day. Complainant met with the investigators and clarified her allegations on April 25, 2017 and provided a witness to Respondent E's conduct. The witness was interviewed on May 4, 2017 and corroborated Complainant's claims.

The investigators sent meeting requests to Respondent E on April 27, May 1, and May 4, 2017. On May 4, 2017, the investigators contacted Segar for assistance arranging the meeting with Respondent E and he met with them the following day. Respondent E denied the claims.

Exceptionally detailed notes of all the interviews are in included in the case files. The interviews were well done and covered all relevant territory.

Following the interviews, on May 22, 2017, the investigators completed their investigation report and determined that there was sufficient evidence that Respondent E violated LSU's PM-73 policy. Pursuant to the then-existing LSU Title IX Policy, Respondent E was afforded the opportunity to appeal this decision to the Title IX Coordinator which he did in a timely manner. Stewart waited until August 9, 2017 to deny the appeal in cursory fashion.

Oddly, prior to his appeal being denied, on June 19, 2017, Sanders charged Respondent E with various related violations of the LSU Code of Student Conduct as if he had not filed a timely

HB: 4848-0171-9519.1

PLAINTIFFS_000194

appeal. On June 23, 2017, Sanders met with Respondent E and on August 21, 2017, Sanders determined that Respondent E was responsible for sexual harassment. The following sanctions were meted out to Respondent E: he had to attend an "Ethics & Decision Making Class via Community Moodle" and was "required to complete a referral with the Student Health Center Office of Wellness & Health Promotion." In addition, he was placed on "Disciplinary Probation with restriction effective August 21, 2017 through May 31, 2018" According to Sanders, "this status will prevent you from holding a leadership position in a registered Student Organization, participating in LSU Study Abroad and/or other representation of the University." While he could not study abroad, this "disciplinary probation" apparently did not bar him from playing football as he played the entire 2017 and 2018 seasons.

Sanders sent a "Memorandum for Victim" to Complainant the same day.

Respondent E then had "the right to accept or decline this outcome." If he declined, the case was to be "reheard" again by a "University Hearing Panel." In such an instance, the UHP would issue "a decision that will replace the outcome in this letter." Not surprisingly, he elected the decline the outcome and request a hearing panel.

A UHP was convened on September 6, 2017 "to issue an outcome in this case." However, at the eleventh hour, Respondent E cancelled his appeal hearing and the original sanctions meted out by Sanders were reinstated.

Despite the modest sanction, Respondent E repeatedly failed to comply with them. On three occasions, Respondent E was sent letters signed "Concerned" because he had completed none of the required sanctions. These were on November 2, 2017, March 5, 2018, and May 1, 2018. With each notice of noncompliance, he was warned that he had to complete the sanction within ten days or a hold would be placed on his registration. He also was threatened with "Failure to Comply" disciplinary sanctions. Inexplicably, he was never charged with a "Failure to Comply" and each time a hold was placed on his registration, it was "temporarily lifted."

It was not until June 6, 2018, over a year after the initial report was filed, that he finally completed his required sanctions for sexually harassing a fellow student.

## H.    Respondent F

Respondent F was identified in the *USA Today* article as a member of LSU's football team who was accused of rape, but "not disciplined." A student-athlete (the "Complainant") alleged Respondent F engaged in non-consensual sexual intercourse with her on July 1, 2018. As discussed below, the allegation was investigated and Respondent F was found responsible and disciplined.

LSUPD records indicate that LSU detectives were assigned on September 6, 2018 to investigate an alleged sexual assault involving Complainant at her on-campus apartment. An LSUPD officer uncovered information about the alleged sexual assault when reviewing cell phone evidence recovered from Jade Lewis' cell phone in connection with the criminal investigation into █████

HB: 4848-0171-9519.1

PLAINTIFFS_000195

███. The officer found evidence on Lewis' phone that led him to believe the Complainant may have been sexually assaulted while she was passed out due to alcohol consumption. This includes a string of text messages to Respondent F saying that he "should not have had sex with [the Complainant] while she was 'blacked out.'"

The LSUPD Officer met with the Complainant on September 6, 2018. The officer explained that he had discovered evidence indicating that she may have been sexually assaulted. The Complainant reported to the officer that she had gone out with friends and that "she did not consensually have sex with Respondent F and that she does not remember much from the night after being in Tiger Land." She also reported that another football player was in the bedroom in Lewis' apartment and was "messing with her." The Complainant told the officer she believed Respondent F and the other football player took inappropriate pictures of her while she was passed out. She did not further elaborate on what she meant by the term "messing with [her]."

The Complainant told the officer that she did not want to press charges against Respondent F, and she did not want to sign a "Title IX release waiver." The officer provided the Complainant with contact information in the event she wanted to press charges or wanted "Title 9 or CARE Team assistance." On September 7, 2018, the Complainant signed LSUPD's "Sexual Violence Confidentiality Waiver," indicating that she did not require any further assistance from the LSU Police Department.

Following this, a report to the Title IX Office was submitted on September 19, 2018 by Miriam Segar stating the following:

> On evening of 9/18/2018 it was reported to a staff member by Jade Lewis that [Complainant] was raped over the summer. Jade Lewis had a conversation with Tennis Director of Operations, Kasen Dudley, and indicated that during the time the police had her phone for a different investigation that they found a text message regarding a sexual assault involving [Complainant]. I met with [Complainant] on 9/19/2018 to let her know that the information had come to my attention and that as a mandatory reporter I would be notifying the Title IX office. [Complainant] shared that a couple of weeks ago she was approached by police who notified her that there were text messages and pictures that implied misconduct had occurred and asked if she would like to discuss what happened with them. [Complainant] declined to speak about the incident at the time. In our meeting, [Complainant] indicated that over the summer (late June/ early July) she went out to Reggie's bar and became intoxicated at the bar and passed out. She was carried to the car and up the stairs in WCA to Jade Lewis' room where she was placed in Jade's bed. She reported that Jade Lewis, Respondent F, Respondent G and herself went back to Jade's apartment. They were driven from the bar by [another student] and he did not enter the apartment. [Complainant] indicated that she remembers Respondent F and Respondent G coming into the room and Respondent F laying with her on the bed and touching her and trying to wake her up. She told him no. Respondent F left the room and came back about 20 min later and tried again. She remembers Respondent G taking pictures and Jade coming into the room and telling Respondent G to leave. After Respondent G and Jade left, Respondent F reportedly began touching her and having sex with her. She indicated that he was "aggressive" pulling her hair and leaving marks on her neck and that she repeatedly

HB: 4848-0171-9519.1

PLAINTIFFS_000196

told him no. The next morning she remembers waking up and he was asleep in her bed and she had vaginal bleeding. She did not ever confront Respondent F. She is uncomfortable seeing Respondent F and has a math class with him and sometimes sees him at the Cox Academic Center. I suggested possibility of changing Math sections.

Separate from this Complaint Form, Husch Blackwell was provided with screenshots of messages between the Complainant and a Women's Tennis Team staff member, indicating that the meeting with Segar was coordinated by Coach Julie Sell who told the Complainant to meet with her and Segar at the "Tiger Cage." We note that this matter *was reported* as required through formal channels by Segar's submission of the Complaint Form (which is directed to the Title IX Office). We also note, however, that the interim informal communications between Athletics staff and student-athletes can lead to a lack of reporting, as evidenced in other cases discussed in the report.

A subsequent notation stated that LSUPD Officer Drake met with the Complainant and Miriam Segar on September 21, 2018 at the request of the Complainant. According to the report, the Complainant wanted to ask Segar and Officer Drake about the investigation processes pertaining to the criminal charges and Title IX. After discussing options, the Complainant "decided that she would like to speak with the Title IX investigators." According to the notes, Segar helped the Complainant arrange a meeting with the Title IX investigators.

Stewart, Scott, and Segar met with the Complainant on September 24, 2018 to explain the Title IX and Sexual Misconduct Policy and process, after which she communicated her desire to pursue a Title IX Investigation. Scott was assigned as the investigator.

The case file indicates that the parties were interviewed and the file includes records of communications with Respondent F (including a notice of the investigation on October 11, 2018),[227] but the file does not include records of communications with the Complainant. The Final Investigation Report indicated that the Lighthouse Program initiated contact with Complainant on September 20, 2018, but the file does not include any information about the interim measures requested by or provided to either party.

The investigation included an interview with Complainant, Respondent F and three witnesses. The investigation also included a review of text message and photograph and video evidence.[228] The Complainant and Respondent F provided their accounts of what occurred, and witnesses, including Lewis and Respondent G who were with Complainant and Respondent F at Lewis' apartment, and a witness who drove the Complainant and Lewis home, provided statements as well. Witness statements and photograph and video evidence provided evidence of Complainant's level of

---

[227] We note that throughout our review of individual case files, we identified a practice of providing notices of investigation to parties with insufficient level of detail to describe the allegations. Now rescinded ED guidance in a Q&A Document dated September 2017 included the following on this point. "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident."

[228] The file we were provided includes the Initial Report Form from LSUPD, but the file does not include details sufficient to determine when it was sent or what other files might have also been sent from LSDPD.

HB: 4848-0171-9519.1

PLAINTIFFS_000197

intoxication. For his part, Respondent F did not deny that sexual intercourse occurred, but he asserted it was consensual.

Ultimately, Scott found Respondent F responsible, finding: "Given the testimony and evidence presented, this investigator finds that the Respondent did violate LSU's PM-73 policy regarding sexual misconduct; specifically Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact."

The rationale and analysis included in the report is as follows:

> This determination is derived from the fact that the Complainant stated she did not give consent for the Respondent to engage sexual intercourse or fondle her. The Complainant stated she was in and out of consciousness from all the alcohol she had consumed that night. The Respondent stated that the Complainant was conscious and gave consent to engage in sexual intercourse. The Respondent also stated that he and the Complainant "were both drunk," This is also evident in text messages between the Respondent and the Witness. Witness and Material Observe accounts, along with texts, videos and photographic evidence, appear to reveal that the Complainant was at some time incapacitated.
>
> . . .
>
> In this particular case, the preponderance of evidence supports that the Complainant was in no mental or physical condition to render consent to the Respondent prior to or during the sexual activity to include fondling and sexual intercourse.

A notice of finding of a violation was sent on November 7, 2018.

On November 30, 2018, Respondent F was then charged with violations of LSU's Code of Student Conduct as follows: Sexual Misconduct; Unauthorized Surveillance; Violating a Rule of the University. A meeting with SAA Director Sanders was scheduled for December 7, 2018. Following the SAA review, Respondent F was again found responsible on January 14, 2019 for sexual misconduct and violating a rule of the University. Respondent F was suspended from the University through December 31, 2019. A no-contact directive remained in place and Respondent F was required to have a mental health assessment prior to re-admission.

Respondent F declined to accept this outcome and requested the case be reheard by UHP on the basis that sanction was "too punitive." The UHP was held on February 25, 2019, and the notice of outcome was sent on February 26, 2019, again finding Respondent F responsible for sexual misconduct and violating a rule of the University. Respondent F was suspended effective February 25, 2019 through December 31, 2019.[229]

---

[229] Consistent with University policy, a notation appeared on Respondent F's transcript during that time period.

123

PLAINTIFFS_000198

Respondent F appealed, arguing bias, excessive sanction, and that he was not able to cross-examine Complainant (who did not participate in hearing). The appeal was dismissed on March 14, 2019, finding no evidence of bias.

Respondent F entered the NCAA "transfer portal" and left the University.

## I.  Respondent G

Respondent G was also a member of the LSU Football Team and was identified in the *USA Today* article as not receiving discipline related to sex assault allegations. The article also noted that he was arrested in connection with those rape allegations, but that his case remains open according to the District Attorney's Office.

We received a case file related to allegations against Respondent G—with two separate alleged incidents. Complainant 1 alleged Respondent G engaged in non-consensual sexual intercourse with her on March 24, 2019. Complainant 2 alleged Respondent G engaged in non-consensual sexual intercourse with her on September 7, 2019. Both cases are summarized and discussed below.

On March 24, 2019, LSUPD officers responded to Baton Rouge General Bluebonnet Hospital in response to an incident that allegedly occurred on LSU's campus in Riverbend Hall. According to the LSU Police Department Incident Report, female LSU student Complainant 1 initially reported that an unknown person grabbed her from behind on the fourth floor of Riverbend Hall and she blacked out. Additional information from the Incident Report indicated that Complainant 1 reported when she "came to, she woke up inside of an unknown apartment in Riverbend Hall."

That same day, an LSUPD Detective met with Complainant 1 for an initial interview. Also present for the interview were a SANE nurse and a Sexual Trauma Awareness & Response counselor. During this interview, Complainant 1 said she could not provide details about the person who grabbed her from behind, but she said she remembered waking up on a couch in what she would come to realize was Riverbend Hall.

Over the course of the next two days, Complainant provided additional details to LSUPD, including that she knew who assaulted her. She said she had been previously protecting this person which is why she left out details. At this point, she identified Respondent G as the alleged assailant. Complainant 1 reported that Respondent G penetrated her vagina and she said he "wasn't stopping if I said no." She said her "mind was going crazy," and she told Respondent G this was not what she wanted and it was not okay. LSUPD had reviewed surveillance footage from the LSU camera system and identified Complainant 1 and another female entering and leaving Riverbend Hall together.

That day, an arrest warrant was issued for Respondent G for Third Degree Rape, and he surrendered to LSUPD on March 27, 2019. The Affidavit for Arrest Warrant stated the following:

> On March 24, 2019 LSU Police were contacted by the victim of a sexual assault
> that occurred in Riverbend Hall earlier that day. The victim stated that she and a

HB: 4848-0171-9519.1

PLAINTIFFS_000199

friend went to Respondent G's apartment in Riverbend Hall. Respondent G is also known as Respondent G. When the victim asked to use the restroom, Respondent G offered her to use the bathroom in his bedroom but then followed her into the room. The victim stated that her memory becomes hazy at this point and she "blacks out". The victim reported the next thing she remembers is her shirt coming off and trying to hold onto her underwear as it was being taken off. Next she remembers being naked and face down on the bed with Respondent G behind her between her legs and penetrated her vagina. The victim stated that she told Respondent G "no, no, no". She stated this caused Respondent G to stop temporarily but he then attempted to try to penetrate her again. The victim stated that she was able to get out from under Respondent G, got dressed and left his bedroom.

Investigators also spoke with a witness to some of the above described events. The witness stated that she does not know what happened while the victim and Respondent G were in his bedroom because she was in a different room of the apartment. The witness did say that while leaving the apartment the victim seemed upset. The witness asked did he "fuck you when you said no?" The victim responded "yes". The witness went back to Respondent G's room to confront him about what happened. She stated that Respondent G admitted to having sex with the victim saying that he stopped because the victim was upset.

The victim and witness both stated they had gone to Tigerland earlier in the night from approximately 11pm-2am. The witness advised that she and the victim had approximately 5 mixed alcohol drinks and three shots. The witness stated this was over a period of approximately 3 hours, 11pm-2am, and they had stopped drinking for approximately 1 hour prior to going to Respondent G's apartment at 3am. The victim and witness both stated they were at Respondent G's apartment from approximately 3am-4:45am, this is confirmed by recorded video surveillance in the building.

At this point, Respondent G entered the NCAA "transfer portal" and had no involvement with the LSU Football team.

The file we were provided is not clear regarding how the matter was referred to the Title IX Office, but it does say that Complainant 1 initiated the Title IX process on April 3, 2019. The matter was assigned to Scott for investigation.

Scott interviewed Complainant 1, Respondent G, and two witnesses. Complainant 1 indicated that she was scared and anxious and "blacked out" in response to what was occurring. She said she did not provide consent to sexual intercourse and told Respondent G to stop. She also said Respondent G stopped briefly but then continued with sexual contact. Respondent G did not deny that sexual intercourse occurred, but he asserted that it was consensual. He said he stopped sexual activity when told to by the Complainant.

The Final Investigation Report and the file do not indicate that Scott considered any other electronic or documentary evidence, such as surveillance videos, copies of text messages, or

125

PLAINTIFFS_000200

medical records from the Complainant.[230] It is also not clear whether the Investigator had access to the LSUPD file during his investigation.

Ultimately, Scott found Respondent G not responsible, stating the following in the Final Investigation Report:

> "Given the testimony and evidence presented, this investigator finds that the Respondent did not violate LSU's PM-73 policy regarding sexual misconduct; specifically Non-Consensual Sexual Intercourse."

The only rationale and analysis included in the report is as follows:

> This determination was rendered on the credibility and testimony provided by all interviewed parties. The testimony from the Complainant, and Respondent appears to substantiate that neither of them were incapacitated, and that the testimony of Complainant and Respondent would lead a reasonable person to believe, "Consent was demonstrated through mutually understandable actions that clearly indicate a willingness to engage in a specific sexual activity. And that once Complainant revoked consent, the Respondent ceased all sexual activity. Finally, Scott found that if the Complainant had a medical diagnosis that caused "black out" conditions, a reasonable person would not have been aware of this condition without being informed.

We note deficiencies here in terms explaining the rationale for the determination. Scott references credibility in his determination, but it is not clear how he arrived at his credibility determination. If he found Respondent G more credible—which is a critical determination given his and Complainant's divergent accounts of what occurred—he does not explain why. The report also does not identify what indications of consent through "mutually understandable actions" that Scott found more likely than not occurred. Again, this determination was critical given the dispute between the parties.

There is no record in the file of the outcome being communicated to the Complainant. This is critical, not only because of Title IX and Clery requirements to provide notification of the result of proceedings that arise from an allegation of dating violence, domestic violence, sexual assault, or stalking, but it is also unclear whether Complainant was able to exercise her right to appeal Scott's finding. The file indicates the results of the investigation were shared with Respondent G via conference call on June 5, 2019, and an outcome letter was sent to him the same day.

The only notation in the file following this communication is a notation from Jennie Stewart on November 5, 2019, indicating that Respondent G and his mother had requested the investigation

---

[230] It is unclear whether Scott reviewed surveillance footage reviewed by LSUPD, and whether he attempted to obtain text message evidence from the parties or the Complainant's medical records from her SANE exam. It is also unclear whether Scott considered interviewing the Complainant's boyfriend, who allegedly communicated with Respondent G after the alleged sexual assault.

HB: 4848-0171-9519.1

PLAINTIFFS_000201

report to show that he was not found responsible, and that Stewart had communications with a football program at another institution about this matter.

On September 7, 2019, Complainant 2 submitted a Sexual Misconduct and Sexual Harassment Complaint Form against Respondent G, alleging that Respondent G again engaged in non-consensual sexual intercourse with her when she was unable to provide consent due to incapacitation.

While the file we received does not explicitly state that the report was closed, the file includes a case form note, dated October 31, 2019, that states the following: "Respondent was not enrolled as a student at LSU. Lighthouse referring victim to LSUPD to pursue." The file did not include information to explain the delay between the report (September 7, 2019) and October 31, 2019, and does not explain the rationale for why the matter was not pursued further by the Title IX Office and who made this determination. The file we received does not include any communications to Complainant 2 or Respondent G.

### J.    Respondent H

On January 24, 2020, Complainant reported to two Resident Assistants that she believed she had been drugged and sexually assaulted while at Tigerland. One of the Resident Assistants notified the Residence Life Coordinator Nicholas Aniol who, in turn, made a PM-73 report to the Title IX Office.

According to the report, Complainant had been drinking and dancing at Tigerland and then left with a male she later believed to be LSU football player Respondent H. Respondent H was a highly recruited quarterback who enrolled at LSU in June 2019.

According to the report, after leaving one of the venues Complainant and Respondent H began having sex in a car, but she was unsure if she consented. She had a lapse in memory in between the incident in the car, leaving Tigerland, and arriving at Miller Hall where she resided.

Resident Life Coordinator Aniol arrived at Miller Hall and shared resources and reporting options with the victim. Complainant elected to file a report with LSUPD who then contacted Baton Rouge PD because the incident had occurred off campus. Complainant was then taken to Woman's Hospital for a SANE exam.

On the same day as the incident, a case was opened by Jeffery Scott who also assigned to the case as investigator. The Complainant was also contacted by the Lighthouse Program on January 27th. Scott, along with Title IX Coordinator Jennie Stewart, spoke with the Complainant's parents on January 29th and explained the Title IX process and reporting options. Stewart also met with the Complainant on January 31 to explain reporting options and concerns. It was at this point the Complainant decided to move forward with the Title IX process. Scott interviewed the Complainant on February 3.

Scott's first attempt at contact with Respondent H was on February 4, 2020 when he sent an email that informed Respondent H of his potential involvement in a PM-73 violation and requested an interview. Respondent H called Scott on February 6 at which time Scott briefed Respondent H on

HB: 4848-0171-9519.1

PLAINTIFFS_000202

the allegation and explained the investigative process and asked to meet in person in the next two weeks. Miriam Segar was notified on February 4 that a Title IX complaint had been filed against Respondent H.

Between February 7-27, Investigator Scott interviewed four witnesses to the incident. Scott included detailed notes of all interviews in his final report.

During his interview, Respondent H said he met Complainant at Tigerland and danced with her. Eventually, he asked if she wanted to have sex in his friend's car to which she said "yes." Respondent H claimed that she was sober enough to consent and give directions back to her residence hall, Miller Hall. He said she showed no signs of being drunk.

Scott completed his investigative report on March 5 and then reviewed it with Respondent H on March 6 including the finding of "Responsible." Segar was also notified by Scott on March 6 of the results. Respondent H was officially suspended from the LSU football team on March 11, 2020.

Scott was contacted on March 12 by Respondent H's attorney. Scott sent a FERPA waiver to the attorney which was signed by Respondent H and returned on March 13 at which point the attorney informed Scott that Respondent H would be appealing the finding of "Responsible" in a letter dated March 12. Respondent H's attorney submitted Respondent H's substantive appeal on March 18.

On April 17, 2020, Jonathan Sanders sent a charge letter to Respondent H informing him of the exact violations he had been charged: 10.2.U Sexual Misconduct and 10.2.Z Violating a Rule of the University (PM-73). This letter also informed Respondent H of his accountability meeting, scheduled for April 23, which could be attended via Zoom or phone due to Covid-19 protocols. The meeting was rescheduled at Respondent H's request on April 24 via Zoom.

At the April 24th meeting, Sanders informed Respondent H again of the finding of "Responsible" and that Respondent H would be suspended from LSU from May 10, 2020 to May 31, 2021. Respondent H was also informed of a "No Contact Directive" with the Complainant. Sanders informed Respondent H of the rationale as well as the right to accept or decline the outcome. Respondent H was also informed that he could request a UHP that would issue a decision that would replace the findings by Sanders. This was also sent to Respondent H via a May 1st letter as was an Outcome Memo sent to the Complainant informing her of the findings and suspension as well as Respondent H's right to decline the outcome and the potential of a UHP.

On May 12th, new LSU General Counsel Winston DeCuir received a letter via email from attorneys Susan Stone and Kristina Supler informing DeCuir that they had been retained by Respondent H to act as his student advisors with respect to his Title IX case. Stone and Supler also requested a hearing and shared that they did not believe Respondent H had been given adequate access to the evidence supporting the claims against him.

Respondent H officially declined the outcome of his investigation on May 12th via letter to Sanders. Respondent H had three business days from receipt of the May 1st letter to decline the outcome but

HB: 4848-0171-9519.1

PLAINTIFFS_000203

claimed he had not opened the letter until May 8th. In this letter, Respondent H also claimed to be confused about LSU's process and procedures and requested a meeting with Sanders for clarification.

On June 4, 2020, DeCuir sent a letter to Respondent H's attorneys informing them that Respondent H had demonstrably logged on to view his outcome letter "on numerous occasions" but had not declined his outcome. On June 5th, Respondent H's request for a UHP was officially denied as untimely. This letter also reaffirmed Respondent H's suspension until May 31, 2021.

On August 6, 2020, Respondent H transferred to another University.

### K.    Respondent I

The *USA Today* article identified Respondent I as an LSU football player who LSU "would not confirm or deny if it disciplined . . . ." After reviewing Respondent I's case file, at least one reason the University could not confirm or deny any discipline against Respondent I is because at the time of the article and associated information requests, Respondent I's case was still being adjudicated.

Respondent I was another highly recruited football player. He enrolled at LSU in June 2019. In Respondent I's student conduct case, an LSU student (the "Complainant") alleged that Respondent I engaged in dating violence against her on September 9, 2020.

On Wednesday, September 9, 2020, LSUPD received a report of a "disturbance" at the Complainant's on-campus residence hall. "Upon arrival, the victim of the incident informed Officers that her ex-boyfriend, [Respondent I], came to her room, destroyed her property, and shoved her into a dresser causing a scrape to her hip." Officers described the Complainant's room as "in disarray with items thrown about, and multiple destroyed items including an iPhone." The responding officers also observed an injury on the Complainant's hip. Respondent I was placed under arrest by LSUPD "based on the evidence observed."

The Complainant executed the University's Sexual Violence and Confidentiality Notice and Waiver form, which authorized law enforcement to investigate the matter and pursue criminal charges, share information with the Office of Dean of Students and initiate a Title IX process, and share her contact information with the Lighthouse Advocacy program to provide support and resources.

The Complainant met with Jennie Stewart on September 11. During this conversation, the student relayed that Respondent H had allegedly threatened the Complainant with retaliation for "ruining their life." The Complainant elected to move forward with a formal complaint against Respondent I during this meeting.

The University interimly suspended Respondent I from the University that same day. Throughout the investigation and adjudication process, the Complainant was provided with access to mental health and counseling resources, alternative housing options, and assistance obtaining a protective order. Notably, the Complainant reported a high degree of satisfaction with the University's services in this regard throughout the process.

129

PLAINTIFFS_000204

Respondent I was charged with "Sexual Harassment" and "Retaliation" under the University's Title IX policy. Significantly, the Trump Title IX Regulations governed the resolution of the complaint.

Investigator Jeffrey Scott initiated an investigation into the report on September 15, 2020. The notice of investigation included reference to the University's Title IX policy, highlighting the Complainant's right to an advisor of choice and providing notice of the support and resources available through the University. The Complainant was interviewed shortly thereafter, during which she described in detail and provided photos documenting significant damage to her person and property.[231]

On September 20, though, the Complainant contacted Scott requesting that the University halt the investigation. After working through a personal matter, the Complainant re-initiated her complaint four days later with the support of the University.

On September 25, Stewart sent a Notice of Investigation and Allegation to Respondent I. On September 29, 2020, Scott sent a "Request for Interview" to Respondent I. Respondent I did not respond. On October 5 and 12, Scott left a voicemail on Respondent I's phone requesting contact, to which he continued to receive no response. On October 13, 2020, Scott contacted Segar for assistance in contacting Respondent I. Segar stated that Respondent I had not responded to any communications from her or anyone else in the Athletics Department.

Scott proceeded with the investigation, and issued an investigative report on October 20, 2020.

The Complainant had an opportunity to review the report and all evidence, and consented to moving forward with the process at that time. Notably, the Complainant wrote to Scott: "I appreciate you for your hard work and diligence. No matter the outcome I am happy to know that victims have a voice at LSU and that we are being supported and heard."

In accordance with the 2020 Title IX Regulations, the report concluded, "Using the definitions above and considering all information from the investigation, the hearing panel must determine findings for each alleged policy violation."

On November 3, 2020, though, the Complainant wrote to Stewart, Bareis, and Scott, stating: "I would like to say that I appreciate the support that I have received, but after some consideration I do not wish to move forward with the investigation." In a follow up conversation with Stewart on November 10, the Complainant reported that Respondent I's family had "been reaching out to her by phone" and "putting pressure on her" to withdraw her complaint. The Complainant indicated that she was "on the fence about wanting to go forward," and said she will decide whether to "participate in a hearing if [the University] go[es] forward contrary to her wish."

