### A.    Communications from Community Members

By way of example, on June 4, 2015, an LSU law professor sent a letter to President Alexander and all of the University's Title IX personnel documenting her reasonable concerns with the way in which the University mishandled a Title IX complaint she filed as well as specific concerns with the legality of various provisions in PM-73.[116] In the letter, the professor "respectfully request[ed] that you immediately amend PM-73 and any related policies to correct these deficiencies" and "also request[ed] that you embark upon a wholesale review of LSU's various Title IX and other antidiscrimination policies in order to identify and correct any other problems." The letter then correctly identified specific problems with PM-73 including that "PM-73 Fails to Provide for the 'Prompt and Equitable' Resolution of Complaints" and that "PM-73 does not to contain any timeframes, whatsoever, relative to formal resolution procedures. Nor does it require LSU to provide any such timeframes." The law professor correctly noted that "these defects are unlawful, inexcusable, and must be remedied" and noted very specific concerns with the lack of timeliness in processing her complaint of sex discrimination. As part of this review, we have been unable to find any documentation memorializing how these concerns were assessed or addressed by the leadership of the University.

In addition to this account, conversations in our investigative interviews and community outreach sessions have detailed other instances in which diverse community members—including students, faculty, staff, and community organizations—have shared their frustration and disappointment in the University's response to community efforts to raise awareness regarding issues of sexual misconduct. These frustrations were aimed largely at Alexander whom community members felt did not prioritize this issue or meaningfully engage with individuals raising concerns.

In addition, as discussed more in Section VIII below, several community members and student organizations (particularly diversity and affinity groups) expressed concerns that the University did not have an equity or civil rights office to independently investigate complaints and advocate for better resolution of discrimination concerns.

### B.    2016-17 Dan Beebe Group Assessment

Several months later, the Dan Beebe Group "was engaged by the Tiger Athletic Foundation at Louisiana State University to conduct an Independent Assessment of human relations risks, including misconduct prevention policies and programs applicable" to both the "Louisiana State University's Athletics Department **and** Louisiana State University." A 77-page report was submitted to Tom Skinner, the University's General Counsel, in "draft" form on March 29, 2016. A "final" version was not located as part of this review, and it is our understanding from representatives of the Beebe Group that a final version was not requested by the University.

While the Beebe Group report is replete with solid recommendations on various topics, for purposes of the Husch Blackwell review, the following are especially notable:

- "DBG recommends that future training sessions for student-athletes and other students affiliated with the Athletics Department should address sexual misconduct reporting

---

[116] This was connected to a series of events in LSU's Law Center which received considerable media attention.