UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, ET AL
                     CASE NO.: 3:21-cv-00242
                     DIVISION WBV-SDJ
VERSUS              JUDGE WENDY B. VITTER
                     MAG. JUDGE JOHNSON
                     JURY DEMANDED

LOUISIANA STATE UNIVERSITY, ET AL

  * * * * * * * * * * * * * * * * * * * * * *

VIDEO CONFERENCE DEPOSITION OF

JEFFREY SCOTT

TAKEN VIA ZOOM, BATON ROUGE, LOUISIANA, ON

NOVEMBER 18, 2022, BEGINNING AT 9:03 A.M.

REPORTED BY:
    JENNIFER W. PICKETT
    CERTIFIED COURT REPORTER
    CERTIFICATE NUMBER 29011

| | | |
|---|---|---|
| 1 | Q | So, your understanding was that you're |
| 2 | | going to be the lead investigator but |
| 3 | | you're not going to be the only |
| 4 | | investigator? |
| 5 | A | Eventually, yes. |
| 6 | Q | Did they eventually hire other |
| 7 | | investigators to help you? |
| 8 | A | No. |
| 9 | Q | How did that work out for you being the |
| 10 | | only investigator? |
| 11 | A | It was a pretty heavy workload being the |
| 12 | | only investigator responsible for nine |
| 13 | | campuses and probably 50,000 individuals. |
| 14 | Q | Did anyone -- let me back up.  Earlier |
| 15 | | you said you left because there were some |
| 16 | | frustrations at LSU.  Was that one of the |
| 17 | | frustrations that you were talking about? |
| 18 | A | Yes, that was one of them. |
| 19 | Q | Did anybody ever say to you, Mr. Scott |
| 20 | | we're trying to hire some new people.  We |
| 21 | | can't find anyone or we're not looking |
| 22 | | right now -- I mean what was being |
| 23 | | communicated to you while you're carrying |
| 24 | | what is admittedly a large caseload? |
| 25 | A | I think that Ms. Stewart was always very |

```
 1         supportive and trying to hire more
 2         investigators.  We were always lobbying
 3         for more investigators.
 4    Q    But the entire time that you were there,
 5         from March of 2018 to May of '21, were
 6         you always the only investigator?
 7    A    Yes.
 8    Q    You said that you were responsible for
 9         all nine campuses; is that correct?
10    A    Yes.
11    Q    And approximately 50,000 students?
12    A    Yes.  I would estimate that with the
13         number of campuses.
14    Q    I assume your office or your main
15         location was in Baton Rouge; is that
16         correct?
17    A    Yes.
18    Q    Did you have to travel a lot to the other
19         campuses or how often were you on the
20         road to go to other campuses?
21    A    Not too often.  Most of the
22         investigations were on the main campus.
23         I had a few investigations involving some
24         of the other campuses.
25    Q    Aside from the investigator role, did you
```

```
 1      a Title IX issue or some kind of
 2      harassment issue?  What was their duty as
 3      far as reporting?
 4  A   Report it to the Title IX office.  We had
 5      various mechanisms to report that.  You
 6      could call, you could send an email, you
 7      could report it through the online system
 8      that we had, so basically just to report
 9      those issues to Title IX and let us take
10      care of it.
11  Q   Were there any departments that you dealt
12      with that had their own reporting policy?
13  A   I think athletics had their own reporting
14      policy, I believe.
15  Q   What was your understanding of the
16      reporting policy in the athletic
17      department?
18  A   I think when I first got there a lot of
19      Title IX cases were reported to Miriam
20      Segar.  She served as the, I guess, Title
21      IX coordinator liaison, I don't know what
22      the position is right offhand.
23  Q   Was it your understanding that if a
24      report was made to Miriam Segar that Ms.
25      Segar was not supposed to do the
```

```
1    A    Yeah, I believe we did talk about it.
2         When I became aware of it I may have said
3         something to her.  I don't remember a
4         specific conversation or any specifics
5         but I probably said something to her like
6         I didn't know this existed.
7    Q    Do you remember what her response was to
8         that?
9    A    No, I'm not too sure if she knew, either.
10   Q    You're not sure if Jennie knew either?
11   A    Yeah, I don't remember her response but I
12        told her what my feelings were.  When I
13        saw it I was like wow, I didn't know this
14        existed.
15   Q    What were your concerns about it at that
16        point?
17   A    It was just a concern that it -- to me it
18        violated the policy of mandatory
19        reporters reporting directly to the Title
20        IX office once they had knowledge of a
21        potential Title IX violation.
22   Q    When you found out about that process,
23        that policy, did you feel like that
24        compromised you as an investigator in the
25        Title IX department?
```

```
 1  A    I don't think so.  I was just surprised
 2       that that existed.  I didn't go any
 3       further on whether it compromised any of
 4       my investigations.
 5  Q    Thank you, Mr. Scott.  I appreciate your
 6       --
 7  A    You're welcome.
 8  Q    -- Being patient with me when we tried to
 9       clarify those.  Albert, I'm all set if
10       you want to go ahead.
11                 CROSS EXAMINATION
12  BY MR. VAN-LARE:
13  Q    Thank you very much, Karen.  Good
14       afternoon, Mr. Scott.
15  A    Good afternoon.
16  Q    My name is Albert Van-Lare and I am one
17       of the attorneys representing Ms. Sharon
18       Lewis in this case.  I will ask you a
19       couple of questions.  Karen already read
20       to you what the ground rules are but I'd
21       just like to supplement that a little
22       bit.  If I ask you a question and you
23       answer it, I'm going to take it that you
24       understood the question.  If I ask you a
25       question that is not comprehensible to
```