```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF LOUISIANA
* * * * * * * * * * * * * * * * * * * * * * * * * * *
                    ABBY OWENS, ET AL.
                         VERSUS
   BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERISTY AND
        AGRICULTURAL AND MECHANICAL COLLEGE, ET AL.

   CASE NO.:3:21-cv-00242        DIVISION: WBV-SDJ
   JUDGE WENDY B. VITTER    MAGISTRATE JUDGE JOHNSON
                       JURY DEMANDED
* * * * * * * * * * * * * * * * * * * * * * * * * * *

                 DEPOSITION OF MIRIAM SEGAR

        TAKEN AT THE OFFICE OF SHOWS, CALI & WALSH
                   628 ST. LOUIS STREET,
                BATON ROUGE, LOUISIANA 70802
                    ON NOVEMBER 1, 2022
                   BEGINNING AT 9:26 A.M.


REPORTED BY:
KRISTINA MARIE CARTER, CCR
CERTIFIED COURT REPORTER
```

```
01  A.    No.
02  Q.    But you felt concerned enough to bring a law firm
03  in?
04  MS. WHITE:
05        Objection.  Argumentative.
06  BY MR. ENGLISH:
07  Q.    But even though you did not feel -- I take that
08  question back.  Even though you did not feel that
09  this situation warranted you going to HR, you did
10  believe it was serious enough to bring an outside
11  law firm in and ask them for advice; correct?
12  A.    I was very concerned that our staff in football
13  brought the young woman, who allegedly told them I'm
14  uncomfortable, to sit down with Les Miles.  I
15  thought that was very poor judgment.  I thought it
16  was reckless.
17           And I felt that I -- I wanted them to know the
18  whole story to find out if -- where our liabilities
19  were with the student because she accused or felt
20  uncomfortable and we bring her in front of him.  And
21  the statements I got from the women say that she
22  went in the first time and could do nothing but cry.
23           And then, she asked to go back in again, so
24  Sharon brought her back in for the second time.  So,
25  yeah, I was concerned.  By the time I got the story,
```

01    I referenced earlier that they made statements,
02 all four of them, independent statements of their
03 interaction, what the student said to them, what
04 they witnessed when the student was put in the room
05 with Coach Miles.
06    And when we met to talk about it, they -- they
07 mentioned that he was involved with hiring students.
08 They felt like he was more involved than he should
09 be, all the -- you know, those things.
10 Q.    **Why didn't you immediately report this to Title 9,**
11 **to the Title 9 office?**
12 MS. WHITE:
13    Objection as to form.
14 A.    The only thing I can tell you was in late 2012 and
15 we didn't have a really structured Title 9 reporting
16 program at that time.  I did report it to counsel to
17 seek advice on how to move forward and which is why
18 I documented the interactions that I had.
19    And I described earlier that we met with the
20 Student 1 and had her sign that she had received the
21 resources and had the information.  That was all
22 part of the same time frame.
23 BY MR. ENGLISH:
24 Q.    **It seems, based off of your testimony today, when**
25 **there is an issue inside the athletic department,**

01  that time frame.  I -- I don't know of anything else
02  off the top of my head.
03  Q.    Okay.  And when you say do scholarships, is that
04  making sure that the scholarships meet those
05  financial parameters for Title 9?
06  A.    Yeah.  So, it's that and, actually, the issuance of
07  the scholarships in coordination with the financial
08  aid office on campus.  And sending out student
09  notifications of financial aid, dealing with parents
10  with questions that come in, signing off on the
11  scholarship papers that are submitted by each sport
12  to make sure we're not exceeding our roster
13  limitations for the next year.  Pretty much all the
14  things surrounding scholarships.
15  Q.    Okay.  And I believe you testified to Mr. English's
16  questions that, at the time of, you know, I guess
17  we'll call it the Les Miles investigation, LSU did
18  not have a Title 9 office; is that correct?
19  A.    I don't -- I can't say they didn't have a Title 9
20  office, not in the way that it exists today, not
21  with the reporting system that's online and the
22  things that, you know, are today.  And at that time,
23  there -- that wasn't how it was set up at all.
24  Q.    Do you recall when the online reporting system was
25  set up?

```
01  A.    Yes, the LSU police.
02  Q.    The LSU police talked to her about Title 9?  What is
03  the LSU police's role with regard to Title 9 as you
04  understand it?
05  A.    My understanding is that the police are required to
06  report instances that they -- they become aware of
07  to the Title 9 office.  I believe they offer
08  resources to all the students that go in and give
09  them the information about campus resources.
10           I think they have students sign which way they
11  want to proceed with, you know, campus resources,
12  Title 9, and all the things.  But the police -- I
13  remember the police was also part of Jennie
14  Stewart's meetings, and so, I -- there's a
15  collaborative effort, I think, between campus, that
16  was my understanding, to handle these, you know,
17  cases.
18  Q.    Okay.  And did you ever base your determination on
19  whether or not to report on whether a victim or a
20  complainant wanted to report it?
21  A.    No.
22  MS. WHITE:
23       Well, I'm going to object to the form.  Go
24  ahead and answer.
25  A.    I -- I knew we had an obligation to report.  The
```

