UNITED STAES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, ET AL.

CASE NO.: 3:21-cv-00242
DIVISION WBV-SDJ

VERSUS                    JUDGE WENDY B. VITTER
MAG. JUDGE JOHNSON
JURY DEMANDED

BOARD OF SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND MECHANICAL
COLLEGE, ET AL

* * * * * * * * * * * * * * * * * * * *

DAY 1 OF THE DEPOSITION OF
JENNIE STEWART

TAKEN AT PHELPS DUNBAR, 400 CONVENTION
STREET, BATON ROUGE, LOUISIANA 70801, ON
NOVEMBER 9, 2022, BEGINNING AT 9:03 A.M.

REPORTED BY:
JENNIFER W. PICKETT
CERTIFIED COURT REPORTER
CERTIFICATE NUMBER 29011

Page 1

19

1    2014 about you really do need to do this,

2    I and then two colleagues were asking the

3    question about who does this work?  Who

4    is doing this work on our campus?  So,

5    I'd worked in and around the area.

6    Q    Who were those two colleagues that you

7    were asking those questions with?

8    A    My direct supervisor, the associate dean

9    of students and director of student

10   advocacy and accountability, Matt

11   Gregory, who's now at Texas Tech, and

12   also the associate vice-chancellor of

13   student life and dean of students, Doctor

14   KC White.

15   Q    And where's Doctor White now?

16   A    Doctor White is now at Northern Alabama's

17   -- I'm not sure if it's vice-president,

18   vice-chancellor overseeing the student

19   affairs division.

20   Q    So, when you three were asking those

21   questions, who were you asking questions

22   to?

23   A    I think in part up our directors chain,

24   up to the vice-chancellor of student

25   affairs.  KC was also asking in the

20

1    leadership roles at the table she sat in.

2    We were discussing in our care team as

3    well, which was a multi-departmental team

4    that I led, asking to see what needs were

5    met, where were they met and where were

6    the gaps in that.

7    Q      And at that time what was your

8    understanding of the Title IX structure

9    at LSU?

10   A      Initially there were some services but we

11   didn't have a formalized structure until

12   there was the naming of Jim Marchand as

13   the Title IX coordinator for the system

14   and then Gaston Reinoso as the campus

15   coordinator.

16   Q      And remind me of when that occurred?

17   A      I believe that was 2013, '14.  Sometime

18   around that date.

19   Q      Got it.  Of the folks that you were

20   personally talking to, what were the

21   responses when you were asking those

22   questions about do we need some more

23   robust services here and more robust

24   programming around Title IX?

25   A      Questions centered on primarily that

Page 20

21

1    Title IX coordinator role to see who was

2    coordinating the efforts and our answer

3    was at that point that we did not have

4    someone in that role.

5    Q    Okay, so it was after that that Jim

6    Marchand was put in that role; is that

7    right?

8    A    That's correct.

9    Q    I believe he had another role and if you

10   could remind me of that, that would help

11   me.

12   A    Yes.  He served in the office of general

13   counsel.  I'm not sure of his title but

14   he was an attorney for LSU.

15   Q    So, then at some point obviously there

16   was a decision made that there needed to

17   be a full-time Title IX coordinator; is

18   that right?

19   A    Correct.

20   Q    Do you remember how that decision came

21   about?

22   A    I wasn't at the table for that.  I

23   believe that that was at a level higher

24   than I was.

25   Q    Were you the person that became the first

22

1    Title IX coordinator?

2    A     The first full-time dedicated, yes.

3    Q     How did that come about?  Was there a

4    search or were you offered the role or

5    how did that come about?

6    A     There was a search done.

7    Q     You may not know because if you were

8    applying you might not have a whole lot

9    of insight but do you know how many other

10   folks applied?

11   A     I don't.  I wasn't privy to that

12   information as a candidate.

13   Q     Did you know how many finalists there

14   were?

15   A     I don't.

16   Q     What was the process for you going

17   through the application and interview

18   process?

19   A     The application process was to submit

20   formally through the employment portal

21   with HR.  My application including

22   resume, cover letter, references and then

23   after that time I believe there was a

24   search committee that reviewed those.

