UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS et al.**<br>*Plaintiffs*<br><br>v.<br><br>**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE**<br>*Defendant* | Case No.: 21-242<br><br>Division WBV-SDJ<br><br>JUDGE WENDY B. VITTER<br><br>MAGISTRATE JUDGE JOHNSON |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT NO. 6: JANE DOE**

Plaintiffs, through undersigned counsel, respectfully submit this Opposition to Defendant's Motion for Summary Judgment No. 6: Jane Doe ("Motion") (ECF No. 474) filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board"). Several genuine issues of material fact exist for jury determination as to whether Plaintiff Jane Doe ("Plaintiff") has sufficient evidence to prove suffering a deprivation of educational opportunity and/or benefits as a result of the Board's unofficial policy of ignoring sexual misconduct at Louisiana State University ("LSU"). Further, genuine issues of material fact exist for jury determination as to whether Plaintiff has filed suit timely. Thus, Defendant's Motion should be denied.

**I.   STANDARD OF REVIEW**

*See* Opposition No. 1, Sec. I, incorporated herein by reference.

**II.   RELEVANT FACTS**

  **A. The Board's mismanagement of sexual misconduct at LSU**

*See* Opposition No. 4, Sec. II.A., incorporated herein by reference.

1

### B. Plaintiff's experience with LSU

Jane Doe started at LSU in the fall of 2018 and was soon after introduced to John Poe[1] by her roommate.[2] Poe lived in the same dorm facility as Doe.[3] That same semester, Poe began a prolonged campaign of stalking and harassment, that eventually escalate to include incidents of physical and sexual assault. No matter how many times Doe asked, Poe refused to leave Doe alone; her attempts to block his number, and ignore his repeated calls, text messages, and knocks on her door were to no avail.[4] Poe became extremely upset over any perceived slight by Doe, no matter how small.[5] He eventually became verbally abusive, calling her "names, like fat and pig."[6] As Doe described in her deposition: "I'd been dating a girl previously, so he called me a fag."[7] Eventually Poe began threatening Doe with violence, causing her justifiable fear.[8]

Beyond claiming that he was going to beat Doe up, Poe's harassment did not stop at verbal threats; his harassment soon after became physical.[9] Poe began "playfully" hitting Doe hard enough to leave bruises; when she asked him to stop, he refused to do so, and pretended as if they were both playing a game.[10] On another occasion, Poe groped Doe's buttocks in public.[11]

Poe also undertook to interfere with, damage, destroy and/or steal Doe's property. When Doe left her dorm room, her roommate would often let Poe in, and Poe would proceed to steal food Doe kept in the room.[12] On one occasion, Poe even smashed Doe's food into the carpet, shoved it

---

[1] John Poe is a pseudonym.
[2] Doe 13:23.
[3] Doe 20.
[4] Doe 22-38.
[5] Doe 26-27.
[6] Doe 35:12-14.
[7] Doe 35:12-14.
[8] Doe 32.
[9] Doe 33.
[10] Doe 26; Doe 27:23-28:2.
[11] Doe 38.
[12] Doe 22.

under other students' doors, and threw the food down the hall of the dormitory.[13] Poe also stole a photograph of Doe and circulated it on SnapChat, with a phone number and a note that read, "Call for a good time."[14] On numerous occasions she would return to her dorm room to discover that her bed smelled as if a man had been sleeping or laying in it; she believes this was also attributable to Poe.[15]

Doe hoped that by denying Poe the attention that he was seeking, he would eventually stop. Accordingly, she stopped speaking with Poe and blocked his phone number and social media accounts.[16] But instead of discontinuing his harassment, Poe began following Doe around campus.[17] Even after blocking Poe's number and social accounts, Poe found ways to contact Doe, through her roommate, creating a new phone number, or by going places on campus where Doe was likely to be.[18] If Poe happened to see Doe on campus he would, without fail, approach her and attempt to engage her, despite her clear indications that she did not desire further contact with him.[19]

When he didn't see her on campus, Poe would come to Doe's dorm room. If Doe answered the door, he would push her out of the way, steal something belonging to Doe from the room, and then run away—telling Doe that he would only return her belongings if she agreed to "cuddle" with him.[20] On one such occasion, Poe stole Doe's laundry supplies and threated Doe that "he was going to eat a Tide pod if [Doe didn't] come cuddle with [Poe]."[21] If Doe did not open the door

---

[13] Doe 22.
[14] Doe 22-24.
[15] Doe 22.
[16] Doe 31.
[17] Doe 26 (testifying that Poe would follow her around the student union and dining hall asking if he could eat with her).
[18] Doe 32; Doe 49.
[19] Doe 32.
[20] Doe 26. *See also* Doe 30-31 (testifying Poe would steal her belongings and refuse to return them).
[21] Doe 30:13.

