UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, et al.**<br>*Plaintiffs*<br><br>v.<br><br>**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE**<br>*Defendant* | Case No.: 21-242<br><br>Division WBV-SDJ<br><br>JUDGE WENDY B. VITTER<br><br>MAGISTRATE JUDGE JOHNSON |

## OPPOSING STATEMENT OF MATERIAL FACTS TO MOTION FOR SUMMARY JUDGMENT NO. 6: JANE DOE

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion for Summary Judgment No. 6, Plaintiff Jane Doe, through undersigned counsel, submits responses to the Board's Statement of Undisputed Material Facts:

1. Jane Doe enrolled at LSU as a freshman in Fall 2018. (Rec. Doc. 182, ¶ 597; Doe 19)[1]

   **Admitted.**

2. Soon after her enrollment, Doe met John Poe, another LSU student, through her roommate. (Doe 20) Poe was a friend of Doe's roommate's boyfriend. (Doe 20)

   **Admitted.**

3. Doe, her roommate, and Poe all lived in North Hall, a residence hall at LSU. (Doe 20)

   **Admitted.**

4. Doe admits Poe was "really, really nice" when they first met, and they were friends. (Doe 28) Doe and Poe would go places together, including attending football games. (Doe 28)

   **Admitted.**

5. According to Doe, she and Poe did not date. (Doe 29) They kissed two times, but they did not have any other intimate contact. (Doe 74-75)

**Admitted.**

6. Doe alleges that, sometime after they attended a football game together, Poe's behavior toward her changed. (Doe 35)

**Admitted.**

7. Doe claims Poe took food from her room and took decorations off her dorm room door. (Doe 22, 26, 20) Doe alleges Poe sometimes offered to return the items if she would go to his room and cuddle with him. (Doe 26)

**Admitted.**

8. Doe further claims that Poe would "play fight" with her and call her names like "fat" and "pig." (Doe 26, 35) Doe admits she was never injured as a result of the play fighting, and she did not report Poe's actions to LSU. (Doe 28)

**Qualified.** Doe did not report the name calling and play fighting to LSU, "at the time." (Doe 28 8)

9. Despite Doe's objections, her roommate allowed Poe to enter their dorm room. (Doe 20-21)

**Admitted.**

10. As a result of his behavior, Doe distanced herself from Poe. (R. Doc. 182, ¶ 604) She stopped talking to him and blocked him on her cell phone and social media accounts. (Doe 31)

**Admitted.**

11. Doe alleges that, despite her efforts, Poe would find ways to contact her or relay messages to her through her roommate. (Doe 31-32)

**Admitted.**

12. Doe and Poe each received LSU's training on Title IX. (Doe 127-129; Doe Exhs. 2021; Sanders Decl. ¶ 3)

**Qualified.** Doe acknowledges receipt of emails referencing Title IX training. She does not recall if she read the emails. Doe can neither admit nor deny if Poe received said training as she has no personal knowledge of said event. (Doe 127 8-9, 129)

13. In late Fall 2018, Doe received information about LSU's policies regarding campus safety. (Doe 127-129; Doe Exhs. 20-21)

**Qualified.** Doe acknowledges receipt of information about LSU's policies referencing Title IX training. She does not recall if she read the emails. (Doe 127-129)

14. Doe was required to complete MyStudent Body training, a program that addresses alcohol, drugs, and sexual violence before November 2, 2018. (Sanders Decl. ¶ 3; Doe 127-128; Doe Exh. 20) Completion of the training was a prerequisite for Spring 2019 registration. (Doe Exh. 20; Sanders Decl. ¶ 3)

**Qualified.** Doe acknowledges she received MyStudentBody training. She recalls a segment on alcohol. She does not remember doing a segment on drugs or sexual violence. (Doe 127-128)

15. The Board's policies were promulgated to students and staff alike before and after Doe's alleged harassment. (Doe 127-129; Doe Exhs. 20-21; Board 30(b)(6) I 29, 5254; Board 30(b)(6) II 259-261; Stewart 38-41)

**Qualified.** Doe can neither admit nor deny whether the Board promulgated policies as she lacks knowledge of such. She does not recall if she read any policies. (Doe 127-12)

3

16. Employees, non-employees, and students, including Doe, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative. (Board 30(b)(6) I 49-52) Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (Id. 53-54)

**Qualified.** Doe can neither admit nor deny whether the Board promulgated policies as she lacks knowledge of such.

17. The Board provided annual training beginning in at least 2014. (Board 30(b)(6) I 3032, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37) Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) I 39, 42)

**Qualified.** Doe can neither admit nor deny as she has no personal knowledge of the training referenced above, when it was provided, what its content was, or who developed the trainings.

