UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ABBY OWENS, ET AL                CIVIL ACTION NO. 21-242

VERSUS
                                 JUDGE WENDY B. VITTER
LOUISIANA STATE
UNIVERSITY, ET AL                MAGISTRATE JUDGE JOHNSON


*** CONFIDENTIAL ***

* * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE DEPOSITION OF:

ELISABETH ANDRIES,

TAKEN ON BEHALF OF BOARD OF SUPERVISORS OF LOUISIANA

STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL

COLLEGE, REPORTED IN THE ABOVE ENTITLED AND NUMBERED

CAUSE BY YOLANDA J. PENA, CERTIFIED COURT REPORTER FOR

THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * *


REPORTED AT THE LAW OFFICES OF:

PHELPS DUNBAR LLP

400 CONVENTION STREET, SUITE 1100

BATON ROUGE, LOUISIANA  70802


COMMENCING AT 9:07 A.M., ON SEPTEMBER 23, 2022.

1          A.    Industrial engineering.

2          Q.    **At some point, did your major change?**

3          A.    Yes.  I started as a mechanical engineer and

4    swapped -- let me think -- in August of 2018, I want to

5    say.

6          Q.    **Were your jobs flexible?**

7          A.    Some, yes.  Some others not so much.

8          Q.    **How many hours -- about how many hours would**

9    **you say you worked a week?**

10         A.    It grew as I stopped doing campus jobs.  So

11   the campus one was you couldn't work over 20 hours a

12   week.  But some weeks, I worked 50 hours; some weeks I

13   worked 20 depending on heavy school loads.

14         Q.    **Did your jobs require you to miss class**

15   **sometimes?**

16         A.    I believe some of the service industry ones

17   weren't so flexible some days, so I may have missed a

18   class or two.

19         Q.    **After you graduated from LSU, where did you**

20   **work?**

21         A.    HashiCorp.

22         Q.    **Would you repeat that for me, please?**

23         A.    HashiCorp.

24         Q.    **And where is that?**

25         A.    It's a completely online company based in

ELISABETH ANDRIES

1        A.    HashiCorp.

2        Q.    **Hashi Corporation.  Is that where you're**

3   **currently employed?**

4        A.    Yes.

5        Q.    **And what is your current position?**

6        A.    Solutions engineer.

7        Q.    **And what is your current rate of pay?**

8        A.    I have a base pay of around 56,000 euros with

9   a commission going up to 15,000 euros per year.

10       Q.    **All right.  Let's go back and talk about your**

11  **time at LSU.**

12            **So you said that you started in August 2016,**

13  **correct?**

14       A.    Yes.

15       Q.    **All right.  Tell me about your first semester.**

16  **How would you describe your first semester at LSU?**

17       A.    So I -- it was a bit messy because there was

18  the Baton Rouge floods that year.  So school started, I

19  believe, two weeks after that, or it started later.  I

20  participated in the fall 2016 rush.  I went into the

21  sorority Delta Gamma.  Yeah, it was very difficult to

22  live with someone in a small dormitory room, but it was

23  a good time with a lot of new difficulties.

24       Q.    **All right.  So at some point, you attended a**

25  **Halloween party in 2016 -- in October of 2016, correct?**

1      A.    Correct.

2      Q.    **All right.  Please tell me about the party**

3   **that night.**

4      A.    It was a fraternity party for Phi -- oh,

5   gosh -- Phi Delts, I believe.  I was invited by a

6   friend at the time, ███████.  I was able to get two

7   of my close friends able to participate in the party as

8   well, invited as dates.

9           And from what I remember, I skipped eating

10  dinner that night because I had a class run a little

11  late or homework took a little too long.  I met my

12  friends at the fraternity house, and we took busses

13  down to Red Eye in New Orleans.  It was a fun time

14  there.

15          And then at some point at night at the bar,

16  I started not to remember.  I got sick, went to the

17  bathroom.  One of my -- my friends from my sorority

18  found me there, connected me with my other friend as

19  well.  They tried to get me back on the bus, and then

20  █████████ took me away from them and put me on a

21  different bus.

22          We were all friends with him, so we thought it

23  was okay.  I was at a place towards the back of the

24  bus.  I -- I was -- began throwing up into my hands,

25  and Rene left to go towards the front of the bus for an

1    unknown amount of time.  And then he returned to the

2    back of the bus, and that's when I was assaulted.

3        **Q.   All right.  When you say you were assaulted,**

4    **please tell me what happened.**

5        A.   I was throwing up into my hands, and he leaned

6    in, and he kept saying, "Come on."  And I kept saying,

7    "No."  He then began to grope me underneath my shirt.

8    I remember shaking my head saying "no" repeatedly.  And

9    then I don't remember except for when I got off the bus

10   and my friends were trying to get me to come back to

11   their dorm with me -- with them.

12       **Q.   Okay.  I'm going ask a few follow-up questions**

13   **based on what you said.**

14            **You mentioned two friends.  Who were those**

15   **friends?**

16       A.   ████████████ was a friend from high school

17   that attended LSU as well.  And ███████████ was

18   my big in sorority.

19       **Q.   So ████████ invited the three of you to the**

20   **party?**

21       A.   No.  ██████ invited me, and two other fraternity

22   members invited ██████ and ██████.

23       **Q.   Okay.  And before this time, you knew**

24   **Mr. Petit; you were friends?**

25       A.   Yes.  We had a lot similar classes as he was

1      things along that nature.

2          Q.   **Did anybody on the bus say anything to**

3      ████████████?

4          A.   I don't believe with me, but when he went to

5      the front of the bus, probably there was conversation.

6          Q.   **Do you know why he went to the front of the**

7      **bus?**

8          A.   I found out that he went there and attempted

9      to assault ████████████████.

10         Q.   **So how did you find that out?**

11         A.   Through my reporting in the Title IX office.

12     I never knew ████████ until after.

13         Q.   **So when you went to the Title IX office,**

14     **that's when you discovered that ██████████████ had**

15     **made similar allegations against ████████████?**

16         A.   I found out because my friend ██████████,

17     who was there that night, had been talking about it

18     with her group of friends and talked about how I was

19     going to -- to -- through the reporting, and she

20     happened to be friends with ████████ at that moment,

21     and then ████████ made a report.  She had originally

22     never known ████'s name before then.

23         Q.   **She?**   ████████?

24         A.   ████████, correct.

25         Q.   **And so timewise, when do you think you**

```
 1    in the back, and -- and I was shoved in between a few
 2    guys.  And I remember the driver being very drunk, and
 3    it was -- and I remember screaming I want out of the
 4    car.
 5         Q.   Did you get out of the car?  Were you able to
 6    get out of the car?
 7         A.   No, as I was sandwiched in between multiple
 8    men.
 9         Q.   So where were your two friends?  They were
10    still in the parking lot of the fraternity house?
11         A.   Yeah, they were left in the parking lot.
12         Q.   So you're in this car with ████ and friends.
13    What happened next?
14         A.   I remember getting very upset and everyone
15    telling ████ to "calm your date down."  And then we
16    finally arrived at North.  I got out.  He walked me up
17    to my floor, and I opened the door, and I kept telling
18    him to stop.  And then my roommate was sleeping in
19    there, ██████████, and he didn't come in because I
20    said she would wake up.
21         Q.   So you said that you kept telling ████ to
22    stop.  What was he doing?
23         A.   He kept trying to come in, and he wouldn't let
24    me close the door.
25         Q.   Did he try to touch you in an inappropriate
```

Case 3:21-cv-00242-WBV-SDJ    Document 486-2    10/13/23    Page 8 of 65

```
 1    way?
 2         A.   Yes.
 3         Q.   In the car with his friends?  Or as he was
 4    walking you back to your room?
 5         A.   Both times.
 6         Q.   Did his friends say anything or do anything to
 7    tell him to stop?
 8         A.   No.
 9         Q.   Did his friends do anything?
10         A.   No.
11         Q.   Did ████ ultimately leave that night?
12         A.   Yes.
13         Q.   When did he leave?
14         A.   When I told him that my roommate was waking
15    up.
16         Q.   Did your roommate hear anything?
17         A.   My roommate was not in the room.
18         Q.   So your roommate wasn't there?
19         A.   No.
20         Q.   You just told him that?
21         A.   Yes.
22         Q.   What other individuals -- did you know any of
23    the other individuals in the car?
24         A.   I recognized the driver, but I -- I don't know
25    his name.
```

1       you think?

