**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ABBY OWENS, et al**<br>*Plaintiffs* | **Case No.: 21-242** |
| | **Division WBV-SDJ** |
| **v.** | |
| | **JUDGE WENDY B. VITTER** |
| **BOARD OF SUPERVISORS OF**<br>**LOUISIANA STATE UNIVERSITY**<br>**AND AGRICULTURAL AND**<br>**MECHANICAL COLLEGE**<br>*Defendant* | **MAGISTRATE JUDGE JOHNSON** |

<u>**OPPOSING STATEMENT OF MATERIAL FACTS  TO MOTION FOR**</u>
<u>**SUMMARY JUDGMENT NO. 8: SARAH BETH KITCH**</u>

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion

for Summary Judgment No. 8, Plaintiff Sarah Beth Kitch, through undersigned counsel, submits

responses to the Board's Statement of Undisputed Material Facts:

1. Sarah Beth Kitch enrolled as a graduate student at LSU in fall 2009.  (Kitch 22-23)1

**Admitted.**

2. In August 2009, Kitch met John Moe, one of her instructors who was a tenured professor

in the Political Science Department.  (Kitch 26) According to Kitch, she and Moe had "closely

aligned" interests as they both studied ancient and medieval political thought.  (Kitch 26)

**Admitted.**

3. Moe offered Kitch a scholarship to study Eric Voegelin political theory.  (Kitch 27)

**Admitted.**

4. Later, in 2011, Moe sponsored Kitch for the Earhart Fellowship, "a prestigious

fellowship for political theory and students of American thought and politics."  (Kitch 28-29)

**Qualified.** Moe sponsored Kitch for the Earhart Fellowship; however, Moe was not the sole decisionmaker in whether Kitch would receive the Fellowship. (Kitch 29-30)

5. Kitch alleges that, during her time as a graduate student, Moe engaged in conduct that made her uncomfortable. (Kitch 38)

**Admitted.**

6. According to Kitch, she was "informed" by Moe that she would drive him to and from class. (Kitch 36-38). Other students also drove Moe to class and other events. (Kitch 35-36, 89-90)

**Qualified.** Moe appointed Kitch to drive him to and from class which was held twice a week, on Tuesdays and Thursdays. (Kitch 36-37). They were alone on these trips. (Kitch 37). Trevor Shelly, who also worked with Moe, may have driven Moe from time to time but not at the rate or in the same way that Kitch did. (Kitch 34-36). Rather, the driving that was done by other graduate students in this period occurred when Moe would summon them to his porch for study sessions. (Kitch 36). When Kitch began writing her dissertation and "disappeared from the rotation of assistants" the new graduate students began driving Moe to class. (Kitch 89-90).

7. Additionally, she says Moe compared their relationship to Martin Heidegger and Hannah Arendt, a philosopher and his much younger student who had an affair. (Kitch 39) Kitch testified that this comment occurred in fall 2012. (Kitch 41) Kitch said Moe did not mention the affair when he referenced the relationship. (Kitch 41)

**Qualified.** Moe did not mention the affair between Martin Heidegger and Hannah Arendt when he made the comment; however, he did not need to, as the affair is a well-known story that "everyone" who studies political theory knows. (Kitch 39, 41-42). Kitch did not welcome the comparison. (Kitch 41).

8. When Kitch was preparing for her graduate student comprehensive exams, Moe allegedly reminded her that ". . . faculty were celestial and I was a mite."  (Kitch 39-40)

**Admitted.**

9. Kitch alleges Moe commented on a secretary's dress in an unprofessional manner which Kitch thought was "a little generational drift and [Moe] doesn't know what's workplace appropriate." (Kitch 50)

**Qualified.** Kitch did say that "at the time" she believed Moe's comment was "a little generational drift" and that Moe did not "know what's workplace appropriate." (Kitch 50). However, Kitch affirmed that the comment was "more than a compliment and that it made her uncomfortable. (Kitch 40, 50). Kitch was not alone in thinking that Moe's comment was unprofessional. (Kitch 40).

10. Moe also allegedly "commented approvingly" on a pair of heels she wore "in a way that made me uncomfortable."  (Kitch 40)

**Qualified.** Kitch purchased a pair of heels, dress slacks, and a dress blouse. It is accurate that Moe "commented approvingly" on a pair of heels in a manner that made Kitch uncomfortable. Kitch also indicated that, "now that I'm a teacher, I recognize is not the way an older faculty member, particularly a male, should address a student, in particular a young female." (Kitch 40). It was important to Kitch that she be recognized for her intellectual work. Moe's comment made Kitch realize that he was not only "paying attention" to her for her intellect. (Kitch 41).

