UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ABBY OWENS, SAMANTHA BRENNAN,
CALISE RICHARDSON, JADE LEWIS,
KENNAN JOHNSON, ELISABETH          CASE NO.
ANDRIES, JANE DOE, ASHLYN          3:21-CV-00242
ROBERTSON, CORINN HOVIS, AND
SARAH BETH KITCH

VS.

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE, AND VERGE AUSBERRY,
MIRIAM SEGAR, JENNIE STEWART,
AND JONATHAN SANDERS, IN THEIR
INDIVIDUAL CAPACITIES

* * * * * * * * * * * * * * * * * * * * * * * *

*** CONFIDENTIAL TRANSCRIPT ***

*** SUBJECT TO PROTECTIVE ORDER ***

The deposition of SARAH BETH KITCH, taken in

connection with the captioned cause, pursuant to

the following stipulations before RITA A. DEROUEN,

Certified Court Reporter, at Phelps Dunbar, 400

Convention Street, Suite 1100, Baton Rouge,

Louisiana 70802 on October 12, 2022, beginning at

8:58 am.

COURT REPORTERS OF LOUISIANA, L.L.C.
9522 Brookline Avenue, Suite 217
Baton Rouge, Louisiana  70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-mail:  depos@courtreportersla.com

1  so it might throw me.

2      **Q.  Did you -- was the documentary ever made**

3  **or filmed?**

4      A.  They made the documentary, but not with my

5  participation.

6      **Q.  Did you provide your story to Claire?**

7      A.  I was in a Zoom room with her, and I

8  introduced myself, but I don't recall sharing my

9  story with her.

10     **Q.  Was it just the two of you in the Zoom**

11 **meeting or were there others?**

12     A.  There were others.

13     **Q.  Who else was in the meeting?**

14     A.  Other women from the lawsuit.  I can't

15 remember who was there and who wasn't there.  But

16 maybe a selection of people from the lawsuit.

17     **Q.  Do you know any of the other plaintiffs in**

18 **the lawsuit?**

19     A.  Only by name.  I've spoken to one of them

20 on the phone once.  Other than that, I don't know

21 them and hadn't heard of them before this.

22     **Q.  And which one of the plaintiffs did you**

23 **speak to by phone?**

24     A.  I think Abby.

25     **Q.  And do you recall when you spoke to**

1    Q.  Did you say he's a pilot?

2    A.  (The witness nodded head.)

3    Q.  What about ████, where does he live?

4    A.  ████ lives in Prairieville, but he's in

5    Florida right now working on the hurricane.

6    Q.  Do you get to visit with him frequently?

7    A.  Not often, but we have a caring

8    relationship.

9    Q.  All right.  Let's get back to your

10   time -- or talk about your time at LSU.  I think

11   you already told me this, but we started talking

12   about home school, so I apologize.

13          When did you enroll at LSU?

14   A.  I first enrolled at LSU as a

15   dual-enrollment student -- time gets by.  I used

16   to have this semester by semester.  So I enrolled

17   in -- it was 2006 or '7 to take Lou Day's media

18   law course and one other course.  I was an

19   undergrad.

20   Q.  Okay.  And so once you completed your

21   undergraduate studies, tell me, when was your next

22   time at LSU?

23   A.  Sure.  So I finished my undergraduate

24   studies.  I was at Oxford.  I came back to the

25   States and I enrolled in the summer of 2009 to

1  begin in fall of 2009.

2      Q.  And at that time, what degree were you

3  pursuing?

4      A.  A master's in political theory.

5      Q.  Did you consider other graduate programs?

6      A.  I wanted to go to Baylor, but I had TOPS

7  left over.

8      Q.  So your TOPS scholarship paid for your

9  master's degree?

10     A.  Yes.

11     Q.  All right.  So when you --

12     A.  For the tuition portion of that.

13     Q.  Sure.  So at the time you entered the

14  graduate program, what was your -- what was your

15  career path?  What did you plan to do?

16     A.  So I had questions about what justice is,

17  and I wanted to find a way to work with those

18  questions.  My parents had encouraged my teaching

19  abilities.  They envisioned me using those

20  abilities in your job.  But they had encouraged my

21  abilities there.

22         I was 18 when I started, so I didn't have

23  a fully made plan.  But I had hoped to use my

24  teaching abilities in some way to explore

25  questions of human dignity, of justice.

1    Q.   What was the basis for your questions?
2  Or, I guess, why did you have those questions at
3  the time?
4    A.   Well, as you already know, I had been
5  assaulted as a child, and I also was given an
6  education where I could read any historical
7  literature, any theological works.  And so my own
8  personal questions and the text and stories that I
9  interacted with made me wonder, what is justice,
10  can we name harm, can we repair harm.
11       My family, like many American families,
12  had a lot of divorce.  And I wanted to know about
13  stable communities, can we create communities, can
14  we create communities that last.  Those were the
15  bases of my questions.
16    Q.   So at some point you completed the
17  master's program, correct?
18    A.   Correct.
19    Q.   And when was that?
20    A.   I graduated from the master's program in
21  May of 2013.
22    Q.   And what did you do next?
23    A.   I was writing my prospectus at the time in
24  order to finish.  So after my first semester
25  there, some of the faculty asked if I wanted to

1  stay on as a doctoral student.  So I had known for

2  some time that I would be staying on, and I had a

3  curriculum accordingly.  So I stayed on to write.

4      **Q.  Were you excited about being a part of the**

5  **doctoral program?**

6      A.  Yeah.  I found a home for my questions.  I

7  had some really good faculty.  Cecil Eubanks

8  understood my questions and he connected me with

9  traditions that could help me flourish as a person

10  and as a teacher.  He nurtured my teaching.

11      **Q.  Were there any other professors that you**

12  **found to be nurturing of your studies?**

13      A.  That's a good question.  Bill Clark and I

14  had a good rapport.

