UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, ET AL.**<br>*Plaintiff*<br><br>v.<br><br>**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE**<br>*Defendants* | Case No.: 21-242<br><br>Division WBV-SDJ<br><br>JUDGE WENDY B. VITTER<br><br>MAGISTRATE JUDGE JOHNSON |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT NO. 9: KENNAN JOHNSON

Plaintiffs, through undersigned counsel, respectfully submit this Opposition to the Board's Motion for Summary Judgment No. 9: Kennan Johnson ("Motion") (ECF No. 477) filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board"). Several genuine issues of material fact exist for jury determination as to whether Plaintiff Kennan Johnson ("Plaintiff") has sufficient evidence to prove suffering a deprivation of educational opportunity and/or benefits as a result of the Board's unofficial policy of ignoring sexual misconduct at Louisiana State University ("LSU"). Further, genuine issues of material fact exist for jury determination as to whether Plaintiff has filed suit timely. Thus, the Board's Motion should be denied.

**I.    STANDARD OF REVIEW**

*See* Opposition No. 1, Sec. I, incorporated herein by reference.

**II.   RELEVANT FACTS**

    **A.  The Board's mismanagement of sexual misconduct at LSU**

*See* Opposition No. 4, Sec. II.A., incorporated herein by reference.

### B. Plaintiff's experiences at LSU

After attending both the University of Central Florida ("UCF"), and then the University of Oregon ("UO") on college athletic scholarships for tennis, Plaintiff was removed from both universities' tennis teams for disciplinary issues.[1] Julia Sell, LSU Women's Tennis Co-Head Coach, attempted to allow Plaintiff to transfer to LSU to play for LSU tennis losing eligibility under the National Collegiate Athletic Association ("NCAA").[2] In the fall of 2016, Plaintiff started at LSU as a member of the women's tennis team but was not able to travel or compete due to her two prior transfers.[3] Although Plaintiff was not on an athletic scholarship during the 2016 season, she was awarded a scholarship in her remaining years with LSU.[4] Although Sell's efforts in assisting Plaintiff with her transfer to LSU to join Sell's team were appreciated, Plaintiff felt that Sell never liked her.[5] Plaintiff believes that "every person at some point…was on [Sell]'s bad side."[6] Plaintiff contends that Sell was difficult to unfavored or unrecruited members of the team, and would even create tension by spreading false rumors.[7]

During her time on the team, Sell consistently told Plaintiff she was overweight.[8] Plaintiff was threatened with extra fitness if she was not able to lose a certain amount of weight or was not able to meet a certain weight goal, which severely damaged Plaintiff's confidence.[9] On one occasion, Mike Sell, LSU Women's Tennis Co-Head Coach, grabbed trail mix out of Plaintiff Lewis' hand on one occasion because it had M&Ms in it.[10] On multiple occasions, Sell would

---

[1] Johnson Dep. 89.
[2] Johnson Dep. 72-81.
[3] Johnson Dep. 80-81.
[4] Johnson Dep. 81.
[5] Johnson Dep. 90.
[6] Johnson Dep. 91:7-9.
[7] Johnson Dep. 92:17-93:1, 97-98.
[8] Johnson Dep. 151.
[9] Johnson Dep. 153.
[10] Lewis Dep. 197.

2

threaten to revoke Plaintiff's athletic scholarship.[11] For example, in the spring of 2018, Sell threatened to withhold submission of her scholarship for the 2018-2019 school year because Plaintiff was not able to meet the weight requirement that Sell had set for her at the time.[12] Plaintiff believed that Sell's comments were not directed toward performance improvement, but rather control over Plaintiff.[13]

