**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ABBY OWENS, et al.** *Plaintiffs* | **Case No.: 21-242** |
| | **Division WBV-SDJ** |
| **v.** | **JUDGE WENDY B. VITTER** |
| **BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE** *Defendant* | **MAGISTRATE JUDGE JOHNSON** |

<u>**OPPOSING STATEMENT OF MATERIAL FACTS TO MOTION FOR**</u>
<u>**SUMMARY JUDGMENT NO. 9: KENNAN JOHNSON**</u>

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion for Summary Judgment No. 9, Plaintiff Kennan Johnson, through undersigned counsel, submits responses to the Board's Statement of Undisputed Material Facts:

1. Kennan Johnson was a student at LSU from Fall 2016 to her graduation in Spring 2019. (Johnson 18, 81; R. Doc. 182, ¶¶ 560, 594)

**Admitted.**

2. Johnson joined the LSU tennis team after having been suspended from the tennis teams at the University of Central Florida (for a physical altercation with another student) and the University of Oregon (for violating team rules). (Johnson 23, 41-43, 66-67)

**Qualified.** While attending the University of Central Florida, Johnson became friends with a former soccer player. Johnson learned that false rumors were being spread that Johnson was talking badly about the soccer player, so Johnson attempted to talk to her to remedy the situation. During this conversation, the soccer player became aggressive and hit Johnson, pulled Johnson's hair, and continued to hit Johnson over the head. Johnson defended herself by pushing the soccer

1

player off of her. Johnson attempted to leave but was unable to do so because there were several football players in the way. The soccer player attacked Johnson again by pulling her hair and hitting Johnson in the head. Eventually, the football players pulled the soccer player and Johnson apart and Johnson was able to leave. (Johnson 41-44). While at the University of Oregon, her had a rule that the players could not drink during the season. On Easter, Johnson drank a glass of wine with her dinner. At the time, she believed it was okay because it was a holiday, she was not going to leave her apartment, and she did not think it would be an issue to drink one glass of wine with dinner. Johnson's roommate told the coach which resulted in Johnson's discipline. (Johnson 66-70). When Johnson explained this incident at the University of Oregon to Julia Sell, J. Sell stated that it was "stupid" to have kicked Johnson off the team and that students should be given "a little leeway to relax." (Johnson 73).

3. After leaving Oregon, Johnson reached out to Julia Sell ("J. Sell"), LSU's tennis coach, about transferring to LSU.  (J. Sell 186-187; Johnson 72-74)

**Admitted.**

4. Johnson was ineligible under NCAA rules to play tennis for her first year, but thereafter J. Sell allowed Johnson to join the LSU team and gave Johnson a tennis scholarship for each remaining year of eligibility.  (Johnson 70-71, 80-81; J. Sell 189-190; R. Doc. 182, ¶¶ 561-562)

**Qualified.** Johnson was ineligible, under NCAA rules, to play tennis in 2016 for her first year at LSU because she had previously transferred twice. The circumstances surrounding the transfer are irrelevant; a suspension was not the reason for her ineligibility. However, Johnson testified that, while she is unsure, the circumstances may have been different if she had transferred to a university within the same conference. After transferring to the University of Oregon from the

University of Central Florida, Johnson was not ineligible. LSU is not in the same conference as the University of Oregon. (Johnson 70-71). Johnson was eligible to play in 2017. (Johnson 81)

5. Johnson had known J. Sell since she was about twelve years old.  (R. Doc. 182, ¶ 559; Johnson 18)

**Qualified.** Johnson first met J. Sell when Johnson was twelve years old; however, they did not keep in touch substantially throughout the years. It was not until Johnson was planning on transferring from the University of Oregon to LSU that their communications became "substantial." (Johnson 18-20).

6. Johnson describes her relationship with J. Sell as "hit or miss" (also, "nice one day and cold the next"); she believed J. Sell's mood changed depending on whether the team was winning. (Johnson 87-88, 95-96, 174). Johnson felt that the better players remained on J. Sell's good side. (Johnson 89, 92-93)

**Qualified.** While how well a player was doing impacted J. Sell's treatment of them, J. Sell was also harder on players that she "didn't favorite." (Johnson 89, 92-93). Johnson believes that J. Sell never liked her. (Johnson 90).

7. With that said, Johnson felt there were some weeks in which J. Sell "adored" her. (Johnson 93)

**Qualified.** While there was a short period of time where J. Sell "adored" Johnson, the next week, J. Sell made Johnson do double fitness. (Johnson 93). Johnson believes that J. Sell never really liked her. (Johnson 90).

8. Johnson also believed that everyone was on J. Sell's "bad side" at some point.  (Johnson 90-91). The players whom J. Sell did not recruit (including Johnson) felt J. Sell was harder on them.  (Johnson 92-93)

**Qualified.** Johnson indicated that everyone was on J. Sell's bad side at some point. However, Johnson also stated that there were a few players who were "constantly" on her bad side. (Johnson 91). J. Sell was not only harder on the players whom she did not recruit, but she was also harder on the players that "she didn't favorite." (Johnson 92-93).

