UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ABBY OWENS, et al.**<br>*Plaintiffs*<br><br>v.<br><br>**BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE**<br>*Defendant* | Case No.: 21-242<br><br>Division WBV-SDJ<br><br>JUDGE WENDY B. VITTER<br><br>MAGISTRATE JUDGE JOHNSON |

### OPPOSING STATEMENT OF MATERIAL FACTS TO MOTION FOR SUMMARY JUDGMENT NO. 10: CORINN HOVIS

Pursuant to Rule 56.1 of the Local Rules and in conjunction with the Opposition to Motion for Summary Judgment No. 10, Plaintiff Corinn Hovis, through undersigned counsel, submits responses to the Board's Statement of Undisputed Material Facts:

1. Hovis attended LSU as an undergraduate student from 2019 to 2022, graduating in three years. (Hovis 14-15)

    **Admitted**.

2. Hovis then enrolled in a master's program at LSU, which, at the time of her deposition, she expected to complete in May 2023. (Hovis 15-16)

    **Admitted**.

3. Hovis alleges that on January 24, 2020, she was sexually assaulted and/or raped by a football player, John Loe. (R. Doc. 182, ¶¶ 652-653, 660, 664)

    **Admitted**.

4. She met Loe for the first time in an off-campus bar, and when Loe asked her to go home with him to his residence, Hovis agreed. (R. Doc. 182, ¶ 657-658)

**Qualified**. Hovis met Loe at a bar in Tigerland. Hovis 19:12-20:19.

5. Hovis believes Loe then raped her in his vehicle, although Hovis has no knowledge of that occurring. (R. Doc. 182, ¶ 660; Hovis 43-44)

**Qualified**. Hovis believes Loe raped her in an SUV, but Hovis has very little memory of what happened in the SUV. Hovis 43-44, 61.

6. That night, Hovis filed a report with the LSU Police Department, who then contacted the Baton Rouge Police Department ("BRPD"). (R. Doc. 182, ¶¶ 665-666)

**Admitted.**

7. The BRPD refused to take a statement from Hovis because Hovis had consented to go home with Parrish. (R. Doc. 182, ¶ 665-666)

**Admitted**.

8. The LSUPD did not agree with this conclusion, and, instead, they drove Hovis to the hospital for a Sexual Assault Nurse Examiner ("SANE") examination. (R. Doc. 182, ¶ 667)

**Admitted**.

9. LSU's Residential Life staff (in Hovis' dorm) promptly reported the incident to LSU's Title IX office. (R. Doc. 182, ¶ 669)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence. The night of her sexual assault Plaintiff felt that the Resident Assistants didn't "really know what to do" either." Hovis 163:18-24. Plaintiff's parents were informed by a family friend of their ability to file a Title IX complaint with LSU on January 24. Hovis 52:16-20, 63:6-9, 64:6-12.

10. On January 31, Jennie Stewart, Title IX Coordinator, met with Hovis to "explain [Hovis'] reporting options," and Hovis decided to move forward with a Title IX investigation. (R. Doc. 182, ¶¶ 670-671)

**Admitted**.

11. As a part of the Title IX process, LSU connected Hovis with the LSU Lighthouse Program, which provides assistance and accommodations to student-survivors of sexual assault, interpersonal violence, stalking, and harassment. (R. Doc. 182, ¶¶ 672-673)

**Admitted**.

12. The Lighthouse Program arranged accommodations for Hovis as a result of the incident with Loe, including time and a half on assignments and exams, a note taker, distraction reduced environments, and consideration for absences. (R. Doc. 182, ¶ 674)

**Qualified**. Hovis applied for accommodations on or around January 31, 2020, but LSU refused to grant these accommodations until June 2020. Hovis 87-88.

13. On February 3, 2020, investigator Jeffrey Scott interviewed Hovis, and, over the next month of his investigation, Scott concluded that Loe had sexually assaulted Hovis. (R. Doc. 182, ¶ 676-677)

**Admitted**.

14. LSU suspended Loe from the football team in February 2020. (Hovis 77, 191-193; Segar Decl.__)

**Admitted**.

15. Loe appealed the Title IX decision, but LSU upheld his suspension. (Hovis 75)

**Admitted**.

16. By electronic letter dated on May 1, 2020, LSU suspended Loe from the university and its campus for one year (from May 10, 2020 to May 31, 2021) and issued a no-contact directive, ordering him to have no communication or contact with Hovis. (R. Doc. 182, ¶ 679; Hovis 79; Sanders Decl. ¶ 15, exh. 10, 11)

**Qualified**. The no-contact directive was mutual: "This mutual 'no contact' order does not imply any judgment regarding the factual nature of the incident." BOS-030864.

