**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

ABBY OWENS, ET AL.                              CIVIL ACTION

VERSUS                                          NO. 21-242-WBV-SDJ

LOUISIANA STATE UNIVERSITY, ET AL.

<u>**ORDER AND REASONS**</u>

Before the Court is Defendant's Motion for Summary Judgment No. 5: Jade Lewis, filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board of Supervisors").[1] Plaintiffs oppose the Motion,[2] and the Board of Supervisors has filed a Reply.[3] After careful consideration of the parties' memoranda and the applicable law, the Motion is **DENIED.**

**I.    FACTUAL and PROCEDURAL BACKGROUND**[4]

This case involves allegations by ten former students of Louisiana State University and Agricultural and Mechanical College ("LSU") that LSU and its Athletic Department funded and implemented a purposefully deficient sexual misconduct and Title IX reporting scheme separate from LSU's official Title IX office

---

[1] R. Doc. 473. The Court notes that the Board of Supervisors originally filed its Motion for Summary Judgment into the record under seal with the consent of the Court. *See*, R. Docs. 372 & 373. The Court subsequently ordered the Board of Supervisors to file a redacted version of the Motion into the record, which was filed into the record as R. Doc. 473. *See,* R. Doc. 428. Both motions, which are identical, remain pending at this time. The remainder of this Order and Reasons, however, will reference only the redacted version of the Motion, R. Doc. 473.

[2] R. Doc. 484. The Court notes that Plaintiffs originally filed their Opposition brief into the record under seal with the consent of the Court. *See,* R. Docs. 403 & 412. The Court subsequently ordered Plaintiffs to file a redacted version of their Opposition brief into the record, which was filed into the record as R. Doc. 484. *See*, R. Doc. 428. The remainder of this Order and Reasons will refer only to the redacted version of the Opposition brief, R. Doc. 484.

[3] R. Doc. 495.

[4] The factual background of this case was extensively detailed by the Court in several prior Orders (*See,* R. Docs. 317, 319, 321, 323, & 340) and, for the sake of brevity, will not be repeated here.

to keep sexual assault claims within the Athletic Department.[5]  The instant Motion concerns the Title IX heightened risk claims asserted by Jade Lewis against the Board of Supervisors, which survived the Court's March 31, 2023 Order and Reasons granting in part and denying in part the Board of Supervisors' Motion to Dismiss the Second Amended Complaint.[6]

The Court limits its recitation of the facts alleged in the Second Amended Complaint to those alleged by Jade Lewis, the facts asserted by other plaintiffs that she relies on in support of her claims, and the facts set out in the Board's Statement of Undisputed Material Facts that Lewis admits are true in her Opposing Statement of Material Facts.[7]  In the Second Amended Complaint, Plaintiffs allege that Lewis was recruited to LSU from New Zealand in the spring of 2017 for her exceptional tennis skills and that Lewis played for the LSU tennis team.[8]  In January 2017, Lewis began a romantic relationship with John Coe, a highly recruited athlete who played on the LSU football team as a wide receiver from 2016 to 2017 and who had previously dated plaintiff Calise Richardson. [9]  Plaintiffs allege that John Coe soon began physically abusing Lewis the same way he had abused Richardson during their relationship, and that Coe physically assaulted Lewis until she was bruised and bloodied on at least six occasions.[10]  Plaintiffs assert that between May 2017 and

---

[5] R. Doc. 1 at ¶ 10; R. Doc. 22 at ¶ 10; R. Doc. 182 at ¶ 25.

[6] R. Doc. 340.

[7] R. Doc. 473-31; R. Doc. 484-1.  The Board's Undisputed Facts that are admitted by Lewis are Numbers 1, 5-6, 8, 10-12, 14, 16, 22, 48-50, 54-57, 62, 65-67, 70-75, & 97.  Lewis denies or offers qualified responses to all of the Board's other Undisputed Facts.

[8] R. Doc. 182 at ¶¶ 452-455.

[9] *Id*. at ¶ 455; *See*, *Id*. at ¶ 147.

[10] *Id*. at ¶¶ 457-58.

August 2018, one or more of Lewis's teammates on the tennis team reported the assaults to the co-head tennis coach, Julia Sell, and that Sell failed to report any of these witness statements to the police, to LSU's Title IX office, or any other entity, nor did she ask Lewis about them.[11]  Plaintiffs allege that no Title IX investigation was initiated into this incident.[12]

On May 19, 2017, Lewis went to John Coe's apartment to get some of her personal belongings and while she was there, she kicked a hole in Coe's bedroom door and Coe punched her in the stomach.[13]  Plaintiffs allege that Lewis's injuries were so severe that she had to see a team athletic trainer, Donavon White and/or Sean Carter, to manage the pain, and further assert that Lewis disclosed Coe's abuse to White and/or Carter in May 2017.[14]  Plaintiffs allege that one of Lewis's teammates also made a comment to White about John Coe's repeated violent assaults on Lewis the same day that Lewis disclosed the abuse.[15]  Plaintiffs assert that at the time of these disclosures, the LSU Athletic Department had knowledge of John Coe's prior pattern of abuse of Richardson.[16]  Plaintiffs allege that neither White nor Carter reported this

---

[11] *Id*. at ¶¶ 459-60.

[12] *Id*. at ¶ 461.

[13] *Id*. at ¶¶ 462-63.

[14] *Id*. at ¶¶ 464-65.

[15] *Id*. at ¶ 467.

[16] *Id*. at ¶ 468.  Elsewhere in the Second Amended Complaint, Plaintiffs allege that Richardson and John Coe began an on again, off again relationship in the summer of 2016 and that Coe was verbally and physically abusive toward Richardson.  *Id*. at ¶¶ 148-49.  Plaintiffs allege that after a football game in October 2016, Richardson went to J.L.'s bar in Tigerland and that John Coe groped her without her consent and then shoved Richardson to the ground.  *Id*. at ¶¶ 152-55.  Plaintiffs allege that John Coe's teammates had to restrain him from attacking Richardson further, that Coe was kicked out of the bar, that Coe "ran at her" when Richardson left the bar later that night, that his teammates again restrained him, and that Coe appeared uninvited at Richardson's apartment later that night and Richardson had to call his teammates to get him away from her.  *Id*. at ¶¶ 156-58.  Plaintiffs allege that Richardson received a phone call the following day from Sharon Lewis, one of Richardson's supervisors in the LSU recruiting office, regarding the incident with John Coe the night

incident to the police, LSU's Title IX office, or any other entity and that no Title IX investigation was initiated.[17]  Plaintiffs allege that Lewis's father called Mike Sell, one of the LSU tennis coaches, twice in the summer of 2017 and voiced concerns about his daughter's relationship with John Coe.[18]  Plaintiffs assert that during the second call, Lewis's father told Julia Sell that John Coe had punched Lewis in the stomach, and that Julia Sell denied the allegation and did not report the incident to the Title IX office.[19]

John Coe physically assaulted Lewis a second time on April 3, 2018.  On that date, Coe went to Lewis's on-campus apartment to pick up some of his clothing and while at her apartment, Coe became angry with Lewis and punched her in the stomach so hard that he fractured her ribs.[20]  On April 14, 2018, John Coe sent a text message to Verge Ausberry, the Executive Deputy Athletic Director and Executive Director of External Relations for LSU,[21] and admitted to punching Lewis in the stomach.[22]  Plaintiffs allege that Ausberry did not report this incident to the police,

---

before.  *Id*. at ¶ 159.  Plaintiffs further allege that Richardson told Sharon Lewis that John Coe had physically attacked her and that no report was made to the Title IX office and no investigation was ever initiated.  *Id*. at ¶¶ 161-64.  Plaintiffs allege that Richardson met with Lewis and Associate Director of Recruiting Operations, Keava Soil-Cormier, the following week during which Richardson disclosed John Coe's assault of her at the bar that weekend.  *Id*. at ¶¶ 165-66.  Plaintiffs allege that neither Sharon Lewis nor Soil-Cormier ever reported the incident to the Title IX office.  *Id*. at ¶ 173.  Plaintiffs further allege that the week after Richardson found out that John Coe was abusing Jade Lewis, Richardson went to her mentor, Verge Ausberry, in tears and told him about John Coe's abuse.  *Id*. at ¶ 213.  The Court notes that Plaintiffs do not specify the date when Richardson spoke to Ausberry.  Plaintiffs allege that Ausberry stopped Richardson and told her to report the abuse to defendant, Miriam Segar.  *Id*. at ¶ 214.  Plaintiffs assert that Segar called Richardson, but that when Richardson returned the call, Segar never responded.  *Id*. at ¶ 215.

[17] *Id*. at ¶¶ 469-70.
[18] *Id*. at ¶ 471.
[19] *Id*. at ¶¶ 472-74.
[20] *Id*. at ¶¶ 477-78.
[21] *Id*. at ¶ 19.
[22] *Id*. at ¶ 479.  The Court notes that Plaintiffs allege that Ausberry was aware of John Coe's prior pattern of violent abuse of his romantic partners because Richardson had told him about John Coe's

LSU's Title IX office, or to any other entity and that no Title IX investigation was initiated.[23]  On April 25, 2018, Lewis went to LSU's athletic trainers, including White and Senior Athletic Trainer Micki Collins, to get examined because she was still in pain.[24]  Lewis told them and Miriam Segar that John Coe had punched her multiple times over the course of the past year, and Segar reported Coe's abuse of Lewis to the Title IX office the following day.[25]  The case was assigned to Title IX Lead Investigator Jeffrey Scott, who interviewed Lewis on May 21, 2018 and interviewed John Coe on June 5, 2018, during which Coe admitted to punching Lewis in the stomach.[26]  Lewis never received a formal report detailing the findings of the Title IX investigation and alleges that John Coe continued to abuse her soon after Investigator Scott concluded his investigation.[27]

On May 31, 2018, John Coe threatened Lewis via text message, stating that he was "really about to beat [her]," that he "might kill [her]," and that she should "just kill [her]self."[28]  In early to mid-June 2018, Lewis and John Coe got into an argument outside of a bar in Tigerland when Coe refused to return Lewis's belongings.[29]  When Lewis tried to go to her car to leave, John Coe put his hands in her face, slammed her against the car, and was about to hit her again until one of his friends stopped him.[30]

---

abuse (*Id.* at ¶ 480), but as the Court previously noted, Plaintiffs allege that Richardson told Ausberry about her abuse from John Coe *after* Lewis reported her abuse.  *See, Id.* at ¶ 213.
[23] *Id.* at ¶¶ 481-82.
[24] *Id.* at ¶¶ 483-84.
[25] *Id.* at ¶¶ 485-86.
[26] *Id.* at ¶¶ 486-90.  *See, Id.* at ¶ 222.
[27] *Id.* at ¶¶ 494-95.
[28] *Id.* at ¶ 498.
[29] *Id.* at ¶ 499.
[30] *Id.* at ¶ 500.

In early to mid-June 2018, John Coe got angry with Lewis because she waved to a friend while riding in his car, and he threw Lewis's phone out the window.[31]  When Lewis exited the vehicle, John Coe abandoned her.[32]  When John Coe returned and Lewis reentered the vehicle, Coe began strangling her.[33]

In the early morning hours of June 18, 2018, John Coe entered Lewis's apartment while intoxicated, jumped on her while she was sleeping in her bed, and began strangling her.[34]  John Coe then hit Lewis and ripped an earring out of her ear.[35]  Lewis's roommate woke up to Lewis screaming and called the police, who separated Lewis and Coe but did not make an arrest.[36]  Lewis and Coe both told the LSU Police Department ("LSUPD") that it was a verbal argument that had not turned physical.[37]  John Coe's attacks continued to escalate over time, and Lewis feared for her physical safety if she reported him.[38]  John Coe repeatedly told Lewis that if she reported him, his parents would ruin her life by taking her to court, getting her kicked out of school, and having her deported back to New Zealand.[39]  Lewis did not tell LSUPD about the physical attack until two months later because she was afraid of the power football players had on campus and she feared further retaliation and abuse by John Coe.[40]  Later that day, Segar found out about the attack from the

---

[31] *Id.* at ¶¶ 501-02.
[32] *Id.* at ¶ 503.
[33] *Id.* at ¶ 504.
[34] *Id.* at ¶ 505.
[35] *Id.* at ¶ 506.
[36] *Id.* at ¶ 507-08.
[37] *Id.* at ¶ 509.
[38] *Id.* at ¶ 510.
[39] *Id.* at ¶ 511.
[40] *Id.* at ¶ 512.