In a follow up phone call on November 13, the Complainant ultimately agreed to go forward with the formal complaint. On November 17, the Complainant wrote, "I am on board with continuing

---

[231] The Complainant also described concerns regarding the welfare of a pet shared by the parties, which were not investigated by the University but were considered in the criminal investigation of Respondent I's alleged conduct.

HB: 4848-0171-9519.1

PLAINTIFFS_000205

the formal process. You will have my full participation." She continued to express her gratitude and appreciation for the Title IX staff throughout the process.

Following a hearing in which Respondent I did not participate, he was found Responsible and expelled from the University.

We note that Respondent I's case presented many of the most significant challenges for a Title IX case: a dating violence allegation, a high-profile student-athlete, and a reluctant complainant. In addition, this case presented the additional challenge of being one of the first matters to progress under the Department of Education's 2020 regulations, which have procedural elements that may deter survivors of interpersonal violence from participating in the process (*i.e.*, a live hearing with cross-examination by the alleged perpetrator). Overall, we found this case handled appropriately and note the Complainant's repeatedly stated gratitude for the care and concern she experienced with the Title IX Office. It is also significant that the University took immediate steps to interimly suspend Respondent I upon notice of the serious allegations, and took other supportive and safety measures which the Complainant expressed a high degree of satisfaction with. The differences between this dating violence case and the cases discussed above indicate that the Title IX staff has learned from previous missteps and oversights—and in interviews both Stewart and Scott referenced the "lessons learned" from the Davis case in particular in handling this matter.

## VII.    Summary of Information from Other Case File Reviews

As a part of our review, we requested a list of Title IX cases from 2015–2021. From this list, we selected representative cases and requested the complete file for each case. Each was selected without our having any advanced knowledge of the details of the matters. When assessing cases for this comparator file review, we selected cases that appeared to involve similar alleged misconduct to those included in our review above (*i.e.*, sexual assault and dating violence). We also selected cases involving respondents who were not student-athletes so that we could at least partially assess whether student-athletes have historically been provided with preferential treatment in the University's Title IX's process.

As an initial matter, the number of cases included in the yearly lists is remarkably low considering the size of the University and in comparison to number reported by institutional peers. This is a potential red flag suggesting possible systemic institutional underreporting or inaccurate centralized record-keeping of reports.

As for the substantive takeaways from our case file review, most files include many of the same concerns identified throughout Section VI above. First, the University does not have a systematic protocol for appropriately documenting communications and other records for Title IX cases. This is due largely to the fact that Title IX compliance is decentralized and spread across several different offices and personnel. Our review of the bulk of the case files provided was unnecessarily complicated because of inconsistent record-keeping and failure to input documents and information into a student's online case file. For example, documents and information would be uploaded to one party's file, while the person entering the data failed to "link" the data to the corresponding party for the same case number. Thus, when we requested a particular case file, we frequently received only half of the applicable documents, and University officials had to search for additional case documents under other party or even witness names upon request. As noted

HB: 4848-0171-9519.1

PLAINTIFFS_000206

throughout this report, it is critical to ensure that all relevant information about a particular individual—whether identified as a complainant, respondent, or third party—that is available to the institution is easily located by Title IX staff in order to aid in future determinations.

Similarly, the files often do not include initial outreach communications with complainants. While investigation reports included in the files typically reference Lighthouse outreach to complainants, for the most part, there are otherwise no records included of communications with complainants about process options and updates about the matter.[232] In addition, some case files include case notes or LSU Cares Reports about supportive measures for students, but references to the support measures offered, requested, and implemented (or rationale for declining to implement) are not routinely included in files.

We note that the absence of many of the communications and documents outlined here does not necessarily mean the documents are not housed in another location; the main take-away, however, is that documents should be stored in a manner that reflects the full case processing and communications.

Second, while the way the cases are recorded allowed us to identify the parties involved, in many cases we were unable to tell from the records what the underlying allegations were for each period beyond a broad "sexual misconduct" designation. Ensuring that reports are categorized based on the nature of the alleged conduct would assist the University in identifying global trends in instances of sexual misconduct, as well as ensure the University can quickly assess whether a particular respondent has a record of engaging in a pattern of misconduct.

Third, with respect to records relating to the investigation, we have noted concerns with the level of detail and accuracy in investigative reports throughout this report. In addition, while this is not true of all cases, there are several instances in which documentary and physical evidence does not appear to be requested during the investigation, which is often later raised in the SAA review or in an appeal. We note that this practice has improved over time, and we have confidence that with additional training, supervision, and resources, investigative staff will continue to improve report writing and evidence documentation.

Finally, it bears noting that we have concerns regarding the University's process for determining and meting out appropriate sanctions for sex-based offenses. Our review of the files has shown that the University's sanction of choice for findings of "sexual misconduct" are "deferred suspension" and "deferred probation." A modest number of cases included a "suspension" outcome, with a common term of a year for the suspension to be in place. Very few cases result in "expulsion," although we see both the number of suspensions and expulsions increasing in recent years. We note that we did not find any evidence of preferences or unfair outcomes based on a respondent or complainant's affiliation or identity—*i.e.*, status as an athlete, member of Greek Life, or other organization.

---

[232] We understand that this may be due to the fact that Lighthouse services, in particular, are coordinated by the University's Health Center and such records are stored in a confidential database. Where Lighthouse is serving the essential function of providing outreach and coordinating supportive measures for Title IX cases, documentation of the communications and information/resources provided in the Title IX case file is required though.

PLAINTIFFS_000207

The University utilizes a sanctioning "Outcomes Guide" to aid in determinations of appropriate sanctions; however, we found that the University's guide with respect to violations of sexual misconduct does not appropriately capture the escalating and mitigating factors commonly utilized to determine the severity of a sanction. We understand that the University is working to update its current Outcomes Guide to be more in line with best practices and consistent with new policy language implemented as a result of the 2020 regulations.

## VIII.   Community Input Summary

As a part of our review, we invited University groups and individuals to speak with us to share their observations and experiences related to sexual misconduct and Title IX compliance at the University.

President Galligan sent an email communication to the University on January 29, 2021 providing information about our review and inviting community members to schedule a time to meet with us to provide information over a four-week period.
In response to President Galligan's communication to student groups, we had two scheduled student group meetings with the following: Tigers Against Sexual Assault and the Student Government Association.

During the individual interviews, we advised community members that, while there are confidential reporting options available through the University, our conversation was not confidential. We advised community members that we would be sharing information with the University and including information we received in summary form in our report. We also advised community members that we would be sharing the information by describing themes as opposed to identifying specific individuals in our report to facilitate candid information-sharing.

Several categories of community members responded to our request to meet, including undergraduate students, graduate students, faculty and staff. The following is a summary of the main takeaways from our community interviews.

### 1.    Community members described a culture that does not promote reporting incidents of sexual misconduct.

Individuals who participated in our Community Input interviews and who have worked in Athletics described a culture that does not promote reporting of alleged misconduct. Individuals alluded to a perception that anti-fraternization policies discourage reporting when misconduct occurs in the context of student-staff and student-athlete relationships and described a fear of retaliation for reporting. In addition, an individual described a culture in which female assistant coaches have not reported alleged sexual harassment from other staff members. Individuals also described a structure in Athletics that attempts to manage reports directly so as not to draw attention to cases. Individuals with experience in Athletics described a sexist attitude towards female student-staff members and interns, with comments and attitudes suggesting that women who complain about student-athletes' conduct are trying to "ruin [athletes'] careers." Individuals also described a

HB: 4848-0171-9519.1

PLAINTIFFS_000208

culture in Athletics in which individuals attempt to resolve interpersonal violence issues directly rather than report the misconduct.

Staff members outside of Athletics also expressed concerns about a culture of not reporting. One staff member described a culture that disbelieves victims in order to protect the University. TASA described a common feeling that the University is "not taking care of survivors."

Groups we met with during our interviews also said the perception that the University has not been making efforts to improve the Title IX process and promote accountability is not "new." They described that individuals have been sharing personal accounts of the University's inadequate response to sexual misconduct on Twitter and other social media platforms. TASA has expanded from a focus on advocacy to support because so many people have expressed a need for that.

One group expressed support for the Title IX Coordinator and favorably described a town hall during the summer of 2020 to introduce her to student leaders. Student Government Association members also described positive communications with the Title IX Office, and TASA highlighted an outreach from the Dean of Students to talk about the organization.

2.    **Community members described a lack of clear directives about mandatory reporting, and, in some instances, described directives to report to academic leaders, rather than the Title IX Office.**

Based on information from community members, it appears it is not clear who faculty should be reporting to—one faculty member indicated mandatory reports of sexual misconduct are made to the Dean of Students or SAA. One Department reported that a dean had directed faculty and staff to report sexual misconduct to the dean and not the Title IX Office. Many individuals made plain that the requirement that reports need to go directly to the Title IX Office needs to be emphasized because of "chain of command" expectations entrenched in academia. A community member shared a perception that AgCenter staff do not receive the same level of communications as the A&M campus about Title IX and reporting, resulting in Ag Center staff not understanding reporting obligations. A community member also suggested University leadership should do more to encourage faculty to be involved.

A graduate student shared information about reporting harassment that was not reported to Title IX for assessment, leaving the student unsure of how it was reported and whether action could have been taken under the University's policy. An instructor also shared an experience that related to both Title IX and non-Title IX issues, but she was never referred to Title IX to address the potential sexual misconduct issues.

3.    **Community members described inadequate and infrequent Title IX Training that needs to be refreshed and provided more regularly.**

Significantly, during our interviews, students described not having sufficient Title IX training. They described brief bystander intervention content at Freshman Orientation, but no training about sexual misconduct following that. Students suggested additional content should focus on prohibited conduct and consent. Groups shared that information shared with freshmen about sexual misconduct, campus resources and the Title IX process does not "stick." Some community

HB: 4848-0171-9519.1

PLAINTIFFS_000209

members described the training as helpful in terms of effectively communicating requirements related to sexual misconduct, but not in terms of making community members more concerned and interested in the issues.

Community members also shared a recommendation for more targeted training for graduate students and adjunct faculty members, including training scenarios other than misconduct involving supervisors and supervisees. Groups requested interactive training opportunities to supplement current online trainings. Throughout the interviews, individuals described advocating for mandatory Title IX training and bystander intervention training for student groups—as a parallel to the state law required anti-hazing training.

> **4.    Community members described various inadequacies in the Title IX process, including a lack of updates about the process, a disconnect between the Title IX and SAA process, inadequate investigations in some instances, and a lack of sufficiently severe sanctions upon findings of responsibility.**

Students described feeling uninformed during the Title IX process. Students also expressed a lack of communication during the investigation and a lack of communication about case outcomes. Students described situations in which complainants were uninformed about the status of the respondent and had ongoing concerns about possible interactions with respondents. Faculty members also described hearing students complain about a lack of communication from the Title IX Office during case processing. In addition to not receiving sufficient updates during the sexual misconduct report assessment, investigation and adjudication phases, groups described a lack of student clarity about requesting and receiving supportive measures and requested clearer information about how such requests are evaluated.

In addition, individuals described concerns about the disconnect between the Title IX process and the SAA process. A graduate student described reporting sexual harassment and receiving an unsatisfactory response from Human Resources and the Title IX Office. The student indicated there did not appear to be communication between HR and the Title IX Office, and when the student ultimately connected with the Title IX Coordinator—upon the student's outreach—the case was "dropped" without explanation. Individuals also described a perception that the UHP process results in unfair determinations by individuals who do not have enough experience with issues related to sexual misconduct or a deep enough understanding of the underlying investigation and recommendations. Students also described a perception that some investigations are not thorough enough, for example, by not including interviews with identified witnesses. Further, individuals described a perception that sanctions are not severe enough to address incidents of sexual misconduct. TASA described hearing from complainants that they have been told significant sanctions are not a likely outcome even upon findings of responsibility. Faculty members described a "definition disconnect"—describing that matters are sometimes reported to the Title IX Office and are dismissed without an explanation as to why. Importantly, students also shared information suggesting that after an initial complaint, potential additional misconduct was not evaluated by the Title IX Office or SAA.

Finally, students described a reliance on Lighthouse to stay informed about process and supportive measures and generally described a positive experience with Lighthouse. One student described

HB: 4848-0171-9519.1

PLAINTIFFS_000210

needing better education about the hearing process, and better education about the need for an advisor to assist during a hearing.

**5.    Community members described frustrations during the process to request and receive supportive measures, as well as difficulties or delays in the implementation of supportive measures.**

Finally, as for supportive measures, students described frustration at needing to "prove" they needed academic accommodations during or following an investigation. Students also described the Title IX Office being disengaged from the provision of support measures, such as housing relocations and academic accommodations. Interviews also raised concerns about implementation of supportive measure, even in cases where there was Title IX Office involvement. One student described a professor asking her why she needed academic leniency on an assignment in front of the whole class—even after he received a communication from the Title IX Office requesting academic accommodations and connecting the need for leniency to a Title IX matter. A student also described a delay in implementing no-contact order; also described a lack of response from Title IX related to concerns about respondent adhering to no-contact order.

In terms of receiving support, individuals praised Lighthouse and the services they provide but described that Lighthouse needs additional resources to expand the program. Community interviews revealed particular challenges facing international students when they experience sexual misconduct and are attempting to navigate the University's systems for addressing misconduct. One student indicated she had critical support from professors—and she said that without a mentorship connection in her program she would not have been able to navigate the investigation and resolution process as easily. Individuals described difficulty getting access to mental health and counseling services through the Student Health Center—an issues that impacts not just those dealing with incidents in sexual misconduct, but broader student health issues. Individuals also discussed safety issues on campus, including recommending expansive escort services and expanded hours for Campus Transit. Finally, individuals described a need for more resources for student-athletes, particularly those who have a history of violent behavior and advocated for efforts to "repair harm" for victims of sexual misconduct.

## IX.    Recommendations

Before outlining our recommendations, we want to directly address a sentiment expressed in community interviews regarding our work, namely, that if this report does not recommend "firing people," an important part of the University community will be disappointed. We understand the sentiment. In drafting this report, we have been guided by the University's desire for us to provide the community with a truthful account of the University's handling of various Title IX matters. When mistakes were made by University employees, we have said so throughout this report. When we have concerns, we have identified them. With that said, we believe it would be inappropriate for us to tell the University who it should or should not discipline. Rather, the leadership of the University should take this report and decide what, if any, discipline is warranted for employees. If the leadership of the University decides to discipline employees, one of the important lessons from this review is that institutional policies and processes should be followed. In addition, those employees should be entitled to full due process protections, including the ability to say this review "got it wrong."

HB: 4848-0171-9519.1

PLAINTIFFS_000211

Throughout this report, we have stressed that in many ways the employees tasked with these important responsibilities were not served well by the leadership of the University. Institutional policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources, calls for additional resources went unheeded, concerns were not responded to, etc. As part of this review, we have interviewed several employees who acknowledged making mistakes and emotionally shared that they were trying their absolute best under exceptionally difficult circumstances.

With that as backdrop, we make the following recommendations to the University. These recommendations are informed by all of the materials we have reviewed, our comments throughout the report, our understanding of national trends and well-recognized best practices, and perhaps most importantly, the input of the various members of the University community who met with us. Each recommendation will require considerable attention and effort, but we are confident that these recommendations provide the University with a road map for correcting problems identified throughout this report.

In making our recommendations, we are mindful that too often conversations about Title IX have been framed by partisans who are concerned exclusively with the rights of either victims of sex misconduct or the rights of those accused of sex misconduct. Our view is that sexual misconduct and relationship violence are egregious harms that require great care in responding to and that being accused of such misconduct is significant and warrants fair and thoughtful processes and personnel. None of the recommendations below are intended in any way to "tilt the scales" to either side in a Title IX matter, but rather to create a system that all members of the University community can have confidence in, even when they do not necessarily agree with the end result of a particular case. The recommendations are also intended to support community members impacted by sex discrimination and hopefully meaningfully reduce the incidence rate of sex discrimination on campus.

1. **The Title IX Office Must Be Staffed Appropriately.** The most important recommendation from this review is that the University's Title IX Office is not appropriately staffed and this needs to be corrected promptly.

   Comprehensive Title IX programs have four areas of focus:

   - Prevention Programming and Training designed to: (a) increase awareness of institutional policy and internal reporting options and resources and (b) reduce incidence of sex discrimination throughout the University community.
   - Report Resolution, *i.e.*, how an institution resolves reports of sex discrimination from start to finish.
   - Support and Resources for community members impacted by sex discrimination.
   - Athletics Compliance, which is subject to a particular regulatory compliance regime.

HB: 4848-0171-9519.1

PLAINTIFFS_000212

With respect to prevention programming and training, ideally, there should be a robust set of Title IX training programs which educate community members on items such as mandatory reporting obligations, bystander intervention, etc. The Title IX Coordinator should also provide more targeted training interventions when the Title IX Coordinator identify problematic trends occurring within the University community. Again, ideally, the Title IX Coordinator develops tools to measure the effectiveness of training programs and adjusts when interventions are ineffective. None of this is being meaningfully and consistently done at LSU primarily because there is insufficient staff to do it. Recommendation 2 below speaks more directly to this concern.

If nothing else, our hope is that this report makes plain to the leadership of the University and the broader LSU community that thoughtfully resolving reports of discrimination is an exceptionally challenging and labor-intensive exercise. Ideally, the Title IX Coordinator creates a uniform set of processes for investigators to follow to ensure that reports are consistently handled with the care they deserve, monitors the timeliness of investigations, and otherwise ensures the quality of institutional resolution of reports of discrimination. The latter includes meaningful and timely communication with the parties, making sure that all relevant evidence is gathered, and reviewing and critiquing investigatory and other reports to ensure that they are robust and evince a thoughtful consideration of the issues.

In evaluating the University's Title IX processes, we are mindful that from 2008–2017, Louisiana's state spending per student decreased 44.9%—the second largest decrease in the country. During that time, LSU's budget was cut a remarkable 16 times. While the University's budget was facing drastic cuts, its unfunded compliance obligations—including compliance mandates around Title IX and Section 504—were exploding in significant ways. Given the myriad challenges created by these budget cuts, it is perhaps understandable that the Title IX Office was not staffed appropriately; however, the most important finding from this review is that it was (and is) not. And until the Title IX Office is staffed appropriately, the vast majority of concerns identified throughout this report will likely continue to plague the University. "Doing more with less" simply does not work in this space.

For perspective, in 2019, the LSU Football team completed a perfect season and won a national championship. The success of the program is a remarkable achievement and shows what the University can accomplish with appropriate resources and personnel. To that end, as of today, the staffing of the football program alone includes eleven full-time coaches; thirteen analysts; nine individuals connected to athletic training, nutrition and strength and conditioning; four individuals to handle equipment; four employees to manage video production; three graduate assistants; a "General Manager;" a "Director of Player Development;" a "Special Assistant to the Head Coach;" an "Assistant Athletics Director – Football;" an "Assistant Director of Operations;" a Coordinator of Football Operations; a Coordinator of Defensive Operations; a Coordinator of Offensive Operations; an Associate Athletics Director of Football Recruiting and Alumni Relations; an Assistant Director of Recruiting Operations; a Senior Consultant; an Assistant Director of On-Campus Recruiting Operations; an Assistant Director of Player Personnel; and a Coordinator of Football Relations. This does not include a bevy of student workers whose

HB: 4848-0171-9519.1

PLAINTIFFS_000213

responsibilities have been described as "coloring cards" for football recruits and their families.

In contrast, LSU's Title IX Office is staffed with a Title IX Coordinator and one "Lead" investigator for a campus with over 34,000 students. This alone is inconsistent with institutional peers, who generally staff Title IX and other equity offices with three to six investigators. In addition, though, the Title IX Coordinator and the investigator fulfill these roles not only at the A&M campus, but for the entire LSU System. Again, among peers, the role of a "system" coordinator with responsibility for overseeing Title IX compliance for multiple campuses is most often a full-time job in and of itself.

Moreover, as discussed in Section II, LSU's Title IX Coordinator wears other hats with significant compliance obligations, serving as the University's Section 504 Coordinator and Clery Act Coordinator. Again, at other institutions the Section 504 Coordinator role alone is most often a standalone position. The Title IX Office does not even have a dedicated administrative assistant to answer phone calls or schedule meetings. While we are critical throughout this report of the way in which the Title IX Office handled some individual cases, it is difficult to imagine anyone being successful in an office with such vast responsibilities but such limited resources. For what it is worth, those challenges were only heightened by the University's decision to utilize an exceptionally cumbersome and labor-intensive process for adjudicating Title IX reports.

Accordingly, while there are a variety of different Title IX staffing models utilized by institutions throughout the country, at a minimum, we recommend that the University immediately provide the Title IX Office with: (a) administrative support personnel; (b) a case manager; and (c) two additional full-time investigators.

Additionally, the Title IX Coordinator position at LSU must be a full-time position whose sole responsibility must be coordinating compliance with Title IX.

2. **Designate a Deputy Title IX Coordinator for Prevention and Training.** We recommend that the University designate a Deputy Title IX Coordinator for Prevention and Training to coordinate the University's prevention and training programs in consultation with the Title IX Coordinator. The Deputy Title IX Coordinator for Prevention and Training should be empowered to develop university-wide initiatives where research makes clear that such programs reduce the incidence of sex discrimination. STAR is an invaluable resource for Baton Rouge and the LSU community and we also recommend that the University contract with STAR to assess the University's current prevention and training program offerings and assist the Deputy Title IX Coordinator for Prevention and Training improve those offerings.

With assistance from STAR, we recommend that the Deputy Title IX Coordinator for Prevention and Training implement the following programs as promptly as practicable:

- The Deputy Title IX Coordinator for Prevention and Training should be responsible for re-designing the University's current online training modules with at least four goals in mind:

HB: 4848-0171-9519.1

PLAINTIFFS_000214

i. Ensuring all University community members understand the behavior institutional policy prohibits as well as the sanctions for engaging in prohibited conduct;

ii. Ensuring that all University constituents are aware of confidential resources and reporting options for community members who are impacted by sexual discrimination;

iii. Ensuring that reporters understand the processes available to resolve their complaints; and

iv. Ensuring that all employees understand their legal obligations to report discrimination (as well as the sanctions which would apply for failing to make a mandatory report).

We recommend that this online training module be delivered, in part, by prominent members of University leadership (including the University President and Board members) to underscore the significance of the University's commitment to this issue. It also must be mandatory for all employees, and compliance must be regularly monitored and enforced.

- Second, we recommend the Deputy Title IX Coordinator for Prevention and Training develop mandatory in-person training for all Athletics personnel regarding maintaining appropriate workplace norms. There is considerable research supporting the proposition that establishing appropriate workplace norms reduces the incidence of sex harassment in the workplace. Similarly, the research is clear that harassment flourishes in work environments in which supervisors exercise little or no control over behavior. This mandatory training should make plain what is not appropriate behavior in the workplace and how leaders must be responsible for intervening when inappropriate behavior is taking place. While the Athletics Department has made progress on these items under new leadership, it is clear that more needs to be done.

- Finally, we recommend that the Deputy Title IX Coordinator for Prevention and Training consider the feasibility of periodically promulgating department and school-level climate surveys to assess climate regarding organizational tolerance for sex discrimination. These surveys would need to be strictly confidential for survey participants and would assess unit and department-based attitudes towards tolerating sex discrimination, including whether employees feel they will be retaliated against for complaining about sex discrimination, whether perpetrators of discrimination are appropriately punished, whether management sets an appropriate tone regarding these issues, and whether management and the University as a whole handle complaints appropriately. These surveys could serve as "temperature checks" for the need for more targeted intervention by the Title IX Coordinator, including customized in-person training.

While this Deputy role does not necessarily have to be a full-time designation, we caution that the University has historically utilized an "other-duties-as-assigned approach" when

140

PLAINTIFFS_000215

assigning responsibility for Title IX compliance. The University should take care to designate an employee with appropriate capacity and resources to take on this critical role.

3. **Designate a Deputy Title IX Coordinator for Support and Resources.** The provision of professional support and resources for individuals impacted by sex discrimination and reports of sex discrimination is a critical component of an effective Title IX program. As it stands now, we have heard nothing but positive feedback about the University's Lighthouse Program. This is a solid foundation to build upon. With that said, the extension of resources is currently not coordinated with the Title IX Coordinator and parties to the Title IX process are rightfully confused about where to go for resources. With that in mind, we recommend creating a dedicated Deputy Title IX Coordinator for Support and Resources who will be responsible for receiving, coordinating, and monitoring implementation of support and resources for all community members impacted by sex discrimination and reports of sex discrimination. While this report has identified many problems, we would be remiss in not pointing out again that Susan Bareis was unanimously praised by members of the University community for the amazing support and resources she has provided. We believe she would be ideal for this position with appropriate support staff.

This position should be removed from the informal or formal process for resolving reports and instead be geared solely to ensuring that impacted individuals receive the full range of supportive measures offered by the University. These resources may include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations. Part of this Deputy Coordinator's role should include ensuring all such resources are provided equitably as appropriate for each particular circumstance, and that determinations with respect to supportive measures are documented appropriately. In addition, the Deputy Coordinator should work closely with other University offices to facilitate delivery of support services.

4. **The Title IX Coordinator Reporting Line Must Change.** The Title IX Coordinator's current reporting line to the Office of General Counsel is rife with conflict of interest concerns. Because of the myriad legal requirements associated with Title IX, the Title IX Coordinator should certainly confer with institutional counsel as necessary. However, the Title IX Coordinator should not directly report to the Office of General Counsel. In at least the short term, we recommend that the Title IX Coordinator immediately begin reporting directly to the University President. Consistent with best practices and the organizational structure of institutional peers, we also recommend that the University consider creating an "Office of Civil Rights" or "Office of Institutional Equity" which would be tasked with processing community reports of all University discrimination claims (*i.e.*, Title IX claims as well as claims involving Title VII and the Americans with Disabilities Act) and be overseen by an appropriately qualified senior member of the University leadership. There are various models for this at peer institutions and we are happy to share additional information regarding those models.

HB: 4848-0171-9519.1

PLAINTIFFS_000216

5. **Implement Internal Monitoring and Quarterly and Annual Reporting.** To ensure effective monitoring of the Title IX Office on a go-forward basis and to promote accountability to the campus community, we recommend the University commit to quarterly and annual reporting from the Title IX Office. On a quarterly basis, we recommend the Title IX Coordinator prepare a report to the President regarding the following:

   - Office staffing and delegation of responsibilities;
   - Statistical information, including the number of reports received by the office; the number of Formal Complainants received by the office; the status of current cases; and the number of cases resolved by the office and the category of resolution; and
   - An update on training that has been provided or coordinated by the Title IX Office.

   In addition, we recommend the Title IX Coordinator prepare an annual report that will be shared with the campus community with similar information regarding Title IX Office staff, trainings provided to the community and statistical information regarding Title IX case processing. Given the University's expressed desire to begin to demonstrate immediate improvements in the University's response to issues of sexual misconduct, we recommend the University release a semi-annual and annual report for 2021 and 2022, publishing reports from the Title IX office on **September 1, 2021** and **March 1, 2022**.

6. **Recordkeeping Must Be Improved.** The Title IX Office must develop a comprehensive recordkeeping system which, among other things, monitors reports of discrimination and whether interim and final sanctions are complied with. The University's use of case management software such as Maxient and/or Ethics Point is helpful in this regard—so long as all employees tasked with documenting incidents and communications are trained appropriately on the University's system and reporting guidelines. This may seem picayune, but our review above illustrates some of the many significant ways Title IX matters can be handled inappropriately because there is inadequate recordkeeping. A case manager is often used at peer institutions to do this work.