01  me that Ashlyn -- and this is all contemporaneously
02  documented, so you'll have it.  I'm doing this from
03  memory many years later, so I can tell you what she
04  told me, but --
05  Q.      Well, let's not do that.  Let me show you what I
06  think you're referring to.
07  A.      Okay.
08  MS. LASKY:
09       Endya, can you pull up Segar 344, please?
10  BY MS. LASKY:
11  Q.      I think this was a document that was just produced
12  to us and I was going to ask whose notes.  Do you
13  refer to yourself in the third person in those?
14  (Showing document.)
15  A.      (Viewing document.)  This -- yeah, this was me.
16  Q.      Okay.  All right.  So, let's just start off -- let's
17  just, for context, these are the notes that you
18  kept, you prepared --
19  A.      (Viewing document.)  Um-hum.
20  Q.      -- correct?
21  A.      Yes.
22  Q.      Regarding the complaint made to you by the student
23  athlete related to the assault of Ashlyn; is that
24  correct?
25  A.      (Viewing document.)  Yes.  And this is what I sent

01  as an attachment to Jim Marchand and, I believe,
02  Mari Fuentes.  I think Bob Barton was copied on it.
03  And I don't -- I don't remember if there was
04  somebody else on the email.  But, yes, this was an
05  attachment.
06  Q.    Okay.  And then, to orient us in time, that means as
07  of January 2016, or at least through January 29,
08  that online reporting system had not been set up;
09  correct?
10  A.    If it was, I wasn't told, notified, didn't use it at
11  this time because I didn't know about it.
12  Q.    Okay.  At the time that you filled out these notes,
13  did you know who the -- there's a reference in here
14  to the student athlete; right, and then, there's a
15  reference to the student.  You knew who the student
16  athlete was because you met with her; correct?
17  A.    Yes.
18  Q.    And then, it says (quoted as read), "Shared that her
19  friend."  Did you know who the friend was?
20  A.    Yes.
21  Q.    And then, did you know who the two male student
22  athletes were?
23  A.    Yes.
24  Q.    Okay.  So, why was that not put into these notes
25  that were sent to the people that you just said you

01  emailed them to?
02  A.    Because I had previously given all the names and
03  gone over the entire -- the scenarios of what
04  happened.  I sent the notes to commemorate the
05  conversations, the time frame, and what occurred.
06          And at the time, we really didn't put -- we
07  tried not to put student athlete names whether we
08  were filing -- and students -- whether we were
09  filing a report with -- for an NCAA violation or
10  whatever, a summary, we didn't often -- we didn't
11  always include it because of public records requests
12  and different things.
13          So, it was that was just how we did it back
14  then and -- and this is what I referenced.  I did
15  give the names.  It was confirmed in the Husch
16  Blackwell report that I shared the names.  And my
17  accountability in the Husch Blackwell report was
18  that I didn't put it in the online system.
19          And my, I guess, complaint about that is I
20  didn't have access, at the time, to go on the back
21  side and add these names.  I was never asked to put
22  -- go back to your document, put the names in.  And
23  I felt like I reported and that I did everything
24  that I could in this circumstance.
25  Q.    Okay.  Thank you.  Were you ever instructed or