25   The next piece was invitation for

Page 22

31

1    A      On appeal because I was the appellate

2    person.  That was something that I did

3    but my role was not in the initial

4    investigative piece, no.

5    Q      So, you had mentioned that in 2018 -- you

6    had started in February 2016 as the Title

7    IX coordinator and Clery coordinator;

8    correct?

9    A      That is correct.

10   Q      And then in 2018 you had also had

11   additional responsibilities added as the

12   ADA and Section 504 coordinator; is that

13   correct?

14   A      Correct.

15   Q      If you know, how was it decided that

16   those additional responsibilities were

17   going to be added to your job

18   description?

19   A      I believe when it was noticed that the

20   person who held that role was departing

21   for retirement there was a conversation

22   with Tom Skinner, who at that time was my

23   supervisor and indicated that we would

24   meet to find a place for ADA 504 since

25   that role would no longer be filled and I

Page 31

32

1    don't recall specifically the words but

2    it was decided there then that I would

3    take that on an interim basis.

4    Q    Had that role prior to you taking it on

5    been a full-time, dedicated position?

6    A    No.

7    Q    And what were the prior person's other

8    responsibilities, if you know?

9    A    The person directly preceding me is the

10   only person that I'm aware of who filled

11   that role.  I don't know who did that

12   before but it was the associate vice-

13   chancellor for HR.  It was that person's

14   role.

15   Q    Do you know why that role would not

16   continue handling those responsibilities?

17   A    I don't recall.

18   Q    Did you volunteer to take on those

19   additional roles?

20   A    I did not offer myself, no.  But when it

21   was asked of me I agreed.

22   Q    Did you have any concerns about how that

23   might affect your workload, taking on

24   those additional roles?

25   A    Yes.

Page 32

33

1    Q    Tell me about that.

2    A    Sure.  The workload was immense to begin

3    with and I had identified that we were in

4    need of more full-time, dedicated staff

5    already on the Title IX front, much less

6    Clery and then later ADA.  But in the

7    conversation with Mr. Skinner, we

8    identified that this was a short-term,

9    we've got to find a permanent solution

10   and I didn't know that we had other

11   options at that time but the plan was

12   that that would be moved elsewhere.

13   Q    Was that ever moved elsewhere?

14   A    It was not.

15   Q    Do you know why?

16   A    I think we didn't have a place for that

17   to be, the historical -- what I inherited

18   was the other duties as assigned so I

19   think in looking at available resources

20   of the institution, creating a new stand-

21   up position wasn't something that was

22   believed to be at our disposal at that

23   time.

24   Q    Was it something that you ever raised

25   with anybody?

Page 33

34

1    A    I did.

2    Q    Tell me about that.

3    A    Sure.  Tom and I talked about it from the

4    very beginning and he said yeah, this is

5    a big load.  We've got to find a place

6    for this.  At the same time he was

7    building up a severely understaffed

8    General Counsel office so I think it was

9    a matter of stopping bleeding in a number

10    of places.  He never disagreed with the

11    need at all but I think there were many

12    demands that he was fulfilling and then

13    he departed end of 2019, so a year and a

14    half in.

15    Q    When he left who became your supervisor?

16    A    For a short time Trey Jones was named as

17    our General Counsel and I believe that

18    was a period of less than a month until a

19    new General Counsel was named in Winston

20    Decuir.

21    Q    During your time as Title IX coordinator,

22    was your supervisor always the General

23    Counsel?

24    A    Yes.

25    Q    At some point you stopped being the Title

Court Reporters of Louisiana          225-201-9650
A Veritext Company          www.veritext.com

35

1    IX coordinator; correct?

2    A      That is correct.

3    Q      And when did that occur?

4    A      That was in April of 2021.  Jane Cassidy

5    had been named of a newly-formed office,

6    the Office of Civil Rights and Title IX,

7    and she and I -- at that point there were

8    three of us.  There was Jane, myself and

9    Jeff Scott to build this office out and

10   Jane said the first thing we need to do

11   is get people.  We need job descriptions,

12   we need Clery, ADA, Title IX.  These are

13   going to be distinct roles and at that

14   point I believe I may have been the

15   longest-serving Title IX coordinator in

16   the SEC and I said to Jane I've run my

17   course with this.  If we're doing job

18   descriptions, may I choose which one I

19   take and she said let me check on that.