3

when Poe knocked, he would vandalize her property by removing decorations Doe had placed on the door.[22]

At first, Doe was hesitant to report Poe out of fear that she would lose her roommate's friendship.[23] She was also concerned that her resident assistant (RA) would not believe her, or worse, would force her to move.[24] However, by March 2019, Doe realized Poe would not give up his campaign of harassment, despite her clear requests that he stop contacting her. Feeling harassed and unsafe, she told roommate that she intended to report Poe.[25] When Poe found out that Doe was planning to report him, he escalated his stalking tactics.[26] Doe sent Poe a text message telling him to stop contacting her; he responded by threatening to falsely report her to Residence Life for bullying and harassment.[27]

In March 2019, when Doe could no longer handle the abuse, she finally resolved to report his conduct.[28] Doe contacted her RA from the previous semester for advice, and the RA confirmed for Doe that Poe's pattern of behavior was indeed harassment.[29] The RA told Doe that there were people on campus who could help and advised Doe to make a report to the Title IX Office.[30] Still, Doe was worried that there would be no consequences for Poe; after all, Poe had been in trouble before, and nothing had really happened to him as a result.[31] Doe was afraid that reporting Poe would only make him angrier and more determined to harass her, but would do nothing to actually

---

[22] Doe 30.
[23] Doe 37.
[24] Doe 37.
[25] Doe 39.
[26] Doe 39-40.
[27] Doe 40.
[28] Doe 32; Doe 46.
[29] Doe 50.
[30] Doe 49-50.
[31] Doe 51-52.

put a stop to his harassment.[32] Ultimately, Doe relied on her RA's advice and agreed to meet with Title IX representatives in her dorm room.[33]

However, upon interacting with the Title IX office Doe was met not with support and affirmation, but with what she construed as accusations.[34] Her initial meeting was uncomfortable and made Doe feel as if she was being interrogated and blamed for Poe's harassment, and for inconveniencing the employees within the Title IX office.[35] The interviewer barraged Doe with repetitive questions and made her feel as though none of her answers were valid; it was even implied that the harassment was Doe's fault because, on two occasions prior to the first indication of abusive behavior, Doe and Poe had kissed.[36] Doe provided the Title IX investigator with copies of text messages and voicemails from Poe, including messages received from a second phone number Poe used after she blocked his first number, as well as names of witnesses who could confirm her allegations.[37] Those witnesses were never interviewed.[38]

After multiple meetings with Title IX representatives, the LSU employee working in the Title IX Office informed Doe that she could request a no-contact order against Poe, but that her allegations of stalking and sexual harassment did not fall under Title IX.[39] That assertion was flatly false and directly contradicts the plain text of LSU's Title IX policy, which explicitly states that stalking and sexual harassment are covered violations.[40] Doe asked why these items did not fall

---

[32] Doe 52.
[33] Doe 53.
[34] Doe 73-74.
[35] Doe 73.
[36] Doe. 74-75.
[37] Doe 79-80; Doe Exh. 6; Doe 76:15-21.
[38] Doe 76:15-21.
[39] Doe 81:1-5; Doe 84:20-24.
[40] "In accordance with Title IX and other applicable law, Louisiana State University ("LSU") is committed to providing a learning, working, and living environment that promotes integrity, civility, and mutual respect in an environment free of discrimination on the basis of sex and sexual misconduct which includes sexual assault, sexual harassment, dating violence, domestic violence, stalking and retaliation." PLAINTIFFS_000358.