18. In addition to the campus-wide training, some departments, such as Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 39, 42)

**Qualified.** Doe can neither admit nor deny as she has no personal knowledge of the training referenced above.

19. LSU did not receive a report from Doe about Poe's behavior in 2018. (Doe 32; Board 30(b)(6) I 48-49; Sanders Decl. ¶ 12)

**Admitted.**

20. During the Spring semester 2019, Doe's roommate invited her to go to Chipotle, and Doe agreed. (Doe 38, 40; R. Doc. 182, ¶ 606) Doe claims she did not realize Poe was invited to go until he got into her roommate's car. (Doe 38, 40)

**Admitted.**

21. Doe claims Poe grabbed her butt as they were walking to Chipotle. (Doe 38, 40-41) Doe testified in her deposition that she told Poe to stop and not touch her again. (Doe 38)

**Admitted.**

22. After the interaction, the three returned to North Hall with their food, but Doe and Poe did not eat together. (Doe 42)

**Admitted.**

23. Doe did not report Poe's behavior to anyone at LSU. (Doe 42)

**Qualified**. Doe did not report Poe's behavior "at that time." (Doe 42 17-20)

24. Doe alleges she was upset about not receiving a job, and Poe sent her a message on Twitter congratulating her on a job offer. (Doe 37-38, 43)

**Admitted.**

25. Doe also alleges Poe took a picture from her room and wrote a phone number on it (which was not Doe's) with a message reading "Call for a good time." (Doe 22-25)

**Admitted.**

26. After these incidents, Doe told her roommate that she was going to report Poe and her roommate's boyfriend to Residential Life. (Doe 38-39)

**Admitted.**

5

27. After Doe's conversation with her roommate, Doe alleges Poe got a new phone number, called Doe, and left a voicemail telling Doe although she was "struggling in life," that was not an excuse to take her anger out on her roommate. (Doe 39)

**Admitted.**

28. Doe alleges the next day or so, she received a text message from the same number (because she did not block the number). (Doe 39-40) In the text message, Doe alleges Poe confirmed his identity and threatened to report her. (Doe 40)

**Admitted.**

29. On or around March 19, 2019, Doe reported Poe to her former resident assistant. (Doe 32, 46, 49-50; Doe Exhs. 1-2)

**Admitted.**

30. A few hours later, a representative of Residential Life met with Doe (who was accompanied by one of her friends at Doe's request) in Doe's room at North Hall. (Doe 53-54) During the meeting, Doe was informed about available resources like the Lighthouse Program, a "No Contact" order, and the LSU Police Department.

**Admitted.**

31. Doe's complaint was submitted to the Title IX Office, and Doe was contacted by a representative of that office on March 21, 2019. (Doe Exh. 5)

**Admitted.**

32. Plaintiff testified that she never interacted with or spoke to Jennie Stewart. (Doe 118, 154-155)

**Admitted.**

33. Stewart testified that Kimberly Davis, a graduate student in the Title IX office, handled the intake of Doe's case, and that Stewart did not communicate directly with Doe. (Stewart 261-262)

**Admitted.**

34. Doe was offered the option to move to "a safe space" (i.e., another room for a threeday period), with the option to move to another room permanently. (Doe 53-55; R. Doc. 182, ¶¶ 620-622) Doe accepted the temporary housing and ultimately relocated to another dorm. (Doe 54-56)

**Admitted.**

35. Doe testified that after the meeting she felt like her concerns had been addressed and she was satisfied with the meeting. (Doe 56)

**Admitted.**

36. Doe visited Lighthouse on March 29, 2019 seeking academic accommodations, specifically, extended time, a distraction reduced environment, consideration for absences, and note taking. (Doe 57, 71-72; Doe Exh. 4)

**Admitted.**

37. Doe testified that she met weekly with Crystal Loup in the Lighthouse Program from March 2019 to Fall 2019. (Doe 63)

**Admitted.**

38. The Title IX office investigated Doe's complaint. (Doe Exh. 7) Based on the information gathered during the investigation, the Title IX office determined that Doe's allegations fell outside of Title IX. (Doe 84)

**Admitted.**

39. The Maxient file regarding Doe's complaint indicates that Doe was interviewed by Davis of the Title IX Office, and the notes of her interviews were included in the file. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 6)

**Qualified.** Doe can neither admit nor deny as she has no personal knowledge of what the notes say.

40. According to the Maxient file, although Doe provided the names of students to be interviewed in connection with her complaint, neither student responded to requests to be interviewed by Title IX. (Doe Exh. 7)

**Qualified.** Doe can neither admit nor deny if the students responded as she has no personal knowledge of those events.