2              A.   I believe so.

3              Q.   Let me ask, did you have any classes with Rene

4       during this semester?  This would have been the fall of

5       2016.  Did you have any classes with him?

6              A.   I believe I had physics with him and that's

7       how we became friends.  I think me, him, and possibly

8       ███████ all had the same class.

9              Q.   Did you sit next to each other in class?

10             A.   Yeah, for the most part.

11             Q.   Did you continue to sit next to him in class

12      after the -- I'm going to refer to it as a Halloween

13      party just so you understand.

14             A.   Okay.

15             Q.   Did you sit next to him after the Halloween

16      party?

17             A.   Yes.

18             Q.   So the next time you saw ██████, did you say

19      anything to him about what happened the night of the

20      Halloween party?

21             A.   No.

22             Q.   Did he say anything to you about the Halloween

23      party?

24             A.   No.

25             Q.   So this November 8th, 2006 -- 2016 party, what

1    interaction with ▉▉▉ outside of school?

2        A.   I'm not entirely sure, but we often did

3    homework together with a group of other students from

4    physics, calculus, anything in between really.

5        Q.   So throughout the fall semester; is that

6    correct?

7        A.   Correct.

8        Q.   During those -- I'll call them study sessions.

9    During those study sessions, did ▉▉▉ do anything or

10    act inappropriately toward you?

11        A.   No.

12        Q.   Did you socialize with ▉▉▉outside of those

13    study sessions?

14        A.   Yes.

15        Q.   Tell me how you would socialize with him.

16        A.   He was friends with a lot of people in my

17    sorority, so he would often appear at the sorority

18    house.  We would also -- I was close friends with a lot

19    of people from that fraternity at the time, so anything

20    from -- anytime the fraternity had an event, I would

21    see him.  Going out to Tigerland, he was often there at

22    the bars since we had a pretty close circle.

23        Q.   Who was in that circle?

24        A.   My friend ▉▉▉ and ▉▉▉ as well.  ▉▉▉ and a

25    couple of his friends.  I don't remember their -- their

```
 1            A.    Sorry, I'm forgetting some of the names.
 2    One's name was ███.  She was not in a sorority.  I
 3    believe she was a random roommate.  I was subleasing
 4    from a girl in my sorority named ███.  And my other
 5    roommate was also in my sorority, but I'm blanking on
 6    her name right now.
 7            Q.    Okay.  After -- we'll call this the July
 8    incident.  After the July incident, did you call the
 9    police?
10            A.    No.
11            Q.    Did you tell your parents what happened?
12            A.    No.
13            Q.    Did you tell your roommates what happened?
14            A.    No.
15            Q.    Did you tell anybody about this interaction at
16    that time?
17            A.    ███ lived in the building just across from
18    mine, so I believe the next day, I told her everything
19    from the Halloween incident and that night.  And later
20    that week, I had told ███ as well.
21            Q.    Did you tell anybody else?
22            A.    I believe a few other of my close friends.  I
23    told a girl named ██████████ because she would
24    often be very close with him, and I was nervous it
25    happening to her.  I told a few other girls in my
```

1      Q.   Did you express those concerns to anyone at
2  the Lighthouse?

3      A.   No.  I just talked to my therapist about it.

4      Q.   What did your therapist say about that
5  particular -- about the group setting?

6      A.   She said it's not for everyone and she
7  understands.

8      Q.   Were the sessions led by therapists?

9      A.   The session in 2019 was led by -- I'm not sure
10  if it was -- if she was a therapist or some type of
11  doctor, but I know she had a book of some sort, so some
12  professional in a manner of dealing with stress.

13      Q.   And what about the second session?  Was that
14  also --

15      A.   It was the same woman, yes.

16      Q.   All right.  So I want to understand exactly
17  what you were told about what could be offered, and I
18  just -- you said that there was not much they could do
19  since you weren't willing to give the name.  Would you
20  explain that for me?

21      A.   Yes.  It was about a -- I would say no longer
22  than a 20-minute meeting where I walked in; she asked
23  why I was there.  I explained to her that I was
24  assaulted at a fraternity party in October of 2016.
25  She asked if I wanted to give the name.  I said, "No,

1    I'm just here looking for options."

2         She handed me some very small generic

3    pamphlet.  I wouldn't say -- I don't even know how

4    big that would be, but like a very small, little,

5    "no bigger than a credit card," I guess, piece of paper

6    about numbers I could call if I'm dealing with stress.

7    I think it brought up the STAR program in Baton Rouge,

8    and then told me if I didn't want to make a report,

9    then there's not much that she could do for me.

10        **Q.   Do you remember the person's name?**

11        A.   No.

12        **Q.   Did the person offer you any sort of resources**

13   **to help with school?**

14        A.   No.  She did ask if I was using the mental

15   health services.  I said yes.  And she said that's

16   about all that we can give you.

17        (Exhibit No. 1 was marked for identification.)

18   BY MS. GREEN:

19        **Q.   I'll show you a document that actually you**

20   **produced or your lawyers produced on your behalf.  I'll**

21   **give it to you.  It's marked as Exhibit 1.**

22             MS. GREEN:  We do have copies.

23   BY MS. GREEN:

24        **Q.   I'll give you a few minutes to read it before**

25   **I ask any questions.  Okay.**

1      Q.    Okay.  Do you know if your professors actually

2  were informed that you needed these services?

3      A.    I had to be the one to fill out all those

4  documents and submit them, so Lighthouse would not have

5  been the one to do that.  I would have to have done

6  that, but I don't remember if I did it that year or

7  not.

8      Q.    Okay.  Do you know if -- I understand that you

9  communicate with your professors.  Do you know if

10  Lighthouse sends any communication to professors

11  indicating that you are receiving Disability Services?

12      A.    I'm not sure.

13      Q.    All right.  So after the -- this is

14  February 2018.  Do you think this is about the time

15  that you went to Lighthouse for the first time?

16      A.    Yes.

17      Q.    All right.  So tell me about the rest of that

18  semester.  How did the rest of that semester go for

19  you?  And this would have been the spring of 2018.

20      A.    I'll try to remember the full dates of when I

21  changed majors and everything.  I believe this was the

22  semester that I completely failed out of college.

23      Q.    Okay.  Tell me what happened with that.

24      A.    There were multiple things adding to this.

25  I think, one, fully realizing my assaults; and two,

1    because I was dealing with a fibroadenoma lump that was

2    growing in my chest at a rapid rate that I --

3    eventually, I had surgery for later that year.

4         **Q.    So you when did you discover that you had the**

5    **lump?**

6         A.    I believe it was around the same time I went

7    to Lighthouse, around February or March of 2018.

8         **Q.    And who was the doctor who was treating you**

9    **for that?**

10        A.    I saw multiple doctors.  I first went to LSU.

11   I don't remember the name of the -- the gynecologist

12   who saw it first.  I then got recommended to go to the

13   Woman's Hospital in Baton Rouge.  And my mom then

14   proceeded to take me to a specialist in New Orleans,

15   and the one who still saw me after that was Dr. Colfry.

16        **Q.    So did you ultimately resign from the**

17   **university that semester?**

18        A.    No.  I did a post-withdrawal, I believe,

19   almost a full year later, but I fully finished all the

20   courses.

21        **Q.    So when did you return to LSU?**

22        A.    I returned that fall on academic probation.

23        **Q.    So you returned the fall.  And was that**

24   **because of the grades that you received in the spring**

25   **of 2018?**

1      A.   Correct.

2      Q.   **So what were the terms of your academic**

3      **probation, to the extent you remember?**

4      A.   From what I remember, it was something along

5      the lines that if I failed other class, I wouldn't be

6      able to return to LSU for -- I'm not entirely sure, but

7      I think it's a year.

8      Q.   **So in the spring of 2018, did you miss a fair**

9      **amount of class?**

10     A.   I missed a lot of class.

11     Q.   **How much class would you say you missed to**

12     **basically attend doctors' appointments because of this**

13     **health condition with the lump that was found?**

14     A.   I think for just doctors' appointments, I

15     think total would have been maybe about three weeks'

16     worth of class, two to three weeks.  But also just due

17     to depression episodes, I would say I missed about a

18     third of all of my classes.

19     Q.   **During this time, did you communicate with**

20     **anybody at Lighthouse about the amount of classes that**

21     **you were missing?**

22     A.   Based on this form that I don't fully

23     remember, I believe I talked to them about absences, as

24     it says also here, to have some consideration for it.

25     But no, I don't remember having much communication with

1      to speak with him at all --

2           Q.   Sure.

3           A.   -- after that moment.

4           Q.   And so even if you were -- you just happened

5      to be at a bar in Tigerland, you didn't have any

6      interaction with him?