11. Finally, Kitch alleges that, in March 2013, while she was writing her dissertation prospectus and preparing to defend it, Moe kissed her.  (Kitch 52; R. Doc. 182, ¶¶ 717721)

**Qualified**. Sometime in the Fall 2012 to Spring 2013, Kitch received a phone call from Moe's daughters who were concerned because they had not heard from him. They asked Kitch if

she would go by his house to check on him. (Kitch 50-52). When Kitch arrived at Moe's home, she knocked on the door and Kitch called out that he was there, so she walked into his home. Kitch noticed that Moe was sitting on the couch with an "assortment of wine bottles" on the couch next to him. Kitch explained to Moe that his daughters were worried. Moe stood up and "unsteadily" walked to the kitchen. As they were standing in the kitchen talking, Moe instructed Kitch to kiss him. Kitch said no. Moe then kissed Kitch on the mouth. At that time, Kitch had only been kissed on the mouth by her prior abuser, so she was "repulsed and nauseated." (Kitch 52).

12. Kitch did not have any other physical contact with Moe that made her uncomfortable. (Kitch 74)

**Qualified.** It is true that Moe did not have any other physical contact with Kitch after the kiss; however, Kitch remained cautious and "stayed as far out of any potential for that" as she could. (Kitch 74).

13. Kitch did not report Moe's actions while she was enrolled at LSU.  (Kitch 94)

**Qualified.** Kitch did not report Moe's actions while she was a student at LSU because Moe was very well-known and a "giant" in the field while Kitch was a third or fourth-year graduate student. Kitch understood that if she reported Moe, she would "take a fall in the department" and she did not want to jeopardize her "fledgling career." (Kitch 46-47).

14. Two months later, in May 2013, Kitch graduated from the master's program and transitioned to the doctoral program.  (Kitch 24; Kitch Exh. 9)

**Admitted.**

15. The members of her dissertation advisory committee were Moe and two other professors in the Political Science Department, Cecil Eubanks and William Stoner.  (Kitch 56, 70) Moe served as Kitch's advisor.  (Kitch 63-65, 71)

4

**Admitted.**

16. Kitch chose a topic for her dissertation prospectus and successfully defended the prospectus. (Kitch 70-72)

**Qualified**. To avoid working closely with Moe on choosing a dissertation topic, she chose a topic that would be "tolerable" to her and of interest to him. (Kitch 67). It was after Kitch successfully defended her prospectus that "things became more difficult" for her. (Kitch 70). She had difficulty writing the book manuscript due to her experiences with Moe because her confidence with Moe as her advisor "was shattered." (Kitch 70-71).

17. Kitch completed her dissertation in late fall 2014 and graduated from LSU with her doctorate in December 2014. (Kitch 89, 178; Kitch Exh. 9)

**Admitted.**

18. While she was enrolled at LSU, Kitch never complained about Moe to the Title IX office. (Kitch 94; Board 30(b)(6) 48-49)

**Qualified.** After completing Title IX training at LSU, Kitch was under the impression that LSU "didn't understand really what the problem with sexual harassment was and didn't trust" that LSU could help her. Further, given Moe's status at LSU compared to hers, Kitch believed that she could not ask LSU for help without "jeopardizing" herself. (Kitch 94). Her belief was affirmed when she spoke to a woman at the Title IX Office in the Fall of 2019. Kitch reported Moe's behavior and the woman appeared to be sympathetic. She told Kitch that she had suffered harassment and that she understood. The woman in the Title IX Office then asked Kitch why she had not reported Moe's behavior sooner. Kitch explained that she believed that a report would jeopardize her status as a graduate student. The woman agreed and stated, "it's good that you didn't

report then, no one would have done anything, and it would have only caused you trouble." (Kitch 121, 123-124).