15           Wayne Parent and I had a good rapport.  I

16  got to know him better later, but he was really

17  kind, understood my interests.  I never took a

18  class from him, but we had offices across the hall

19  from each other.

20           Belinda Davis was very generous with her

21  time.  There aren't very many women in political

22  science.  And she was willing to entertain my

23  questions, like how do you do this job and have

24  children.

25           Johanna Dunaway was a young faculty member

1   theorists for being a big character.  I didn't

2   learn until later his reputation for flamboyance.

3   He was getting very elderly when I knew him in the

4   program, but you could still see a remnant of the

5   self-assuredness, the grandiosity, the character.

6   So when I was a young student, I wanted to excel

7   in his classes.

8          When he became less able, I was on

9   fellowship, and so then I started to interact with

10  him more.  But I also did general grad student

11  work, ordering cookies from Aramark for a speaker

12  that he would have in, preparing the posters,

13  distributing the posters, working with LSU

14  facilities to make sure there were chairs in the

15  room and that the air conditioning was on, things

16  like that.

17  **Q.  Did anyone else -- was anyone else**

18  **assigned to work with Dr. ▇▇▇▇?**

19  A.  I'm sure he had TAs through the years.  I

20  don't remember who was doing what.  I, as a

21  fellowship student, didn't formally have a

22  teaching assistantship, but because the fellowship

23  came from ▇▇▇▇, I was understood to be his

24  assistant.

25  **Q.  And is that what Dr. ▇▇▇▇ communicated**

1  the rate that I did or in the way that I did.  We

2  were all grad students, so ██████ would summon us

3  to his porch for study sessions.  And we were all

4  grad students, so we all lived in an immersive

5  world studying, programming.

6      **Q.  So all of you were studying -- all of the**

7  **grad students were studying?**

8      A.  More or less.  The political theorists

9  tended to be serious, to be reading, writing at

10  all times.

11     **Q.  Okay.  When did you -- or when did it**

12  **become necessary to drive Dr. ██████?**

13     A.  I think it was 2012.

14     **Q.  And did Dr. ██████ ask you about driving**

15  **him?**

16     A.  He more appointed me.

17     **Q.  What do you mean by that?**

18     A.  He more informed me that I would be

19  driving him to and from class.

20     **Q.  And why was he not able to drive himself?**

21     A.  His leg, I think his right leg, no longer

22  worked at his command.

23     **Q.  So Dr. ██████ informed you that you would**

24  **have to drive him?**

25     A.  Correct.

1    Q.  And how often was class?

2    A.  Tuesday/Thursday, if I'm right.

3    Q.  Where were you living at the time?

4    A.  Prairieville.

5    Q.  So when you left Prairieville to attend

6  class, tell me where you would go, or how you

7  would handle the transportation.

8    A.  So my routine in those days was to try to

9  beat the morning traffic.  So I'd leave

10 Prairieville early, arrive on campus, park in the

11 ag lot, walk to Stubbs, study, whatever I needed

12 to do, go out to the ag lot, drive to ████'s

13 house, park my car, get in his car, drive his car

14 into the faculty parking, be there for class or

15 pick him up after class, take him back down the

16 stairs, take his car back to his house, take my

17 car back to campus, continue working.

18   Q.  Were you ever accompanied by anyone when

19 you drove Dr. ████?

20   A.  Not that I can recall.  There may have

21 been an exception, but not customarily.

22   Q.  Did you feel comfortable driving

23 Dr. ████ by yourself?

24   A.  In the beginning.  I was -- it was part of

25 my routine.  I was under the impression that it

1   was part of keeping my role in the department.

2   But, over time, there were things that ███████ said

3   and did that made me uncomfortable.

4          I assumed that that was not only part of

5   being a woman in political theory but part of

6   being a woman at LSU.  People made comments about

7   me as a political theorist or did things that

8   seemed sexist or inappropriate, and I, as a young

9   woman in a male-dominated field, assumed that it

10  was part of the job to tolerate things that seemed

11  uncomfortable.

12      **Q.  Okay.  So I have -- I want to ask several**

13  **follow-up questions.**

14          **Did Dr. ███████ever tell you that driving**

15  **him was part of the routine?**

16      A.  He told me to be there and drive him.  So

17  it was implied.

18      **Q.  I'm sorry, I didn't mean to interrupt you.**

19      A.  Go ahead.

20      **Q.  Did you ever tell him that you didn't feel**

21  **comfortable driving him?**

22      A.  No.  I needed the fellowship.  I needed to

23  be in the program.  So I said yes to the duties

24  that were assigned to me.

25      **Q.  Did you ever ask Dr. ███████ if someone**

1   comprehensive exam is to write six five-page

2   essays with no notes in a room in 24 hours.  In

3   order to prepare for this trial, you have

4   to -- well, if you want to succeed at it, you've

5   got to give it some attention.  And so as I was

6   preparing, he would remind me that my faculty were

7   celestial and I was a mite.

8       **Q.  Was there anything else he said that made**

9   **you uncomfortable?**

10      A.  In the hall in front of other people he

11  might comment on a secretary's dress in a way that

12  I was not alone in thinking was not professional.

13          I really wanted to succeed, so I -- I had

14  entered the program straight from summer camp.  I

15  was wearing those $2 Old Navy flip-flops and Old

16  Navy skirt and shirt and, over time, I thought, if

17  I'm going to do this, I need to kick it up a

18  notch.  So I got a pair of heels and dress slacks

19  and a dress blouse, a small wardrobe of these.

20          And ████████ commented approvingly on the

21  heels in a way that made me uncomfortable at the

22  time and, now that I'm a teacher, I recognize is

23  not the way an older faculty member, particularly

24  a male, should address a student, in particular, a

25  young female.