Most notably, Plaintiff, who identifies as a lesbian, was inappropriately "ostracized" by Sell for her sexuality during her time at LSU.[14] Plaintiff was told by Sell that she "needed to keep who [she] was and [her] lifestyle out of the locker room so [she] didn't offend" her teammates.[15] However, Plaintiff contends that she had a close relationship with her teammates, and believes they would have spoken to her about any concerns directly.[16] Sometime after Sell made this comment to Plaintiff, Plaintiff began a dating relationship with a new member of the women's tennis team.[17] The discomfort was apparent in Sell's body language whenever she was around Plaintiff and her partner.[18] Sell criticized Plaintiff for dating another team member and causing drama; yet, Plaintiff contends that it was Sell who would create drama by fabricating false issues.[19] Sell would also ask personal questions prying into Plaintiff's relationship, despite having no fixed interest on any other team member's dating life asked about their relationship in ways she did not ask about straight teammates' relationships.[20] Plaintiff suffered abuse from her partner during this relationship, and Sell became involved.[21] Plaintiff reported to Sell that her partner had hit her, and

---

[11] Johnson Dep. 89.
[12] Johnson Dep. 159.
[13] Johnson Dep. 174.
[14] Johnson Dep. 32, 99, 201:3-6.
[15] Johnson Dep. 98.
[16] Johnson Dep. 206.
[17] Johnson Dep. 208.
[18] Johnson Dep. 118.
[19] Johnson Dep. 99-100.
[20] Johnson Dep. 119-120.
[21] Johnson Dep. 101.

Sell recommended to meet with an athletic trainer and Miriam Segar, LSU Senior Associate Athletic Director, who later met with Plaintiff.[22] Segar simply offered the option for Plaintiff to file a police report, but did not file the report with the Title IX office.[23] Although the investigation report states that Segar referred Plaintiff to a counselor for assistance with emotional distress, Plaintiff had already been seeing a counselor and received no new or additional resources.[24]

Prior to her time at LSU, Plaintiff had a history of depression and anxiety due to childhood trauma.[25] However, Plaintiff believes that her anxiety and depression has actually worsened due to Sell's mistreatment, and has even developed symptoms of disordered eating.[26] This, along with the other notable experiences discussed, Plaintiff experienced significant anxiety when she was around Sell, which impacted her tennis performance negatively.[27] Plaintiff would starve herself for several days at a time, and would even force herself to vomit in order to reach Sell's goal weight.[28] Overall, Plaintiff felt uncomfortable being her true self when on the tennis team and around Sell, and even felt "[i]t was like going into the closet all over again."[29]

Although Plaintiff wanted to attend LSU for graduate school and received a few alternative letters of recommendation, she ultimately did not apply because Sell, the most important individual to provide her recommendation to Plaintiff, refused to write her a letter in support.[30] Instead, Plaintiff pursued massage therapy, which was not her passion.[31] After attending three different institutions just to play a sport that she loved, Plaintiff graduated LSU hating tennis and feeling

---

[22] Johnson Dep. 101, 127.
[23] Johnson Dep. 128-29.
[24] Johnson Dep. 130-31; Johnson Exh. 11.
[25] Johnson Dep. 50, 53-54.
[26] Johnson Dep. 292.
[27] Johnson Dep. 94.
[28] Johnson Dep. 156.
[29] Johnson Dep. 98, 209.
[30] Johnson Dep. 144, 152.
[31] Johnson Dep. 17.

insecure.[32] Plaintiff specifically contends that she abandoned tennis due to Sell's inappropriate treatment.[33] Plaintiff became severely depressed and experienced suicidal ideation and self-mutilation, which led to a self-admission into a psychiatric hospital.[34]

### III. LAW AND ARGUMENT

*See* Opposition No. 1, Sec. III, incorporated herein by reference.

#### A. A genuine issue of material fact exists as to whether Plaintiff's claims were timely filed.

*See* Opposition No. 1, Sec. III.B., incorporated herein by reference.

#### B. Policy-based Heightened Risk Claim

*See* Opposition No. 1, Sec. III.D, incorporated herein by reference.

##### 1. *A genuine issue of material fact exists as to whether the Board maintained a policy of deliberate indifference to reports of sexual misconduct.*

*See* Opposition No. 1, Sec. III.D.2., incorporated herein by reference.