9. Johnson believed she started off "behind" because she had been kicked off two other teams. (Johnson 89). Johnson understood that she was more of a risk to bring in at LSU because she had already been kicked off of two teams. (Johnson 80)

**Qualified.** Johnson believed that she started off "behind" in terms of becoming J. Sell's "favorite."

10. Johnson appreciated J. Sell's efforts to try to get her the year of eligibility and to get Johnson admitted at LSU. (Johnson 80)

**Admitted.**

11. Johnson always had a good relationship with Mike Sell ("M. Sell"), who also served as LSU tennis coach with J. Sell. (Johnson 87, 257). Johnson felt that M. Sell was one of the few people who got her through LSU. (Johnson 200-202)

**Admitted.**

12. Johnson testified that she met with a nutritionist regarding her weight, but others did so as well. (Johnson 165-166, 170) Johnson found that the more she weighed, the harder it was to recover and be quick during matches. She testified that her weight also made her more prone to injury. (Johnson 157-158)

**Qualified.** While on the tennis team at LSU, Johnson was "consistently" told that she was "carrying too much weight." (Johnson 151). Johnson was told that if she did not lose a certain amount of weight or did not meet her weight goal, she would have to do extra fitness. (Johnson

4

153). Towards the end of her second-to-the-last year at LSU, Johnson was not sure whether J. Sell was going to re-submit her scholarship because she was not able to meet the weight requirement that she had set for Johnson over the holiday break. (Johnson 161). During the weekends that the team traveled to away games, the players were not allowed caffeine or sweets. During one of those weekends, another player attempted to snack on trail mix; however, M. Sell snatched the trail mix out of her hand and told her that she could not eat it because there were M&Ms in it. (Lewis 197). Johnson met with the nutritionist once a week. (Johnson 164). Only one other player had to meet with the nutritionist to get her weight down. Two other players had to meet with the nutritionist to get their weight up. (Johnson 170). Because of the pressure of losing weight from J. Sell, Johnson did not feel confident in herself. (Johnson 153). She would go to practice after not having eaten anything that day and she would sometimes not eat for a couple days in general just so she could make weight. (Johnson 156). She believed that J. Sell's conversations about weight were to "instill the fact that she was in control." Johnson believed that if J. Sell really wanted to help Johnson, she would not have threatened Johnson with scholarship loss or loss of playing time. (Johnson 174).

13. Johnson sustained injuries to her knee, shoulder, back, biceps, wrist, foot strain, and a concussion while attending LSU. (Johnson 138-140). From time to time, she missed matches and training based on these on and off injuries. (Johnson 141-142)

**Qualified.** Johnson's knee issues began before her time at LSU and was due to Osgood-Schlatter disease, a condition that runs in her family and that also impacts her father. Johnson also experienced issues with her shoulder prior to her time at LSU. Johnson's surgery on her wrist was to remove a cyst. Further, Johnson's concussion stemmed either from a blow from Johnson's then-girlfriend or from a fall where Johnson hit her head on her dresser, rather than an athletic injury. (Johnson 138-141).

14. Johnson told J. Sell when she went to LSU that she had been seeing a nutritionist and wanted to continue doing the same thing at LSU. (Johnson 72; see J. Sell 193-194)

**Denied.** While Johnson did see a nutritionist while at the University of Central Florida, she did not see a nutritionist at the University of Oregon. Johnson does not recall telling J. Sell that she had been seeing a nutritionist and that she wished to continue. (Johnson 72).

15. J. Sell gave Johnson a scholarship each year. (R. Doc. 182, ¶ 569; Johnson 81).

**Qualified.** While J. Sell did award Johnson a scholarship each year, J. Sell would threaten Johnson's continued receipt of the scholarship "all the time." (Johnson 89).

16. Johnson alleges only one negative comment by J. Sell about Johnson's sexual orientation. (R. Doc. 182, ¶¶ 585-586; Johnson 205-206) Specifically, Johnson claims that one day J. Sell asked Johnson "to keep her lifestyle" out of the locker room. (R. Doc. 182, ¶ 586; Johnson 205-206)

**Qualified.** Johnson was in the locker room and J. Sell told her that she wanted to talk to her. J. Sell then informed Johnson that she needed to keep who she was and her lifestyle out of the locker room so she "didn't offend the girls." (Johnson 98, 205-206). Johnson identifies as a "lesbian." (Johnson 32).

17. Johnson assumes ███████, another player on the team, said something to J. Sell about Johnson's sexual orientation and that was why J. Sell said something to Johnson. (Johnson 102, 205-206). However, Johnson also acknowledges that her relationship with fellow teammate, ███████, created distractions in the locker room, and thus, this could be the basis for the alleged comment. (Johnson 99)

**Qualified.** Johnson testified that while ███████ may have gone to J. Sell she does not know whether that was, in fact, what occurred. (Johnson 205). Johnson does not believe that

any other player complained to J. Sell because they all "were pretty open about their feelings" so Johnson believed that if they were bothered, they would have told her directly. (Johnson 206). Johnson did acknowledge that her relationship with her teammate, ████████, caused distractions in the locker room at some point, she did not acknowledge that this could be the basis for J. Sell's comment. In fact, Johnson's relationship with her teammate could not have been a basis for J. Sell's comment because when the comment was made, Johnson was not yet dating ████████. In fact, the comment was made before ████████ was even on the team. (Johnson 208).

18. Johnson never made any report to LSU about J. Sell's conduct.  (R. Doc. 182, ¶¶ 563, 576; Johnson 180, 283)

**Qualified.**  Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship. (Johnson 287)

19. Johnson claims harassment during the period 2017 to Spring 2019 when she graduated. Johnson did not file suit until approximately two years later, on April 26, 2021.  (Johnson 18, 265; R. Doc. 1; R. Doc. 182, ¶ 594)

**Qualified.** Johnson read the Husch Blackwell Report when it came out and learned of the systemic failures by LSU (Johnson 288). She decided to file a lawsuit when she learned from the report how LSU had treated her teammates, Plaintiffs Abby Owens and Jade Lewis. (Johnson 284).

20. The Husch Blackwell Report did not mention Johnson's own allegations against J. Sell. (Johnson 289; R. Doc. 1-2) Johnson was not interviewed by Husch Blackwell, and she only appears to be referenced, not by name, in connection with her conversation regarding Jade Lewis's alleged assault.  (Johnson 289; R. Doc. 1-2).