17. Loe never returned to LSU after his suspension because he transferred to another university to play football. (R. Doc. 182, ¶ 682)

**Admitted**.

18. Hovis had no further direct communications with Loe. (Hovis 108)

**Qualified**. It is unclear what time period this is referring to, but Loe reached out to Hovis on Snapchat the day after the rape. Hovis 72.

19. Hovis also never saw Loe again. (Hovis 72)

**Qualified**. It is unclear what time period this is referring to, but Loe reached out to Hovis on Snapchat the day after the rape. Hovis 72.

20. Following LSU's Title IX investigation and response, Hovis' mother sent the following email to Stewart: Good morning, Jennie.  It's Karrie Hovis, Corinn's mom.  I wanted to reach out and say thank you.  We appreciate everything you did to help us through Corinn's case.  The news has been harsh about how the university handles [T]itle IX cases.  I can't speak for other victims['] parents, but for us, you went over and above to help us navigate the process.  Corinn is doing so well, and we attribute that to how you helped her through this situation.  Thank you again! (Hovis Exh. 7; Hovis 139-140)

**Qualified**. This message was sent to Jennie Stewart by text message on November 19, 2020. Hovis Exhibit 7.

21. Following issuance of the no-contact order to Loe, Hovis received two direct messages on Instagram that she assumed were sent on behalf of Loe. (Hovis 108-110; Sanders Exh. 2)

**Admitted**.

22. Hovis said one was from ▮▮▮▮▮▮, who represented herself as Loe's possible girlfriend, and the other was from "an anonymous football account," who Hovis also believed to be ▮▮▮▮▮▮. (Hovis 108-109; Sanders Exh. 2)

**Admitted**.

23. After Hovis received the first message from an anonymous Instagram account, "lsufootballupdates2020," Hovis forwarded the message to Jonathan Sanders on May 8, 2020. (Hovis 109-110; Sanders Decl. ¶ 16, Exh. 12)

**Admitted**.

24. Sanders responded almost immediately, thanking Hovis for letting him know, asking whether she knew the identity of the person, encouraging her to block the sender, and informing her that he would look into the situation. (Sanders Decl. ¶ 16, Exh. 12)

**Admitted**.

25. Hovis replied that she did not know the identity but would block them immediately and thanked Sanders for his help. Id.

**Admitted**.

26. Sanders contacted Miriam Segar, Sr. Associate Athletics Director/SWA to determine if LSU Athletics knew the owner of the account. (Sanders 156; Sanders Decl. ¶ 16, Exh. 13) Segar confirmed that the account was not associated with LSU. Id.

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

27. Sanders also contacted LSUPD to determine if there was a way for LSUPD to determine the account ownership. (Sanders Decl. ¶ 16, Exh. 13) LSUPD responded that a criminal investigation would be required in order to determine the account owner, and that at this point, the messages did not show criminality. Id.

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

28. The second Instagram message came from a different sender, who referred to herself as Loe's "on-and-off again girlfriend" and asked Hovis to "have mercy on [Loe], don't pursue that." (Hovis 108-110)

**Admitted**.

29. Hovis forwarded the message to Jennie Stewart on May 11, 2020, who responded that she was so sorry that Hovis had to deal with this and said that Stewart would "work on it." (Hovis 110).

**Admitted**.

30. Hovis also forwarded the message to Sanders that same day, who responded that he was "so sorry to hear that" and "would be happy to look further into this as well." (Sanders Decl, ¶ 17, Exh. 14)

**Admitted**.

31. LSU contacted Loe about the communications by email. (Sanders Decl. ¶ 17, Exhs. 15, 16)

**Admitted**.

32. LSU reiterated the no-contact prohibitions which included no contact to Hovis through a third party. Id.

**Admitted**.

33. The communications ceased after Hovis notified LSU. (Hovis 110, 132)

**Qualified**. The communications ceased after the second notification to LSU. The communications did not cease after the first notification to LSU. Hovis 110, 132.