LSUPD report and made a second report with the Title IX office about John Coe's abuse of Lewis.[41]  LSU subsequently charged John Coe with a potential violation of the Code of Student Conduct and charged Lewis with violating the residential life policy for having a candle in her room when LSUPD came to her apartment the night that John Coe had strangled her.[42]  Plaintiffs allege that Lewis was placed on academic probation on or around June 22, 2018 for violating the policy, while LSU took no disciplinary action against John Coe for physically attacking Lewis.[43]

Jonathan Sanders, the Associate Dean of Students and Director of LSU's Office of Student Advocacy & Accountability, interviewed John Coe and Lewis regarding the June 18, 2018 incident, during which Lewis told Sanders that John Coe had punched her in the past.[44]  Plaintiffs allege that at least three witnesses told Sanders about the full extent of John Coe's abuse of Lewis, including Lewis's roommate, one of Lewis's teammates who had helped cover bruises on Lewis's neck with makeup after one of the assaults, and John Coe's roommate and teammate on the football team who told Sanders he knew about the physical abuse and that assistant football coach Mickey Joseph would call him each week asking if Lewis was at his and Coe's apartment.[45]  Plaintiffs allege that, despite receiving numerous reports of John Coe's repeated attacks on Lewis and Richardson, LSU did not initiate any formal disciplinary action against John Coe other than banning him from the weight room

---

[41] *Id*. at ¶ 513.
[42] *Id*. at ¶¶ 514-15.
[43] *Id*. at ¶ 516.
[44] *Id*. at ¶¶ 22, 518-21.
[45] *Id*. at ¶¶ 523-26.

that summer.[46]  LSU allowed John Coe back into the weight room once the 2018 football season began and he participated in the team's first practice on August 4, 2018.[47]  Plaintiffs allege that John Coe's mother and some of the football coaches made comments to Lewis indicating that they blamed her for John Coe being banned from the weight room.[48]  Plaintiffs allege that when Lewis brought these comments to Segar' attention, Segar told Lewis, "That's what happens when the cops come to your apartment."[49]

In August 2018, Lewis provided Segar with photographs of the bruises and scratches John Coe gave her and the threatening text messages that she received from John Coe, and Segar reported the abuse to LSUPD later that day.[50]  John Coe was arrested the next day and charged with felony dating violence, and was suspended indefinitely from the LSU football team.[51]  Plaintiffs allege that when interviewed by police on August 22, 2018, White, Julia Sell, and Mike Sell falsely stated that they did not learn of John Coe's abuse of Lewis until April 2018 and June 2018, respectively.[52]  The LSUPD arrested John Coe a second time on or around September 16, 2018 after detectives learned he was continuing to physically assault Lewis in violation of court orders.[53]  John Coe withdrew from LSU the following day and in March 2019, Coe pleaded guilty to two counts of battery and one count of

---

[46] *Id.* at ¶ 527.
[47] *Id.* at ¶ 528.
[48] *Id.* at ¶¶ 529-30.
[49] *Id.* at ¶¶ 531-32.
[50] *Id.* at ¶¶ 535-37.
[51] *Id.* at ¶¶ 539-40.
[52] *Id.* at ¶ 541.
[53] *Id.* at ¶ 544.

violating a protective order against Lewis.[54]  LSU expelled John Coe on or around

July 18, 2019 for violating the LSU Code of Student Conduct and the LSU Title IX

Policy.[55]

On April 26, 2021, Lewis, along with nine other plaintiffs, filed suit against the

Board of Supervisors and various LSU officials asserting, among other claims, Title

IX violations.[56]  In the Second Amended Complaint, Lewis asserts the following seven

claims: Count I, Violation of Title IX, Deliberate Indifference to Sex Discrimination

in violation of 20 U.S.C. §§ 1681, *et seq*.; Count II, Violation of Title IX, Hostile

Environment in violation of 20 U.S.C. §§ 1681, *et seq*.; Count III, Violation of Title IX,

Heightened Risk in violation of 20 U.S.C. §§ 1681, *et seq*.; Count IV, Violation of Title

IX, Retaliation by Withholding Protection Otherwise Conferred by Title IX in

violation of 20 U.S.C. §§ 1681, *et seq*.;[57] Count V, First Amendment Retaliation in

violation of 42 U.S.C. § 1983 and the First Amendment;[58] Count VI, Denial of Equal

Protection in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment;[59] and

Count VII, Denial of Substantive and Procedural Due Process in violation of 42 U.S.C.

§ 1983 and the Fourteenth Amendment.[60]

---

[54] *Id*. at ¶¶ 345-46.
[55] *Id*. at ¶ 552.
[56] R. Doc. 1.
[57] Lewis only asserted the claims in Counts I-IV against the Board of Supervisors.  *Id*. at ¶¶ 754-1001.
[58] Lewis only asserted Count V against individually-named defendants in their individual capacities.
*See,* R. Doc. 182 at p. 134.  Those individual defendants were subsequently dismissed from this action.
*See,* R. Docs. 317, 319, 321, & 323.
[59] Lewis only asserted Count VI against individually-named defendants in their individual capacities.
*See,* R. Doc. 182 at p. 142.  Those individual defendants were subsequently dismissed from this action.
*See,* R. Docs. 317, 319, 321, & 323.
[60] Lewis only asserted Count VII against individually-named defendants in their individual capacities.
*See,* R. Doc. 182 at p. 145.  Those individual defendants were subsequently dismissed from this action.
*See,* R. Docs. 317, 319, 321, & 323.

In response to a Motion to Dismiss filed by the Board of Supervisors, the Court dismissed Lewis's deliberate indifference, hostile environment, and retaliation claims against the Board of Supervisors.[61] Thus, the only remaining claim asserted by Lewis against the Board of Supervisors is her heightened risk claim asserted in Count III.

In Count III of the Second Amended Complaint, Plaintiffs allege that the Board of Supervisors created a heightened risk of sex-based discrimination on LSU's campus by mishandling and discouraging reports of sexual assault.[62] Plaintiffs specifically allege that LSU created a heightened risk of sexual misconduct on campus for John Coe's victims, including Lewis, because LSU failed to properly record or investigate Richardson's disclosure of John Coe's dating violence and allowed a known abuser to remain on campus with unfettered access to the student body.[63] Plaintiffs allege that when John Coe and Lewis began a romantic relationship, LSU had knowledge of John Coe's dating violence against Richardson one year prior.[64] Plaintiffs allege that by not offering Lewis any support measures and by failing to open a proper investigation following reports of John Coe's dating violence in May 2017, LSU allowed Lewis to continue to experience a heightened risk of sexual assault by John Coe.[65] Plaintiffs allege that Lewis never received any formal report detailing the findings of the Title IX investigations conducted in May 2018 regarding her

---

[61] R. Doc. 340.
[62] R. Doc. 182 at ¶¶ 917-921.
[63] *Id*. at ¶ 931(b) & (g).
[64] *Id*. at ¶ 931(f).
[65] *Id*. at ¶ 931(h).

allegations of physical abuse by John Coe.[66]  Plaintiffs also allege that no one at LSU

ever offered Lewis any support, resources, accommodations, or interim measures.[67]

   In the instant Motion, the Board of Supervisors argues that it is entitled to

summary judgment on Lewis's perpetrator-based heightened risk claim because

Lewis cannot meet any of the five necessary elements of her claim.[68]  The Board of

Supervisors further asserts that to the extent Lewis has asserted a heightened risk

claim based on LSU's official policy of deliberate indifference to sexual misconduct,

that claim "is unavailable as a matter of law."[69]  The Board of Supervisors also asserts

that Lewis's heightened risk claims are prescribed as a matter of law.[70]  Plaintiffs

argue that genuine issues of material fact preclude summary judgment on both of

Lewis's heightened risk claims, including whether the claims are timely.[71]  In

---

[66] *Id*. at ¶¶ 461, 470, 475, 482, 496, 533.

[67] *Id*. at ¶¶ 312-314.

[68] R. Doc. 473 at ¶¶ 1-2; R. Doc. 473-30 at pp. 10-20.  The Court notes that throughout its Memorandum in Support, the Board of Supervisors repeatedly "adopts by reference" the arguments made in the nine other concurrently-filed motions for summary pertaining to the other nine plaintiffs.  *See, generally*, R. Doc. 473-30.  Further, in its Reply brief, the Board of Supervisors "adopts and incorporates" the arguments and evidence referenced in the Board's nine other reply memoranda.  R. Doc. 495 at p. 1, n.1.  It appears that the Board of Supervisors used this tactic to avoid seeking leave to exceed the page limits applicable to supporting memoranda and reply briefs.  *See*, Local Civil Rule 7(g) of the Local Rules of the United States District Court for the Middle District of Louisiana.  Plaintiffs employ a similar tactic, cross-referencing portions of other opposition briefs they filed in response to the nine other motions for summary judgment filed by the Board of Supervisors, likely as a means to avoid requesting leave to exceed the page limit.  *See, generally*, R. Doc. 484.  The Court looks with extreme disfavor on motions that incorporate other motions, especially after discussing with counsel that it would allow individually filed briefing addressing each plaintiff's claims.  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Ragas v. Tenn. Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc*., 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)) (internal quotation marks omitted).  "Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  The Court discourages both parties from employing such tactics in the future.

[69] R. Doc. 473 at ¶ 3; R. Doc. 473-30 at pp. 20-24.

[70] R. Doc. 473 at ¶ 4; R. Doc. 473-30 at pp. 24-25.

[71] R. Doc. 484.

response, the Board of Supervisors maintains that it is entitled to summary judgment on Lewis's heightened risk claims.[72]

## II.    LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[73]  When assessing whether a dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." [74]   While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[75]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party. [76]  Where, as here, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[77]  The burden then shifts to the nonmoving party who must go beyond the

---

[72] R. Doc. 495.

[73] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

[74] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).

[75] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[76] *Delta & Pine Land Co.*, 530 F.3d at 399 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[77] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[78]

## B. Title IX.

"Congress enacted Title IX in 1972 with two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'"[79]  In line with those objectives, Title IX provides that, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[80]  Title IX is enforceable by private right of action for damages.[81] Through this private right of action, institutions receiving federal funds may be liable for, among other things, student-on-student sexual harassment if: (1) the institution had actual knowledge of the harassment; (2) the harasser was under the institution's control; (3) the harassment was based on the victim's sex; (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit;" and (5) the institution was deliberately indifferent to the harassment.[82]

---

[78] *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (*quoting* Fed. R. Civ. P. 56(e)).

[79] *Roe v. Cypress-Fairbanks Ind. Sch. Dist.*, 53 F.4th 334, 340-341 (5th Cir. 2022) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (alteration in original)).

[80] *Roe*, 53 F.4th at 341 (*quoting* 20 U.S.C. § 1681(a)) (internal quotation marks omitted).

[81] *Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)).

[82] *Roe*, 53 F.4th at 341 (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (alteration in original)) (internal quotation marks omitted).

## III.    ANALYSIS

In their Second Amended Complaint, Plaintiffs allege that the Board of Supervisors created a heightened risk of sexual misconduct on campus for John Coe's victims, including Jade Lewis.[83]  The Court will refer to this as Lewis's perpetrator-based heightened risk claim.  Plaintiffs further allege that the Board of Supervisors' Title IX policies and practices were so deficient that the Board of Supervisors was deliberately indifferent to the risk of Plaintiffs' sexual assault and "cultivated a culture of silence by failing to report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures . . . ."[84]  The Court will refer to this as Lewis's policy-based heightened risk claim.  The Board of Supervisors argues that it is entitled to summary judgment on both claims because a heightened risk claim based on an official policy is "unavailable as a matter of law,"[85] and because Lewis cannot establish the necessary elements of either claim.[86]  The Board of Supervisors also argues that any heightened risk claim is prescribed as a matter of law.[87]

At the outset, the Court rejects as baseless the Board of Supervisors' assertion that a heightened risk claim based upon an official policy is unavailable, as the Supreme Court has implicitly recognized a heightened risk claim based upon an

---

[83] R. Doc. 182 at ¶ 931.
[84] *Id.* at ¶¶ 926-928.
[85] R. Doc. 473 at ¶ 3; R. Doc. 473-30 at pp. 20-24.
[86] R. Doc. 473 at ¶¶ 2 & 3; R. Doc. 473-30 at pp. 10-20.
[87] R. Doc. 473 at ¶ 4; R. Doc. 473-30 at pp. 24-25.

institution's official policy.[88]   Additionally, the Fifth Circuit clearly recognized a policy-based heightened risk claim in *Roe v. Cypress-Fairbanks Independent School District*, although the court ultimately determined that the plaintiff failed to raise a genuine dispute as to the elements of the claim.[89]   The Board of Supervisors acknowledges *Roe*, though it contends that the Fifth Circuit "seemingly recognized" the possibility of a pre-assault heightened risk claim in the context of student-on-student sexual harassment.[90]   The Court agrees with Plaintiffs that *Roe* does not foreclose a policy-based heightened risk claim.[91]   The Court further notes that several district courts in this Circuit, including this one, have recognized a policy-based heightened risk claim.[92]   The Board of Supervisors fails to acknowledge or address

---

[88] *See, Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (distinguishing claims involving an "official policy" of discrimination from those seeking to hold an institution liable for the discriminatory acts of an individual); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (recognizing that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim, but clarifying that "this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute.") (quoting *Franklin v. Gwinnett Cnty. Pub. Schools*, 503 U.S. 60, 74-75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (internal quotation marks omitted)).

[89] 53 F.4th 334, 341-42 (5th Cir. 2022) ("Roe first argues that the district's Title IX policies and practices were so deficient that the District was deliberately indifferent to the risk of her sexual assault. . . . . Relatedly, Roe also argues that the District was deliberately indifferent to the known risk of dating violence and sexual assault at Cypress Creek. . . . [T]hese theories do not suffice under our circuit's binding case law.  Even if Roe is correct that the District failed to appropriately implement its Title IX obligations, she does not connect this failure to the District's knowledge about her in particular. . . . Furthermore, the District's response to other incidents of sexual harassment do not show the District's knowledge of a substantial risk of *Roe's* sexual assault."  The Fifth Circuit explained that, "While genuinely disturbing, neither [argument] shows actual knowledge of Roe's risk of sexual assault.") (emphasis in original).