   In addition, when discretionary decisions are made—*e.g.*, decisions about whether to honor a request not to proceed with a Title IX investigation—there should be a detailed explanation for how the University arrived at its decision.

   Again, while this review was limited to Title IX, a similar process should be employed regarding whether an incident warrants a Clery Timely Warning. Regarding Timely Warnings, we recommend providing an addendum to an incident report involving a Clery crime reflecting the explanation as to why an alert was not issued in a particular situation.

7. **Targeted Training for Athletics.** Thoughtfully understanding problems is an essential part of fixing them. In this instance, there have been various public concerns expressed that athletes accused of Title IX violations have been the beneficiaries of favoritism by the Title IX Office. In reality, the problems identified throughout this report have arisen in a variety of different contexts and departments. While there are unique problems in Athletics (in particular around reporting), the suggestion that LSU student athletes in the Title IX process are getting special treatment is simply not supported by what we have learned in

PLAINTIFFS_000217

this review. There is also no evidence that anyone in a leadership position within the University has put any sort of pressure on the Title IX Office or otherwise to reach conclusions favorable to prominent student athletes.

With all of that said, as mentioned above, the Athletics Department needs clarity from leadership (and training) about roles and expectations. The process whereby one person in Athletics serves as the gatekeeper of discrimination reports (and whether they get to the Title IX Coordinator) **must end immediately**. This process has served no one well.

All Athletics employees must be clearly instructed that they are required to make reports of sex discrimination directly to the Title IX Coordinator. This also needs to be made clear annually in training overseen by the University's Title IX Office. It is also imperative that new Athletics staff—upon hiring—be provided with training on institutional expectations in this regard.

In addition, the football team, in particular, is long overdue for training targeted to their players with a goal of minimizing incidence rate. This training should be coordinated with the University's Title IX Coordinator and we highly recommend the University develop a contractual arrangement with Baton Rouge's Sexual Trauma & Response organization to facilitate this training.

8. **Mandatory Reporting Obligations Must Be Clear.** The University's mandatory reporting deficiencies are not unique to Athletics and should be addressed immediately. For years now, the University has been told that it needs to clarify its policies and training regarding who is a mandatory reporter for purposes of Title IX and how those reporters satisfy their mandatory reporting obligations. There has been a remarkable lack of leadership on this. While our review was focused on Title IX issues, we have similar concerns for employee mandatory reporting obligations created by the Clery Act.

Additionally, there is no guidance on what the consequences of failing to make a required report are. All of this needs to be remedied immediately. To that end, we make the following recommendations: (a) the University should immediately clarify in institutional policy the employees who are required to make mandatory reports both under Title IX and pursuant to the Clery Act; (b) that policy should stress who the reports must be made to and outline how to satisfy reporting obligations; and (c) the policy should make clear the consequences to employees for failing to make a report.

Regarding the latter, Texas recently enacted legislation which required employees to make reports of sex discrimination to the Title IX Coordinator.[233] That law also required institutions to terminate any employee who fails to make a report. Whether that is wise policy remains to be seen. With that said, the University should make clear that a failure to report is a serious offense which warrants a serious sanction and should at least consider whether it should always warrant termination as is the case in Texas. The University can consider articulating specific exacerbating or mitigating factors to aid in this analysis.

---

[233] *See* Tex. Edu. Code § 51.252.

HB: 4848-0171-9519.1

PLAINTIFFS_000218

While updating the policy is a start, this mandatory reporting obligation needs to be stressed in a training program for all employees. Additionally, all covered employees should be required to acknowledge they are aware of their mandatory reporting obligations. This training should also be included in employee orientation sessions.

Finally, the University should also create an easy-to-use and easy-to-locate webpage to facilitate employee mandatory reports. Website updates should also be considered for students, as our review of case files and conversations with community members made clear that neither students nor employees had clarity regarding the "best" or most direct way to make a report to the Title IX Office.

Regarding Campus Security Authorities under the Clery Act, while we did not conduct an Clery audit, we have the following observations. LSU's Annual Security Report does not include a definition of a CSA or a list of the CSAs. LSU should compile a comprehensive list of CSAs so that the University can ensure those on campus with that status understand their role and obligations. The list of CSAs should include identified CSAs at all of the nine campuses. Without clear information about individuals designated as CSAs, it is difficult to assess whether such individuals are being well trained. Training CSAs is not complicated, but it is essential so that CSAs know what their role is with regard to campus security. Beyond designating CSAs and training them, the University should establish an internal system for connecting with CSAs on a somewhat regular basis (*i.e.*, beginning of academic year and beginning of each calendar year) to remind them of their obligations and give them an opportunity to report any information they have received about criminal activity but have not yet reported.

9. **Finalize the LSUPD MOU.** As discussed at length in Section II of this report, LSUPD should finalize its MOU with the Title IX Office as soon as possible.

10. **Title IX Personnel Must Get Specialized Training on Dating and Domestic Violence.** Dating and domestic violence cases are exceptionally challenging. The Trump Title IX Regulations further complicate the handling of these cases. It is essential that employees tasked with resolving these reports (including third-party providers) be required to obtain biannual training on the unique issues raised by interpersonal violence cases. Again, we highly recommend the University develop a contractual arrangement with Baton Rouge's Sexual Trauma Awareness & Response organization to facilitate this training.[234] We have also had positive experiences with The One Love Foundation.

11. **Accountability is Critical.** As demonstrated in this report, the University has been provided with recommendations for years about Title IX which have never been implemented. For any of the recommendations made by Husch Blackwell that the University accepts, clear deadlines should be established by the leadership of the University for implementing those recommendations and those deadlines should be made public on a website so that the public can monitor progress and leadership can be held accountable for whether they are honoring their commitments.

---

[234] *See* https://star.ngo/.

HB: 4848-0171-9519.1

PLAINTIFFS_000219

12. **Special Care is Warranted for Cases Involving Athletes.** As indicated at the beginning of this report, the vast majority of sexual assault on campuses around the country is never reported. When reports are made and involve prominent campus athletes, it is also quite common for reporters to be reluctant to participate in University disciplinary processes and potentially face the wrath of sports fans. We have seen this phenomenon several times in our file reviews here. This is a deeply entrenched cultural problem and it presents a remarkable challenge, a challenge again arguably made more complicated by the Trump Title IX Regulations. One way to confront it is to bring the sex assault incidence rate down and we are hopeful that our training and reporting recommendations will assist in that regard. We also believe a robust bystander intervention program which has genuine buy-in from the leadership of the Athletics Department and active participation by prominent student athletes will assist. We are also optimistic that a robust and coordinated effort to provide resources and support to reporters coupled with an appropriate tone at the top from the leadership of the Athletics Department will be helpful. With all of that said, this is an exceptionally complicated challenge and one the Title IX Coordinator and the leadership of the University should be monitoring on a regular basis.

13. **Develop and Implement Alternative Resolution Options and Restorative Justice for Sex Discrimination Matters.** There was clear consensus in our community interviews that students wanted as robust an offering of alternatives to investigation/adjudication as possible for dealing with sex discrimination complaints. This consensus is in line with developing best practices. We recommend that such alternative resolution processes be offered and formalized to the extent practicable in the University's sex discrimination policies. Of course, it is essential to recognize that alternative resolution will not be appropriate in all cases (*e.g.*, when such resolution will not adequately protect the safety of the individuals involved and/or the University community) and we recommend that the policy provide a process for the Title IX Coordinator to assess when alternative resolution would be inappropriate.

We are especially optimistic about the benefits of restorative justice in this space. In particular, we believe restorative processes would be especially worthwhile in (1) the context of informal or alternative resolution of cases that do not present imminent safety concerns for the harmed individual or the community; (2) reintegrating and rebuilding trust in situations when individuals are found responsible for violating University policies but are permitted to remain in or return to the campus community; and (3) in response to larger climate and bias issues and community building.

14. **Implement Timelines for Resolutions and Options for Participants in Untimely Cases.** Throughout our review, it became clear that the resolution of many sex discrimination claims took an unreasonably long period of time. While we acknowledge that many complaints of sex discrimination can be complicated, we recommend that a reasonable and presumptively appropriate timeline be memorialized in institutional policy as soon as possible. We recommend that the timeframe can be extended for good cause (*e.g.*, to ensure the integrity and completeness of an investigation; comply with a request by law enforcement for temporary delay to gather evidence; provide reasonable accommodations for availability of key witnesses; etc.).

HB: 4848-0171-9519.1

PLAINTIFFS_000220

In addition, in the event a Title IX matter is not being handled in a timely manner, we recommend the University provide participants with an opportunity to complain directly to a member of the University's leadership team who, in appropriate circumstances, will be empowered to direct additional resources to the investigation to ensure that it is conducted as promptly as possible.

15. **Thoughtfully Consider Presumptively Appropriate Sanctions.** One of the concerns identified throughout this review is whether community members who are found responsible for sexual misconduct are being sanctioned in a manner consistent with the seriousness of the offense Throughout our community interviews, there was a clear consensus that the University's current sanctioning guidelines were too lenient. As we noted throughout our review, there were a number of cases where we believed the sanctions meted out by the University were not sufficiently serious. At some peer institutions, detailed sanctioning matrices have been developed for sex misconduct cases. Others have opted for presumptively appropriate sanctions with expulsion or termination the presumptively appropriate sanction for certain serious infractions. We recommend that the University reconsider its sanctioning guidelines. To that end, we recommend that the University initiate a task force consisting of employee and student leaders to assess whether the University's current approach to sanctions is in line with peer institutions and, more importantly, consistent with the professed values of the University.

16. **The University Needs a New Centralized Website to Increase Understanding and Simplify Process.** Students and employees described the University's Title IX website and related pages as exceptionally difficult to navigate. We agree. Our review of the website found that University policies, procedures, and resources are available, but not easy to navigate. Research has shown that efforts to "increase the accessibility of policies, links, and Title IX coordinator information, along with campus climate surveys (by making these public surveys) and training of the university communities" helps build trust in the University's handling of these sensitive matters and results in increased reporting. Accordingly, we also recommend that the University create a new "Title IX" or "Interpersonal Violence Prevention and Response" webpage as soon as possible. There are several high-quality webpages at other universities which can serve as templates, including the University of Rhode Island's "Sexual Violence Prevention and Response" page and the University of Oregon's "Help for Survivors" page.

17. **Regularly Measure Climate and Effectiveness.** All of the changes recommended above are designed with three broad goals in mind:

    (a)    improve the institutional response to reports of sex discrimination from the perspective of reporters, respondents, and other impacted third parties;

    (b)    create a climate where subjects of sex discrimination feel supported and are aware of the full range of university options and resources; and

    (c)    improve the University's overall climate around sex discrimination.

PLAINTIFFS_000221

We are hopeful that these recommendations will assist in accomplishing these goals. With that said, we think it is critically important for the University to regularly measure whether these interventions are succeeding as well as the overall effectiveness of the University's comprehensive Title IX program.

To that end, the training recommended above should not be done for its own sake or to "check a compliance box." Rather, the recommended training and other training and prevention programs ultimately created by the University should always be intentional. For each program, there should be:

- a preliminary assessment of needs (i.e., what are the knowledge deficits that are being addressed or the attitudes which the training is trying to change);
- clear training goals;
- an opportunity for participant feedback geared to assessing whether training goals are being met; and
- a regular process for reviewing participant feedback, assessing what worked and what did not work, and making necessary adjustments.

In terms of measuring broader institutional goals, we recommend the university evaluate progress in an annual, ongoing longitudinal campus climate survey which measures at least the following items:

- prevalence of campus sex discrimination;
- community perceptions about institutional response to sex discrimination generally; and
- community and participant perceptions about the effectiveness of the University's incident resolution processes.

This may help the University gauge the prevalence of all forms of sexual misconduct affecting its community. It may also shed light on the campus community's perception about institutional efforts to combat sexual misconduct and the extent of the community's knowledge about institutional resources and policies.

We recommend that this report be made public and posted prominently on the University's website.

18. **The Rules Must Apply to Everyone.** One of the witnesses we spoke with penned a thoughtful column titled "LSU has good sexual misconduct policies. It needs to follow them."[235] For reasons we discussed above, we actually have concerns with many aspects of the University's previous policies. Quibbles aside, the broader point is a good one: the University needs to ensure that its Title IX policies and processes are followed and apply equally to everyone. The "work arounds" employed by the University to try to control narratives or "protect the brand" have served the University community poorly. When

---

[235] https://lailluminator.com/2020/11/20/guest-column-lsu-has-good-sexual-misconduct-policies-it-needs-to-follow-them/

HB: 4848-0171-9519.1

PLAINTIFFS_000222

community members learn about sex discrimination, reports need to be made to the Title IX Office. When reports are made, they need to be handed pursuant to institutional policy no matter the status of the parties or complicated the situation. The unintended negative consequences and spillover impacts of failing to "play it straight" are considerable.

This is a detailed report and we have tried to cover considerable territory. Of course, there may nevertheless be issues or outstanding questions we have missed. In the event you would like us to address a specific question, please let us know.

We are grateful for the opportunity to have worked with LSU on this important project and are hopeful that this review will make a difference in the lives of LSU students and employees.

148

PLAINTIFFS_000223

# Exhibit A
# PM-73

PLAINTIFFS_000224

## Louisiana State University System

*3810 West Lakeshore Drive*
*Bacon Rouge, Louisiana 70808*

*Office of che President*

*225 1578-21 1 1*
*225 / 578-5524 fax*

Permanent Memorandum No. 73 (PM-73)

Effective June 18, 2014

F. King Alexander, President

# 1

## TITLE IX AND SEXUAL MISCONDUCT POLICY

### TITLE IX AND SEXUAL MISCONDUCT

In accordance with Title IX and other applicable law, Louisiana State University ("LSU") is committed to providing a learning, working, and living environment that promotes integrity, civility, and mutual respect in an environment free of discrimination on the basis of sex and sexual misconduct which includes sex discrimination, sexual harassment, dating violence, domestic violence, sexual assault, stalking and retaliation. LSU prohibits sex discrimination and sexual misconduct. This policy applies to all persons without regard to sexual orientation, gender identity and/or gender expression.

Sex discrimination and sexual misconduct violate an individual's fundamental rights and personal dignity. LSU considers sex discrimination and sexual misconduct in all of its forms to be serious offenses. This policy has been developed to reaffirm these principles and to provide recourse for individuals whose rights have been violated. This policy establishes a mechanism for determining when rights have been violated in employment, student life, campus support services, LSU programs and/or an academic environment.

### Nondiscrimination Notice

LSU does not discriminate on the basis of race, creed, color, marital status, sexual orientation, gender identity, gender expression, religion, sex, national origin, age, mental or physical disability, or veteran's status in its programs and activities and provides equal access to its

*Louisiana Scace University* & Agrimltttral *and Mechanical* College
LSU m *Alexandria* • LSU ac *Eunice* • *University of New Orleans* • LSU in *Shreveport* • *Heberc Law Center* • LSU *Agricultural* Center
Pennington *Biomedical Research Center* • LSU *Health Sciences Center - New Orleans* • LSU *Health Sciences Center - Shreveport* • LSU *Health Care Services Division*

PLAINTIFFS_000225

programs and activities.  Inquiries regarding the non-discrimination policy should be directed to the individual or individuals designated in each campus' applicable policy.

## I. JURISDICTION

**A.** This policy shall apply to conduct that occurs on an LSU campus, at LSU sponsored activities, and/or when the Student or Employee is representing LSU.  LSU shall have discretion to extend jurisdiction over conduct that occurs off campus when the conduct adversely and significantly affects the learning environment or LSU community and would be a violation of this policy and/or any applicable campus policy or code of conduct, if the conduct had occurred on campus. In determining whether or not to extend jurisdiction, LSU may consider, among other factors, its ability to gather information and effect a resolution. LSU may extend jurisdiction (over off-campus conduct) if the alleged conduct by the student or employee:

**1.**  Involved violence or produced a reasonable fear of physical harm; and/or

**2.**  Involved any other members of the LSU community or any academic work, records, documents, or property of LSU.

**B.** Each Student shall be responsible for his/her conduct from the time of acceptance for admission through the actual awarding of a degree.

**C.** Employees are responsible for their conduct during work hours, on campus, at LSU-sponsored activities, and/or when the employee is representing LSU, or when their conduct would adversely affect LSU's image, regardless of whether such conduct occurs on-campus or off-campus.

**D.** This policy also applies to any person who is both a student and an employee at LSU, arising out of, or in connection with, conduct in either or both of those capacities. Any violation of this policy may subject such person to disciplinary action, as applicable, in either or both of those capacities.

## II. DEFINITIONS

**"Advisor of Choice"** A Student or Employee has the right to have one Advisor of his/her choice present during any meeting conducted under this policy. The Advisor may not have personal involvement regarding any facts or circumstances of the alleged misconduct. The Advisor's only function shall be to assist and/or consult with the Student or Employee. The Advisor may not act as a spokesperson. The Advisor may be an attorney but participation shall be limited, as stated above.

2

PLAINTIFFS_000226

"Consent" means the affirmative and voluntary agreement to engage in a specific sexual activity during a sexual encounter. Consent cannot be given by any individual who is mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason; or under duress, threat, coercion, or force; or inferred under circumstances in which consent is not clear, including but not limited to the absence of "no" or "stop", or the existence of prior or current relationship or sexual activity.

"Dating Violence" includes violence committed by a person who is or has been in a relationship of a romantic or intimate nature with the victim: (1) The existence of such a relationship shall be determined based on the report and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. (2) For the purpose of this definition dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence. (3) For the purposes of complying with Title 34 CFR 668.41, of the federal register and pertaining to the annual security report under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), any incident meeting this definition is considered a crime for the purposes of Clery Act reporting.

"Domestic Violence" includes (1) A felony or misdemeanor crime of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred. (2) For the purposes of complying with Title 34 CFR 668.41, any incident meeting this definition is considered a crime for the purposes of Clery Act reporting.

"Hostile Environment" includes conduct of a sexual nature that is sufficiently severe, persistent, or pervasive to limit a student's or employee's ability to participate in or benefit from the education program or from one's employment, or to create a hostile or abusive educational or work environment.

"Incapacitation" includes a person's inability to provide consent due to the use of drugs or alcohol, when the person is asleep or unconscious, or because of an intellectual or other disability that prevents the student or employee from having the capacity to give consent.

"Responding Person" includes any student or employee against whom a complaint under this policy has been made for an alleged violation of this policy.

3

PLAINTIFFS_000227

"Responsible Party" includes any employee: who has the authority to take action to redress sexual violence or who has been given the duty of reporting incidents of sexual violence or any other misconduct by students or employees to the Title IX coordinator or other appropriate school designee; or whom a student or employee could reasonably believe has this authority or duty; or any student employees.

"Sexual assault" is any type of sexual contact or behavior that occurs without the explicit consent of the recipient. Sexual assault includes sexual activities as forced sexual intercourse, forcible sodomy, child molestation, incest, fondling, attempted rape, and includes sexual acts against people who are unable to consent either due to age or incapacitation.

"Sex Discrimination" includes behaviors and actions that deny or limit a person's ability to benefit from, and/or fully participate in the educational programs, activities, and services because of a person's gender.

"Sexual Harassment" includes unwelcome sexual advances, intimidation, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: {1} submission to such conduct is made either explicitly or implicitly a term or condition of employment, academic status, receipt of university services, participation in university activities and programs, or affects the measure of a student's academic performance; or, (2) submission to or rejection of such conduct is used as the basis for a decision affecting employment, academic status, receipt of services, participation in university activities and programs, or the measure of a student's academic performance; or, {3} such conduct has the purpose or effect of unreasonably interfering with employment, academic performance and is severe, persistent, or pervasive and/or creates an intimidating, hostile, or offensive work or educational environment .

"Sexual Misconduct" includes any sexual act or contact of a sexual nature that occurs, regardless of personal relationship, without the consent of the other person(s), or that occurs when the person(s) is unable to give consent or whose consent is coerced or obtained in a fraudulent manner. Sexual misconduct includes, but is not limited to, unwanted sexual contact with an object without consent and/or by force, video voyeurism, violence of a sexual nature, sexual abuse, non-consensual sexual intercourse, sexual exploitation, sexual assault, and obtaining, posting, or disclosure of intimate descriptions, photos or videos without express consent of the other person(s).

"Stalking" includes: {1} Engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety or the safety of others; or suffer substantial emotional distress. (2) For the purpose of this definition course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes,

4

PLAINTIFFS_000228

conducts surveillance, threatens, or communicates to or about, a person, or interferes with a person's property. Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling. Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim.

III. TITLE IX COORDINATORS

The President shall designate the LSU Title IX Coordinator who shall be responsible for the implementation, enforcement, and coordination of Title IX for LSU. The Chancellor of each Campus shall designate a Campus Title IX Coordinator with designated responsibilities to oversee on-campus Title IX compliance.

The President also shall designate a Deputy Title IX Coordinator for Athletics. In consultation with the Chancellors and Athletic Directors for each campus, this individual will monitor sports equity, including offerings, participation, and scholarships on all campuses for compliance with Title IX. Any investigations or complaints involving student athletes or Athletics personnel (other than those involving sports equity) shall be handled and/or investigated by the LSU Title IX Coordinator and/or the Campus Title IX Coordinators, or their designee, as appropriate under the circumstances and in accordance with this Policy.

IV. INITIATION OF COMPLAINTS

A.    Application

This policy applies to all campuses and other administrative units. These procedures may be supplemented by more specific campus procedures that are consistent with this Policy and PM-55.

B.    Complaints

Any student or employee who believes that he or she has been subjected to discrimination, harassment or sexual misconduct or any other violation of this policy has a right to report the conduct to the Campus Title IX Coordinator or to any other responsible party which includes: the campus administrator with responsibility for human resource management, student conduct or the department head of the relevant academic department. Persons who may have experienced criminal sexual misconduct are strongly encouraged to report the offense to campus police or local law enforcement, as well as to the Campus Title IX Coordinator or the persons named above. To the extent possible, the complainant and those who receive the complaint should preserve evidence

5

PLAINTIFFS_000229

and not disturb the potential crime scene. The complainant, however, has the legal right not to provide a statement to campus police or law enforcement.

C.      Notification of Complaints

Any person who receives a complaint under this policy *shall* promptly notify the Campus Title IX Coordinator, who shall be responsible for notifying LSU Title IX Coordinator and any campus administrators, who may be involved in the resolution process. Any supervisor, who witnesses or receives a report or complaint, *shall* notify the Campus Title IX Coordinator.

D.      Interim Measures

At any time after becoming aware of a complaint, the Title IX Coordinator may recommend that interim protections or remedies for the parties involved or witnesses be provided by appropriate LSU officials. These protections or remedies for the parties involved or witnesses will be provided by appropriate University officials. Remedies may include separating the parties, placing limitations on contact between the parties, interim suspension, or making alternative workplace, classroom, course scheduling, dining, or student housing arrangements.

E.      Confidentiality

All parties involved in a complaint, any investigation, and/or resolution, including witnesses, shall keep information concerning the complaint private and shall be notified of this obligation. Only individuals employed as mental health counselors, victim's advocates and university chaplains can guarantee confidentiality. LSU may be required to divulge information on a need-to-know basis in order to properly address the complaint or pursuant to subpoena, or other court or administrative order, or as may be required by applicable law. Violations of confidentiality, if identified and confirmed, may result in disciplinary or corrective action.

V. PROCESSING OF COMPLAINT

A. Initial Review

The Campus Title IX Coordinator shall conduct or supervise the initial review of the complaint, with such assistance, as needed and/or appropriate under the circumstances, from other campus administrators with responsibilities relevant to the nature of the complaint. A responding or complaining student or employee has the right to one advisor of choice at any stage of this process. The initial review of the complaint shall be concluded as quickly as possible, within a

6

reasonable amount of time required to complete the review in a manner that is adequate, reliable, and impartial.

To ensure a prompt and thorough initial review, the complainant should provide as much of the following information as possible. A complaint may be submitted anonymously or by an individual who is not a party to the alleged violation. This may, but is not required to be, provided in writing:

- The name, organization, department, and position of the person or persons allegedly violating this Policy;

- A description of the incident(s), including the date(s), location(s), and the presence of any witness(es);

- If the complainant is an employee, the alleged effect of the incident(s) on the complainant's position, salary, benefits, promotional opportunities, or other terms or conditions of employment;

- The name(s) of other student(s) or employee(s) who might have been subject to the same or similar conduct; and/or

- Any other information the complainant believes to be relevant to the alleged sexual misconduct, discrimination, harassment, or retaliation.

**B. Resolution Procedures**

The University has both an informal and formal resolution procedure for alleged violations of this policy. Both procedures will be implemented by individuals who have received training on issues related to sex discrimination and sexual misconduct. The complainant and the responding student or employee has the right to one advisor of choice at any stage of the Informal Resolution or Formal Resolution processes.

As set forth below, an informal resolution procedure is available under certain circumstances. After the initial review or a full investigation, if the investigator finds that reasonable cause exists to believe that this Policy has been violated, the Campus Title IX Coordinator or designee will determine whether the informal resolution procedure is appropriate. If it is not appropriate, a full investigation is required.

If the Campus Title IX Coordinator or designee determines that informal resolution is appropriate, the complainant and responding person shall be advised of the informal resolution procedure. If both consent in writing, the informal resolution procedure will be followed, without further investigation, unless and until informal resolution is unsuccessful.

7

PLAINTIFFS_000231

A determination that there is not reasonable cause to believe that this Policy has been violated can be made only after full investigation. Such determination is subject to the approval of the Campus Title IX Coordinator or designee. In such case, the complainant, by written request, may have that determination reviewed by the LSU Title IX Coordinator, whose decision shall be final.

1. Informal Resolution

The use of the informal resolution procedure is optional and must be agreed upon by all parties involved. The formal procedure will be followed: if any of the persons involved in the complaint do not wish to engage in the informal procedure; if the Campus Title IX Coordinator deems the informal procedure inappropriate for the alleged offense; or, if an attempt to utilize the informal procedure has been unsuccessful. Informal procedures are not appropriate for, or applied in, cases involving violence or non-consensual sexual intercourse. Information obtained regarding the complaint will be treated as privately as possible, with only those with a need to know being informed of the complaint. Both informal and formal resolution procedures will utilize a preponderance of the evidence standard, throughout the process, with respect to determinations as to whether, or not, there has been a violation of this Policy.

An attempt to informally resolve the complaint shall be made or supervised by the Campus Title IX Coordinator and should be concluded within sixty {60} calendar days of the decision to pursue informal resolution. Such informal resolution can include meeting with each party to the complaint; review of any initial findings; recommending reassignment, separation or monitoring of the parties; a mediated or facilitated meeting with the parties (however, no complainant shall ever be required to meet with the responding person in an informal resolution); and any other actions deemed appropriate by the parties and LSU. Any further inquiry or review deemed necessary should be concluded in that same period. Once the informal resolution procedure is complete, written notification of the proposed resolution shall be given to all parties. Any party dissatisfied with the outcome of the informal resolution procedure has the right to make a written request, within fifteen (15) calendar days of written notification of the proposed resolution, to the office of the Campus Title IX Coordinator, that the formal resolution procedure, set forth below, be pursued.

2  Formal Resolution: If any party is unsatisfied with the outcome of the informal resolution process or if LSU, the accused, and/or the complainant have not consented to and/or determined that informal resolution is inappropriate or insufficient, the formal procedure will be utilized.