20   She checked with whomever she needed to

21   check, I wasn't privy to, and she came

22   back and the answer was yes, that I could

23   select and I said then I choose to move

24   forward with the ADA 504 role.

25   Q      What made you decide that?

Page 35

48

1    Q    Do you recall if you ever took any

2    training when you were in SAA that was

3    promulgated by the university that would

4    have been similar -- prior to 2016?  I'm

5    sorry.

6    A    There was a CSA training that I took.

7    That was a Dolores Stafford product.

8    Q    What does CSA stand for?

9    A    Campus Security Authority under Clery.

10   Q    So, not Title IX-specific; correct?

11   A    No, not specific -- related but not

12   specific.

13   Q    Let's talk about athletics.  You had

14   referenced that.  What involvement did

15   you have in ensuring that either students

16   or staff within athletics were trained

17   about Title IX?

18   A    The second week of my work in February of

19   2016, I was pulled into a meeting where

20   the Dan Beebe Group was presenting.

21   Their work had preceded my time in there

22   so I was getting up to speed where they

23   were on defining the product that they

24   were -- I'm sorry, not defining,

25   refining.  The product they were to

Page 48

49

1    deliver to employees and student athletes

2    in athletics.

3    Q       What was the purpose of you being in this

4    meeting; do you remember?

5    A       Because it included areas of Title IX-

6    related content so Tom Skinner, Dan

7    Layzell and Joe Alleva were at that

8    meeting and they pulled me into that as

9    well.

10   Q       What contributions did you provide in

11   that meeting, if you can recall?

12   A       At that very first meeting it was

13   understanding of what was going on,

14   getting me up-to-speed at that point.

15   But there were subsequent meetings on

16   content that were dry-runs essentially

17   for invested parties to provide feedback

18   about the content from the Dan Beebe

19   Group.

20   Q       What were your thoughts on the training

21   that was being provided by the Beebe

22   Group?

23   A       It was broad.  It included human

24   relations risks, so it wasn't specific to

25   Title IX, though it did include it.  And

Page 49

50

1    later, sometime before COVID -- I can't

2    recall the year specifically but -- we

3    invited Mike -- I can't recall his last

4    name -- from Dan Beebe to present to my

5    case management group for Title IX plus a

6    few other folks who were in our work

7    employees to review the content.  We had

8    an evaluative tool about the content of

9    it as related just through the scope of

10    Title IX and we provided that feedback

11    through athletics.

12    Q     What feedback did you provide if you can

13    recall?

14    A     I haven't looked at that in quite some

15    time so I can't speak to it but it did

16    indicate that there were some needs and

17    amendments for clarity and to indicate

18    that reporting was to happen outside of

19    athletics to the Title IX coordinator,

20    not within.

21    Q     So, your understanding was that what they

22    were presenting was that they should

23    report within; is that correct?

24    A     No, I don't think that's correct.  I

25    think there was a lack of clarity where

Page 50

51

1    the messages go to the Title IX office.

2    We wanted that to be front, center and

3    clear and it wasn't.  The message was not

4    to the contrary, it was just not robust

5    and clear.

6    Q    When you provided that feedback, was your

7    feedback implemented?

8    A    Stephanie Rempe was at the university

9    newly during the time.  And I think that

10   going through that piece she, Miriam and

11   I sat down and we went through all the

12   feedback that we received from the group

13   I'd assembled and they were very open to

14   hearing it, concerned about it and wanted

15   to move swiftly on it.

16   Q    Do you know -- (connection issues)

17   A    I'm sorry, I'll ask for a repeat, there

18   was an interruption.

19   (Connection discussion)

20   Q    Sure.  So, my question was, do you know

21   specifically if that training was updated

22   to make it clear that folks should be

23   reporting to the Title IX office?

24   A    It was my understanding that was what was

25   going to happen.  Some time in 2020 I was

Page 51

54

1   directly is the way to report.