5

under the Title IX Offices purview, and she recalled the response of Assistant Director of Student Advocacy and Accountability ("SAA"), Daniel DeLuca, in her deposition, as follows: "[H]e couldn't tell me, there was some law. I don't remember what law, but he said he couldn't tell me because of that law."[41] Doe left the Title IX process frustrated and despondent.[42]

Later that same week, Doe went to the Lighthouse Program ("Lighthouse"), a program on LSU's campus designed to assist survivors of sexual misconduct.[43] There, she met Lighthouse employee Crystal Loupe, who advised Doe that she could get a no-contact order against Poe.[44] Based on that advice, Doe requested a no-contact order issue against Poe, but never received confirmation as to whether LSU ever issued one in response.[45] Although Doe received an email suggesting that a no-contact order would issue, she never received a copy of the order nor any instructions for what to do if it was violated.[46] When she later requested a copy of her Title IX file, there was no order in the file.[47]

Doe never learned what ultimately happened with her Title IX report. When Doe contacted DeLuca to try to find out, she was told she was not allowed to know because of FERPA.[48] He also told her he could not tell her if there was a no-contact order in place because of FERPA.[49]

Doe continued to see Crystal Loupe at the Lighthouse until the fall of 2019, when Loupe informed her that she needed more professional, therapeutic help than Loupe could offer. Loupe advised Doe of her concerns that Doe was exhibiting signs of increasingly severe depression. As Doe testified, "[Loupe] just told me that she couldn't help me, that she deals with…just like Title

---

[41] Doe 85:10-13.
[42] Doe 73; Doe 89.
[43] Doe 57.
[44] Doe 57.
[45] Doe 57-62
[46] Doe 116; Doe 61-62.
[47] Doe 116; Doe 61-62.
[48] The Family Education Rights and Privacy Act, 20 U.S.C. § 1232g; 34 CFR Part 99; Doe 114-15.
[49] Doe 114-15.

6

IX stuff and that…I wasn't just depressed about the Title IX anymore, I was starting to get depression about everything."[50] Thereafter, Doe attempted to see a therapist at LSU, but was dissuaded when she was told she would only be allowed up to ten sessions, and would thereafter be cut off.[51] As a result of her experiences with the Title IX process, Doe's depression got significantly worse.[52] She began having severe nightmares that persisted throughout 2019.[53] Ultimately, without resources available on-campus, Doe was forced to begin seeing a psychiatrist in private practice.[54]

As a result of these experiences, Doe's grades began to suffer.[55] When she returned to LSU in Fall 2019, Doe moved into a gated community where she began to feel somewhat safe.[56] Still, she experienced ongoing stress and depression concerning the failed Title IX process.[57] When classes resumed, Doe missed—and resultantly failed—multiple classes due to her undiagnosed PTSD, among other disorders, along with depression and anxiety.[58] As Doe testified, "I had a lot of depression about filing the Title IX report, wishing I had never done it. I was really depressed because I felt like I went through all of it for nothing."[59] Doe was expelled from LSU.[60] The failed Title IX process was her only known stressor at that time.[61]

After failing out of LSU, Doe was forced to get a full time job and enroll in a community college, which she attended from Summer 2020 through Fall 2021.[62] Although she eventually was

---

[50] Doe 63:20-25.
[51] Doe 68.
[52] Doe 68-70.
[53] Doe 68-70.
[54] Doe 68-70.
[55] Doe Exh. 11; Doe 96-98.
[56] Doe 138.
[57] Doe 98.
[58] Doe 97-98; Doe 121.
[59] Doe 98:11-14.
[60] Doe 97-98.
[61] Doe 98.
[62] Doe 14-15; Doe 100.

7

readmitted to LSU in Spring 2022, Doe lost her scholarship by inadvertently failing to meet the requirement that she maintain her enrollment across consecutive semesters as a result of her expulsion.[63] Now, Doe is facing challenges gaining admission to LSU's business school as a result of her diminished GPA and her inconsistent undergraduate transcript; she fears it may be impossible for her to obtain a master's in business administration from LSU, as she had always hoped and planned to do.[64]

After her experience with Poe and the Title IX Office, Doe was diagnosed, for the first time, with a binge-eating disorder, which she believes resulted from the failed Title IX process.[65] She also suffers PTSD as a result, which continues to cause her night terrors.[66] She fears she may never be able to gain admission to LSU's business school or obtain a business and account degree, as she had always hoped and planned to do.[67]

It was not until 2021 when Doe read the Husch Blackwell report that she learned of LSU's Title IX failures with respect to other students.[68] The information in the Husch Blackwell report shed new light and understanding on her own experience attempting to navigate reporting of her own abuse through LSU's Title IX Office.