41. Based on the information obtained during the investigation, including Davis's notes, the Title IX office determined that Doe's complaint did not constitute a Title IX violation. (Doe 84; Sanders Decl. ¶ 12)

**Admitted.**

42. Doe's complaint was referred to Student Advocacy and Accountability ("SAA") for further review to determine whether Poe's actions violated the Student Code of Conduct. (Sanders Decl. ¶ 12; Doe 84-85; Doe Exhs. 8 and 9)

**Admitted.**

43. SAA investigated Doe's complaint and cited Poe for violations of the Student Code of Conduct. (Sanders Decl. ¶ 12) Specifically, Poe was charged with Harassment, Offensive Behavior, Property Misuse, and Stalking, and was ultimately found responsible for Harassment and Property Misuse. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

**Admitted.**

44. As a result of the findings by SAA, Poe was placed on disciplinary probation from June 7, 2019 through May 31, 2020. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

**Admitted.**

45. In addition, a mutual "No Contact" Order between Poe and Doe was issued. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)  Under the terms of the order, the parties were directed to avoid contact with each other until the directive was lifted in writing.  (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

**Qualified.** Doe was never informed that there was a mutual no-contact order.

46. Poe was also required to write a reflection essay and submit it to SAA by July 7, 2019. (Sanders Decl. ¶ 12; Sanders Decl. Exh. 7)

**Qualified.**  Doe can neither admit nor deny if Poe was required to write an essay as she has no personal knowledge of said events.

47. Prior to Doe's complaint, the Title IX office did not receive any complaints about Poe. (Board 30(b)(6) I 48-49)

**Qualified.** Doe can neither admit nor deny if there were other complaints about Poe as she has no personal knowledge of said events.

48. Doe admits she did not have any interaction with Poe after her report to Residential Life in March 2019.  (Doe 46)

**Admitted.**

49. Plaintiff filed suit on April 26, 2021. (R. Doc. 1)

**Admitted.**

50. Doe did not read the entirety of the Husch Blackwell Report, and none of the allegations in the Husch Blackwell Report relate to her.  (Doe 95; R. Doc. 1-2)

**Qualified.** While the specific details about individual people in the Husch Blackwell report do not include any information related to Doe's personal experience of abuse at LSU, the systemic issues identified in the report regarding LSU's dysfunctional Title IX and sexual misconduct response systems relate directly to her.

51. According to Doe, her alleged harassment occurred in the Fall of 2018 and the Spring of 2019. (R. Doc. 182, ¶¶ 597-616; Doe 22-23, 35) By this time, she knew of her alleged injuries and the perpetrator. (See Doe 22-25, 37-39, 40-44)

**Qualified.** Doe acknowledges that the harassment occurred between Fall 2018 and Spring 2019. However, Doe was never notified of the existence of a no-contact order until years later.

52. Doe's complaint reached the Title IX office by March 2019 and the SAA office by May 2019. (Doe Exhs. 5, 8)

**Admitted.**

53. Between March and May 2019, Doe communicated with representatives in Residential Life, Lighthouse, Title IX, and Student Advocacy and Accountability to process her report. (Doe 53-54, 57, 71-72, 84-85; Doe Exhs. 4-5, 7-9)

**Admitted.**

54. On May 14, 2019, Doe responded to an email from Crystal Loup, Coordinator, Wellness & Health Promotion at The Lighthouse Program stating: "I met with student accountability and advocacy and the person I talked to said that title ix said that [Poe] wasn't in violation of their policies so they sent it to their office to try and find a violation there." (Doe 86-87; Doe Exh. 9)

**Admitted.**

10

55. As of at least May 14, 2019, Doe knew that her complaint was not being handled by Title IX and instead was being handled by SAA. (Doe 84)

**Admitted.**

56. All of the examples in the Second Amended Complaint and Jury Demand (the "Complaint") of how LSU allegedly created a heightened risk of sexual misconduct on campus for Poe's victims relate to conduct occurring after Doe's alleged harassment by Poe. (R. Doc. 182, ¶ 934 (a)-(c))

**Denied.** The Second Amended Complaint discusses LSU's Title IX Office's systemic failures before and during to Poe's misconduct towards Doe.