7           A.   There was one interaction when my now-husband

8      came to visit me from France in the fall of 2018.  We

9      were -- I don't remember the exact dates.  I would have

10     to pull that up.  But we went out after a game to

11     Tigerland, and we then went to Pluckers, which is

12     across the street.

13           He was sitting there with some of -- one of

14     my old sorority sisters and also some people from his

15     fraternity, and he kept trying to talk to me.  I kept

16     avoiding him and not answering.  And then my

17     now-husband responded to tell him to knock it off and

18     just leave me alone.  And ███████ tried to get in a fight

19     with him, in which his fraternity brothers pulled him

20     back.

21           Q.   And that was in the fall of 2018?

22           A.   Yes.

23           Q.   And at that point in time, did your husband

24     know about the July incident and the Halloween party?

25           A.   Yes.  I told him about it that New Year's, so

1     January 1st, 2018.

2          Q.   Other than this incident -- or this

3     interaction, you didn't have any other interaction

4     with ███████ in 2018, correct?

5          A.   Correct.

6          Q.   All right.  So when was the -- I'm trying to

7     keep my semesters straight.  So the fall of 2018.  What

8     about the spring of 2019?  Did you have any

9     interactions with ████████ in the spring of 2019?

10         A.   He was in my class with Dr. Roberto Champney.

11    I forgot the exact name of the class, but he was in

12    that classroom.

13         Q.   Did you sit next to each other in class?

14         A.   No.  I sat in the furthest possible corner of

15    that classroom when I did show up.

16         Q.   Did you miss a lot of class?

17         A.   I missed almost half of those classes.

18         Q.   And why is that?

19         A.   Either I would show up and have to leave

20    within -- before even class started or in the middle of

21    it from having a panic attack or just the fear of going

22    in there.

23         Q.   And why did you have a fear of going to class?

24         A.   Because ██████ had assaulted me successfully

25    once and attempted a second time.

1      Q.   And just so I'm clear, we're talking about the

2  events that happened in October of 2016 and then again

3  in July of 2017, correct?

4      A.   Correct.  And he had also turned violent

5  against my husband.

6      Q.   And are you referring to the incident at the

7  bar that you just told me about?

8      A.   Correct.

9      Q.   That occurred in 2018?

10     A.   Correct.

11     Q.   Did your husband call the police to report

12  that?

13     A.   No, since no -- no physical touch had

14  happened.

15     Q.   So after you go to Dr. Champney's class and

16  ██████is there, at that point, do you go to LSU or -- to

17  seek assistance?

18     A.   My roommate at the time, ██████████, had

19  informed me that you could get disability to miss

20  classes due to assault reasons and things like that.

21  She said that there was probably more, but she was

22  unsure.

23          So I went to -- Laura Jones was a -- just a

24  general doctor at the LSU Health clinic, who then

25  referred me to the Disability Services for it.  And

1    then Dawn -- I'm forgetting her last name -- then

2    informed me that I could go and make a report.

3        Q.   Okay.  So when you say "make a report," what

4    kind of report?

5        A.   I believe that was the first time I ever had

6    heard the words "Title IX."

7        Q.   Had you ever seen the words "Title IX" before?

8        A.   I had never heard it until then, or seen it,

9    that I recall.

10       Q.   Do you recall if the little pamphlet that you

11   got from The Lighthouse Program actually talked about

12   or referenced Title IX?

13       A.   It might have but --

14       Q.   You're just not sure?

15       A.   I'm not sure.  The only time of significance

16   hearing about Title IX was during that meeting with the

17   disability.

18       Q.   Sure.  So in that meeting, the Disability

19   Services person did inform you of the Title IX

20   complaint process?

21       A.   Correct.  Very briefly.  She didn't have too

22   much information on it.

23       Q.   So how did you leave it?  Did you have enough

24   information to do something?  Or how did you get more

25   information if she didn't have much information about

1    it?

2        A.    I mean, it says so in the Husch Blackwell

3    report, but I had googled "Title IX LSU."  Not much

4    came up, so I went to -- I assumed it would be with the

5    student accountability office because I felt that was

6    the closest wording, "accountability," to something

7    like that.  And I filed a request stating I want to

8    file a Title IX report.

9        Q.    When you were with -- or during your meeting

10    with Disability Services, did you request any

11    disability services?

12        A.    I did.  I requested the same that's on this

13    exhibit here, which would be the extended time

14    consideration for absences and note-taking.

15        Q.    Okay.  And was that -- after you requested

16    these services, were those same services provided in

17    the spring of 2019?

18        A.    They were all except note-taking, as I believe

19    they didn't have an official notetaker offer in that

20    class.

21        Q.    And when you say they didn't have an

22    official notetaker, you're talking about just for

23    Professor Champney's class?

24        A.    Yes.  And also for the fall classes as well,

25    the -- the next fall, so fall 2019.

1    it's Kimberly Davis, if I had to say her last name.

2    I'm pretty sure it was her.  And she just took my

3    statement.  And I asked multiple times, I had heard of

4    a -- like, a no contact -- I believe Tracy told me

5    about that, a no-contact order that the school could

6    do.  I asked if that would be given to me if I was to

7    give the statement out of fear of ███ trying it

8    contact me given the incident at the bar with my

9    husband.

10           And she assured me that I could have that.

11    She took my statement, asked if there were other people

12    that I knew of.  I had given the name of a fellow

13    student who I knew ███ had assaulted as well just to

14    have her contact the student.

15           And -- yeah, that was about it.  I think it

16    lasted an hour or two or so, but -- and then she told

17    me she -- we would be in contact with the no-contact

18    order within a week or two.  And then she also told me

19    that she wasn't sure how long the investigation takes,

20    to not expect it to be quick.

21    **Q.    Okay.  So as far as the no contact order is**

22    **concerned, you said you wanted one out of fear for ███**

23    **contacting you because of the bar incident.  When you**

24    **were in class with ████████, did he try to contact you**

25    **while you were in class?**

1    next day if she was okay.  I ran into them -- this was

2    before October, so I believe September, at the

3    earliest, I had run into her.  And she said she was

4    fine, and so she told me about a year later what had

5    actually happened.

6         **Q.   So you believe she told you in September of**

7    **2017?**

8         A.   Sometime in 2017, 2018.

9         **Q.   And what did she tell you happened?**

10        A.   That ████ just kept being super pushy and

11   forceful and they were both very drunk and she ended up

12   having sex with him, but she felt like it was very much

13   against her wishes.

14        **Q.   So at the time that you met with Ms. Davis,**

15   **you gave her Ms. ████'s name?  Or Ms. ████ asked**

16   **you to keep her name confidential?**

17        A.   I gave her the name.  She said she would

18   report it, but she wanted to be confidential.

19        **Q.   Sure.  Do you know -- did Mr. ████ tell you**

20   **whether or not she made her own report --**

21        A.   She said --

22        **Q.   -- to Title IX?**

23        A.   She told me that she doesn't want to make her

24   own, but if it would help take him down, she would also

25   report for the numbers sake, but she didn't want to do

1    a whole separate one on her own.

2         Q.   At the end of the meeting with Ms. Davis, did

3    you feel like the -- you received the information that

4    you needed in connection with your report?

5         A.   No.  I just -- I felt like it was kind of up

6    in the air of what the next steps were, other than just

7    wait to hear the outcome.

8         Q.   Why did you feel that way?  Why did you feel

9    like it was up in the air?

10        A.   Because there wasn't a given time frame of how

11   long it would be.  She just said it would take a long

12   time sometimes or it would be very short and that

13   they'll contact us when that happens.  And so I kind of

14   left with the confusion of when they would contact

15   Rene, when any of this would be finalized, or anything

16   that would happen after that.

17        Q.   Sure.  So you understood that an investigation

18   would occur, correct?

19        A.   Correct.

20        Q.   You were just unsure about the -- how long it

21   would take to complete the investigation?

22        A.   Correct.

23        Q.   And you expected to hear back from Ms. Davis

24   within a week about the no contact order?

25        A.   Yeah.  She said within a week or two.

1    Q.   Okay.  Did you hear from Ms. Davis within a

2    week or two?

3    A.   I believe within the week -- or a week had

4    gone by.  I emailed her and asked if they had issued

5    him the no contact just because I was nervous when they

6    would ask him question and bring up the investigation,

7    and that's when she gave me the peer-to-peer no contact

8    order.

9    Q.   Okay.  And what is a peer-to-peer no contact

10   order?