19. By her graduation in December 2014, Kitch knew the facts forming the basis of her claim—the identity of the perpetrator, the entirety of Moe's conduct towards her, and her injuries. (See R. Doc. 340, pp. 18-19)

**Denied**. Kitch did not learn the facts forming the basis for her claims—LSU's systemic failures in its Title IX  and sexual misconduct response program—until April or May of 2021 following news reports regarding this lawsuit. (Kitch declaration 4)

20. In late summer or fall 2019, Kitch alleges that she called the Title IX office to report Moe.  (Kitch 99, 122) At the time of her report, Kitch was no longer a student or faculty member, and Moe was no longer employed at LSU.  (Kitch 126, 186)

**Admitted.**

21. When Kitch contacted LSU in 2019 to report Moe's conduct, she had knowledge of all facts regarding her claim.  (Kitch 99, 122)

**Denied**. Kitch did not learn the facts forming the basis for her claims—LSU's systemic failures in its Title IX  and sexual misconduct response program—until April or May of 2021 following news reports regarding this lawsuit. (Kitch declaration 4)

22. Kitch's post-graduation report was the first notice LSU received of any sexually harassing or inappropriate conduct by Moe.  (Board 30(b)(6) 48-49)

**Qualified.** Kitch can neither admit nor deny if her report was the first regarding Moe as she has no personal knowledge as to other reports.  Kitch acknowledges that the Board testified as such.

23. Kitch's post-graduation report of Moe was the only report of Title IX-related conduct LSU had ever received regarding Moe. (Board 30(b)(6) 48-49)

**Qualified.** Kitch can neither admit nor deny if her report was the first regarding Moe as she has no personal knowledge as to other reports. Kitch acknowledges that the Board testified as such.

24. Moe retired from LSU in spring 2015. (Kitch 60)

**Admitted**.

25. Kitch did not read the Husch Blackwell Report, and there are no factual statements in the report relating to Kitch or Moe. (Kitch 148; R. Doc. 1-1)

**Admitted.**

26. During her time as an LSU student, Kitch consistently had a 4.0 grade point average. (Sanders Decl. ¶ 7, Exh. 2)

**Admitted.**

27. Additionally, she received the Eric Vogelin Scholars Award twice (2009 and 2010) and the H.B. Earhart Fellowship five times (2010, 2011, 2012, 2013, and 2014). (Kitch Exh. 9)

**Admitted.**

28. Kitch suffered no loss in terms of a dissertation advisor, as she testified she sought advice from Professor Eubanks. (Kitch 65-66)

**Denied.** Following Moe's behavior, Kitch's confidence in her relationship with Moe was "shattered," which made writing difficult for Kitch. (Kitch 70-71). Kitch was forced to figure out how to successfully graduate with an advisor whom she not only "mistrusted" but was "afraid of." Kirk did seek advice from Professor Eubanks. However, Professor Eubanks was never Kitch's dissertation advisor. (Kitch 65).

7

29. According to her deposition testimony, Kitch excelled during her time at LSU.  (Kitch 56)

**Qualified.** When explaining why *at that time* she felt like she could not leave LSU, Kitch explained that she was a "22-year-old with a journalism degree from Southeastern" which was "not a super employable situation to be in 2013." Further, despite Moe's behavior, Kitch had "invested an incredible amount of effort" to become "excellent" in the field. She "was not able to give that up." (Kitch 55-56). However, her path was not easy. Following Moe's abuse, Kitch's confidence in her relationship with Moe was "shattered." (Kitch 70-71). Despite Moe being her advisor, Kitch both "mistrusted" and was "afraid of" him. (Kitch 65). This made writing difficult for Kitch. (Kitch 70-71). She did not believe that she could tell anyone without ending her career "at LSU and in political theory." She felt very alone and "very trapped" in navigating how to handle what she experienced by herself. (Kitch 92-93).

30. According to Kitch, her alleged damages came after she graduated, when she was unable to complete her dissertation-to-book project which impacted her ability to obtain a tenure track position.  (Kitch 75, 109, 132-133, 176-177)

**Denied.** While the effects of Moe's behavior extended after Kitch was no longer at LSU, the damage occurred while she was still a student. In addition to the damage to her education described above, Kitch's experiences with Moe "opened up an entirely new and...unexpected set of experiences" for her. (Kitch 61-62). Following the kiss in particular, Moe felt "disgusted" and "betrayed," like her "whole work was on the line" and that "the world had come apart and shifted." (Kitch 52-53). The mere mention of Moe triggered a "physiological response" in Kitch. (Kitch 61). She began showing symptoms of PTSD in Fall of 2015.  (Kitch 127, Kitch declaration 2)

8

Kitch has attended counseling sessions at least once a month with Katherine Volk since 2015 where she discusses her experiences with Moe and LSU. (Kitch 62).