1    Q.   Do you remember what he said to you?

2    A.   I couldn't recall it to you word for word,

3    but I can recall the self-consciousness and the

4    sense of exposure that it evoked in me.   I

5    desperately wanted to be seen for the intellectual

6    work I was doing.   He made me know that that's not

7    the only thing he was paying attention to through

8    comments like what I've described to you.

9    Q.   Okay.   So the first comment about the

10   philosopher and the student, one, do you recall

11   when that comment was made?

12   A.   It was on his porch sometime during my

13   comps prep.   I took my comps in December of 2012.

14   I prepared for the year but especially for the

15   fall semester of 2012.

16   Q.   Were -- you and Dr. ███████ were the only

17   two there at his house?

18   A.   Correct.

19   Q.   During -- when he compared himself and you

20   to the philosopher and the student, did he mention

21   the affair?

22   A.   It was known.

23   Q.   My question --

24   A.   No.

25   Q.   Okay.

1  The first is all humanities students are extremely

2  vulnerable.  You have to invest a great deal and

3  you depend on your faculty.

4       In my case, I was also dependent in

5  particular on this one faculty member.  And I, as

6  a very young student, felt that this path was the

7  only path open to me.  I wanted to study justice

8  for a living, and there's just not so many ways to

9  do that.  And so I thought I had found a path and

10  that I ought to cling to it real tightly.

11       So that general vulnerability of

12  humanities graduate students was extremely

13  palpable to me personally.

14  **Q.  I understand, based on what you said, that**

15  **you didn't want to say anything to Dr. ███████**

16  **about his behavior towards you.**

17       **Did you say anything to anyone at LSU**

18  **about his behavior towards you?**

19  A.  My understanding was that if I -- like my

20  impression of the department was that ██████ is a

21  giant in this field.  I went to a conference at

22  Princeton and they were like, Oh, you're a ███████

23  student.  Like that's one link removed freaking

24  Eric Voegelin.  Like it's a very small world of

25  celebrity.

1       But I understood that if I said anything
2   that jeopardized my relationship to ████, I
3   would take the fall in the department.  He had an
4   established career.  I was a third, fourth-year
5   grad student.  So it was extremely important to me
6   to not say anything to anyone because I did not
7   want to jeopardize my fledgling career.
8       **Q.   Okay.  When you say that you -- it was**
9   **your understanding, other than Dr. ████'s**
10  **position as far as -- in academia, if you will,**
11  **what was your understanding based upon?**
12      A.   Sure.  So the chair at the time of the
13  incidents at ████'s house, the time when he told
14  me to kiss him and I told him no and then he
15  kissed me anyway, the chair at the time was Bill
16  Clark.
17      I had a good rapport with Bill Clark.  My
18  second field was in comparative politics.  Bill
19  Clark was a comparativist.  I thought about
20  telling Bill Clark, but then I considered my
21  environment.
22      Kevin Mulcahy is a long-time professor at
23  LSU.  If you walk on campus, you'll notice at
24  least nine trees dedicated to Emily Mulcahy, his
25  mother, or to things like the glory of the study

1   you mentioned.  You said that Dr. ███████ made a

2   comment about a secretary's dress.

3           When was that comment made?

4       A.  Maybe fall of 2012 or spring of 2013,

5   somewhere in there.  Maybe fall of 2013.

6       Q.  Did you hear Dr. █████ make the comment?

7       A.  I was there, I heard him.

8       Q.  And do you recall what he said?

9       A.  Not word for word, I couldn't recall it to

10  you.

11      Q.  And whatever Dr. ██████ said you thought

12  was more than a compliment?

13      A.  Yes.  At the time, I thought it's a little

14  generational drift and he doesn't know what's

15  workplace appropriate.

16      Q.  But you're not sure what he said?

17      A.  I couldn't recall it to you now, no.

18      Q.  Okay.  You mentioned the kiss with

19  Dr. ██████.  Tell me about that.

20      A.  Sure.  So ██████ has maybe four children,

21  and two of them, his daughters, at least one or

22  two -- at least one, maybe two, had my number.

23  They knew that I was his assistant, his delegate.

24  And so if ██████ needed something, to go to the

25  dentist, or one day he fell, needed someone to

1  come pick him up, they or he would call me.

2        One day, his daughters hadn't heard from

3  him, and so they called me.  I was leaving campus.

4  And whichever one it was, I can't remember, asked

5  if I would go by and check on him.  I was glad to;

6  I was his assistant.

7        I didn't think of the events that I've

8  described to you or the comments that I've

9  described to you as a pattern yet.  They were just

10  part of the environment, part of the world I lived

11  in.

12        When I got to ███████'s house, I knocked on

13  the door.  I'd been there plenty of times for

14  discussion over papers, preparations for

15  comprehensive exams.  He was seated on the couch.

16  At this time, he needed a cane; he didn't always

17  use it.  On the couch next to him there were an

18  assortment of wine bottles, if I recall correctly.

19        I entered his house after his -- he called

20  out that he was there.  And I checked on him, let

21  him know that his daughters were worried about

22  him, was he okay.  He rose unsteadily from his

23  couch, walked over to the kitchen, around the

24  wall.

25        As we were standing in the kitchen, he

1  talked with me maybe about my upcoming work, I

2  don't recall.  And then we were standing face to

3  face in the kitchen, he a little wobbly.  I was

4  wearing a long purple dress and a denim jacket.

5          And he surprised me when he said, Kiss me.

6  And I said, No.  He leaned forward and kissed me

7  on the mouth.  I had never, except for ████, been

8  kissed on the mouth, and I was repulsed and

9  nauseated.

10          I left, got into my car.  Between the fall

11  of 2013 and -- of 2012, excuse me, the fall of

12  2012 and the spring of 2013, I lived too much on a

13  diet of peanut butter and chocolate, so there was

14  some handy in the car.  And I grabbed this

15  Ghirardelli cabernet chocolate and ate it to try

16  to get the taste out of my mouth.