Plaintiff suffered abuse from her partner while at LSU, and Sell became involved.[35] Plaintiff reported to Sell that her partner had hit her, and Sell recommended to meet with an athletic trainer and Miriam Segar, LSU Senior Associate Athletic Director, who later met with Plaintiff.[36] Segar simply offered the option for Plaintiff to file a police report, but did not file the report with the Title IX office.[37] Although the investigation report states that Segar referred Plaintiff to a counselor for assistance with emotional distress, Plaintiff had already been seeing a counselor and

---

[32] Johnson Dep. 201.
[33] Johnson Dep. 201-02.
[34] Johnson Dep. 214, 245.
[35] Johnson Dep. 101.
[36] Johnson Dep. 101,127.
[37] Johnson Dep. 128-29.

5

received no new or additional resources.[38] Plaintiff was not provided with any information about Title IX at that time, and Plaintiff never received contact from Title IX office.[39]

> **2. A genuine issue of material fact exists as to whether the Board's policy of deliberate indifference created a heightened risk of sexual harassment that was known or obvious.**

*See* Opposition No. 1, Sec. III.D.3., incorporated herein by reference.

> **3. A genuine issue of material fact exists as to whether, as a result, Plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived her of access to the educational opportunities or benefits provided by LSU**

*See* Opposition No. 6, Sec. III.B.3., incorporated herein by reference.

LSU wrongly argues that sex discrimination based on sexual orientation and gender identity did not fall under Title IX until efforts by the U.S. Department of Education and President Biden began in 2020, citing guidance issued by the U.S. Department of Education, Office of Civil Rights ("OCR") guidance document and one case filed in the U.S. District Court for the Northern District of Texas.[40] In fact, OCR has issued several guidance documents over the past thirteen years to provide detailed explanation as to exactly how Title IX applies to gender-based and sexual harassment of LGBTQ+ students. In 2010, OCR issued a Dear Colleague Letter ("DCL") explaining the intersection of federal anti-discrimination statutes, such as Title IX, and bullying.[41] The 2010 OCR DCL lists specific examples of Title IX violations; one of which includes a school's failure to recognize the bullying of an LGBT student as gender-based harassment.[42] In OCR's example, an LGBT high school student, who was perceived as effeminate and nontraditional in

---

[38] Johnson Dep. 130-31; Johnson Dep. Ex. 11.
[39] Johnson Dep. 129.
[40] Motion No. 9 at 11-12.
[41] Office for Civil Rights, *Dear Colleague Letter from Assistant Secretary for Civil Rights Russlynn Ali*, U.S. DEP'T EDUC. (Oct. 26, 2010), http://perma.cc/2NDD-FVEW ("2010 OCR DCL").
[42] *Id*. at 7-8.

both his personal grooming and choice of extracurricular activities, was taunted with "anti-gay slurs and sexual comments," and "physically assaulted, threatened, and ridiculed because he did not conform to stereotypical notions of how teenage boys are expected to act and appear."[43] OCR reasons this scenario as a Title IX violation because the institution failed to recognize the bullying as a form of prohibited sex discrimination, and thus did not take effective action to stop the harassment.[44]

In 2011, OCR issued additional guidance on Title IX's application to sexual violence, and later issued "Questions and Answers on Title IX and Sexual Violence" ("Q&A") explaining, among other things, institutions' obligations to investigate and resolve allegations of sexual violence against LGBT students.[45] In the Q&A, OCR affirms that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity," and makes clear that schools are obligated to remedy sexual violence including when "accompanied by anti-gay comments or . . . partly based on a student's actual or perceived sexual orientation." In 2015, OCR issued a "Title IX Resource Guide" that explains the application of Title IX to sex-based harassment.[46] This guidance document similarly affirms that an institution is obligated to "investigate and resolve allegations