**Admitted.**

21. Johnson graduated in Spring 2019.  (Johnson 18; R. Doc. 182, ¶ 594). By that date, Johnson knew of the previous training she had received prior to the alleged abuse.  (Johnson 81-84, 86; Johnson Exhs. 9, 10)  She also knew of the entirety of J. Sell's conduct toward her. (Johnson 81, 285-286; R. Doc. 182, ¶¶ 563-579, 585-587)

**Qualified.** While Johnson knew of J. Sell's inappropriate conduct toward her, she did not learn about LSU's systemic failures until she read the Husch Blackwell Report when it came out. (Johnson 288). Johnson is unable to admit or deny whether she knew of the previous training she had received prior to the alleged abuse because she does not know what training is referenced, who "she" refers to in this sentence, or what alleged abuse is referenced.

22. Johnson also knew of the Title IX process, having already engaged in it in January 2019 regarding her altercation with Taylor Bridges, a teammate who Johnson briefly dated.  (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12). Thus, at that time, Johnson knew that an altercation in a same sex relationship implicated LSU's Title IX process.  (Johnson Exh. 12)

**Qualified.**  Johnson does not allege that the abuse she experienced from J. Sell was "an altercation in a same sex relationship."  Rather, she alleges that J. Sell discriminated against and harassed her based on her sex.

23. Johnson was also informed of LSU's resources for victims of sexual assault and was advised of support services.  (Johnson 131-132; Johnson Exh. 11). Indeed, Johnson was offered and utilized counseling services at LSU.  (Johnson 131-132, 142-146; Johnson Exh. 11)

**Admitted.**

24. At no time during that Title IX process or after did Johnson complain about any conduct by J. Sell. (Johnson 283)  She otherwise never made any Title IX complaints for which she can criticize LSU's response.  (Johnson 127-130, 180-181).

**Qualified.**  Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship.  Johnson felt like taking away her scholarship was "already being hung over my head."  (Johnson 287)

25. Johnson was the first and only plaintiff to assert sexual allegations against J. Sell (R. Doc. 182, ¶ 563)  No one complained of sexual assault by J. Sell before Johnson's complaint.

**Qualified.** Johnson can neither admit nor deny whether there were other complaints against J. Sell as Johnson has no personal knowledge of said events. Johnson is also unclear as to what "sexual allegations" means.

26. Johnson testified that she never told anyone about alleged sexual abuse by J. Sell. (Johnson 180, 283)

**Qualified.**  Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship.  Johnson felt like taking away her scholarship was "already being hung over my head."  (Johnson 287)

27. Johnson testified to many reasons why she believes J. Sell treated players harshly, if at all, including the player's performance, whether J. Sell was in a bad mood due to a loss, whether the player had a good attitude, and whether J. Sell recruited the player.  (Johnson 87-89, 93-98, 174, 277)

**Qualified.** While how well a player was doing impacted J. Sell's treatment of them, J. Sell was also harder on players that she just "didn't favorite." (Johnson 89, 92-93). Johnson believes that J. Sell never liked her. (Johnson 90).

9

28. Many players, not just Johnson, had issues with J. Sell. (Johnson 90-92)

**Admitted.**

29. The incidents Johnson complains about occurred between Spring 2017 and Spring 2019. (Johnson 18, 81; R. Doc. 182, ¶¶ 562, 594)

**Admitted.**

30. Johnson testified that many players, not just Johnson, were worried about disappointing J. Sell. (Johnson 96). Those other players were heterosexual. (Johnson 105)

**Qualified.** Johnson and some other players were worried that J. Sell would be disappointed in how they played. (Johnson 96). Johnson can neither admit nor deny other players' sexual orientations as she lacks knowledge as to such.

31. Johnson testified that J. Sell preferred players with good attitudes and who played well. (Johnson 87, 89, 93-94, 96-97)   By contrast, Johnson had "tiffs" with just about everyone on the team at one point or another over tennis and she threw her tennis racquet in a trash can and "broke a racquet or two." (Johnson 103-104, 217)

**Qualified.** While how well a player was doing impacted J. Sell's treatment of them, J. Sell was also harder on players that she just "didn't favorite." (Johnson 89, 92-93). Johnson believes that J. Sell never liked her. (Johnson 90). Johnson did put her tennis bag in the trash can, and broke one or two racquets; however, this occurred after M. Sell informed Johnson that she was pulled from the singles match without a stated reason (Johnson 216-217). Johnson was particularly upset because she was pulled from what would have been her last match and her mother and grandmother traveled all the way to LSU to watch her play. (Johnson 214, 218).

32. Johnson describes herself as an "emotional" person, stating that "if I'm not a zero, I'm a ten." (Johnson 147, 227)  Johnson testified that her emotions got her into trouble on the tennis court.  (Johnson 215-217, 277-278)

**Qualified.** Johnson does describe herself as an emotional person. She has been diagnosed with bipolar disorder and has been battling depression and anxiety since fifteen-years-old (Johnson 40, 50). However, Johnson did not state that her emotions "got her into trouble on the tennis court." Rather, Johnson explained that she did have an emotional reaction on a particular occasion; however, this occurred after M. Sell informed her that she was pulled from the singles match after she was "outplayed" in the prior match. (Johnson 215-217). She was upset because she was pulled from what would have been her last match and her mother and grandmother traveled all the way to LSU to watch her play. (Johnson 214, 218). Johnson did testify that J. Sell met with her to discuss her attitude. However, Johnson also stated that she was the most "vocal" player on the team and enjoyed pumping her teammates up. Johnson believed that if she were not vocal, her teammates would know she was "off," and it might affect their play. However, she did not believe "it was her job to pump everybody up." (Johnson 277-278).

33. In one tournament near the end of her tennis career, Johnson got emotional after losing a game. (Johnson 215-216). She acknowledges she may have given J. Sell the impression that she stopped trying in her match, including that she put her tennis bag in the trash can and broke one or two racquets. (Johnson 216-217).