34. Hovis does not know whether the two social media messages were sent on Loe's behalf. (Hovis 110-111).

**Admitted**.

35. LSU received no information showing Loe that instigated the messages. (Hovis 111)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence. Hovis testified that she did not know whether LSU had confirmation that Loe instigated the messages. Hovis 111.

36. Loe denied to LSU that he had any knowledge of the communications. (Sanders Decl. ¶ 17, Exh. 15, 16)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

37. LSU's no-contact directive to Loe specifically advised him of this particular prohibition. (Sanders Decl. ¶ 15, Exhs. 10, 11) It stated, among other things, ". . . Both you and Corinn Hovis are to refrain from: . . . 4. Contacting or communicating with one another, including through a third party, social media, or in any way at any time. . ." (Sanders Decl. ¶ 15, Exhs. 10, 11) (emphasis added)

**Admitted**.

38. Hovis also received a copy of this directive to Loe. (Sanders Decl. ¶ 15, Exh. 11)

**Admitted**.

39. After Hovis received the second message, Scott contacted Loe about the communications, stating by email on May 15, 2020: It has come to my attention that persons claiming to be associated with you, one in particular claiming to be your "on and off girlfriend," have been contacting Corinn Hovis. I wanted to take this opportunity to remind you of the No Contact Order between yourself and Corinn that was referenced in the letter sent to you on May 1, 2020, from Dr. Jonathan Sanders Associate, Dean of Students. (Sanders Decl. ¶ 17, Exhs. 13, 14)

**Admitted**.

40. Scott further reiterated Loe's no-contact prohibitions, which included no contact to Hovis through a third party. Id.

**Admitted**.

41. Hovis sent the third-party communications to LSU on May 8 and May 11, 2020, respectively, and Scott contacted Loe and advised Loe of the violation on May 15, 2020. (Sanders Decl. ¶ 17, exh. 13, 14)

**Admitted**.

42. The Board's written official policy, Permanent Memoranda 73 ("PM-73"), prohibits sexual misconduct, including but not limited to sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, video voyeurism, obtaining, posting or disclosing an intimate description, photo, or video without express consent, dating violence, domestic violence, stalking and other sex crimes. (Stewart 203, Stewart Exh. 2)

**Qualified**. PM-73 states: "'Sexual Misconduct': A sexual act or contact of a sexual nature that occurs, regardless of personal relationship, without the consent of the other person(s), or that

8

occurs when the person(s) is unable to give consent or whose consent is coerced or obtained in a fraudulent manner. For the purpose of this Policy, sexual misconduct includes, but is not limited to, sexual assault, sexual abuse, violence of a sexual nature, sexual harassment, non-consensual sexual intercourse, sexual exploitation, video voyeurism, contact of a sexual nature with an object, or the obtaining, posting or disclosure of intimate descriptions, photos, or videos without the express consent or the persons depicted therein, as well as dating violence, domestic violence and stalking, as well as crimes of a sexual nature as defined in Title 14 or the Louisiana Revised Statutes or at La. R.S. 44:51." Stewart Exhibit 2.

43. PM-73 requires each campus to "regularly offer training, educational and prevention programs designed to inform the campus or community about the law of [T]itle IX and LSU's Title IX Policy."  (Stewart Exh. 2)

**Qualified**. PM-73 speaks for itself. Stewart Exhibit 2.

44. The Board's policies were promulgated to students and staff alike before and after Hovis' assault.  Board 30(b)(6) I 29-30, 53-54; Board 30(b)(6) II 256-261; Stewart 38.

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of what LSU promulgated to whom.

45. Employees, non-employees, and students, including Hovis, had the option to report Title IX claims through multiple mechanisms, including directly to a Title IX representative, or through Maxient, and Hovis utilized the Title IX system.  (Board 30(b)(6) I 51-52)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.  Hovis did not submit her own complaint; her parents contacted Jennie Stewart directly. Hovis 63-64.

9

46. Likewise, information about how to contact the campus Title IX office was provided to students and was housed on the Student Advocacy and Accountability website, Dean of Students website, HRM website, and on the Title IX website at various points. Id. at 53-54.