[90] R. Doc. 473-30 at p. 20 (*citing* R. Doc. 469-14 at pp. 16-20).

[91] R. Doc. 484 at p. 16  (citing R. Doc. 480 at pp. 14-23); R. Doc. 480 at p. 18.

[92] *See, Doe v. Bd. Of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 467 (M.D. La. 2023) ("The recognition of this private right of action has given rise to two general avenues for Title IX claims— one for claims based on an official policy of discrimination and another for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault.") (quoting *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 879 (W.D. Tex. 2019) (internal quotation marks omitted)); *Lozano*, 408 F. Supp. 3d at 882 ("The Court finds that Lozano has plausibly alleged that Baylor's selective enforcement of reports of domestic abuse and sexual assault created a heightened risk of

this authority in its Motion or Reply brief.  To the extent the Board of Supervisors asserts that, "this Court, consistent with *Roe*, likewise referenced a heightened risk framework premised on pre-assault student-on-student conduct in its ruling on the Board's motion to dismiss" and "did **not** find a heightened risk claim existed based on an official policy,"[93] the Board of Supervisors misconstrues the Court's prior ruling, which is not as narrow as the Board contends.

The Court likewise rejects as moot the Board of Supervisors' assertion that Lewis's heightened risk claims are prescribed as a matter of law.[94]  The Court previously determined that Plaintiffs' Title IX heightened risk claims did not accrue until the publication of the Husch Blackwell report in March 2021 and, as such, are timely.[95]  Thus, the only issue before the Court is whether the Board of Supervisors has shown that Lewis cannot meet the elements of her two heightened risk claims. For the reasons set forth below, the Court finds that Lewis has raised a genuine issue of material fact as to each of the elements of her perpetrator-based heightened risk

---

assault, which subjected her to a sexually discriminatory education environment under Title IX. Lozano's heightened risk claim fits squarely within the official-policy rubric previously identified by the Supreme Court."); *Gruver v. La. through Bd. Of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 401 F. Supp. 3d 742, 762 (M.D. La. 2019) ("The Court finds that, as in *Baylor*, if these facts are proven, a jury may infer that LSU's policy created the heightened risk to Greek male students of serious injury or death by hazing, thereby inflicting the injury alleged herein.") (citing *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646 (W.D. Tex. 2017)); *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 783 (W.D. Tex. 2018) (concluding that, "These alleged facts, construed as true, 'raise a right to relief above the speculative level' that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy of discrimination that created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain.") (footnote and citation omitted); *Doe 1*, 240 F. Supp. 3d at 661 ("Plaintiff's heightened-risk claims fit squarely within the official-policy rubric previously identified by the Court, and the Court is satisfied that Plaintiffs have met their burden under Rule 12(b)(6).").

[93] R. Doc. 473-30 at p. 10 (*citing* R. Doc. 469-14 at p. 9-16); R. Doc. 469-14 at p. 10 (emphasis in original).
[94] R. Doc. 473 at ¶ 4; R. Doc. 473-30 at pp. 24-25.
[95] R. Doc. 340 at p. 20 (citing *Doe 1 v. Baylor University*, 240 F. Supp. 3d 646, 663 (W.D. Tex. 2017)).

claim and her official policy-based heightened risk claim and that the Board of Supervisors is, therefore, not entitled to summary judgment.

## A. Lewis's Perpetrator-Based Heightened Risk Claim

### 1. Element one: Whether the Board of Supervisors had actual knowledge of John Coe's prior harassment of Calise Richardson.

The Fifth Circuit has held that the first element, actual knowledge, "means that the school must have actual, not constructive, knowledge of sexual harassment."[96]  "Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a 'substantial risk that sexual abuse would occur.'"[97]  According to the Fifth Circuit, "liability requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[98]  The Fifth Circuit has also held that for a school to have "actual knowledge" of harassment, an "appropriate person" – "an official [with] authority to address the alleged discrimination and to institute corrective measures" – must have actual knowledge of the discrimination and an opportunity to rectify it.[99]

As previously mentioned, Plaintiffs allege in the Second Amended Complaint that Calise Richardson and John Coe began an on-again, off-again relationship in the

---

[96] *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *K.S. v. Nw. Indep. Sch. Dist.*, 689 Fed.Appx. 780, 784 (5th Cir. 2017)).

[97] *Roe*, 53 F.4th at 341 (quoting *M.E. v. Alvin Indep. Sch. Dist.*, 840 Fed.Appx. 773, 775 (5th Cir. 2020)) (internal quotation marks omitted).

[98] *Roe*, 53 F.4th at 341 (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997)).

[99] *Doe v. Edgewood Ind. Sch. Dist.*, 964 F.3d 351, 358-59 (5th Cir. 2020) (quoting *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)).

summer of 2016 and that Coe became verbally and physically abusive toward Richardson.[100]  Plaintiffs allege that in October 2016, after a football game, John Coe groped Richardson without her consent at J.L.'s bar in Tigerland and shoved Richardson to the ground.[101]  Plaintiffs allege that John Coe's teammates restrained him from attacking Richardson further, and that when Richardson left the bar later that night, John Coe "ran at her" and his teammates had to restrain him again.[102]  Plaintiffs allege that later that night, John Coe appeared uninvited at Richardson's apartment and that Richardson had to call Coe's teammates to get him away from her.[103]

Plaintiffs allege that Richardson received a call the next day from Sharon Lewis, one of her direct supervisors in the recruiting office, regarding the incident with John Coe the night before.[104]  Plaintiffs allege that Richardson told Sharon Lewis that John Coe had physically attacked her, and that Richardson agreed to meet with Sharon Lewis and Associate Director of Recruiting Operations, Keava Soil-Cormier, the following week.[105]  Plaintiffs allege that Richardson disclosed John Coe's assault at the bar that weekend to Sharon Lewis and Soil-Cormier during that meeting and that they minimized her experience by stating that they could call the police if Richardson felt like this was "big enough to ruin John Coe's career at LSU."[106]  Plaintiffs assert that when Richardson told Sharon Lewis and Soil-Cormier that she

---

[100] R. Doc. 182 at ¶¶ 148-49.
[101] *Id*. at ¶¶ 152-155.
[102] *Id*. at ¶¶ 156-157.
[103] *Id*. at ¶ 158.
[104] *Id*. at ¶ 159.
[105] *Id*. at ¶¶ 161-65.
[106] *Id*. at ¶ 167.

was afraid of John Coe because he had stalked her and tried to attack her at her housing complex, they laughed at her and mocked her for being afraid of him.[107] Plaintiffs allege that Sharon Lewis and Soil-Cormier never offered Richardson resources, counseling, support services, or asked if she felt safe, and that they never reported the incident to the Title IX office.[108]

The Board of Supervisors concedes in its Motion that when Jade Lewis and John Coe began their relationship in January 2017, Sharon Lewis and Soil-Cormier knew about a prior incident between Calise Richardson and John Coe that occurred at an off-campus bar.[109]  The Board, however, claims that Richardson's version of events varies from saying that John Coe threw a drink at her to saying that Coe pushed her to the ground, and further claims that Richardson testified that she cannot specifically remember what she told Sharon Lewis and Soil-Cormier had happened.[110]  The Board of Supervisors argues that Sharon Lewis and Soil-Cormier did not perceive Richardson to be making a claim of physical abuse by John Coe during that meeting and, as such, LSU did not have actual knowledge of a substantial risk that John Coe would engage in domestic violence against Jade Lewis.[111] Plaintiffs assert that a genuine issue of material fact exists as to whether the Board of Supervisors had actual knowledge that a substantial risk of sexual abuse would occur, relying exclusively upon arguments made in their Opposition to the Board's

---

[107] *Id*. at ¶¶ 168-69.
[108] *Id*. at ¶¶ 172-73.
[109] R. Doc. 473-30 at p. 11.  *See,* R. Doc. 473-31 at ¶ 76.
[110] R. Doc. 473-30 at p. 11 (*citing* R. Doc. 473-12 at pp. 2, 4, 5, 6, & 7).
[111] R. Doc. 473-30 at p. 11 (*citing* R. Doc. 473-9 at pp. 2, 3-4 & R. Doc. 473-10 at pp. 2-3).

motion for summary judgment regarding Samantha Brennan's heightened risk claims.[112]  In the portion of the Opposition brief cited by Plaintiffs, Plaintiffs assert that LSU had actual knowledge of John Coe's threat to the LSU campus in 2016 when he attacked Richardson in J.L.'s bar.[113]

The evidence before the Court clearly raises a genuine dispute regarding whether the Board of Supervisors had actual knowledge of John Coe's assault of Richardson in October 2016, only months before John Coe physically assaulted Lewis on May 19, 2017 by punching her in the stomach.  Indeed, the Board of Supervisors concedes that it was aware of Coe's "prior misconduct" as of January 2017 when Lewis and Coe's relationship began.[114]  The Court further finds that this fact is material to Lewis's perpetrator-based heightened risk claim. Specifically, Richardson repeatedly testified that John Coe groped her and pushed her to the ground in J.L.'s bar and that she told Sharon Lewis and Soil-Cormier "what had happened" when she met with them to discuss the incident a week later.[115]  Upon further questioning, Richardson clarified that she told Sharon Lewis and Soil-Cormier "all of the details" that she had given during her deposition.[116]  Richardson also testified that when she told Sharon Lewis and Soil-Cormier what had happened, they told her that they would help her file a police report if she felt that this was "big enough to ruin his life."[117]  Soil-Cormier denies that she or Sharon Lewis made that

---

[112] R. Doc. 484 at p. 20 (*citing* R. Doc. 481 at pp. 7-9).
[113] R. Doc. 481 at pp. 8-9.
[114] R. Doc. 473-31 at pp. 12-13.
[115] R. Doc. 473-12 at pp. 2, 3-4, 5, 6.
[116] *Id*. at p. 4.
[117] *Id*. at p. 5.

statement to Jade Lewis.[118]  Richardson further testified that Sharon Lewis told her

that because there was no physical altercation or sexual assault "this was the way

athletics handle [sic] things."[119]  In its Statement of Undisputed Material Facts, the

Board of Supervisors confirms that Richardson advised Lewis and Soil-Cormier

"exactly what . . . happened that night," but claim that Lewis and Soil-Cormier "did

not perceive Richardson to be making a claim of physical abuse by Coe."[120]

The deposition testimony of Sharon Lewis and Soil-Cormier contradict

Richardson's testimony.  Sharon Lewis denied that Richardson told her and Soil-

Cormier that she was scared of John Coe, and further testified that Richardson

"laughed because she thought it was funny that she threw the drink" at John Coe.[121]

Soil-Cormier similarly testified that she did not recall any employees reporting to her

that they were being sexually harassed, including Richardson, and that she did not

---

[118] R. Doc. 473-10 at p. 3.

[119] R. Doc. 473-12 at p. 6.  The Court is also aware of additional evidence in the record, namely the Husch Blackwell report, which supports Richardson's testimony.  The report mentions that during an October 2018 Title IX investigation of allegations that Sharon Lewis failed to report Title IX violations concerning Calise Richardson, Sharon Lewis said during "her Title IX interview" that, "'because [there was] no physical altercation or sexual assault,' she let [Craig] handle' the situation because 'this was the way athletics handled things.'"  *See*, R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13 (*citing* R. Doc. 483-28)); R. Doc. 483-28 at p. 62.  According to the report, "Craig" is Dameyune Craig, John Coe's position coach on the LSU football team.  *Id.* at pp. 59 & 62.  The Court notes that Plaintiffs in their Opposition brief (R. Doc. 484 at p. 1) "incorporate by reference" factual allegations regarding "The Board's mismanagement of sexual misconduct at LSU" set forth in another opposition brief filed in response to the Board's Motion for Summary Judgment as to Samantha Brennan's claims.  R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13).  That portion of the other opposition brief cites to portions of a complete copy of the March 3, 2021 Husch Blackwell report that Plaintiffs filed in support of that opposition brief.  *See*, R. Doc. 483 at pp. 2-13 (*citing* R. Doc. 483-28).

[120] R. Doc. 473-31 at p. 13.