In such cases, at the recommendation of the Campus Title IX Coordinator and after an initial review, a trained investigator will conduct a full investigation into the facts and circumstances of the complaint. The investigation may include in-person interviews with all parties involved and interviews of any direct witnesses. Both parties will be given the opportunity to identify

8

PLAINTIFFS_000232

witnesses to be interviewed. The investigator may also collect and review any documents or other relevant information to include but not limited to photographs, video recordings, or other social media.  All parties to the complaint will be provided written notice regarding the details of the alleged violation of this Policy prior to the initiation of the full investigation. All parties will have an opportunity to identify pertinent evidence to be considered by the investigator. The investigator will present a written investigative summary, based on a preponderance of the evidence standard, and will submit the summary to the Campus Title IX Coordinator and the LSU Title IX Coordinator, who will notify the appropriate Campus offices.  Any such investigation shall be conducted by the Campus Title IX Coordinator or a trained person, authorized and assigned as an investigator by the Campus Title IX Coordinator, including, but not limited to, trained employees from human resource management department or the ,student services or student life department,  or other qualified University employees.

The complainant and the individual who is the subject of the complaint will be notified in writing of the results of the investigation. Information obtained regarding the complaint will be treated as confidentially as possible (as set forth herein) with only those with a legitimate educational interest being informed of the complaint and the outcome of the investigation.

The formal procedure  will  consist of a  formal review of all  allegations presented by the complainant and the results of any investigation.  Each Campus shall adopt procedures for Formal Resolution of complaints of violation of this Policy that afford both the complainant and the responding person due process. The Campus procedures for resolution of such complaints shall be subject to review and approval by the LSU Title IX Coordinator.

## C. RESOLUTION/DISCIPLINARY  ACTION

LSU will take appropriate action against any person found to be in violation of this policy.  (Note: violations of this policy may subject an individual to civil or criminal liability under the state or federal law).

When an employee is deemed to have violated this policy, the Campus Title IX Coordinator and Human Resource Management will jointly determine the appropriate disciplinary action, or recommendation for disciplinary action, up to and including dismissal, in accordance with applicable laws, rules, and/or LSU policies.

For violations involving students, except when acting in the capacity of an employee, the appropriate campus office for student services or student life will determine the appropriate action, pursuant to any applicable code of student conduct and/or policy/policies governing student conduct.

9

PLAINTIFFS_000233

In addition, to the extent possible, LSU will interact with appropriate law enforcement or third parties to address the actions of non-students or non-employees.

Violations of this Policy may result in outcomes such as residential life contract cancellation, deferred suspension, suspension, expulsion, class only restriction and separation of employment (student).

D.  **COOPERATION WITH LAW ENFORCEMENT**

LSU will comply with law enforcement requests for cooperation and such cooperation may require LSU to temporarily suspend the fact-finding aspect of a Title IX investigation while the law enforcement agency is in the process of gathering evidence. LSU will promptly resume its Title IX investigation as soon as notified by law enforcement that it has completed the evidence gathering process. LSU may provide up to 10 calendar days to allow for the law enforcement agency criminal process/investigation to unfold prior to resuming the fact-finding aspect of the Title IX investigation.

The University will implement appropriate interim steps/remedies during the law enforcement agency's investigation to provide for the safety of the complainant and the campus community and the avoidance of retaliation.

E.  **RETALIATION**

Retaliation against a person  who has  been  subjected to sexual discrimination or  sexual misconduct, or against one, who in good faith brings a complaint of sexual discrimination or sexual misconduct or who, in good faith, participates in the investigation of a sexual discrimination or sexual misconduct complaint, is prohibited and shall be a violation of this policy and shall constitute misconduct subject to disciplinary or other action, as described above. LSU will take steps to prevent recurrence and remedy the effects of any violation of this Policy.

F.  **RECORD KEEPING**

Records will be kept in accordance with Louisiana law and federal law. For students, records will be kept for 7 (seven) years, except in cases of cases of suspension and expulsion, which records shall be permanent.  Employment actions in violation of this policy will be filed in the employee/s' respective Employee Relations file.

10

PLAINTIFFS_000234

**G.  OTHER  ASSISTANCE**

Campuses and the communities in which they are located can provide other assistance to persons impacted by a violation of this policy. Each campus will develop and maintain a list of departments, programs/services, or community-based agencies offering assistance to students and employees concerning issues related to this policy.

**H.  PREVENTION  PROGRAMS**

Campuses and the communities in which they are located regularly offer educational programs and prevention programs designed to inform the campus or community on the negative impact of sexual violence. Each campus will develop and maintain a list of educational programs, prevention programs, and other events designed to reduce the incidence of sexual violence on campus or within the community. Each campus should identify and include a bystander intervention program and programs addressing issue related to this policy.

**I. RELATED POLICIES**

To the extent other LSU or campus-based policies may conflict with this policy, the provisions of this policy shall supersede and govern.

11

PLAINTIFFS_000235

# Exhibit B
# Audit - Oversight and Prevention of Sexual Misconduct

PLAINTIFFS_000236



**Office of Internal Audit**
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

## EXECUTIVE SUMMARY

Internal Audit completed a multi-campus audit of sexual misconduct from the Board-approved Fiscal Year 2017 Audit Plan. This report provides an evaluation of controls to educate the campus community, investigate allegations, and assign responsibility for ensuring compliance with Title IX obligations. Title IX of the Education Amendments of 1972 applies to institutions receiving federal financial assistance from the U.S. Department of Education and was enacted to protect against discrimination based on sex in educational programs or activities. Some key areas that recipients have Title IX obligations are recruitment, admissions, counseling, financial assistance, athletics, sex-based harassment, discipline, pregnant or parenting students, and employment.

We focused on sexual misconduct, based on risk. Testing was conducted at campuses with students present since most of the key areas of the law are designed to ensure equal rights and access for students. The scope included activities between June 1, 2015 and December 31, 2016. Based on testing performed, we have the following recommendations for LSU Administration:

1. Verify that the job responsibilities of Title IX Campus Coordinators do not create the appearance of bias.
2. Implement a standard mechanism to consistently record complaints of potential PM-73 violations and track their disposition.
3. Ensure confidential advisors have been clearly identified and all employees understand the applicability for exceptions to sexual misconduct reporting obligations.
4. Obtain guidance from the Louisiana Attorney General to determine if LA-RS 46:1844 applies to internal disclosures of sexual assault victims' identities for Title IX compliance efforts.
5. Present a memorandum of understanding to local law enforcement in the New Orleans area regarding sexual violence incidents involving HSCNO students or employees.
6. Reinstitute the Ombud's Office, making it available to both students and employees, and heightening awareness regarding its functionality and availability.
7. Make training available to all students and consider providing targeted training to groups more likely to become aware of violations. Explore learning management systems or other methods to efficiently monitor employee compliance with required annual training.
8. Remove or amend conflicting policies; ensure the non-discrimination notice is updated and included in all required publications; and, verify contact information for Title IX Campus Coordinators is complete and easily located.
9. Evaluate PM-73 to determine whether revisions are necessary to reflect suggested guidelines and consider addressing, in policy, romantic or dating relationships between employees and students when some level of authority is exercised.

Management agreed with these recommendations and is in the process of implementing the corrective action plans included in Appendix A. We appreciate the assistance provided by legal counsel, campus Title IX Coordinators, investigators, and administrative personnel during the engagement.

Page | 1

PLAINTIFFS_000237

**Office of Internal Audit**
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

## SCOPE AND OBJECTIVES

The scope of this audit included the following LSU campuses: Agricultural Center (AgCtr), Eunice (LSUE), A&M Baton Rouge (LSU A&M), Alexandria (LSUA), Shreveport (LSUS), and the Health Sciences Centers in New Orleans (HSCNO) and Shreveport (HSCS). The Health Care Services Division and Pennington Biomedical Research Center were excluded from our scope since they have no responsibility for and minimal interaction with students, who are the primary focus of the regulation. We also limited the scope of testing to sexual misconduct based on risk; therefore, we excluded gender equity in sports, education for pregnant or parenting students, and equal access to courses or programs in the areas of science, technology, engineering, and math (STEM). The audit focused on controls executed between July 1, 2015 and December 31, 2016.

Our primary objective was to determine compliance with applicable federal regulations and related guidance as well as ensuring institutional policy and procedures regarding sexual misconduct were effectively designed to mitigate the risks. We identified the following risks, which served as the basis for testing at each campus:

- University not responding appropriately to an incident of sexual misconduct
- Failure to conduct a timely, thorough investigation and support findings based on a preponderance of evidence
- Insufficient coordination with law enforcement regarding incidents of sexual misconduct involving University students and/or personnel
- Grievance procedures not designed to promote prompt and equitable processing of allegations and preventing retaliation
- Campus community not receiving adequate education and prevention resources
- Unsatisfactory documentation tracking the process and disposition of allegations

Testing included the following:

Training/Awareness – verified necessary training was provided to employees likely to witness or receive reports of sexual misconduct such as professors, administrators, resident advisors, coaching staff, and University Police. Evaluated campus awareness efforts such as links on the home page, postings in common areas (e.g. student union), and publications (e.g. applications or handbooks). Conducted interviews to assess understanding of reporting obligations.

Investigations/Adjudication – interviewed campus law enforcement and Title IX Campus Coordinators to determine how communication flows from each area. Reviewed a sample of sexual misconduct allegations to confirm all pertinent information was captured at the time of complaint, investigations were conducted independently, documentation was maintained to support the conclusion based upon evidentiary standards, and subsequent action was taken, as appropriate.

PLAINTIFFS_000238



Office of Internal Audit
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

Title IX Coordinators – reviewed the roles and responsibilities of the Title IX Campus Coordinators to verify that they do not have conflicting responsibilities.  Also reviewed mitigating controls such as adequacy of the appeals process.

Procedures that yielded issues are discussed in our recommendations to management.  This internal audit activity was conducted in conformance with the International Standards for the Professional Practice of Internal Auditing set by the Institute of Internal Auditors.

## BACKGROUND

The Office for Civil Rights (OCR) enforces Title IX of the 1972 Education Amendments to the Civil Rights Act which prohibits discrimination on the basis of sex at institutions that receive federal financial assistance from the U.S. Department of Education.  Title IX provides legal protection against gender-based discrimination for both students and employees in all educational programs and activities including admissions, access to courses, counseling or guidance, housing, financial assistance, employment, and athletics.

Federal policy materials, implementation guidelines, OCR resolutions, and case law influence how Title IX laws are interpreted and applied.  Recently, the focus has shifted to areas beyond gender equity.  On April 4, 2011, OCR issued a "Dear Colleague Letter" discussing how sexual misconduct impacts an individual's work and study environment.  The letter also addressed the institutional responsibilities to investigate and respond to these types of incidents.

In 2014, LSU recognized that the University required additional controls related to those areas.  As a result, the President issued Permanent Memorandum 73 (PM-73) – "Title IX and Sexual Misconduct Policy," which applies to all LSU campuses.  The University expanded their processes and established controls to prevent acts of sex-based discrimination or sexual misconduct and to take prompt, appropriate action to investigate and effectively discipline those found to have engaged in such conduct in a manner consistent with law and due process to prevent recurrence.  This included hiring a central Title IX Coordinator to oversee the implementation, enforcement, and coordination of compliance efforts for all LSU campuses.  In addition, each chancellor designated a Title IX Campus Coordinator.

Varying procedures and degrees of control exist at each campus.  For example, during our audit we noted inconsistencies in mechanisms for reporting allegations, recordkeeping, investigation processes, who makes the final decision about whether a violation occurred, and how adjudication proceedings are conducted.  Regarding athletics, LSU A&M requires student athletes and coaches to attend an annual comprehensive training session on Title IX provided by Dan Beebe Group Consulting (DBG).

PLAINTIFFS_000239



Office of Internal Audit
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

DBG was also engaged by the Tiger Athletic Foundation (TAF) to complete an independent assessment of human relations risks applicable to LSU A&M athletics, including misconduct prevention policies and programs.  Materials considered in their review were LSU permanent memoranda, policy statements, student policies, staff handbook, Athletic Department policies and procedures, student athlete handbook, team handbooks, and the LSU Ethics and Integrity Hotline.  DBG issued a report on March 29, 2016; suggestions relevant to this audit were incorporated into our recommendations below.

## FINDINGS AND RECOMMENDATIONS

### Finding No. 1: Reporting and Investigating Misconduct

The following observations indicate controls may be insufficient to mitigate potential conflicts of interest with reporting and investigating allegations of sexual misconduct:

- Investigator/Coordinator:
    - The Title IX Campus Coordinator at HSCS reports to the campus General Counsel.
    - The HSCNO Title IX Campus Coordinator is the Vice Chancellor for Academic Affairs and Dean of the School of Graduate Studies.  However, he essentially functions as the Dean of Students since he is responsible for making the final decision regarding disciplinary actions.
    - The LSUS Dean of Students has made informal decisions when the Title IX Campus Coordinator recused herself from an investigation.
- Lack of documentation to evidence that both the complainant (and respondent, where applicable) were provided with resources, informed of their right to pursue criminal action, and notified of the initiation of an investigation as well as the resulting outcome.
- No formal or consistent procedures for documenting complaints received and tracking their disposition.

OCR guidance does not specifically exclude particular employees from serving as Title IX Coordinators; however, they advise against designating employees whose other responsibilities may present a conflict such as a disciplinary board member, general counsel, Dean of Students, or Athletics Director.  LSU's central Title IX Coordinator acts as final adjudicator for all campuses on decisions concerning whether an individual violated PM-73; however, this does not eliminate potential conflicts regarding the disciplinary action resulting from such violations.

**Recommendation:** Management should establish appropriate segregation of duties so that individuals designated as Title IX Campus Coordinators do not have additional job functions that would create the appearance of bias.  Potential conflicts may be further mitigated by strengthening appeals procedures, including adding information about the process and related contacts when communicating the outcome of the investigation.  DBG also suggests clarifying the process for conducting investigations, determining discipline/resolution, and hearing appeals as well as identify the campus officials or departments responsible for each.

PLAINTIFFS_000240



Office of Internal Audit
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

Finally, management should implement a standard mechanism to record complaints received and track the disposition. This should allow for a method to document the date and method of delivery for the information or handouts that institutions are required to provide both the complainant and the respondent.

**Finding No. 2: Obligations of Responsible Employees**

Based on interviews and testing performed, it appears that additional procedures may be required to ensure "responsible employees" have been identified and understand their reporting obligations under Title IX. Related observations include the following:

- HSCNO: no allegations reported during the 18-month audit scope; a draft Memorandum of Understanding (MOU) has not been reported to local law enforcement; confidential advisors did not receive training related to their specific roles and responsibilities
- LSU-A: no allegations reported during the 18-month audit scope
- Confusion at multiple campuses regarding victim confidentiality when incidents are disclosed to an employee holding licenses that typically protect personal information
- Lack of coordination with LSU A&M police at due to interpretation of state statute

Institutions are required to take immediate and appropriate steps once they become aware of incidents of possible sexual misconduct. OCR deems a school to have notice if a responsible employee knew, or in the exercise of reasonable care should have known, about the misconduct. A "responsible employee" is one who has the authority to take action to redress sexual misconduct, who has been given the duty to report incidents of sexual misconduct to the Title IX Coordinator, or whom a student could reasonably believe has this authority or duty.

LSU's training materials specify that **all** employees have a responsibility to report a potential incident within 24 hours with the exception of privileged individuals (confidential advisors, victim advocates, mental health counselors, and clergy). However, the exemption does not extend to employees who maintain professional licenses affording the privilege of confidentiality when those individuals are not engaged in employment with the University in a capacity offering such privilege. For example, a Psychologist who is a professor and becomes aware of potential sexual misconduct after presenting a lecture and a Psychologist who becomes aware while providing support services at the Student Health Center would have different reporting obligations.

OCR also recommends entering into a MOU with local law enforcement regarding protocol for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. The MOU would be necessary since local law enforcement are not responsible employees of the University. LSU A&M Police Department (LSUPD) requires written consent from the victim before they will disclose information to the Title IX Campus Coordinator. The LSUPD Sexual Violence Confidentiality Notice and Waiver references Louisiana Revised Statute 46:1844, which prohibits publicly disclosing the identity of a victim who's been subjected to a sexual crime.

PLAINTIFFS_000241



Office of Internal Audit
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

However, it is unclear whether communicating this information to the Title IX Campus Coordinator would be considered public disclosure.

**Recommendation:** We recommend management ensure confidential advisors have been clearly identified and all employees understand the applicability for exceptions to sexual misconduct reporting obligations.  In addition, management should obtain guidance from the Louisiana Attorney General or otherwise seek legal counsel to determine the applicability of LA-RS 46:1844 to internal disclosures of sexual assault victims' identities related to Title IX compliance efforts.  Finally, management should present a MOU to local law enforcement in the New Orleans area regarding sexual violence incidents involving HSCNO students or employees.

### Finding No. 3: Education and Awareness

All campuses provided some Title IX training; however, we noted the following areas where training could be enhanced:

- Training is not available to students at LSUA
- Student training is only provided to freshmen at LSUS and HSCS
- Training at LSUE is only mandatory for students who are athletes, student workers, or living on campus
- Student training at LSU A&M does not contain suggested training content
- Training provided to LSU A&M employees is not monitored

**Recommendation:** Management should make training available to all students and confirm that it contains suggested content.  Campuses should consider providing targeted training to groups more likely to become aware of potential Title IX incidents (e.g. athletics, band, Greek life, student organizations, and residential advisors).  This may also include adding a clause to coaching contracts or student organization registration documents regarding compliance with reporting potential Title IX incidents to the Title IX Campus Coordinator.  The University should also explore learning management systems or other methods to efficiently monitor employee compliance with required annual training.  Additionally, DBG suggested reinstituting the Ombud's office as well as heightening awareness regarding the function of the office and availability to both students and employees.

### Finding No. 4: Policies/Procedures and Publications

Policies, procedures, and publications related to Title IX are not sufficient to meet institutional obligations outlined by OCR.  Our audit revealed the following issues, applicable to all campuses within the scope of review unless otherwise noted:

- The notice of non-discrimination was not included in all publications where such publication was required and/or did not contain the necessary elements
- Published contact information for Title IX Campus Coordinators is incomplete and/or not widely communicated (all campuses except LSU A&M)

PLAINTIFFS_000242



Office of Internal Audit
Louisiana State University
3810 West Lakeshore Drive • Suite 122 • Baton Rouge, LA 70808

1705 – Oversight and Prevention of
Sexual Misconduct (Multi-Campus)
September 13, 2017

- Campus Title IX websites were difficult to find through regular navigation or the use of keyword searches
- PM-73 meets the minimum requirements for grievance procedures but not all suggested areas are covered, such as conflicts of interest

The Department of Education requires institutions publish a notice of non-discrimination stating that they do not discriminate on the basis of sex in education programs or activities it operates, that they are required by Title IX not to discriminate in such a manner, and that questions may be referred to the Title IX Coordinator or to OCR. Notification must be distributed to applicants for admission or employment, students and parents or guardians, employees, and sources of referrals of applicants for admission or employment. The notice must be included in any bulletins, announcements, publications, catalogs, application forms, or recruitment materials. Additional statutes require issuing notices of non-discrimination; the elements from other regulations may be combined with Title IX to produce one collective notice. The notification must contain the name or title, address, phone number, and email of the Title IX Coordinator.

An assessment performed by DBG consultants revealed contradicting University employee and student policies and identified potential risks associated with unclear, inconsistent, or outdated reporting procedures and investigative processes. For example, PS-73 states that all complaints of sexual harassment must be reported to the Office of Human Resource Management, while PM-73 directs reporting to the Title IX Campus Coordinator or any other responsible person. Their report also identified the need to update the non-discrimination notice to reflect genetic information and color, as well as recommended policy language such as LSU's right to utilize an outside third-party investigator. Finally, DBG recognized the challenges associated with romantic or dating relationships in a work, educational, or athletic environment; the University currently does not have policy or guidelines in this area.

**Recommendation:** Management should remove or amend conflicting policies, handbooks, web-based information, and other guidance documents; ensure the non-discrimination notice is updated and included in all required publications; display a link to the respective campus' Title IX website on their homepage or other prominent location; and, verify contact information for Title IX Campus Coordinators is complete and easily located. In addition, management should evaluate PM-73 and determine whether revisions are necessary to reflect suggested guidelines. Management should also consider addressing, in policy, romantic or dating relationships between employees and students where the employee is in a position to exercise authority or supervision over the student.

Implementation of these recommendations will not only assist the University in complying with its obligations under Title IX, but will enhance community awareness and promote reporting of incidents of potential sexual misconduct.

PLAINTIFFS_000243



**DISTRIBUTION LIST**

F. King Alexander, President
Richard Koubek, Executive Vice President and Provost
Dan Layzell, Executive Vice President for Finance and Administration
Tom Skinner, Vice President and General Counsel
Larry Hollier, Health Sciences Center New Orleans Chancellor
G.E. Ghali, Health Sciences Center Shreveport Chancellor
William Richardson, Vice President for Agriculture
Donna Ryan, Pennington Biomedical Research Center Interim Executive Director
Kimberly Russell, LSU Eunice Chancellor
Lawrence Clark, LSU Shreveport Chancellor
Guiyou Huang, LSU Alexandria Chancellor
Jennie Stewart, LSU Title IX Coordinator
Chad Brackin, Chief Auditor

PLAINTIFFS_000244

APPENDIX A –
MANAGEMENT'S RESPONSE

PLAINTIFFS_000245



**University Administration**
*Office of Legal Affairs and General Counsel*

# Management Response to Internal Audit
## Prevention of Sex Based Discrimination (Multi-Campus)

**Finding Number 1 Recommendation:** Management should verify that investigators have been assigned and trained at each of the LSU campuses. The University may benefit from a pool of central investigators with liaisons at each campus. This would reduce training costs since participation is voluntary in addition to an employee's regular duties, and there is high turnover.

Management should establish appropriate segregation of duties so that individuals designated as Title IX Coordinators do not have additional job functions that would create the appearance of bias. Potential conflicts may be further mitigated by strengthening appeals procedures, including adding information about the process and related contacts to the notice of investigation outcome. DBG also suggests clarifying the process for conducting investigations, determining discipline/resolution, and hearing appeals as well as the campus officials or departments responsible for each.

Finally, management should implement a standard mechanism to record complaints received and track the disposition. This should allow for a method to document the date and method of delivery for the information or handouts that institutions are required to provide both the complainant and the respondent.

Management agrees,

- A centralized investigation model is integral to the success of the campuses. Currently a search is underway for a Lead Title IX Investigator who will join the campus in Spring 2018.
  **Responsible Personnel:** Title IX Coordinator
  **Implementation Date:** April 1, 2018

- TIX Coordinator review all appointments of TIX Campus Coordinators and to create a job description for TIX Campus Coordinators.
  **Responsible Personnel:** TIX Coordinator
  **Implementation Date:** July 1, 2018

PLAINTIFFS_000246

- A single electronic repository for TIX cases across all campuses is ideal. Due to the Student Data Modernization Project, full realization of the TIX e-file process may be delayed approximately two years.

  During this delay, the TIX Coordinator will disseminate to all campuses a single cover sheet for use in all TIX cases. This shall include date of incident, date of notice received and other essential case information.
  **Responsible Personnel:** TIX Coordinator
  **Implementation Date:** January 15, 2018

- Information on appeals shall be included on all PM-73 outcomes which include the name and contact information for the respective Campus Coordinator.
  **Responsible Personnel:** Campus Coordinators
  **Implementation Date:** February 1, 2018

**Finding Number 2 Recommendation:** We recommend management ensure confidential advisors have been clearly identified and all employees understand the applicability for exceptions to sexual misconduct reporting obligations. In addition, management should obtain a legal opinion to determine the applicability of LA-RS 46:1844 to internal disclosures of sexual assault victims' identities related to Title IX compliance efforts. Finally, management should present a MOU to local law enforcement in the New Orleans area regarding sexual violence incidents involving HSCNO students or employees.

**Management agrees,**

- To revise MOU's at all campuses with local law enforcement and the DA's Office as they are on a two year cycle of review.
  **Responsible Personnel:** Campus Coordinators on respective campus
  **Implementation Date:** June 1, 2018

- All Confidential Advisors have received the state created and required training as of October 16, 2017.
  **Responsible Personnel:** Campus Coordinators
  **Implementation Date:** Completed

- Work with LSU A&M HRM to consider the option of embedding language recognizing the privilege of employees whose employment duties and licensure afford a confidential privilege.
  **Responsible Personnel:** TIX Coordinator in conjunction with LSU A&M Deputy Coordinator for HRM
  **Implementation Date:** August 1, 2018

PLAINTIFFS_000247

**Responsible Personnel:** TIX Coordinator in conjunction with LSU A&M Deputy Coordinator for HRM
**Implementation Date:** August 1, 2018

- To pursue the question of whether LSUPD's sharing with the Title IX Coordinator constitutes a public disclosure. This questions relates to LSUPD's assertion that such sharing would be prohibited by LRS 46:1844
**Responsible Personnel:** Office of General Counsel
**Implementation Date:** March 1, 2018

**Finding Number 3 Recommendation:** Management should make training available to all students and confirm that it contains suggested content. Campuses should consider providing targeted training to groups more likely to become aware of potential Title IX incidents (e.g. athletics, band, Greek life, student organizations, and residential advisors). This may also include adding a clause to coaching contracts or student organization registration documents regarding compliance with reporting potential Title IX incidents to the Title IX Coordinator. The University should also explore learning management systems or other methods to efficiently monitor employee compliance with required annual training. Additionally, DBG suggested reinstituting the Ombud's office as well as heightening awareness regarding the function of the office and availability to both students and employees.

Management agrees,

- To review LSU A&M content in the training for students will be reviewed for required content.
**Responsible Personnel:** TIX Coordinator with Student Health Center personnel
**Implementation Date:** March 1, 2018

- LSUE and LSUA have hired a shared Campus Coordinator. Hiring of this position shall increase education, response and training within both communities. With increased education at LSUA, reports are expected to increase.
**Responsible Personnel:** TIX Coordinator and Chancellors
**Implementation Date:** Completed

- To review and revamp language included in the student organizational advisor agreement and training. The current advisor training process is being overhauled by new leadership in Campus Life.
**Responsible Personnel:** TIX Coordinator
**Implementation Date:** August 1, 2018

- With the need for a comprehensive learning management platform to track training, including that consistent with PM-73. However, given that this issue would be well outside the scope of TIX, an alternate option will be implemented.

PLAINTIFFS_000248

A quarterly sampling of employees will be done to ensure compliance with training requirements. Any results of non-compliance will be shared with supervisors.
**Responsible Personnel**: TIX Coordinator to oversee with implementation in HRM Training and Development
**Implementation Date:** June 1, 2018

- The position of Ombudsman should be reinstated. The search process is underway through General Counsel.
  **Responsible Personnel:** General Counsel
  **Implementation Date:** February 1, 2018

**Finding Number 4 Recommendation:** Management should remove or amend conflicting policies, handbooks, web-based information, and other guidance documents; ensure the non-discrimination notice is updated and included in all required publications; display a link to the respective campus' Title IX website on their homepage; and, verify contact information for Title IX Coordinators is complete and easily located. In addition, management should evaluate PM-73 and determine whether revisions are necessary to reflect suggested guidelines. Management should also consider addressing, in policy, romantic or dating relationships with students, especially when there is some level of authority, supervision, or influence.

Implementation of these recommendations will not only assist the University in complying with its obligations under Title IX, but will enhance community awareness and promote reporting of incidents of potential sexual misconduct.