2   Q     Who was disagreeing with you?

3   A     Winston Decuir disagreed with me.  It was

4   his proposal to let athletics stand as a

5   separate effectively institution for

6   campus coordinator and that no reports --

7   it was unreasonable to expect that

8   everybody was going to report directly,

9   that those should still go to Miriam.

10  Q     So, was there any resolution after this

11  meeting in October of 2020?

12  A     No.  No there wasn't.  There was still

13  disagreement.  I was still holding to the

14  position it'd come directly.

15  Q     So, as far as you know, during the time

16  that you were the Title IX coordinator no

17  directive was ever provided to athletics

18  to tell them to report directly to your

19  office?

20  A     I'll say this.  There were directives.

21  Tom Skinner, I and then-president

22  Alexander went to the president's

23  cabinet, which included then-sitting AD,

24  Joe Alleva and the directive was -- I

25  believe this may have been early in my

Page 54

55

1    tenure.  I can't speak specifically the

2    year.  It was sometime between my

3    starting and COVID when Tom was still

4    here.  There were some concerns about

5    reports not coming, that they should be

6    reported elsewhere, up the food chain and

7    Tom and then-president Alexander sent

8    directly deans and vice-presidents, let

9    me be clear.  Every one of you is

10   responsible for ensuring that your people

11   know where to report.  That reporting

12   place is to the Title IX coordinator, no

13   bones about it.  It does not go up to

14   someone else for review.  If someone

15   needs help in doing a report perhaps for

16   their first time, assist them in doing

17   their role by helping them report

18   directly; is that clear?  The answer was

19   yes.  Yes, that is clear.

20   Q     And you said Joe Alleva was in that

21   meeting; correct?

22   A     Yes, he was.  And then --

23   Q     Go ahead.  I'm sorry.

24   A     I later learned that sometime in 2020

25   that shortly afterward there was an email

Page 55

56

1    circulated contrary to that, that

2    indicated reporting to Miriam.

3    Q    Got it.  And that email was circulated by

4    Joe Alleva; correct?

5    A    Had his name on it when I read it, yes.

6    Q    So, when you first -- I'm trying to get

7    the timeline down.  I'm going back to the

8    Beebe Group, the training that was

9    provided by them.  When did you first

10    raise concerns after -- so let me just

11    clarify, let me try and summarize here.

12    So, you first reviewed the Beebe training

13    sometime in 2016 or 2017; is that right?

14    A    2016, yes.

15    Q    At that time you provided feedback that

16    it needed to be more clear that reporting

17    needed to come directly to your office;

18    is that correct?

19    A    Correct.

20    Q    And it was your understanding or at least

21    you didn't have any reason to think

22    otherwise that that occurred; is that

23    correct?

24    A    I'm sorry, to be clear that what didn't

25    occur?

57

1    Q      So, it was your understanding after you

2    provided the feedback that this training

3    needs to advise people to report directly

4    to my office.  It needs to be clear.

5    After you provided that feedback it was

6    your understanding that that training was

7    updated to provide that information; is

8    that right?

9    A      That's my belief, yes.

10   Q      What caused you to believe that?

11   A      So going forward, I had said I understand

12   the Beebe theory is that there are small

13   group meetings within teams, perhaps even

14   position for a large team or for

15   employees in certain roles but I want to

16   see this presentation outside of

17   presenting to a constituency.  So, the

18   next year I was included in seeing a part

19   of the presentation for two

20   constituencies in athletics, so I said

21   people need to see a face.  They need to

22   see a person.  I don't have to be the

23   full deliverer but they have to know that

24   I'm a real person.  People go to who they

25   know.  So, I was invited to participate

Page 57

58

1    for two of the presentations -- not in-

2    full because of perhaps of the chilling

3    effect of things that were outside my

4    area but yes, I participated there.

5    Q    When did you have those two times that

6    you participated?  When did those two

7    dates occur if you can recall, just

8    approximate is fine?

9    A    I can't recall.  I'm narrowing the dates.

10    It was not in my first year.  It would

11    have been on a second go-round and it was

12    while Tom was still there so that puts it

13    somewhere between '17 and '19.

14    Q    During the time that you participated,

15    were you providing the information that

16    folks should report directly to your

17    office?