### III. LAW AND ARGUMENT

*See* Opposition No. 1, Sec. III, incorporated herein by reference.

#### A. A genuine issue of material fact exists as to whether Plaintiff's claims were timely filed

*See* Opposition No. 1, Sec. III.C., incorporated herein by reference.

---

[63] Doe 15; Doe 123.
[64] Doe 14.
[65] Doe 120.
[66] Doe 121.
[67] Doe 14.
[68] Doe 90.

The Board argues that Plaintiff's claims are time-barred because her original Complaint was filed outside the prescription period. For the same reasons discussed in connection with the other opposing memoranda filed herewith, this not the case, as Plaintiff did not and could not have become aware of the Board's violations of her rights until the release of the Husch Blackwell report.

### B. Policy-Based Heightened Risk claim

*See* Opposition No. 1, Sec. III.D., incorporated herein by reference.

#### *1. A genuine issue of material fact exists as to whether the Board maintained a policy of deliberate indifference to reports of sexual misconduct.*

*See* Opposition No. 1, Sec. III.D.1., incorporated herein by reference.

Evidence of LSU's deliberate indifference with respect to Doe includes: 1) its failure to properly discipline Poe for past instances of misconduct, causing both Doe to believe that her report would be fruitless;[69] 2) LSU's aggressive, interrogative approach with Doe in her meeting with Title IX staff, blaming her for kissing Poe in the past;[70] 3) failure to interview Doe's witnesses;[71] 4) failure to investigate her report under Title IX, as required by LSU's own Title IX policy;[72] 5) failure to implement a no-contact order and/or failure to properly document and notify Doe as to whether a no-contact order was in place;[73] and 6) failure to provide Doe with sufficient counseling sessions, both as a supportive measure and as necessary remedy to the hostile environment she had experienced.[74]

---

[69] Doe 49-52.
[70] Doe 73-75.
[71] Doe 76:15-21.
[72] Doe 81:1-5; Doe 84:20-24.
[73] Doe 57-62; Doe 116.
[74] Doe 68.

### 2. *A genuine issue of material fact exists as to whether the Board's policy of deliberate indifference created a heightened risk of sexual harassment that was known or obvious.*

*See* Opposition No. 1, Sec. III.D.2., incorporated herein by reference.

LSU's failure to competently respond to Doe in accordance with its Title IX obligations illustrates the University's generalized policy of deliberate indifference, and its indifference to abuse on its campus undoubtedly created a heightened risk of sexual harassment that was known and obvious. As discussed above, Doe was hesitant to report Poe out of fears that nothing would come of it, and Poe would face no consequences for his harassment.[75] Still Doe felt so harassed and unsafe that she finally reported his conduct. As she described:

> Basically, I felt like there was nothing I could do to protect myself, I guess, because I knew he had the capability to be violent with the fighting and stuff. And I felt like he was out of control and like didn't understand what 'no' meant…. [H]e would threaten me with violence… he was bigger than me and stronger. And I was just scared.[76]

Doe worried there would be no consequences for Poe. When he had "gotten in trouble" for stealing property and throwing food in the past, there was no real disciplinary action taken against him; effectively, nothing happened to him as a result.[77] Doe was afraid that reporting him would only make him angrier and more determined to harass her, and there would be no meaningful intervention by the University in response.[78]

Those fears were justified and borne out through Doe's experience with the Title IX Office, where she was told, erroneously, that stalking and harassment were not abuses addressed under Title IX.[79] Instead of providing support and resources, Doe was met with accusations, interrogated,

---

[75] Doe 49-52.
[76] Doe 32:13-24.
[77] Doe 50-52.
[78] Doe 52.
[79] Doe 81:1-5; Doe 84:20-24.

and blamed for her own abuse.[80] LSU's indifference was in fact palpable, as Doe left the Title IX Office feeling as if she was being blamed for inconveniencing its employees.[81] When Doe finally requested that a protective order issue against Doe, she never received a copy of the order or any instruction as to how to enforce it, if it was ever actually issued, which Doe doubts.[82] It would appear she is correct in that assumption, as her Title IX file contained no indication that a no-contact order had ever issued.[83]

Worse, when Doe attempted to follow up on her Title IX report and obtain information about the status of the investigation and the no-contact order, she was stonewalled. The Title IX Office advised that no information about her own claim could be disclosed to her under FERPA.[84] This assertion was also incorrect. LSU's response to Doe's report of legitimate threats, stalking, and harassment is indicative of the school's deliberate indifference to address concerns of sexual harassment and misconduct on its campus. This general policy of indifference to misconduct that was known and/or obvious in turn discouraged reporting, failed to remediated incidences of misconduct, and thereby created a heightened risk of sexual harassment. Based on these facts, summary judgment must be denied.