57. Doe is the first and only plaintiff to allege conduct by Poe, and the only student who made claims of a sexual nature against Poe. (Sanders Decl. ¶ 12; Board 30(b)(6) I 4849)

**Qualified**. Doe acknowledges that Sanders and the Board testified that her complaint was the only one against Poe. Doe can neither admit nor deny the accuracy of this testimony. Further, while there are no other plaintiffs *in this lawsuit* who name Poe as their abuser, Doe can neither admit nor deny whether there are any other plaintiffs who allege conduct by Poe as she lacks knowledge of such.

58. In 2017, the LSU Office of Internal Audit conducted an audit regarding Title IX obligations, specifically sexual misconduct (the "Audit"). (R. Doc. 1-1, p. 164) The Audit reviewed activities between June 1, 2015 and December 31, 2016 (prior to Doe becoming an LSU student and prior to Doe's alleged interactions with Poe), and its findings related to multiple campuses. (Id.) The Audit noted that PM-73 was already in place since 2014, pre-dating the Audit's review period. (R. Doc. 1-1, p. 166)

**Admitted.**

## ADDITIONAL FACTS

1. Supplemental Opposing Statement of Material Facts as to Opposition to Motions No. 1-10 is incorporated herein by reference.

2. Jane Doe started at LSU in the fall of 2018 and would soon after be introduced to John Poe by her roommate. Doe 13:23, 19, 20.

3. Poe lived in the same dorm facility as Doe. Doe 20.

4. No matter how many times Doe asked, Poe refused to leave Doe alone; her attempts to block his number, and ignore his repeated calls, text messages, and knocks on her door were to no avail. Doe 32.

5. Poe became extremely upset over any perceived slight by Doe, no matter how small. Doe 26-27.

6. He eventually became verbally abusive, calling her "names, like fat and pig." 6 As Doe described in her deposition: "I'd been dating a girl previously, so he called me a fag." Doe 35:12-14, 37.

7. Eventually Poe began threatening Doe with violence, causing her justifiable fear. Doe 32:13-33:20.

8. She is no longer friends with her roommate because of what happened with Poe, "she would let [Poe] into my room without me knowing and knowing I didn't like it." Doe 19:24-20:1.

9. Beyond claiming that he was going to beat Doe up, Poe's harassment did not stop at verbal threats. Doe 33. Soon his harassment became physical. Poe began "playfully" hitting Doe hard enough to leave bruises; when she asked him to stop, he refused to do so, but pretended as if they were both playing a game. Doe 26-28:2, 126.

10. On another occasion, Poe groped Doe's buttocks in public. Doe 38.

11. When Doe left her dorm room, her roommate would often let Poe in, and Poe would proceed to steal food Doe kept in the room. Doe 22:5-10, 24:19. On some occasions, Poe would smash her food into the carpet, shove it under other students' doors, or throw the food down the hall of the dormitory. Doe 22:5-10, 24:19.

12. Poe also stole a photograph of Doe and circulated it on SnapChat, with a phone number and a note that read, "Call for a good time." Doe 22:5-10, 24:19.

13. On numerous occasions she would return to her dorm room to discover that her bed smelled as if a man had been sleeping or laying in it; she believes this was also attributable to Poe. Doe 22:12.

14. Doe hoped that by denying Poe the attention that he was seeking, he would eventually stop. Accordingly, she stopped speaking with Poe and blocked his phone number and social media accounts. Doe 31.

15. But instead of discontinuing his harassment, Poe began following Doe around campus. Doe 26.

16. Even after blocking Poe's number and social accounts, Poe found ways to contact Doe, through her roommate or by going places on campus where Doe was likely to be. Doe 32.

17. If Poe happened to see Doe on campus he would, without fail, approach her and attempt to engage her, despite her clear indications that she did not desire further contact with him. Doe 26.