11   A.   From my understanding, that I would fill this

12   out and give it to ████ myself through email or, I

13   guess, handing him in person.  And I'm not even

14   entirely sure who would enforce it.

15   Q.   Did she -- did Ms. Davis communicate to you

16   who would enforce it or whether there was an LSU

17   representative that would be tasked with enforcing the

18   peer-to-peer no contact order?

19   A.   No.

20   Q.   Did she tell you -- well, you said she gave

21   you a peer-to-peer no contact order.  Did she say

22   anything about the no contact order you had requested?

23   A.   She said that since he hadn't directly tried

24   to contact me personally since 2017, that there was no

25   issue to put one out there.

 1          Q.   Okay.  So let's just go to the letter.  In the

 2     letter, if you look at the second paragraph, it says,

 3     "Since" -- I'm assuming that's ████ -- "has not tried

 4     to contact you recently, particularly since you ended

 5     up in the same class together, there isn't any

 6     communication to cease."

 7               That's consistent with what we've previously

 8     discussed, correct?

 9          A.   Correct.

10          Q.   So then you testified that you were provided

11     the language for a peer-to-peer contact letter.  Did

12     you decide to do that peer-to-peer contact letter?

13          A.   No.

14          Q.   Why not?

15          A.   For multiple reasons; one just being scared

16     contacting him in general since the last interaction

17     was questionably violent and just not wanting to reach

18     out to him at all.

19          Q.   Sure.  And when you refer to the last

20     interaction, you're talking about your interaction in

21     July of 2017 or the interaction with your boyfriend in

22     the bar in 2018?

23          A.   The 2018.

24          Q.   Did Mr. ████████ try to contact you after you

25     received this communication from Ms. Davis?

1       A.   No.

2       Q.   Do you recall, when was the next time you had

3  any interaction with Mr. ████?

4       A.   There wasn't anything directly said.  I

5  don't -- I don't believe since I -- the filing and

6  after.  It was both parties avoiding each other.

7       Q.   Okay.  So effectively outside of what played

8  out in the Title IX process, which we'll talk about in

9  a few minutes, you didn't have any interaction with

10  Mr. ████ after the bar incident in 2018?

11       A.   Correct.  Other than running into him with

12  after school study sessions and getting up and leaving,

13  there was no words spoken to each other.

14       Q.   Okay.  So at this point, you have heard from

15  Ms. Davis about the no contact order, and she's told

16  you the investigation will take a while, but you're not

17  quite sure how long that would be?

18       A.   Correct.

19       Q.   All right.  When was the next time you heard

20  from the Title IX office?

21       A.   I'm honestly not entirely sure.  The next

22  time I remember is -- is getting the call about the

23  investigation from Jeff Scott or him asking me when we

24  could set up a call to discuss it, but I don't remember

25  if there was something in between or not.

1    the investigation wasn't being conducted?

2        A.    As far as the investigation, no.  I do believe

3    it was being conducted.

4        Q.    Okay.  All right.  So you say at some point,

5    Mr. Scott contacts you about the investigation being

6    completed.  When was that?

7        A.    I believe it was around my birthday in 2019

8    because I was in -- I remember walking around in

9    France, receiving a call.  So sometime around May 28th,

10    either before or after that shortly.  And he told me

11    that the outcome of the call.

12        Q.    Okay.  And what did he tell you?

13        A.    He -- from what -- from what I remember, he

14    explained to me that he had found ███ guilty of the

15    assaults that I reported.

16        Q.    Did he tell you anything else?

17        A.    I'm -- I'm unsure.

18        Q.    Did he explain to you what the next step in

19    the process was?

20        A.    I believe I asked, and he said that's not

21    entirely his department, so he's unsure but someone

22    will be in contact with me shortly.

23        Q.    Okay.  I'm going to show you -- actually, I'm

24    going to show you two things together.  The first is

25    BOS 2665, and then the second is BOS 1503 through 1508,

1   I believe.

2              MS. GREEN:  We'll mark them as

3       Exhibit 7.

4       (Exhibit No. 7 was marked for identification.)

5   BY MS. GREEN:

6       Q.   Ms. Andries, is this the report that you

7   received from Mr. Scott?

8       A.   Yes.

9       Q.   Did you review the results with Mr. Scott?

10      A.   I believe he briefly reviewed over it during

11  the phone call and then sent me the full report.

12      Q.   Did you have any questions about the report

13  after you read it?

14      A.   No.

15      Q.   Did you -- let's go, in particular, to page 3

16  of 6, which begins on BOS 1505, continues on to 1506.

17  The summary that relates to you, did you have -- did

18  you see anything in the report that you found to be

19  inaccurate?

20      A.   No, I don't believe so.

21      Q.   Okay.  And then after -- did Mr. Scott tell

22  you what was the next step in the process?  I think you

23  answered this question already, so I'm sorry.

24      A.   No problem.  He told me, essentially, that it

25  would be passed on to the accountability office with

1    the next steps and that -- and I asked him what happens

2    next after then, and he said it wasn't really within

3    his jurisdiction, so he's not entirely sure of the

4    process.

5         Q.   Okay.  Did you expect to receive a

6    communication from the accountability office after?

7         A.   Yes.

8         Q.   So tell me what happened next in the -- as you

9    recall.

10        A.   After the phone call, I believe that's one

11   of the first times I contacted ██████, the other

12   complaint in this report that happened the same night.

13   So that was the first time I contacted her, so that's

14   when we kind of bonded together to make sure we were

15   both being updated.  I don't exactly remember the next

16   step that happened, though.

17        Q.   Okay.  I'm going to show you a document -- or

18   a string of documents marked BOS 1501 through BOS 1502.

19             MS. GREEN:  We'll mark it as Exhibit 8.

20        (Exhibit No. 8 was marked for identification.)

21   BY MS. GREEN:

22        Q.   Ms. Andries, do you recall receiving this

23   letter dated June 4, 2019?

24        A.   Yes.

25        Q.   So the second paragraph of the letter

1      indicates that the office has determined that a

2      violation has occurred, correct?

3              A.    Correct.

4              Q.    And then the third paragraph of the letter

5      indicates that the decision may be appealed within ten

6      days of the notice to Ms. Jennie Stewart.  Correct?

7              A.    Correct.

8              Q.    So you understood that the decision could be

9      appealed; is that correct?

10             A.    Correct.

11             Q.    All right.  Do you know if the decision was

12     appealed?

13             A.    I found out later it was, but I was not

14     directly notified about it because after the ten

15     business days, not hearing anything back, I thought it

16     was not.  And I later found out that it was extended to

17     be appealed and then appealed.

18             Q.    Tell me -- first of all, how did you find out

19     that it was, as you say, extended to be appealed?

20             A.    After the ten business days, I was content

21     with it.  But since ████████ and I had started talking,

22     she called the office to make sure of it, and I believe

23     that's when Jennie told her something about it being

24     extended.

25                   If I'm going to be honest, I think this part

```
1              It's starts here.
2    BY MS. GREEN:
3        Q.   Yeah.  It's the section -- section 8,
4    "Appeal."
5        A.   Okay.
6        Q.   So this is -- this explains the process.  And
7    it does indicate -- or I should say, after reading this
8    section, you understand that appeals were allowed for
9    ten business days?
10       A.   Yes, after receiving this.
11       Q.   And you received this -- this was attached to
12   the email that you got in March of 2019, correct?
13       A.   Correct.
14       Q.   Okay.  So let's go back and talk about the
15   extensions.  Do you know if the office granted
16   extensions to other individuals?
17       A.   Referring to other cases?
18       Q.   Yes, in other cases.
19       A.   I'm not sure of any other case.
20       Q.   So do you have any reason to dispute that the
21   office granted extensions to individuals in other
22   cases?
23            MS. HASH:  Object.
24       A.   I mean, I could only guess, but I have no
25   idea.
```

1    BY MS. GREEN:

2        Q.    Okay.  What happened -- you said that ▮▮▮▮

3    called the office and spoke to Ms. Stewart about the

4    extension.  And what explanation did Ms. Stewart

5    provide?

6                    MS. HASH:  Objection.

7        A.    She -- from what ▮▮▮▮▮▮ informed me, she

8    told her that was none of our business.

9    BY MS. GREEN:

10        Q.    She told you that the reason for the extension

11    was none of your business?

12        A.    Correct.

13        Q.    Okay.  Did you ultimately receive any

14    communication from Ms. Stewart indicating why an

15    extension was provided?