In August 2018, Kitch was hired at the University of Missouri. (Kitch 106). When it came time to turn her dissertation into a "tenurable project," she could not complete it because she "would pull out the files, lose capacity to speak, feel very distressed, alone, feel very betrayed" due to her experiences with Moe. Eventually, she realized that she could not continue the same project that she had begun while at LSU and that she would need to begin a new project. However, that was not an option because it would have been too difficult to start over while her "tenure clock was ticking." (Kitch 103). The University of Missouri extended her a one-year extension on the tenure timeline. (Kitch 117). However, she could "never carry it out." (Kitch 106). In May 2020, Plaintiff left her position at the University of Missouri because she "didn't have the confidence in creating a credible tenure case." (Kitch 132). A tenure position is ideal to Kitch because it allows for more autonomy, and she believes that it would allow her to be a "more available mom." (Kitch 164-166). However, she no longer has the time to research and/or write. (Kitch 135).

31. The Board provided annual training beginning in at least 2014. (Board 30(b)(6) 30-32, 36-37) For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) 33, 36-37)

**Qualified.** Kitch can neither admit nor deny as she has no personal knowledge of these events. Kitch acknowledges that the Board testified as such.

32. Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) 39, 42)

**Qualified.** Kitch can neither admit nor deny as she has no personal knowledge of these events. Kitch acknowledges that the Board testified as such.

9

33. Like other faculty, Moe received LSU Title IX training. (Sanders Decl. ¶ 6)

**Qualified.** Kitch can neither admit nor deny as she has no personal knowledge of these events. Kitch acknowledges that Sanders declared as such.

34. Like other students, Kitch completed MyStudentBody training, a program that addresses alcohol, drugs, and sexual violence, which all students are required to complete. (Kitch 96-97; Sanders Decl. ¶ 3)

**Qualified.** Kitch is not sure if she completed MyStudentBody specifically. (Kitch 96-97) Furthermore, Kitch can neither admit nor deny as she has no personal knowledge of these events regarding other students. Kitch acknowledges that Sanders declared as such.

35. Kitch received Title IX and sexual harassment training through LSU because of her role as a graduate student instructor. (Kitch 94-97; Exh. 3) In particular, as an instructor, Kitch completed ethics, sexual harassment, and Title IX training. (Kitch 94; Kitch Exh. 3)

**Qualified.** LSU's training led Kitch to believe that LSU didn't understand what sexual harassment was, "and I didn't trust that there would be anyone who I could talk to." (Kitch 94; Kitch Exh. 3)

36. Employees, non-employees, and students, including Kitch, had the option to report Title IX claims through multiple mechanisms. (Board 30(b)(6) 49-52)

**Qualified.** Kitch can neither admit nor deny as she has no personal knowledge of these events regarding other students. Kitch acknowledges that the Board testified as such.

37. Likewise, information about how to make a Title IX complaint was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. (Board 30(b)(6) 52)

**Qualified.** Kitch can neither admit nor deny as she has no personal knowledge of these events regarding other students. Kitch acknowledges that the board testified as such.

## ADDITIONAL FACTS

1.      Supplemental Opposing Statement of Material Facts to as to Opposition to Motions No. 1-10 is incorporated herein by reference.

2.      Sarah Beth Kitch first enrolled at LSU in 2006 or 2007 as a dual enrollment student to take two courses while pursuing her undergraduate degree. Kitch 22.

3.      In 2009, Kitch enrolled in the Master of Political Theory program at LSU Kitch 22-23.

4.      Kitch was understood to be Moe's assistant during her fellowship. Kitch 33.

5.      In 2012, Moe informed Plaintiff that she would be driving him to and from class, twice a week on Tuesdays and Thursdays. Kitch 36-37. They were alone on these trips. Kitch 37.

6.      On the days that Kitch would drive Moe to and from class, Kitch would leave her house early, park in the "ag lot" on campus, walk to Stubbs and study, drive to Moe's and park her car, get in Moe's car and drive him to the faculty parking lot, pick Moe up after class, take him back to his house, and then finally Kitch would take her car back to campus and continue working. Kitch 37.

7.      Moe did and said things that made Kitch uncomfortable, such as sexist and inappropriate comments. Kitch 38.

8.      In fall 2012, Moe made a comment that he was like Heidegger and Plaintiff was like Arendt. As background, Martin Heidegger was a philosopher and Hannah Arendt was a student of Heidegger's and it was well-known that they had an affair, which was unwelcome to Plaintiff. Kitch 41.

9.      Sometime in Fall 2012 to Fall 2013, Plaintiff witnessed Moe make a comment regarding a secretary's dress in a way that was not professional. Kitch 40.

10.     During the Fall of 2012, Professor Moe commented approvingly on Kitch's new heels, dress slacks, and blouse in a manner that made me feel uncomfortable. Kitch Declaration ¶ 1.