17          My parents didn't drink when I was growing

18  up, they don't now.  I had only limited experience

19  with someone being drunk in their own home, and I

20  assumed later that maybe that's the condition

21  ████ was in.  But anyway, it tasted horrible and

22  I wanted to get rid of the taste.

23          And I drove.  And my heart was racing.

24  And I felt so disgusted and so betrayed.  And I

25  didn't know -- I felt like the whole -- my whole

1  work was on the line, like how would I go back.

2  And I remember driving and feeling like the whole

3  world had come apart and shifted.

4        And I felt very alone.  I couldn't tell my

5  parents because I didn't know how they'd react.  I

6  couldn't tell Bill Clark because ███████ was on

7  the loose.  If they didn't stop ██████, they

8  wouldn't stop me -- they wouldn't stop ██████,

9  they wouldn't protect me.  And I was devastated.

10     **Q.  So I'm going to ask a few follow-up**

11  **questions.  First of all, this is just for me to**

12  **understand.**

13         **How big is Dr. ██████ in comparison to**

14  **you?**

15     A.  He's not a tall man.  He's round, or was

16  round at the time.  Some taller than me but not

17  much.

18     **Q.  So were you -- as a practical matter, were**

19  **you able to pick him up when he fell -- were you**

20  **able to pick him up when he fell by yourself or**

21  **did you need help to do that.**

22     A.  My mom was a physical therapist tech, and

23  she had taught me how to help my grandparents get

24  up, so I knew how to raise a person who is not

25  able to raise himself.

```
 1          But those were the kind of things.  I had
 2   worked very closely with ████████, so why would I be
 3   nervous or why would I feel disgusted?  Those were
 4   the kind of things I needed to be able to explain
 5   to him.
 6             ███████ was such a character in the
 7   department, and if someone were talking about him
 8   or doing an impression of him and it triggered a
 9   physiological response in me, I wanted John to
10   know what was happening.
11        Q.  Did other things trigger physiological
12   responses in you?
13        A.  What do you mean?
14        Q.  I mean the situation with ████████.
15        A.  Yes, of course.
16        Q.  How did you determine what was triggered
17   by ██████ as opposed to ███████████?
18   ██████████████████████████████████████████████████
19   ██████████████████████████████████████████████████
20   ██████████████████████████████████████████████████
21   ██████████████████████████████████████████████████
22   ██████████████████████████████████████████████████
23          I had assumed that sexual vulnerability of
24   this kind was behind me, and this opened up an
25   entirely new and, to me, unexpected set of
```

```
 1  experiences.  The two threads were extremely
 2  distinct to me.
 3      Q.  In your discussions with John when you
 4  told him about Dr. ████████, did you also tell him
 5  about ████████████?
 6      A.  He already knew about that.
 7      Q.  Okay.  When did you tell him about ████████
 8  ████?
 9      A.  Early in our dating.  Fall of 2013.
10      Q.  And I know that you said that you had
11  pastoral counseling and then you started seeing a
12  therapist in October or summer of 2015.
13          Had either of them basically distinguished
14  between -- I'll use your terminology -- the
15  threads, Dr. ████████ versus the ████████████████
16  ████████████████?
17      A.  Yes.  They're very distinct threads.  They
18  don't typically come up in the same conversation.
19  If we're talking about early in my work with
20  Katherine, I was talking about the abuse that
21  ████████ inflicted on me.  When I've talked with her
22  about the impact that ████████ had on my project,
23  that's a very different conversation.
24      Q.  And I understand it's a different
25  conversation for you.  My question is:  Has she
```

1  weeks and weeks and weeks and months of prep work

2  that each of those trials requires.

3        A typical day for me would be getting to

4  campus before the sun came up and leaving well

5  after dark.  You -- I invested an incredible

6  amount of time.

7        After █████████ kissed me, I didn't trust him

8  as an adviser.  I felt that he was not evaluating

9  my intellectual work in the way that I hoped that

10 he would.

11       I understood that there were dimensions of

12 the relationship that he had imagined or

13 anticipated that were absolutely beyond the pale

14 to me, and in that context, I needed to figure out

15 how to finish my degree with an adviser who I not

16 only now mistrusted but was, at some level, afraid

17 of without letting anyone else in the department

18 know that there was a problem.

19       And so I started showing up to Cecil

20 Eubanks' office with my prospectus work, my

21 dissertation work, which was not his job.  He was

22 always generous to political theorists.  He pushed

23 us hard and cared about us a lot.  But he wasn't

24 my dissertation adviser.

25       So I started showing up with chapters and

1  asking him to read them.  It wasn't his job.  He

2  didn't get credit for it.  It was totally overtime

3  on his part.  But he's a tender and discreet man.

4  He took me without question.  I showed up, I asked

5  him to read chapters, he read chapters.

6      **Q.  In the time that -- the time frame after**

7  **the kiss, that's how I'll refer to it, where were**

8  **you --**

9      A.  With apologies to Rodan, that's how we'll

10  refer to it.

11     **Q.  With -- where were you in the continuum?**

12  **Were you in the phase of the prospectus at that**

13  **time?**

14     A.  I was writing my prospectus at the time.

15  So what this means is that I went from writing a

16  project -- so you normally have some negotiation

17  with your adviser, right.  Some advisers

18  are -- prepare yourselves -- egotistical.  And so

19  you normally have some negotiation.

20          They want you to write about a topic that

21  they care about.  You want to write about a topic

22  you care about.  Hopefully you're united enough in

23  your interests that you come to an easy

24  negotiation.

25          ███████  first wanted me to write about the

1  relationship between religious liberty and

2  political liberty.  I mean, I've taught classes on

3  it, but I wasn't about to write a dissertation on

4  it.  That was a normal kind of negotiation.

5       After he kissed me, I understood that

6  whatever I wrote needed to be unoffensive to him.

7  It needed to be something he would accept.  But I

8  didn't want to work closely with him on it.  I

9  didn't want to get into any kind of serious

10  negotiation about a topic that I wanted to pursue

11  more.

12       I picked a thing that I knew would be

13  tolerable to me and of interest to him.  And my

14  goal in doing that was to not have to engage

15  closely as I wrote.

16       MS. GREEN:

17            Okay.  I think this might be a good

18            time for us to take a break.

19       (A break was taken from 10:38 a.m. to

20            10:53 a.m.)

21  BY MS. GREEN:

22       Q.  Dr. Kitch, we discussed several things, so

23  now I want to work a little backward and get a

24  timeline in place, if you will.

25            So can you tell me when you started your

1  don't know now about the gap.

2        But it couldn't have been long, because I

3  defended in spring of 2013 and I, by this

4  timeline, had written something in the summer, and

5  I was writing and presented at the Philadelphia

6  Society in the fall.

7        **Q.  And so at this time, your goal is still to**

8  **basically complete your dissertation and have it**

9  **be in the format of a publication at some point?**

10       A.  Yes.  So what you do is you write the

11  dissertation and then you defend that.  And you

12  can go on the job market with a description of how

13  you're going to turn that dissertation into a

14  book.  So my goal was to get to that point.

15       **Q.  So when did you complete your**

16  **dissertation?**

17       A.  In late fall of 2014.

18       **Q.  And during the course of the time when**

19  **Dr. ████ kissed you and when you completed it,**

20  **how often would you -- completed your**

21  **dissertation, sorry, how often would you interact**

22  **with him?**

23       A.  Not as often as before.  But I would still

24  see him in the hall.  After that, some other

25  students who were his like new -- when you start

 1  compelling.  That's demanding work.

 2      **Q.  So the -- are you essentially -- you're**

 3  **essentially writing for a different audience?**

 4      A.  Not a totally different audience.  You're

 5  writing on the same questions, and your goal is to

 6  strip away all of the excess that your committee

 7  or subfield requires in order to create clarity.

 8          I wasn't concerned about the process of

 9  creating clarity.  My background was in journalism

10  and mass comm from Southeastern.  So that kind of

11  writing was familiar to me and enjoyable to me,

12  and I tried to write as well as I could with that

13  process in mind.  The part that made it hard were

14  the relational dynamics that shifted.

15      **Q.  Even though you were -- even though you**

16  **had basically curtailed your interactions with**

17  **Dr. ▮▮▮▮▮▮▮, you still had difficulty writing?**

18      A.  Yes, because I -- he was still formally my

19  adviser, and I was very distressed by the way that

20  he had changed our relationship and more

21  distressed by the fact that I felt I couldn't tell

22  anyone without ending my career at LSU and in

23  political theory.

24          And so I felt very alone and very trapped

25  in trying to figure out this problem by myself as

1   a young woman.  That was what made it difficult.

2       **Q.  So at some point, you did complete your**

3   **dissertation, correct?**

4       A.  Thanks be to God.  Yes, I did.

5       **Q.  And when was that?**

6       A.  In the fall of 2014.

7       **Q.  And at that point, you still had the same**

8   **members on your committee, correct?**

9       A.  Correct, as far as I can remember.

10      **Q.  And did you still have the person from the**

11  **other department?  I don't remember --**

12      A.  I think Andrea Miller was still on there.

13  I don't remember anyone new.  The outside person,

14  as long as they're neutral, is the least of

15  someone -- you hope you don't have to worry about.

16  So it was nothing memorable.

17      **Q.  And there was nothing -- there was nothing**

18  **that occurred during that process that made you**

19  **uncomfortable or that you felt like Dr. ████████ did**

20  **that was inappropriate?**

21      A.  No, not at that point.  It was just that

22  our -- I felt our relationship was very

23  undermined, and I felt vulnerable, and I felt like

24  I needed to keep my head down and finish and move

25  on my way.

1    it, and I had gotten there, and I had to turn that

2    dissertation into a tenurable project; but then,

3    when I tried to, I couldn't.

4         I would pull out the files, lose my

5    capacity to speak, feel very distressed, alone,

6    feel very betrayed.  And then at some point I

7    realized that I couldn't continue the project and

8    that I would have to create a new project.  But by

9    that time, I didn't think I could start from

10   scratch and create a new book while my tenure

11   clock was ticking.

12        The goal of writing the dissertation as a

13   dissertation-to-book project is -- and especially

14   for women, and especially for women who want to

15   have children, is that you do all that before the

16   baby comes or you do all that while you're in grad

17   school so that you can use that work later.

18        In my field, it's not uncommon for women

19   to postpone having children until they get tenure,

20   and I didn't want to do that.  So I was counting

21   on the work I had done, as is customary in my

22   field, in the dissertation to become the book

23   project.

24        And at Mizzou, I realized that I would not

25   be able to finish that project, which is another

1      A.   That's okay.   Lots of advisers in this

2  life path.

3           No, I was working on Martin Luther King,

4  Jr.   I did not find myself able to go back to the

5  dissertation-to-book project.   But I had post doc.

6  I needed to have a job talk.   I needed to have an

7  article that I could say, Hey, this is what I'm

8  working on.

9           So I -- after Ferguson, my students had

10  been interested in reading African-American

11  political thought, and I jumped in with them.   I

12  taught a course on MLK at LSU, and then I was

13  continuing -- I decided maybe I could pull

14  something out of that for the post doc.

15          So when I was at Princeton, I worked on

16  the MLK project, not on the dissertation-to-book

17  project, for the reasons I've described to you.

18      **Q.   Did you work on the dissertation-to-book**

19  **project at all after you graduated?**

20      A.   I mean, I would try.   I would pull the

21  papers out and I would look at the manuscript and

22  think about how I might should revise it, but I

23  could never carry that out.

24      **Q.   And so when you got to Mizzou -- when did**

25  **you start at Mizzou?**

1    A.   August of 2018.

2    **Q.  So I know you said that you -- less than**

3  **one in eight is what you said, I think?**

4    A.   Uh-huh.

5    **Q.  Receive a tenure track position?**

6    A.   A full-time position, much less a tenure

7  track position, yes.

8    **Q.  So at that time, was it disclosed to you**

9  **or communicated to you that the expectation is**

10  **that you would have a publication, or tell me**

11  **what --**

12    A.   Yes.  The instructions were to make a

13  footprint in your field according to the standards

14  of your field.  So my tenure home was in the

15  Truman School of Public Affairs.  The Truman

16  School is a multidisciplinary school.  So the

17  standard was to do what is customary in each

18  scholar's own field.  And in my field, that is

19  turning your dissertation into a book project.

20    **Q.  So you couldn't have used the MLK**

21  **political theory that you had worked on at**

22  **Princeton for the Mizzou job?**

23    A.   That's a good question.  I would have

24  needed four such articles, but I didn't have a

25  program -- like I -- my question about King, the

```
1              (Exhibit 6 was marked.)
2         MS. GREEN:
3              Most of these things we've already
4         discussed.  And I just want you to know,
5         after we finish this, though, we're going
6         to take a break.
7         MS. TRUSZKOWSKI:
8              Oh, good.  Thank you.
9   BY MS. GREEN:
10       Q.  So, Dr. Kitch, is this the statement that
11  you submitted in support of your request?
12       A.  It is.
13       Q.  Most of this we've already discussed, but
14  I do want to ask a few questions to -- just
15  because I want to make sure that I understand what
16  you're saying.
17            So you mentioned this earlier, and we
18  didn't complete the thought, so let's go ahead and
19  complete it now.
20            On the second page of the letter, at the
21  end of the second paragraph, there's a reference
22  to you calling the Title IX office in the fall of
23  2019.
24       A.  Yes.
25       Q.  Tell me about that conversation.
```

1          As I prepared this, asking Eubanks for a
2    letter and thinking about how to pitch my tenure
3    extension, I thought, Now I can report, everything
4    is in the open, and if it's going to hurt my
5    career, that's already out there and so now I can
6    just report.
7          So I called LSU's Title IX office and I
8    told them I had a case to report.  I don't
9    remember if I reported it like on the first call
10   that I made or if I had to call back.  I remember
11   walking up and down on the pavers in our front
12   yard in Missouri and talking to the woman on the
13   phone.
14         She asked what happened.  I told her.  It
15   was difficult to tell her.  I had -- other than
16   letting -- thinking about how to tell my directors
17   at Mizzou, I hadn't talked with a stranger about
18   it.  And I felt weak for being affected by
19   ███████'s action.  I felt dumb for not figuring out
20   how to overcome it by myself.  And I felt all of
21   those things as I answered this woman's questions.
22         I didn't take notes.  I assumed that she
23   was taking notes.  And it was as much as I could
24   do to get it out.  So then she was very
25   sympathetic.  She told me that she had suffered

1   harassment and that she understood.  She told me
2   that -- she was older, a little bit older at
3   least.  She told me that she understood that
4   harassment of this kind had been more accepted in
5   another day.
6          And she told me -- well, she asked me why
7   I had called then, and I said I called in case
8   there were other cases that might be linked to it
9   and just to -- to register that this had happened
10  on the academic side of LSU and I wanted there to
11  be a record.
12         And she asked why I hadn't reported
13  earlier, and I told her that I -- what I told you,
14  I thought it would imperil my standing as a grad
15  student.  And then she said, It's good that you
16  didn't report then, no one would have done
17  anything and it would have only caused you
18  trouble.
19         And I thought that fit my assessment of
20  the university's lack of seriousness on these
21  issues.  And I felt some settledness that even the
22  Title IX lady thought I hadn't made a misstep in
23  not reporting it earlier, and if the Title IX lady
24  thought I had made a good decision, that was
25  probably the best decision I could have made.

1   Q.  So do you know -- it seems like you made

2   more than one call; is that correct?

3   A.  I seem to recollect that I called once to

4   say I wanted to make a report, and then maybe I

5   set up an appointment to make the report, maybe

6   someone wasn't in the office.  I think I called

7   twice.  I think I talked to two different people.

8   Again, I assumed that they were making a record.

9   I didn't take careful notes.  It was an extremely

10  difficult time for me.

11      I remember, after making the call, sitting

12  in this tan rocking chair that John and I had in

13  our living room and just being doubled over and

14  just weeping and thinking like, It's not that hard

15  to not harass people, why did you do this.

16  Q.  So you said you spoke to two different

17  people.  Do you -- you clearly recall the details

18  of one conversation.

19      Do you recall the details of the other

20  conversation?

21  A.  No, not in detail.

22  Q.  Do you know the name of the -- either of

23  the individuals who took your calls?

24  A.  I didn't -- I wrote down Jennie Stewart's

25  name at the time.  And maybe the other woman was

1   named Chevon Gates.  I, again, didn't take notes.

2   It was like -- it felt like showing up at the

3   emergency room.  My job is just to tell what I

4   know and someone else will be the professional who

5   makes the record.

6       Q.  So you didn't take notes, and you're not

7   sure if it was Jennie Stewart or Chevon Gates?

8       A.  The person that I ultimately told the

9   story to I don't think was Jennie Stewart; I think

10  it was Chevon Gates.

11      Q.  And Ms. Gates told you that it was good

12  that you didn't report it while you were a

13  student?

14      A.  The woman that I spoke with, if it was

15  Chevon Gates, the woman that I spoke with told me

16  that it was good that I didn't report it while I

17  was a student.  She said, No one would have done

18  anything and it would have only caused you

19  trouble.

20      Q.  Were those the only two communications

21  that you had with the Title IX office?

22      A.  Yes, to my recollection.  I thought my job

23  was to call and report, and I did that.

24      Q.  Do you know if LSU -- or the Title IX

25  office took any action after you called and

SARAH KITCH

1    reported?

2        A.    To my recollection, in the call, the woman

3    I spoke with told me there was no action to take,

4    that they might look into records, but that there

5    was nothing else to do because, by this point,

6    Sandoz was retired.

7        Q.    I think you mentioned earlier Dr. Stoner

8    maybe asking you to chair a panel?

9        A.    That's right.  Good memory.

10        Q.    Based on -- when did Dr. -- he was retired

11    in the spring of 2015?

12        A.    Correct.

13        Q.    So he was gone at the time of your report?

14        A.    Yes.

15        Q.    All right.  Let's skip over -- let's go

16    back to Exhibit 6.  At the bottom, the last full

17    paragraph, there's a reference to post-traumatic

18    stress disorder.  I'm sorry, I'm on page 2.

19        A.    Yes.

20        Q.    Were you diagnosed with this condition?

21        A.    I had symptoms of it.  I was not given an

22    evaluation of it until a little later, but I

23    recognized the symptoms of it.

24        Q.    Who evaluated the symptoms?

25        A.    Katherine Volk gave me an evaluation.  She

Case 3:21-cv-00242-WBV-SDJ    Document 487-3    10/13/23   Page 36 of 45

1    let me know that she could do it as my therapist,

2    but if it needed to be like an expert outside

3    thing, that I would have to ask someone else.

4         But I think she and I were both -- I was

5    interested.  I can't speak for her, but I was

6    interested in trying to survey the damage, so I

7    asked her to evaluate me.

8    **Q.  And when did she evaluate you?**

9    A.  I lived -- I was walking in Montrose, so I

10   lived in Montrose.  It was in 2021, probably --

11   probably the summer, maybe the fall, I don't

12   recall exactly.

13        But she asked me the questions, and then

14   afterward she indicated that she was concerned,

15   like asked if I could be around people for the

16   next little bit, and suggested that I be extra

17   cautious after recounting and taking the panel.

18   **Q.  After recounting and taking the panel?**

19   A.  After recounting the stories that I've

20   told you here and taking the PTSD survey,

21   instrument.

22   **Q.  And that occurred in the summer of 2021?**

23   A.  Yes, or fall.  Somewhere in there.

24   **Q.  On page 3, the second paragraph, there's a**

25   **reference to lost time -- or time lost.**

1   in support.  And then, as you see, the associate

2   provost wrote back approving that request.

3           MS. GREEN:

4               At this point, I think it's a good

5               time for us to take a break.

6           (A break was taken from 12:41 p.m. to

7           1:45 p.m.)

8   BY MS. GREEN:

9       Q.  Dr. Kitch, before the break, we were

10  discussing your request for an extension at Mizzou

11  and the grant of that extension.

12      A.  Yes.

13      Q.  Are you still employed in that position?

14      A.  No.

15      Q.  When did your employment in that position

16  end?

17      A.  May of 2020.

18      Q.  And did you leave that position

19  voluntarily?

20      A.  I did.

21      Q.  Why?

22      A.  Because I didn't have confidence in

23  creating a credible tenure case.

24      Q.  And was that confidence, or the lack of

25  confidence, based on what we discussed earlier

1  about the dissertation-to-book project?

2      A.  Yes.

3      Q.  Where did you work after you left the

4  Mizzou position?

5      A.  I served as an adjunct for the University

6  of Houston.  But that wasn't until the spring, so

7  let me back up.

8          I worked as an editor doing remote editing

9  work, and I adjuncted for -- I think I adjuncted

10  an Ashland University course that fall, fall of

11  '20.  And then in spring of '21, I adjuncted three

12  UH courses, a Mizzou course, and an Ashland

13  course.  So I adjuncted five classes in the

14  spring.

15     Q.  I'm going to show you what we'll mark as

16  Exhibit 9.  You've referenced it many times, so I

17  think it's probably easier if we attach it.  It's

18  your CV.

19     A.  Is it the CV?  Finally.  The record of

20  things.

21         (Exhibit 9 was marked.)

22  BY MS. GREEN:

23     Q.  So this is your CV that was produced to us

24  in discovery.  My question is:  Is this up to

25  date?  Does this have all of your publications and

SARAH KITCH

1   other credentials as of the date of the

2   production?

3       A.   That's a good question.   This was up to

4   date at the time of production, yes.   I have

5   a -- let's see.   I have a new job since this one.

6   I teach at St. Agnes Academy in Houston.   I'm a

7   history teacher there.

8       Q.   And when did you begin at St. Agnes?

9       A.   Fall of '21.

10      Q.   Is it a high school?

11      A.   It's a high school.

12      Q.   Is that a full-time position?

13      A.   It is.

14      Q.   And what is your current salary?

15      A.   Sorry, numbers in the midst of this.   I am

16  at about 67-.

17      Q.   Are you reviewing notes?   What are you

18  reviewing?

19      A.   This is just the documents we discussed

20  earlier, what do I have, what did I review.   So

21  this is the pages from the claim.   This is my list

22  of damages that I gave to the attorneys.   This is

23  my statement on damages.   These are the three

24  documents you asked me about at the beginning of

25  our time together.

1    Q.   Sure.   I just wanted to make sure that

2    those are the same things we were reviewing.

3    A.   Sure.   I am at about -- I started at 65-,

4    I got a small raise, so I'm at about 66- right

5    now, if I remember correctly.

6    Q.   Okay.   And one question I have for you,

7    because we -- your position ended in May of 2020

8    at Mizzou, and then I know for a time -- were

9    you -- you mentioned several adjunct professor

10   positions.

11         Were you teaching remotely --

12   A.   Yes.

13   Q.   -- because of COVID?

14   A.   I was teaching remotely because that's --

15   because of COVID, but also because that was the

16   kind of adjunct that was available.

17   Q.   So two questions.   First, are you

18   interested in a tenure position?

19   A.   Yes.

20   Q.   Second question is:   Do you believe that

21   you are able to turn a dissertation, not

22   necessarily the one that you wrote at LSU, but are

23   you able to turn some dissertation into a book?

24   A.   At this point, I don't have the time to

25   research or write.   I'm a full-time high school

SARAH KITCH

1  benefits.

2        **Why are you seeking lost maternity**

3  **benefits?**

4        A.   When I worked at the University of

5  Missouri, I had paid maternity leave.  My current

6  job at the time of the interrogatory had no fully

7  paid maternity leave, and that's a serious chunk

8  of change if you need it.

9        I worked hard to get the kind of job that

10 could make motherhood and professional life

11 consonant.  In fact, one of the reasons that I

12 went into this field was that -- when I was a very

13 young grad student, I would go to conferences.

14       And there were not very many women there,

15 but when they were there, I would go over and talk

16 to them and ask, Do you have kids, how do you make

17 it work.  I knew that I would need to work.

18       My mom had been a stay-at-home mom, she

19 had home-schooled.  But I knew I would need to

20 work.  But it was a really big deal to me to find

21 a way to be available as a mom and to do something

22 significant with the time that I had to be at

23 work, and I thought that this was the best way I

24 could find, academic life was the best way I could

25 find to be available to children and to do

1    not?

2        A.    They have been careful not to clarify.

3        Q.    So we're unsure?

4        A.    Unsure.

5            I just talked with the head of diversity,

6    and she's not sure either.  Nobody knows.  We'll

7    see.  Somebody's got to have a baby.

8        Q.    You're claiming future lost wages and lost

9    earning capacity.  What are you seeking -- the

10    number that's in the interrogatories is

11    $2,420,000.

12            I guess question one is:  How did you

13    calculate that number?

14        A.    I thought about what I was making at

15    Mizzou, which was good money for a humanities

16    professor.  I thought about what I was making at

17    St. Agnes.  I thought about how long I expected to

18    be able to have a career in this field.  If my

19    career is ten years shorter than my mentors', I'd

20    still be working till I was 75.  So I calculated

21    the difference over time.

22        Q.    What was your salary at Mizzou?

23        A.    About 80-.

24        Q.    And you expect -- your calculation is

25    based on the presumption that you'll work until

SARAH KITCH

1    available as a mom.  It was really important to me

2    to find a field where my time at work felt

3    valuable, felt meaningful, and where that wouldn't

4    become all-consuming, where I could have a life

5    outside of work.

6              And the best way I could find to do that

7    was in the academic world.  And when people said

8    it's really, really hard to get a tenured track

9    job, you've got to work really, really hard and

10   then be lucky on top of that, I was like, I'll

11   just work harder than other people, that's fine, I

12   can do it, if that's what it takes.

13             And so I made that investment on the

14   understanding that the time that I put in would

15   pay off later in being able to spend time with my

16   daughter if I -- the kid who turned out to be my

17   daughter, she came into the world.

18             The tenure track is not a perfect job, but

19   it provides a reward for a decade of intense

20   effort, and that reward is flexibility of time.

21   That reward is being able to have some autonomy

22   over what you spend your time on.

23             You have to do service hours, you have to

24   be on committees, you have to fill out paperwork,

25   you have to do all those things, but you get to

1  decide what you write about, publish about.  You

2  get to decide what kind of conferences you go to.

3  And that was very important to me as a young

4  woman, to create that possibility in case I got to

5  become a mother.

6          There are other jobs at universities.

7  There are staff jobs, there are lecturer jobs.

8  Lecturer jobs don't pay what tenure track jobs pay

9  even though you -- so a lecturer teaches four

10  quarters a semester and does service.

11          A tenure track professor teaches two

12  courses a semester, researches, and does service.

13  So a lecturer doesn't have to research for

14  promotion, but a lecturer gets paid considerably

15  less than a tenure track faculty member.

16          Then there are staff jobs, which rarely,

17  but sometimes, pay comparably to tenure track

18  faculty, but they are conventional work hours,

19  full days, year round.  While academics typically

20  do work in the summer to prepare for courses, to

21  go to conferences, to work on publications, the

22  benefit to me of the tenure track is that you get

23  to structure your days, and that's not something

24  you can do with a staff job.

25          So the tenure track is exceptional -- it's

1  exceptionally difficult to get to it.  I intended
2  to get to it, I aimed to get to it, because I
3  thought it would help me be a more available mom.
4        And I spent years toiling, before I knew
5  John, before I was married, before I had a CV, on
6  the hope that I was building a life that we could
7  enjoy better because I had worked my butt off for
8  a decade.
9      Q.  Does your current job afford you
10  flexibility?
11      A.  No.
12      Q.  And why is that?
13      A.  Well, it's a high school teaching
14  position.  So in the academic world, I could say,
15  These are the two classes I'm teaching, this is
16  the time of day I'm teaching them at.  And maybe
17  you have to negotiate about who teaches what time
18  slot, but you have a good deal of choice over what
19  you teach and when you teach it, and you can
20  structure your week in a way that allows you to do
21  your classwork, do your research, do your service
22  in hours that fit with little people's lives, with
23  little children's lives.
24        In my current job, I have a rotating
25  schedule and my day is essentially scheduled for