---

[43] *Id.* at 7.
[44] *Id.* at 7-8.
[45] *See* Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, U.S. DEP'T EDUC. 5-6 (Apr. 29, 2014), http://perma.cc/S6YV-L2KW ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. . . . A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence."); *see also Bullying DCL*, *supra* note 41, at 8 ("Although Title IX does not prohibit discrimination based solely on sexual orientation, Title IX does protect all students, including . . . LGBT . . . students, from sex discrimination. When students are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX.").
[46] Office for Civil Rights, *Title IX Resource Guide*, U.S. DEP'T EDUC. 15-17 (2015) http://perma.cc/GN4J-MEZE.

of sexual or gender-based harassment of lesbian, gay, bisexual, and transgender students using the same procedures and standards that it uses in all complaints involving sex-based harassment."

OCR and the U.S. Department of Justice ("DOJ") also took significant steps to enforce Title IX when schools failed to take appropriate action to stop gender-based and sexual harassment of LGBTQ students during the relevant period. For example, OCR investigated the Title IX complaint filed by Seth Walsh's mother against California's Tehachapi School District.[47] Walsh committed suicide after enduring years of unrelenting bullying and sexual harassment by his school peers that escalated after he came out as gay.[48] After investigating the complaint, OCR and DOJ concluded that Walsh had been subjected to "persistent, pervasive, and often severe sex-based harassment that resulted in a hostile educational environment of which the [d]istrict had notice," and that the school district had violated Title IX by failing "to take steps sufficient to stop the harassment, to prevent its recurrence, or to eliminate the hostile environment."[49] In reaching this conclusion, OCR and DOJ confirmed that Walsh had suffered sex-based harassment because the harassment was "sexual in nature" and "gender-based, motivated by [Walsh's] failure to act as some of his peers believed a boy should act."[50] They also noted that the use of anti-gay epithets against Walsh often "stemmed from commonly held attitudes and perceptions about gender and masculinity from which also flowed the sexual and other gender-based conduct . . . ."[51]

Likewise, many courts held that discrimination based on sexual orientation did, in fact, violate Title IX. For example, in *Riccio*, plaintiff Stefanie Andree alleged that students called her derogatory names—including "bitch," "dyke," "lesbian," "gay," and "lesbian lover[]"—and threw

---

[47] Office for Civil Rights, *Letter of Findings to Tehachapi Unified Sch. Dist.*, U.S. EDUC. DEP'T, 5-6 (June 29, 2011), https://perma.cc/SLU7-Q5TM.
[48] *Id.* at 1112-13.
[49] *Id.*
[50] *Id.*
[51] *Id.*

8

objects at her.[52] The defendant school board sought to dismiss Andree's Title IX claim on summary judgment, arguing that "the thrust of the slurs were of a sexual orientation nature and not gender specific" and "Title IX does not provide a remedy for discrimination based on sexual orientation."[53] The court rejected this argument, holding that "Andree, a female student, targeted by other female students and called a variety of pejorative epithets, including ones implying that she is a female homosexual, has established a genuine issue of fact as to whether this harassment amounts to gender-based discrimination, actionable under Title IX."[54]

Plaintiff, who identifies as a lesbian, was inappropriately "ostracized" by Sell for her sexuality during her time at LSU.[55] Plaintiff was told by Sell that she "needed to keep who [she] was and [her] lifestyle out of the locker room so [she] didn't offend" her teammates.[56] However, Plaintiff contends that she had a close relationship with her teammates, and believes they would have spoken to her about any concerns directly.[57] Sometime after Sell made this comment to Plaintiff, Plaintiff began a dating relationship with a new member of the women's tennis team.[58] The discomfort was apparent in Sell's body language whenever she was around Plaintiff and her partner.[59] Sell criticized Plaintiff for dating another team member and causing drama; yet, Plaintiff contends that it was Sell who would create drama by fabricating false issues.[60] Sell would also ask personal questions prying into Plaintiff's relationship, despite having no fixed interest on any other

---

[52] *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 222-23 (D. Conn. 2006).
[53] *Id.* at 225.
[54] *Id.* at 226; *see also Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 151-52 (N.D.N.Y. 2011) (concluding that the plaintiff stated a Title IX claim for nonconformity to "sexist stereotypes" where plaintiff alleged he was called homophobic and sexist epithets and "was mocked with effeminate gestures") and *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d 1165, 1170 (N.D. Cal. 2000) (holding that "it is reasonable to infer that the basis of the attacks was a perceived belief about Plaintiff's sexuality, i.e. that Plaintiff was harassed on the basis of sex" due to verbal harassment, threats, and a serious assault based on the plaintiff's peers' belief that he was gay).
[55] Johnson Dep. 32, 99, 201:3-6.
[56] Johnson Dep. 98.
[57] Johnson Dep. 206.
[58] Johnson Dep. 208.
[59] Johnson Dep. 118.
[60] Johnson Dep. 99-100.

9

team member's dating life asked about their relationship in ways she did not ask about straight teammates' relationships.[61] Plaintiff suffered abuse from her partner during this relationship, and Sell became involved.[62] Plaintiff reported to Sell that her partner had hit her, and Sell recommended to meet with an athletic trainer and Miriam Segar, LSU Senior Associate Athletic Director, who later met with Plaintiff.[63] Segar simply offered the option for Plaintiff to file a police report, but did not file the report with the Title IX office.[64] Although the investigation report states that Segar referred Plaintiff to a counselor for assistance with emotional distress, Plaintiff had already been seeing a counselor and received no new or additional resources.[65]

Plaintiff believes that her anxiety and depression worsened due to Sell's mistreatment, and has even developed symptoms of disordered eating.[66] During her time at LSU, Plaintiff experienced significant anxiety when she was around Sell, which impacted her tennis performance negatively.[67] Plaintiff would starve herself for several days at a time, and would even force herself to vomit in order to reach Sell's goal weight.[68] Overall, Plaintiff felt uncomfortable being her true self when on the tennis team and around Sell, and even felt "[i]t was like going into the closet all over again."[69]

Following graduation from LSU, Plaintiff wanted to attend LSU for graduate school and received a few alternative letters of recommendation; however, she ultimately did not apply because Sell refused to write her a letter in support.[70] Instead, Plaintiff pursued massage therapy,

---

[61] Johnson Dep. 119-120.
[62] Johnson Dep. 101.
[63] Johnson Dep. 101,127.
[64] Johnson Dep. 128-29.
[65] Johnson Dep. 130-31; Johnson Dep. Ex. 11.
[66] Johnson Dep. 292.
[67] Johnson Dep. 94.
[68] Johnson Dep. 156.
[69] Johnson Dep. 98, 209.
[70] Johnson Dep. 144, 152.

which was not her passion.[71] After attending three different institutions just to play a sport that she loved, Plaintiff graduated LSU hating tennis and feeling insecure.[72] Plaintiff specifically contends that she has abandoned tennis due to Sell's inappropriate treatment.[73] Plaintiff has even experienced suicidal ideation and self-mutilation, which led to a self-admission into a psychiatric hospital, due to the Board's failures.[74]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment No. 9, as it relates to Kennan Johnson.

Respectfully Submitted

*/s/ Catherine E. Lasky*

Karen Truszkowski
*Pro Hac Vice*
Temperance Legal Group
503 Mall Court #131
Lansing, Michigan 48912
P: (844) 534-2560
F: (800) 531-6527
karen@temperancelegalgroup.com

Catherine E. Lasky (La. Bar 28652)
Endya L. Hash (La. Bar 38260)
Katie Lasky Law
619 Homedale Street
New Orleans, Louisiana 70124
P: (504) 584-7336
F: (504) 375-2221
katie@katielaskylaw.com
endya@katielaskylaw.com


Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

---

[71] Johnson Dep. 17.
[72] Johnson Dep. 201.
[73] Johnson Dep. 201-02.
[74] Johnson Dep. 214, 245.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

                                    */s/ Elizabeth K. Abdnour*
                                    Elizabeth K. Abdnour