**Denied.** This is a mischaracterization of Johnson's testimony. Johnson testified that she does not know whether she had given J. Sell the impression that she had stopped trying in her match. Neither J. Sell nor M. Sell gave Johnson the impression that it seemed like she had "just quit" on the doubles match. Johnson testified that she did not "stop trying" in that match and that

11

they were just "outplayed." (Johnson 215-216). Johnson did cry, put her tennis bag in the trash can, and broke one or two racquets; however, this occurred after M. Sell informed Johnson that she was pulled from the singles match. (Johnson 216-217). Johnson was upset because she was pulled from what would have been her last match and her mother and grandmother traveled all the way to LSU to watch her play. (Johnson 214, 218).

34. Johnson said it would make "100 percent" sense to pull Johnson from the singles match if she had stopped trying in the doubles match. (Johnson 216-217) After this match, Johnson was pulled from the singles event.  (Johnson 216).

**Qualified.** Johnson did testify that it would make "100 percent" sense to pull her from singles match *if* she had stopped trying in the doubles match. (Johnson 216-217). While Johnson was pulled from the singles match after losing the doubles match, Johnson did not "stop trying" in that match. Rather, they were just "outplayed." Neither J. Sell nor M. Sell gave Johnson the impression that it seemed like she had "just quit" on the doubles match. (Johnson 215-216).

35. Johnson testified that J. Sell told her to meet J. Sell at the indoor courts and said, "You might want to bring tissues, because I'm going to make you cry." (Johnson 277; Johnson Exh. 40). In that conversation, J. Sell talked to Johnson about her attitude.  (Johnson 277-278).

**Admitted.**

36. She told Johnson that she needed "to continue to work on it, because when [Johnson] got angry it affects others." (Johnson 277). Johnson agrees that her actions sometimes affected how others played. (Johnson 277-278).

**Qualified.** Johnson testified that she was the most "vocal" player on her team. For example, she enjoyed "Go Tigers" and "pump people up." Johnson believed that if she were not as vocal,

then her teammates would know she was "off" and that it might affect them. Johnson also testified that she did not believe that "it was her job to pump everybody up." (Johnson 277-278).

37. Johnson testified that J. Sell often made players, not just Johnson, run extra fitness when the players would lose a match. (Johnson 93-94, 98-99) Johnson felt this behavior was toxic, but it applied to all players. (Johnson 98-99)

**Qualified.** Johnson was also made to do extra fitness if she did not meet her weight goals given by J. Sell. (Johnson 153).

38. J. Sell recruited Johnson to LSU, knowing Johnson's sexual orientation. (Johnson 106-108; J. Sell 195-196). J. Sell also told Johnson that her sexuality made no difference to J. Sell. (Johnson 106-107)

**Qualified**. J. Sell informed Johnson that she knew that Johnson was "gay" since she met her. (Johnson 106). While J. Sell claimed that Johnson's sexuality made no difference to her, J. Sell instructed Johnson to keep her "lifestyle" out of the locker room (Johnson 98, 205-206). Once Johnson began dating ███████████, Johnson could tell by J. Sell's body language that she was not happy about the relationship. (Johnson 118). In some instances, J. Sell would "check in" on Johnson and ██████ and see how they were doing it. Johnson felt awkward after these conversations. J. Sell was not having similar conversations with any other player on the team. (Johnson 119-120). No other player on the team disclosed that they were "gay" or "bisexual." (Johnson 105). In addition, J. Sell often criticized Johnson for dating someone on the team because of the drama it allegedly caused. However, on occasion, J. Sell would create the drama. Johnson and ██████ would not have any discourse, yet J. Sell would assume there was a problem between them and would confront them. On occasion, these interactions with J. Sell would then cause an

issue, whether it be between Johnson and J. Sell, ▮▮▮ and J. Sell, or Johnson and ▮▮▮ (Johnson 99).

39. When Johnson was having difficulties with Johnson's mother due to Johnson's sexuality, J. Sell asked Johnson's LSU counselor to reach out to Johnson because J. Sell was worried Johnson felt pressured by the discussions with her mother. (Johnson 149-150; Johnson Exh. 13, p. 11).

**Admitted.**

40. Johnson's social media posts and text messages suggest she felt very supported by J. Sell up to the time she was graduating. (Johnson 222-226, 264; Johnson Exhs. 16-23). For example, in social media posts and text messages, Johnson stated that she was "Soooo thankful for these two amazing human beings," referring to Julia and Michael Sell; thanked the Sells for putting up with Johnson's emotions and "vouching" for Johnson to play on LSU's team; and thanked them for never giving up on Johnson. (Johnson 222-231; Johnson Exhs. 16-18, 20-23).

**Qualified.** Johnson is diagnosed with depression, personality disorder, and bipolar disorder. (Johnson 40, 239). Johnson felt that if she "wasn't smiling 24/7, I was apparently in a bad mood." (Johnson 233) Johnson was emotional and expressive. (Johnson 229) (Johnson declaration 3)

41. Johnson admitted that she had a lot of confidence issues, and Mike and Julia Sell helped her through those and kept her from crumbling. (Johnson 226).

**Qualified.** Johnson testified that she was referring to M. Sell more than J. Sell. (Johnson 226). J. Sell's comments about Johnson's weight caused Johnson to lose confidence in herself. (Johnson 153).

42. At one point Johnson dated one of the other players on the team, ███████. (Johnson 106, 205-206, 117-120). Johnson said J. Sell never commented negatively about Johnson's relationship with █████; Johnson just believed from J. Sell's "body language" that J. Sell was not happy that the two teammates were dating. (Johnson 118, 120) Johnson admits that her relationship with █████ caused friction. (Johnson 118-122)

**Qualified.** Once Johnson began dating ███████, Johnson could tell by J. Sell's body language that she was not happy about the relationship. (Johnson 118). In some instances, J. Sell would "check in" on Johnson and █████ and see how they were doing it. Johnson felt awkward after these conversations. J. Sell was not having similar conversations with any other player on the team. (Johnson 119-120). No other player on the team disclosed that they were "gay" or "bisexual." (Johnson 105). In addition, J. Sell often criticized Johnson for dating someone on the team because of the drama it allegedly caused. However, on occasion, J. Sell would create the drama. Johnson and █████ would not have any discourse, yet J. Sell would assume there was a problem between them and would confront them. On occasion, these interactions with J. Sell would then cause an issue, whether it be between Johnson and J. Sell, █████ and J. Sell, or Johnson and █████ (Johnson 99).

43. Per Johnson, J. Sell showed concern "because [the relationship] was bringing drama into the locker room, which I understand, because we're dating and we're on the same team." (Johnson 99) Johnson describes that she and █████ were "toxic for each other." (Johnson 115) She said that "[b]eing together on the team was rough for us," and "it became one of those things like we saw each other too much. So there were those little arguments where like some of the girls on the team were like, You need to just not [date]." (Johnson 118)

**Qualified.** While Johnson does admit that her relationship with ████████ caused friction, there were instances where J. Sell created the friction. Johnson and ████ would not have any discourse, yet J. Sell would assume there was a problem between them and would confront them. On occasion, these interactions with J. Sell would then cause an issue, whether it be between Johnson and J. Sell, ████ and J. Sell, or Johnson and Taylor. (Johnson 99).

44. Everybody on the team told them at one point that they needed to break up, which Johnson said was "common sense" (Johnson 120-121) She said there was a "lot of tension in the locker room, which then affected the girls," and ████ and Johnson did not socialize with the other girls on the team. (Johnson 119-121)

**Admitted.**

45. For example, Johnson testified that other teammates felt like Johnson and ████ were not "branch[ing] out" with the other team members. (Johnson 119) As an additional example, at away tennis tournaments, other players complained to J. Sell that they could not use their hotel room because Johnson and ████ were engaging in sexual conduct in the shared hotel room. (J. Sell 199-200; Johnson 121-122)

**Qualified.** Despite allegations, Johnson and ████████ did not lock any player out of their rooms. Johnson has never heard of any other player complaining that they could not get into the room because her and ████ were in there. (Johnson 121-122).

46. Johnson testified that Jade Lewis' abusive relationship with John Coe was also stressful for the team. (Johnson 189)

**Qualified.** Jade Lewis's relationship with John Coe was stressful for the team because they were worried about Jade. (Johnson 189). Johnson reported her concerns about what was occurring between Jade Lewis and John Coe to J. Sell. J. Sell informed Johnson that she would handle it and

that if Johnson would focus on her tennis rather than her teammates, she would be a better tennis player. (Johnson 194). J. Sell then met with the entire team, minus Jade, and told them to stay away from Jade because she is not good to be around. (Johnson 181). The team was instructed, if they saw Jade, not to "talk to her" and "don't hang out with her." (Johnson 190).

47. Neither M. Sell or J. Sell ever said they did not want Johnson dating ███████ (Johnson 118) Other than checking on ██████ and Johnson periodically to make sure they were okay with the relationship, J. Sell did not otherwise say anything about the relationship to ██████ and Johnson. (Johnson 120)

**Qualified.** Once Johnson began dating ████████ Johnson could tell by J. Sell's body language that she was not happy about the relationship. (Johnson 118). In some instances, J. Sell would "check in" on Johnson and ██████ and see how they were doing it. Johnson felt awkward after these conversations. J. Sell was not having similar conversations with any other player on the team. (Johnson 119-120). No other player on the team disclosed that they were "gay" or "bisexual." (Johnson 105). However, J. Sell's conversations with Johnson was not limited to checking in to make sure they were okay. In addition, J. Sell often criticized Johnson for dating someone on the team because of the drama it allegedly caused. And on occasion, J. Sell would create the drama. Johnson and ██████ would not have any discourse, yet J. Sell would assume there was a problem between them and would confront them. On occasion, these interactions with J. Sell would then cause an issue, whether it be between Johnson and J. Sell, ██████ and J. Sell, or Johnson and Taylor. (Johnson 99).

48. Per Johnson, one day J. Sell asked Johnson "to keep her lifestyle" out of the locker room. (R. Doc. 182, ¶ 586; Johnson 205-206, 208) This is the only negative comment Johnson said that J. Sell made. (Johnson 205-206, 208, 213) J. Sell denies making this comment. (J. Sell

196-197) Johnson testified that this single comment by J. Sell was "kind of offensive." (Johnson 200, 206)

**Qualified.** Johnson was in the locker room and J. Sell told her that she wanted to talk to her. J. Sell then informed Johnson that she needed to keep who she was and her lifestyle out of the locker room so she "didn't offend the girls." (Johnson 98, 205-206). Johnson identifies as a "lesbian." (Johnson 32). J. Sell's comment about Johnson's lifestyle impacted how Johnson acted. She felt like she could no longer be herself and described the feeling as "going into the closet all over again." (Johnson 98, 209).

49. Johnson acknowledged that the alleged comment may have been precipitated by the issues created by the relationship in the locker room (Johnson 99, 119-121) Johnson suspects the comment was made because another player, who Johnson believes is homophobic, said something to J. Sell. (Johnson 205-206). Johnson describes the player as "sheltered" and "homeschooled," and someone who did not participate in team dinners or hang out with the teammates. (Johnson 203-205)

**Denied.** Although Johnson did acknowledge that her relationship with her teammate, ███████ caused distractions in the locker room at some point, she did not say this could be the basis for J. Sell's comment. In fact, Johnson's relationship with her teammate could not have been a basis for J. Sell's comment because when the comment was made, Johnson was not yet dating ███████ In fact, the comment was made before ███████ was even on the team. (Johnson 208). In addition, Johnson testified that while ███████ may have gone to Julia, she does not know whether that was, in fact, what occurred. (Johnson 205).

50. Johnson disclosed to J. Sell shortly after arriving at LSU that Johnson had been in a toxic dating relationship with a woman at the University of Oregon. (Johnson 106-108) Johnson

indicated that J. Sell already knew Johnson was homosexual since she first met Johnson.  (Johnson 106-107; J. Sell 195-196)  J. Sell responded that it did not matter to J. Sell that Johnson was homosexual.  (Johnson 107)

**Qualified.** While J. Sell claimed that Johnson's sexuality made no difference to her, J. Sell instructed Johnson to keep her "lifestyle" out of the locker room (Johnson 98, 205-206). Once Johnson began dating ██████, Johnson could tell by J. Sell's body language that she was not happy about the relationship. (Johnson 118). In some instances, J. Sell would "check in" on Johnson and ████ and see how they were doing it. Johnson felt awkward after these conversations. J. Sell was not having similar conversations with any other player on the team. (Johnson 119-120). No other player on the team disclosed that they were "gay" or "bisexual." (Johnson 105). In addition, J. Sell often criticized Johnson for dating someone on the team because of the drama it allegedly caused. However, on occasion, J. Sell would create the drama. Johnson and ████ would not have any discourse, yet J. Sell would assume there was a problem between them and would confront them. On occasion, these interactions with J. Sell would then cause an issue, whether it be between Johnson and J. Sell, ████ and J. Sell, or Johnson and ████. (Johnson 99).

51.  Johnson cannot show any prior reports, nor did Johnson make any reports.  (Johnson 283; Board 30(b)(6) I 66-67; Segar Decl. ¶ 9)

**Qualified.**  Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship.  Johnson felt like taking away her scholarship was "already being hung over my head."  (Johnson 287)

52. Johnson graduated from LSU on schedule in Spring 2019. (Johnson 18; R. Doc. 182, ¶ 594)

**Admitted.**

53. Johnson's transcript shows her grades fluctuated up and down, with no indication her grades during her first year (when she was not playing on the tennis team)—2.67 and 2.12—were notably higher than her grades during her time on the tennis team—2.35, 2.9, 3.5, 2.13, 3.5. (Johnson 200; Johnson Exh. 14; R. Doc. 182, ¶ 596)  Indeed, Johnson testified that her grades were good when she was at LSU.  (Johnson 291)

**Admitted.**

54. Johnson testified that missing out on graduate school, not her grades, was her only lost educational opportunity.  (Johnson 291)

**Denied.** J. Sell's impacted Johnson's educational experience in many ways, to which she testified at length. Johnson testified that her anxiety and depression worsened with J. Sell's treatment of her. (Johnson 292). Johnson felt a lot of "fear" and "unsettledness" in J. Sell's presence "especially on the tennis court." (Johnson 94). J. Sell's comment about Johnson's "lifestyle" impacted how Johnson acted and her level of comfort on the tennis team. She felt like she could no longer be herself and described the feeling as "going into the closet all over again." (Johnson 98, 209). Johnson left LSU hating tennis and not feeling secure within herself. She decided that she could not pursue tennis anymore because of how J. Sell treated her. (Johnson 201).

55. Johnson testified that she was hospitalized after graduating.  (Johnson 214)

**Qualified.** Johnson fell into a very deep depression and admitted herself into St. Clare's Psychiatric Unit. (Johnson 245). (Johnson declaration 1)

56. Johnson alleged that J. Sell would not write Johnson a letter of recommendation for graduate school.  (Johnson 132)  Johnson speculates J. Sell would not do so because "she didn't

like me," but Johnson testified that J. Sell never told her that she did not like Johnson.  (Johnson 136)  Johnson did not apply to graduate school. (Johnson 132-133)

**Qualified.** Johnson wanted to pursue graduate school at LSU. She asked J. Sell to write her a letter of recommendation; however, J. Sell told her no. (Johnson 132). Johnson believes that J. Sell denied her request because she did not like her. (Johnson 146). Johnson believed that having a letter of recommendation from J. Sell in particular was most important for her graduate school application that following J. Sell's refusal, Johnson felt defeated and did not apply. (Johnson 137, 144).

57. The Board's written official policy, Permanent Memorandum 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203; Stewart Exh. 2)

**Qualified.**  Johnson can neither admit nor deny the content or purpose of PM-73 as Johnson has no personal knowledge of said policy content or purpose, and the policy speaks for itself. Johnson acknowledges that Stewart testified to such.

58. PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy." (Stewart 203; Stewart Exh. 2)  The Board's policies were promulgated to students and staff alike before and after Johnson's alleged issues with J. Sell.  (Johnson 81-86; Johnson Exhs. 9, 10; Board 30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 259-261; Stewart 38-41)

**Qualified.**  Johnson can neither admit nor deny as to the content or purpose of PM-73 as Johnson has no personal knowledge of said policy content or purpose, or whether the policy was

promulgated to students and staff, and the policy speaks for itself.  Johnson acknowledges that

Stewart and the Board testified to such.

59. Employees, non-employees, and students, including Johnson, had the option to

report Title IX claims through multiple mechanisms, including directly to a Title IX representative,

or through Maxient.  (Board 30(b)(6) I, 49-52)

**Qualified.**  Johnson can neither admit nor deny as to the reporting options as she has no

personal knowledge of such.  Johnson acknowledges that the Board testified to such.

60. Likewise, information about how to contact the campus Title IX office was provided

to students and was housed on the Student Advocacy and Accountability website, Dean of Students

website, HRM website, and on the Title IX website at various points.  (Board 30(b)(6) I 53-54)

**Qualified.**  Johnson can neither admit nor deny as she has no personal knowledge of such.

Johnson acknowledges that the Board testified to such.

61. Johnson participated in the Title IX process in January 2019 when she made a report to

Miriam Segar, Senior Associate Athletic Director, that her teammate and girlfriend, Taylor

Bridges, slapped her.  (Johnson 105-106, 112, 114-115, 127-130, 132; Johnson Exhs. 11, 12).

**Admitted.**

62. Per Johnson, ██████ hit Johnson during an argument (after Johnson disclosed she had

kissed another girl). (Johnson 125) Johnson was drunk during the altercation. (Johnson 125-126)

Johnson was not injured in the altercation.  (Johnson 126-127)

**Qualified.** Johnson informed her then-girlfriend, ██████ that she had kissed another girl

while she was under the influence a few days before. Johnson felt guilty and wanted ██████ to

know. ██████ then hit Johnson multiple times. Johnson did not hit ██████ back. While Johnson had

been drinking at the time of the confrontation, she was not drunk. (Johnson 125-126). This was not the first time that ▮▮▮▮ had physically assaulted Johnson. (Johnson 127).

63. Afterward, Johnson called her mom, who told her to contact J. Sell. (Johnson 117) Johnson reported this incident to J. Sell and J. Sell wanted Johnson to report the situation to Segar, which Johnson did.  (Johnson 127-128)

**Qualified.** Johnson first reported the assault to J. Sell the morning after the incident. J. Sell instructed Johnson to meet with the trainer for an evaluation and then speak with Miriam Segar. (Johnson 127).

64. Segar met with Bridges and Johnson separately, and both indicated they felt safe, that they were okay to continue practicing and traveling together on the team, and that they did not need any accommodation. (Johnson Exh. 12; Johnson 131-132)

**Qualified.** When Johnson met with Segar, Segar asked Johnson what occurred, if she wanted to press charges, and "that was pretty much it." (Johnson 128).

65. Johnson was informed that the alleged conduct was unlawful and that "in addition to the Title IX process, she could file a police report and press legal charges regarding the interaction." (Johnson 131; Johnson Exh. 12)

**Qualified.** When Johnson met with Segar, Segar asked Johnson what occurred and if she wanted to press charges, and "that was pretty much it." Johnson indicated that she did not want to press charges against ▮▮▮▮ because that can ruin someone's life. (Johnson 128).

66. Both women indicated they did not want to move forward with the Title IX process. (Johnson Exh. 12; Johnson 131)

**Admitted.**

67. Johnson felt she had the full opportunity to report this incident to Title IX, and she had no problems with how Segar responded to the incident.  (Johnson 132, 304-305).

**Qualified.**  Johnson stated that she had no idea if Segar complied with the administrative requirements of Title IX. (Johnson 305)

68. Johnson never complained to Segar or the Title IX office about J. Sell, nor at any other time.  (Johnson 180, 283; Segar Decl. ¶ 9)

**Qualified.**  Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship.  Johnson felt like taking away her scholarship was "already being hung over my head."  (Johnson 287)

69. This was the only report Johnson ever made to Miriam Segar or Title IX.  (Johnson 180, 283) Johnson testified that ███████ hit Johnson other times, but Johnson did not report such conduct.  (Johnson 126-127, 180, 283)

**Admitted.**

70. The Board provided training beginning in at least 2014, which training took place on an annual basis.  (Board 30(b)(6) I 30-32, 36-37)  For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX.  (R. Doc. 30(b)(6) I 33, 36-37)

**Qualified.**  Johnson can neither admit nor deny whether the Board provided training, when it took place, how it was administered, or who reviewed it, as Johnson has no personal knowledge of said events.  Johnson acknowledges that the Board testified to such.

71. In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks.   (Board 30(b)(6) I 38-39, 41-43)

**Qualified.** Johnson can neither admit nor deny whether such training was provided or what the motivation for any such training was as Johnson has no personal knowledge of said events. Johnson acknowledges that the Board testified to such.

72. Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) I 39, 42-44)

**Qualified.** Johnson can neither admit nor deny who developed any trainings or what their content was as Johnson has no personal knowledge of said events. Johnson acknowledges that the Board testified to such.

73. Johnson and her alleged harasser, J. Sell, received training. (Johnson 81-86; Johnson Exhs, 9, 10; J. Sell 83-88; Sanders Decl. ¶¶ 3, 5; Segar ¶¶ 5, 6, Exh. 3,4; Board 30(b)(6) 88) In addition, Johnson admits that, "[a]s an athlete, Johnson was required to go to Title IX trainings." (R. Doc. 182, ¶ 593; see Segar II 348-349, 359-360; Segar Exh. 17; Segar Decl. ¶ 5, Exh. 3) Johnson also acknowledged that she received and completed a training course on sexual assault, which training LSU mandated that students complete as a prerequisite to registering for classes. (Johnson 84)2

**Qualified.** Johnson can neither admit nor deny whether J. Sell received training as Johnson has no personal knowledge of said events. Johnson acknowledges that the Board testified to such.

74. As indicated above, Johnson never made a report of sexual misconduct regarding J. Sell while at LSU. (Johnson 283). LSU has also never received a report regarding sexual orientation harassment in the women's tennis program, by Julia Sell, whether from Plaintiff or otherwise. (Board 30(b)(6) I 66-67)

**Qualified.** Johnson can neither admit nor deny whether any other reports were made as Johnson has no personal knowledge of said events. Johnson acknowledges that the Board testified to such.

75. Johnson and J. Sell each received training. (Segar Decl, ¶¶ 5, 6, Exh. 3, 4; Sanders Decl., ¶¶ 3, 6)

**Qualified.** Johnson can neither admit nor deny whether J. Sell received training as Johnson has no personal knowledge of said events. Johnson acknowledges that Segar testified to such.

76. Johnson never reported her frustrations with J. Sell to the Title IX office when she reported the conduct with ███, nor did she make any reports to Title IX thereafter, despite having received training and received a response and resources from the Title IX office. (Johnson 81-86, 283; Johnson Exhs. 9, 10)

**Qualified.** Johnson did not speak out or report J. Sell's conduct because she didn't want to lose her scholarship. Johnson felt like taking away her scholarship was "already being hung over my head." (Johnson 287) (Johnson declaration 3)

## ADDITIONAL FACTS

1. Supplemental Opposing Statement of Material Facts as to Opposition to Motions No. 1-10 is incorporated herein by reference.

2. After attending both the University of Central Florida ("UCF"), and then the University of Oregon ("UO") on college athletic scholarships for tennis, Plaintiff was removed from both universities' tennis teams for disciplinary issues. Johnson 89.

3. Julia Sell, LSU Women's Tennis Co-Head Coach, attempted to allow Plaintiff to transfer to LSU to play for LSU tennis without losing eligibility under the National Collegiate Athletic Association ("NCAA"). Johnson 72-81.

4. In the fall of 2016, Plaintiff started at LSU as a member of the women's tennis team but was not able to travel or compete due to her two prior transfers. Johnson 80-81.

5. Although Plaintiff was not on an athletic scholarship during the 2016 season, she was awarded a scholarship in her remaining years with LSU. Johnson 81.

6. Although Sell's efforts in assisting Plaintiff with her transfer to LSU to join Sell's team were appreciated, Plaintiff felt that Sell never liked her. Johnson 90.

7. Plaintiff believes that "every person at some point…was on [Sell]'s bad side." Johnson 91:7-9.

8. Plaintiff contends that Sell was difficult to unfavored or unrecruited members of the team, and would even create tension by spreading false rumors. Johnson 92:17-93:1, 97-98.

9. During her time on the team, Sell consistently told Plaintiff she was overweight. Johnson 151.

10. Plaintiff was threatened with extra fitness if she was not able to lose a certain amount of weight or was not able to meet a certain weight goal, which severely damaged Plaintiff's confidence. Johnson 153.

11. On one occasion, Mike Sell, LSU Women's Tennis Co-Head Coach, grabbed trail mix out of teammate Jade Lewis's hand on one occasion because it had M&Ms in it. J. Lewis I 197.

12. On multiple occasions, Sell would threaten to revoke Plaintiff's athletic scholarship. Johnson 89.

13. For example, in the spring of 2018, Sell threatened to withhold submission of her scholarship for the 2018-2019 school year because Plaintiff was not able to meet the weight requirement that Sell had set for her at the time. Johnson 159.

14. Plaintiff believed that Sell's comments were not directed toward performance improvement, but rather control over Plaintiff.   Johnson 174.

15. Most notably, Plaintiff, who identifies as a lesbian, was inappropriately "ostracized" by Sell for her sexuality during her time at LSU. Johnson 32, 99, 201:3-6.

16. Plaintiff was told by Sell that she "needed to keep who [she] was and [her] lifestyle out of the locker room so [she] didn't offend" her teammates.   Johnson 98.

17. However, Plaintiff contends that she had a close relationship with her teammates, and believes they would have spoken to her about any concerns directly. Johnson 206.

18. Sometime after Sell made this comment to Plaintiff, Plaintiff began a dating relationship with a new member of the women's tennis team. Johnson 208.

19. The discomfort was apparent in Sell's body language whenever she was around Plaintiff and her romantic partner. Johnson 118.

20. Sell criticized Plaintiff for dating another team member and causing drama; yet, Plaintiff contends that it was Sell who would create drama by fabricating false issues. Johnson 99-100.

21. Sell would also ask personal questions prying into Plaintiff's relationship, despite having no fixed interest on any other team member's dating life or asked about their relationship in ways she did not ask about straight teammates' relationships. Johnson 119-120.

22. Plaintiff suffered abuse from her romantic partner during this relationship and Sell became involved. Johnson 101.

23. Plaintiff reported to Sell that her romantic partner had hit her and Sell recommended to meet with an athletic trainer and Miriam Segar, LSU Senior Associate Athletic Director, who later met with Plaintiff. Johnson 101,127.

24. Segar simply offered the option for Plaintiff to file a police report, but did not file the report with the Title IX office. Johnson 128-29.

25. Although the investigation report states that Segar referred Plaintiff to a counselor for assistance with emotional distress, Plaintiff had already been seeing a counselor and received no new or additional resources. Johnson 130-31; Johnson Exh. 11.

26. Plaintiff had a history of depression and anxiety due to childhood trauma. Johnson 50, 53-54.

27. Plaintiff believes that her anxiety and depression has actually worsened due to Sell's mistreatment and has even developed symptoms of disordered eating. Johnson 292.

28. This, along with the other notable experiences discussed, Plaintiff experienced significant anxiety when she was around Sell, which impacted her tennis performance negatively. Johnson 94.

29. Plaintiff would starve herself for several days at a time and would even force herself to vomit in order to reach Sell's goal weight. Johnson 156.

30. Overall, Plaintiff felt uncomfortable being her true self when on the tennis team and around Sell, and even felt "[i]t was like going into the closet all over again." Johnson 98, 209.

31. Although Plaintiff wanted to attend LSU for graduate school and received a few alternative letters of recommendation, she ultimately did not apply because Sell, the most important individual to provide her recommendation to Plaintiff, refused to write her a letter in support. Johnson 144, 152.

32. Instead, Plaintiff pursued massage therapy, which was not her passion. Johnson 17.

33. Plaintiff graduated LSU hating tennis and feeling insecure. Johnson 201.

34. Plaintiff specifically contends that she abandoned tennis due to Sell's inappropriate treatment. Johnson 201-02.

35. Plaintiff became severely depressed and experienced suicidal ideation and self-mutilation, which led to a self-admission into a psychiatric hospital. Johnson 214, 245.

Respectfully Submitted,

*/s/ Catherine E. Lasky*

Karen Truszkowski     Catherine E. Lasky (La. Bar 28652)
*Pro Hac Vice*        Endya L. Hash (La. Bar 38260)
Temperance Legal Group    Katie Lasky Law
503 Mall Court #131     619 Homedale Street
Lansing, Michigan 48912    New Orleans, Louisiana 70124
P: (844) 534-2560      P: (504) 584-7336
F: (800) 531-6527      F: (504) 375-2221
karen@temperancelegalgroup.com  katie@katielaskylaw.com
             endya@katielaskylaw.com


Elizabeth K. Abdnour
*Pro Hac Vice*
Abdnour Weiker LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

/s/ *Elizabeth K. Abdnour*
Elizabeth K. Abdnour