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

47. The Board provided training beginning in at least 2014, which training took place on an annual basis. (Board 30(b)(6) I 30-32, 36-37)  For ease of attendance, LSU administered the trainings electronically, the content of which was reviewed by Title IX. (Board 30(b)(6) I 33, 36-37)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.  LSU paid no attention to the content of the trainings, whether employees actually completed the trainings, or what employees were told would happen if they did not attend. Board 138.  Stewart had concerns about the content of the Beebe training, including but not limited to the fact that it did not clearly explain employee reporting obligations. Stewart 49-51.

48. In addition to the campus-wide training, some departments, such as Athletics, Greek Life, and Residential Life, administered additional training to mitigate additional risks. (Board 30(b)(6) I 38-39,41-43)  Many of these trainings were developed by the Title IX office and included the "big three topics" of consent, healthy relationships, and bystander intervention. (Board 30(b)(6) 39, 42-44)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.  LSU paid no attention to the content of the trainings, whether employees actually completed the trainings, or what employees were told would happen if they

10

did not attend. Board 138. Stewart had concerns about the content of the Beebe training, including but not limited to the fact that it did not clearly explain employee reporting obligations. Stewart 49-51.

49. Like other students, Hovis and her alleged assaulter, Loe, received MyStudentBody training. (Sanders Decl. ¶ 3) Because of his role as a student athlete, Loe received additional training through the Dan Beebe Group/Protection for All. (Segar Decl. ___)

**Qualified**. There is no evidence provided that Hovis or Loe personally completed this training.

50. The LSU Office of Internal Audit conducted an audit regarding Title IX obligations, specifically sexual misconduct (the "Audit"). (R. Doc. 1-1, p. 164)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

51. The audit reviewed activities between June 1, 2015 and December 31, 2016, years before Hovis' alleged assault, and its findings related to multiple campuses. Id.

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

52. The Audit noted that PM-73 was already in place since 2014, pre-dating the audit's review period and Hovis's enrollment, and it acknowledged that the Athletics Department already required student athletes and coaches to attend an annual comprehensive training session on Title IX provided by a consultant, Dan Beebe Group Consulting. (R. Doc. 1-1, p. 166)

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence.

11

53. Audit Finding No. 2 related to "Obligations of Responsible Employees" contains only two findings that were possibly be related to LSU's Baton Rouge campus:   "Confusion at multiple campus regarding victim confidentiality when incidents are disclosed to an employee holding licenses that typically protect personal information; and  Lack of coordination with LSU A&M policy at [sic] due to interpretation of state statute."

**Qualified**. Hovis can neither admit nor deny this allegation as she has no personal knowledge of its occurrence. Audit Finding No. 2 states, "Lack of coordination with LSU A&M police at [sic] due to interpretation of state statute."

54. Neither finding relates to Hovis.

**Denied**. A lack of coordination with LSU A&M police relates to Hovis. The Audit addresses the fact that OCR "recommends entering into a MOU with local law enforcement regarding protocol for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. The MOU would be necessary since local law enforcement are not responsible employees of the University. LSU A&M Police Department (LSUPD) requires written consent from the victim before they will disclose information to the Title IX Campus Coordinator. The LSUPD Sexual Violence Confidentiality Notice and Waiver references Louisiana Revised Statute 46:1844, which prohibits publicly disclosing the identity of a victim who's been subjected to a sexual crime. However, it is unclear whether communicating this information to the Title IX Campus Coordinator would be considered public disclosure." PLAINTIFFS_000242. Despite years of knowing about this failure, at the time of Hovis's assault, LSU had still not executed an MOU with LSUPD, as recommended by this Audit and required to comply with state law. PLAINTIFFS_000093; BOS-029859; Stewart 107.

55. As to the first bullet, the Audit acknowledged that all employees are required to report a potential incident within 24 hours, with the exception of privileged individuals (confidential advisors, victim advocates, mental health counselors, and clergy). (R. Doc. 1-1, p. 168) The Audit also noted the differing reporting obligations in place for employees who may possess certain professional licenses but who are "not engaged in employment with the University in a capacity offering such privilege," such as a psychologist employed as a professor versus a psychologist employed at the Student Health Center. (R. Doc. 1-1, p. 168) The Audit recommended that management "ensure confidential advisors have been clearly identified and all employees understand the applicability of the exceptions to sexual misconduct reporting obligations." (R. Doc. 1-1, p. 169)

**Qualified**. It is not clear what "first bullet" is being referenced.

56. The Audit did not find that Responsible Employees were not properly trained.

**Qualified**. The Audit found, "Based on interviews and testing performed, it appears that additional procedures may be required to ensure "responsible employees" have been identified and understand their reporting obligations under Title IX." PLAINTIFFS_000241. The Audit also found, "training provided to LSU A&M employees is not monitored" and "The University should also explore learning management systems or other methods to efficiently monitor employee compliance with required annual training." PLAINTIFFS_000242.

57. As to the second bullet, the Audit recommended seeking guidance from the Attorney General's office regarding the applicability of La. R.S. 46:1844, relating to disclosure of a victim's identity who has been subjected to a crime. (R. Doc. 1-1, pp. 168-169) This finding does not relate to responsible employee training in the context of Hovis' case.

**Denied**.  It is not clear what "first bullet" is being referenced, and the second sentence is a legal conclusion, not a fact.

58. University management set forth specific steps it would take to implement the Audit's recommendations, including that management agreed to ensure that "[a]ll Confidential Advisors have received the state created and required training as of October 16, 2017" and to "[w]ork with LSU A&M HRM to consider the option of embedding language recognizing the privilege of employees whose employment duties and licensure afford a confidential privilege." (R. Doc. 1-1, p. 174)

**Admitted**.

## ADDITIONAL FACTS

1. Supplemental Opposing Statement of Material Facts as to Opposition to Motions No. 1-10 is incorporated herein by reference.

2. Plaintiff started at LSU in Fall of 2019 and lived in the Miller Hall dormitory and rushed Kappa Delta sorority. Hovis 14, 17-18.

3. In January 2020, Plaintiff was raped by a quarterback on the LSU football team, John Loe, in his vehicle outside of -one of the bars in the Tigerland neighborhood near LSU.  Hovis 31-44.

4. Back at her dormitory, Plaintiff's resident assistant (RA) called the LSU Police Department; police arrived and told Plaintiff they could not do anything because the rape did not occur on campus. Hovis 52.

5. Neither LSUPD nor Plaintiff's RA made a report to the Title IX office. Hovis 52, 163.

6. Plaintiff's parents learned of the Title IX office and made a report on her behalf and Title IX Coordinator Jennie Stewart contacted Plaintiff. Hovis 52, 64.

7. The case was assigned to LSU's sole investigator for all nine of its campuses, Jeffrey Scott. Hovis 68, Scott 14.

8. During the investigation, Scott inquired into what Plaintiff was wearing that night and asked her to send him a photo of her outfit. Hovis 81.

9. At the time of Loe's suspension, Plaintiff was a freshman and was concerned that she would see him on campus while she was trying to complete her education at LSU because his suspension only lasted one year. Hovis 129, 166.

10. During that entire seven-month period, Plaintiff was uncomfortable with being on campus with Loe, but nothing was done to help her. Hovis 136.

11. After the Title IX office issued a no-contact order, Plaintiff received two separate messages from Loe's girlfriend, as well as messages from an anonymous account that she believed belonged to Loe's girlfriend. Hovis 108.

12. LSU did not initiate any discipline against Loe for these violations of the no-contact order and did not even update Plaintiff on whether they investigated her complaints. Hovis 110-111, 132.

13. After the rape Plaintiff was diagnosed with post-traumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD). Hovis 144-45.

14. It was not until at least five months later that Plaintiff was able to receive these accommodations. Hovis 88-89.

15. Sometimes, Plaintiff's professors simply refused to implement her approved accommodations, such as when Plaintiff was unable to attend her sociology midterm due

15

to her diagnoses and thereafter failed the midterm, and her professor refused to allow her to take it at an alternate time, despite "consideration for absences" being listed within her approved accommodations that semester. Hovis 95.

16. Due to the lack of access to accommodations for her spring semester, Plaintiff even had to hire a private tutor as she was failing a class. Hovis 198.

17. Plaintiff ultimately ended up failing this course anyway due to the lack of access to vital, approved accommodations during the spring semester of 2020. Hovis 92,

18. Following that semester, Plaintiff finally received accommodations in the summer and fall semesters of 2020. Hovis 96.

19. Even when accommodations were provided to Plaintiff, they did little to help her access her education; for example, Plaintiff was a social work major, in which there were few to no exams given, rendering the accommodations of time and a half on exams and reduced test taking environment virtually useless. Hovis 105-06.

20. Plaintiff's accommodation of "consideration of absences" was additionally unhelpful, as there was no guarantee that the "consideration" would be granted by her professors. Hovis 106.

21. Plaintiff's overall grade was based on projects and assignments, rather than exams, yet she received no accommodations that provided support for these critical assignments. Hovis 106.

22. When Plaintiff applied for disability accommodations again on January 20, 2021, she was still "experiencing increased stress and anxiety related to past traumatic incidents in addition to current retraumatization." Hovis 99.

23. However, Disability Services refused to reinstate Plaintiff's accommodations because the Lighthouse Program-- LSU's program designed to assist victims of sexual assault-- had a six-month limitation on access to accommodations. Hovis 101-102.

24. Plaintiff was unable to secure accommodations again until the summer semester of 2021, after having to secure an appointment with an LSU psychiatrist. Hovis 102-103.

25. In the spring semester of 2020, Plaintiff spiraled into a "deep depression," in which it was difficult for her to take care of herself or even get out of bed. Hovis 91.

26. Plaintiff describes Tigerland as "a cluster of bars that all college students go to. It's five of them. . . . right next to campus, like in walking distance . . . every week in sorority we'd have exchanges with one of the fraternities and they're usually—they're held at one of these bars in Tigerland. So that was my first exposure, I guess, to Tigerland." Hovis 19:12-20:19. Plaintiff went to Tigerland once or twice a week during her fall 2019 semester. Hovis 20:10-19.

27. On the night of her rape, Plaintiff had gone to Tigerland with about five of her friends. Hovis 28.

28. John Loe was at one of the Tigerland bars and he was introduced to Hovis as "one of the quarterbacks for LSU." Hovis 31.

29. Hovis does not remember much from that night, but she does recall that John Loe wanted her to go home with him and he eventually led her out to an SUV in the Tigerland parking lot. Hovis 38. Hovis has few memories from inside the SUV; she only recalls vomiting and being physically unable to stand. Hovis 41, 44.

30. In March of 2020, Hovis started taking anti-anxiety and anti-depression medications. Hovis 11.

31. Hovis finds school very hard, and help is difficult to find. Hovis 9.

32. Plaintiff felt that, the night of her sexual assault, the Resident Assistants didn't "really know what to do" either." Hovis 163:18-24.

33. In Plaintiff's perspective, even the counselors at LSU acted with disregard to the trauma she experienced. Hovis 165:2-9.

34. In Spring 2020, Plaintiff had several classes in buildings located within close proximity of the football stadium, which triggered Plaintiff's memory and distress of the incident. Hovis 92:8-20.

35. Plaintiff felt uncomfortable disclosing the sexual assault to her professors at that time, so she depended on Ms. Bareis to help her access her accommodations through Disability Services as her advocate. Hovis 94:13 – 95:18.

36. The Title IX process to longer than Plaintiff ever anticipated, lasting six to seven months. Hovis 129. "Yeah, I thought that this would – I thought it would take maybe two months, two, three months. And then it just continued going and going." Hovis 129:13.

37. Hovis testified, "I'm not comfortable being on campus knowing he's a student here. I just didn't feel like that was taken very seriously." Hovis 136:10.

Respectfully Submitted,

*/s/ Catherine E. Lasky*

| | |
|---|---|
| Karen Truszkowski | Catherine E. Lasky (La. Bar 28652) |
| *Pro Hac Vice* | Endya L. Hash (La. Bar 38260) |
| Temperance Legal Group | Katie Lasky Law |
| 503 Mall Court #131 | 619 Homedale Street |
| Lansing, Michigan 48912 | New Orleans, Louisiana 70124 |
| P: (844) 534-2560 | P: (504) 584-7336 |
| F: (800) 531-6527 | F: (504) 375-2221 |
| karen@temperancelegalgroup.com | katie@katielaskylaw.com |
| | endya@katielaskylaw.com |

>Elizabeth K. Abdnour
>*Pro Hac Vice*
>Abdnour Weiker LLP
>500 E. Michigan Ave., Ste. 130
>Lansing, MI 48912
>(517) 994-1776
>(614) 417-5081
>liz@education-rights.com
>
>*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been served on all parties via counsel of record by electronic mail this 31st day of July 2023.

>*/s/ Elizabeth K. Abdnour*
>Elizabeth K. Abdnour