[121] R. Doc. 473-9 at pp. 3-4.  The Court is also aware of additional evidence in the record, namely the Husch Blackwell report, which supports Sharon Lewis's testimony.  The report mentions that Sharon Lewis and Soil-Cormier "adamantly deny" that Richardson told them she was scared of John Coe or that they laughed when she asked for help.  R. Doc. 483-28 at p. 60.  The report further states that, "A third party interviewed as part of this review and who witnessed this meeting [between Richardson, Sharon Lewis, and Soil-Cormier] also sides with Lewis and Soil-Cormier and said Complainant 1 did not say she feared for her safety."  *Id.*

get the sense that John Coe "had done anything to abuse Calise Richardson" during Richardson's meeting with Soil-Cormier and Sharon Lewis.[122]

The Court finds that a reasonable juror could review this evidence and conclude that LSU had actual notice of Richardson's harassment by John Coe in October 2016 when Richardson met with Sharon Lewis and Soil-Cormier to discuss the incident that occurred at J.L.'s bar. The Court notes that the Board of Supervisors asserts, in a footnote in its Motion, that it cannot be held liable because neither Sharon Lewis nor Soil-Cormier meet the definition of "appropriate persons" who have the authority to take corrective action regarding harassment.[123] The Board emphasizes that, "The obligation to report harassing conduct **does not** qualify an employee as having the ability to take corrective action."[124] The Board of Supervisors' position, however, ignores LSU's Title IX Policy, which defines a "Responsible Person" as, "Any employee who has the authority to take action to redress sexual violence *or who has been given the duty of reporting incidents of sexual violence or any other misconduct prohibited by this policy by students or employees to the Title IX coordinator or other appropriate school designee*."[125] While the Board does not allege any additional facts to support its position that Sharon Lewis and Soil-Cormier are not "Responsible Persons" under LSU's Title IX Policy, the Court finds that the Board has highlighted another fact that is both disputed and material to the actual knowledge element of Lewis's heightened risk claim. This is because Plaintiffs allege

---

[122] R. Doc. 473-10 at pp. 2-3.
[123] R. Doc. 473-30 at p. 11, n.14.
[124] *Id*. (emphasis in original).
[125] R. Doc. 473-4 at p. 6 (emphasis added); R. Doc. 484-56 (emphasis added).

in their Second Amended Complaint that Sharon Lewis and Soil-Cormier are both "Responsible Employees" who are required to notify the Title IX Campus Coordinator of sexual misconduct under LSU's Title IX Policy. [126]  It is not lost on the Court that the Board of Supervisors, in its Statement of Uncontested Material Facts, further advises that, "In the case of Plaintiff Brennan, Sharon Lewis was quick to report sexual misconduct," seemingly conceding that Sharon Lewis believed she was required to report such misconduct.[127]  The Court finds that a reasonable juror, after reviewing and weighing the evidence, could conclude that Sharon Lewis and Soil-Cormier are both Responsible Employees under LSU's Title IX Policy.

Based upon the foregoing evidence, the Court finds that Plaintiffs have raised a genuine dispute regarding whether the Board of Supervisors had actual knowledge, through Sharon Lewis and Soil-Cormier, of John Coe's alleged physical harassment of Richardson in October 2016, prior to John Coe's physical assault of Jade Lewis in April 2017.  The Court further finds that this fact is material to the outcome of Lewis's perpetrator-based heightened risk claim.  As such, the Board is not entitled to summary judgment on the basis that Lewis cannot satisfy the first element of her perpetrator-based heightened risk claim.[128]

---

[126] R. Doc. 182 at ¶¶ 33-34, 161-162, 191, 193-95, 197, 782, 868, & 876.  The Court is also aware of additional evidence in the record, namely the Husch Blackwell report, which concluded that when John Coe advised his position coach, Dameyune Craig, that Richardson had thrown a drink on him at J.L.'s bar and Craig advised Sharon Lewis of the incident, "even this version of the report triggered an obligation under then-existing Athletics policy for Craig to notify Segar of this incident.  Segar says she never was notified about it and we have been unable to locate any University records suggesting Craig made a report."  R. Doc. 483-28 at p. 59.

[127] R. Doc. 473-31 at p. 15.

[128] Because the Court finds that a genuine issue of material fact exists as to whether the Board of Supervisors had actual knowledge of John Coe's harassment of Richardson in October 2016, the Court

2. **Element two:  Whether the Board of Supervisors exercised substantial control over John Coe and the context in which the harassment of Lewis occurred.**

To satisfy the second element of her heightened risk claim, Lewis must show that the Board of Supervisors "exercises substantial control over both the harasser and the context in which the known harassment occurs."[129]  Citing Fifth Circuit authority, the Board of Supervisors argues that Lewis cannot show that the Board exercised substantial control over John Coe in the context of "Coe's many off-campus assaults other than perhaps the one on-campus assault at Lewis' dorm in June 2018, which assault Lewis repeatedly denied occurred to the police, Title IX, SAA, and Segar."[130]  The Board of Supervisors further asserts that LSU  lacked substantial control over the conduct that occurred off-campus that had no relation to university activities.[131]  The Board notes that, "Although LSU investigated Lewis' off-campus incidents as potential violations of PM-73, PM-73 encompasses broader conduct than Title IX."[132]  The Board also asserts that once John Coe withdrew from LSU in September 2018, LSU had no control over Coe or his off-campus conduct because he was no longer a student.[133]  The Board claims that, although it learned of some other possible injuries to Lewis after John Coe withdrew, "liability cannot attach to these instances."[134]

---

need not address the Board's arguments regarding whether Lewis can establish actual knowledge of John Coe's harassment in May 2017.  R. Doc. 473-30 at pp. 12-14.

[129] *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 644-45, 119 S.Ct. 1661, 1672, 143 L.Ed.2d 839 (1999).

[130] R. Doc. 473-30 at p. 14.  *See,* R. Doc. 473-31 at ¶ 25.

[131] R. Doc. 473-30 at p. 14.

[132] *Id*. at n. 23.

[133] *Id*. at p. 15.

[134] *Id*.

Plaintiffs assert that a genuine issue of material fact exists as to whether John Coe was under the Board of Supervisors' control at the time of the harassment, relying exclusively upon arguments made earlier in the Opposition brief regarding Lewis's policy-based heightened risk claim.[135]   With respect to her other claim, Plaintiffs assert that there is no dispute that when most of the incidents involving Lewis and John Coe occurred, Coe was a student athlete at LSU and was allowed to remain on the football team until his second arrest in July 2019.[136]   Plaintiffs argue that the 2017 and early 2018 incidents occurred on-campus and in an area near campus that students experience as part of "University life."[137]   Plaintiffs contend that John Coe's off-campus harassment of Lewis posed a direct threat to students' educations and the university environment.[138]

Plaintiffs also claim that as a scholarship athlete, John Coe received benefits from LSU that allowed him to reside off campus, but did not make him immune from the university's control.   Plaintiffs point out that the Board investigated John Coe's conduct and sanctioned him following his first arrest, and argue that these facts alone could allow a jury to determine that LSU exercised substantial control over Coe's conduct.[139]   Plaintiffs also assert that there is no dispute that the Board held

---

[135] R. Doc. 484 at p. 20 (*citing* "Section III.D.3. [sic] above, incorporated herein by reference").  This appears to be a reference to Section III.A.3, wherein Plaintiffs address whether the heightened risk posed by John Coe occurred in a context subject to the Board's control.  *See,* R. Doc. 484 at pp.17-19.

[136] R. Doc. 484 at p. 17.  The Court notes that in the Second Amended Complaint and in their Statement of Material Facts, Plaintiffs assert that John Coe was suspended from the football team after his arrest on August 17, 2018.  *See,* R. Doc. 182 at ¶¶ 535-40; R. Doc. 484-4 at p. 20.

[137] R. Doc. 484 at p. 17 (*citing* R. Doc. 484-41 at pp. 19, 22, 24, & 33; *C.R. ex rel. Rainville v. Eugene Sch. Dist. 4J*, 835 F.3d 1142 (9th Cir. 2016)).

[138] R. Doc. 484 at p. 18 (citing authority).

[139] *Id.*

authority to discipline Coe and that the suspension of Coe's weight room privileges, his suspension from the football team, and LSU's ordering Coe to attend counseling sessions are sufficient for a jury to determine that LSU exercised substantial control over Coe.[140]  Plaintiffs argue that there can be no dispute that LSU had authority over student participation its Athletic Department, the broader school environment, the conduct of student athletes, their living arrangements and supervision, participation in its educational opportunities, disciplinary record keeping practices, LSUPD, Title IX office resources, and overall student enrollment, and that LSU had the power to investigate and discipline John Coe's repetitive abuse of Lewis and his prior victims within each of these contexts.[141]  According to Plaintiffs, this authority gave LSU the significant power to influence the risk of sexual harassment of its students within the environment, indicating control over the context of the harassment.[142] In its Statement of Undisputed Material Facts, the Board of Supervisors acknowledges its disciplinary authority over Coe, conceding in several instances that it exercised such authority even while Coe lived off-campus.[143]

The Court agrees with Plaintiffs that the evidence of record shows that a genuine issue of material fact exists as to whether the Board of Supervisors exercised substantial control over John Coe and the context of his harassment of Lewis. Specifically, the parties dispute whether John Coe's apartment was on-campus or off-campus at the time of the May 19, 2017 incident, during which John Coe punched

---

[140] *Id.*
[141] *Id.* at p. 19.
[142] *Id.*
[143] R. Doc. 473-31 at ¶¶ 29-31, 40-42, 44, 46, 52, 56, and 59.

Lewis in the stomach when she was at his apartment.  The Board seems to assert that the only on-campus assault occurred "at Lewis' dorm in June 2018,"[144] but the Board's Statement of Undisputed Material Facts is silent as to the location of Coe's apartment on May 19, 2017.[145]  Plaintiffs, on the other hand, assert that the 2017 incident occurred on campus, but they cite Lewis's deposition testimony in which she seems to say that he lived in an off-campus apartment complex.[146]  Thus, there is a genuine dispute between the parties regarding whether John Coe's first assault of Lewis occurred on or off-campus.  The Court finds the location of the May 19, 2017 incident material to the outcome of the control element of Lewis's heightened risk claim.  As such, the Board is not entitled to summary judgment on the basis that Lewis cannot satisfy the control element.

The Court further finds that, even if the May 19, 2017 incident occurred at John Coe's off-campus apartment, an assault that occurs off-campus may satisfy the control element of a heightened risk claim.  The Supreme Court has made clear that, "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority."[147]  Further, the Court in *Davis* took pains to define terms and phrases in Title IX, including "under the operations of a funding recipient" and "the

---

[144] R. Doc. 473-30 at p. 14.
[145] R. Doc. 473-31 at p. 2.
[146] R. Doc. 484 at p. 17 (*citing* R. Doc. 484-41 at p. 19) ("The first time, he punched me in the stomach in his apartment at The Standard opposite of [West Campus Apartments], 2017, April or May.").
[147] *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 646-47, 119 S.Ct. 1661, 1673, 14 L.Ed.2d 839 (1999).

harassment must take place in a context subject to the school district's control."[148] The Court further noted that Webster's Third New International Dictionary defines "under" as "in or into a condition of subjection, regulation, or subordination," and that Random House Dictionary defines "under" as "subject to the authority, direction, or supervision of."[149]

Here, Plaintiffs have gone beyond the pleadings and have provided the Court with a copy of LSU's Code of Student Conduct, which states that, "The University shall have discretion to extend jurisdiction over conduct that occurs off campus when the conduct adversely and significantly affects the learning environment or University community and would be in violation of the Code if the conduct had occurred on campus…," and when the alleged conduct involves "members of the University community . . . ."[150]  The Code of Student Conduct also defines "campus" broadly to include "all land, buildings, property, and facilities in the possession of, owned by, used by, or controlled by the University," as well as "land leased to others, property owned, managed or maintained by the University, and all streets, alleys, sidewalks, and public ways adjacent to any land of the University or the land upon which housing is located even if the housing is not owned by the University."[151]  The Court has also been provided with LSU's Title IX and Sexual Misconduct Policy,

---

[148] 526 U.S. at 644-647, 119 S.Ct. at 1672-73.
[149] 526 U.S. at 645, 119 S.Ct. at 1672.
[150] R. Doc. 484 at p. 17 (*citing* R. Doc. 481 at pp. 9-16); R. Doc. 481 at pp. 11 & 13 (*citing* R. Doc. 481-4 & R. Doc. 481-4 at p. 7).
[151] R. Doc. 481-4 at p. 4.

effective December 15, 2015, which states:

> This policy shall apply to conduct that occurs on an LSU campus, at LSU sponsored activities, and/or when the student or employee is representing LSU.  LSU shall have discretion to extend jurisdiction over conduct that occurs off campus when the conduct adversely or significantly affects the learning environment or LSU community and would be a violation of this policy and/or any applicable campus policy or code of conduct, if the conduct had occurred on campus. . . LSU may extend jurisdiction (over off-campus conduct) if the alleged conduct by the student or employee:
>> 1. Involved violence or produced a reasonable fear of physical harm; and/or
>> 2. Involved any other members of the LSU community or any academic work, records, documents, or property of LSU.[152]

While the Board of Supervisors asserts that Plaintiffs' position that disciplinary authority equates to "control" conflicts with the Supreme Court's holding in *Davis*, the Board does not contest Plaintiffs' assertion that the Board had disciplinary authority over John Coe as a student and a student-athlete.[153]  Moreover, the Board's own Statement of Undisputed Material Facts makes clear that LSU exercised substantial disciplinary authority over John Coe when it banned Coe from the weight room and suspended him indefinitely from the football team after his arrest in August 2018.[154]

Without clear guidance from the Fifth Circuit regarding whether an assault that occurs off-campus can satisfy the control element, the Court looks to decisions from district courts in this Circuit, which have found that off-campus rape and assault "*is* actionable, particularly when the university is actually aware of prior

---

[152] R. Doc. 473-4 at p. 4.
[153] *See*, R. Doc. 495 at p. 7.
[154] R. Doc. 473-31 at p. 8 (*citing* R. Doc. 473-3 at pp. 10, 18).

assaults by the *same* student-attacker."[155]   While those cases were in a different posture than the instant matter, as they involved motions to dismiss rather than motions for summary judgment, the Court nonetheless finds them persuasive.   Here, the Court has found that a genuine dispute exists as to whether the Board had actual knowledge of John Coe's physical harassment of Richardson at the time John Coe physically abused Lewis in May 2017.   As such, the Court finds that Plaintiffs have raised a genuine issue of material fact regarding whether the Board of Supervisors exercised substantial control over both John Coe and the context in which his physical assaults of Lewis occurred based upon LSU's Title IX Policy and the Code of Student Conduct.   Accordingly, the Board of Supervisors is not entitled to summary judgment on the basis that Plaintiffs cannot establish the control element of Lewis's perpetrator-based heightened risk claim.

### 3.   Element three: Whether the harassment was based upon Lewis's sex.

The third element of a heightened risk claim is whether the harassment was based on the victim's sex.[156]   The Board of Supervisors argues that the conduct at issue does not fall within the purview of Title IX because it does not involve a sexual

---

[155] *Doe v. Bd. Of Supervisors of Univ. of La. System*, 650 F. Supp. 3d 452, 468 (M.D. La. 2023) (emphasis in original) (citing *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 610-12 (W.D. Tex. 2017) (student-plaintiff stated actionable heightened risk *and* post-reporting claims based on sexual assault that occurred at 'an off-campus party,' where the university knew of prior reports of sexual assault committed by the same student-attacker); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 883 (W.D. Tex. 2019) (actionable Title IX claims based on assaults occurring at off-campus apartment and a restaurant parking lot); *Doe I v. Baylor Univ.*, 240 F. Supp. 3d 646, 654 (W.D. Tex. 2017) (actionable Title IX claims based on sexual assault occurring "at a house near campus")).

[156] *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F. 4th 334, 341 (5th Cir. 2022) (citing *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011)).   *See, Doe*, 650 F. Supp. 3d at 468 ("Despite their differences, the same elements define Plaintiff's heightened-risk claim and her post reporting claim.   *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341-42 (5th Cir. 2022).").

assault, and instead involves only physical violence.[157]  The Board of Supervisors asserts that domestic violence is not inherently sexual, and that while domestic violence may be motivated, at least in part, by a victim's sex, it can also be motivated by other reasons, including personal animus or jealousy.[158]  The Board emphasizes that Lewis admitted that she never reported sexual abuse to LSU, and only reported physical abuse.[159]  The Board also notes that the Department of Education's 2020 regulations now include "dating violence" in the definition of sexual harassment, and that the Department of Education made clear that the regulations are not to be applied retroactively.[160]

Plaintiffs argue that the Board of Supervisors' position is "unfounded," as both jurisprudence and federal regulations establish that dating violence is sex-based.[161] Plaintiffs point out that recently published federal regulations promulgated under Title IX expressly include "dating violence" and "domestic violence" within the definition of sex-based harassment,[162] and that LSU's own 2015 Title IX Policy defined "sexual misconduct" to include "dating violence, domestic violence and stalking."[163]  Plaintiffs assert that for the Board of Supervisors to now claim that

---

[157] R. Doc. 473-30 at p. 15.

[158] *Id*.

[159] *Id*. (*citing* R. Doc. 473-3 at p. 33).

[160] R. Doc. 473-30 at p. 15, n.29 (*citing* 34 CFR § 106.31; United States Dep't of Educ., Office for Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment*, p. 10 (July 2021) (updated June 28, 2022) https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf).

[161] R. Doc. 484 at p. 21.

[162] *Id*. at pp. 21-22 (*citing* 34 C.F.R. § 106.30(a)(3) (2020)).

[163] R. Doc. 484 at p. 22 (*citing* R. Doc. 484-32 & R. Doc. 484-65 at p. 1).

John Coe's physical abuse of Lewis is insufficient to state a claim under Title IX is disingenuous and contrary to its own institutional policies.[164]

Plaintiffs further assert that courts look at the totality of circumstances to determine whether the conduct is sex-based and infer discriminatory motivation from evidence such as gender-specific epithets, acts that perpetuate stereotypes of women, and patterns of abusive conduct, including physical and sexual assaults.[165] Citing out-of-circuit authority, Plaintiffs claim that even when personal animosity or jealousy is a motivating factor in the harasser's conduct, the harassment can also be motivated by the victim's sex, as the two motives are not mutually exclusive.[166] Plaintiffs assert that whether there is sex-based bias depends on the nature of the conduct, not the nature of the relationship between a victim and her harasser.[167] Plaintiffs claim that John Coe gave Lewis rules that she had to follow in their relationship and that it was no secret that she had to obey him.[168] Plaintiffs also dispute the Board's assertion that there is no dispute regarding whether John Coe sexually assaulted Lewis, and further assert that Lewis testified that there were times that she may have had sex with John Coe due to fear of retaliation.[169]

The Court agrees with Plaintiffs and finds disingenuous the Board's assertion that John Coe's physical abuse of Lewis is not actionable under Title IX solely because

---

[164] R. Doc. 484 at p. 22.
[165] *Id.* (citing authority).
[166] *Id.* at pp. 22-23 (citing authority).
[167] *Id.* at p. 23 (citing *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229-30 (1st Cir. 2007); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 433 (E.D.N.Y. 2009)).
[168] R. Doc. 484 at p. 23 (*citing* R. Doc. 484-41 at p. 8).
[169] R. Doc. 484 at p. 24 (*citing* R. Doc. 484-41 at p. 15).

Lewis never reported sexual abuse.[170]  The Board's position clearly contradicts LSU's Title IX and Sexual Misconduct Policy, effective December 15, 2015, which expressly states that:

> In accordance with Title IX and other applicable law, Louisiana State University ("LSU") is committed to providing a learning, working, and living environment that promotes integrity, civility, and mutual respect in an environment free of discrimination on the basis of sex and sexual misconduct which include sexual assault, sexual harassment, dating violence, domestic violence, stalking and retaliation.[171]

The policy also defines "Sexual Misconduct" to include "dating violence, domestic violence and stalking."[172]  Thus, LSU's Title IX Policy did not limit Title IX reports or LSU's Title IX obligations to allegations of sexual harassment and specifically covered allegations of domestic violence.  The foregoing policy language indicates that the Board viewed allegations of dating violence and domestic violence as within the purview of Title IX in 2015.

The Board correctly notes, however, that as of August 14, 2020, the Code of Federal Regulations now defines the term "sexual harassment" to include sexual assault, dating violence, domestic violence, and stalking,[173] and that the regulation does not seem to apply retroactively.[174]  Nevertheless, that does not end the Court's analysis.  Instead, the Court must determine whether John Coe's physical harassment of Lewis was based upon her sex.

---

[170] R. Doc. 473-30 at p. 15; R. Doc. 473-31 at p. 1.
[171] R. Doc. 473-4 at p. 3.
[172] *Id.* at p. 4.
[173] 34 C.F.R. § 106.30 (2020).
[174] 85 FR 30026-01, 2020 WL 2525707 at n.290 (May 19, 2020).

Both parties recognize that domestic violence can be motivated by the victim's sex.[175] While the Board seems to take the position that the domestic violence in this case was not based on Lewis's sex, it has offered no evidence to suggest that it was based on something else, like a personal animus or jealousy. Instead, the Board of Supervisors acknowledges in its Statement of Undisputed Material Facts that, "According to Lewis, Coe was manipulative and controlling, and he became physically abusive" following their initiation of a sexual relationship.[176] Moreover, the cases cited by the Board to support its conclusion that physical abuse is not covered by Title IX are distinguishable. In *Sanches v. Carrollton-Farmers Branch Independent School District*, the only Fifth Circuit case cited by the Board, the Fifth Circuit concluded that a female high schooler's conduct in referring to another female student as a "ho," spreading rumors about the other student, and slapping the other student's buttock as she walked by was not sexual harassment because the conduct was not based on the student's sex.[177] The Fifth Circuit found nothing in the record to suggest that the student was motivated by anything other than personal animus, and concluded that her conduct "is more properly described as teasing or bullying than as sexual harassment."[178] Unlike *Sanches,* the physical abuse that occurred in this case is not akin to "teasing or bullying." There is no dispute that John Coe punched Lewis in the stomach on several occasions, and even fractured her ribs by doing so, all within and during their sexual and dating relationship.

---

[175] R. Doc. 473-30 at p. 15; R. Doc. 484 at pp. 22-23.
[176] R. Doc. 473-31 at p. 1-2.
[177] 647 F.3d 156, 162, 165-66 (5th Cir. 2011).
[178] *Id*. at 165-66.

In contrast, Plaintiffs have put forth evidence, namely Lewis's deposition testimony, which indicates that the physical abuse was based upon her sex. Lewis testified that there were certain rules that John Coe wanted her to abide by,[179] and she gave conflicting testimony regarding whether Coe sexually assaulted her.[180] Lewis also testified that when she went to John Coe's apartment on May 19, 2017 to get some of her things, John Coe was "a bit rude," he "got mad and told me to leave," and then "he opened the door and just punched me as hard as he could."[181] Lewis also testified that on April 3, 2018, John Coe was mad at her for going to a bar with some friends and another football player and he went to her apartment to get some shirts "And punched me in the stomach again."[182] Lewis stated that, "He came over. He was walking out the door. I grabbed him, like, from his back to turn him around, and then he punched me in the stomach."[183] This testimony raises a genuine dispute regarding whether John Coe's physical abuse of Lewis was based upon her sex. It further raises a credibility question for the jury to determine whether it believes Lewis's testimony. The Court further finds that this fact is material to the outcome of Lewis's perpetrator-based heightened risk claim. Accordingly, the Motion is denied to the extent the Board seeks summary judgment on the basis that Lewis cannot show that John Coe's harassment of her was based upon her sex.

---

[179] R. Doc. 473-1 at pp. 7-8.
[180] *Id*. at pp. 8-9; R. Doc. 473-3 at pp. 17 & 33.
[181] R. Doc. 473-1 at pp. 11-12.
[182] *Id*. at pp. 13-14.
[183] *Id*. at p. 14.

**4. Element four: Whether the harassment was "so severe, pervasive, and objectively offensive" that it effectively barred Lewis access to an educational opportunity or benefit.**

The Supreme Court has concluded that a defendant can be held liable for damages under Title IX "only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."[184]  The Supreme Court has also suggested, without deciding, that a single instance of sufficiently severe one-on-one peer harassment is unlikely to satisfy the "severe, pervasive, and objectively offensive" standard.[185]  Nonetheless, the Fifth Circuit in *Roe v. Cypress-Fairbanks Independent School District* recognized a circuit split regarding whether a single instance of sufficiently severe one-on-one peer harassment could ever rise to the level of "pervasive" harassment.[186]  The Fifth Circuit pointed out that while three circuits have held that "pervasive" student-on-student harassment for Title IX purposes requires multiple incidents of harassment,[187] four circuits have held that students must demonstrate only that a school's deliberate indifference made harassment more likely, not that it actually led to any additional post-notice incidents of harassment.[188]

---

[184] *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 650, 119 S.Ct. 1661, 1675, 143 L.Ed.2d 839 (1999); *See, Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 342 (5th Cir. 2022) (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011)) (same).

[185] *Davis*, 526 U.S. at 652-53, 119 S.Ct. at 1676.

[186] *Roe*, 53 F.4th at 342 (citing *Davis*, 526 U.S. at 652-53, 119 S.Ct. 1661).

[187] *Roe*, 53 F.4th at 342-43 (citing *Kollaritsch v. Mich. Stat Univ. Bd. Of Trustees*, 944 F.3d 613, 620 (6th Cir. 2019); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)).

[188] *Roe*, 53 F.4th at 343 (citing *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 275 (4th Cir. 2021); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1108 (10th Cir. 2019); *Fitzgerald v. Barnstable Sch. Comm.*, 504

Without weighing-in on the circuit split, the Fifth Circuit in *Roe* concluded that a reasonable jury could conclude that the harassment experienced by the plaintiff in its case was pervasive "no matter on which side of the circuit split we fall."[189]

The Board of Supervisors argues that Lewis cannot satisfy the fourth element of her perpetrator-based heightened risk claim because she cannot show a deprivation of educational benefits.[190] The Board makes no argument regarding whether John Coe's harassment of Lewis was sufficiently severe, pervasive, and objectively offensive to satisfy the fourth element. Instead, the Board asserts that Lewis only claims that she was deprived of educational benefits because she temporarily withdrew from LSU in 2017.[191] The Board, however, claims that was always Lewis's plan, as she testified that when she signed with LSU she knew she was only going to stay for a semester before leaving to be a professional tennis player.[192] According to the Board, Lewis returned and earned her bachelor's degree from LSU.[193] The Board of Supervisors further asserts that Lewis cannot show that any different action by LSU in addressing her situation would have prevented her injuries, since Lewis continued a relationship with John Coe despite friends, parents, and LSU employees advising her to stay away from him.[194] The Board claims that, "Colleges have limited ability to protect students from off-campus violence, and it is too tenuous to suggest

---

F.3d 165, 172 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009); *Williams v. Bd. Of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295-97 (11th Cir. 2007)).

[189] *Roe*, 53 F.4th at 343.
[190] R. Doc. 473-30 at p. 20.
[191] *Id.* (*citing* R. Doc. 182 at ¶ 790).
[192] R. Doc. 473-30 at p. 20 (*citing* R. Doc. 473-2 at p. 29).
[193] R. Doc. 473-30 at p. 20 (*citing* R. Doc. 473-3 at pp. 37-38).
[194] R. Doc. 473-30 at p. 19 (*citing* R. Doc. 473-1 at pp. 33-34, 36; R. Doc. 473-2 at p. 4).

that LSU had a duty to protect Lewis from someone she could not protect herself from."[195]

Plaintiffs, adopting the same arguments made as to the causation element of Lewis's policy-based heightened risk claim and incorporating arguments made in another opposition brief filed contemporaneously with this one, assert that the fourth element only requires a plaintiff to prove that the harassment had a "concrete, negative effect" on her education.[196]  Plaintiffs contend that diminished academic performance and physical violence constitute negative impacts on access to education that are sufficient to make a claim under Title IX.[197]  Plaintiffs claim that Lewis missed classes and assignments to attend various court hearings and to deal with the abuse she suffered, that she missed scheduled tutoring sessions and was unable to prepare academically and mentally for her exams, and that she performed poorly on those exams.[198]  Plaintiffs provide evidence that Lewis's academic advisor's concerns were reported to Miriam Segar, Associate Athletic Director, but not to LSU's Title IX office.[199]  Plaintiffs argue that Lewis was consistently treated as the wrongdoer by LSU after reporting John Coe's abuse, pointing out that she was put on probation for having a candle in her room when LSU was purportedly investigating Coe in 2018 and again in the summer of 2019 after a physical altercation started by one of John

---

[195] R. Doc. 473-30 at pp. 19-20.

[196] R. Doc. 484 at p. 25 (*citing* R. Doc. 484 at pp. 19-20 (*citing* R. Doc. 485 at pp. 11-16 (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015)))).

[197] R. Doc. 485 at pp. 13-14 (citing *Henderson v. Bd. Of Supervisors of Southern Univ. and A&M College*, Civ. A. No. 21-297-JWD-RLB, 2020 WL 2614620, at *10 (M.D. La. Mar. 23, 2023) (deGravelles, J.)).

[198] R. Doc. 484 at p. 19 (*citing* R. Doc. 484-57).

[199] R. Doc. 484 at p. 19 (*citing* R. Doc. 484-57).

Coe's girlfriends who accused Lewis of putting Coe in jail.[200]  Plaintiffs claim that Lewis reported this retaliation to Jonathan Sanders, the Associate Dean of Students and Director of LSU's Office of Student Advocate & Accountability,[201] who put Lewis on probation despite knowing Lewis's history of abuse by John Coe.[202]  Plaintiffs argue that Lewis was isolated from her tennis teammates, told that she was ruining John Coe's career, and repeatedly shown that she could not trust the LSU system when Coe experienced no meaningful consequences for his abuse.[203]

At the outset, the Court notes that the Board does not dispute Lewis's allegations she was physically abused by John Coe on several occasions between May 2017 and June 2018, nor does the Board dispute the severity of the abuse.[204]  The Board likewise does not dispute that John Coe admitted to both Jeffrey Scott, LSU Title IX investigator, and Verge Ausberry that that he punched Lewis.[205]  Plaintiffs have provided a copy of LSU's PM-73 Investigative Report addressing "allegations of violations of University Policies on Dating Violence under the definition within LSU's Title IX and Sexual Misconduct Policy (known hereafter as PM-73) concerning LSU student [John Coe] toward LSU student Jade Lewis."[206]  The PM-73 Investigative Report lists the "Date of Reported Incidents" as April 3, 2018, June 18, 2018, and September 16, 2018, and lists the "Date LSU was notified of Incidents" as April 26,

---

[200] R. Doc. 484 at p. 20.
[201] R. Doc. 182 at ¶ 22.
[202] R. Doc. 484 at p. 20 (*citing* R. Doc. 484-42 at p. 2).
[203] R. Doc. 484 at p. 20.
[204] R. Doc. 473-31 at ¶¶ 7-8, 20-21, & 33-35.
[205] *Id.* at pp. 4, 5-6 & 15.
[206] R. Doc. 484-4 at p. 1.

2018, June 18, 2018, and September 16, 2018, respectively.[207]  The Board asserts that it cannot be held liable because Lewis chose to continue a relationship with John Coe after the physical abuse, and that Lewis was not deprived of any educational benefits as a result of the abuse because she chose to leave LSU in 2017 to pursue a professional tennis career.  The Court disagrees.

The Court finds that Plaintiffs have provided sufficient evidence that the physical abuse Lewis suffered at the hands of John Coe – including John Coe punching Lewis so hard that he fractured her ribs – was so severe, pervasive, and objectively offensive that it effectively barred Lewis's access to an educational opportunity or benefit at LSU.  As such, it is a question of fact that should be left to the jury.  While the Board focuses on the fact that Lewis left LSU in 2017 to pursue a career as a professional tennis player,[208] the Board fails to acknowledge, much less address, the fact that Lewis returned to LSU in 2018.[209]  Plaintiffs have provided additional information to support this, including Miriam Segar's Title IX report of the April 3, 2018 incident, in which she states the following:

> As background to the incident, Lewis attended LSU in Sprint 2017 and
> was romantically involved with [redacted].  Lewis did not return to
> school Fall 2017 and pursued professional athletic career.  Lewis
> returned to Baton Rouge in March 2018 and is currently enrolled in an

---

[207] *Id.*

[208] R. Doc. 473-30 at p. 20.

[209] *See,* R. Doc. 473-4 at p. 17 ("As background to the incident, Lewis attended LSU in Spring 2017 and was romantically involved with [redacted].  Lewis did not return to school Fall 2017 and pursued professional athletic career.  Lewis returned to Baton Rouge in March 2018 and is currently enrolled in an online course and is enrolling in Spring Intersession and Summer classes and will maintain enrollment in 2018-19 academic year."); R. Doc. 473-31 at p. 15 ("While Lewis claims she was deprived of educational benefits because she temporarily withdrew from LSU in 2017, that was always her plan. (R. Doc. 182, ¶ 790; Lewis 189) [sic]  She testified that when she 'signed the contract' with LSU, she knew she was only staying for a semester before going pro.  (Lewis 189)  Afterward, Lewis returned and earned her bachelor's degree. (Lewis II 421-22) [sic]").  *See, generally*, R. Doc. 495.

online course and is enrolling in Spring Intersession and Summer classes and will maintain enrollment in 2018-19 academic year.[210]

LSU's PM-73 Investigative Report also confirms that Lewis was an undergraduate student at LSU when she was abused by John Coe in 2018.[211] Plaintiffs have submitted evidence showing that Kirstin DeFusco, Assistant Direct of Academic Affairs, advised Miriam Segar, Senior Associate Athletic Director and Senior Woman Administrator for LSU, by email on September 20, 2018 that Lewis was missing classes and tutoring sessions, and that Lewis was having trouble academically as a result of her abuse by John Coe.[212] Prior decisions from this Court suggest that this evidence is sufficient to show that Lewis's harassment effectively denied her access to educational opportunities or benefits provided by LSU.[213]

The Court further finds that determining whether the physical abuse Lewis suffered was so severe that it deprived her of access to educational opportunities or benefits provided by LSU is a factual dispute that will require credibility determinations and the weighing of evidence, which the Court cannot do in the context of a summary judgment motion. When assessing whether a dispute regarding any material fact exists, the Court considers "all of the evidence in the record but

---

[210] R. Doc. 484-43 at p. 1.

[211] R. Doc. 484-4 at p. 1.

[212] R. Doc. 484-57.

[213] *See, Henderson v. Bd. Of Supervisors of Southern Univ. and A&M College*, Civ. A. No. 21-297-JWD-RLB, 2020 WL 2614620, at *10-11 (M.D. La. Mar. 23, 2023) ("Plaintiffs do not allege that Thompson was forced to change his study habits or move to another district, was withdrawn from school because of the harassment, or that his grades declined as a result of the four days of bullying. *Fennell*, 804 F.3d at 410. Nor do Plaintiffs allege that Thompson suffered any physical harm or that he became 'homebound or hospitalized' due to the harassment. *Prendergast*, 2018 WL 6710034, at *8 (citations omitted).") (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015); *Prendergast as Next Friends of L.P. v. Wylie Indep. Sch. Dist.*, Civ. A. No. 18-20, 2018 WL 6710034 (E.D. Tex. Dec. 4, 2018), *report and recommendation adopted*, Civ. A. No. 18-20, 2018 WL 6705536 (E.D. Tex. Dec. 20, 2018)).

refrain[s] from making credibility determinations or weighing the evidence." [214] Based upon the evidence before the Court, the Court finds that there exists a genuine issue of material fact regarding whether John Coe's physical abuse of Lewis was so severe, pervasive, and objectively offensive that it effectively barred Lewis's access to an educational opportunity or benefit offered by LSU. Thus, the Board of Supervisors has failed to show that it is entitled to summary judgment on the basis that Lewis cannot establish this element of her heightened risk claim.

### 5. Element five: Whether the Board of Supervisors was deliberately indifferent to the harassment.

The fifth element of a heightened risk claim, deliberate indifference, is "a high bar, and neither negligence nor mere unreasonableness is enough." [215] The deliberate indifference element is met where the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." [216] The Fifth Circuit has cautioned that, "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ." [217] Additionally, Fifth Circuit precedent makes clear "that negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that

---

[214] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).

[215] *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 642, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). *See, Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (same).

[216] *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674. *See, Roe*, 53 F.4th at 341 (quoting *Sanches*, 647 F.3d at 167) (same).

[217] *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998)) (internal quotation marks omitted). *See also*, *Sanches*, 647 F.3d at 168 ("Ineffective responses . . . are not necessarily clearly unreasonable.").

most reasonable persons could have improved upon do not equate to deliberate indifference."[218]  The Fifth Circuit has held that courts should afford broad deference to school officials and should not second-guess the disciplinary decisions made by school administrators.[219]

The Board argues that the undisputed facts refute a finding of deliberate indifference and that Lewis must accept some responsibility for the outcomes from LSU because LSU could only act upon information that Lewis provided, which Lewis admits was often false.[220]  The Board asserts that it does not intend to blame a victim of domestic violence for their hesitation to report the violence, but maintains that it cannot be responsible for false information that Lewis provided.[221]  The Board claims that LSU endeavored to act in a manner that respected Lewis's decision not to participate in the Title IX process, and that the Board should not be liable for a plaintiff who chooses not to participate in the process.[222]  The Board then details how members of LSU's staff, including Jennie Stewart, Jonathan Sanders, Jeffrey Scott, and Miriam Segar, tried to help Lewis, thereby demonstrating a lack of indifference on the Board's part.[223]

Plaintiffs assert that a genuine issue of material fact exists as to whether the Board of Supervisors was deliberately indifferent to John Coe's ongoing abuse of Lewis.[224]  Plaintiffs claim that a university's failure to take any investigatory or

---

[218] *I.F.*, 915 F.3d at 369 (citing authority) (internal quotation marks omitted).
[219] *Roe*, 53 F.4th at 341 (citing *Davis*, 526 U.S. at 648, 119 S.Ct. 1661).
[220] R. Doc. 473-30 at p. 16 (*citing* R. Doc. 473-1 at pp. 26-28, 30; R. Doc. 473-3 at pp. 12-13, 20, 23).
[221] R. Doc. 473-30 at pp. 16-17.
[222] R. Doc. 473-30 at p. 17 (citing authority).
[223] *Id.* at pp. 17-19.
[224] R. Doc. 484 at p. 21 (*citing* R. Doc. 481 at pp. 17-18).

remedial action in response to dating violence on campus amounts to deliberate indifference in violation of Title IX. Plaintiffs assert that Title IX requires LSU to adequately respond when it has actual knowledge of sex-based abuses, and that it failed to do so for Lewis.[225] Plaintiffs argue that there were multiple times when LSU responded to John Coe's ongoing abuse with deliberate indifference, particularly when LSU officials ignored the abuse, ignored Lewis's reports of retaliation, unnecessarily delayed the investigation resulting in Coe abusing Lewis further, blamed Lewis for the abuse she suffered, and punished Lewis instead of Coe.[226] Plaintiffs point out that despite the numerous reports of John Coe's repeated attacks on Lewis and Richardson, LSU did not initiate any formal disciplinary action against Coe other than an unofficial suspension from the weight room that would not be reported for any drafting or transfer purposes.[227] To the extent the Board claims Lewis was not transparent with the details of her abuse, Plaintiffs argue that Lewis was employing a clear survival strategy whereby young women often remain in a dating relationship after their partner acts violently.[228]

In response, the Board argues that Lewis fails to offer any evidence of deliberate indifference, and instead relies on inadmissible opinions about dating violence from sources Lewis never identified as an expert or lay witness in this case.[229]

---

[225] R. Doc. 484 at p. 21 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288-90, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)) (internal quotation marks omitted).
[226] R. Doc. 484 at p. 21.
[227] *Id*. (*citing* R. Doc. 484-52; R. Doc. 484-4 at p. 12; R. Doc. 484-41 at p. 124).
[228] R. Doc. 484 at pp. 24-25 (citing authority).
[229] R. Doc. 495 at p. 9.

To the extent that the Board and Plaintiffs focus their arguments on whether the Board was deliberately indifferent to *Lewis's* reports of physical abuse by John Coe, their arguments miss the mark.  As the Board seemingly recognized in another summary judgment motion filed simultaneously with this one,[230] because Lewis has brought a heightened risk claim, the correct focus is on LSU's response to John Coe's alleged *prior* harassment of Richardson and whether it was deliberately indifferent in response to that harassment.[231]  Because the Board failed to address the issue of LSU's deliberate indifference to Richardson's allegations of physical harassment by John Coe, it has failed to show that it is entitled to summary judgment on the basis that Lewis cannot satisfy the fifth element of her perpetrator-based heightened risk claim.[232]

---

[230] *See*, R. Doc. 492 at p. 7.

[231] *See*, *Doe v. Bd. Of Supervisors of Univ. of Louisiana Sys.,* Civ. A. No. 22-00338-BAJ-SDJ, 2023 WL 143171, at *12 (M.D. La. Jan. 10, 2023) (Jackson, J.) ("Second, ULS's argument that Plaintiff fails to allege ULS's 'knowledge of the alleged prior acts of sexual misconduct by Silva is flatly contradicted by Plaintiff's Complaint, which specifically asserts that in April 2015 Dean Tapo—an 'appropriate person' under Title IX, with authority to investigate and respond to allegations of sexual assault— *knew* of Silva's prior rape arrest, yet failed to conduct any investigation whatsoever, and instead responded by placing Silva on disciplinary probation.  These allegations establish ULS's actual knowledge of unlawful harassment *and*—based on ULS's alleged inaction—deliberate indifference to the same (for reasons already explained.).") (internal citation omitted).

[232] Although not relevant to the analysis of the element of deliberate indifference, the Court rejects as meritless the Board's assertion that it acted in a manner that respected Lewis's wishes and therefore cannot be liable "for a plaintiff who chooses not to participate in the Title IX process."  R. Doc. 473-30 at p. 17.  Under this argument, the Board of Supervisors would have no responsibility to discipline a student for conduct, regardless of the circumstances, if that was not the victim's wishes.  Not only does that reasoning fly in the face of common sense, it also completely ignores LSU's own Title IX and Sexual Misconduct Policy, effective December 15, 2015, which states that, "Notice of a complaint may or may not come from a formal complaint," and further provides that, "at any time after becoming aware of a complaint" the campus Title IX officials may recommend that interim protections or remedies be provided.  R. Doc. 481-14 at p. 7.  The remedies include "issuing a timely warning to the campus community, separating the parties, placing limitation on contact between the parties, interim suspension from campus, or making alternative workplace, classroom, course scheduling, dining, or student housing arrangements."  *Id.*  None of these remedies were provided in response to John Coe's abuse of Lewis.

Nonetheless, the evidence before the Court raises a genuine issue of material fact regarding whether the Board of Supervisors was deliberately indifferent in its response to Richardson's allegation that she was physically assaulted by John Coe in October 2016.  As previously discussed, the Board concedes in its Motion that when Lewis and John Coe began their relationship in January 2017, Sharon Lewis and Soil-Cormier knew about John Coe's prior assault of Richardson that occurred at an off-campus bar.[233]  The Board does not dispute that Richardson disclosed the assault to Sharon Lewis and Soil-Cormier when she met with them a week after the incident occurred.  The Court has already determined that a genuine issue of material fact exists as to whether the Board of Supervisors had actual knowledge of Richardson's physical assault through Sharon Lewis and Keava Soil-Cormier because the parties dispute whether Sharon Lewis and Soil-Cormier are "Responsible Employees" under LSU's Title IX Policy.  While the Board concedes that Sharon Lewis and Soil-Cormier were aware of Coe's prior abuse of Richardson, the Board has failed to direct the Court to any evidence showing that Sharon Lewis or Soil-Cormier reported Coe's assault of Richardson to LSU's Title Office.  There is also evidence before the Court that John Coe told his position coach, Dameyune Craig, about the incident with Richardson right after it happened, and that Craig failed to report the incident to the Title IX office.[234]  The evidence before the Court indicates that LSU's Title IX office did not

---

[233] R. Doc. 473-30 at p. 11; R. Doc. 473-31 at ¶¶ 76-78.
[234] *See,* R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13 (*citing* R. Doc. 483-28)); R. Doc. 483-28 at pp. 59 & 61.

become aware of the October 2016 incident between John Coe and Richardson until October 2018, when her internship supervisor walked her to the Title IX office.[235]

The Court finds that the foregoing evidence raises a genuine dispute regarding whether the Board of Supervisors was deliberately indifferent to Richardson's allegation that she was physically assaulted by John Coe in October 2016. While Richardson chose not to pursue an investigation, a reasonable juror could find that the failure of Sharon Lewis, Keava Soil-Cormier, or Dameyune Craig to report the allegations to LSU's Title IX office constitutes deliberate indifference by the Board of Supervisors. The evidence before the Court suggests that LSU turned a blind eye to Richardson's allegations of physical assault. As such, the Motion is denied to the extent the Board of Supervisors asserts that Lewis cannot satisfy the fifth element of her perpetrator-based heightened risk claim.

### B. Lewis's Policy-Based Heightened Risk Claim

In addition to a perpetrator-based heightened risk claim, Plaintiffs assert that the Board of Supervisors' handling of reports of sexual assault created a heightened risk of sexual assault because "LSU knew of and permitted a campus condition rife with sexual misconduct, and sexual misconduct was rampant on campus."[236] Plaintiffs allege that the Board of Supervisors had an official policy, practice, and/or custom of deliberate indifference through which it cultivated a culture of silence by failing to: report complaints of sex-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure

---

[235] R. Doc. 483-28 at p. 61.
[236] R. Doc. 182 at ¶¶ 917-921.

victimized students had equal access to educational opportunities and benefits or grievance procedures.[237]  Specifically, Plaintiffs assert that the Board of Supervisors failed to properly train employees in their Title IX reporting obligations, failed to ensure employee compliance with Title IX Policy, failed to report complaints of sex-based discrimination, and failed to initiate and/or conduct adequate investigations and grievance procedures under Title IX.[238]

Although not specifically asserted by either party, both parties recognize that there is no Fifth Circuit authority regarding the analytical framework applicable to policy-based heightened risk claims.[239]  The parties seem to agree that a policy-based heightened risk claim requires a plaintiff to prove the following four elements: (1) the institution maintained a policy of deliberate indifference to reports of sexual misconduct; (2) which created a heightened risk of sexual harassment that was known or obvious; (3) in a context subject to the school's control; and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."[240]  The Court will address each factor in turn.

---

[237] *Id.* at ¶ 926.

[238] *Id.* at ¶¶ 922 & 926.

[239] *See,* R. Doc. 473-30 at p. 20 (*citing* R. Doc. 469-14 at pp. 16-20); R. Doc. 484 at p. 16 (*citing* R. Doc. 480 at pp. 14-23).

[240] R. Doc. 473-30 at pp. 20-24 & nn.43, 50 (citing *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1174 (10th Cir. 2007)); R. Doc. 484 at p. 16 (*citing* R. Doc. 480 at pp. 14-15 (quoting *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 464-65 (6th Cir. 2022), cert. denied sub nom. *Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Doe*, 143 S.Ct. 574, 214 L.Ed.2d 340 (2023)) (internal quotation marks omitted).  The Court notes that the Board of Supervisors lists the fourth element as "causation."  R. Doc. 473-30 at pp. 23-24.

### 1. Element one: Whether the Board of Supervisors had a policy of deliberate indifference to reports of sexual misconduct.

The Board of Supervisors asserts that it is entitled to summary judgment on Lewis's policy-based heightened risk claim because Lewis cannot establish that LSU had a policy of deliberate indifference to reports of sexual misconduct that applied to Lewis.[241] The Board claims that Lewis offers no single specific, non-conclusory LSU policy that applied to her unique situation and to which she can link her injuries from John Coe.[242] The Court disagrees.

"The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault."[243] "In evaluating such claims, courts must consider whether the defendant-institution's

---

[241] R. Doc. 473-30 at pp. 20-23.

[242] *Id.* at p. 20.

[243] *Doe 12 v. Baylor Univ.*, 336 F.Supp.3d 763, 779 (W.D. Tex. 2018) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis Next Friend LaShonda D v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute"); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 661 (W.D. Tex. 2017) (same).

policy or custom inflicted the alleged injury."[244]  The Board of Supervisors recognizes that:

> "a funding recipient can be said to have 'intentionally acted in clear violation of Title IX' when the violation is **caused by** official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient."[245]

Plaintiffs have gone beyond the pleadings and produced an overwhelming amount of evidence that raises a genuine issue of material fact regarding whether the Board of Supervisors maintained a policy of deliberate indifference to reports of sexual misconduct.  Specifically, Plaintiffs have provided evidence supporting their contention that LSU had a longstanding policy of ignoring, underfunding, and undermining its official Title IX program by willfully refusing to allocate sufficient funding to the Title IX program, knowingly allowing various departments, including the Athletic Department, to circumvent the Title IX office and handle reports of sexual misconduct and harassment internally through school officials who were not given proper training, and by failing to follow industry-standard recommendations and best practices made by their own Title IX Coordinator and independent outside auditors.

---

[244] *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 779-80 (W.D. Tex. 2018) (citing *Gebser*, 524 U.S. at 291, 118 S.Ct. 1989 (locating an analogue to the Title IX jurisprudence in the municipal liability doctrine); *Bd. Of Cnty. Comm'rs Bryan Cnty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (explaining that plaintiffs seeking to impose liability on a municipality under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"); *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (noting the necessity of analyzing whether execution of a municipal policy inflicted the injury); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 661 (W.D. Tex. 2017) (same).

[245] R. Doc. 473-30 at p. 21 (*citing* R. Doc. 469-14 at pp. 16-20); R. Doc. 469-14 at p. 18 (quoting *Simpson v. Univ. of Colorado, Boulder*, 500 F.3d 1170, 1178 (10th Cir 2007)) (emphasis added by the Board).

First and foremost, there is the Husch Blackwell report, commissioned by LSU and issued on March 3, 2021, which reviewed, among other things, "Over 60 Title IX investigation case files from 2015 to present."[246]  One of the conclusions reached in the report is that, "Various incidents of athletics-related misconduct have not been appropriately reported to the University's Title IX Coordinator.  We are especially concerned about a lack of reporting *prior to November 2016* for reasons discussed below."[247]  The report further provides that, "our concerns about reporting are not limited to Athletics.  Institutional reporting policy and training have been unclear for years."[248]  The authors of the report observed that, "there was a clear lack of leadership in providing clarity about institutional reporting obligations.  This was a long-recognized problem at the University that was never meaningfully addressed."[249]  The Husch Blackwell report also concluded that LSU's Title IX office "has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates.  We have identified concerns that the Office has at times not handled those matters reported to it appropriately."[250]  The report again notes that, "while the *USA Today* article focused primarily on Athletics, we found deficiencies in a variety of different matters."[251]  The Husch Blackwell report also found that, "the University was slow to adopt Title IX policies, hire

---

[246] R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13 (*citing* R. Doc. 483-28)).  *See,* R. Doc. 483-28 at pp. 1 & 4.
[247] R. Doc. 483-28 at p. 5 (emphasis added).
[248] *Id.* at pp. 5-6.
[249] *Id.* at p. 76, n.171.
[250] *Id.* at p. 6.
[251] *Id.*

personnel, or meaningfully address concerns identified by community members and internal and external reviews."[252]

The Husch Blackwell report further states that, "Many of the issues identified throughout this report have been flagged previously in other reviews of the University's Title IX operations," and that, "over the last five years, there have been at least five reviews (three form external consultants and firms, one from the University's Office of Internal Audit, and one from a University task force) conducted by the University which have touched on Title IX issues."[253] The report mentions that on August 30, 2016, LSU President F. King Alexander issued a "Presidential Charge" to create a "task force" of students, faculty, and staff to review LSU's "current policies, practices, and procedures as they relate to Title IX and to provide recommendations to the President that reflect campus needs and are informed by nationally-recognized benchmarked practices."[254] The task force submitted a report in February 2017 with 17 recommendations regarding Title IX compliance.[255] The Husch Blackwell report states that, "As part of this review, we have been unable to find any documentation memorializing how this Task Force report was assessed or addressed by the leadership of the University."[256]

The Husch Blackwell report points out that additional internal and external reviews of LSU's Title IX Policy were conducted in 2016, 2017, 2018, and 2019.[257]

---

[252] *Id*.
[253] *Id*. at p. 38.
[254] *Id*. (citation omitted).
[255] *Id*. at pp. 41-44.
[256] *Id*. at p. 44.
[257] *Id*. at pp. 39-40, 44-48.

The Husch Blackwell report states that, "Remarkably, the [2019] report, which was done in part to assess the University's Title IX policies and practices as they apply to LSU's Athletics Department, was never shared with the University's Title IX Office or the Athletics Department."[258]  The "Recommendations" section of the Husch Blackwell report reiterates that, "Institutional policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources, calls for additional resources went unheeded, concerns were not responded to, etc."[259]  The report further states that, "As demonstrated in this report, the University has been provided with recommendations for years about Title IX which have never been implemented."[260]

There are also several letters and emails in the record, seemingly in response to the serious allegations and conclusions contained in the Husch Blackwell report, wherein LSU officials admit to the university's failings in its Title IX reporting obligations.  There is a letter from James Stephen Perry, a former member of the Board of Supervisors, directed to "Senator Barrow and Committee Members," in which Perry asserts that, "the University had failed its students," and that, "[t]here can be no question that LSU failed in its duties and that there were structural, communication, chain of command, and individual performance failures."[261]  The

---

[258] *Id.* at p. 48.
[259] *Id.* at p. 139.
[260] *Id.* at p. 146.
[261] R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13); R. Doc. 483 at p. 3 (*quoting* R. Doc. 483-4 at p. 1) (internal quotation marks omitted).  The Court notes that there is no date on the letter.

letter further provides that Perry had read that "many violations and threats against women students both inside of and outside of the Athletics Department never even reached the Title IX office."[262]  There is also a letter issued by Jane Cassidy, Interim VP of Civil Rights & Title IX at LSU, to "LSU Students, Faculty, and Staff" wherein she admits that, "We now know with great clarity that our system to protect one another from sexual harassment and violence has failed, and we must act expeditiously to remediate the problem."[263]  Board of Supervisors President Remy Voisin Starns also issued a statement stating, "I also want to apologize to the survivors.  Our university did not do right by you.  We see that now, and we are here to tell you that it's not okay."[264]

Plaintiffs have also provided evidence indicating that LSU Interim President Tom Galligan testified to the Louisiana Senate that, "there was no culture of punishment at LSU.  There was no notice at the time as to what would happen.  The policies were very unclear.  There were directions within departments to report title IX issues to places they should not have been reported."[265]  Galligan also admitted that LSU's "most serious misstep.  And this is noted in the Husch Blackwell report, is failing to report by employees when they didn't understand they were responsible or they didn't comply with the regulation."[266]  In a letter to the "LSU Community" on March 5, 2021, Galligan advised that the results of the Husch Blackwell report would

---

[262] *See,* R. Doc. 483 at p. 3 (*quoting* R. Doc. 483-4 at pp. 1-2) (internal quotation marks omitted).
[263] R. Doc. 483 at p. 2 (*quoting* R. Doc. 483-5) (internal quotation marks omitted).  The Court notes that there is no date on the letter.
[264] R. Doc. 483 at p. 2 (*quoting* R. Doc. 483-17) (internal quotation marks omitted).  The Court notes that there is no date on Starns' statement.
[265] R. Doc. 483 at p. 3 (*quoting* R. Doc. 483-53) (internal quotation marks omitted).
[266] R. Doc. 483 at p. 3 (*quoting* R. Doc. 483-53) (internal quotation marks omitted).

be disclosed and that, "Perhaps most troubling of all the report's findings is the understanding that, whether through our actions or inactions, our institution betrayed the very people we are sworn to protect. Our job is to protect our students and support them in their times of need. It has become clear we haven't always fully lived up to our commitment."[267] As previously discussed, the evidence before the Court also shows that despite knowing about John Coe's physical harassment of Richardson in October 2016, neither Sharon Lewis, Keava Soil-Cormier, nor Dameyune Craig reported the abuse to LSU's Title IX office.

The Court finds that the foregoing evidence is more than sufficient to raise a genuine issue of fact regarding whether the Board of Supervisors had a policy of deliberate indifference to reports of sexual misconduct before John Coe's physical abuse of Lewis. The Court further finds that this dispute is material to Lewis's policy-based heightened risk claim, thereby precluding summary judgment.

### 2. Element two: Whether the Board of Supervisors' policy of deliberate indifference to reports of sexual misconduct created a heightened risk of sexual harassment that was known or obvious.

The Board of Supervisors asserts that Lewis cannot show that the risk of physical violence resulting from any alleged policy was "known or obvious," and relies upon arguments previously made as to the actual knowledge element of Lewis's perpetrator-based heightened risk claim to support its position.[268] Plaintiffs likewise rely upon arguments made in another opposition brief they filed contemporaneously with this one to assert that the Board's policy of deliberate indifference created a

---

[267] R. Doc. 483 at p. 3 (*quoting* R. Doc. 483-8) (internal quotation marks omitted).
[268] R. Doc. 473-30 at p. 23 (*citing* R. Doc. 473-30 at pp. 10-14).

heightened risk of sexual harassment to Lewis that was known or obvious.[269] Plaintiffs argue that LSU's policy of deliberate indifference manifested itself on campus through the siloed Title IX process in the Athletic Department that resulted in untrained school officials, including White, Segar, Joseph, and Ausberry, failing to take the appropriate action when Coe's violence against Lewis was reported.[270]

The Court finds that the same evidence referenced above raises a genuine dispute regarding whether the Board's alleged policy of deliberate indifference created a heightened risk of sexual harassment to Lewis that was "known or obvious,"[271] especially in light of the wide timespan that the Husch Blackwell report encompassed, which included the timeframe of Richardson's alleged abuse. The Court agrees with Plaintiffs that additional sexual misconduct on campus, like what happened to Lewis, is the expected consequence of failing to meaningfully investigate and report Title IX complaints and failing to adequately train staff and students regarding how to respond to sexual misconduct, such as Richardson's allegations of physical abuse by John Coe.[272]

With respect to Lewis specifically, the Court finds that Plaintiffs have raised a genuine dispute regarding whether the risk of John Coe committing additional acts

---

[269] R. Doc. 484 at p. 17 (*citing* R. Doc. 480 at p. 21).

[270] R. Doc. 484 at p. 17. While Plaintiffs do not state who "Joseph" is, this appears to be a reference to LSU assistant coach, Mickey Joseph. *See*, R. Doc. 182 at ¶ 526 ("John Coe's roommate and teammate on the football team told Defendant Sanders that he knew about the physical abuse [of Lewis] and that assistant football coach Mickey Joseph ('Joseph') would call him each week asking if Plaintiff Lewis was at his and John Coe's apartment.").

[271] *Doe v. Texas A&M Univ.*, 634 F. Supp. 3d 365, 376 (S.D. Tex. 2022) (citing *Karasek v. Regents of Univ. of Calif.*, 956 F.3d 1093, 1112 (9th Cir. 2020)).

[272] R. Doc. 484 at p. 17 (*citing* R. Doc. 480 at p. 21).

481 at p. 19 (*citing* R. Doc. 480 at p. 21).

of physical abuse, including punching Lewis in the stomach on May 19, 2017 and again on April 3, 2018, was known or obvious since Sharon Lewis, Keava Soil-Cormier, and Dameyune Craig had actual knowledge in October 2016 of Richardson's allegations that she was physically harassed by John Coe.  Further, the Board has not directed the Court to any evidence showing that Sharon Lewis or Soil-Cormier interviewed John Coe about Richardson's allegations, and the evidence before the Court suggests that the incident was not reported to LSU's Title IX office until October 2018, when Richardson's internship supervisor walked her to the Title IX office.[273]

The Court rejects as baseless the Board of Supervisors' assertion that Plaintiffs "have no evidence of widespread, systemic conduct that created a 'known risk' of physical violence by Coe and that would have precluded Lewis' alleged harm."[274]  The Board's position is contradicted by the evidence set forth above and cited in Lewis's Opposition brief.  The Court therefore finds that genuine issues of material fact preclude summary judgment on the basis that Lewis cannot satisfy the second element of her policy-based heightened risk claim.

### 3. *Element three: Whether Lewis's assault occurred in a context subject to the Board's control.*

With respect to this element and whether the physical assaults at issue occurred in a context subject to LSU's control, the Board of Supervisors relies upon the arguments it previously made regarding the control element of Lewis's

---

[273] R. Doc. 484 at p. 1 (*citing* R. Doc. 483 at pp. 2-13 (*citing* R. Doc. 483-28)); R. Doc. 483-28 at p. 61.
[274] R. Doc. 473-30 at p. 23.

perpetrator-based heightened risk claim.[275]  Plaintiffs, however, argue that the 2017 and early 2018 incidents occurred on campus, and that John Coe's harassment occurred both on campus and in an area near campus that students experience as part of university life.[276]  Plaintiffs also claim that the off-campus harassment posed a direct threat to students' educations and the university environment.[277]  Plaintiffs argue the fact that the Board investigated John Coe's conduct and sanctioned him after his first arrest (by suspending his weight room privileges and suspending him from the football team) could lead a jury to determine that LSU exercised substantial control over Coe's conduct.[278]  Plaintiffs assert that LSU had regulatory authority sufficient to ameliorate the threat of harassment because it had authority over student participation in its Athletic Department, the broader school environment, the conduct of student athletes, their living arrangements and supervision, participation in its educational opportunities, disciplinary record-keeping practices, the LSU Police Department, Title IX office resources, and overall student enrollment.[279]  Plaintiffs contend that within each of these contexts, LSU had the power to investigate and discipline John Coe's repetitive abuse of Lewis and his prior victims, such that LSU had significant power to influence the risk of sexual harassment of its students within the environment, indicating control over the context of Lewis's abuse.[280]

---

[275] *Id.* (*citing* R. Doc. 473-30 at pp. 14-15).
[276] R. Doc. 484 at p. 17 (*citing* R. Doc. 484-41 at pp. 19, 22, 24, & 33; *C.R. ex rel. Rainville v. Eugene Sch. Dist. 4J,* 835 F.3d 1142 (9th Cir. 2016)).
[277] R. Doc. 484 at p. 18 (citing authority).
[278] *Id.*
[279] *Id*. at pp. 18-19.
[280] *Id*. at p. 19.

For the same reasons previously stated with respect to Lewis's perpetrator-based heightened risk claim, the Court finds that genuine issues of material fact exist regarding whether the Board of Supervisors exercised substantial control over the context of John Coe's physical abuse of Lewis that occurred both on and off campus.

### 4. Element four: Whether, as a result of the Board's deliberate indifference, Lewis suffered harassment that was so severe, pervasive, and objectively offensive that it deprived her of access to the educational opportunities or benefits provided by LSU.

The Board of Supervisors argues that Lewis cannot satisfy the element of causation because she "cannot show that her generalized statements relating to training, LSU's 2017 audit, and failure to report complaints or to engage in investigations would have prevented her harm." [281]    Seemingly relying upon deposition testimony from Miriam Segar,[282] the Board asserts that Lewis cannot establish a causal link between any purported policy of deliberate indifference and the harm she alleges because Lewis continued her relationship with John Coe long after he was expelled from LSU.  The Board claims that Plaintiffs cannot show that any additional training or different investigation or reporting would have changed these circumstances.[283]

---

[281] R. Doc. 473-30 at p. 24.

[282] *Id*.  The Court notes that the Board of Supervisors purports to quote from Segar's deposition testimony and cites "Segar 154-155" as the source of that testimony.  The Court, however, has reviewed pages 154 and 155 of Segar's deposition transcript, as provided by the Board, and it does not reference Jade Lewis or John Coe.  *See*, R. Doc. 473-14 at pp. 2-3.  Instead, it references a "final investigative report" regarding Les Miles.  *Id*. at p. 2.  The Court also reviewed the portions of Segar's deposition transcript that Plaintiffs submitted and was unable to locate the language quoted by the Board.  *See*, R. Docs. 484-62 & 484-63.

[283] R. Doc. 473-30 at p. 24 (citing *Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100 (D. Kan. 2017)).

Plaintiffs assert that Lewis can satisfy the causation element of her policy-based heightened risk claim for the same reasons she can satisfy the causation element of her perpetrator-based heightened risk claim.[284]  Plaintiffs incorporate arguments made in another opposition brief filed contemporaneously with this one,[285] wherein Plaintiffs assert that a plaintiff need only prove that her harassment had a "concrete, negative effect" on her education and that diminished academic performance is one such negative effect.[286]  Plaintiffs claim that Lewis suffered "concrete, negative effects" as a result of the physical abuse inflicted by John Coe, including missing classes and a decline in grades.[287]  Plaintiffs further assert that Lewis was isolated from her tennis teammates, told that she was ruining John Coe's career, and was repeatedly shown that she could not trust the LSU system when John Coe experienced no meaningful consequences for his abuse, which also shows that she was deprived of educational opportunities or benefits provided by LSU as a result of her abuse by Coe.[288]

For the same reasons that the Court determined genuine issues of material fact preclude summary judgment as to this element of Lewis's perpetrator-based heightened risk claim, the Court likewise finds that Plaintiffs have provided sufficient evidence to show that genuine issues of material fact exist regarding whether the Board of Supervisors' policy of deliberate indifference to reports of sexual

---

[284] R. Doc. 484 at pp. 19-20 (*citing* R. Doc. 485 at pp. 11-16).  *See*, R. Doc. 484 at p. 25 (*citing* R. Doc. 484 at pp. 19-20).

[285] R. Doc. 484 at p. 19 (*citing* R. Doc. 485 at pp. 11-16).

[286] R. Doc. 484 at p. 19 (*citing* R. Doc. 485 at pp. 11-16); R. Doc. 485 at p. 12 (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015)) (cleaned up) (internal quotation marks omitted).

[287] R. Doc. 484 at pp. 19-20 (*citing* R. Doc. 484-57).

[288] R. Doc. 484 at p. 20.

misconduct caused Lewis to suffer harassment – including at least two post-notice incidents of physical abuse [289] – that was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunities and benefits provided by LSU. Determining whether LSU's policy of deliberate indifference caused Lewis to suffer harassment that was so severe, pervasive, and objectively offensive that it deprived her of access to the education opportunities or benefits provided by LSU will require credibility determinations and the weighing of evidence, which the Court cannot do in the context of a summary judgment motion. As such, the Board of Supervisors is not entitled to summary judgment on the basis that Lewis cannot satisfy this element of her policy-based heightened risk claim.

Because the Court finds that genuine issues of material fact preclude summary judgment on Lewis's perpetrator-based heightened risk claim and her policy-based heightened risk, the Board of Supervisors' Motion is denied.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment No. 5: Jade Lewis, filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College [290] and Defendant's Motion for Summary Judgment No. 5: Jade Lewis[291] are **DENIED.**

New Orleans, Louisiana, December 22, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[289] R. Doc. 473-31 at ¶¶ 7-9, 20-21, 33-35.
[290] R. Doc. 473.
[291] R. Doc. 372.