**Management Agrees,**

- LSU TIX Coordinator has created a list of contacts to be notified of the need for addition of the LSU Non-Discrimination Statement in their materials. Implementation will take longer only because the statement must first be reviewed and revised.
  **Responsible Personnel:** TIX Coordinator
  **Implementation Date:** August 1, 2018

- LSU's Non-Discrimination Statement will be reviewed to ensure it reflects all required state and federal protected categories.
  **Responsible Personnel:** TIX Coordinator with General Counsel and Strategic Communications
  **Implementation Date:** March 1, 2018

- Reviews of PS and PM's related to sexual harassment and sexual misconduct will be reviewed and, if necessary, amended or rescinded.
  **Responsible Personnel:** TIX Coordinator in conjunction with Office of Academic Affairs
  **Implementation Date:** August 1, 2018

PLAINTIFFS_000249

- LSU TIC Coordinator will work with all Campus Coordinators to ensure a link on the home page, not embedded multiple clicks from home page.
  **Responsible Personnel**: TIX and Campus Coordinators
  **Implementation Date**: February 1, 2018

- General Counsel will commence consideration of a policy regarding consensual romantic relationships.
  **Responsible Personnel**: General Counsel
  **Implementation Date**: June 30, 2018

_____          12/5/17
Signature                                 Date

PLAINTIFFS_000250

# Exhibit C
# Coaches and Staff
# Acknowledgment Form

PLAINTIFFS_000251

10. During your employment or affiliation, did you understand the University's policies and reporting procedures/grievance procedures?

11. Any additional comments?

**APPENDIX D**

**HUMAN RELATIONS RISK MANAGEMENT TRAINING:**
**COACHES AND STAFF ACKNOWLEDGEMENT FORM**

I attended the Human Relations Risk Management Training program in [DATE HERE] as facilitated by [TRAINERS HERE] of [TRAINERS' ORGANIZATION HERE] for the Louisiana State University Athletics Department ("Athletics Department"). I understand that harassment, discrimination, retaliation, bullying, hazing and other misconduct is prohibited by the University and will not be tolerated. I understand that those found to have committed misconduct will be disciplined.

Should any employee observe or be personally subjected to harassment, discrimination, retaliation, bullying, hazing and other misconduct, the Athletics Department and University offer multiple avenues of internal complaint as provided during training. Employees are not required to confront the persons who are the source of the complaint or closely associated with the persons who are the source of the complaint, but have a responsibility to inform an uninvolved member of the Athletics Department or University administration, or otherwise utilize available avenues of reporting, so prompt action may be taken to stop misconduct and prevent future occurrences. Anyone named in a

PLAINTIFFS_000252

complaint will not be part of the investigative team.  The Athletics Department and the University also may utilize an outside third-party investigator to help resolve allegations of harassment, discrimination, retaliation, bullying, hazing and other misconduct.

The University does not tolerate retaliation against those making good faith allegations of misconduct or those participating in a corresponding investigation.  The University recognizes that making false, bad faith accusations can have serious consequences for those who are wrongly accused.  The University prohibits knowingly making false and/or malicious misconduct allegations, as well as deliberately providing false information during an investigation.


_____       _____

PRINTED – Name of Coach/Employee              Date


_____

SIGNATURE of Coach/Employee


_____

Sport or Department – Men's/Women's (if applicable)


## HUMAN RELATIONS RISK MANAGEMENT TRAINING:
## STUDENT-ATHLETE ACKNOWLEDGEMENT FORM

I attended the Human Relations Risk Management Training program in [DATE HERE] as facilitated by [TRAINERS HERE] of [TRAINERS' ORGANIZATION HERE] for the Louisiana State University Athletics Department ("Athletics Department").   I understand that harassment, discrimination, retaliation, bullying, hazing and other misconduct is prohibited by the University and will not be tolerated.  I understand that those found to have committed misconduct will be disciplined.

Should any student observe or be personally subjected to harassment, discrimination, retaliation, bullying, hazing and other misconduct (such as sexual misconduct), the Athletics Department and University offer multiple avenues of internal complaint as provided during training.  Student-athletes

PLAINTIFFS_000253

# Exhibit D
# Athletics Department
# Policies & Procedures

PLAINTIFFS_000254

**LOUISIANA STATE UNIVERSITY**

**ATHLETIC DEPARTMENT POLICIES AND PROCEDURES**

**Set forth below are policies and procedures that are applicable to LSU Athletic Department full-time and part-time employees as described.  Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.      LSU employees who have been issued an LSU phone may not use personal phones for business related purposes. This includes using a personal phone for telephone and text/email communication between employees and Athletic Department student employees.  All employees who have been issued an LSU phone shall declare all personal phones on the form entitled "List of All Telephones Owned or Used by Staff Member," attached to this statement.

2.      No coaches and/or medical staff may drink alcohol while traveling and representing LSU during team related events/functions.  Exceptions may be granted by the Athletics Director for extended trips that include special events.

3.      No employee will actively send/receive texts, emails or other electronic messages while driving student-athletes.

4.      In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified.  After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CP1-2) within five (5) days of filing the verbal report.  In addition, the employee will immediately notify LSU Police and the Director of Athletics.  All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement.  If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

5.      No athletics department employee's relative (including relatives by marriage) will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area. This includes student employees.

6.      All coaches and strength and conditioning employees who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

7.      Employees will report any personal arrests, DWI, felony, misdemeanors or other similar legal matters to his/her immediate administrative supervisor within 24 hours of occurrence.

8.      If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

9.      All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately.  Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing.  Student-athletes in travel status representing LSU must not consume alcohol and/or illicit drugs.  Violations of this standard must be reported immediately to Sr. Associate Athletics Director Student Services, Miriam Segar.

PLAINTIFFS_000255

10.     No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with Athletic Department student employees. Exceptions must be requested in writing and may only be approved by the Athletic Director.

11.     No employee shall have one-on-one personal meetings with an Athletic Department student employee, with the exception of the following persons: Senior Associate Athletics Director, Student Services; Senior Associate Athletics Director, Compliance; Compliance Director; and Human Resource Manager.

12.     No employee may hire an Athletic Department student employee, employed within his/her same department, to perform personal work (babysit, run errands) or work on non-LSU matters.

13.     Any employee, student employee, or volunteer who becomes aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar.

*I affirm that I have read, fully understand, and agree to comply with the policies and procedures set forth above, and that my failure to do so may be cause for LSU to take disciplinary or other appropriate employment action against me.*

*Name (Please Print):*

| *Signature:* | *Date:* |
| --- | --- |

PLAINTIFFS_000256

# Exhibit E
# Football Operations
# Policies & Procedures

PLAINTIFFS_000257

**LOUISIANA STATE UNIVERSITY**

*FOOTBALL OPERATIONS POLICIES AND PROCEDURES*

**Set forth below are policies and procedures that are applicable to LSU Football Operations full-time and part-time employees as described.  Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.     LSU employees who have been issued an LSU phone may not use personal phones for business-related purposes. This includes using a personal phone for telephone and text/email communication between employees and Athletic Department student employees.  All employees who have been issued an LSU phone shall declare all personal phones on the form entitled "List of All Telephones Owned or Used by Staff Member," attached to this statement.

2.     No coaches and/or medical staff may drink alcohol while traveling and representing LSU during team related events/functions.  Exceptions may be granted by the Athletics Director for extended trips that include special events.

3.     No employee will actively send/receive texts, emails or other electronic messages while driving student-athletes.

4.     In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified.  After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CP1-2) within five (5) days of filing the verbal report.  In addition, the employee will immediately notify LSU Police and the Director of Athletics.  All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement.  If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

5.     No athletics department employee's relative (including relatives by marriage) will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area.   This includes student employees.

6.     All coaches and strength and conditioning employees who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

7.     Employees will report any personal arrests, DWI, felony, misdemeanors or other similar legal matters to his/her immediate administrative supervisor within 24 hours of occurrence.

8.     If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

9.     All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately.  Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing.  Student-athletes in travel status representing LSU must not consume alcohol and/or illicit drugs.  Violations of this policy must be reported immediately to Sr. Associate Athletics Director Student Services, Miriam Segar.

PLAINTIFFS_000258

10.     No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with any student employees of Football Operations or the Athletic Department. Exceptions must be requested in writing and may only be approved by the Athletic Director.

11.     No employee shall have one-on-one personal meetings with an Athletic Department student employee, with the exception of the following persons: Senior Associate Athletics Director, Student Services; Senior Associate Athletics Director, Compliance; Compliance Director; and Human Resource Manager.

12.     No employee may hire a Football Operations student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

13.     Coaches/Assistant Coaches are prohibited from having one-on-one contact with student employees. This includes in-person meetings, text, social media, email, and phone calls with a student employee. Full time staff members are available to assist Coaches/Assistant Coaches.  If a Coach/Assistant Coach needs assistance from a student employee, this will be arranged through the student employee's supervisor, a full-time administrative staff member.  Coaches should not make any direct request of a student employee.

14.     Coaches/Assistant Coaches shall not exchange personal contact information with a student employee.

15.     Coaches/Assistant Coaches will have no direct or indirect role in hiring student employees or selecting student volunteers.

16.     Any employee, student employee, or volunteer who becomes aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar.

*I affirm that I have read, fully understand, and agree to comply with the policies and procedures set forth above, and that my failure to do so may be cause for LSU to take disciplinary or other appropriate employment action against me.*

*Name (Please Print):*

| *Signature:* | *Date:* |
| --- | --- |

PLAINTIFFS_000259

# Exhibit F
# Acknowledgment of
# Policies & Procedures
# Football Operations Staff

PLAINTIFFS_000260

LOUISIANA STATE UNIVERSITY

*ACKNOWLEDGEMENT OF POLICIES AND PROCEDURES*

*ALL FOOTBALL OPERATIONS STAFF*

**Set forth below are policies and procedures that are applicable to all LSU Football Operations full, part-time, and student employees.  Please review these policies and procedures and sign below, signifying your understanding and agreement to abide by these policies and procedures.**

1.      No personal phones may be used for business related purposes. This includes using a personal phone for telephone and text/email communication between any employee and student employees.

2.      No employee may drink alcohol while traveling and representing LSU during team related events/functions.

3.      In situations where an LSU employee becomes aware of possible neglect or abuse of a child, Mandatory Reporter Laws require immediate action. Louisiana Department of Children & Family Services at 1 (855) 453-5437 must be notified.  After making a verbal report of an incident, the employee must also provide written notification to the East Baton Rouge Parish Department of Children & Family Services (using DCF/CW Form CP1-2) within five (5) days of filing the verbal report.  In addition, the employee will immediately notify LSU Police, the Vice Chancellor and Director of Athletics.  All employees must make all reasonable efforts to ensure the safety of Minors participating in programs and activities covered by this Policy, including removal of Minors from dangerous or potentially dangerous situations, irrespective of any other limitation or requirement. If a situation is felt to present imminent danger to a Minor, LSU Police should be called immediately.

4.      No athletics department employee's relative will be employed in any position that reports directly to the employee or his/her department or immediate supervisory area. This includes student employees.

5.      All employees (including coaches) who conduct individual player workouts must be CPR certified. New employees who will perform these duties must obtain CPR certification as soon as possible after official hire. Employees who are not CPR certified are not allowed to conduct individual player workouts without a certified athletic trainer present.

6.      Report any personal arrests, DWI, misdemeanors or other similar legal matters to [ Sr. Associate Athletics Director Student Services, Miriam Segar, ] within 24 hours of occurrence. If an employee becomes aware that a student-athlete is arrested, engages in misconduct unbecoming of a student-athlete, is involved with any recruiting violations or participates in a hazing activity, it is imperative that Sr. Associate Athletics Director Student Services, Miriam Segar, is notified immediately but no later than 24 hours after the event occurs.

7.      All employees must report suspicions of illegal drug/alcohol abuse by student-athletes to Sr. Associate Athletics Director Student Services, Miriam Segar, immediately.  Student-athletes who attend an LSU event (practice, strength & conditioning, academic, etc.) or who are traveling representing LSU and are suspected of alcohol or illicit drug use must be withheld from activity and must immediately be referred for substance abuse testing.

8.      No employee may send personal texts, make personal phone calls, send personal email or use social media to communicate with student employees.

9.      No employee shall have one-on-one personal meetings with a student employee.  No coach or assistant coach may hire a student employee to perform personal work (babysit, run errands) or work on non-LSU matters.

PLAINTIFFS_000261

# Exhibit G
# Training Room Clarification
# Policy Addendum

PLAINTIFFS_000262

Training Room Clarification
Policy Addendum

In response to questions from training room staff about the recently distributed policies and procedures of the athletics department, this addendum will serve to clarify the expectation of the athletics department and is considered part of the policies and procedures.

The policies and procedures for the athletics department were reduced to writing to clarify the expectations for staff members to memorialize existing practices and to serve as a best practices document. The policies govern all athletic department employees in daily departmental operation.

In the training room there are two groups of LSU students: graduate assistants and LSU undergraduate students. The GA's receive an athletics scholarship for their services for work performed and the LSU undergraduate students generally are working/ volunteering as part of their undergraduate athletic training educational curriculum. The undergraduate students are not considered student employees. However, the policies and procedures do apply to the undergraduate students and GA's. The reason for inclusion in the policy is not predicated on where they are paid or not but rather if there is a reporting line that exists between student and staff member. Therefore they too are prohibited from providing personal work for athletic training staff members.

The policy prohibits consumption of alcohol while training/medical staff is in travel status only. All staff members are entitled to a private life and this policy is not applicable when the training staff member is not traveling with his/her respective team. The travel status clarification is important since in many instances the athletic trainer specifically/solely is responsible for providing medical care to student-athletes while our teams are in travel status.

It is understood that individuals cannot control what is received within their electronic transmissions including email and text messaging. The policy references send/receive to define the expectation that an active exchange of information should not be occurring while a staff member is driving.

Athletic training staff members do supervise and mentor students and so it is understandable that there will be occasions that as part of these activities, direct communication between undergraduate and graduate student and employee will exist. The exclusion of personal communication does not preclude the following types of interactions: conversations involving a response to an athletics situation, questions involving the academic curriculum, conversations regarding student performance and/or grades, information shared through public blogs and twitter, etc. All of these types of communication are viewed as work related exchanges, not personal interactions.

Personal exchanges between staff members and students should be extremely limited and should always be witnessed by another staff member. Documenting the interaction is very important and expected. When personal counseling may be indicated referrals should be made to the appropriate departmental and/or campus resources. On any occasion that personal interaction occurs, the staff member must bring the matter to the attention of Head Athletic Trainer, Jack Marucci.

653355.1

PLAINTIFFS_000263

# Exhibit H
# Student Employee
# Policies & Procedures

PLAINTIFFS_000264

## STUDENT EMPLOYEE POLICIES & PROCEDURES

Each department of the Athletic Department depends upon student employees and allocates work and special projects, according to the work schedule of the students.  The following policies and procedures are provided to ensure consistency in expectations of student employees among the various departments.  They are not intended to be all inclusive, but a basic guide outlining minimum standards.  Failure to adhere to the policies and procedures listed below may result in discipline up to and including suspension or termination.  Please review these policies and procedures and sign below signifying your understanding of and agreement to abide by them.

1.  Student schedules are established at the beginning of each semester with flexibility for exams, special projects, semester breaks, etc.  You are expected to inform your direct supervisor of needed time off as soon as you are aware of the necessity to allow time for rearranging workloads.

2.  If you will not be reporting for work you must contact your supervisor via a telephone call or e-mail.  It is not acceptable for you to miss work without reporting the absence.

3.  Each student will be trained for specific tasks relevant to the section to which they have been assigned.  When these tasks are completed, you are expected to "look for other work" within your section.

4.  Personal phone calls should be kept to a minimum.

5.  The core business hours of the Athletic Department are M-F, 8:00 am to 4:30 pm.  Work schedules should be designed during these hours unless there is a flex schedule in place in your division with adequate supervision.  If a work period exceeds five (5) hours, a 30-minute lunch (non-paid) must be taken.

6.  You must wear clothing suitable for an office environment.  Spandex, midriff shirts, short shorts/skirts, halter tops, swimsuit pieces, etc. shall NOT be worn.

7.  Duties assigned to student employees often involve running errands on or off campus.  If an errand requires you to drive a State vehicle (including golf carts) you must have a valid DA-2054 (Authorization and Driver History Form) on file with Property Management.  You are not allowed to drive your personal vehicles for business.

8.  Assigned duties may involve sensitive data or personal information (SSN's, salaries, etc.).  Such data should be kept strictly confidential.  Breach of confidentiality will lead to immediate termination.

9.  If you have a question about anything you are assigned to do, please ask!  There are many federal, state, university and NCAA regulations for which LSU is responsible.  It is important that you fully understand what you are doing.  Do not hesitate to ask questions.

647632.1

PLAINTIFFS_000265

10. You must attend all mandatory HR Educational Seminars during your employment as a student worker in the LSU Athletic Department.

11. You have a responsibility to report any suspected or known violations of LSU or NCAA policies to my supervisor and/or the Athletic Administration Compliance Office. Specifically:

> **You may not engage in sports wagering.  Sports wagering includes placing, accepting or soliciting a wager (on a staff member's or student-athlete's own behalf or on behalf of others) of any type with any individual or organization on any intercollegiate, amateur or professional team or contest.**

> **Examples of sports wagering include, but are not limited to, the use of a bookmaker or parlay card; Internet sports wagering; auctions in which bids are placed on teams, individuals or contests; and pools or fantasy leagues in which an entry fee is required and there is an opportunity to win a prize.**

> **You may not provide or arrange to have provided a benefit to a student-athlete or the student-athlete's friends or family without express permission from the athletics department.**

> **You may not provide improper academic assistance to a student-athlete.**

> **If you are found to have violated an NCAA/SEC rule or knowingly covered up the violation of an NCAA/SEC rule, you may be subject to discipline up to and including termination.**

NCAA rules violations are often committed without malicious intent.  Nevertheless, a violation reflects poorly on the Athletic Department.  Specifically, be mindful of violations such as gambling (office pools, bookies, competition, etc.) and extra benefits for student-athletes (equipment, discounts at stores, etc.)

The Athletic Department has a Compliance staff to assist with rules questions and all issues.  These persons are available to assist with obtaining information necessary to ensure compliance with all NCAA/SEC rules.

12. Do not send personal texts, make personal phone calls, send personal email or use social media to communicate with any coach/assistant coach or Athletic Department employee. Exceptions must be requested in writing and may only be approved by the Athletic Director or his designee.

13. You are prohibited from having one-on-one personal meetings with any coach/assistant coach or Athletic Department employee, with the exception of the following persons: Senior Associate Athletics Director, Student Services; Senior Associate Athletics Director, Compliance; Compliance Director; and Human Resource Manager.

647632.1

PLAINTIFFS_000266

14. No employee may hire an Athletic Department student employee, employed within his/her same department.  You are prohibited from performing personal work (babysit, run errands) or work on non-LSU matters for any Athletic Department employee in your department.

15. Your interaction with student athletes and prospective student athletes should be limited to Athletic Department business.  Do not give prospective student athletes/student athletes your personal contact information.  Further, you are prohibited from fraternizing with recruits.  This includes texting, personal phone calls, twitter, or use of social media to communicate with recruits.  You are obligated to comply with NCAA rules regarding recruiting.

16. If you become aware of a violation or potential violation of these policies and procedures shall immediately report the matter to Sr. Associate Athletics Director Student Services, Miriam Segar.

I have read the above guidelines and agree to abide by them.  The original will be filed in my personnel file.

_____       _____

Employee's Signature                                        Date

647632.1

PLAINTIFFS_000267

# Exhibit I
# Email from Joe Alleva
# to All Athletics Staff
# June 8, 2016

PLAINTIFFS_000268

**From:** Joseph Alleva <joealleva@lsu.edu>
**Sent:** Wednesday, June 08, 2016 4:23 PM
**To:** Blaine C Gautier <gautier@lsu.edu>; Ronald C Wheat <wheatrc@lsu.edu>; Dennis S Johnson <djohn81@lsu.edu>; Christopher D Kragthorpe <ckragt1@lsu.edu>; Eric J Mateos <emateo1@lsu.edu>; Edward C Blount <ebloun2@lsu.edu>; Leon D Wright <lwrig27@lsu.edu>; Keava C Soil-Cormier <ksoilc1@lsu.edu>; Brian J Squeglia <bsqueglia@lsu.edu>; Maria C Berthiaume <mberth8@lsu.edu>; Sean M Carter <scart41@lsu.edu>; Tesa E Johns <tjoh215@lsu.edu>; Casey E Kyriacopoulos <ckyria1@lsu.edu>; Jordan Pierce <jpier35@lsu.edu>; Kelsey Hounshell <khouns1@lsu.edu>; Donovan White <dwhit42@lsu.edu>; John T Michel <jmich16@lsu.edu>; Emily E Hairston <ehairs2@lsu.edu>; Al Pinkins <apinkins@lsu.edu>; Alan D Dunn <adunn@lsu.edu>; Alisha M Tolbert <atolbe3@lsu.edu>; Amanda M Adams <aadams@lsu.edu>; Amanda C Qubty <aqubty@lsu.edu>; Andrea L Tepe <tepeal@lsu.edu>; Andy Barker <abarker@lsu.edu>; Andrew L Cannizaro <acannizaro@lsu.edu>; Bennie J Brazell <bbraze2@lsu.edu>; Beth Torina <btorina@lsu.edu>; Blair Napolitano <blair@lsu.edu>; Bo Bahnsen <bbahnse@lsu.edu>; Bradley D Peveto <peveto@lsu.edu>; Brendan Suhr <bsuhr@lsu.edu>; Brian F Broussard <brouss@lsu.edu>; Brian G Lee <brianlee@lsu.edu>; Brian J Squeglia <bsqueglia@lsu.edu>; Brittany F Carvalhido <bfd1@lsu.edu>; C Kent Lowe <clowe@lsu.edu>; Carl Goody <cgoody@lsu.edu>; Charlene C Thomas <ctswin@lsu.edu>; Charles W Winstead <winstead@lsu.edu>; Charles S Leonard <coachl@lsu.edu>; Chase Kreitler <chasekreitler@lsu.edu>; Christopher D Kragthorpe <ckragt1@lsu.edu>; Christopher J Parent <cparen3@lsu.edu>; Clinton W Self <cself2@lsu.edu>; Clyde Verdin <cverdin@lsu.edu>; Tammye Y Lofton <tlofto1@lsu.edu>; Verge S Ausberry <vausbe1@lsu.edu>; Wanda T Carrier <wcarrie@lsu.edu>; Cory E Couture <ccouture@lsu.edu>; D D Breaux <ddbreaux@lsu.edu>; Dameyune V Craig <dcraig@lsu.edu>; Daniel A Nunes <dnunes1@lsu.edu>; Dave Aranda <daranda@lsu.edu>; Dave Geyer <dgeyer@lsu.edu>; David A Taylor <dataylor@lsu.edu>; Dean R Dingman <dd@lsu.edu>; Debbie Hensley <dhensley@lsu.edu>; Debbie Parris-Thymes <dparris@lsu.edu>; Dennis G Shaver <shaver@lsu.edu>; Derek D Calvert <dcalve2@lsu.edu>; Douglas J Shaffer <djshaffer@lsu.edu>; Douglas L Aucoin <daucoi3@lsu.edu>; Dreyfus R Milstead <dmilst1@lsu.edu>; Edward J Orgeron <eorgeron@lsu.edu>; Eduardo "Eddie" Nunez <enunez@lsu.edu>; Elise Evans <mevans@lsu.edu>; Emmett E David <edavid@lsu.edu>; Eric A Hummel <ehumme1@lsu.edu>; Ethan C Pheister <epheister@lsu.edu>; Florence L Williams <fwilli3@lsu.edu>; Fran Flory <frflory@lsu.edu>; Gregory E Stringfellow <gstring@lsu.edu>; Gwen Butler <gbutle3@lsu.edu>; Hannah E Roudebush <hroudebush@lsu.edu>; Hannah Turner <hturner@lsu.edu>; Howard Dobson <hdobson@lsu.edu>; J Kevin Wagner <jwagne2@lsu.edu>; Jabbar J Juluke <jjuluke@lsu.edu>; Jacob J Marucci <jmarucc@lsu.edu>; Jacqueline J McClendon <jmcclen@lsu.edu>; Jacob M Riedel <jriedel@lsu.edu>; James C Thomas <jthom29@lsu.edu>; James T Moffitt <jmoffi1@lsu.edu>; Jason Feirman <jfeirman@lsu.edu>; Jay Clark <jayclark@lsu.edu>; Jeffery P Grigus <jgrigu1@lsu.edu>; Jeff deVeer <jeff@lsu.edu>; Jeffrey G Brown <jbrow29@lsu.edu>; Jennifer Rodrigues <jrodrigues@lsu.edu>; Jenna L Hall <jennahall@lsu.edu>; Joseph H Stanek <jhstanek@lsu.edu>; John R Maher <jmaher@lsu.edu>; John E Schiebe <jschieb@lsu.edu>; John H Jones <johnnyjones@lsu.edu>; Joseph Alleva <alleva@lsu.edu>; Joseph E Robertson <jrobe51@lsu.edu>; Josh Pratt <jpratt7@tigers.lsu.edu>; Julia S Sell <jsell@lsu.edu>; Karen M Bahnsen <kbahnse@lsu.edu>; Katie Gerlach <kgerlach@lsu.edu>; Khadevis K Robinson <kd@lsu.edu>; Krystal B Faircloth <kbenne6@lsu.edu>; Lane M Director <laned@lsu.edu>; Latasha R Butts <tbutts@lsu.edu>; Laura K Whalen <lwhalen@lsu.edu>; Lauren T Reagan <lreagan@lsu.edu>; Les Miles <lem042@lsu.edu>; Lois E Stuckey <lstuck1@lsu.edu>; Louis V Bourgeois <lbour11@lsu.edu>; LSU Radio <lsuradio@lsu.edu>; LSUSports Webmaster <lsusports@lsu.edu>; Mallory A Mickus <mmickus@lsu.edu>; Mark J Lee <marklee@lsu.edu>; Mark R Ewing <mrewing@lsu.edu>; MaryJane Merrill <mmerrill@lsu.edu>; Micah I Gibbs <mgibbs7@lsu.edu>; Michael Bonnette <mbonnet@lsu.edu>; Michael B Harkness <mharkness@lsu.edu>; Michael Sell <msell@lsu.edu>; Michael W Henderson <mhende2@lsu.edu>;

Michelle S Collins <msandy1@lsu.edu>; Miriam F Segar <msegar@lsu.edu>; Morris B Carney <mo@lsu.edu>; Neal R Lamonica <nlamoni@lsu.edu>; Nikki Caldwell <ncaldwell@lsu.edu>; Nolan D Cain <nolancain@lsu.edu>; Pamela D LeBlanc <plebla1@lsu.edu>; Paul Mainieri <paulmainieri@lsu.edu>; PJ Odom <pjodom@lsu.edu>; Reginald K Miller <reggiemiller@lsu.edu>; Renee' Braud <rarbour@lsu.edu>; Richard S Dempsey <rdemps3@lsu.edu>; Ricky A Lefebvre <rlefebvre@lsu.edu>; Robert R Snyder <rsnyde3@lsu.edu>; Robert Kirby <robertkirby@lsu.edu>; Robert P Moore <rmoore6@lsu.edu>; Ronnie M Haliburton <rhalibu@lsu.edu>; Russell L Brock <rlbrock@lsu.edu>; Samuel J Nader <snader@lsu.edu>; Shaeeta K Williams <shawilliams@lsu.edu>; Sharon L Lewis <smangum@lsu.edu>; Shawn Eddy <reddy1@lsu.edu>; Shelly Mullenix <smulle1@lsu.edu>; Spencer L Farley <sfarley@lsu.edu>; Stephen B Franz <sfranz2@lsu.edu>; Stephen A Mellor <stevemellor@lsu.edu>; Steven C Ensminger <sensminger@lsu.edu>; Tamara A Davis <tdavi18@lsu.edu>; Taylor R Jacobs <tjacobs@lsu.edu>; Terrance L Bold <tbold1@lsu.edu>; Timothy M Messa <tmessa@lsu.edu>; Todd W Jeansonne <tjeans2@lsu.edu>; Travis M Roy <troy1@lsu.edu>; Virginia R Robertson <vrobert@lsu.edu>; Wanda L Babin <wbabin@lsu.edu>; Wayne R Morris <wmorris1@lsu.edu>; Wendy Carpenter <wcarpen@lsu.edu>; Wendy G Nall <wnall@lsu.edu>; Will C Wright <wwright@lsu.edu>; William A Stafford <wstaff2@lsu.edu>; William P Franques <wfranqu@lsu.edu>; Abram R Dotson <adotson@lsu.edu>; Alex Barras <abarra4@lsu.edu>; Alexis J Rather <arathe1@lsu.edu>; Alfred E Bell <alfredbell@lsu.edu>; Alicia English <aenglish@lsu.edu>; Anita F Davis <adavi32@lsu.edu>; Ashlynne J Johnson <ajoh187@lsu.edu>; Ben Iannacchione <bianna1@tigers.lsu.edu>; Blaine C Gautier <gautier@lsu.edu>; Braden C Miller <bmill57@lsu.edu>; Byron K Weathers <byronw@lsu.edu>; Calvin Scott <cscot3@lsu.edu>; Malcolm G Cameron <camcameron@lsu.edu>; Chad D Hebert <chebert1@lsu.edu>; Charles V Baglio <cbags10@lsu.edu>; Chase P Contine <ccontine@lsu.edu>; Corey Raymond <craymond@lsu.edu>; Danny Bryan <jbrya12@lsu.edu>; Deborah C Ferdinand <dferdi1@lsu.edu>; Derek Yush <dyush@lsu.edu>; David E Griffing <dgriffing@lsu.edu>; Dorothy Chissell <dchiss1@lsu.edu>; Dorvin T Georgetown <dgeorgetown@lsu.edu>; Earl J Chevalier <echeva1@lsu.edu>; Eddie W Tolbert <etolbe2@lsu.edu>; Emily V Dixon <emily@lsu.edu>; Eric Donoval <edonov2@lsu.edu>; Eric M Pearson <epearson@lsu.edu>; Ferrell G Shillings <fgs1@lsu.edu>; Frank H Jones <fjones4@lsu.edu>; Gabrielle Dixon <gabrielledixon@lsu.edu>; Garrett S Runion <grunion@lsu.edu>; Garrett J Thibodeaux <gthibodeaux@lsu.edu>; Hunter B Geisman <hgeism1@lsu.edu>; Hunter S Sexton <hsexto1@lsu.edu>; Jake Terry <jterry9@lsu.edu>; Ja'Kouri D Brown <jakouribrown@lsu.edu>; James Mitchell <jmitch@lsu.edu>; James R Weathers <jammie@lsu.edu>; Jeana F Kempe <jfuccillo@lsu.edu>; Jeffrey D Grimes <grimey@lsu.edu>; Jeffrey C Gray <jeffreygray@lsu.edu>; Jennifer Chow <jchow@lsu.edu>; Jermaine Johnson <jermainejohnson@lsu.edu>; Jill L Wilson <jwilson1@lsu.edu>; John Brower <jbrower@lsu.edu>; Jon M Pfeifer <jpfeif3@lsu.edu>; Jonathan Wessinger <jwessi1@lsu.edu>; Jordan Jackson <jordanjackson@lsu.edu>; Julie Cribbs <jcribbs@lsu.edu>; Alfonso J Lockett <jlockett@lsu.edu>; Kathleen M O'Brien <kobrien@lsu.edu>; Katie A Copeland <copeland@lsu.edu>; Keava C Soil-Cormier <ksoilc1@lsu.edu>; Kelly J Willie <kwilli5@lsu.edu>; Kewan Carey <kcarey@lsu.edu>; Kristen H Cain <khobbs2@lsu.edu>; Laura C Lamberth <llamberth@lsu.edu>; Lauren C Silvio <lsilvi4@lsu.edu>; Leo P Richard <leorichard@lsu.edu>; Leroy Williams <lwilli1@lsu.edu>; Lindsay K Leftwich <lleftwich@lsu.edu>; Mark A Honore <mhonore@lsu.edu>; Mathew Shanklin <shanklin@lsu.edu>; Matthew D Jakoubek <mjakoubek@lsu.edu>; Matthew N LaBorde <mlabor5@lsu.edu>; Melissa M Seal <melmoore@lsu.edu>; Nicholas D Williams <nwilliams@lsu.edu>; Pamela V Workman <pworkman@lsu.edu>; Pauline L Zernott <pzernott@lsu.edu>; Quinlan Duhon <quinlan@lsu.edu>; Quinten K Lynn <qlynn@lsu.edu>; Reynard T Green <reynardgreen@lsu.edu>; Ricky Hartford <rhartf2@lsu.edu>; Robert L Shavers <rshave1@lsu.edu>; Rodney Ballard <rballard@lsu.edu>; Rodney R Glynn <rglynn2@lsu.edu>; Ronald C Wheat <wheatrc@lsu.edu>; Shalini M Gogawale <smg@lsu.edu>; SherDedrick Bullitts <sbulli2@lsu.edu>; Steven J Kragthorpe <skragthorpe@lsu.edu>; Sumonn B Morgan

<smorg13@lsu.edu>; Terri Poleman <tpoleman@shorttravel.com>; Todd Lane <toddlane@lsu.edu>; Tracy A Price <tprice9@lsu.edu>; Zach Kendrick <zkendr1@lsu.edu>
**Subject:** IMPORTANT - LSU Policies & Procedures Reminder

In light of recent national events, I want to remind our coaches and staff the importance of immediately and fully reporting all issues of sexual harassment, misconduct or sexual assault of which you are or become aware.

As we have discussed many times in staff and other meetings, as a university employee, it is your responsibility to report any potential issues of which you are aware. I want to stress that you as a staff member absolutely should **not** attempt to conduct any investigation or make any determination regarding alleged, reported or suspected misconduct. Instead, you are required to report all potential issues so that they are properly addressed by trained university officials.  Please report these issues to either Miriam Segar, Sr. Associate Athletics Director Student Services or Wendy Nall, Assistant Athletics Director HR. Both of these individuals have been trained in Title IX law and university protocol for investigation and can help facilitate the proper reporting that is required by law and University policy.

The link below provides additional information about the applicable LSU policies and resources available.

http://www.lsu.edu/hrm/policies_and_procedures/Title_IX_item71081.php

Additionally, I want to remind you all that a coach or athletic department staff member should not interfere with any university investigation, academic investigation or disciplinary process. In order to prevent the presumption of undue influence, coaches and sport specific staff members should not converse or communicate in any manner with university officials, professors or other university staff members regarding cases involving student-athletes, unless directed to as part of a formal University or law enforcement investigation. Please allow designated athletic, academic and university staff members to handle these issues.  If you have any questions about this directive, please contact me directly or, alternatively, contact Miriam Segar or Wendy Nall.

Joe Alleva
Vice Chancellor/Director of Athletics

PLAINTIFFS_000271

# Exhibit J
# Joe Alleva Memo to
# All Athletics Employees
# February 14, 2018

PLAINTIFFS_000272



**VICE CHANCELLOR AND DIRECTOR OF ATHLETICS**
Louisiana State University • Department of Athletics

February 14, 2018

LSU Athletics Staff,

I would like to remind all of you of your responsibility as a State employee to immediately report any knowledge you have of inappropriate conduct, sexual harassment or sexual assault. The University has trained investigators who will examine every issue or concern reported, in accordance with applicable laws.

Please notify Miriam Segar, Sr. Associate Athletics Director, of any such issue immediately so that the concern can be forwarded to the appropriate personnel on campus. If you prefer to report a concern directly, please report online through the LSU Cares website (www.lsu.edu/lsucares) or contact the LSU Police.

Note that Athletics will not directly investigate the concern, but will refer it for review by the appropriate University staff. The University has trained investigators who will review reported incidents. It is very important that any issue, even those seemingly small, are reported immediately. <u>Please don't try to investigate the claim or talk to any witnesses on your own.</u> Your only responsibility is to serve as a mandatory reporter and immediately communicate all credible information of which you become aware.

It is our responsibility to remain vigilant in reference to all student-athletes, employees and our fellow staff members and to mandate and promote an atmosphere of compliance with all state and federal reporting laws. Failure to report an issue will have serious ramifications for you personally, LSU Athletics and the University. As Athletics Director, I expect that everyone will positively contribute to our program and report all issues immediately.

Sincerely,

Joe Alleva
Vice Chancellor & Director of Athletics



PLAINTIFFS_000273

# Exhibit K
# President F. King Alexander's
# Presidential Charge

PLAINTIFFS_000274

**APPROVED**

*F. King Alexander* 8/30/16
F. King Alexander    Date
LSU President

## Task Force

### Presidential Charge

LSU is committed to providing a learning, working, and living environment that promotes integrity, *civility*, dignity, and respect for all members.  To achieve this goal and meet our institutional mission, we must create an environment free of discrimination on the basis of sex and sexual misconduct.  To develop and maintain this environment, we must consistently review and update our institutional policies and practices.

To ensure we foster environments that advance our institutional mission as it relates to Title IX of the Educational Amendments of 1972 and associated policies, I charge each campus with creating a Title IX Task Force, as per Section XVI in PM-73.  Each Task Force will be chaired or co-chaired by the campus Title IX Campus Coordinator (or designee of the Title IX Campus Coordinator in cooperation with the LSU Title IX Coordinator).   These campus-wide Task Forces will be comprised of students (on instructional campuses), faculty, and staff with subject-matter expertise on issues related to Title IX.

Each Task Force will be charged with and empowered to review our current policies, practices, and procedures as they relate to Title IX* and to provide recommendations to the President that reflect campus needs and are informed by nationally-recognized benchmarked practices.

 I charge each campus task force with the following:

1. Examine current education and prevention practices regarding sexual misconduct (sexual harassment, sexual assault, stalking, dating violence, domestic violence, retaliation, etc.);
2. Examine current support networks and services for victim/survivors of sexual misconduct;
3. Examine current practices surrounding PM-73;
4. Examine policies and practices surrounding pregnant and parenting community members (students and employees);
5. Examine policies and practices surrounding GLBTQ issues;
6. Examine any other related Title IX issues that arise as a result these task forces.*

* with the exclusion of sports equity

### Mission

The Task Force will ensure Louisiana State University's compliance with Title IX of the Education Amendments of 1972 and associated policies by making recommendations to the President on campus policy implementation and revision and adoption of nationally-recognized best practices.

### Timeline

Each Task Force shall submit a report to the President by July 1, 2017.  This report shall include any implemented changes, recommendations for change and identified needs to promote environments of integrity, civility, dignity and respect for all members.

# Exhibit L
# PM-73 and Related Policies
# Workgroup Report
# February 21, 2017

PLAINTIFFS_000276

# PM-73 and Related Policies Workgroup Report

**Draft, February 21, 2017**

**<u>Committee Members</u>**

Elizabeth R. Carter, Chair
Benjamin Cornwell
Noelle Davis
Endya Hash
Julie Henriquez
Sigrid Kelsey
Mandi Lopez
Jennifer Normand
Tracey Rizzuto

1

PLAINTIFFS_000277

# Table of Contents

**RECOMMENDATIONS RELATED TO PM-73 AND RELATED POLICIES/PROCEDURES**                3

**RECOMMENDATION 1:  COORDINATION OF POLICIES**                                              3
**RECOMMENDATION 2: CLARITY AND ACCESSIBILITY**                                              3
**RECOMMENDATION 3:  TERMINOLOGY USED IN PM-73**                                             4
**RECOMMENDATION 4: PM-73 AMNESTY POLICY**                                                   4
**RECOMMENDATION 5: RETALIATION**                                                            5
**RECOMMENDATION 6: MANDATORY REPORTING OBLIGATIONS**                                        6
**RECOMMENDATION 7: CONFIDENTIALITY**                                                        7
**RECOMMENDATION 8: CONFIDENTIAL ADVISORS**                                                  7
**RECOMMENDATION 9: CONFLICTS OF INTEREST**                                                  8
**RECOMMENDATION 10: DUE PROCESS CONCERNS**                                                  8
**RECOMMENDATION 11: INDEMNIFICATION**                                                       8
**RECOMMENDATION 12: ACT 172**                                                               9
**RECOMMENDATION 13: ACADEMIC FREEDOM**                                                      9
**RECOMMENDATION 14: TITLE IX COORDINATORS**                                                 10
**RECOMMENDATION 15: CONTINUATION OF WORKGROUP/TASKFORCE; SUGGESTIONS**                       11
**RECOMMENDATION 16: TITLE VI POLICY AND TITLE VII POLICY**                                   11
**RECOMMENDATION 17: OTHER ANTI-DISCRIMINATION POLICIES**                                     12

**APPENDIX 2: CLARITY AND ACCESSIBILITY**                                                    13

**APPENDIX 6: MANDATORY REPORTING OBLIGATIONS**                                              15

**APPENDIX 7: CONFIDENTIALITY**                                                              17

**APPENDIX 9: CONFLICTS OF INTEREST**                                                        18

**APPENDIX 12: ACT 172**                                                                     21

**APPENDIX 13: ACADEMIC FREEDOM**                                                            26

PLAINTIFFS_000278

## Recommendations Related to PM-73 and Related Policies/Procedures

### Recommendation 1:  Coordination of Policies

**Recommendation:** Ensure coordination of all LSU policies with PM-73. Ensure periodic review of all LSU policies to coordinate with periodic updates to PM-73.

**Rationale**: Many LSU policies address issues that are also addressed in PM-73. Often, those policies are inconsistent with PM-73. A process should be put in place to review and revise various LSU policies on a periodic basis to ensure coordination and consistency with PM-73. In particular, the following items should be reviewed on a periodic basis to ensure consistency: Faculty Handbook, PS-95, PS-104, and the Student Code of Conduct.

### Recommendation 2: Clarity and Accessibility

**Recommendation:** Take steps to enhance clarity and accessibility of LSU's policies, their interplay, and the complaint process.

**Rationale:** PM-73 is a fourteen-page document that is rather difficult to understand. To some extent, this is unavoidable. The workgroup noted that policies at other institutions face similar problems. Nonetheless, every effort should be made to enhance clarity and readability. Further, LSU should take additional steps to help members of the LSU community better understand their rights, responsibilities, and the various procedures relating to Title IX. The workgroup recommends implementing user-friendly approaches to help enhance clarity and accessibility.

In particular, the workgroup recommends the following steps:

- LSU policies should also advise parties of their rights under applicable state and federal law, and include links to appropriate websites (such as the EEOC and the Department of Education).

- LSU should employ flowcharts and similar imagery to more clearly illustrate the concepts covered by PM-73.

- LSU should have user-friendly guides for understanding the various types of complains and procedures that may arise under Title IX.

3

PLAINTIFFS_000279

- All of the foregoing should be available on LSU's website in a centralized and easily located place.

**Appendix 2** includes links to websites at other institutions that the workgroup found helpful. Without commenting on or endorsing the particular policy positions taken by these sources, the workgroup noted that these types of materials should be developed by and implemented at LSU.

## Recommendation 3:  Terminology Used in PM-73

**Recommendation:** Review and revise some of the definitions and other terms used in PM-73 to ensure clarity, consistency, and compliance with applicable law.

**Rationale**: The various definitions and other terms used in PM-73 should be carefully reviewed to ensure clarity, consistency, and compliance with applicable law. In particular, the workgroup identified the following issues:

- PM-73 makes reference to Louisiana's criminal laws. However, some laws (such as La. Rev. Stat. §14:89) referenced by PM-73 are clearly unconstitutional and should be carved out from the scope of PM-73. Similarly, the reference to La. Rev. Stat. §44:51 is confusing.

- PM-73 sets forth some time periods in terms of "business days." That term is not defined anywhere in PM-73 and could be susceptible of varying interpretations.

- The definition of "sexual assault" in PM-73 should be consolidated and revised. It is currently defined several different times.

- The definition of "sexual harassment" should be expanded to include harassment based on sexual orientation, gender expression, marital status, pregnancy/reproduction, and similar types of sexual harassment.

## Recommendation 4: PM-73 Amnesty Policy

4

PLAINTIFFS_000280

**Recommendation:** Expand the amnesty policy set forth in PM-73 (1) to be available to all members of the LSU community; (2) and to provide amnesty from a wider variety of possible offenses.

**Rationale**. The April 4, 2011 Dear Colleagues Letter encouraged schools to adopt amnesty policies to encourage reporting of sexual violence. The letter explained: "Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved." Similarly, the Louisiana Campus Accountability and Safety Act (La. Rev. Stat. 17:3399.11 *et seq.*) requires LSU to implement "an amnesty policy for any student who reports, in good faith, sexual violence to the institution." PM-73 currently includes an amnesty policy at p. 13 that seems consistent with this requirement. As written, PM-73 appears to expand the amnesty suggested by the Dear Colleagues Letter and by the Campus Accountability and Safety Act in several ways. The workgroup believes this is laudable on the part of LSU and makes two recommendations to further encourage reporting.

First, the amnesty policy should be expanded to include all members of the LSU community—not just students. PM-73 only contemplates amnesty with respect to "non-violent student conduct violations." Obviously, such language is insufficient to provide amnesty to faculty, staff, and other non-student members of the LSU community. The workgroup recommends expanding the scope of the amnesty to more clearly include all members of the LSU community.

Second, the amnesty policy should be expanded to more clearly include all types of non-violent violations (not just those relating to drinking or drug use). This recommendation is related to the first recommendation. As currently written, amnesty is limited to students who committed "a nonviolent student conduct violation, such as underage drinking, at or near the time of the complained incident." Many members of the LSU community are unlikely to be involved in underage drinking simply because they are over 21. They may, however, be hesitant to come forward because of other types of conduct violations that occurred near the time of the conduct. Such conduct violations might include issues of academic honesty/cheating, violations of computer usage/email policies, violations of the tobacco policies, or violations of policies prohibiting romantic relationships between students and faculty. The workgroup recommends expanding the scope of amnesty to more clearly include a wider variety of non-violent conduct issues.

**Recommendation 5: Retaliation**

5

**Recommendation**: Revise and expand the definition of "retaliation" as used in PM-73.

**Rationale.** PM-73 contains lengthy definitions and explanations for a number of the acts that it prohibits. Yet, PM-73 contains little explanation of what types of actions constitute retaliation. Parties are often afraid to come forward for fear of retaliation—particularly when the accused party is in a position of power or authority. PM-73 should better explain what types of acts constitute prohibited retaliation. The workgroup notes that the Department of Education and the EEOC have some excellent resources regarding retaliation.

## Recommendation 6: Mandatory Reporting Obligations

**Recommendation:** Better describe the reporting obligations of various members of the LSU community. Expand the persons excluded from "responsible person" to clearly apply to lawyers, doctors, and others in a legally recognized confidential relationship.

**Rationale.** PM-73 defines "responsible person" at p. 4 as "any employee who was the authority to take action to redress sexual violence or who has been given the duty of reporting incidents of sexual violence or any other misconduct prohibited by this policy…" On p. 7, PM-73 explains that "any responsible person who receives actual notice of a complaint" is to report such complaint to the Title IX coordinator. The language in these provisions is somewhat confusing and could be improved in several ways.

First, it is the workgroup's understanding that a "responsible person" means any LSU employee who is not specifically exempted from the definition. But, that interpretation is not necessarily clear from the language on p. 4.

Second, on p. 7, PM-73 requires a responsible person to make a report when he receives "actual notice of a complaint." That same paragraph then requires "any supervisor, or other responsibly party who witnesses or receives a report or complaint" to notify the Title IX coordinator. The language used is somewhat inconsistent and confusing. As a result there is a fair amount of confusion among members of the LSU community regarding their reporting obligations.

Third, PM-73 seems to exclude certain people from the definition of "responsible person." These exclusions are inconsistent and are too narrow. This should be revised. At p. 4, PM-73 says "Responsible Persons do not include victims' advocates, mental health counselors, or clergy."  At p. 7, the definition is slightly different. In any event, it should be made more clear that confidential advisors—as that term is used in the Louisiana Campus Accountability and Safety Act (La. Rev. Stat. 17:3399.11 *et seq.*)—are excluded from the mandatory reporting obligation. Additionally, PM-73 should make it more clear that lawyers, doctors, spouses, and other persons in a legally recognized confidential relationship with the complaining party may maintain confidentiality even though they might also be members of the LSU community.

PLAINTIFFS_000282

**Appendix 6** is an example of a flyer used by Cornell University to better explain reporting obligations to faculty. Without commenting on or endorsing the particular policy positions taken by this source, the workgroup noted that these types of materials should be developed by and implemented at LSU.

## Recommendation 7: Confidentiality

**Recommendation**: Clarify which persons/resources are permitted to receive confidential reports.

**Rationale**: This recommendation is related to Recommendation 6.  The workgroup learned that there is considerable confusion in the LSU community regarding who may receive a complaint confidentially. To encourage reporting, it is imperative that LSU make clear who may receive complaints confidentially, and who may not receive complaints confidentially. The Department of Education has emphasized the importance of making this issue clear on several occasions. The workgroup recommends clarifying who may receive confidential reports and making that information clear on the LSU website and relevant publications.

Confidentiality raises particularly thorny issues in some of the professional schools—such as the law school—where many faculty members are also subject to professional licensure. Some law school faculty, for example, feel quite strongly that deeming them to be "responsible persons" may often conflict with their professional obligations as attorneys. The workgroup recommends further discussing this issue with affected faculty members and developing policies that appropriately reflect the sometimes conflicting positions such faculty members are placed in.

**Appendix 7** includes a link to a sample confidentiality policy proposed by the White House Task Force as well as links to websites from other institutions that have clearly set forth who may (and who may not) receive a confidential report. Appendix 7 also contains some of the professional obligations that have given rise to concern among professional-school faculty. Without commenting on or endorsing the particular policy positions taken by these sources, the workgroup noted that these types of materials should be developed and or considered in revising and implementing PM-73.

## Recommendation 8: Confidential Advisors

**Recommendation:** Take steps to ensure that each campus and each program/school has at least one person designated as a "confidential advisor."

**Rationale**: The Louisiana Campus Accountability and Safety Act (La. Rev. Stat. 17:3399.11 *et seq.*) requires each institution to appoint an adequate number of confidential advisors. Confidential advisors are among the few people exempted from the mandatory reporting provisions of PM-73. In addition to appointing an adequate number of confidential advisors, as required by law, the workgroup also believes that it is important that confidential advisors be widely distributed across the LSU community to enhance accessibility. The

7

PLAINTIFFS_000283

workgroup recommends that each campus, program/school have at least one person who is designated as a confidential advisor. The workgroup further recommends that the identities and contact information for the various confidential advisors be included in a centralized location on the LSU website.

## Recommendation 9: Conflicts of Interest

**Recommendation:** Include appropriate language in PM-73 to address conflicts of interest of investigators and other parties.

**Rationale:** When an investigator or other party has an actual or perceived conflict of interest it undermines the integrity of the process and the appearance of fairness. The Department of Education has noted this concern on several occasions. The April 4, 2011 Dear Colleagues Letter emphasizes this point at follows: "Additionally, a school's investigation and hearing process cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact finder or decisions-maker and the parties should be disclosed." PM-73 should include a provision prohibiting parties with an actual or perceived conflict of interest from participating in investigations and other proceedings. Such a provision should address issues such as: (1) apparent or actual conflicts; (2) ability of either party to seek recusal in the event of a conflict of interest; and (3) the responsibility of persons with a conflict to disclose the conflict and to recuse themselves

**Appendix 9** contains some sample provisions from other institutions that address conflicts of interest. Without commenting on or endorsing the particular policy positions taken by these sources, the workgroup noted that a conflict of interest provision should be developed by and implemented at LSU.

## Recommendation 10: Due Process Concerns

**Recommendation:** Ensure that both PM-73 and its implementation are fair and equitable to both parties.

**Rationale.** Title IX requires schools to adopt "prompt and equitable" grievance procedures. In order for a procedure to be equitable, both parties must be afforded equivalent rights and opportunities. The workgroup received a number of anecdotal reports that vividly illustrated instances where there was a perceived or actual lack of fairness. LSU should continue to investigate and review this issue.

## Recommendation 11: Indemnification

8

PLAINTIFFS_000284

**Recommendation:** Revise PM-73 and related policies to make it clear that faculty/students/staff and other parties serving on hearing committees will be indemnified for their participation.

**Rationale.** Members of the LSU community, including students and faculty, are often called upon to serve on hearing panels, serve as confidential advisors, or otherwise participate in the implementation of PM-73. It is conceivable that they could face personal liability if a party is dissatisfied with the outcome of an investigation or hearing. The workgroup believes it is important for LSU to reasonably indemnify participants in such proceedings and to clearly delineate the scope and nature of such indemnification in writing.

## Recommendation 12: ACT 172

**Recommendation:** Review PM-73 and related policies to ensure compliance with Act 172 of the 2015 Legislative Session, including the Campus Accountability and Safety Act (La. Rev. Stat. 17:3399.11 *et seq.*).

**Rationale.** Act 172 of the 2015 Legislative Session sets forth a number of requirements that relate to PM-73. LSU appears to have already taken some steps to comply with the Act—yet some challenges remain. In particular, the workgroup notes the following concerns:

- ACT 172 requires LSU to adopt an inter-campus transfer policy. The workgroup was unable to locate any such document.

- ACT 172 requires LSU enter into a Memorandum of Understanding with law enforcement. The workgroup was unable to locate any such document.

- ACT 172 requires LSU to promulgate a Campus Security Policy. The workgroup was unable to locate any such document.

**Appendix 12** discusses the Act in more detail and some of the challenges the workgroup identified in LSU's current implementation of the Act.

## Recommendation 13: Academic Freedom

PLAINTIFFS_000285

Recommendation: Include a provision pertaining to academic freedom in PM-73.

Rationale. Academic freedom is central to LSU's educational purposes. Although PM-73 currently addresses the First Amendment—it does so in a brief and general manner. PM-73 ought to include a more specific statement relating to academic freedom. Moreover, PM-73 ought to reaffirm LSU's commitment to academic freedom and diversity of thought and expression.

Appendix 13 includes some sample similar provisions relative to academic freedom from other institutions. Without commenting on or endorsing the particular policy positions taken by these sources, the workgroup noted that a provision relating to academic freedom should be included in PM-73.

## Recommendation 14: Title IX Coordinators

Recommendation: Ensure that steps are taken to ensure that the Title IX coordinators maintain impartiality—such as appropriate job descriptions and avoiding conflicts of interests.

Rationale: The Department of Education has often emphasized the importance of Title IX Coordinators. For example, the April 24, 2015 Dear Colleague Letter explains that the Title IX coordinator should not have "other job responsibilities that may create a conflict of interest." The letter goes on to explain that: "For example, designating a disciplinary board member, general counsel, dean of students, superintendent, principal, or athletics directors as the Title IX coordinator may pose a conflict of interest." The workgroup identified several problems with LSU's current Title IX coordinator structure.

First, it is not immediately clear from the organizational charts available from the LSU website who the various Title IX coordinators report to. The organizational charts (and any related governing documents) should be revised to make it clear that the various Title IX coordinators do not have conflicting responsibilities.

Second, at least one Title IX coordinator's physical office is apparently located in the General Counsel's office. Even if that coordinator does not report to the general counsel— which would clearly be inappropriate—the physical location of the office may give rise to the appearance of a conflict of interest. The Title IX coordinators should have offices that are physically located in neutral and accessible locations on campus.

Third, at least two Title IX coordinators appear to have conflicting job responsibilities. LSU's website lists Maria Fuentes Martin as both the LSU Dean of Students and the Title IX Deputy Coordinator for Students—a conflict expressly contemplated by the 2015 Dear Colleague Letter. LSU's website also lists Gaston Reinoso as the Title IX Deputy Coordinator for Employees. It appears, however, that Mr. Reinoso may have other job responsibilities in the office of Human Resources Management that might conflict with his duty as Title IX coordinator.

10

PLAINTIFFS_000286

**Recommendation 15: Continuation of Workgroup/Taskforce; Suggestions**

**Recommendation**: The work of the Title IX Taskforce and its individual workgroups should continue on an ongoing basis. Contact information for the taskforce/workgroup members should be made available to the LSU community to that the taskforce/workgroups may continue to receive input from the LSU community on an ongoing basis.

**Rationale**: The workgroup believes that periodic review of PM-73 and other Title IX issues is essential. Moreover, the workgroup believes that additional issues may arise that ought to be thoughtfully considered by the Taskforce and appropriate workgroups. The workgroup recommends that the both the Taskforce and the appropriate workgroups be maintained on an ongoing basis for such periodic review and that their contact information be made available to the LSU community so that additional suggestions/concerns may be received and considered on an ongoing basis.

**Recommendation 16: Title VI Policy and Title VII Policy**

**Recommendation**: LSU should implement and revise policies and grievance procedures related to Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964. Such policies and procedures should be consistent with the Title IX policy.

**Rationale**. Title VI of the Civil Rights Act of 1964 makes it unlawful to discriminate on the basis of race, color, or national origin in federally funded education programs or activities. Unlike Title IX, Title VI does not specifically require schools to adopt and publish grievance procedures or appoint specific coordinators. However, the Department of Education's October 26, 2010 Dear Colleague letter has made it clear that "schools should have well-publicized policies prohibiting harassment and procedures for reporting and resolving complaints that will alert the school to incidents of harassment."

Title VII of the Civil Rights Act of 1964 prohibits discrimination against employees and prospective employees or applicants on the basis of race, color, national origin, religion, and sex. Title VII applies to public higher educational employers—like LSU—that have 15 or more employees. Although they are not necessarily required to do so, employers often provide their own internal grievance procedures to address employee claims. LSU has done so through PM-55 and other policies.

The workgroup notes that issues arising under Title IX sometimes also involve issues arising under Title VI and Title VII. The workgroup noted that it is currently unclear whether a case involving issues under both Title IX and one of the other statutes could be fully resolved through the current PM-73 process or whether a person would need to file multiple complaints

PLAINTIFFS_000287

and go through different processes for each—a result that seems absurd. The workgroup also notes that LSU's policies and procedures relating to Title VI and Title VII are likely in need of updating and revision and would benefit from the same type of attention given to Title IX. The workgroup recommends undergoing such a revision and ensuring that the various policies are consistent with each other and that cases involving more than one statute can be resolved in a single process, where appropriate.

## Recommendation 17: Other Anti-Discrimination Policies

**Recommendation**: LSU should implement and revise policies and grievance procedures related to other anti-discrimination legislation. To the extent possible, these policies and procedures should be consistent with the Title IX policy.

**Rationale**: This recommendation is related to Recommendation 16. The workgroup notes that, in addition to Title VI and Title VII, there are other anti-discrimination laws applicable to LSU. Furthermore, issues arising under Title VI, Title VII, and/or Title IX might also implicate issues arising under other anti-discrimination legislation. The workgroup believes that LSU's policies and procedures relating to other types of discrimination are likely in need of updating and revision and would benefit from the same type of attention given to Title IX. The workgroup recommends undergoing such a revision and ensuring that the various policies are consistent with each other and that cases involving more than one statute can be resolved in a single process, where appropriate.

In particular, the workgroup identified the following as items for consideration:

- Age Discrimination in Employment Act of 1967
- Americans with Disabilities Act of 1990
- Equal Employment Opportunity Act of 1972
- Equal Pay Act of 1963
- Genetic Information Nondiscrimination Act of 2008
- Pregnancy Discrimination Act of 1978

12

PLAINTIFFS_000288

## Appendix 2: Clarity and Accessibility

**Links and References to Applicable State and Federal Law**

A number of institutions include links and references to applicable state and federal law. Both the EEOC and the Department of Education have promulgated a number of user-friendly guides. The following are some examples.

- **Auburn University**
    - Links to relevant state laws: http://auburn.edu/administration/aaeeo/title-ix/policies_terms/campus.html

- **Iowa State University**
    - Numerous links to outside sources: http://www.eoc.iastate.edu/november-30th---title-ix-coordinator

- **Tulane University**
    - Numerous links to outside sources: https://www2.tulane.edu/equity/title-ix-sexual-violence-2014.cfm

**Use of Flowcharts**

A number of institutions have promulgated user-friendly flowcharts and similar devices to better illustrate their Title IX policies. The following are some examples:

- **Auburn University**
    - Flowchart illustrating investigative process: http://www.auburn.edu/administration/aaeeo/title-ix/process_flowchart.pdf

- **Colorado State University**
    - Flowchart illustrating investigative process: http://www.supportandsafety.colostate.edu/process

- **Emory University**
    - Flowchart illustrating investigative process: http://sexualmisconductresources.emory.edu/what_to_know/flowchart.html

PLAINTIFFS_000289

**Q & A or FAQ Sections**

A number of institutions have promulgated user-friendly Q&A or FAQ sections relevant to various aspects of their Title IX policies. The following are some examples:

- **Auburn University**
    - Multiple FAQ sections, including this one for employees: http://auburn.edu/administration/aaeeo/title-ix/faq/employees.html
    - And this one about the disciplinary process: http://auburn.edu/administration/aaeeo/title-ix/faq/disciplinary.html

- **Mississippi State**
    - FAQ Section: https://www.oci.msstate.edu/focus-areas/title-ix-sexual-misconduct/faq/

- **Purdue University**
    - Compliance Guide for Mandatory Reporters includes both Q&A section and a flowchart: http://www.purdue.edu/titleix/complianceGuide/index.html

**Other Guides/Resources**

- **University of Alabama**
    - Has a guide outlining what to do and who to contact after an incident of sexual assault: https://eoo.uga.edu/focus-on/what-do-if-you-or-someone-you-know-has-been-sexually-assaulted

- **Tulane University**
    - Has a guide outlining what to do and who to contact after an incident of sexual violence. http://www.titleix.tulane.edu/get-help-now/

14

PLAINTIFFS_000290

## Appendix 6: Mandatory Reporting Obligations

(*available at*: http://titleix.cornell.edu/reporting/staff-and-faculty-duty-to-consult/ )

### STAFF AND FACULTY DUTY TO CONSULT

# Office of the Title IX Coordinator

150 Day Hall, Ithaca, New York 14853

Email: titleix@cornell.edu; Phone: 607.255.2242; Web: titleix.cornell.edu

Consult Online: biasconcerns.cornell.edu (online report form)



**What is the Duty to Consult?**

- It is University policy that Cornell faculty and staff, (with important confidential exceptions) are required to consult with the Title IX Coordinator or a Deputy Title IX Coordinator when they become aware of an alleged incident that if true might be prohibited conduct under Policy 6.4 involving a student.
- Be prepared with the name, date, time, location, and description of incident (if known).

[ See Cornell University, Policy 6.4 ]

Cornell University is committed to providing a safe and nondiscriminatory environment for all members of the Cornell community. Cornell University will not tolerate gender-based harassment, sexual harassment, sexual assault, domestic and dating violence, stalking, sexual exploitation, or other forms of sexual misconduct committed by or against students, staff, or faculty.

We share the responsibility for creating a safer, more caring campus culture in which bias, harassment, and violence have no place—and every member of our community is free to flourish. Cornell University complies with applicable state and federal statutes, including Title IX of the federal Higher Education Amendment of 1972, which prohibits discrimination on the basis of sex in any education program or activity receiving federal financial aid. Sexual assault and sexual harassment are forms of sex discrimination prohibited by Title IX.

**Prohibited Student Conduct:**
- Dating Violence
- Domestic Violence
- Sexual Assault
- Sexual Exploitation
- Sexual Harassment
- Gender-Based Harassment
- Stalking
- Retaliation

**Confidential Resources:**
- Gannett Health Services
- Faculty and Staff Assistance Program
- Cornell United Religious Work Chaplains
- Cornell Victim Advocates
- Director of Women's Resource Center
- Director of LGBT Resource Center
- University Ombudsman

**Office of the Title IX Coordinator**                                   Page 1 of 2

15

PLAINTIFFS_000291

**What Happens When You Consult with the Title IX Coordinator?**

- Written explanation of student rights, options, and the process.
  - o Care & Concern Email from the Title IX Coordinator
  - o Informational meeting (if they choose)
- Assistance accessing services and accommodations:
  - o Counselling, advocacy, or medical services
  - o Academic support and accommodations (class schedules)
  - o Job assignments and accommodations (work schedules)
  - o Campus housing
  - o Escort and transportation services
- Protective measures including:
  - o "No-contact" orders
  - o Temporary suspension (if a formal complaint occurs)

**What Does Not Happen?**

When staff or faculty consult with the Title IX Office, it does not trigger:

- A report to the Police
- Contact with Parents, Coaches, Advisors etc.
- A Formal Complaint or Notice to any other Party

We strongly support a complainant's desire for confidentiality or decision not to pursue resolution under Policy 6.4.

If they decide not to file a complaint, the University will honor the request, as long as doing so does not impact the University's ability to provide a safe and non-discriminatory environment.

**Best Practices if a Student Reports to You:**

- Listen fully and allow for silence; you don't have to talk every time they stop talking.
- Ask how you can help.
- Remind the student that the incident is NOT their fault.
- Work with the Title IX Coordinator to connect students to resources they may need immediately for their health and safety and/or to preserve evidence, including medical assistance, counseling, or law enforcement.
- Support students in making decisions about whom to tell and how to proceed.
- Offer to accompany them in seeking medical care or counseling, or in contacting the police, but do NOT insist.
- Accept the wide range of feelings and experiences a student may have, including shock, denial, sleeplessness, intrusive memories or thoughts about the incident, inability to focus, and feelings of guilt, despair, depression, fear, anxiety, self-blame, and anger.



## If a Student Reports Prohibited Conduct to You, Tell the Student:

**Privacy:**

"All Cornell offices and employees who cannot guarantee confidentiality will maintain your privacy to the greatest extent possible. The information you provide to a nonconfidential resource will be relayed only as necessary for the Title IX Coordinator to investigate and/or seek a resolution."

**Your Rights Statement:**

"You have the right to make a report to Cornell University Police, local law enforcement, and/or state police or choose not to report; to report the incident to Cornell; to be protected by Cornell from retaliation for reporting an incident; and to receive assistance and resources from Cornell."

---

**Office of the Title IX Coordinator**

Page 2 of 2

PLAINTIFFS_000292

# Appendix 7: Confidentiality

**Sample Language for Reporting and Confidentially Disclosing Sexual Violence**:

- White House Task Force to Protect Students from Sexual Assault, April 2014: https://www.justice.gov/file/910281/download

**University Websites Explaining Who May Receive a Confidential Report:**

- **University of Alabama**:
    - https://eoo.uga.edu/sites/default/files/sar_resources_chart_1.pdf

- **University of Texas:**
    - https://titleix.utexas.edu/resources/

- **MIT**
    - https://titleix.mit.edu/resources/confidential

**Potentially Conflicting Professional Obligations**

- **Lawyers**: MRPC Rule 1.8: Duties to Prospective Client

    - http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_18_duties_of_prospective_client.html

PLAINTIFFS_000293

# Appendix 9: Conflicts of Interest

**Columbia Southern University**

(*available at*: http://www.columbiasouthern.edu/downloads/pdf/licensure/titleix.aspx )

*Under "Statement of Reporting Party's Rights"*

"The right to petition that any CSU representative in the process be recused on the basis of demonstrated bias or conflict-of-interest;"

*Under "Statement of Responding Party's Rights":*

"The right to petition that any CSU representative be recused from the resolution process on the basis of demonstrated bias and/or conflict-of-interest;"


**Macalester College**

(*available at:* http://www.macalester.edu/titleix/sexualmisconductpolicy/)

**This policy addresses conflicts of interest in a few places:**

1. *Responsibilities of the Title IX Coordinator include:*

   "Evaluating allegations of bias or conflict of interest relating to procedures outlined in the policy;"

2. *A Conflicts Section*

   "If a complainant or respondent has any concern that any individual acting for the College under this policy has a conflict of interest or bias, such concern should immediately be reported in writing to the Title IX Coordinator. Any concern regarding a conflict of interest or bias must be submitted within two (2) days after receiving notice of the person's involvement in the process. The Title IX Coordinator or the Title IX Coordinator's designee(s) will review the concerns and take appropriate steps to ensure that no conflicts of interest exist on the part of anyone investigating or resolving a complaint under this policy. If the Title IX Coordinator has a conflict of interest with respect to a complaint, the College's Dean of Students/Deputy Title IX Coordinator shall appoint an alternate person to oversee adherence to the Sexual Misconduct Policy with respect to the complaint at issue. If the Dean of Students/Deputy Title IX Coordinator is a party to the complaint or has a conflict of interest with respect to a complaint, the Associate Dean of Students/Deputy Title IX Coordinator shall ensure that the College

18

PLAINTIFFS_000294

puts in place appropriate safeguards under the circumstances to ensure that the institution promptly and equitably responds to the complaint, including, but not limited to, appointment of alternate individuals to oversee adherence to the Sexual Misconduct Policy."

3. *A section about the investigation*

### A. Investigation

The Title IX Coordinator or the Title IX Coordinator's designee(s) will designate one or more investigators. The College will ensure that the investigator(s) has received the appropriate training, and is impartial and free of any conflict of interest.  The parties shall receive written notice of the investigator(s) appointed.  If any party has a concern that the investigator(s) has a conflict of interest, the party should report the concern in writing as indicated in the "Conflicts" section above.

## University of Georgia

(*available at*: https://eoo.uga.edu/policies/sexual-misconduct-policy)

### 4.1.7.7 Recusal/Challenge for Bias

Any party may challenge the participation of any institution official or employee in the process on the grounds of personal bias by submitting a written statement to the institution's designee setting forth the basis for the challenge. The written challenge should be submitted within a reasonable time after the individual reasonably should have known of the existence of the bias. The institution's designee will determine whether to sustain or deny the challenge, and if sustained, the replacement to be appointed.

## University of Illinois Springfield

(*available at*: http://www.uis.edu/titleix/title-ix-sexual-misconduct-policy/)

### Section 9. Conflicts of Interest

Persons conducting functions pursuant to this policy must be free from conflicts of interest and bias for or against any party. UIS officials having a conflict of interest or bias in a particular case must recuse themselves from taking part in the complaint resolution process and notify the appropriate UIS or University of Illinois official so that a substitute can be designated. Similarly, either party to a complaint may request a substitution for an official with authority to make a finding or impose a sanction in their proceeding if the participation of the official poses a conflict of interest. See Appendix J.

For additional information on how certain conflicts of interest are resolved, see Appendix M.

PLAINTIFFS_000295

*Appendix M addresses what do to if the accused party is the Title IX Coordinator or the Chancellor.*

**Yeshiva University, Albert Einstein College of Medicine**

(*available at*: https://www.einstein.yu.edu/docs/administration/policies/non-discrimination-and-anti-harassment-policy.pdf)

If applicable, where a Panel Member is unable or unwilling to undertake the review of a complaint, for example because of a conflict of interest, the Title IX Coordinator will select another Panel Member. In addition, at the reasonable request of a party to the complaint (for example, because of a conflict of interest), the Title IX Coordinator will select another Panel Member or mediator (as applicable). Where acceptable to both parties, the Panel Member(s) involved may request that an additional Panel Member(s) and/or the Title IX Coordinator be present for the discussions.

PLAINTIFFS_000296

## Appendix 12: ACT 172

**Overview of the Act and Some Problems with its Current Implementation at LSU**

**I. REQUIREMENTS OF THE ACT**

ACT 172 of the 2015 Legislative Sessions is comprised of two parts. The first portion of the Act requires that, when funding is available, public postsecondary education institutions must administer an annual, anonymous sexual assault climate survey to the students.  Student participation must be voluntary, and students cannot face negative consequences for declining to participate. The Board of Regents develops the survey and the procedures for administration of the survey, and the Act suggests using a survey developed by the Center on Violence Against Women and Children at the Rutgers University School of Social Work as a model. The results of the survey must be in a written report submitted to the Governor and the Legislature, as well as published on the board's website.

The second portion of the Act is known as the Campus Accountability and Safety Act ("CASA"), and applies to public postsecondary education institutions that receive certain types of funding. The CASA has two main substantive parts: Coordination with local law enforcement, and campus security policy.

**A. Coordination with Law Enforcement**

The section regarding coordination with local law enforcement provides that each institution and all law enforcement agencies located with the parish of the institution must enter into a memorandum of understanding to clearly delineate responsibilities and share information. This memorandum must specifically include how to address sexually-oriented criminal offences occurring against students, but can encompass other crimes as well. The memorandum must be updated every two years. The memorandum must include: protocols of investigative responsibilities; standards for notification and communication and measures to promote evidence preservation; agreed-upon training for issues related to sexually-oriented criminal offenses; and methods of sharing general information in order to improve campus safety. Law enforcement agencies must include information on its police report regarding the status of victim as a student.

**B. Campus Security Policy**

The section regarding the campus security policy provides that the institution must establish uniform policies and best practices to address reporting sexually-oriented criminal offenses on campus, prevention of such crimes, and the medical and mental health required for victims. This includes confidential advisors, information on the institution's website, online reporting, an amnesty policy, training, and an inter-campus transfer policy.

21

PLAINTIFFS_000297

### 1. Confidential Advisors

The CASA mandates that institutions designate individuals to will serve as confidential advisors. These confidential advisors can be anyone, and the act suggests that health care staff, clergy, staff of a women's center, and any victim services organizations serve in these positions. Confidential advisors must be trained to address issues specific to sexually-oriented crimes, and the attorney general in collaboration with the Board of regents shall develop these online training materials in addition to the standard training.

The confidential advisor must be trained to inform the victim of seven things: (1) rights of the victim under federal and state law school policies, (2) victim's reporting options, including notifying the institution or notifying local law enforcement, (3) any reasonably foreseeable consequences of the various reporting options, (4) the investigation process and disciplinary process of the institution, (5) the investigation and adjudication process of local law enforcement, (6) the limited jurisdiction, scope, and sanctions of the school's disciplinary proceeding, (7) reasonable accommodations the institution may be able to provide, (8) information on the nearest medical facility to have a rape kit administered by a trained individual, as well as transportation and reimbursement information.

Confidential advisors can serve as an advocate for victim when the victim has been fully informed of the process for reporting and has requested the advisor act as advocate in writing. Confidential advisors must be authorized to be able to work with the institution to arrange reasonable accommodations, and accompany victims to interviews and campus proceedings. Confidential advisors must provide written information of victim's rights and institution's responsibilities regarding protective orders and advise the victim. Confidential advisors cannot be obligated to report crimes to the institution or law enforcement, and reasonable accommodations requested by a confidential advisor cannot trigger an investigation by the institution. Each institution must have an adequate number of confidential advisors based on its size.

### 2. Website

The LSU website must list seven things: (1) contact information for obtaining a confidential advisor, (2) reporting options for victims, (3) process of investigation and disciplinary proceedings, (4) process of investigation and adjudication of law enforcement, (5) potential reasonable accommodations, (6) contact information for hotlines, updated on a timely basis, and (7) the name and location of the nearest medical facility where a rape kit can be administered by a trained individual.

### 3. Online Reporting

Institutions are encouraged to provide anonymous online reporting system in order to collect patterns of crime on campus.

22

PLAINTIFFS_000298

### *4. Amnesty Policy*

The institution cannot sanction a student who reports in good faith any type of sexual violence. Furthermore, if a student is reporting in good faith, he or she cannot be sanctioned for related non-violent crimes such as underage drinking that may be revealed in the course of a report.

### *5. Training*

The Board of Regents, coordinating with the attorney general and victim services organization, must develop a program to train everyone who is involved in implementing these procedures, specifically those that will be interviewing witnesses or resolving complaints.

### *6. Inter-campus Transfer Policy*

The Board of Regents must require that institutions communicate with each other regarding the transfer of students that have been found in violation of sexually oriented criminal offenses. The Board must also require that institution withhold transcripts of students seeking a transfer during pending disciplinary action relative to sexually oriented offenses.

### LSU'S COMPLIANCE

Using PM-73 and the LSU website as references, this memorandum attempts to highlight the areas the workgroup identified as needing further attention by LSU.

### A. Memorandum of Understanding

A cursory internet search revealed no information regarding a memorandum of understanding ("MOU") between LSU and local law enforcement. This memorandum of understanding is a requirement of the Act and is mandated by PM-73. LSU is currently not in compliance if they have not entered into an MOU with local law enforcement.

LSU cannot be held liable if law enforcement refuses to enter into an MOU. Furthermore, the school could possibly have entered into an MOU that is not yet available to the public. If the school has entered into an MOU, then it should be made available to the public. In particular, the MOU may serve as a resource to confidential advisors—who are required to educate victims on their rights and the investigative processes. Doing this requires a complete knowledge of how the university and law enforcement intend to interact.

### B. Campus Security Policy

PLAINTIFFS_000299

Act 172 requires campuses to establish uniform policies and best practices to address reporting, prevention, and medical and mental heath resources for sexually oriented criminal offenses including confidential advisors, information on the institution's website, online reporting, an amnesty policy, training, and an inter-campus transfer policy. PM-73 and the LSU Website serve many of these purposes such as information on resources, online reporting, an amnesty policy, and inter-campus transfer policy. However, there is still no publication of best practices for addressing reporting and much of this information is difficult for survivors and advocates to understand. It is possible that the campus has trained the Lighthouse advocates on all of these issues and on the best practices, but it is not clear that there are uniform policies, and these practices are not made clear to the public. Advocates that may be working for local organizations or a victim that is hesitant to approach an advocate would have no way of knowing how these complaints are handled or the best way to report.

**C. Confidential Advisors**

PM-73 defines a confidential advisor in a way that seems to comply with CASA. PM-73 also provides that confidential advisors are allowed to accompany complainants to each phase of the investigation process. However, it is unclear who the confidential advisors are on this campus.

The remainder of CASA's imperatives for confidential advisors addresses the advisor's duties to inform victims and their training. This seems to fall outside of the scope of this workgroup.

The most problematic aspect of the confidential advisors is that CASA requires that they be able to request reasonable accommodations for the victims, and that the request for reasonable accommodations cannot trigger an investigation. It is unclear whether these victim's advocates listed by the Lighthouse have this ability. Further, PM-73 states that once a responsible person receives actual notice of a complaint they must notify the Title IX Coordinator and an investigation must begin. Victims advocates are not considered "responsible persons" who have an obligation to report, but it is difficult to see how these advocates are going to request reasonable accommodations without notifying another "responsible person" that there has been a violation. Therefore, it seems impossible to reconcile the provision of CASA, which is meant to provide protective measures for victims, with the provision of PM-73 that requires notifying the Title IX Coordinator.

PLAINTIFFS_000300

**D. Website**

CASA requires that the school website describe the process of investigation and disciplinary proceedings. While PM-73 and the Student Handbook are both posted to LSU's website, it is not stated anywhere on the Lighthouse page or another page a simple, understandable explanation of how the disciplinary proceedings are performed. CASA also requires the website to contain a description of the process of investigation and adjudication of law enforcement. This information also could not be found on the website.

The website did provide required information such as potential reasonable accommodations, contact information for hotlines, and information on how to find the name and location of the nearest medical facility where a rape kit can be administered by a trained individual. The main issue with LSU's website is that all of this information is spread out and difficult for anyone to actually find. Addressing all of these issues in a simple way in one location is best practice for victims, and LSU should not only be clearer about the disciplinary process, but also make that process and other information easy for victims to find.

**E. Training**

LSU has training procedures in place, but these procedures do not seem to be public. Although the Act does not explicitly require these procedures to be public, transparency may be enhanced if they are made public.

25

PLAINTIFFS_000301

## Appendix 13: Academic Freedom

The following provisions are sample provisions from other institutions relating to academic freedom that may be helpful in including such a provision in PM-73.

**University of Alabama:**

(*available at: http://titleix.ua.edu/sexual-misconduct-policy.html#academic%20freedom*)

In cases of alleged prohibited sexual misconduct, the protections of the First Amendment must be considered if issues of speech or artistic expression are involved. Free speech rights apply in the classroom and in all other educational programs and activities of public institutions, and First Amendment rights apply to the speech of students and employees.  Great care must be taken not to inhibit open discussion, academic debate, and expression of personal opinion, particularly in the classroom. Nonetheless, speech or conduct of a harassing, sexual, or hostile nature that occurs in the context of educational instruction may exceed the protections of academic freedom and constitute prohibited harassment if it meets the definition of sexual misconduct and (1) is reasonably regarded as non-professorial speech (i.e. advances a personal interest of the student or faculty member as opposed to furthering the learning process or legitimate objectives of the course), or (2) lacks an accepted pedagogical purpose or is not germane to the academic subject matter.

\*                        \*                        \*

In the event of any conflict, the Sexual Misconduct Policy found on the University's Title IX website will govern:

www.titleix.ua.edu/sexual-misconduct-policy.  The Sexual Misconduct Policy does not create a contract or quasi-contract between the University or any University employee and any individual that may be affected by the Policy.

**University of Georgia**

(*available at*: https://eoo.uga.edu/policies/non-discrimination-anti-harassment-policy)

The University is committed to protecting, maintaining and encouraging both freedom of expression and full academic freedom of inquiry, teaching, service, and research. Academic freedom and freedom of expression shall be strongly considered in investigating complaints and reports of discrimination or harassment, but academic freedom and freedom of expression will not excuse behavior that constitutes a violation of the law or this Policy.

26

PLAINTIFFS_000302

27

PLAINTIFFS_000303

# Exhibit M
# Title IX Structure and Needs
# Presentation

PLAINTIFFS_000304



**Title IX Structure and Needs**

PLAINTIFFS_000305



# Current Structure

Jennie

Alexandria | Eunice | HSC NO | Pennington | AgCenter | Shreveport | HSC S | Health Care Svcs | 2 Deputies

14 Investigators

*Most campuses our CC is also our investigator



PLAINTIFFS_000306

# 2015/16 By The Numbers

- 131 Investigations (all campuses)

Pennington, HCS 0

Alexandria, 1

HSC NO 1

AgCenter 2

Shreveport 7

HSC S 8

Eunice, A&M HSC 11

A&M SLE 88

A&M HRM 11





PLAINTIFFS_000307

# Current Numbers

- 131 cases (all campuses)
- 1,709.25 investigative staff hours = $41,087 (based on $50K salary)
  - 13.25 hours per case (very low estimate, area of risk)
- $22,500 add comp/year (Spring/Summer 16)
- $32,000 fall/spring 16/17
- $20K training per year
- $93,087 Total current dollar cost



PLAINTIFFS_000308

# What is holding us back?

- Specialists – regular and ongoing training
- Varying levels of training, skill and availability
  - Interview techniques, report writing
  - Serving the needs of our community
- Non-sustainable model
  - $20K training opportunity yielded poor retention (14/40)
    - 7 investigators for anticipated 90 cases (SLE and LSU A and M)
  - Mental stress and exhaustion (doing more than 1 job)
    - CC's on other campuses are also investigating
  - Emotional toll on our staff



PLAINTIFFS_000309

# Campus Comparison

- TX A&M — Rick (system), **campus** based TIX Coor and Investigator system. 8-12K is tipping point

- Baylor (all staff in TIX Office)  16,600 stu pop
  - Coor, Sr Deputy Coor, 1 Investigators, 1 Case Manager, Training and Prevention Spec, Admin Asst.. External Adj

- Texas Tech — (staff housed elsewhere)  35,900 stu pop
  - TIX Coor is OGS, 1 lead and 3 investigators (making pitch for 4th) housed in ODOS

- Kansas — Office of Institutional Opportunity and Access (all CR Complaints)  28,100
  - Director plus 3 investigators (making pitch for 4th)



# Campus Comparison

- Minnesota – Office of Equal Opportunity and AA 51,200 student pop
  - Reports to AVP, then VP, then President
  - 1 Director, 5 Associates (do investigation), Admin Asst
- Oklahoma – Instit Equity Office 37,000 (all campus student pop)
  - University Equal Opp and TIX Officer, Asst TIX Coor, TIX Investigator, Equity Investigator, Admin Asst (ALL CAMPUSES)
  - Each campus has a TIX Campus Coor
  - Shared investigative, centralized model



# Needs Analysis

- 1 for 8-12,000 (this is the number folks are finding as the standard, Rick Olshak, Scott Lewis)

- Enterprise need 5-6

- Housed in BR (1 lead, 4-5 investigators)

- Dispatched to campuses to work with Campus Coordinators, as needed

- Title IX Office – later may include other civil rights issues (ADA, especially)



# Risks/Benefits

- Ad hoc is a stop gap
- Continuity and consistency
  - Student and employee experience
  - Across campuses
- Specialists
- Best trained and best practiced
- Necessary time to dedicate
- Avoid potential costs
  - Litigation, damages, reputation costs, lost enrollment, media address, harm to folks who've chosen LSU

PLAINTIFFS_000313

# Proposed Structure

## Title IX Coordinator

### Campus Coor dinators

Investigation Logistics

Awareness of Process, Guidance

Service to Campus Community

Education

Compliance

### Lead Investigator

Investigators

Content, Interview, Report

Outcome and Adjudication

Specialists in their area



PLAINTIFFS_000314

# Proposed Structure and Investment

- 1 lead investigator $65,000  (first hire)
- 4/5 investigators  (@$50 each, range $45-55K) $200-250,000
- Initial Training $4k/investigator $20,000
- Travel (for investigation) $10,000 (high estimate)
- 2 Grad assistants  (@ $1,700/mo/10 mos)  $34,000
  - Training, education and outreach
  - Data Collection, Data Analysis and Research (benchmarking, case law)

- Total Minimum Request $329,000

- Other costs – ongoing training (webinars, seminars)



# Timeline

- Lead ( Early Spring 2017)

- Investigators (Later Spring 2017)

- Summer 2017 ATIXA campus based training
  - Investigators and CC partners
  - CC's
  - Adjudicators (Panels, Conduct Folks, HRM Folks)
- Fall 2017 implementation of new model (Coincides with implementation of Task Force recommendations)
- Fall 2018 data available for professional investigator model
- Fall 2019 possible move to oversee all civil rights issues (adding ADA)



PLAINTIFFS_000316

# Exhibit N
# Outcomes Guide

PLAINTIFFS_000317

## 10. 1 Academic Misconduct – Undergraduate Students

**<u>All responsible students in this category will have a transcript notation for the duration of the probationary period</u>**
*If behavior is more aligned with ethics and decision making- assign Ethics and Decision Making video review or EDMC.*

|  |  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|---|
| A. | Collaboration | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or Ethics and Decision Making Video Review or EDMC* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| B. | Collusion | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or Ethics and Decision Making Video Review or EDMC* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| C. | Copying | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or Ethics and Decision Making Video Review or EDMC* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| D. | Failure to Follow Course Requirements | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic Moodle Module* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |

2020-21    **Cases may include mitigating or aggravating factors that will necessitate appropriate deviation from the outcomes guide**    1

PLAINTIFFS_000318

LSU | Student Advocacy & Accountability

| | | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|---|
| E. | False Information | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Ethics and Decision Making Video Review or EDMC | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| F. | Misrepresentation | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Ethics and Decision Making Video Review or EDMC | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| G. | Other Academic Misconduct | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or Ethics and Decision Making Video Review or EDMC* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| H. | Plagiarism | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or EDMC* OR Academic Assignment Resubmission | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |
| I. | Unauthorized Materials | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Zero on assignment (some cases, drop the overall letter grade by one letter)<br><br>Academic or Ethics and Decision Making Video Review EDMC* | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Zero on assignment **and** drop the overall letter grade by one letter<br><br>Commitment to Community Class | Deferred Suspension *until* graduation<br><br>Fail the course |

PLAINTIFFS_000319

**LSU** | Student Advocacy & Accountability

**10.1 Academic Misconduct- Graduate Students**

*All responsible students in this category will have a transcript notation for the duration of the probationary period*
*If behavior is more aligned with ethics and decision making- assign Ethics and Decision Making video review or EDMC.*

|  | 1st Violation | 2nd Violation |
|---|---|---|
| A. Collaboration | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| B. Collusion | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| C. Copying | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| D. Failure to Follow Course Requirements | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| E. False Information | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>EDMC | Suspension (minimum 2 semesters)<br><br>Fail the Course |

PLAINTIFFS_000320

**LSU | Student Advocacy & Accountability**

|  | 1st Violation | 2nd Violation |
|---|---|---|
| F. Misrepresentation | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>EDMC | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| G. Other Academic Misconduct | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| H. Plagiarism | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* OR Academic Assignment Resubmission | Suspension (minimum 2 semesters)<br><br>Fail the Course |
| I. Unauthorized Materials | Deferred Suspension (minimum 2 semesters)<br><br>Zero on assignment **and** drop overall letter grade by one letter<br><br>Academic or EDMC* | Suspension (minimum 2 semesters)<br><br>Fail the Course |

Drop of a letter grade means a full letter with the plus/minus grading (ex. Student earned B+ and the grade would be dropped to a C+)

2020-21          **Cases may include mitigating or aggravating factors that will necessitate appropriate deviation from the outcomes guide**          4

PLAINTIFFS_000321

**LSU** | Student Advocacy
& Accountability

**10.1 Academic Misconduct- Independent Distant Learning Students**

*No probationary status or educational activities are assigned due to the nature of the student's enrollment*

|  | 1st Violation (One Assignment) | 1st Violation (Two or More Assignments) | 2nd Violation |
|---|---|---|---|
| A. Collaboration<br>B. Collusion<br>C. Copying<br>D. Failure to Follow Course Requirements<br>E. Other Academic Misconduct<br>F. Misrepresentation<br>G. Other Academic Misconduct<br>H. Plagiarism<br>I. Unauthorized Materials | Zero on the assignment | Zero on the assignments **AND** drop overall letter grade by one letter | Zero in the class |

**10.2 Behavioral Misconduct**

**Section 10.2A- Alcohol**

*Students found responsible, under 21 in this section must be assigned a referral to SHC or Psych Services, unless discussed with your supervisor*

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Simple Possession &/or Consumption<br><br>Student Under the age of 21 | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Referral to LSU Health and Wellness- Alcohol Brief Intervention<br><br>Alcohol Survey<br><br>Ethics and Decision Making Video Review or EDMC | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Referral to LSU Psychological Services<br><br>LSU Commitment to Community Essay or Commitment to Community Class | Deferred Suspension *until* Graduation |

PLAINTIFFS_000322

**LSU | Student Advocacy & Accountability**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Simple Possession &/or Consumption<br><br>Student over the age of 21 | Disciplinary Probation w/o Restriction (2 semesters)<br><br>LSU Commitment to Community Essay or Ethics and Decision Making Video Review | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Referral to LSU Psychological Services<br><br>LSU Commitment to Community Essay or Commitment to Community Class | Deferred Suspension *until* Graduation |
| Endangering Consumption & excessive quantity of possession<br><br>Examples: DWI & DUI, Student transported or unresponsive; Common source Alcohol | Deferred Suspension (2 semesters)<br><br>Referral to LSU Psychological Services<br><br>Commitment to Community Class | Deferred Suspension until Graduation or Suspension<br><br>Full Substance Abuse Panel | Suspension |
| Distribution of Alcohol | Disciplinary Probation WITH Restriction (2 semesters)<br><br>EDMC | Deferred Suspension until Graduation<br><br>LSU Commitment to Community Essay or Commitment to Community Class | Suspension |

**10.2C- Coercive Behavior**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| An act by an individual or group, explicit or implicit condition for initiation/admission/affiliation/continued membership in group, w/ or w/o consent, could demean, disgrace, humiliate, or degrade a student, could result in extreme embarrassment or affect mental health or dignity, line-ups, scavenger hunts and personal servitude | Disciplinary Probation w/o or WITH Restriction (1-2 semesters)<br><br>Restitution (if applicable)<br><br>Letter to Future Self or LSU Commitment to Community Essay, SHC Healthy Relationships | Deferred Suspension or Suspension (2 semesters)<br><br>Referral to Health & Wellness/Mental Health/ Psychological Services, Restitution,<br><br>Commitment to Community Class | Suspension or Expulsion |

PLAINTIFFS_000323

**LSU** | Student Advocacy & Accountability

**10.2C- Complicity**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Attempting to Commit, Being Involved, Partnership, Implication, Manipulation | Disciplinary Probation w/o or WITH Restriction (1-2 semesters)<br><br>EDMC or LSU Commitment to Community Essay or Letter to Future Self | Disciplinary Probation WITH Restriction Deferred Suspension (1-2 semesters)<br><br>Commitment to Community Class or Letter to Future Self | Deferred Suspension *until* Graduation or Suspension |

**10.2D- Computer Misuse**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Unauthorized access, alteration of computer equipment, failing to comply with laws, license agreements, contracts governing software, using University computing resources for prohibited activities, or ANY VIOLATION OF LSU COMPUTER POLICIES | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>Deferred suspension of computer privileges<br><br>EDMC or Code of Student Conduct Policy Review or LSU Commitment to Community Essay | Disciplinary Probation WITH Restriction (1-2 semesters)<br><br>Denial/loss of computer privileges<br><br>Commitment to Community Class | Suspension |

**10.2E- Disorderly Conduct**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Impairs of interferes with orderly functions or processes of LSU | Disciplinary Probation w/o or WITH Restriction (1-2 semesters)<br><br>Restitution<br><br>Ethics and Decision Making Video Review or EDMC or LSU Commitment to Community Essay | Deferred Suspension or Suspension (2 semesters)<br><br>Referral to Health & Wellness/Mental Health/ Psychological Services<br><br>Restitution<br><br>Commitment to Community Class or Letter to Future Self | Suspension or Expulsion |

PLAINTIFFS_000324

**LSU** | **Student Advocacy & Accountability**

**Section 10.2F- Disruption/Obstruction**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Disruption of teaching, administration, etc. (see code)<br><br>Example: Disrupting the learning process | Disciplinary Probation w/o or WITH Restriction (2 semesters)<br><br>LSU Commitment to Community Essay or Ethics and Decision Making Video Review | Disciplinary Probation WITH Restriction or Deferred Suspension for (2 semesters or *until* Graduation) or Suspension<br><br>Referral to SHC/Mental Health/ Psychological Services<br><br>Commitment to Community Class | Suspension or Expulsion |

**Section 10.2G- Drugs**

   ***Students found responsible in this section must be assigned a referral to Psych Services\*, unless discussed with your supervisor!!***

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Possession/Paraphernalia &/or Use OR in the Presence of Possession/Use<br><br>**Sanctioning considerations for all violations include:**<br>• How the violation was committed<br>• The amount and nature of the drug(s) involved<br>• The level of knowledge and the intent of the student<br>• Prior disciplinary history of the student | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Marijuana Survey*<br><br>SHC 1st Time Marijuana Referral* or Referral to Psychological Services<br><br>Ethics and Decision Making Video Review or LSU Commitment to Community Essay or EDMC<br><br>* *if drug is marijuana* | Disciplinary Probation or Deferred Suspension (*until* Graduation) or Suspension<br><br>Referral Psychological Services<br><br>Commitment to Community Class or Letter to Future Self | Suspension or Expulsion |

PLAINTIFFS_000325

**LSU | Student Advocacy & Accountability**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Significant Levels of Possession/Paraphernalia &/or Use | Deferred Suspension (*until* Graduation)<br><br>Referral to Psychological Services<br><br>LSU Code of Student Conduct Essay or Commitment to Community Class | Suspension | Expulsion |
| Furnishing, distribution or manufacture | Suspension (2 semesters), Upon Return: Deferred Suspension (2 semesters)<br><br>Substance Abuse Assessment prior to return | Expulsion | N/A |

**Section 10.2H- Endangerment**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Physical Abuse, Threat, Force against self or others<br><br>Example: minor altercation, pushing, shoving, or threat of force | Disciplinary Probation WITH Restriction (2 semesters)<br><br>EDMC Moodle Module or LSU Commitment to Community Essay or Letter to Future Self<br><br>Referral to SHC for Healthy Relationships/Anger Mgmt. (if appropriate)<br><br>No Contact Directive | Deferred Suspension (2 semesters); followed by Disciplinary Probation WITH Restriction (2 semesters)<br><br>Commitment to Community Class<br><br>No Contact Directive, Loss of Violation to appropriate area if necessary | Suspension or Expulsion |
| Severe Physical Abuse, Threat, Force against self or others<br><br>Example: group altercation, group threat of force, hazing-like behavior | Deferred Suspension (2 semesters); followed by Disciplinary Probation WITH Restriction (2 semesters)<br><br>Commitment to Community Class<br><br>No Contact Directive | Suspension |  |

PLAINTIFFS_000326

**LSU | Student Advocacy & Accountability**

**Section 10.2I- Failure to Comply**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Defying the order of any University policy, contract, mandate or rule<br><br>Example: Non-compliance with University rule; Failure to appear in meeting when requested; Failure to complete outcome by given deadline | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>LSU Commitment to Community Essay or Ethics and Decision Making Video Review or LSU COVID Guidelines Moodle module | Disciplinary Probation WITH Restriction or Deferred Suspension (2 semesters)<br><br>Commitment to Community Class | Deferred Suspension (2 semesters) or Suspension (1-2) semesters |

**10.2J- False Information**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Providing false information to any University official<br><br>Example: Dishonest in administrative meeting; etc. | Disciplinary Probation WITH Restriction (2 semesters)<br><br>Ethics and Decision Making Video Review or EDMC | Deferred Suspension (2 semesters) or Suspension | Suspension |

**10.2K &N- Forgery & Identity Misuse**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Altering, Falsifying, misrepresenting documents | Disciplinary Probation WITH Restriction (1-2 Semesters)<br><br>Ethics and Decision Making Video Review or LSU Policy Review or EDMC | Deferred Suspension (2 semesters)<br><br>Commitment to Community Class | Suspension or Expulsion |
| ID Misuse<br><br>(ex: Football game entry, UREC entry, dining facilities) | Warning (2 semesters)<br><br>Identification Misuse Essay | Disciplinary Probation w/o or WITH Restriction (2 semesters)<br><br>Commitment to Community Class | Deferred Suspension (2 Semesters) or Suspension |

PLAINTIFFS_000327

LSU | Student Advocacy & Accountability

**10.2L- Harassment**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Harassment (of any nature) | Disciplinary Probation WITH Restriction (2-4 semesters) or Deferred Suspension (2 semesters)<br><br>Referral to SHC for Healthy Relationships<br><br>EDMC or LSU Commitment to Community Essay<br><br>No Contact Directive | Deferred suspension (*until* Graduation) or Suspension;<br><br>Referral to Mental Health/ Psychological Services<br><br>Commitment to Community Class<br><br>No Contact Directive | Suspension or Expulsion |
| Harassment that is sexual in nature or involves bias or discrimination | Disciplinary Probation With Restriction *until* Graduation; or Deferred Suspension or Suspension; or Expulsion; Class-only Restriction; Referral to Mental Health/ Psychological Services; EDMC Moodle Module; No Contact Directive | Suspension or Expulsion<br><br>No Contact Directive | Expulsion |

**10.2M- Hazing**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Hazing (See Code for complete definition)<br><br>Participation in or Involvement in planning | Suspension (1-2 years) *minimum of 1 semester; Upon Return: Disciplinary Probation WITH Restriction (2 semesters)<br><br>Upon return: Psychological evaluation to be readmitted (if applicable) | Expulsion | N/A |

PLAINTIFFS_000328

**LSU | Student Advocacy & Accountability**

**10.2O- Improper Sales & Solicitation**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Solicitation, sale, fundraising, canvassing, distribution or posting of written material without authorization, email, web or printed, selling or purchasing ID, selling or purchasing academic materials | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Ethics and Decision Making Video Review or EDMC<br><br>Restitution (if appropriate) | Deferred Suspension (2 semesters); followed by Disciplinary Probation WITH Restriction (2 semesters)<br><br>Commitment to Community Class<br><br>Restitution (if appropriate) | Suspension |

**10.2P-Offensive Behavior**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Lewd, indecent, or obscene conduct in a public place, electronically, or overall social media | Disciplinary Probation WITH Restriction for 2-4 semesters<br><br>Referral to Psych Services<br><br>No Contact Directive<br><br>EDMC | Deferred Suspension (4 semesters) or Suspension<br><br>No Contact Directive<br><br>Commitment to Community Class | Suspension or Expulsion |

**10.2Q- Property Misuse**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Intentional or Reckless Destruction, defacement or damage of University property or another student's property | Disciplinary Probation w/o Restriction (2 semesters)<br><br>Ethics and Decision Making Video Review or EDMC or LSU Commitment to Community Essay<br><br>Restitution (if appropriate) | Disciplinary Probation WITH Restriction (4 semesters or *until* Graduation) or Deferred Suspension<br><br>Commitment to Community Class<br><br>Restitution (if appropriate)<br><br>Ban from facility in question | Suspension or Expulsion;<br><br>Restitution |

PLAINTIFFS_000329

LSU | Student Advocacy & Accountability

**10.2R- Residential Life**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Utilized when one (1) or more of the violations listed below may have occurred | *Utilize the information within the Grid below for appropriate Outcomes* | *Utilize the information within the Grid below for appropriate Outcomes* | *Utilize the information within the Grid below for appropriate Outcomes* |
| Animals | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>Removal of Animal;<br><br>Restitution Fee<br>- Minimum $200 for animals with dander in residence hall<br>- Minimum $300 for animals with dander in apartment<br>- Variable fee for other animals<br>- Housing Contract Status Review (minimum Deferred Housing Removal) | Disciplinary Probation WITH Restriction (1-2 semesters)<br><br>Removal of Animal;<br><br>EDMC Moodle Module or Commitment to Community Essay;<br><br>Restitution Fee<br>- Minimum $200 for animals with dander in residence hall<br>- Minimum $300 for animals with dander in apartment<br>- Variable fee for other animals<br>- Housing Contract Status Review | Residential Life Direct Administration Action;<br><br>Referral to SAA or Assistant Director for Conduct, Advocacy, and Policy (Res Life) |
| Bias Related Actions | Disciplinary Probation without OR **WITH RESTRICTION** (1-2 semesters);<br><br>EDMC Moodle Module or Commitment to Community Essay;<br><br>Housing Contract Status Review (minimum Deferred Housing Removal) | Disciplinary Probation **WITH RESTRICTION** OR Deferred Suspension (1-2 semesters);<br><br>Commitment to Community Class;<br><br>Housing Contract Status Review | Residential Life Direct Administration Action;<br><br>Referral to SAA or Assistant Director for Conduct, Advocacy, and Policy (Res Life) |
| Coronavirus, COVID-19, Related Violations | Disciplinary Probation without OR **WITH RESTRICTION** (1-2 | Disciplinary Probation **WITH RESTRICTION** OR Deferred Suspension (1-2 | Residential Life Direct Administration |

PLAINTIFFS_000330

**LSU | Student Advocacy & Accountability**

| | | | |
|---|---|---|---|
| | semesters);<br><br>Coronavirus Essay OR Health, Safety and COVID-19 Moodle Module;<br><br>Housing Contract Status Review (minimum Deferred Housing Removal) | semesters);<br><br>Wellness & Health Promotion Referral;<br><br>Commitment to Community Class;<br><br>Housing Contract Status Review | Action;<br><br>Referral to SAA or Assistant Director for Conduct, Advocacy, and Policy (Res Life) |
| Guests & Guest Visitation | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>Loss of Guest Privileges within Residential Life Community/Communities (minimum of 2 weeks; maximum of end of Housing Contract) | Disciplinary Probation WITH Restriction (1-2 semesters)<br><br>Loss of Guest Privileges within Residential Life Community/Communities (minimum of 2 weeks; maximum of end of Housing Contract);<br><br>EDMC Moodle Module | Disciplinary Probation WITH Restriction or Deferred Suspension (2 semesters)<br><br>Loss of Guest Privileges within Residential Life communities for remainder of Housing Contract;<br><br>Commitment to Community Class |
| Handbook (potential violation of one or more policy outlined within the *Living on Campus Handbook*) | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>EDMC Moodle Module or LSU Code of Student Conduct Essay | Disciplinary Probation WITH Restriction (1-2 semesters)<br><br>Commitment to Community Class or Commitment to Community Essay | Deferred Suspension (2 semesters)<br><br>Commitment to Community Class |
| Health & Safety | Warning (only issued by Residential Life Student Conduct Office);<br><br>Confiscated Item | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>Confiscated Item;<br><br>EDMC Moodle Module or Commitment to Community Essay | Disciplinary Probation WITH Restriction or Deferred Suspension (1-2 semesters)<br><br>Confiscated Item;<br><br>Commitment to Community Class |
| Housing Contract | *One of the Following:*<br>Deferred Housing Removal;<br>Housing Relocation;<br>Housing Removal | *One of the Following:*<br>Deferred Housing Removal;<br>Housing Relocation;<br>Housing Removal | *One of the Following:*<br>Housing Relocation;<br>Housing Removal |

PLAINTIFFS_000331

**LSU** | **Student Advocacy & Accountability**

| Tobacco/Vaporizer<br><br>*Used within Residential Life community* | Disciplinary Probation w/o Restriction (1-2 semesters)<br><br>Tobacco-Free Policy Essay<br><br>Restitution (if applicable)<br>- Minimum $75 if room alarm activated<br>- Minimum $100 if building alarm activated<br>- Variable fee if damage occurred to Residential Life property | Disciplinary Probation WITH Restriction (2 semesters)<br><br>EDMC Moodle Module OR Commitment to Community Essay<br><br>Restitution (if applicable)<br>- Minimum $75 if room alarm activated<br>- Minimum $100 if building alarm activated<br>- Variable fee if damage occurred to Residential Life property | Deferred Suspension (2 semesters)<br><br>Commitment to Community Class<br><br>Wellness & Health Promotion Referral<br><br>Restitution (if applicable)<br>- Minimum $75 if room alarm activated<br>- Minimum $100 if building alarm activated<br>- Variable fee if damage occurred to Residential Life property |
|---|---|---|---|

**10.2S- Safety**

|  | 1st Violation | 2nd Violation** | 3rd Violation |
|---|---|---|---|
| Tampering with safety equipment and/or warning system, setting or causing a fire, engaging in dangerous activities contrary to posted or verbal warnings | Disciplinary Probation w/o or WITH restriction (2 semesters)<br><br>EDMC or LSU Commitment to Community Essay<br><br>Restitution (if appropriate) | Disciplinary Probation WITH restriction or Deferred Suspension (2 semesters)<br><br>Commitment to Community Class<br><br>Restitution (if appropriate) | Suspension or Expulsion<br><br>Restitution |

**10.2T- Sexual Harassment**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
|  | Disciplinary Probation With Restriction *until* Graduation; or Deferred Suspension or Suspension; or Expulsion; Class-only Restriction; | Suspension or Expulsion<br><br>No Contact Directive | Expulsion |

PLAINTIFFS_000332

LSU | Student Advocacy & Accountability

| | | | |
|---|---|---|---|
| | Referral to Mental Health/ Psychological Services; EDMC Moodle Module; No Contact Directive | | |

**10.2U- Sexual Misconduct**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| | Deferred Suspension or Suspension; or Expulsion; Class-only restriction; Referral to Mental Health/ Psychological Services; EDMC Moodle Module; No Contact Directive | Suspension or Expulsion No Contact Directive | Expulsion |

**10.2V- Stalking**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Repeated unwanted conduct with another person | Disciplinary Probation WITH Restriction (4 semesters) Referral to Mental Health/ Psychological Services/ No Contact Directive/ Ban from areas of University (if appropriate) EDMC | Suspension or Expulsion | Expulsion |

**10.2W- Theft**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Theft, embezzlement, possession of stolen property or services of university or another individual | Disciplinary Probation WITH Restriction (2 semesters) Restitution / return of stolen property | Disciplinary Probation WITH Restriction (*until* Graduation) or Deferred Suspension (4 semesters) | Suspension or Expulsion |

2020-21          **Cases may include mitigating or aggravating factors that will necessitate appropriate deviation from the outcomes guide**          16

LSU | Student Advocacy & Accountability

| | | Restitution / return of stolen property<br><br>Commitment to Community Class | |
|---|---|---|---|

**10.2X- Trespassing**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Unauthorized entry or use of any property or facility | Disciplinary Probation w/o Restriction (2 semesters)<br><br>EDMC or LSU Commitment to Community Essay or Letter to Future Self<br><br>Restitution (if appropriate) | Disciplinary Probation WITH Restriction or Deferred Suspension (4 semesters)<br><br>Commitment to Community Class<br><br>Restitution (if appropriate)<br><br>Ban from facility in question | Suspension or Expulsion<br><br>Restitution |

**10.2Y- Unauthorized Surveillance**

| | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Creating, making, possessing, storing, sharing, or distributing unauthorized video or digital/photo images of a person taken in a location in which that person has a reasonable expectation of privacy | Disciplinary Probation WITH Restriction or Deferred Suspension (2 semesters)<br><br>No Contact Directive<br><br>EDMC or LSU Code of Student Conduct Essay | Deferred Suspension (2 semesters) followed by Disciplinary Probation WITH Restriction (2 semesters)<br><br>Referral to Psych Services or Mental Health<br><br>Commitment to Community class | Suspension or Expulsion |

PLAINTIFFS_000334

LSU | **Student Advocacy & Accountability**

**10.2Z- Violating a Rule of the University**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Violating, attempting or assisting in violating any contract, rule, policy, bylaw or regulation of the University<br><br>Ex: PS-78, PS- 107, PS- 118* | Disciplinary Probation w/ or WITH Restriction or Deferred Suspension (1-2 semesters)<br><br>Ethics and Decision Making Video Review or EDMC or LSU Code of Student Conduct Essay<br><br>* Tobacco-Free Policy Essay | Deferred Suspension (*until* Graduation) or Suspension<br><br>Commitment to Community Class or Letter to Future Self | Suspension or Expulsion |

**10.2AA- Weapon**

|  | 1st Violation | 2nd Violation | 3rd Violation |
|---|---|---|---|
| Possession on one's person any object used or designed to inflict or attempt to inflict harm or injury<br><br>Full list of examples in Code: firearm, facsimile gun, air gun, knife, explosive, dangerous chemical | Disciplinary Probation WITH Restriction (3-4 semesters) or Deferred Suspension (2 semesters)<br><br>EDMC or LSU Code of Student Conduct Essay<br><br>Removal of weapon | Deferred Suspension *until* Graduation or Suspension;<br><br>Removal of weapon<br><br>Commitment to Community Class or Letter to Future Self | Suspension or Expulsion |

PLAINTIFFS_000335