18    A    Yes.

19    Q    So then in 2020, you get this call from

20    Mike and he says I'm coming to campus

21    tomorrow.  I'm going to present and then

22    you learn at that point that those

23    materials in 2020 were not providing that

24    information; is that correct?

25    A    Correct to the extent that it was Dan

Page 58

59

1    Beebe and not Mike then, in 2020.

2    Q    I'm sorry.  Got it.  Okay.  And so, do

3    you know, you may not, why that

4    information was no longer being provided?

5    A    I did not know why.  I went directly to

6    my supervisor and said this is a concern

7    apparently presenting tomorrow and this

8    is inaccurate.   There were phone calls

9    of well maybe we can indicate that you

10   can report to Miriam or let them also

11   know but make sure that you report to

12   Title IX, too.  And I said no.  The

13   message is report to Title IX.  If we're

14   putting someone else in the mix, then

15   that's not what we should be doing.  If

16   someone else feels that they need to

17   decompress, if someone feels that they

18   need help in doing that, that's okay but

19   we're not sending a mixed message.

20   Q    What was the response to that?

21   A    The response that I got was well, I think

22   it's really important that people have

23   options and coaches are not going to

24   report directly.  It was a re-visit of

25   the October conversation about that there

Page 59

60

1    needed to be someone in athletics that

2    people in athletics could utilize.

3    Q    You said this was a re-visit of the

4    October conversation so was it near the

5    end of 2020 then that you had this

6    conversation with Dan and raised the

7    issues?

8    A    If I recall correctly.  I don't recall

9    the date but I remember that being

10   subsequent to because the presentation

11   was the next day.

12   Q    Who were you having this conversation

13   with?

14   A    Winston Decuir, my supervisor.

15   Q    Is he still your supervisor?

16   A    No, ma'am.

17   Q    Do you have any idea -- was that coming

18   to him from athletics or was that coming

19   from him, himself?  You may not know the

20   answer to that.

21   A    I don't know that answer.

22   Q    I think I heard somebody else.

23   A    I think there was a cough in our room.

24   Q    No worries, just wanted to make sure I'm

25   getting what anybody else wanted to say

Page 60

63

1    provide copies of everything to everybody

2    after we're done today.  I was just going

3    till the last minute last night getting

4    everything prepared.  So, we'll do it

5    online here and then I'll provide copies

6    after.  So this PowerPoint, did you

7    review what was included in the Husch

8    Blackwell report?  You said you reviewed

9    the whole thing so can you just confirm

10   for me that you reviewed this PowerPoint

11   and that it's accurate?  This is the

12   PowerPoint that you provided in your

13   presentation?

14   A    From what I've seen of the two slides

15   you've shown, yes.

16   Q    I'll go through it real slowly so you can

17   look at it.

18   A    Yes, that's correct.  Thank you.

19   Q    Absolutely.  Thank you.  I appreciate

20   your looking through it.  Tell me who you

21   gave this presentation to?

22   A    I was intended to present to the

23   president, President Alexander at the

24   time, Dan Layzell, who was the vice-

25   president of finance and administration

Page 63

64

1    and then my supervisor, who is the

2    general counsel in legal affairs, Tom

3    Skinner.  At the last minute I believe

4    the president was unable to attend but we

5    proceeded with Mr. Skinner and Doctor

6    Layzell.

7    Q      What prompted you to prepare this

8    presentation?

9    A      At the point I had ad hoc investigators,

10   other duties as assigned from all of the

11   campuses -- I believe there were forty-

12   two different people.  Some people would

13   come in and out.  Of course, changes in

14   family, changes in work duties would mean

15   that somebody else wasn't able to serve

16   on the team any longer.  And I thought

17   there's no way that this is a sustainable

18   model of managing an influx and outflow

19   of forty-two people.  The other piece was

20   that although these were wonderful

21   people, this was not a model where people

22   were dedicating their full-time expertise

23   towards this issue.  I knew coming in,

24   other campuses had people who did this

25   work full-time and that that was what we

Page 64

65

1    needed to be able to guide other campuses

2    and to be able to do the work on the A&M

3    campus.

4    Q     When you say there were forty-two people,

5    what were those forty-two people's roles?

6    A     Meaning their full-time role or what role

7    they were serving for Title IX?

8    Q     For Title IX?

9    A     They were serving as investigators,

10   deputy coordinators -- I'm sorry,

11   investigators and deputy coordinators.

12   Q     And those were who you were referring to

13   as ad hoc investigators; correct?

14   A     Yes.

15   Q     You don't have to go through all forty-

16   two but in general what were the other

17   positions that these folks held full-

18   time?

19   A     There were folks who were full-time staff

20   in residential life, career center, the

21   graduate school -- this is specific to

22   the A&M campus -- primarily from student

23   affairs, that's where the lion's share

24   were pulled from.  We also had some from

25   human resource management but it was

Court Reporters of Louisiana        225-201-9650
A Veritext Company           www.veritext.com

66

1    primarily human service related areas.

2    Q    Do you happen to know what training had

3    these folks received in how to perform

4    Title IX investigations?

5    A    Yes.  In either late 2015 or early 2016,

6    prior to my taking the role, there was a

7    training on the A&M campus conducted for

8    all of the campuses.  It was by ATIXA and

9    it was an investigator training.

10   Q    How long was that training?

11   A    I don't know.  I didn't attend.  But my

12   understanding was it was more than one

13   day for sure.  Do you mind if we break

14   soon?

15   Q    Of course.  Yes, absolutely.  I'm happy

16   to break.  How much time would you like

17   to take?

18   A    Just five is fine.

19   Q    All right, we'll do five minutes then.

20            MR. PHAYER:

21                 Let's take ten minutes.

22            MS. ABDNOUR:

23                 Okay.  Ten minutes sounds

24   good.

25   (Off the record.)

Page 66

84

1    real-time, an investigative process,

2    supported measures process working with

3    humans is very different than Monday-

4    morning quarterbacking.  So yeah, I think

5    that.

6    Q    Was there anything important that you

7    shared with them that wasn't included in

8    the report?

9    A    I don't think there are any major points

10   that I addressed that were not included.

11   Q    I'm going to go through it with you now

12   and I've got certain portions highlighted

13   to make it easier for both of us here.

14   So, the first section that I want to

15   touch on -- it starts on what's marked as

16   page ten of the report.  In the PDF it's

17   showing as page twelve.  And this is

18   where they're summarizing when you came

19   in to fill the role as a full-time

20   position, taking it over from Jim

21   Marchand, who was doing it sort of on a

22   part-time basis it seemed.  And here it's

23   basically summarizing that there were

24   some concerns that you had with respect

25   to whether the University was complying

Page 84

85

1    with the 2011 Dear Colleague letter from

2    the U.S. Department of Education and so

3    my question for you here is did you start

4    raising concerns right after the 2011

5    Dear Colleague letter or -- in terms of

6    needing a full-time Title IX coordinator

7    -- or was that later on that you started

8    raising those concerns?

9    A    The conversations that I mentioned with

10   Doctor KC White and Doctor Matt Gregory,

11   those started while I was in my role in

12   SAA.  The conversations about who does

13   this, who does this in its entirety, who

14   does pieces of this, where are we

15   deficient -- so, I can't recall when

16   those conversations started but it was in

17   response to the Dear Colleague letter.

18   Q    So, is it fair to say that you and your

19   colleagues were raising concerns for at

20   least a couple of years prior to the

21   university creating that position?

22   A    Agreed.

23   Q    And they also identify here that they had

24   concerns about you reporting directly to

25   the general counsel.  Is that something

Page 85

1    1    raise it internally?

2    2    A    I think in light of greater conversations

3    3    about the full scope of the load, not

4    4    just that as a single, stand-alone

5    5    conversation.

6    6    Q    When Jeff was doing his investigations

7    7    and putting together his reports, what

8    8    role did you have in that process?

9    9    A    We processed a lot together because there

10   10   were two of us.  So, he would come in and

11   11   tell me I got this person in, I didn't

12   12   get this person in, I think I need to get

13   13   this person, this person's been

14   14   identified but it doesn't seem there's

15   15   something substantive, so we were doing a

16   16   lot of status checks.  We had a weekly

17   17   check-in, just the two of us.  And then

18   18   we also had a case management meeting

19   19   standing once a week with our greater

20   20   team.

21   21   Q    Did you provide any direct oversight of

22   22   the reports and by that I mean did you

23   23   review any portion of the reports before

24   24   they were finalized?

25   25   A    Sometimes I did if he needed other eyes

Page 101

1   on it.  Sometimes he would have questions
2   and I want to run this by you, can you
3   take a look at this, but generally he
4   said I'm completed with my process I said
5   okay, well when will the report be done,
6   has that been sent out.  So no, I wasn't
7   reviewing reports regularly unless there
8   was a request for that.
9   Q     Was there anybody else that was reviewing
10  reports regularly?
11  A     No, but sometimes he would make requests
12  in our general counsel office, if there
13  was need for review.  So, I think that
14  there -- it was not a regular request but
15  had been a request at some points.
16  Q     But there was no procedure in place to
17  have the reports reviewed before they
18  were finalized?
19  A     No.
20  Q     So, is it accurate to say that there were
21  some reports that were investigated
22  entirely by Jeff, the reports were
23  produced entirely by Jeff, the findings
24  were produced entirely by Jeff and then
25  they were sent to the parties without

Page 102

1    1    anyone ever looking at them other than

2    2    Jeff?

3    3    A     Likely.  Yes.

4    4    Q     What training did Jeff receive once he

5    5    started in your office.  He came on, he

6    6    hadn't had any direct experience in

7    7    higher ed or a Title IX office.  What

8    8    training was provided to him at that

9    9    point?

10   10   A     He did training through the same avenues.

11   11   He and I were often partners in training.

12   12   If one was attending something the other

13   13   was as well because we were such a

14   14   limited staff.  NACUA, ATIXA, ASCA,

15   15   Courtney Bullard, I'm sorry I can't

16   16   remember her organization, she was often

17   17   one we utilized as well for webinars,

18   18   trainings, et cetera.

19   19   Q     Was he ever sent to a comprehensive Title

20   20   IX investigator training, something

21   21   similar to the multi-day ATIXA training

22   22   that you went to?

23   23   A     I don't recall.

24   24   Q     You're not sure or you don't think he

25   25   did?

Page 103

1   1   A     I can't recall.  I'm sorry.  I don't

2   2   remember to be able to answer your

3   3   question.

4   4   Q     No problem.  I want to look now at the

5   5   bottom of page eleven there.  There's a

6   6   footnote 36 and it looks like the Husch

7   7   Blackwell report is referencing a fifth

8   8   responsibility that you had that we

9   9   hadn't talked about before, that you were

10  10  assigned the role of director of digital

11  11  resources and content accessibility in

12  12  August 2019; is that accurate?

13  13  A      It is.  Yes.  We had a DOE Office of

14  14  Civil Rights complaint about

15  15  accessibility of our digital resources,

16  16  specifically our websites and in response

17  17  to that a committee was convened to

18  18  review that.  I became part of that when

19  19  I assume the ADA 504 role and then when

20  20  we decided that we needed some kind of

21  21  review, so well you're the ADA 504

22  22  coordinator, do this.  But one of the

23  23  outcomes of our committee, which was very

24  24  robust and exhaustive, was the

25  25  determining need for a position

Page 104

```
1    1    specifically as the director of digital
2    2    resources and content.  That was the
3    3    recommendation of this committee.  We
4    4    identified that this work was not ad hoc
5    5    other duties as assigned, that this was
6    6    dedicated work.  We left off there and I
7    7    maintained that role by right of me being
8    8    the ADA 504 coordinator until that was
9    9    filled in January of 2022.
10   10   Q    So, there was a committee that said this
11   11   should not be your responsibility
12   12   anymore.  This should be a new role and
13   13   what happened was a new one was created
14   14   and given to you; is that right?
15   15   A    Right.  So, the associate pro -- Doctor
16   16   Matt Lee -- he had served in a provost
17   17   role, sometimes interim and such, but in
18   18   academic affairs.  He and I worked to
19   19   craft the job description.  We
20   20   benchmarked against places that were
21   21   doing this well, places that had a
22   22   structure for this.  We crafted the
23   23   description, we put it forward in 2019
24   24   and the answer was sorry, we can't fund
25   25   this.
```

Page 105

```
 1    1    you working?

 2    2    A      It was limited because in 2014 I became a

 3    3    mom.  So, there was some good limit

 4    4    imposed by the little lady who needed to

 5    5    eat and to be picked up.  But I would go

 6    6    to my regular work hours and then I would

 7    7    review reports or have conversations,

 8    8    communicate with staff members after-

 9    9    hours and weekends so it was certainly

10   10    exceeding those in-office hours.

11   11    Q      I'm going to go now to, let's see -- I

12   12    think a lot of the stuff we already

13   13    covered as well so I'm not going to make

14   14    you go through this twice. I want to talk

15   15    to you about this piece, we're on page

16   16    sixteen of the Husch Blackwell report and

17   17    we're -- this is where there was some

18   18    discussion in the report of

19   19    communications between LSUPD and your

20   20    office.  So, the first paragraph that I

21   21    have highlighted there -- it looks like

22   22    Husch Blackwell had asked the chief of

23   23    LSUPD about reporting to your office and

24   24    he was saying that they won't do so

25   25    without a waiver from the victim.  The
```

Page 107

1    next paragraph, though, identifies that

2    they think -- that Husch Blackwell thinks

3    and then it looks like your office and

4    the general counsel's office thought that

5    their interpretation was incorrect and

6    that they should have been reporting

7    everything to your office.  So, tell me

8    about that.  That sounds like that was

9    probably something that was ongoing

10   during your entire time as Title IX

11   coordinator; is that accurate?

12   A      That is accurate.

13   Q      So what -- this seems like it was just

14   sort of a log jam or something.  Tell me

15   about if you ever raised concerns to

16   anybody about the fact that LSUPD was not

17   reporting incidents to your office?

18   A      Yes.  I inherited the concern and there

19   had been a written -- I don't know if it

20   would be considered an opinion when Jim

21   Marchand was in the role and indicated

22   that it was an erroneous interpretation

23   by our police department about this piece

24   and that information should be shared.

25   Then when it came to me, the issue wasn't

Page 108

```
 1    1    resolved and I raised it with Tom Skinner
 2    2    and he had pulled together folks to sit
 3    3    at the table about this.  Some folks from
 4    4    general counsel under his supervision,
 5    5    LSUPD, and we talked about it and there
 6    6    was no resolution.  The stance was well
 7    7    we'll just have people sign the waiver if
 8    8    they want to and I said that that's not
 9    9    it.  This is not an option.  This is a
10   10    requirement.  These are responsible
11   11    employees. So, it just persisted with no
12   12    resolution and I probably badgeringly so,
13   13    would write to the chief when something
14   14    might become known to us later indicating
15   15    this is one of the things that you should
16   16    have known and I never got a response
17   17    from him.
18   18    Q     Help me understand the organizational
19   19    structure of -- wouldn't the president or
20   20    the general counsel's office have had the
21   21    authority to tell him you need to do
22   22    this?
23   23    A     Well, I think one of the challenges that
24   24    was presented was that they could be
25   25    told, meaning general counsel, PD or
```

Page 109

```
 1   1   Q     Did you maintain any notes or
 2   2   documentation of your determination that
 3   3   this was different from other dating or
 4   4   domestic violence situations?
 5   5   A     All of my documentation was submitted
 6   6   with the case so I think perhaps we did
 7   7   that verbally and that may not have been
 8   8   documented in the case.
 9   9   Q     I just want to go back up to these text
10  10   messages again.  Regardless of anything
11  11   else that's going on, these three text
12  12   messages would not in and of themselves
13  13   trigger a no-contact directive or
14  14   something?
15  15                   MR. PHAYER:
16  16                     Is that a question?
17  17                   MS. ABDNOUR:
18  18                     Yes.
19  19   A     So, your question is would those text
20  20   messages themselves trigger a no-contact
21  21   order?
22  22   BY MS. ABDNOUR:
23  23   Q     Or some action by your office?
24  24   A     Some action, yes.  And we did do that
25  25   action.  We had contact.  So, in addition
```

Page 192