> ### 3. *A genuine issue of material fact exists as to whether, as a result, Plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived her of access to the educational opportunities or benefits provided by LSU.*

The evidence further supports a finding that Plaintiff suffered deprivation of educational opportunities and benefits sufficient to give rise to Title IX liability as a result of the discrimination she suffered. As the *Davis* Court explained, a plaintiff does not need to have been entirely excluded

---

[80] Doe 73-75.
[81] Doe 73.
[82] Doe 57-62; Doe 116.
[83] Doe 61-62.
[84] Doe 85.

11

from an educational institution, nor to have been confronted with an "overt, physical deprivation of access to school resources" to establish an educational injury.[85] A plaintiff must only prove that the harassment had "a 'concrete, negative effect' on [their] education."[86] This negative effect is sufficient to deny a student equal access to their education. Even a single incident of sexual assault, as occurred with this Plaintiff and several others, is sufficient to give rise to a Title IX violation.[87]

As discussed, Plaintiff's academic performance suffered to such an extent that her grades dropped, she missed classes, and she was ultimately expelled; this caused Plaintiff to lose her scholarship, forcing her to get a full-time job while she attended a local community college. Even after returning to LSU, she lost her scholarship and key educational opportunities. Moreover, her future hopes of obtaining a business and accounting degree from LSU are now seriously diminished.

Negative effects that sufficiently deny a student equal access to their education include, but are not limited to, lost academic opportunities and diminished academic performance. Courts

---

[85] *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650-51, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

[86] *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (quoting *Davis*, 526 U.S. at 654) (applying *Davis* to analogous Title VI racial harassment claim); *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 699 (4th Cir. 2007) (identifying manners of exclusion contemplated by *Davis*).

[87] *See*, *e.g.*, *Jennings*, 444 F.3d at 268, 274 n.12 (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe Dep. at v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as…severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005)))

have found that lost academic opportunities include missed classes,[88] dropped courses,[89] exclusion from campus facilities,[90] and changed study habits.[91] The severity element of a Title IX claim was recently addressed in two cases before this Court. In *Henderson v. Board of supervisors of Southern University and A&M College*, Judge John deGravelles of this Court discussed the standard for determining whether harassment is "'so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit[.]'"[92] The Court found that the measure of the severity of the harassment is determined by whether the harassment has a "concrete, negative effect" on the plaintiff's education.[93] The Court noted that negative impacts on access to education sufficient to make a claim under Title IX include, but are not limited to, forcing a student to change their study habits, move to another district, or become homebound or hospitalized. Additional examples of negative impacts include diminished grades and the experience of physical violence.[94]

---

[88] *See, e.g., Doe Dep. at v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 276 (4th Cir. 2021) (holding jury could find educational deprivation where plaintiff's attendance declined).
[89] *See, e.g., Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022) (holding student established educational deprivation when she changed her major to avoid further harassment).
[90] *Davis*, 526 U.S. at 651 (identifying "female students [excluded] from using a particular school resource, such as "a computer lab," as an obvious Title IX injury); *Farmer v. Kan. State Univ.,* 918 F.3d 1094, 1104-05 (10th Cir. 2019) (holding students were deprived of educational opportunities where they avoided campus library and other resources to avoid their rapists).
[91] *See, e.g., Fennell*, 804 F.3d at 410 (identifying changed study habits as a cognizable educational deprivation); *Wamer*, 27 F.4th 471 (holding student established educational deprivation when she changed her major to avoid further harassment).
[92] *Henderson*, No. CV 21-297-JWD-RLB, 2023 WL 2614620, at *10 (M.D. La. Mar. 23, 2023) (quoting *Sanches*, 647 F.3d at 165 (citing *Davis*, 526 U.S. at 650, 119 S. Ct. 1661)).
[93] *Henderson*, 2023 WL 2614620, at *10 (quoting *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020) (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015))).
[94] *Henderson*, 2023 WL 2614620, at *10 (quoting *Fennell*, 804 F.3d at 410 (internal citations, quotations, and alterations omitted); *Prendergast as Next Friends of L.P. v. Wylie Indep. Sch. Dist.*, No. 18-20, 2018 WL 6710034, at *8 (E.D. Tex. Dec. 4, 2018), *report and recommendation adopted*, No. 18-20, 2018 WL 6705536 (E.D. Tex. Dec. 20, 2018) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248–49 (10th Cir. 1999) (being homebound or hospitalized); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (physical violence)); *Fennell*, 804 F.3d at 410 (finding reasonable jurors could conclude that the plaintiffs were deprived of educational opportunities when one victim "suffered from anxiety and required alternative study arrangements," and the other two "were ultimately withdrawn from [that school district] and moved to another district.") (emphasis added); *see also Z. M-D. b/n/f Menzia v. Austin Indep. Sch. Dist.*, No. 19-991, 2020 WL 4550909, at *5 (W.D. Tex. Aug. 6, 2020) (finding the allegations showed a concrete, negative effect on the victim's education because he "had

In *Doe v. Board of Supervisors of the University of Louisiana System*, Judge Jackson of the Middle District rejected the defendants argument—similar to the Board's arguments here—that a certain form of harassment experienced by the plaintiffs was not sufficiently severe to incur liability under Title IX.[95] Judge Jackson found sufficient negative impact was established by evidence that the plaintiff changed her routines and avoided certain areas of campus to minimize chance encounters with her assailant, which he found plainly deprived her of the full scope of opportunities provided by her university.[96]

In support of its Motion, the Board misquotes *Davis* for the argument that a drop in GPA is not a sufficient deprivation, but diminished academic performance is a common way that Title IX plaintiffs establish an educational deprivation.[97] Contrary to Defendant's assertions, *Davis* explained that a drop in GPA *alone* would not give rise to Title IX liability because *a plaintiff must also establish all the other elements* of a Title IX claim, not because additional educational harms are required.[98] *Davis* observed that a victim's grades can, in fact, "provide necessary evidence of a potential link between her education and [the] misconduct."[99] Further, *Davis* does not suggest, as the Board argues, that Title IX only forbids especially severe education deprivations more significant than those experienced by Plaintiff. Nowhere in *Davis* did the Supreme Court seek to

---

to be hospitalized for severe depression and suicidal ideation due to the harassment, and ultimately withdrew from [the school] entirely."); *see also Yarbrough v. Denton Indep. Sch. Dist.*, No. 420-433, 2021 WL 4704579, at *4 (E.D. Tex. Feb. 5, 2021) (finding the allegations sufficient to plead the harassment had a concrete, negative effect on the victim's education because he alleged, among other things, that he experienced anxiety and depression and was eventually withdrawn from the school district, but emphasizing that plaintiff "plausibly pleaded an example recognized by the Fifth Circuit: forcing a student to move to another district."); *see also Prendergast*, 2018 WL 6710034, at *8 (plaintiffs felt they 'had no choice but to remove [him] from' " his school); *cf. Sewell*, 974 F.3d at 585 (finding the allegations that the abuse by a school employee left the victim depressed, isolated, distraught, and traumatized were enough, but emphasizing that teacher-on student harassment is more likely to support Title IX liability than is peer harassment).

[95] *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, No. CV 22-00338-BAJ-SDJ, 2023 WL 143171, at *10 (M.D. La. Jan. 10, 2023).
[96] *Bd. of Supervisors of Univ. of La. Sys.,* 2023 WL 143171, at *11.
[97] *See Fennell*, 804 F.3d at 410 (citing *Davis*, 526 U.S. at 652); *Fairfax*, 1 F.4th at 276.
[98] *See* 526 U.S at 652.
[99] *Id.*

14

limit Title IX to prohibit only the worst of the worst educational injuries.[100] Indeed, there is no support for such an interpretation within the statutory text, which categorically forbids a school from "exclud[ing a person] from participation in," or "den[ying her] the benefits of," its programming "on the basis of sex."[101] The statute, on its face, does not distinguish between moderate and severe exclusions or denials.

Potential interactions between an assailant and a victim are enough to preclude summary judgment on the question of whether a heightened risk of harassment is sufficient to deprive the victim of access to educational opportunities provided to her at school. "[T]he continuing presence of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination."[102] Courts have also held that evidence of emotional distress because of the school's actions is sufficient to establish a genuine issue of material fact about whether a student's access to educational opportunities at school were affected.[103] A jury may find Plaintiff's distress, caused by LSU's actions, effectively barred her from accessing her educational opportunities and benefits.

Potential interactions between an assailant and a victim are enough to preclude summary judgment on the question of whether a heightened risk of harassment is sufficient to deprive the victim of access to educational opportunities provided to her at school. "[T]he continuing presence

---

[100] *See id.* at 651.
[101] 20 U.S.C. § 1681(a).
[102] *Wills v. Brown Univ.*, 184 F.3d 20, 37 (1st Cir. 1999). *See also Doe Dep. at ex rel Doe Dep. at v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (where assailant and victim shared a class and lunch period, "jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe Dep. at's educational experience"); *Kelly v. Yale Univ.*, No. 3:01-CV-1591 (JCH), 2003 U.S. Dist. LEXIS 4543 at *3 (D. Conn. Mar. 26, 2003) ("a reasonable jury could conclude that further encounters, of any sort, [could] . . . deprive the victim of access to educational opportunities provided by a university"); *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 U.S. Dist. LEXIS 100780 (S.D. Ohio June 15, 2018) (school's actions made plaintiff vulnerable to sexual harassment " even though she never actually encountered him on campus").
[103] *See T.Z. v. City of New York*, 634 F. Supp. 2d 263, 267, 272 (E.D.N.Y. 2009) (finding genuine issue of material fact when student suffered nightmares, uncontrollable crying, loss of concentration, and other emotional distress symptoms); *Bruning v. Carroll Comm. Sch. Dist.*, 486 F. Supp. 2d 892, 917-18 (N.D. Iowa 2007).

of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination."[104]

Here, testimony and evidence reveal that Doe's suffered significant negative impacts as a result of Poe's abuse and the Title IX Office's mishandling of her claim. As discussed above, Doe suffers PTSD, increased depression and anxiety, and a binge eating disorder as a result of her ordeal. She began experiencing regular night terrors as a result. Doe's grades dropped, she missed and failed multiple classes, and was expelled, forcing her to attend a community college. When she returned to LSU, she lost her scholarship, and her hopes of pursuing a business and accounting degree are now severely diminished. All of the foregoing had significant adverse impacts on Doe's access to educational opportunities and benefits and were the direct result of her harassment and the University's failure to respond in accordance with its obligations under Title IX. Based on the evidence, a reasonable jury could find sufficient grounds for liability on the part of Defendant for depriving Doe of educational opportunities and benefits as a result of her sexual harassment, and summary judgment is therefore improper in this case.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment No. 6, as it relates to Jane Doe.

---

[104] *Wills v. Brown Univ.*, 184 F.3d 20, 37 (1st Cir. 1999). *See also Doe Dep. at ex rel Doe Dep. at v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (where assailant and victim shared a class and lunch period, "jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe Dep. at's educational experience"); *Kelly v. Yale Univ.*, No. 3:01-CV-1591 (JCH), 2003 U.S. Dist. LEXIS 4543 at *3 (D. Conn. Mar. 26, 2003) ("a reasonable jury could conclude that further encounters, of any sort, [could] . . . deprive the victim of access to educational opportunities provided by a university"); *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 U.S. Dist. LEXIS 100780 (S.D. Ohio June 15, 2018) (school's actions made plaintiff vulnerable to sexual harassment "even though she never actually encountered him on campus").

Respectfully Submitted

/s/ Catherine E. Lasky

| | |
|---|---|
| Karen Truszkowski | Catherine E. Lasky (La. Bar 28652) |
| *Pro Hac Vice* | Endya L. Hash (La. Bar 38260) |
| Temperance Legal Group | Katie Lasky Law |
| 503 Mall Court #131 | 619 Homedale Street |
| Lansing, Michigan 48912 | New Orleans, Louisiana 70124 |
| P: (844) 534-2560 | P: (504) 584-7336 |
| F: (800) 531-6527 | F: (504) 375-2221 |
| karen@temperancelegalgroup.com | katie@katielaskylaw.com |
| | endya@katielaskylaw.com |

Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

/s/ Elizabeth K. Abdnour
Elizabeth K. Abdnour