18. When he didn't see her on campus, Poe would come to Doe's dorm room. If Doe answered the door, he would push her out of the way, steal something belonging to Doe from the room, and then run away—telling Doe that he would only return her belongings if she agreed to "cuddle" with him. Doe 26.

19. On one such occasion, Poe stole Doe's laundry supplies and threated Doe that "he was going to eat a Tide pod if [Doe didn't] come cuddle with [Poe]." Doe 30:13.

20. If Doe did not open the door when Poe knocked, he would vandalize her property by removing decorations Doe had placed on the door. Doe 26-30.

21. At first, Doe was hesitant to report Poe out of fear that she would lose her roommate's friendship. Doe 28, 37.

22. She was also concerned that her resident assistant (RA) would not believe her, or worse, would force her to move. Doe 37.

23. However, by March 2019, Doe realized Poe would not give up his campaign of harassment, despite her clear requests that he stop contacting her. Feeling harassed and unsafe, she told roommate that she intended to report Poe. Doe 39, 44.

24. When Poe found out that Doe was planning to report him, he escalated his stalking tactics. Doe 39-40.

25. Doe sent Poe a text message telling him to stop contacting her; he responded by threatening to falsely report her to Residence Life for bullying and harassment. Doe 39-40.

26. When Doe could no longer handle the abuse, she finally resolved to report his conduct. Doe 32:13-18.

27. Doe called an RA for advice, and the RA confirmed for Doe that Poe's pattern of behavior was indeed harassment. Doe 49-50.

28. The RA told Doe that there were people on campus who could help and advised Doe to make a report to the Title IX Office. Doe 49-50.

29. Still, Doe was worried that there would be no consequences for Poe; after all, Poe had been in trouble before, and nothing had really happened to him as a result. Doe 51-52.

30. Doe was afraid that reporting Poe would only make him angrier and more determined to harass her but would do nothing to actually put a stop to his harassment. Doe 51-52.

31. Upon interacting with Title IX, Doe was met not with support and affirmation, but with what she construed as accusations. Her initial meeting was uncomfortable and made Doe feel as if she was being interrogated and blamed for Poe's harassment, and for inconveniencing the Title IX first responders. Doe 73.

32. The interviewer barraged her with repetitive questions and made her feel as though none of her answers were valid; they implied that the harassment was Doe's fault because, on two occasions prior to the first indication of abusive behavior, Doe and Poe had kissed. Doe 74-75.

33. After reporting, she met with Title IX and they asked her if she wanted to move and put her in a safe room in Evangeline Hall for three days. Doe 54:2-9. After those three days, Doe and her suitemate decided to move to Evangeline Hall. Doe 55. Doe did not want to move but it appeared to be the only option to stop contact with Poe. Doe 162.

34. Doe provided the Title IX investigator with copies of text messages and voicemails from Poe, some from a second phone number Poe used after she blocked his first number, as well as names of witnesses who could confirm her allegations. Doe 76:15-21.

35. Those witnesses were never interviewed. Doe 76:15-21.

36. At the conclusion of her first meeting, the LSU employee working in the Title IX Office informed Doe that she could get a no-contact order against Poe, but that stalking and sexual harassment did not fall under Title IX. Doe 81:1-5, 84:20-24.

37. That assertion was flatly false and directly contradicts the plain text of LSU's Title IX policy, which explicitly states that stalking and sexual harassment are covered violations. PLAINTIFFS_000358.

38. Doe asked why these items did not fall under the Title IX Offices purview, and she recalled the response of Assistant Director of Student Advocacy and Accountability ("SAA"), Daniel DeLuca, in her deposition, as follows: "[H]e couldn't tell me, there was some law. I don't remember what law, but he said he couldn't tell me because of that law." Doe 85:10-13.

39. Later that same week, Doe went to the Lighthouse, an organization on LSU's campus designed to assist survivors of sexual misconduct. Doe 57. There, she met Lighthouse employee Crystal Loupe, who advised Doe that she could get a no-contact order against Poe. Doe 57.

40. Based on that advice, Doe requested a no-contact order issue against Poe, but she does not know whether LSU ever issued one in response. Doe 58.

41. Doe received an email suggesting that a no-contact order would issue, but she never received a copy of the order, nor any instructions for what to do if it was violated. Doe 61:22-62:3.

42. When she later requested a copy of her Title IX file, there was no order in the file. Doe 61:22-62:3.

43. Doe never learned what ultimately happened with her Title IX report. When Doe contacted DeLuca to try to find out, she was told she was not allowed to know because of FERPA. Doe 114-5. He also told her he could not tell her if there was a no-contact order in place because of FERPA. Doe 114-5.

44. Doe continued to see Crystal Loupe at the Lighthouse until the fall of 2019, when Loupe informed her that she needed more professional, therapeutic help than Loupe could offer. Loupe advised Doe of her concerns that Doe was exhibiting signs of increasingly severe depression. As Doe testified, "[Loupe] just told me that she couldn't help me, that she deals with…just like Title IX stuff and that…I wasn't just depressed about the Title IX anymore, I was starting to get depression about everything." Doe 63:20-25.

45. Thereafter, Doe tried to see a therapist at LSU, but was dissuaded when she was told she would only be allowed up to ten sessions and would then be cut off. Doe 66:8-14.

46. As a result of her experiences with the Title IX process, Doe's depression got significantly worse. Doe 68-69

47. Doe began having severe nightmares that persisted throughout 2019. Doe 68-70.

48. Ultimately, without resources available on-campus, Doe was forced to begin seeing a psychiatrist in private practice. Doe 68-70.

49. As a result of these experiences, Doe's grades began to suffer. JANE DOE 000105, Exhibit 11; Doe 96-97.

50. LSU told her she needed to take a semester off, which she did, and returned to LSU in Fall 2019. JANE DOE 000105, Exhibit 11; Doe 96-98.

51. When she returned, Doe moved into a gated community where she began to feel somewhat safe. Doe 138.

52. Still, she experienced ongoing stress and depression concerning the failed Title IX process. Doe 98.

53. When classes resumed, Doe missed—and resultantly failed—multiple classes due to her undiagnosed PTSD, among other disorders, along with depression and anxiety. Doe 97-98.

17

54. As Doe testified, "I had a lot of depression about filing the Title IX report, wishing I had never done it. I was really depressed because I felt like I went through all of it for nothing." Doe 98:11-14.

55. Doe was expelled from LSU. Doe 97-98.

56. The failed Title IX process was her only known stressor at that time. Doe 98.

57. After failing out of LSU, Doe was forced to get a full-time job and enroll in a community college, which she attended from Summer 2020 through Fall 2021. Doe 14-15, 100.

58. Because of her transfer to the community college, Doe was forced to change her major. Doe Dep. at 14-15.

59. Although she eventually was readmitted to LSU in Spring 2022, she lost her scholarships, failing to meet the requirement that she maintain her enrollment across consecutive semesters as a result of her expulsion. Doe 110, 123, 137.

60. Doe is facing challenges gaining admission to LSU's business school as a result of her diminished GPA and her spotty undergraduate transcript; she fears it may be impossible for her to obtain an MBA from LSU, as she had always hoped and planned to do. Doe 14.

61. After her experience with Poe and the Title IX Office, Doe was diagnosed, for the first time, with a binge-eating disorder, which she believes resulted from the failed Title IX process. Doe 120:12-17.

62. She also suffers PTSD as a result, which continues to cause her night terrors. Doe 121:15.

63. It was not until 2021, when Doe read the Husch Blackwell report that she learned of LSU's Title IX failures with respect to other students. Doe 90.

                                                Respectfully Submitted,

                                                */s/ Catherine E. Lasky*

| | |
|---|---|
| Karen Truszkowski | Catherine E. Lasky (La. Bar 28652) |
| *Pro Hac Vice* | Endya L. Hash (La. Bar 38260) |
| Temperance Legal Group | Katie Lasky Law |
| 503 Mall Court #131 | 619 Homedale Street |
| Lansing, Michigan 48912 | New Orleans, Louisiana 70124 |
| P: (844) 534-2560 | P: (504) 584-7336 |
| F: (800) 531-6527 | F: (504) 375-2221 |
| karen@temperancelegalgroup.com | katie@katielaskylaw.com |
| | endya@katielaskylaw.com |

                                                Elizabeth K. Abdnour
                                              *Pro Hac Vice*
                                              Abdnour Weiker LLP
                                              500 E. Michigan Ave., Ste. 130
                                              Lansing, MI 48912
                                              (517) 994-1776
                                              (614) 417-5081
                                              liz@education-rights.com

                                              *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

                                              */s/ Elizabeth K. Abdnour*
                                              Elizabeth K. Abdnour