16        A.    Never.

17    (Exhibit No. 9 was marked for identification.)

18    BY MS. GREEN:

19        Q.    I'm going to show you a document marked as

20    Exhibit 9, Bates numbered BOS 2666.  And I really only

21    intend to ask you about the email at the top of the

22    page because you were copied on that email.

23            Do you recall receiving this email,

24    Ms. Andries?

25        A.    Yes.

1    week later?  Two weeks later?  Just do you recall?

2         A.   Sometime in August.

3         Q.   So did you -- did Mr. Sanders call you, or did

4    you receive an email from him?

5         A.   I believe it was just an email.

6         Q.   Okay.  And tell me about the communication you

7    had with him.

8         A.   Before the meeting?

9         Q.   Yes.  I'm sorry.

10        A.   If I -- if I can recall correctly, it was just

11   an email to set up a time because he wanted to just ask

12   a few questions.

13        Q.   And did you schedule an in-person meeting?

14        A.   It was in person.

15        Q.   Okay.  I'm going to show you documents Bates

16   number 1510 -- BOS 1510 through 1524.

17                  MS. GREEN:  We'll mark this as

18             Exhibit 11.

19        (Exhibit No. 11 was marked for identification.)

20   BY MS. GREEN:

21        Q.   Do you recall receiving this letter,

22   Ms. Andries?

23        A.   Yes.

24        Q.   And in this letter, it says that you -- or

25   Mr. Sanders requested to meet with you on the 22nd of

1    Q.    When you left the meeting with Mr. Sanders,

2    did you feel like your -- any questions had been

3    addressed?

4         A.    All I remember when leaving that meeting was

5    being extremely angry and felt completely disrespected.

6         Q.    Okay.  Why is that?

7         A.    He reread my entire assault case back to me,

8    which I felt was very triggering, and also proceeded to

9    ask questions, whether if I take drugs and things along

10   that.

11        Q.    And things along -- what other questions did

12   he ask you?

13        A.    My -- my attire for that night, if -- in one

14   report, I said the middle back of the bus, and then in

15   the next, I said the back of the bus, so which one

16   really is it?  Asking multiple -- which drugs I take

17   and clarifying which ones and going through that and

18   other things, but I don't fully recall the rest.

19        Q.    Did Mr. Sanders tell you why he was asking

20   those questions?

21        A.    I asked him why he was asking if the

22   investigation was over.  He then got defensive and

23   said, "I'm just trying to -- to figure out a proper

24   assessment."

25        Q.    A proper assessment of what?

1            MS. HASH:  Objection.

2       A.  I'm not sure.  I can only guess, so I'm not

3   sure.

4   BY MS. GREEN:

5       Q.  Sure.  Did you understand that Mr. Sanders was

6   gathering information to determine an outcome for this

7   particular case?

8       A.  It didn't really feel that way.

9       Q.  I understand that's not how you felt.  But

10  I guess my question is did you understand that

11  Mr. Sanders was gathering information to determine the

12  proper disciplinary action?

13      A.  That's what I was told.

14      Q.  That's what Mr. Sanders told you?

15      A.  Correct.

16      Q.  And that's also what's contained in the policy

17  we just read --

18      A.  Correct.

19      Q.  -- correct?

20          Do you know if Mr. Sanders asked those

21  questions of Mr. ▮▮▮▮ when he met with him?

22      A.  I don't know.

23      Q.  Do you have any reason to believe he didn't

24  ask those questions of Mr. ▮▮▮▮ or similar questions

25  of Mr. ▮▮▮▮?

```
 1                    MS. HASH:  Objection.
 2         A.   I don't know.
 3    BY MS. GREEN:
 4         Q.   Do you have any reason to believe Mr. Sanders
 5    doesn't ask similar questions in -- of complainants in
 6    other cases?
 7                    MS. HASH:  Objection.
 8         A.   All I know is what ████████ told me, and he
 9    reread the case over to her.  And it sounded like there
10    were similar questions asked to her as well, but that's
11    all I can speak on.
12    BY MS. GREEN:
13         Q.   Based on what ████████ told you, your
14    interview with Mr. Sanders and her interview were very
15    similar?
16         A.   Yes.
17         Q.   Did Mr. Sanders give you the opportunity to
18    provide any additional information to help him
19    determine an outcome?
20         A.   Yes.  I then gave him ████████████'s name yet
21    again.
22         Q.   Did you give him any other information?
23         A.   No.  I believe I told him I could maybe find a
24    phone file, and I had deleted it years ago, so...
25         Q.   I'll show you what's -- we're going to mark as
```

1    just re-tweets of the -- like, the protests and the

2    USA Today articles and just information with LSU for

3    sexual trauma victims, but I didn't really, so to say,

4    air out my dirty laundry.

5         **Q.   Do you still have those posts?**

6         A.   I never deleted them unless they were the

7    Snapchat 24-hour things, which are naturally deleted.

8         **Q.   Have you given copies of those posts to your**

9    **attorneys?**

10        A.   Yes.

11             MS. GREEN:  Have they been produced to

12             us?

13             MS. HASH:  No.  Well, some of them might

14             have; not all.

15             MS. GREEN:  We'll have to check on that

16             just to make sure we get them and have time to

17             question her about them.

18             MS. HASH:  Absolutely.

19    BY MS. GREEN:

20        **Q.   Do you know if Mr. Sanders contacted**

21    **███████████?**

22        A.   I asked ███████████, I believe, a month or

23    two later in October, and she told me that she was

24    never contacted by anyone.

25        **Q.   Ms. ████████ is the person who -- I just want**

1    to make sure I remember -- said that she would not make

2    a report herself but would assist if needed, correct?

3         A.   Correct.

4         Q.   Do you know if Mr. -- Ms. ████████'s name is

5    the only name that you gave to Mr. Sanders?

6         A.   Yes.  Other than, I assume, ████████ as

7    well, the friend that's been in the story, but...

8         Q.   Do you know for sure if you gave Mr. Sanders

9    ████████'s -- I'm sorry, ████████'s name?

10         A.   I believe I mentioned her name in the report.

11         Q.   What outcome did Mr. Sanders ultimately reach?

12         A.   I believe it was deferred suspension, which I

13    misinterpreted as real suspension.

14         Q.   When you say "misinterpreted," what do you

15    mean?

16         A.   I read the word "suspension" and thought that

17    he was suspended from school because I did not fully

18    read into what exactly that entailed until ████████ and

19    I discussed it a few days later.

20         Q.   Do you recall receiving notice from SAA about

21    the outcome or the determination of the outcome?

22         A.   Yes.

23         Q.   I'm going to show you a document.  It's

24    actually several pages, BOS 2733 to 2751.  We'll mark

25    it as Exhibit 13.

1     for consideration and be able to be completely revoked.

2          **Q.   Okay.  And so you didn't decline the outcome**

3     **of the letter.  Was the outcome of the letter actually**

4     **declined?**

5          A.   Yes, by both ████████ and ████.

6          **Q.   Okay.**

7               MS. GREEN:  Could we go off the record

8               for a second?

9                    (Recess taken.)

10    BY MS. GREEN:

11         **Q.   Ms. Andries, I will give you a document I'm**

12    **going to mark as Exhibit 14.  It's Bates labeled**

13    **BOS 2723 through 2732.**

14         (Exhibit No. 14 was marked for identification.)

15    BY MS. GREEN:

16         **Q.   I will represent to you it is a similar letter**

17    **that I just questioned you about, just as a second**

18    **communication via Maxient.**

19         A.   Okay.

20         **Q.   Ms. Andries, do you recall receiving this**

21    **notification?**

22         A.   Yes.  Although I don't fully remember the UHP

23    guide for students.  It may have been attached, but I

24    don't remember seeing this entire thing.

25         **Q.   So it could have been attached; you just don't**

1    recall?

2        A.    Yes.

3        Q.    Earlier, when I asked you if you declined the

4    outcome, you said no, but you said that Ms. ██████

5    and Mr. ██████ did; is that correct?

6        A.    Correct.

7        Q.    And that is consistent with what is -- what's

8    on page 2725, although the names are redacted, correct?

9        A.    Correct.

10       Q.    Okay.  Earlier you testified that you didn't

11   decline the outcome, and you gave a reason.  I want you

12   to explain why you didn't decline the outcome.

13             MS. HASH:  Objection to form.

14       A.    There were a few reasons.  One being that, if

15   I objected to the outcome, that -- also it would be

16   brought to question at the panel that even if -- like,

17   the -- I guess the correct phrase would be if he

18   assaulted me and ██████ or not would also be

19   questioned and be able to be revoked as well.  I was

20   told that multiple times, that that would also be up to

21   question, not just the outcome of the punishment.

22             So in fear of that being completely revoked --

23   and having done this for nothing was there on top of I

24   was catching up with two weeks of school work that I

25   had missed during this time.  And I didn't feel like

1    filling out another form, and ███████ told me she

2    filled it out.

3    BY MS. GREEN:

4         **Q.   Who told you that basically the finding could**

5    **be overturned?**

6         A.   Tracy Blanchard.

7         **Q.   Did Ms. Blanchard tell you that in connection**

8    **with explaining the process?**

9         A.   Yes.  She did explain the UH -- UCH, however

10   it is -- this pamphlet, she explained it to me on top

11   of that.

12        **Q.   Do you remember what exactly Ms. Blanchard**

13   **told you?**

14        A.   Regarding which topic?

15        **Q.   About the -- basically, what you just said**

16   **about the finding -- basically, that the panel could**

17   **review the finding of responsibility as well -- or**

18   **responsible as well.**

19        A.   Yes.  She said, if you objected to this one,

20   that we would go to the panel and every single step

21   along the way was then brought up again to be appealed

22   or not.

23        **Q.   So did you understand that the UHP was a**

24   **rehearing?**

25        A.   I believe so.

1      A.   I contacted Tracy Blanchard, and I believe my

2   father called the school as well when I didn't get a

3   clearcut answer.

4      **Q.   Okay.  And I'm sorry.  You said the response**

5   **that was given to you was that -- was Mr. ███,**

6   **in fact, supposed to be at the football game?**

7      A.   It wasn't entirely clear.  I can't remember if

8   it was before or after this, but there was one moment

9   when they told me interim rights were still in act and

10  that's why he was allowed on campus for things.  And

11  then I believe, after my father had called, they

12  explained they had forgotten to take out his student

13  ticket rights or pause his student IDs, something along

14  those lines.

15     **Q.   So did you see Mr. ███ on campus after --**

16  **anytime after that football game?**

17     A.   I tended to avoid campus as much as possible.

18  I was taking classes online since I was forced to do

19  so, yeah.

20     **Q.   And when was that?**

21     A.   The fall of 2019.

22     **Q.   And why were you forced to take classes**

23  **online?**

24     A.   Since school had started in August and this

25  was still within the interim rights, we had four out of

1       five of my classes together, which since it's a

2       senior-level industrial engineering classes, you don't

3       have many options on different times and things like

4       that.  And so they contacted him as well and asked him

5       to give up some of the classes, which of course Rene

6       did not respond at all.  So they told me since I was

7       the uncomfortable one, I would have to rearrange my

8       schedule around his.

9           **Q.  During the classes that you had together,**

10      **would you -- did Mr. ███████ contact you or try to**

11      **interact with you?**

12          A.   No.

13          **Q.   And you didn't sit next to him, correct?**

14          A.   No.  I ended up not going to any of the

15      classes because they sat me down, I believe, a few days

16      before school started and tried to get me to rearrange

17      it, as well when school had started, so I missed about

18      two weeks of class.

19          **Q.   And when you say they sat you down, just tell**

20      **me who --**

21          A.   Tracy Blanchard and Ashley -- I'm forgetting

22      her last name, but she was an engineering counselor.

23          **Q.   I'm sorry.  And you said they sat you down and**

24      **said what?**

25          A.   Since I was the uncomfortable one, I would

1    have to move my schedule around his since we were

2    students and we had equal rights.

3         Q.   Did you meet with Ms. Blanchard and Ms. Gray

4    before the semester started?

5         A.   So it would only have been a few days before.

6         Q.   And during that meeting, did you review your

7    schedules?

8         A.   Yes.  They -- Tracy had already taken both of

9    ours to see how many.  That's how I found out I had

10   four out of five of them and sat down with the

11   engineering counselors so that we could go through the

12   flow chart that the engineering department usually puts

13   out to see what would affect my graduation or not.

14        Q.   So when you were working through the class

15   schedules, it was to make sure you stayed on track as

16   far as graduation is concerned?

17        A.   Correct.

18        Q.   And did you stay on track as far as graduation

19   is concerned?

20        A.   Yes.  But I had to fight to stay in those

21   classes and take them online.

22        Q.   What do you mean when you say you had to fight

23   to stay in the classes?

24        A.   So the way that a lot of the engineering

25   classes are is that there are specific ones for

1      Q.    Okay.

2      A.    It was the second -- I know it was, like, the

3   second version of something around statistical analysis

4   or something like that.

5      Q.    Was this the -- was this the first time that

6   you had taken that class?

7      A.    Correct.

8      Q.    And so the other classes that you took, were

9   you pleased with the courses that were selected?

10      A.    No.  I had to -- I had planned that with my

11   study group that I have had for over a year or two at

12   that point and had to take the classes on my own and

13   find a new study group.  So all of my friends got to

14   walk to class, do lunches together, and I had to go

15   home, take some, or go with a completely different set

16   of students that I hadn't interacted with before.

17      Q.    Did you ultimately end up with a new study

18   group?

19      A.    Not -- maybe just one or two people but not

20   nearly the same amount.

21      Q.    And these other classes didn't delay your

22   graduation date, correct?

23      A.    Didn't delay it, no.

24      Q.    Ms. Andries, I'm going to give you three

25   groups of documents, and we'll look at them together.

1     situated for the fall of 2019?

2          A.   Yes, but I missed about two weeks of classes,

3     I said earlier.

4          Q.   And when you missed the -- that two weeks of

5     class, tell me, how did you make up that time?

6          A.   I didn't sleep much to catch up on that.  A

7     lot of my teachers gave me extended deadlines, which

8     sometimes I -- with one, I remember I didn't catch up

9     until almost the last week of class.  Yeah, things

10    related to that.

11         Q.   So did your professors -- at that time, did

12    you have the accommodations order in place through

13    Disability Services?

14         A.   Yes.

15         Q.   So your teachers were still -- do you remember

16    what accommodations were in place at that time?

17         A.   Yes.  It was the absences for classes,

18    note-taking, and extended time for tests.

19         Q.   So you missed the class time, but you

20    ultimately were able to catch up through your efforts

21    as well as the accommodations through Disability

22    Services?

23         A.   Correct.  Well, not all.  I remember I didn't

24    submit some labs or some assignments because it was

25    just too much, and I'd rather have taken the zero than

1    though it says page 2 at the bottom, because of the

2    double-sided nature of the original document.

3              In the -- you testified earlier about you

4    having to resign from school.  Tell me about the

5    circumstances.  I know you mentioned earlier that you

6    did it retroactively.  So tell me what happened in

7    connection with your retroactive resignation.

8         A.   You're referring to the second semester,

9    2017/2018?

10        Q.   I'm sorry.  I'm referring to -- yes.  So where

11   it's -- and at the bottom, there's a note that says,

12   "Resigned March 23, 2018."  Yes.

13        A.   So this semester and the semester before --

14   the semester before, that was the first time I

15   addressed my assault to my therapist.  Also, this was

16   when I was reconsidering swapping from mechanical to

17   industrial engineering.  I was still registered as

18   mechanical engineer until the second semester of 2018.

19   So -- and the ones with -- the one where it says

20   "resigned," that was when I had the fibroadenoma lump

21   as well as going to Lighthouse for the first time.

22        Q.   And so did you resign -- I think you said you

23   resigned at some point later.  Does that mean you

24   initiated the process at some point later?

25        A.   Yeah.  So every single one of these classes I

ELISABETH ANDRIES

1          additional pages to the exhibit, 2625 and

2          2626.  You can just add it to the back.  We'll

3          keep them all together.  Thank you.

4     BY MS. GREEN:

5          Q.   Ms. Andries, I want to direct your attention

6     to 2626, which is the third page of this exhibit.

7               Is this the statement you wrote in support of

8     your request for resignation?

9          A.   Correct.

10         Q.   And did Tracy Blanchard assist you in

11    connection with drafting your statement?

12         A.   I believe she proofread it.

13         Q.   I want to direct your attention to 2625,

14    particularly the last sentence of that email.  Would

15    you read it, please?

16         A.   "I also want to thank you so much for

17    everything you helped me with and for making LSU feel

18    more like a home again."

19         Q.   Would you explain what you meant by that

20    statement?

21         A.   I had a difficult time with some of my

22    professors as well as the Title IX things and feeling

23    unsafe on campus just from the assault in general

24    because I had withdrawn from activities and failed out

25    and things like that.  And I trusted Tracy to help me

```
1            Q.    An in-person meeting?

2            A.    In-person meeting.

3            Q.    And so you asked for private sessions or --

4       and Ms. Gray told you that that's usually not

5       available?

6            A.    Correct.

7            Q.    And did she give any further explanation?

8            A.    Yes.  Because engineering classes, especially

9       senior levels, are so determined on group projects and

10      group sessions that it's next to impossible to do them

11      privately.

12           Q.    And are engineering classes at senior level

13      based on group projects?

14           A.    Yes.  There are a lot of group projects that I

15      had to do individually.

16           Q.    So some of the group projects you were able to

17      do -- you were able to do on an individual basis?

18           A.    Just for that one class that I got for the

19      private study with Dr. Laura Ikuma.

20           Q.    Do you know if other engineering students have

21      been allowed to do private study for group-based

22      projects?

23           A.    I'm not sure.

24           Q.    Even though you weren't allowed to do the

25      individual study for some of the other classes, you
```

1    concerns about not receiving notice of the appeals, do

2    you know if Ms. Blanchard addressed your concerns with

3    anyone?

4         A.    I'm not sure.

5         Q.    Did she email you to tell you that she had

6    addressed your concerns with anyone?

7         A.    The only time that she said she would handle

8    a concern I had would be with the spring class with

9    Roberto Champney, and she would inform him of my

10   situation so I would not have to talk to him.  And I

11   found out later that she had not.

12        Q.    Did Ms. Blanchard -- why do you think

13   Ms. Blanchard didn't talk to Dr. Champney -- or

14   Professor Champney?

15        A.    Because I had a meeting with him to discuss a

16   project because he had an issue with it, I think

17   opening it or something.  So I met with him in person,

18   and he had asked why I was missing so many classes.

19   Because with disability, you're only allowed to miss a

20   certain percentage or else it becomes more negligent

21   situations.  And I said, "Oh, didn't student advocacy

22   call you to explain my situation with Title IX?"  And

23   he was shocked and said, "This is the first time I'm

24   hearing any of that."

25        Q.    And did you -- do you know if Mr. --

1    Professor Champney talked to Ms. Blanchard after that

2    conversation with you?

3         A.   I don't know, but I found out during the

4    Husch Blackwell report that he had filed a

5    student-in-distress complaint about me and nothing was

6    followed up with that.

7         Q.   The Husch Blackwell report indicated that he

8    filed a report?

9         A.   Correct.

10         Q.   And the Husch Blackwell report indicated that

11    nothing was followed up?

12         A.   Correct.

13         Q.   Did you read the Husch Blackwell report?

14         A.   Yes.

15         Q.   Did you read all of the Husch Blackwell

16    report?

17         A.   No.

18         Q.   Did you only read the portions that were

19    related to you?

20         A.   For the most part, yes.

21         Q.   Was there anything in the Husch Blackwell

22    report that you thought was incorrect?

23              MS. HASH:  Object to form.

24         A.   I felt as if I was portrayed a bit differently

25    than how I am.  But other than that, not really.

1   allowed to sit in mine.  I think that was the only

2   concern regarding the next semester's worth.

3          **Q.   And so you had gotten assurances from the head**

4   **of the engineering department?**

5          A.   Of the industrial engineering department, yes.

6          (Exhibit No. 29 was marked for identification.)

7   BY MS. GREEN:

8          **Q.   All right.  I will show you what is marked as**

9   **28 -- 29, BOS 2644 through 2645.**

10         **So Ms. Andries, do you recognize these emails?**

11         A.   Yes.

12         **Q.   And so at this point in time, Ms. Blanchard**

13  **has communicated with you and indicated that Mr. Petit**

14  **doesn't have any schedule conflict for the fall; is**

15  **that correct?**

16         A.   Yes.

17         **Q.   And then let's talk about the spring of 2021.**

18  **Is that the semester that you graduated?**

19         A.   Correct.

20         **Q.   Did you have any scheduling challenges in the**

21  **spring of 2021?**

22         A.   No.

23         **Q.   At that point, was Mr. ▮▮▮▮ back on campus?**

24         A.   Yes.  But I believe we were still fully --

25  almost fully remote because of COVID.

1    around then.

2        Q.   Okay.  And then there's a surgery due to chest

3    trauma that's listed here.  Tell me about that.

4        A.   That would be the fibroadenoma that I talked

5    about before.  There's not much about those that's kind

6    of known why they're caused, but the doctor -- I mean,

7    it kind of falls under the same as just lumps in

8    general, so it could be from distress.  It could be

9    from genetics, anything like that, but since I haven't

10   grown one since that incident, I related it to that.

11       Q.   So a doctor -- did a doctor relate the

12   situation or the allegations in the lawsuit to your

13   lump?

14       A.   I did not inform my doctor of my sexual

15   trauma.

16       Q.   You're seeking past lost wages.  Would you

17   tell me what lost wages you're seeking?

18       A.   Well, considering I had to -- I failed out a

19   semester, I would have not worked for up to a year.

20   Depending on how I arranged or had taken more classes,

21   I would have been able to graduate a year earlier, if I

22   had not had failed, and also been able to take all the

23   classes I meant to in certain semesters as well as I

24   know I quit my coffee job at French Truck Coffee as

25   ████ started frequenting there.  I had to quit doing

1    that because, also, I had to catch up with school a

2    lot, things like that.

3         Q.   How much were you earning at French Truck

4    Coffee?

5         A.   I'm not sure of the exact amount.  I would

6    work there --

7         Q.   Do you remember the hourly rate?

8         A.   We also worked for tips.  It was $8 an hour.

9    The tips would vary per week, and I worked, I feel,

10   around 30 hours a week, average, not including the

11   summers.  I definitely work over that.

12        Q.   You're seeking damages from missed activities.

13   What missed activities?

14        A.   I quit my sorority early.  I also stopped

15   going -- I was a treasurer for the Formula One Society

16   of Automated Engineers on LSU's campus, and I was asked

17   to resign during the 2018 semester.  And I didn't

18   rejoin until, I believe, that -- the January 2020,

19   whenever I knew ████ wasn't on campus anymore, -or

20   February 2020, somewhere around that time frame.

21        Q.   Why did you quit your sorority early?

22        A.   Because when I would speak to my friends about

23   ████ assaulting me, they didn't believe me half the

24   time.  They continued to invite him to the house, and

25   after I lost my scholarship, it was too much to pay

 1    for.

 2         Q.   Why were you asked to resign from the

 3    engineering society?  I hope that I said that right.

 4         A.   It's correct.

 5              Because I wasn't able to remain focused as I

 6    often disassociated around that time.  I was -- I

 7    failed all of my classes, so it was very hard to remain

 8    focused and able to do the job that I was assigned to

 9    do.

10         Q.   You're seeking compensation for medicines

11    totaling about $54,000.  Can you explain what medicines

12    are included on this list or in your calculation?

13         A.   I did take some antianxiety medication.  I'm

14    not entirely sure which years that was, but I know it

15    was before 2019.  I also took some temporary

16    antianxiety medicine in 2019 instead of the regular

17    long-term ones.  I currently am assigned to take

18    antianxiety medicine because of this lawsuit going on

19    now and also the numerous amount of therapy I have to

20    go to.  I don't know if that's included in meds,

21    though, technically speaking.

22         Q.   Do you have insurance that covers any portion

23    of the cost of your medicines?

24         A.   My parents do for some of them, yes.  And in

25    France, I'm not covered by the social security, but

1    top of my head.

2    BY MS. GREEN:

3         Q.   After the -- after the incident -- well, what

4    I will call the bus trip, the Halloween trip, did you

5    drink after that?

6         A.   I did, but I was always very cautious to eat

7    before.

8         Q.   Did you ever get drunk after that incident?

9              MS. HASH:   Objection.

10        A.   In certain situations, yes.

11   BY MS. GREEN:

12        Q.   In what situations?

13        A.   Only around friends that I trusted, and I

14   always watched myself, so...

15        Q.   Why didn't you sue Mr. ██████ in connection

16   with the allegations in your lawsuit?

17              MS. HASH:   Object to form.

18        A.   I believe Louisiana only has a one year for

19   civil lawsuits.  So by the time I even recognized it

20   happened to me, it had almost been passed that time.

21   BY MS. GREEN:

22        Q.   You're seeking damages for moving costs.  How

23   is that related to the allegations in the lawsuit?

24        A.   I mean, moving to France wasn't just because

25   of my husband.  He was fine with moving here.  I wanted

1    to get as far away as possible from all of this mess

2    and my family anxiety and running into people who

3    didn't believe me.  I also moved from closer to LSU

4    campus to Mid City so I could not go to Tigerland as

5    much and try to find a new area of Baton Rouge to hang

6    around so I wouldn't run into him again.

7         Q.   So you're seeking damages also for the cost

8    while you were still an LSU student?

9         A.   Yes.

10        Q.   Was your husband living in France -- was your

11   husband living in France -- let me ask this in a better

12   way.

13             When was your husband -- when did your husband

14   become a resident of France?

15        A.   He is French, so he was born there.

16        Q.   So he's always lived there, but he was open to

17   living in Louisiana?

18        A.   He studied abroad in Florida as well during

19   2016.  That's how we connected.  So he was always

20   willing to move to America as well.

21        Q.   All right.  And tell me about the loss of

22   educational opportunities at LSU.

23             MS. HASH:  Objection.

24        A.   I think I stated it earlier with having to

25   move my classes around, losing my study groups, having

1    in any responsibilities he had to follow up on the

2    report by Dr. Champney.  Is that fair?

3         A.   Yes, I'm not sure.

4         Q.   Okay.  The next line says, "He did not" --

5    this is Jonathan Sanders individually -- "did not

6    follow LSU's established Title IX complaint

7    investigation procedures."

8              Can you -- can you identify what those

9    procedures were that he personally did not follow?

10             MS. HASH:  Objection.

11        A.   I would have to see the requirements per LSU's

12   procedures.  I cannot recall all of them right now.

13   BY MR. LARGE:

14        Q.   Okay.  Do you recall any procedures --

15   because, I mean, this is discovery, and to defend the

16   case, it's important to know what procedures you are

17   alleging that he violated.

18        A.   I would have to --

19        Q.   This is your written response, and I would

20   like to just follow up and see if you can expound on

21   that a little bit.

22        A.   Of course.  But as I don't have the LSU's

23   Title IX procedures in front of me, I can't exactly

24   quote what was or was not followed.

25        Q.   So nothing sticks out in your head.  There's

1    not a -- there's not a "Yep, that was a bad policy" --
2    or excuse me, "That was a bad decision by him not to
3    follow this particular policy"?
4              MS. HASH:  Objection.
5         A.   I mean, if I can recall one in particular, is
6    that if a student has two accounts of sexual
7    misconduct, then they are automatically suspend and not
8    the deferred suspension.  I remember that came up in
9    the Husch Blackwell report as well.  So that one was
10   not followed.  But far as the other ones, I would have
11   to go down the list and read them again.
12   BY MR. LARGE:
13        Q.   Okay.  Was that -- was that Dr. Sanders's
14   responsibilities, or was it Title IX?  Do you know
15   whose responsibility that was?
16             MS. HASH:  Objection.
17        A.   From what I can recall, Dr. Sanders was the
18   one in charge of the accountability part after the
19   investigation is conducted, and the accountability part
20   was the one referring to the punishment associated.
21   BY MR. LARGE:
22        Q.   Right.  And it turned out that Dr. Sanders was
23   not the last person or body to pass judgment on
24   Mr. ██████'s discipline.  Is that correct?
25             MS. HASH:  Objection.

1    the people underneath them are doing?

2              MS. HASH:  Objection.

3        A.   I mean, it depends on the job.

4    BY MR. LARGE:

5        Q.   Okay.  How about the job in your instance?

6    I mean, did you expect to get emails from Jonathan

7    Sanders and Mr. DeLuca and some of the people from

8    Title IX throughout this whole process?  I mean, you

9    only spoke to Dr. Sanders once or twice, and it seems

10   here from your allegations like you're expecting a

11   very, very hands-on contact with you.  Is that correct?

12       A.   I'm expecting some form of contact, yes.

13       Q.   By him personally?

14       A.   As he was one of the people who dealt with my

15   case, yes.

16       Q.   Okay.  Did you want him -- you think

17   Jonathan Sanders and Tracy Blanchard should have been

18   doing the same exact thing?

19              MS. HASH:  Objection.

20       A.   I'm not sure.

21   BY MR. LARGE:

22       Q.   Okay.  But as we'll look when we go through

23   some of the emails, you did spend quite a bit a time

24   with Tracy Blanchard working on your accommodations and

25   your -- your class schedule and stuff, correct?

1      A.    As --

2      Q.    How would -- go ahead.  Sorry, my bad.

3      A.    Well, as a victim in a situation, I don't

4   really feel like it's fair and just to assign me a

5   punishment.

6      Q.    Okay.  So let's think about this from

7   practically terms, and I'll try to ask you this way.

8   Not saying it's you, but consider this hypothetical.

9          We have a no contact order against a student

10  that has done something wrong to another student.  If

11  that student walks around and gets in within the

12  contact area, how is that person not also subject to

13  the no contact order?

14                MS. HASH:  Objection.

15     A.    I mean, as I'm the victim in the situation and

16  had to move my classes around as well as leave my study

17  group and multiple organizations, I don't really think

18  that would have been an issue nor had it ever been an

19  issue at that point.

20  BY MR. LARGE:

21     Q.    Okay.  But that -- this was you personally,

22  right?

23                MS. HASH:  Objection.

24  BY MR. LARGE:

25     Q.    Let me ask you this:  His appeal process and

1    BY MR. LARGE:

2         Q.   Why was it unnecessary?

3              MS. HASH:  Objection.

4              Go ahead.

5         A.   He was found responsible by Jeffrey Scott.

6    I don't think that was meant for him to open up to

7    interpretation of who was responsible after the

8    foundings were -- after the findings were found.

9    BY MR. LARGE:

10        Q.   So that -- but that's your interpretation?

11             MS. HASH:  Objection.

12   BY MR. LARGE:

13        Q.   Do you know it to be a fact that

14   Jonathan Sanders was not supposed to interview you as

15   part of his process of determining the proper

16   punishment for Mr. █████?

17        A.   I don't believe I'm accusing him for

18   interviewing me.  I'm accusing him for unnecessary

19   questions.

20        Q.   Okay.  And the unnecessary questions, as I

21   think I remember them from earlier in the deposition,

22   were where you were on the bus?

23        A.   Yes, amongst other things.

24        Q.   Okay.  Tell me the other things.

25        A.   Was I on any other drugs.  He asked if I had

 1    but in this case, the SAA office.  One of the
 2    accusations is they failed to make the accommodations
 3    you needed or failed to work with you on it or
 4    basically were indifferent.  Does this indicate
 5    otherwise?
 6                    MS. HASH:   Objection.
 7        A.    So according to Title IX policy, interim
 8    rights, the victim is supposed to be given equal
 9    opportunities to education.  And in this email, in this
10    situation, I was made to move out as I was not offered
11    the equal rights to participate in this class.
12    BY MR. LARGE:
13        Q.    Okay.  And I think at one time -- and one of
14    the things you mention in the complaint and I think in
15    other places is that you believe it was inappropriate
16    for Tracy Blanchard to tell you you and other --
17    Mr. ███████ have the same rights.  Is that --
18        A.    As he was convicted of assaulting two women on
19    campus and I had not been convicted of anything at that
20    moment in time, I do believe that is a bit unjust.
21        Q.    Okay.  Did you question Ms. Blanchard or
22    Ms. Stewart, why they -- why at least Tracy's opinion
23    is "I cannot force him to"?
24        A.    As I said earlier, I don't believe
25    Jennie Stewart participated in our in-person meeting,

```
 1    created heightened risk."
 2             Does "LSU" include Jonathan Sanders in that
 3    paragraph?
 4                  MS. HASH:  Objection.
 5        A.   I believe so.
 6    BY MR. LARGE:
 7        Q.   Okay.  How did he create a heightened risk of
 8    sexual misconduct on campus?
 9                  MS. HASH:  Objection.
10        A.   By giving a deferred suspension to someone who
11    had already, convicted, assaulted two women.
12    BY MR. LARGE:
13        Q.   Okay.  And when you mean convicted, you mean
14    that Jeffrey Scott, the investigator, made a finding;
15    is that correct?
16        A.   Correct.
17        Q.   Okay.  And so that -- when the complaint talks
18    generally about creating a heightened risk and it talks
19    about LSU creating it, is it -- if I understand your
20    testimony correctly, is it -- Jonathan Sanders only
21    involvement in that is that he made the decision to do
22    a deferred suspension?
23                  MS. HASH:  Objection.
24        A.   Can you rephrase the question?
25    BY MR. LARGE:
```