11.     Sometime in the Fall 2012 to Spring 2013, Plaintiff received a call from Moe's daughters concerned because they had not heard from him and asked if she would go by his house and check on him. Kitch 50. When she arrived, she Sandos was sitting on the couch with wine bottles on the couch next to him. Kitch 51-52 Moe stood up and "unsteadily" walked to the kitchen. Kitch 51-52

12.     As they were standing in the kitchen talking, Moe instructed Plaintiff to kiss him. Kitch 52.

13.     Plaintiff said no. Kitch 52.

14.     Moe then leaned forward and kissed Plaintiff on the mouth. Kitch 52.

15.     Plaintiff was "repulsed and nauseated." Kitch 52.

16.     Because Moe is very well-known and she was a third or fourth-year grad student, Plaintiff believed that reporting his behavior would put her career at risk. Kitch 46-47.

17.     After the kiss, Plaintiff became concerned that Moe was not evaluating her intellectual work appropriately. Kitch 65.

18.     To avoid working closely with Moe on choosing a dissertation topic, she chose a topic that would be tolerable to her and of interest to him rather than pursuing her true interests. Kitch 67.

19.     Plaintiff also began going to a different professor, Cecil Eubanks, for feedback, rather than Moe. Kitch 65-66.

20.     Kitch first exhibited symptoms of Post-Traumatic Stress Disorder in the Fall of 2015. Kitch Declaration ¶ 2.

21.     If someone talks about Moe or does an impression of him, it triggers a physiological response in Plaintiff. Kitch 61.

22.     Plaintiff was evaluated by Katherine Volk sometime in the Summer or Fall of 2021. Kitch 127:25, 128:8-12.

23.     In August 2018, Kitch was hired by the University of Missouri as an Assistant Professor – tenure track. Kitch Declaration ¶ 3.

24.     When it came time to turn her dissertation into a book, which was necessary for her to earn tenure, Plaintiff could not complete it because she experienced stress and anxiety over Moe's abuse. Kitch 92-93, 103.

25.     Ultimately, Plaintiff was forced to leave the University of Missouri because she was unable to complete the dissertation and therefore could not earn tenure. Kitch 132-133.  As an academic, Plaintiff was always interested in obtaining a tenured professor position, which is very important for intellectual and professional progress. Kitch Dep. 132, 164-165. Additionally, a tenured position would have allowed Plaintiff the ability to both work and parent. Kitch 164-165.

26.     In the Fall of 2019, Kitch reported Moe's behavior to LSUs Title IX office. (Kitch 121, 123). Kitch chose to report then because she knew others that were attending or were planning on attending LSU and she had already "lost whatever was at stake in terms of people." (Kitch 122). When Plaintiff called the Title IX office to make a report in 2019, a Title IX staffer told her it was

a good thing she hadn't reported previously because it would have only caused her trouble. Kitch 123.

27.    Plaintiff has been in counseling since 2015, during which she is working through the effects of Moe's abuse and LSU's response to her report. Kitch 62.

28.    Kitch first learned about LSU's systemic mismanagement of Title IX and sexual misconduct via news reports about this lawsuit in April or May of 2021. Kitch Declaration ¶ 4. Prior to this lawsuit, Kitch had not yet heard of any of the other Plaintiffs and first learned of the lawsuit in a news article after its filing. Kitch 19.

29.    Kitch then contacted counsel for Plaintiffs to assess my case for inclusion in the lawsuit. Kitch Declaration ¶ 5.

30.    Plaintiff was to be Professor John Moe's assistant during her fellowship. Kitch 33.

Respectfully Submitted,

/s/ Catherine E. Lasky

Karen Truszkowski                    Catherine E. Lasky (La. Bar 28652)
*Pro Hac Vice*                       Endya L. Hash (La. Bar 38260)
Temperance Legal Group               Katie Lasky Law
503 Mall Court #131                  619 Homedale Street
Lansing, Michigan 48912              New Orleans, Louisiana 70124
P: (844) 534-2560                    P: (504) 584-7336
F: (800) 531-6527                    F: (504) 375-2221
karen@temperancelegalgroup.com       katie@katielaskylaw.com
                                     endya@katielaskylaw.com

                                     Elizabeth K. Abdnour
                                     *Pro Hac Vice*
                                     Abdnour Weiker LLP
                                     500 E. Michigan Ave., Ste. 130
                                     Lansing, MI 48912
                                     (517) 994-1776
                                     (614) 417-5081

14

liz@education-rights.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour